**CURTIS, MALLET-PREVOST,**
**COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
Joseph D. Pizzurro
L. P. Harrison 3rd
Michael J. Moscato
Nancy E. Delaney
*Counsel for Plaintiff, Debtor Lehman Brothers*
*Holdings Inc.*

**QUINN EMANUEL**
**URQUHART & SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
John B. Quinn
Erica Taggart
*Counsel for Proposed Plaintiff/Intervenor, the*
*Official Committee of Unsecured Creditors of*
*Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.,* | : | |
| | : | |
| Debtors. | : | |

------------------------------------------------------------------------ X

| | | |
|---|---|---|
| LEHMAN BROTHERS HOLDINGS INC., and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., | : | |
| | : | |
| Plaintiff and Proposed Plaintiff Intervenor, | : | |
| | : | |
| -against- | : | |
| | : | Adversary Proceeding |
| | : | |
| JPMORGAN CHASE BANK, N.A., | : | No.: 10-_____ (JMP) |
| | : | |
| Defendant. | : | **COMPLAINT** |

------------------------------------------------------------------------ X

Plaintiff, Lehman Brothers Holdings Inc. ("LBHI"), by its undersigned attorneys, alleges the following against defendant, JPMorgan Chase Bank, N.A. ("JPMorgan"):

## NATURE OF THE CASE

1.     A century ago, John Pierpont Morgan used his position atop the world of finance to shore up a teetering firm and rescue the nation from the brink of financial collapse. A century later, when the nation faced another epic financial crisis, Morgan's namesake firm stripped a faltering Lehman Brothers of desperately needed cash. On the brink of LBHI's bankruptcy, JPMorgan leveraged its life and death power as the brokerage firm's primary clearing bank to force LBHI into a series of one-sided agreements and to siphon billions of dollars in critically-needed assets. The purpose of these last-minute maneuvers was to leapfrog JPMorgan over other creditors by putting itself in the position of an overcollateralized creditor, not just for clearing obligations, but for any and all possible obligations of LBHI or any of its subsidiaries that JPMorgan believed could result from an LBHI bankruptcy. The effect of JPMorgan's actions – taken with the benefit of unparalleled inside knowledge – was devastating. JPMorgan not only took billions of dollars more than it needed from LBHI, but it also accelerated LBHI's freefall into bankruptcy by denying it an opportunity for a more orderly wind-down, costing the LBHI estate tens of billions of dollars in lost value.

2.     JPMorgan accomplished its design, in part, by using the threat that it would stop providing LBHI's subsidiaries, including Lehman Brothers Inc. ("LBI"; LBHI and all of its subsidiaries, "Lehman"), with the essential clearing services that were the lifeblood of Lehman's broker-dealer business. With this financial gun to LBHI's head, JPMorgan was able to extract extraordinarily one-sided agreements from LBHI literally overnight. JPMorgan then relied on those overreaching and invalid agreements to extract billions of dollars in collateral from LBHI shortly before the bankruptcy, collateral that JPMorgan used not for clearing exposures, but to

secure billions of dollars of grossly exaggerated exposures that it now claims were incurred as a result of Lehman's bankruptcy filings. JPMorgan did this at a time when LBHI, and many of its subsidiaries, were insolvent, and JPMorgan provided no consideration in return, let alone anything resembling reasonably equivalent value. Those billions of dollars in collateral rightfully belong to the LBHI estate and its creditors.

3.      JPMorgan was able to achieve its goal only because of its unique position as primary clearing bank to Lehman's broker-dealer business. In the eight years before LBHI's bankruptcy, JPMorgan provided clearing services to LBI pursuant to a clearance agreement. Each trading day, JPMorgan served as the third party intermediary for the vast majority of LBI's trades and triparty repurchases, acting as custodian over the securities and cash subject to those transactions until the counterparties had each delivered their matching part of the transaction. LBI's ability to buy and sell securities quickly, and to effect repurchase transactions, was an essential feature of Lehman's business, and could not be accomplished without these clearing services. JPMorgan was compensated well for this critical service, receiving hundreds of millions of dollars in fees over the years for its role as trading intermediary.

4.      In the weeks preceding LBHI's bankruptcy filing, JPMorgan's top management were the ultimate insiders to the evolving crisis, enjoying real-time access to the key decision-makers at the United States Treasury and the Federal Reserve Bank of New York. JPMorgan's investment bankers were also attempting to assist Lehman's primary potential bidder, the Korea Development Bank, and consequently had first-hand knowledge of its intentions regarding a potential acquisition. JPMorgan also had direct access to internal financial information about Lehman, including an advance opportunity to review and comment on Lehman's presentation to the rating agencies. At one crucial point, JPMorgan was invited to a meeting with Lehman to

consider rescue financing proposals, but instead used it as an opportunity to probe Lehman's financial condition and business plans from a risk management perspective. With all of the bank's tentacles encircling the financial crisis at Lehman, JPMorgan was uniquely positioned to capitalize on the opportunities that crisis presented.

5.      With the benefit of its unparalleled access to critical nonpublic information about Lehman, JPMorgan grew increasingly concerned about Lehman's solvency and financial viability in August and September 2008. In response, JPMorgan was able to flex the power of its clearing bank position to take swift and severe steps to catapult itself ahead of all of LBHI's other creditors. In late August 2008, JPMorgan insisted that LBHI enter into a guaranty of the clearing obligations of many of its subsidiaries, including LBI, and also required that LBHI become a party to the clearance agreement and execute a security agreement securing LBHI's obligations under the guaranty. Then, in the days immediately preceding LBHI's bankruptcy filing, JPMorgan required LBHI to enter into a new series of agreements – dictated by JPMorgan – that were designed to ensure that JPMorgan would stand ahead of all other creditors should LBHI be forced to file for bankruptcy. JPMorgan forced LBHI to sign these agreements in the early hours of September 10, 2008, just minutes before the rest of the world would hear LBHI's earnings report. JPMorgan coerced LBHI's compliance with the threat that Lehman's ability to clear trades would be cut off, which would have forced the immediate collapse of Lehman's business. LBHI received nothing in return for incurring the obligations set forth in those agreements, and they were executed at a time when LBHI was insolvent and/or undercapitalized, and when, on information and belief, many of LBHI's subsidiaries were also insolvent.

6.      JPMorgan did not stop there. It also drained LBHI of desperately needed cash by making repeated demands that LBHI increase the amount of collateral payments it posted. In the

last four business days before LBHI's chapter 11 filing, JPMorgan seized $8.6 billion of cash collateral, including over $5 billion in cash on the final business day. All the while that JPMorgan was aggressively leveraging its position to grab increasingly more collateral, JPMorgan knew that it was already overcollateralized by billions of dollars.

7.     JPMorgan's insistence on the new agreements in August and September 2008, its unjustified demands for billions in additional collateral, and its refusal to return that collateral in the critical days before LBHI's bankruptcy filing, severely constrained LBHI's liquidity and impeded its ability to pursue and implement alternatives and initiatives that would have resulted in the preservation of billions in value. Instead, LBHI's liquidity constraints compelled an exigent chapter 11 filing that has resulted in tens of billions of dollars in additional lost value to the LBHI estate and its creditors.

8.     It is now too late to undo all the harm caused by the LBHI bankruptcy. It is not too late, however, to return to LBHI's estate and its creditors the billions of dollars of LBHI assets that JPMorgan illegally converted and continues to hold, and to compensate LBHI for all the damages that flow directly from JPMorgan's misconduct. This lawsuit seeks to return that value to the LBHI estate and to restore all of the creditors to the position they would have occupied but for JPMorgan's wrongful conduct.

## THE PARTIES

9.     LBHI is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, New York 10019, and its current principal business address at 1271 Avenue of the Americas, New York, New York 10020.

10.     JPMorgan is a national banking association chartered under the laws of the United States, with its principal business address at 270 Park Avenue, New York, New York 10012.

## VENUE AND JURISDICTION

11.     On September 15, 2008 (the "Petition Date"), LBHI filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code"). LBHI continues to operate its business and manage its property as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

12.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and (c). This is a core proceeding within the meaning of 28 U.S.C. § 157(b). The claims asserted include proceedings to determine, avoid and recover preferences and fraudulent transfers, obligations and/or conveyances. In addition, resolution of the claims asserted will have an effect upon the administration of LBHI's chapter 11 case, the value of its estate and any distribution to its creditors.

13.     Pursuant to 28 U.S.C. §§ 157(a) and 157(b)(1) and the district court's reference of proceedings to the bankruptcy court, this Court may exercise subject matter jurisdiction. Venue in this district is proper in accordance with 28 U.S.C. § 1409(a).

14.     LBHI brings this adversary proceeding pursuant to and under Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and seeks relief under Sections 105(a), 362, 502(d), 506(d), 541, 542, 544, 547, 548, 550, 551 and 553 of the Bankruptcy Code, 28 U.S.C. § 2201 and applicable provisions of state law.

# FACTUAL ALLEGATIONS

## Overview of the JPMorgan-Lehman Relationship

15. Prior to its bankruptcy, Lehman was the fourth largest investment bank in the United States. Founded in 1855, it offered an array of financial services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management, and private equity. It also provided prime broker services to professional investors and hedge funds, allowing them to borrow securities and cash to be able to invest on a leveraged basis using borrowed funds, or debt, to increase the returns on equity. In order for Lehman to provide its services, especially the prime broker services, it needed the ability to buy and sell billions of dollars of securities each day for itself and its customers.

16. During all relevant periods, JPMorgan was Lehman's primary bank. It provided secured and unsecured intra-day credit advances for Lehman's clearing activities. It was the leading credit provider to Lehman, including acting as lead arranger and administrative agent for LBHI's $2 billion unsecured revolving credit facility. JPMorgan was also Lehman's main depository bank for deposit accounts, one of Lehman's largest global counterparties for derivatives activity in terms of numbers of trades and aggregate notional amounts, Lehman's first overall counterparty among United States banks for fixed income and equity securities transactions, and the agent for securities clearing activities for Lehman worldwide.

17. Overall, Lehman entities paid fees exceeding $180 million to JPMorgan and its affiliates from the beginning of 2005 through the first six months of 2008.

## The 2000 Clearance Agreement

18. Among its many roles, JPMorgan served as the principal clearing bank for LBI, LBHI's United States capital markets broker-dealer subsidiary. As such, JPMorgan acted as LBI's intermediary and agent in all securities trades entered into by LBI. JPMorgan would make

payments, transfer securities, and facilitate trades on behalf of LBI. JPMorgan also acted as LBI's agent in triparty repurchasing agreements that LBI used to obtain short-term financing. This clearing function was essential to LBI's business.

19.     JPMorgan acted as clearing bank for LBI pursuant to a Clearance Agreement entered into on June 15, 2000 (hereinafter, the "2000 Clearance Agreement"), between LBI and The Chase Manhattan Bank ("Chase"), JPMorgan's predecessor-in-interest. This document served as the operative contract for JPMorgan's clearing services for LBI over the next eight years.

20.     The terms and provisions of the 2000 Clearance Agreement generally followed the format of customary and ordinary clearance agreements. The 2000 Clearance Agreement included: (i) a lending provision authorizing Chase to make loans to facilitate the clearance process; and (ii) lien provisions giving Chase a lien over certain assets to secure "any advances or loans [Chase] may extend to [LBI] pursuant to this Agreement."

21.     As is typical in the industry and as expressly provided under the 2000 Clearance Agreement, JPMorgan extended daily credit to LBI to cover its exposure for processing trades. For example, in the purchase of a security, JPMorgan would wire transfer the purchase price to the clearance agent of the seller before JPMorgan received the security being purchased. By sending out cash or securities in anticipation of receiving the matching security or cash, clearing banks incur what is referred to as "intra-day exposure." The normal pattern was that the intra-day exposure to JPMorgan would be reduced to zero by the end of the settlement process each trading day, except for exposure from "failed" trades, which were generally insignificant.

22.     The intra-day exposure for advances made by JPMorgan to LBI under the 2000 Clearance Agreement was secured by a lien on certain accounts maintained by LBI with

JPMorgan, and the cash and securities on deposit in those accounts. Because JPMorgan was the primary clearing bank for LBI, virtually all LBI's securities and cash used in its trading activities were on deposit with JPMorgan or in JPMorgan accounts at depositories. Thus, all LBI's trading assets against which JPMorgan maintained a lien were subject to that security interest and served as collateral for all intra-day exposures of JPMorgan under the 2000 Clearance Agreement.

23.    JPMorgan's security rights to LBI's collateral were limited, however, to the assets in LBI's accounts subject to JPMorgan's lien and did not extend to the accounts of any other Lehman entity. In addition, pursuant to the parties' understanding and course of dealing over the next eight years, LBI had the right to access its collateral at the close of settlement each day in order to use such collateral for overnight funding and other purposes.

24.    The 2000 Clearance Agreement provided that the advances of funds and other extensions of credit in connection with clearance activities would be made at Chase's discretion, and that reimbursement by LBI was to be made upon demand. Significantly, however, the parties acknowledged a course of dealing between themselves with respect to the advancement of credit and, as a result, required that notice be given prior to any refusal to extend such credit. Section 5 of the 2000 Clearance Agreement provided:

> Notwithstanding the fact that we may from time to time make advances or loans pursuant to this paragraph or otherwise extend credit to you, whether or not as a regular pattern, we may at any time decline to extend such credit at our discretion, *with notice* and if we are precluded from extending such credit as a result of any law, regulation or applicable ruling. (Emphasis supplied.)

25.    The 2000 Clearance Agreement further provided that LBI could transfer money out of its Clearing and Custody accounts "to the extent that after such transfer [JPMorgan] remain[ed] fully collateralized." Nothing in the 2000 Clearance Agreement gave JPMorgan the right to be overcollateralized.

26.     The 2000 Clearance Agreement itself could not be terminated without proper notice. Section 17 of the 2000 Clearance Agreement provided that either party could terminate the agreement by written notice if: (i) the other party entered into a proceeding for bankruptcy; (ii) the other party failed to comply with any material provision of the agreement, which failure was not cured within 30 days after notice of such failure; or (iii) any representation or warranty made in the agreement by the other party shall have proven to have been, at the time made, false or misleading in any material respect.

27.     The initial term of the 2000 Clearance Agreement commenced on June 15, 2000, and ended on October 7, 2002. The parties continued to operate under the 2000 Clearance Agreement from 2000 on, and amended it in 2008 (as discussed below). Prior to LBHI's bankruptcy filing, JPMorgan never provided written notice of a continuing material default or alleged that any representations or warranties were false or misleading at the time they were made. Consequently, the 2000 Clearance Agreement was still in effect when LBHI filed for bankruptcy.

**The August Agreements**

28.     After operating under the original 2000 Clearance Agreement for eight years, on or about August 18, 2008, JPMorgan presented Lehman with a set of documents altering the terms of the clearance relationship between the parties. These alterations included adding LBHI as a guarantor of the obligations of LBI and other Lehman subsidiaries under the 2000 Clearance Agreement. The new documents were executed on or about August 29, 2008. They included an amendment to the 2000 Clearance Agreement (the "August Amendment"), a guaranty agreement (the "August Guaranty"), and a security agreement (the "August Security Agreement"; collectively, the "August Agreements").

29.     On information and belief, at the time the parties entered into the August Agreements, LBHI was undercapitalized, and certain of the Lehman subsidiaries whose obligations were guaranteed under those agreements, including LBI, were insolvent.

30.     Notwithstanding LBHI's undercapitalization, LBHI agreed under the August Agreements to post collateral to guarantee the intra-day trading obligations of LBI and the other Lehman subsidiaries arising under the 2000 Clearance Agreement. The parties further agreed that LBHI's maximum liability under the August Guaranty would be limited to the value of LBHI collateral held by JPMorgan (measured on a daily basis) in two specified accounts subject to JPMorgan's lien.

31.     The parties also negotiated a crucial provision that confirmed LBHI's right to access its collateral at the end of each trading day. Specifically, the August Security Agreement provided that, to the extent LBHI determined that its collateral was no longer required to secure the intra-day clearance obligations of its subsidiaries, it was entitled to transfer its posted collateral from the accounts specifically pledged under the August Security Agreement to a lien-free account (the "Overnight Account"). In this regard, the August Security Agreement provided:

> … at the end of a business day, if [LBHI] has determined that no Obligations (as defined in the Clearance Agreement) remain outstanding, [LBHI] may transfer to an account (the 'Overnight Account') any and all Security held in or credited to or otherwise carried in the Accounts.

32.     As explained above, by the nature of the clearance process, the intra-day clearance-related exposures of JPMorgan to the Lehman subsidiaries would typically be reduced to zero at the end of each trading day. Thus, the August Security Agreement provided for the right of LBHI to have access to all – or at least a substantial majority – of its collateral overnight.

33. While the August Agreements purported to give JPMorgan significant new rights against LBHI, they gave LBHI nothing of value in exchange. JPMorgan's obligations to the Lehman entities remained essentially the same as they were prior to the August Agreements. Further, LBHI did not even receive reasonably equivalent value from guaranteeing its subsidiaries' obligations because, among other things, on information and belief, certain of those subsidiaries, including LBI, were insolvent at the time the August Agreements were executed.

34. According to Lehman's Code of Authorities, only Ian Lowitt (as LBHI's Chief Financial Officer ("CFO")) or someone of equivalent or higher corporate rank could approve a guaranty such as the August Guaranty, while Paolo Tonucci (as LBHI's Treasurer) had the authority to execute the August Amendment and the August Security Agreement. Thus, while the August Security Agreement and the August Amendment were signed by Tonucci, the August Guaranty was signed by Lowitt. Significantly, the August Guaranty, because it had to be executed by Lowitt, was transmitted to JPMorgan separately from the August Amendment and August Security Agreement.

**As The Ultimate Insider, JPMorgan Learns Confidential Information About Lehman**

35. By September 2008, JPMorgan had obtained unparalleled access to and knowledge of Lehman's financial condition and prospects. As Lehman's most significant relationship bank, JPMorgan was invited into Lehman's strategic planning and was given access to Lehman's most confidential information, results, plans and outlook, as the firm held itself out as Lehman's trusted partner, advisor, and potential investor. And given JPMorgan's role in the nation's financial system, and the close relationships its leaders had with key policymakers, JPMorgan management was invited into the United States government's inner circle as it planned its efforts to address the issues relating to Lehman's financial distress. JPMorgan also

leveraged these relationships to gain an inside track on representing Lehman's main suitor, the Korea Development Bank ("KDB").

36.     On September 4, 2008, senior management of LBHI met with senior officers of JPMorgan, including its senior risk officer, Barry Zubrow. According to a JPMorgan-prepared agenda, the purpose of the meeting was to discuss Lehman's upcoming third quarter results, including the expected significant asset write-downs from Lehman's commercial and residential real estate assets, and Lehman's plans going forward. After the meeting, Zubrow and the JPMorgan executives expressed skepticism about the viability of Lehman's plans.

37.     JPMorgan also offered to assist Lehman by providing feedback on Lehman's draft presentations to the ratings agencies. On the evening of September 4, 2008, Paolo Tonucci of LBHI e-mailed a copy of Lehman's Fitch presentation to JPMorgan executives for their comments. Tonucci warned in the cover e-mail that the presentation contained "a lot of confidential info." Senior JPMorgan executives, including Zubrow and Mark Doctoroff, the primary Lehman relationship manager, reviewed and commented on the presentation. In response, Lowitt e-mailed Zubrow to remind him that: "The materials we sent you are very sensitive, and trust that they will be kept to the limited group we met with and your rating advisory team."

38.     As early as August 2008, JPMorgan's top management had also reached out to KDB's Chairman, in the hope of representing KDB in connection with its proposed investment in Lehman. JPMorgan subsequently pitched KDB on three key points: (1) "JPM knows Lehman best as the largest liquidity provider and #1 financing bank for Lehman"; (2) that JPMorgan could perform prompt and thorough diligence on Lehman; and (3) that Steve Black (Co-Chief Executive Officer of the Investment Banking Division of JPMorgan) "and Jamie Dimon

[JPMorgan's CEO] know Dick Fuld [LBHI's Chairman] very well, are also close to Hank Paulson of US Treasury to discuss any potential support to the deal/KDB." As a result of its relationship with KDB, JPMorgan's leadership learned on the morning of September 5, 2008 that KDB was unlikely to press forward with the transaction.

39.     In addition, on the morning of September 9, 2008, Jamie Dimon and other senior officers of JPMorgan met in Washington, D.C., with the Chairman of the Federal Reserve, Ben Bernanke. That same morning, Dimon also met with the Secretary of the United States Treasury, Henry Paulson.

40.     On information and belief, at these September 9, 2008 meetings with the principal financial services policymakers, Dimon and the JPMorgan team discussed the financial state and future prospects of Lehman, as well as the United States government's intent not to rescue Lehman should it be forced to file for bankruptcy. From those conversations, the JPMorgan leadership determined that they would accelerate their efforts to secure LBHI collateral and capitalize on a Lehman bankruptcy.

41.     LBHI originally intended to release its preliminary earnings report for the third fiscal quarter of 2008 on September 17, 2008. However, because news in the marketplace of the collapse of talks with KDB and analysts' estimates of losses caused a sharp drop in LBHI's stock price on September 9, 2008, senior management of LBHI decided to release the preliminary earnings report earlier, on Wednesday, September 10, 2008, at 7:30 a.m. Given its unique access to Lehman and its affairs, JPMorgan knew what Lehman was going to announce to the market.

42.     Also on September 9, 2008, Black and Fuld followed up on a discussion Dimon had with Fuld two days earlier in which Dimon suggested JPMorgan might be willing to provide

funding to Lehman by purchasing preferred shares. Black agreed to send a team to a diligence session.

43. Rather than sending the dealmakers Lehman expected, JPMorgan sent a team that included senior risk managers. The risk team was not there to conduct due diligence on a potential acquisition, as portrayed to Lehman, but rather to probe into Lehman's confidential records and plans. JPMorgan's team, led by Douglas Braunstein and John Hogan, left the meeting and reportedly called Dimon and Black in Washington to tell them what was learned at the "diligence" session in New York. In an e-mail that evening, Hogan reported to Black, Dimon and other senior officers of JPMorgan that Lehman was seeking help, such as a credit line from JPMorgan. Despite promising Fuld that morning that he would send a team of JPMorgan bankers to explore just such a possibility, Black responded by asking about the "drugs they apparently have been taking to think that we would do something like that."

### JPMorgan Demands That LBHI Enter Into the September Agreements

44. By September 9, 2008, JPMorgan had learned that the federal government was unlikely to provide support to Lehman, had been informed that the leading acquirer, KDB, had dropped talks with Lehman, and had previewed LBHI's planned preliminary earnings announcement. In light of the unique information it gained as the ultimate insider, JPMorgan wasted no time maneuvering to gain a preferred position over LBHI's other creditors.

45. According to JPMorgan's own calculations, at least as of September 4, 2008, as a result of the billions in securities and cash that LBHI and other Lehman entities had posted in the prior months to secure the clearing-related obligations of the Lehman subsidiaries, JPMorgan was more than fully collateralized for intra-day clearing risk. JPMorgan further acknowledged that LBHI, too, believed JPMorgan was overcollateralized against any intra-day risks.

46.     Nevertheless, with the benefit of the highly material nonpublic information that JPMorgan learned from Lehman and federal policymakers, and upon learning that LBHI would publicly release its earnings earlier than expected, JPMorgan required LBHI to enter into a new series of agreements to ensure that JPMorgan would stand ahead of all other LBHI creditors – not just for its clearance exposure, but for all possible exposure that could result from an LBHI bankruptcy.  Even though the parties had just executed the August Agreements, Diane Genova, in-house counsel for JPMorgan, called Andrew Yeung, a junior in-house lawyer for LBHI, on the evening of September 9, 2008, and advised that her team was putting together a new set of security agreements that LBHI would need to sign.  At 8:50 p.m. on the night of September 9, 2008, JPMorgan forwarded a guaranty (the "September Guaranty") and security agreement (the "September Security Agreement") to Yeung.  At some point later that evening, JPMorgan forwarded the remaining agreements, including a further amendment to the 2000 Clearance Agreement (the "September Amendment") and an "Account Control Agreement" (the "Account Control Agreement"; collectively, the "September Agreements").

47.     Late that same evening, JPMorgan executives made multiple calls to Paolo Tonucci and Dan Fleming of LBHI, neither of whom had the authority to execute the September Guaranty, and demanded that the draft September Agreements be approved by Ian Lowitt and executed before LBHI's earnings call, scheduled for 7:30 a.m. the next day.  However, JPMorgan was advised that Lowitt was home, and that he could not be disturbed because of his role in the crucial earnings call scheduled for the next morning.

48.     JPMorgan executives led Fleming and other LBHI personnel to believe that, if LBHI did not execute the proposed agreements before LBHI's earnings call, JPMorgan would

immediately stop extending intra-day credit to, and clearing trades for, Lehman. In fact, JPMorgan would have taken such action if LBHI did not accede to its demands.

49.    Although either action, if taken without commercially reasonable notice, would have constituted a breach of the parties' clearance agreement, LBHI was in no position to insist on its contract rights. All parties knew that if JPMorgan immediately ceased clearing activities or extending intra-day credit to Lehman, Lehman's entire business would immediately collapse. JPMorgan was one of only two banks, the other being the Bank of New York, that could provide the clearing services required by Lehman. It would have taken several months, if not longer, to transfer clearing responsibilities to the Bank of New York, and Lehman could not have survived for more than a day without a bank to clear its trades. Under these circumstances, LBHI had no alternative but to accede to JPMorgan's demand to enter into the September Agreements.

50.    During the course of the evening, JPMorgan's in-house counsel further represented to Yeung that LBHI's Chairman, Dick Fuld, had previously agreed to the terms of the September Agreements in a conversation with Steve Black of JPMorgan. Yeung did not realize that this was not true. However, because LBHI's senior executives were all exclusively occupied with preparing for the next morning's critical earnings call, Yeung was unable to verify the truth or falsity of the misrepresentation made to him.

51.    The September Agreements radically altered the relationship between JPMorgan and LBHI. Pursuant to these documents, JPMorgan required that LBHI guarantee and secure all exposures of all JPMorgan entities to all Lehman entities, without regard to the nature, legal vehicle or jurisdiction, and to convert all unsecured and unguaranteed exposures into guaranteed and secured exposures. For example, JPMorgan has since asserted that the September Agreements guarantee and secure over $3 billion in purported derivatives obligations of LBHI

subsidiaries that were previously unsecured, as well as approximately $720 million in claims arising out of losses incurred not by JPMorgan, but by its <u>customers</u> who invested in JPMorgan funds.

52. The September Guaranty further purported to amend the cap on LBHI's liability set forth in the August Guaranty by providing as follows: "The Guarantor's maximum liability under the Guaranty shall be THREE BILLION DOLLARS ($3,000,000,000) or such greater amount that the Bank has requested from time to time as further security in support of this Guaranty."

53. In addition, while the August Security Agreement provided that only two specific LBHI accounts (and the assets therein) would be subject to JPMorgan's security interest, the proposed September Agreements included the new September Security Agreement that covered <u>all</u> accounts of LBHI at JPMorgan or <u>any of its affiliates</u>.

54. The September Agreements also included the Account Control Agreement, which purported to give JPMorgan control over certain LBHI-owned money market funds.

55. Crucially, the September Agreements deleted the provision in the August Security Agreement that expressly gave LBHI the right to transfer its collateral from the pledged accounts to the lien-free overnight account – an important right that had been negotiated and confirmed only two weeks earlier. In its place, the September Agreements provided that LBHI would only be allowed to access its collateral "upon three days written notice to the Bank." Thus, even if all exposures of JPMorgan to Lehman for clearing services had been fully eliminated at the end of the trading day, JPMorgan now purported to gain the right to withhold LBHI's collateral for three days following written notice by LBHI.

56.     While the September Agreements purported to give JPMorgan significant new rights vis-à-vis LBHI, they gave LBHI nothing in exchange. JPMorgan did not give up any rights or incur any new obligations under the proposed September Agreements. Instead, JPMorgan's obligations would remain the same as they were under its clearance-related agreements with Lehman prior to September 9, 2008.

57.     On the evening of September 9, 2008, Yeung sent an e-mail to Tonucci and Fleming (and others) in which he attempted to advise them of the onerous and unreasonable terms of the September Agreements. However, because Tonucci was preparing for the next morning's crucial earnings call, he did not review that e-mail. Nor did he otherwise become aware of the terms of the proposed agreements until after their execution. Similarly, neither Lowitt nor any other LBHI executive with the authority to bind LBHI to the September Guaranty reviewed or approved that guaranty and related agreements.

58.     Instead, believing that JPMorgan would cease extending credit and clearing if the September Agreements were not executed prior to 7:30 a.m. on September 10, 2008 (which would have been a breach of the 2000 Clearance Agreement), Fleming instructed Yeung to "proceed as though we will agree to all the terms laid out by JPM." Legal counsel for the parties thus worked through the night of September 9, 2008, to finalize the agreements. Throughout the course of the evening of September 9, 2008, and the early morning of September 10, 2008, JPMorgan rejected any attempt by LBHI to negotiate or alter any material terms of the September Agreements.

59.     Early on the morning of September 10, 2008, Tonucci executed the most significant of the September Agreements, *i.e.*, the September Guaranty, the September Security Agreement, the September Amendment, and the Account Control Agreement. Pursuant to

JPMorgan's demand that the September Agreements be executed prior to LBHI's earnings call, at 7:33 a.m. on the morning of September 10, 2008, Yeung e-mailed the executed signature pages to JPMorgan showing Tonucci's signature.

60.    At that time, LBHI and its subsidiaries were only days away from bankruptcy, and were insolvent.  Given JPMorgan's unique access to information concerning Lehman's financial state and future prospects, JPMorgan was or should have been aware of that fact.

61.    Neither Tonucci nor any other LBHI employee received approval of the September Guaranty from Ian Lowitt or any other senior LBHI executive with the authority to bind LBHI to those agreements.  As stated above, under Lehman's Code of Authorities, the CFO or someone of equivalent or higher corporate rank was required to approve the September Guaranty.  JPMorgan was well aware that Tonucci, as Treasurer, was not authorized to sign the September Guaranty.  Notwithstanding its knowledge that Ian Lowitt was unavailable, and that his approval was required to bind LBHI to the September Guaranty, JPMorgan, in its rush to put itself ahead of all other creditors of LBHI, accepted the September Guaranty even though it had been executed by a person not authorized to sign it.

**JPMorgan Demands Even More Excess Collateral**

62.    During the last week of LBHI's existence, JPMorgan used the September Agreements as a pretext to improperly extract billions of dollars in cash from LBHI as additional collateral.  JPMorgan made these demands for additional collateral even though, at the time, JPMorgan had already concluded that it held sufficient collateral to cover its intra-day clearing risk.  In fact, although the demands were made pursuant to a purported amendment to the 2000 Clearance Agreement, as well as a guaranty and security agreement executed in the context of the 2000 Clearance Agreement (*i.e.*, the September Agreements), JPMorgan's collateral demands had nothing to do with intra-day clearance obligations.  Instead, JPMorgan officials have since

admitted that the billions of dollars in cash collateral demands were based primarily on the possibility of closing out derivatives contracts on favorable terms in the event of an LBHI bankruptcy, and were not made in connection with exposure under the 2000 Clearance Agreement. JPMorgan did not make this intent known to LBHI when it made its demands.

63.     At the time, the JPMorgan entities had no right to demand additional collateral from the LBHI subsidiaries under the derivatives contracts themselves. On a net basis, the LBHI subsidiaries were "in-the-money" under those contracts, as demonstrated by the fact that JPMorgan was obliged to post approximately $1 billion to the LBHI subsidiaries as collateral to cover those obligations. In fact, absent an LBHI bankruptcy, if the market continued to move in the direction it had been trending, the trading position of the parties was such that the JPMorgan entities would have been obliged to post significantly more collateral with their Lehman counterparties.

64.     Moreover, the terms of the derivatives contracts did not permit the JPMorgan entities to demand collateral from LBHI. Because JPMorgan could not legitimately demand the collateral from LBHI or the Lehman counterparties under the derivatives contracts, JPMorgan attempted to circumvent those contracts by cloaking its demands with the September Agreements.

65.     Although the LBHI subsidiaries were "in-the-money" under the derivatives contracts at the time (on a net basis), JPMorgan's collateral demands were based on risk models that apparently assumed a future LBHI bankruptcy. Even so, JPMorgan demanded billions of dollars worth of collateral in excess of what even its own risk models suggested was the total amount to which it could be entitled in the event of a Lehman bankruptcy default under the derivatives contracts.

66. JPMorgan's accelerated demands for additional collateral, which continued through the eve of LBHI's bankruptcy filing, contributed significantly to LBHI's inability to meet the liquidity needs of its business. Indeed, LBHI was already insolvent at that time. Specifically, in response to JPMorgan's demands, on September 9, 2008, LBHI posted $1 billion in cash and $1.67 billion in money market funds. On September 10, 2008, LBHI delivered to JPMorgan approximately $300 million of cash. Similarly, on September 11, 2008, LBHI posted additional cash in the amount of $600 million as collateral for JPMorgan. Even though JPMorgan did not intend to secure intra-day clearing exposure with this collateral, the demands were made under color of the September Agreements, and were backed by the improper threat that, if LBHI did not comply, JPMorgan would immediately stop extending intra-day credit to, and clearing trades for, Lehman, in violation of its obligations under the 2000 Clearance Agreement. Although LBHI protested these demands, it had no choice but to comply.

67. Then, late in the evening of September 11, 2008, JPMorgan e-mailed to LBHI a written "Notice" requiring confirmation that LBHI would wire to JPMorgan an additional $5 billion in cash prior to the open of business on Friday, September 12, 2008. In the Notice, JPMorgan threatened that, if it did not receive the demanded additional collateral, "we intend to exercise our right to decline to extend credit to you under the [Clearance] Agreement."

68. JPMorgan's threat to stop advancing credit, if implemented without commercially reasonable notice, would have constituted a breach of the parties' clearance agreement. This is particularly so given that JPMorgan was fully collateralized against intra-day clearance exposure. Nonetheless, LBHI was well aware that refusing JPMorgan's demand for this additional $5 billion was not an option. For example, on September 12, 2008, LBHI senior officers circulated via e-mail a "Back-Up Contingency Plan," wherein it was noted, "JPM as 'clearing bank'

continues to ask for more cash collateral. If we don't provide the cash, they refuse to clear, we fail . . .."

69.     JPMorgan made this last-minute demand for $5 billion in cash notwithstanding the fact that it was already overcollateralized and that LBHI was insolvent. In fact, internal JPMorgan documents demonstrate that it made the improper demand simply because JPMorgan desired to have an "extra cushion."

70.     JPMorgan promised that it would return the $5 billion at the close-of-settlement on Friday, September 12, 2008. However, notwithstanding this representation and promise, JPMorgan had no intention of returning any of LBHI's collateral, but instead had determined to deny LBHI access to that collateral – regardless of any request by LBHI for its return.

71.     To have any hope of surviving through the day, Lehman needed JPMorgan's clearing services. After struggling to locate such an enormous sum on such short notice, on September 12, 2008, LBHI delivered what was essentially its last available $5 billion of cash to JPMorgan. LBHI delivered the $5 billion in cash only by pulling virtually every unencumbered asset it could deliver.

72.     Upon receiving the approximately $8.6 billion in cash and money market funds that it extracted from LBHI during this last week, JPMorgan swept those assets out of the LBHI account on which JPMorgan purportedly had a lien pursuant to the August Agreements and into other accounts held by JPMorgan. Accordingly, as of September 12, 2008, there was a zero balance in the cash account pledged by LBHI under the August Agreements, and JPMorgan had forfeited any lien it may have held over the $8.6 billion in cash and money market funds pursuant to those agreements.

**JPMorgan Prevents LBHI's Access to Its Cash and Other Collateral Held by JPMorgan**

73.     As of close-of-trading on Friday, September 12, 2008, after settlement of all intra-day clearance liabilities, JPMorgan had no clearance exposure whatsoever to Lehman. Nonetheless, JPMorgan retained billions of dollars in LBHI collateral.

74.     JPMorgan's overreaching collateral grabs destroyed LBHI's remaining liquidity pool. As JPMorgan was aware, LBHI's ability to access its collateral on September 12, 2008 and during the following weekend was critical to Lehman's efforts to stave off bankruptcy long enough to facilitate a sale of its business or, at the very least, to organize an orderly wind-down and preserve as much value as possible for creditors. On Friday, September 12, 2008, and throughout the weekend until Monday morning, LBHI repeatedly requested access to this excess collateral for use overnight and over the weekend. However, during this period, JPMorgan locked down and denied LBHI access to its collateral.

75.     JPMorgan conceded in its internal communications that, at this time, JPMorgan held billions of dollars in excess LBHI collateral. Indeed, an internal JPMorgan analysis concluded that, as of September 12, 2008, JPMorgan was overcollateralized by as much as $6.1 billion for the clearance exposures alone. Nevertheless, JPMorgan refused each demand from LBHI that it be given access to its own assets. In numerous internal e-mails circulated throughout the weekend and Monday morning, JPMorgan management gave orders not to allow LBHI to access its collateral, or to otherwise allow any LBHI cash or securities to be sent out from JPMorgan, for any reason.

76.     At the same time that JPMorgan was refusing LBHI's requests for access to its collateral, Dimon was attending a meeting at the New York Federal Reserve with the heads of the other major United States financial institutions. The purpose of the meeting was ostensibly to discuss whether the attendees' firms could formulate a plan to avoid the collapse of Lehman

and the catastrophic impact such a failure would have on the global financial system. Such a plan never materialized.

77.     At all times, JPMorgan was aware that the failure of one of its key competitors would redound to JPMorgan's benefit. And these benefits did materialize almost immediately following Lehman's demise. As Dimon later boasted during JPMorgan's earnings call for the fourth quarter of 2008, JPMorgan saw "exceptional" market share gains in trading and investment banking, including equity and debt capital markets, M&A and corporate client coverage.

**LBHI Is Forced to File for Bankruptcy on September 15, 2008**

78.     On the morning of Monday, September 15, 2008, London time, a London-based subsidiary of LBHI, Lehman Brothers International (Europe) ("LBIE"), was short on its capital requirements and, under United Kingdom law, LBIE could not open for business without its directors potentially incurring personal liability for that shortfall. In light of this risk, LBIE was forced to file for administration in London (the U.K. equivalent of bankruptcy) on the morning of September 15, 2008, London time. That same morning, LBHI filed for bankruptcy under chapter 11 of the Bankruptcy Code.

79.     JPMorgan's demands for and receipt of the billions of dollars in cash collateral, and its refusal to allow LBHI to access its own assets, contributed to the exigency of LBHI's bankruptcy filing. Had LBHI been able to file a well-prepared and orderly chapter 11, as a company of Lehman's size and complexity ordinarily would, circumstances would have been very different for the estate. At the very least, LBHI could have organized a more orderly wind-down that could have prevented the destruction of billions of dollars in value to the LBHI estate that followed the September 15, 2008 filing. JPMorgan's overreaching collateral demands thus

caused losses of tens of billions of dollars, due to Lehman's inability to engage in pre-filing measures to preserve estate value.

80.    For example, much of the value destruction came from the bankruptcy filing of LBHI as parent guarantor, which triggered a cascade of defaults at Lehman subsidiaries that held trading contracts.  This resulted in a termination of hundreds of thousands of separate derivatives contracts with counterparties, including JPMorgan.  Among the terminated contracts were those in which Lehman was substantially in-the-money.  The additional time which would have been available but for JPMorgan's improper collateral grab, could have allowed Lehman to transfer or unwind many of its 1.1 million derivatives trades, preserving enormous value.

**JPMorgan Continues to Hold Billions of Dollars of LBHI Assets**

81.    JPMorgan's demands for, and improper withholding of, the approximately $8.6 billion in cash and money market funds it extracted from LBHI in the week leading up to LBHI's bankruptcy were made under color of the September Agreements.  But those agreements – which were executed when LBHI and, on information and belief, its subsidiaries were insolvent – are invalid and unenforceable under the fraudulent conveyance provisions of the Bankruptcy Code. As set forth below, the September Agreements are not entitled to the "safe harbor" protections of the Bankruptcy Code.  As such, the approximately $8.6 billion of cash and money market funds that was transferred under color of those agreements are property of the LBHI estate that should have been in LBHI's possession as of the Petition Date.  JPMorgan has no right to keep this collateral at the expense of LBHI's other creditors.

82.    Moreover, the September Agreements are invalid and unenforceable pursuant to the common law, because they were procured by JPMorgan through unlawful economic coercion, they lacked consideration, and further because the LBHI employee who executed the September Guaranty lacked the authority to bind LBHI to that contract.  Accordingly, JPMorgan

has no right to continue to withhold or apply the $8.6 billion in cash and money market funds demanded and received by JPMorgan pursuant to the September Agreements.

83.     Similarly, the August Guaranty and the August Security Agreement are invalid and unenforceable and are not entitled to the safe harbor protections of the Bankruptcy Code. Therefore, JPMorgan had no right to demand and withhold the billions of dollars in LBHI securities that were transferred to JPMorgan to secure obligations purportedly arising under those agreements.

84.     Even if the August Guaranty and August Security Agreement were valid, JPMorgan was required to return the $8.6 billion of cash and money market funds because those assets were not held in any account in which JPMorgan had a security interest pursuant to the August Agreements. Therefore, LBHI's obligations under the August Guaranty were capped at the value of the LBHI securities held in the pledged accounts, and JPMorgan had no right to retain or apply any of the $8.6 billion in cash and money market funds to satisfy those obligations. JPMorgan would have also breached the August Guaranty as well as the August Security Agreement, because it locked down and refused LBHI access to the billions of dollars in LBHI collateral that it held on the evening of September 12, 2008, even though JPMorgan had no clearance-related exposure at that time. JPMorgan would further be in breach of the August Agreements because, to the extent those agreements were the purported basis for demanding and retaining the $8.6 billion of cash and money market funds in the week prior to LBHI's bankruptcy, the demands for those amounts far exceeded what was reasonably required at the time to secure the clearance-related obligations arising under those agreements. In fact, unbeknownst to LBHI, JPMorgan made its demands for the $8.6 billion in cash and money

market funds with the intent to secure obligations <u>other than</u> the clearance obligations arising under the August Agreements.

85.     As a result of the foregoing, LBHI's estate is entitled to the return of LBHI's assets pursuant to various provisions of the Bankruptcy Code, because the transfers of such assets are not entitled to safe harbor protections, and they constitute actual or constructive fraudulent transfers, improper preference payments, and an impermissible build up of collateral for the purpose of putting JPMorgan in a position of having more assets against which it could setoff claims.  Separate and apart from the relief provided by the Bankruptcy Code, as a result of JPMorgan's misconduct, LBHI is also entitled to damages.

86.     JPMorgan should not be allowed to retain the benefit of its wrongful conduct.  The billions of dollars in improperly withheld assets should be returned to LBHI's estate, and all other damages resulting from JPMorgan's misconduct should be awarded, for the benefit of LBHI's creditors.

## CAUSES OF ACTION

### COUNT I
**(Avoidance of September Agreements as Actually Fraudulent Under
Section 548 of the Bankruptcy Code)**

87.     The allegations in paragraphs 1 through 86 are incorporated by reference as though fully set forth below.

88.     Within two (2) years of the Petition Date, LBHI entered into the September Agreements.

89.     Entry into the September Guaranty was an obligation incurred by LBHI to or for the benefit of JPMorgan.  Entry into the remainder of the September Agreements was either a transfer made or an obligation incurred by LBHI to or for the benefit of JPMorgan.

90. Entry into each of the September Agreements was made with an actual intent to hinder, delay, and/or defraud LBHI's creditors. Such an intent can be inferred from the traditional badges of fraud surrounding LBHI's entry into the September Agreements. Among other things, on September 10, 2008, the global markets were experiencing a meltdown, LBHI and many of its subsidiaries were insolvent, LBHI received no consideration in exchange for its expanded obligations under the September Agreements, and the September Agreements were executed on a hasty, rushed basis without any meaningful negotiation between LBHI and JPMorgan.

91. As a result of LBHI's entry into the September Agreements, LBHI and its creditors have been harmed.

92. The September Agreements are avoidable under Section 548(a)(1)(A) of the Bankruptcy Code.

## COUNT II
**(Avoidance of August Guaranty and August Security Agreement as Actually Fraudulent Under Section 548 of the Bankruptcy Code)**

93. The allegations in paragraphs 1 through 92 are incorporated by reference as though fully set forth below.

94. Within two (2) years of the Petition Date, LBHI entered into the August Agreements.

95. Entry into the August Guaranty was an obligation incurred by LBHI to or for the benefit of JPMorgan. Entry into the August Security Agreement was a transfer made by LBHI to or for the benefit of JPMorgan.

96. Entry into the August Guaranty and the August Security Agreement was made with an actual intent to hinder, delay, and/or defraud LBHI's creditors. Such an intent can be inferred from the traditional badges of fraud surrounding LBHI's entry into the August Guaranty

and the August Security Agreement. Among other things, on August 29, 2008, the global markets were experiencing a meltdown, on information and belief LBHI was undercapitalized and many of its subsidiaries were insolvent and/or undercapitalized, and LBHI received no consideration in exchange for its expanded obligations under the August Agreements.

97. As a result of LBHI's entry into the August Guaranty and the August Security Agreement, LBHI and its creditors have been harmed.

98. The August Guaranty and the August Security Agreement are avoidable under Section 548(a)(1)(A) of the Bankruptcy Code.

**COUNT III**
**(Avoidance of Collateral Transfers as Actually Fraudulent Under**
**Section 548 of the Bankruptcy Code)**

99. The allegations in paragraphs 1 through 98 are incorporated by reference as though fully set forth below.

100. Within two (2) years of the Petition Date, LBHI transferred certain securities to JPMorgan and JPMorgan retained such securities after the close of business on September 12, 2008 in the absence of the existence of any clearance exposure (the "Securities Transfers").

101. On September 9, 2008, within two (2) years of the Petition Date, LBHI transferred $2.67 billion in cash and money market funds to JPMorgan and JPMorgan retained such funds after the close of business on September 12, 2008 in the absence of the existence of any clearance exposure (the "September 9 Cash Transfer").

102. On September 10, 2008, within two (2) years of the Petition Date, LBHI transferred $300 million of cash to JPMorgan and JPMorgan retained such funds after the close of business on September 12, 2008 in the absence of the existence of any clearance exposure (the "September 10 Cash Transfer").

103.    On September 11, 2008, within two (2) years of the Petition Date, LBHI transferred $600 million of cash to JPMorgan and JPMorgan retained such funds after the close of business on September 12, 2008 in the absence of the existence of any clearance exposure (the "September 11 Cash Transfer").

104.    On September 12, 2008, within two (2) years of the Petition Date, LBHI transferred $5 billion of cash to JPMorgan and JPMorgan retained such funds after the close of business on September 12, 2008 in the absence of the existence of any clearance exposure (the "September 12 Cash Transfer" and, collectively with the September 9 Transfer, the September 10 Cash Transfer and the September 11 Cash Transfer, the "September Transfers"). The Securities Transfers and the September Transfers are collectively referred to as the "Collateral Transfers."

105.    Each of the Collateral Transfers was a transfer made by LBHI to or for the benefit of JPMorgan.

106.    Each of the Collateral Transfers was made with an actual intent to hinder, delay, and/or defraud LBHI's creditors. Such an intent can be inferred from the traditional badges of fraud surrounding LBHI's entry into the Collateral Transfers. Among other things, at the time of each of the Collateral Transfers, the global markets were experiencing a meltdown, on information and belief LBHI and many of its subsidiaries were insolvent and/or undercapitalized, LBHI received no consideration in exchange for the Collateral Transfers, and the Collateral Transfers were made on a hasty, rushed basis.

107.    As a result of the Collateral Transfers, LBHI and its creditors have been harmed.

108.    Each of the Collateral Transfers is individually avoidable under Section 548(a)(1)(A) of the Bankruptcy Code.

## COUNT IV
### (Recovery of Avoided Fraudulent Transfers Under Section 550
### of the Bankruptcy Code)

109.     The allegations in paragraphs 1 through 108 are incorporated by reference as though fully set forth below.

110.     The Collateral Transfers are avoidable as actual fraudulent transfers pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and accordingly, pursuant to Section 550(a) of the Bankruptcy Code, LBHI is entitled to recover from JPMorgan the value of the Collateral Transfers plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of LBHI's estate.

## COUNT V
### (Avoidance of September Agreements as Constructively Fraudulent
### Under Section 548 of the Bankruptcy Code)

111.     The allegations in paragraphs 1 through 110 are incorporated by reference as though fully set forth below.

112.     Within two (2) years of the Petition Date, LBHI entered into the September Agreements.

113.     Entry into the September Guaranty was an obligation incurred by LBHI to or for the benefit of JPMorgan.  Entry into the remainder of the September Agreements was either a transfer made or an obligation incurred by LBHI to or for the benefit of JPMorgan.

114.     LBHI received less than reasonably equivalent value in exchange for its entry into the September Agreements.

115.     When LBHI entered into the September Agreements, LBHI was insolvent or became insolvent as a result of the transfers and/or incurrence of obligations; was engaged in business or a transaction, or was about to engage in business or a transaction, for which its

remaining property was unreasonably small capital; and/or intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

116.    The safe harbor provisions of Section 546(e) of the Bankruptcy Code do not apply to the September Agreements.

117.    The September Agreements are avoidable under Section 548(a)(1)(B) of the Bankruptcy Code.

## COUNT VI
### (Avoidance of September Guaranty as Constructively Fraudulent Under Section 548 of the Bankruptcy Code)

118.    The allegations in paragraphs 1 through 117 are incorporated by reference as though fully set forth below.

119.    Within two (2) years of the Petition Date, LBHI entered into the September Guaranty.

120.    Entry into the September Guaranty was an obligation incurred by LBHI to or for the benefit of JPMorgan.

121.    LBHI received less than reasonably equivalent value in exchange for its entry into the September Guaranty.

122.    When LBHI entered into the September Guaranty, LBHI was insolvent or became insolvent as a result of the incurrence of the obligation; was engaged in business or a transaction, or was about to engage in business or a transaction, for which its remaining property was unreasonably small capital; and/or intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

123.    The safe harbor provisions of Section 546(e) of the Bankruptcy Code do not apply to the September Guaranty.

124.    The September Guaranty is avoidable under Section 548(a)(1)(B) of the Bankruptcy Code.

## COUNT VII
**(Avoidance of August Guaranty as Constructively Fraudulent Under Section 548 of the Bankruptcy Code)**

125.    The allegations in paragraphs 1 through 124 are incorporated by reference as though fully set forth below.

126.    Within two (2) years of the Petition Date, LBHI entered into the August Guaranty.

127.    Entry into the August Guaranty was an obligation incurred by LBHI to or for the benefit of JPMorgan.

128.    LBHI received less than reasonably equivalent value in exchange for its entry into August Guaranty.

129.    On information and belief, when LBHI entered into the August Guaranty, LBHI was engaged in business or a transaction, or was about to engage in business or a transaction, for which its remaining property was unreasonably small capital.

130.    The safe harbor provisions of Section 546(e) of the Bankruptcy Code do not apply to the August Guaranty.

131.    The August Guaranty is avoidable under Section 548(a)(1)(B) of the Bankruptcy Code.

## COUNT VIII
**(Avoidance of Collateral Transfers as Constructively Fraudulent Under Section 548 of the Bankruptcy Code)**

132.    The allegations in paragraphs 1 through 131 are incorporated by reference as though fully set forth below.

133. Within two (2) years of the Petition Date, LBHI transferred the Collateral Transfers.

134. Each of the Collateral Transfers was a transfer made by LBHI to or for the benefit of JPMorgan.

135. LBHI received less than reasonably equivalent value in exchange for its transfer of each of the Collateral Transfers.

136. On information and belief, when LBHI transferred each of the Collateral Transfers, LBHI was insolvent or became insolvent as a result of the transfers; was engaged in business or a transaction, or was about to engage in business or a transaction, for which its remaining property was unreasonably small capital; and/or intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

137. The safe harbor provisions of Section 546(e) of the Bankruptcy Code do not apply to the Collateral Transfers.

138. Each of the Collateral Transfers is avoidable under Section 548(a)(1)(B) of the Bankruptcy Code.

**COUNT IX**
**(Recovery of Avoided Fraudulent Transfers Under Section 550**
**of the Bankruptcy Code)**

139. The allegations in paragraphs 1 through 138 are incorporated by reference as though fully set forth below.

140. The Collateral Transfers are avoidable as constructive fraudulent transfers pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and accordingly, pursuant to Section 550(a) of the Bankruptcy Code, LBHI is entitled to recover from JPMorgan the value of the Collateral Transfers plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of LBHI's estate.

## COUNT X
### (Avoidance of September Agreements as Constructively Fraudulent Under Section 544 and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)

141.     The allegations in paragraphs 1 through 140 are incorporated by reference as though fully set forth below.

142.     Pursuant to Section 544(b) of the Bankruptcy Code, LBHI has the rights of an existing unsecured creditor of LBHI.  Section 544(b) permits LBHI to assert claims and causes of action that such a creditor could assert under applicable state law.

143.     Prior to the Petition Date, LBHI entered into the September Agreements.

144.     Entry into the September Guaranty was an obligation incurred by LBHI to or for the benefit of JPMorgan.  Entry into the remainder of the September Agreements was either a transfer made or an obligation incurred by LBHI to or for the benefit of JPMorgan.

145.     LBHI did not receive fair consideration, or a fair equivalent, or reasonably equivalent value in exchange for its entry into the September Agreements.

146.     When LBHI entered into the September Agreements, LBHI was insolvent or became insolvent as a result of the transfers; was engaged in business or a transaction, or was about to engage in business or a transaction, for which its remaining property was unreasonably small capital; and/or intended to incur, or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

147.     The safe harbor provisions of Section 546(e) of the Bankruptcy Code do not apply to the September Agreements.

148.     The September Agreements are avoidable under Section 544 of the Bankruptcy Code and applicable state law.

## COUNT XI
### (Avoidance of September Guaranty as Constructively Fraudulent Under Section 544 and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)

149.    The allegations in paragraphs 1 through 148 are incorporated by reference as though fully set forth below.

150.    Pursuant to Section 544(b) of the Bankruptcy Code, LBHI has the rights of an existing unsecured creditor of LBHI. Section 544(b) permits LBHI to assert claims and causes of action that such a creditor could assert under applicable state law.

151.    Prior to the Petition Date, LBHI entered into the September Guaranty.

152.    Entry into the September Guaranty was an obligation incurred by LBHI to or for the benefit of JPMorgan.

153.    LBHI did not receive fair consideration, or a fair equivalent, or reasonably equivalent value in exchange for its entry into the September Guaranty.

154.    When LBHI entered into the September Guaranty, LBHI was insolvent or became insolvent as a result of the incurrence of the obligation; was engaged in business or a transaction, or was about to engage in business or a transaction, for which its remaining property was unreasonably small capital; and/or intended to incur, or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

155.    The safe harbor provisions of Section 546(e) of the Bankruptcy Code do not apply to the September Guaranty.

156.    The entry into the September Guaranty is avoidable as a fraudulent incurrence of an obligation under Section 544 of the Bankruptcy Code and applicable state law.

## COUNT XII
### (Declaratory Judgment Invalidating August Security Agreement)

157. The allegations in paragraphs 1 through 156 are incorporated by reference as though fully set forth below.

158. There is an actual and justiciable controversy between LBHI and JPMorgan as to the validity and enforceability of the August Security Agreement.

159. LBHI is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 that the August Security Agreement is invalid and unenforceable. For the reasons set forth above, the August Guaranty is invalid and unenforceable. The failure of the August Guaranty results in the invalidity and unenforceability of the August Security Agreement, because the August Security Agreement is meaningless without the August Guaranty.

## COUNT XIII
### (Declaratory Judgment Invalidating the September Security Agreement, the September Amendment, and the Account Control Agreement)

160. The allegations in paragraphs 1 through 159 are incorporated by reference as though fully set forth below.

161. There is an actual and justiciable controversy between LBHI and JPMorgan as to the validity and enforceability of the September Security Agreement, the September Amendment, and the Account Control Agreement.

162. LBHI is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 that the September Security Agreement, the September Amendment, and the Account Control Agreement are invalid and unenforceable. For the reasons set forth above, the September Guaranty is invalid and unenforceable. The failure of the September Guaranty results in the invalidity and unenforceability of the September Security Agreement, the September

Amendment, and the Account Control Agreement, because those agreements are meaningless without the September Guaranty.

**COUNT XIV**
**(Avoidance of Collateral Transfers as Constructively Fraudulent Under Section 544 and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law)**

163.     The allegations in paragraphs 1 through 162 are incorporated by reference as though fully set forth below.

164.     Pursuant to Section 544(b) of the Bankruptcy Code, LBHI has the rights of an existing unsecured creditor of LBHI.  Section 544(b) permits LBHI to assert claims and causes of action that such a creditor could assert under applicable state law.

165.     Prior to the Petition Date, LBHI transferred the Collateral Transfers.

166.     Each of the Collateral Transfers was a transfer made by LBHI to or for the benefit of JPMorgan.

167.     LBHI did not receive fair consideration, or a fair equivalent, or reasonably equivalent value in exchange for its entry into each of the Collateral Transfers.

168.     On information and belief, when LBHI transferred each of the Collateral Transfers, LBHI was insolvent or became insolvent as a result of the transfers; was engaged in business or a transaction, or was about to engage in business or a transaction, for which its remaining property was unreasonably small capital; and/or intended to incur, or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

169.     The safe harbor provisions of Section 546(e) of the Bankruptcy Code do not apply to the Collateral Transfers.

170.     Each of the Collateral Transfers is avoidable under Section 544 of the Bankruptcy Code and applicable state law.

## COUNT XV
### (Recovery of Avoided Fraudulent Transfers Under Section 550 of the Bankruptcy Code)

171.     The allegations in paragraphs 1 through 170 are incorporated by reference as though fully set forth below.

172.     The Collateral Transfers are avoidable as constructive fraudulent transfers pursuant to Section 544 of the Bankruptcy Code and applicable state law, and accordingly, pursuant to Section 550(a) of the Bankruptcy Code, LBHI is entitled to recover from JPMorgan the value of the Collateral Transfers plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of LBHI's estate.

## COUNT XVI
### (Avoidance of Preferential Transfer of September Security Agreement Under Section 547 of the Bankruptcy Code)

173.     The allegations in paragraphs 1 through 172 are incorporated by reference as though fully set forth below.

174.     Within ninety (90) days prior to the Petition Date, LBHI entered into the September Security Agreement to or for the benefit of JPMorgan and JPMorgan was a creditor of LBHI.

175.     The September Security Agreement was a transfer made by LBHI to or for the benefit of JPMorgan because it attempted to secure previously unsecured obligations of LBHI.

176.     The September Security Agreement was made for, or on account of, an antecedent debt (within the scope of Section 547(b) of the Bankruptcy Code) owed by LBHI to JPMorgan.

177.     The September Security Agreement was made while LBHI was insolvent or was presumed to be insolvent pursuant to Section 547(f) of the Bankruptcy Code.

178.    The September Security Agreement enabled JPMorgan to receive a larger share of LBHI's estate than if such transfer had not been made and if JPMorgan had received payment of such debt in a liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code.

179.    The safe harbor provisions of Section 546(e) of the Bankruptcy Code do not apply to the September Security Agreement.

180.    The September Security Agreement is avoidable as a preference under Section 547(b) of the Bankruptcy Code.

## COUNT XVII
### (Avoidance of Preferential Transfer of Account Control Agreement Under Section 547 of the Bankruptcy Code)

181.    The allegations in paragraphs 1 through 180 are incorporated by reference as though fully set forth below.

182.    Within ninety (90) days prior to the Petition Date, LBHI entered into the Account Control Agreement to or for the benefit of JPMorgan and JPMorgan was a creditor of LBHI.

183.    The Account Control Agreement was a transfer made by LBHI to or for the benefit of JPMorgan.

184.    The Account Control Agreement was made for, or on account of, an antecedent debt (within the scope of Section 547(b) of the Bankruptcy Code) owed by LBHI to JPMorgan.

185.    The Account Control Agreement was made while LBHI was insolvent or was presumed to be insolvent pursuant to Section 547(f) of the Bankruptcy Code.

186.    The Account Control Agreement enabled JPMorgan to receive a larger share of LBHI's estate than if such transfer had not been made and if JPMorgan had received payment of such debt in a liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code.

187.    The safe harbor provisions of Section 546(e) of the Bankruptcy Code do not apply to the Account Control Agreement.

188.    The Account Control Agreement is avoidable as a preference under Section 547(b) of the Bankruptcy Code.

## COUNT XVIII
**(Avoidance of Preferential Transfer of September Transfers
Under Section 547 of the Bankruptcy Code)**

189.    The allegations in paragraphs 1 through 188 are incorporated by reference as though fully set forth below.

190.    Within ninety (90) days prior to the Petition Date, LBHI, directly or through a conduit, transferred, or caused to be transferred, each of the September Transfers, to or for the benefit of JPMorgan and JPMorgan was a creditor of LBHI.

191.    Each of the September Transfers was a transfer made by LBHI to or for the benefit of JPMorgan.

192.    Each of the September Transfers was made for, or on account of, an antecedent debt (within the scope of Section 547(b) of the Bankruptcy Code) owed by LBHI to JPMorgan.

193.    Each of the September Transfers was made while LBHI was insolvent or was presumed to be insolvent pursuant to Section 547(f) of the Bankruptcy Code.

194.    Each of the September Transfers enabled JPMorgan to receive a larger share of LBHI's estate than if such transfers had not been made and if JPMorgan had received payment of such debt in a liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code.

195.    The safe harbor provisions of Section 546(e) of the Bankruptcy Code do not apply to the September Transfers.

196.    Each of the September Transfers is avoidable as a preference under Section 547(b) of the Bankruptcy Code.

## COUNT XIX
### (Recovery of Avoided Preferential Transfers Under Section 550
### of the Bankruptcy Code)

197.   The allegations in paragraphs 1 through 196 are incorporated by reference as though fully set forth below.

198.   The September Transfers are avoidable as preferential transfers pursuant to Section 547 of the Bankruptcy Code, and accordingly, pursuant to Section 550(a) of the Bankruptcy Code, LBHI is entitled to recover from JPMorgan the value of the September Transfers plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of LBHI's estate.

## COUNT XX
### (Turnover of Property Held by JPMorgan Under Section 542
### of the Bankruptcy Code)

199.   The allegations in paragraphs 1 through 198 are incorporated by reference as though fully set forth below.

200.   On the evening of September 12, 2008, JPMorgan held collateral posted by LBHI that did not secure any obligations of LBHI to JPMorgan (the "Excess Collateral").

201.   The Excess Collateral is property of the estate because the September Agreements are void and invalid, and accordingly, JPMorgan did not have a contractual right to hold the Excess Collateral.

202.   JPMorgan is in possession, custody and/or control of the Excess Collateral, which is of substantial value or benefit to the estate and which is property belonging to LBHI that may be used, sold or leased by LBHI.  JPMorgan should be ordered to turn over the Excess Collateral or the value thereof to LBHI immediately.

## COUNT XXI
### (Avoidance of September Transfers as Transfers Made for Purpose
of Obtaining a Right to Setoff Under Section 553(a)(3) of the
Bankruptcy Code)

203.     The allegations in paragraphs 1 through 202 are incorporated by reference as though fully set forth below.

204.     Within ninety (90) days prior to the Petition Date, LBHI transferred each of the September Transfers.

205.     At all times on and during the ninety (90) days immediately preceding the Petition Date, LBHI was insolvent for purposes of Section 553(c) of the Bankruptcy Code.

206.     JPMorgan caused LBHI to transfer the September Transfers for the purpose of obtaining a right to setoff against LBHI.

207.     The safe harbor provisions of the Bankruptcy Code do not apply to the September Transfers.

208.     Each of the September Transfers is avoidable under Section 553 of the Bankruptcy Code.

## COUNT XXII
### (Avoidance of September Transfers as Improvement in
Position Under Section 553(b) of the Bankruptcy Code)

209.     The allegations in paragraphs 1 through 208 are incorporated by reference as though fully set forth below.

210.     As of ninety (90) days prior to the Petition Date, and at all relevant times prior to and including the Petition Date, JPMorgan was a creditor of LBHI.  JPMorgan has asserted that, at certain times within ninety (90) days of the Petition Date, it held a claim against LBHI.

211.     Within ninety (90) days prior to the Petition Date, LBHI entered into each of the September Transfers.

212.     At all times on and during the ninety (90) days immediately preceding the Petition Date, LBHI was insolvent for purposes of Section 553(c) of the Bankruptcy Code.

213.     JPMorgan improved its position through LBHI's transfer of the September Transfers because the amount of the insufficiency on the date of the setoff was less than the insufficiency on the later of ninety (90) days prior to the Petition Date and the first date during the ninety (90) days immediately preceding the Petition Date on which there was an insufficiency.  For purposes of this Count, insufficiency means the amount by which any claims asserted by JPMorgan exceeded any mutual debt owing to LBHI by JPMorgan.

214.     The safe harbor provisions of the Bankruptcy Code do not apply to the September Transfers.

215.     Pursuant to Section 553(b) of the Bankruptcy Code, JPMorgan is liable for the amount by which the September Transfers enabled it to improve its credit position with respect to LBHI in the ninety (90) days preceding the Petition Date.

**COUNT XXIII**
**(Recovery of Avoided Transfers as Impermissible Improvement in**
**Position Under Section 550 of the Bankruptcy Code)**

216.     The allegations in paragraphs 1 through 215 are incorporated by reference as though fully set forth below.

217.     The September Transfers are avoidable as impermissible improvements in position pursuant to Section 553(b) of the Bankruptcy Code, and accordingly, pursuant to Section 550(a) of the Bankruptcy Code, LBHI is entitled to recover from JPMorgan the value of the September Transfers plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of LBHI's estate.

## COUNT XXIV
### (Equitable Subordination Under Sections 510(c) and 105(a) of the Bankruptcy Code)

218.     The allegations in paragraphs 1 through 217 are incorporated by reference as though fully set forth below.

219.     JPMorgan engaged in and benefited from inequitable conduct that resulted in injury to LBHI's creditors and conferred an unfair advantage to JPMorgan. This inequitable conduct has resulted in harm to LBHI and its entire creditor body because general unsecured creditors are less likely to recover the full amounts due to them.

220.     JPMorgan's conduct has been inequitable, egregious, unconscionable and/or outrageous and has harmed LBHI, its employees, creditors and other stakeholders. In equity and good conscience, any claim or interest of JPMorgan in respect of LBHI's estate should be equitably subordinated pursuant to Section 501(c) of the Bankruptcy Code and/or disallowed to the fullest extent permitted by law. Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

## COUNT XXV
### (Disallowance of Claims Under Section 502(d) of the Bankruptcy Code and Avoidance of Liens Securing Such Claims Under Section 506(d))

221.     The allegations in paragraphs 1 through 220 are incorporated by reference as though fully set forth below.

222.     Claims held by JPMorgan against LBHI are subject to disallowance under Section 502(d) of the Bankruptcy Code unless and until JPMorgan has turned over to LBHI all property transferred, or paid LBHI the value of such property, for which JPMorgan is liable under Sections 542, 550 or 553 of the Bankruptcy Code.

223.     In the event that (a) the property is recoverable from JPMorgan under Sections 542, 550 or 553 of the Bankruptcy Code, or (b) any of the transfers made to JPMorgan

are avoidable under Sections 544, 547 or 548 of the Bankruptcy Code, then all of the claims of JPMorgan against LBHI should be disallowed unless and until JPMorgan has turned over to LBHI all property transferred, or paid LBHI the value of such property, for which it is liable under Sections 542, 550 or 553 of the Bankruptcy Code.

224.     Based on the foregoing, to the extent a lien secures a claim that is disallowed, such liens are void under Section 506(d) of the Bankruptcy Code.

### COUNT XXVI
### (Imposition of Constructive Trust and Turnover of $5 Billion of Cash)

225.     The allegations in paragraphs 1 through 224 are incorporated by reference as though fully set forth herein.

226.     On September 11, 2008, in the context of the confidential relationship between JPMorgan and LBHI, JPMorgan demanded that LBHI post $5 billion in cash as purported collateral by the next day, September 12, 2008.

227.     In connection with this demand, JPMorgan agreed that it would return the $5 billion in cash to LBHI at the end of the settlement day on September 12, 2008.

228.     In reliance upon JPMorgan's representation that it would return the $5 billion in cash at the close of the settlement day, LBHI posted the $5 billion in cash as collateral with JPMorgan.

229.     Notwithstanding demands from LBHI that JPMorgan return, *inter alia*, the $5 billion in cash following the close of settlement on September 12, 2008, JPMorgan breached its agreement and refused to return the $5 billion to LBHI. To date, JPMorgan is unjustly enriched by its continual and wrongful withholding of the $5 billion cash.

230.     The $5 billion in cash is property of the estate because JPMorgan holds such funds in a constructive trust for LBHI.

231.    JPMorgan is in possession, custody and/or control of the $5 billion in cash, which is of substantial value or benefit to the estate and which is property belonging to LBHI that may be used, sold or leased by LBHI.  JPMorgan should be ordered to turn over the $5 billion to LBHI immediately.

**COUNT XXVII**
**(Violation of Automatic Stay)**

232.    The allegations in paragraphs 1 through 231 are incorporated by reference as though fully set forth herein.

233.    JPMorgan violated the automatic stay and Section 362(a)(7) of the Bankruptcy Code when it effected various seizures and setoffs against funds transferred to JPMorgan under color of the September Agreements to satisfy obligations purportedly owed to JPMorgan and its related parties under certain derivatives contracts.

234.    The collateral used by JPMorgan to effectuate the setoffs was not posted pursuant to, and was not sufficiently related to, the derivatives contracts.  Thus, any setoff is not protected by the safe harbor provisions of the Bankruptcy Code.  In fact, the $8.6 billion of collateral was posted by LBHI at a time when JPMorgan did not have the contractual right to demand collateral under the derivatives contracts.

235.    Pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LBHI requests that this Court issue a judgment that JPMorgan's wrongful setoffs against funds transferred in connection with the September Agreements were willful violations of the automatic stay under Section 362(a)(7).

**COUNT XXVIII**
**(Turnover of Funds Seized in Violation of Automatic Stay)**

236.    The allegations in paragraphs 1 through 235 are incorporated by reference as though fully set forth herein.

237.    The funds that were seized by JPMorgan to satisfy obligations allegedly owed to JPMorgan and its related parties under certain derivatives contracts are property of LBHI's estate under Section 541 of the Bankruptcy Code.

238.    JPMorgan should be ordered to turn over the funds seized or their equivalent to LBHI immediately.

**COUNT XXIX**
**(Declaratory Judgment Invalidating the September Agreements)**

239.    The allegations in paragraphs 1 through 238 are incorporated by reference as though fully set forth herein.

240.    LBHI is entitled to a declaratory judgment that the September Agreements never took effect, and are otherwise invalid and unenforceable, because they were the product of coercion, were not properly authorized, and lacked consideration.

**Coercion and/or Duress**

241.    As set forth above, pursuant to the 2000 Clearance Agreement (as amended), JPMorgan was obligated to provide clearing services to Lehman.  JPMorgan had no right to immediately cease clearing for Lehman.  The 2000 Clearance Agreement further provided that JPMorgan had an obligation to continue to provide intra-day credit to Lehman in connection with these clearing services, until such time as JPMorgan gave commercially reasonable notice of its intent to cease extending such credit.  JPMorgan was further required by the covenant of good faith and fair dealing to refrain from immediately ceasing to clear and/or provide credit to Lehman, especially when fully collateralized at the time, because of the parties' years of prior practice and the devastating effect such action would have on Lehman's business.

242.    On the evening of September 9, 2008, JPMorgan threatened that, if LBHI did not execute the proposed agreements before LBHI's earnings call, scheduled for 7:30 a.m. the next

day, JPMorgan would immediately stop extending intra-day credit to, and clearing trades for, Lehman.

243.    Notwithstanding the fact that this threatened action, if taken, would have constituted a violation of the 2000 Clearance Agreement and/or the covenant of good faith and fair dealing, LBHI could not refuse JPMorgan's demand that it enter into the September Agreements. If JPMorgan ceased providing clearing services and/or intra-day credit to Lehman, Lehman's business would have immediately collapsed.

244.    Nor was there an alternative to entering the September Agreements available to LBHI. As described above, JPMorgan was one of only two banks that could provide the required clearing services to Lehman (the other being the Bank of New York) – and it would have been impossible to transfer Lehman's business to the Bank of New York in the eleven overnight hours between JPMorgan's demand on the night of September 9, 2008, and the deadline given by JPMorgan of 7:30 a.m. the next morning.

245.    As a result of JPMorgan's conduct, LBHI involuntarily acceded to JPMorgan's demand to enter into the September Agreements.

**Lack of Authority or Apparent Authority**

246.    As set forth above, the individual who executed the September Guaranty on behalf of LBHI had no authority to do so. JPMorgan was or should have been aware of that fact. The failure of the September Guaranty results in the invalidity and unenforceability of the remaining September Agreements, because those agreements all depend upon the September Guaranty.

**Lack of Consideration**

247.    As set forth above, the September Agreements lacked consideration. The September Agreements provided no new rights for LBHI; instead, they purportedly required

LBHI to give up critical rights and assume expanded obligations. Conversely, JPMorgan did not incur any new obligations or otherwise provide any new consideration in connection with those agreements; instead, all of the terms of the September Agreements gave unprecedented and extraordinary rights to JPMorgan at the expense of LBHI.

*      *      *

248. There is an actual and justiciable controversy between LBHI and JPMorgan as to the validity and enforceability of the September Agreements.

249. For all the reasons set forth above, LBHI is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 that the September Agreements never took effect, and are otherwise invalid and unenforceable.

<strong><u>COUNT XXX</u></strong><br/><strong>(Unjust Enrichment: All Collateral)</strong>

250. The allegations in paragraphs 1 through 249 are incorporated by reference as though fully set forth herein.

251. In the weeks leading up to LBHI's bankruptcy, JPMorgan demanded and received billions of dollars in LBHI securities pursuant to the August Agreements, and approximately $8.6 billion in cash and money market funds pursuant to the September Agreements. JPMorgan has therefore benefited in the amount of billions of dollars, at the expense of LBHI.

252. For the reasons set forth above, the August Guaranty and August Security Agreement are invalid and unenforceable. There were no other contracts between the parties that governed the LBHI securities held as purported collateral under the August Guaranty and August Security Agreement.

253. For the reasons set forth above, the September Agreements are also invalid and unenforceable. There were no other contracts between the parties that governed the approximately $8.6 billion held as purported collateral under the September Agreements.

254. As a result of the foregoing, JPMorgan has been unjustly enriched, and LBHI has been damaged, in an amount to be determined at trial. Equity and good conscience demand the return of these LBHI assets to LBHI, or an award of damages equivalent to the value of such assets. LBHI is also entitled to any and all damages that resulted from JPMorgan's unauthorized and unlawful withholding of these assets.

**COUNT XXXI**
**(Conversion: All Collateral)**

255. The allegations in paragraphs 1 through 254 are incorporated by reference as though fully set forth herein.

256. As of close-of-trading on September 12, 2008, JPMorgan locked down billions of dollars in LBHI assets. For all the reasons set forth herein, both the August Guaranty and August Security Agreement, as well as the September Agreements, are invalid and unenforceable. Moreover, even if valid, those agreements did not give JPMorgan any right to be overcollateralized. Accordingly, JPMorgan has no right to keep the billions of dollars of LBHI assets.

257. On Friday, September 12, 2008, and throughout the weekend until LBHI's bankruptcy filing on Monday, September 15, 2008, LBHI made repeated demands that JPMorgan return LBHI's assets. Although JPMorgan had no right to withhold these assets, it wrongfully refused each such demand.

258. As a result of the foregoing, JPMorgan wrongfully converted billions of dollars in LBHI assets, and LBHI has been damaged thereby. LBHI is entitled to the return of its assets, or

an award of damages equivalent to the value of the LBHI assets that JPMorgan wrongfully converted. LBHI is also entitled to any and all damages that resulted from JPMorgan's unauthorized and unlawful conversion of these assets.

**COUNT XXXII**
**(Unjust Enrichment: $8.6 Billion in Cash and Money Market Funds)**

259. The allegations in paragraphs 1 through 258 are incorporated by reference as though fully set forth herein.

260. As described above, JPMorgan demanded and received $8.6 billion in cash and money market funds as purported collateral from LBHI prior to LBHI's bankruptcy. At least as of September 12, 2008, JPMorgan had swept the $8.6 billion out of the cash account on which JPMorgan purportedly had a lien pursuant to the August Security Agreement. Thus, even if the August Guaranty and August Security Agreement were valid, because the September Security Agreement is invalid and unenforceable, the $8.6 billion was not in any account over which JPMorgan had any lien or any other purported rights as against LBHI.

261. Accordingly, the $8.6 billion in cash and money market funds is not the subject of any security agreement or other contract between LBHI and JPMorgan. JPMorgan has no right to the benefit it receives from holding these assets.

262. As a result of the foregoing, JPMorgan has been unjustly enriched, and LBHI has been damaged, in an amount not less than $8.6 billion. Equity and good conscience demand the return of these LBHI assets to LBHI, or an award of damages equivalent to the value of such assets. LBHI is also entitled to any and all damages that resulted from JPMorgan's unauthorized and unlawful withholding of these assets.

## COUNT XXXIII
### (Conversion: $8.6 Billion in Cash and Money Market Funds)

263.     The allegations in paragraphs 1 through 262 are incorporated by reference as though fully set forth herein.

264.     As described above, JPMorgan demanded and received $8.6 billion in cash and money market funds as purported collateral from LBHI prior to LBHI's bankruptcy. At least as of September 12, 2008, JPMorgan had swept the $8.6 billion out of the cash account on which JPMorgan purportedly had a lien pursuant to the August Security Agreement. Thus, even if the August Guaranty and August Security Agreement were valid, because the September Security Agreement is invalid and unenforceable, the $8.6 billion was not in any account over which JPMorgan had any lien or any other purported rights as against LBHI.

265.     On Friday, September 12, 2008, and throughout the weekend until LBHI's bankruptcy filing on Monday, September 15, 2008, LBHI made repeated demands that JPMorgan return at least the $8.6 billion in cash and money market funds. Although JPMorgan had no right to withhold these assets, it wrongfully refused each such demand.

266.     As a result of the foregoing, JPMorgan wrongfully converted at least $8.6 billion in LBHI assets, and LBHI has been damaged thereby. LBHI is entitled to the return of its assets, or an award of damages equivalent to the value of the LBHI assets that JPMorgan wrongfully converted. LBHI is also entitled to any and all damages that resulted from JPMorgan's unauthorized and unlawful conversion of these assets.

## COUNT XXXIV
### (In the Alternative, Breach of the 2000 Clearance Agreement: Improper Collateral Demands)

267.  The allegations in paragraphs 1 through 266 are incorporated by reference as though fully set forth herein.

268.  For the reasons set forth above, the September Agreements are invalid and unenforceable.

269.  Pursuant to the 2000 Clearance Agreement, JPMorgan did not have the right to be more than fully collateralized, or to demand collateral for anything beyond what was needed to secure obligations arising under that agreement.

270.  Nevertheless, in the week immediately prior to LBHI's bankruptcy, JPMorgan demanded and received from LBHI at least $8.6 billion of cash and money market funds, despite the fact that it was already fully collateralized for current and anticipated obligations.  Moreover, as of the end of trading on September 12, 2008, JPMorgan could have remained fully collateralized for all outstanding LBHI obligations arising under the 2000 Clearance Agreement without retaining the $8.6 billion transferred that week.  Notwithstanding this overcollateralization, JPMorgan locked down the $8.6 billion and prevented LBHI from obtaining access to it.

271.  As a result of the foregoing, JPMorgan breached the 2000 Clearance Agreement, and has thereby caused damage to LBHI.  LBHI is therefore entitled to an award of billions of dollars in damages, in an amount to be determined at trial.

## COUNT XXXV
### (In the Alternative, Breach of the August Agreements: Improper Collateral Demands)

272.  The allegations in paragraphs 1 through 271 are incorporated by reference as though fully set forth herein.

273. For the reasons set forth above, the September Agreements are invalid and unenforceable.

274. As set forth above, in response to JPMorgan's repeated and excessive demands in the weeks leading up to the LBHI bankruptcy, LBHI was forced to post billions of dollars in LBHI assets with JPMorgan as purported security for LBHI obligations.

275. However, at the time JPMorgan made these repeated and excessive demands for collateral, JPMorgan knew that such additional collateral was not reasonably required to secure JPMorgan with respect to intra-day clearance-related obligations arising under the August Guaranty. Instead, JPMorgan demanded such collateral as security for potential non-clearance obligations of LBHI and/or its subsidiaries.

276. JPMorgan had no right under the August Agreements to demand and withhold LBHI assets as collateral for obligations other than intra-day clearance obligations. Accordingly, to the extent any of the collateral demanded and received by JPMorgan for non-clearing obligations is purportedly governed by the August Agreements, JPMorgan is in breach of those agreements.

277. Even if JPMorgan intended to use the billions of dollars of pledged LBHI assets as security for intra-day clearance obligations, the amount of collateral demanded and received nonetheless exceeded what was reasonably required to secure JPMorgan for such obligations. As such, JPMorgan's demands for and withholding of these LBHI assets as security under the guise of the August Agreements constitutes a breach of those agreements.

278. As a result of the foregoing, JPMorgan breached the August Agreements, and has thereby caused damage to LBHI. LBHI is therefore entitled to an award of billions of dollars in damages, in an amount to be determined at trial.

## COUNT XXXVI
### (In the Alternative, Breach of the August Agreements: Improper Withholding of Collateral)

279.     The allegations in paragraphs 1 through 278 are incorporated by reference as though fully set forth herein.

280.     For the reasons set forth above, the September Agreements are invalid and unenforceable.

281.     Pursuant to the August Agreements, at the end of any given trading day, JPMorgan was required to give LBHI access to any LBHI collateral held by JPMorgan, to the extent such collateral exceeded the obligations of LBHI to JPMorgan under those agreements.

282.     As of the end of trading on September 12, 2008, Lehman had no clearance-related obligations or debts to JPMorgan whatsoever.  At that time, JPMorgan held and locked down billions of dollars in LBHI assets as purported collateral.  To the extent those assets were governed by the August Agreements, JPMorgan was obligated to allow LBHI to access those assets that evening.

283.     As a result of JPMorgan's misconduct, JPMorgan breached the August Agreements, and has thereby caused damage to LBHI.  LBHI is therefore entitled to an award of billions of dollars in damages, in an amount to be determined at trial.

## COUNT XXXVII
### (In the Alternative, Breach of the Implied Covenant of Good Faith and Fair Dealing:  August Agreements)

284.     The allegations in paragraphs 1 through 283 are incorporated by reference as though fully set forth herein.

285.     For the reasons set forth above, the September Agreements are invalid and unenforceable.

286. New York law recognizes an implied covenant of good faith and fair dealing in all contracts. Pursuant to this principle, JPMorgan owed LBHI a duty of good faith and fair dealing under the August Agreements.

287. As described above, in the weeks leading up to LBHI's bankruptcy, JPMorgan used its dominant bargaining position and improper threats to force LBHI to post billions of dollars of collateral in excess of what was needed to secure JPMorgan's clearance exposure. This improper conduct of JPMorgan deprived LBHI of any right under the August Agreements to refuse unreasonable and excessive collateral demands by JPMorgan. Moreover, JPMorgan made its demands knowing they would drain LBHI of much-needed liquidity and would severely impair LBHI's ability to continue to operate.

288. Then, JPMorgan refused to give LBHI access to its collateral on Friday, September 12, 2008, and throughout that weekend. JPMorgan made this refusal notwithstanding its knowledge that the collateral was not required to secure any legitimate exposure of JPMorgan, and its knowledge that LBHI's access to that collateral was critical to LBHI's efforts to save its business.

289. The foregoing conduct of JPMorgan was performed in bad faith, for the improper purpose of ensuring that JPMorgan would stand ahead of LBHI's other creditors in the event of LBHI's bankruptcy. For example, JPMorgan's primary purpose in making its collateral demands was to circumvent derivatives contracts between JPMorgan entities and LBHI subsidiaries that did not allow for such demands, in an attempt to ensure JPMorgan could pay itself 100 cents on the dollar for previously unsecured obligations it anticipated could arise under those contracts if LBHI filed for bankruptcy. Moreover, JPMorgan's collateral demands far exceeded what even its own risk models suggested was required to secure those anticipated obligations.

290. Pursuant to this wrongful conduct, JPMorgan has improperly withheld billions of dollars in LBHI assets, at the expense of LBHI and its creditors.

291. As a result of the foregoing, JPMorgan breached its implied covenant of good faith and fair dealing with LBHI, embodied in the August Agreements, and LBHI has suffered damages as a result. LBHI is therefore entitled to an award of billions of dollars in damages, in an amount to be determined at trial.

## COUNT XXXVIII
### (Coercion and/or Duress With Respect to the September Agreements)

292. The allegations in paragraphs 1 through 291 are incorporated by reference as though fully set forth herein.

293. As set forth above, pursuant to the 2000 Clearance Agreement (as amended), JPMorgan was obligated to provide clearing services to Lehman. JPMorgan had no right to immediately cease clearing for Lehman. The 2000 Clearance Agreement further provided that JPMorgan had an obligation to continue to provide intra-day credit to Lehman in connection with these clearing services, until such time as JPMorgan gave commercially reasonable notice of its intent to cease extending such credit. JPMorgan was further required by the covenant of good faith and fair dealing to refrain from immediately ceasing to clear and/or provide credit to Lehman, especially when fully collateralized at the time, because of the parties' years of prior practice and the devastating effect such action would have on Lehman's business.

294. On the evening of September 9, 2008, JPMorgan threatened that, if LBHI did not execute the proposed agreements before LBHI's earnings call, scheduled for 7:30 a.m. the next day, JPMorgan would immediately stop extending intra-day credit to, and clearing trades for, Lehman.

295.    Notwithstanding the fact that this threatened action, if taken, would have constituted a violation of the 2000 Clearance Agreement and/or the covenant of good faith and fair dealing, LBHI could not refuse JPMorgan's demand that it enter into the September Agreements. If JPMorgan ceased providing clearing services and/or intra-day credit to Lehman, Lehman's business would have immediately collapsed.

296.    Nor was there an alternative to entering the September Agreements available to LBHI. As described above, JPMorgan was one of only two banks that could provide the required clearing services to Lehman (the other being the Bank of New York) – and it would have been impossible to transfer Lehman's business to the Bank of New York in the eleven overnight hours between JPMorgan's demand on the night of September 9, 2008, and the deadline given by JPMorgan of 7:30 a.m. the next morning.

297.    As a result of the above, the September Agreements never took effect, and are otherwise invalid and unenforceable, because they are the product of coercion and/or duress.

298.    Under cover of the September Agreements, JPMorgan has improperly withheld billions of dollars in LBHI assets, notwithstanding LBHI's demand for the return of same.

299.    As a result of the foregoing, LBHI is entitled to rescission of the September Agreements, as well as damages, in an amount to be determined at trial.

### COUNT XXXIX
**(In the Alternative, Breach of the Implied Covenant of Good Faith and Fair Dealing:  September Agreements)**

300.    The allegations in paragraphs 1 through 299 are incorporated by reference as though fully set forth herein.

301.    New York law recognizes an implied covenant of good faith and fair dealing in all contracts. Pursuant to this principle, JPMorgan owed LBHI a duty of good faith and fair dealing under the September Agreements.

302.  As described above, in the weeks leading up to LBHI's bankruptcy, JPMorgan used its dominant bargaining position and improper threats to force LBHI to post billions of dollars of collateral in excess of what was needed to secure JPMorgan's exposure.  This improper conduct of JPMorgan deprived LBHI of any right under the September Agreements to refuse unreasonable and excessive collateral demands by JPMorgan.  Moreover, JPMorgan made its demands knowing they would drain LBHI of much-needed liquidity and would severely impair Lehman's ability to continue to operate.

303.  Then, JPMorgan refused to give LBHI access to its collateral on Friday, September 12, 2008, and throughout that weekend.  JPMorgan made this refusal notwithstanding its knowledge that the collateral was not required to secure any legitimate exposure of JPMorgan, and its knowledge that LBHI's access to that collateral was critical to LBHI's efforts to save its business.

304.  The foregoing conduct of JPMorgan was performed in bad faith, for the improper purpose of ensuring that JPMorgan would stand ahead of LBHI's other creditors in the event of LBHI's bankruptcy.  For example, JPMorgan's primary purpose in making its collateral demands was to circumvent derivatives contracts between JPMorgan entities and LBHI subsidiaries that did not allow for such demands, in an attempt to ensure JPMorgan could pay itself 100 cents on the dollar for previously unsecured obligations it anticipated could arise under those contracts if LBHI filed for bankruptcy.  Moreover, JPMorgan's collateral demands far exceeded what even its own risk models suggested was required to secure those anticipated obligations.

305.  Pursuant to this wrongful conduct, JPMorgan has improperly withheld billions of dollars in LBHI assets, at the expense of LBHI and its creditors.

306.    As a result of the foregoing, JPMorgan breached its implied covenant of good faith and fair dealing with LBHI, embodied in the September Agreements, and LBHI has suffered damages as a result.  LBHI is therefore entitled to an award of billions of dollars in damages, in an amount to be determined at trial.

**COUNT XL**
**(Coercion and/or Duress With Respect to Demands for $8.6 Billion**
**in Cash and Cash Equivalents)**

307.    The allegations in paragraphs 1 through 306 are incorporated by reference as though fully set forth herein.

308.    As described above, on September 9, 2008, JPMorgan demanded as additional collateral, and LBHI posted, $1 billion in cash and $1.67 billion in money market funds.  On September 10, 2008, again at the insistence of JPMorgan, LBHI delivered to JPMorgan approximately $300 million of cash.  Similarly, on September 11, 2008, LBHI posted additional cash in the amount of $600 million as collateral for JPMorgan.  These demands were backed by the improper threat that, if LBHI did not comply, JPMorgan would immediately stop extending intra-day credit to, and clearing trades for, Lehman, in violation of its obligations under the 2000 Clearance Agreement.

309.    Then, late in the evening of September 11, 2008, JPMorgan sent to LBHI a written "Notice" requiring confirmation that LBHI would wire to JPMorgan an additional $5 billion in cash prior to opening of business on Friday, September 12, 2008.  In the Notice, JPMorgan threatened that, if LBHI did not comply with JPMorgan's demand, "we intend to exercise our right to decline to extend credit to you under the [Clearance] Agreement." JPMorgan's threat was improper and wrongful.  JPMorgan had no right to refuse to extend credit to Lehman on the morning of Friday, September 12, 2008, or to cease providing clearing services for Lehman with such little notice.  As described above, such action, if taken, would have

constituted a breach of the 2000 Clearance Agreement and/or JPMorgan's duty of good faith and fair dealing.

310.    Notwithstanding, LBHI was in no position to insist on its contract rights with respect to any of these demands. Both JPMorgan and LBHI knew that, if JPMorgan carried through with its threats, Lehman's business would immediately collapse. LBHI had no alternative but to accede to JPMorgan's demands.

311.    LBHI therefore involuntarily delivered $8.6 billion in cash and money market funds to JPMorgan.

312.    As a result of the foregoing, LBHI was wrongfully coerced into agreeing to deliver $8.6 billion in cash and money market funds. LBHI is therefore entitled to rescission of its agreements to deliver the $8.6 billion in cash and money market funds to JPMorgan and a return of the $8.6 billion, or entitled to an award of damages in the amount of $8.6 billion, as well as all other damages resulting from JPMorgan's misconduct, in an amount to be determined at trial.

## COUNT XLI
### (Fraud With Respect to the September 12, 2008 Demand for $5 Billion Cash)

313.    The allegations in paragraphs 1 through 312 are incorporated by reference as though fully set forth herein.

314.    As described above, on September 11, 2008, JPMorgan demanded that LBHI post $5 billion in cash as purported collateral by the next day, September 12, 2008.

315.    LBHI was not obligated under the September Agreements, or any other agreement between the parties, to post the $5 billion as demanded by JPMorgan. However, to induce LBHI to post the $5 billion as additional collateral, JPMorgan represented that it would return the $5 billion to LBHI at the end of the trading day on September 12, 2008.

316. It was critical to the survival of LBHI's business that it have access to its $5 billion in cash on the evening of September 12, 2008 and throughout the following weekend. However, in reliance on JPMorgan's representation, LBHI transferred $5 billion in cash as purported collateral to JPMorgan.

317. At the time JPMorgan made its representation and induced LBHI to post the $5 billion as collateral, JPMorgan had no intention of returning the $5 billion to LBHI. In fact, JPMorgan had already determined that it would lock down all LBHI assets, including the $5 billion, as soon as those assets were transferred to JPMorgan.

318. LBHI is entitled to an award of direct damages in the amount of $5 billion, as well as all other damages resulting from JPMorgan's misconduct, in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, LBHI demands judgment against JPMorgan, as follows:

    a.    Declaring that the August Guaranty and August Security Agreement never took effect, and are otherwise invalid and unenforceable;

    b.    Declaring that the September Agreements never took effect, and are otherwise invalid and unenforceable;

    c.    Ordering JPMorgan to return to LBHI all LBHI assets held by JPMorgan prior to LBHI's bankruptcy filing;

    d.    In the alternative to paragraph (c) above, awarding LBHI damages in an amount commensurate with the value of all LBHI assets held by JPMorgan as of September 12, 2008, in addition to statutory interest;

e.       Awarding LBHI all other damages suffered as a result of JPMorgan's misconduct, in an amount to be determined at trial, in addition to statutory interest;

f.       Equitably subordinating and/or disallowing JPMorgan's claims and interests in respect of LBHI's estate;

g.       Disallowing the claims and avoiding the liens of JPMorgan against LBHI unless and until JPMorgan has turned over to LBHI the value of such transferred property for which JPMorgan is liable under Sections 542, 550 and 553 of the Bankruptcy Code;

h.       Preserving all transfers and liens avoided for the benefit of LBHI's estate under Section 551 of the Bankruptcy Code;

i.       Declaring that JPMorgan willfully violated the automatic stay and ordering them to pay LBHI an amount to be determined at trial for such violation of the automatic stay;

j.       Awarding LBHI costs and disbursements of this action and attorneys' fees; and

*[Remainder of Page Intentionally Left Blank]*

k.     Awarding such other and further relief as this Court deems just and proper.

Dated: May 26, 2010
      New York, New York

**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**

By: /s/ Joseph D. Pizzurro

Joseph D. Pizzurro
L. P. Harrison 3rd
Michael J. Moscato
Nancy E. Delaney
Peter J. Behmke
Cindi M. Eilbott
101 Park Avenue
New York, New York 10178-0061
(212) 696-6000
*Counsel for Plaintiff, Debtor Lehman Brothers Holdings Inc.*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: /s/ John B. Quinn

John B. Quinn
Erica Taggart
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
(213) 443-3000

Susheel Kirpalani
Andrew J. Rossman
James Tecce
Christopher D. Kercher
51 Madison Avenue, 22nd Floor,
New York, New York 10010-1601
(212) 849-7000
*Counsel for Proposed Plaintiff/Intervenor, the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc.*