**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | |
| Debtors. | |

| | |
|---|---|
| LEHMAN BROTHERS HOLDINGS INC. and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Adversary Proceeding No. 10-03266 (JMP) |
| Plaintiff and Plaintiff Intervenor, | |
| -against- | |
| JPMORGAN CHASE BANK, N.A., | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OF DEFENDANT JPMORGAN CHASE BANK, N.A.

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
(212) 403-1000

*Attorneys for Defendant JPMorgan Chase Bank, N.A.*

Dated: October 19, 2010

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .........................................................................................1

BACKGROUND ......................................................................................................11

    A.    JPMorgan's role as LBI's clearing bank and tri-party repo agent ........................11

    B.    The Clearance Agreement...................................................................13

    C.    The August Agreements .....................................................................14

    D.    The September Agreements .................................................................15

    E.    LBHI's chapter 11 cases ....................................................................17

        1.    JPMorgan's post-petition advances and LBHI's Comfort Order Motion.....................................................................................17

        2.    JPMorgan's claims.................................................................19

ARGUMENT .........................................................................................................20

POINT I    THE STANDARDS GOVERNING THIS MOTION.............................................20

POINT II    THE BANKRUPTCY CODE'S SAFE HARBORS MANDATE DISMISSAL OF THE AMENDED COMPLAINT'S CONSTRUCTIVE FRAUDULENT TRANSFER AND PREFERENCE CLAIMS.  (COUNTS V-VIII, X-XII, XV, XVII, XIX, XXI-XXIII) ..........................................22

    A.    The Bankruptcy Code's safe harbors shield securities contracts, repurchase agreements, and swap agreements from avoidance claims. ................23

        1.    The safe harbors were enacted to promote stability in the financial markets by preventing protected transactions, such as the ones challenged here, from being disturbed in bankruptcy...............................24

        2.    Dismissal based on the safe harbors should be granted at the earliest possible point in a lawsuit. ............................................26

    B.    The safe harbors require dismissal of all constructive fraudulent transfer and preference claims seeking avoidance of transfers of collateral and grants of liens to JPMorgan. ...................................................................29

        1.    The safe harbors require dismissal of plaintiffs' constructive fraudulent transfer and preference claims seeking avoidance of collateral transfers to JPMorgan.  (Counts VIII, XV, XXIII)....................29

a. The collateral transfers were made by or to a "financial institution," a "financial participant," and a "swap participant." ..................................................................30

b. The Clearance Agreement, the September Security Agreement, the September Guaranty, and derivatives contracts are "securities contracts," "repurchase agreements," and "swap agreements." ..........................................31

c. The collateral transfers were made "in connection with" the Clearance Agreement, September Security Agreement, September Guaranty, and derivatives contracts ...........................35

2. The safe harbors require dismissal of plaintiffs' constructive fraudulent transfer claims seeking avoidance of the alleged "funds sweep."  (Counts XVII, XIX) ...................................................39

3. The safe harbors require dismissal of plaintiffs' constructive fraudulent transfer and preference claims seeking avoidance of the liens under the September Security Agreement, the September Amendment, and the Account Control Agreement.  (Counts V, X, XXI, XXII) ...................................................................40

a. The September Security Agreement and September Amendment are protected by the safe harbors. .............................40

b. The Account Control Agreement is protected by the safe harbors. ..................................................................41

4. The liens and collateral transfers are shielded from avoidance as a matter of law regardless of whether the Amended Complaint states a claim for avoidance of LBHI's obligations under the Guaranties. .........42

a. The liens granted to JPMorgan would be valid without the Guaranties because they secured the obligations of LBHI's subsidiaries. ..................................................................43

b. The language, structure, and intent of the safe harbors prevent indirect avoidance of protected transfers. .........................45

C. The safe harbors require dismissal of plaintiffs' constructive fraudulent transfer claims for avoidance of LBHI's obligations under the Guaranties. (Counts V-VII, X-XII) ...............................................50

POINT III    PLAINTIFFS CANNOT ESCAPE THE SAFE HARBORS BY ALLEGING ACTUAL INTENT TO DEFRAUD CREDITORS, IMPROPER SETOFF, OR ANY OTHER AVOIDANCE-RELATED THEORY.  (COUNTS I-IV, IX, XIII-XIV, XVI, XVIII, XX, XXIV-XXIX, XXXI, XXXIII-XXXIV) ...............53

A.    The Amended Complaint fails to state a claim for avoidance of actual intent fraudulent transfers. (Counts I-III)................................................53

B.    The Amended Complaint fails to state a claim based on improper setoff or violation of the automatic stay. (Counts XXVI, XXVIII, XXXIII)....................58

    1.    The Amended Complaint fails to plead plausibly that the September collateral transfers were a setoff subject to section 553. .........59

    2.    Section 553(a)(3) does not provide the trustee with power to avoid amounts set off pre-petition. ....................................................................63

    3.    Even if mischaracterized as a setoff, the September collateral transfers are protected by the safe harbors.................................................64

    4.    The claim for setoff in violation of the automatic stay fails to state a claim. (Count XXXIII)................................................................................65

C.    Plaintiffs' claims for recovery, declaratory judgments, turnover, and disallowance of claims should all be dismissed. (Counts IV, IX, XIII-XIV, XVI, XVIII, XX, XXIV, XXV, XXVII, XXIX, XXXI, XXXIV)...............69

    1.    Dismissal of plaintiffs' avoidance claims requires dismissal of plaintiffs' claims under section 550 of the Bankruptcy Code. (Counts IV, IX, XVI, XVIII, XX, XXIV, XXIX) ......................................69

    2.    The Amended Complaint fails to allege facts to support declaratory judgments that the August and September Security Agreements, the September Amendment, and the Account Control Agreement are invalid and unenforceable. (Counts XIII, XIV) ...................................70

    3.    The Amended Complaint fails to allege facts to support a claim for turnover under section 542 of the Bankruptcy Code. (Counts XXV, XXVII, XXXIV) ................................................................................71

    4.    The Amended Complaint fails to state a claim for disallowance of claims under section 502(d) of the Bankruptcy Code or for voiding of liens under section 506(d) of the Code. (Count XXXI) ......................73

POINT IV    PLAINTIFFS' COMMON LAW CLAIMS SHOULD BE DISMISSED. (COUNTS XXXII, XXXV-XLIX)............................................................74

A.    Federal bankruptcy law preempts plaintiffs' claims seeking to avoid collateral transfers on the basis of constructive trust, unjust enrichment, and conversion. (Counts XXXII, XXXVI-XXXVII, XXXIX-XL)....................77

B.    Plaintiffs' claim for a declaratory judgment that JPMorgan has no lien over $6.9 billion in cash collateral posted by LBHI, as well as associated unjust enrichment and conversion claims, are refuted by the August and September Agreements and the U.C.C. (Counts XXXVIII-XL) .........................82

C.  Plaintiffs' breach of contract claims should be dismissed.
    (Counts XLI-XLV, XLVII) ..............................................................87

    1.  JPMorgan did not breach the express terms of any agreement by
        requesting and holding collateral. ..............................................88

        a.  JPMorgan did not breach the Clearance Agreement. ....................88

        b.  LBHI waived any claim for consequential damages in the
            Clearance Agreement. ..................................................92

        c.  JPMorgan did not breach the August Agreements. .......................92

    2.  JPMorgan did not breach the implied covenant of good faith and
        fair dealing by requesting and holding collateral. .....................95

    3.  LBHI waived any claim for breach of contract or the implied
        covenant of good faith and fair dealing based on JPMorgan's
        requests for collateral. ......................................................99

D.  Plaintiffs' claims attacking the validity of the September Agreements and
    the "agreement" to transfer collateral should be dismissed.  (Counts
    XXXV, XLVI, XLVIII) ............................................................100

    1.  LBHI waived any claim that the September Agreements are invalid
        or unenforceable. ................................................................101

        a.  LBHI waived any claim that the September Agreements are
            invalid for lack of consideration. ..................................103

        b.  LBHI waived any claim that the September Agreements
            were the product of coercion or duress and therefore
            invalid. .............................................................................104

        c.  LBHI waived any claim that the September Agreements are
            invalid for lack of authority. ......................................105

    2.  LBHI ratified the September Agreements and the delivery of $8.6
        billion in collateral. ..........................................................106

    3.  The September Agreements are not invalid for lack of
        consideration. ......................................................................111

E.  Plaintiffs' common law fraud claim should be dismissed.  (Count XLIX) .........115

F.  Plaintiffs' constructive trust claim should be dismissed.  (Count XXXII) ..........121

    1.  Plaintiffs' allegation that JPMorgan breached an oral "agreement"
        to return the collateral cannot support the equitable remedy of
        constructive trust. ..............................................................121

      2.      Plaintiffs' allegation of a "confidential relationship" between JPMorgan and LBHI is insufficient as a matter of law............................124

POINT V    PLAINTIFFS' EQUITABLE SUBORDINATION CLAIM SHOULD BE DISMISSED.  (COUNT XXX)................................................................................128

    A.    JPMorgan was not an "insider" of LBHI............................................128

    B.    Plaintiffs have not alleged inequitable conduct sufficient to support equitable subordination of JPMorgan's claim. ....................................................132

CONCLUSION....................................................................................................................135

# TABLE OF AUTHORITIES

**Page**

## CASES

*4 B's Realty 1530 CR39, LLC* v. *Toscano*,
2009 WL 702011 (S.D.N.Y. Mar. 12, 2009) .......................................................120

*48th St. Steakhouse, Inc.* v. *Rockefeller Ctr., Inc.*
(*In re 48th St. Steakhouse, Inc.*),
61 B.R. 182 (Bankr. S.D.N.Y. 1986)...........................................................49 n.13

*80 Nassau Assocs.* v. *Crossland Fed. Sav. Bank*
(*In re 80 Nassau Assocs.*),
169 B.R. 832 (Bankr. S.D.N.Y. 1994)...............................................132, 134 n.35

*ADT Operations, Inc.* v. *Chase Manhattan Bank, N.A.*,
173 Misc. 2d 959 (N.Y. Sup. Ct. 1997).............................................126 n.34, 127

*AJW Partners LLC* v. *Itronics, Inc.*,
68 A.D.3d 567 (1st Dep't 2009) .........................................................................98

*Alfa, S.A.B. de C.V.* v. *Enron Creditors Recovery Corp.*
(*In re Enron Creditors Recovery Corp.*),
422 B.R. 423 (S.D.N.Y. 2009)...............................................................24, 25, 51

*Am. Home Mortg. Inv. Corp.* v. *Lehman Bros. Inc.*
(*In re Am. Home Mortg. Holdings, Inc.*),
388 B.R. 69 (Bankr. D. Del. 2008) ...............................................................21, 38

*Amcan Holdings, Inc.* v. *Canadian Imperial Bank of Commerce*,
70 A.D.3d 423 (1st Dep't 2010) .........................................................................98

*Amusement Indus., Inc.* v. *Citigroup Global Mkts. Realty Corp.*
(*In re First Republic Grp. Realty, LLC*),
421 B.R. 659 (Bankr. S.D.N.Y. 2009)...............................................................108

*Aniero Concrete Co.* v. *N.Y. City Constr. Auth.*,
1997 WL 3268 (S.D.N.Y. Jan. 3, 1997) .....................................................102 n.24

*Ashcroft* v. *Iqbal*,
129 S. Ct. 1937 (2009)............................................................................. *passim*

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*
493 F.3d 87 (2d Cir. 2007)...............................................................................56

*Badger Freightways, Inc.* v. *Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*
(*In re Badger Freightways, Inc.*),
106 B.R. 971 (Bankr. N.D. Ill. 1989) ...............................................................131

*Baker* v. *Nat'l City Bank of Cleveland*,
511 F.2d 1016 (6th Cir. 1975) ...........................................................................60

*Banco Do Estado de Sao Paolo, S.A.* v. *Mendes Junior Int'l Co.*,
   249 A.D.2d 137 (1st Dep't 1998) ................................................................105 n.25

*Bank Leumi Trust Co. of N.Y.* v. *D'Evori Int'l, Inc.*,
   163 A.D.2d 26 (1st Dep't 1990) ...............................................................111

*Banque Arabe et Internationale D'Investissement* v. *Md. Nat'l Bank*,
   57 F.3d 146 (2d Cir. 1995)........................................................................116

*BC Media Funding Co. II* v. *Lazauskas*,
   2008 WL 4735236 (S.D.N.Y. Oct. 24, 2008) ...........................................105 n.25

*Bear, Stearns Funding, Inc.* v. *Interface Grp.-Nev., Inc.*,
   361 F. Supp. 2d 283 (S.D.N.Y. 2005).......................................................95

*Belfance* v. *BancOhio/Nat'l Bank*
   *(In re McCormick)*,
   5 B.R. 726 (Bankr. N.D. Ohio 1980) ........................................................60

*Bell Atlantic Corp.* v. *Twombly*,
   550 U.S. 544 (2007)....................................................................................*passim*

*Benjamin* v. *Diamond*
   *(In re Mobile Steel Co.)*,
   563 F.2d 692 (5th Cir. 1977) ....................................................................128

*Bergquist* v. *First Nat'l Bank of St. Paul*
   *(In re Am. Lumber Co.)*,
   5 B.R. 470 (D. Minn. 1980) ......................................................................130, 131

*Bertoni* v. *Catucci*,
   117 A.D.2d 892 (3d Dep't 1986) ..............................................................123

*Besette* v. *Avco Fin. Servs., Inc.*,
   230 F.3d 439 (1st Cir. 2000) .....................................................................78

*Bevill, Bressler & Schulman Asset Mgmt. Corp.* v. *Spencer Sav. & Loan Ass'n*
   *(In re Bevill, Bressler & Schulman Asset Mgmt. Corp.)*,
   878 F.2d 742 (3d Cir. 1989).......................................................................38, 51

*Bibbo* v. *Dean Witter Reynolds, Inc.*,
   151 F.3d 559 (6th Cir. 1998) ...................................................................78

*Boccardi Capital Sys., Inc.* v. *D.E. Shaw Laminar Portfolios, L.L.C.*,
   2009 WL 362118 (S.D.N.Y. Feb. 9, 2009)...............................................124, 127

*Brandt* v. *B.A. Capital Co.*
   *(In re Plassein Int'l Corp.)*,
   366 B.R. 318 (Bankr. D. Del. 2007) .........................................................38

*Bridgestone/Firestone, Inc.* v. *Recovery Credit Servs., Inc.*,
   98 F.3d 13 (2d Cir. 1996)..........................................................................117

*C.B.S. Rubbish Removal Co., Inc.* v. *Winters Waste Servs. of N.Y., Inc.*,
   18 A.D.3d 790 (2d Dep't 2005) ................................................................110

*Calyon N.Y. Branch* v. *Am. Home Mortg. Corp.*
   (*In re Am. Home Mortg., Inc.*),
   379 B.R. 503 (Bankr. D. Del. 2008) ...............................................................30, 32

*Campaniello Imps., Ltd.* v. *Saporiti Italia S.p.A.*,
   117 F.3d 655 (2d Cir. 1997)...................................................................................56

*Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A.* v. *Boyer*
   (*In re U.S.A. Diversified Prods., Inc.*),
   196 B.R. 801 (N.D. Ind. 1996) ..............................................................................63

*Casa de Cambio Majapara S.A. de C.V.* v. *Wachovia Bank N.A.*
   (*In re Casa de Cambio Majapara S.A. de C.V.*),
   390 B.R. 595 (Bankr. N.D. Ill. 2008) ................................................................37, 38

*Cipollone* v. *Liggett Grp., Inc.*,
   505 U.S. 504 (1992)...............................................................................................77

*Cisneros* v. *Alpine Ridge Grp.*,
   508 U.S. 10 (1993).................................................................................................46

*Citibank, N.A.* v. *Emery*
   (*In re Emery*),
   132 F.3d 892 (2d Cir. 1998)...................................................................................45

*Citibank, N.A.* v. *Plapinger*,
   66 N.Y.2d 90 (1985) .........................................................................101, 102, 103, 106

*Citizens Bank of Md.* v. *Strumpf*,
   516 U.S. 16 (1995).................................................................................................60

*Clark-Fitzpatrick, Inc.* v. *Long Island R.R. Co.*,
   70 N.Y.2d 382 (1987) ..........................................................................................122

*CLC Creditors' Grantor Trust* v. *Howard Sav. Bank*
   (*In re Commercial Loan Corp.*),
   396 B.R. 730 (Bankr. N.D. Ill. 2008) ...................................................................57

*Compania Sud-Americana de Vapores, S.A.* v. *IBJ Schroder Bank & Trust Co.*,
   785 F. Supp. 411 (S.D.N.Y. 1992) .............................................................125, 126

*Conley* v. *Gibson*,
   355 U.S. 41 (1957) ................................................................................................20

*Contemporary Indus. Corp.* v. *Frost*,
   564 F.3d 981 (8th Cir. 2009) .....................................................................28, 78, 80

*Conyers* v. *Rossides*,
   558 F.3d 137 (2d Cir. 2009)...................................................................................46

*Coregis Ins. Co.* v. *American Health Foundation, Inc.*,
   241 F.3d 123 (2d Cir. 2001)...................................................................................66

*Cortec Indus., Inc.* v. *Sum Holding L.P.*,
   949 F.2d 42 (2d Cir. 1991).....................................................................................21

*Cosoff* v. *Rodman*
   (*In re W.T. Grant Co.*),
   699 F.2d 599, 610 (2d Cir. 1983).................................................129, 131, 132

*Craig* v. *Dain Bosworth, Inc.*
   (*In re Am. Sec. & Loan, Inc.*),
   1988 WL 1568184 (Bankr. S.D. Iowa Sept. 30, 1988).........................49

*Dalton* v. *Educ. Testing Serv.*,
   87 N.Y.2d 384 (1995) ...............................................................95

*Davis & Assocs., Inc.* v. *Health Mgmt. Servs. Inc.*,
   168 F. Supp. 2d 109 (S.D.N.Y. 2001).......................................109

*DiPierro* v. *Taddeo*
   (*In re Taddeo*),
   685 F.2d 24 (2d Cir. 1982).......................................................78

*Dobroshi* v. *Bank of Am., N.A.*,
   65 A.D.3d 882 (1st Dep't 2009) ...........................................126 n.34

*Duration Mun. Fund, L.P.* v. *J.P. Morgan Secs. Inc.*,
   2009 WL 2999201 (N.Y. Sup. Ct. Sept. 16, 2009)........................97

*E. Equip. & Servs. Corp.* v. *Factory Point Nat'l Bank, Bennington*,
   236 F.3d 117 (2d Cir. 2001).....................................................78

*Enron Corp.* v. *Bear, Stearns Int'l Ltd.*
   (*In re Enron Corp.*),
   323 B.R. 857 (Bankr. S.D.N.Y. 2005) .....................................21

*Enron Corp.* v. *Int'l Fin. Corp.*
   (*In re Enron Corp.*),
   341 B.R. 451 (Bankr. S.D.N.Y. 2006) .....................................38

*Fasolino Foods Co.* v. *Banca Nazionale Del Lavoro*,
   961 F.2d 1052 (2d Cir. 1992)...................................................95

*Fidelity Fed. Sav. & Loan Ass'n* v. *De la Cuesta*,
   458 U.S. 141 (1982).................................................................77

*First N.Y. Bank for Bus.* v. *DeMarco*,
   130 B.R. 650 (S.D.N.Y. 1991).................................................112

*FMG, Inc.* v. *Forest Elec. Corp.*,
   795 F. Supp. 147 (E.D. Pa. 1992) .........................................105

*Ford Motor Credit Co.* v. *NYC Police Dep't*,
   503 F.3d 186 (2d Cir. 2007)......................................................41

*Fortunoff* v. *Triad Land Assocs.*,
   906 F. Supp. 107 (E.D.N.Y. 1995) .....................................102 n.24

*Fruchthandler* v. *Green*,
   233 A.D.2d 214 (1st Dep't 1996) ...........................................111

*Geler* v. *Nat'l Westminster Bank, USA,*
   770 F. Supp. 210 (S.D.N.Y. 1991) ..................................................95

*Gen. Trading Co., Inc.* v. *A&D Food Corp.,*
   292 A.D.2d 266 (1st Dep't 2002) ................................................103

*Grappo* v. *Alitalia Linee Aere Italaliane, S.p.A.,*
   56 F.3d 427 (2d Cir. 1995)..........................................................117

*Harris* v. *Provident Life & Accident Ins. Co.,*
   310 F.3d 73 (2d Cir. 2002)............................................................98

*Harrison Court Assocs.* v. *220 Westchester Ave. Assocs.,*
   203 A.D.2d 244 (2d Dep't 1994) ................................................103

*Heritage Assocs., II, L.L.C.* v. *Maryland*
   *(In re Heritage Assocs., II, L.L.C.),*
   336 B.R. 255 (Bankr. D. Md. 2006) ..............................................49

*Highland Sec. Co. ex rel. Georgetown Hospitality Assocs., L.P.* v. *Hecht,*
   145 A.D.2d 393 (1st Dep't 1988) ................................................120

*Hirsch* v. *London S.S. Owners' Mut. Life Ins. Ass'n Ltd.*
   *(In re Seatrain Lines, Inc.),*
   198 B.R. 45 (S.D.N.Y. 1996).........................................................72

*Holyoke Nursing Home, Inc.* v. *Health Care Fin. Admin.*
   *(In re Holyoke Nursing Home Inc.),*
   273 B.R. 305 (Bankr. D. Mass. 2002) ...........................................62

*Hutson* v. *E.I. du Pont de Nemours & Co., Inc.*
   *(In re Nat'l Gas Distribs., LLC),*
   556 F.3d 247 (4th Cir. 2009).........................................................51

*IBJ Schroder Bank & Trust Co.* v. *Resolution Trust Corp.,*
   26 F.3d 370 (2d Cir. 1994)...........................................108, 111 n.28

*IMG Fragrance Brands, LLC* v. *Houbigant, Inc.,*
   679 F. Supp. 2d 395 (S.D.N.Y. 2009)..........................................117

*In re Actrade Fin. Techs. Ltd.,*
   337 B.R. 791 (Bankr. S.D.N.Y. 2005)......................................56, 58

*In re Am. Remanufacturers, Inc.,*
   2008 WL 2909871 (Bankr. D. Del. July 25, 2008)........................62

*In re Andrew Velez Constr., Inc.,*
   373 B.R. 262 (Bankr. S.D.N.Y. 2007) ...........................................72

*In re Aphton Corp.,*
   423 B.R. 76 (Bankr. D. Del. 2010) ................................................70

*In re Badger Lines, Inc.,*
   202 F.3d 945 (7th Cir. 2000) .........................................................42

*In re Boston Shipyard Corp.*,
  886 F.2d 451 (1st Cir. 1989) ...................................................................107

*In re Broad St. Assocs.*,
  163 B.R. 68 (Bankr. E.D. Va. 1993) ..........................................................70

*In re Colonial Realty Co.*,
  980 F.2d 125 (2d Cir. 1992)......................................................................72

*In re Davis*,
  29 B.R. 652 (Bankr. W.D.N.Y. 1983) ........................................................60

*In re DJK Residential LLC*,
  416 B.R. 100 (Bankr. S.D.N.Y. 2009).........................................................20

*In re Gehrke*,
  158 B.R. 465 (Bankr. N.D. Iowa 1993) ......................................................60

*In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*,
  731 F.2d 1032 (2d Cir. 1984)....................................................................57

*In re Keller Fin. Servs. of Fl.*,
  248 B.R. 859 (Bankr. M.D. Fl. 2000)..................................................37 n.12

*In re Lehman Bros. Holdings, Inc.*,
  2010 WL 1783395 (Bankr. S.D.N.Y. May 5, 2010)......................................46

*In re Lifestyle Furnishings, LLC*,
  418 B.R. 382 (Bankr. D. Idaho 2009) .........................................................60

*In re Lombard-Wall Inc.*,
  No. 82 B 11556 (Bankr. S.D.N.Y. Sept. 16, 1982).......................................25

*In re Metiom, Inc.*,
  301 B.R. 634 (Bankr. S.D.N.Y. 2003) ........................................................73

*In re Musicland Holding Corp.*,
  386 B.R. 428 (S.D.N.Y. 2008)...........................................................96, 99

*In re Pomilio*,
  425 B.R. 11 (Bankr. E.D.N.Y. 2010)..........................................................73

*In re Powell*,
  314 B.R. 567 (Bankr. N.D. Tex. 2004)................................................37 n.12

*In re S. Afr. Apartheid Litig.*,
  633 F. Supp. 2d 117 (S.D.N.Y. 2009).......................................................108

*In re W.T. Grant Co.*,
  4 B.R. 53 (Bankr. S.D.N.Y. 1980) ...........................................................132

*In re Wey*,
  827 F.2d 140 (7th Cir. 1987) ...........................................................101 n.21

*Interbulk, Ltd.* v. *Louis Dreyfus Corp.*
  (*In re Interbulk, Ltd.*),
  240 B.R. 195 (Bankr. S.D.N.Y. 1999) ..................................................37, 38

*Int'l Plaza Assocs., L.P.* v. *Lacher*,
   63 A.D.3d 527 (1st Dep't 2009) ...............................................................120

*Jarboe* v. *U.S. Small Bus. Admin.*
   *(In re Hancock)*,
   137 B.R. 835 (Bankr. N.D. Okla. 1992) ................................................62 n.17

*John St. Leasehold LLC* v. *Fed. Deposit Ins. Corp.*,
   1996 WL 737196 (S.D.N.Y. Dec. 24, 1996) ...........................................120

*Kalisch* v. *Maple Trade Fin. Corp.*
   *(In re Kalisch)*,
   413 B.R. 115 (Bankr. S.D.N.Y. 2008) .............................................128, 132

*Kamerman* v. *Steinberg*,
   891 F.2d 424 (2d Cir. 1989)...................................................................107

*Keene Corp.* v. *Bogan*,
   1990 WL 1864 (S.D.N.Y. Jan. 11, 1990) ..................................................97

*Keeseville Nat'l Bank* v. *Gulati*,
   194 A.D.2d 970 (3d Dep't 1993) .....................................................104, 106

*Kramer* v. *Lockwood Pension Servs., Inc.*,
   653 F. Supp. 2d 354 (S.D.N.Y. 2009)........................................................90

*Lama Holding Co.* v. *Smith Barney Inc.*,
   88 N.Y.2d 413 (1996) ............................................................................116

*Landau* v. *Am. Int'l Grp., Inc.*,
   1997 WL 590854 (S.D.N.Y. Sept. 23, 1997).......................................108 n.26

*Leasing Serv. Corp.* v. *Vita Italian Rest., Inc.*,
   171 A.D.2d 926 (3d Dep't 1991) .............................................................108

*Lerner* v. *Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir. 2006)............................................................116, 117

*LFD Operating, Inc.* v. *Ames Dep't Stores, Inc.*
   *(In re Ames Dep't Stores, Inc.)*,
   274 B.R. 600 (Bankr. S.D.N.Y. 2002) .............................................124, 125

*Liberty Mut. Fire Ins. Co.* v. *Mystic Transp., Inc.*,
   2004 WL 2071703 (S.D.N.Y. Sept. 16, 2004).........................................103

*Liquidation Trust* v. *Daimler AG*
   *(In re Old Carco LLC (f/k/a Chrysler LLC))*,
   2010 WL 2925997 (Bankr. S.D.N.Y. July 27, 2010) ...........11, 21, 54, 55

*Mfrs. Hanover Trust Co.* v. *Yanakas*,
   7 F.3d 310 (2d Cir. 1993)........................................................................102

*Maryland* v. *Louisiana*,
   451 U.S. 725 (1981)..................................................................................77

*Merex A.G.* v. *Fairchild Weston Sys., Inc.*,
810 F. Supp. 1356 (S.D.N.Y. 1993)..................................................................108

*Metro. Life Ins. Co.* v. *RJR Nabisco, Inc.*,
716 F. Supp. 1504 (S.D.N.Y. 1989).................................................................95

*Metro. Life Ins. Co.* v. *Noble Lowndes Int'l, Inc.*,
84 N.Y.2d 430 (1994).........................................................................................92

*Miller* v. *Schloss*,
218 N.Y. 400 (1916)........................................................................................122

*Mitchell* v. *Forsyth*,
472 U.S. 511 (1985)..........................................................................................28

*Munroe* v. *Harriman*,
85 F.2d 493 (2d Cir. 1936).............................................................................108

*N.Y. Univ.* v. *Cont'l Ins. Co.*,
87 N.Y.2d 308 (1995)......................................................................................118

*Nelson* v. *Blacker*,
713 F. Supp. 107 (S.D.N.Y. 1989) ...............................................................107

*Net2Globe Int'l, Inc.* v. *Time Warner Telecom of N.Y.*,
273 F. Supp. 2d 436 (S.D.N.Y. 2003)............................................................92

*Nisselson* v. *Softbank AM Corp.*
*(In re MarketXT Holdings Corp.)*,
361 B.R. 369 (Bankr. S.D.N.Y. 2007) ...................................... *passim*

*O&G Indus., Inc.* v. *Nat'l R.R. Passenger Corp.*,
537 F.3d 153 (2d Cir. 2008).....................................................................77, 82

*O'Brien* v. *Nat'l Prop. Analysts Partners*,
936 F.2d 674 (2d Cir. 1991)...........................................................................116

*Official Comm. of Unsecured Creditors* v. *Austin Fin. Servs., Inc.*
*(In re KDI Holdings, Inc.)*,
277 B.R. 493 (Bankr. S.D.N.Y. 1999)............................129, 130, 131

*Official Comm. of Unsecured Creditors* v. *Bay Harbour Master Ltd.*
*(In re BH S&B Holdings LLC)*,
420 B.R. 112 (Bankr. S.D.N.Y. 2009)..............................129, 133

*Official Comm. of Unsecured Creditors of Hydrogen, L.L.C.* v. *Blomen*
*(In re Hydrogen, L.L.C.)*,
431 B.R. 337 (Bankr. S.D.N.Y. 2010) ...................................... *passim*

*Official Comm. of Unsecured Creditors of Sunbeam Corp.* v.
*Morgan Stanley & Co. (In re Sunbeam Corp.)*,
284 B.R. 355 (Bankr. S.D.N.Y. 2002) ...................................... *passim*

*Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of*
*Del. Inc.* v. *Fleet Retail Fin. Grp.*
*(In re Hechinger Inv. Co. of Del.),*
274 B.R. 71 (D. Del. 2002) ..............................................................38, 79, 80

*Olivieri* v. *McDonald's Corp.,*
678 F. Supp. 996 (E.D.N.Y. 1988) ...............................................................118

*Orix Fin. Servs.* v. *Thunder Ridge Energy Inc.,*
2006 WL 587483 (S.D.N.Y. Mar. 8, 2006) ...................................................115

*Pan Am Corp.* v. *Delta Air Lines, Inc.,*
175 B.R. 438 (S.D.N.Y. 1994)..............................................................129, 132

*PC COM, Inc.* v. *Proteon, Inc.,*
906 F. Supp. 894 (S.D.N.Y. 1995) ................................................................61

*Pen Pak Corp.* v. *LaSalle Nat'l Bank of Chi.,*
240 A.D.2d 384 (2d Dep't 1997)...................................................................55

*Pereira* v. *Grecogas Ltd.*
*(In re Saba Enters., Inc.),*
421 B.R. 626 (Bankr. S.D.N.Y. 2009) ................................................20, 54, 72

*Perlstein* v. *Kullberg Amato Picacone,*
158 A.D.2d 251 (1st Dep't 1990) ................................................................104

*Permanent Mission of India to the United Nations* v. *City of N.Y.,*
551 U.S. 193 (2007)......................................................................................40

*Pertuso* v. *Ford Motor Credit Co.,*
233 F.3d 417 (6th Cir. 2000) .........................................................................78

*Petrello* v. *White,*
412 F. Supp. 2d 215 (E.D.N.Y. 2006) .....................................................123 n.33

*Petrohawk Energy Corp.* v. *Law Debenture Trust Co. of N.Y.,*
2007 WL 211096 (S.D.N.Y. Jan. 29, 2007) .............................................122 n.31

*Pot Luck LLC* v. *Freeman,*
2010 WL 908475 (S.D.N.Y. Mar. 8, 2010) ...................................................118

*Preferred Equities Corp.* v. *Ziegelman,*
190 A.D.2d 784 (2d Dep't 1993) .............................................................102 n.24

*Printables, Inc.* v. *Brittany Dyeing & Printing Corp.,*
126 B.R. 162 (S.D.N.Y. 1991)........................................................................72

*Prisco* v. *New York,*
804 F. Supp. 518 (S.D.N.Y. 1992) .........................................................108, 109

*Putnam Realty, Inc.* v. *Terminal Moving & Storage Co.*
*(In re Terminal Moving & Storage Co.),*
631 F.2d 547 (8th Cir. 1980) ...................................................................44, 112

*Reale* v. *Reale*,
   485 F. Supp. 2d 247 (W.D.N.Y. 2007) ......................................................123 n.33

*Red Tulip, LLC* v. *Neiva*,
   44 A.D.3d 204 (1st Dep't 2007) .............................................................102

*Reliastar Life Ins. Co. of N.Y.* v. *Home Depot U.S.A., Inc.*,
   570 F.3d 513 (2d Cir. 2009)..................................................................102 n.23

*Richardson* v. *Principal Fin. Grp., Inc.*
   *(In re Bayless)*,
   2007 WL 1114064 (Bankr. C.D. Ill. Apr. 12, 2007).............................62 n.17

*Robb* v. *Vos*,
   155 U.S. 13 (1894)..................................................................................111 n.28

*Rocchio* v. *Biondi*,
   40 A.D.3d 615 (2d Dep't 2007) ..............................................................126

*Rodriguez* v. *It's Just Lunch, Int'l*,
   2010 WL 685009 (S.D.N.Y. Feb. 23, 2010)...........................................119 n.30

*Romano* v. *Kazacos*,
   609 F.3d 512 (2d Cir. 2010)..................................................................37 n.12

*Rosenblatt* v. *Christie*,
   195 F. App'x 11 (2d Cir. 2006) .............................................................124

*Ross* v. *Bolton*,
   904 F.2d 819 (2d Cir. 1990)..................................................................116

*Salomon* v. *Kaiser*
   *(In re Kaiser)*,
   722 F.2d 1574 (2d Cir. 1983).................................................................56

*Santa Fe Pointe, LP* v. *Greystone Servicing Corp., Inc.*,
   2009 WL 1438285 (N.D. Cal. May 19, 2009) .......................................104

*Savage & Assocs., P.C.* v. *Mandl*
   *(In re Teligent Inc.)*,
   325 B.R. 134 (Bankr. S.D.N.Y. 2005) ...................................................72

*Sec. Pac. Mortg. & Real Estate Servs., Inc.* v. *Republic of Phil.*,
   962 F.2d 204 (2d Cir. 1992)..................................................................125

*Secs. Inv. Prot. Corp.* v. *Stratton Oakmont, Inc.*,
   234 B.R. 293 (Bankr. S.D.N.Y. 1999) ...................................................69

*Seligson* v. *N.Y. Produce Exch.*,
   394 F. Supp. 125 (S.D.N.Y. 1975) ........................................................27, 47

*Sharp Int'l Corp.* v. *State St. Bank & Trust Co.*
   *(In re Sharp Int'l Corp.)*,
   403 F.3d 43 (2d Cir. 2005).....................................................................53, 57, 98

*Simmons* v. *Thompson*,
   29 A.D. 559 (1st Dep't 1898) ..................................................................108

*Smith* v. *Assocs. Commercial Corp.*
   *(In re Clark Pipe & Supply Co.)*,
   893 F.2d 693 (5th Cir. 1990) ....................................................129, 131

*Smith* v. *Mark Twain Nat'l Bank*,
   805 F.2d 278 (8th Cir. 1986) ...........................................................62, 65

*SNS Bank, N.V.* v. *Citibank, N.A.*,
   7 A.D.3d 352 (1st Dep't 2004) .........................................................124

*Societe Nationale D'Exploitation Industrielle des Tabacs et Allumettes* v.
   *Salomon Bros. Int'l Ltd.*,
   251 A.D.3d 137 (1st Dep't 1998) ....................................................124

*Societe Nationale D'Exploitation Industrielle des Tabacs et Allumettes* v.
   *Salomon Bros. Int'l Ltd.*,
   1998 N.Y. Misc. LEXIS 219 (Sup. Ct. Feb. 9, 1998)................126 n.34

*State St. Bank & Trust Co.* v. *Inversiones Errazuriz Limitada*,
   374 F.3d 158 (2d Cir. 2004)................................................................95

*Superintendent of Ins.* v. *Ochs*
   *(In re First Cent. Fin. Corp.)*,
   377 F.3d 209 (2d Cir. 2004)............................ 121, 122, 123 & n.33, 124

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008)......................................................119 n.30

*Tekinsight.com, Inc.* v. *Stylesite Mktg., Inc.*
   *(In re Stylesite Mktg., Inc.)*,
   253 B.R. 503 (Bankr. S.D.N.Y. 2000).......................................122 n.31

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).............................................................................21

*The Responsible Person of Musicland Holding Corp.* v. *Best Buy Co.*
   *(In re Musicland Holding Corp.)*,
   398 B.R. 761 (Bankr. S.D.N.Y. 2008)...............................................54

*Thrifty Oil Co.* v. *Bank of Am. Nat'l Trust and Sav. Ass'n*,
   322 F.3d 1039 (9th Cir. 2003) ............................................................28

*Trabucco* v. *Intesa Sanpaolo, S.P.A.*,
   695 F. Supp. 2d 98 (S.D.N.Y. 2010)........................................116, 118

*UBS AG, Stamford Branch* v. *HealthSouth Corp.*,
   645 F. Supp. 2d 135 (S.D.N.Y. 2008)......................................105, 106

*United Bank of Afr., P.L.C. N.Y. Branch* v. *Odimayo*,
   1994 WL 185826 (S.D.N.Y. May 10, 1994) ....................................114

*United States* v. *Aleskerova*,
   300 F.3d 286 (2d Cir. 2002)........................................................49 n.13

*United States* v. *Locke*,
  529 U.S. 89 (2000)............................................................................82

*United States* v. *Ron Pair Enters., Inc.*,
  489 U.S. 235 (1989).................................................................45, 47, 51

*United States* v. *Sec. Indus. Bank*,
  459 U.S. 70 (1982)............................................................................41

*VCG Special Opportunities Master Fund Ltd.* v. *Citibank, N.A.*,
  594 F. Supp. 2d 334 (S.D.N.Y. 2008)..............................99, 100, 122 n.32

*VKK Corp.* v. *Nat'l Football League*,
  244 F.3d 114 (2d Cir. 2001).........................................107, 109, 110

*Wagner* v. *First Horizon Pharm. Corp.*,
  464 F.3d 1273 (11th Cir. 2006) ...........................................................133

*Wall St. Assocs.* v. *Brodsky*,
  257 A.D.2d 526 (1st Dep't 1999) ..........................................................55

*Warner Theatre Assocs. Ltd. P'ship* v. *Met. Life Ins. Co.*,
  1997 WL 685334 (S.D.N.Y. Nov. 4, 1997)...........................................95

*Warney* v. *Monroe County*,
  587 F.3d 113 (2d Cir. 2009).................................................................22

*Weiss* v. *Weiss*,
  266 A.D. 801 (2d Dep't 1943) ......................................................113, 114

*Wells Fargo Bank Minn., N.A.* v. *Nassau Broad. Partners, L.P.*,
  2003 WL 22339299 (S.D.N.Y. Oct. 10, 2003) ............................102 n.23

*Wells Fargo Bank Nw., N.A.* v. *Taca Int'l Airlines, S.A.*,
  247 F. Supp. 2d 352 (S.D.N.Y. 2002)........................................102 n.23

*Wiener* v. *Lazard Freres & Co.*,
  241 A.D.2d 114 (1st Dep't 1998) ........................................................127

*Williams* v. *Morgan Stanley Capital Corp., Inc.*
  *(In re Olympic Natural Gas Co.)*,
  294 F.3d 737 (5th Cir. 2002).................................................................28

*World Wrestling Entm't, Inc.* v. *Jakks Pac., Inc.*,
  530 F. Supp. 2d 486 (S.D.N.Y. 2007)..................................................125

*Yak* v. *Bank Brussels Lambert*,
  252 F.3d 127 (2d Cir. 2001)..................................................................21

## CONSTITUTION, STATUTES, AND RULES

11 U.S.C. § 101...................................................................................*passim*

11 U.S.C. § 330.................................................................................37 n.12

11 U.S.C. § 362...................................................................................*passim*

11 U.S.C. § 363 ........................................................................................72

11 U.S.C. § 502 ..................................................................... 73, 74 & n.19

11 U.S.C. § 506 ...................................................................................73, 74

11 U.S.C. § 510 .......................................................................128, 134 n.35

11 U.S.C. § 522 ...................................................................................72, 73

11 U.S.C. § 541 ...............................................................................72, 74 n.19

11 U.S.C. § 542 ...................................................63, 71, 72, 73, 74 n.19

11 U.S.C. § 543 ........................................................................................73

11 U.S.C. § 544 ...................................................................46, 69, 73, 79, 80

11 U.S.C. § 545 ...........................................................................46, 69, 73

11 U.S.C. § 546 ................................................................................. passim

11 U.S.C. § 547 ...................................................................46, 62, 65, 69, 73

11 U.S.C. § 548 ................................................................................. passim

11 U.S.C. § 549 ...............................................................................69, 73

11 U.S.C. § 550 ................................................................................. passim

11 U.S.C. § 553 ................................................................................. passim

11 U.S.C. § 555 ...............................................................................48, 59, 64

11 U.S.C. § 556 ...............................................................................48, 59, 64

11 U.S.C. § 559 ...............................................................................48, 59, 64

11 U.S.C. § 560 ...............................................................................48, 59, 64

11 U.S.C. § 561 ...................................................................................48, 59

11 U.S.C. § 724 ...............................................................................69, 73

11 U.S.C. § 741 ................................................................................. passim

11 U.S.C. § 761 ........................................................................................51

Fed. R. Bankr. P. 2004 ...................................................................10, 55

Fed. R. Bankr. P. 7009 .......................................................................1, 20

Fed. R. Bankr. P. 7012 .......................................................................1, 20

Fed. R. Civ. P. 9(b) ......................................................................... passim

Fed. R. Civ. P. 12(b)(6) .........................................................1, 20, 21, 38

N.Y. Gen. Oblig. Law § 5-1105 ...................................................114, 115

N.Y. U.C.C. § 9-102 ................................................................................44

N.Y. U.C.C. § 9-104 ........................................................................85, 87

N.Y. U.C.C. § 9-207 ................................................................................44

N.Y. U.C.C. § 9-312 .................................................................................................84

N.Y. U.C.C. § 9-315 .................................................................................................86

N.Y. U.C.C. § 9-332 .................................................................................................86

Pub. L. No. 109-8, § 907, 119 Stat. 23 (2005)........................................................26

Pub. L. No. 109-390, § 5, 120 Stat. 2692 (2006)....................................................26

U.S. Const. art. I, § 8................................................................................................78

U.S. Const. art. VI, cl. 2...........................................................................................77

## OTHER AUTHORITIES

*Bankruptcy Law and Repurchase Agreements:  Hearings on H.R. 2852 and H.R. 3418 Before the Subcomm. on Monopolies and Commercial Law of the House Comm. on the Judiciary*, 98th Cong., 2d Sess. (1984) ...........................................................25

*Collier on Bankruptcy* (15th ed. 1987) .........................................................101 n.21

Edward R. Morrison & Joerg Riegel, *Financial Contracts and the New Bankruptcy Code:  Insulating Markets From Bankrupt Debtors and Bankruptcy Judges*, 13 Am. Bankr. Inst. L. Rev. 641 (2005) .........................................................24, 26, 33, 52

H.R. Rep. No. 95-595 (1977)...............................................................................24, 62

H.R. Rep. No. 97-420 (1982)....................................................................................25

H.R. Rep. No. 109-648 (2006)..................................................................................26

*Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the Comm. on the Judiciary*, 94th Cong., pt. 4 (1976) ...........................24

Julian B. McDonnell, *Uniform Commercial Code Analysis of Revised Article 9* (1999)..............44

S. Rep. No. 95-989 (1978).........................................................................................27

JPMorgan Chase Bank, N.A. ("JPMorgan")[1] respectfully submits this Memorandum of Law in support of its Motion to Dismiss the First Amended Complaint (the "Amended Complaint") filed against it by Lehman Brothers Holdings Inc. ("LBHI," together with its subsidiaries, "Lehman") and the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. (the "Creditors' Committee"). For the reasons set forth below, JPMorgan moves to dismiss all 49 counts in the Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), as incorporated in Bankruptcy Rule 7012, and, where applicable, Federal Rule of Civil Procedure 9(b), as incorporated in Bankruptcy Rule 7009.

## PRELIMINARY STATEMENT

In the midst of the worst financial crisis since the Great Depression, when Lehman was on the brink of the largest corporate default in U.S. history, JPMorgan — alone among major banks — took immense risks to continue to support Lehman. As primary clearing bank for LBHI's broker-dealer subsidiary, Lehman Brothers Inc. ("LBI"), JPMorgan typically extended more than *$100 billion* in credit each day to LBI for the settlement and clearance of its securities transactions, including settling (or "unwinding") LBI's massive book of overnight repurchase agreements each morning by extending credit to pay LBI's overnight repurchase agreement investors. Between September 9 and 12, 2008, when JPMorgan could have avoided the vast bulk of its exposure by declining to extend credit to LBI on any morning, JPMorgan did not cut and run.

Instead, balancing the need to protect its own soundness with the interests of Lehman, Lehman's customers and overnight investors, and the financial markets generally,

---

[1] For purposes of this Motion, "JPMorgan" means JPMorgan Chase Bank, N.A. and/or its relevant subsidiaries and affiliates, as the context requires.

JPMorgan made enormous extensions of clearing and settlement credit to Lehman in reliance on $8.6 billion in collateral that it sought and obtained that same week to secure its substantial risk. At the same time, while other financial players were running for the exits, JPMorgan — in justifiable reliance upon the fact that Lehman had provided JPMorgan with the collateral it needed — continued to support Lehman in the financial markets, not only by accepting new Lehman derivatives trades, but also by agreeing to step into the trades of other parties that would no longer do business with Lehman.

Indeed, as this Court is well aware, even *after* LBHI filed for bankruptcy on September 15, 2008, JPMorgan continued, at the urging of LBHI and the Federal Reserve Bank of New York, to extend many tens of billions of dollars of credit to LBI on a daily basis, without imposing any additional collateral requirements. JPMorgan's willingness to continue making clearing advances to LBI during those tumultuous days, when it had every right to refuse to do so, allowed LBI to keep operating and made possible the sale of LBI's business and assets to Barclays Capital, not to mention the loss-free transfer of tens of thousands of customer accounts.

As a result of JPMorgan's willingness to continue to extend credit to Lehman, JPMorgan entered this case with nearly $30 billion in claims. The overwhelming majority of those claims — more than $25 billion — arose out of clearing advances made to LBI *after* LBHI's bankruptcy filing. In addition, more than $3 billion of JPMorgan's claims arose from its exposure under swap agreements, many of which JPMorgan entered into — or substituted into through novations — as part of JPMorgan's efforts to support Lehman in increasingly distressed markets.

Two years later, LBHI and its Creditors' Committee are now attempting to erase this history, breathing new life into the adage that no good deed goes unpunished. JPMorgan's Motion to Dismiss plaintiffs' original complaint (the "Original Complaint") demonstrated that

plaintiffs' 41 counts had failed to state a legally cognizable claim.  In response to that Motion, plaintiffs have now filed an Amended Complaint, but it does nothing to cure the deficiencies of its predecessor.  The essence of the Amended Complaint is that JPMorgan, which provided credit of unmatched magnitude to Lehman during and after its collapse, in fact is to *blame* for LBHI's precipitous bankruptcy filing, and should be forced not only to return the $8.6 billion in collateral that it received, but to pay "tens of billions of dollars" in damages to LBHI.  Am. Compl. ¶¶ 1-2.  The speculative premise of plaintiffs' damages theory is that, if Lehman would have had access to the $8.6 billion in collateral delivered to JPMorgan, it could have avoided bankruptcy for some undefined period of time and engaged in an "orderly" liquidation that would have saved untold billions of dollars in value.

Left unsaid, however, is how Lehman could have survived for even one day without the financing provided by JPMorgan in reliance on that same collateral.  Also unexplained is why JPMorgan, faced with the prospect of liquidating a more than $100 billion portfolio in a chaotic and rapidly declining securities market upon a Lehman failure — not to mention the contemporaneous failures of AIG, Merrill Lynch and other major dealers, which then appeared entirely possible — would have provided a struggling Lehman with tens of billions of dollars in new credit without the additional collateral that it had requested and received.

The similarly implausible premise of plaintiffs' avoidance theory is that JPMorgan — despite its enormous loans to LBI and market support for Lehman — did not provide Lehman reasonably equivalent value in exchange for the collateral, liens, and guaranties that it received in the weeks leading up to Lehman's demise.  Here, plaintiffs choose simply to ignore the obvious and enormous value JPMorgan provided in continuing to extend credit to Lehman, which enabled Lehman to continue to operate and without which LBHI's own intense efforts to

arrange a strategic transaction or other solution prior to September 15, 2008 would have been impossible.

To decide this case, however, there is no need to reach the issue of value. That is because plaintiffs' avoidance theories are precluded by the Bankruptcy Code's safe harbor provisions. Indeed, this is the paradigmatic case for application of the safe harbor provisions, which were enacted by Congress for the express purpose of enabling financial institutions, like JPMorgan, to conduct business with troubled counterparties in protected markets without fear that transactions entered into at a time when bankruptcy is only a possibility will be disturbed after the fact when the possibility becomes a reality. The very purpose of the safe harbors is to enable financial institutions like JPMorgan to conduct business with troubled companies and thereby avoid precipitous bankruptcy filings — to avoid a "run on the bank." Without the safe harbors, financial institutions will almost surely to do just what JPMorgan did not do: cut and run at the first sign of trouble. *See infra* Point II.A.

Thus, absent actual intent to defraud on the part of the debtor, sections 546(e), (f), and (g) of the Bankruptcy Code prevent avoidance of transfers made to "financial institutions," "financial participants," and other protected parties in connection with securities contracts, repurchase agreements, or swap agreements. There can be no dispute that, under the terms of the Code, JPMorgan is a protected party and that the clearance agreement between JPMorgan and LBI, the derivatives contracts between JPMorgan and LBHI subsidiaries, and the security agreements granting liens on LBHI's assets are "securities contracts," "repurchase agreements," or "swap agreements." 11 U.S.C. §§ 546(e)-(g). Nor is there any serious question that the transfers plaintiffs seek to avoid — namely, the grants of liens and transfers of collateral to JPMorgan — were made "in connection with" those protected contracts. *Id.* The statutory safe harbors present an insurmountable legal obstacle to the assertion of constructive fraudulent transfer and

preference claims directed at JPMorgan's security interests and the transfers of collateral to JPMorgan. *See infra* Point II.B.

That the safe harbor provisions bar their claims is clearly no surprise to plaintiffs, which is why the Amended Complaint labors, futilely, to evade application of the clear statutory language. Thus, while the Amended Complaint simply asserts — at least 21 times — that the safe harbors are not applicable here, it does not even begin to allege any facts to support that assertion. The Amended Complaint, for example, does not identify a single contract between Lehman and JPMorgan that is not clearly a "securities contract" or a "swap agreement." Nor does it identify a single obligation to JPMorgan that did not arise under a safe-harbored agreement.

Undeterred by the facts — that JPMorgan advanced huge amounts of credit to Lehman and thereby kept it alive — and undaunted by the law — that the transfers of collateral that secured those advances are protected by the safe harbor provisions of the Bankruptcy Code — LBHI and the Creditors' Committee search in vain for some legal theory that would permit them to evade the safe harbors. Thus, apparently latching onto a concededly unprecedented argument identified by the Court-appointed Examiner in LBHI's chapter 11 case, the Amended Complaint assumes that LBHI's guaranty obligations to JPMorgan are subject to avoidance as fraudulent transfers and fall outside the statutory safe harbor. *See* Report of Anton R. Valukas, Examiner, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (JMP), Vol. 5, at 1762-66 & n.6578 (Bankr. S.D.N.Y. Mar. 11, 2010) (the "Examiner Report"). With no discernible explanation, plaintiffs conclude that LBHI's grant of liens and related collateral transfers to JPMorgan are thereby rendered "meaningless" and the clearly applicable safe harbors for transfers can be ignored. Am. Compl. ¶¶ 167, 170.

Plaintiffs' assumption that LBHI's guaranty obligations are unprotected by the safe harbors is wrong: It flies in the face of Congress's clear intent to shield entire financial markets, including the securities and derivatives markets, from avoidance actions. *See infra* Point II.C. But even if plaintiffs were right that the guaranty obligations are avoidable, their novel theory — *i.e.*, that avoidance of the guaranty obligations would eliminate the protections of the safe harbors for the grants of liens and collateral transfers to JPMorgan — suffers from two fundamental errors.

*First*, it studiously ignores the fact that the security agreement under which the collateral was transferred expressly secures not only LBHI's obligations but also the obligations of LBHI's subsidiaries, none of which are challenged in the Amended Complaint. Thus, even if LBHI's obligations under the Guaranties were avoided, the liens on LBHI's property would still secure outstanding and enforceable obligations to JPMorgan, and hence would be anything but "meaningless." *Second*, section 546 of the Code on its face operates to protect safe-harbored transfers "notwithstanding" the avoidance provisions of the Code, including the section 548(a) "avoidance of obligations" language upon which the Amended Complaint relies. The statute, therefore, squarely precludes any argument that protected transfers can be attacked indirectly through attempted avoidance of a related obligation. Accordingly, regardless of whether LBHI's obligations are avoidable, LBHI's grant of liens on its property to secure the obligations of its subsidiaries, along with the related collateral transfers, are protected by the safe harbors. *See infra* Point II.B.4.

The balance of plaintiffs' avoidance claims are equally unsupportable. For instance, plaintiffs attempt to escape the safe harbors by purporting to plead an actual intent fraudulent transfer under section 548(a)(1) of the Bankruptcy Code. But plaintiffs still fail to plead in the Amended Complaint that LBHI made the transfers with the actual intent to hinder,

delay, or defraud its creditors. Likewise, while both the Original and the Amended Complaints purport to attack JPMorgan for engaging in improper setoffs, they never plead that a setoff ever took place. Moreover, in response to JPMorgan's Motion to Dismiss the Original Complaint, plaintiffs identified in their Amended Complaint 13 instances in which JPMorgan applied its LBHI collateral post-petition, but each of these transfers on its face was plainly made in connection with a safe-harbored contract. Plaintiffs' remaining grab-bag of avoidance-related claims are duplicative and meritless. *See infra* Point III.

The rest of the Amended Complaint, which consists of a hodgepodge of common law theories, fares no better. Thus:

- Plaintiffs' claims of constructive trust, unjust enrichment, and conversion are merely repackaged avoidance claims and are preempted by federal law. *See infra* Point IV.A. The claim for a declaratory judgment that JPMorgan has no lien on the $6.9 billion in cash collateral posted by LBHI in the week before its bankruptcy filing because JPMorgan allegedly swept the collateral into a JPMorgan general ledger cash collateral account, along with associated claims for unjust enrichment and conversion, should also be dismissed because JPMorgan was expressly authorized, by contract and statute, to direct the disposition of LBHI's cash collateral. By contrast, had LBHI withdrawn the cash collateral without providing JPMorgan three days' notice, as the Amended Complaint indicates it would have done, such withdrawal would have constituted a clear breach of the September Security Agreement. *See infra* Point IV.B.

- Plaintiffs' breach of contract claims simply recycle the allegations that JPMorgan improperly requested and withheld collateral from LBHI. The

Amended Complaint, however, does not identify any contractual provision that regulates the amount of collateral that JPMorgan was entitled to request, nor does it identify any provision that entitled LBHI to the immediate release of its collateral from JPMorgan. Likewise, plaintiffs' claims for breach of the implied covenant of good faith and fair dealing cite no relevant contractual provision with which JPMorgan's requests for collateral purportedly interfered. Moreover, plaintiffs' claims for "billions of dollars in damages" are barred by LBHI's contractual waiver of consequential damages. *See infra* Point IV.C.

- The Amended Complaint fails to state any cognizable claim attacking the validity of the Security Agreement, Guaranty, and associated agreements executed as of September 9, 2008 (the "September Agreements").[2] Plaintiffs allege that the September Agreements are invalid because they were procured by JPMorgan's improper threats to withhold credit and lacked consideration, and the September Guaranty was signed by an allegedly unauthorized officer of LBHI. These claims fail as a matter of law for at least three reasons: (1) They were expressly waived by the "waiver-of-defenses" clause in the September Guaranty; (2) LBHI ratified all of the challenged agreements through its subsequent conduct, including by seeking and accepting the benefits of JPMorgan's extension of hundreds of billions of dollars of credit in reliance on those agreements, foreclosing a claim of duress arising from

---

[2] *See infra* Background, for the meaning of defined terms. The usage of defined terms in this Motion is for the most part identical to the usage in the Complaint.

JPMorgan's alleged failure to provide "commercially reasonable notice" that it might cease extending credit; and (3) these massive extensions of credit to LBI constituted adequate consideration to support LBHI's entry into the September Agreements.  *See infra* Point IV.D.

- In the Original Complaint, plaintiffs pled that LBHI relied on an alleged fraudulent oral promise by an unidentified person at JPMorgan to return $5 billion in collateral to LBHI at the end of the trading day on September 12. Now, four months later, the Amended Complaint claims that the purported promisor, who previously could not be identified, was none other than James Dimon, JPMorgan's CEO.  Notwithstanding this newly minted allegation, the claim still does not contain sufficient details to create a plausible inference that this supposed promise was ever actually made, much less to satisfy the particularity requirements of Rule 9(b).  Moreover, the Amended Complaint fails to allege any facts to support its conclusory assertion that JPMorgan had any fraudulent intent.  Further, plaintiffs' claim of an allegedly fraudulent misrepresentation is contradicted by the provisions of the September Security Agreement and barred by its "no oral modifications" clause, which plaintiffs simply ignore.  *See infra* Point IV.E.

- Plaintiffs' constructive trust claim is yet another repackaged version of the preempted unjust enrichment claims, and fails to plead any basis for the imposition of equitable relief or that there was a fiduciary relationship between JPMorgan and LBHI.  *See infra* Point IV.F.

Finally, the Amended Complaint makes a half-hearted request for equitable subordination of JPMorgan's claims. Looking past their empty rhetoric, however, plaintiffs fail to allege that JPMorgan was an "insider" of LBHI or any factual basis for concluding that JPMorgan engaged in inequitable conduct, much less conduct that could meet the stringent standard for subordination of the claims of a non-insider. *See infra* Point V.

<div align="center">*        *        *</div>

By advancing more than $100 billion a day to facilitate the settlement of the repurchase agreements and securities trading operations of LBI as it struggled to survive, and taking on enormous amounts of additional potential derivatives exposure, JPMorgan engaged in exactly the types of risky but market-stabilizing transactions that Congress encouraged through enactment of the safe harbors. Allowing this fundamentally flawed Amended Complaint to proceed against JPMorgan, and thus subjecting JPMorgan to the risk and expense of this multi-billion-dollar litigation, would eliminate the very certainty that the safe harbors were intended to provide, and would inevitably encourage the next financial institution in a similar position to pull the plug rather than take risks of the kind that JPMorgan took for Lehman.

Plaintiffs' failure to allege a single claim that can withstand a motion to dismiss is all the more telling in light of plaintiffs' access to tens of thousands of pages of Rule 2004 discovery from JPMorgan, not to mention the exhaustive investigation performed by this Court's Examiner. And even after considering JPMorgan's arguments in support of dismissal, plaintiffs cannot add anything new to their Amended Complaint that buttresses their claims. Indeed, to the extent that the Amended Complaint even addresses JPMorgan's safe harbor defenses, it confirms that JPMorgan exercised its contract rights in connection with protected contracts, principally a clearance agreement constituting a securities contract, derivatives contracts constituting swap agreements, and related security agreements. Am. Compl. ¶ 268; *see infra* Point III.B.4. Having

failed to plead an adequate basis for their alleged claims, plaintiffs' Amended Complaint should be dismissed for failure to state a claim. *See, e.g.*, *Liquidation Trust* v. *Daimler AG (In re Old Carco LLC (f/k/a Chrysler LLC))*, 2010 WL 2925997, at *3 (Bankr. S.D.N.Y. July 27, 2010) (granting defendants' motion to dismiss entire complaint on grounds that plaintiff failed to allege "sufficient facts . . . to suggest that the legally vulnerable conduct is plausible" (*citing Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 556 (2007))).

## BACKGROUND

The facts set forth herein are drawn from the Amended Complaint and other documents properly before the Court on a motion to dismiss. The facts alleged in the Amended Complaint are assumed to be true for purposes of this Motion to Dismiss.

### A.  JPMorgan's role as LBI's clearing bank and tri-party repo agent

JPMorgan has served as LBI's principal clearing bank and agent for LBI's tri-party repurchase agreements, or "tri-party repos," since at least 2000. Am. Compl. ¶¶ 3, 18-19. It is one of only two banks in the United States that provide tri-party repo agency services. Task Force on Tri-Party Repo Infrastructure, Report of Payments Risk Committee, at 3 (May 17, 2010) (the "Task Force Report") (Wolf Decl. Ex. 10).[3]

In its capacity as LBI's clearing bank, JPMorgan facilitated — both through extensions of credit and the effectuation of transactions — the clearance and settlement of securities trades by LBI. Am. Compl. ¶¶ 3, 18. As part of its clearing bank services, JPMorgan also acted as agent for LBI and its tri-party repo investors — such as money market funds, mutual funds, and pension funds — which purchased LBI's securities in the evening, subject to LBI's

---

[3] "Wolf Decl." refers to the Declaration of Amy R. Wolf in Support of Defendant's Motion to Dismiss the Amended Complaint, filed herewith.

agreement to repurchase those securities the next morning. *Id.* On the morning of each trading day, to facilitate LBI's repurchase of its securities, JPMorgan extended huge amounts of credit to LBI (typically exceeding $100 billion per day) when it settled LBI's outstanding tri-party repos by repaying cash to the investors and moving LBI's securities into LBI accounts on which JPMorgan held liens (a process referred to as "unwinding" the repos). *Id.* ¶¶ 3, 18, 21-22.

Tri-party repos play a key role in the U.S. financial system, and the tri-party repo market is dependent on the Bankruptcy Code's safe harbors. As recently explained in a report by the Task Force on Tri-Party Repo Infrastructure, which accompanied a White Paper prepared by the Federal Reserve Bank of New York:

> *The attractiveness of the tri-party repo market is driven by the treatment of repurchase transactions in bankruptcy,* the use of securities as collateral (including daily margining and haircuts), and the custodian services of the Clearing Banks which provide protections that do not exist for bilateral repo investors or unsecured creditors. As a result, *the U.S. repo market contributes significantly to the liquidity and efficiency of the U.S. Treasury and Agency (including Agency MBS) securities markets,* which collectively make up approximately 75% of the total collateral in the U.S. repo market. *The importance of the U.S. repo market is underscored by the fact that it is the market in which the Federal Reserve operationally implements U.S. monetary policy.*

> \*      \*      \*

> *The U.S. repo market in general and the tri-party repo market in particular have provided important benefits* (e.g., flexibility and reduced funding costs due to credit protections and operational efficiencies) *to the financial system and have helped to reduce the cost of borrowing for the U.S. Treasury, thereby lowering debt-service costs borne by taxpayers.*

> At several points during the financial crisis of 2007-2009, the tri-party repo market took on particular importance in relation to the failures and near-failures of Countrywide Securities, Bear Stearns, and Lehman Brothers. *The potential for the tri-party repo markets to cease functioning, with impacts to securities firms, money market mutual funds, major banks involved in payment and settlements globally, and even to the liquidity of the U.S. Treasury and Agency*

> *securities, has been cited by policy makers as a key concern behind*
> *aggressive interventions to contain the financial crisis.*

Wolf Decl. Ex. 10 at 3-4 (emphasis added and citations omitted). The average daily volume of the tri-party repo market grew to *$2.8 trillion* in 2008. *Id.* at 3. "As a result, the amount of secured credit and market risk exposure borne by the two Clearing Banks in the normal course of business today is extreme . . . ." *Id.* at 14.

**B.      The Clearance Agreement**

JPMorgan cleared securities transactions for LBI pursuant to a Clearance Agreement dated as of June 15, 2000 (the "Clearance Agreement") (Wolf Decl. Ex. 1). Am. Compl. ¶¶ 19-20. The Clearance Agreement did not create any obligation for JPMorgan to extend credit to LBI. Rather, it stated that "[w]e may, solely at our discretion, permit you to use funds credited to the Account prior to final payment." Wolf Decl. Ex. 1, § 5. Section 5 of the Clearance Agreement further provided that "[a]ll loans, whether of money or securities, shall be payable on demand." *Id.*; Am. Compl. ¶ 24.

Consistent with the lack of any credit commitment, the Clearance Agreement did not expressly address the terms under which credit might be extended by JPMorgan or the collateral that would be required. The Clearance Agreement granted JPMorgan a lien on the assets held in LBI's accounts at JPMorgan, other than segregated customer accounts. Wolf Decl. Ex. 1, § 11(a); Am. Compl. ¶ 22. The Clearance Agreement also limited LBI's ability to transfer securities out of the accounts upon which JPMorgan held a lien, permitting such transfers only "to the extent that after such transfer [JPMorgan] remain[s] fully collateralized." Wolf Decl. Ex. 1, § 3.

LBI also agreed to limit JPMorgan's liability by waiving any claim for consequential damages under the Clearance Agreement: "In no event shall we [JPMorgan] be liable

for special, indirect, punitive or consequential damages, whether or not we have been advised as to the possibility thereof and regardless of the form of action." *Id.* § 13 ("Limited Liability").

## C.      The August Agreements

During the summer of 2008, LBHI posted collateral at JPMorgan to secure JPMorgan's clearance exposure to LBI and certain other LBHI subsidiaries.  Am. Compl. ¶ 30. Subsequent to this transfer of collateral, LBHI executed a Guaranty (the "August Guaranty") and a Security Agreement (the "August Security Agreement") in favor of JPMorgan, and JPMorgan and LBHI entered into an Amendment to the Clearance Agreement (the "August Amendment"), all three dated as of August 26, 2008 (collectively, the "August Agreements").  *Id.* ¶ 28.

The August Amendment added LBHI and several LBHI subsidiaries as additional customers under the Clearance Agreement, which was originally between JPMorgan and LBI only.  Wolf Decl. Ex. 3, § 1; Am. Compl. ¶ 28.  The August Security Agreement granted JPMorgan a lien on certain LBHI accounts at JPMorgan in which LBHI had posted collateral "[a]s security for the payment of all the Liabilities," as defined in the August Guaranty.  Wolf Decl. Ex. 5 at 2.  Under the August Guaranty, LBHI guaranteed payment of the "Liabilities," which were defined to include all obligations and liabilities to JPMorgan under the Clearance Agreement of all of LBHI's subsidiaries which were parties to the Clearance Agreement, including LBI.  Wolf Decl. Ex. 4, § 1.  Thus, the collateral posted by LBHI was explicitly intended to secure *LBI's* obligations under the Clearance Agreement.  LBHI's maximum liability under the August Guaranty was limited to the value, adjusted on a daily basis, of the collateral held or requested to secure the August Guaranty.  *Id.*; Am. Compl. ¶ 30.

The August Security Agreement provided that, to the extent LBHI determined that no Lehman party to the Clearance Agreement had outstanding clearance obligations to JPMorgan, LBHI could transfer the collateral posted under the August Agreements to an "Over-

night Account" at JPMorgan.  Wolf Decl. Ex. 5 at 3; Am. Compl. ¶ 31.  The August Security

Agreement further stated that any determination by LBHI or certain affiliates that no clearance

obligations to JPMorgan remained outstanding would "not be binding upon [JPMorgan]."  Wolf

Decl. Ex. 5 at 3.  Nothing in the August Security Agreement purported to grant LBHI a general

right of "access" to the additional collateral.  Further, the August Security Agreement provided:

"[LBHI] and [JPMorgan] . . . acknowledge and agree . . . that [JPMorgan], as the secured party

hereunder, may issue instructions to direct disposition of any and all of the funds in the deposit

accounts . . . without the consent of [LBHI]."  Wolf Decl. Ex. 5 at 2.

### D.    The September Agreements

In September 2008, LBHI agreed to post additional collateral in cash or cash

equivalents to secure not only JPMorgan's clearance exposure, but also all of JPMorgan's

exposure arising from other dealings with LBHI's subsidiaries, principally derivatives

transactions.  Am. Compl. ¶¶ 62, 66, 71.  As of September 9, 2008, the parties entered into an

additional Amendment to the Clearance Agreement (the "September Amendment"), a Security

Agreement (the "September Security Agreement"), and a Guaranty (the "September Guaranty"),

as well as an Account Control Agreement (the "Account Control Agreement") (collectively, the

"September Agreements").  *Id.* ¶ 59.

The September Amendment amended the Clearance Agreement by expanding the

term "Obligations" to include all obligations, of whatever nature, of all Lehman entities to all

JPMorgan entities, including clearance obligations, trading obligations, and derivatives obliga-

tions.  Wolf Decl. Ex. 6 at 1; Am. Compl. ¶ 51.  The September Guaranty defined the guaranteed

"Liabilities" as all obligations of LBHI and any of its subsidiaries to JPMorgan and any of its

affiliates or subsidiaries, and also expressly contemplated obligations arising from clearance,

trading, and derivatives transactions.  Wolf Decl. Ex. 7, § 1; Am. Compl. ¶ 51.  The September

Security Agreement granted a lien on all of LBHI's accounts at JPMorgan (other than the Overnight Account referenced in the August Security Agreement), the assets contained therein, and the proceeds thereof, as security for payment of the Liabilities. Wolf Decl. Ex. 8 at 1-2.

The September Security Agreement further provided that, in specified circumstances, LBHI could take back the collateral pledged to JPMorgan "upon three days written notice to the Bank." *Id.* at 3; Am. Compl. ¶ 55. Like the August Security Agreement, the September Security Agreement permitted JPMorgan to "direct disposition of any and all of the funds in the deposit accounts" without LBHI's consent. Wolf Decl. Ex. 8 at 2. The parties also executed an Account Control Agreement that perfected JPMorgan's security interest in shares and related accounts of certain JPMorgan money market funds posted as collateral by LBHI. Wolf Decl. Ex. 9 at 1; Am. Compl. ¶ 54.

The September Guaranty stated that it was "absolute and unconditional irrespective of . . . any lack of validity or enforceability of . . . [the September Agreements]," and that LBHI "irrevocably waive[d] the right to assert . . . defenses, set-offs or counterclaims in any litigation or other proceeding relating to . . . [the September Agreements]." Wolf Decl. Ex. 7, § 2. As under the August Guaranty, LBHI's maximum liability under the September Guaranty was capped by reference to the collateral requested from time to time to secure the September Guaranty. *Id.* § 1; Am. Compl. ¶ 52.

Between September 9 and September 11, 2008, JPMorgan requested additional collateral and received approximately $3.6 billion in cash and money market funds as collateral under the September Agreements. Am. Compl. ¶ 66. On September 11, 2008, JPMorgan requested a further $5 billion in cash collateral and sent LBHI a letter stating that, if LBHI did not post the collateral by the open of business the following day, "we intend to exercise our right to decline to extend credit to you under the [Clearance] Agreement." *Id.* ¶ 67 (alteration in origi-

nal).  JPMorgan received the $5 billion in cash collateral the following day.  *Id.* ¶ 71.  In order to protect its lien on the collateral, JPMorgan transferred the cash component of the $8.6 billion in collateral out of the demand deposit account to which it had been delivered into a JPMorgan general ledger cash collateral account (the "General Ledger Cash Collateral Account").  *Id.* ¶ 72.

## E.  LBHI's chapter 11 cases

During the weekend of September 13-14, 2008, JPMorgan executives participated in meetings at the Federal Reserve Bank of New York with government officials and representatives of major financial institutions regarding the financial crisis generally, and a potential sale and/or rescue of Lehman in particular.  Am. Compl. ¶ 76.  LBHI filed a petition for relief under chapter 11 of the Bankruptcy Code in the early morning hours of September 15, 2008.  *Id.* ¶ 78.

### 1.  JPMorgan's post-petition advances and LBHI's Comfort Order Motion

At the open of business on September 15, just a few hours after the filing of the largest bankruptcy in history, JPMorgan made clearing advances to unwind LBI's outstanding tri-party repos in the amount of $87 billion.  *See* Motion of Lehman Brothers Holdings Inc. for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Clearing Advances, D.I. 29, ¶ 9 (Bankr. S.D.N.Y. Sept. 16, 2008) (the "Comfort Order Motion") (Wolf Decl. Ex. 11).  These advances were made at the urging of both LBHI and the Federal Reserve.  *Id.* JPMorgan advanced a "comparable amount" to unwind LBI's tri-party repos the following day. *Id.*

On September 16, the day after its bankruptcy filing, LBHI filed a motion in this Court for the purpose of inducing JPMorgan to continue to extend credit to settle and clear securities transactions for LBI.  *See id.*  In that Comfort Order Motion, LBHI explained to the Court that "[JPMorgan] may, *in its sole discretion*, make advances to or for the benefit of the respective

Lehman Clearance Parties[4] [under the Clearance Agreement], which are payable . . . upon demand by [JPMorgan]." *Id.* ¶ 6 (emphasis added). LBHI emphasized that "[a]ny cloud on the guarantees vis-à-vis the Holding Company Collateral will inhibit [JPMorgan] from clearing advances to or for the benefit of the Lehman Clearance Parties to the detriment of public investors." *Id.* ¶ 19. The purpose of the Comfort Order Motion, then, was to provide JPMorgan with comfort that it could continue to make clearance advances knowing that such advances "will be allowed as claims under the Guarantee Agreements secured by the Holding Company Collateral." *Id.* ¶ 12. LBHI also acknowledged that the Clearance Agreement, the August and September Guaranties, and the August and September Security Agreements "are 'securities contracts' within the meaning of section 741(7) of the Bankruptcy Code." *Id.* ¶ 17; *see also id.* ¶¶ 12, 13 (citing 11 U.S.C. §§ 741(7)(A)(v), (xi)).

At the hearing on the Comfort Order Motion, counsel for LBHI emphasized the "critical function" of JPMorgan's continued extensions of credit to LBI, and stated that it was "completely understandable" that JPMorgan needed assurance that the Guaranties and collateral provided pre-petition would cover JPMorgan's post-petition advances pursuant to section 364 of the Bankruptcy Code. Comfort Order Motion Hr'g Tr. 27:9-12, 27:25-28:1 (Wolf Decl. Ex. 12). LBHI told the Court that "we believe that the guaranty and the collateral covers not only those transactions which have already occurred but as well the future transactions." *Id.* at 28:6-8. The Federal Reserve supported LBHI's Motion, telling the Court that "the services that [JPMorgan] has been providing are critical to the smooth functioning of the financial markets." *Id.* at 34:12-

---

[4] The "Lehman Clearance Parties" are defined in the Comfort Order Motion as LBHI, LBI, Lehman Commercial Paper Inc., Lehman Brothers International (Europe), Lehman Brothers OTC Derivatives Inc., Lehman Brothers Japan Inc., Lehman Brothers Bank, FSB, Lehman Brothers Bankhaus Aktiengesellschaft, and Lehman Brothers Commercial Bank. Wolf Decl. Ex. 11, ¶ 5.

15. The Court granted the Motion, finding it "entirely appropriate and consistent with the need to provide market liquidity for this debtor and its affiliates." *Id.* at 35:1-2; *see also* Order Pursuant to Section 105 of the Bankruptcy Code Confirming Status of Clearing Advances, D.I. 47 (Bankr. S.D.N.Y. Sept. 16, 2008) (Wolf Decl. Ex. 13) (the "Comfort Order").

### 2. JPMorgan's claims

Principally as a result of JPMorgan's extensions of credit to LBI after the commencement of LBHI's chapter 11 case (and after entry of the Comfort Order), JPMorgan held claims against the LBHI estate of nearly $30 billion, as described in proofs of claim filed with this Court (as amended on April 1, 2010, the "JPMorgan Proofs of Claim") (Wolf Decl. Ex. 14). Specifically, the JPMorgan Proofs of Claim included secured claims under the August and September Guaranties with respect to more than $25.5 billion owed by LBI to JPMorgan for extensions of credit under the Clearance Agreement, and reflect the application of more than $1.9 billion of the cash collateral posted under the September Security Agreement to the more than $3 billion of swap agreement liabilities of various LBHI subsidiaries to JPMorgan.[5] No objection has been filed to the JPMorgan Proofs of Claim in which the foregoing claims were asserted.

---

[5] *See* Wolf Decl. Ex. 14, Amended and Restated Annex to the JPMorgan Proof of Claim against LBHI (the "LBHI Claims Annex"), at 3-39; Wolf Decl. Ex. 14, Amended and Restated Annex to the JPMorgan Proof of Claim against LBI (the "LBI Claims Annex," attached as Exhibit B to the LBHI Claims Annex), at 2-3 (Clearance Claims). The bulk of the swap agreement claims were also covered by individual guaranties executed and delivered by LBHI from 1993 to 1998 in connection with the relevant ISDA Master Agreements. *See* LBHI Claims Annex at 4 and Exhibit A to the LBHI Claims Annex.

# ARGUMENT

## POINT I

## THE STANDARDS GOVERNING THIS MOTION

In *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 563 (2007), the Supreme Court held that its previous formulation of the notice-pleading standard in *Conley* v. *Gibson* "ha[d] earned its retirement," and reformulated the basic test to determine whether a plaintiff has stated a valid claim. To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), as incorporated in Bankruptcy Rule 7012, it is now clear that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (alteration in original).

Rather, as explained in both *Twombly* and the Supreme Court's elaboration in *Ashcroft* v. *Iqbal*, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). "To show facial plausibility, the Claimant must plead 'factual content that allows the court to draw the *reasonable inference* that the [defendant] is liable for the misconduct alleged.'" *In re DJK Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) (quoting *Iqbal*, 129 S. Ct. at 1949) (emphasis added).

Of course, where a complaint alleges fraud, the pleading requirements imposed by Fed. R. Civ. P. 9(b), as incorporated in Bankruptcy Rule 7009, are even more demanding: The plaintiff "must state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), including, at a minimum, "facts that give rise to a *strong inference* of fraudulent intent," *Pereira* v. *Grecogas Ltd. (In re Saba Enters., Inc.)*, 421 B.R. 626, 642 (Bankr. S.D.N.Y. 2009) (emphasis added).

In assessing whether to dismiss a complaint, courts are entitled to consider not only the complaint itself, but also "other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *accord, e.g.*, *Liquidation Trust* v. *Daimler AG (In re Old Carco LLC (f/k/a Chrysler LLC))*, 2010 WL 2925997, at *4 (Bankr. S.D.N.Y. July 27, 2010).

Likewise, the Second Circuit has held that a court may consider documents that are "integral to the complaint," *Cortec Indus., Inc.* v. *Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991), including agreements relied upon in bringing suit, *Yak* v. *Bank Brussels Lambert*, 252 F.3d 127, 130-31 (2d Cir. 2001); *see also, e.g.*, *Am. Home Mortg. Inv. Corp.* v. *Lehman Bros. Inc. (In re Am. Home Mortg. Holdings, Inc.)*, 388 B.R. 69, 83-84 (Bankr. D. Del. 2008) (trading confirmations were "integral" to complaint seeking ruling that Lehman could not invoke Bankruptcy Code safe harbor applicable to repurchase agreements); *Enron Corp.* v. *Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857, 869 (Bankr. S.D.N.Y. 2005) (agreement reflecting terms of transaction forming subject of complaint's avoidance claims and defendants' safe harbor defenses could be considered by court on motion to dismiss because plaintiff "relied upon its terms . . . in drafting the Complaint").

Consequently, in deciding this Motion, the Court can and should consider the various documents that are integral to the Amended Complaint, which include the agreements the Amended Complaint is challenging and has put at issue — for example, the Clearance Agreement and its amendments in August and September 2008, *e.g.*, Am. Compl. ¶¶ 18, 28, 46; the August Security Agreement and Guaranty, *e.g.*, *id.* ¶ 28; the Account Control Agreement, *e.g.*, *id.* ¶ 46; and the September Security Agreement and Guaranty, *e.g.*, *id.* The Court should also

consider matters of which judicial notice may be taken, such as court filings in these chapter 11 cases. *See*, *e.g.*, *Warney* v. *Monroe County*, 587 F.3d 113, 118 (2d Cir. 2009) (taking judicial notice of court filings).

Based on the Amended Complaint and documents properly considered on this Motion, and under the "plausibility" standard established by the Supreme Court, the inescapable conclusion is that the Amended Complaint fails to state any valid claim for relief.

<div align="center">

**POINT II**

**THE BANKRUPTCY CODE'S SAFE HARBORS
MANDATE DISMISSAL OF THE AMENDED
COMPLAINT'S CONSTRUCTIVE FRAUDULENT
TRANSFER AND PREFERENCE CLAIMS.
(COUNTS V-VIII, X-XII, XV, XVII, XIX, XXI-XXIII)**

</div>

Absent actual intent to defraud on the part of the debtor, section 546(e) of the Bankruptcy Code precludes avoidance of *any* transfer to a financial institution made "in connection with a securities contract," 11 U.S.C. § 546(e), which is defined to cover, among other things, *any* contract for the purchase or sale of securities, *any* extension of credit for the clearance or settlement of securities transactions, and a wide array of related contracts, including security agreements and guaranties, *id*. § 741(7). Other provisions of section 546 grant parallel protections to transfers in connection with repurchase agreements, *id.* § 546(f), and transfers under or in connection with swap agreements, *id*. § 546(g). *See infra* Point II.A.

The safe harbors of section 546 mandate dismissal of plaintiffs' claims to avoid transfers to JPMorgan based on theories of constructive fraudulent transfer or preference. As explained below, the September Security Agreement, the Clearance Agreement and its amendments, as well as the financial markets transactions between JPMorgan and Lehman, are all textbook examples of "securities contracts," "repurchase agreements," or "swap agreements." Moreover, as the Amended Complaint itself confirms, *e.g.*, Am. Compl. ¶ 62, the transfers at-

tacked in the Amended Complaint — namely, the grant of liens to JPMorgan in the September Security Agreement, and the collateral transfers to JPMorgan between September 9, 2008 and September 12, 2008 — were made in connection with those safe-harbored contracts and transactions. The safe harbors, accordingly, squarely apply to protect the transfers at issue. And that is so regardless of whether the Amended Complaint states a claim for avoidance of LBHI's obligations under the Guaranties. *See infra* Point II.B.

The Amended Complaint, moreover, does *not* state a constructive fraudulent transfer claim for avoidance of LBHI's obligations under the Guaranties, because the safe harbors bar any such claim just as they bar avoidance of the transfers to JPMorgan. Any ruling to the contrary would contravene the comprehensive statutory scheme designed to protect the securities, repurchase agreement, and derivatives markets as a whole from the risks and costs associated with avoidance actions. *See infra* Point II.C.

## A. The Bankruptcy Code's safe harbors shield securities contracts, repurchase agreements, and swap agreements from avoidance claims.

The Bankruptcy Code shields a broad array of financial transactions from avoidance actions that are not predicated on actual intent. In conjunction with the Code's sweeping automatic stay exceptions and close-out protections for the same financial transactions, these exemptions from avoidance provide a comprehensive "safe harbor" for participants in major financial markets. To effectuate the fundamental purpose of the avoidance safe harbors — namely, to provide certainty to participants in protected markets that their transactions will not be disturbed in bankruptcy — dismissal based on the safe harbors should be granted at the earliest possible stage of a lawsuit; otherwise, the certainty provided by the safe harbors would be illusory, and financial institutions such as JPMorgan will be deterred from providing the kind of support to struggling counterparties that JPMorgan provided here to Lehman.

1. **The safe harbors were enacted to promote stability in the financial markets by preventing protected transactions, such as the ones challenged here, from being disturbed in bankruptcy.**

Since the enactment of the Bankruptcy Code, the safe harbors from avoidance actions have been consistently expanded to protect more transactions and more market participants. Whereas the original safe harbor, as enacted in 1978, simply prohibited avoidance of commodities margin payments, Congress has since "broadened the former safe harbor by extending its scope to include the securities markets" and other specified markets. *Alfa, S.A.B. de C.V. v. Enron Creditors Recovery Corp. (In re Enron Creditors Recovery Corp.)*, 422 B.R. 423, 428-29 (S.D.N.Y. 2009). The result of these amendments to the safe harbors is that, "instead of protecting particular parties, the Code now protects *entire markets*" from the destabilizing effects of a bankruptcy proceeding. Edward R. Morrison & Joerg Riegel, *Financial Contracts and the New Bankruptcy Code: Insulating Markets From Bankrupt Debtors and Bankruptcy Judges*, 13 Am. Bankr. Inst. L. Rev. 641, 645 (2005) (emphasis added).

The purpose of the safe harbors, from their inception, has been to promote stability in large and inherently unstable financial markets by protecting transactions in those markets from being disturbed in a bankruptcy. As explained in the legislative history of the original safe harbor, "the financial stability of the clearing houses, with often millions of dollars at their disposal, would be severely threatened by" exposure to avoidance claims; as well, actions to avoid margin payments made by clearing houses could set off a "chain reaction" of insolvencies among all other market participants, "threatening the entire industry." *See Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the Comm. on the Judiciary*, 94th Cong., pt. 4, at 2406, 2412 (1976) (testimony of William Bagley, Chairman, Commodity Futures Trading Commission); *see also* H.R. Rep. No. 95-595, at 271 (1977) (original safe harbor provision was "derived largely from the testimony of Chairman Bagley").

Similarly, as explained in legislative history from 1982, when Congress expanded the safe harbors to cover "securities contracts" and other financial contracts, the function of the safe harbors is to prevent "the insolvency of one commodity or security firm from spreading to other firms," which could threaten "the collapse of the affected market." H.R. Rep. 97-420, at 1 (1982) (quoted in *In re Enron Creditors Recovery Corp.*, 422 B.R. at 429). The safe harbors, in sum, act "to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." *Id.*

The goal of providing certainty for market participants has continued to animate Congress as it has amended the safe harbors. For example, after a "bench decision of the bankruptcy court in the *Lombard-Wall* case," *see In re Lombard-Wall Inc.*, No. 82 B 11556 (Bankr. S.D.N.Y. Sept. 16, 1982), which held that counterparties to repurchase agreements "were subject to the automatic stay provisions of the bankruptcy code," Congress became concerned about reports that "many institutional users pulled back out of fear about their ability to recover funds *in a timely fashion*," *Bankruptcy Law and Repurchase Agreements: Hearings on H.R. 2852 and H.R. 3418 Before the Subcommittee on Monopolies and Commercial Law of the House Comm. on the Judiciary*, 98th Cong., 2d Sess., at 24-25 (1984) (statement of Rep. Walter E. Fauntroy) (emphasis added). As a result, Congress amended the safe harbors to cover repurchase agreements in order to "remove from the large market for these important instruments the undesirable and potentially dangerous uncertainty about the status of repos in bankruptcy cases." *Id.* at 22.

As currently enacted, section 546 of the Bankruptcy Code protects, among other things, *all* transfers made by or to specified parties "in connection with" a "securities contract" or "repurchase agreement," as well as *all* transfers made by or to specified parties "under or in connection with" a "swap agreement." *See* 11 U.S.C. §§ 546(e)-(g). The list of protected parties, moreover, is quite broad: Any "financial institution" or "financial participant," among other par-

ties, is covered by the safe harbor for "securities contracts," *id.* § 546(e); any "repo participant" or "financial participant" is covered by the safe harbor for "repurchase agreements," *id.* § 546(f); and any "swap participant" or "financial participant" is protected by the safe harbor for "swap agreements," *id.* § 546(g).

The contracts referenced in section 546 are likewise broadly defined to provide the maximum protection to the relevant markets. Most notably, in 2005, Congress amended the definitions of the terms "securities contract," "repurchase agreement," and "swap agreement," among others, to include "any security agreement or arrangement, or other credit enhancement related to any agreement or transaction referred to in [the relevant section], including any guarantee or reimbursement obligation." *See* Pub. L. No. 109-8, § 907(a), 119 Stat. 23, 171-74 (2005); 11 U.S.C. §§ 741(7), 101(47), 101(53B). In 2005, Congress also added language to the definition of "swap agreement" to make clear that "essentially all derivatives have become 'swap agreements;' all parties to them, and all transfers under or in connection with them, enjoy the Code's protections." Morrison & Riegel, *supra*, at 648; *see* 11 U.S.C. § 101(53B)(A)(ii)(I).

In 2006, moreover, Congress added "any extension of credit for the clearance or settlement of securities transactions" to the list of transactions qualifying for protection as a "securities contract," *see* Pub. L. No. 109-390, § 5(a)(3)(E), 120 Stat. 2692, 2697 (2006); 11 U.S.C. § 741(7) — an amendment that was "intended to confirm that the definition encompasses credit extended for the execution, clearance and settlement of securities transactions, which provide important liquidity to the securities markets." H.R. Rep. No. 109-648, at 5 (2006).

2.      **Dismissal based on the safe harbors should be granted at the earliest possible point in a lawsuit.**

This Court can and should confirm the applicability of the statutory safe harbors on this Motion to Dismiss. The powerful safeguards enacted by Congress in the Bankruptcy

Code embody an emphatic congressional intent to provide certainty to financial institutions like JPMorgan that they will not be subjected to uncertain and expensive litigation based on their activity in the securities, derivatives, and other protected markets. Indeed, the safe harbor was created in 1978 to overrule a decision, *Seligson* v. *New York Produce Exchange*, 394 F. Supp. 125 (S.D.N.Y. 1975), that did not actually avoid margin payments to a clearing house, but simply ruled that a constructive fraudulent transfer claim to avoid such payments was not subject to dismissal as a matter of law. *See id.* at 132-34; *see also* S. Rep. No. 95-989, at 106 (1978) ("Subsection (c) overrules *Seligson* v. *New York Produce Exchange*, and provides *as a matter of law* that margin payments made by or to a clearing organization are not voidable." (emphasis added)).

To say the least, a ruling that clearing banks such as JPMorgan are subject to avoidance claims for requesting and receiving margin from dealers in the tri-party repo market would introduce, in the words of the legislative history, "undesirable and potentially dangerous uncertainty" about the status of such transactions. As has recently been explained: "The attractiveness of the tri-party repo market is driven by the treatment of repurchase transactions in bankruptcy . . . and the custodian services of the Clearing Banks," including JPMorgan, "which provide protections that do not exist for bilateral repo investors or unsecured creditors." Task Force Report at 3 (Wolf Decl. Ex. 10). The same report also notes that the impact of a failure of the massive tri-party repo market would extend to "securities firms, money market mutual funds, major banks . . . and even to the liquidity of the U.S. Treasury and Agency securities." *Id.* at 4.

The safe harbors thus are the predicate for JPMorgan's ability to continue to act as clearing bank and derivatives counterparty for companies in financial distress. If the safe harbors are not enforced from the outset of this and other cases, leaving JPMorgan's capital and shareholders exposed to a threat of massive potential liability for many years, it will be difficult

or impossible for JPMorgan and other financial institutions to provide the critical support to troubled market participants that JPMorgan provided to Lehman. In that event, the Congressional purpose in enacting the safe harbors would be thwarted: Financial institutions will be forced to retreat from the market when their customers and counterparties are in trouble, and those customers and counterparties will lose access to liquidity when it is most needed.

The pleading regime mandated by the Supreme Court in *Iqbal* and *Twombly* reinforces the need to apply the avoidance safe harbors on a motion to dismiss. *Iqbal*, while expounding a generally applicable pleading standard, arose in the specific context of an officer immunity defense that courts regularly consider at the dismissal stage. *See* 129 S. Ct. at 1945-46, 1954. Tellingly, the Bankruptcy Code's safe harbors have likewise been described as providing "immuni[ty]" from avoidance to protected transfers. *See Contemporary Indus. Corp.* v. *Frost*, 564 F.3d 981, 984 (8th Cir. 2009); *Thrifty Oil Co.* v. *Bank of Am. Nat'l Trust and Sav. Ass'n*, 322 F.3d 1039, 1051 n.13 (9th Cir. 2003); *Williams* v. *Morgan Stanley Capital Corp., Inc. (In re Olympic Natural Gas Co.)*, 294 F.3d 737, 739 (5th Cir. 2002). And rightly so — like officer immunity, the safe harbor provisions reflect a policy of protection not only from liability but also from the costs and risks of litigation. *Cf. Mitchell* v. *Forsyth*, 472 U.S. 511, 526 (1985) (describing qualified immunity as an "entitlement not to stand trial or face the other burdens of litigation").

In sum, given the twin mandates of the Bankruptcy Code's safe harbors and the Supreme Court's pleading jurisprudence, the Amended Complaint should receive searching scrutiny from this Court — scrutiny that, as will now be shown, compels dismissal of its avoidance claims.

**B.    The safe harbors require dismissal of all constructive fraudulent transfer and preference claims seeking avoidance of transfers of collateral and grants of liens to JPMorgan.**

The Amended Complaint seeks to avoid three types of "transfers" under the constructive fraudulent transfer and preference provisions of the Bankruptcy Code or state law: (1) the delivery of $8.6 billion in collateral to JPMorgan prior to LBHI's bankruptcy; (2) the alleged "sweep" of $6.9 billion in cash, which JPMorgan had received as collateral, from a Lehman deposit account to the General Ledger Cash Collateral Account; and (3) the grant of liens to JPMorgan under the September Security Agreement and related documents.  Although plaintiffs assert 21 times that the safe harbors do not apply, *see* Am. Compl. ¶¶ 81, 83, 85, 116, 123, 130, 137, 147, 155, 163, 177, 186, 196, 206, 214, 222, 230, 236, 241, 248, 268, that bare legal assertion is entitled to no weight.  *E.g.*, *Iqbal*, 129 S. Ct. at 1949.  The safe harbor provisions of section 546 squarely apply to require dismissal of plaintiffs' constructive fraudulent transfer and preference claims.

**1.    The safe harbors require dismissal of plaintiffs' constructive fraudulent transfer and preference claims seeking avoidance of collateral transfers to JPMorgan.  (Counts VIII, XV, XXIII)**

Section 546 of the Bankruptcy Code protects, among other things, pre-petition transfers made by or to:  (1) a "financial institution" or "financial participant" in connection with a "securities contract," 11 U.S.C. § 546(e); (2) a "financial participant" in connection with a "repurchase agreement," *id*. § 546(f); and (3) a "financial participant" or "swap participant" under or in connection with a "swap agreement," *id*. § 546(g).  JPMorgan is a "financial institution," a "financial participant," and a "swap participant"; and the $8.6 billion in collateral transfers to JPMorgan were made in connection with securities contracts, repurchase agreements, or swap agreements.  Thus, under the express language of section 546 of the Code, the collateral transfers at the heart of plaintiffs' Amended Complaint are immune from attack.

### a. The collateral transfers were made by or to a "financial institution," a "financial participant," and a "swap participant."

The Amended Complaint concedes that JPMorgan is a "financial institution," which is defined in section 101(22) of the Code to include a "commercial bank," 11 U.S.C. § 101(22). The Amended Complaint calls JPMorgan a "financial institution[]," Am. Compl. ¶ 76, and also alleges that JPMorgan is "a national banking association chartered under the laws of the United States," *id.* ¶ 10; *see Calyon N.Y. Branch* v. *Am. Home Mortg. Corp. (In re Am. Home Mortgage, Inc.)*, 379 B.R. 503, 519 (Bankr. D. Del. 2008) (commercial bank was a "financial institution" for purposes of the Code definition).

JPMorgan also is a "financial participant" as defined by the Code — *i.e.*, a party to outstanding safe-harbored contracts totaling at least $1 billion in gross notional or principal dollar amount. *See* 11 U.S.C. § 101(22A). The very size of the avoidance claims in the Amended Complaint, challenging billions of dollars of transfers to secure clearance obligations and derivatives contracts, makes it plain that JPMorgan qualifies as a "financial participant."[6]

Finally, JPMorgan is a "swap participant" — *i.e.*, "an entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor." *Id.* § 101(53C). Since the definition of "swap agreement" in section 101(53B) includes all manner of derivatives contracts, as well as "security agreements" and "guarantees" related to such contracts, the extensive allegations in the Amended Complaint regarding derivatives contracts

---

[6] *See, e.g.*, Am. Compl. ¶ 16 (alleging that JPMorgan was "one of Lehman's largest global counterparties for derivatives activity in terms of numbers of trades and aggregate notional amounts"); *id.* ¶ 18 ("JPMorgan acted as LBI's intermediary and agent in all securities trades entered into by LBI . . . [and] as LBI's agent in triparty repurchasing agreements that LBI used to obtain short-term financing"); *id.* ¶¶ 63, 66-67 (derivatives obligations between JPMorgan and LBHI subsidiaries allegedly required $1 billion of collateral from JPMorgan).

guaranteed and secured by the September Agreements (*e.g.*, Am. Compl. ¶¶ 63-65) make clear that JPMorgan is a "swap participant."

> **b.** **The Clearance Agreement, the September Security Agreement, the September Guaranty, and derivatives contracts are "securities contracts," "repurchase agreements," and "swap agreements."**

The Clearance Agreement between JPMorgan and LBI, the September Security Agreement and Guaranty, and the derivatives and other financial markets contracts between JPMorgan and LBHI subsidiaries all constitute "securities contracts," "repurchase agreements," or "swap agreements" eligible to shield the September collateral transfers from avoidance under section 546.[7] The principal contracts involved are discussed below:

The Clearance Agreement and extensions of credit thereunder are "securities contracts." — The definition of "securities contract" in the Code includes an "extension of credit for the clearance or settlement of securities transactions." 11 U.S.C. § 741(7)(A)(v). On the face of the Clearance Agreement, it is plain that extensions of credit made by JPMorgan to LBI pursuant to the Clearance Agreement were for the clearance and settlement of securities transactions, including the extensions of credit to facilitate daily settlement of Lehman's outstanding tri-party repo book. *See* Wolf Decl. Ex. 1 at 1 (describing JPMorgan as LBI's "non-exclusive clearance agent for securities transactions"); *id.* § 5 ("We may, solely at our discretion . . . advance funds to you prior to final payment.").

The allegations of the Amended Complaint confirm that conclusion. *See* Am. Compl. ¶ 20 (noting that the Clearance Agreement included a "lending provision authorizing

---

[7] LBHI agreed with this conclusion in the Comfort Order Motion, stating that the "Clearance Agreements, Guarantee Agreements and Security Agreements are 'securities contracts' within the meaning of section 741(7) of the Bankruptcy Code." Wolf Decl. Ex. 11, ¶ 17.

[JPMorgan] to make loans to facilitate the clearance process"); *id*. ¶ 21 ("As is typical in the in-dustry and as expressly provided under the 2000 Clearance Agreement, JPMorgan extended daily credit to LBI to cover its exposure for processing trades.").  Accordingly, the Clearance Agreement and JPMorgan's clearance and settlement-related extensions of credit thereunder are "securities contracts" under subsection (v) of the definition.

The Clearance Agreement is a "securities contract" and "repurchase agreement" based on its function as a master agreement. — A "securities contract" is defined to include a "master agreement that provides for an agreement or transaction referred to" elsewhere in the definition of securities contract, 11 U.S.C. § 741(7)(A)(x), *i.e.*, an agreement that governs other agreements or transactions that are "securities contracts."  Similarly, a "repurchase agreement" includes a "master agreement that provides for an agreement or transaction referred to" else-where in the definition of repurchase agreement, *id*. § 101(47)(A)(iv).  The Clearance Agreement is a "securities contract" and a "repurchase agreement" under these definitions as well.

Like the "Repurchase Agreement" in *American Home Mortgage*, which was found to be both a repurchase agreement and a securities contract, the Clearance Agreement "es-tablishes the relationship between the Debtor[] and [the Debtor's bank] and outlines the rights and obligations related to the sale and repurchase of [securities] thereunder."  *In re Am. Home Mortg., Inc.*, 379 B.R. at 509.  The Clearance Agreement declares that JPMorgan agrees "to act as your non-exclusive clearance agent for securities transactions," *see* Wolf Decl. Ex. 1 at 1, and proceeds to set forth JPMorgan's functions as both an agent for the clearance of securities trans-actions and an agent under LBI's tri-party repurchase arrangement, *id*. ¶¶ 1-4, 9.  The Amended Complaint, moreover, acknowledges these functions.  *See* Am. Compl. ¶ 3 (JPMorgan served as "third party intermediary for the vast majority of LBI's trades and triparty repurchases"), *id*. ¶ 18 (JPMorgan "served as the principal clearing bank for LBI" and "also acted as LBI's agent in tri-

party repurchasing agreements"). Accordingly, because the Clearance Agreement consolidates and governs multiple "securities contracts" and "repurchase agreements," the Clearance Agreement is a "master agreement" of the kind identified in the definitions of "securities contract" and "repurchase agreement."

The derivatives contracts and transactions pleaded in the Amended Complaint are "swap agreements." — A "swap agreement" is defined as one of ten broad categories of agreements and transactions encompassing a wide range of interest rate, currency, equity, and credit derivatives, among others, as well as any agreement or transaction similar to those categorized that is "the subject of recurrent dealings in the swap or other derivatives markets." 11 U.S.C. § 101(53B)(A)(ii)(I). By this definition, "essentially all derivatives have become 'swap agreements;' all parties to them, and all transfers under or in connection with them, enjoy the Code's protections." Morrison & Riegel, *supra*, at 648. Accordingly, the derivatives contracts and transactions between JPMorgan and LBHI and its subsidiaries, which the Amended Complaint has itself pleaded, *see, e.g.*, Am. Compl. ¶¶ 16, 62-65, are "swap agreements" as defined by the Code.[8]

The September Guaranty and September Security Agreement are "securities contracts," "repurchase agreements," and "swap agreements" based on their function as credit enhancements. — As defined in sections 101 and 741 of the Code, securities contracts, repurchase agreements, and swap agreements include "any security agreement or arrangement or other

---

[8] As described in JPMorgan's Proofs of Claim against LBHI and its subsidiaries that engaged in swap agreements with JPMorgan, LBHI's and its subsidiaries' obligations with respect to derivatives arise under various Master Agreements between JPMorgan and Lehman counterparties on an industry-standard form promulgated by the International Swaps and Derivatives Association (ISDA). *See* LBHI Claims Annex, at 10-11, 14-21, 29, 35 and Exhibit A to the LBHI Claims Annex (Wolf Decl. Ex. 14).

credit enhancement related to any [protected] agreement or transaction . . . including any guarantee or reimbursement obligation by or to a . . . financial participant in connection with any [of the protected agreements or transactions]." *See* 11 U.S.C. §§ 101(47)(A)(v), 101(53B)(A)(vi), 741(7)(A)(xi).

      The September Security Agreement and September Guaranty explicitly reference "derivative transactions" and "clearing advances" as among the transactions that JPMorgan was conducting with LBHI subsidiaries.[9]  Additionally, the September Security Agreement and September Guaranty state that the function of those agreements was to secure and guarantee "*all* obligations and liabilities of the Borrowers to the Bank of whatever nature."  Wolf Decl. Ex. 7, § 1 (emphasis added); *see also* Wolf Decl. Ex. 8 at 1-2.  As the Amended Complaint sets forth, JPMorgan was "one of Lehman's largest global counterparties for derivatives activity in terms of numbers of trades and aggregate notional amounts, Lehman's first overall counterparty among United States banks for fixed income and equity securities transactions, and the agent for securities clearing activities for Lehman worldwide."  Am. Compl. ¶ 16.  Thus, securing and guaranteeing "all" of the obligations and liabilities of LBHI's subsidiaries to JPMorgan meant securing and guaranteeing those arising under the securities contracts, repurchase agreements, and swap agreements governing these relationships.  In fact, plaintiffs specifically identify a list of obligations owed by Lehman entities to JPMorgan entities that arose under such protected financial markets agreements.  *See* Am. Compl. ¶ 268; *infra* Point III.B.4.  Accordingly, the September

---

[9] *See*, *e.g.*, Wolf Decl. Ex. 7 at 1 (granting guaranty "in order to induce the Bank from time to time, to extend or continue to extend credit, clearing advances, clearing loans or other financial accommodations to the Borrowers and/or to transact business, trade or enter into derivative transactions with the Borrowers"); Wolf Decl. Ex. 8, ¶ 1 ("In consideration of JPMorgan Chase Bank, N.A. . . . extending credit to and/or transacting business, trading or engaging in derivative transactions with the undersigned and/or its subsidiaries, the undersigned hereby agree(s) that the Bank shall have the rights, remedies and benefits hereinafter set forth.").

Guaranty and Security Agreement are clearly "security agreement[s] or arrangement[s] or other credit enhancement[s] related to" securities, repurchase, and swap agreements and transactions.[10]

<u>The Clearance Agreement is also a "securities contract," "repurchase agreement," and "swap agreement" based on its function as a credit enhancement.</u> — Section 11 of the Clearance Agreement grants JPMorgan a lien. Wolf Decl. Ex. 1, § 11. Prior to the September Amendment, the section 11 lien grant was in "consideration of any advances or loans [JPMorgan] may extend to [Customer] pursuant to this Agreement." *Id.* The September Amendment expanded the lien to a grant of "security for the payment of all of [LBHI and its subsidiaries'] existing or future indebtedness, obligations and liabilities of any kind to [JPMorgan] including, without limitation, arising in connection with trades, derivative transactions, settlement of securities hereunder or any other business." Wolf Decl. Ex. 6, § 1.

Similar to the preceding analysis of the September Security Agreement, the lien granted by section 11 of the Clearance Agreement, as amended by the September Amendment, establishes that the Clearance Agreement is a security agreement or other credit enhancement within the definitions of "securities contract," "repurchase agreement," and "swap agreement."

c. **The collateral transfers were made "in connection with" the Clearance Agreement, September Security Agreement, September Guaranty, and derivatives contracts.**

The Amended Complaint pleads that JPMorgan's collateral requests in September 2008 were "made pursuant to a purported amendment to the 2000 Clearance Agreement, as well as a guaranty and security agreement executed in the context of the 2000 Clearance Agreement

---

[10] The August Guaranty and August Security Agreement are likewise "securities contracts" and "repurchase agreements," because they guarantee or secure all obligations incurred under the Clearance Agreement. *See* Wolf Decl. Ex. 4, § 1. As shown above, the Clearance Agreement was a "securities contract" and a "repurchase agreement" even before it was amended as of September 9, 2008.

(*i.e.*, the September Agreements)." Am. Compl. ¶ 62; *see also id.* ¶ 82 (alleging that JPMorgan "demanded and received" $8.6 billion in collateral "pursuant to the September Agreements"). The Amended Complaint further alleges that the collateral requests were "based primarily on the possibility of closing out derivatives contracts," and that certain collateral transfers were made in response to a written "Notice" from JPMorgan to LBHI that extension of credit under the Clearance Agreement was contingent on receiving the collateral requested. Am. Compl. ¶¶ 62, 67. The Amended Complaint, moreover, does not identify a single specific obligation owed to JPMorgan by LBHI or its subsidiaries that did not arise under the Clearance Agreement, other securities and repurchase contracts, or derivatives contracts.[11] Based on the Amended Complaint itself, therefore, the inescapable conclusion is that the collateral transfers to JPMorgan were made "in connection with" "securities contracts," "repurchase agreements," or "swap agreements," and thus fall squarely within the statutory safe harbor.

Nonetheless, in an apparent attempt to evade the clear application of the safe harbors to the transfers at issue, plaintiffs baldly assert that JPMorgan's collateral requests: (a) "were not made in connection with exposure under the 2000 Clearance Agreement," Am. Compl. ¶ 62; and (b) were not made "under the derivatives contracts" between JPMorgan and Lehman, *id*. ¶¶ 63, 64. But even if these carefully worded allegations are taken at face value, the September collateral transfers are *still* fully protected by section 546.

First, it is not relevant whether the collateral transfers were made in connection with Clearance Agreement "*exposure*," an unclear and non-statutory term introduced by paragraph 62 of the Amended Complaint. To qualify for safe harbor protection, the transfers need

---

[11] In contrast, JPMorgan has set forth in detail billions of dollars of securities contract and swap agreement claims in JPMorgan's Proofs of Claim against LBHI and its subsidiaries, to which no objection has been filed and hence remain prima facie valid. *See supra* Background § E.2.

only have been made "in connection with" the securities contract, 11 U.S.C. § 546(e), a term

with a "broad[] meaning similar to 'related to.'"  *Interbulk, Ltd.* v. *Louis Dreyfus Corp. (In re

Interbulk, Ltd.)*, 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999).[12]

The Amended Complaint does not — and cannot — allege facts showing that the

challenged transfers to JPMorgan were not made "in connection with" — or "related to" — the

huge daily extensions of credit that JPMorgan was making, and anticipated it would continue to

make, to LBI under the Clearance Agreement for the clearance or settlement of securities trans-

actions.  *Cf. Casa de Cambio Majapara S.A. de C.V.* v. *Wachovia Bank, N.A. (In re Casa de

Cambio Majapara S.A. de C.V.)*, 390 B.R. 595, 599 (Bankr. N.D. Ill. 2008) (refusing to read re-

quirement into section 546(g) that protected transfers need to be "'made to or for the benefit of

[the transferee] *in its capacity as a swap participant*,'" because section 546(g) is "addressed to

transfers 'to a swap participant' without qualifiers of any kind" (emphasis in original; citation

omitted)).

It is likewise irrelevant whether the collateral transfers were made "under" deriva-

tives contracts.  Section 546 on its face only requires that transfers be made "in connection with"

protected agreements and, as a result, encompasses transfers beyond those made pursuant to the

---

[12] Based on its plain meaning, the term "in connection with," as used in federal statutes including
the Bankruptcy Code, has been broadly construed.  *See Romano* v. *Kazacos*, 609 F.3d 512, 523-
24 (2d Cir. 2010) (explaining that "we must give a broad construction to the 'in connection with'
requirement" in federal securities law and holding that the requirement was met where alleged
misrepresentations and the purchase or sale of securities were part of a "string of events that
were all intertwined" (internal quotation marks omitted)); *see also, e.g.*, *In re Powell*, 314 B.R.
567, 571 (Bankr. N.D. Tex. 2004) (explaining that the phrase "in connection with the bankruptcy
case" under section 330(a) of the Bankruptcy Code "must be read liberally to include attorney
work for a debtor that could have a conceivable effect on the Chapter 13 case while a debtor
prosecutes a Chapter 13 case"); *In re Keller Fin. Servs. of Fl.*, 248 B.R. 859, 879 (Bankr. M.D.
Fl. 2000) ("For purposes of § 329 [of the Bankruptcy Code], the scope of the phrase 'in connec-
tion with' is broad.").

terms of the agreements themselves. *See Interbulk, Ltd.*, 240 B.R. at 202 (explaining that while a transfer is made "under" a protected agreement "when it is accomplished according to the method prescribed in the agreement itself," the term "in connection with" has a "broader meaning"). Indeed, Congress specifically amended section 546(g) in 2005 to clarify that protected transfers need not be made both "under" *and* "in connection with" a swap agreement, but may be made "under" *or* "in connection with" the agreement. *In re Casa de Cambio Majapara S.A. de C.V.*, 390 B.R. at 598. Here, therefore, it makes no difference if the transfers were made "under the derivatives contracts," Am. Compl. ¶ 63, because they were indisputably made "in connection with" those contracts, as alleged by the Amended Complaint itself, *see id.* ¶ 62.

Accordingly, the collateral transfers to JPMorgan were made "in connection with" the Clearance Agreement, the September Agreements, the derivatives and other financial markets contracts between JPMorgan and Lehman, and the transactions thereunder — all of which are "securities contracts," "repurchase agreements," or "swap agreements" under the Bankruptcy Code. As a result, LBHI's claims in Counts VIII, XV, and XXIII that the collateral transfers should be avoided as constructively fraudulent or preferential transfers should be dismissed. *See, e.g.*, *Bevill, Bressler & Schulman Asset Mgmt. Corp.* v. *Spencer Sav. & Loan Ass'n (In re Bevill, Bressler & Schulman Asset Mgmt. Corp.)*, 878 F.2d 742, 753 (3d Cir. 1989) (directing dismissal of complaint under Rule 12(b)(6) on the basis of section 546(f) safe harbor; *Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del. Inc.* v. *Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.)*, 274 B.R. 71, 86 (D. Del. 2002) (granting defendants' motion to dismiss fraudulent conveyance claims because section 546(e) protected the contested transfers from avoidance); *Enron Corp.* v. *Int'l Fin. Corp. (In re Enron Corp.)*, 341 B.R. 451, 459 (Bankr. S.D.N.Y. 2006) (same); *Brandt* v. *B.A. Capital Co. (In re Plassein Int'l Corp.)*, 366 B.R. 318, 322-26 (Bankr. D. Del. 2007), *aff'd*, 388 B.R. 46 (D. Del. 2008) (same).

### 2. The safe harbors require dismissal of plaintiffs' constructive fraudulent transfer claims seeking avoidance of the alleged "funds sweep." (Counts XVII, XIX)

In Counts XVII and XIX, the Amended Complaint seeks to avoid JPMorgan's alleged transfer of approximately $6.9 billion in cash from an LBHI cash account to the General Ledger Cash Collateral Account. This alleged transfer, however, is fully protected by the safe harbors for the same reasons that the challenged collateral transfers are protected by the safe harbors.

The Amended Complaint asserts that the alleged "sweep" of funds from an LBHI account to a JPMorgan account was a "transfer" "to or for the benefit of JPMorgan." Am. Compl. ¶¶ 183, 193. JPMorgan, as discussed above, is undeniably a "financial institution," "financial participant," or "swap participant" as those terms are defined in the Bankruptcy Code's safe harbor provisions. *See supra* Point II.B.1.a.

Moreover, the Amended Complaint alleges that the cash that JPMorgan allegedly "swept" out of LBHI's account was the same cash that had just been deposited with JPMorgan — between September 9 and September 12 — in response to JPMorgan's collateral requests. *See* Am. Compl. ¶ 72. That cash, as discussed above, was deposited at JPMorgan to serve as collateral for the obligations of LBHI and its subsidiaries — *i.e.*, obligations arising under "securities contracts," "repurchase agreements," and "swap agreements." *See supra* Point II.B.1.b-c. The alleged "funds sweep," therefore, was a disposition of those funds that was not only necessarily made "in connection with" the same "securities contracts," "repurchase agreements," and "swap agreements" as the initial collateral transfers, but was also authorized by the safe-harbored August and September Security Agreements, *see infra* Point IV.B, and is thus protected by the Bankruptcy Code's safe harbors.

**3.    The safe harbors require dismissal of plaintiffs' constructive fraudulent transfer and preference claims seeking avoidance of the liens under the September Security Agreement, the September Amendment, and the Account Control Agreement. (Counts V, X, XXI, XXII)**

In Counts V, X, XXI, and XXII, the Amended Complaint seeks avoidance of the liens under the September Security Agreement, the September Amendment, and the Account Control Agreement as constructive fraudulent transfers or preferences.  Like plaintiffs' claims seeking avoidance of the September collateral transfers, these claims are barred by the safe harbors.

**a.    The September Security Agreement and September Amendment are protected by the safe harbors.**

The September Security Agreement granted liens to secure all "Liabilities" as defined in the September Guaranty, which defines Liabilities in pertinent part as all obligations and liabilities of "the Borrowers," Wolf Decl. Ex. 7, § 1 — namely, LBHI and each of its direct and indirect subsidiaries — in consideration of JPMorgan's *inter alia* "trading or engaging in derivative transactions," Wolf Decl. Ex. 8 at 1.  Similarly, the September Amendment by its terms expanded the lien granted by section 11 of the Clearance Agreement, extending the lien to secure all of the "existing or future indebtedness, obligations and liabilities of any kind," including "arising in connection with trades, derivative transactions, settlement of securities [under the Clearance Agreement] or any other business."  Wolf Decl. Ex. 6, § 1.

A grant of a lien is indisputably a "transfer" within the meaning of the Bankruptcy Code.  *See* 11 U.S.C. § 101(54) (definition of "transfer" expressly includes "the creation of a lien").  And the grant of a security interest or its perfection is uniformly regarded by courts as a present transfer of an interest in property.  *See Permanent Mission of India to the United Nations* v. *City of N.Y.*, 551 U.S. 193, 198 (2007) (liens are "interests in property"); *United States* v. *Sec.*

*Indus. Bank*, 459 U.S. 70, 80 (1982) (liens are "property rights" distinguishable from "traditional contract rights"); *Ford Motor Credit Co.* v. *NYC Police Dep't*, 503 F.3d 186, 191 (2d Cir. 2007) ("[A] security interest is indisputably a property interest protected by the Fourteenth Amendment."). Thus, in seeking avoidance of the liens under the September Security Agreement and September Amendment, the Amended Complaint necessarily seeks avoidance of "transfers" made to JPMorgan in the form of the grant of liens.

JPMorgan is undeniably a "financial institution," "financial participant," or "swap participant." *See supra* Point II.B.1.a. Moreover, the Clearance Agreement, the September Security Agreement and Guaranty, the derivatives and other financial markets contracts, and the transactions under those agreements are "securities contracts," "repurchase agreements," or "swap agreements" under the statutory definitions. *See supra* Point II.B.1.b. Accordingly, the grant of liens by the September Security Agreement and the September Amendment to secure "Liabilities" that include the Clearance Agreement, repurchase, securities trading and derivatives obligations were "transfers" made to JPMorgan as a protected party "under or in connection with" an array of securities contracts, repurchase agreements, and swap agreements, and are thus shielded from avoidance under sections 546(e), (f), and (g) of the Code.

> **b.** **The Account Control Agreement is protected by the safe harbors.**

The September 9, 2008 Account Control Agreement recites that LBHI "has granted" JPMorgan a security interest, under the September Security Agreement, in shares and related accounts of certain money market funds, and states that LBHI, JPMorgan, and the funds are entering into the agreement to provide for control of the shares and accounts and to perfect JPMorgan's security interest therein. Wolf Decl. Ex. 9 at 1.

Perfection of a security interest is a "transfer" under the Bankruptcy Code. *See In re Badger Lines, Inc.*, 202 F.3d 945, 946 (7th Cir. 2000) (describing "perfection" of a lien as a "transfer"). Indeed, the Amended Complaint pleads that the Account Control Agreement "was a transfer made by LBHI to or for the benefit of JPMorgan." Am. Compl. ¶ 183. Thus, the perfection of security interests through the Account Control Agreement was a transfer made to a financial institution, financial participant, or swap participant in connection with a protected contract (the Clearance Agreement, September Guaranty, and September Security Agreement), and hence is shielded from avoidance.

4.    **The liens and collateral transfers are shielded from avoidance as a matter of law regardless of whether the Amended Complaint states a claim for avoidance of LBHI's obligations under the Guaranties.**

Faced with the Bankruptcy Code's direct prohibition on avoidance of the collateral transfers and the liens granted in the Security Agreements, the Amended Complaint appears to latch onto a novel avoidance theory that was identified in the Report of the Examiner appointed in these cases. *See generally* Examiner Report at 1767-87. Plaintiffs' theory appears to be that, if LBHI's *obligations* under the August and September Guaranties are avoidable as constructively fraudulent transfers (Counts V-VII and X-XII), then the liens granted to JPMorgan in the August and September Security Agreements are somehow rendered "meaningless" (Counts XIII-XIV).

The theory referenced in the Amended Complaint has two major flaws: *First*, the liens granted to JPMorgan on their face secured the obligations owed to JPMorgan by all of LBHI's subsidiaries, not just LBHI's guaranty obligations, and are thus enforceable without regard to the Guaranties; *second*, the plain language and legislative intent of the safe harbor provisions unambiguously refute any suggestion that avoidance of a safe-harbored transfer can be ef-

fected through avoidance of an obligation.  In any event, as discussed in Point II.C, *infra*, the

safe harbor provisions fully insulate LBHI's guaranty obligations from attack.

        **a.**        **The liens granted to JPMorgan would be valid without the Guaranties because they secured the obligations of LBHI's subsidiaries.**

Even if the safe harbor provisions would allow the indirect avoidance of a safe-

harbored grant of a lien through avoidance of an obligation it secures, the liens granted to

JPMorgan nonetheless cannot be avoided, because on their face they are not dependent on the

existence or enforceability of the Guaranties.  Both the September Security Agreement and the

August Security Agreement secure distinct obligations *in addition to* LBHI's guaranty obliga-

tions to JPMorgan.  Each Security Agreement states that, "[a]s security for the payment of all the

Liabilities" — defined to have the same meaning as in the Guaranty executed at the same time

— "the undersigned hereby grant(s) to the Bank a security interest in, and a general lien upon

and/or right of set-off of, the Security."  *See* Wolf Decl. Ex. 5 at 2; Wolf Decl. Ex. 8 at 2.  In the

August Guaranty, and thus the August Security Agreement, the term "Liabilities" includes all

obligations under the Clearance Agreement incurred by LBI and the other subsidiaries of LBHI

whose debts were guaranteed.  *See* Wolf Decl. Ex. 4, § 1.  In the September Guaranty, and thus

the September Security Agreement, "Liabilities" is defined to include all obligations of any kind

incurred by any of LBHI's subsidiaries.  *See* Wolf Decl. Ex. 7, § 1.  Accordingly, both Security

Agreements granted a lien to JPMorgan to secure the obligations of LBHI's subsidiaries, none of

which are challenged in the Amended Complaint.

        Under the New York Uniform Commercial Code, the security interests granted to

JPMorgan to secure the obligations of LBHI's subsidiaries were plainly enforceable against the

collateral — *with or without the incurrence of any personal liability on the part of LBHI*.  Sec-

tion 102(a)(28) of Article 9 defines a debtor as "a person having an interest, other than a security

interest or other lien, in the collateral, *whether or not the person is an obligor*."  N.Y. U.C.C. § 9-102(a)(28)(A) (emphasis added).  This definition of "debtor" is in contrast to Article 9's definition of "obligor" in section 9-102(a)(59)(i).  An "obligor" with respect to an obligation secured by a security interest is the person that "owes payment or other performance of the obligation."  N.Y. U.C.C. § 9-102(59).  In illustrating this distinction, one commentator provides the following example:

> **Example B:**  If Mary Smith borrows money from First Bank without granting a security interest in any of her assets and Tom Jones, *without himself incurring a monetary obligation*, grants a security interest in his diamond ring to secure the loan made to Mary, then Mary Smith is simply an obligor and Tom Jones is simply a debtor.

Julian B. McDonnell, *Uniform Commercial Code Analysis of Revised Article 9*, at 54 (1999) (emphasis added); *see also*, *e.g.*, *Putnam Realty, Inc.* v. *Terminal Moving & Storage Co. (In re Terminal Moving & Storage Co.)*, 631 F.2d 547, 551 (8th Cir. 1980) (en banc) (affirming validity of security interest granted by corporation to secure shareholder's debts and stating that "[t]here is no requirement under the U.C.C. that the entity whose assets are pledged must receive consideration").

In the August and September Security Agreements, therefore, LBHI — separate and apart from any monetary obligation that it may have had under the Guaranties — granted a security interest in its assets to secure obligations owed by LBHI subsidiaries.  This arrangement, often referred to as a "hypothecation," is, as discussed above, expressly contemplated by Article 9 of the Uniform Commercial Code.  Indeed, as the Court is well aware from other proceedings in the Lehman chapter 11 cases, "rehypothecation" — in which property of a pledgor may be repledged by the pledgee to secure obligations for which the original pledgor has no liability — is quite common in the securities and financial markets, and is also provided for by the Uniform Commercial Code.  *See* N.Y. U.C.C. § 9-207(c)(3).

Moreover, in view of the fact that LBHI's obligations under the August and September Guaranties were contractually limited to the value of the LBHI collateral held or requested, *see* Wolf Decl. Ex. 4, § 1; Ex. 7, § 1, it is obvious that the collateral was of principal importance under the August and September Agreements — not the Guaranties. Plaintiffs' attempt to upset the collateral transfers based on the alleged avoidability of the obligations under the Guaranties — particularly their assertion that the Security Agreements would be rendered "meaningless" if the essentially non-recourse obligations were avoided — is tantamount to a tiny tail wagging an enormous dog.

Accordingly, even if the guaranty obligations were somehow avoided, or even if they had never existed, there would be no basis whatsoever to invalidate JPMorgan's liens. Far from being "meaningless" without LBHI's guaranty obligations, Am. Compl. ¶¶ 159, 162, the liens granted by LBHI to secure the obligations of *other* entities are independently recognized and protected by New York law.

> **b.** **The language, structure, and intent of the safe harbors prevent indirect avoidance of protected transfers.**

As a more general matter, the plain language, structure, and intent behind section 546 squarely preclude any argument that a protected transfer can be avoided indirectly through avoidance of an obligation. The United States Supreme Court has held that, in interpreting the Bankruptcy Code, "[t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' In such cases, the intention of the drafters, rather than the strict language, controls." *United States* v. *Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) (citations omitted; alteration in original); *accord Citibank, N.A.* v. *Emery (In re Emery)*, 132 F.3d 892, 895-96 (2d Cir. 1998) (quoting and applying *Ron Pair*). Here, both the plain meaning of

the legislation *and* the intention of the drafters establish that the safe harbors preclude avoidance of transfers by avoidance of the underlying obligation.

Beginning with the language of the statute, sections 546(e), (f), and (g) of the Bankruptcy Code all provide that, "*[n]otwithstanding* sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid" certain protected transfers. 11 U.S.C. §§ 546(e)-(g) (emphasis added). On its face, therefore, the statute not only bars avoidance of protected transfers, but does so "notwithstanding" statutory provisions that authorize avoidance of *both* "transfers" *and* "obligations." *E.g.*, *id.* § 548(a)(1)(B) (authorizing avoidance of "transfers" and "obligations" absent reasonably equivalent value if financial tests are met).

The plain import of the "notwithstanding" clause is that the enumerated provisions that authorize avoidance of transfers *and* obligations are entirely overridden by the safe harbor: Those provisions may not be used — either directly or indirectly — to avoid a safe-harbored transfer. Robust application of similar "notwithstanding" clauses in statutes and contracts is longstanding and universal. As this Court has recently observed, "the phrase 'notwithstanding any other provision of law' has consistently been interpreted *as written* by courts." *In re Lehman Bros. Holdings, Inc.*, 2010 WL 1783395, at *6 (Bankr. S.D.N.Y. May 5, 2010) (emphasis added) (citing *Cisneros* v. *Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) (noting that courts "have interpreted similar 'notwithstanding' language . . . to *supersede all other laws*" (internal quotation marks omitted) (emphasis added)); *see also*, *e.g.*, *Cisneros*, 508 U.S. at 18 ("As we have noted previously in construing statutes, the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section."); *accord Conyers* v. *Rossides*, 558 F.3d 137, 145 (2d Cir. 2009).

Had Congress for some reason actually wished to limit the scope of the safe harbor provisions and allow avoidance of obligations as an indirect means to set aside protected transfers, it could have easily done so. Indeed, a perfectly good model for such legislation is to be found in the final words of each of the section 546 safe harbors — "except under section 548(a)(1)(A) of this title." Just as Congress preserved the ability to attack transfers that were made with actual intent to defraud creditors, it could just as easily have added to that concluding phrase words such as "or as a result of an avoidance of an obligation under section 548(a) of this title." But Congress did no such thing.

The structure and underlying intent of the statute confirm the dictate of its language. Rewriting section 546 to allow avoidance of transfers through avoidance of obligations would undermine the very foundation of the safe harbors and render them nullities, a result that would be "demonstrably at odds with the intentions of its drafters." *Ron Pair Enters., Inc.*, 489 U.S. at 242. As discussed above, Congress originally enacted the safe harbor in response to *Seligson* v. *New York Produce Exchange* to ensure that margin payments could not be avoided except where actual intent fraud was involved. *See supra* Point II.A.2. Yet, under plaintiffs' apparent reading of the statute, the very transfers of margin payments that Congress sought to protect in overruling *Seligson* could be avoided by seeking to avoid the debtor's *obligations* under the commodities contracts to make the margin payments. By simply recasting an attack on a "margin payment" as an attack on the "obligation" to make a margin payment, a plaintiff would be able to avoid the very margin payments that Congress from the beginning has sought to protect through the statutory safe harbor. *See Seligson*, 394 F. Supp. 125, 132-34 (S.D.N.Y. 1975) (avoidance of margin payment sought based on lack of fair consideration).

This contorted reading of the statute would open the door to attacks on safe-harbored transfers. For example, a debtor could attack an obligation to make a payment under a

swap agreement on the theory that, when the obligation was incurred, the debtor did not receive reasonably equivalent value. Given that the potential for economic loss due to market fluctuations is inherent in many swap agreements — as it is in other safe-harbored contracts — allowing a party to challenge those agreements retrospectively, and thereby indirectly challenge the associated transfers, would create many opportunities to second guess transfers made under protected contracts. At the very least, protected counterparties would be unable to resolve issues of reasonably equivalent value on motions to dismiss, and would thus be subjected to the delay and uncertainty of extended litigation. Instead of serving as a cornerstone protecting financial markets, the safe harbors would in many cases be no more than a formalistic obstacle course to finding an avoidable obligation.

Other safe harbor provisions in the Bankruptcy Code beyond section 546 make it still more plain that Congress did not codify a toothless statutory scheme. Sections 362(b)(7), (b)(17), and (b)(27) of the Bankruptcy Code permit the exercise of contractual rights under safe-harbored contracts despite the automatic stay. 11 U.S.C. §§ 362(b)(7), (b)(17), and (b)(27). And sections 555, 556, and 559 to 561 of the Code provide that the "exercise of a contractual right" to "cause the liquidation, termination or acceleration" of such contracts based on an *ipso facto* clause "shall not be stayed, avoided or otherwise limited by operation of *any provision of this title*." *Id.* §§ 555, 556, 559, 560, 561 (emphasis added). By virtue of these provisions, nothing in the Bankruptcy Code, including the avoidance provisions, can operate to prevent a counterparty to a protected contract from exercising contractual remedies and paying itself out of its collateral.

Finally, as a matter of statutory construction, any doubt as to Congress's intent should be resolved *against* permitting a plaintiff to accomplish indirectly what a statute prohibits

it from doing directly.[13]  In *Heritage Associates, II, L.L.C.* v. *Maryland (In re Heritage Associates, II, L.L.C.)*, 336 B.R. 255 (Bankr. D. Md. 2006), this principle was applied to prevent a debtor from avoiding a guaranty as a backdoor to recovery of an unavoidable transfer.  In that case, a chapter 11 debtor sued a state agency to avoid a guaranty under which the agency could withhold payments in order to recoup overpayments it had made.  Dismissing the complaint, the court explained that "the essential nature of the Committee's suit is to recover money from a state agency" — a clear evasion of the state's sovereign immunity.  *Id.* at 260.  Here, likewise, the "essential nature" of the avoidance claims against JPMorgan is an effort to avoid grants of liens and recover transfers of collateral to JPMorgan — a clear evasion of JPMorgan's protections under the safe harbors.  *See also Craig* v. *Dain Bosworth, Inc. (In re Am. Sec. & Loan, Inc.)*, 1988 WL 1568184, at *4 (Bankr. S.D. Iowa Sept. 30, 1988) (refusing to "allow the protections of section 546(e) to be undermined" by allowing the trustee to "recover indirectly via section 550" what section 546(e) prevented the trustee from recovering directly).

　　　　For multiple reasons, therefore, regardless of LBHI's obligations under the Guaranties, the claims in the Amended Complaint that seek avoidance of the liens granted to JPMorgan and related collateral transfers should all be dismissed under section 546 of the Bankruptcy Code.

---

[13]  *See generally United States* v. *Aleskerova*, 300 F.3d 286, 301 (2d Cir. 2002) ("Just as a district court is not free to undermine a statutory prohibition by directly contravening its command, it may not do so indirectly. . . ."); *48th St. Steakhouse, Inc.* v. *Rockefeller Ctr., Inc. (In re 48th St. Steakhouse, Inc.)*, 61 B.R. 182, 187 (Bankr. S.D.N.Y. 1986) (barring landlord's effort "to obtain . . . by indirection that which it recognized it could not obtain directly" under section 362(a)(3) of the Code).

C.    **The safe harbors require dismissal of plaintiffs' constructive fraudulent transfer claims for avoidance of LBHI's obligations under the Guaranties.  (Counts V-VII, X-XII)**

Although avoidance of LBHI's *obligations* under the Guaranties in this case could have no bearing on the challenged *transfers* for the reasons set forth above, LBHI's guaranty obligations are, in any event, not themselves avoidable.  As explained below, section 546's safe harbor provisions protect LBHI's guaranty obligations just as they protect the challenged transfers.

There is no question that the September Guaranty falls within the plain meaning of various safe-harbor definitions, including "securities contract," "repurchase agreement," and "swap agreement."  *See supra* Point II.B.1.b.  Likewise, the August Guaranty on its face is at least a "securities contract" and a "repurchase agreement," since it expressly guarantees all obligations and liabilities incurred under the Clearance Agreement (Wolf Decl. Ex. 4, § 1), which is a "securities contract" and a "repurchase agreement."  In seeking to avoid LBHI's guaranty obligations, therefore, plaintiffs are indisputably seeking to avoid obligations under contracts covered by the safe harbor definitions.

Against this backdrop, the most that plaintiffs could possibly cite in support of their conclusory allegations that the safe harbors "do not apply" to protect LBHI's obligations under the Guaranties, Am. Compl. ¶¶ 116, 123, 130, 147, 155, 163, is the unadorned omission of an express reference to "obligations" in the language of section 546.  While the issue is one of first impression,[14] reading the statute to permit avoidance of an *obligation* under a safe-harbored contract — even though transfers in connection with, and the exercise of rights under, the same

---

[14] As the Examiner notes, there are no reported decisions on the issue of whether obligations are excluded from the section 546 safe harbors.  *See* Examiner Report at 1763 n.6578.

contract are protected — would be "demonstrably at odds with the intentions of its drafters," *Ron Pair Enters., Inc.*, 489 U.S. at 242, and thus should not be countenanced.

The safe harbors on their face are intended to protect "parties to specified commodities and financial *contracts*." *Hutson* v. *E.I. du Pont de Nemours & Co., Inc. (In re Nat'l Gas Distribs., LLC)*, 556 F.3d 247, 252 (4th Cir. 2009) (emphasis added). This focus is evident from the very words that the Code uses to designate categories of protected transactions, all of which represent types of *contracts* — in the words of the Code, "securities *contract*" (§ 741(7)), "commodity *contract*" (§ 761(4)), "forward *contract*" (§ 101(25)), repurchase *agreement*" (§ 101(47)), "swap *agreement*" (§ 101(53B)), "master netting *agreement*" (§ 101(38A)), and any related "master *agreement*," "security *agreement*," "credit enhancement . . . [,] *guarantee* or reimbursement *obligation*," *e.g.*, § 741(7)(A)(xi) (emphasis added). Similarly, the shields provided by the safe harbors from the automatic stay and the wide-ranging permission to exercise close-out remedies described earlier are animated by the protection of a protected counterparty's ability to exercise *contract* rights.

The statute's pervasive focus on *contracts* flows from the fundamental purpose of the safe harbors — namely, to promote stability in the financial markets, including the securities, repurchase agreement, and derivatives markets, by insulating transactions in those markets from the risks posed by a bankruptcy. *See supra* Point II.A; *see also*, *e.g.*, *In re Enron Creditors Recovery Corp.*, 422 B.R. at 429 (the safe harbors "ensure settlement finality, and therefore market stability" in the securities industry); *In re Bevill, Bressler & Schulman Asset Mgmt. Corp.*, 878 F.2d at 748 ("'The certainty and fluidity needed by professionals on both sides of the transactions is of such importance that one debtor's filing of a petition should not be permitted to impair the functioning of the market as a result of the Code's automatic stay, or have the integrity of contract relationships upset by the Code's avoidance provisions.'" (citation omitted)). By

broadly protecting the exercise of rights, and the performance of obligations, under protected contracts, the Code by its terms "now protects" the "*entire markets*" created by those contracts from avoidance actions and from restrictions imposed by the automatic stay. Morrison & Riegel, *supra*, at 645 (emphasis added).

While the transfers to JPMorgan at issue here are protected from avoidance regardless of whether LBHI's guaranty obligations are avoided, any ruling that the safe harbors do not protect contractual "obligations" would thoroughly undermine the protections granted by the safe harbors. For example, parties to unsecured swap agreements would be able to bring actions in bankruptcy to set aside those agreements, notwithstanding the sweeping definition of the term "swap agreement" included in the safe harbor provisions. *See* 11 U.S.C. § 101(53B)(A)(ii)(I) (including in definition broad categories of "swap," "option," "future" and "forward" agreements as well as any "agreement or transaction that is similar to any other agreement or transaction referred to in [the definition]").

In sum, to permit attempted avoidance of "obligations" that arise under safe-harbored contracts would create an incoherent gap in the safe harbor protections, and in doing so would upset the settled expectations of market participants that rely on those protections in conducting their business.

**POINT III**

**PLAINTIFFS CANNOT ESCAPE THE SAFE HARBORS BY ALLEGING ACTUAL INTENT TO DEFRAUD CREDITORS, IMPROPER SETOFF, OR ANY OTHER AVOIDANCE-RELATED THEORY. (COUNTS I-IV, IX, XIII-XIV, XVI, XVIII, XX, XXIV-XXIX, XXXI, XXXIII-XXXIV)**

In an attempt to escape the safe harbor provisions that preclude avoidance of the challenged transfers based on theories of preference or constructive fraudulent transfer, plaintiffs have brought an array of additional avoidance and related claims against JPMorgan, including claims of actual fraud and improper setoff, as well as various claims that are predicated on the assumed success of plaintiffs' avoidance theories. None of the additional claims is remotely plausible, and they should all be dismissed as a matter of law.

**A.      The Amended Complaint fails to state a claim for avoidance of actual intent fraudulent transfers.  (Counts I-III)**

Plaintiffs attempt in Counts I-III of the Amended Complaint to circumvent the safe harbors by alleging that the September Agreements, the August Guaranty and August Security Agreement, and the collateral transfers to JPMorgan are avoidable under section 548(a)(1)(A) of the Bankruptcy Code, which authorizes avoidance of transfers or obligations if "the debtor" acted with the "actual intent to hinder, delay, or defraud" creditors.  11 U.S.C. § 548(a)(1)(A).  These counts fail to state a claim.

Rule 9(b) of the Federal Rules of Civil Procedure requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "As 'actual intent to hinder, delay, or defraud' constitutes fraud," the Second Circuit has held that actual intent fraudulent transfer claims "must be pled with speci-ficity, as required by Fed. R. Civ. P. 9(b)."  *Sharp Int'l Corp.* v. *State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (citation omitted); *accord*, *e.g.*, *Liquidation*

*Trust* v. *Daimler AG (In re Old Carco LLC (f/k/a Chrysler LLC))*, 2010 WL 2925997, at *16 (Bankr. S.D.N.Y. July 27, 2010); *Pereira* v. *Grecogas Ltd. (In re Saba Enters., Inc.)*, 421 B.R. 626, 640 (Bankr. S.D.N.Y. 2009); *Nisselson* v. *Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007).

   To plead actual intent with the requisite specificity, a plaintiff must, at a minimum, allege "facts that give rise to a *strong inference* of fraudulent intent" on the part of the debtor. *In re Saba Enters., Inc.*, 421 B.R. at 642 (internal quotation marks omitted) (emphasis added); *accord The Responsible Person of Musicland Holding Corp.* v. *Best Buy Co. (In re Musicland Holding Corp.)*, 398 B.R. 761, 773 (Bankr. S.D.N.Y. 2008). "A strong inference of fraudulent intent may be established either (1) by alleging facts demonstrating that the [debtor] had both the motive and the opportunity to commit fraud or (2) by alleging facts that 'constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *E.g.*, *In re Saba Enters., Inc.*, 421 B.R. at 642 (quoting *In re Musicland Holding Corp.*, 398 B.R. at 774)).

   LBHI's Original Complaint scrupulously avoided making *any* allegation of fraudulent intent on the part of LBHI. Instead, LBHI simply alleged — in the passive voice, without saying *who* committed fraud on creditors, or why or how the unnamed perpetrator committed the fraud — that "[e]ntry into each of the September Agreements was made with an actual intent to hinder, delay, and/or defraud LBHI's creditors." Original Compl. ¶ 90; *accord id.* ¶¶ 96, 106 (same allegations for the August Guaranty and Security Agreement and the collateral transfers).

   LBHI has now amended the Original Complaint, and yet it has *not* added any further allegations to support the claim that LBHI defrauded its creditors. Rather, as in the Original Complaint, the Amended Complaint alleges, again in the passive voice, that "[e]ntry into each of the September Agreements was made with an actual intent to hinder, delay, and/or defraud

LBHI's creditors."  Am. Compl. ¶ 90; *accord id.* ¶¶ 96, 106.  In sum, despite JPMorgan's having moved to dismiss the Original Complaint based in part on LBHI's failure to plead its own fraudulent intent — a critical element of any actual intent claim, *see* 11 U.S.C. § 548(a)(1)(A) — LBHI has chosen to do nothing to attempt to remedy that failure.

LBHI's continued failure to allege its *own* fraudulent intent requires dismissal with prejudice of its actual fraud claim.  *See*, *e.g.*, *In re Old Carco LLC*, 2010 WL 2925997, at *20 (dismissing actual fraud claim based on the absence from the complaint of "particularized facts concerning the alleged intentional fraud claim").  This conclusion, moreover, is strongly reinforced by plaintiffs' access to an extensive record of inquiry and information provided by the Rule 2004 discovery and the Examiner Report.  *See id.* at *17 (dismissal of actual intent claim warranted where Rule 2004 discovery and other information provided "ample opportunity to investigate any potential claims prior to filing the Complaint").

The so-called "traditional badges of fraud," which plaintiffs invoke in each of their actual fraud counts, Am. Compl. ¶¶ 90, 96, 106, do nothing to rescue those claims.  In recognition of the "difficulty" that a *creditor* faces in "proving actual intent" of a debtor, New York law permits a creditor "to rely on 'badges of fraud' to support [its] case, *i.e.*, circumstances so commonly associated with fraudulent transfers 'that their presence gives rise to an inference of intent.'"  *Wall St. Assocs.* v. *Brodsky*, 257 A.D.2d 526, 529 (1st Dep't 1999) (quoting *Pen Pak Corp.* v. *LaSalle Nat'l Bank of Chi.*, 240 A.D.2d 384, 386 (2d Dep't 1997)).  But those indirect indicia of fraud can hardly excuse a debtor such as LBHI from making any direct allegations of its own fraudulent intent.

Permitting such pleading by a debtor in possession would contravene the elementary requirements of Rule 9(b), under which a plaintiff must allege the facts that support an inference of fraudulent intent if those facts are not "peculiarly within the opposing party's

knowledge." *Campaniello Imps., Ltd.* v. *Saporiti Italia S.p.A.*, 117 F.3d 655, 664 (2d Cir. 1997) (internal quotation marks and citation omitted); *see also ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 106 (2d Cir. 2007) ("If [plaintiff] had access to the details necessary to make these allegations, it must plead them and not just tell the defendants to go find them.").

Even putting aside the critical absence of direct fraud allegations, the "badges of fraud" that LBHI alleges are insufficient to support any inference of fraud here. Thus, the Amended Complaint does nothing more than allege that "the global markets were experiencing a meltdown, LBHI and many of its subsidiaries were insolvent, LBHI received no consideration in exchange for its expanded obligations . . . , and the September Agreements were executed on a hasty, rushed basis." Am. Compl. ¶ 90. Similar allegations are made about the September collateral transfers and the August Agreements, *id.* ¶¶ 96, 106, although the August Agreements are not alleged to have been entered into on a "hasty, rushed basis."

But these supposed badges of fraud, individually and in the aggregate, are insufficient to plead LBHI's fraudulent intent. To begin with, the condition of the "global markets" has no bearing on LBHI's intent and, accordingly, is not cited in the case law as a badge of fraud. *See*, *e.g.*, *Salomon* v. *Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582-83 (2d Cir. 1983) (reciting badges of fraud); *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005) (same). Indeed, if plaintiffs were correct that the financial "meltdown" of September 2008 is somehow a badge of fraud, every transfer made by Lehman or other financial institutions at that time would carry a badge of fraud — an absurd result.

Plaintiffs' allegations of insolvency, undercapitalization, and lack of adequate consideration are no more sufficient. While these allegations would bear on a claim for constructive fraud absent the safe harbors, they provide no support for an inference of actual intent to defraud creditors. *See In re MarketXT Holdings Corp.*, 361 B.R. at 396-97 (dismissing actual

intent claim despite allegations of insolvency and lack of "adequate consideration"); *see also CLC Creditors' Grantor Trust* v. *Howard Sav. Bank (In re Commercial Loan Corp.)*, 396 B.R. 730, 747 (Bankr. N.D. Ill. 2008) ("If the elements of constructive fraud were enough to demonstrate actual fraud, the constructive fraud provisions of [the fraudulent transfer statute] would be superfluous.").

Finally, although the Amended Complaint alleges that the September Agreements and transfers of collateral to JPMorgan were made on a "hasty, rushed basis," Am. Compl. ¶¶ 90, 106, the Amended Complaint also alleges that it was *JPMorgan*, rather than Lehman, that "wasted no time" in reaching those agreements and making "accelerated demands for additional collateral." *Id.* ¶¶ 44, 66; *see generally id.* ¶¶ 44-69. The alleged "haste," therefore, is quite different from the type of "haste" on the part of a *debtor* that might support an inference of an intent to defraud creditors. *See*, *e.g.*, *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1041 (2d Cir. 1984) ("All of these factors suggest a haste from which one might infer that the timing of the sale was of the essence to [the transferor]," leading to the inference that "[the transferor] intended the sale of its stock . . . to hinder or delay the government's collection of moneys owing or about to be due from it.").

The crux of the Amended Complaint here is that *JPMorgan* pressed "to gain a preferred position over LBHI's other creditors." Am. Compl. ¶ 44. That allegation, however, does *not*, under Second Circuit law, give rise to an actual intent fraudulent transfer claim. *See In re Sharp Int'l*, 403 F.3d at 47, 56 (dismissing actual intent claim against creditor that "arranged quietly" for the repayment of its debt out of proceeds of fraudulent notes and holding that a "preference between creditors" cannot as a matter of law be a fraudulent transfer).

Ultimately, therefore, the Amended Complaint's limited attempt to identify badges of fraud falls far short. Like the Original Complaint, the Amended Complaint sets forth

no "specific allegations" that support "the existence of several badges of fraud." *In re Actrade Fin. Techs. Ltd.*, 337 B.R. at 809. Nor, as discussed above, does the Amended Complaint even plead LBHI's intent to defraud creditors, despite LBHI's knowledge of and access to any facts that would support such allegations. Accordingly, Counts I-III of the Amended Complaint should be dismissed.

**B.     The Amended Complaint fails to state a claim based on improper setoff or violation of the automatic stay. (Counts XXVI, XXVIII, XXXIII)**

The Amended Complaint alleges that the September collateral transfers to JPMorgan are avoidable under sections 553(a)(3) and 553(b) of the Bankruptcy Code because they were allegedly made for the purpose of obtaining a right of setoff or constituted an impermissible improvement of JPMorgan's position via a setoff. *See* Counts XXVI and XXVIII. The Amended Complaint also alleges that JPMorgan's uses of collateral to satisfy obligations owed to it by Lehman entities were setoffs that violated the automatic stay. *See* Count XXXIII. These are facially implausible allegations, since they seek to rely upon the setoff provisions of the Code to recover what the Amended Complaint and Bankruptcy Code have chosen to label and otherwise treat as "transfers."

Section 553(a) of the Code authorizes and regulates the right of a creditor to set off debts owing to it by the debtor against debts it owes to the debtor; section 553(b) then describes circumstances in which the trustee may recover amounts set off pre-petition. Section 362(a)(7) stays the setoff of pre-petition debts owing to the debtor against claims against the debtor. Here, however, the Amended Complaint fails to plead facts that would establish that the collateral transfers or applications of the collateral amounted to setoffs at all.

In addition, section 553(a) of the Bankruptcy Code, invoked by Count XXVI of the Amended Complaint, on its face does not purport to give the trustee any power to avoid effectuated setoffs.

Finally, sections 553 and 362 themselves incorporate safe harbor protections that would shield the collateral transfers and applications of collateral to the extent that they somehow could be understood as constituting the exercise of setoff rights. Therefore, the claims in Counts XXVI, XXVIII, and XXXIII should be dismissed as a matter of law.

1.   **The Amended Complaint fails to plead plausibly that the September collateral transfers were a setoff subject to section 553.**

Count XXVI of the Amended Complaint seeks "avoidance" of the September collateral transfers pursuant to section 553(a)(3) of the Bankruptcy Code. Section 553(a) allows a creditor to "offset a mutual debt owing by such creditor to the debtor . . . against a claim of such creditor against the debtor," but then lists three categories of exceptions. The third of these, section 553(a)(3), limits the right of setoff to the extent that the debt owed to the debtor by such creditor was incurred by such creditor: (a) within 90 days before the debtor's filing of a bankruptcy petition; (b) while the debtor was insolvent; and (c) for the purpose of obtaining a right of setoff against a debtor, *except* for a setoff of a kind described in sections 362(b)(6), (b)(7), (b)(17), or (b)(27), as well as sections 555, 556, 559, 560, or 561.

Count XXVIII of the Amended Complaint seeks to avoid the collateral transfers as an impermissible improvement in JPMorgan's position pursuant to section 553(b) of the Bankruptcy Code, which gives the trustee the right to recover certain amounts set off by a creditor within 90 days before the filing of the debtor's bankruptcy petition, "[e]xcept with respect to a setoff of a kind described in Section 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560 [or] 561."

Fundamental to the occurrence of any setoff, according to the Supreme Court, is an "intent permanently to settle accounts." *Citizens Bank of Md.* v. *Strumpf*, 516 U.S. 16, 19 (1995) (bank's temporary administrative freeze was not a setoff). In other words, the amount owing by the debtor to the creditor must be treated as having been paid by the setoff. Reflecting that intent, a "setoff has not occurred until three steps have been taken: (i) a decision to effectuate a setoff, (ii) some action accomplishing the setoff, and (iii) a recording of the setoff." *Id.* Accordingly, a "setoff does not arise automatically merely because the [creditor] and the debtor have mutual debts, but only occurs when there has been a deliberate, overt action demonstrating that the [creditor] has exercised its right to set off." *Belfance* v. *BancOhio/Nat'l Bank (In re McCormick)*, 5 B.R. 726, 730 (Bankr. N.D. Ohio 1980) (citing *Baker* v. *Nat'l City Bank of Cleveland*, 511 F.2d 1016 (6th Cir. 1975)); *accord In re Lifestyle Furnishings, LLC*, 418 B.R. 382, 387 (Bankr. D. Idaho 2009) ("A creditor must take affirmative action to exercise its right of setoff." (citations omitted)); *In re Gehrke*, 158 B.R. 465, 468 (Bankr. N.D. Iowa 1993) (same); *In re Davis*, 29 B.R. 652, 654 (Bankr. W.D.N.Y. 1983) (identifying among steps necessary for setoff "some affirmative action to accomplish the setoff must be taken").

The Amended Complaint fails to allege that JPMorgan ever set off in advance of LBHI's bankruptcy filing. Instead, Count XXVI of the Amended Complaint merely alleges in pertinent part that within 90 days of its filing LBHI "transferred each of the September Transfers," Am. Compl. ¶ 233, and that JPMorgan "caused LBHI to transfer the September Transfers for the purpose of obtaining a right to setoff against LBHI," *id.* ¶ 235, with the alleged result that "[e]ach of the September Transfers is avoidable under Section 553 of the Bankruptcy Code," *id.* ¶ 237.

Similarly, Count XXVIII of the Amended Complaint claims only that "LBHI entered into each of the September Transfers" within 90 days of its filing, *id.* ¶ 245, and that

JPMorgan "improved its position through LBHI's transfer of the September Transfers" within the meaning of section 553(b), *id.* ¶ 247, which allegedly renders JPMorgan liable "for the amount by which the September Transfers enabled it to improve its credit position with respect to LBHI" in the 90 days before its filing, *id.* ¶ 249. These claims simply do not establish that a setoff ever occurred, because they do not allege that JPMorgan actually applied LBHI's property pre-petition to satisfy LBHI's debts to JPMorgan.[15]

Moreover, the September 2008 collateral transfers are not themselves pre-petition setoffs by JPMorgan. As defined by the Amended Complaint, the "September Transfers" represent four distinct September 2008 transfers of cash and money market funds from LBHI to JPMorgan. *See id.* ¶¶ 101-04. Mere transfers of cash and property from LBHI to JPMorgan, however, do not represent "setoffs" within the meaning of the Bankruptcy Code because they do not represent transactions in which "parties that owe mutual debts to each other . . . assert the amounts owed, subtract one from the other, and pay only the balance." *PC COM, Inc.* v. *Proteon, Inc.*, 906 F. Supp. 894, 903 (S.D.N.Y. 1995).

On a generous reading, then, the most the Amended Complaint could be said to allege is that collateral was transferred pre-petition that might someday be available to set off. But section 553 of the Code does not purport to prohibit the transfer of collateral that someday could lead to an exercise of setoff rights.[16] Rather, the statute both authorizes and restricts only

---

[15] Similarly, the Amended Complaint earlier alleges that the transfers of LBHI's assets to JPMorgan were "an impermissible build up of collateral for the purpose of putting JPMorgan in a position of having more assets against which it *could* setoff claims." Am. Compl. ¶ 85 (emphasis added).

[16] Even if the Code did prohibit such transfers, the Amended Complaint fails to allege any factual basis for its bare conclusion that the transfers were made "for the purpose of obtaining a right to setoff against LBHI." Am. Compl. ¶ 235.

the act of setoff itself, which is not alleged to have occurred. A challenge to a transfer of collateral, on the other hand, is within the domain of voidable preference law.

Consistent with this common-sense distinction, courts for decades have distinguished between setoff, on the one hand, and transfer (as defined in the Code), on the other, finding that section 553 of the Code deals exclusively with preferential acts of setoff (as opposed to preferential transfers) while section 547 deals exclusively with preferential transfers (as opposed to preferential setoffs). *See*, *e.g.*, *Smith* v. *Mark Twain Nat'l Bank*, 805 F.2d 278, 289-91 (8th Cir. 1986) ("Various authorities, cases and commentators have noted that the rules in Section 553 'do not apply with respect to "set-offs" that are in fact seizure of property subject to a security interest.'" (citations omitted)).[17]

This judicial distinction is founded on the very definition of "transfer" in the Bankruptcy Code, 11 U.S.C. § 101(54), which deliberately omits "setoff." *See* H.R. Rep. No. 95-595, at 549 (1977) ("Inclusion of 'setoff' is deleted. The effect is that a 'setoff' is not subject to being set aside as a preferential transfer but will be subject to special rules."); *see also In re Am. Remanufacturers, Inc.*, 2008 WL 2909871, at *2 (Bankr. D. Del. July 25, 2008) (relying on legislative history to conclude that setoffs are not avoidable as preferential or fraudulent transfers); *Holyoke Nursing Home, Inc.* v. *Health Care Fin. Admin. (In re Holyoke Nursing Home Inc.)*, 273 B.R. 305, 309-10 (Bankr. D. Mass. 2002) (same).

---

[17] *See also Richardson* v. *Principal Fin. Grp., Inc. (In re Bayless)*, 2007 WL 1114064, at *3 (Bankr. C.D. Ill. April 12, 2007) ("When there is a conflict between the avoidance of preferential transfers under § 547 and setoff under § 553, setoff should be construed to minimize its interference with § 547."); *Jarboe* v. *U.S. Small Bus. Admin. (In re Hancock)*, 137 B.R. 835, 845 (Bankr. N.D. Okla. 1992) ("Where a transaction . . . involves a mere netting-out of counterclaims or reconciliation of accounts and not a transfer of money or property, then such transaction may be considered a 'setoff' within the meaning of § 553. . . . Any other transaction should be recognized as a 'transfer' . . . and subject to avoidance as provided by § 547.").

In sum, plaintiffs cannot circumvent the bedrock distinction between transfer and setoff; if plaintiffs wish to attack the collateral transfers, they must run the gauntlets of the safe harbors and other defenses to avoidance of *transfers*, which as previously demonstrated they cannot do. Counts XXVI and XXVIII should thus be dismissed as a matter of law.

2.   **Section 553(a)(3) does not provide the trustee with power to avoid amounts set off pre-petition.**

Count XXVI of the Amended Complaint alleges that "[e]ach of the September Transfers is avoidable," presumably under section 553(a)(3) of the Bankruptcy Code. Am. Compl. ¶ 237. By its plain terms, however, section 553(a)(3) simply describes one of three exceptions to the general rule stated in the introductory language of section 553 that the Bankruptcy Code does not affect a creditor's right of setoff. Subsection (a)(3) does not purport to give the trustee any right to avoid amounts that have been set off pre-petition. There is accordingly no statutory basis for the Amended Complaint's attempted use of section 553(a)(3) to "avoid" the September transfers.

This limitation on the scope of section 553(a)(3) becomes obvious upon comparison of its language with the text of section 553(b), as well as with section 550 of the Code. Section 553(b), unlike section 553(a), expressly provides that "the trustee may recover from such creditor [certain amounts] offset." And section 550, which governs the trustee's recovery to satisfy avoidance judgments, provides that the trustee may recover certain amounts to the extent that a transfer is avoided under section 553(b) but *not* section 553(a) of the Bankruptcy Code. *Cf. Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A.* v. *Boyer (In re U.S.A. Diversified Prods., Inc.)*, 196 B.R. 801, 808 (N.D. Ind. 1996) (affirming bankruptcy court's conclusion that section 550 did not apply to proceedings under section 542, which is not listed in section 550 as an avoidance provision).

Again, although plaintiffs doubtless wish they could procure avoidance of the challenged collateral transfers without facing the strictures placed upon the avoidance of pre-petition transfers, section 553(a) offers them no escape from their burden. Because section 553(a) does not give the trustee the right to avoid pre-petition setoffs, Count XXVI of the Amended Complaint should be dismissed as a matter of law.

**3.    Even if mischaracterized as a setoff, the September collateral transfers are protected by the safe harbors.**

Each of Counts XXVI and XXVIII specifically alleges that the "safe harbor provisions of the Bankruptcy Code do not apply to the September Transfers." Am. Compl. ¶¶ 236, 248. This is wrong: Even if the challenged transfers could actually be viewed as acts of setoff, the safe harbors would protect them from avoidance.

Sections 362(b)(6), (b)(7), and (b)(17) of the Bankruptcy Code are exceptions to the automatic stay for the exercise of a right of setoff by a financial institution or financial participant pursuant to commodities, forward, and securities contracts, repurchase agreements, and swap agreements, respectively. *See* 11 U.S.C. §§ 362(b)(6), (b)(7), (b)(17). Further, sections 555, 556, 559, and 560 of the Bankruptcy Code allow a financial institution or financial participant to exercise *inter alia* its setoff rights pursuant to securities contracts, commodities contracts, forward contracts, repurchase agreements, and swap contracts, respectively. *See id.* §§ 555, 556, 559, 560. Section 553, moreover, expressly protects setoffs permitted by these automatic stay exceptions and close-out provisions of the safe harbors. *See id.* §§ 553(a)(2)(B)(ii), 553(a)(3)(C), 553(b)(1).

For the reasons described at Point II.B above, the September 2008 collateral transfers are transactions of the type described in these sections of the Bankruptcy Code: JPMorgan is a financial institution and a financial participant, and the transfers of collateral were made in

connection with securities contracts, repurchase agreements, or swap agreements, and as exercises of JPMorgan's contractual rights thereunder. As a result, even if the collateral transfers could be construed as setoffs in the first instance, they were not prohibited by sections 553(a)(3) and 553(b), and Counts XXVI and XXVIII should be dismissed.

4. **The claim for setoff in violation of the automatic stay fails to state a claim. (Count XXXIII)**

The Amended Complaint alleges that JPMorgan violated the automatic stay "when it effected various seizures and setoffs" to satisfy obligations "under certain derivatives contracts," and continues with the unexplained allegations that any setoff was not "posted pursuant to, and was not sufficiently related to, the derivatives contracts," and hence is "not protected by the safe harbor provisions" of the Code, concluding with a request for a declaration that these purported "wrongful setoffs" were "willful violations of the automatic stay under section 362(a)(7)." Am. Compl. ¶¶ 267-69. The Amended Complaint, however, pleads nothing but erroneous conclusions that JPMorgan effectuated a setoff and that other elements of a purported stay violation exist. This claim should be dismissed as well.

First, the Amended Complaint fails to provide a plausible basis for its assertion that JPMorgan actually effected a setoff. The Amended Complaint alleges that JPMorgan "liquidated" collateral in which it had a security interest to pay obligations owed by Lehman entities. *See* Am. Compl. ¶¶ 267-68. Where a creditor has a security interest, however, the creditor's use of its collateral to satisfy a debt is *not* a setoff — at most, it is a "transfer" subject to the Bankruptcy Code's avoidance provisions. *See Smith*, 805 F.2d at 290 (concluding that section 553 of the Bankruptcy Code, which governs setoffs, "is inapplicable to *valid* foreclosures of security interests," but noting that the "Trustee could . . . attempt to avoid Bank's foreclosure of its interest as a preference under 11 U.S.C. § 547"). Accordingly, the Amended Complaint offers no

basis to conclude that, when JPMorgan allegedly used the property to satisfy debts owed to it, JPMorgan engaged in a "setoff" rather than an exercise of its rights as a secured creditor.

Additionally, even if the alleged liquidations and uses of collateral were "setoffs," the Amended Complaint fails to plead any plausible basis as to how the purported setoffs were not, in the words of the Amended Complaint, "pursuant to" or "sufficiently related to" protected contracts. Each of the safe harbors in section 362(b) provides that a financial institution, financial participant, or other protected party may exercise any of its "contractual rights," free of the automatic stay, "under any security agreement or arrangement or other credit enhancement forming a part of or related to" a protected contract. 11 U.S.C. §§ 362(b)(6) (securities contract), 362(b)(7) (repurchase agreement), (b)(17) (swap agreement), (b)(27) (master netting agreement).

The statute, accordingly, only requires that the exercise of "contractual rights" under a security agreement or other credit enhancement be "related to" a protected contract — a purposely broad term. *See Coregis Ins. Co.* v. *Am. Health Found., Inc.*, 241 F.3d 123, 128-29 (2d Cir. 2001) (analyzing the term "related to" and concluding that it is "broad," "not necessarily tied to the concept of a causal connection," and defined as "equivalent to the phrases 'in connection with' and 'associated with'"). Here, in light of plaintiffs' own allegations regarding the transfers of collateral to JPMorgan, *see*, *e.g.*, Am. Compl. ¶ 62 (alleging that JPMorgan requested collateral "based primarily on the possibility of closing derivatives contracts"), the Amended Complaint itself establishes that any "setoffs" involving that collateral were "related to" protected contracts.

Indeed, the Amended Complaint itself further confirms that the safe harbors apply to JPMorgan's alleged application of LBHI collateral. In clear response to the argument for dismissal of this claim in JPMorgan's Motion to Dismiss the Original Complaint, the Amended Complaint, unlike the Original Complaint, specifies the alleged "setoffs" that plaintiffs challenge

as violative of the automatic stay. *See* Am. Compl. ¶ 268. But the specific "setoffs" that are mentioned only demonstrate that JPMorgan exercised its contract rights in connection with pro-tected contracts, particularly swap agreements, repurchase agreements, and securities contracts.

As reflected by the terms of the contracts under which the Amended Complaint alleges that JPMorgan exercised its contract rights, which are attached to the Wolf Declaration and were cited in the JPMorgan Proofs of Claim, each of the obligations identified by plaintiffs as allegedly having been satisfied with Lehman collateral was incurred in connection with a safe harbored swap agreement, securities contract, or other protected contract or transaction:[18]

### Swap Agreements

- JPMorgan liquidated $1.57 billion of collateral for claims of JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., and JPMorgan Bank Dublin plc, Bear Stearns Credit Products Inc., JPMorgan Securities Ltd., and JPMorgan Ventures Energy Corp. against Lehman Brothers Special Financing Inc. and Lehman Brothers Commodity Services Inc. under an ISDA Master Agreement dated as of December 20, 1995. *See* Wolf Decl. Ex. 15.

- JPMorgan liquidated $80.3 million of collateral for a Washington Mutual Bank claim against Lehman Brothers Special Financing Inc. under an ISDA Master Agreement dated as of May 28, 1998 and amended as of July 23, 2008. *See* Wolf Decl. Ex. 16.

- JPMorgan liquidated $138.5 million of collateral for claims of JPMorgan Chase Bank, N.A. and Bear Stearns Forex Inc. against Lehman Brothers Commercial Corp. under an ISDA Master Agreement dated as of November 15, 1993. *See* Wolf Decl. Ex. 17.

---

[18] For ease of comparison to paragraph 268 of the Amended Complaint, the bullet points below follow the language used in the Amended Complaint to describe the applications of collateral referred to in paragraph 268. The use of this language, however, is subject to the following clari-fications: (a) each instance in which the term "liquidated" is used refers to the application by JPMorgan of cash collateral posted by LBHI, and (b) in some instances, the description of an ap-plication of collateral in the Amended Complaint includes JPMorgan claimants and/or Lehman obligors in addition to those actually involved.

- JPMorgan liquidated $3.4 million of collateral for a J.P. Morgan Markets Limited claim against Lehman Brothers International (Europe) under an ISDA Master Agreement dated as of August 26, 1997.  *See* Wolf Decl. Ex. 18.

- JPMorgan liquidated $2.1 million of collateral for a J.P. Morgan Bank Dublin PLC claim against Lehman Brothers International (Europe) under an ISDA Master Agreement dated as of June 18, 1997.  *See* Wolf Decl. Ex. 19.

- JPMorgan liquidated $91.0 million of collateral for claims of JPMorgan Chase Bank, N.A. and JPMorgan International Bank Ltd. against Lehman Brothers Finance, S.A. under an ISDA Master Agreement dated as of November 15, 1993.  *See* Wolf Decl. Ex. 20.

- JPMorgan liquidated $10.2 million of collateral for a J.P. Morgan Markets Limited claim against Lehman Brothers Finance, S.A. under an ISDA Master Agreement dated as of January 14, 1994 and amended as of July 11, 2008.  *See* Wolf Decl. Ex. 21.

- JPMorgan liquidated $17.6 million of collateral for a J.P. Morgan Markets Limited claim against Lehman Brothers Special Financing Inc. under an ISDA Master Agreement dated as of July 11, 2001.  *See* Wolf Decl. Ex. 22.

Repurchase Agreements and Securities Contracts

- JPMorgan liquidated $3.9 million of collateral for a JPMorgan Chase Funding Inc. claim against Lehman Brothers International (Europe).  *See* Wolf Decl. Ex. 23.

- JPMorgan liquidated $1.9 million of collateral for a J.P. Morgan Markets Limited claim against Lehman Brothers International (Europe).  *See* Wolf Decl. Ex. 24.

- JPMorgan liquidated $18.9 million of collateral for a J.P. Morgan Markets Limited claim against LBREM II BS Financing Mezz Holdings LLC.  *See* Wolf Decl. Ex. 25.

- JPMorgan liquidated $10.1 million of LBHI collateral to pay an LBI obligation to J.P. Morgan Securities Inc.  *See* Wolf Decl. Ex. 26.

- JPMorgan liquidated $525,266 of LBHI collateral to pay an LBI obligation to J.P. Morgan Clearing Corp.  *See* Wolf Decl. Ex. 27.

For these reasons, therefore, Count XXXIII fails as a matter of law and should be dismissed.

**C. Plaintiffs' claims for recovery, declaratory judgments, turnover, and disallowance of claims should all be dismissed. (Counts IV, IX, XIII-XIV, XVI, XVIII, XX, XXIV, XXV, XXVII, XXIX, XXXI, XXXIV)**

Various counts of the Amended Complaint seek recovery of avoided transfers under section 550 of the Code, declaratory judgments that certain agreements are unenforceable because the Guaranties are allegedly avoidable, turnover of property allegedly held under avoidable contracts, and disallowance of claims based on agreements that are allegedly avoidable. Because all of those claims are predicated on the flawed avoidance claims, the failure of the avoidance claims likewise requires their dismissal. Moreover, as set forth below, many of the claims should also be dismissed on independent grounds.

**1. Dismissal of plaintiffs' avoidance claims requires dismissal of plaintiffs' claims under section 550 of the Bankruptcy Code. (Counts IV, IX, XVI, XVIII, XX, XXIV, XXIX)**

The Amended Complaint asserts that section 550 of the Bankruptcy Code entitles LBHI to recover the collateral transferred to JPMorgan and the funds swept into the General Ledger Cash Collateral Account in September 2008 because the collateral transfers and "funds sweep" at that time are subject to avoidance under sections 548(a)(1)(A), 548(a)(1)(B), 544, 547, and 553(b) of the Code. These claims should be dismissed along with the avoidance claims.

Section 550(a) provides that "to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property." 11 U.S.C. § 550(a). Under the plain language of the statute, therefore, "recovery for the estate under § 550(a) is available only to the extent a transfer has been successfully avoided pursuant to any of the avoidance sections of the Bankruptcy Code." *Secs. Inv. Prot. Corp.* v. *Stratton Oakmont, Inc.*, 234 B.R. 293, 312 (Bankr. S.D.N.Y. 1999).

Accordingly, when claims to avoid transfers are dismissed, claims seeking recovery of those transfers under section 550(a) should likewise be dismissed. *See*, *e.g.*, *In re Aphton Corp.*, 423 B.R. 76, 92 (Bankr. D. Del. 2010) (dismissing § 550 claim as "inapplicable because the § 548 claim . . . has been dismissed"); *In re Broad St. Assocs.*, 163 B.R. 68, 72 (Bankr. E.D. Va. 1993) (dismissing § 550(a)(1) claim because debtor did not adequately allege underlying avoidance claim). Counts IV, IX, XVI, XVIII, XX, XXIV, and XXIX of the Amended Complaint should thus be dismissed.

2. **The Amended Complaint fails to allege facts to support declaratory judgments that the August and September Security Agreements, the September Amendment, and the Account Control Agreement are invalid and unenforceable. (Counts XIII, XIV)**

Count XIII of the Amended Complaint seeks a declaratory judgment that the August Security Agreement is invalid and unenforceable. Am. Compl. ¶¶ 165-67. Count XIV seeks a declaratory judgment that the September Security Agreement, the September Amendment, and the Account Control Agreement are invalid and unenforceable. *Id.* ¶¶ 168-70. Both counts are predicated on the unfounded notion that, if LBHI's obligations under a guaranty were avoided, the contemporaneous grants of security to JPMorgan would then be "meaningless." *Id.* ¶¶ 167, 170.

As a threshold matter, these claims all fail on the basis that the Amended Complaint does not state valid claims for avoidance of obligations under either the August Guaranty or the September Guaranty. *See supra* Points II.C, III.A. Since LBHI's guaranty obligations are not avoidable, there is no basis to declare that other agreements are "meaningless" based on their avoidance.

Even if LBHI's guaranty obligations were avoidable, however, the requests for declaratory relief lack any foundation. The Amended Complaint makes no attempt to explain

why the August and September Security Agreements, or the related September Agreements, are "meaningless" without the Guaranties' obligations — and, as a matter of law, they are not.

Regardless of whether LBHI had a guaranty obligation to JPMorgan, LBHI — as a "debtor" under Article 9 of the U.C.C. — was fully able and entitled as a matter of law to enter into a security agreement, and post collateral, to secure debts owed by its subsidiaries. *See supra* Point II.B.4.a (demonstrating that the U.C.C. distinguishes between a "debtor" and an "obligor" and permits a "debtor" entity to pledge collateral to secure obligations of a separate "obligor" entity). The assertion that the grant and perfection of security interests are "meaningless" without the Guaranties is thus incapable of supporting a cognizable claim.

### 3. The Amended Complaint fails to allege facts to support a claim for turnover under section 542 of the Bankruptcy Code. (Counts XXV, XXVII, XXXIV)

The Amended Complaint's claims for turnover of property under section 542 of the Bankruptcy Code in Counts XXV, XXVII, and XXXIV should likewise be dismissed. The first and second "turnover" claims, which seek, respectively, the return of allegedly "excess collateral" held by JPMorgan on September 12, 2008 and the return of the September Transfers, are predicated on the allegation that "[t]he September Agreements are void and invalid." Am. Compl. ¶¶ 229, 240. Since the September Agreements are not avoidable, let alone void and invalid, *see supra* Points II.B-C, III.A, these turnover claims fail. Likewise, the third "turnover" claim, which seeks the return of funds that were allegedly taken by JPMorgan in violation of the automatic stay, is predicated on an alleged stay violation, Am. Compl. ¶¶ 271-72 — a claim that fails as a matter of law, *see supra* Point III.B.4.

In any event, the Amended Complaint fails to state a valid claim for turnover because it does not allege that JPMorgan holds property of the estate. Under section 542 of the Code, "an entity, other than a custodian, in possession, custody, or control, during the case, of

property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor

may exempt under section 522 of this title, shall deliver to the trustee, and account for, such

property or the value of such property." 11 U.S.C. § 542(a). Section 542(a), therefore, pertains

only to "property that the trustee may use, sell, or lease under section 363 of this title," which

provides that the "trustee . . . may use, sell or lease . . . *property of the estate*." *Id.* § 363(b)(1)

(emphasis added). Thus, "[i]n order for [the debtor] to bring an action under § 542, it must dem-

onstrate that it has an interest in the property sought to be recovered, and that such interest falls

within the meaning of 'property of the estate' as defined by 11 U.S.C. § 541." *Printables, Inc.* v.

*Brittany Dyeing & Printing Corp.*, 126 B.R. 162, 164 (S.D.N.Y. 1991); *accord, e.g., Pereira* v.

*Grecogas Ltd. (In re Saba Enters., Inc.)*, 421 B.R. 626, 659 n.25 (Bankr. S.D.N.Y. 1009); *Sav-*

*age & Assocs., P.C.* v. *Mandl (In re Teligent, Inc.)*, 325 B.R. 134, 137 (Bankr. S.D.N.Y. 2005).

      Although the Amended Complaint asserts that the Excess Collateral and Septem-

ber Transfers are "property of the estate," that allegation is supported only by the bare legal con-

clusion that "LBHI has a legal or equitable interest in the Excess Collateral." Am. Compl.

¶¶ 228, 239. The Second Circuit, however, has squarely held that "property of the estate" under

section 541 of the Code does *not* encompass property that the debtor has transferred and seeks to

recover through an avoidance action. *See In re Colonial Realty Co.*, 980 F.2d 125, 131 (2d Cir.

1992). Rather, "[p]roperty that has been fraudulently or preferentially transferred does not be-

come property of the estate until it has been recovered." *In re Andrew Velez Constr., Inc.*, 373

B.R. 262, 273 (Bankr. S.D.N.Y. 2007) (quoting *In re Teligent Inc.*, 325 B.R. at 137).

      In sum, "[i]t is settled law that the debtor cannot use the turnover provisions to

liquidate contract disputes or otherwise demand assets whose title is in dispute." *Hirsch* v. *Lon-*

*don S.S. Owners' Mut. Life Ins. Ass'n Ltd. (In re Seatrain Lines, Inc.)*, 198 B.R. 45, 50 n.7

(S.D.N.Y. 1996) (internal quotation marks and citation omitted).  The claims for turnover under

section 542(a) thus should be dismissed.

>**4.** **The Amended Complaint fails to state a claim for disallowance**
>**of claims under section 502(d) of the Bankruptcy Code or for**
>**voiding of liens under section 506(d) of the Code.  (Count**
>**XXXI)**

In Count XXXI, the Amended Complaint alleges that because JPMorgan is hold-

ing property recoverable under the Code's avoidance provisions, claims held by JPMorgan

against LBHI should be disallowed under section 502(d) of the Code, and any lien securing the

claims thereby disallowed should be voided under section 506(d) of the Code.  That claim, how-

ever, necessarily fails along with plaintiffs' underlying avoidance claims.

Section 502(d) of the Code provides that "the court shall disallow any claim of

any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or

that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549,

or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any

such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or

553 of this title."  11 U.S.C. § 502(d).  Section 506(d) of the Code provides that, with certain ex-

ceptions, "[t]o the extent that a lien secures a claim against the debtor that is not an allowed se-

cured claim, such lien is void."  *Id.* § 506(d).

Accordingly, to prevail on an action under section 502(d), the trustee must first

obtain a determination that a transferee "received an avoidable preference or an avoidable . . .

transfer."  *In re Metiom, Inc.*, 301 B.R. 634, 641-42 (Bankr. S.D.N.Y. 2003).  Likewise, to in-

validate a lien under section 506(d), the trustee must, at the very least, demonstrate that there is

some basis to disallow a claim.  *E.g.*, *In re Pomilio*, 425 B.R. 11, 16 (Bankr. E.D.N.Y. 2010)

("This function [of voiding a lien under section 506(d)] cannot occur unless and until a secured

claim is disallowed.").  Here, because plaintiffs' avoidance claims are all subject to dismissal, the

claims under section 502(d) and section 506(d) should likewise be dismissed.[19]

<div align="center">

**POINT IV**

**PLAINTIFFS' COMMON LAW CLAIMS SHOULD
BE DISMISSED.  (COUNTS XXXII, XXXV-XLIX)**

</div>

Faced with the protections afforded to JPMorgan's receipt of collateral by the

Bankruptcy Code's safe harbor provisions, plaintiffs have concocted a variety of common law

theories to achieve the very result precluded by the safe harbors.  Plaintiffs' efforts to bypass the

prohibitions of federal law all fail.

As a threshold matter, federal bankruptcy law preempts plaintiffs' claims of "con-

structive trust," "unjust enrichment," and "conversion" (Counts XXXII, XXXVI-XXXVII,

XXXIX-XL), which seek nothing more than to recover collateral transfers that Congress has ex-

plicitly declared unavoidable under the safe harbors.  *See infra* Point IV.A.  The claim for a de-

claratory judgment that JPMorgan has no lien on the $6.9 billion in cash collateral posted by

LBHI in the week before its bankruptcy filing because JPMorgan allegedly swept the collateral

into the JPMorgan General Ledger Cash Collateral Account (Count XXXVIII), along with asso-

ciated claims for unjust enrichment and conversion (Counts XXXIX-XL), should also be dis-

---

[19]  Plaintiffs' claims under sections 502(d) and 542 of the Code are also barred at this time by the Collateral Disposition Agreement (the "CDA"), *see* Wolf Decl. Ex. 28, approved by this Court on March 24, 2010, *see* D.I. 7785.  LBHI agreed in the CDA that "§§ 502(d), 541 and 542 . . . shall not apply with respect to any failure on the part of [JPMorgan] to pay, repay or otherwise disgorge" the amount of any claim that is paid but later determined to have been subject to avoidance or disallowance, until five days after the issuance of a final, non-appealable order or entry into a settlement agreement that resolves all claims of JPMorgan and its affiliates against the Debtors and all potential actions, proceedings and challenges with respect to such claims, the collateral posted by Lehman to JPMorgan in respect of such claims, and payment on the claims. *See* Wolf Decl. Ex. 28, ¶ 6(b).  These predicates have not occurred.

missed because they are contradicted by explicit contractual and statutory authority that gave JPMorgan the right to direct the disposition of LBHI's funds. *See infra* Point IV.B.

Even plaintiffs' claims that purport to seek damages beyond the return of the transferred collateral are still at bottom attacks on JPMorgan's receipt of collateral from LBHI, and accordingly lack any legally cognizable basis outside the sphere of avoidance law. The result is a collection of ill-fitting causes of action, each of which should be dismissed for failure to state a claim. Thus:

- In their "breach of contract" claims (Counts XLI-XLIV), plaintiffs allege that JPMorgan breached its agreements with LBHI by requesting and retaining the collateral. But nothing in those agreements even speaks to the issue of how much collateral JPMorgan could request from LBHI, let alone *forbids* JPMorgan from making any request. Nor can plaintiffs identify any provision that entitled LBHI to the immediate release of its collateral from JPMorgan. *See infra* Point IV.C.1.a. Plaintiffs' claims for breach of the Clearance Agreement, which purport to seek billions of dollars in damages, are also barred by that agreement's explicit, fully enforceable waiver of consequential damages. *See infra* Point IV.C.1.b. Plaintiffs' attempt to invoke the implied covenant of good faith and fair dealing (Counts XLV, XLVII) likewise fails, as the implied covenant can only be used to enforce existing contractual rights — not to create new rights from whole cloth. *See infra* Point IV.C.2.

- Plaintiffs' claims that the September Agreements are invalid for lack of consideration, lack of authority (as to the September Guaranty), and coercion or duress (Counts XXXV, XLVI) also fail on multiple grounds. *First*, the September Guaranty contains a broad waiver of LBHI's right to assert any

defenses to the validity of the September Agreements. This waiver, executed by a sophisticated party advised by counsel, is fatal to LBHI's defenses to those agreements. *See infra* Point IV.D.1. *Second*, LBHI repeatedly ratified the September Agreements, as well as any "agreement" to provide collateral (which plaintiffs challenge on grounds of coercion or duress in Count XLVIII), by its continued performance and acceptance of benefits pursuant to, and its suit to enforce, the Agreements, precluding any claim of duress based on JPMorgan's alleged failure to provide "commercially reasonable notice" that it might cease extending credit. *See infra* Point IV.D.2. *Third*, plaintiffs' claim that the September Agreements lacked consideration is belied by the fact — recognized elsewhere in the Amended Complaint, *see* ¶ 48 — that JPMorgan advanced billions of dollars of credit to LBHI's subsidiary, LBI, which was ample consideration for LBHI's entry into the September Agreements. *See infra* Point IV.D.3.

- Plaintiffs' claim that the transfer of $5 billion in collateral to JPMorgan on September 12, 2008 was induced by a fraudulent promise that JPMorgan would return the collateral at the end of the same day (Count XLIX) relies on the vaguest of allegations, only now identifying the alleged speaker (after plaintiffs failed to do so in their original pleading), but still not specifying what was actually said (as opposed to the conclusory assertion that "a promise" was made), when it was said, whether it was on the phone or in person, or who was involved in the conversation in which the statement was purportedly made. The claim thus should be dismissed for failure to satisfy the requirements of Rule 9(b). The alleged oral promise on which this claim

is premised is also directly counter to, and therefore made unenforceable by, an explicit provision of the September Agreements governing the return of collateral.  *See infra* Point IV.E.

- Finally, plaintiffs' request for imposition of a constructive trust on the collateral (Count XXXII) fails for a host of reasons in addition to preemption, including that plaintiffs' panoply of other claims preclude them from pleading that they lack an adequate remedy at law.  *See infra* Point IV.F.

**A.      Federal bankruptcy law preempts plaintiffs' claims seeking to avoid collateral transfers on the basis of constructive trust, unjust enrichment, and conversion.  (Counts XXXII, XXXVI-XXXVII, XXXIX-XL)**

The Supremacy Clause of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  The Supreme Court has long held that this constitutional command mandates that any state law that conflicts with federal law is "without effect."  *Maryland* v. *Louisiana*, 451 U.S. 725, 746 (1981).  This preemption of state law may be found not only when Congress has explicitly voiced its intent to preempt, but also (1) when the state law "actually conflicts with federal law" (so-called "conflict preemption"), or (2) when "federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it'" (so-called "field preemption").  *Cipollone* v. *Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting *Fidelity Fed. Sav. & Loan Ass'n* v. *De la Cuesta*, 458 U.S. 141, 153 (1982)); *accord O&G Indus., Inc.* v. *Nat'l R.R. Passenger Corp.*, 537 F.3d 153, 161 (2d Cir. 2008).

The Second Circuit and other federal courts of appeals have repeatedly affirmed that the Bankruptcy Code preempts the assertion of both common law and statutory claims under

state law that would clash with the text of the Code or the policies underlying it. *See, e.g.*, *E. Equip. & Servs. Corp.* v. *Factory Point Nat'l Bank, Bennington*, 236 F.3d 117, 120-21 (2d Cir. 2001) (per curiam) (Bankruptcy Code preempted claims under state tort law seeking damages for alleged violation of automatic stay); *DiPierro* v. *Taddeo (In re Taddeo)*, 685 F.2d 24, 28-29 (2d Cir. 1982) (provision of chapter 13 permitting debtors to cure defaults preempted New York law on the subject); *Besette* v. *Avco Fin. Servs., Inc.*, 230 F.3d 439, 447-48 (1st Cir. 2000) (Bankruptcy Code's remedial provisions preempted unjust enrichment claim for collecting debt under a reaffirmation agreement that violated section 524 of the Code); *Pertuso* v. *Ford Motor Credit Co.*, 233 F.3d 417, 425-26 (6th Cir. 2000) (same).

   As the Sixth Circuit put it in *Pertuso*, "[p]ermitting assertion of a host of state law causes of action to redress wrongs under the Bankruptcy Code would undermine the uniformity the Code endeavors to preserve and would 'stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" 233 F.3d at 426 (alteration in original) (quoting *Bibbo* v. *Dean Witter Reynolds, Inc.*, 151 F.3d 559, 562-63 (6th Cir. 1998)); *see also* U.S. Const. art. I, § 8 (vesting Congress with power to establish "uniform laws on the subject of bankruptcies throughout the United States").

   Two federal courts, including the Eighth Circuit Court of Appeals in a decision just last year, have directly considered the application of these settled constitutional principles to the section 546 safe harbors. Both courts held that the Bankruptcy Code preempts common law claims seeking to recover transfers that are protected from avoidance by the safe harbors. In *Contemporary Industries Corp.* v. *Frost*, 564 F.3d 981 (8th Cir. 2009), the debtor corporation and its creditors' committee brought claims against the corporation's former shareholders seeking to recover payments that they received in exchange for their stock in a leveraged buyout transaction. Plaintiffs sought to recover these payments as fraudulent transfers under section

544(b) of the Bankruptcy Code and incorporated state fraudulent conveyance law, as well as on the common law theories that the payments unjustly enriched the defendants and constituted illegal/excessive shareholder distributions under state law.  *Id.* at 983-84.

Holding that plaintiffs' avoidance claims were barred by section 546(e)'s protection of settlement payments, the Eighth Circuit went on to hold that plaintiffs' claims seeking to recover those payments under state law were therefore preempted.  Based on the well-established constitutional rule of preemption that a state law must give way to the extent that it conflicts with, or frustrates, federal law, the court of appeals held that plaintiffs' state law claims were preempted because they would conflict with section 546(e):

> Through its state law claims, CIC seeks to recover the same payments we have already held are unavoidable under § 546(e).  Allowing recovery on these claims would render the § 546(e) exemption meaningless, and would wholly frustrate the purpose behind that section.  Thus, CIC's state law claims must fail.

*Id.* at 988.

Similarly, in *Official Committee of Unsecured Creditors of Hechinger Investment Co. of Delaware, Inc.* v. *Fleet Retail Finance Group (In re Hechinger Investment Co. of Delaware)*, 274 B.R. 71 (D. Del. 2002), the district court held that the Bankruptcy Code preempts state-law claims to recover, as here, transfers protected by a safe harbor.  In *Hechinger*, as in *Contemporary Industries*, the creditors' committee sought to recover payments made to the debtor corporation's former shareholders in a leveraged buyout, asserting both a fraudulent transfer claim under the Bankruptcy Code and an unjust enrichment claim under state common law.

The district court held that the shareholder payments fell within the section 546(e) safe harbor, thus precluding avoidance of those payments as fraudulent transfers under federal bankruptcy law.  *Id.* at 86-89.  The court then concluded that section 546(e) preempted plaintiff's common law unjust enrichment claim.  *Id.* at 96.  Noting that plaintiff "seeks the same remedy

under its unjust enrichment claim as that sought under its fraudulent transfer claim," the court held that recovery of these transfers under state law would frustrate Congress's purpose in enacting section 546(e):

> If the court were to entertain the Committee's unjust enrichment claim, a claim that effectively acts as an avoidance claim against the shareholders in a transaction that the court has already found is an unavoidable settlement payment, and allowed the Committee to circumvent section 546(e) by asserting a state law claim for unjust enrichment based on the same facts and seeking essentially the same relief, the purpose of section 546(e) would be frustrated. Claims that Congress deemed unavoidable under sections 544(b) and 546(e) of the Bankruptcy Code can not be avoided by simply re-labeling avoidance claims as unjust enrichment claims; if they could, the exemption set forth in section 546(e) would be rendered useless. Because the Committee's unjust enrichment claim effectively acts as a section 544 fraudulent conveyance claim, it directly conflicts with the remedial exemption set forth in Code section 546(e).

*Id.* (citations omitted).

The preemption principles set forth in *Contemporary Industries* and *Hechinger* apply with even greater force in this case. Unlike the stockholders in *Contemporary Industries* and *Hechinger*, who might be viewed as unintended beneficiaries of the Code's safe harbors, the protected transfers to JPMorgan, a financial institution engaged in clearance, repurchase, and derivatives transactions, are at the core of the safe harbors. Dismissal of state law claims clashing with that core protection is thus all the more imperative here.

Many of plaintiffs' purported non-bankruptcy claims — including Counts XXXII, XXXVI-XXXVII, and XXXIX-XL — are really avoidance claims repackaged in a common law guise, "seek[ing] to recover the same payments [that] . . . are unavoidable" under the safe harbors. *Contemporary Industries*, 564 F.3d at 988. Specifically:

- Count XXXII, which is styled as a claim for "constructive trust," alleges that JPMorgan demanded, received, and withheld $5 billion in cash collateral from

LBHI and asks the Court to order JPMorgan "to turn over the $5 billion to LBHI immediately";

- Count XXXVI, which is styled as a claim for "unjust enrichment," alleges that JPMorgan demanded and received collateral from LBHI in the form of securities, cash, and money market funds and seeks "return of these LBHI assets to LBHI";

- Count XXXVII, which is styled as a claim for "conversion," alleges that "JPMorgan locked down billions of dollars in LBHI assets," that "JPMorgan has no right to keep the billions of dollars of LBHI assets," and that "LBHI is entitled to the return of its assets";

- Count XXXIX, which is styled as a claim for "unjust enrichment," alleges that JPMorgan demanded and received $8.6 billion in cash and money market funds as collateral from LBHI and seeks "return of these LBHI assets to LBHI"; and

- Count XL, which is styled as a claim for "conversion," alleges that JPMorgan demanded, received, and withheld $8.6 billion in cash and money market funds as collateral from LBHI and that "LBHI is entitled to the return of its assets."

These claims essentially attempt to substitute common law claims of constructive trust, unjust enrichment, and conversion for avoidance claims directed at transfers that are safe-harbored. Such common law claims are plainly preempted. Avoidability of transfers is specifically governed by bankruptcy law. Allowing plaintiffs to use the common law to avoid transfers that federal law dictates are not avoidable would collide head-on with both the plain text of the

safe harbor provisions and their purpose — to insulate protected transactions and other financial contracts from the effects of a bankruptcy filing, thereby maintaining the stability of financial markets.  The supremacy of the federal statutory scheme enacted in the Bankruptcy Code precludes plaintiffs from circumventing the safe harbors in this manner.  *See, e.g.*, *O&G Indus., Inc.*, 537 F.3d at 161 (preemption may be found "if the [state] statute 'stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress'" (quoting *United States* v. *Locke*, 529 U.S. 89, 109 (2000))).

Plaintiffs' "constructive trust," "unjust enrichment," and "conversion" claims in Counts XXXII, XXXVI-XXXVII, and XXXIX-XL of the Amended Complaint should, therefore, be dismissed because they are preempted by federal bankruptcy law.

**B.     Plaintiffs' claim for a declaratory judgment that JPMorgan has no lien over $6.9 billion in cash collateral posted by LBHI, as well as associated unjust enrichment and conversion claims, are refuted by the August and September Agreements and the U.C.C.  (Counts XXXVIII-XL)**

Count XXXVIII seeks a declaratory judgment that JPMorgan has no lien on the $6.9 billion in cash collateral posted by LBHI in the week before the bankruptcy filing because JPMorgan allegedly swept the collateral from an account on which it had a lien to the JPMorgan General Ledger Cash Collateral Account.  Am. Compl. ¶¶ 72, 293-98.  This claim has essentially two components:  (1) that JPMorgan engaged in an "unauthorized conversion" of the cash collateral in violation of the August and September Security Agreements, and (2) that JPMorgan lost its lien on the $6.9 billion by moving it to the General Ledger Cash Collateral Account.  *Id.* ¶¶ 294-95.  Therefore, plaintiffs conclude, JPMorgan's retention of the $6.9 billion amounts to unjust enrichment (Count XXXIX) and conversion (Count XL).  These claims fail as a matter of law because they are contradicted by explicit contractual and statutory authority that gave JPMorgan the right to direct the disposition of LBHI's collateral.

Under the August and September Security Agreements, JPMorgan was granted a lien on certain LBHI accounts, the assets "held in or credited to" those accounts, and "all proceeds of any and all of the foregoing Security." Wolf Decl. Ex. 5 at 1-2; Ex. 8 at 1. Under the August Security Agreement, those accounts consisted of an LBHI securities account, an LBHI deposit account (the "Deposit Account"), and any other account at JPMorgan to which LBHI moved assets from either of these two accounts. Wolf Decl. Ex. 5 at 1. The September Security Agreement expanded the accounts subject to JPMorgan's lien to include all LBHI accounts held at JPMorgan (except for the Overnight Account identified in the August Security Agreement). Wolf Decl. Ex. 8 at 1. Between September 9 and September 12, 2008, $6.9 billion in cash was deposited into the Deposit Account. Am. Compl. ¶¶ 66, 71. Over the same time period, JPMorgan moved the $6.9 billion out of the Deposit Account and into JPMorgan's General Ledger Cash Collateral Account. *Id.* ¶ 72. Plaintiffs claim that this allegedly "unauthorized transfer" violated the August and September Security Agreements and caused JPMorgan to lose its lien on the $6.9 billion in cash because the General Ledger Cash Collateral Account was not one of the accounts on which the August and September Security Agreements granted JPMorgan a lien. *Id.* ¶¶ 294-95. This claim, and the Counts that are predicated on it, fail for several reasons.

First, plaintiffs' assertion that JPMorgan was not authorized to sweep the collateral into the General Ledger Cash Collateral Account, and that the sweep violated the August and September Security Agreements, is flatly contradicted by those very Agreements. LBHI deposited the cash collateral — which it had agreed in the September Security Agreement not to withdraw on less than three days' written notice, Wolf Decl. Ex. 8 at 3 — into the Deposit Account, from which LBHI could freely withdraw funds. Am. Compl. ¶ 294. Under both the August and September Security Agreements, JPMorgan was expressly permitted to take the actions

it took to ensure that LBHI did not withdraw the cash collateral from the Deposit Account in violation of the Security Agreements.

Those Agreements provide: "[LBHI] and [JPMorgan] . . . acknowledge and agree . . . that [JPMorgan], *as the secured party hereunder*, may issue instructions to direct disposition of any and all of the funds in the deposit accounts . . . *without the consent of [LBHI]*." Wolf Decl. Ex. 5 at 2; Ex. 8 at 2 (emphasis added). On the face of the Amended Complaint, JPMorgan did nothing more by sweeping the cash than to exercise its right, "as the secured party" under the Security Agreements, to direct the disposition of the funds held in the Deposit Account. Thus, far from eliminating JPMorgan's lien, the cash sweep did just the opposite: It moved JPMorgan's collateral into a safer place to protect that lien. Plaintiffs' sinister allegations that JPMorgan took this action "secretly," Am. Compl. ¶ 338, or "unilaterally, and with no notice to LBHI," *id.* ¶ 72, are of no moment, as the Security Agreements clearly provide that JPMorgan could direct the movement of the funds without LBHI's consent. Wolf Decl. Ex. 5 at 2; Ex. 8 at 2.

Plaintiffs' claim that JPMorgan lost its lien by moving the cash to the General Ledger Cash Collateral Account also ignores the rights of JPMorgan as a secured party under Article 9 of the Uniform Commercial Code, which governs and is expressly incorporated into the August and September Security Agreements.[20] Under the U.C.C., a secured party may perfect a security interest in a deposit account only by obtaining "control" of that account. N.Y. U.C.C. § 9-312(b)(1). One of the means by which a secured party may acquire control of a deposit ac-

---

[20] The August and September Security Agreements grant JPMorgan "the rights and remedies with respect to the Security of a secured party under the Uniform Commercial Code (whether or not the Code is in effect in the jurisdiction where the rights and remedies are asserted)." Wolf Decl. Ex. 5 at 3; Ex. 8 at 3.

count is by obtaining from the debtor the right to "direct[] disposition of the funds in the deposit account without further consent by the debtor." *Id.* § 9-104(a)(2).

That is precisely what LBHI and JPMorgan agreed to in the August and September Security Agreements — they gave JPMorgan "control" by permitting JPMorgan to direct the disposition of funds in the Deposit Account. Plaintiffs' apparent position is that a secured party who obtains the right to direct the disposition of funds — one of the touchstones of a perfected security interest in a deposit account under the U.C.C. — sacrifices its security interest when it actually exercises that right. This would be an absurd result.

Nor is the analysis affected by plaintiffs' allegation that JPMorgan swept the cash "for the improper purpose of ensuring that LBHI would be unable to obtain access to its own funds." Am. Compl. ¶ 72. If that was in fact JPMorgan's purpose, it was not only a proper exercise of JPMorgan's contractual and statutory rights as a secured party, but also a result expressly contemplated by the U.C.C. As noted in Official Comment 3 to section 9-104, "the arrangements giving rise to control may themselves prevent, or may enable the secured party at its discretion to prevent, the debtor from reaching the funds on deposit . . . ." N.Y. U.C.C. § 9-104, Official cmt. 3.

LBHI's decision to permit JPMorgan to direct the disposition of funds in the Deposit Account "without the consent of [LBHI]" conferred upon JPMorgan, in the words of the U.C.C., the "discretion to prevent . . . the debtor from reaching the funds on deposit." JPMorgan's exercise of that discretion was entirely appropriate: Because LBHI did not have the right to reclaim the collateral except upon three days' notice to JPMorgan, *see* September Security Agreement at 3 (Wolf Decl. Ex. 8), JPMorgan's cash sweep was a prudent protective measure that prevented LBHI from removing the collateral in breach of the September Security Agreement.

Plaintiffs' allegation that JPMorgan acted inappropriately in this regard gets it exactly backward. What *would have* been improper is if LBHI had spirited the cash collateral out of its Deposit Account within hours of posting it, as the Amended Complaint suggests it would have done. Am. Compl. ¶ 72. Such an unauthorized withdrawal would have not only defeated the purpose of *secured* lending, but also violated LBHI's consciously negotiated obligation to give JPMorgan three days' notice before withdrawing the collateral. Indeed, plaintiffs' implicit admission in the Amended Complaint that LBHI would have taken back the cash collateral in breach of that commitment demonstrates that JPMorgan's precautionary measure was entirely warranted.

Moreover, the August and September Security Agreements provide that JPMorgan can "use or operate any of the Security for the purpose of preserving the Security or its value in the manner and to the extent [JPMorgan] deems appropriate." Wolf Decl. Ex. 5 at 3; Ex. 8 at 3. By placing the cash collateral in the General Ledger Cash Collateral Account where it would not be vulnerable to withdrawal by LBHI in violation of the September Security Agreement, JPMorgan exercised its contractual right to "preserv[e] the Security or its value" as it deemed necessary and appropriate as a secured party, all as expressly authorized by the August and September Security Agreements. Plaintiffs' allegations to the contrary are baseless.

Plaintiffs' assertion that JPMorgan lost its lien on the $6.9 billion in cash collateral also ignores JPMorgan's security interest in proceeds. Under the U.C.C., when funds are transferred from a deposit account in which a secured party has a security interest to another account, the second account constitutes proceeds of the first account and the secured creditor's security interest attaches to the second account. *See* N.Y. U.C.C. § 9-332, Official cmt. 2, Example 2; *see also id.* § 9-315(a). Thus, JPMorgan's transfer of the cash into the General Ledger

Cash Collateral Account resulted in proceeds on which JPMorgan's lien continued and was per-

fected by control. *See id.* § 9-104(a)(1).

Finally, in Counts XXXIX and XL, plaintiffs tack on claims with respect to the

$1.7 billion in money market funds that was posted by LBHI as collateral with JPMorgan on

September 9, 2008. Plaintiffs' inclusion of the money market funds in these Counts is perplex-

ing, since JPMorgan did not move the money market funds along with the $6.9 billion in cash,

and plaintiffs do not allege that it did. Instead, plaintiffs merely repeat for the tenth time that the

September Security Agreement is "invalid and unenforceable," Am. Compl. ¶¶ 302, 306, and

therefore that the lien on the money market funds is invalid and unenforceable. As shown in

Points II.B and III.A above and Point IV.D below, however, the September Security Agreement

is valid and enforceable. These claims regarding the $1.7 billion in money market funds must

accordingly be dismissed.

In sum, plaintiffs' claims that JPMorgan forfeited its lien on the $6.9 billion in

cash (Counts XXXVIII through XL) simply ignore the relevant provisions of the August and

September Security Agreements and the U.C.C., which empowered JPMorgan to direct the dis-

position of LBHI's cash collateral. Plaintiffs' claims that JPMorgan's retention of the $1.7 bil-

lion in money market funds constitutes unjust enrichment and conversion (Counts XXXIX and

XL) also fail in that they depend entirely on the assumed invalidity of the September Security

Agreement, which, as addressed elsewhere on this Motion, is demonstrably wrong. As a result,

Counts XXXVIII through XL should be dismissed.

**C.      Plaintiffs' breach of contract claims should be dismissed.
         (Counts XLI-XLV, XLVII)**

Like the conversion and unjust enrichment claims, plaintiffs' contract claims are

predicated on allegations that JPMorgan improperly requested and withheld collateral from

LBHI in the days preceding its bankruptcy. *See* Counts XLI-XLV, XLVII. Plaintiffs allege that JPMorgan breached the Clearance Agreement when it "demanded and received from LBHI billions of dollars in LBHI assets," Am. Compl. ¶ 312; they claim that these "repeated and excessive demands for collateral" also breached the August Agreements, *id.* ¶ 325; they assert that JPMorgan further breached both the Clearance Agreement and the August Agreements when it "held and locked down" LBHI's collateral after the close of trading on September 12, 2008, *id.* ¶¶ 320, 332; and they allege that JPMorgan breached the implied covenant of good faith and fair dealing in the August and September Agreements when it "force[d] LBHI to post billions of dollars in collateral" and then "refused to give LBHI access to any of its collateral," *id.* ¶¶ 337, 339, 353-54.

Plaintiffs' "breach of contract" claims should be dismissed for the simple reason that they do not allege a breach of any governing agreement. None of the agreements between JPMorgan and LBHI even addressed the issue of how much collateral JPMorgan could request, nor did they require the immediate return of the collateral upon LBHI's demand, as plaintiffs have pled. If LBHI thought JPMorgan's requests were excessive, nothing in any of the agreements prevented LBHI from declining to comply with them. But having agreed to provide the collateral and accepted the resulting benefits, LBHI does not now have any contractual grounds for forcing JPMorgan to return the collateral or pay damages for having held onto collateral LBHI provided to it.

     1.     **JPMorgan did not breach the express terms of any agreement by requesting and holding collateral.**

     a.     **JPMorgan did not breach the Clearance Agreement.**

Plaintiffs purport to allege two breaches of the Clearance Agreement. First, they allege that JPMorgan requested collateral from LBHI that either exceeded the amount necessary

to secure LBHI's clearance obligations or, alternatively, was used by JPMorgan to secure LBHI's non-clearance obligations.  *See* Count XLI.  According to plaintiffs, JPMorgan's requests for this collateral constituted a breach of the Clearance Agreement because "JPMorgan did not have the right to be more than fully collateralized, or to demand collateral for anything beyond what was needed to secure obligations arising under that agreement."  Am. Compl. ¶ 311.  Second, plaintiffs allege that JPMorgan breached the Clearance Agreement by withholding LBHI's collateral at the close of trading on September 12, 2008.  *See* Count XLII.

Plaintiffs' claims that JPMorgan breached the Clearance Agreement by requesting and holding collateral are confusing, as plaintiffs' own allegations establish that the Clearance Agreement does not govern their claims relating to the collateral at issue.  Notably, plaintiffs frame these claims in terms that are expressly conditional and hypothetical:  "*to the extent any of the collateral* demanded and received by JPMorgan for non-clearing obligations *is purportedly governed by the 2000 Clearance Agreement*, JPMorgan is in breach of those agreements [*sic*]."  Am. Compl. ¶ 314 (emphasis added); *see also id.* ¶ 315 ("JPMorgan's demands for and withholding of these LBHI assets, *to the extent governed by the 2000 Clearance Agreement*, constitutes a breach of that agreement." (emphasis added)); *id.* ¶ 320 ("*To the extent those assets were governed by the 2000 Clearance Agreement*, JPMorgan was obligated to allow LBHI to access those assets that evening and to follow LBHI's instructions with respect to the transfer of such assets." (emphasis added)).

Contrary to these hypothetical claims for breach of the Clearance Agreement, elsewhere in the Amended Complaint plaintiffs explicitly and unconditionally allege that the *September Agreements* governed the $8.6 billion in cash and money market funds that LBHI posted as collateral in the week preceding its bankruptcy.  Thus, plaintiffs allege:  "There were no other contracts between the parties that governed the approximately $8.6 billion held as pur-

ported *collateral under the September Agreements*." *Id.* ¶ 287 (emphasis added); *see also id.* ¶ 82 ("$8.6 billion in cash and money market funds [was] demanded and received by JPMorgan *pursuant to the September Agreements*" (emphasis added)). Plaintiffs also explicitly allege that JPMorgan demanded "billions of dollars in LBHI securities . . . to secure obligations purportedly arising under" the August Guaranty and the August Security Agreement. *Id.* ¶ 83. Further undermining any claim that LBHI actually posted collateral under the Clearance Agreement, the Amended Complaint contains no allegation that LBHI engaged in any clearance activities; it alleges only that *LBI* engaged in such activities, *see*, *e.g.*, *id.* ¶¶ 2-3, 18-19.

As the Amended Complaint itself makes clear, then, collateral was not posted pursuant to the Clearance Agreement, and as a result plaintiffs' claims that JPMorgan breached the Clearance Agreement by demanding and holding LBHI's collateral fail to state a claim for relief.

Even if the Clearance Agreement governed any of the collateral at issue, plaintiffs' claims of breach still fail because plaintiffs cannot identify any provision of the agreement that prohibited JPMorgan's alleged conduct. *See Kramer* v. *Lockwood Pension Servs., Inc.*, 653 F. Supp. 2d 354, 386 (S.D.N.Y. 2009) ("In pleading such a [breach of contract] claim, a plaintiff must provide specific allegations as to . . . what provisions of the agreement were breached as a result of the acts at issue."). The only provision of the Clearance Agreement on which plaintiffs appear to be relying for their breach claims is section 3, which states:

> We [JPMorgan] are hereby authorized as your [the Lehman parties']
> agent, and agree pursuant to your instructions . . . to permit you to
> make transfers between the Clearing Account(s), Custody Account(s)
> and the Segregated Account(s) or other accounts, it being understood
> that *we shall only permit transfers* from the Clearing Account(s) to the
> Custody Account(s) or Segregated Account(s) *to the extent that after
> such transfer we remain fully collateralized* . . . .

Wolf Decl. Ex. 1, § 3 (emphasis added).  Section 3 does not provide a basis for either of plaintiffs' claims that JPMorgan breached the Clearance Agreement.

First, section 3 of the Clearance Agreement has nothing to do with *requests* for collateral, and thus JPMorgan's requests for collateral in any amount could not have breached the provision.  As the language quoted above shows, the provision deals with transfers of funds between accounts in the course of clearing operations.  Contrary to plaintiffs' allegation, which is apparently based on this provision, that "JPMorgan did not have the right to be more than fully collateralized, or to demand collateral for anything beyond what was needed to secure obligations arising under [the Clearance Agreement]," Am. Compl. ¶ 311, the reference in section 3 to full collateralization operates as a limitation on the rights of the Lehman clearance parties to transfer collateral between accounts, *not* on JPMorgan's right to request collateral.  The Amended Complaint cites nothing for this allegation, because there is nothing anywhere in the Clearance Agreement that addresses in any way how much collateral JPMorgan could request from LBHI or any other Lehman entity.  This is hardly surprising in view of the absence of any lending commitment in the Clearance Agreement, and the fact that any loans made by JPMorgan thereunder are entirely discretionary and payable on demand.  *See* Wolf Decl. Ex. 1, § 5.

Second, section 3 does not impose a general requirement on JPMorgan to return collateral to LBHI if JPMorgan is "fully collateralized."  Rather, the provision deals with the ability of a party, in the course of clearance operations, to transfer collateral from the Clearing Account to another account.  Given that LBHI is not alleged to have engaged in any clearance operations, section 3 of the Clearance Agreement simply did not apply, and thus imposed no obligation on JPMorgan to return collateral that LBHI posted pursuant to other agreements.

Accordingly, plaintiffs have no claim for breach of the Clearance Agreement.  Not only is there no provision in the Clearance Agreement that prohibited JPMorgan from re-

questing or continuing to hold collateral, but plaintiffs also concede that the agreement did not even govern the collateral at issue. Counts XLI and XLII should be dismissed for failure to state a claim for breach of contract.

**b.**     **LBHI waived any claim for consequential damages in the Clearance Agreement.**

Although plaintiffs' claims for breach of the Clearance Agreement should be dismissed in their entirety, the request for "billions of dollars in damages" in connection with those claims, Am. Compl. ¶¶ 316, 321, also runs afoul of the explicit waiver of consequential damages in that agreement. Section 13 of the Clearance Agreement provides: "In no event shall we [JPMorgan] be liable for special, indirect, punitive or consequential damages, whether or not we have been advised as to the possibility thereof and regardless of the form of action." Wolf Decl. Ex. 1, § 13. Contractual provisions limiting damages are enforceable under New York law. *See, e.g.*, *Metro. Life Ins. Co.* v. *Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436 (1994) ("A limitation on liability provision in a contract represents the parties' agreement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor."); *Net2Globe Int'l, Inc.* v. *Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 449-56 (S.D.N.Y. 2003) (upholding limitation on "any incidental, indirect, special or consequential damages"). While plaintiffs' request for "damages" here appears to be principally just another way of asking for the return of the collateral, any claim for additional damages that allegedly resulted from LBHI's inability to access the collateral is barred by this explicit waiver of consequential damages.

**c.**     **JPMorgan did not breach the August Agreements.**

Plaintiffs allege that JPMorgan breached the August Agreements by requesting collateral and withholding it after the close of business on September 12, 2008. *See* Counts

XLIII-XLIV.  These claims also fail to allege a breach of any actual contractual provision and thus must be dismissed.

First, there is no provision in any of the August Agreements that imposes any restriction on JPMorgan's right to request collateral.  Indeed, JPMorgan did not undertake any obligations in the August Agreements.  JPMorgan did not even sign the August Guaranty or Security Agreement; as is typical, they were signed only by LBHI, with all rights running in favor of, and no obligations imposed upon, JPMorgan.  The August Agreements grant liens for the benefit of JPMorgan; they do not purport to address, much less limit, JPMorgan's right to seek other collateral from LBHI.  The only provision in the August Agreements that even addresses the issue of requests for collateral is a recitation that "the Bank may from time to time request further security or payments on account of any of the Liabilities," Wolf Decl. Ex. 5 at 5, essentially precatory language that certainly imposed no restriction on JPMorgan.

Second, plaintiffs' claim that JPMorgan was obligated to return LBHI's collateral on September 12, 2008 is also not supported by the text of the August Agreements.  Plaintiffs appear to rely on a provision of the August Security Agreement, which they quote earlier in the Amended Complaint as follows:  ". . . at the end of a business day, if [LBHI] has determined that no Obligations (as defined in the Clearance Agreement) remain outstanding, [LBHI] may transfer to an account (the 'Overnight Account') any and all Security held in or credited to or otherwise carried in the Accounts."  Am. Compl. ¶ 31 (quoting Wolf Decl. Ex. 5 at 3) (omission and alterations in original).  Once again, on its face the contract provision cited in the Amended Complaint does not support its allegation:  The cited language says only that LBHI may transfer the collateral overnight to a different account at JPMorgan; it does *not* provide LBHI with any right to withdraw the collateral from the Bank, nor does it obligate JPMorgan to return any of the collateral.

Plaintiffs' invocation of the August Security Agreement's "Overnight Account" provision to support their claim that JPMorgan improperly withheld the cash collateral that LBHI posted in September is also inconsistent with plaintiffs' position throughout the Amended Complaint that the cash was delivered under the *September* Agreements. Although plaintiffs allege in Count XLIV that JPMorgan breached the August Agreements when it "held and locked down $8.6 billion of LBHI's cash and money market funds, as well as billions of dollars of securities," Am. Compl. ¶ 332, plaintiffs explicitly allege earlier in the Amended Complaint that JPMorgan held the $8.6 billion in cash and money market funds as collateral pursuant to the *September* Agreements. *See, e.g.*, *id*. ¶¶ 82, 287. Plaintiffs can have no claim that JPMorgan's withholding of the $8.6 billion breached the August Agreements when, by their own allegations, that collateral was not held under the August Agreements.

And plaintiffs do not and cannot allege a breach of any express provision in the September Agreements, because, as pleaded in the Amended Complaint, the September Security Agreement did not contain the "Overnight Account" provision; that agreement provided that LBHI could only access its collateral on three days' written notice to JPMorgan. *See* Wolf Decl. Ex. 8 at 3; *see also* Am. Compl. ¶ 55 ("[T]he September Agreements deleted the provision in the August Security Agreement that expressly gave LBHI the right to transfer its collateral from the pledged accounts to the lien-free overnight account . . . . In its place, the September Agreements provided that LBHI would only be allowed to access its collateral 'upon three days written notice to the Bank.'"). Plaintiffs never allege that LBHI complied with this notice provision, nor could they, as three days did not pass between the close of trading on September 12 and LBHI's bankruptcy filing on the morning of September 15.

Accordingly, plaintiffs' claims for breach of the August Agreements in Counts XLIII and XLIV should be dismissed for failure to state a claim for breach of contract.

## 2. JPMorgan did not breach the implied covenant of good faith and fair dealing by requesting and holding collateral.

After asserting that JPMorgan breached the explicit terms of the Clearance Agreement and the August Agreements by requesting and holding collateral, plaintiffs tack on claims that the same conduct also constituted a breach of the implied covenant of good faith and fair dealing in the August Agreements and the September Agreements. *See* Counts XLV, XLVII. These claims cannot be sustained.

An implied covenant claim arises when, although the express terms of the contract have not been breached, one party has "nonetheless effectively deprived the other of those express, explicitly bargained-for benefits." *Metro. Life Ins. Co.* v. *RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1517 (S.D.N.Y. 1989). The implied covenant prohibits a party from engaging in "conduct which would interfere with the other party's right to realize the benefit of the bargain." *Bear, Stearns Funding, Inc.* v. *Interface Grp.-Nev., Inc.*, 361 F. Supp. 2d 283, 298 (S.D.N.Y. 2005). It does not, however, "give rise to independent obligations by itself." *Warner Theatre Assocs. Ltd. P'ship* v. *Metro. Life Ins. Co.*, 1997 WL 685334, at *6 (S.D.N.Y. Nov. 4, 1997); *see also State St. Bank & Trust Co.* v. *Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004) ("'[N]o obligation can be implied that would be inconsistent with other terms of the contractual relationship.'" (quoting *Dalton* v. *Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995))); *Fasolino Foods Co.* v. *Banca Nazionale Del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) (breach of implied covenant is "'merely a breach of the underlying contract'" (quoting *Geler* v. *Nat'l Westminster Bank, USA*, 770 F. Supp. 210, 215 (S.D.N.Y. 1991))).

In their Amended Complaint, in an apparent attempt to address the previously-neglected requirement that they plead that JPMorgan deprived LBHI of an express contractual right, plaintiffs now allege that JPMorgan's "sweep" of $6.9 billion in cash collateral prevented

LBHI from "excercis[ing] its express right under the August Security Agreement to access its cash at the end of the business day." Am. Compl. ¶ 338. This allegation is insufficient to establish that LBHI was deprived of any contractual right, as required to sustain an implied covenant claim.

First, plaintiffs' allegation that JPMorgan deprived LBHI of a right to access the cash under the August Security Agreement does not make sense in light of plaintiffs' allegations earlier in the Amended Complaint that the cash collateral was governed not by the August Agreements, but by the September Agreements. *See* Am. Compl. ¶¶ 82, 287; *supra* Point IV.C.1. And the September Agreements did not give LBHI any "right to access" its collateral at the end of the day; they explicitly provided that LBHI could only access its collateral on three days' written notice to JPMorgan, which LBHI never provided. *See* Wolf Decl. Ex. 8 at 3; *see also* Am. Compl. ¶ 55.

Second, even if plaintiffs had not alleged that the cash collateral was governed by the September Agreements, the August Agreements also did not provide LBHI with any "right to access" the collateral overnight. Rather, the August Security Agreement only allowed LBHI to transfer collateral to a different account (called the "Overnight Account") within JPMorgan, and even that right was subject to all of JPMorgan's rights under the Agreement. *See* Wolf Decl. Ex. 5 at 3 ("Except as otherwise provided herein . . . the undersigned may transfer to an account . . . ."). Included among those other rights was JPMorgan's right to "issue instructions to direct disposition of any and all of the funds in the deposit accounts . . . *without the consent of [LBHI]*." *Id.* at 2 (emphasis added); *see also supra* Point IV.B. A claim for breach of the implied covenant cannot be predicated on conduct that is expressly allowed by the contract. *See In re Musicland Holding Corp.*, 386 B.R. 428, 439 (S.D.N.Y. 2008) (courts should not find a breach of the implied covenant when doing so "'reads so much into the contract as to create a

new term or when alleged misconduct is expressly allowed by the contract'" (quoting *Keene Corp.* v. *Bogan*, 1990 WL 1864, at *14 (S.D.N.Y. Jan. 11, 1990))).

Plaintiffs also try to satisfy the requirements for pleading an implied covenant claim by fabricating another supposed "right" that exists nowhere in any agreement between the parties. Plaintiffs allege in Count XLV that JPMorgan's demands for collateral "deprived LBHI of any right under the August Agreements to refuse unreasonable and excessive collateral demands by JPMorgan," Am. Compl. ¶ 337, and they allege in Count XLVII that this conduct "deprived LBHI of any right under the September Agreements to refuse unreasonable and excessive collateral demands by JPMorgan," *id.* ¶ 353. Plaintiffs point to no provision in the August or September Agreements that creates this supposed "right," because none exists. Of course, LBHI could refuse to post collateral, and JPMorgan could refuse to extend credit if the requested collateral was not posted. But the parties' agreements themselves did not regulate how much collateral JPMorgan could request or whether LBHI could, or could not, refuse any such requests. Therefore, a claim for breach of contract on such grounds, whether express or implied, simply does not lie. "A claim of implied duty of good faith and fair dealing cannot create new duties under a contract or substitute for an insufficient contract claim." *Duration Mun. Fund, L.P.* v. *J.P. Morgan Secs. Inc.*, 2009 WL 2999201, at *7 (N.Y. Sup. Ct. Sept. 16, 2009), *aff'd*, 2010 WL 4008274 (1st Dep't Oct. 14, 2010); *see also supra* Point IV.C.1.

This nonexistent contractual "right" to refuse collateral demands is yet another effort to reinvent and resurrect plaintiffs' safe-harbored avoidance claims. Indeed, plaintiffs explicitly frame the allegations in their implied covenant claims in the language of preference: According to plaintiffs, JPMorgan breached the implied covenant by acting in "bad faith, for the improper purpose of ensuring that JPMorgan would stand ahead of LBHI's other creditors in the event of LBHI's bankruptcy." Am. Compl. ¶¶ 340, 355. This allegation is not only a recycling

of plaintiffs' preference theory, it also is of no legal consequence, as "a mere preference between creditors does not constitute bad faith." *Sharp Int'l Corp.* v. *State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 54 (2d Cir. 2005).

Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing in the August Agreements (Count XLV) not only fails to state a claim, it also should be dismissed as duplicative of plaintiffs' claims that JPMorgan breached the explicit terms of those agreements. New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris* v. *Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002); *accord Amcan Holdings, Inc.* v. *Canadian Imperial Bank of Commerce*, 70 A.D.3d 423, 426 (1st Dep't 2010) ("The claim that defendants breached the implied covenant of good faith and fair dealing was properly dismissed as duplicative of the breach-of-contract claim, as both claims arise from the same facts and seek the identical damages for each alleged breach." (citations omitted)); *AJW Partners LLC* v. *Itronics, Inc.*, 68 A.D.3d 567, 568-69 (1st Dep't 2009). Here, plaintiffs' implied covenant claim is based on the allegations that JPMorgan "force[d] LBHI to post billions of dollars of collateral" and then "refused to give LBHI access to any of its collateral on Friday, September 12, 2008." Am. Compl. ¶¶ 337, 339. This is the same alleged conduct that underlies plaintiffs' claims for breach of the August Agreements. *See* Counts XLIII-XLIV. New York law does not allow plaintiffs to maintain these duplicative claims.

Additional grounds also exist for dismissing plaintiffs' implied covenant claim related to the September Agreements (Count XLVII). In particular, plaintiffs allege that JPMorgan breached the implied covenant in the September Agreements by "refus[ing] to give LBHI access to its collateral on Friday, September 12, 2008, and throughout that weekend." Am. Compl. ¶ 354. But as noted above, the September Agreements explicitly provided that LBHI could only

access its collateral on three days' written notice to JPMorgan.  *See* Wolf Decl. Ex. 8 at 3; *see also* Am. Compl. ¶ 55.  Plaintiffs do not allege that LBHI ever satisfied this notice provision of the September Agreements, nor could they, as three days did not pass between the close of trading on September 12 and LBHI's bankruptcy filing on the morning of September 15.  Plaintiffs cannot invoke the implied covenant in an attempt to evade this express term of the parties' agreement.  *See In re Musicland Holding Corp.*, 386 B.R. at 439.

Accordingly, Counts XLV and XLVII should be dismissed for failure to state a claim for breach of the implied covenant of good faith and fair dealing.

### 3. LBHI waived any claim for breach of contract or the implied covenant of good faith and fair dealing based on JPMorgan's requests for collateral.

Finally, even if JPMorgan's requests for collateral could have constituted a breach of any contract, LBHI waived such breach by posting the collateral and accepting the benefits of JPMorgan's continued extensions of credit.  "It is well-established that where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach."  *VCG Special Opportunities Master Fund Ltd.* v. *Citibank, N.A.*, 594 F. Supp. 2d 334, 342 (S.D.N.Y. 2008), *aff'd*, 355 F. App'x 507 (2d Cir. 2009) (internal quotation marks and citations omitted).

In *VCG*, the plaintiff claimed that Citibank breached a credit default swap contract by requesting collateral that allegedly exceeded its exposure.  While the plaintiff maintained that it was not obligated to pay the amounts Citibank requested, it nonetheless continued to post those amounts and to receive Citibank's regular payments under the contract.  As a result, the court held, the plaintiff could not "claim that Citibank breached the CDS Contract by wrongly demanding additional collateral."  *Id.* at 343.  Nor could the plaintiff claim a breach of the im-

plied covenant of good faith and fair dealing based on the collateral requests, as the court held that this claim was also "waived in light of VCG's continued posting of the demanded collateral and acceptance of the benefits of the CDS Contract." *Id.* at 344.

Here, as in *VCG*, LBHI posted the collateral that JPMorgan requested, and it induced JPMorgan, in reliance on the collateral it received, to continue extending credit to LBI and trading with Lehman derivatives counterparties. Notwithstanding plaintiffs' after-the-fact claim that JPMorgan had no right to request that collateral, LBHI waived any claim for breach of contract or the implied covenant based on those requests by complying with them, inducing JPMorgan to advance funds in reliance thereon, and accepting the resulting benefits.

**D.  Plaintiffs' claims attacking the validity of the September Agreements and the "agreement" to transfer collateral should be dismissed. (Counts XXXV, XLVI, XLVIII)**

Plaintiffs challenge the September Agreements as invalid and unenforceable under various common law theories, including that the agreements lacked consideration, that they were the product of coercion or duress, and that the September Guaranty, in particular, was not properly authorized. *See* Count XXXV ("Declaratory Judgment Invalidating the September Agreements"); Count XLVII ("Coercion and/or Duress With Respect to the September Agreements"); Count XLVIII ("Coercion and/or Duress With Respect to Demands for $8.6 Billion in Cash and Cash Equivalents"). These claims should be rejected for numerous reasons, as explained below.

1.      **LBHI waived any claim that the September Agreements are
        invalid or unenforceable.**

Plaintiffs' attack on the September Agreements is barred, as LBHI explicitly

agreed to waive any defenses based on the purported invalidity of any of the agreements.[21]  The

September Guaranty states as follows:

> The liability of the Guarantor under this Guaranty is *absolute and
> unconditional* irrespective of: . . . (d) without being limited by the
> foregoing, *any lack of validity or enforceability* of any Facility,
> Facility Document or Liability; and (e) *any other setoff, defense, or
> counterclaim whatsoever* (in any case, whether based on contract, tort
> or any other theory) or circumstance whatsoever *with respect to the
> Liabilities, the Facilities or the Facility Documents* contemplated
> thereby which might constitute a legal or equitable defense available
> to, or discharge of, the Borrowers or a guarantor; and *the Guarantor
> irrevocably waives the right to assert such defenses, set-offs or
> counterclaims in any litigation or other proceeding relating to the
> Liabilities, the Facilities or the Facility Documents contemplated
> thereby*.

Wolf Decl. Ex. 7, § 2 (emphasis added).  As reflected in the above language, this provision of the

Guaranty applies by its terms to waive any defense with respect to the "Facility Documents,"

which is defined to include both the Guaranty and the Security Agreement.  *See id.* at 1.[22]

New York courts have widely given effect to clauses, sometimes called "hell or

high water" clauses, that waive defenses to the validity or enforceability of a guaranty or other

contractual obligation.  *See, e.g.*, *Citibank, N.A.* v. *Plapinger*, 66 N.Y.2d 90, 92 (1985) ("Fraud

in the inducement of a guarantee . . . is not a defense to an action on the guarantee when the

---

[21] LBHI's pre-bankruptcy waiver of defenses is binding on the estate.  *See In re Wey*, 827 F.2d
140, 142 (7th Cir. 1987) ("'[T]he trustee . . . is bound by any waiver of a defense made by the
debtor *before* the filing of the petition in bankruptcy.'" (quoting *Collier on Bankruptcy* ¶ 558.01,
at 558-5 (15th ed. 1987)) (emphasis in original)).

[22] The August Guaranty also contains such a waiver of defenses.  *See* Wolf Decl. Ex. 4, § 2.
Plaintiffs do not attack the validity of the August Agreements on contract-law grounds, but if
they did, the waiver of defenses in the August Guaranty would likewise bar such a claim.

guarantee recites that it is absolute and unconditional irrespective of any lack of validity or enforceability of the guarantee, or any other circumstance which might otherwise constitute a defense . . . ."); *Red Tulip, LLC* v. *Neiva*, 44 A.D.3d 204, 209 (1st Dep't 2007) ("Relying on *Citibank*, New York courts have consistently upheld broadly worded waiver language . . . to preclude the assertion of defenses to a guaranty.").[23]

A waiver will be enforced, particularly as between sophisticated parties, when, as here, it specifically waives "any challenge to the validity of the guarantee itself" and contains "a blanket disclaimer . . . as to 'any other circumstance which might otherwise constitute a defense' to the Guarantee." *Mfrs. Hanover Trust Co.* v. *Yanakas*, 7 F.3d 310, 316-17 (2d Cir. 1993) (quoting *Plapinger*, 66 N.Y.2d at 92).[24]

There is ample precedent for applying the waiver-of-defenses clause to each of the grounds that plaintiffs assert here for invalidating the September Agreements: lack of consideration, coercion/duress, and lack of authority.

---

[23] *See also Reliastar Life Ins. Co. of N.Y.* v. *Home Depot U.S.A., Inc.*, 570 F.3d 513, 519 (2d Cir. 2009) ("Under New York law, 'hell or high water' clauses are generally enforceable."); *Wells Fargo Bank Minn., N.A.* v. *Nassau Broad. Partners, L.P.*, 2003 WL 22339299, at *7 (S.D.N.Y. Oct. 10, 2003) (enforcing "hell or high water" provision in equipment lease); *Wells Fargo Bank Nw., N.A.* v. *Taca Int'l Airlines, S.A.*, 247 F. Supp. 2d 352, 361 (S.D.N.Y. 2002) (same).

[24] *Accord Aniero Concrete Co.* v. *N.Y. City Constr. Auth.*, 1997 WL 3268, at *8 (S.D.N.Y. Jan. 3, 1997) (enforcing waiver clause that was "sufficiently specific," where agreement was "not merely a standard form agreement" and plaintiff was "a business sufficiently large and sophisticated to take on a project whose cost it estimated as close to $19 million"); *Fortunoff* v. *Triad Land Assocs.*, 906 F. Supp. 107, 119-20 (E.D.N.Y. 1995) (upholding waiver of defenses where plaintiffs, despite their argument that they had no opportunity to negotiate, were "sophisticated business people," and language of waiver was "sufficiently specific to bar plaintiffs' defense of fraud as a matter of law"); *Preferred Equities Corp.* v. *Ziegelman*, 190 A.D.2d 784, 784-85 (2d Dep't 1993) (enforcing waiver stating that guaranty was "unconditional and irrevocable, irrespective of . . . an[y] . . . circumstances which might . . . constitute a legal or equitable discharge or release of guarantor or surety" (omissions in original)).

### a. LBHI waived any claim that the September Agreements are invalid for lack of consideration.

New York courts enforce waiver-of-defenses clauses to bar the assertion that a guaranty lacked consideration. In *Harrison Court Associates* v. *220 Westchester Avenue Associates*, 203 A.D.2d 244 (2d Dep't 1994), defendants executed a guaranty of a corporate mortgage, which stated that they "absolutely and unconditionally" guaranteed repayment of the mortgage and that the guaranty would "not be affected, modified or impaired by any state of facts or the happening from time to time of any event, including . . . [t]he invalidity, irregularity, illegality or unenforceability of, or any defect in" the guaranty itself. *Id.* at 244-45 (omission and alteration in original). Defendants argued that the guaranty was unenforceable because the plaintiff gave no consideration for it. *Id.* at 244.

The Appellate Division rejected this argument, holding that, in light of the waiver-of-defenses clause, defendants were "precluded from asserting the defense of lack of consideration with respect to the plaintiff's right to enforce the guarantee." *Id.* at 245. Similarly, in *Liberty Mutual Fire Insurance Co.* v. *Mystic Transportation, Inc.*, 2004 WL 2071703 (S.D.N.Y. Sept. 16, 2004), the district court rejected a guarantor's argument that he received no consideration for guaranteeing a settlement agreement, holding that "an individual who executes an absolute and unconditional guarantee is precluded from raising not only lack of consideration, but also various contractual defenses such as fraud in the inducement." *Id.* at *3 (citing *Plapinger*, 66 N.Y.2d at 93).

Many other decisions have likewise held that a waiver-of-defenses clause bars a defense of lack of consideration under New York law. *See Gen. Trading Co., Inc.* v. *A&D Food Corp.*, 292 A.D.2d 266, 267 (1st Dep't 2002) ("The guarantee, which states that it is absolute and unconditional and that the guarantors waive the right to interpose any defenses, effectively

waived the defenses of fraud in the inducement and failure of consideration defendants would now raise."); *Keeseville Nat'l Bank* v. *Gulati*, 194 A.D.2d 970, 971 (3d Dep't 1993) ("[T]he notes contained an explicit waiver of 'all defenses, rights of set-off and rights to interpose counterclaims'; this language is sufficient to extinguish defendant's right to rely on any possible failure of consideration . . . ."); *Perlstein* v. *Kullberg Amato Picacone*, 158 A.D.2d 251, 251-52 (1st Dep't 1990) (where promissory note provided that "the liability of the makers hereunder . . . shall not be subject to any offset, defense, or counterclaim," "the waivers contained in the promissory note bar defendants from asserting the alleged failure of consideration to avoid summary judgment for failure to make payments under the promissory note"); *Santa Fe Pointe, LP* v. *Greystone Servicing Corp., Inc.*, 2009 WL 1438285, at *6 (N.D. Cal. May 19, 2009) (applying New York law to hold that defense of lack of consideration was barred because guarantor "stated in the Guaranty that his obligations . . . were 'continuing, absolute and unconditional, irrespective of any circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor'").

> ### b. LBHI waived any claim that the September Agreements were the product of coercion or duress and therefore invalid.

Courts applying New York law have also routinely held that a waiver-of-defenses clause bars claims that the guaranty was the product of coercion or duress. In *Santa Fe Pointe, LP*, in which the defendant argued that the guaranty he executed not only lacked consideration, but also was invalid on the ground of economic duress because he was "forced to accept" it due to certain financial commitments he had already made, a California federal court applied New York law to hold that "such defense is foreclosed by [defendant's] statement in the Guaranty that his obligations . . . were 'continuing, absolute and unconditional, *irrespective of any circum-*

*stance whatsoever* which might otherwise constitute a legal or equitable discharge or defense of a guarantor.'" 2009 WL 1438285, at *6.

The Eastern District of Pennsylvania applied New York law to reach the same conclusion in *FMG, Inc.* v. *Forest Elec. Corp.*, 795 F. Supp. 147 (E.D. Pa. 1992). The case involved a guaranty which recited that it was "an absolute, continuing, and unlimited guaranty without regard to (a) the validity, legality or enforceability in whole or in part of the Loan and Security Agreement; . . . or (d) any setoff, counterclaim or any circumstances which might constitute a defense or discharge." *Id.* at 149-50. The district court held that, under this clause, the guarantors were "barred from raising defenses of fraudulent inducement and economic duress." *Id.* at 151.[25]

> ### c. LBHI waived any claim that the September Agreements are invalid for lack of authority.

Claims that the party executing a guaranty lacked authority are also waivable under New York law. In *UBS AG, Stamford Branch* v. *HealthSouth Corp.*, 645 F. Supp. 2d 135 (S.D.N.Y. 2008), defendant HealthSouth entered into a guaranty stating that it would be "construed as a continuing[,] absolute and unconditional guarantee of payment without regard to the validity, regularity or enforceability of the Agreement or any Note or any guarantee thereof . . . and without regard to . . . any other circumstance whatsoever . . . which constitutes, or might be construed to constitute, an equitable or legal discharge." *Id.* at 138 (first and second omissions in

---

[25] *See also BC Media Funding Co. II* v. *Lazauskas*, 2008 WL 4735236, at *3 (S.D.N.Y. Oct. 24, 2008) (noting that, had defendants pursued duress argument, "they would have failed" because "[d]efendants' unconditional guarantees prevent them from asserting any defenses"); *Banco Do Estado de Sao Paolo, S.A.* v. *Mendes Junior Int'l Co.*, 249 A.D.2d 137, 138 (1st Dep't 1998) (noting that defense of duress, though abandoned by defendants, was barred by clause stating that guaranty was "absolute and unconditional" and was enforceable "irrespective of . . . any other circumstances which might constitute a defense" (omission in original)).

original).  HealthSouth argued that the guaranty was "void *ab initio* because it was executed by a faithless agent who had no actual or apparent authority to sign it."  *Id.* at 143 (internal quotation marks omitted).

The district court held that the New York Court of Appeals' leading decision in *Citibank, N.A.* v. *Plapinger*, cited above, compelled rejection of this agency argument, as the waiver-of-defenses clause in the guaranty "preclude[d] [HealthSouth's] present argument that the Agreement is unenforceable because its agent's authorization was suspect."  *Id.*; *see also Keeseville Nat'l Bank*, 194 A.D.2d at 971 (waiver-of-defenses clause was "sufficient to extinguish defendant's right to rely on . . . lack of authority in his then attorney to complete the notes").

The district court in *HealthSouth* also gave effect to HealthSouth's express representations that the agreement was a "legal, valid and binding obligation" and that it had been "duly authorized."  645 F. Supp. 2d at 143.  The September Guaranty contains a similar representation that it "has been duly authorized by all necessary corporate action" and "is the legal, valid and binding obligation of the Guarantor."  Wolf Decl. Ex. 7, § 9.

Accordingly, Counts XXXV and XLVI should be dismissed as precluded by the waiver-of-defenses clause in the September Guaranty.

**2.      LBHI ratified the September Agreements and the delivery of $8.6 billion in collateral.**

As noted, plaintiffs claim that the September Agreements are invalid because they were executed under duress — in response to an alleged threat to cease extending credit to or clearing trades for LBI without "commercially reasonable notice" — and that the September Guaranty is invalid for lack of authority.  Counts XXXV, XLVI.  They also argue that LBHI's "agreements" to deliver $8.6 billion in collateral between September 9 and September 12, 2008

were the result of duress and are subject to "rescission."  Count XLVIII.  For purposes of this

Motion, it is not necessary to address whether the notice given here was commercially reason-

able (or even contractually required) in view of the circumstances and the parties' prior practices.

It is clear from the face of the Amended Complaint — in addition to matters that occurred in this

Court and are subject to judicial notice — that LBHI ratified the September Agreements, includ-

ing any contemporaneous deliveries of collateral, and has therefore waived its right to repudiate

them.  Accordingly, even had plaintiffs not waived whatever right they had to assert these

claims, they should be dismissed.

Under New York law, a contract executed under duress is voidable, not void *ab

initio*.  *See, e.g.*, *VKK Corp.* v. *Nat'l Football League*, 244 F.3d 114, 122 (2d Cir. 2001); *see also

Nelson* v. *Blacker*, 713 F. Supp. 107, 110 (S.D.N.Y. 1989) ("A contract executed under duress is

not void but merely voidable.").  In order to avoid a contract on grounds of economic duress, a

plaintiff must establish the existence of "(1) a threat, (2) which was unlawfully made, and

(3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no

other alternatives."  *Kamerman* v. *Steinberg*, 891 F.2d 424, 431 (2d Cir. 1989).

However, a party seeking to avoid a contract for duress must have acted promptly

to repudiate the contract, otherwise "he will be deemed to have ratified it."  *VKK Corp.*, 244 F.3d

at 122-23; *accord Nisselson* v. *Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R.

369, 402 (Bankr. S.D.N.Y. 2007).  A party may also ratify a contract executed under duress by

"'intentionally accepting benefits under the contract,' by 'remaining silent or acquiescing in the

contract for a period of time after he has the opportunity to avoid it,' or by 'acting upon it, per-

forming under it, or affirmatively acknowledging it.'"  *VKK Corp.*, 244 F.3d at 123 (citing *In re

Boston Shipyard Corp.*, 886 F.2d 451, 455 (1st Cir. 1989)).

As with duress, "a contract entered into . . . by an unauthorized agent . . . is void-able," *Leasing Serv. Corp.* v. *Vita Italian Rest., Inc.*, 171 A.D.2d 926, 927 (3d Dep't 1991), unless it is ratified by the principal on whose behalf the agent purported to act. *See, e.g., Merex A.G.* v. *Fairchild Weston Sys., Inc.*, 810 F. Supp. 1356, 1370 (S.D.N.Y. 1993). Ratification in this context is "the express or implied adoption of acts of another by one for whom the other assumes to be acting but without authority." *Prisco* v. *New York*, 804 F. Supp. 518, 523 (S.D.N.Y. 1992).

The unauthorized agent's acts will be imputed to the principal "'if the principal adopts the unauthorized act of his agent in order to retain a benefit for himself.'" *In re S. Afr. Apartheid Litig.*, 633 F. Supp. 2d 117, 122 (S.D.N.Y. 2009) (quoting *Munroe* v. *Harriman*, 85 F.2d 493, 495 (2d Cir. 1936)). Further, "it is well-established that the filing of a lawsuit to enforce one's rights pursuant to a . . . contract given in connection with an allegedly unauthorized act, ratifies the unauthorized act." *Amusement Indus., Inc.* v. *Citigroup Global Mkts. Realty Corp. (In re First Republic Grp. Realty, LLC)*, 421 B.R. 659, 682 (Bankr. S.D.N.Y. 2009) (citing *IBJ Schroder Bank & Trust Co.* v. *Resolution Trust Corp.*, 26 F.3d 370, 375 (2d Cir. 1994); *Simmons* v. *Thompson*, 29 A.D. 559, 562 (1st Dep't 1898)).[26]

In light of these settled principles, plaintiffs' attempt to invalidate the September Agreements, and to rescind the related collateral transfers, collides with the fact that LBHI: (1) performed and accepted considerable benefits under the September Agreements, (2) force-fully advocated in this Court for the continuation of the benefits of the September Agreements

---

[26] "Although ratification is an affirmative defense, it is properly considered on a motion to dismiss when . . . the issue is obvious from the pleadings and papers before the court." *Landau* v. *Am. Int'l Grp., Inc.*, 1997 WL 590854, at *3 (S.D.N.Y. Sept. 23, 1997), *aff'd*, 164 F.3d 618 (2d Cir. 1998); *In re MarketXT Holdings Corp.*, 361 B.R. at 402 (granting defendant's motion to dismiss debtor's duress claims in part on grounds of ratification).

one day after its bankruptcy filing, and (3) now sues to enforce its purported rights under those Agreements while simultaneously seeking to undo them.  In light of their choice to embrace rather than repudiate the September Agreements, plaintiffs' attempt to have it both ways is barred by the ratification doctrine.

As described in the Amended Complaint, LBHI "intentionally accept[ed] benefits under the contract," *VKK Corp.*, 244 F.3d at 123, when, at Lehman's request, JPMorgan extended tens of billions of dollars in credit following execution of the September Agreements. Am. Compl. ¶ 48 (alleging that JPMorgan "would have" stopped extending intraday credit to Lehman if LBHI had not executed the September Agreements).  LBHI also performed under the September Agreements, posting $8.6 billion in money market funds and cash collateral between September 9 and September 12, 2008 in response to JPMorgan's requests for collateral.  *Id.* ¶¶ 66, 71; *see also VKK Corp.*, 244 F.3d at 123 (a party may ratify an agreement by "acting upon it" or "performing under it"); *Prisco*, 804 F. Supp. at 523 ("the express *or implied* adoption of the acts of another" serves to ratify otherwise unauthorized acts (emphasis added)).

"[A] person claiming duress must act promptly to repudiate the contract . . . or he will be deemed to have waived his right to do so."  *VKK Corp.*, 244 F.3d at 122.  Such acts of repudiation include instituting legal action, *see Davis & Assocs., Inc.* v. *Health Mgmt. Servs., Inc.*, 168 F. Supp. 2d 109, 117 n.3 (S.D.N.Y. 2001), including a bankruptcy filing, *see In re MarketXT Holdings Corp.*, 361 B.R. at 401.  Yet, instead of promptly repudiating the September Agreements or seeking the Court's assistance to recover the collateral or relieve it from the September Agreements it had supposedly executed with a "financial gun to [its] head," Am. Compl. ¶ 2, LBHI did exactly the opposite:  It moved for an order of this Court to ensure that JPMorgan would *continue* to extend credit under the protections afforded it by the September Agreements and the collateral.  *See* Comfort Order Motion ¶ 18 (Wolf Decl. Ex. 11).

Although LBHI was now under the protection of this Court, free to invoke the Court's assistance to extricate itself from the allegedly "overreaching and invalid agreements" that JPMorgan had been "able to extract," Am. Compl. ¶ 2, LBHI instead represented to the Court that it was "completely understandable" that JPMorgan had requested the "comfort" sought by the Motion, and that "[i]n our view, we believe that the guaranty and the collateral covers not only those transactions which have already occurred but as well the future transactions." Wolf Decl. Ex. 12 at 27:25-28:8.

After the Court entered the Comfort Order, JPMorgan relied on that Order along with the September Agreements in extending tens of billions of dollars of credit to LBI each day though the September 19, 2008 sale of LBI assets to Barclays. Plaintiffs' request for a declaratory judgment that "the September Agreements never took effect, and are otherwise invalid and unenforceable," is unfathomable in light of LBHI's prior request for relief from this Court and its eager acceptance of massive benefits under the very agreements it now would repudiate, and should be dismissed.[27] *See, e.g.*, *In re Market XT Holdings Corp.*, 361 B.R. at 402 (granting defendants' motion to dismiss duress claim on grounds of ratification doctrine among other reasons); *C.B.S. Rubbish Removal Co., Inc.* v. *Winters Waste Servs. of N.Y., Inc.*, 18 A.D.3d 790, 792 (2d Dep't 2005) (same); *see also VKK Corp.*, 244 F.3d at 123 (explaining that the requirement of prompt repudiation "protects the stability and reliability of such agreements by denying

---

[27] While JPMorgan does not contend that the Comfort Order itself validated the September Agreements, the Order did not absolve LBHI of its responsibility to promptly repudiate those Agreements instead of enjoying benefits thereunder and only challenging them as coercive nearly two years later. Nor is the Court required to disregard the fact that LBHI actively sought the Order to facilitate continued financing for LBI. If LBHI secretly harbored the view that the September Agreements had been executed under duress or without proper authority, it was obligated by New York law to express that view before asking this Court to enter the Comfort Order and inducing JPMorgan to provide tens of billions of dollars in clearing advances.

the weaker party the heads I win, tails you lose option of waiting to see how the arrangement works out and then deciding whether to seek to undo it"); *Fruchthandler* v. *Green*, 233 A.D.2d 214, 215 (1st Dep't 1996) ("Having accepted the benefits of the agreement before commencing this action, plaintiff, in effect, ratified the release and is therefore barred from alleging economic duress in its execution."); *Bank Leumi Trust Co. of N.Y.* v. *D'Evori Int'l, Inc.*, 163 A.D.2d 26, 31 (1st Dep't 1990) (rejecting as a matter of law plaintiffs' claim that guaranty was executed under duress partly on grounds that plaintiffs "accepted the benefits of the bank's [extension of credit] in reliance upon their guarantees and thereby ratified the same").[28]

Because LBHI's undisputed conduct, both before and after its bankruptcy filing, demonstrates that it intended to be bound by the September Agreements, LBHI has relinquished any right to seek to invalidate the September Agreements on grounds of duress and lack of authority.

3. **The September Agreements are not invalid for lack of consideration.**

Plaintiffs assert that the September Agreements are unsupported by consideration, and therefore should be invalidated, because they "provided no new rights for LBHI" and "JPMorgan did not incur any new obligations." Am. Compl. ¶ 281 (Count XXXV). As demon-

---

[28] Plaintiffs' effort to invalidate the September Agreements is also precluded by their inconsistent claims to enforce rights in this Adversary Proceeding under the very same agreements they claim should be nullified. *Compare* Am. Compl. ¶ 357 ("JPMorgan breached its implied covenant of good faith and fair dealing with LBHI, *embodied in the September Agreements*") (emphasis added), *with* Am. Compl. ¶ 274 ("LBHI is entitled to a declaratory judgment that the September Agreements never took effect, and are otherwise invalid and unenforceable, because they were the product of coercion [and] were not properly authorized"). Though parties are generally free to plead in the alternative, the law is clear that the assertion of rights under a contract in litigation serves to ratify it. *See IBJ Schroder Bank & Trust Co.* v. *Resolution Trust Corp.*, 26 F.3d 370, 375 (2d Cir. 1994) ("'[O]ne of the most unequivocal methods of showing ratification of an agent's act is the bringing of an action based upon such an act.'" (quoting *Robb* v. *Vos*, 155 U.S. 13, 43 (1894))).

strated above, this argument fails because LBHI explicitly agreed to waive any defenses based on the purported invalidity of the agreements. *See supra* Point IV.D.1. The claim should be rejected for the additional reason that, as a matter of law, the consideration provided to LBI, which plaintiffs have not challenged as inadequate, was sufficient to support LBHI's entry into the September Agreements. Indeed, the notion that LBHI was somehow indifferent to the credit extended to LBI following execution of the September Agreements is belied by the fact that LBHI filed the Comfort Order Motion in LBHI's own chapter 11 case asserting that it was vital for LBHI's estate for the credit provided by JPMorgan to be continued.

Where a third party (here, LBHI) seeks to guarantee the obligations of a principal obligor (here, LBI), consideration need only pass to the principal obligor. *See*, *e.g.*, *First N.Y. Bank for Bus.* v. *DeMarco*, 130 B.R. 650, 654 (S.D.N.Y. 1991) ("Consideration passing from a creditor to a principal obligor is sufficient consideration to support a third-party guaranty of the principal obligor's debts."). Likewise, under the U.C.C.,[29] a party granting a security interest to secure the debts of another need not receive consideration to support the security agreement. *See Putnam Realty, Inc.* v. *Terminal Moving & Storage Co., Inc. (In re Terminal Moving & Storage Co., Inc.)*, 631 F.2d 547, 550-51 (8th Cir. 1980) (*en banc*) (affirming validity of security interest granted by corporation to secure shareholder's debts and stating that "[t]here is no requirement under the U.C.C. that the entity whose assets are pledged must receive consideration"). Thus, plaintiffs' assertion that the September Agreements were not supported by consideration because they "provided no new rights for LBHI," Am. Compl. ¶ 281, even if true, is of no moment.

---

[29] The September Security Agreement provides: "The Bank shall have . . . the rights and remedies with respect to the Security of a secured party under the Uniform Commercial Code (whether or not the Code is in effect in the jurisdiction where the rights and remedies are asserted)." Wolf Decl. Ex. 8 at 3.

Plaintiffs do not even allege that JPMorgan did not provide consideration to LBI, nor could they. It is black-letter law that "[p]erformance by a promisee of an act which he is not obligated to perform, or the surrender by him of a privilege which he has the legal right to assert, is sufficient consideration for a promise." *Weiss* v. *Weiss*, 266 A.D. 801, 801 (2d Dep't 1943). It is equally clear that JPMorgan was not obligated to extend credit to LBI under the Clearance Agreement or any other agreements with LBI. Section 5 of the Clearance Agreement, entitled "Loans and Advances," states that JPMorgan "may, *solely at our discretion*, permit you to use funds credited to the Account prior to final payment." Wolf Decl. Ex. 1, § 5 (emphasis added). The same section later reiterates that any overdraft advances would be made by JPMorgan "solely at our discretion," and that JPMorgan reserved the right to "at any time decline to extend . . . credit at our discretion, with notice." *Id.* Section 5 further provides that "[a]ll loans, whether of money or securities, shall be payable on demand." *Id.*

The Clearance Agreement could not be clearer, therefore, that JPMorgan had no affirmative duty to extend credit to LBI, and that, even if it did extend credit, it could require immediate repayment. LBHI has expressly conceded this before this Court. *See* Comfort Order Motion ¶ 6 (Wolf Decl. Ex. 11) ("[JPMorgan] may, in its sole discretion, make advances to or for the benefit of the respective Lehman Clearance Parties, which are payable by the respective Lehman Clearance parties upon demand by [JPMorgan]."); *id.* ¶ 9 ("[JPMorgan] may elect to make additional advances under the Clearance Agreements in its sole discretion . . . .").

Notwithstanding the lack of any obligation to extend credit, JPMorgan extended hundreds of billions of dollars in credit to LBI following execution of the September Agreements. *See* Comfort Order Motion ¶ 9 (Wolf Decl. Ex. 11) (stating that on September 15, 2008, "[JPMorgan] advanced approximately $87 billion . . . to or for the benefit of the Lehman Clearance Parties at the request of Lehman and the Federal Reserve Bank of New York" and "a com-

parable amount" on the following day); *see also* Am. Compl. ¶ 48 (alleging that JPMorgan

"would have" stopped extending intraday credit to LBI if LBHI had not executed the September

Agreements).

Thus, JPMorgan not only performed an act it was under no obligation to perform,

it also "surrender[ed] . . . a privilege which [it had] the legal right to assert," *Weiss*, 266 A.D. at

801, namely, the right to "at any time decline to extend . . . credit" to LBI, when it extended tens

of billions of dollars of credit each day to unwind the tri-party repos and facilitate LBI's securi-

ties trading operations. Wolf Decl. Ex. 1, § 5. In doing so, JPMorgan unequivocally provided

consideration for the September Agreements.

At any rate, regardless of whether JPMorgan provided *present* consideration for

LBHI's entry into the September Agreements, the indisputable existence of *past* consideration is

sufficient to render the agreements enforceable under New York law. Section 5-1105 of the New

York General Obligations Law ("GOL") provides:

> A promise in writing and signed by the promisor or by his agent shall
> not be denied effect as a valid contractual obligation on the ground that
> consideration for the promise is past or executed, if the consideration
> is expressed in the writing and is proved to have been given or
> performed and would be a valid consideration but for the time when it
> was given or performed.

In particular, a guaranty supported by past consideration has been held to be valid and

enforceable if it meets all the requirements of GOL section 5-1105.

In *United Bank of Africa, P.L.C. New York Branch* v. *Odimayo*, 1994 WL 185826

(S.D.N.Y. May 10, 1994), the defendants sought to invalidate for lack of consideration a guar-

anty they had entered into on behalf of a corporation they owned. The defendants argued that the

loan had been disbursed to the corporation several weeks prior to the defendants' execution of

the guaranty, such that any consideration for the guaranty was only past consideration and there-

fore insufficient. The court rejected the defendants' position, holding that past consideration was sufficient under section 5-1105 so long as the consideration was expressed in the contract to be enforced. *Id.* at *3; *see also Orix Fin. Servs.* v. *Thunder Ridge Energy Inc.*, 2006 WL 587483, at *13-14 (S.D.N.Y. Mar. 8, 2006) (lender's prior extension of credit was sufficient consideration to support guaranty because it was expressed in a writing signed by the promisor).

Here, as in *Odimayo* and *Thunder Ridge*, it is not disputed that JPMorgan made extensions of credit to LBI prior to execution of the September Agreements, which credit was sufficient consideration for its parent's guaranty. It is further undisputed that each of those Agreements expressed the consideration in a writing signed by LBHI. *See* September Guaranty at 1 (Wolf Decl. Ex. 7) ("for good and valuable consideration and in order to induce the Bank from time to time, to extend or continue to extend credit"); September Security Agreement at 1 (Wolf Decl. Ex. 8) ("In consideration of [JPMorgan] . . . extending credit to . . . [LBHI] and/or its subsidiaries"); September Amendment at 1 (Wolf Decl. Ex. 6) ("for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged"). Thus, GOL section 5-1105 provides a further reason why plaintiffs' attempt to invalidate the September Agreements for lack of consideration must fail.

## E. Plaintiffs' common law fraud claim should be dismissed. (Count XLIX)

In Count XLIX of the Amended Complaint, plaintiffs charge JPMorgan with fraudulently inducing LBHI's agreement to post $5 billion in collateral on September 12, 2008. After failing in their original pleading to even identify the speaker of the allegedly fraudulent statement, plaintiffs have now tossed in the name of JPMorgan's CEO, asserting that "Jamie Dimon of JPMorgan represented that JPMorgan would return the $5 billion to LBHI at the end of the trading day on September 12, 2008." Am. Compl. ¶ 366. Notwithstanding the apparent sud-

den recovery of memory that allows plaintiffs to plead that Mr. Dimon purportedly made the alleged fraudulent misrepresentation, the Amended Complaint still fails to meet the stringent requirements for pleading a fraud claim.

Fraud under New York common law requires (1) a material misrepresentation of fact, (2) intent to defraud, (3) reasonable reliance, and (4) damage as a result of such reliance. *See Banque Arabe et Internationale D'Investissement* v. *Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995); *Lama Holding Co.* v. *Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996). Allegations of fraud are subject to the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure, which requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To plead a fraud claim with sufficient particularity to satisfy Rule 9(b), a plaintiff must specify (1) the statements, (2) the speaker, (3) the time and place of the statements, and (4) "why the statements were fraudulent." *Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006). In other words, "a plaintiff must set forth the who, what, when, where and how of the alleged fraud." *Trabucco* v. *Intesa Sanpaolo, S.P.A.*, 695 F. Supp. 2d 98, 108 (S.D.N.Y. 2010) (internal quotation marks omitted). This heightened pleading standard serves to "provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from 'improvident charges of wrongdoing,' and to protect a defendant against the institution of a strike suit." *O'Brien* v. *Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (quoting *Ross* v. *Bolton*, 904 F.2d 819, 823 (2d Cir. 1990)).

Plaintiffs' insertion of Mr. Dimon's name into their Amended Complaint is not nearly enough to satisfy the "who, what, when, where and how" requirement for pleading fraud, nor does it provide JPMorgan with "fair notice" of the claim against it. The Amended Complaint still does not specify what Mr. Dimon allegedly said: It simply asserts in conclusory fashion that he made a "representation and promise" that JPMorgan would return the $5 billion at the end of

the day on September 12, but it does not so much as paraphrase the actual words that Mr. Dimon allegedly spoke. Am. Compl. ¶ 70. Nor does the Amended Complaint provide any other facts with regard to this alleged misrepresentation, such as when it was said, whether it was on the phone or in person, who was involved in the conversation in which the statement was purportedly made, or whether it came with any conditions or qualifications — as one might expect that any "agreement" governing the disposition of $5 billion would. Plaintiffs' barebones pleading falls far short of the particularity requirements of Rule 9(b). *See, e.g.*, *IMG Fragrance Brands, LLC* v. *Houbigant, Inc.*, 679 F. Supp. 2d 395, 410 (S.D.N.Y. 2009) (holding that an allegation fell "woefully short of the particularity required by the Federal Rules" when it "identified both the content of the misrepresentation and who made the misrepresentation but has failed to identify when the misrepresentation was made, where it was made, and how it was made").

In addition to pleading with particularity the facts surrounding an alleged fraudulent misrepresentation, a plaintiff alleging fraud must plead "facts that give rise to a strong inference of fraudulent intent." *Lerner*, 459 F.3d at 290-91 (internal quotation marks omitted). Here, plaintiffs have failed to meet their burden of pleading fraudulent intent. The only allegation of intent in plaintiffs' fraud claim is the conclusory assertion that, at the time Mr. Dimon supposedly "promised" to return the collateral, "JPMorgan had no intention of returning the $5 billion to LBHI." Am. Compl. ¶ 368. Under Second Circuit precedent, it is questionable whether such a claim that a defendant entered into an agreement with no intention to perform it can support a fraud claim at all. *See, e.g.*, *Grappo* v. *Alitalia Linee Aere Italaliane, S.p.A.*, 56 F.3d 427, 434 (2d Cir. 1995) ("A cause of action for fraud does not generally lie where the plaintiff alleges only that the defendant entered into a contract with no intention of performing."); *Bridgestone/Firestone, Inc.* v. *Recovery Credit Servs., Inc.*, 98 F.3d 13, 19-20 (2d Cir. 1996) ("inten-

tionally-false statements by [defendant] indicating his intent to perform under the contract" are "not sufficient to support a claim of fraud under New York law").

Even in those cases that have recognized a fraud claim based on an alleged broken promise, the courts have required plaintiffs to make a specific showing that "'the defendants had no intention of carrying out [the promise] at the time the promise was made.'" *Trabucco*, 695 F. Supp. 2d at 108 (quoting *Olivieri* v. *McDonald's Corp.*, 678 F. Supp. 996, 1001 (E.D.N.Y. 1988)) (alteration in original). A plaintiff cannot meet this standard merely by alleging that the defendant ultimately did not perform its promise. Nor is it sufficient to allege in conclusory fashion that the defendant never intended to perform. *See id.* ("To meet this standard the plaintiff must go beyond a mere showing of nonperformance." (internal quotation marks omitted)); *Pot Luck LLC* v. *Freeman*, 2010 WL 908475, at *4 (S.D.N.Y. Mar. 8, 2010) ("[I]f a claim alleges that a defendant intended to breach a contract at the time of its formation, the simple fact of nonperformance of a promise is insufficient to raise an inference of fraud." (internal quotation marks omitted)); *accord N.Y. Univ.* v. *Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995) ("General allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support the claim [for fraud].").

Thus, for example, in *Trabucco*, the plaintiffs alleged that the defendant bank committed fraud by promising to reimburse them for the repurchase of stock that the bank had erroneously sold, even though the bank never intended to keep that promise. The court held that plaintiffs did not state a fraud claim because they "fail[ed] to allege facts supporting their legal conclusion that [the bank] never intended to reimburse their account," and "a mere showing of nonperformance" was insufficient to overcome this hurdle. *Trabucco*, 695 F. Supp. 2d at 109 (internal quotation marks omitted); *see also Pot Luck LLC*, 2010 WL 908475, at *4 (dismissing fraud claim where "Plaintiff's allegations of fraud consist entirely of conclusory assertions that

Defendants 'made . . . representations to Plaintiff knowing at the time that said representations were made that they had no intention of fulfilling their promises to Plaintiff'" (omission in original)).

Here, too, plaintiffs' allegations of intent are completely conclusory, flatly asserting that "JPMorgan" — plaintiffs apparently remain unwilling or unable to attribute fraudulent intent to an actual human being[30] — "had no intention of returning the $5 billion to LBHI" and that "JPMorgan had already determined that it would lock down all LBHI assets." Am. Compl. ¶ 368. Plaintiffs allege no specific facts that provide a basis for those allegations.

Moreover, plaintiffs' implausible allegation that JPMorgan "fraudulently" promised that it would return the $5 billion in collateral within hours of its posting on September 12 actually runs directly counter to the explicit provisions of the September Security Agreement governing precisely the same subject matter — LBHI's right to request the return of its collateral. The Agreement provided that LBHI could "upon three days written notice to the Bank transfer any Security." Wolf Decl. Ex. 8 at 3. The Agreement further provided that: "No provision hereof shall be modified or limited except by a written instrument expressly referred hereto and to the provision so modified or limited." *Id.* at 6.

Plaintiffs' allegation of fraud based on an alleged promise that was inconsistent with the provisions of the September Security Agreement is no more than an effort to circumvent the Agreement's "no oral modifications" clause by dressing up a contractually ineffective alleged

---

[30] *See Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("When the defendant is a corporate entity, . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."); *cf. Rodriguez* v. *It's Just Lunch, Int'l*, 2010 WL 685009, at *5 (S.D.N.Y. Feb. 23, 2010) ("Attributing fraudulent statements to a group . . . does not satisfy the Rule 9(b) standard, as allegations of false representations must be attributed to specific defendants.").

broken oral promise as a fraudulent misrepresentation. But New York law precludes any such claim because reliance on such a promise cannot be reasonable as a matter of law: "Where a written agreement expressly bars oral modification of the agreement, a party cannot argue that it reasonably relied on an oral modification for purposes of establishing a fraud or negligent misrepresentation claim." *John St. Leasehold LLC* v. *Fed. Deposit Ins. Corp.*, 1996 WL 737196, at *7 (S.D.N.Y. Dec. 24, 1996); *see also 4 B's Realty 1530 CR39, LLC* v. *Toscano*, 2009 WL 702011, at *5-6 (S.D.N.Y. Mar. 12, 2009) (holding that reliance on alleged oral modifications was not reasonable in context of transaction between sophisticated parties); *Int'l Plaza Assocs., L.P.* v. *Lacher*, 63 A.D.3d 527, 528 (1st Dep't 2009) (upholding dismissal of fraud claim because "the terms of the lease, including the no oral modification clause, preclude reasonable reliance on the alleged 'misrepresentations'"); *Highland Sec. Co. ex rel. Georgetown Hospitality Assocs., L.P.* v. *Hecht*, 145 A.D.2d 393, 393 (1st Dep't 1988) ("[T]he purported misrepresentation involved herein . . . does not support a claim for fraud since the oral promise was not enforceable and no justifiable reliance could be placed thereon.").

Plaintiffs have alleged no facts indicating that JPMorgan's purported oral promise met the criteria for modifications set forth in the September Security Agreement. All they allege is that Mr. Dimon promised to return the collateral at the close of settlement on September 12, 2008. Thus, plaintiffs' claim is that LBHI reasonably relied on an oral promise that was at variance with an explicit term in a written contract that included a provision stating that it could not be modified orally.

In sum, Count XLIX of the Amended Complaint — which charges JPMorgan with having orally promised to return collateral in a manner inconsistent with the governing Security Agreement — fails to adequately plead the elements of a fraud claim and should be dismissed.

**F.      Plaintiffs' constructive trust claim should be dismissed.  (Count XXXII)**

In Count XXXII, plaintiffs seek a "constructive trust and turnover" of the $5 billion of cash collateral that LBHI pledged to JPMorgan on September 12, 2008.  As demonstrated in Point IV.A above, federal bankruptcy law preempts this claim, which is yet another attempt to avoid a collateral transfer that Congress has declared to be unavoidable.  Even absent preemption, however, plaintiffs have failed to state a claim for constructive trust.

**1.      Plaintiffs' allegation that JPMorgan breached an oral "agreement" to return the collateral cannot support the equitable remedy of constructive trust.**

Plaintiffs' constructive trust claim is based on essentially the same allegations as their fraud claim:  that JPMorgan "agreed that it would return the $5 billion in cash to LBHI" at the end of the trading day, that LBHI posted the collateral "[i]n reliance upon JPMorgan's representation," and that JPMorgan "breached its agreement" by refusing to return the collateral.  Am. Compl. ¶¶ 260-63.  To the extent plaintiffs' claim for imposition of a constructive trust is predicated on a theory that LBHI was fraudulently induced into delivering the $5 billion in cash collateral on September 12, the claim should be dismissed for failure to meet the requirements of Rule 9(b), as well as the other reasons discussed above.  *See supra* Point IV.E.

To the extent plaintiffs are attempting to plead a non-fraud claim based on JPMorgan's alleged breach of an implausible oral "agreement" to return the collateral, that claim also fails.  The Second Circuit has held that, under New York law, constructive trust is an equitable remedy that is intended to be "fraud-rectifying" rather than "intent-enforcing." *Superintendent of Ins.* v. *Ochs (In re First Cent. Fin. Corp.)*, 377 F.3d 209, 216 (2d Cir. 2004).  "[A] constructive trust claim is intended to prevent one who failed to meet an obligation or committed a fraud or other misconduct from becoming unjustly enriched." *Id.* at 218.  Although "a showing

of actual fraud or wrongful conduct is not strictly required for a constructive trust," a court will not exercise its equitable powers to impose a constructive trust merely because one party claims that its contractual expectations were frustrated. *See id.* at 216-17. Plaintiffs' allegation that JPMorgan "breached" an oral "agreement" to return the collateral, Am. Compl. ¶ 263, is thus wholly inadequate to support a constructive trust.

Plaintiffs' attempt to predicate a constructive trust claim on the breach of an alleged oral agreement to return collateral also fails because this issue was governed by a *written* agreement: the September Security Agreement. In *First Central*, the Second Circuit held that imposition of a constructive trust is not appropriate when the rights of the parties are defined by a written agreement. *See* 377 F.3d at 213-16.[31] The Second Circuit based this conclusion on New York's well-established rule that unjust enrichment, an element of a constructive trust claim, generally cannot be found "in the face of a valid and enforceable written agreement." *In re First Cent. Fin. Corp.*, 377 F.3d at 213-14 (citing *Miller* v. *Schloss*, 218 N.Y. 400, 407 (1916)).[32] More broadly, constructive trust is a species of quasi-contract remedy, and "'the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.'" *In re First Cent. Fin. Corp.*, 377 F.3d at 213-14 (quoting *Clark-Fitzpatrick, Inc.* v. *Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987)).

---

[31] *Accord Petrohawk Energy Corp.* v. *Law Debenture Trust Co. of N.Y.*, 2007 WL 211096, at *7 (S.D.N.Y. Jan. 29, 2007) (existence of valid contracts barred constructive trust in "complex commercial dispute between sophisticated financial entities"); *Tekinsight.com, Inc.* v. *Stylesite Mktg., Inc. (In re Stylesite Mktg., Inc.)*, 253 B.R. 503, 508 (Bankr. S.D.N.Y. 2000) (existence of valid contract "bars the imposition of a constructive trust").

[32] *See also VCG Special Opportunities Master Fund Ltd.* v. *Citibank, N.A.*, 594 F. Supp. 2d 334, 345 (S.D.N.Y. 2008) (holding that "VCG's claims for unjust enrichment and conversion necessarily fail as being duplicative of VCG's claim for breach of contract"), *aff'd*, 355 F. App'x 507 (2d Cir. 2009).

Here, the Amended Complaint explicitly alleges that JPMorgan held the cash collateral pursuant to the September Agreements. *See, e.g.*, Am. Compl. ¶ 287 ($8.6 billion was "held as purported collateral under the September Agreements"). As discussed above, the September Security Agreement, which could only be modified in writing, directly addressed requests for return of collateral, requiring LBHI to provide JPMorgan with three days' written notice if it wanted any of its collateral back. *See* Wolf Decl. Ex. 8 at 3, 6. In the face of this controlling contractual provision, which plaintiffs never allege that LBHI satisfied, plaintiffs cannot invoke constructive trust to rewrite the terms of the Agreement or to enforce an alleged oral modification. *See In re First Cent. Fin. Corp.*, 377 F.3d at 213-16.[33]

Plaintiffs' constructive trust claim also fails because plaintiffs have an adequate remedy at law. "As an equitable remedy, a constructive trust should not be imposed unless it is demonstrated that a legal remedy is inadequate." *First Central*, 377 F.3d at 215 (quoting *Bertoni* v. *Catucci*, 117 A.D.2d 892, 895 (3d Dep't 1986)); *see also id.* ("[W]here a valid agreement controls the rights and obligations of the parties, an adequate remedy at law typically exists."). Here, plaintiffs are seeking to recover the exact same collateral not only through their contract and other common law claims, but also through their avoidance claims under bankruptcy law. While meritless, these claims would provide plaintiffs with an adequate legal remedy. Accordingly, no reason exists for equity to intervene and impose a constructive trust.

---

[33] *See also Petrello* v. *White*, 412 F. Supp. 2d 215, 232-33 (E.D.N.Y. 2006) (court could not, as a matter of law, impose constructive trust over land that was subject of valid contract of sale, despite seller's claim that parties had a "secret agreement" to reconvey the land); *Reale* v. *Reale*, 485 F. Supp. 2d 247, 253 (W.D.N.Y. 2007) ("Where there is a written agreement between the parties, an oral promise cannot be invoked to defeat the terms of that agreement." (emphasis omitted) (citing *In re First Cent. Fin. Corp.*, 377 F.3d at 213-14)).

## 2. Plaintiffs' allegation of a "confidential relationship" between JPMorgan and LBHI is insufficient as a matter of law.

As shown in the preceding section, plaintiffs' allegation that JPMorgan breached an oral agreement to return collateral cannot support the equitable remedy of constructive trust. Plaintiffs' otherwise inadequate constructive trust claim is in no way bolstered by their allegation that this supposed agreement was made "in the context of the confidential relationship between JPMorgan and LBHI." Am. Compl. ¶ 260. Through this cursory allegation, plaintiffs appear to be trying to plead a "confidential or fiduciary relationship," which New York courts generally cite as an element of a constructive trust claim. *In re First Cent. Fin. Corp.*, 377 F.3d at 212. But plaintiffs' allegation is wholly insufficient to satisfy this element.

New York courts that have relied upon the nature of the parties' relationship to justify imposition of a constructive trust in a business dispute have done so only in the context of a fiduciary relationship. *See*, *e.g.*, *Rosenblatt* v. *Christie*, 195 F. App'x 11, 13 (2d Cir. 2006) ("[A] plaintiff who is unable to demonstrate a fiduciary relationship, generally cannot establish a constructive trust claim."); *Boccardi Capital Sys., Inc.* v. *D.E. Shaw Laminar Portfolios, L.L.C.*, 2009 WL 362118, at *7 (S.D.N.Y. Feb. 9, 2009) ("[A]s the assertion of a fiduciary relationship in this case is a predicate to the imposition of a constructive trust, that claim must also fail."), *aff'd*, 355 F. App'x 516 (2d Cir. 2009).

"Under New York law, a fiduciary relationship exists when a person is under a duty to act or render advice for another's benefit." *LFD Operating, Inc.* v. *Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.)*, 274 B.R. 600, 627 (Bankr. S.D.N.Y. 2002), *aff'd*, 2004 WL 1948754 (S.D.N.Y. Sept. 1, 2004), *aff'd*, 144 F. App'x 900 (2d Cir. 2005). A fiduciary relationship is characterized by a "high degree of dominance and reliance." *SNS Bank, N.V.* v. *Citibank, N.A.*, 7 A.D.3d 352, 355-56 (1st Dep't 2004) (quoting *Societe Nationale D'Exploitation Indus-*

*trielle de Tabacs et Allumettes* v. *Salomon Bros. Int'l Ltd.*, 251 A.D.3d 137, 138 (1st Dep't 1998)). "[A]n arm's length business relationship" does not meet this standard. *Id.*; *accord Sec. Pac. Mortg. & Real Estate Servs., Inc.* v. *Republic of Phil.*, 962 F.2d 204, 210 (2d Cir. 1992) ("confidential or fiduciary relationship" element of constructive trust was not met where contract "resulted from arms length bargaining"); *In re Ames*, 274 B.R. at 626 ("In New York, no fiduciary relationship exists where parties were acting and contracting at arms-length to a business transaction."). Moreover, "where a contract governs the relationship between two commercial parties, the assumption is that there is no fiduciary relationship unless the contract provides otherwise." *World Wrestling Entm't, Inc.* v. *Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 503-04 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 695 (2d Cir. 2009).

New York courts have specifically declined to impose fiduciary duties in the context of arm's-length lending and financial transactions between sophisticated parties. For example, in *Compania Sud-Americana de Vapores, S.A.* v. *IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411 (S.D.N.Y. 1992), the plaintiff alleged that the defendant bank breached its fiduciary duties by charging foreign exchange rates in excess of the rates it allegedly promised. As support for its claim that a fiduciary relationship existed, the plaintiff contended that the parties had a fifty-year relationship, that the bank performed services that were "special and unique," that the bank acted in the capacity of a manager and fiduciary for the plaintiff's currency conversions, and that the longstanding relationship and the manner in which the bank conducted the currency-exchange business led the plaintiff to repose "trust and confidence" in the bank. *Id.* at 425. The court rejected plaintiff's argument and held "as a matter of law, that no fiduciary relationship existed" between the parties because they were sophisticated business entities that "engaged in mutually beneficial, arms-length commercial transactions." *Id.* at 425-26. Even if it were true that the defendant bank performed a "unique" service and promised to give the plaintiff favorable

rates, the court held, these facts would be insufficient to create a fiduciary duty in "a typical arms-length relationship designed to further the interests of the respective parties." *Id.* at 426.[34]

Plaintiffs have not pled any facts that would "plausibly suggest" the existence of the type of relationship that New York courts generally require for imposition of a constructive trust. Nowhere is it alleged that JPMorgan was a fiduciary for LBHI, nor could the allegations of the Amended Complaint possibly support such a conclusion. LBHI was a highly sophisticated financial institution that contracted with JPMorgan as a third-party provider of clearing services and as a counterparty. *See, e.g.*, Am. Compl. ¶¶ 15-27. LBHI and JPMorgan had an "arms-length relationship designed to further the interests of the respective parties," not a fiduciary relationship in which JPMorgan was obligated to put LBHI's interests ahead of its own. *Compania Sud-Americana*, 785 F. Supp. at 426.

Plaintiffs' allegations that JPMorgan had access to "inside" or "confidential" information about LBHI, *e.g.*, Am. Compl. ¶¶ 1, 35, do not transform the parties' arm's-length commercial relationship into a fiduciary relationship. The word "confidential," as used in the term "confidential or fiduciary relationship" in the constructive trust case law, refers to a relationship "where a bond of trust and confidence exists between the parties." *Rocchio* v. *Biondi*,

---

[34] Numerous New York cases have reached a similar conclusion. *See, e.g.*, *Societe Nationale d'Exploitation des Tabacs et Allumettes* v. *Salomon Bros. Int'l Ltd.*, 1998 N.Y. Misc. LEXIS 219, at *4-5 (Sup. Ct. Feb. 9, 1998) ("Claims of breach of fiduciary duty have generally been rejected in cases involving transactions between sophisticated parties in the financial services industry."); *ADT Operations, Inc.* v. *Chase Manhattan Bank, N.A.*, 173 Misc. 2d 959, 967 (N.Y. Sup. Ct. 1997) ("New York courts have never adopted the notion that a mere debtor/creditor relationship between a bank and a customer creates a fiduciary duty, and have imposed such a duty only in extreme cases involving grossly unequal bargaining power or the domination or control of the customer by the bank."); *cf. Dobroshi* v. *Bank of Am., N.A.*, 65 A.D.3d 882, 884 (1st Dep't 2009) ("This court has repeatedly held that an arm's length borrower-lender relationship is not of a confidential or fiduciary nature and therefore does not support a cause of action for negligent misrepresentation.").

40 A.D.3d 615, 616 (2d Dep't 2007).  It does not refer to a situation in which one party provides another "nonpublic" information in the context of an arm's-length commercial relationship.  *See Boccardi Capital Sys., Inc.*, 2009 WL 362118, at \*6-7 (defendant did not become fiduciary of plaintiff when parties entered into confidentiality agreement as part of "purely commercial relationship").

Here, JPMorgan's access to information about LBHI was typical of a lender-borrower relationship, in which the lender decides whether to extend credit based on nonpublic financial information provided by the borrower.  As New York courts have held, "a fiduciary duty is not created by the mere communication of confidential information from the customer to the bank, which is a necessary incident of virtually any extension of credit."  *ADT Operations, Inc.*, 173 Misc. 2d at 967; *accord Wiener* v. *Lazard Freres & Co.*, 241 A.D.2d 114, 122 (1st Dep't 1998) ("Nor is the mere communication of confidential information sufficient in and of itself to create a fiduciary relationship between a bank and its customers."); *Boccardi Capital Sys., Inc.* v. *D.E. Shaw Laminar Portfolios, L.L.C.*, 355 F. App'x 516, 519 (2d Cir. 2009) ("Nor would Shaw's receipt of confidential information, without more, transform it into Boccardi's fiduciary.").

Plaintiffs' allegation of a "confidential relationship" between JPMorgan and LBHI is thus insufficient to support imposition of a constructive trust, even if plaintiffs had adequately pled other bases for such equitable relief.

## POINT V

## PLAINTIFFS' EQUITABLE SUBORDINATION
## CLAIM SHOULD BE DISMISSED.  (COUNT XXX)

In Count XXX of the Amended Complaint, plaintiffs ask this Court to equitably subordinate the claims of JPMorgan, a secured creditor with tens of billions of dollars in claims against the LBHI estate.  "Equitable subordination is an extraordinary remedy that is to be used sparingly." *Kalisch* v. *Maple Trade Fin. Corp. (In re Kalisch)*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008), *aff'd*, 2009 WL 2900247 (S.D.N.Y. Sept. 9, 2009).  It requires a showing of conduct that is "egregious and severely unfair to other creditors."  *Official Comm. of Unsecured Creditors of Sunbeam Corp.* v. *Morgan Stanley & Co. (In re Sunbeam Corp.)*, 284 B.R. 355, 364 (Bankr. S.D.N.Y. 2002).  Plaintiffs have not sufficiently pled that JPMorgan engaged in any conduct that meets this stringent standard.  Accordingly, plaintiffs' equitable subordination claim should be dismissed.

### A.      JPMorgan was not an "insider" of LBHI.

Section 510(c) of the Bankruptcy Code allows courts to, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim."  11 U.S.C. § 510(c).  Courts may order equitable subordination if (1) the claimant engaged in inequitable conduct, and (2) the inequitable conduct caused injury to other creditors or gave an unfair advantage to the claimant.  *See, e.g.*, *Official Comm. of Unsecured Creditors of Hydrogen, L.L.C.* v. *Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337, 360 (Bankr. S.D.N.Y. 2010) (citing *Benjamin* v. *Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977)).  A threshold question in determining whether equitable subordination is appropriate is whether the defendant is an "insider" of the debtor, because "[t]he scrutiny for presence of inequitable conduct is more stringent with respect to creditors who are insiders of the

debtor." *Id.* at 361; *accord Official Comm. of Unsecured Creditors* v. *Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112, 156 (Bankr. S.D.N.Y. 2009) ("When the defendant is an insider, his conduct is subject to greater scrutiny.").

A non-management creditor will only be considered an "insider" for purposes of equitable subordination if it "dominated and controlled the debtor." *Official Comm. of Unsecured Creditors* v. *Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 511 (Bankr. S.D.N.Y. 1999). The degree of domination and control exercised by the creditor must be substantial, such that there has been a "merger of identity" in which "the creditor has become, in effect, the *alter ego* of the debtor." *Pan Am Corp.* v. *Delta Air Lines, Inc.*, 175 B.R. 438, 500 (S.D.N.Y. 1994).

Courts have refused to find that lenders met this standard even in cases when they closely monitored the borrower or exerted some degree of influence over its affairs: "To establish domination and control by a lender, the allegations must indicate something more than the monitoring of a debtor's operations and proffering advice to management, even where the lender threatens to withhold future loans should the advice not be taken." *In re KDI Holdings*, 277 B.R. at 511 (citing *Cosoff* v. *Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 610 (2d Cir. 1983)); *accord Pan Am Corp.*, 175 B.R. at 500 (holding that Delta was not "insider" of Pan Am even though "Delta was the only debtor in possession lender and had special access to Pan Am's premises and personnel, and received details of Pan Am's flight operations not sought by other creditors"); *Smith* v. *Assocs. Commercial Corp. (In re Clark Pipe & Supply Co.)*, 893 F.2d 693, 702 (5th Cir. 1990) (holding that lender was not "insider" even though it exercised "potent leverage" over borrower and monitored its activities pursuant to loan agreement).

Cases holding that a lender met the "insider" standard have generally involved a substantial degree of managerial control going far beyond a typical lender-borrower relationship.

For example, in *Nisselson* v. *Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369 (Bankr. S.D.N.Y. 2007), the court held that a lender was an "insider" for purposes of equitable subordination because it owned 24% of the debtor's stock, held two seats on the debtor's board of directors, controlled the board's ability to obtain a quorum, and had significant rights as a pre-ferred stockholder. *See id.* at 386-88. Similarly, in *In re KDI Holdings*, the court held that the "insider" standard was met because the defendants, among other things, engaged in direct man-agement of the debtors, participated directly in choosing who would be employed by the debtors at a management level, held a controlling amount of the debtors' capital and voting equity, and made loans that were not at arm's length. *See* 277 B.R. at 512-13; *see also Bergquist* v. *First Nat'l Bank of St. Paul (In re Am. Lumber Co.)*, 5 B.R. 470, 474, 478 (D. Minn. 1980) (finding that defendant controlled debtor, including by making personnel decisions and decisions about which creditors would be paid).

The allegations of the Amended Complaint do not come close to meeting the high bar necessary to establish that JPMorgan was an "insider" of LBHI. Indeed, in their equitable subordination cause of action, plaintiffs do not allege that JPMorgan was an "insider" at all. *See* Count XXX. Although plaintiffs do refer to JPMorgan elsewhere in the Amended Complaint as the "ultimate insider," Am. Compl. ¶¶ 4, 44, this conclusory label refers to alleged access to con-fidential information and is not accompanied by allegations that JPMorgan had the power to and in fact did exercise control over LBHI. Plaintiffs do not, and cannot, allege that JPMorgan was a substantial equity owner of LBHI, that JPMorgan exercised any managerial control over LBHI, or that the relationship between the two companies was anything other than an arm's-length lender-borrower relationship.

The Amended Complaint's allegations of "insider" status rest principally on JPMorgan's being privy to information about LBHI's financial condition and prospects, informa-

tion that JPMorgan allegedly obtained in the context of monitoring credit risk and advising a potential acquirer. *See, e.g.*, Am. Compl. ¶¶ 4, 35. Such allegations that a lender was closely monitoring a substantial borrower are neither remarkable nor sufficient to establish "insider" status. *See In re W.T. Grant*, 699 F.2d at 610 ("There is no doubt that, at least from March of 1974, the banks kept careful watch on what was going on at Grant; they would have been derelict in their duty to their own creditors and stockholders if they had not."); *In re Clark Pipe & Supply Co.*, 893 F.2d at 602 ("Associates' close watch over Clark's affairs does not, by itself, . . . amount to such conduct as would justify equitable subordination.").

Plaintiffs' further allegation that JPMorgan had leverage over LBHI because it provided, and could withhold, important credit is also not enough to move this case outside of the standard lender-borrower framework. As the Second Circuit recognized in *In re W.T. Grant*, "there is generally no objection to a creditor's using his bargaining position, including his ability to refuse to make further loans needed by the debtor, to improve the status of his existing claims." 699 F.2d at 610; *cf. Badger Freightways, Inc.* v. *Cont'l Ill. Nat'l Bank & Trust Co. of Chi. (In re Badger Freightways, Inc.)*, 106 B.R. 971, 982 (Bankr. N.D. Ill. 1989) ("[I]f in the course of bargaining a bank merely exerts leverage in terms of threatening to assert its legal rights, this by itself is not enough to make it an insider. The fact that a debtor has a weak bargaining position and few choices does not indicate that the other party is an insider as long as the bank cannot unilaterally implement the transfer in issue." (footnote omitted)).

It is only when the lender crosses the line into exercising managerial control of the debtor — sitting on the board of directors, making personnel decisions, deciding which creditors to pay — that the lender will be deemed an "insider" for purposes of equitable subordination. *See In re MarketXT Holdings Corp.*, 361 B.R. at 386-88; *In re KDI Holdings*, 277 B.R. at 512-13; *In re Am. Lumber Co.*, 5 B.R. at 474, 478. Plaintiffs never allege that JPMorgan had the

ability to exercise managerial control over LBHI; while JPMorgan was an important source of credit and other services to LBHI, its role was always as an outsider engaged in business relationships with Lehman.

Plaintiffs have thus not made sufficient allegations that JPMorgan was an "insider" to subject it to greater scrutiny for purposes of equitable subordination.

**B.  Plaintiffs have not alleged inequitable conduct sufficient to support equitable subordination of JPMorgan's claim.**

Because JPMorgan was not an "insider" of LBHI, plaintiffs must allege a heightened degree of inequitable conduct to succeed on their equitable subordination claim:

> When a non-insider or non-fiduciary is involved, courts have required that a claimant's conduct be egregious and severely unfair to other creditors before its claim will be equitably subordinated.  The conduct required has been described as "substantial misconduct tantamount to fraud, misrepresentation, overreaching or spoilation [*sic*]."  Few cases find that non-insider, non-fiduciary claimants meet this standard.

*In re Sunbeam Corp.*, 284 B.R. at 364 (citations omitted) (quoting *80 Nassau Assocs.* v. *Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 838-39 (Bankr. S.D.N.Y. 1994)); *accord In re Kalisch*, 413 B.R. at 133 ("In cases of non-insider equitable subordination such as this, the proponent of subordination has the burden of proving, among other things, that the claimant engaged in egregious, improper or wrongful conduct that damages creditors."); *Pan Am Corp.*, 175 B.R. at 500-01 ("To obtain equitable subordination against a creditor who is not an 'insider' to the debtor, it must be shown that the creditor 'committed fraud, overreaching or spoliation to the detriment of others.'" (quoting *In re W.T. Grant Co.*, 4 B.R. 53, 75 (Bankr. S.D.N.Y. 1980), *aff'd*, 699 F.2d 599 (2d Cir. 1983))).

Courts in this district have not hesitated to dismiss equitable subordination claims when the plaintiff failed to sufficiently plead the requisite inequitable conduct.  *See In re Hydrogen*, 431 B.R. at 361 (dismissing equitable subordination claim, even though defendants were

insiders, because complaint lacked any sufficiently pled allegations of inequitable conduct); *In re BH S&B Holdings*, 420 B.R. at 156-57 (dismissing equitable subordination claim because plaintiff had not pled that defendant was an insider or that it engaged in inequitable conduct).

Here, plaintiffs' equitable subordination claim contains only a cursory allegation that "JPMorgan's conduct has been inequitable, egregious, unconscionable and/or outrageous." Am. Compl. ¶ 254. This allegation contains nothing more than "labels and conclusions"; it is a "formulaic recitation of the elements of a cause of action," which the Supreme Court has held to be insufficient to satisfy the pleading requirements of Rule 8. *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949 (2009).

Thus, Count XXX of the Amended Complaint does not allege *any* specific conduct on the part of JPMorgan. Rather, plaintiffs merely incorporate the prior allegations of the Amended Complaint without specifying the supposedly "egregious" conduct on which they are relying to support their equitable subordination claim — a practice that has aptly been described as "shotgun pleading." *E.g.*, *Wagner* v. *First Horizon Pharm. Corp.*, 464 F.3d 1273, 1279 (11th Cir. 2006) ("Shotgun pleadings are those that incorporate every antecedent allegation by reference into each subsequent claim for relief or affirmative defense. . . . Such pleadings divert already stretched judicial resources into disputes that are not structurally prepared to use those resources efficiently." (citations omitted)).

Even if the Court were to sift through the prior allegations of the Amended Complaint in an attempt to find some factual basis for plaintiffs' conclusory rhetoric, the equitable subordination claim would still fail. The only claim in the Amended Complaint that arguably rises to the level of pleading "fraud, misrepresentation, overreaching or spoilation [*sic*]," *In re Sunbeam Corp.*, 284 B.R. at 364, is plaintiffs' common law fraud claim (Count XLIX). As demonstrated above, that claim is based on a purported misrepresentation that not only utterly fails to

meet the requirements of Rule 9(b), but is also contradicted by the terms of the September Security Agreement. *See supra* Point IV.E. Indeed, each of plaintiffs' other claims should also be dismissed for the reasons discussed above, leaving no allegations of "inequitable conduct" — let alone "egregious" inequitable conduct — to support equitable subordination. *See In re Hydrogen*, 431 B.R. at 361 (dismissing equitable subordination claim where court had already dismissed breach of fiduciary duty and unjust enrichment claims).

Finally, looking past the conclusory allegations of inequitable conduct in the Amended Complaint, the facts of which this Court is well aware and can take judicial notice belie any claim that JPMorgan acted inequitably. In LBHI's final days — and beyond — JPMorgan continued to extend credit to LBI after most other financial institutions and counterparties had fled. Far from being inequitable or harming other creditors, JPMorgan's continued extensions of credit allowed LBI to survive until it could be sold to Barclays, softening the blow for LBI's customers but leaving JPMorgan with tens of billions of dollars in claims. Plaintiffs' blunderbuss attack on JPMorgan and their request for subordination of claims that arose from JPMorgan's continued support of Lehman are themselves egregious and inequitable. Count XXX of the Amended Complaint accordingly should be dismissed.[35]

---

[35] Plaintiffs also request that JPMorgan's claim be "disallowed" pursuant to the equitable subordination provision of the Bankruptcy Code, 11 U.S.C. § 510(c). Am. Compl. ¶ 254. This request should be dismissed on its face, because "[e]quitable subordination can only be used to re-order priorities, not to disallow claims." *In re Sunbeam Corp.*, 284 B.R. at 363 (citing *In re 80 Nassau Assocs.*, 169 B.R. at 837).

# CONCLUSION

For the foregoing reasons, JPMorgan respectfully requests that the Amended

Complaint be dismissed in its entirety.

Dated:    New York, New York
            October 19, 2010

<div style="margin-left:40%">

Respectfully submitted,

</div>

*Of counsel:*

<div style="margin-left:40%">

WACHTELL, LIPTON, ROSEN & KATZ

</div>

Harold S. Novikoff
Amy R. Wolf
Marc Wolinsky
Douglas K. Mayer
Ian Boczko
Emil A. Kleinhaus
Graham W. Meli
Grant R. Mainland

<div style="margin-left:40%">

By:  */s/ Paul Vizcarrondo, Jr.*
     Paul Vizcarrondo, Jr.

51 West 52nd Street
New York, NY 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000

*Attorneys for Defendant JPMorgan Chase Bank, N.A.*

</div>