# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (JMP) |
| Debtors. |  |
| LEHMAN BROTHERS HOLDINGS INC. and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Adversary Proceeding No. 10-03266 (JMP) |
| Plaintiff/Counterclaim-Defendant and Plaintiff Intervenor, |  |
| -against- |  |
| JPMORGAN CHASE BANK, N.A., |  |
| Defendant/Counterclaimant. |  |

## COUNTERCLAIMS OF JPMORGAN CHASE BANK, N.A.

## [REDACTED]

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
(212) 403-1000

Dated:  December 1, 2010

*Attorneys for Defendant/Counterclaimant*
*JPMorgan Bank, N.A.*

Defendant and Counterclaimant JPMorgan Chase Bank, N.A. ("JPMorgan"), by its attorneys, upon knowledge as to itself and its conduct and otherwise upon information and belief, alleges for its Counterclaims against Lehman Brothers Holdings Inc. ("LBHI," together with its subsidiaries, "Lehman") as follows:

## NATURE OF THE ACTION

1.     These counterclaims seek relief for a fraud perpetrated by LBHI against JPMorgan after LBHI's bankruptcy filing and prior to the liquidation of Lehman Brothers Inc. ("LBI"). Through false and misleading representations and omissions, LBHI led JPMorgan to believe that Barclays Capital Inc. ("Barclays") would purchase the LBI securities securing JPMorgan's loans to LBI and that, with the proceeds of the sale, JPMorgan's loans to LBI would be repaid in full. Acting in reliance on LBHI's false and misleading statements, JPMorgan loaned more than $70 billion to LBI on the morning of September 18, 2008 and, later that day, released to Barclays securities valued at $5 billion that JPMorgan was holding as margin for its loans to LBI. Barclays, however, did not purchase all of the LBI securities that LBHI represented that it would; instead, with Lehman's help, Barclays cherry picked the securities that it wanted, took JPMorgan's $5 billion of margin, and left billions of dollars of LBI's worst securities behind. As a result, after LBI's liquidation proceeding commenced on Friday, September 19, JPMorgan was stuck with loans to LBI of more than $25 billion secured by many of Lehman's most toxic securities.

2.     LBHI's fraud on JPMorgan was possible only because of JPMorgan's willingness to support LBI with massive loans even after LBHI filed for bankruptcy. When LBHI filed its chapter 11 case on September 15, 2008, JPMorgan had little or no exposure to LBI, the broker-dealer for which JPMorgan acted as clearing bank. Overnight investors under repurchase agreements, or "repos," were holding LBI's securities, and JPMorgan had no obligation to lend LBI

the approximately $87 billion that LBI needed to buy the portfolio back. JPMorgan, accordingly, could have walked away from Lehman on the morning of September 15, as many of Lehman's customers, counterparties and other banks had already done.

3.     Instead, at the urging of LBHI and the Federal Reserve Bank of New York (the "Fed"), which had agreed to finance LBI on an overnight basis in lieu of the private investors who had fled the scene, JPMorgan made intraday loans to LBI of approximately $87 billion on the morning of Monday, September 15. JPMorgan's loans were secured principally by LBI's holdings in commercial paper, government securities, and corporate debt and equity. By making those loans, which it was not obliged to do, JPMorgan allowed LBI to repay its overnight investors the full amounts owed to them. Had JPMorgan not done this, the overnight investors would have liquidated the securities pledged to them, LBHI would have been unable to sell LBI's business, and thousands of Lehman employees would have lost their jobs.

4.     A sale transaction between Lehman and Barclays took shape early in the week of September 15. JPMorgan's loan exposure to LBI was to be fully repaid upon consummation of that transaction — or so JPMorgan was told. On Wednesday, September 17, LBHI filed a motion with this Court (the "Sale Motion") seeking approval of the sale of LBI's operations and assets to Barclays. The Asset Purchase Agreement ("APA") submitted with the Sale Motion stated that, with narrow exceptions, Barclays would purchase *all* of LBI's securities. Based on the Sale Motion and the APA, and multiple representations by Barclays and Lehman executives, JPMorgan believed, and had every reason to believe, that its loans to LBI would be repaid in full as part of the sale transaction. And, indeed, in anticipation of this purchase, beginning on the night of Monday, September 15, and continuing through the night of Wednesday, September 17, Barclays itself financed billions of dollars of LBI securities on an overnight basis, in increasing amounts

each night. Based on specific representations made by LBHI and Barclays, JPMorgan reasonably expected that, as part of the sale, Barclays would purchase the securities necessary to repay JPMorgan's loans, including all the securities that Barclays was already financing overnight.

5. On the morning of Thursday, September 18, in reliance on numerous misrepresentations by LBHI and Barclays, and unaware of their true intentions, JPMorgan unwound LBI's entire overnight repo book, including by loaning $15.8 billion to LBI to repay *Barclays* the amount it had invested with LBI on Wednesday night through an overnight repo. JPMorgan did so with the justified expectation that Barclays would be purchasing all of the securities that secured JPMorgan's intraday loans, including the securities that Barclays itself had financed Wednesday night. Later on Thursday, after senior executives at Barclays again persuaded senior executives at JPMorgan that JPMorgan's outstanding loans to LBI would be repaid in full, JPMorgan acceded to Barclays' demand that JPMorgan release securities valued at $5 billion that it was holding as margin, which JPMorgan had the right to keep until its loans to LBI were repaid.

6. Not until Friday, September 19, was JPMorgan told that, contrary to LBHI's and Barclays' representations, Barclays would leave JPMorgan with large portions of LBI's securities, including the very securities that Barclays itself had financed on Wednesday night with a $15.8 billion repo. At that point, when JPMorgan demanded that Barclays at least continue to finance the securities that backed its $15.8 billion repo from Wednesday night, a Barclays representative offered the excuse that Barclays "forgot" to finance those securities. Later that same morning, the representative stated that Barclays did not recognize any obligation to finance the securities. Thus, when the dust settled, JPMorgan was left holding the bag, with more than $25 billion of outstanding loans to LBI secured by a depleted collateral pool containing many of

LBI's worst securities — securities that were illiquid, had never traded and were supported largely by Lehman's own credit. The billions of dollars of collateral value attributed to these securities was often based on Lehman's own pricing, because no price was available for them from JPMorgan's usual third-party pricing sources.

7.      Only later was JPMorgan able to determine that the position in which it unexpectedly found itself was the result of collusion and deception by LBHI and Barclays. It is now clear that the APA and the Sale Motion filed with the Court were false and misleading. Contrary to LBHI's representations to the Court and to JPMorgan, when LBHI filed the Sale Motion, the amount and identity of the securities to be purchased by Barclays had not been determined. The Sale Motion and the terms of the APA notwithstanding, Barclays retained the option as of September 17 to refuse to purchase billions of dollars of LBI-owned securities that it did not want, irrespective of the terms of the APA and the representations in the Sale Motion.

8.      Indeed, when the APA was filed, LBHI already knew that Barclays did not intend to purchase all of the assets identified in the APA as "Purchased Assets." ████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████ Likewise, the schedule of assets that was circulated among Barclays and Lehman personnel on Tuesday, September 16 stated that Barclays would purchase only $1.1 billion of commercial paper, again evidencing the parties' understanding that Barclays would not purchase all of LBI's commercial paper holdings. ████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████

9.     Also undisclosed was a written agreement between Barclays and the Fed (the "Takeout Agreement"), completed soon after the Sale Motion was filed, that obligated Barclays to purchase the securities that *the Fed* was financing, but said nothing about the remainder of LBI's securities, including those that *Barclays* and *JPMorgan* were financing. Once the Takeout Agreement was in place, Barclays and Lehman undertook to manipulate the configuration of the LBI repo book so that Barclays could leave the least desirable securities behind with JPMorgan. Knowing that the Takeout Agreement only required Barclays to buy *the Fed's* position, on Wednesday, September 17, Lehman — which had the ability to access JPMorgan's computer system and allocate securities to particular investors — reallocated billions of dollars worth of LBI's most illiquid securities away from overnight repo "shells" that had been financed by the Fed the previous night to overnight repo shells that would be financed by *Barclays* on Wednesday night. By reconfiguring the repo shells, Lehman ensured that the securities that Barclays was obligated to purchase under the Takeout Agreement, *i.e.*, those financed by the Fed, were LBI's most desirable securities. Meanwhile, Lehman moved RACERS and other illiquid securities out of the Fed's repo shell and into the Barclays shell, giving Barclays the ability to comply with the Takeout Agreement yet, as JPMorgan was to discover after the fact, leave those undesired securities behind.

10.     LBHI, Lehman employees, and Barclays all benefited greatly from the deception of JPMorgan: LBHI secured critical financing for LBI while the sale to Barclays was pending; senior Lehman employees greased the wheels of a transaction with Barclays, the firm offering

them future lucrative employment; and Barclays positioned itself to buy the securities of its choice and leave billions of dollars of illiquid securities behind with JPMorgan.

11.     After the Securities Investor Protection Corporation ("SIPC") commenced LBI's liquidation proceeding, JPMorgan was left with more than $25 billion of unpaid loans to LBI. As explained below, by virtue of LBHI's fraud on JPMorgan, LBHI was liable to JPMorgan for that entire amount as an administrative expense of its estate.  Although those loans have now been fully paid, JPMorgan had to use most of the approximately $8.6 billion in cash collateral that it received from Lehman in September 2008 to pay those loans, because it was unable to sell many of the illiquid and difficult-to-value securities that Barclays had left behind.  JPMorgan ultimately transferred the unsold securities to LBHI under the Collateral Disposition Agreement approved by this Court in March 2010.  However, under the Collateral Disposition Agreement, LBHI reserved its rights to challenge JPMorgan's entitlement to the cash collateral and JPMorgan reserved its rights to treat the value of any of the returned securities as collateral for its claims.

12.     Despite having deceived JPMorgan into making the massive loans to LBI that required JPMorgan to use much of the $8.6 billion in collateral that it received from Lehman, LBHI is now seeking to recover that very collateral, as well as unspecified damages, through this lawsuit.  As set forth in JPMorgan's motion to dismiss the Amended Complaint, LBHI's claims against JPMorgan fail for many reasons.  But if, as a result of being required to return any of the $8.6 billion in collateral or pay damages to LBHI, JPMorgan is unable to recover the full amount of its loans or is otherwise prejudiced by this lawsuit, JPMorgan will have suffered direct and proximate harm from LBHI's fraudulent misconduct.  In that event, JPMorgan will be entitled,

among other things, to recover as an administrative expense of the LBHI estate any portion of the more than $25 billion of loans under the Clearance Agreement that has not been paid in full.

## PARTIES

13.     Defendant and Counterclaimant JPMorgan is a national banking association chartered under the laws of the United States with its principal place of business at 1111 Polaris Parkway, Columbus, Ohio 43240.

14.     Plaintiff and Counterclaim-Defendant LBHI is a Delaware corporation with its former principal place of business at 745 Seventh Avenue, New York, New York 10019, and its current principal business address at 1271 Avenue of the Americas, New York, New York, 10020.

## JURISDICTION AND VENUE

15.     On September 15, 2008 (the "Petition Date"), LBHI filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code"). LBHI continues to operate its business and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

16.     The Court has jurisdiction over these counterclaims under 28 U.S.C. § 1334(b), 28 U.S.C. § 1334(a), and 28 U.S.C. § 959(a).  This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

17.     Venue in this district is proper in accordance with 28 U.S.C. § 1409(a).

18.     JPMorgan brings these counterclaims at this time pursuant to this Court's Amended Scheduling Order and Discovery Plan entered on October 8, 2010.

# FACTS

## I.  JPMorgan's relationship with Lehman

### A.  JPMorgan's role as clearing bank

19.    Before September 22, 2008, JPMorgan served as the principal clearing bank for LBI for a variety of securities transactions. JPMorgan maintained numerous accounts for LBI, through which it processed billions of dollars of cash and securities transactions generated by LBI's operations, and provided tens of billions of dollars of intraday loans to LBI on a daily basis.

20.    As part of its clearing bank relationship, JPMorgan facilitated triparty repo transactions involving LBI and overnight investors, such as money market funds. In the triparty repo transactions, repo investors purchased LBI's securities in the evening, subject to LBI's agreement to repurchase those securities the next morning. On the morning of each trading day, to facilitate LBI's repurchase of securities, JPMorgan made intraday loans to LBI in amounts typically exceeding $100 billion. This process is referred to as "unwinding" the overnight repos. JPMorgan's intraday loans to LBI were secured by the securities in LBI's clearance accounts at JPMorgan, which typically included the same securities that were purchased by investors overnight.

21.    JPMorgan cleared securities transactions for LBI, including for triparty repos, under a Clearance Agreement dated as of June 15, 2000 (as amended from time to time, the "Clearance Agreement"). The Clearance Agreement did not require JPMorgan to extend credit to LBI. In addition, the Clearance Agreement granted JPMorgan a lien on the assets held in LBI accounts at JPMorgan, other than segregated customer accounts. The Clearance Agreement also contains a broad indemnification clause, which requires the Lehman parties to indemnify JPMorgan in

- 8 -

respect of "all losses, claims, damages, liabilities or actions" relating to the Clearance Agreement.

**B.    JPMorgan's postpetition clearing advances**

22.    By Friday, September 12, 2008, it had become apparent that Lehman's condition was quite grave, as customers, counterparties, and investors had stopped dealing with Lehman, Lehman's stock price had dropped precipitously, credit default swap spreads on Lehman had widened dramatically, and concern was widespread that Lehman could not survive past the upcoming weekend without an acquisition or government rescue. JPMorgan nonetheless loaned LBI sufficient funds to unwind overnight financings on the morning of September 12, and during the day continued to make additional advances in connection with clearing and settlement operations. At the end of the day on Friday, September 12, overnight repo investors advanced sufficient funds to LBI to take out JPMorgan's intraday loans. Therefore, during the weekend of September 13-14, JPMorgan had little or no clearance-related exposure to LBI.

23.    That weekend, the United States Department of the Treasury and the Fed made extensive efforts to encourage a sale of Lehman to Bank of America, Barclays PLC or another buyer. After those efforts failed, on Sunday, September 14, the Fed and the Securities Exchange Commission pressured LBHI to file for bankruptcy. LBHI understood that commencing a chapter 11 case would be the only way for LBI to be able to finance its triparty repo securities on an overnight basis through the Fed's Primary Dealer Credit Facility ("PDCF"). Triparty repo investors were not returning, and without PDCF financing, LBI would not survive long enough to effectuate a sale or an orderly liquidation of LBI's business. LBHI accordingly filed a chapter 11 petition in the early morning hours of Monday, September 15.

24.     LBI did not enter a liquidation proceeding concurrently with LBHI's chapter 11 filing.  Rather, LBHI expected LBI to continue operating.  Once LBHI was in chapter 11, as expected the Fed permitted LBI to finance the triparty collateral pool on an overnight basis through the PDCF, and continued to provide access to the Open Market Operations ("OMO") and Term Securities Lending Facility ("TSLF").

25.     Over the same weekend, representatives of both the Fed and LBHI, including Paolo Tonucci, the Treasurer of LBHI, requested that JPMorgan continue to finance LBI's triparty repo book with intraday loans.  These loans were essential to LBI's continued operation.  Tonucci represented to Jane Buyers-Russo of JPMorgan that LBI would conduct an orderly wind-down of its business, including a sale of the securities that were pledged to JPMorgan on an intraday basis, prior to the commencement of a liquidation proceeding for LBI.  Tonucci further represented that, as confirmed by the Fed, the Fed would fully finance LBI on an overnight basis during the wind-down.  Although JPMorgan was being asked to take major intraday risk without additional collateral, it agreed to make further loans in order to reduce the disruption to the financial markets, and based on the representations that its loans would be repaid prior to a liquidation of LBI.  Thus, at the opening of business on Monday, September 15, just a few hours after the filing of the largest bankruptcy in history, JPMorgan loaned approximately $87 billion to LBI, and thereafter made additional intraday advances in connection with the clearance and settlement of LBI's securities transactions.

26.     Meanwhile, Barclays and Lehman were discussing a revised transaction whereby Barclays would purchase LBI's assets, including the assets being financed in its triparty repo book.  As an initial step in that process, Barclays began to participate as an overnight investor in LBI's triparty repo arrangement.  Accordingly, on Monday, September 15, Barclays executed

standard documentation with LBI and JPMorgan to cover triparty repo transactions with LBI. On Monday night, Barclays invested roughly $2 billion with LBI on an overnight basis. On Tuesday night, that amount increased to $10.5 billion, and on Wednesday night, it increased to $15.8 billion.

27.     With LBHI in bankruptcy, almost all of the investors that had historically provided overnight financing of LBI's triparty positions stopped doing so. LBI was thus financed overnight through a combination of Fed-provided PDCF and OMO financings, blind bilateral repos through the General Collateral Finance ("GCF") repo program administered by The Depository Trust and Clearing Corporation ("DTCC"), triparty repos with Barclays, and a small amount of other triparty repos. To the extent that this financing was insufficient, JPMorgan provided additional overnight financing.

28.     On the morning of Tuesday, September 16, JPMorgan provided LBI with over $70 billion in intraday loans that enabled LBI to unwind its overnight financings. JPMorgan did so based on the representations that had been made to it, by Tonucci and others, that LBI would repay the intraday loans with overnight financing from the Fed. Later that day, Gerard LaRocca, Chief Administrative Officer of Barclays, had a conversation with Heidi Miller, CEO of Treasury and Securities Services at JPMorgan, a member of JPMorgan's executive committee, and the senior executive at JPMorgan responsible for JPMorgan's triparty and clearing business. LaRocca told Miller that, as part of an asset sale negotiated between Barclays and Lehman, Barclays would take out LBI's entire triparty book, after which JPMorgan would no longer have to provide LBI with intraday loans to finance that book. LaRocca also told Miller that Barclays was working on an agreement under which LBI would move its securities to Bank of New York, Barclays' clearing bank.

29.     Separately, on Tuesday, September 16, Tonucci and Ian Lowitt, then the CFO of

LBHI, contacted Buyers-Russo of JPMorgan to inform her that Lehman and Barclays had agreed

on the terms of an asset purchase agreement under which Barclays would buy LBI's assets.

Lowitt and Tonucci represented that Barclays would fully support LBI until the deal closed, in-

cluding by providing overnight financing of LBI securities that would reduce or eliminate LBI's

dependence on the Fed.  Based on the statements made by Tonucci and Lowitt, Buyers-Russo

reasonably understood that JPMorgan would be made whole each night by Barclays, if not by the

Fed, until the deal closed, at which point JPMorgan would be taken out in full.

30.     Also on Tuesday, September 16, LBHI filed a motion in this Court to induce

JPMorgan to continue to extend credit to settle and clear securities transactions for LBI (the

"Comfort Order Motion").  In the Comfort Order Motion, LBHI sought an order from the Court

providing that JPMorgan's ongoing clearing advances would be treated as if they were prepeti-

tion advances for purposes of LBHI's August and September guaranties and security agreements

in favor of JPMorgan.  LBHI represented to the Court that "[i]t is essential to Lehman's custom-

ers that [JPMorgan] continue to clear securities transactions for the Lehman Clearance Parties in

accordance with its prepetition practices," and that the relief requested was needed to "facilitate a

smooth and orderly transition of Lehman's operations into chapter 11, and minimize not only the

disruption of Lehman's business affairs, but also the disruption of the financial markets as a

whole."

31.     At the hearing on the Comfort Order Motion, which was held the same day the

motion was filed, counsel for LBHI further emphasized the "critical function" of JPMorgan's

continued extensions of credit to LBI.  The Fed also supported the motion, telling the Court that

"the services that [JPMorgan] has been providing are critical to the smooth functioning of financial markets." The Court granted the Comfort Order the same day, September 16.

32.    On the night of Tuesday, September 16, in order to enable LBI to satisfy intraday loans from JPMorgan to LBI, Barclays provided $10.5 billion in cash to LBI through an overnight triparty repo, the Fed provided $26.7 billion in overnight financing, and the remainder of LBI's cash financing was provided through GCF repos, other triparty investors and a $1.9 billion loan from JPMorgan. The following morning, Wednesday, September 17, consistent with its critical role in providing LBI with the support LBI needed to survive, JPMorgan made intraday loans to LBI exceeding $70 billion, which allowed LBI to continue functioning and to repay the full amounts LBI had received from Barclays, the Fed and other triparty investors on an overnight basis. JPMorgan again reasonably understood, based on the statements that had been made by Tonucci, Lowitt and others, that the intraday loans would be repaid at the end of the trading day by the Fed or Barclays.

## II.    LBHI's and Barclays' fraud on JPMorgan

### A.    LBHI misrepresents its agreement with Barclays.

33.    On the morning of Wednesday, September 17, LBHI filed a motion with this Court to approve the sale of LBI's business and the assets defined in the APA as the "Purchased Assets." LBHI served the Sale Motion on JPMorgan and a wide array of other creditors and parties-in-interest. The Sale Motion sought an order approving the sale of the "Purchased Assets," as defined in the APA, and included the APA as an exhibit. The Sale Motion described the "Purchased Assets" as "LBI's assets, as well as three real properties." LBHI and Barclays knew when LBHI filed the Sale Motion that JPMorgan would rely on the motion and the APA in determining whether to continue to provide financing to LBI.

34.    The APA provided in Section 2.1 that, upon approval of the APA, Barclays would buy all the "Purchased Assets." The APA defined the "Purchased Assets" as "all the assets of Seller and its Subsidiaries used in connection with the Business (excluding the Excluded Assets)"; the APA defined "Business," in turn, to include the "brokerage, dealing, [and] trading" businesses. The definition of "Purchased Assets" made explicit, moreover, that the acquired assets included *all* of LBI's "government securities, commercial paper, corporate debt, corporate equity, exchange traded derivatives and collateralized short-term agreements with a book value as of the date hereof of approximately $70 billion (collectively, 'Long Positions')."

35.    The APA provided in Section 2.2 that Barclays would not purchase the "Excluded Assets." The "Excluded Assets" were limited to certain specified assets, including commercial real estate investments and 50% of positions in residential real estate mortgage securities; they did not include the government securities, corporate debt, and commercial paper in LBI's triparty repo book. Thus, securities such as RACERS — commercial paper that Lehman valued at approximately $5 billion — were included in the definition of "Purchased Assets," and were not included in the definition of "Excluded Assets."

36.    The net effect of these provisions of the APA was that Barclays had committed to purchase the securities against which JPMorgan was making loans to LBI — *i.e.*, securities with an estimated value of approximately $70 billion. Through the Sale Motion, therefore, LBHI explicitly caused JPMorgan to believe that the Barclays transaction would fully extinguish JPMorgan's clearance-related exposure to LBI.

37.    LBHI's representations in the Sale Motion and APA were intentionally, or at least recklessly, false and misleading. LBHI knew, at the time that it filed the Sale Motion, that Barclays had not actually agreed to purchase all of the "Purchased Assets" that LBHI was seeking

permission to sell. ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ Barclays' then-

General Counsel, Jonathan Hughes, has similarly admitted that as of the time the Sale Motion

was filed on September 17, "there were aspects of the APA that upon signature were known

among the parties to be the subject of ongoing discussion; and indeed it became apparent very

quickly indeed that there were aspects of the APA which needed to be refined." ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████

    38.    Not only did LBHI know that Barclays would not necessarily purchase the securi-

ties defined as "Purchased Assets," but it knew that *Barclays* would determine which securities it

would purchase. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

39.    LBHI also knew that, to the extent there was an agreement as of September 17 on the securities to be purchased by Barclays, it was different from the filed APA. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

40.    A schedule that Barclays and Lehman prepared on Tuesday, September 16, which Lehman executives have described as the guiding document for Lehman and Barclays, was also inconsistent with the filed APA. While the APA explicitly includes "commercial paper" in the definition of "Purchased Assets," and does not include commercial paper in the definition of "Excluded Assets," the schedule states that Barclays would purchase only $1.1 billion of commercial paper. The schedule thus indicates that Barclays was not intending to purchase RACERS and, therefore, that Barclays was not intending to purchase all of LBI's commercial paper, as stated in the APA.

41.    ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



42.

43.

44.     Despite all this, neither JPMorgan nor the Court was advised that the terms of the filed APA did not reflect the true terms of the agreement between LBHI and Barclays.  In particular, neither JPMorgan nor the Court was advised that, contrary to the Sale Motion, the APA,

and other representations, Barclays in fact had not agreed to acquire all the securities defined as "Purchased Assets" and retained the option to refuse to purchase the securities that it did not want. Indeed, the fact that Barclays, facilitated by LBHI, cherry picked LBI's securities portfolio and stuck JPMorgan with the undesirable securities was the principal cause of the $70 billion to $47.4 billion reduction, between Wednesday September 17 and Friday September 19, in the amount of securities purchased by Barclays — not a purported drop in market value as represented to this Court at the September 19 sale hearing.

### B. Barclays misrepresents its agreement with Lehman.

45.     On numerous occasions on Wednesday, September 17, Barclays reaffirmed the false representations that LBHI had made in the Sale Motion and the APA. For example, Barclays represented in a press release issued early in the morning on Wednesday that it would "acquire trading assets with a current estimated value of £40bn (US$72bn)." Likewise, John Varley of Barclays stated in an analyst call on Wednesday, without qualification, that "[w]e are acquiring trading assets with a current estimated value of 72 billion dollars."

46.     With Lehman's full knowledge, Barclays also represented explicitly that JPMorgan's exposure to Lehman would be fully extinguished as part of the sale. During a conference call on Wednesday evening among Ray Stancil, Jon Ciciola and Ed Corral of JPMorgan, David Petrie and John Rodefeld from Barclays, and David Aronow and others from Lehman, the representatives of Barclays and Lehman told JPMorgan that on the next day, Thursday, September 18, Barclays would enter into a repurchase agreement with LBI under which it would transfer approximately $45 billion to JPMorgan to purchase the LBI securities being financed by the Fed — which, including the PDCF, OMO and TSLF programs, totaled roughly $50 billion of securities.

Rodefeld or Petrie also stated, without contradiction from Aronow or others at Lehman, that on Thursday, Barclays would finance LBI's remaining securities on an ongoing basis, leaving JPMorgan with no outstanding exposure to LBI once the sale closed. No one from either Lehman or Barclays disclosed on that call that Barclays would not purchase all the securities in LBI's triparty book or seek to leave behind securities to which LBI had attributed many billions of dollars of value.

47.     Later on Wednesday night, at approximately 9:00 p.m., Gerard LaRocca of Barclays and Arthur Certosimo of Bank of New York, Barclays' clearing bank, called Buyers-Russo of JPMorgan. LaRocca told Buyers-Russo that, under the deal with Barclays, JPMorgan would have no clearance exposure to LBI by the end of Thursday, September 18. LaRocca explicitly represented that all of JPMorgan's triparty exposure to LBI would be eliminated on Thursday, September 18. LaRocca stated further that, once the transaction was effectuated, JPMorgan would hold *surplus* LBI securities of $1.5 billion. And, again, LaRocca did not disclose on that call that Barclays would not purchase all the securities in LBI's triparty book or seek to leave behind securities to which LBI had attributed many billions of dollars of value. LaRocca made these representations, and failed to disclose Barclays' true intentions, to induce JPMorgan to provide LBI with additional financing on Thursday morning, including intraday loans in excess of $70 billion necessary to unwind LBI's overnight repos and, in particular, to repay Barclays on its $15.8 billion overnight repo from Wednesday night, September 17.

**C.     LBHI manipulates the securities to be
          transferred to Barclays.**

48.     After representing to the Court and to JPMorgan in the Sale Motion and the APA on the morning of September 17 that Barclays would purchase all the "Purchased Assets" that

served as JPMorgan's collateral, including all commercial paper, LBHI and Barclays took action that would allow Barclays to pick and choose the securities it would purchase and leave the worst securities behind.

49.     On the afternoon of Wednesday, September 17, hours after LBHI filed the Sale Motion, Barclays entered into a written agreement with the Fed — the Takeout Agreement — that was not disclosed to JPMorgan or the Court, even though the negotiation of the agreement had commenced at least a day earlier. The Takeout Agreement required Barclays, "[b]y not later than the opening of business on Monday, September 22, 2008," to purchase "the entirety of the [Fed']s position . . . for a payment equal to the aggregate outstanding amount then due to the [Fed]." Ian Lowitt met with representatives of Barclays, Bank of New York, and the Fed on Wednesday to discuss how the Takeout Agreement would be implemented.

50.     At the same time as it was entering into the Takeout Agreement, Barclays was working with Lehman to ensure that Barclays would be able to cherry pick LBI's best securities without running afoul of the Takeout Agreement. Each night, the securities that were eligible for LBI's triparty repo were allocated into overnight "shells" for different investors. The shells were used by JPMorgan customers, such as LBI, to designate the investor accounts into which securities subject to a triparty repo would be placed overnight. Lehman operations personnel had access to the computer system at JPMorgan through which securities were allocated into the overnight shells. Using that access, Lehman had the ability to alter the configuration of the shells so that eligible securities would be allocated to particular investors. Because most of the triparty investors had fled after LBHI filed its chapter 11 petition, the key shells during the week of September 15 were the shells for the Fed's financing and the shell for Barclays' triparty repo financing.

51.     On Tuesday night, September 16, many of the riskiest securities that were eligible for the triparty repo had been financed by the Fed.  Those securities included RACERS, as well as securities called SASCO, which, like RACERS, were backed largely by Lehman's own credit, were priced on the basis of Lehman's own marks, and had never traded.  A third large and illiquid structured product, Kingfisher, was also financed by the Fed on September 16; it too had never traded and was priced on the basis of Lehman's marks.  Numerous other illiquid securities were also financed by the Fed on Tuesday night.  If the same securities that the Fed had financed on Tuesday night, September 16, continued to be financed by the Fed on Wednesday night, September 17, and if the sale transaction was implemented on September 18, the Takeout Agreement would have required Barclays to pay billions of dollars to purchase many of LBI's riskiest securities.

52.     Barclays, however, did not want LBI's riskiest securities, which were not among the securities that Barclays had financed on Monday and Tuesday nights.  And Lehman was ready and willing to help Barclays avoid buying those securities when it acquired the Fed position.  Thus, during the day on Wednesday, September 17, the same day the Takeout Agreement was executed, Lehman altered the allocation of securities into overnight shells, causing the illiquid, hard-to-value securities that had been financed by the Fed on Tuesday night to be financed by Barclays for the first time on Wednesday night, when Barclays provided $15.8 billion in triparty repo financing to LBI.  Since Barclays was only obligated under the undisclosed Takeout Agreement to purchase the securities that the Fed was financing, Lehman's reconfiguration of the shells put Barclays in a position to purchase LBI's best securities while leaving behind the riskiest securities, including the RACERS, SASCO and Kingfisher securities, among others.

53. The change in the composition of LBI's triparty shells was dramatic. On Tuesday night, September 16, the vast majority of the Collateralized Mortgage Obligations (CMOs) held by LBI — some $2.3 billion worth — were financed by the Fed. Likewise, approximately $5.2 billion of commercial paper (*i.e.*, RACERS) and other Lehman-priced structured products were financed by the Fed on Tuesday night. On Wednesday night, September 17, the vast majority of the CMOs and the Lehman-priced structured products were financed by Barclays. RACERS, SASCO and Kingfisher were all moved from the Fed's portfolio to Barclays' portfolio.

54. Lehman's manipulation of the overnight shells further demonstrates that, as of September 17, Lehman and Barclays knew that Barclays at least had the option not to acquire securities falling within the APA's definition of "Purchased Assets." If Barclays was obligated to purchase all of the securities in the triparty repo book, other than "Excluded Assets," the manipulation of the triparty shells would have served no purpose.

55. LBHI and Barclays, accordingly, knew on Wednesday, September 17, that the APA filed with the Court and served upon JPMorgan and other creditors did not accurately describe the material terms of their deal and failed to disclose that Barclays would not purchase all the securities defined in the APA as "Purchased Assets" and would seek to leave behind securities to which LBI had attributed many billions of dollars of value. They also knew that Lehman and Barclays were working together to permit Barclays to take LBI's more desirable securities and leave the least desirable securities behind at JPMorgan.

**D. Lehman and Barclays implement their transaction before the Court approves it.**

56. The Takeout Agreement required Barclays to take out the Fed's financing position by no later than Monday, September 22, the anticipated closing date of the sale. In the

meantime, the hearing date on the Sale Motion had been set for Friday, September 19. The APA did not require the transfer of securities from LBI to Barclays to take place before September 22. Nonetheless, on Wednesday, September 17, LBHI and Barclays determined that the transfer of securities to Barclays should occur the next day, Thursday, September 18, in advance of this Court's approval of the proposed transaction. They also decided to go forward without informing the Court or LBHI's creditors about the transfer of the securities or that Barclays would not necessarily be purchasing billions of dollars of securities identified in the filed APA as "Purchased Assets."

57. The timing of the transfer of the securities contributed to the success of the fraudulent scheme. The transfer had to be completed *before* the Court hearing on September 19, or JPMorgan would learn that Barclays was not buying LBI's undesirable securities. Lehman and Barclays executives knew that, as of Thursday morning, September 18, JPMorgan expected that LBI would repay all of its outstanding loans as part of the Barclays transaction. They also knew that JPMorgan, based on representations by Tonucci of LBHI, Rodefeld and Petrie of Barclays, and others, believed that any overnight financing provided by Barclays was intended to support LBI until closing, when Barclays would purchase all the assets it was financing. By transferring Barclays' hand-picked securities to its custodian, Bank of New York, prior to Court approval of the sale, at a time when the Court and creditors as a whole were in the dark about the parties' actual deal, Lehman and Barclays took full advantage of having deceived JPMorgan. As a result, JPMorgan was stuck with a $25 billion loan to LBI against a depleted collateral pool consisting largely of inappropriate and inferior securities.

**E.** **JPMorgan lends more than $70 billion to LBI and releases $5 billion in margin.**

58.     Overnight on Wednesday, September 17, Barclays provided $15.8 billion in tri-party repo financing of LBI securities, while the Fed provided approximately $27.4 billion of overnight cash financing through the PDCF and the OMO. The remainder of LBI's securities was financed through triparty repos and overnight repos under the GCF program administered by the DTCC and by a $4.4 billion loan from JPMorgan. As of Wednesday night, LBI securities valued at over $70 billion were being financed.

59.     On the morning of Thursday, September 18, in reliance upon LBHI's and Barclays' numerous representations that JPMorgan's clearance-related exposure to LBI would be eliminated, and unaware of any other plan, JPMorgan unwound LBI's overnight repos and repaid the Fed's overnight cash financing, loaning in excess of $70 billion to LBI. Of this amount, $15.8 billion was credit extended to LBI to allow it to pay cash to Barclays to repurchase the securities that Barclays had financed overnight through its triparty repo. Had JPMorgan known that the representations made in the Sale Motion, the APA and otherwise were false and misleading and failed to disclose material facts, and that Lehman and Barclays were working together to ensure that Barclays could pick and choose the securities it wanted, JPMorgan would not have loaned $70 billion to unwind the $15.8 billion Barclays triparty repo and LBI's other overnight financings on the morning of September 18.

60.     When JPMorgan advanced more than $70 billion to LBI on the morning of Thursday, September 18, it had been led to believe by Barclays and LBHI that Barclays would purchase all of the securities defined in the APA as "Purchased Assets" and, as a result, repay all of JPMorgan's loans to LBI. JPMorgan reasonably understood, based on the numerous misrepre-

sentations and misleading statements that had been made to it, that Barclays would provide suffi-

cient funding to LBI to finance all the securities remaining in LBI's portfolio, including by "roll-

ing" the $15.8 billion repo provided by Barclays the previous night (increased in size as neces-

sary to fully repay JPMorgan's intraday loans).

61.     Starting on the morning of Thursday, September 18, Lehman and Barclays began

to implement their transaction. To commence the transfer of securities to Bank of New York,

Barclays wired $5 billion to JPMorgan. As a result of operational issues, however, the delivery

of the additional $40 billion that Barclays had said it would deliver early on Thursday was de-

layed.

62.     In the meantime, Barclays discussed internally — at the highest levels — that it

would not purchase major pieces of LBI's triparty book, notwithstanding the APA and in spite of

its pattern of financing activity from the previous nights. At 5:38 p.m. on Thursday, September

18, Gerard LaRocca of Barclays wrote an email to Richard Ricci, Barclays' chief negotiator in

connection with the Lehman transaction, with the following subject line: "JPM will BE

ANNOYED with several billion of collateral tonight that we will not finance." At 5:48 pm, La-

Rocca wrote an email to Ricci and Robert Diamond, the CEO of Barclays Capital Inc. and Presi-

dent of Barclays PLC, with the subject: "Urgent WE NEED TO TALK, JPM IS GOING TO BE

MORE ANNOYED WITH WHAT I HAVE PLANNED THAT WILL SAVE BARCLAYS

SIZE." What LaRocca "had planned" was that Barclays would purchase *only* the securities that

it was required to purchase under the Takeout Agreement, which, as a result of the reconfigura-

tion of the triparty "shells," were LBI's best securities. The remaining securities, including

RACERS and the other illiquid structured products that Barclays itself had financed on Wednes-

day night, September 17, would be left behind for JPMorgan.

63.     In addition to operational issues, the transfer of securities to Barclays was also held up on September 18 because Barclays did not want JPMorgan to hold the margin on the securities that LBI was transferring. Prior to and after the unwind on Thursday morning, JPMorgan employees had informed Barclays and Lehman that JPMorgan would transfer LBI securities to Barclays on Thursday on a "dollar-for-dollar" basis: in exchange for a $45 billion payment by Barclays, JPMorgan would transfer collateral only of the same value, withholding the margin, or the difference between the cash received and the value of the securities being delivered. One of JPMorgan's objectives in keeping the margin was to protect against unforeseen liabilities arising out of the clearance business. Thus, JPMorgan believed that it would end the day on Thursday not only without exposure to LBI, but also with approximately $4.6 billion in securities, *i.e.*, the estimated amount of the margin that it was keeping. Once its exposure to LBI was eliminated and the securities transferred, JPMorgan would release the margin.

64.     Had JPMorgan kept the margin on the securities being transferred on Thursday, September 18, it could have retained those securities as collateral for the large loan that it was ultimately stuck with after the Barclays transaction was complete. In that case, however, Barclays would not have received securities valued at approximately $5 billion above the level of the cash that it had delivered to LBI. Diamond dealt with this problem. At around 6:00 p.m. on Thursday, September 18, during a phone call with senior executives of JPMorgan, including Miller, Barry Zubrow (Chief Risk Officer), William Winters (co-CEO of the investment bank) and Stephen Cutler (General Counsel), Diamond, who was joined on the call by Rich Ricci, Barclays' Chief Operating Officer, insisted that JPMorgan not keep the margin embedded in the securities valued at $50 billion that Barclays was buying for $45 billion.

65.    To induce JPMorgan to release the margin, Diamond, through his affirmative statements and failure to reveal Barclays' true intentions, persuaded JPMorgan that, by the end of Thursday, JPMorgan's triparty exposure to LBI would be extinguished and, at the conclusion of the transaction, JPMorgan would not have further exposure to LBI. Diamond did so even though LaRocca had emailed Diamond and Ricci before the call: "Urgent WE NEED TO TALK, JPM IS GOING TO BE MORE ANNOYED WITH WHAT I HAVE PLANNED THAT WILL SAVE BARCLAYS SIZE."

66.    Based on Diamond's representations, which were entirely consistent with the false representations that LBHI and Barclays had made to JPMorgan on prior occasions, as well as Diamond's failure to reveal Barclays' true intentions and correct the misrepresentations and misleading statements of the prior day, JPMorgan's senior executives agreed to transfer securities having a collateral value of roughly $50 billion upon receipt of $45 billion in cash. Had JPMorgan known that Barclays would not purchase all of the "Purchased Assets," and that Barclays and Lehman were working together to ensure that JPMorgan was left with a large loan against LBI's least desirable securities, it would not have agreed to release its margin valued at $5 billion.

### F.    JPMorgan transfers securities valued at $42.7 billion to Barclays and then advances $7 billion to Lehman.

67.    After JPMorgan agreed to release its margin valued at $5 billion, the transfer of securities to Barclays went forward. Starting at approximately 6:30 p.m. on Thursday, September 18, an additional $40 billion in cash was transferred to LBI's account at JPMorgan. The transfer of securities to Barclays subsequently resumed, with Lehman personnel directing which securities were to be transferred — or not transferred — to Barclays' account at Bank of New

York based on a list that had been provided to them by Wednesday, September 17. Ultimately, the transfer of securities could not be completed before DTCC closed for the night. When DTCC closed at around 11:00 p.m., securities valued at approximately $42.7 billion had been transferred to Barclays, out of securities valued at roughly $50 billion that were supposed to be transferred in exchange for $45 billion.

68.    During the securities transfer, Lehman employees relied on a list of the securities that Barclays did not want to purchase, and thus did not want to be transferred. ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████

69.    Before the transfer of securities was completed, Lehman took additional steps to ensure that Barclays left JPMorgan with outstanding loans collateralized by LBI's least desirable securities. Late on Thursday, September 18, James Seery of Lehman stated in at least one phone call with John Mahon of Barclays that Barclays should avoid purchasing RACERS. Seery believed that the value of RACERS was "suspect" and, in his discussion with Mahon, Seery questioned whether RACERS was an "appropriate" security. RACERS, meanwhile, had already been intentionally moved on Wednesday out of the Fed portfolio that Barclays had committed to purchase, so Barclays was in a position to leave it behind.

70.    In an effort to finish the transfer on Thursday night even after the DTCC had closed, Lehman decided to substitute cash for the securities remaining to be transferred. Accordingly, John Palchynsky and Dan Fleming of Lehman instructed JPMorgan to transfer $7 billion of cash — representing an estimate of the value of the remaining securities to be delivered to

Bank of New York — from Lehman's Demand Deposit Account at JPMorgan into a triparty cash collateral account to secure Barclays. Because the Demand Deposit Account was in overdraft, Lehman required a discretionary advance from JPMorgan to transfer the $7 billion. In further reliance upon LBHI's and Barclays' prior representations that Barclays would extinguish JPMorgan's clearance exposure in full, and unaware of any other plan, JPMorgan advanced LBI the $7 billion.

### G. Barclays and Lehman reveal that JPMorgan would be stuck with a massive loan secured by the worst LBI collateral.

71.    Beginning after 1:00 a.m. on Friday, September 19, representatives of Lehman, Barclays and JPMorgan had a series of telephone communications during which it began to emerge that, contrary to all the representations that had been made to JPMorgan, Barclays would not purchase or finance the securities left at LBI, including the securities that Barclays had financed on Wednesday night with its $15.8 billion triparty repo.

72.    In the first call, which took place at approximately 1:30 a.m., Hraska of Lehman informed Corral and Ciciola of JPMorgan that, after receiving the $45 billion from Barclays, Lehman had a funding shortfall of more than $23 billion, which included both the $15.8 billion previously funded by Barclays and an additional funding gap of well over $7 billion. Since Barclays was not closing the funding gap, as JPMorgan had been told that it would, LBI needed to turn its intraday loans from JPMorgan for those amounts into an overnight loan. In response, Corral insisted to Hraska that Barclays at least provide the $15.8 billion of funding that it had provided on Wednesday night.

73.    Soon thereafter, during a subsequent call, Hraska and Daniel Fleming of Lehman represented to Corral that they had checked with Barclays and that Barclays had confirmed that it

*would* provide the $15.8 billion of funding as soon as the transfer facilities opened the next morning.

74.    At approximately 8:00 a.m. on Friday morning, September 19, during a phone call in which David Aronow of Lehman participated, Petrie of Barclays claimed to Ciciola of JPMorgan that Petrie was "confused" and "forgot" about the $15.8 billion repo. Then, in a call at approximately 8:30 a.m. among Petrie of Barclays, Fleming of Lehman and Corral of JPMorgan, Petrie announced that Barclays did not recognize an obligation on its part to finance the securities that it had financed the night of Wednesday, September 17 with its $15.8 billion triparty repo. Soon after that call, Corral called Fleming separately to discuss the situation. Fleming, evidencing his recognition that JPMorgan had been wronged, told Corral that he was "sick to his stomach" about Barclays not taking the securities that secured its $15.8 billion repo of Wednesday night.

75.    Accordingly, when SIPC commenced LBI's liquidation proceeding on Friday, September 19, JPMorgan's exposure to Lehman had not remotely been retired. As a result of the actions of Lehman personnel, who manipulated the allocation of securities collateral between the Fed and Barclays on Wednesday night and worked with Barclays to ensure that LBI's least desirable securities stayed behind at JPMorgan, Barclays was able to cherry pick the securities that it purchased from LBI. JPMorgan, in turn, was left with loans to LBI exceeding $25 billion, which included both the $15.8 billion that JPMorgan loaned to repay Barclays on Thursday morning, September 18, and additional financing positions that Barclays did not assume. JPMorgan's loans, moreover, were secured by RACERS and other inferior collateral that Barclays itself had financed on Wednesday night and yet had managed, with the aid of Lehman executives and other personnel, to avoid taking as part of the acquisition. This outcome was possible because

Barclays, purportedly in an effort to support Lehman, had financed increasingly large portions of LBI securities for three straight nights (Monday, Tuesday, and Wednesday) — and then decided, with Lehman's active participation and contrary to the terms of the filed APA, to leave behind at JPMorgan the very securities that it had financed on Wednesday night, September 17.

### H.    LBHI misleads the Court again at the sale hearing.

76.    In Court on Friday, September 19, 2008, at the hearing to approve the sale trans-action and APA that LBHI had filed on September 17, counsel to LBHI told the Court, based on false information provided by LBHI, that Barclays was buying only $47.4 billion in securities, rather than the approximately $70 billion in "Purchased Assets" under the APA, because "the markets dropped and the value of the securities dropped as well."

77.    This explanation was false.  The primary cause of the decline from $70 billion in securities to $50 billion was not a decline in the market value of the securities.  Rather, it was that, contrary to what had been represented to the Court and JPMorgan in the Sale Motion, Bar-clays was not actually purchasing all or even close to all of the assets defined in the APA as "Purchased Assets."  Instead, Barclays was purchasing a cherry-picked portion of those assets and sticking JPMorgan with the remainder.  At the time, JPMorgan did not yet know about LBHI's and Barclays' machinations that left JPMorgan with a claim for more than $25 billion against LBI secured largely by LBI's least desirable collateral.

78.    Only after the Court had approved the sale transaction did LBHI disclose the ac-tual transaction between itself and Barclays.  A "Clarification Letter" dated "as of" Saturday, September 20, 2008, but executed only on September 22, 2008, finally disclosed that the ap-proximately $50 billion in collateral value of assets purchased by Barclays on Thursday, Sep-tember 18, pursuant to the $45 billion cash amount repurchase arrangement between Barclays

and the Fed, would constitute the securities to be purchased by Barclays. In other words, the $45 billion repo would be cancelled and Barclays would simply keep the securities it received on Thursday, September 18, leaving behind the rest of LBI's securities. The Clarification Letter, therefore, was not a "clarification" at all: it fundamentally changed the APA's definition of "Purchased Assets"; it corrected the completely false description of the deal that had been given to the Court prior to approval of the sale on Friday night; and it disclosed to the Court and to creditors for the first time the details of the repo transaction that became the sale transaction. The person who signed the Clarification Letter on Lehman's behalf, Steven Berkenfeld, has admitted that the Clarification Letter was a "different deal" than the deal disclosed to the Court and creditors on September 17, 2008.

79.     LBHI's own counsel, at the hearing on LBHI's motion under Federal Rule of Civil Procedure 60(b) to set aside this Court's order approving the Barclays sale, has likewise admitted that the Clarification Letter, by changing the definition of "Purchased Assets," had the effect of "strik[ing] out the agreement that's been there all week." LBHI's counsel further admitted that the deal disclosed in the APA was not the deal that had been "actually transacted" at the time.

80.     Despite spending months in this Court litigating the issues surrounding the Barclays sale, neither LBHI nor Barclays has ever made clear to the Court why the transaction described in the Sale Motion, under which Barclays would purchase securities with a book value of approximately $70 billion, dramatically changed in the span of two days into a transaction under which Barclays would purchase less than $50 billion of securities. Nor have the parties to LBHI's Rule 60(b) motion explained to the Court why Barclays purchased LBI's securities portfolio a full day before the sale hearing on September 19, or why JPMorgan was never told about

the Takeout Agreement and was otherwise left out of key discussions about the transaction. Neither LBHI nor Barclays has wanted to admit that the machinations that followed LBHI's filing, as well as the inaccurate statements made in Court filings, were designed to leave JPMorgan with a loan of over $25 billion secured largely by LBI's least desirable collateral.

### III.   JPMorgan's damages

81.     As a result of LBHI's fraudulent inducement of JPMorgan to extend credit to LBI on September 18, 2008, JPMorgan ended up with over $25 billion in claims against the LBI estate from extensions of credit under the Clearance Agreement. Major portions of the securities left in LBI's clearing account, which secured those claims, were illiquid, had never traded, were priced on the basis of Lehman's own marks and were structured largely based on Lehman's own credit.

82.     When JPMorgan proved unable to sell much of the collateral that Barclays left behind for it on September 18, 2008, it was forced to apply most of the approximately $8.6 billion in cash collateral that it received from Lehman in September 2008 to satisfy LBI's unpaid loans. JPMorgan subsequently transferred to LBHI the illiquid securities collateral that Barclays had left behind under the Collateral Disposition Agreement approved by this Court in March 2010, but JPMorgan reserved its rights to access the value of the returned collateral in the event it would be needed.

83.     On May 26, 2010, LBHI and its creditors' committee initiated this adversary proceeding against JPMorgan seeking the return of the $8.6 billion in collateral that was delivered to JPMorgan in September 2008, most of which was used by JPMorgan to pay the outstanding loans under the Clearance Agreement. If JPMorgan is required to return any significant portion of that collateral to LBI, and the value of the securities transferred to LBHI under the Collateral

Disposition Agreement is inadequate to satisfy any outstanding claims, JPMorgan will no longer be fully paid on its claims. In that event, or if JPMorgan is otherwise required to pay damages to the LBHI estate, JPMorgan will have suffered direct and proximate harm from LBHI's tortious misconduct.

## IV.    LBHI's motive to deceive JPMorgan

84.    As alleged above, numerous Lehman executives participated extensively in effectuating the series of transactions that resulted in JPMorgan being left with a more than $25 billion loan to LBI secured by a collateral pool that included much of LBI's least desirable securities. Senior executives at LBHI, who were acting to further the interests of LBHI, as well as their own interests, were highly motivated to work with Barclays in defrauding JPMorgan. The executives knew that, without a transaction with Barclays, LBI would have been obliged to unwind its business and liquidate. They also knew that JPMorgan's intraday financing was essential to LBI's continued operation, and thus to any transaction with Barclays. Had JPMorgan realized that it would be left with a large loan to LBI secured by inappropriate collateral, it was clear that the Barclays sale would have been jeopardized. But it was also clear to LBHI that Barclays did not want to buy all the securities that JPMorgan was financing. Faced with these realities, senior LBHI executives participated in a scheme to mislead JPMorgan.

85.    Moreover, Ian Lowitt, Paolo Tonucci, James Seery (Global Head of Fixed Income), and James Hraska (manager of the Secured Financing Operations Group), among other executives, were motivated to advance the interests of Barclays over the legitimate interests of JPMorgan during the week of September 15. At the same time that Lowitt, Tonucci, Hraska, Seery and others were negotiating a sale of LBI's assets to Barclays, they were negotiating, or about to negotiate, employment agreements for themselves with Barclays.

86.     Thus, on September 18, the same day that LBI securities were transferred to Barclays, Lowitt signed a multi-million-dollar employment contract with Barclays, which was contingent on the Barclays deal closing.  Likewise, prior to closing, Barclays offered Tonucci a lucrative contract, which Tonucci accepted.  Seery joined Barclays soon after the closing, where he was paid several million dollars despite having no specific responsibilities.  Hraska, too, joined Barclays soon after the closing.

87.     All of these executives, therefore, had a motive to facilitate a Barclays purchase and curry favor with Barclays, at the same time they were advancing the interests of LBHI, by aiding and abetting Barclays in deceiving JPMorgan.  When, late in the week of September 15, it appeared to Lowitt that the Barclays deal might not close, Lowitt wrote to Tonucci that if that happened, "you and I are toast despite all our heroics."

## FIRST CAUSE OF ACTION
### (Fraudulent Misrepresentation)

88.     The allegations of all of the preceding paragraphs are realleged and incorporated herein by reference.

89.     On September 17, 2008, LBHI made intentionally, or at least recklessly, false and misleading representations of material fact, and omitted to disclose material facts, to JPMorgan. Among other things, LBHI represented in the Sale Motion and related filings:  (a) that the APA constituted an agreement between LBHI and Barclays accurately describing the sale transaction that would take place upon Court approval; (b) that the securities defined in the APA as "Purchased Assets" were the securities that Barclays was obligated to purchase, and would purchase, in connection with the sale transaction; and (c) that the only LBI securities that Barclays would not purchase were those defined in the APA as "Excluded Assets."  In addition, on September

16, 2008, Tonucci and Lowitt of LBHI made materially false and misleading representations to Buyers-Russo that persuaded Buyers-Russo that JPMorgan's loans to LBI would be repaid each night, either by Barclays or the Fed, until the sale transaction closed, at which point JPMorgan would be taken out in full.

90.     LBHI knew that it was making representations of material fact that were false and misleading, and made such false and misleading representations, and omitted to disclose material facts, intentionally or with reckless indifference to the truth.  Executives at LBHI knew at the time:  (a) that the APA was false when filed and subject to change in the most material ways, including with respect to the securities that would be purchased; (b) that Barclays had already decided not to purchase certain securities in the triparty repo portfolio, including RACERS and other illiquid securities, even though they fell within the definition of "Purchased Assets"; (c) that Barclays had an option to refuse to purchase significant portions of the $70 billion in securities defined as "Purchased Assets"; and (d) accordingly, that JPMorgan would not necessarily be repaid in full on its outstanding loans to LBI.  LBHI also knew on Wednesday, September 17, that LBI's triparty repo shells were being reconfigured to divert securities from the Fed's shell to Barclays' shell, and that Lehman and Barclays personnel had been working together for several days to identify securities that Barclays would not purchase from LBI.

91.     LBHI's materially false and misleading statements were reasonably calculated to deceive, were made with the intent to deceive and with reckless indifference to the truth, and did in fact deceive JPMorgan to unwind LBI's overnight financings on the morning of September 18, to release margin, and to facilitate the transfer from LBI to Barclays of the securities that Barclays had chosen to purchase.  By filing its Sale Motion and failing to disclose the true status of the transactions contemplated by the Sale Motion, LBHI misled not only the Court, but also

LBI's creditors, including, most notably, JPMorgan. At the time of LBHI's Sale Motion and other misrepresentations and misleading statements, LBHI knew that JPMorgan was making vast intraday loans to LBI, secured by LBI's securities portfolio, which were necessary to keep LBI alive for long enough to effectuate either an orderly liquidation or a sale to Barclays.

92.     LBHI and its representatives were highly motivated to deceive JPMorgan. JPMorgan's extensions of credit to LBI were critical to any sale of LBI. In addition, senior Lehman executives depended on the closing of the sale to Barclays to benefit from lucrative employment contracts with Barclays. Had JPMorgan known that Barclays was not committed to purchase the "Purchased Assets" under the APA, it would not have unwound the Barclay's tri-party repo and other overnight financings on the morning of September 18. Nor would JPMorgan have released margin valued at $5 billion to Barclays later that day.

93.     JPMorgan reasonably believed LBHI's misrepresentations to be true and justifiably relied upon them to its detriment. Unaware of the contrary facts, JPMorgan had every reason to believe: (a) that the Sale Motion and the APA, which were filed with this Court, accurately described the agreement between LBHI and Barclays; and (b) the representations made by Lehman and Barclays that upon consummation of the APA, and the transactions contemplated by the APA, JPMorgan's loans to LBI would be repaid in full. Based on JPMorgan's reasonable understanding and expectation that Barclays would purchase the securities that JPMorgan was financing, JPMorgan unwound LBI's overnight financings on the morning of September 18, 2008, including by advancing $15.8 billion for Barclays' benefit, and agreed to release margin valued at $5 billion later that day.

94.     As a direct and proximate result of LBHI's false and misleading statements, JPMorgan incurred over $25 billion in claims against LBHI's estate that it otherwise would not

have incurred. The collateral securing those claims included much of LBI's most illiquid, least desirable securities, and in fact JPMorgan could not sell many of those securities to recover its claims against LBI.

95.    JPMorgan is entitled to administrative expense priority for damages in connection with LBHI's post-petition fraud.

## SECOND CAUSE OF ACTION
### (Fraudulent Concealment)

96.    The allegations of all of the preceding paragraphs are realleged and incorporated herein by reference.

97.    LBHI intentionally, or at least recklessly, failed to disclose and omitted material facts that it had a duty to disclose to JPMorgan. LBHI also engaged in active concealment of material facts by taking actions designed to prevent, and which did prevent, the discovery of facts giving rise to JPMorgan's fraud claims; LBHI employed artifices to prevent JPMorgan from gaining knowledge of the facts; and LBHI made representations intended to avoid suspicion by JPMorgan and to prevent JPMorgan from making inquiry.

98.    LBHI failed to disclose, concealed and omitted material facts from JPMorgan, including: (a) that the APA, even upon signature, was inaccurate and subject to change in material ways, including with respect to the securities that would be purchased by Barclays; (b) that notwithstanding the terms of the APA, Barclays had the option, which it later exercised, to refuse to purchase significant portions of the $70 billion in securities included in the APA's definition of "Purchased Assets"; (c) that Barclays had entered into the Takeout Agreement with the Fed; (d) that Lehman and Barclays had actively manipulated LBI's triparty repo shells on September 17, 2008 to divert unwanted securities from the Fed's overnight shell to Barclays' shell; (e) that

Barclays had reserved to itself the right to decide, and in fact had decided prior to entry into the APA, not to purchase certain securities, including RACERS and other illiquid securities, that fell within the definition of "Purchased Assets"; and (f) that Barclays had reserved to itself the right to decide, and in fact had decided prior to the time that JPMorgan extended intraday financing to LBI on Thursday, September 18, 2008, and prior to the time that JPMorgan agreed to release margin valued at $5 billion, not to purchase certain securities, including RACERS and other illiquid securities, that fell within the definition of "Purchased Assets."

99.    These facts were material. Had JPMorgan known that Barclays was not committed to purchase the securities defined as the "Purchased Assets" in the APA, and instead could cherry pick the securities it would purchase and seek to stick JPMorgan with LBI's least desirable securities, JPMorgan would not have extended credit to LBI to repay its overnight financings on the morning of September 18. In particular, JPMorgan would not have unwound the Barclays triparty repo on the morning of September 18 and would not have released margin valued at $5 billion to Barclays later that day.

100.    LBHI had a duty to disclose the concealed, undisclosed and omitted facts because LBHI made false and misleading statements and representations directly to JPMorgan; LBHI possessed superior knowledge and information about the material facts that would have revealed that the statements and representations made to JPMorgan were materially false and misleading; and LBHI was on notice, and knew, that JPMorgan was justifiably relying upon the false and misleading statements made by LBHI and that JPMorgan was acting under a mistaken belief that those statements and representations were true and complete.

101.    LBHI's concealment, non-disclosure and omission of material facts were reasonably calculated to deceive, intended to deceive and reckless, and did in fact deceive JPMor-

gan. For the reasons described herein, LBHI and its representatives were highly motivated to deceive JPMorgan and knew that JPMorgan would have declined to unwind LBI's overnight repos or insisted that its intraday loans to LBI be satisfied in full, thereby imposing upon Barclays an obligation that it did not want to assume.

102. JPMorgan justifiably relied to its detriment on LBHI's concealment, non-disclosure and omission of material facts. The facts that were concealed from JPMorgan were within the peculiar knowledge of LBHI and were not readily ascertainable by JPMorgan.

103. As a direct and proximate result of LBHI's concealment, non-disclosure and omission of material facts, JPMorgan incurred over $25 billion in claims against LBHI's estate that it otherwise would not have incurred. The collateral securing those claims included much of LBI's most illiquid, least desirable securities, and in fact JPMorgan could not sell many of those securities to recover its claims against LBI.

104. JPMorgan is entitled to administrative expense priority for damages in connection with LBHI's post-petition fraud.

### THIRD CAUSE OF ACTION
#### (Aiding and Abetting Fraud)

105. The allegations of all of the preceding paragraphs are realleged and incorporated herein by reference.

106. LBHI aided and abetted Barclays in perpetrating a fraud on JPMorgan. On multiple occasions prior to JPMorgan's unwind of LBI's overnight financings on the morning of Thursday, September 18, and then release of margin valued at $5 billion, Barclays affirmatively misrepresented, and failed to disclose, material facts to JPMorgan concerning its purchase of assets from Lehman. Among other things:

A.      LaRocca of Barclays told Miller of JPMorgan on Tuesday, September 16 that Barclays would purchase the entire LBI repo book, and failed to disclose Barclays' actual plans relating to the sale transaction.

B.      Barclays entered into the APA knowing that the APA did not accurately set forth its agreement with Lehman, that Lehman would file the false and misleading APA with the Court, and that the Court and JPMorgan would rely on it.

C.      During a conference call during the evening of Wednesday, September 17 among Stancil, Ciciola and Corral of JPMorgan, Petrie, Rodefeld and others from Barclays, and Lehman representatives, the Barclays representatives stated that Barclays, in addition to purchasing the securities that were financed by the Fed, would continue to finance whatever securities remained at LBI after the purchase of the Fed position. They also failed to disclose Barclays' actual plans relating to the sale transaction.

D.      At around 9:00 p.m. on Wednesday, September 17, LaRocca of Barclays and Certosimo of Bank of New York called Buyers-Russo of JPMorgan and told her again that, as a result of the Barclays/Lehman transaction, JPMorgan would have no clearance exposure to LBI by the end of Thursday, September 18.

E.      At around 6 p.m. on Thursday, September 18, Diamond of Barclays, through affirmative statements and material omissions, persuaded JPMorgan that, by the end of Thursday, JPMorgan's triparty exposure to LBI would be extinguished and, at the conclusion of the transaction, JPMorgan would not have further exposure to LBI.

107.      Barclays knew that it was making representations of material fact that were false and misleading, and made such false and misleading representations, and omitted to disclose material facts, intentionally or with reckless indifference to the truth. On September 17, before representing to JPMorgan that its exposure to LBI would be extinguished in full, Barclays had already taken steps, with the aid of Lehman, to ensure that LBI's lower-quality securities were moved from the Fed portfolio, which Barclays had committed to purchase under the Takeout Agreement, to Barclays' own overnight portfolio. And on September 18, when Diamond induced JPMorgan to release margin valued at $5 billion on the basis that JPMorgan's exposure

would be entirely extinguished, Diamond knew that Barclays would not purchase large portions of the securities that JPMorgan was financing.

108.    Barclays' materially false and misleading statements were reasonably calculated to deceive, were made with the intent to deceive and with reckless indifference to the truth, and did in fact deceive JPMorgan. Barclays wished to purchase LBI as a going concern at a favorable price. To do so, Barclays needed LBI to remain in business until the transaction was complete — and for that, JPMorgan's financing was essential. At the same time, Barclays wished to avoid purchasing the illiquid, never-traded, difficult-to-value securities on LBI's balance sheet. The materially false and misleading statements made to JPMorgan, on which Barclays knew JPMorgan would rely, were designed to accomplish these goals by deceiving JPMorgan into continuing to extend credit to LBI, to release margin, and to transfer LBI's higher-quality securities to Bank of New York, Barclays' clearing bank.

109.    JPMorgan reasonably believed Barclays' misrepresentations to be true and, unaware of Barclay's true intentions, justifiably relied upon them. With the justifiable expectation that Barclays would purchase all of LBI's trading assets, and thus provide LBI with cash sufficient to repay JPMorgan's clearance-related exposure, JPMorgan unwound LBI's overnight financings on the morning of Thursday, September 18, 2008 and agreed to release margin valued at $5 billion to Barclays later that day. Had JPMorgan known that Barclays was not committed to purchase all of the securities defined in the APA as "Purchased Assets," it would not have unwound the Barclay's triparty repo and other overnight financings on the morning of September 18. Nor would JPMorgan have released margin valued at $5 billion to Barclays later that day.

110.    Barclays had a duty to disclose the concealed, undisclosed and omitted facts because Barclays made false and misleading statements and representations directly to JPMorgan;

Barclays possessed superior knowledge and information about the material facts that would have revealed that the statements and representations made to JPMorgan were materially false and misleading; and Barclays was on notice, and knew, that JPMorgan was justifiably relying upon the false and misleading statements made by Barclays and that JPMorgan was acting under a mistaken belief that those statements and representations were true and complete.

111.    As a direct and proximate result of Barclays' false and misleading statements, Barclays' material omissions, and LBHI's aiding and abetting of Barclays' fraud, JPMorgan incurred over $25 billion in claims against LBHI's estate that it otherwise would not have incurred. The collateral securing those claims included much of LBI's most illiquid, least desirable securities, and in fact JPMorgan could not sell much of it to repay all of its claims against LBI.

112.    LBHI actually knew, or consciously avoided knowing, that Barclays was perpetrating a fraud upon JPMorgan. On the morning of September 18, LBHI knew that JPMorgan was extending credit to Lehman on the mistaken belief, perpetuated by Barclays, that Barclays would purchase all of the securities that JPMorgan was financing. LBHI also knew that Barclays had caused that mistaken but justifiable belief by representing to JPMorgan that, among other things, the Barclays repo from Wednesday night would be renewed on Thursday night and by failing to disclose that Barclays would not purchase all of LBI's triparty book and leave JPMorgan with LBI's least desirable securities.

113.    LBHI provided Barclays with substantial assistance in perpetrating a fraud upon JPMorgan. Among other things, LBHI filed the Sale Motion and the APA, which misrepresented the agreement between LBHI and Barclays. LBHI representatives helped Barclays identify undesirable securities in LBI's triparty repo book; Lehman manipulated the repo shells on Wednesday, September 17 to ensure that Barclays could cherry pick LBI's best securities; and

Lehman personnel took numerous steps to ensure that only the securities Barclays wanted were actually transferred to Barclays on September 18. Without Lehman's assistance, Barclays would not have been able to accomplish its fraud on JPMorgan.

114. JPMorgan is entitled to administrative expense priority for damages in connection with LBHI's post-petition aiding and abetting of fraud.

## FOURTH CAUSE OF ACTION
### (Indemnification under the Clearance Agreement)

115. The allegations of all of the preceding paragraphs are realleged and incorporated herein by reference.

116. Section 16 of the Clearance Agreement, entitled "Indemnification," provides in relevant part: "Except where we are negligent or have engaged in willful misconduct, or have breached this Agreement for reasons other than those listed in Section 12 hereof, you will indemnify us and hold us harmless against any and all losses, claims, damages, liabilities or actions to which we may become subject, and reimburse us for any expenses (including reasonable attorneys' fees and expenses) incurred by us in connection therewith, insofar as such losses, claims, damages, liabilities or actions arise out of or are based upon or are in any way related to this Agreement. Without limiting the generality of the foregoing indemnification, we shall be indemnified for all reasonable costs and expenses, including reasonable attorneys' fees, for our successful defense against claims by you that we were negligent or engaged in willful misconduct."

117. Under an Amendment to the Clearance Agreement between JPMorgan and LBHI dated as of August 26, 2008, LBHI is a party to the Clearance Agreement.

118.	Under the Guaranty executed by LBHI in favor of JPMorgan dated as of August 26, 2008 (the "August Guaranty"), and under the Guaranty executed by LBHI in favor of JPMorgan dated as of September 9, 2008 (the "September Guarantee"), LBHI guaranteed payment of all obligations and liabilities to JPMorgan under the Clearance Agreement of all LBHI subsidiaries.

119.	Under the Security Agreement between LBHI and JPMorgan dated as of August 26, 2008 (the "August Security Agreement"), and under the Security Agreement between the parties dated as of September 9, 2008 (the "September Security Agreement"), JPMorgan has a lien on certain of LBHI's accounts at JPMorgan, the assets contained therein, and the proceeds thereof, as security for payment of LBHI's obligations under the August and September Guaranties and the Clearance Agreement.

120.	On September 15, 2010, LBHI filed the First Amended Complaint in this adversary proceeding, seeking, *inter alia*, the return of collateral that was delivered to JPMorgan in September 2008 to secure payment of LBHI's guaranty of its subsidiaries' obligations under the Clearance Agreement.  The First Amended Complaint further seeks to hold JPMorgan liable for actions and omissions it allegedly took in its role as Lehman's clearing bank pursuant to the Clearance Agreement.

121.	The causes of action asserted in the First Amended Complaint seek payment of "losses, claims, damages, liabilities or actions" that "arise out of," are "based upon" and/or are "related to" the Clearance Agreement.

122.	LBHI is therefore obligated to indemnify JPMorgan and hold JPMorgan harmless against any and all losses, claims, damages, liabilities or actions to which it has subjected

JPMorgan, and to reimburse JPMorgan for all expenses, including attorneys' fees and expenses, incurred by JPMorgan in connection therewith.

123.    JPMorgan's claims against LBHI for indemnification are secured by liens on LBHI's accounts at JPMorgan, which liens were granted to JPMorgan pursuant to the August and September Security Agreements.

## FIFTH CAUSE OF ACTION
### (Indemnification under the Custodial Undertaking)

124.    The allegations of all of the preceding paragraphs are realleged and incorporated herein by reference.

125.    On September 15, 2008, JPMorgan (as "Bank"), LBI (as "Seller"), and Barclays (as "Buyer") entered into a Custodial Undertaking in Connection with Master Repurchase Agreement (the "Custodial Undertaking"). The first "whereas" clause of the Custodial Undertaking notes that Barclays and LBI "have entered into a Master Repurchase Agreement (the 'Repurchase Agreement') dated December 19, 1996." The second "whereas" clause explains that "Buyer and Seller have requested that Bank undertake certain agency and custodial functions in connection with the Repurchase Agreement." The Custodial Undertaking specified the functions JPMorgan agreed to undertake.

126.    Paragraph 9 of the Custodial Undertaking, captioned "Indemnification," provides in relevant part: "Seller and Buyer hereby agree, jointly and severally, to indemnify Bank for, and hold it harmless against, any loss, liability or expense in connection with, arising out of or in any way related to this Agreement or the Repurchase Agreement, or any action or omission by Bank in connection with this Agreement, including the reasonable costs, expenses and fees of attorneys chosen by Bank incurred in defending any claim of such liability, except that Seller and

Buyer shall not be liable for any loss, liability or expense to the extent that it is determined to be the direct result of acts or omissions on the part of Bank constituting negligence or willful mis-conduct. Notwithstanding the foregoing, Bank shall be absolutely indemnified by each other party for, and held harmless against, any loss, liability or expense (including the reasonable costs, expenses and fees of attorneys chosen by Bank incurred in defending any claim of such liability) incurred as a result of complying with the instructions of Buyer or Seller, including without limitation any such compliance which constitutes or is alleged to constitute a violation of the rights of any party or a violation of an injunction, stay, order or law."

127.    During the week of September 15, 2008, the repo transactions between Barclays and LBI were effectuated under the Repurchase Agreement. Moreover, each repo transaction required the agency and custodial services of JPMorgan pursuant to the Custodial Undertaking.

128.    If JPMorgan is unable to recover the full amount of any of its loans to LBI, or otherwise is required to pay damages to the Lehman estates, JPMorgan will have suffered a "loss . . . in connection with, arising out of or in any way related to th[e] [Custodial Undertaking] or the Repurchase Agreement." For the reasons set forth herein, moreover, the "loss" will have been occasioned "as a result of [JPMorgan] complying with the instructions of Buyer or Seller."

129.    In defending against the First Amended Complaint and prosecuting these Coun-terclaims, JPMorgan has incurred, and will continue to incur, "expense[s] in connection with, arising out of or in any way related to th[e] [Custodial Undertaking] or the Repurchase Agree-ment" and "as a result of complying with the instructions of Buyer or Seller."

130.    LBI, as Seller, is therefore obligated under the Custodial Undertaking to indem-nify JPMorgan and hold JPMorgan harmless against any and all losses, claims, damages, liabili-ties or actions to which it and Barclays have subjected JPMorgan, and to reimburse JPMorgan

for all expenses, including attorneys' fees and expenses, incurred by JPMorgan in connection therewith.

131.    Under the September Guaranty, LBHI guaranteed payment of all obligations and liabilities of its subsidiaries, including LBI, to JPMorgan. Under the September Security Agreement, LBHI's guaranty is secured by liens on LBHI's accounts at JPMorgan.

WHEREFORE, Defendant and Counterclaimant JPMorgan prays as follows:

    i.    For damages in an amount to be determined at trial;

    ii.    For costs and expenses of this action, including expert and attorneys fees;

    iii.    For a declaration and order requiring LBHI to indemnify JPMorgan for the losses, claims, damages, liabilities or actions to which it has subjected JPMorgan, and to reimburse JPMorgan for all expenses incurred in connection therewith.

    iv.    For interest at the legal rate; and

    v.    For such other and further relief as this Court may deem just and proper.

Dated:    December 1, 2010
            New York, New York

*Of Counsel:*

Harold S. Novikoff
Marc Wolinsky
Amy R. Wolf
Douglas K. Mayer
Ian Boczko
Emil A. Kleinhaus
Alexander B. Lees
S. Christopher Szczerban

WACHTELL, LIPTON, ROSEN & KATZ

By: _____
      Paul Vizcarrondo, Jr.

51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000

*Attorneys for Defendant and Counterclaimant*
*JPMorgan Chase Bank, N.A.*