**CURTIS, MALLET-PREVOST,**
**COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
*Counsel for Plaintiff, Debtor Lehman Brothers*
*Holdings Inc.*

**QUINN EMANUEL**
**URQUHART & SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543

51 Madison Avenue
New York, New York 10010
*Counsel for Plaintiff/Intervenor, the*
*Official Committee of Unsecured Creditors of*
*Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------- X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No.: 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | |
| | : | |
| Debtors. | : | |

--------------------------------------------------------------- X

| | | |
|---|---|---|
| LEHMAN BROTHERS HOLDINGS INC., and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., | : | |
| | : | |
| Plaintiff and Plaintiff Intervenor, | : | |
| | : | |
| -against- | : | Adversary Proceeding |
| | : | |
| JPMORGAN CHASE BANK, N.A., | : | No.: 10-03266 (JMP) |
| | : | |
| Defendant. | : | |

--------------------------------------------------------------- X

**PLAINTIFFS' OPPOSITION TO JPMORGAN CHASE BANK, N.A.'s**
**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ................................................................................................7

I. JPMorgan Acts as LBI's Clearing Bank for Eight Years .......................................7

II. The August Agreements .......................................................................................7

III. JPMorgan Demands That LBHI Enter Into the September Agreements.................8

IV. JPMorgan Demands an Additional Collateral Cushion..........................................9

V. JPMorgan Prevents LBHI's Access to Its Cash and Other Collateral Held by
JPMorgan, and LBHI Is Forced to File for Bankruptcy .........................................10

LEGAL STANDARD .....................................................................................................11

ARGUMENT.................................................................................................................15

POINT I  THE SAFE HARBOR PROVISIONS OF THE BANKRUPTCY
CODE DO NOT PROVIDE A BASIS FOR DISMISSAL OF
PLAINTIFFS' AVOIDANCE CLAIMS .............................................................15

A. JPMorgan Applies the Wrong Standard for Determining If a Case Can Be
Dismissed on the Pleadings Due to the Section 546 Safe Harbor Provisions..........16

B. The Safe Harbor Provisions Do Not Shield the Guaranties, Without Which
the Collateral Transfers that Secured Those Guaranties Cannot Be Applied
to the Debts of LBHI's Subsidiaries (Counts VI-VII, XI-XIV)..............................18

1. LBHI's Claims for Constructive Fraudulent Conveyance
to Avoid the August and September Guaranties State
Valid Causes of Action Because the Safe Harbors Only
Apply to Transfers, Not Incurrences of Obligations........................................19

a. The Language of Section 546 is Limited to Transfers ..............................19

b. The Omission of the Word "Obligations" from Section 546
Should be Considered Intentional and Meaningful ..................................22

c. Section 546's Use of the Term "Notwithstanding" Does Not
Justify Extending the Section 546 Safe Harbors to Obligations................27

i

  d. Limiting Section 546 to Its Plain Text – Covering Only
   Transfers – Comports Squarely With the Spirit and
   Purpose of the Safe Harbor Provisions ......................................29

   (i) The Enunciated Policy Behind the Safe Harbors Uniquely
    Applies to Transfers Related to Certain Market Transactions ..........30

   (ii) Avoiding Obligations Incurred When a Debtor Is Insolvent or
    Undercapitalized for Less Than Reasonably Equivalent Value
    Comports With the Policy Behind the Bankruptcy Code...................32

   (iii) It Is JPMorgan, and Not Plaintiffs, That Is Attempting
    to Use the Safe Harbor Provisions to Accomplish
    Indirectly What It Cannot Do Directly ...............................................34

 2. In the Absence of Valid Guaranties from LBHI,
  JPMorgan Cannot Use LBHI's Cash and Securities
  to Repay Itself for the Debts of LBHI's Subsidiaries .......................................35

C. The September Agreements and $8.6 Billion Transfers Are Not
 Safe Harbored Because the September Agreements Are Not
 Securities Contracts, Swap Agreements or Repurchase Agreements .....................43

 1. By Their Plain Language, the September Guaranty and
  September Security Agreement Are Not "Securities Contracts,"
  "Repurchase Agreements" or "Swap Agreements" ..........................................45

 2. Mere Reference In a Preliminary Statement to Derivative
  Transactions or Clearing Advances, Among a Host of Other
  Transactions, Does Not Render the September Guaranty and
  September Security Agreement "Securities Contracts,"
  "Repurchase Agreements" or "Swap Agreements" ..........................................48

 3. Extrinsic Evidence Indicates at Least a Factual Question
  Regarding Whether the September Agreements Qualify
  as Securities, Repurchase or Swap Agreements ..............................................50

  a. The September Agreements and $8.6 Billion Transfers
   Are Not Securities Contracts or Repurchase Agreements,
   or Transfers Made In Connection With Such Agreements........................50

  b. The September Agreements and Collateral Transfers
   Are Not Swap Agreements or Transfers Made in
   Connection With Swap Agreements.........................................................53

 4. JPMorgan's Argument Runs Counter to the Purpose of the Section 546
  Safe Harbor Provisions, Which Do Not Provide Wholesale Protection
  of Transfers in Connection With a Guaranty of All Liabilities ........................57

D. JPMorgan's $6.9 Billion Cash Sweep Is Not Protected by the Safe Harbor Provisions (Counts XVII and XIX) ............................60

POINT II JPMORGAN'S MOTION TO DISMISS PLAINTIFFS' BANKRUPTCY CLAIMS ON NON-SAFE HARBOR GROUNDS SHOULD BE DENIED .......61

A. The Amended Complaint States Claims for Avoidance of Actual Fraudulent Conveyances (Counts I-III) ....................................61

   1. The Amended Complaint Pleads Sufficient Badges of Fraud ..........................62

   2. The Amended Complaint Pleads Facts Establishing That the Certain and Foreseeable Result of the Conveyances Was to Hinder or Delay Creditors ...............................65

   3. JPMorgan's Intent Should Be Imputed to LBHI .............................68

B. The Amended Complaint States Claims for Turnover of LBHI's Property (Counts XXV-XXVIII) ........................................70

   1. Counts XXV and XXVII State Prima Facie Claims for Turnover of LBHI's Property .........................................72

   2. Pursuant to Section 553, JPMorgan's Obligation to Return LBHI's Property Cannot Be Set Off Against Any Purported LBHI Obligations ..........73

C. The Amended Complaint States a Claim That JPMorgan Set Off In Violation of the Automatic Stay and LBHI Is Entitled to Turnover of $1.9 Billion (Count XXXIII).............................76

   1. The Safe Harbor Provisions of Section 362(b) Do Not Apply .........................77

   2. JPMorgan's Self-Help Application of $1.9 Billion Was Subject to the Automatic Stay Even If It Constituted a Foreclosure on a Security Interest ...............................79

D. Plaintiffs' Counts for Recovery (Counts IV, IX, XVI, XVIII, XX, XXIV and XXIX), Disallowance of Claims and Avoidance of Liens Securing Such Claims (Count XXXI) Are Well-Pleaded ..............................80

POINT III JPMORGAN'S MOTION TO DISMISS PLAINTIFFS' COMMON LAW CLAIMS SHOULD BE DENIED .........................................81

A. The Amended Complaint States a Claim for Declaratory Judgment That JPMorgan Has No Lien or Other Security Interest With Respect to LBHI's $8.6 Billion (Count XXXVIII)............................81

1.  JPMorgan Has No Lien Over Assets Transferred by JPMorgan Out of the Pledged Accounts and Into JPMorgan's General Ledger Account ............. 82

2.  JPMorgan Had No Right Under the Security Agreements or UCC to Transfer LBHI's $6.9 Billion in the Absence of a Default by LBHI .............. 85

3.  The UCC's Provisions Regarding "Control" of Collateral For Purposes of Perfection Did Not Authorize JPMorgan to Transfer LBHI's $6.9 Billion ......................................................................... 90

4.  Any Purported Lien Did Not Attach to JPMorgan's Account As "Proceeds" of the Collateral ......................................................... 92

5.  The Amended Complaint States a Claim That JPMorgan Has No Security Interest With Respect to the $1.7 Billion of Money Market Funds ......................................................... 93

B.  The Amended Complaint States Claims for Unjust Enrichment and Conversion With Respect to LBHI's $8.6 Billion (Counts XXXIX and XL) ......... 94

C.  The Amended Complaint States Claims for a Declaratory Judgment That the September Agreements Are Invalid and Unenforceable (Count XXXV), for Duress With Respect to the September Agreements (Count XLVI), and Duress With Respect to the $8.6 Billion in Collateral Transfers (Count XLVIII) .................... 94

1.  The September Agreements Are Invalid for Lack of Consideration ................ 95

2.  LBHI Did Not Waive Its Defenses to the September Agreements ................... 98

    a.  A Waiver Must Be Voluntarily and Knowingly Entered Into and Not the Product of Duress or Undue Influence ........................... 98

    b.  The September Guaranty Does Not Waive the Defenses of Lack of Authority, Duress, or Lack of Consideration, Because It Does Not Specifically Address Those Defenses .................... 102

3.  LBHI Did Not Ratify the September Agreements or the $8.6 Billion of Transfers Made Pursuant Thereto ...................................... 103

    a.  The Performance of a Disputed Contract While Under Duress, for a Period of Several Days Only, Does Not Ratify That Contract ............. 105

    b.  LBHI Expressly Reserved Its Right to Challenge the September Agreements and the $8.6 Billion of Collateral Transfers Under the September 16 Order ............................... 107

     c.    This Lawsuit's Assertion of Alternative Claims Arising Under the
September Agreements Does Not Ratify Those Agreements ..................107

     d.    Section 558 of the Bankruptcy Code Precludes a
Finding That LBHI Waived Defenses to the
September Agreements or Collateral Transfers ........................................109

D.  The Amended Complaint States Claims That JPMorgan
Breached the 2000 Clearance Agreement (Counts XLI-XLII)
and the August Security Agreement (Counts XLIII-XLIV) ...................................109

    1.    To the Extent JPMorgan's Demands for and Retention of LBHI's $8.6
Billion Are Governed by the 2000 Clearance Agreement or the August
Security Agreement, JPMorgan Breached Such Agreement ..........................111

    2.    To the Extent Any LBHI Collateral Is Governed by the
2000 Clearance Agreement or August Security Agreement,
JPMorgan's Refusal to Allow LBHI to Access That
Collateral Constitutes an Additional Breach ...................................................115

         a.    Both the 2000 Clearance Agreement and the August
Security Agreement Required JPMorgan to Permit
LBHI Access to Its Assets at the Close of Business ...............................115

         b.    JPMorgan's Breach of the 2000 Clearance Agreement
and the August Security Agreement .......................................................117

    3.    LBHI Did Not Waive Its Claims for Breach of Contract ...............................118

E.  JPMorgan Breached the Covenant of Good Faith and Fair
Dealing Under the August Agreements (Count XLV) and
the September Agreements (Count XLVII) ...........................................................119

    1.    JPMorgan's Excessive Collateral Demands
Breached the Duty of Good Faith and Fair Dealing ......................................120

    2.    JPMorgan's Use of Improper Threats to Force LBHI to Post
Collateral Constitutes an Additional Breach of the Implied Covenant ...........124

    3.    JPMorgan Breached the Implied Covenant
by Refusing to Return LBHI's Collateral .......................................................125

F.  The Amended Complaint States a Claim for Fraud (Count XLIX) ......................127

G.  The Amended Complaint Alleges Facts That Justify
Imposition of a Constructive Trust (Count XXXII) ..............................................131

1. The Invalid September Security Agreement Does Not Bar the Imposition of a Constructive Trust..............................132

2. Plaintiffs' Other Claims Regarding the $5 Billion, Which Seek Damages, Do Not Warrant Dismissal of the Constructive Trust Claim.........133

3. The Amended Complaint Alleges Fraud and Other Misconduct Sufficient to Justify a Constructive Trust ...................................133

4. LBHI and JPMorgan Shared a "Confidential Relationship" ..........................134

H. Plaintiffs' Claims for Unjust Enrichment, Conversion and Constructive Trust Are Not Preempted by the Bankruptcy Code (Counts XXXII, XXXVI-XXXVII, XXXIX-XL) .......................................135

1. There Is No Basis for Field Preemption .........................................136

2. The Section 546 Safe Harbor Provisions Do Not Conflict With Plaintiffs' State Law Claims....................................137

POINT IV  THE AMENDED COMPLAINT STATES A CLAIM FOR EQUITABLE SUBORDINATION (Count XXX) ...........................................141

A. JPMorgan Was an Insider For Purposes of Plaintiffs' Equitable Subordination Claim...........................................141

B. Even If Not an Insider, JPMorgan's Misconduct Supports Equitable Subordination.......................................................143

CONCLUSION.................................................................................................145

# TABLE OF AUTHORITIES

**Page**

## CASES

48th Street Steakhouse, Inc. v. Rockefeller Group, Inc.
(In re 48th Steakhouse, Inc.),
835 F.2d 427 (2d Cir. 1987) .................................................................................76

604 Columbus Ave. Realty Trust v. Capital Bank and Trust Co.
(In re 604 Columbus Ave. Realty Trust),
119 B.R. 350 (Bankr. D. Mass. 1990) ...............................................................144

In re 604 Columbus Ave. Realty Trust,
968 F.2d 1332 (1st Cir. 1992)............................................................................144

Acito v. IMCERA Group,
47 F.3d 47 (2d Cir. 1995) ..................................................................................129

Adelphia Recovery Trust v. Bank of Am., N.A.,
390 B.R. 64 (S.D.N.Y. 2008) ................................................................. 144 fn.46

Ades & Berg Group Investors v. Breeden
(In re Ades & Berg Group Investors),
550 F.3d 240 (2d Cir. 2008) ..............................................................................132

In re Adirondack Timber Enter.,
2010 Bankr. LEXIS 1420 (Bankr. N.D.N.Y. Apr. 28, 2010)........................85, 91

AEP Energy Servs. Gas Holding Co. v. Bank of Am.,
2007 U.S. Dist. LEXIS 93022 (S.D.N.Y. Dec. 18, 2007) ..................................140

Alfa, S.A.B. de C.V. v. Enron Creditors Recovery Corp.
(In re Enron Creditors Recovery Corp.),
422 B.R. 423 (S.D.N.Y. 2009)......................................................................44, 54

Allstate Ins. Co. v. Administratia Asigurarilor De Stat,
948 F. Supp. 285 (S.D.N.Y. 1996) ....................................................................111

Alsens Am. Portland Cement Works v. Degnon Contracting Co.,
222 N.Y. 34 (1917)............................................................................................118

Aluminum Mills Corp. v. Citicorp N.A., Inc.
(In re Aluminum Mills Corp.),
132 B.R. 869 (Bankr. N.D. Ill. 1991) ................................................................144

In re Am. Props., Inc.,
14 B.R. 637, 643 (Bankr. D. Kan. 1981) .............................................................65

Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.,
351 F. Supp. 2d 79 (S.D.N.Y. 2004) .............................................45, 57, 62, 80

In re Ames Dept. Stores, Inc.,
582 F.3d 422 (2d Cir. 2009) ................................................................................29

Amusement Indus., Inc. v. Stern,
    693 F. Supp. 2d 301 (S.D.N.Y. 2010) ................................................................108

In re Andrew Velez Construction, Inc.,
    373 B.R. 262 (Bankr. S.D.N.Y. 2007).........................................................68 fn.23

Aniero Concrete Co. v. N.Y. Citi Constr. Auth.,
    1997 U.S. Dist. LEXIS 22 (S.D.N.Y. Jan. 3, 1997) .............................100 fn.33, 102

In re Aphton Corp.,
    423 B.R. 76 (Bankr. D. Del. 2010) ...................................................................18

Application of Gruen,
    18 N.Y.S.2d 990 (N.Y. Sup. Ct. 1940) .............................................................105

In re Aquasport, Inc.,
    115 B.R. 720 (Bankr. S.D. Fla. 1990) ...............................................................75

In re Aquasport, Inc.,
    155 B.R. 245 (S.D. Fla. 1992) .........................................................................75

In re Aquasport, Inc.,
    985 F.2d 579 (11th Cir. 1993) .........................................................................75

Aramony v. United Way of Am.,
    254 F.3d 403 (2d Cir. 2001) .......................................................................85-87

In re Arctic Enters., Inc.,
    21 B.R. 215 (Bankr. D. Minn. 1982) ................................................................74

Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co.,
    2006 U.S. Dist. LEXIS 34709 (S.D.N.Y. May 31, 2006) ......................................140

Arnold v. Baisch (In re Great Lakes Boat Repair),
    2006 Bankr. LEXIS 2537 (Bankr. W.D.N.Y. 2006) .............................................136

ASARCO LLC v. Ams. Mining Corp.,
    396 B.R. 278 (S.D. Tex. 2008) ...................................................................65-66

Ashcroft v. Iqbal,
    129 S. Ct. 1937 (2009).........................................................................11, 16-17

In re Asia Global Crossing, Ltd.,
    333 B.R. 199 (S.D.N.Y. 2005) ................................................................21, 24-25

Austin Investments, Inc. v. Loral Corp.,
    29 N.Y.2d 124, 324 N.Y.S.2d 22 (1971)...........................................................105

Banco Do Estado de Sao Paolo, S.A. v. Mendes Junior Int'l Co.,
    249 A.D.2d 137 (1st Dep't 1998) ...................................................................101

Bank of Am., N.A. v. Lehman Bros. Holdings Inc.
(In re Lehman Bros. Holdings Inc.),
    2010 Bankr. LEXIS 3867 (Bankr. S.D.N.Y. Nov. 16, 2010) ...........................passim

Bank Leumi Trust Co. of N.Y. v. D'Evori Int'l, Inc.,
    163 A.D.2d 26 (1st Dep't 1990) .....................................................................106

Barclays Bank of N.Y. v. Heady Electric Co. Inc.,
    571 N.Y.S.2d 650 (3d Dep't 1991) ..............................................122

In re Bayer Corp. Combination Aspirin Prod. Mktg. and Sales Practices Litig.,
    701 F. Supp. 2d 356 (E.D.N.Y. 2010) ........................................128

Bazzano v. L'Oreal,
    1996 U.S. Dist. LEXIS 6529 (S.D.N.Y. May 14, 1996) ..............132

BC Media Funding Co. II v. Lazauskas,
    2008 U.S. Dist. LEXIS 87124 (S.D.N.Y. Oct. 24, 2008)..............101

Bear, Stearns Funding, Inc. v. Interface Group – Nevada, Inc.,
    361 F. Supp. 2d 283 (S.D.N.Y. 2005) ........................................125

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007)...........................................................11, 18

Benjamin v. Diamond
(In re Mobile Steel Co.),
    563 F.2d 692 (5th Cir.1977) ......................................................141

In re Bennett,
    149 B.R. 16 (N.D.N.Y. 1993)..................................................96-97

In re Bennett Funding Group,
    146 F.3d 136 (2d Cir. 1998) ........................................................84

Besette v. Avco Fin. Servs. Inc.,
    230 F.3d 439 (1st Cir. 2000)............................................ 140 fn.44

Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass'n,
    878 F.2d 742 (3d Cir. 1989) ...................................................30-31

BFP v. Resolution Trust Corp.,
    511 U.S. 531 (1994)......................................................................22

Bison Capital Corp. v. ATP Oil & Gas Corp.,
    2010 U.S. Dist. LEXIS 62836 (S.D.N.Y. June 24, 2010) ...........117

In re Blava In-Line, Inc.,
    133 B.R. 33 (Bankr. S.D.N.Y. 1991)...........................................76

In re Bohlen Enterprises, Ltd.,
    78 B.R. 556 (Bankr. N.D. Iowa 1987)..........................................74

In re Bohlen Enterprises, Ltd.,
    859 F.2d 561 (8th Cir. 1988) .......................................................74

In re Boscia,
    237 B.R. 184 (Bankr. M.D. Fla. 1998) ........................................71

Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.,
    41 N.Y.2d 397 (1977)..................................................................114

Butler v. David Shaw, Inc.,
    72 F.3d 437 (4th Cir. 1996) ....................................................32, 60

Calvin Klein Trademark Trust v. Wachner,
    123 F. Supp. 2d 731 (S.D.N.Y. 2000) ...................................................134

Canterbury Realty and Equip. Corp. v. Poughkeepsie Savings Bank,
    135 A.D.2d 102 (3d Dep't 1988)........................................................122

Casa de Cambio Majapara S.A. de C.V. v. Wachovia Bank, N.A.
    (In re Casa de Cambio Majapara S.A. de C.V.),
    390 B.R. 595 (Bankr. N.D. Ill. 2008) .......................................... 47 fn.15

CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.,
    2009 U.S. Dist. LEXIS 59540 (S.D.N.Y. July 13, 2009).................. 121-22

Chicago v. Envtl. Def. Fund,
    511 U.S. 328 (1994)...........................................................................22

Chipwich, Inc. v. Peltz
    (In re Chipwich, Inc.),
    1993 Bankr. LEXIS 535 (Bankr. S.D.N.Y. Mar. 31, 1993) ........... 64 fn.22

Chrysler Capital Corp. v. Century Power Corp.,
    778 F. Supp. 1260 (S.D.N.Y. 1991) .............................................. 132-33

Cisneros v. Alpine Ridge Group,
    508 U.S. 10 (1993)............................................................................27

Citibank, N.A. v. Plapinger,
    66 N.Y.2d 90 (1985) ................................................................... 100-03

Citibank, N.A. v. Real Coffee Trading Co., N.V.,
    566 F. Supp 1158 (S.D.N.Y. 1983) ...................................................104

Commercial Fin. Servs., Inc. v. Jones
    (In re Commercial Fin. Servs.),
    251 B.R. 397 (Bankr. N.D. Okla. 2000) ..............................................81

Components Direct, Inc. v. European Am. Bank & Trust Co.,
    572 N.Y.S.2d 359 (2d Dep't 1991) ......................................................97

In re Consolidated Capital Equities Corp.,
    143 B.R. 80 (N.D. Tex. Bankr. 1992) ......................................... 26 fn.7

In re Contemporary Indus. Corp.,
    2007 Bankr. LEXIS 4609 (D. Neb. June 29, 2007)..............................139

Contemporary Indus. Corp. v. Frost
    (In re Contemporary Indus. Corp.),
    564 F.3d 981 (8th Cir. 2009) ......................17 fn.4, 47 fn.15, 137-39

Continental Group, Inc. v. Justice,
    536 F. Supp. 658 (D. Del. 1982).......................................................109

Conyers v. Rossides,
    558 F.3d 137 (2d Cir. 2009) ..............................................................27

Copy-Data Sys. Inc. v. Toshiba Am., Inc.,
  755 F.2d 293 (2d Cir. 1985) ..................................................................96

Country World, Inc. v. Imperial Frozen Foods Co.,
  589 N.Y.S.2d 81 (2d Dep't 1992) ..........................................................130

Covey v. Commercial Nat'l Bank of Peoria,
  960 F.2d 657 (7th Cir. 1992) ................................................................21

In re Craig,
  92 B.R. 394 (Bankr. D. Neb. 1988) ......................................................66

Dalton v. Educ. Testing Serv.,
  87 N.Y.2d 384 (1995) ..........................................................................121

In re Davis,
  169 B.R. 285 (E.D.N.Y. 1994) .................................................. 68 fn.23, 69

Davis v. Eastman Kodak Co.,
  2007 U.S. Dist. LEXIS 23193 (W.D.N.Y. Mar. 29, 2007) ....................99

Davis v. Ind. State Police,
  541 F.3d 760 (7th Cir. 2008) ................................................................18

Dean v. Davis,
  242 U.S. 438 (1917) ..........................................................................65-66

In re Derivium Capital LLC,
  437 B.R. 798 (Bankr. D.S.C. 2010) ......................................................18

Dewsnup v. Timm,
  502 U.S. 410 (1992) ..............................................................................81

DiPierro v. Taddeo
  (In re Taddeo),
  685 F.2d 24 (2d Cir. 1982) ......................................................... 140 fn.44

DKR Capital, Inc. v. AIG Int'l West Broadway Fund, Ltd.,
  2003 U.S. Dist. LEXIS 17498 (S.D.N.Y. Oct. 2, 2003) ........................47

Doldan v. Fenner,
  765 N.Y.S.2d 401 (4th Dep't 2003) ......................................................47

E. Equip. & Servs. Corp. v. Factory Point Nat'l Bank, Bennington,
  236 F.3d 117 (2d Cir. 2001) ....................................................... 140 fn.44

Eastern Airlines, Inc. v. Chemical Bank, Inc.,
  1997 U.S. Dist. LEXIS 7380 (S.D.N.Y. 1997) ....................................71

English v. Gen. Elec. Co.,
  496 U.S. 72 (1990) ..............................................................................135

In re Enron Corp.,
  328 B.R. 58 (Bankr. S.D.N.Y. 2005) ................................................66-65

Erickson v. Pardus,
  551 U.S. 89 (2007) ................................................................................18

In re Estate of Kittinger,
    101 N.Y.S.2d 844 (N.Y. Sur. Ct. 1950) ...................................................105

Evergreen Bank v. St. Onge
    (In re St. Onge),
    1996 U.S. Dist. LEXIS 2029 (N.D.N.Y. Feb. 21, 1996).............................42

Fafoutis v. Lyons,
    149 A.D.2d 565 (2d Dep't 1989)...............................................................96

Fantozzi v. Axsus Tech. Inc.,
    2007 U.S. Dist. LEXIS 61448 (S.D.N.Y. Aug. 20, 2007).........................126

Fantozzi v. Axsys Technologies, Inc.,
    2008 U.S. Dist. LEXIS 94040 (S.D.N.Y. Nov. 6, 2008)..........................126

Fasolino Foods Co. v. Banca Nazionale Del Lavoro,
    961 F.2d 1052 (2d Cir. 1992) ......................................................... 121 fn.39

Finkelstein v. Itkowitz & Harwood,
    28 A.D.3d 336, 812 N.Y.S.2d 355 (1st Dep't 2006) .................................99

First Nat'l Bank of Glen Falls v. Myers,
    9 A.D.2d 823 (3d Dep't 1959)..................................................................41

Flores v. Procida Realty & Constr. Corp.,
    4 N.Y.3d 363 (2005)...............................................................................114

Friedrich v. Local No. 780,
    515 F.2d 225 (5th Cir. 1975) ............................................................. 85-86

Forbes v. Forbes,
    191 B.R. 510 (Bankr. R.I. 1996)..............................................................88

Fortunoff v. Triad Land Assocs.,
    906 F. Supp. 107 (E.D.N.Y. 1995) ................................................. 100 fn.34

Fruchtandler v. Green,
    233 A.D.2d 214 (1st Dep't 1996) ...........................................................106

Geltzer v. Artists Mktg. Corp.
    (In re Cassandra Group),
    338 B.R. 583 (Bankr. S.D.N.Y. 2006)....................................................136

Gilbert Frank Corp. v. Federal Ins. Co.,
    70 N.Y.2d 966 (1988).............................................................................118

God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs., LLP,
    6 N.Y.3d 371 (2006)...............................................................................114

Grace v. Sterling, Grace & Co.,
    30 A.D.2d 61 (1st Dep't 1968) .................................................................88

In re Grafton Partners,
    321 B.R. 527 (B.A.P. 9th Cir. 2005) ........................................................30

Great Falls Bank v. Pardo,
  622 A.2d 1353 (N.J. Super. Ct. Ch. Div. 1993)..................................................40

G.T. Schjeldahl Co. v. Local Lodge 1680,
  393 F.2d 502 (1st Cir. 1968)..................................................................................86

In re Gulfport Pilots Ass'n, Inc.,
  434 B.R. 380 (Bankr. S.D. Ms. 2010) ............................................................ 15 fn.3

Harris v. Key Bank Nat'l Assoc.,
  89 F. Supp. 2d 408 (W.D.N.Y. 2000)....................................................................88

Hartman v. Harris,
  1990 U.S. Dist. LEXIS 17078 (S.D.N.Y. Dec. 18, 1990) .....................................140

In re Hecht,
  41 B.R. 701 (Bankr. S.D.N.Y. 1984)......................................................................74

Heller v. Goldin Restructuring Fund, L.P.,
  590 F. Supp. 2d 603 (S.D.N.Y. 2008) ....................................................................42

Helms v. Roti
  (In re Roti),
  271 B.R. 281 (N.D. Ill. 2002) .................................................................................66

Hertzoff v. Diaz,
  533 F. Supp. 2d 470 (S.D.N.Y. 2008) ............................................................ 113-14

Highland Capital Mgmt. LP v. Schneider,
  607 F.3d 322 (2d Cir. 2010) ........................................................................ 95 fn.31

Highland Capital Mgmt. LP v. Chesapeake Energy Corp.
  (In re Seven Seas Petroleum, Inc.),
  522 F.3d 575 (5th Cir. 2008) ...............................................................................137

Hummel v. AstraZeneca LP,
  575 F. Supp. 2d 568 (S.D.N.Y. 2008) ...................................................................99

Hutson v. E.I. du Pont de Nemours & Co.
  (In re Nat'l Gas Distribs.),
  556 F.3d 247 (4th Cir. 2009) .................................................................................45

IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.,
  26 F.3d 370 (2d Cir. 1994) ...................................................................................108

In re Imperial Credit Indus., Inc.,
  527 F.3d 959 (9th Cir. 2008) .................................................................................26

In re Ingersoll,
  90 B.R. 168 (Bankr. W.D.N.C. 1987) .............................................................. 41 fn.13

Int'l Motor Sports Group, Inc. v. Gordon,
  1999 U.S. Dist. LEXIS 12610 (S.D.N.Y. Aug. 16, 1999)......................................128

Int'l Multifoods Corp. v. Commercial Union,
  309 F.3d 76 (2d Cir. 2002) ............................................................................ 86-87

Interbulk, Ltd. v. Louis Dreyfus Corp.
   (In re Interbulk, Ltd.),
   240 B.R. 195 (Bankr. S.D.N.Y. 1999) ........................................ 47 fn.15

In re the IT Group, Inc.,
   359 B.R. 97 (Bankr. D. Del. 2006) ........................................ 18

Italian & French Wine Co. of Buffalo Inc. v. Negociants U.S.A. Inc.,
   842 F. Supp. 693 (W.D.N.Y. 1993) ........................................ 96-97

In re J.A. Jones, Inc.,
   361 B.R. 94 (Bankr. W.D.N.C. 2007) ........................................ 52 fn.17

Jackson v. Mishkin
   (In re Adler, Coleman Clearing Corp.),
   263 B.R. 406 (S.D.N.Y. 2001) ........................................ 32, 46, 54, 68

Johnson v. NBD Park Ridge Bank
   (In re Octagon Roofing),
   124 B.R. 522 (Bankr. N.D. Ill. 1991) ........................................ 42

Joint Venture Asset Acquisition v. Zellner,
   808 F. Supp. 289 (S.D.N.Y. 1992) ........................................ 99

Jones Apparel Group, Inc. v. Polo Ralph Lauren Corp.,
   N.Y.S.2d 409 (1st Dep't 2005) ........................................ 48-49

In re Kaiser,
   722 F.2d 1574 (2d Cir. 1983) ........................................ 63

Kittay v. Flutie N.Y. Corp.
   (In re Flutie),
   310 B.R. 31 (Bankr. S.D.N.Y. 2004) ........................................ 136

Koffman v. Osteoimplant Tech. Inc.,
   182 B.R. 115 (D. Md. 1995) ........................................ 136

Koreag, Controle et Revision S.A. v. Refco F/x Assoc., Inc.
   (In re Koreag, Controle et Revision S.A.),
   961 F.2d 341 (2d Cir. 1992) ........................................ 134

Kovian v. Fulton Cnty. Nat'l Bank & Trust Co.,
   857 F. Supp. 1032 (N.D.N.Y. 1994) ........................................ 104, 119

Lamie v. U.S. Trustee,
   540 U.S. 526 (2004) ........................................ 23

In re Laminated Veneers Co.,
   471 F.2d 1124 (2d Cir. 1973) ........................................ 91

Layne v. Bank One, Kentucky, N.A.,
   395 F.3d 271 (6th Cir. 2005) ........................................ 88

In re Lehman Bros. Holdings, Inc.,
   433 B.R. 101 (Bankr. S.D.N.Y. 2010) ........................................ 27 fn.8

In re Lehman Bros. Holdings, Inc.,
    404 B.R. 752 (Bankr. S.D.N.Y. 2009).................................................84

Linzer Prods. Corp. v. Sekar,
    499 F. Supp. 2d 540 (S.D.N.Y. 2007) .......................................125

Lipsky v. Commonwealth United Corp.,
    551 F.2d 887 (2d Cir. 1976) ..............................................................47

Liquidating Trust of U.S. Wireless Corp., Inc. v. Bhatnagar
    (In re U.S. Wireless Corp.),
    333 B.R. 688 (Bankr. D. Del. 2005)............................... 139 fn.43

In re Liquidation of N.Y. Sur. Co.,
    728 N.Y.S.2d 915 (Sup. Ct. Nassau County 2001) ................113

Lohr v. Medtronic Inc.,
    518 U.S. 470 (1996).........................................................................135

In re Loranger Mfg. Corp.,
    324 B.R. 575 (W.D. Pa. 2005)....................................... 139 fn.43

In re M. Fabrikant & Sons, Inc.,
    394 B.R. 721 (Bankr. S.D.N.Y. 2008).........................................25

In re MarketXT Holdings Corp.,
    361 B.R. 369 (S.D.N.Y. 2007) ...................................................106

In re Marta Cooperative, Inc.,
    74 Misc. 2d 612 (N.Y. County Ct. 1973) ..................................91

Majestic Farms Supply Ltd. v. Serv. Riding Apparel Ltd.,
    524 N.Y.S.2d 245 (2d Dep't 1988) ..............................................97

Mallon Resources Corp. v. Midland Bank,
    1997 U.S. Dist. LEXIS 10346 (S.D.N.Y. July 17, 1997).......122

Matter of Fasano/Harriss Pie Co.,
    43 B.R. 864 (Bankr. Mich. 1984) ................................. 41 fn.13

Matter of S & W Exporters, Inc.,
    16 B.R. 941 (Bankr. S.D.N.Y. 1982).................62, 69-70, 69 fn.24

In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litig.,
    399 F. Supp. 2d 242 (S.D.N.Y. 2005) .......................................99

Metro. Life Ins. Co. v. RJR Nabisco, Inc.,
    716 F. Supp. 1504 (S.D.N.Y. 1989) ............................. 121 fn.39

In re Metromedia Fiber Network, Inc.,
    335 B.R. 41 (Bankr. S.D.N.Y. 2005)...........................................87

Mfrs. Hanover Trust Co. v. Restivo,
    564 N.Y.S.2d 141 (1st Dep't 1991)............................................102

Mfrs. Hanover Trust Co. v. Yanakas,
    7 F.3d 310 (2d Cir. 1993) ............................................ 100 fn.33, 102

Midwest Corp. v. Global Cable, Inc.,
 688 F. Supp. 872 (S.D.N.Y. 1988) ............................................ 103 fn.35

Mitchell v. Forsyth,
 472 U.S. 511 (1985).............................................................. 16-17

MNC Comm. Corp. v. Joseph T. Ryerson & Son, Inc.,
 882 F.2d 615 (2d Cir. 1989) ..................................... 41 fn.13, 76

In re Modafferi,
 45 B.R. 370 (S.D.N.Y. 1985) ...........................................................85

Municipal Consultants & Publishers, Inc. v. Ramapo,
 47 N.Y.2d 144 (1979) ...................................................................114

In re Nirvana Rest. Inc.,
 337 B.R. 495 (Bankr. S.D.N.Y. 2006)..........................................25

In re N.Y. Sur. Co.,
 96 N.Y.2d 719 (2001)...................................................................113

New Hampshire v. Maine,
 532 U.S. 742 (2001) ............................................................. 5 fn.17

N.J. Steel Corp. v. The Bank of N.Y.,
 1997 U.S. Dist. LEXIS 18137 (S.D.N.Y. 1997)........................141

Newfield v. Ettlinger,
 194 N.Y.S.2d 670 (N.Y. Sup. Ct. 1959)......................................65

Newfield v. Ettlinger,
 10 A.D.2d 947 (1st Dep't 1960) .................................................65

Nisselson v. Ford Motor Co.
 (In re Monahan Ford Corp.),
 340 B.R. 1 (Bankr. E.D.N.Y. 2006) ..........................................144

Novak v. Kasaks,
 216 F.3d 300 (2d Cir. 2000) ....................................................128

Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del. Inc.
 v. Fleet Retail Fin. Group,
 274 B.R. 71 (D. Del. 2002)............................................... 137-39

Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark
 (In re Nat'l Forge Co.),
 344 B.R. 340 (W.D. Penn. 2006)..................................................24

Ogunsanya v. Langmuir,
 2008 U.S. Dist. LEXIS 74376 (E.D.N.Y. Sept. 26, 2008) ........130

In re Operation Open City Inc.,
 148 B.R. 184 (Bankr. S.D.N.Y. 1992).........................................76

Padilla v. Yoo,
 633 F. Supp. 2d 1005 (N.D. Cal. 2009) ............................... 16-17

Pan Am Corp. v. Delta Air Lines, Inc.,
        175 B.R. 438 (S.D.N.Y. 1994) ............................................................142

Pani v. Empire Blue Cross Blue Shield,
        152 F.3d 67 (2d Cir. 1996) ...................................................................18

In re Park South Sec., LLC,
        326 B.R. 505 (Bankr. S.D.N.Y. 2005)....................................................63

PDL Vitari Corp. v. Olympus Indus. Inc.,
        718 F. Supp. 197 (S.D.N.Y. 1989) ......................................................140

Pepper v. Litton,
        308 U.S. 295 (1939)................................................................ 144 fn.46

Peregrine Fixed Income, Ltd. v. JP Morgan Chase Bank,
        2006 U.S. Dist. LEXIS 8766 (S.D.N.Y. Jan. 26, 2006) ..........................42

Pertuso v. Ford Motor Credit Co.,
        233 F.3d 417 (6th Cir. 2000) ....................................................... 140 fn.44

Preferred Equities Corp. v. Ziegelman,
        190 A.D.2d 784 (2d Dep't 1993).................................................. 100 fn.34

Proteus Books Ltd. v. Cherry Lane Music Co.,
        873 F.2d 502 (2d Cir. 1989) ................................................................119

QSI Holdings, Inc. v. Alford,
        382 B.R. 731 (W.D. Mich. 2007) .............................................. 29-32, 46

QSI Holdings, Inc. v. Alford,
        571 F.3d 545 (6th Cir. 2009) ...............................................................32

In re Quality Stores, Inc.,
        355 B.R. 629 (Bankr. W.D. Mich. 2006) ...............................................30

Rajbhandari v. Shah,
        2006 U.S. Dist. LEXIS 894 (S.D.N.Y. Jan. 12, 2006) ...........................114

Reale v. Reale,
        485 F. Supp. 2d 247 (W.D.N.Y. 2007)..................................................132

Rector v. Calamus Group, Inc.,
        794 N.Y.S.2d 470 (3d Dep't 2005) .......................................................114

Reliastar Life Ins. Co. of N.Y. v. Home Depot U.S.A., Inc.,
        570 F.3d 513 (2d Cir. 2009) ...................................................... 100 fn.33

In re Revco D.S.,
        1990 Bankr. LEXIS 2966 (Bankr. D. Ohio Dec. 17, 1990) ......................25

Revson v. Cinque & Cinque, P.C.,
        221 F.3d 59 (2d Cir. 2000) ...................................................................42

Rexnord Holdings, Inc. v. Bidermann,
        21 F.3d 522 (2d Cir. 1994) ...................................................................76

Robb v. Vos,
    155 U.S. 13 (1894)..................................................................108

Rosener v. Majestic Mgmt.,
    (In re OODC, LLC),
    321 B.R. 128 (Bankr. D. Del. 2005).....................................144

Rubin v. Manufacturers Hanover Trust Co.,
    661 F.2d 979 (2d Cir. 1981) .............................................. 21-22

In re Saba Enters., Inc.,
    421 B.R. 626 (Bankr. S.D.N.Y. 2009)....................................63

Santa Fe Pointe, LP v. Greystone Servicing Corp.,
    2009 U.S. Dist. LEXIS 42469 (N.D. Cal. May 19, 2009)........101

Schietinger v. Tauscher Cronacher Prof'l Eng'rs, P.C.,
    40 A.D.3d 954, 838 N.Y.S.2d 95 (2d Dep't 2007)................114

Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.
    (In re Sec. Investor Prot. Corp.),
    234 B.R. 293 (Bankr. S.D.N.Y. 1999)............................... 63-64

Second Pa. Real Estate Corp. v. Papercraft Corp.
    (In re Papercraft Corp.),
    126 B.R. 926 (Bankr. W.D. Pa. 1991)...................................109

In re Semcrude,
    399 B.R. 388 (Bankr. D. Del. 2009).................................. 41 fn.13

Shammas v. Merchants Nat'l Bank,
    1990 U.S. Dist. LEXIS 19334 (D. Mass. Nov. 9, 1990) .........41

Shapiro v. Wilgus,
    287 U.S. 348 (1932)................................................................66

Shepherd v. Bering Sea Originals,
    578 P.2d 587 (Alaska 1978) ...................................................41

Shugrue v. Chemical Bank
    (In re Ionosphere Clubs, Inc.),
    177 B.R. 198 (Bankr. S.D.N.Y. 1995).....................................79

Silverman v. K.E.R.U. Realty Corp.
    (In re Allou Distribs., Inc.),
    379 B.R. 5 (Bankr. E.D.N.Y. 2007) .................................. 64 fn.22

Sims v. First Consumer Nat'l Bank,
    303 A.D.2d 288 (1st Dep't 2003)..........................................127

Smith v. Duffey,
    576 F.3d 336, 340 (7th Cir. 2009) ...........................................17

Smith v. Fed. Reserve Bank of N.Y.,
    280 F. Supp. 2d 314 (S.D.N.Y. 2003) .....................................27

Smith v. Fed. Reserve Bank of N.Y.,
    346 F.3d 264 (2d Cir. 2003) .................................................................28

Sosnoff v. Carter,
    165 A.D.2d 486 (1st Dep't 1991) ............................... 95 fn.31, 105

Stamelman v. Fleishman-Hillard, Inc.,
    2003 U.S. Dist. LEXIS 13328 (S.D.N.Y. July 31, 2003) ...............130

State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada,
    374 F.3d 158 (2d Cir. 2004) ........................................................ 120-21

Sterling Nat'l Bank v. Goldberg,
    277 A.D.2d 45 (1st Dep't 2000) ................................................................97

Superintendent of Ins. v. Ochs
    (In re First Cent. Fin. Corp.),
    377 F.3d 209 (2d Cir. 2004) ...................................................... 132-33

In re S.W. Bach & Co.,
    425 B.R. 78 (Bankr. S.D.N.Y. 2010) .......................................................32

Swersky v. Dreyer & Traub,
    643 N.Y.S.2d 33 (S. Ct. N.Y. 1996) .......................................................130

Taylor v. Vt. Dep't of Educ.,
    313 F.3d 768 (2d Cir. 2002) .......................................................................11

Tese-Milner v. TPAC, LLC
    (In re Ticketplanet.com),
    313 B.R. 46 (Bankr. S.D.N.Y. 2004) .............................. 141, 141 fn.45

Thrifty Oil Co. v. Bank of Am. Nat'l Trust and Sav. Ass'n,
    322 F.3d 1039 (9th Cir. 2003) ....................................... 17 fn.4, 47 fn.15

Tierney v. Capricorn Invs.,
    189 A.D.2d 629 (1st Dep't 1993) ....................................................... 95-96

In re Topcor, Inc.,
    132 B.R. 119 (Bankr. N.D. Tex. 1991) ....................................................32

In re Trace Int'l Holdings, Inc.,
    287 B.R. 98 (Bankr. S.D.N.Y. 2002) ................................................ 26 fn.7

In re Tronox,
    429 B.R. 73 (Bankr. S.D.N.Y.) ................................................................62

UBS AG Stamford Branch v. HealthSouth Corp.,
    645 F. Supp. 2d 135 (S.D.N.Y. 2008) ............................... 99 fn.32, 101

United States v. Whiting Pools,
    462 U.S. 198 (1983) .................................................................................72

U.S. Bank Nat'l Assoc. v. PMCC Calpine New England Investment LLC,
    2006 U.S. Dist. LEXIS 38708 (S.D.N.Y. June 12, 2006) ......................88

U.S. Gypsum Co. v. Nat'l Gypsum Co.,
    352 U.S. 457 (1957)..............................................................108, 133

Valley Nat'l Bank v. Greenwich Ins. Co.,
    254 F. Supp. 2d 448 (S.D.N.Y. 2003) ..............................102-03

VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.,
    594 F. Supp. 2d 334 (S.D.N.Y. 2008) ...............................118-19

VKK Corp. v. Nat'l Football League,
    244 F.3d 114 (2d Cir. 2001) ............................................106

Wallace v. Merrill Lynch Capital Svcs. Inc.,
    2005 N.Y. Slip. Op. 52076U (Sup. Ct. N.Y. Cty. Dec. 14, 2005)...................123-24

Wallace v. Merrill Lynch Capital Svcs. Inc.,
    2006 N.Y. Op. 3807 (1st Dep't 2006) ..............................124

Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.,
    1997 U.S. Dist. LEXIS 17217 (S.D.N.Y. Nov. 4, 1997).................121 fn.39

Wells Fargo Bank Minn., N.A. v. Nassau Broad. Partners, L.P.,
    2002 U.S. Dist. LEXIS 17191 (S.D.N.Y. Sept. 12, 2002)..............100 fn.33

Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A.,
    247 F. Supp. 2d 352 (S.D.N.Y. 2002) ..............................100 fn.34

Wieboldt Stores, Inc. v. Schottenstein,
    94 B.R. 488 (N.D. Ill. 1988) ........................................62

Wight v. BankAmerica Corp.,
    219 F.3d 79 (2d Cir. 2000) ............................................128 fn.40

Williams v. Morgan Stanley Capital Corp.
(In re Olympic Natural Gas Co.),
    294 F.3d 737 (5th Cir. 2002) ...............................17 fn.4, 47 fn.15

In re Worldcom, Inc.,
    361 B.R. 697 (S.D.N.Y. 2007) ........................................52 fn.17

Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.,
    341 F. Supp. 2d 258 (S.D.N.Y. 2004) ..............................126-27

## STATUTES

11 U.S.C. § 101.............................................................21, 45, 54

11 U.S.C. § 105.............................................................12

11 U.S.C. § 330.............................................................23

11 U.S.C. § 362.............................................................76-79, 77 fn. 26

11 U.S.C. § 363.............................................................71

11 U.S.C. § 502.............................................................passim

11 U.S.C. § 524.................................................................140 fn.44

11 U.S.C. § 541.............................................................71-72, 137

11 U.S.C. § 542......................................................70-73, 76, 81

11 U.S.C. § 544................................................................_passim_

11 U.S.C. § 545.................................................................19, 27

11 U.S.C. § 546..................................................................passim

11 U.S.C. § 547.............................................................19, 27, 80

11 U.S.C. § 548..............................................................._passim_

11 U.S.C. § 550.............................................................25, 80-81

11 U.S.C. § 553..............................................................._passim_

11 U.S.C. § 558......................................................................109

11 U.S.C. § 560.........................................................27 fn.8, 77

11 U.S.C. § 741..............................................................52 fn.17

12 U.S.C. § 1828.....................................................................26

Bankruptcy Act of 1898, ch. 541, § 67(e), 30 Stat. 544, 564 (1898) .........................23

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005,
    Pub. L. No. 109-8, § 753, 119 Stat. 23, 182 (2005)...........................23

Chandler Act, ch. 575, § 67d, 52 Stat. 840, 877-78 (1938) ..............22, 33, 69 fn.24

N.Y. Debt. & Cred. Law § 273 ................................................26 fn.7

N.Y. Debt. & Cred. Law § 274 ....................................................25

NY Gen. Oblig. Law § 5-1105 ....................................................98

NY UCC § 9-102 ......................................................................92

NY UCC § 9-104 .................................................................90-91

NY UCC § 9-203 ......................................................................83

NY UCC § 9-204 ......................................................................84

NY UCC § 9-205 ......................................................................83

NY UCC § 9-207 .................................................................87-89

NY UCC § 9-315 ......................................................................92

NY UCC § 9-332 .................................................................84, 92

NY UCC § 9-601 ......................................................................90

Terror Risk Insurance Act,
    Pub. L. No. 107-297, § 201, 116 Stat. 2322 (2002)...............27-28, 28 fn.9

# RULES

Federal R. Bankr. P. 3007.................................................................... 15 fn.3

Federal R. Bankr. P. 7008........................................................................108

Federal R. Bankr. P. 7012.........................................................................11

Federal R. Civ. P. 8................................................ 18, 73, 107-08, 133

Federal R. Civ. P. 9(b) ................................................................... passim

Federal R. Civ. P. 12(b)(6) ..................................................................11, 47

# OTHER AUTHORITIES

5 Lawrence P. King, Collier on Bankruptcy (15th ed. Rev. 2000)................................................68

5 Lawrence P. King, Collier on Bankruptcy (16th ed. Rev. 2010)..................................... 41 fn.13

25 Am. Jur. 2d Duress and Undue Influence § 36 (2010) .............................................69

136 Cong. Rec. S7536 (daily ed. June 6, 1990) ...........................................................55

Bankruptcy of Commodity and Securities Brokers: Hearing Before the
Subcomm. on Monopolies and Commercial Law of the H. Comm. on the
Judiciary, 97th Cong., 1st Sess. (1981) ............................................. 30-31

Bankruptcy Treatment of Swap Agreements and Forward Contracts: Hearing
Before the Subcomm. on Economic and Commercial Law of the H. Comm.
of the Judiciary, 101st Cong. (1990) ..................................................... 54-55

Black's Law Dictionary 811 (9th ed. 2009) ........................................ 36 fn.11

David Gray Carlson, The Logical Structure of Fraudulent Transfers and
Equitable Subordination,
45 Wm. & Mary L. Rev. 157, 184 (2003) ...............................................33

H.R. Rep. No. 109-31, pt. 1, at 122 (2005)
reprinted in 2005 U.S.C.C.A.N. 88, 183...............................................49

H.R. Rep. No. 109-31, pt. 1, at 129 (2005)
reprinted in 2005 U.S.C.C.A.N. 88, 189...............................................55

Jack F. Williams, The Fallacies of Contemporary Fraudulent Transfer
Models as Applied to Intercorporate Guaranties: Fraudulent Transfer Law
as a Fuzzy System,
15 Cardozo L. Rev. 1403, 1411-17 (1994)..............................................33

Kenneth C. Kettering, Securitization and Its Discontents,
29 Cardozo L. Rev. 1553 (2008) ............................................................23

Nat'l Bankr. Conference, Analysis of H.R. 12889, 74th Cong., 2d Sess. (1936) ........................33

Restatement (Second) of Torts §8A (1965)......................................... 66-67

Restatement of Security § 17 (1941) ......................................................88

Plaintiffs Lehman Brothers Holdings Inc. ("LBHI"; together with its subsidiaries and affiliates "Lehman") and the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. (the "Committee"; together with LBHI, "Plaintiffs") respectfully submit this opposition to the motion of JPMorgan Chase Bank, N.A. ("JPMorgan") to dismiss Plaintiffs' First Amended Complaint (the "Amended Complaint" or "Am. Compl."). For the reasons discussed below, the motion should be denied in its entirety.

## PRELIMINARY STATEMENT

In the weeks immediately before LBHI filed for bankruptcy, JPMorgan used the immense leverage it had as the clearing bank for Lehman's broker-dealer business to acquire unprecedented guaranties from LBHI and extract billions of dollars of LBHI assets. JPMorgan's purpose in making these demands was not to protect itself legitimately, as it now asserts, but to catapult itself ahead of LBHI's other creditors and gain an enormous reserve of collateral to draw upon for any claim it hoped to assert upon an LBHI bankruptcy. JPMorgan now argues it is entitled to apply the billions of dollars of assets it extracted from LBHI to satisfy itself dollar-for-dollar for any and all claims JPMorgan or any of its affiliates have against any LBHI subsidiary – from banking service fees to inflated claims under derivatives contracts that JPMorgan acquired after LBHI's bankruptcy.

None of the concessions demanded from LBHI were required to facilitate clearance or derivatives activity. JPMorgan did not have any right under the parties' clearance or derivatives contracts to demand additional excess collateral from LBHI or to terminate those contracts if its demands were not met. And prior to JPMorgan's most egregious demands in September 2008, JPMorgan had itself determined it held more than sufficient collateral to

support its clearance-related extensions of credit to Lehman, and had further agreed that it <u>owed</u> Lehman $1 billion under the parties' derivatives contracts.

As JPMorgan learned information about Lehman's financial condition from Lehman and U.S. regulators, JPMorgan used its leverage as Lehman's clearance agent to extract a limitless guaranty from LBHI for all obligations of the Lehman subsidiaries to JPMorgan or any of its affiliates, across the entire range of business between the firms (the "September Guaranty"), and to demand billions of dollars of LBHI assets to support that guaranty. JPMorgan did so notwithstanding its knowledge that LBHI desperately needed to maximize its liquidity during this critical week. LBHI was forced to comply with JPMorgan's demands under the threat that JPMorgan would otherwise breach its contractual obligation to continue as Lehman's clearance agent. Both parties knew that JPMorgan's threat, if carried through, would have caused the immediate collapse of Lehman's business. JPMorgan then refused LBHI's repeated requests for return of its assets on LBHI's last day of business, Friday, September 12, 2008, and throughout the following weekend, even though JPMorgan knew that LBHI desperately needed those assets to stave off a bankruptcy filing and, as JPMorgan has since admitted, it "had little or no clearance-related exposure" to Lehman at that time.

JPMorgan argues that its rapacious conduct is protected by the Bankruptcy Code's safe harbor provisions. Section 546 of the Bankruptcy Code specifically protects from avoidance certain transfers made in connection with defined securities contracts, repurchase agreements or swap agreements. Congress crafted the safe harbor provisions to ensure that the bankruptcy of one major market participant would not result in the systemic failure of the country's financial markets resulting from unwinds of interconnected transfers. The safe harbors do not, however, allow one creditor to use its leverage to extract money and commitments to

alter the priority of payments after bankruptcy. And they were certainly not designed to protect eleventh-hour concessions extracted through the use of misrepresentations and coercion, all for the purpose of bypassing existing derivatives contracts and manufacturing a windfall to be realized upon a debtor's bankruptcy.

In particular, JPMorgan does little to justify extending the safe harbors to the most important contracts in this case – the two guaranties that LBHI executed in the month before its bankruptcy that together purport to require LBHI to pay JPMorgan for any and all debts of LBHI's subsidiaries. In the guaranty executed in August 2008 (the "August Guaranty"), LBHI purported to guarantee the clearance-related liabilities of LBI and certain other LBHI subsidiaries, and pursuant to the security agreement entered into as part of that transaction (the "August Security Agreement"), LBHI granted a lien over two specific LBHI accounts as security for the August Guaranty. In the guaranty entered into the week before the LBHI bankruptcy, (the "September Guaranty"), which JPMorgan demanded be executed prior to Lehman's September 10 earnings call, LBHI purported to guarantee any claim whatsoever of JPMorgan against any LBHI subsidiary (together with the August Guaranty, the "Guaranties"), and pursuant to a simultaneously executed security agreement (the "September Security Agreement"), LBHI purported to grant a lien over defined LBHI accounts as security for that guaranty (together with the August Security Agreement, the "Security Agreements"). These critical Guaranties are subject to myriad defenses and challenges to their enforcement.

First and foremost, the Guaranties are subject to avoidance because the incurrence of these obligations was constructively fraudulent as to creditors under sections 544 and 548 of the Bankruptcy Code. LBHI incurred these obligations when it was insolvent and/or undercapitalized and did not receive reasonably equivalent value. Although JPMorgan attempts

to argue that obligations such as these should have been included in the language of section 546's safe harbor provisions, section 546 only safe harbors certain transfers to financial institutions; it does not safe harbor the incurrence of obligations. Moreover, none of the goals that motivated passage of the safe harbor provisions justify reading terms into section 546 that Congress intentionally omitted. Plaintiffs are thus entitled to seek avoidance of these Guaranties executed on the eve of bankruptcy, which purport to override the Bankruptcy Code's rules regarding priority of payment and elevate one overreaching creditor over all others.

Without the Guaranties, JPMorgan is not entitled to use LBHI's assets to satisfy itself for the debts of LBHI's subsidiaries. The liens on LBHI's collateral purported to secure LBHI's obligations under the Guaranties. The parties did not intend to grant free-standing liens wholly separate from the Guaranties that would give JPMorgan the right to use LBHI assets to satisfy its claims against LBHI's subsidiaries in the absence of any contractual obligation for LBHI to do so. This is clear from the language of the Security Agreements, which do not even define the liabilities secured except by reference to the Guaranties. It is also clear from the interconnectedness of the Security Agreements and the Guaranties, which were executed as part of the same transactions and repeatedly cross-reference each other. In any event, to the extent there is any question of what the parties intended in this regard, the issue should be decided after discovery, and not on the pleadings.

Separate and apart from the distinction between obligations and transfers, neither section 546 nor any of the other safe harbor provisions apply to any of the September Agreements, or the $8.6 billion of LBHI cash and cash equivalents posted pursuant thereto. Section 546's safe harbors protect only transfers made pursuant to defined securities contracts, repurchase agreements or swap agreements. They do not extend to contracts such as the

overreaching September Agreements and related collateral transfers that purported to create a collateral pool that JPMorgan could apply against any and all obligations of any Lehman subsidiary that could arise upon bankruptcy.

The Guaranties and their related Security Agreements and collateral transfers are also not safe harbored because they were executed and made with the actual intent to hinder, delay and defraud creditors. The Amended Complaint pleads these actual fraudulent conveyance claims under section 548 through badges of fraud, as well as the inevitability that LBHI's ceding its last liquidity to JPMorgan while insolvent and facing imminent bankruptcy would have the effect of hindering and delaying its many other creditors. Moreover, the Amended Complaint pleads facts sufficient to show that JPMorgan so controlled and coerced LBHI to enter into the agreements and make the collateral transfers, all to get ahead of other creditors after a Lehman bankruptcy, that its intent can be imputed to LBHI under section 548.

The critical September Agreements, which JPMorgan now relies upon as the basis for asserting a host of claims against the LBHI estate, are further invalid and unenforceable because they were the product of unlawful threats, were unsupported by consideration, and JPMorgan knew the LBHI employee that signed the September Guaranty had no authority to do so. The Amended Compliant pleads more than sufficient facts to establish that these contracts are invalid and unenforceable according to these bedrock common law principles as well.

Even if the September Agreements were valid, however, JPMorgan would have no right to at least the billions of dollars in cash that LBHI deposited during its last week. As JPMorgan admits, it transferred those funds from Lehman's deposit account to JPMorgan's own general ledger account immediately upon receipt, in the absence of any default that would have justified foreclosure on this collateral. Because both the August Security Agreement and the

September Security Agreement specify that JPMorgan's lien on LBHI property is limited to funds held in certain defined LBHI accounts, JPMorgan has no lien with respect to those funds. This unilateral act by JPMorgan, along with JPMorgan's refusal to return the billions in cash and securities, also substantiate the Amended Complaint's numerous claims for unjust enrichment, conversion, breaches of contract and breaches of the covenant of good faith and fair dealing.

The Amended Complaint also establishes independent claims for coercion and duress with respect to JPMorgan's use of unlawful threats to force LBHI to enter the September Agreements and to comply with exorbitant, eleventh-hour collateral demands. It further sets forth claims for fraud and constructive trust with respect to JPMorgan's false promise that it would return LBHI's $5 billion of cash at the close of business on September 12, 2008, made to induce LBHI to post what was essentially its last $5 billion to JPMorgan on the final business day before LBHI's bankruptcy. Finally, the Amended Complaint establishes that JPMorgan's misconduct justifies equitably subordinating its claims against the LBHI estate to those of other LBHI creditors.

All of these claims in the Amended Complaint are supported by the factual allegations asserted therein, which must be accepted as true and received in the light most favorable to Plaintiffs on this motion to dismiss. JPMorgan's motion to dismiss the Amended Complaint should be denied.

# STATEMENT OF FACTS

**I.     JPMorgan Acts as LBI's Clearing Bank for Eight Years**

Prior to its bankruptcy, JPMorgan was Lehman's primary bank, and among its many roles, JPMorgan served as the principal clearing bank for LBHI's U.S. broker-dealer subsidiary, Lehman Brothers Inc. ("LBI"). (Id. ¶¶ 3, 16). LBI's ability to buy and sell securities quickly was an essential feature of Lehman's business, and could not be accomplished without JPMorgan's clearing services. (Id. ¶¶ 15, 16).

JPMorgan acted as clearing bank pursuant to a Clearance Agreement entered into with LBI on June 15, 2000 (the "2000 Clearance Agreement"). (Id. ¶ 19). As expressly provided under the 2000 Clearance Agreement, JPMorgan extended daily credit to LBI to cover its exposure for processing trades. (Id. ¶ 21). JPMorgan's security for this credit was limited to LBI's collateral – LBHI was neither a user of JPMorgan's clearance services nor a guarantor of LBI's obligations under the 2000 Clearance Agreement. (Id. ¶¶ 18, 22, 23).

**II.    The August Agreements**

After operating under the original 2000 Clearance Agreement for eight years, in August 2008 JPMorgan required that LBHI guarantee LBI's obligations under that agreement, as well as the clearing obligations of other Lehman subsidiaries that were added as parties to that agreement. (Id. ¶ 28). The new documents included the August Guaranty and August Security Agreement, as well as an amendment to the 2000 Clearance Agreement (the "August Amendment," collectively, the "August Agreements"). (Id.). The August Security Agreement gave JPMorgan a lien over specific LBHI accounts at JPMorgan. (Id. ¶ 30). The parties similarly agreed that LBHI's maximum liability under the August Guaranty would be limited to the value of LBHI collateral held by JPMorgan (measured on a daily basis) in the two specified

accounts subject to JPMorgan's lien. (Id.). The parties also included a provision that confirmed LBHI's right to access its collateral at the end of each trading day. (Id. ¶ 31).

While the August Agreements purported to give JPMorgan significant new rights against LBHI, LBHI received nothing in exchange. (Id. ¶ 33). LBHI itself did not use any of JPMorgan's clearance services. (Id. ¶¶ 18, 22-23). Further, LBHI did not receive reasonably equivalent value from guaranteeing its subsidiaries' obligations because, among other things, certain of those subsidiaries, including LBI, were insolvent at the time the August Agreements were entered into. (Id. ¶ 33).

## III.    JPMorgan Demands That LBHI Enter Into the September Agreements

On September 9, 2008, LBHI announced that it would release its preliminary earnings report for the third fiscal quarter of 2008 on September 10, 2008, at 7:30 a.m. (Id. ¶ 41). Given its unique access to Lehman and its affairs, JPMorgan knew what Lehman was going to announce to the market. (Id. ¶¶ 41, 44). In advance of that call, JPMorgan required LBHI to enter into a new series of agreements to ensure that JPMorgan would get paid dollar-for-dollar by LBHI ahead of all other creditors in the event of a Lehman bankruptcy – not just for LBI's clearance obligations, but for all possible claims against any Lehman subsidiary of any kind. (Id. ¶ 46). During the night of September 9, 2008, JPMorgan forwarded the September Guaranty, the September Security Agreement, a further amendment to the 2000 Clearance Agreement (the "September Amendment"), and an "Account Control Agreement" (the "Account Control Agreement"; collectively, the "September Agreements") to LBHI. (Id.). JPMorgan executives led LBHI personnel to believe that, if LBHI did not execute the proposed agreements before that earnings call, JPMorgan would immediately stop extending intra-day credit to, and clearing trades for, LBI. (Id. ¶¶ 47, 48). All parties knew that if JPMorgan carried out its threat, Lehman's entire business would immediately collapse. (Id. ¶ 49).

Pursuant to the September Agreements, JPMorgan required that LBHI guarantee and secure <u>all</u> exposures of <u>all</u> JPMorgan entities to <u>all</u> Lehman entities, without regard to the nature or source of such obligations, and to convert all unsecured and unguaranteed exposures into guaranteed and secured exposures. (<u>Id.</u> ¶ 51). While the September Agreements purported to give JPMorgan significant new rights vis-à-vis LBHI, they gave LBHI nothing in exchange. (<u>Id.</u> ¶ 56). Instead, JPMorgan's obligations would remain the same as they were under its clearance-related agreements with Lehman prior to September 9, 2008. (<u>Id.</u>). In addition, at that time, LBHI and certain of its subsidiaries were insolvent and only days away from bankruptcy. (<u>Id.</u> ¶ 60).

## IV.    JPMorgan Demands an Additional Collateral Cushion

Prior to execution of the September Agreements, JPMorgan concluded it was more than fully collateralized against intra-day clearing risk related to LBI and the other Lehman trading subsidiaries. (<u>Id.</u> ¶ 45). Nevertheless, from September 9 through September 11, 2008, JPMorgan demanded and received $1.9 billion of cash and $1.7 billion of money market funds from LBHI. (<u>Id.</u> ¶ 66). JPMorgan has since claimed that these billions of dollars in collateral demands were based primarily on the possibility of closing out derivatives contracts on favorable terms in the event of an LBHI bankruptcy – not in connection with any exposure under the 2000 Clearance Agreement, as represented to LBHI at the time. (<u>Id.</u> ¶ 62). This collateral grab was particularly egregious because, at the time, the JPMorgan entities had no right to demand additional collateral from the LBHI subsidiaries under the derivatives contracts themselves. In fact, on a net basis, the LBHI subsidiaries were "in-the-money" under those contracts, and JPMorgan had been obliged to post approximately $1 billion to the LBHI subsidiaries as collateral to cover those obligations. (<u>Id.</u> ¶ 63).

9

Then, late in the evening of September 11, 2008, JPMorgan e-mailed to LBHI a written "Notice" requiring confirmation that LBHI would wire to JPMorgan an additional $5 billion in cash prior to the open of business on Friday, September 12, 2008. (Id. ¶ 67). In the Notice, JPMorgan threatened that, if it did not receive the demanded additional collateral, "we intend to exercise our right to decline to extend credit to you under the [Clearance] Agreement." (Id.). Notwithstanding this reference to clearance-related extensions of credit, internal JPMorgan documents reveal that it made its last demand for $5 billion because it desired an "extra cushion" that could be applied to any and all claims against any Lehman entity. (Id. ¶ 69). In response to protests from LBHI, and to further induce LBHI to accede to this demand, JPMorgan's Chief Executive Officer Jamie Dimon promised Lehman's Chairman Richard Fuld that JPMorgan would return the $5 billion at the end of the day on Friday, September 12, 2008, after all trades had cleared and settled. (Id. ¶ 70). However, to prevent LBHI from withdrawing its previous cash collateral deposits, JPMorgan had already transferred those funds to its own general ledger account immediately upon receipt, and JPMorgan had no intention of returning either the previous deposits or the demanded $5 billion. (Id. ¶¶ 70, 72).

On September 12, 2008, LBHI delivered what was essentially its last available $5 billion of cash to JPMorgan. (Id. ¶ 71). As with each of the prior LBHI cash deposits totaling $1.9 billion, JPMorgan immediately swept LBHI's $5 billion deposit out of the LBHI account on which JPMorgan purportedly had a lien and into JPMorgan's own general ledger account, in order to ensure that LBHI would be unable to access its funds. (Id. ¶ 72).

## V. JPMorgan Prevents LBHI's Access to Its Cash and Other Collateral Held by JPMorgan, and LBHI Is Forced to File for Bankruptcy

As of the close-of-trading on Friday, September 12, 2008, JPMorgan had no clearance exposure whatsoever to Lehman. (Id. ¶ 73). That day, and throughout the following

weekend, LBHI repeatedly requested access to the excess collateral held by JPMorgan. (Id. ¶ 74). However, JPMorgan management gave orders not to allow LBHI to access its collateral, or to otherwise allow any LBHI cash or securities to be sent out from JPMorgan, for any reason. (Id. ¶ 75). JPMorgan's demands for and receipt of the billions of dollars in collateral, and its refusal to allow LBHI to access its own assets, contributed to the exigency of LBHI's bankruptcy filing, and thus caused losses of tens of billions of dollars by preventing Lehman from engaging in pre-filing measures to preserve estate value. (Id. ¶¶ 79, 80).

## LEGAL STANDARD

JPMorgan moves to dismiss this action under Federal Rule of Civil Procedure 12(b)(6), made applicable to this adversary proceeding by Rule 7012 of the Federal Rules of Bankruptcy Procedure. In deciding this motion, all facts stated in the Amended Complaint are assumed to be true, with all reasonable inferences drawn in Plaintiffs' favor. Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002) ("In ruling on a Rule 12(b)(6) motion, we accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party."). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

Despite this settled law, JPMorgan's memorandum of law in support of its motion to dismiss (the "Moving Brief" or "Mov. Brief") repeatedly refers to and relies upon its own factual allegations beyond the scope of the Amended Complaint. Indeed, the Moving Brief opens with twenty pages of preliminary statement and purported background that is replete with factual claims that are outside the Amended Complaint, and asks the Court to interpret the

Amended Complaint's factual allegations in a manner contrary to their plain meaning and with inferences favorable to JPMorgan. JPMorgan's reliance on its own version of the facts as a purported basis for its motion to dismiss is just one of many indications that this case should not be resolved on the pleadings.

Moreover, the Moving Brief grossly mischaracterizes the events and facts it purports to describe. For example, the Moving Brief relies heavily on the Court's September 16, 2008 Order Pursuant to Section 105 of the Bankruptcy Code Confirming Status of Clearing Advances (the "September 16 Order," see Ex. 13, which JPMorgan refers to as the "Comfort Order").[1] Despite JPMorgan's disclaimer that it "does not contend that the Comfort Order itself validated the September Agreements" (see Mov. Brief at 110, fn. 27), its Moving Brief is peppered with suggestions that the September 16 Order did just that. For example, JPMorgan argues in its introduction that "[t]he purpose of the Comfort Order Motion . . . was to provide JPMorgan with comfort that it could continue to make clearance advances knowing that such advances 'will be allowed as claims under the Guarantee Agreements secured by the Holding Company Collateral.'" (Mov. Brief at 18, quoting Motion of LBHI for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Clearing Advances (the "September 16 Motion"), Ex. 11 ¶ 12).

This is incorrect. The September 16 Order decreed only that any post-petition advances that JPMorgan made pursuant to the 2000 Clearance Agreement, as amended, would be treated as if they had been made pre-petition. In particular, it ordered the following:

---

[1]  Unless otherwise indicated, all exhibit citations refer to exhibits to the Declaration of Amy R. Wolf in Support of Defendant's Motion to Dismiss.

> ORDERED that any of Chase's claims against Lehman arising under or pursuant to the Clearance Agreements, the Guarantee Agreements, or the Securities Agreements arising from any Postpetition Advances shall be allowed as claims under the Guarantee Agreements and will be secured by the Holding Company Collateral <u>to the same extent as if they had been made prior to the date on which the Debtor commenced its chapter 11 case in this Court.</u>

(Ex. 13, September 16 Order (emphasis supplied; parentheticals omitted)).

Indeed, the underlying motion that led to the September 16 Order stated explicitly: "This Motion does not seek an order of the Court validating [JPMorgan] Chase's guarantees of Lehman [sic] or the liens securing such guarantees . . ." (Ex. 11, September 16 Motion ¶ 18). Similarly, JPMorgan's own separate statement in support of the September 16 Motion specifically disclaimed any intention of arguing that the September 16 Order would validate the Guaranties and liens securing them: "[t]he Debtor's motion does not seek a validation of the Bank's guarantee from the Debtor or of the liens that secure that guarantee." (Whitmer Decl. Ex. 1, Statement of JPMorgan in Support of September 16 Motion ¶ 4).[2] Later, during the September 16, 2008 hearing, JPMorgan's counsel explained that JPMorgan was "not seeking to change the status quo of where things would have been had it still been pre-petition. We are not seeking validation of our liens. We are not seeking a validation of the guaranty." (Ex. 12, Hearing Tr., 9/16/08, at 32:13-19). JPMorgan later reiterated the point, stating that it was "asking for a determination that with respect to the advances . . . we are effectively in the same position that we would have been in pre-petition, that is, that it remains covered by the parent guaranty and by the collateral that secures that guaranty. Whatever the legitimacy of that guaranty, whatever the legitimacy of that collateral, we are looking for that comfort." (<u>Id.</u> at 33:23-34:6).

---

[2] All citations to "Whitmer Decl. Ex." refer to the Declaration of Tyler G. Whitmer in Support of Plaintiffs' Opposition to Motion to Dismiss, dated December 15, 2010, and the exhibits thereto.

In an abundance of caution, the Committee secured a separate agreement with JPMorgan to ensure there would be no dispute on this point. In that letter, countersigned by JPMorgan's counsel, JPMorgan agreed that "the Bank will not contend that the [September 16] Order was a validation of the Bank's Guaranties from LBHI or of the liens that secure such Guaranties." (Whitmer Decl. Ex. 2, September 24, 2008 Letter, at 2). In light of JPMorgan's express waiver of any argument that the September 16 Order validated the Guaranties or related liens, that order is not relevant to resolving the merits of Plaintiffs' causes of action, and JPMorgan should not be heard to argue otherwise.

JPMorgan's description of the September 16 Order and related events presents a classic example of why allegations and documents outside the boundaries of a complaint should not be considered in deciding a motion on the pleadings. But it does not stop there. JPMorgan also relies upon assertions relating to its purported claims against the LBHI estate, all of which are outside the four corners of the Amended Complaint.

First, these claims all purportedly arose in the week after LBHI was forced into bankruptcy and therefore cannot immunize JPMorgan's egregious pre-petition conduct any more than the September 16 Order did. This is particularly so given JPMorgan's recent admission that, on LBHI's last day of business and throughout the following weekend – when JPMorgan was refusing to release LBHI's desperately needed collateral on the purported basis that it was required to cover exposure related to JPMorgan's clearing services to LBI – JPMorgan in fact "had little or no clearance-related exposure." (Counterclaims of JPMorgan Chase Bank, N.A. (the "Counterclaims"), ¶¶ 2, 22).

Second, JPMorgan's version of the events of that week, which are the subject of its recently filed forty-eight page Counterclaims, are hotly disputed by LBHI. Among other

things, there are serious questions of fact as to whether any of JPMorgan's alleged post-petition claims are actually related to clearance activity, as JPMorgan now claims. There are also serious questions regarding the merits of JPMorgan's remaining asserted claims, such as its purported claims based on termination payments calculated by JPMorgan under derivatives contracts between the parties.[3] None of those disputed claims or post-petition events should be given any weight for purposes of deciding this motion on the pleadings.

## ARGUMENT

## POINT I

### THE SAFE HARBOR PROVISIONS OF THE BANKRUPTCY CODE DO NOT PROVIDE A BASIS FOR DISMISSAL OF PLAINTIFFS' AVOIDANCE CLAIMS

The Amended Complaint states prima facie claims for avoidance of the August Guaranty as a constructively fraudulent incurrence of an obligation, and for declaratory judgment that the August Security Agreement entered into as support for the obligations arising under that guaranty is also void. (Counts VII, XII-XIII). The Amended Complaint further states claims for avoidance of the September Agreements, and related declaratory relief, as well as avoidance of the $8.6 billion of collateral transfers extracted from LBHI under cover of those agreements in the week before LBHI's bankruptcy. (Counts V-VI, VIII, X-XI, XIV, XVII, XIX). JPMorgan moves to dismiss these claims on the purported basis that the safe harbor provisions of section 546 of the Bankruptcy Code, 11 U.S.C. § 546, protect these transactions. For the reasons set forth below, JPMorgan is wrong.

---

[3] Disputes regarding the merits of JPMorgan's proofs of claims will be addressed pursuant to Rule 3007 of the Federal Rules of Bankruptcy Procedure. "[T]here is no time deadline for filing objections to claims in § 502 or in Rule 3007." In re Gulfport Pilots Ass'n, Inc., 434 B.R. 380, 389, fn. 15 (Bankr. S.D. Ms. 2010).

## A. JPMorgan Applies the Wrong Standard for Determining If a Case Can Be Dismissed on the Pleadings Due to the Section 546 Safe Harbor Provisions

As a threshold matter, JPMorgan urges the Court to apply the wrong standard to determine if the section 546 safe harbor provisions bar Plaintiffs' causes of action. JPMorgan contends that dismissal at the pleadings stage based on the safe harbors is appropriate because Congress supposedly wanted "to provide certainty to financial institutions like [JPMorgan] that they will not be subjected to uncertain and expensive litigation." (Mov. Brief at 27). In support, JPMorgan does not rely on any case construing the safe harbors, but on Iqbal, supra, which JPMorgan concedes "arose in the specific context of an officer immunity defense." Nevertheless, JPMorgan argues that "the Bankruptcy Code's safe harbors have likewise been described as providing "'immuni[ty]' from avoidance." (Mov. Brief at 28). Using this analogy to the qualified immunity enjoyed by government officials, JPMorgan argues that the safe harbor provisions should shield entities like JPMorgan from "the costs and risk of litigation," and thus immunize JPMorgan from defending its conduct in litigation. Id.

JPMorgan's argument fails because reasoning appropriate to qualified immunity for government officials has no place in analyzing application of the safe harbors. First, the safe harbor provisions provide defenses to liability, which are generally determined based on evidence presented during litigation, and not immunity from suit. For true immunity, "[t]he entitlement is an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 1985); Padilla v. Yoo, 633 F. Supp. 2d 1005, 1031 (N.D. Cal. 2009) ("[The qualified immunity]

privilege is an immunity from suit rather than a mere defense to liability.").[4]  Qualified immunity

must be addressed early because, "[i]f a Government official is to devote time to his or her

duties, and to the formulation of sound and responsible policies, it is counterproductive to require

the substantial diversion that is attendant to participating in litigation and making informed

decisions as to how it should proceed." Iqbal, 129 S. Ct. at 1953.

But JPMorgan's safe harbor defense could not be more different from the

immunity afforded officers in cases like Mitchell and Iqbal.  (Mov. Brief at 28).  Defendants who

enjoy qualified immunity are government officials whose attention must remain focused on the

management of government business; in the public interest and not for profit.  For example,

Judge Cabranes expressed his concern that the defendants in Iqbal would be defending a lawsuit

at a time when Ashcroft and Mueller were trying to cope with "a national and international

security emergency unprecedented in the history of the American Republic."  Id.; see also Smith

v. Duffey, 576 F.3d 336, 340 (7th Cir. 2009), quoting Iqbal, 129 S. Ct. at 1954 (explaining that

"Iqbal is special in its own way, because . . . 'in [that] pleading context, . . . we are impelled to

give real content to the concept of qualified immunity for high-level officials who must be

neither deterred nor detracted from the vigorous performance of their duties'").  Such

considerations clearly do not apply to JPMorgan.

---

[4]  Indeed, each of the cases cited by JPMorgan examines "immunity" as a defense to liability –
not a defense to the initiation of a lawsuit.  See Contemporary Indus. Corp. v. Frost (In re Con.
Indus. Corp.), 564 F.3d 981, 984 (8th Cir. 2009) (safe harbor "immunize[s] from avoidance");
Thrifty Oil Co. v. Bank of Am. Nat'l Trust and Sav. Ass'n, 322 F.3d 1039, 1051 fn. 13 (9th Cir.
2003) ("[T]he Swap Amendments . . . immunize swap periodic payments from avoidance as
preferences or fraudulent transfers."); Williams v. Morgan Stanley Capital Corp. (In re Olympic
Natural Gas Co.), 294 F.3d 737, 739 (5th Cir. 2002) ("11 U.S.C. § 546(e) . . . immunizes from
avoidance settlement payments made by a forward contract merchant.").  Moreover, all of those
cases were decided at the summary judgment stage on a fully-developed factual record, and not
on the pleadings.

Finally, the safe harbor provisions provide affirmative defenses that are JPMorgan's burden to prove. See, e.g., In re Derivium Capital LLC, 437 B.R. 798, 812 (Bankr. D.S.C. 2010) ("Defendants bear the burden of proving that § 546(e) is applicable to bar Plaintiff from avoiding these transfers.") (internal citations omitted). In In re Aphton Corp., for example, the court denied a motion to dismiss because "[t]he Court is again bound by Twombly in deciding whether it is plausible that the elements of the asserted cause of action are satisfied. The Court finds that they are." 423 B.R. 76, 95 (Bankr. D. Del. 2010). In doing so, the court noted that defendants "retain all of their defenses, including the defense of claiming that the Exchange Agreement Payment was a settlement agreement under § 546(e)." Id.; see also In re the IT Group, Inc., 359 B.R. 97, 99-100 (Bankr. D. Del. 2006) (analyzing a 546(e) defense as an affirmative defense).

"Complaints need not anticipate and attempt to plead around, potential affirmative defenses. When [Erickson v. Pardus, 551 U.S. 89 (2007)] and [Twombly, supra] restated the requirements of Fed. R. Civ. P. 8, the Justices did not revise the allocation of burdens concerning affirmative defenses." Davis v. Ind. State Police, 541 F.3d 760, 763 (7th Cir. 2008). An affirmative defense can only be considered on a motion to dismiss if the defense is plainly applicable from the face of the complaint or its supporting documents. Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir. 1996).

**B.** **The Safe Harbor Provisions Do Not Shield the Guaranties, Without Which the Collateral Transfers that Secured Those Guaranties Cannot Be Applied to the Debts of LBHI's Subsidiaries (Counts VI-VII, XI-XIV)**

JPMorgan's lead argument is that the safe harbors in section 546 of the Bankruptcy Code prevent Plaintiffs from avoiding the two Guaranties and associated collateral transfers that LBHI made in the weeks before its bankruptcy. Section 546(e) provides in relevant part:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b)
> of this title, the trustee may not avoid . . . a transfer made by or to
> (or for the benefit of) a financial institution, financial participant,
> or securities clearing agency, in connection with a securities
> contract . . . that is made before the commencement of the case,
> except under section 548(a)(1)(A).

11 U.S.C. § 546(e). Subsections (f) and (g) have parallel provisions addressing transfers made in

connection with "a repurchase agreement" and "any swap agreement." 11 U.S.C. § 546(f)-(g).

Based on this section, JPMorgan argues that it is entitled to apply the cash, money market funds

and securities it extracted from LBHI in the weeks before the bankruptcy to satisfy all liabilities

of any kind owed by any LBHI subsidiary to any JPMorgan entity.

As described below, however, the section 546 safe harbor provisions do not

justify dismissing Plaintiffs' causes of action for avoidance of the Guaranties and return of

LBHI's collateral. The Guaranties themselves are not transfers covered by the safe harbors –

they are incurrences of obligations. Without those Guaranties, JPMorgan has no valid lien on the

LBHI deposits at JPMorgan because the collateral only secured whatever liabilities were

guaranteed, and without those Guarantees, JPMorgan has no contractual basis to apply that

collateral to satisfy the alleged liabilities of LBHI's subsidiaries.[5]

**1.  LBHI's Claims for Constructive Fraudulent Conveyance to Avoid the August and September Guaranties State Valid Causes of Action Because the Safe Harbors Only Apply to Transfers, Not Incurrences of Obligations**

**a.  The Language of Section 546 is Limited to Transfers**

An examination of the merits of JPMorgan's motion to dismiss begins with an

explanation of why the Guaranties are not subject to the section 546 safe harbors, and thus the

---

[5]  JPMorgan's safe harbor argument also fails for the independent reason that the September Agreements in particular are not securities contracts, repurchase agreements, or swap agreements covered by section 546, discussed further below. Moreover, the safe harbors are no defense to LBHI's claims for actual fraudulent conveyances under section 548(a)(1)(A), nor to the many common law challenges Plaintiffs have raised to the Guaranties and associated collateral transfers.

Amended Complaint pleads valid causes of action for constructive fraudulent conveyance under sections 544 and 548.

JPMorgan claims that the Guaranties are safe harbored on the purported ground that "section 546's safe harbor provisions protect LBHI's guaranty obligations just as they protect the challenged transfers." (Mov. Brief at 50). But one need look no further than the plain and unambiguous text of this provision to determine that the section 546 safe harbors only shield from avoidance certain transfers, and not the incurrence of obligations.

Specifically, section 546 safe harbors:

- "a <u>transfer</u> made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract";

- "a <u>transfer</u>, made by or to (or for the benefit of) a swap participant or financial participant, under or in connection with any swap agreement"; and

- "a <u>transfer</u> made by or to (or for the benefit of) a repo participant or financial participant, in connection with a repurchase agreement."

11 U.S.C. §§ 546(e)-(g) (emphasis supplied). There is no language in section 546, or anywhere else in the Bankruptcy Code, that extends this safe harbor protection to the incurrence of obligations, or guaranties entered into for less than reasonably equivalent value when the debtor was insolvent or undercapitalized.

In contrast, section 548, governing "fraudulent transfers and obligations," authorizes not only the avoidance of transfers, but also the avoidance of fraudulently incurred obligations. It states in relevant part that "[t]he trustee may avoid any transfer . . . of an interest of the debtor in property, <u>or any obligation</u> . . . <u>incurred by the debtor</u>, that was made <u>or incurred</u> on or within 2 years before the date of the filing of the petition . . . " 11 U.S.C. § 548(a)(1)

(emphasis supplied). The same is true of section 544, which authorizes the avoidance of both transfers and obligations that are avoidable under state law. 11 U.S.C. § 544(b)(1).

JPMorgan does not argue that the Guaranties are transfers, as opposed to the incurrence of obligations. Nor could it. The Bankruptcy Code's definition of transfers does not include the incurrence of obligations. See 11 U.S.C. § 101(54) ("The term 'transfer' means – the creation of a lien; the retention of title as security interest; the foreclosure of a debtor's equity of redemption; or each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with ... property; or an interest in property.").

Courts have found that, for purposes of the Bankruptcy Code, entering a guaranty is deemed the incurrence of an obligation. Although the Bankruptcy Code does not define "obligations," the Southern District of New York Bankruptcy Court specifically has determined that a guaranty does not constitute a "transfer" for purposes of sections 502 and 548 of the Bankruptcy Code. See, e.g., In re Asia Global Crossing, Ltd., 333 B.R. 199, 203 (S.D.N.Y. 2005) (holding that a guaranty was not a transfer for purposes of section 502 and 548 based on the definition of "obligations" in Black's Law Dictionary as "[a] formal binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing for a particular person or set of persons; esp., a duty arising by contract"). Many other courts have confirmed that guaranties are obligations, not transfers. See, e.g., Covey v. Commercial Nat'l Bank of Peoria, 960 F.2d 657, 661 (7th Cir. 1992) ("a note or guarantee is not a 'transfer' for purposes of 11 U.S.C. § 101(54) . . . [but] both note and guarantee are obligations"); Rubin v. Manufacturers Hanover Trust Co., 661 F.2d 979, 990 (2d Cir. 1981) ("[Debtors], as secondary guarantors, became contingently liable if both the principal debtors and the principal guarantors defaulted.

Undoubtedly, therefore, [Debtors] 'incurred' an 'obligation' of repayment [under Bankruptcy Act section 67(d), the precursor to § 548].").

In sum, sections 544 and 548 permit the avoidance of both obligations incurred and also transfers made while insolvent or undercapitalized for less than reasonably equivalent value. The section 546 safe harbor provisions only shield certain <u>transfers</u> from avoidance under these sections. Plaintiffs' claims to avoid the Guaranties – which are plainly obligations, and not transfers – are thus not subject to dismissal based on the section 546 safe harbors.[6]

### b. The Omission of the Word "Obligations" from Section 546 Should be Considered Intentional and Meaningful

In its Moving Brief, JPMorgan argues that the Court should ignore the plain language of section 546 by characterizing the absence of any reference to obligations as merely an "unadorned omission of an express reference to 'obligations' in the language of section 546." (Mov. Brief at 50). But according to settled rules of statutory construction, Congress' silence with respect to obligations and its deliberate decision to speak only to transfers in section 546 should be considered intentional and be respected when interpreting that section.

"[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." <u>BFP v. Resolution Trust Corp.</u>, 511 U.S. 531, 537 (1994), <u>quoting</u> <u>Chicago v. Envtl. Def. Fund</u>, 511 U.S. 328, 338 (1994). Therefore, absent evidence of legislative intent to the contrary, courts will conclude that words omitted in one section but included in another should not be added to the

---

[6] JPMorgan's Moving Brief at times suggests that the Guaranties should be protected because, according to JPMorgan, the section 546 safe harbors were designed to protect "contracts" of the type referenced in that section – <u>i.e.</u>, "securities contracts," "repurchase agreements," or "swap agreements." (Mov. Brief at 51). But as explained herein, the section 546 safe harbors only protect <u>transfers</u> made in connection with those contracts, not the obligations incurred by entering into those contracts. In any event, for the reasons discussed in Point I(C) below, none of the September Agreements qualifies as a "securities contract," a "repurchase agreement" or a "swap agreement."

former section. See Lamie v. U.S. Trustee, 540 U.S. 526, 538 (2004) (declining to read an absent word into 11 U.S.C. § 330(a)(1) because the statute has "a plain, nonabsurd meaning," and stating "[t]here is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted") (internal quotations omitted).

This result is especially appropriate where Congress intentionally added the phrase "incurrence of obligations" to section 548 (a statute specifically referenced in section 546(e)). Under the original Bankruptcy Act, fraudulent conveyance provisions did not expressly apply to obligations. See, e.g., Bankruptcy Act of 1898, ch. 541, § 67(e), 30 Stat. 544, 564 (covering "conveyances, transfers, assignments, or encumbrances, or his property, or any part thereof"). Then, in 1938, the Chandler Act rewrote the 1898 Bankruptcy Act's fraudulent transfer provision and expanded its reach to include fraudulent obligations as well and thus "mirror" the Uniform Fraudulent Transfer Act. Kenneth C. Kettering, Securitization and Its Discontents, 29 Cardozo L. Rev. 1553, 1587 (2008). Yet, despite intentionally adding "obligations" to the scope of section 548, Congress has never amended section 546 to add obligations to that provision.

Moreover, when Congress has wanted to make section 546 and 548 coextensive, it has done so. For example, section 546, as currently enacted, extends to transfers made to certain parties, including "financial participant[s]." 11 U.S.C. § 546. When "financial participant" was added to section 546, Congress also expressly amended section 548 to add the same language to that section as well. See Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 753, 119 Stat. 23, 182 (2005); see also 11 U.S.C. § 548(b)(2)(D).

Courts have applied this rule of statutory construction to the section 546 safe harbors in particular.  Indeed, the court in <u>Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)</u>, 344 B.R. 340 (W.D. Penn. 2006) specifically refused to read words into section 546(e) that Congress had not included in the text.  See <u>id.</u> at 370 ("[I]n essence, Plaintiff would have this Court read into [§ 546(e)] terms that are presently absent.  However, to do so would result not in a construction of the statute, but, in effect, an enlargement of it by the court.") (internal quotations omitted).

Similarly, the Bankruptcy Court for the Southern District of New York has applied this rule to hold that section 502(d), which disallows claims until fraudulently transferred property is returned and which only applies to transfers, does not apply to obligations avoided under section 548.  In <u>In re Asia Global Crossing, Ltd.</u>, 333 B.R. 199 (Bankr. S.D.N.Y. 2005), the court faced the question of whether the trustee could disallow a claim under section 502(d) on the ground that the claimant's guaranty was avoidable under section 548.  Section 502(d), governing "allowance of claims or interests," "prevents the transferee of an avoidable transfer from receiving a distribution, qua creditor, unless he first returns the transfer," but does not address a creditor who allegedly caused the debtor to incur an obligation that is avoidable under chapter 5 of the Bankruptcy Code.  11 U.S.C. § 502(d).

Because section 502(d) applies only to transfers, and not obligations, the court held that section 502(d) "is not . . . coextensive with the avoidance provisions available to the trustee," and thus "[t]he avoidability of the Guaranty does not, therefore, provide a basis to invoke § 548."  <u>In re Asia Global Crossing, Ltd.</u>, 333 B.R. at 202-3.  The Court explained:

The Bankruptcy Code allows a trustee to avoid both transfers and obligations in appropriate circumstances. If the trustee avoids a "transfer," he can recover the property transferred or the value of the property under § 550. If, on the other hand, he avoids an obligation, the obligation is rendered unenforceable, there is nothing to return and § 550 affords no remedy.

Section 502(d) reflects the same distinction. It disallows the claim of the transferee of an avoidable transfer, but does not speak to the claim of an obligee under an avoidable obligation for the reasons already stated; the avoided obligation is rendered unenforceable, and the underlying claim is subject to disallowance without regard to § 502(d).

Id. (citations omitted). Therefore, the court concluded that section 502(d) "disallows the claim of the transferee of an avoidable transfer, but does not speak to the claim of an obligee under an avoidable obligation." Id.; see also In re Revco D.S., Nos. 588-1308 through 588-1321, 588-1305, 588-1761 through 588-1812, and 588-1820, 1990 Bankr. LEXIS 2966, at *67-68 (Bankr. D. Ohio Dec. 17, 1990) ("Section 502(d) limits its application . . . to a fraudulent transfer, while omitting any reference to incurrence of an avoidable obligation.").

Courts have also reached the conclusion that obligations are distinct from transfers in holding that state fraudulent conveyance statutes that apply solely to transfers cannot be applied to obligations. See In re M. Fabrikant & Sons, Inc., 394 B.R. 721, 734 fn. 13 (Bankr. S.D.N.Y. 2008) (New York fraudulent conveyance statute that allows for challenge of transfer of debtor's property on grounds of constructive fraud when a debtor is undercapitalized applies "[b]y its terms . . . to conveyances but not obligations, and cannot be relied on to invalidate the debtors' loan debt or guaranties"); In re Nirvana Rest. Inc., 337 B.R. 495, 508 (Bankr. S.D.N.Y. 2006) (parent corporation's guaranty of subsidiary restaurant's lease was an obligation, not a conveyance; therefore, because "NYDCL § 274 does not invalidate fraudulent obligations" it could not invalidate guaranty).

Courts have also affirmed this principle regarding the omission of the word "obligations" in the context of analogous, non-Bankruptcy Code statutes. For example, the court in In re Imperial Credit Indus., Inc. examined 12 U.S.C. § 1828(u)'s omission of the term "obligations" and noted that "related statutes addressing fraudulent conveyances recognize the distinction between avoiding an obligation and recovering a transfer, suggesting that Congress intentionally omitted obligations from § 1828(u)." 527 F.3d 959, 972 (9th Cir. 2008) (permitting challenge to obligation under a performance guaranty because "§ 1828(u) prohibits persons from bringing fraudulent conveyance claims against federal banking agencies only for 'the return of assets . . . transferred to' a federally insured bank or 'for monetary damages or other legal or equitable relief in connection with such transfer' . . . [but] makes no mention of obligations").

Congress therefore clearly and intentionally chose not to make section 546 coextensive with sections 544 and 548 when it comes to obligations.[7]  The safe harbor provisions do not extend beyond their plain text to cover avoidable obligations.

---

[7] Section 544(b) of the Bankruptcy Code, which grants certain avoidance powers under relevant state law to the trustee, similarly provides that the trustee "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law . . . " 11 U.S.C. § 544(b) (emphasis supplied); see also In re Consolidated Capital Equities Corp., 143 B.R. 80, 87 (N.D. Tex. Bankr. 1992) (applying the Uniform Fraudulent Conveyance Act and noting that "[t]he statute is not ambiguous. It applies to every obligation. The guaranty is an obligation. This court must apply the statute as written"). New York law, which is the applicable state law pursuant to section 544 of the Bankruptcy Code in this case, is similarly based on the Uniform Fraudulent Conveyance Act. See In re Trace Int'l Holdings, Inc., 287 B.R. 98, 107 (Bankr. S.D.N.Y. 2002) ("Under NYDCL § 273, [e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the consideration is made or the obligation is incurred without a fair consideration.") (emphasis supplied).

### c. Section 546's Use of the Term "Notwithstanding" Does Not Justify Extending the Section 546 Safe Harbors to Obligations

JPMorgan's only argument based on the text of section 546 to justify expanding the safe harbor provisions to the fraudulent incurrence of obligations is that the term "notwithstanding" at the beginning of the safe harbor provisions indicates that Congress meant to override all of the debtor's pre-petition avoidance powers, except in the case of actual fraud. (Mov. Brief at 46). In particular, JPMorgan points to the preface of subsections 546(e), (f) and (g), which state "Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer . . . " 11 U.S.C. § 546.

JPMorgan distorts the meaning of the term "notwithstanding." As the cases relied upon by JPMorgan make clear, "the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." See Cisneros v. Alpine Ridge Group, 508 U.S. 10, 18 (1993); Conyers v. Rossides, 558 F.3d 137, 145 fn. 10 (2d Cir. 2009) (holding that provision beginning with "notwithstanding" another provision did not indicate that the first overrode the second entirely).[8] The phrase "notwithstanding" thus indicates that the section that follows overrides other provisions only to the extent there is a conflict between the two.

For example, in Smith v. Fed. Reserve Bank of N.Y., 280 F. Supp. 2d 314 (S.D.N.Y. 2003), the Southern District of New York held that the phrase "notwithstanding any other provision of law" in the Terror Risk Insurance Act ("TRIA") did not override the

---

[8] JPMorgan also cites In re Lehman Bros. Holdings, Inc., 433 B.R. 101 (Bankr. S.D.N.Y. 2010), which involved a statute that does not actually contain the word "notwithstanding." Id. at 110 ("It is true, as Swedbank points out, that the phrase 'notwithstanding any other provision of law' has consistently been interpreted as written by courts. But the Court must honor the plain language of the [560 and 561 safe harbor provisions, which, by their terms, do not contain such a blanket 'notwithstanding' clause.") (citations omitted)).

president's power to confiscate assets under the International Emergency Economic Powers Act ("IEEPA").[9] In so holding, the district court stated that "[t]he phrase 'notwithstanding any other provision of law' simply means that Section 201(a) controls if there is another provision of law that conflicts with it . . . It does not mean, as plaintiffs urge, that the TRIA covers the entire field and nullifies all previous statutes that pertain to blocked assets." Id. at 319-20. The Second Circuit affirmed the ruling, holding that "the 'notwithstanding' clause applies only when some 'other provision of law' conflicts with TRIA. We see no conflict here." Smith v. Fed. Reserve Bank of N.Y., 346 F.3d 264, 271 (2d Cir. 2003).[10]

JPMorgan also points to the end of subsections 546(e), (f) and (g), which contain the phrase "except under section 548(a)(1)(A) of this title" (citing the provision authorizing avoidance of transfers and obligations made with "actual intent to hinder, delay or defraud" creditors). (Mov. Brief at 47). JPMorgan uses this exception to argue that, if Congress had wanted to preserve the avoidance powers for obligations, it would have included a similar exception along the lines of "or as a result of an avoidance of an obligation under section 548(a) of this title." Id. But actual fraudulent transfers warrant different treatment in the safe harbor context because the same facts could give rise to an actual fraudulent conveyance claim under section 548(a)(1)(A) and a safe harbored constructive fraudulent conveyance claim under section

---

[9] A provision of the TRIA stated that "[n]otwithstanding any other provision of law . . . in every case in which a person had obtained a judgment against a terrorist party on a claim based upon an act of terrorism . . . the blocked assets of that terrorist party . . . shall be subject to execution or attachment." TRIA § 201, Pub. L. No. 107-297, 116 Stat. 2322 (2002).

[10] The court went on to reason that the TRIA should not extend to "confiscating" terrorists' assets because the TRIA only discussed "blocking" assets, whereas another statute applied both to blocking and confiscating. Id. The same reasoning supports Plaintiffs' contention that section 546 should not extend to obligations because section 546 only addresses transfers, despite referring to a provision addressing both transfers and obligations.

548(a)(1)(B).  Without providing a specific exception for actual fraudulent conveyances, section 546 might suggest that such a transaction was not subject to avoidance because it fit the terms of the safe harbor, even though the transfer was made with the actual intent to hinder, delay or defraud creditors.  Thus, the end of section 546 addresses situations covered by both section 546 (safe harbors) and also section 548(a)(1)(A) (actual fraud), and it clarifies that such circumstances are subject to avoidance notwithstanding the safe harbors.  The same cannot be said of the avoidance of obligations, which are only addressed by section 548 and not section 546.  In other words, there is no potential conflict regarding avoidable obligations that requires an express exception.

        **d.**      **Limiting Section 546 to Its Plain Text – Covering Only Transfers – Comports Squarely With the Spirit and Purpose of the Safe Harbor Provisions**

Moving beyond the plain language of the statute, JPMorgan argues that the section 546 safe harbors should not be limited to transfers because "doing so would upset the settled expectations of market participants that rely on those protections in conducting their business."  (Mov. Brief at 52).  In support, JPMorgan points to various types of contracts that are safe harbored and argues that "[t]he safe harbors on their face are intended to protect 'parties to specified commodities and financial contracts.'"  (Mov. Brief at 51).

As an initial matter, arguments based on the policy behind a statute cannot override the plain terms of the statute.  In re Ames Dep't Stores, Inc., 582 F.3d 422, 427 (2d Cir. 2009) ("Statutory interpretation always begins with the plain language of the statute.")  Legislative history is considered "only when 'the plain statutory language is ambiguous or would lead to an absurd result.'"  Id.  In particular, courts interpreting section 546(e) begin with its plain meaning.  See QSI Holdings, Inc. v. Alford, 382 B.R. 731, 739 (W.D. Mich. 2007) ("In attempting to discern the limits of the § 546(e) exemption, the Court must first look to the

statutory language."); In re Quality Stores, Inc., 355 B.R. 629, 634-35 (Bankr. W.D. Mich. 2006) (finding that leveraged buyout payments were settlement payments and declining to impose "result-oriented interpretation of the language of the statute" because "application of the plain language of § 546(e) does not lead to an unjust or absurd result").

Nevertheless, a reading of the section 546 safe harbor provisions that does not encompass obligations incurred while the debtor was insolvent and/or undercapitalized for less than reasonably equivalent value comports with the policy behind the safe harbors and the underlying avoidance rules.

(i)     **The Enunciated Policy Behind the Safe Harbors Uniquely Applies to Transfers Related to Certain Market Transactions**

The legislative history of section 546 makes clear that it was designed to prevent a domino effect in the market that could result from the return of certain types of transfers that had already been passed from a recipient to various counterparties. See Bankruptcy of Commodity and Securities Brokers: Hearing Before the Subcomm. on Monopolies and Commercial Law of the H. Comm. on the Judiciary, 97th Cong., 1st Sess. at 203 (1981) (statement of Edmund R. Schroeder, counsel for New York Cocoa Clearing Association and New York Coffee and Sugar Clearing Association) ("The principal problem addressed by the commodity-related provisions in the 1978 Code was the domino effect which could result if the trustee in bankruptcy of one party in the clearing chain could avoid and recover margin payments which had been paid by that party to its broker or, if the bankrupt were a clearing member, to the clearing organization."); In re Grafton Partners, 321 B.R. 527, 539 (B.A.P. 9th Cir. 2005) ("courts consistently focus on the context of the statute as having been designed to protect public markets" in determining whether the safe harbors should protect a particular transaction); Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass'n, 878 F.2d 742, 747 (3d Cir. 1989) (discussing, in

context of 1982 amendments to the Bankruptcy Code, Congress's "concern[] about the volatile nature of the commodities and securities markets" and its decision "that certain protections were necessary to prevent the insolvency of one commodity or security firm from spreading to other firms and possibly threatening the collapse of the affected market").

This purpose is reflected in the hearings regarding the 1982 amendments to the Bankruptcy Code, in which one Congressperson asked why "the broker, who is only one of many of the creditors of the customer, should get what amounts to a preferred position vis-à-vis the customer and his trustee and any other creditors?" Bankruptcy of Commodity and Securities Brokers: Hearing Before the Subcomm. on Monopolies and Commercial Law of the H. Comm. on the Judiciary, 97th Cong., 1st Sess. at 497 (1981) (statement of M. Caldwell Butler, Member, Comm. on the Judiciary). In response, the speaker explained that a safe harbor was needed for certain transactions to minimize the risks inherent in forcing the return of margin payments that affect an entire market.

> What we are talking about is a very highly liquid item whose price changes with great rapidity. Under those circumstances it does not make any sense, either on behalf of the debtor or on behalf of the broker or on behalf of the clearing organizations to have everyone at a market risk during that period . . .

Id. (statement of Donald J. Crawford, Senior Vice President, Securities Industry Association). This history confirms that the safe harbors were only meant to shield certain transfers based on their cascading effect on the market, and not give a free pass to impose obligations on a soon-to-be bankrupt debtor to pay money for future liabilities.

Furthermore, given that the safe harbor provisions are statutory exceptions to a general rule, they must be construed narrowly. QSI Holdings, Inc., 382 B.R. at 737 (describing safe harbors as an "exception to public policy underlying the avoidance provisions in the Bankruptcy Code – intended to prevent a debtor from diminishing funds that are generally

available for distribution to creditors"), aff'd 571 F.3d 545 (6th Cir. 2009); cf. Bank of Am.,

N.A. v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.) ("Bank of America"),

No. 08-1753 (JMP), 2010 Bankr. LEXIS 3867, at *69 (Bankr. S.D.N.Y. Nov. 16, 2010)

(observing that safe harbor "exceptions to the automatic stay are to be construed narrowly").

> **(ii)**     **Avoiding Obligations Incurred When a Debtor Is Insolvent or Undercapitalized for Less Than Reasonably Equivalent Value Comports With the Policy Behind the Bankruptcy Code**

Moreover, the safe harbors' goal of preventing ripple effects to the market is a

limited exception to the policy behind the avoidance rules, which reflect "Congress's

determination, reflected in a trustee's avoidance powers under § 548 . . . that 'a few individuals

should not be allowed to benefit from transfers by an insolvent entity at the expense of the

many.'" Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.), 263 B.R. 406, 479

(S.D.N.Y. 2001) ("Congress intended equal shares of the bankruptcy estate for creditors of equal

rank."); see also Butler v. David Shaw, Inc., 72 F.3d 437, 441 fn. 6 (4th Cir. 1996) ("the power

to avoid preferential transfers ensures that each creditor in the same class will receive the same

pro rata share of the debtor's estate" and "reduces the incentive to rush to dismember a

financially unstable debtor by allowing the trustee to recoup last-minute payments to creditors")

(internal quotations omitted); In re S.W. Bach & Co., 425 B.R. 78, 103-04 (Bankr. S.D.N.Y.

2010) ("[T]he purpose of the trustee's avoidance powers is to protect creditors, and arguably to

encourage an equitable distribution of the debtor's property to creditors, and, in turn, prevent a

debtor from favoring one creditor or third party over other creditors, all of which go to the heart

of federal bankruptcy proceedings of restructuring debtor-creditor relations") (internal quotations

omitted); In re Topcor, Inc., 132 B.R. 119, 125 (Bankr. N.D. Tex. 1991) ("The Court also points

out that its holding is in accord with the general policy of the Code to provide trustees broad

avoidance powers to maximize the value of the estate for the benefit of all creditors.").

Section 548 and its predecessor, Bankruptcy Act section 67d, have provided for the avoidance of obligations since 1938, when the portion of the Bankruptcy Act dealing with avoidance was amended to comply in both "substance" and "language" with the Uniform Fraudulent Conveyance Act. Nat'l Bankr. Conference, Analysis of H.R. 12889, 74th Cong., 2d Sess., at 212 & fn. 3 (1936); see Chandler Act, ch. 575, § 67d, 52 Stat. 840, 877-78 (1938) (repealed 1978). Fraudulent conveyance law "recognizes that when a debtor is insolvent, its assets are essentially held for its unsecured creditors. Thus, when a debtor . . . incurs obligations, it does so with someone else's money." Jack F. Williams, The Fallacies of Contemporary Fraudulent Transfer Models as Applied to Intercorporate Guaranties: Fraudulent Transfer Law as a Fuzzy System, 15 Cardozo L. Rev. 1403, 1411-17 (1994) ("The fraudulent obligation is an infringement of the creditor's right to realize upon the available assets of its debtor."); see also David Gray Carlson, The Logical Structure of Fraudulent Transfers and Equitable Subordination, 45 Wm. & Mary L. Rev. 157, 184 (2003) ("Annulment [of a debtor's obligation] becomes analytically necessary . . . when the fraudulent obligation yields a payment or [an]other transfer secures it.").

Thus, allowing obligations to be avoided comports with Congress's intent in passing both section 548's avoidance rules and also the section 546 safe harbors. Avoiding a debtor's guaranty of obligations, made while insolvent and for less than reasonably equivalent value, does not threaten a domino effect in the markets. It does not risk systemic failure caused by one participant's bankruptcy, i.e., the failure of related transactions that could result from undoing a transfer related to a securities contract, repurchase agreement or swap agreement. Instead, onerous, pre-bankruptcy obligations like the Guaranties do nothing more than allow one

33

creditor priority access to the debtor's assets to satisfy its debts in full, at the expense of all other similarly situated creditors – the very abuse that section 548 was designed to prevent.

> ### (iii) It Is JPMorgan, and Not Plaintiffs, That Is Attempting to Use the Safe Harbor Provisions to Accomplish Indirectly What It Cannot Do Directly

Finally, JPMorgan argues that the Court should expand section 546's safe harbor provisions to cover obligations so parties cannot accomplish the result of unwinding a transfer indirectly by avoiding the obligation providing the basis for the transfer. (Mov. Brief at 47). It warns that if obligations of this type are subject to avoidance, then any plaintiff could attack a transfer falling within the safe harbors simply by attacking the underlying obligation that gave rise to those payments. In doing so, JPMorgan grossly overstates the effect of permitting avoidance actions for obligations.

First of all, the avoidance of obligations falling under section 548 would only potentially affect transfers based solely on a guaranty made by the debtor when it was insolvent and/or undercapitalized for less than reasonably equivalent value. It would have no effect on transfers, including margin and settlement payments, based on pre-existing, valid contracts, such as clearance or swap agreements. In the instant situation, for example, transfers from LBI in connection with the 2000 Clearance Agreement – which existed long before bankruptcy, and was entered into while LBI was solvent and in exchange for value – would remain protected from attack on the basis of section 546(e). Thus, the transfers described in section 546 would still be safe harbored, assuming they were made pursuant to valid, legitimate contractual obligations.

Furthermore, it is JPMorgan that seeks to do indirectly what it could not do directly given the Bankruptcy Code's avoidance provisions. After all, JPMorgan argues that it is entitled to keep and use LBHI's collateral even though the contractual basis for giving that collateral is subject to avoidance under section 548 (i.e., incurred by the debtor within 2 years of

the petition date, for less than reasonably equivalent value, when the debtor was insolvent, undercapitalized, or unable to pay its debts as they became due). Indeed, the facts of this case pose the extreme example of why transfers should not be protected when based solely on avoidable obligations – because then a powerful counterparty like JPMorgan could extract assets from an insolvent, soon-to-be bankrupt debtor and apply that money to satisfy its own claims at the expense of every other creditor, all based on a coerced and improper obligation. In other words, rather than protecting transfers to financial institutions made pursuant to valid and unavoidable clearing, commodities and swap agreements, which would be in line with the language and purpose of section 546, JPMorgan seeks to preserve its coerced and last minute imposition of onerous guaranties executed by LBHI under exigent circumstances by claiming the assets extracted to support them is protected by the safe harbors. The Bankruptcy Code simply does not protect this type of activity.

For all of these reasons, Plaintiffs' causes of action for avoidance of the August and September Guaranties based on the avoidance powers of sections 544 and 548 state valid causes of action and should not be dismissed on the pleadings. (Counts VI-VII, X-XI).

**2. In the Absence of Valid Guaranties from LBHI, JPMorgan Cannot Use LBHI's Cash and Securities to Repay Itself for the Debts of LBHI's Subsidiaries**

Whereas JPMorgan spends little attention on Plaintiffs' challenges to the August and September Guaranties, it devotes much of its Moving Brief attempting to justify using the collateral it extracted from LBHI to fully offset the debts of LBHI's subsidiaries, even without a valid LBHI guaranty of those debts. Thus, JPMorgan asks the Court to dismiss all causes of action seeking return of LBHI's collateral – not just the section 548 avoidance claims – even if LBHI's Guaranties are avoided under sections 544 or 548.

But without the Guaranties, Plaintiffs are entitled to a return of LBHI's funds and securities on deposit at the bank because JPMorgan lacks an independent, valid lien over those assets in the absence of the Guaranties. As explained below, both the language of the Security Agreements and the facts pleaded in the Amended Complaint demonstrate that the Security Agreements are wholly dependent on the Guaranties, and that the parties did not intend to grant JPMorgan an independent, free-standing lien on LBHI's accounts on which JPMorgan would have the right to foreclose absent any valid guaranty or contractual obligation by LBHI.[11]

Despite the language of the Security Agreements and the clear import of the Amended Complaint's allegations, JPMorgan asks this Court to rule on the pleadings that the Guaranties were somehow superfluous to the transactions entered into in August 2008 and September 2008. In support of its argument that the Guaranties are of no consequence, JPMorgan points to the fact that the Security Agreements purport to grant JPMorgan a lien to satisfy "Liabilities," as that term is used in the respective Guaranties. (Ex. 5, August Security Agreement at 1; Ex. 8, September Security Agreement at 1). Notably, the specific liabilities subject to the liens are not independently defined in the Security Agreements, which instead provide that "the term 'Liabilities' shall mean (a) all 'Liabilities' as defined in the Guaranty." (Ex. 5, August Security Agreement at 1; Ex. 8, September Security Agreement at 1). JPMorgan argues that, because the Guaranties cover liabilities of LBHI's subsidiaries under the 2000 Clearance Agreement (in the case of the August Guaranty), or all obligations whatsoever of LBHI's subsidiaries (in the case of the September Guaranty), the Security Agreements granted

---

[11] JPMorgan refers to such a free-standing lien arrangement, incorrectly, as an "hypothecation." (Mov. Brief at 44). Black's Law Dictionary defines "hypothecation" as "[t]he pledging of something as security without delivery of title or possession." Black's Law Dictionary 811 (9th ed. 2009). But regardless of the label applied, or whether such an arrangement is allowed by the Uniform Commercial Code, the Amended Complaint and the contracts themselves are clear that the parties did not contemplate or agree to such a stand-alone lien.

JPMorgan free-standing liens on LBHI's collateral to satisfy any and all liabilities of LBHI's subsidiaries, even without the Guaranties.

But the language in the agreements belies JPMorgan's argument. First of all, as mentioned above, the Security Agreements have no independent definition of the liabilities being secured – they just refer to the liabilities covered by the Guaranties. Thus, without the Guaranties, the Security Agreements are literally meaningless.

Moreover, an integral aspect of the definition of Liabilities, as that term is defined in the Guaranties, is that they are guaranteed by LBHI. Specifically, the August Guaranty defines "Liabilities" as follows:

> The Guarantor unconditionally and irrevocably guarantees to the Bank the punctual payment of all obligations and liabilities (including without limitation the "Obligations" as defined in the Clearance Agreement) of the Borrowers to the Bank of whatever nature, whether now existing or hereafter incurred, whether created directly or acquired by the Bank by assignment or otherwise, whether matured or unmatured and whether absolute or contingent, when the same is due and/or due and payable, whether on demand, at stated maturity, by acceleration or otherwise, and whether for principle, interest, fees, expenses, indemnification or otherwise (all of the foregoing sums being the 'Liabilities'), pursuant to the Clearance Agreement, dated as of June 15, 2000 . . .

(Ex. 4, August Guaranty § 1 (emphasis supplied)). The September Guaranty defines "Liabilities" with almost identical language – omitting only the limitation that such liabilities be "pursuant to the Clearance Agreement." (Ex. 7, September Guaranty § 1). What is noteworthy about this definition is that it begins with the statement that "[t]he Guarantor unconditionally and irrevocably guarantees to the Bank the punctual payment of . . ." (Id.; see also Ex. 4, August Guaranty § 1). Thus, the "Liabilities" defined in the Guaranties and incorporated by reference into the Security Agreements include the limitation that they are guaranteed by LBHI through the Guaranties. Put another way, unguaranteed debts of LBHI's subsidiaries cannot be "Liabilities"

under this definition because they are not sums that "the Guarantor unconditionally and irrevocably guarantee[d]."

Similarly, the two Guaranties further link the liabilities to the Guaranties by describing the "Liabilities" as those that become due and payable for the purposes of the Guaranties. Specifically, in the same paragraphs in which the Guaranties define the term "Liabilities," there is a clause that provides the Liabilities must be paid notwithstanding any stay or injunction. In so doing, the Guaranties describe the liabilities as becoming "due and payable for the purposes of this Guaranty." (Ex. 4, August Guaranty § 1 (emphasis supplied) ("The Guarantor agrees that, as between the Guarantor and the Bank, the Liabilities may be declared to be due and payable for the purposes of this Guaranty notwithstanding any stay . . ."); Ex. 7, September Guaranty § 1 (same)). This language further demonstrates that the "Liabilities" defined in the Guaranties and incorporated by reference into the Security Agreements are only those that are covered by the Guaranties.

The language in the Guaranties regarding LBHI's maximum liability similarly describes the liens on LBHI's accounts as being in support of the Guaranties:

- August Guaranty: "The Guarantor's maximum liability under this Guaranty shall adjust each day and for each such day shall be equal to the dollar amount of cash and securities . . . (i) held on such day in the accounts of the guarantor subject to the Clearance Agreement and the Security Agreement and (ii) that the Bank has notified the Guarantor to be delivered to the Bank on such day in support of this Guaranty." (Ex. 4, August Guaranty § 1 (emphasis supplied)).

- September Guaranty: "The Guarantor's maximum liability under this Guaranty shall be THREE BILLION DOLLARS ($3,000,000,000) or such greater amount that the Bank has requested from time to time as further security in support of this Guaranty." (Ex. 7, September Guaranty § 1 (emphasis supplied)).

These provisions further make clear that the LBHI collateral on deposit with JPMorgan secured LBHI's obligations under the Guaranties and nothing else.

What is clear from the text is confirmed by the context in which the contracts were executed. The parties executed each Guaranty on the same day and as part of the same transaction as its related Security Agreement. (Am. Compl. ¶¶ 28, 59). The Security Agreements also repeatedly refer to LBHI as "Guarantor" without defining the term – further evidence that the parties understood that the Security Agreements were integrally connected to the Guaranties. In contrast, nothing in the contracts supports JPMorgan's position that the Security Agreements were intended to be stand-alone agreements, wholly separate from the Guaranties. Indeed, JPMorgan's interpretation of the contracts would render the Guaranties meaningless because if, as JPMorgan contends, it can be fully paid for the obligations of LBHI's subsidiaries based on the Security Agreements alone, there would be no need for LBHI also to guaranty those obligations separately.

Furthermore, although beyond the scope of the Amended Complaint, JPMorgan's own representations in the weeks immediately following execution of these contracts further confirm that LBHI's collateral secured only the liabilities that LBHI purported to guarantee, rather than serving as free standing security for LBHI's subsidiaries' liabilities. For example, in JPMorgan's statement filed in support of the September 16 Motion, JPMorgan acknowledged that it was "[LBHI's] obligations under the Guarantee Agreements" that were "secured by collateral . . . pledged to [JPMorgan] pursuant to the [Security Agreements]." (Whitmer Decl. Ex. 1, JPMorgan Statement in Support of September 16 Order ¶ 2) (emphasis supplied).[12] During the hearing on the September 16 Motion, counsel for JPMorgan similarly stated that JPMorgan was "asking for a determination that . . . we are effectively in the same position that

---

[12]  Indeed, the Court ordered that claims based on certain post-petition advances "shall be allowed as claims under the Guarantee Agreements and will be secured by the Holding Company Collateral" to the same extent as those arising out of pre-petition advances. (Ex. 1, September 16 Order).

we would have been in pre-petition, that is, that it remains covered by the parent guaranty and by the collateral that secures that guaranty." (Ex. 12, Hearing Tr., 9/16/08, at 33:23-34:6) (emphasis supplied). Shortly after the September 16 Order was entered, JPMorgan's counsel acknowledged that understanding again by countersigning a letter from the Committee confirming that JPMorgan "will not contend that the [September 16] Order was a validation of the Bank's Guaranties from LBHI or of the liens that secure such Guaranties." (Whitmer Decl. Ex. 2, September 24, 2008 Letter at 2 (emphasis supplied)). JPMorgan's counsel was only confirming what was obvious at the time – that the Security Agreements were dependent on the Guaranties, and LBHI's collateral secured only the liabilities that LBHI guaranteed.

In fact, JPMorgan's Counterclaims, filed just weeks ago, characterize the liens in the same way. In that recent pleading, JPMorgan alleges that the Security Agreements provide JPMorgan with "a lien on certain of LBHI's accounts at JPMorgan, the assets contained therein, and the proceeds thereof, as security for payment of LBHI's obligations under the August and September Guaranties and the Clearance Agreement." (Counterclaims ¶ 119) (emphasis supplied). The next paragraph continues the same characterization, referring to "collateral that was delivered to JPMorgan in September 2008 to secure payment of LBHI's guaranty of its subsidiaries' obligations under the Clearance Agreement." (Counterclaims ¶ 120).

Thus, JPMorgan can only apply LBHI collateral to the debts of LBHI's subsidiaries if the Guaranties are valid and enforceable. Without the Guaranties, there are no obligations to which the liens attach. See Great Falls Bank v. Pardo, 622 A.2d 1353, 263 N.J. Super. 388 (N.J. Super. Ct. Ch. Div. 1993) ("The court agrees with the general premise of [Guarantor's] argument, i.e., if the guaranty agreement is unenforceable, the mortgage that was executed to secure it also must fall," although finding that the guaranty in that case was valid);

Shammas v. Merchants Nat'l Bank, No. 90-12217N, 1990 U.S. Dist. LEXIS 19334, at *14 (D. Mass. Nov. 9, 1990) ("given that [Guarantor]'s guaranty is most probably void, her signature on the second mortgage, which secures the void guaranty, may also fail. The language of the mortgage implies that the mortgage is conditioned upon the mortgagors having 'guaranteed the Promissory Note' . . . If [Guarantor]'s guaranty fails, because they are inherently linked, the mortgage may go in its wake."); Shepherd v. Bering Sea Originals, 578 P.2d 587, 591 (Alaska 1978) ("[Guarantors] personally guaranteed the loan and assigned the life insurance policy as security for their liability. Thus, technically, the life insurance policy was to secure the guaranty, not the underlying loan."); First Nat'l Bank of Glen Falls v. Myers, 9 A.D.2d 823, 192 N.Y.S.2d 940 (3d Dep't 1959) (father's mortgage securing payment of son's note found to secure separate guaranty rather than note itself).[13]

At the very least, the allegations in the Amended Complaint, along with the contractual language discussed above, create a question of fact as to whether JPMorgan has a contractual right to use LBHI's collateral to satisfy the debts of its subsidiaries if the Guaranties

---

[13] Nor would JPMorgan, in the absence of valid guaranties or liens, have any right to setoff against LBHI's assets. Section 553 requires that any setoff be mutual. 11 U.S.C. § 553. "Allowing triangular setoffs would open the door to all sorts of applications, thereby encroaching upon the fundamental bankruptcy policy of equality of distribution without serving the basic purposes that preserving rights of setoff in bankruptcy were designed to serve." 5 Lawrence P. King, Collier on Bankruptcy ¶ 553.03[3][b][i] (16th ed. Rev. 2010).

Thus, in the absence of valid guaranties or liens, the application of LBHI's collateral to satisfy claims against LBHI's subsidiaries would be exactly the type of non-mutual triangular setoff prohibited by the Code. See, e.g., MNC Comm. Corp. v. Joseph T. Ryerson & Son, Inc., 882 F.2d 615, 618 fn. 2 (2d Cir. 1989) ("[U]nder federal bankruptcy law, a subsidiary's debt may not be set off against the credit of a parent."); Matter of Fasano/Harriss Pie Co., 43 B.R. 864, 870 (Bankr. Mich. 1984) (an intercorporate relationship "is insufficient to meet the mutuality requirement in a third party claim of setoff against a member of the corporate family."); 5 Collier on Bankruptcy ¶ 553.03[3][b][i] (collecting cases). Furthermore, the parties cannot override the prohibition of triangular setoffs by agreement. In re Semcrude, 399 B.R. 388, 398 (Bankr. D. Del. 2009), aff'd 428 B.R. 590 (D. Del. 2010). Some courts have found that even guarantees are not sufficient to create mutuality. See In re Ingersoll, 90 B.R. 168, 171 (Bankr. W.D.N.C. 1987).

are invalid or unenforceable. See Johnson v. NBD Park Ridge Bank (In re Octagon Roofing),

124 B.R. 522, 527 (Bankr. N.D. Ill. 1991) (holding that Trustee pleaded a viable cause of action

for constructively fraudulent transfer where trustee contended that "the primary purpose of the

[m]ortgage was to support the guaranty by Debtor of [a third-party company's] obligations . . . to

the Bank" because resolution of the disagreement necessitated interpretation of conflicting

language in the mortgage agreement).

      Moreover, any doubts about party intent and, therefore, the effect of the contracts

must be construed against JPMorgan for two reasons. First, that is the appropriate application of

the legal standard for motions to dismiss. Peregrine Fixed Income, Ltd. v. JPMorgan Chase

Bank, 05 Civ. 4351 (RMB) (THK), 2006 U.S. Dist. LEXIS 8766, at *3 (S.D.N.Y. Jan. 26, 2006)

(on a motion to dismiss, courts "should resolve any contractual ambiguities in favor of the

plaintiff") (internal quotation omitted); see also Heller v. Goldin Restructuring Fund, L.P., 590 F.

Supp. 2d 603, 607 fn. 4 (S.D.N.Y. 2008) ("In deciding to incorporate . . . documents 'by

reference,' the Court . . . will strive to resolve any contractual ambiguities in [Plaintiff's] favor.")

(citation omitted). Second, Plaintiffs are entitled to the benefit of the doubt because JPMorgan

drafted both sets of agreements and provided the September Guaranty and September Security

Agreement to LBHI fewer than twelve hours before JPMorgan demanded that they be executed,

allowing no negotiation of the substantive terms of those agreements. (Am. Compl. ¶ 58);

Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 67 (2d Cir. 2000) ("Under New York law,

equivocal contract provisions are generally to be construed against the drafter."); Evergreen

Bank v. St. Onge (In re St. Onge), 94-CV-1441 (RSP), 1996 U.S. Dist. LEXIS 2029, at *11

(N.D.N.Y. Feb. 21, 1996) (applying this rule of interpretation to a security agreement). In sum,

JPMorgan's argument that Plaintiffs are not entitled to return of LBHI's collateral fails as a

matter of law. If Plaintiffs' allegations are borne out, then JPMorgan is not entitled to use LBHI's collateral to satisfy itself fully for the debts of LBHI's subsidiaries without valid and enforceable LBHI guaranties of those debts.

## C. The September Agreements and $8.6 Billion Transfers Are Not Safe Harbored Because the September Agreements Are Not Securities Contracts, Swap Agreements or Repurchase Agreements

A wholly independent reason why neither the September Agreements nor the $8.6 billion of related collateral transfers are protected by the safe harbors is that they were not transactions made in connection with "securities contracts," "repurchase agreements" or "swap agreements," as those terms are defined under the Bankruptcy Code.

On its face, the September Guaranty purported to create a limitless guaranty by LBHI of all potential obligations of any nature owed by any Lehman subsidiary to any JPMorgan affiliate, unconnected to any safe harbored activity. (Ex. 7, September Guaranty § 1; Am. Compl. ¶ 51). Similarly, the September Security Agreement purported to create a lien to secure that unlimited guaranty. (Ex. 9, September Security Agreement § 2; Am. Compl. ¶ 51). Likewise, the September Amendment purported to replace the 2000 Clearance Agreement's pre-existing lien provision with a limitless lien that would secure any and all claims of JPMorgan or its affiliates against any Lehman entity. (Ex. 6, September Amendment ¶ 1; Am. Compl. ¶ 51).[14] Consistent with the above, JPMorgan's demands for $8.6 billion, made under cover of the September Guaranty and September Security Agreement, were for the purpose of creating a general collateral pool that it could tap anytime and for any reason, including in the event of an

---

[14] The remaining September Agreement, the Account Control Agreement, purported to give JPMorgan "control" over LBHI's $1.7 billion of money market fund shares within the meaning of the Uniform Commercial Code, in order to perfect the security interest (if any) that attached to those funds pursuant to the September Security Agreement. (Am. Compl. ¶ 54; Ex. 9). Accordingly, to the extent this Court finds that the September Security Agreement is not subject to the safe harbor provisions of the Bankruptcy Code, that ruling should apply with equal force to the Account Control Agreement.

LBHI bankruptcy, and were not intended to facilitate any clearance, repurchase or swap transaction. (Am. Compl. ¶¶ 62, 66, 69). As a matter of law, the September Agreements are therefore not "securities contracts," "repurchase agreements" or "swap agreements" for purposes of the section 546 safe harbor provisions, which do not provide cover for a party that seeks to put itself ahead of all other creditors of an estate regardless of the basis of its claims.

Moving beyond the plain language of the contracts themselves, the question of whether the September Agreements and $8.6 billion of related collateral transfers qualify for safe harbor protection would at least require a careful fact-intensive inquiry. Among the factors to be considered are: whether these transactions have the substantive characteristics of clearance, repurchase or swap transactions, and whether they were entered into to facilitate such transactions; JPMorgan's use of coercion and misrepresentations to acquire the agreements and collateral; JPMorgan's intent in demanding these agreements and transfers when it was already contractually protected and adequately secured pursuant to industry standard documentation; whether JPMorgan's real goal was to gain a preferred position over all other LBHI creditors; and whether these transactions implicate the public policy concerns underlying the safe harbors. JPMorgan's Moving Brief addresses none of these issues.

The question of application of the safe harbor provisions to these transactions is not one that should be decided on a motion to dismiss. Instead, this Court should conduct a factual inquiry into whether the September Agreements and related $8.6 billion of collateral postings are actually the types of transactions that qualify for protection under the section 546 safe harbors. See Alfa, S.A.B. de C.V. v. Enron Creditors Recovery Corp. (In re Enron Creditors Recovery Corp.), 422 B.R. 423, 439 (S.D.N.Y. 2009) (holding that such inquiry is appropriate "in determining the applicability of the safe harbor to any particular set of novel facts");

Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp., 351 F. Supp. 2d 79, 107-108 (S.D.N.Y. 2004) (denying motion to dismiss fraudulent conveyance claims on safe harbor grounds because "it is unclear, as a factual matter, that the transfers qualify as 'settlement payments'"; "[r]esolution of these issues must therefore await the taking of evidence"); accord Hutson v. E.I. du Pont de Nemours and Co., Inc. (In re Nat'l Gas Distrib.), 556 F.3d 247, 250 (4th Cir. 2009) (remanding to determine whether "factually and legally . . . natural gas supply contracts were swap agreements based on any classification included in § 101(53B)"); cf. Bank of America, 2010 Bankr. LEXIS 3867 at *66 (whether the safe harbor "exception will apply to a particular security agreement calls for a review of the facts and circumstances of each transaction or series of transactions").

JPMorgan should not be allowed to manipulate the safe harbor provisions of the Bankruptcy Code to gain a preferred position over all other creditors by extracting an onerous guaranty and lien, and siphoning LBHI's liquidity in its last critical week. Nor should they insulate JPMorgan from legitimate and serious inquiry into its intentions and actions.

1. **By Their Plain Language, the September Guaranty and September Security Agreement Are Not "Securities Contracts," "Repurchase Agreements" or "Swap Agreements"**

JPMorgan's Moving Brief relies heavily on the argument that the September Agreements "all constitute 'securities contracts,' 'repurchase agreements,' or 'swap agreements' eligible to shield the September collateral transfers from avoidance under section 546." (Mov. Brief at 31). This premise underlies its entire safe harbor argument, because section 546 only covers transfers made "in connection with" certain contracts, including "a securities contract," "a repurchase agreement," and "any swap agreement." 11 U.S.C. § 546(e)-(g).

But the operative language of the September Guaranty and September Security Agreement did not connect to any safe harbored transactions, but instead purported to create

limitless guaranties by LBHI for any and all claims JPMorgan or any of its affiliates may have against Lehman subsidiaries, and a lien to support those guaranties. Specifically, the operative section of the September Guaranty purports to create an LBHI guaranty of the "punctual payment of all obligations and liabilities of [Lehman] to the Bank of whatever nature, whether now existing or hereafter incurred . . . " (Ex. 7, September Guaranty § 1). The operative language does not refer or connect to any securities contract, repurchase agreement or swap agreement. The September Security Agreement, in turn, purported to create a lien to secure that limitless guaranty. (Ex. 8, September Security Agreement at 2; see also Am. Compl. ¶ 51).

The section 546 safe harbors are not "boundless." Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.), 263 B.R. 406, 478 (S.D.N.Y. 2001); 11 U.S.C. § 546(e)-(g). Instead, they are an "exception to public policy underlying the avoidance provisions in the Bankruptcy Code – intended to prevent a debtor from diminishing funds that are generally available for distribution to creditors," see QSI Holdings, Inc., 382 B.R. at 737, and should therefore be construed narrowly and in a manner consistent with the overall goal of the Bankruptcy Code of providing equality of distribution to creditors. See Jackson, 263 B.R. at 479-480 (describing the "clash of interests" between the safe harbors and the avoidance powers of a trustee in bankruptcy); cf. Bank of America, 2010 Bankr. LEXIS 3867 at *69 (observing that safe harbor "exceptions to the automatic stay are to be construed narrowly").

Plaintiffs are unaware of any case, and JPMorgan does not cite to one, in which contracts that purported to create a limitless guaranty and lien to support that guaranty were deemed "securities contracts," "repurchase agreements" or "swap agreements."[15] Indeed, such a ruling would be contrary to the well-established authority, cited above, that the safe harbor provisions of the Bankruptcy Code are to be construed narrowly and for the purpose of protecting certain defined transactions.

At the very least, the September Agreements and collateral transfers thereunder cannot be deemed safe harbored on a motion to dismiss where there is no contract language that explicitly and unambiguously defines the September Guaranty and September Security Agreement as the types of agreements referenced in section 546's safe harbor provisions. See Doldan v. Fenner, 309 A.D.2d 1274, 1275-76, 765 N.Y.S.2d 401, 403 (4th Dep't 2003) (issue of parties' intent required resort to extrinsic evidence and could not be resolved on a motion to dismiss); DKR Capital, Inc. v. AIG Int'l West Broadway Fund, Ltd., 03 Civ. 1568 (JGK), 2003 U.S. Dist. LEXIS 17498, at *13 (S.D.N.Y. October 2, 2003) ("In deciding a Rule 12(b)(6) motion to dismiss a breach of contract claim, the Court's role is not to resolve ambiguities in the language of the contract."), citing Lipsky v. Commonwealth United Corp., 551 F.2d 887, 897 (2d Cir. 1976).

---

[15] (See Mov. Brief at 37, citing Casa de Cambio Majapara S.A. de C.V. v. Wachovia Bank, N.A. (In re Casa de Cambio Majapara S.A. de C.V.), 390 B.R. 595, 596-97 (Bankr. N.D. Ill. 2008) (specific foreign exchange swap agreement); Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.), 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999) (specific freight swap agreements); see also Mov. Brief at 28, citing Contemporary Indus. Corp. v. Frost, 564 F.3d 981, 984 (8th Cir. 2009) (purchase and sale of stock pursuant to a leveraged buyout); Thrifty Oil Co. v. Bank of Am. Nat'l Trust and Sav. Ass'n, 322 F.3d 1039, 1044-45 (9th Cir. 2003) (involving specific interest rate swaps); In re Olympic Natural Gas Co., 294 F.3d at 739 (involving specific natural gas forward contracts)).

**2.** **Mere Reference In a Preliminary Statement to Derivative Transactions or Clearing Advances, Among a Host of Other Transactions, Does Not Render the September Guaranty and September Security Agreement "Securities Contracts," "Repurchase Agreements" or "Swap Agreements"**

Unable to point to anything in the operative language of the September Guaranty or September Security Agreement that would render either of them a securities contract, repurchase agreement or swap agreement, or a credit enhancement to such agreements, JPMorgan tries to fill the void by looking to the contracts' non-operative recital language. (Mov. Brief at 34). In particular, JPMorgan relies on the following Preliminary Statement in the September Guaranty:

> The Guarantor . . . desires to transact business and/or trade with and/or enter into derivative transactions with and/or to obtain credit, clearing advances, clearing loans or other financial accommodation from the Bank and to continue such business, trading, derivative activity and/or such extensions of credit, clearing advances, clearing loans or other financial accommodation and the bank has requested that it receive the following guaranty of the undersigned before it will consider extending such credit.

(Ex. 7, September Guaranty "Preliminary Statement"). JPMorgan also points to the preface to the September Security Agreement, which refers to JPMorgan "extending credit to and/or transacting business, trading or engaging in derivative transactions with the undersigned and/or its subsidiaries." (Ex. 8, September Security Agreement at 1). Based on these self-serving statements – inserted by JPMorgan (see Am. Compl. ¶¶ 46, 58) – JPMorgan argues that when the September Guaranty and September Security Agreement refer to all liabilities, they somehow "meant securing and guaranteeing those arising under the securities contracts, repurchase agreements, and swap agreements governing these relationships." (Mov. Brief at 34).

As an initial matter, it is settled New York contract law that recital clauses are not operative and do not alter the nature of the contracts. See Jones Apparel Group, Inc. v. Polo Ralph Lauren Corp., 16 A.D. 3d 279, 791 N.Y.S.2d 409, 410 (1st Dep't 2005) ("there is no need

to refer to [the contract's] recitals, which are not part of the operative agreement") (collecting authority). Reference to clearance or derivatives transactions (among a host of other transactions) in the preface thus does not alter the substance of the agreements, nor otherwise render them the type of specifically defined credit enhancements that fall within the narrow safe harbor protections of section 546.

But even if this language in the preface were instead part of the operative language in the contract, it would do nothing to alter the conclusion that the September Guaranty and September Security Agreement purport to create a limitless guaranty and lien, and are avoidable as fraudulent conveyances. The prefatory language does not purport to limit the operation of these agreements to clearance or derivatives activity, but instead references the entire range of business conducted between JPMorgan or any of its affiliates with any Lehman entity. The section 546 safe harbor provisions do not encompass such broad credit enhancements entered into immediately prior to bankruptcy, and a non-operative reference to unspecified "clearance" or "derivatives" activity does not otherwise bring those contracts within the safe harbors' scope. See, e.g., H.R. Rep. No. 109-31, at 122 (2005), reprinted in 2005 U.S.C.C.A.N. 88, 183 ("Traditional commercial arrangements . . . cannot be treated as 'swaps' under the FDIA, the FCUA, or the Bankruptcy Code because the parties purport to document or label the transactions as 'swap agreements.'")

Accordingly, based on the plain operative language of the September Guaranty and the September Security Agreement alone, neither of those contracts nor any collateral transfers made pursuant thereto are entitled to protection under the section 546 safe harbor provisions.

3. **Extrinsic Evidence Indicates at Least a Factual Question Regarding Whether the September Agreements Qualify as Securities, Repurchase or Swap Agreements**

Moving outside the language of the contracts themselves, JPMorgan points to the allegations in the Amended Complaint regarding JPMorgan being one of Lehman's largest global counterparties for derivatives activity and other fixed income and equity securities transactions, among other things. (Mov. Brief at 34, quoting Am. Compl. ¶ 16). Based on this statement about the relationship between JPMorgan and Lehman, JPMorgan argues that the Court can just assume the September Agreements' references to "all liabilities" of LBHI subsidiaries must have meant "those arising under the securities contracts, repurchase agreements, and swap agreements governing those relationships." (Mov. Brief at 34). As demonstrated below, the facts pleaded in the Amended Complaint do not support such an assumption, but to the contrary, present a serious factual question as to whether any of the September Agreements or $8.6 billion of collateral transfers qualify for safe harbor protection.

a. **The September Agreements and $8.6 Billion Transfers Are Not Securities Contracts or Repurchase Agreements, or Transfers Made In Connection With Such Agreements**

Throughout the Moving Brief, JPMorgan argues that the September Agreements and $8.6 billion of collateral transfers are immune from scrutiny under the Bankruptcy Code because they purportedly qualify as, inter alia, "securities contracts" or "repurchase agreements" within the meaning of the safe harbors, or as transactions made in connection with such agreements. (See, e.g., Mov. Brief at 31-35). But JPMorgan reaches this conclusion without any evaluation of the September Agreements' substance or the context in which they were executed, or even its own purpose in making the related collateral demands. JPMorgan's superficial analysis should not persuade this Court. Nor is this Court required to accept JPMorgan's brazen mischaracterization of the allegations in the Amended Complaint as some "admission" by

Plaintiffs that the September Agreements and collateral demands were connected to clearance activity, when the facts pleaded make it clear that any purported connection to clearance activity was a pretext and sham. (See Mov. Brief at 35-36, quoting Am. Compl. ¶ 62).[16]

As stated above, the purported contractual basis for JPMorgan's conclusion that the September Agreements are entitled to safe harbor protection as "securities contracts" or "repurchase agreements" is that their non-operative prefatory clauses "explicitly reference . . . 'clearing advances' as among the transactions that JPMorgan was conducting with LBHI subsidiaries." (Mov. Brief at 34). Notwithstanding this self-serving reference to clearing advances, neither the September Agreements nor the $8.6 billion of collateral transfers acted as credit support for clearance and trading activity under the 2000 Clearance Agreement. JPMorgan had already determined that it had sufficient credit support in place for its clearance-related extensions of credit to Lehman, by virtue of the August Agreements and the billions of dollars of collateral posted by LBHI prior to September 2008. (Am. Compl. ¶¶ 21-22, 28, 45). Instead, JPMorgan's goal was to use its clearance relationship with Lehman as a pretext for obtaining, through the September Agreements, a guaranty and security for all other potential

---

[16] The paragraph from the Amended Complaint cited in the Moving Brief at 35-36 clearly explains that "JPMorgan used the September Agreements as a pretext to improperly extract billions of dollars in cash from LBHI as additional collateral." (Am. Compl. ¶ 62). Similarly, the sentence selectively quoted by JPMorgan reads in full: "In fact, although the demands were made pursuant to a purported amendment to the 2000 Clearance Agreement, as well as a guaranty and security agreement executed in the context of the 2000 Clearance Agreement (i.e., the September Agreements), JPMorgan's collateral demands had nothing to do with intra-day clearance obligations." (Am. Compl. ¶ 62) (emphasis supplied). The Moving Brief omits the underlined language and misleadingly argues that this sentence somehow constitutes an admission by Plaintiffs that the September Agreements and collateral demands were made in connection with the 2000 Clearance Agreement. (Mov. Brief at 35-36).

claims of JPMorgan (or any of its affiliates) against any Lehman entity, regardless of the nature

of those claims. (Am. Compl. ¶¶ 45, 62).[17]

Thus, for example, the September Amendment purported to expand the definition

of "Obligations" subject to the lien provision of the 2000 Clearance Agreement to include not

just clearance-related obligations, but "all of your existing or future indebtedness, obligations,

and liabilities of any kind to us . . ." (Ex. 6, September Amendment ¶ 1 (emphasis supplied); see

also Am. Compl. ¶ 51). As described above, the September Guaranty and September Security

Agreement similarly purported to create a limitless guaranty for the range of potential claims of

JPMorgan against any Lehman subsidiary, and a lien to support that guaranty. (Ex. 7, September

Guaranty § 1; Ex. 8, September Security Agreement at 2; see also Am. Compl. ¶ 51).

---

[17] JPMorgan also points to LBHI's statement in connection with the September 16 Order that "The Clearance Agreements, Guarantee Agreements, and Security Agreements are 'securities contracts' within the meaning of section 741(7) of the Bankruptcy Code." (Mov. Brief at 18; id. at 31 fn. 7, quoting Ex. 11, September 16 Order Motion at ¶ 17)).

The September 16 Order itself does not address the issue. In fact, the Court explicitly stated that it was incidental at the hearing, explaining that "[t]here was a reference in the statement [of JPMorgan in support of the September 16 Motion] to Section 741 and the definition of securities contract and the assertion that these documents all fit that definition. I'm not quarrelling with that assertion nor am I making a finding that the assertion is correct." (Ex. 12, Hearing Tr., 9/16/08 at 29:18-22). Because the Court explicitly stated that it was not deciding the issue, there is clearly no judicial estoppel that would bind LBHI to its statement or warrant determination on a motion to dismiss. See In re Worldcom, Inc., 361 B.R. 697, 714 (S.D.N.Y. 2007) ("Judicial estoppel requires that a court accept a particular position in the prior action."), quoting New Hampshire v. Maine, 532 U.S. 742 (2001).

Moreover, in no event would this characterization be enforceable against the Committee. In re J.A. Jones, Inc., 361 B.R. 94, 104-07 (Bankr. W.D.N.C. 2007) ("[T]he use of judicial estoppel is inappropriate in this case because the 'party to be estopped' would be the general body of unsecured creditors, not the party that made the statement, which is the Debtor."). The Committee was appointed the day after the September 16 Order, so cannot be bound by statements made before its formation. Id. at 104-07 (debtor's statements made in connection with emergency motion early in bankruptcy proceedings had no preclusive effect based on judicial estoppel or issue preclusion on later-formed committees of creditors).

That the September Agreements were not connected to clearance or tri-party repurchase activity is further demonstrated by the fact that the $8.6 billion of collateral demanded by JPMorgan under cover of those agreements was not intended by JPMorgan to secure clearance or repurchase obligations. Even JPMorgan contends that at least the first $3.6 billion of collateral demands had nothing to do with clearance or repurchase activity. (Am. Compl. ¶ 62). And internal JPMorgan documents demonstrate that it did not require the final $5 billion demanded from LBHI to support clearance activity, but that it made this demand solely because it desired to have an "extra cushion" that it could apply to any and all claims that could arise upon an LBHI bankruptcy. (Am. Compl. ¶ 69).

Indeed, the only link between the September Agreements and collateral transfers to a clearance or repurchase contract is the unlawful threat that JPMorgan used to force LBHI to execute those agreements and make the transfers – i.e., that JPMorgan would cease clearing for and extending related credit to Lehman under the 2000 Clearance Agreement, in violation of that agreement. (Am. Compl. ¶¶ 48-49, 66, 69). That unlawful threat to breach a clearance or repurchase contract plainly cannot satisfy the safe harbors' requirement that the transaction at issue be entered "in connection with" such contracts.

**b.  The September Agreements and Collateral Transfers Are Not "Swap Agreements" or Transfers Made in Connection With Swap Agreements**

Nor are the September Agreements or collateral transfers entitled to protection under the safe harbor provisions as "swap agreements," or as transfers made in connection with swap agreements. This is so regardless of JPMorgan's current assertion – undisclosed to LBHI at the time of the transactions themselves – that JPMorgan intended to use a portion of the

collateral demanded pursuant to the September Agreements to fund an improper derivatives contracts windfall that purportedly arose post-petition. (Am. Compl. ¶¶ 62-65).[18]

The September Agreements do not qualify for protection under the section 546(g) safe harbor as "swap agreements" because they would not be recognized as such in the securities industry – the touchstone for interpreting the definition of "swap agreement" under the Bankruptcy Code. Moreover, JPMorgan's misconduct and improper purpose in acquiring the September Agreements further demonstrate that they are not the type of transactions that Congress intended to protect from scrutiny under the section 546(g) safe harbor.

For purposes of the section 546(g) safe harbor, the Bankruptcy Code defines the term "swap agreement" by reference to what are commonly regarded as such agreements in the securities trade (see 11 U.S.C. § 101(53B)(A)(i)-(v) (defining "swap agreement" to include, e.g., "swap," "option," "forward," and "futures" contracts related to a variety of subject matter, or "master agreements" governing such contracts)), including "any security agreement or arrangement or other credit enhancement related to any agreements or transactions referred to in clause (i) through (v)" of section 101(53B). 11 U.S.C. § 101(53B)(A)(v).

Thus, "Congress has made clear that [section 546(e) and accompanying provisions] are to be defined with reference to the common understanding, practice and usage in the securities industry." Alfa, S.A.B. de C.V. v. Enron Creditors Recovery Corp. (In re Enron Creditors Recovery Corp.), 422 B.R. 423, 437 (S.D.N.Y. 2009), citing Jackson, 263 B.R. at 475 (alterations in original); see also Bankruptcy Treatment of Swap Agreements and Forward

---

[18] As discussed at pages 14-15, supra, the Lehman counterparties vigorously dispute JPMorgan's post-bankruptcy calculations of the close-out amounts due under their derivatives contracts. In fact, no net early termination payment was due to JPMorgan with respect to the post-bankruptcy termination of those contracts.

Contracts: Hearing Before the Subcomm. on Economic and Commercial Law of the H. Comm. of the Judiciary, 101st Cong. 22 (1990) (statement of Mark C. Brickell, Chairman, International Swap Dealers Association) ("[T]he legislation presents no risk of abuse, in light of the financial sophistication of all parties to these transactions and movement toward standard industry documentation based on the formats developed by ISDA and other groups of market participants."); 136 Cong. Rec. S7536 (daily ed. June 6, 1990) (explaining that the safe harbor legislation "protects ordinary swap payments against exposure to preference avoidance actions during the bankruptcy proceeding") (emphasis supplied); H.R. Rep. No. 109-31, at 129 (2005), reprinted in 2005 U.S.C.C.A.N. 88, 189 ("[The] definition of 'swap agreement' in this subsection should not be interpreted to permit parties to document non-swaps as swap transactions.").

Well before the September Agreements were executed or even contemplated, JPMorgan had the type of credit support in place for its derivatives transactions with Lehman that was consistent with industry standards and usage, pursuant to standard form ISDA Master Agreements. (Mov. Brief at 33, fn. 8). In stark contrast to those ISDA Master Agreements, the September Agreements do not meet any recognized definition of "swap agreements." As the Amended Complaint makes clear, LBHI's entry into the September Agreements and its related postings of collateral were not part of, and were not required to facilitate, any derivatives transaction between the parties.

The only feature of the September Agreements that JPMorgan argues qualifies them as "swap agreements" (or as transfers made in connection with swap agreements) is that they provided a mechanism for JPMorgan to demand billions of dollars from LBHI to secure every potential Lehman obligation that could arise in the future which, in JPMorgan's view, included inchoate derivatives claims. But this feature of the September Agreements is directly

contrary to fundamental characteristics of swap contracts. As an initial matter, swap contracts do not provide for a lien on the guarantor's assets for any and all claims that may arise between the parties. Moreover, it would be completely illogical and contrary to the basic functioning of swap agreements for a parent serving as guarantor to grant a lien and post collateral when its subsidiaries were "in the money" under the relevant derivatives contracts by as much as $1 billion at the time of the demand. (See Am. Compl. ¶ 63). This is particularly so where, as here: (i) the counterparties had already been operating under the derivatives contracts for some time; (ii) LBHI provided credit support for those contracts under separate pre-existing agreements; (iii) the "out-of-the-money" demanding party had no right to terminate those contracts or hold up performance if its demands for a new lien and collateral were not met; and (iv) no consideration was even offered for the new lien or collateral postings. (Am. Compl. ¶ 56).

Not only were the September Agreements and collateral postings unrelated to any derivatives transaction, they were specifically intended by JPMorgan to circumvent the provisions of the parties' pre-existing derivatives contracts that regulate the posting of collateral. (Am. Compl. ¶¶ 46-65). Because JPMorgan had no right to demand collateral from LBHI under the parties' derivatives contracts, JPMorgan never told LBHI that it intended any of the demanded collateral to support derivatives obligations. (Am. Compl. ¶ 62).[19] Instead, JPMorgan falsely represented that the collateral was required for clearance activity, and threatened to cease acting as agent under the 2000 Clearance Agreement unless its demands were met. (Am. Compl. ¶¶ 48, 62, 67).

---

[19] As explained in the Amended Complaint, JPMorgan could not demand collateral from the Lehman counterparties at the time, because Lehman was "in-the-money" by as much as $1 billion under the derivatives contracts. (Am. Complaint ¶ 63). And under no circumstances did the derivatives contracts allow JPMorgan to demand collateral from LBHI in its capacity as guarantor of the Lehman subsidiaries' obligations. (Id. ¶ 64).

These allegations are more than sufficient to demonstrate the existence of a serious factual issues regarding whether, for purposes of the section 546(g) safe harbor, the September Agreements or collateral postings fit the definition of "swap agreements," or transfers made in connection with such agreements. JPMorgan's argument that any of Plaintiffs' avoidance claims can be dismissed on the pleadings without an appropriate factual inquiry should therefore be rejected.

### 4. JPMorgan's Argument Runs Counter to the Purpose of the Section 546 Safe Harbor Provisions, Which Do Not Provide Wholesale Protection of Transfers in Connection With a Guaranty of All Liabilities

There are also serious factual questions regarding whether the systemic risks that the safe harbors were designed to contain are implicated with respect to the unprecedented and overreaching September Agreements and related multi-billion dollar collateral transfers. This provides an additional and independent basis for denying JPMorgan's motion to dismiss. See American Tissue, 351 F. Supp. 2d at 107-108 (denying motion to dismiss because, inter alia, it was not clear that the purported settlement payments at issue implicated the public policy concerns underlying the safe harbors).

This Court recently dealt with a similar situation involving Lehman and Bank of America, and observed the inequity in allowing a clearing bank to exercise its "palpable economic leverage" to demand a new lien and extract millions of dollars in cash collateral from a struggling LBHI. Bank of America, 2010 Bankr. LEXIS 3867 at *12. This Court observed:

> LBHI, at a time of increasing financial distress, found itself in the coerced position of facing a demand for collateral that it could not refuse. The setting matters here and highlights how inequitable it would be for BOA to succeed in improving its position relative to other creditors on account of the circumstances enabling it to exert powerful leverage tied to Lehman's cash management practices.

> The security agreement was negotiated by the parties under the
> stress of the moment and with the added pressure of a fixed and
> very tight deadline. LBHI really had no choice. If it did not
> acquiesce in BOA's specific demands for collateral, BOA
> threatened to discontinue the practice of clearing checks if intra-
> day overdrafts occurred, thereby causing potential serious
> disruption in LBHI's ability to function normally. This was the
> situation when LBHI signed the security agreement and delivered
> $500 million to BOA as security for overdrafts.

Id. (emphasis supplied).  The same analysis applies equally to JPMorgan's conduct here.

Congress surely did not intend to create a gaping loophole through the safe harbor provisions

that would allow a sophisticated party to extract eleventh-hour, parent-level guaranties with

complete immunity regardless of the nature of the underlying transactions.

This Court should similarly not be persuaded by JPMorgan's baseless policy

argument that the safe harbor provisions "are the predicate for JPMorgan's ability to continue to

act as clearing bank and derivatives counterparty for companies in financial distress." (Mov.

Brief at 27).  In addition to the fact that the September Agreements and collateral transfers were

not intended to support clearance activity or legitimate derivatives obligations, JPMorgan was

already fully collateralized and protected pursuant to industry standard documentation and the

collateral posted pursuant thereto.  JPMorgan thus cannot credibly argue that it relied on the

September Agreements or collateral grabs, or that they would be protected by the safe harbors, to

continue acting as clearing agent or derivatives counterparty.

JPMorgan's assertion that its post-bankruptcy application of LBHI's collateral to purported clearance or derivatives obligations retroactively cloaks the September Agreements and collateral demands in the protections of the safe harbors is similarly misconceived. (Mov. Brief at 19, 36).[20] As an initial matter, the Lehman entities vigorously dispute the legitimacy of JPMorgan's so-called clearance claims, and there are serious factual questions as to whether these post-petition claims are even related to clearance activity, as JPMorgan now asserts. Lehman similarly disputes JPMorgan's post-bankruptcy calculations of the settlement amounts purportedly due under the derivatives contracts (including those acquired by JPMorgan after LBHI's bankruptcy petition). As such, JPMorgan's assertion of post-petition claims, which have no basis in the Amended Complaint, cannot provide a basis for ruling on the pleadings.

Moreover, JPMorgan's argument, if accepted, would create an incentive for conduct that directly conflicts with the underlying policies of the Bankruptcy Code and the narrow interpretation that is to be afforded to the safe harbor provisions. See Bank of America, 2010 Bankr. LEXIS 3867 at *68. In effect, creditors would be given an incentive to always extract as much as possible from troubled companies in the way of guaranties, liens and assets, even if not required to facilitate safe harbored activity, because the creditors would be given a later opportunity to recharacterize and justify those transactions after-the-fact. As seen in this case, such behavior wreaks havoc not only on the troubled company itself, but further disadvantages other creditors that did not engage in such aggressive self-help. This outcome

---

[20] Note that JPMorgan has also asserted a host of clearly non-safe harbored claims against the LBHI estate under color of the September Agreements. For example, JPMorgan has asserted that the September Agreements provide guaranty and security for hundreds of millions of dollars of trading losses incurred by JPMorgan fund customers as a result of the depreciation in value of Lehman bonds held by those funds (see Am. Compl. ¶ 51), as well as for overdrafts, legal fees and expenses, contingent letter of credit claims, misdirected wire transfers, service fees and account charges (see Ex. 14), none of which are remotely within the scope of the safe harbor protections of the Bankruptcy Code.

would directly conflict with the Bankruptcy Code's goal of providing for the fair and equitable treatment of similarly situated creditors, and provides an additional basis for rejecting JPMorgan's argument. See, e.g., Butler v. David Shaw, Inc., 72 F.3d 437, 441 fn. 6 (4th Cir. 1996) (noting that the avoidance powers of the trustee "reduces the incentive to rush to dismember a financially unstable debtor").

**D.**   **JPMorgan's $6.9 Billion Cash Sweep Is Not Protected by the Safe Harbor Provisions (Counts XVII and XIX)**

Finally, Counts XVII and XIX state claims for avoidance with respect to LBHI's $6.9 billion of funds that JPMorgan transferred from LBHI's deposit account to JPMorgan's own general ledger account in the week prior to LBHI's bankruptcy. Contrary to JPMorgan's assertion, the fact that these funds were originally deposited in response to JPMorgan's collateral demands under the September Agreements does not render this $6.9 billion cash sweep a safe harbored transaction. (Mov. Brief at 39). For all the reasons discussed above, neither the September Agreements nor the original collateral transfers are protected as safe harbored transactions.

But even if this were not the case, JPMorgan's subsequent unauthorized transfers of the $6.9 billion of LBHI funds into JPMorgan's own general ledger account would not qualify for safe harbor status because they were not made as part of, or to facilitate, any securities contract, repurchase agreement or swap agreement transaction. According to JPMorgan, they were made solely "to ensure that LBHI did not withdraw the cash collateral" when LBHI most needed those assets during its last critical week (see Mov. Brief at 83-84), and as explained in Point III(A) below, the transfers violated the terms of both the August Security Agreement and the September Security Agreement. Accordingly, these independent transfers of LBHI's $6.9

billion are not subject to safe harbor protection, and JPMorgan's motion to dismiss Plaintiffs' avoidance claims on that basis should be denied.

**POINT II**

**JPMORGAN'S MOTION TO DISMISS PLAINTIFFS' BANKRUPTCY CLAIMS ON NON-SAFE HARBOR GROUNDS SHOULD BE DENIED**

To the extent JPMorgan moves to dismiss Plaintiffs' claims arising under the Bankruptcy Code on purported grounds other than the safe harbors, the motion should be denied for the reasons set forth below.

**A. The Amended Complaint States Claims for Avoidance of Actual Fraudulent Conveyances (Counts I-III)**

Counts I-III state the bases for avoidance of the August Guaranty and August Security Agreement, the September Agreements, and the involuntary transfers to JPMorgan of $8.6 billion of cash and money market funds, as actual fraudulent transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code, because they were made with the actual intent to hinder, delay, or defraud creditors.[21]

In its Moving Brief, JPMorgan argues that the Amended Complaint does not adequately plead a factual basis for the intent element of actual fraud. But the Amended Complaint includes numerous factual allegations that would give rise to an inference of an "actual intent to hinder, delay, or defraud" creditors, as required by section 548(a)(1)(A). Indeed, this inference can be reached in any of three ways: (i) the badges of fraud pleaded in the Amended Complaint provide sufficient circumstantial evidence that the transfers were made with an intent to hinder, delay or defraud creditors; (ii) the facts demonstrate that the certain and foreseeable consequence of the conveyances was to hinder, delay or defraud creditors of LBHI;

---

[21] JPMorgan concedes that actual fraud is an exception to the safe harbor provisions of the Bankruptcy Code. (See, e.g., Mov. Brief at 53).

or (iii) JPMorgan's actual intent to put itself ahead of other LBHI creditors should be imputed to

LBHI, because JPMorgan coerced LBHI to involuntarily enter the September Agreements and

transfer billions of dollars to JPMorgan for that very purpose.

A complaint meets the notice requirement of Federal Rule of Civil Procedure 9(b)

if it "describes the specific injury, describes the legal theories upon which it bases its claims, and

suffices to allow each defendant to prepare an effective answer or defense." Am. Tissue, 351 F.

Supp. 2d at 107 (refusing to grant motion to dismiss based on allegation that plaintiff failed to

plead actual fraud with particularity); see also In re Tronox, 429 B.R. 73, 92 (Bankr. S.D.N.Y.

2010); Wieboldt Stores, Inc. v. Schottenstein, 94 B.R. 488, 498 (N.D. Ill. 1988) (finding that

claim of actual fraud satisfied Rule 9(b) because the pleadings recited supporting facts, explained

the events surrounding the transaction sought to be avoided, described each defendant's

participation in the transaction, and described the effect of the transaction).

Thus, the complaint need not detail all of a plaintiff's evidence, but must put the

defendant on sufficient notice to prepare a defense. Wieboldt, 94 B.R. at 498 ("Pleadings are not

intended to supplant the process of discovery."). The "existence of actual fraudulent intent is a

question of fact" and courts even hesitate to grant summary judgment on such claims, preferring

the matter go to the trier of fact. Matter of S & W Exporters, Inc., 16 B.R. 941, 947 (Bankr.

S.D.N.Y. 1982) (denying summary judgment on issue of fraudulent transfer). The Amended

Complaint meets this standard.

1.     **The Amended Complaint Pleads Sufficient Badges of Fraud**

First of all, the badges of fraud pleaded in the Amended Complaint create a

"strong inference of fraudulent intent" on the part of LBHI, and require denial of JPMorgan's

motion to dismiss Plaintiffs' section 548(a)(1)(A) claims with respect to the August Guaranty

and Security Agreement, the September Agreements, and the LBHI assets transferred to JPMorgan pursuant thereto.

Courts in the Second Circuit have held that the following badges of fraud create a strong inference of fraudulent intent: (1) a close relationship among the parties to the transaction; (2) a questionable or hasty transfer not in the usual course of business; (3) the existence of an unconscionable discrepancy between the value of the property transferred and the consideration received therefore; (4) the chronology of the events and transactions under inquiry; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred. See, e.g., In re Kaiser, 722 F.2d 1574, 1582-83 (2d Cir. 1983); In re Enron Corp., 328 B.R. 58, 73-74 (Bankr. S.D.N.Y. 2005); In re Saba Enters., Inc., 421 B.R. 626, 640-43 (Bankr. S.D.N.Y. 2009); In re Park South Sec., LLC, 326 B.R. 505, 518 fn. 11 (Bankr. S.D.N.Y. 2005); Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc. (In re Sec. Investor Prot. Corp.), 234 B.R. 293, 315-16 (Bankr. S.D.N.Y. 1999). Pleading these badges of fraud is all that is required to survive a motion to dismiss.

The Amended Complaint alleges the existence of each of these badges of fraud. Specifically: (1) LBHI was wholly dependent on JPMorgan for the conduct of its business, and JPMorgan was an insider with unparalleled access to information regarding LBHI's state of affairs and future plans (Am. Compl. ¶¶ 2, 4, 35); (2) each transaction occurred on a rushed basis, with little or no negotiation, and was unprecedented in the prior course of business between the parties (and the industry generally) (id. ¶¶ 46-48, 58); (3) LBHI received nothing in exchange for incurring billions of dollars in potential obligations pursuant to the agreements, or

for transferring the billions of dollars in LBHI assets to JPMorgan (id. ¶¶ 5, 33, 56); (4) these transactions occurred in a suspiciously short time frame leading up to the LBHI bankruptcy (id. ¶¶ 46-48, 66-67); (5) they resulted in a massive drain of LBHI's liquidity and an unjustified transfer of property to JPMorgan prior to LBHI's bankruptcy petition (id. ¶ 74); and (6) each transaction occurred at a time when LBHI was insolvent and/or undercapitalized (id. ¶¶ 5, 30, 60, 66).

Furthermore, contrary to JPMorgan's assertion, pleading badges of fraud to satisfy the intent requirement of section 548(a)(1)(A) is not only available to creditors of an estate, but is also available to debtors in possession of an estate (among others). See, e.g., Enron, 328 B.R. at 73. This is particularly so where, as here, the debtor in possession has lost access to many of the individuals that managed the debtor's affairs prepetition. See id.; see also In re Sec. Investor Prot. Corp., 234 B.R. at 315 (a trustee pleading fraud "is entitled to some leeway in the areas of scienter and particularity because he has no personal knowledge of the facts"). Under such circumstances, courts "take a more liberal approach" in determining whether a debtor in possession's pleadings of actual fraud meet the standard of Federal Rule of Civil Procedure 9(b). Enron, 328 B.R. at 73.[22]

Viewed either under this "more liberal" test or the ordinary Rule 9(b) pleading standard, the Amended Complaint alleges sufficient facts to warrant denial of JPMorgan's motion to dismiss Counts I-III. See, e.g., Enron, 328 B.R. at 73-74 (denying motion to dismiss

---

[22] As a general matter, for allegations of actual fraud, bankruptcy courts routinely allow a more relaxed pleading standard for a party that was not personally involved in the transaction at issue. Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.), 379 B.R. 5, 17 (Bankr. E.D.N.Y. 2007) ("[I]n the bankruptcy context, courts have evaluated fraud allegations more liberally than in other civil actions charging fraud."); see also Chipwich, Inc. v. Peltz (In re Chipwich, Inc.), Nos. 92 B 44298, 92-9943A, 1993 Bankr. LEXIS 535, at *23 (Bankr. S.D.N.Y. Mar. 31, 1993) ("Because [the debtor in possession] was not a party to the Transfer, [his] fraudulent conveyance claims are governed by a relaxed standard with regard to particularity.").

where plaintiff pleaded Enron's insolvency, that the sophisticated transferee had knowledge of Enron's precarious financial position that was not available to other creditors, and that the payments depleted Enron's liquidity and disadvantaged other creditors).

2. **The Amended Complaint Pleads Facts Establishing That the Certain and Foreseeable Result of the Conveyances Was to Hinder or Delay Creditors**

Based on these badges of fraud and other allegations, the Amended Complaint pleads sufficient facts to create a strong inference of intent on the part of LBHI because the certain and foreseeable result of the highly unusual transactions at issue would be to hinder, delay, or defraud creditors of LBHI. Under section 548, "a transfer may be made with fraudulent intent even though the debtor did not intend to harm creditors but knew that by entering the transaction, creditors would inevitably be hindered, delayed, or defrauded." ASARCO LLC v. Ams. Mining Corp., 396 B.R. 278, 386-87 (S.D. Tex. 2008) (finding that the transferor entered into the transaction at issue with full knowledge that creditors would be hindered or delayed as a result, thus satisfying the intent element of an actual fraud claim under section 548); see also In re Am. Props., Inc., 14 B.R. 637, 643 (Bankr. D. Kan. 1981) ("The Court finds full knowledge of the effect of [a] transaction on the creditors . . . and despite this knowledge, the intentionally carrying out of the transaction, to be 'actual intent' to hinder, delay or defraud creditors within the meaning of § 548(a)(1)."); Newfield v. Ettlinger, 22 Misc. 2d 769, 775, 194 N.Y.S.2d 670, 678 (N.Y. Sup. Ct. 1959) ("An intent in this instance is shown where the proof indicates that at the time of making the transfer the officer or director of the corporation knew it would result in other creditors not being paid their fair pro rata share of the assets."), appeal dismissed, 10 A.D.2d 947 (1st Dep't 1960).

Indeed, the United States Supreme Court has long held that "[a] transfer, the intent (or obviously necessary effect) of which is to deprive creditors of the benefits sought to be

secured by the Bankruptcy Act, 'hinders, delays or defrauds creditors.'" <u>Dean v. Davis</u>, 242 U.S. 438, 444 (1917) (Brandeis, J.) (affirming finding of actual fraudulent transfer); <u>see also</u> <u>In re Craig</u>, 92 B.R. 394 (Bankr. D. Neb. 1988). Justice Brandeis, in describing the facts sufficient to find the requisite intent, explained that the debtor:

> [K]new that he was insolvent. He knew that he was making a preferential payment. He must have known that suspension of his business and bankruptcy would result from giving and recording a mortgage of all his property to secure a note which had matured before the mortgage was executed. The lower courts were justified in concluding that he intended the necessary consequences of his act.

<u>Dean</u>, 242 U.S. at 445. As the Supreme Court noted again fifteen years later, "[m]any an embarrassed debtor holds the genuine belief that, if suits can be staved off for a season, he will weather a financial storm, and pay his debts in full." <u>Shapiro v. Wilgus</u>, 287 U.S. 348, 354 (1932). Nonetheless, the Supreme Court in that case explained that, while such a debtor may lack the intent to defraud, he may still be liable for a fraudulent conveyance by virtue of the "intent to hinder and delay [creditors]." <u>Id.</u> (finding the conveyance avoidable where "the aim of the debtor was to prevent the disruption of the business at the suit of hostile creditors and to cause the assets to be nursed for the benefit of all concerned.").

Similarly, pursuant to the Restatement (Second) of Torts, an actor possesses the "intent" to cause the consequences of his act if "he believes that the consequences are substantially certain to result from it." Restatement (Second) of Torts, §8A (1965); <u>cf.</u> <u>ASARCO LLC</u>, 396 B.R. at 387 ("Many fraudulent transfer cases cite to the Restatement (Second) of Torts for the definition of 'intent' under the [Uniform Fraudulent Transfers Act (UFTA).]") (collecting authority); <u>Helms v. Roti (In re Roti)</u>, 271 B.R. 281, 300-01 (N.D. Ill. 2002) ("Sections 5 and 6 of the UFTA are analogous to 11 U.S.C. section 548(a)(1) and (2).") As explained in the comments to the Restatement, "[i]ntent is not . . . limited to consequences which are desired. If

the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." Id., cmt. b.

Here, the allegations in the Amended Complaint give rise to a strong inference that LBHI knew that entering the August Agreements and September Agreements, and transferring its last billions of dollars to JPMorgan, would have the certain effect of hindering or delaying LBHI's other creditors. For example, the Amended Complaint explains how LBHI took on unprecedented and onerous Guaranties of all obligations of its subsidiaries, and granted JPMorgan liens on LBHI accounts holding billions of dollars of cash and securities to secure those Guaranties, notwithstanding LBHI's insolvency and/or undercapitalization at the time. (Am. Compl. ¶¶ 30, 59-60). Indeed, LBHI entered into the September Agreements and transferred billions of dollars of cash and money market funds at a time when LBHI and its subsidiaries were insolvent and only days away from bankruptcy. (Am. Compl. ¶¶ 60-66). As alleged in the Amended Complaint, on the last business day before bankruptcy, "LBHI delivered what was essentially its last available $5 billion of cash to JPMorgan," and this transfer contributed to the exigency of LBHI's bankruptcy filing. (Am. Compl. ¶¶ 71, 79).

Pursuant to the above authority, such facts support a strong inference that the certain and foreseeable result of acceding to these transactions was to push LBHI into bankruptcy, and to hinder or delay creditors of LBHI that would otherwise have been entitled to share in the distribution of the billions of dollars transferred to JPMorgan. That LBHI was coerced into entering these agreements and transferring the $8.6 billion of collateral does not diminish its awareness of the consequences of its actions. The Amended Complaint thus alleges facts that if proven will show that LBHI had the requisite intent at the time of the transactions.

### 3.	JPMorgan's Intent Should Be Imputed to LBHI

Alternatively, the Amended Complaint establishes that JPMorgan so directed and controlled these transactions through the use of unlawful coercion – and LBHI entered these transactions involuntarily and while under duress – that JPMorgan's intent to hinder, delay or defraud LBHI's creditors should be imputed to LBHI for purposes of these claims.

"[W]hen the transferee or obligee is in a position to dominate or control the debtor's disposition of his property . . . his intent to hinder, delay, or defraud creditors may be imputed to the debtor so as to render the transfer fraudulent within section 548(a)(1)(A) regardless of the actual purpose of the debtor transferor." 5 Lawrence P. King, Collier on Bankruptcy ¶ 548.04[1], at 548-24 (15th ed. 2000), quoted in Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.), 263 B.R. 406, 442-43 (S.D.N.Y. 2001).

While in the typical case the domination or control derives from a corporate relationship between the transferee and the debtor, courts within the Southern District of New York have held that such a relationship is not necessary to impute the intent of the transferee to the debtor. See, e.g., Jackson, 263 B.R. at 443 ("The central consideration under § 548(a)(1)A) is not what form of ownership or institutional links govern the relationship between the transferee and the debtor."). The relevant inquiry is whether the transferee is in a position to dominate or control the debtor's disposition of his property. Id., citing 5 Collier on Bankruptcy ¶ 548.04[1], at 548-24.[23]

---

[23] The transferee's superior bargaining position, standing alone, would not justify the imputation of the transferee's intent to the debtor. See In re Andrew Velez Construction, Inc., 373 B.R. 262 (Bankr. S.D.N.Y. 2007). Instead, the transferee must employ unlawful economic coercion that deprives the debtor of its own free will, and forces the debtor to accede to the transferee's demands. In re Davis, 169 B.R. 285, 295-96 (E.D.N.Y. 1994). This is precisely what Plaintiffs have pleaded in the Amended Complaint.

Section 548(a)(1) – the prefatory clause of section 548(a)(1)(A) – anticipates that unlawfully coerced transfers or obligations are avoidable as fraudulent conveyances, in that it expressly provides for the avoidance of conveyances made "involuntarily." 11 U.S.C. § 548(a)(1). As explained by the court in In re Davis, 169 B.R. 285 (E.D.N.Y. 1994), "courts recognize that an involuntary transfer of property may occur under circumstances that, although not beyond the debtor's control, involve fraud, material misrepresentation, or coercion." 169 B.R. at 296 (emphasis supplied) (collecting authority). Indeed, a fundamental feature of economic coercion or duress is that, as a matter of law, the will of the party under duress is supplanted by that of the dominating party. See 25 Am. Jur. 2d Duress and Undue Influence § 36 (duress "deprives one person of his or her freedom of choice or overcomes his or her will or free agency and substitutes the will of another in its place") (collecting authority).

Thus, in the only case of which Plaintiffs are aware that has addressed the issue, the court allowed the trustee to proceed to trial on the basis that, for transfers made under duress, the intent of the dominating party may satisfy the intent requirement of an actual fraudulent conveyance action. See Matter of S&W Exporters, Inc., 16 B.R. 941, 946-47 (Bankr. S.D.N.Y. 1982). In S&W Exporters, the trustee asserted an actual fraudulent conveyance claim to avoid transfers of property and money that the debtor made while under duress imposed by the transferee.[24] Id. at 946. There was no evidence that the debtor itself acted with the requisite fraudulent intent, nor was there the type of corporate relationship or shared management between the parties that would traditionally justify imputation of the transferee's intent to the debtor. Id. at 947. Nonetheless, the Bankruptcy Court for the Southern District of New York denied the

---

[24] The trustee's cause of action was based on section 67(d)(2)(d) of the Bankruptcy Act, the predecessor to the actual fraudulent conveyance provisions of section 548(a)(1)(A) of the modern Bankruptcy Code. See S&W Exporters, 16 B.R. at 946.

defendant's motion for summary judgment on the trustee's actual fraudulent conveyance action, and held that "the Trustee has the right to present evidence before this court at a full hearing on the merits of his contention that [the debtor's] transfers of property and money to Faberge were extracted by a level of force and duress amounting to an intent to defraud." Id.

Here, the Amended Complaint alleges that JPMorgan exercised its domination and control of Lehman to coerce it into entering into the September Agreements and transferring billions of dollars of collateral under cover of those agreements. For example, the Amended Complaint describes how JPMorgan's unlawful threats to cease clearing and extending credit to Lehman deprived LBHI of control over its own affairs and forced LBHI to enter the September Agreements involuntarily and transfer $8.6 billion to JPMorgan. (Am. Compl. ¶¶ 48-49, 57-58, 66-68).

Plaintiffs should thus be allowed to present evidence that JPMorgan supplanted its will for that of LBHI. In so doing, JPMorgan effectively stood on both sides of these transactions, ensuring that it would be granted unprecedented rights pursuant to the September Agreements and that $8.6 billion would be removed from the reach of LBHI's other creditors. JPMorgan's motion to dismiss Counts I-III should therefore be denied for this reason as well.

## B. The Amended Complaint States Claims for Turnover of LBHI's Property (Counts XXV-XXVIII)

Count XXV of the Amended Complaint seeks, pursuant to section 542 of the Bankruptcy Code, the turnover of the billions of dollars of LBHI securities, as well as the $8.6 billion of LBHI cash and money market funds, that were transferred to JPMorgan prior to the bankruptcy on the basis that JPMorgan is withholding these assets without any contractual right to do so. (Am. Compl. ¶¶ 226-231). Similarly, Count XXVII seeks the turnover of the

$8.6 billion posted under cover of the September Agreements, because those agreements are invalid and unenforceable. (Am. Compl. ¶¶ 238-242).

A party seeking turnover under section 542(a) must simply show that: (1) the property is "property of the estate" as defined in section 541 of the Bankruptcy Code; and (2) the debtor is entitled to use, sell or lease such property pursuant to Section 363 of the Bankruptcy Code. See 11 U.S.C. 542(a); In re Boscia, 237 B.R. 184, 187 (Bankr. M.D. Fla. 1998). Section 542(b) further provides that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee." 11 U.S.C. § 542(b). As discussed below, all of these elements are well-pleaded in Counts XXV and XXVII.

The only exception to the turnover provision of section 542(b) is that a defendant may withhold payment "to the extent that such debt may be offset under Section 553 of this title against a claim against the debtor." 11 U.S.C. § 542(b). Counts XXVI and XXVIII set forth the bases on which this Court should find that no such offset rights exist in this case, especially given that the burden is on the defendant to establish that it has a right of offset under section 553. See Eastern Airlines, Inc. v. Chemical Bank, Inc., No. 95 Civ. 3981 (JSR), 1997 U.S. Dist. LEXIS 7380, at *5-6 (S.D.N.Y. 1997).

Thus, for the reasons discussed below, none of JPMorgan's arguments seeking dismissal of Counts XXV-XXVIII has merit, and JPMorgan's motion to dismiss these counts should be denied.

1. **Counts XXV and XXVII State Prima Facie Claims for Turnover of LBHI's Property**

JPMorgan offers two arguments for dismissal of the turnover counts (Counts XXV and XXVII). First, JPMorgan argues that it has a contract right to withhold LBHI's assets based on the September Agreements. (Mov. Brief at 71). For the reasons discussed throughout, those agreements are invalid and unenforceable, and JPMorgan's motion to dismiss the turnover counts on this basis should therefore be denied. See Points I, II(A), III(C).

Second, JPMorgan claims that the Amended Complaint fails to allege facts demonstrating that JPMorgan holds "property of the estate" as defined in section 541 of the Bankruptcy Code. (Mov. Brief at 71-72). Section 541(a) of the Bankruptcy Code provides that "property of the estate" includes property in which the debtor has a legal or equitable interest. 11 U.S.C. § 541(a). That property owned by a corporate debtor is "property of the estate" is a basic tenant of bankruptcy law. See United States v. Whiting Pools, 462 U.S. 198, 211 (1983) (recognizing that until a transfer of ownership takes place, such as a sale, the property remains the debtor's and thus is subject to the turnover requirement under § 542(a)).

The Amended Complaint details how LBHI transferred billions of dollars of securities that it owned, as well as $8.6 billion of LBHI's cash and money market funds, to LBHI's accounts subject to JPMorgan's liens as purported collateral in the weeks leading up to LBHI's bankruptcy. (See, e.g., Am. Compl. ¶¶ 45, 62, 66, 71). The Amended Complaint further explains that JPMorgan then "prevented LBHI's access to its cash and other collateral" – the very assets that are the subject of Plaintiffs' turnover claims. (Am. Compl. ¶¶ 73-77). Accordingly, JPMorgan's argument that the Amended Complaint somehow lacks factual allegations demonstrating that LBHI owns the property at issue should be rejected.

JPMorgan further argues that Plaintiffs' assertion of fraudulent conveyance and preference claims regarding the assets at issue precludes a finding that they are property of the estate, on the basis that "[p]roperty that has been fraudulently or preferentially transferred does not become property of the estate until it has been recovered." (Mov. Brief at 72 (citation omitted)). But there has not yet been any determination in this case that LBHI's property was fraudulently or preferentially transferred and, accordingly, dismissal of Plaintiffs' turnover claims would be inappropriate to the extent they provide an alternative basis for relief. See Fed. R. Civ. P. 8(d)(2) ("[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically ..."); Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.")

JPMorgan's final assertion that a "debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute" (see Mov. Brief at72 (citation omitted)), is similarly without merit. Nothing in the Amended Complaint suggests that LBHI's ownership interest in its property is in dispute.

## 2. Pursuant to Section 553, JPMorgan's Obligation to Return LBHI's Property Cannot Be Set Off Against Any Purported LBHI Obligations

Pursuant to section 542(b) of the Bankruptcy Code, property of the estate must be turned over to the trustee except "to the extent that such debt may be offset under Section 553 of this title against a claim against the debtor." 11 U.S.C. § 542(b). As described in Counts XXVI and XXVIII, no such exception is applicable in this case because, pursuant to sections 553(a)(3)

and (b) of the Bankruptcy Code, JPMorgan is precluded from asserting any purported right of setoff against its obligation to return LBHI's property. (Am. Compl. ¶¶ 232-37, 243-49).[25]

The purpose of sections 553(a)(3) and (b) is to prevent a creditor from intentionally accumulating the debtor's property on the eve of the bankruptcy filing in order to obtain a greater repayment, thereby improving its position over other creditors. In re Arctic Enters., Inc., 21 B.R. 215, 217 (Bankr. D. Minn. 1982); see also In re Hecht, 41 B.R. 701, 706 (Bankr. S.D.N.Y. 1984) (the "basic purpose behind 11 U.S.C. § 553(b) [is] to limit the improvement in one creditor's position and thus benefit all unsecured creditors . . ."). The Amended Complaint describes in detail how JPMorgan's purpose in making its collateral demands in the week before LBHI's bankruptcy was to put itself ahead of other creditors by accumulating assets that could be used to satisfy any JPMorgan claims that would arise upon the LBHI bankruptcy filing. (See, e.g., Am. Compl. ¶¶ 1, 46, 62, 69). Where, as was the case here, property is procured, accepted, or "built up" for the hidden purpose of creating a right to set off in favor of a creditor, that creditor will lose any right of setoff it may have had. In re Bohlen Enterprises, Ltd., 78 B.R. 556, 560 (Bankr. N.D. Iowa 1987) (deposits which were "procured, accepted or 'built up' for the real purpose of allowing the bank to obtain a setoff" were considered preferential and setoff was prohibited), rev'd on other grounds, 859 F.2d 561 (8th Cir. 1988).

JPMorgan does not challenge this aspect of Counts XXVI and XXVIII. Instead, JPMorgan argues that section 553 does not preclude it from asserting setoff rights because the exercise of those alleged rights are purportedly subject to the safe harbor protections of the

---

[25] In addition, section 553 may prohibit set-off for certain of JPMorgan's claims to the extent that they are not based on a mutual debt owing by such creditor, especially in the absence of valid Guaranties by LBHI for the debts of its subsidiaries, or to the extent that they did not arise before the commencement of the case. 11 U.S.C. § 553(a).

Bankruptcy Code. (Mov. Brief at 64-65). For all the reasons set forth in Points I and II(C)(1) herein, the safe harbor provisions do not apply to the transactions at issue, and they do not provide a basis for allowing JPMorgan to exercise any purported setoff rights here.

JPMorgan further argues that section 553 does not preclude the exercise of setoff rights because the Amended Complaint does "not allege that JPMorgan actually applied LBHI's property pre-petition to satisfy LBHI's debts to JPMorgan." (Mov. Brief at 61). But the fact that JPMorgan did not exercise a pre-petition setoff has no bearing on whether JPMorgan built up an LBHI asset pool for the improper goal of improving its position over other LBHI creditors. In re Aquasport, Inc., 115 B.R. 720, 722 (Bankr. S.D. Fla. 1990) (the court "can weigh the improvement of position test even in a post-petition setoff situation, and appears bound to do so where no relief from the automatic stay has been requested by the creditor"), aff'd 155 B.R. 245 (S.D. Fla. 1992), aff'd without op., 985 F.2d 579 (11th Cir. 1993).

JPMorgan's final argument regarding Counts XXVI and XXVIII is that section 553(a)(3) does not provide the trustee with an affirmative cause of action for avoidance of setoffs. (Mov. Brief at 63-64). However, JPMorgan is holding onto LBHI's deposits on the basis that it has a right to use them to setoff against the debts of its subsidiaries. Counts XXVI and XXVIII are thus pleaded as an independent challenge to any assertion by JPMorgan that it is entitled to withhold LBHI's property in order to setoff against its claims against the estate and its subsidiaries.

Accordingly, JPMorgan's motion to dismiss Counts XXV through XXVIII should be denied.

**C.     The Amended Complaint States a Claim That JPMorgan Set Off In Violation of the Automatic Stay and LBHI Is Entitled to Turnover of $1.9 Billion (Count XXXIII)**

Count XXXIII of the Amended Complaint describes how, post-petition, JPMorgan set off approximately $1.9 billion of purported claims arising under swap agreements against funds LBHI was forced to transfer to JPMorgan under cover of the September Agreements.  (See Am. Compl. ¶¶ 266-69).  JPMorgan's unauthorized application of LBHI's $1.9 billion against purported derivatives obligations constituted a willful violation of the automatic stay, and is thus void ab initio.  See Bank of America, 2010 Bankr. LEXIS 3867 at *70-72; see also 48th Street Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th Steakhouse, Inc.), 835 F.2d 427 (2d Cir. 1987) ("[A]ctions taken in violation of the stay are void and without effect."); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 527 (2d Cir. 1994) ("[A]ny proceedings or actions described in section 362(a)(1) are void and without vitality if they occur after the automatic stay takes effect.").

Plaintiffs are thus entitled to turnover of the $1.9 billion pursuant to section 542 of the Bankruptcy Code.  See Bank of America, 2010 Bankr. LEXIS 3867 at *70-72; see also In re Operation Open City Inc., 148 B.R. 184, 194 (Bankr. S.D.N.Y. 1992) (ordering the turnover of funds set off in violation of the automatic stay, because to rule otherwise "would have the practical effect of holding that there is an automatic right of setoff"); In re Blava In-Line, Inc., 133 B.R. 33, 36 (Bankr. S.D.N.Y. 1991) (holding that "[t]he bankruptcy court should deny a setoff to those creditors who violate the automatic stay" and ordering the turnover of setoff funds), citing MNC Commercial Corp. v. Joseph T. Ryerson & Sons, Inc., 882 F.2d 615, 618 (2d Cir. 1989).

1. **The Safe Harbor Provisions of Section 362(b) Do Not Apply**

In its Moving Brief, JPMorgan attempts to invoke the safe harbor protections of sections 362(b)(6), (b)(7), (b)(17) and (b)(27) of the Bankruptcy Code to justify its post-petition application of LBHI's $1.9 billion against purported obligations arising under swap contracts between JPMorgan and LBHI subsidiaries. (Mov. Brief at 64).

As an initial matter, sections 362(b)(6) and (b)(7) have no application on this motion to dismiss because, notwithstanding JPMorgan's reliance on its own proofs of claims and characterizations of the transactions at issue, the Amended Complaint plainly alleges that JPMorgan applied LBHI's $1.9 billion to purported obligations arising under "derivatives contracts," and not under "any commodity contract, forward contract or securities contract," or to "any repurchase agreement." (Am. Compl. ¶ 268).[26]

Nor do sections 362(b)(17) or (b)(27) of the Bankruptcy Code provide safe harbor protection for JPMorgan's unauthorized post-petition setoff. Section 362(b)(17) provides an exception to the automatic stay for:

> the exercise by a swap participant or a financial participant of any contractual right (as defined in section 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any swap agreement or of any contractual right (as defined in section 560) to offset or net out any termination values, payment amounts, or other transfer obligations arising under or in connection with 1 or more such agreements, including any master agreement for such agreement.

11 U.S.C. § 362(b)(17). Section 362(b)(27) provides a similar exception with respect to security agreements "forming a part of or related to any master netting agreements." 11 U.S.C. §

---

[26] In any event, JPMorgan's application of LBHI's funds to such contractual obligations would not be subject to the safe harbor provisions of sections 362(b)(6) or (b)(7) based on the same reasoning as to why the section 362(b)(17) and (b)(27) safe harbors do not apply, as discussed herein: i.e., the $1.9 billion was not transferred to JPMorgan pursuant to any security agreement forming a part of or related to "any commodity contract, forward contract or securities contract," or "any repurchase agreement." See Point I(C), supra.

362(b)(27). These sections, like any other exception to the automatic stay, are "to be construed narrowly." Bank of America, 2010 Bankr. LEXIS 3867 at *69. As a threshold matter, because the September Agreements are invalid and unenforceable, JPMorgan certainly had no right to apply any of the collateral demanded under cover of those agreements to alleged claims arising under swap agreements or master netting agreements.

Moreover, as this Court has recently explained, "in order to qualify for the exception [of section 362(b)(17)] the security agreement must be part of or must relate to a swap agreement." Id. at *66. The purpose of section 362(b)(17) is to ensure that the automatic stay does "not impact the exercise of a contractual right of setoff that is otherwise consistent with recognized customs and practices of market participants who engage in swap transactions." Id. at *65-66. Further, the "language [of section 362(b)(17)] is not so loose in its wording and reasonable application that unrelated security agreements or unrelated collateral . . . may be taken, without judicial oversight or restraint, to satisfy claims of a swap participant." Id. at *68. "Whether the exception will apply to a particular security agreement calls for a review of the facts and circumstances of each transaction or series of transactions and, of necessity, must be decided on a case by case basis by market participants or, in the event of a dispute, by the Court." Id. at *66. This logic applies with equal force with respect to the section 362(b)(27) exception for master netting agreements.

For all the reasons set forth in Point I(C), supra, none of the September Agreements qualifies as a "swap agreement," or as a "security agreement or arrangement or other credit enhancement forming a part of or related to any swap agreement" or a "master netting agreement," and none of the $8.6 billion of collateral transfers made pursuant to the September Agreements was a transfer made in connection with such swap, master netting or

related agreements, as those terms are defined under the Bankruptcy Code.  Furthermore, the Amended Complaint alleges that none of the $8.6 billion of collateral transfers was legitimately related to swap activity, or was "consistent with recognized customs and practices of market participants who engage in swap transactions" as required for the exception to the automatic stay.  See Bank of America, 2010 Bankr. LEXIS 3867 at *65-66.

Accordingly, JPMorgan's application of the $1.9 billion should not be entitled to safe harbor protection under sections 362(b)(17) or (b)(27), and the setoff would constitute a violation of the automatic stay.  At the very least, a factual dispute remains about the extent to which JPMorgan's purported contractual right of setoff is truly consistent with recognized customs and practices of market participants who engage in swap transactions.

### 2. JPMorgan's Self-Help Application of $1.9 Billion Was Subject to the Automatic Stay Even If It Constituted a Foreclosure on a Security Interest

JPMorgan further argues that its unilateral application of LBHI's $1.9 billion does not constitute a "setoff," but was instead a foreclosure on an alleged security interest.  (Mov. Brief at 65).  But this distinction is irrelevant for purposes of determining whether a stay violation occurred.[27]  It is well-established that any act to foreclose on a security interest is also prohibited by the automatic stay.  See 11 U.S.C. § 362(a)(4) (staying "any act to create, perfect, or enforce any lien against property of the estate"); see also Shugrue v. Chemical Bank (In re Ionosphere Clubs, Inc.), 177 B.R. 198, 206 (Bankr. S.D.N.Y. 1995) ("[a]llowing a creditor to foreclose on collateral without moving for relief from the automatic stay is repugnant to the bankruptcy system which stresses notice to parties in interest before assets are forever removed from the bankruptcy estate by a creditor.").  Accordingly, even if JPMorgan's application of

---

[27]  As explained in the Amended Complaint and below at Point III(A), JPMorgan in fact did not have any lien or other security interest with respect to the $1.9 billion of LBHI funds that it applied to the derivatives claims.  As such, JPMorgan's application of those funds could not be deemed a foreclosure on collateral in any event.

LBHI's funds to the purported derivatives obligations of its subsidiaries could be characterized as a foreclosure on a security interest, rather than a setoff, it nevertheless violated the automatic stay.

Count XXXIII, which seeks this relief, is therefore well-pleaded, and JPMorgan's motion to dismiss this claim should be denied.

## D. Plaintiffs' Counts for Recovery (Counts IV, IX, XVI, XVIII, XX, XXIV and XXIX), Disallowance of Claims and Avoidance of Liens Securing Such Claims (Count XXXI) Are Well-Pleaded

Pursuant to section 550 of the Bankruptcy Code, a debtor is entitled to recover transfers that have been avoided pursuant to sections 544, 547, 548, or 553. See 11 U.S.C. § 550(a). Counts IV, IX, XVI, XVIII, XX, XXIV and XXIX of the Amended Complaint seek, pursuant to section 550, the recovery of transfers that are subject to avoidance for the reasons set forth in Counts I-III, V-VIII, X-XII, XV, XVII, XIX, XXI-XXIII, and XXVIII.

JPMorgan's sole purported ground for dismissal of Plaintiffs' section 550 claims is its contention that the underlying avoidance counts should be dismissed. (Mov. Brief at 69-70). For the reasons discussed herein, Plaintiffs' avoidance counts are well-pleaded and not subject to dismissal. See Points I and II(A), supra. JPMorgan's motion to dismiss Counts IV, IX, XVI, XVIII, XX, XXIV and XXIX should therefore be denied. See Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp., 351 F. Supp. 2d 79, 107 fn. 26 (S.D.N.Y. 2004) ("Because the Court has rejected DLJ's arguments for dismissal of the fraudulent conveyance claims, the basis for DLG's objection to the § 550(a) count no longer exists.").

Pursuant to section 502(d) of the Bankruptcy Code, any JPMorgan claims against LBHI should be disallowed to the extent JPMorgan continues to withhold LBHI property subject to avoidance. See 11 U.S.C. § 502(d). Similarly, pursuant to section 506(d), any JPMorgan lien encumbering LBHI property is void to the extent such lien purports to secure a claim against

LBHI that is not an allowed secured claim. 11 U.S.C. § 502(d). Count XXXI of the Amended

Complaint sets forth claims under sections 502(d) and 506(d) seeking this relief with respect to

transfers subject to avoidance, turnover and setoff pursuant to Counts I-III, V-VIII, X-XII, XV,

XVII, XIX, XXI-XXIII, and XXV-XXVIII.

As with Plaintiffs' section 550 claims, JPMorgan's only offered basis for

dismissal of Count XXXI is its argument that Plaintiffs' predicate avoidance claims should be

dismissed. (Mov. Brief at 73-74).[28] Because the avoidance claims are not subject to dismissal,

JPMorgan's motion to dismiss Count XXXI should be denied. See Commercial Fin. Servs., Inc.

v. Jones (In re Commercial Fin. Servs.), 251 B.R. 397, 411 (Bankr. N.D. Okla. 2000) (denying

motion to dismiss section 502(d) claim because the predicate section 542 avoidance claim was

well-pleaded); Dewsnup v. Timm, 502 U.S. 410, 415-16 (1992) (recognizing that Section 506(d)

serves the "function of voiding a lien whenever a claim secured by the lien has not been

allowed").

## POINT III

### JPMORGAN'S MOTION TO DISMISS PLAINTIFFS' COMMON LAW CLAIMS SHOULD BE DENIED

**A.    The Amended Complaint States a Claim for Declaratory Judgment That JPMorgan Has No Lien or Other Security Interest With Respect to LBHI's $8.6 Billion (Count XXXVIII)**

Count XXXVIII of the Amended Complaint seeks a declaratory judgment that

JPMorgan has no lien or other security interest with respect to the $6.9 billion in cash and $1.7

billion in money market funds that JPMorgan demanded and LBHI transferred during the last

---

[28] In a footnote, JPMorgan also claims that Counts XXV, XXVII, XXXI and XXXIV are barred "at this time" by the Collateral Disposition Agreement (the "CDA"). (Mov. Brief at 74, fn. 19). This argument is without merit. The provision of the CDA referenced by JPMorgan relates to the timing of certain payments that may result from any claim for relief. There is nothing in the CDA which dictates the content or timing of any of the counts in the Amended Complaint.

week that LBHI was in business. Although LBHI initially deposited its $6.9 billion of cash in

LBHI's account at JPMorgan subject to JPMorgan's lien (to the extent valid and enforceable),

immediately upon receipt, JPMorgan unilaterally transferred the funds out of LBHI's deposit

account and into JPMorgan's own general ledger account, leaving the LBHI deposit account with

a zero balance, in order to ensure that LBHI would be unable to access its own funds. (Am.

Compl. ¶ 72; see also Mov. Brief at 84). Neither Security Agreement authorized JPMorgan to

transfer LBHI's funds to its own account in the absence of a default. By the terms of the

Security Agreements – which provided for a lien over the LBHI deposit account only, and not

the cash itself or JPMorgan's general ledger account – JPMorgan lost the benefit of any security

interest it may have had with respect to the $6.9 billion.

LBHI is therefore entitled to a declaratory judgment that, pursuant to the terms of

the Security Agreements, JPMorgan had no lien or other security interest with respect to LBHI's

$6.9 billion as of the time LBHI filed for bankruptcy on September 15, 2008. For the reasons

discussed below, JPMorgan's only argument regarding the $1.7 billion of money market funds is

similarly without merit, and Plaintiffs should be allowed to proceed on that declaratory judgment

claim as well.

### 1. JPMorgan Has No Lien Over Assets Transferred by JPMorgan Out of the Pledged Accounts and Into JPMorgan's General Ledger Account

JPMorgan's lien on LBHI's property pursuant to the August Security Agreement

was limited to two specifically identified LBHI accounts – a "Securities Account" and a "Cash

Account." (Am. Compl. ¶ 30; Ex. 5, August Security Agreement at 1). The September Security

Agreement purported to grant a lien on "all accounts" of LBHI held at JPMorgan, except for the

lien-free Overnight Account identified in the August Security Agreement. (Am. Compl. ¶ 53;

Ex. 8, September Security Agreement at 1). These pledged LBHI accounts are defined in the Security Agreements as the "Accounts."

In response to JPMorgan's collateral demands, LBHI deposited $6.9 billion into the Cash Account. (Am. Compl. ¶ 72). Immediately upon receipt – and with no notice to LBHI – JPMorgan transferred these funds out of the Cash Account and into its own general ledger account, leaving LBHI's Cash Account with a zero balance. (Id.) Under the terms of the Security Agreements, this unauthorized transfer resulted in the loss of any security interest JPMorgan may have had over the $6.9 billion pursuant to the Security Agreements.

First, the Security Agreements did not purport to grant a lien over JPMorgan's own general ledger account, nor could they. Section 9-203 of the UCC clearly provides that "a security interest is enforceable against the debtor and third parties with respect to the collateral only if . . . the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party." NY UCC § 9-203. In this case, LBHI plainly had no ownership interest or other rights with respect to JPMorgan's general ledger account. Accordingly, as a matter of law, LBHI could not grant any security interest in that JPMorgan account.

Second, by the express terms of both Security Agreements, the lien granted by LBHI over its pledged Accounts was a "floating lien" – that is, a lien covering only "funds and/or other assets <u>from time to time</u> held in or credited to the Accounts or otherwise carried in the Accounts." (Exs. 5 & 8, Security Agreements at 1, definition of "Security" (emphasis supplied); <u>see also</u> Official Comment 2 to NY UCC § 9-205 ("This Article expressly validates the 'floating lien' on shifting collateral.")). Thus, LBHI granted a lien over its <u>accounts</u> at JPMorgan – not its funds or its securities generally – and the lien attached only to the funds and securities held "from time to time" in or to the credit of the pledged Accounts. The very nature

of the floating lien established by the Security Agreements is that, when funds are transferred out of the pledged Accounts, the lien no longer attaches to those funds. See NY UCC § 9-204 ("This section adopts the principle of a 'continuing general lien' or 'floating lien.' It validates a security interest in the debtor's existing and (upon acquisition) future assets, even though the debtor has liberty to use or dispose of the collateral without being required to account for the proceeds or substitute new collateral.") (emphasis supplied).[29]

Section 9-332 of the UCC further confirms that funds transferred from a deposit account are transferred free of any lien on that account (unless the transferee acts in collusion with the debtor, which is certainly not the case here). See NY UCC § 9-332 ("[a] transferee of funds from a deposit account takes the funds free of a security interest in the deposit account"). This is a consequence of the fact that a security interest in a deposit account does not attach to the funds in and of themselves, even though they are "on deposit" in the account, but instead attaches only to the depositor's right to withdraw the funds credited to the account. As this Court noted in another decision in the Lehman proceedings: "The deposit of cash into a bank account creates a debtor-creditor relationship between the bank (as debtor) and the depositor (as creditor), at which time the depositor 'parts with title to the funds in exchange for a debt owed to him by the bank.'" In re Lehman Brothers Holdings Inc., 404 B.R. 752, 758 (Bankr. S.D.N.Y. 2009), quoting In re Bennett Funding Group, 146 F.3d 136, 139 (2d Cir. 1998). Accordingly, because the lien attached to the LBHI account – as opposed to the $6.9 billion on deposit therein – there was no lien that could "continue" to attach to the funds once they were transferred to JPMorgan's general ledger account.

---

[29] The floating lien concept was further linked to the functioning of the August Guaranty and September Guaranty, which limited LBHI's liability under those guaranties to the value of collateral held in the defined Accounts. (See Ex. 4, August Guaranty § 1; Ex. 7, September Guaranty § 1; see also Am. Compl. ¶¶ 30, 52).

In sum, by the terms of the Security Agreements themselves, JPMorgan could have no lien or other security interest with respect to LBHI's $6.9 billion once JPMorgan debited LBHI's pledged Account and transferred those funds to JPMorgan's general ledger account. In re Adirondack Timber Enter., No. 08-12553, 2010 Bankr. LEXIS 1420, at * 7-8 (Bankr. N.D.N.Y. Apr. 28, 2010) ("'Unless the grant of a security interest is contained in the security agreement, there is no security interest' . . . When an agreement is clear and complete, the writing should be enforced according to its terms."), quoting In re Modafferi, 45 B.R. 370, 371 (S.D.N.Y. 1985) (collecting authority). Plaintiffs are entitled to a declaratory judgment on that basis, and none of JPMorgan's purported justifications for its unauthorized transfer, discussed below, alters this conclusion.

### 2. JPMorgan Had No Right Under the Security Agreements or UCC to Transfer LBHI's $6.9 Billion in the Absence of a Default by LBHI

In its Moving Brief, JPMorgan selectively quotes the clause in the Security Agreements stating that JPMorgan could "issue instructions to direct disposition of any and all funds," to apparently argue that it had a general and unconstrained right to transfer or dispose of the collateral pledged by LBHI. (Mov. Brief at 84, quoting Security Agreements at 2). But the Security Agreements did not grant an unfettered right to JPMorgan to unilaterally transfer or dispose of LBHI's property. The prefatory clause cited by JPMorgan expressly provided that JPMorgan could only issue such instructions and orders "as the secured party hereunder," meaning that JPMorgan was only authorized to issue such instructions and orders to give effect to its defined rights as secured party under the Security Agreements, as set forth in the specific provisions of those agreements that immediately follow in the text. See Aramony v. United Way of Am., 254 F.3d 403, 413-414 (2d Cir. 2001) (a general paragraph is limited by subsequent specific paragraphs regarding the same issue), citing, inter alia, Friedrich v. Local No. 780, 515

F.2d 225, 227-28 (5th Cir. 1975) ("a contractual clause must be read in its context, and a subsequent specification impliedly limits the meaning of a preceding generalization") (internal quotation omitted), G.T. Schjeldahl Co. v. Local Lodge 1680, 393 F.2d 502, 504 (1st Cir. 1968) (same).

As the Security Agreements made clear, each of those specific rights could only be triggered "upon the occurrence and during the continuation of a Default or to preserve the Security or its value." (Exs. 5 & 8, Security Agreements at 2-3). The specific clauses of the Security Agreements that provide for JPMorgan's rights as secured party are expressly so limited. (See id. at 2 ("[t]he right is expressly granted to the Bank, in each case upon the occurrence and during the continuation of a Default or to preserve the Security or its value, to transfer to . . . itself or its nominee any of the Security . . ."), id. at 3 ("[t]he Bank may upon the occurrence and during the continuation of a Default or to preserve the Security or its value use or operate any of the Security for the purpose of preserving the Security or its value . . .") (emphasis supplied)).

Accordingly, nothing in the Security Agreements granted JPMorgan a general right to unilaterally transfer LBHI's funds to itself. Indeed, if the prefatory sentence quoted in the Moving Brief were as limitless in application as JPMorgan contends, there would be no need for the specific provisions quoted above, which plainly authorize JPMorgan to issue instructions and orders to direct the disposition of the collateral only in specified circumstances. See Bank of America, 2010 Bankr. LEXIS 3867 at *43 ("This reading of the language would lead to unintended consequences by giving greater significance to the meaning of general provisions than the more specific provisions within the security agreement . . . [t]he specific is supposed to trump the general, not vice versa."), citing Aramony, 254 F.3d at 413; see also Int'l Multifoods

Corp. v. Commercial Union, 309 F.3d 76, 86 (2d Cir. 2002) ("We disfavor contract interpretations that render provisions of a contract superfluous."); In re Metromedia Fiber Network, Inc., 335 B.R. 41, 53 (Bankr. S.D.N.Y. 2005) ("Courts avoid adopting an interpretation that would nullify or render meaningless other contract terms.") (collecting authority). Per those specific provisions of the Security Agreements, JPMorgan could only issue such instructions and orders upon a default by LBHI, or potentially to preserve the collateral or its value.

It is undisputed that, when JPMorgan transferred LBHI's $6.9 billion to its own account, there was no default on LBHI's part that would have permitted JPMorgan to exercise the right to foreclose on the collateral under the terms of either Security Agreement. (Am. Compl. ¶ 72; see also Mov. Brief at 84). Because there was no LBHI default, and JPMorgan had no right to foreclosure, JPMorgan instead argues that it was authorized under the Security Agreements to transfer LBHI's $6.9 billion to JPMorgan's general ledger account in order to ensure that the funds "would not be vulnerable to withdrawal by LBHI." (Mov. Brief at 86). As the sole support for this proposition, JPMorgan cites to the provision of the Security Agreements that authorized JPMorgan to take particular actions "to preserve the Security or its value." (Mov. Brief at 86, quoting Exs. 5 & 8, Security Agreements at 2-3). However, as explained below, neither the provision relied upon by JPMorgan, nor any other aspect of the Security Agreements, gave JPMorgan the right to transfer LBHI's funds from an LBHI account to a JPMorgan account for the purpose of preventing LBHI's access to the cash collateral.

In fact, the preservation of collateral or its value is a duty placed on secured parties, and not – as JPMorgan would have it – a right of secured parties against their debtors. See NY UCC § 9-207(a) ("a secured party shall use reasonable care in the custody and preservation of collateral in the secured party's possession"). This duty requires the secured

party to exercise reasonable care to ensure that the pledged property is not lost or damaged or, in the case of collateral such as securities, to protect the value of the securities. See, e.g., Harris v. Key Bank Nat'l Assoc., 89 F. Supp. 2d 408, 412-13 (W.D.N.Y. 2000); Grace v. Sterling, Grace & Co., 30 A.D.2d 61, 64, 289 N.Y.S.2d 632, 637 (1st Dep't 1968); Forbes v. Forbes, 191 B.R. 510, 516 (Bankr. R.I. 1996) ("According to NY UCC § 9-207(1), 'a secured party must use reasonable care in the custody and preservation of collateral in his possession.' As a general rule that duty relates to physical care."); accord Layne v. Bank One, Kentucky, N.A., 395 F.3d 271, 276 (6th Cir. 2005) ("the rule of reasonable care expressed in this Section is confined to the *physical care* of the chattel, whether an object such as a horse or piece of jewelry or a negotiable instrument or document of title"), quoting Restatement of Security § 17, cmt. A (1941) (emphasis in original).

Pursuant to UCC § 9-207(b)(4), the secured party is authorized to "use or operate" the collateral as necessary to comply with its duty under section 9-207(a) to preserve the subject matter of the pledge against damage or loss in value. See NY UCC § 9-207(b)(4)(A) ("the secured party may use or operate the collateral . . . for the purpose of preserving the collateral or its value"); see also U.S. Bank Nat'l Assoc. v. PMCC Calpine New England Investment LLC, 06 Civ. 3906 (JSR), 2006 U.S. Dist. LEXIS 38708, at *6 (S.D.N.Y. June 12, 2006) (invoking UCC § 9-207(b)(4) as authority for secured party to use or operate its collateral – two power plants – to avoid physical damage to the facilities' equipment and to preserve the value of the facilities as a going-concern).

The Security Agreements tracked these provisions of the UCC, and thus required JPMorgan to preserve the LBHI collateral and authorized JPMorgan to "use or operate any of the Security for the purpose of preserving the Security or its value." (Exs. 5 & 8, Security

Agreements at 3). This obligation and corresponding right have nothing to do with a secured party transferring collateral to ensure it cannot be accessed by the pledgor, much less extending the lien beyond its agreed-upon boundaries. Indeed, UCC § 9-207(b)(4), and the parallel provision in the Security Agreements, do not even address these issues.

JPMorgan does not argue that its transfer of the $6.9 billion did anything to preserve the funds or their value, nor could it. Regardless of which account – LBHI's or JPMorgan's – the funds were credited to, they were denominated in U.S. dollars and held at the same institution (JPMorgan), subject in either case to no greater or lesser risk of loss or change in value.

Accordingly, the provision of the Security Agreements relied upon in the Moving Brief did not authorize JPMorgan to transfer LBHI's $6.9 billion "to ensure that LBHI did not withdraw the cash collateral." (See Mov. Brief at 83-84, 86). This is particularly so given that JPMorgan's unauthorized transfer violated LBHI's express right under the August Security Agreement to transfer its funds into a lien-free Overnight Account so they could be accessed at the end of each trading day. (See Am. Compl. ¶ 31 ("[t]he parties also negotiated a crucial provision that confirmed LBHI's right to access its collateral at the end of each trading day"), citing Ex. 5, August Security Agreement at 3; see also Am. Compl. ¶ 72). JPMorgan does not address this aspect of the August Security Agreement in its Moving Brief.

Instead, JPMorgan focuses on the provision in the September Security Agreement that purported to require three days' written notice from LBHI to access its funds, and argues that taking LBHI's cash was somehow justified by this notice provision. (Mov. Brief at 86). But as explained above, nothing in the September Security Agreement authorized JPMorgan to transfer LBHI's funds out of LBHI's accounts to enforce compliance with the three day notice

provision, nor did the September Security Agreement provide that the boundaries of JPMorgan's lien would be extended to JPMorgan's general ledger account in the event JPMorgan took such action.[30]

In sum, neither the Security Agreements nor the UCC authorized JPMorgan to transfer or dispose of LBHI's $6.9 billion for the purpose of keeping those funds "safe" from LBHI. JPMorgan's argument to the contrary should be rejected.

### 3. The UCC's Provisions Regarding "Control" of Collateral For Purposes of Perfection Did Not Authorize JPMorgan to Transfer LBHI's $6.9 Billion

JPMorgan next argues that section 9-104 of the UCC, which describes the elements of "control" necessary for a secured party to perfect a security interest in a deposit account, somehow provided JPMorgan with a general right to transfer or dispose of LBHI's property, unconstrained by the terms of the Security Agreements that delineate the circumstances under which JPMorgan was authorized to direct disposition of those funds. (Mov. Brief at 84-85). JPMorgan's reliance on section 9-104(a) as somehow superseding the provisions of the Security Agreements is completely misplaced.

It is axiomatic that the grant of a security interest, and of "control" over collateral, is intended to give the secured party the right to direct the disposition of the collateral in agreed upon circumstances – generally, upon default. See NY UCC § 9-601. Indeed, Official Comment 3 to section 9-104, quoted in selective part by JPMorgan, expressly contemplates that the secured

---

[30] Moreover, there was nothing that compelled JPMorgan to transfer LBHI's funds to itself, if its purpose was to ensure that LBHI would be unable to withdraw those funds. (Mov. Brief at 86). Regardless of whether JPMorgan had a right to prevent such withdrawal (it did not), other methods were clearly available to JPMorgan that would not have resulted in the loss of its security interest. For example, as explained in the Amended Complaint, "[i]n numerous e-mails circulated throughout the weekend and Monday morning, JPMorgan management gave orders not to allow LBHI to access its collateral, or to otherwise allow <u>any</u> LBHI cash or securities to be sent out from JPMorgan, for any reason." (Am. Compl. ¶ 75 (emphasis in original)).

party's right to dispose of collateral typically would <u>not</u> be absolute, but instead would be triggered by agreed-upon circumstances and conditions. NY UCC § 9-104, Official cmt. 3 ("An agreement to comply with the secured party's instructions suffices for 'control' of a deposit account under this section even if the bank's agreement is subject to specified conditions, e.g., that the secured party's instructions are accompanied by a certification that the debtor is in default.").

Nor does the portion of Official Comment 3 quoted by JPMorgan provide that section 9-104 otherwise creates some independent right to dispose of collateral or to prevent the debtor from reaching its funds on deposit. (Mov. Brief at 85). To the contrary, when read in full, that sentence explains that the debtor's access to the collateral and the secured party's "control" of the funds can co-exist, and contemplates that the balance between the two will be governed by agreement between the parties. NY UCC § 9-104, Official cmt. 3 ("Although the arrangements giving rise to control may themselves prevent, or may enable the secured party at its discretion to prevent, the debtor from reaching the funds on deposit, subsection (b) makes clear that the debtor's ability to reach the funds is not inconsistent with 'control.'").

In other words, under UCC § 9-104, "control" need not be absolute in order to establish a perfected security interest. It is left to the agreement of the parties to determine under what circumstances the secured party may exercise its control by directing the disposition of the collateral. See In re Adirondack Timber Enter., 2010 Bankr. LEXIS 1420 at *7-8 ("It is the security agreement which embodies the intentions of the parties."), citing In re Laminated Veneers Co., 471 F.2d 1124, 1125 (2d Cir. 1973); In re Marta Cooperative, Inc., 74 Misc. 2d 612, 614, 344 N.Y.S.2d 676, 678 (N.Y. County Ct. 1973) ("The security agreement is the document which embodies the actual agreement between the parties.") (collecting authority). In

this case, JPMorgan lost its lien over the funds when it exercised control over LBHI's $6.9 billion in circumstances where, pursuant to the terms of the Security Agreements, it did not have the right to do so.

### 4. Any Purported Lien Did Not Attach to JPMorgan's Account As "Proceeds" of the Collateral

JPMorgan's final argument is that its "transfer of the cash into the General Ledger Cash Collateral Account resulted in proceeds on which JPMorgan's lien continued." (Mov. Brief at 86-87). As the primary support for this dubious proposition, JPMorgan cites to Official Comment 2, Example 2, to UCC § 9-332. (Id.). But the example merely points out that, even though a lien will not follow funds transferred from one bank to another (because those funds become property of the second bank), the debtor's deposit account at the second bank constitutes "proceeds" of the pledged account at the first bank. NY UCC § 9-332, Official cmt. 2, Example 2. This is for the very good reason that, upon making the transfer, the depositor receives the right to withdraw the funds from its account at the second bank in exchange for giving up its deposit at the first bank.

The cited example is thus plainly not applicable where, as here, the secured party makes an unauthorized transfer of the debtor's funds into the secured party's own account. Pursuant to UCC § 9-102(a)(64), "proceeds" are property or rights acquired in exchange for or upon the disposition of the original collateral. NY UCC § 9-102(a)(64). Because JPMorgan gave LBHI no rights in its general ledger account in exchange for the funds transferred into it, the JPMorgan account simply does not constitute "proceeds." For this same reason, JPMorgan's citation to section 9-315(a) of the UCC, which provides generally that "a security interest attaches to any identifiable proceeds of collateral," is not applicable.

In sum, because the collateral at issue pledged by LBHI under the Security Agreements consisted solely of LBHI's deposit account, JPMorgan had a lien over the funds on deposit in that account only for so long as the funds remained credited thereto. Because JPMorgan transferred the funds to itself, reducing the account balance to zero and giving LBHI nothing in return as "proceeds" of the transfer, the benefit of the lien was lost to JPMorgan.

5.     **The Amended Complaint States a Claim That JPMorgan Has No Security Interest With Respect to the $1.7 Billion of Money Market Funds**

The September Security Agreement and the Account Control Agreement are the only two agreements at issue that purport to provide JPMorgan with a perfected security interest over LBHI's $1.7 billion of money market funds.   JPMorgan's only challenge to Plaintiffs' claims with respect to those funds is the unsupportable assertion that these agreements are valid and enforceable. (Mov. Brief at 87).  For all the reasons set forth in the Amended Complaint and herein, none of the September Agreements are valid, and Plaintiffs' claim for declaratory judgment regarding the $1.7 billion of money market funds should therefore be allowed to proceed.

*                *                *

For all the reasons set forth above, JPMorgan lost any security interest it may have had with respect to LBHI's $6.9 billion in funds when it transferred those funds to its own general ledger account.  JPMorgan further has no security interest in the $1.7 billion of money market funds, because its purported security interest is based exclusively on the invalid September Agreements.  LBHI is entitled to a declaratory judgment so stating, and the motion to dismiss Count XXXVIII should be denied.

**B.     The Amended Complaint States Claims for Unjust Enrichment and
         Conversion With Respect to LBHI's $8.6 Billion (Counts XXXIX and XL)**

Counts XXXIX and XL set forth causes of action for unjust enrichment and

conversion, respectively, based on JPMorgan's withholding of LBHI's $8.6 billion in the

absence of any valid lien or other security interest. (Am. Compl. ¶¶ 229-308). This LBHI

property should be returned to the LBHI estate for distribution to creditors, and JPMorgan should

be ordered to pay any damages resulting from its unauthorized withholding of those funds.

For the reasons discussed in Point III(A), JPMorgan's argument that Counts

XXXIX and XL should be dismissed on the basis of a purported lien is without merit. (Mov.

Brief at 82). JPMorgan's motion to dismiss these counts should be denied.

**C.     The Amended Complaint States Claims for a Declaratory Judgment That the
         September Agreements Are Invalid and Unenforceable (Count XXXV), for Duress
         With Respect to the September Agreements (Count XLVI), and Duress With
         Respect to the $8.6 Billion in Collateral Transfers (Count XLVIII)**

The Amended Complaint sets forth well-pleaded claims that the September

Agreements are invalid and unenforceable on the bases of duress, lack of authority, and lack of

consideration. (Count XXXV). The Amended Complaint further establishes that Plaintiffs are

entitled to damages, as well as rescission of the September Agreements and the $8.6 billion in

collateral transfers made pursuant thereto, because those transactions were the product of

JPMorgan's unlawful use of threats and economic coercion. (Counts XLVI and Count XLVIII).

1.    **The September Agreements Are Invalid for Lack of Consideration**

The only ground for invalidating the September Agreements that JPMorgan

addresses on the merits is Plaintiffs' allegation that those agreements were not supported by

consideration.[31]  In essence, JPMorgan argues that the clearing services and related credit it

provided to LBI constitute the consideration for the September Agreements.  (Mov. Brief at 111-

12).  However, JPMorgan's argument ignores the fact that it was already under a pre-existing

duty to provide those services to LBI pursuant to the 2000 Clearance Agreement.  The

September Agreements did not alter or extend that duty in any way, nor did they include any

promise that JPMorgan would continue to provide such services for any definite period.  As a

matter of law, JPMorgan's performance of its obligations under the 2000 Clearance Agreement

cannot constitute the new consideration required to support the September Agreements.

Under New York law's "pre-existing duty" rule, where a party is under a pre-

existing duty to perform a certain service or act, promising to perform that same service or act

cannot be consideration for a new agreement.  See Tierney v. Capricorn Invs., 189 A.D.2d 629,

631, 592 N.Y.S.2d 700 (1st Dep't 1993) ("Neither a promise to do that which the promisor is

already bound to do, nor the performance of an existing legal obligation constitutes valid

---

[31]  JPMorgan does not challenge the Amended Complaint's allegation that the September
Agreements were executed while LBHI was under duress, or that LBHI's delivery of $8.6 billion
in collateral to JPMorgan was the result of duress.  These facts provide sufficient basis to find
that the September Agreements are invalid and unenforceable, that the transfers of $8.6 billion in
collateral should be rescinded, and that LBHI is entitled to damages.  See, e.g., Sosnoff v. Carter,
165 A.D.2d 486, 491, 568 N.Y.S.2d 43, 46 (1st Dep't 1991) ("a contract is voidable on the
ground of duress when it is established that the party making the claim was forced to agree to it
by means of a wrongful threat precluding the exercise of his free will").

Nor does JPMorgan challenge the fact that it knew Paolo Tonucci, the signatory to the
September Guaranty, had no actual or apparent authority to execute that agreement on behalf of
LBHI.  (Am. Compl. ¶ 61).  This fact, taken separately or together with JPMorgan's economic
coercion, provides an additional reason to find that the September Agreements are void.  See
Highland Capital Mgmt. LP v. Schneider, 607 F.3d 322, 327-331 (2d Cir. 2010).

consideration.""); Fafoutis v. Lyons, 149 A.D.2d 565, 566, 540 N.Y.S.2d 20, 21 (2d Dep't 1989)

("A covenant to do what one is already under a legal obligation to do is not sufficient

consideration for another contract."); In re Bennett, 149 B.R. 16, 19 (N.D.N.Y. 1993).

Pursuant to the 2000 Clearance Agreement, JPMorgan agreed to provide clearing

services to LBI. (Am. Compl. ¶ 19; Ex. 1, 2000 Clearance Agreement § 3). While Section 17 of

the 2000 Clearance Agreement provided that either party could terminate the agreement by

written notice upon the occurrence of certain, specified events (such as a counterparty's

bankruptcy, or discovery of fraud in the inducement of the agreement), it is undisputed that none

of these events had occurred as of the execution of the September Agreements on September 10,

2008. (Am. Compl. ¶¶ 26-27; Ex. 1, 2000 Clearance Agreement § 17). Accordingly, JPMorgan

had no right to stop providing clearing services to LBI under the 2000 Clearance Agreement, and

JPMorgan does not argue otherwise.

Instead, JPMorgan argues that it "had no affirmative duty to extend credit to LBI"

under the 2000 Clearance Agreement because the 2000 Clearance Agreement provided that

JPMorgan would extend credit to LBI at JPMorgan's discretion. (See Mov. Brief at 113).

Crucially, however, the 2000 Clearance Agreement required JPMorgan to give "notice" before

refusing to extend such credit. (Id. ¶¶ 21, 24; Ex. 1, 2000 Clearance Agreement § 5 (providing

that JPMorgan "may at any time decline to extend such credit at our discretion, with notice . . ."

(emphasis supplied)). Under New York law, "notice," such as that required by the 2000

Clearance Agreement, must be commercially reasonable. See Copy-Data Sys. Inc. v. Toshiba

Am., Inc., 755 F.2d 293, 301 (2d Cir. 1985) (an at-will obligation is terminable after reasonable

notice); Italian & French Wine Co. of Buffalo Inc. v. Negociants U.S.A. Inc., 842 F. Supp. 693,

699 (W.D.N.Y. 1993) ("the 'reasonable notice doctrine' is well established in New York law. If

a contract exists for a reasonable duration, a plaintiff is entitled to a reasonable notice of termination"); Majestic Farms Supply Ltd. v. Serv. Riding Apparel Ltd., 137 A.D.2d 501, 524 N.Y.S.2d 245 (2d Dep't 1988) (implying reasonable notice requirement to contract terminable at will).

While it is a question of fact as to what would constitute commercially reasonable notice in this context, courts applying New York law under similar circumstances have required a period of notice to the borrower sufficient to allow it to seek alternate financing. See, e.g., Components Direct, Inc. v. European Am. Bank & Trust Co., 175 A.D.2d 227, 230, 572 N.Y.S.2d 359, 361 (2d Dep't 1991) (finding that, particularly where the borrower depends upon the credit agreement for its existence, "the obligation of good faith would require a period of notice to allow the [borrower] a reasonable opportunity to seek alternate credit"); Sterling Nat'l Bank v. Goldberg, 277 A.D.2d 45, 46-47, N.Y.S.2d 409, 410-11 (1st Dep't 2000).

JPMorgan gave no such notice in this case. On the contrary, late in the evening of September 9, 2008, JPMorgan demanded that LBHI execute the September Agreements prior to the LBHI earnings call scheduled for 7:30 a.m. the next day. (Am. Compl. ¶¶ 47-48, 276). The overnight hours between JPMorgan's demand and deadline fell far short of the commercially reasonable notice period required under the 2000 Clearance Agreement. (Am. Compl. ¶¶ 278).

Accordingly, because JPMorgan had no right to refuse to extend credit to LBI when the September Agreements were executed, JPMorgan cannot point to its extensions of clearance-related credit as consideration for those agreements. See, e.g., In re Bennett, 149 B.R. at 19 ("[N]either the promise to do a thing, nor the actual doing of it, will be a good consideration if it is a thing which the party is bound to do . . . by a subsisting contract with the other party.").

JPMorgan's final argument, based on Section 5-1105 of the New York General Obligations Law, fails for the same reason. (Mov. Brief at 114-115). Because the 2000 Clearance Agreement required JPMorgan to provide clearance services and related credit to LBI, doing so prior to execution of the September Agreements cannot constitute consideration. Even if this were not the case, JPMorgan ignores that each daily extension of credit to LBI was extinguished at the end of each trading day. (Am. Compl. ¶ 21). Thus, unlike the cases relied upon by JPMorgan in its Moving Brief, there was no outstanding loan to act as the "past consideration" sufficient to support the September Agreements.

## 2. LBHI Did Not Waive Its Defenses to the September Agreements

Instead of addressing the merits of Plaintiffs' allegations that JPMorgan procured the September Agreements through economic coercion, and that JPMorgan knew the employee who signed the September Guaranty had no authority to do so, JPMorgan argues that LBHI waived its right to challenge the validity of the September Agreements. JPMorgan's argument relies on a boilerplate provision in the September Guaranty, which itself was unsupported by consideration. For the reasons discussed below, LBHI did not waive its right to challenge the September Agreements or JPMorgan's wrongdoing in procuring them.

### a. A Waiver Must Be Voluntarily and Knowingly Entered Into and Not the Product of Duress or Undue Influence

In its Moving Brief, JPMorgan argues that the September Guaranty's boilerplate waiver of defenses clause precludes LBHI from now arguing that LBHI executed the September Agreements involuntarily and while under duress (Mov. Brief at 101-102, 104-105; Am. Compl. ¶¶ 275-279), or that JPMorgan knew the September Guaranty was signed by an LBHI employee without authority to bind LBHI. (Mov. Brief at 105-106; Am. Compl. ¶¶ 57, 61, 280).

JPMorgan's argument flies in the face of well-established New York law that, to be enforceable, a waiver must be "knowingly and voluntarily entered into" and must not be "the product of fraud, duress, or undue influence." See, e.g., Hummel v. AstraZeneca LP, 575 F. Supp. 2d 568, 570 (S.D.N.Y. 2008); Joint Venture Asset Acquisition v. Zellner, 808 F. Supp. 289, 302 (S.D.N.Y. 1992) ("Under New York law, a release or waiver clause may be attacked and set aside, even if it is clear on its face, for substantive flaws in its execution, such as fraud in the inducement, illegality, duress, or mutual mistake.") (citations omitted); Davis v. Eastman Kodak Co., No. 04-CV-6098, 2007 U.S. Dist. LEXIS 23193, at *18 (W.D.N.Y. Mar. 29, 2007) ("[A] release must be knowing and voluntary in order to be valid. Where the totality of circumstances surrounding how the release was obtained demonstrates that it was not a knowing and voluntarily decision because of duress, coercion or fraudulent misrepresentations . . . the release . . . [is] voidable."). Waivers are likewise unenforceable when entered into by an agent without authority to do so on behalf of the principal. See, e.g., In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litig., 399 F. Supp. 2d 242, 246-50 (S.D.N.Y. 2005) (stating that release of liability would be unenforceable where signatory did not have actual or apparent authority to sign the release); Finkelstein v. Itkowitz & Harwood, 28 A.D.3d 336, 812 N.Y.S.2d 355 (1st Dep't 2006) (waiver made by one without authority to bind defendant held ineffective).[32]

---

[32] UBS AG Stamford Branch v. HealthSouth Corp., 645 F. Supp. 2d 135 (S.D.N.Y. 2008), cited in the Moving Brief at 105-106, is not to the contrary. In that case, as a condition precedent to entering the contract, the Board of Directors had adopted a resolution that approved the terms of the contract, authorized execution, and further named the signatory as an individual with the authority to bind the company. Id. at 138. Under those circumstances, the court held that the company's lack of authority defense both failed on the merits and was waived pursuant to a waiver clause in the contract. Id. at 142-44. HealthSouth does not stand for the proposition that where, as here, a contract is entered into without the knowledge or consent of the principal, a waiver clause contained therein may serve to waive the principal's defense to that contract.

Neither JPMorgan's main case, <u>Citibank, N.A. v. Plapinger</u>, 66 N.Y.2d 90, 495 N.Y.S.2d 309 (1985), nor the string of cases cited in JPMorgan's Moving Brief at footnotes 23-24, addresses the situation where the party who waived defenses was itself under duress. (Mov. Brief at 102, fn. 23-24). Nor do those cases address the situation where an unauthorized agent executes the waiver without the principal's knowledge or consent. Indeed, in half of the cases cited in the Moving Brief for the proposition that waiver clauses "will be enforced," the court declined to enforce the waiver clause and allowed the issue to proceed to trial, highlighting the factual nature of the enforceability of such clauses.[33] In the remaining cases, the courts found that parties had waived fraudulent inducement claims through a combination of a waiver of defenses clause and a contractual provision that the party was not relying on extra-contractual representations.[34] As stated by the <u>Plapinger</u> court, permitting the fraudulent inducement claim

---

[33] <u>See</u>, <u>e.g.</u>, <u>Reliastar Life Ins. Co. of N.Y. v. Home Depot U.S.A., Inc.</u>, 570 F.3d 513, 519 (2d Cir. 2009) (reversing decision of district court that "hell or high water" clause barred Home Depot's defense to the agreement). The courts similarly declined to find waiver even in those cases which JPMorgan misrepresents as having enforced waiver clauses. <u>See</u>, <u>e.g.</u>, <u>Aniero Concrete Co. v. N.Y. City Constr. Auth.</u>, 94 Civ. 9111, 95 Civ. 3506, 1997 U.S. Dist. LEXIS 22, *33 (S.D.N.Y. Jan. 3, 1997) ("I conclude that although the Waiver Clause meets the specificity requirements of <u>Danann</u> and its progeny, it does not prohibit Aniero from asserting that it reasonably relied on misrepresentations by Aetna and Hudson"); <u>Wells Fargo Bank Minn., N.A. v. Nassau Broad. Partners, L.P.</u>, 01 Civ. 11255 (HB), 2002 U.S. Dist. LEXIS 17191, at *6 (S.D.N.Y. Sept. 12, 2002) ("Wells Fargo asserts that the hell or highwater clauses necessarily warrant summary judgment in its favor. I disagree …"); <u>see</u> <u>also</u> <u>Mfrs. Hanover Trust Co. v. Yanakas</u>, 7 F.3d 310, 316-17 (2d Cir. 1993) ("the mere general recitation that a guarantee is 'absolute and unconditional' is insufficient under <u>Plapinger</u> to bar a defense of fraudulent inducement").

[34] <u>See</u>, <u>e.g.</u>, <u>Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A.</u>, 247 F. Supp. 2d 352, 358-59 (N.D.N.Y. 1993) (finding that defense of fraud in the inducement was precluded based on waiver of defenses clause combined with defendant's disclaimer of reliance on extra-contractual representations); <u>Fortunoff v. Triad Land Assocs.</u>, 906 F. Supp. 107, 119 (E.D.N.Y. 1995) ("The language in the estoppel clause is very specific and certainly contemplates the type of fraud alleged and waived here"); <u>Preferred Equities Corp. v. Ziegelman</u>, 190 A.D.2d 784, 784-85, 593 N.Y.S.2d 548, 549 (2d Dep't 1993) ("Preferred has waived the defense of fraud in the inducement").

to proceed under such circumstances "would in effect condone defendants' own fraud in deliberately misrepresenting their true intention." Plapinger, 66 N.Y.2d at 95 (internal quotations and citations omitted). Such reasoning has no application to LBHI's duress or lack of authority defenses in this case.

JPMorgan cites no controlling case where a court ruled that a waiver provision contained in a contract signed while under duress and without authority waived a meritorious duress or lack of authority defense. To the contrary, in all of the controlling cases relied upon by JPMorgan, the court either found that there was no factual basis for the defense or that it had been abandoned. See BC Media Funding Co. II v. Lazauskas, 08 CV 6228 (RPP), 2008 U.S. Dist. LEXIS 87124, at *8 (S.D.N.Y. Oct. 24, 2008); UBS AG Stamford Branch v. HealthSouth Corp., 645 F. Supp. 2d 135, 142-144 (S.D.N.Y. 2008); Banco Do Estado de Sao Paolo, S.A. v. Mendes Junior Int'l Co., 249 A.D. 2d 137, 138, 672 N.Y.S.2d 28, 29 (1st Dep't 1998); see also Santa Fe Pointe, LP v. Greystone Servicing Corp., No. C-07-5454 MMC, 2009 U.S. Dist. LEXIS 42469, at *18 (N.D. Cal. May 19, 2009).

The absurdity of JPMorgan's position is self-evident. If JPMorgan were correct, then every time a party sought to force its counterparty to sign an agreement under duress, it could insulate itself from its own wrongdoing by inserting a waiver of defenses clause in the coerced agreement. Similarly, any non-authorized person could execute an agreement on behalf of another and, so long as the agreement included a waiver of defenses, bind the unsuspecting, would-be principal to the agreement even if, as here, everyone knew the signatory lacked authority. JPMorgan's argument that LBHI waived its duress and lack of authority claims should therefore be rejected.

**b.     The September Guaranty Does Not Waive the Defenses of
          Lack of Authority, Duress, or Lack of Consideration,
          Because It Does Not Specifically Address Those Defenses**

JPMorgan's argument fails for the independent reason that, in order to invalidate

an asserted defense, a waiver of defenses clause must specifically disclaim the asserted defense.

See Mfrs. Hanover Trust Co. v. Yanakas, 7 F.3d 310, 316-17 (2d Cir. 1993) (under Plapinger,

"the touchstone is specificity"), citing Mfrs. Hanover Trust Co. v. Restivo, 169 A.D.2d 413, 414,

564 N.Y.S.2d 141, 141 (1st Dep't 1991) (claims that "MHT representative fraudulently

represented that [defendants'] guarantees were temporary and conditional upon MHT's

advancing sufficient funds to consummate a business merger are barred by the language of the

guarantees stating that they were continuing and unconditional.") (emphasis supplied).  Because

the boilerplate waiver in the September Guaranty does not specifically address the defenses of

lack of authority, duress, or lack of consideration, those defenses are not waived.

Although New York courts have occasionally enforced more general waivers of

defenses, this relaxed standard only applies where the contract was "signed 'following extended

negotiations between sophisticated business people.'"  Yanakas, 7 F.3d at 316 (2d Cir. 1993),

quoting Plapinger, 66 N.Y.2d at 95.  General waivers are only enforced where both parties

participated in drafting the contract and the waiver is "tailored to the matters at issue" and "not

merely a standard form agreement."  See, e.g., Aniero Concrete, 1997 U.S. Dist. LEXIS 22 at

*27-28 (waiver of defenses enforced where contract negotiations lasted a month and the

agreement was "entered into at arms length by sophisticated contracting parties") (internal

quotation and citations omitted); see also Valley Nat'l Bank v. Greenwich Ins. Co., 254 F. Supp.

2d 448, 459 (S.D.N.Y. 2003) (waiver of defenses enforced where clause was drafted by the party

seeking to invalidate it, used routinely in that party's business, and where "both parties had an

opportunity to further clarify and carve out any additional exceptions for liability they wanted to

make, but ended up settling for the inclusive language of the disclaimer waiver"); Plapinger, 66 N.Y.2d at 95 ("[F]ollowing extended negotiations between sophisticated business people, what has been hammered out is a multimillion dollar personal guarantee proclaimed by defendants to be 'absolute and unconditional.'").

The relaxed specificity standard does not apply here, where there was no negotiation of the September Guaranty whatsoever. (Am. Compl. ¶¶ 5, 58). Far from being "hammered out," the boilerplate waiver was already included in the draft September Guaranty that JPMorgan forced LBHI to sign on eleven overnight hours notice. (Am. Compl. ¶¶ 46, 49, 58).[35]

### 3. LBHI Did Not Ratify the September Agreements or the $8.6 Billion of Transfers Made Pursuant Thereto

JPMorgan's final defense to the invalidity of the September Agreements and the $8.6 billion of collateral transfers made pursuant thereto is that LBHI somehow ratified those agreements because LBHI purportedly: (i) "performed and accepted considerable benefits under the September Agreements," (ii) "forcefully advocated" for the continuation of those benefits in connection with the September 16 Order, and (iii) "now sues to enforce its purported rights" under the September Agreements. (Mov. Brief at 108-109). Each of these contentions is meritless.

As an initial matter, JPMorgan's ratification argument is based on the false premise that LBHI received "benefits" under the September Agreements in the form of clearing services and related extensions of credit provided by JPMorgan to LBI. (Mov. Brief at 109-110).

---

[35] LBHI's lack of consideration claim is likewise unaffected by the waiver of defenses contained in the September Guaranty. See, e.g., Midwest Corp. v. Global Cable, Inc., 688 F. Supp. 872, 875-77 (S.D.N.Y. 1988) (court sustained failure of consideration defense concerning guaranty, even though guaranty contained a waiver of defenses clause that court determined had waived the defense of fraudulent inducement).

As explained in the Amended Complaint and in Point III(C)(1), JPMorgan was under a pre-existing contractual duty to provide those benefits, and the September Agreements did not alter, enhance, or expand JPMorgan's obligations. (Am. Compl. ¶ 56 ("JPMorgan's obligations would remain the same as they were under its clearance-related agreements with Lehman prior to September 9, 2008")).[36] Continuation of the parties' benefits and obligations under the 2000 Clearance Agreement is not, as a matter of law, a ratification of the September Agreements. See, e.g., Kovian v. Fulton Cnty. Nat'l Bank & Trust Co., 857 F. Supp. 1032, 1040 (N.D.N.Y. 1994) ("If . . . the cancellation of the [debt] was a pre-existing duty of the Bank, then plaintiffs cannot be said to have maintained any benefit from the release.").

In any event, whether a party ratified a contract by action is a question of fact. The party's actual intent – or whether the allegedly ratifying conduct is sufficient to imply such intent – should not be decided on a motion to dismiss. Citibank, N.A. v. Real Coffee Trading Co., N.V., 566 F. Supp 1158, 1163-65 (S.D.N.Y. 1983) ("It is well settled that questions of motive, intent and credibility should not be determined on a summary judgment motion, but rather must be determined at trial.").

---

[36] As support for its theory that the extension of clearance-related credit flowed from the September Agreements, JPMorgan cites Plaintiffs' allegation that "JPMorgan 'would have' stopped extending intraday credit to Lehman if LBHI had not executed the September Agreements." (Mov. Brief at 109, citing Am. Compl. ¶ 96). Of course, as the Amended Complaint further establishes, if JPMorgan had stopped extending such credit it would have been in breach of the 2000 Clearance Agreement. (Am. Compl. ¶¶ 48-49; see also Point III(C)(1)). JPMorgan's provision of services that it was under a pre-existing duty to provide cannot constitute a benefit to LBHI under the September Agreements.

a.    **The Performance of a Disputed Contract While Under Duress,
for a Period of Several Days Only, Does Not Ratify That Contract**

JPMorgan's argument is also deficient because all of the so-called ratifying acts

by LBHI – including the transfers of $8.6 billion to JPMorgan in the last week of LBHI's

existence – were performed while LBHI was under duress.  (Am. Compl. ¶¶ 66-68, 363).

Under New York law, "where during the period of acquiescence or at the time of

the alleged ratification the disaffirming party is still under the same continuing duress, he has no

obligation to repudiate until the duress has ceased."  Sosnoff v. Carter, 165 A.D.2d 486, 492, 568

N.Y.S.2d 43, 47 (1st Dep't 1991); see also Austin Instrument, Inc. v. Loral Corp., 29 N.Y.2d

124, 133, 324 N.Y.S.2d 22, 28 (1971) (holding continuing duress excuses prompt repudiation);

Application of Gruen, 173 Misc. 765, 766-67, 18 N.Y.S.2d 990, 992-93 (N.Y. Sup. Ct. 1940)

("Acts of respondent while still under the influence of the very threats which induced the making

of the agreement are insufficient in themselves to ratify the agreement and waive the claim of

duress."); In re Estate of Kittinger, 199 Misc. 377, 381, 101 N.Y.S.2d 844, 846 (N.Y. Sur. Ct.

1950) ("[The] contention that the coercion continued until decedent's death is a sufficient

answer, if proved, to [the] argument that the failure to attack the separation agreement during

decedent's lifetime constituted a ratification of the agreement and laches.").  Because at all

relevant times LBHI was under the same continuing duress that forced it to enter the September

Agreements in the first instance, any subsequent acts performed by LBHI could not serve to

ratify those agreements or the collateral transfers made pursuant thereto.

JPMorgan further argues that LBHI should be deemed to have ratified the

September Agreements and the $8.6 billion of collateral transfers because it did not act

"promptly" to repudiate those agreements or seek the Court's assistance in recovering the

collateral.  (Mov. Brief at 109).  However, as JPMorgan recognizes, the filing of a bankruptcy

petition itself is sufficient repudiation to preserve an estate's right to rescind a disputed agreement. (Mov. Brief at 109 ("[s]uch acts of repudiation include instituting legal action ... including a bankruptcy filing")). LBHI filed for bankruptcy only three business days after executing the September Agreements, so JPMorgan can hardly argue that this act of repudiation was untimely. Moreover, LBI only accepted JPMorgan's clearing services and related credit for five business days following LBHI's bankruptcy. Even assuming these services were deemed "benefits" under the September Agreements (as opposed to the 2000 Clearance Agreement), the eight business days from execution of the September Agreements through the cessation of services is nowhere near the time required for a party to ratify a contract by acquiescence.

For example, in <u>VKK Corp. v. Nat'l Football League</u>, 244 F.3d 114 (2d Cir. 2001), cited by JPMorgan for the proposition that a party "must act promptly to repudiate the contract . . . or he will be deemed to have waived his right to do so," the court found a ratification because the plaintiff waited <u>thirty months</u> before challenging the contract. 244 F. 3d 123. Each of the remaining cases relied upon by JPMorgan involved similarly lengthy time periods. <u>See</u> <u>In re MarketXT Holdings Corp.</u>, 361 B.R. 369, 402 (S.D.N.Y. 2007) (more than one year); <u>Bank Leumi Trust Co. of N.Y. v. D'Evori Int'l, Inc.</u>, 163 A.D.2d 26, 31, 558 N.Y.S.2d 909, 914 (1st Dep't 1990) (six months); <u>Fruchtandler v. Green</u>, 233 A.D.2d 214, 215, 649 N.Y.S.2d 694, 696 (1st Dep't 1996) (an "inordinate length of time"). Plaintiffs are unaware of any New York case, and JPMorgan does not cite to one, in which a party was deemed to have ratified a contract after performing for less than two weeks.

### b. LBHI Expressly Reserved Its Right to Challenge the September Agreements and the $8.6 Billion of Collateral Transfers Under the September 16 Order

JPMorgan also argues that LBHI forfeited its right to challenge the September Agreements or collateral transfers when it joined JPMorgan in petitioning the Court for the September 16 Order regarding continuing clearing services for LBI in the week after LBHI's bankruptcy. (Mov. Brief at 109-111). JPMorgan's current position is both contrary to the unambiguous terms of the September 16 Order itself and, as demonstrated at pages 12-14, supra, belied by the contemporaneous representations of its own counsel.

JPMorgan cannot credibly argue that the motion seeking the September 16 Order or the underlying events which led to the issuance of the September 16 Order somehow served to ratify and validate the September Agreements or the $8.6 billion of collateral transfers given the multiple and express reservations of rights. Nor can JPMorgan credibly argue that it "relied on that Order along with the September Agreements in extending tens of billions of dollars of credit to LBI" (Mov. Brief at 110), given that JPMorgan's own counsel expressly acknowledged there were questions regarding the legitimacy of those agreements and the underlying collateral.

### c. This Lawsuit's Assertion of Alternative Claims Arising Under the September Agreements Does Not Ratify Those Agreements

JPMorgan next argues that the Plaintiffs' filing of this Amended Complaint, which includes alternative claims against JPMorgan arising under the September Agreements, somehow ratified those agreements. (Mov. Brief at 111, fn. 28). As the Amended Complaint itself and this brief make clear, it is Plaintiffs' position that the September Agreements are invalid and unenforceable on a number of grounds. However, Plaintiffs may plead in the alternative that JPMorgan breached the September Agreements if they are deemed enforceable. Thus, JPMorgan's argument is plainly at odds with Federal Rule of Civil Procedure 8(d), made

applicable here by Rule 7008 of the Federal Bankruptcy Rules. Fed. R. Civ. P. 8(d)(2) ("[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically ..."); Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."); see also U.S. Gypsum Co. v. Nat'l Gypsum Co., 352 U.S. 457, 467 (1957) (alternative pleading expressly permitted under Fed. R. Civ. P. 8).

Indeed, courts routinely allow plaintiffs to allege that a contract is invalid, but in the event the court finds otherwise, that the defendant breached that contract. Amusement Indus., Inc. v. Stern, 693 F. Supp. 2d 301, 307-08 (S.D.N.Y. 2010) (pursuant to Rule 8(d), allowing party to plead lack of contractual relationship and simultaneously make a claim for indemnity if such a relationship is found to exist). JPMorgan does not cite any case holding that pleading an alternative breach of contract claim under such circumstances ratified that contract. Instead, JPMorgan relies on IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp., 26 F.3d 370 (2d Cir. 1994). (Mov. Brief at 111, fn. 28). In that case, the court held that appellant RTC ratified its agent's repudiation of certain bonds and indentures because, in a prior lawsuit, "RTC made its position clear with regard to the repudiation by Roelle when it stated repeatedly (32 times) in its answer and third-party complaint that it had repudiated the Indenture and bonds." Id. at 375. Similarly, in Robb v. Vos, 155 U.S. 13 (1894), the Court held that the plaintiffs ratified the sale of property made by their agent by filing an answer and cross-petition in prior legal proceedings seeking to "appropriate to themselves the benefit" of that transaction. Id. at 39.

LBHI has never taken the position that the September Agreements are valid, nor has it relied on the September Agreements in prior proceedings to enforce rights under those agreements. LBHI's assertion in this lawsuit that JPMorgan breached the September

Agreements, clearly pleaded in the alternative, cannot constitute a ratification of those agreements.

> **d. Section 558 of the Bankruptcy Code Precludes a Finding That LBHI Waived Defenses to the September Agreements or Collateral Transfers**

Finally, LBHI could not have waived the estate's defenses to the enforceability of the September Agreements, or the $8.6 billion of pre-petition collateral transfers, by virtue of any post-petition conduct. Such a post-petition waiver of the estate's defenses is expressly prohibited by section 558 of the Bankruptcy Code, which provides:

> [t]he estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statutes of limitation, statutes of frauds, usury, and other personal defenses. <u>A waiver of any such defense by the debtor after the commencement of the case does not bind the estate.</u>

11 U.S.C. § 558 (emphasis supplied); <u>see also</u> <u>Second Pa. Real Estate Corp. v. Papercraft Corp. (In re Papercraft Corp.)</u>, 126 B.R. 926, 931 (Bankr. W.D. Pa. 1991) (because "[t]he estate has the benefit of . . . a defense even if [the debtor], after the commencement of the case, waives it . . . [t]he waiver is not binding upon the estate"); <u>Continental Group, Inc. v. Justice</u>, 536 F. Supp. 658, 661 (D. Del. 1982). Section 558 thus provides an additional and independent basis for rejecting JPMorgan's waiver argument.

**D. The Amended Complaint States Claims That JPMorgan Breached the 2000 Clearance Agreement (Counts XLI-XLII) and the August Security Agreement (Counts XLIII-XLIV)**

JPMorgan's motion to dismiss Counts XLI-XLII, for breach of the 2000 Clearance Agreement, and Counts XLIII-XLIV, for breach of the August Security Agreement, should also be denied.

For all of the reasons set forth in the Amended Complaint and above, the September Agreements are invalid and unenforceable. For this reason alone, LBHI's $8.6 billion

should be returned to LBHI. This is because JPMorgan was already fully collateralized for any clearance-related extensions of credit, and the remaining relevant agreements – the 2000 Clearance Agreement and the August Agreements – only permitted JPMorgan to request or retain LBHI collateral for obligations incurred by LBHI's subsidiaries in connection with clearing activity. Those agreements did not permit JPMorgan to be overcollateralized for clearance obligations, or to use LBHI's collateral for any other purpose. Thus, to the extent JPMorgan claims the $8.6 billion is governed by either the 2000 Clearance Agreement or the August Agreements, JPMorgan's demand for and retention of those funds for non-clearance obligations is a breach of those agreements.

In addition, JPMorgan would have breached those agreements when, as of the close of settlement on September 12, 2008, it locked down and refused to give LBHI access to its collateral, including not only the $8.6 billion of cash and money market funds but also the billions of dollars of LBHI securities then held by JPMorgan. To the extent either the 2000 Clearance Agreement or August Security Agreement are found to govern these LBHI assets, JPMorgan's refusal in this regard would constitute a separate and independent breach of both the 2000 Clearance Agreement and the August Security Agreement, entitling LBHI to damages.

In its Moving Brief, JPMorgan argues that these claims should be dismissed because the Amended Complaint alleges that the $8.6 billion of collateral demands were made under cover of the "September Agreements," rather than the 2000 Clearance Agreement or the August Agreements. (Mov. Brief at 89-90, 94). As an initial matter, JPMorgan's argument does not reach the billions of dollars worth of securities pledged pursuant to the August Security Agreement and/or the 2000 Clearance Agreement, as amended by the August Amendment. (Am. Compl. ¶ 45). But even with respect to the $8.6 billion of cash and money market funds,

JPMorgan itself claims elsewhere in the Moving Brief that these collateral transfers were made in connection with the 2000 Clearance Agreement (see Mov. Brief at 38), and further argues that it has a lien over at least the $6.9 billion of cash pursuant to the August Security Agreement. (See, e.g., Mov. Brief at 83). Plaintiffs should therefore be allowed to proceed on the alternative claims that, to the extent the 2000 Clearance Agreement or August Security Agreement governed the $8.6 billion of collateral, JPMorgan breached such agreement. See Allstate Ins. Co. v. Administratia Asigurarilor De Stat, 948 F. Supp. 285, 310 (S.D.N.Y. 1996) (denying summary judgment on contract and implied contract claims because there was a "question of which, if any, of the contracts underlying the instant litigation govern").

For the reasons discussed below, the remainder of JPMorgan's defenses to Plaintiffs' breach of contract claims are similarly without merit.

**1.      To the Extent JPMorgan's Demands for and Retention of LBHI's $8.6 Billion Are Governed by the 2000 Clearance Agreement or the August Security Agreement, JPMorgan Breached Such Agreement**

JPMorgan argues that, even if the 2000 Clearance Agreement does govern the collateral transfers, it does not contain any limitation on the collateral that JPMorgan can demand. (Mov. Brief at 91). In fact, both the 2000 Clearance Agreement, as amended, and the August Security Agreement expressly provided that JPMorgan could only request and retain LBHI collateral for the purpose of securing clearance-related obligations arising under the 2000 Clearance Agreement. They did not give JPMorgan the right to be overcollateralized for clearance-related extensions of credit. Thus, to the extent the $8.6 billion is governed by either of these agreements, JPMorgan breached those agreements because the $8.6 billion was extracted from LBHI to cover non-clearance obligations at a time when JPMorgan was fully collateralized for clearance.

Specifically, in the August Guaranty, LBHI purported to guaranty the payment of obligations and liabilities of Lehman subsidiaries arising under the 2000 Clearance Agreement. (Ex. 4, August Guaranty § 1). In the related August Security Agreement, LBHI pledged specific LBHI accounts as security for LBHI's obligations under the August Guaranty. (See Ex. 5, August Security Agreement at 1 ("the term 'Liabilities' shall mean (a) all 'Liabilities' as defined in the Guaranty . . .")). The August Security Agreement further provided that JPMorgan "may from time to time request further security or payments on account of any of the Liabilities," as that term is defined in the August Guaranty. (Id. at 5). Thus, JPMorgan had a right to request and retain collateral, but only for the purpose of securing clearance-related obligations.

In connection with the August Security Agreement and August Guaranty, LBHI also entered into the August Amendment to the 2000 Clearance Agreement. (Am. Compl. ¶ 28). In addition to adding LBHI as a party to the 2000 Clearance Agreement, the August Amendment added a new Section 2.5 to ensure that any rights of JPMorgan to LBHI collateral arising under the 2000 Clearance Agreement would be limited to those set forth in the August Guaranty and August Security Agreement – i.e., limited to clearance-related obligations. (Ex. 3, August Amendment § 2 ("any security interest, lien, right of set-off or other collateral accommodation provided by any Lehman entity pursuant to this Agreement shall not be available to support the obligations and liabilities of any other Lehman entity pursuant to this Agreement.")). Similarly, section 3 of the 2000 Clearance Agreement further confirmed that JPMorgan had no right to demand collateral beyond what was needed to "fully collateralize[]" the clearance-related obligations arising under that agreement. (Ex. 1, 2000 Clearance Agreement § 3; Am. Compl. ¶ 25). Neither the August Security Agreement nor the 2000 Clearance Agreement authorized

JPMorgan to request or retain collateral to cover anything other than clearance-related obligations.

As detailed in the Amended Complaint, at least as of September 4, 2008, JPMorgan had determined that it was adequately secured for clearance-related obligations arising under the 2000 Clearance Agreement or the August Agreements. (Am. Compl. ¶ 45). Nevertheless, over the course of the next week and up until the last business day before LBHI's bankruptcy filing, JPMorgan demanded and locked down $8.6 billion of LBHI cash and money market funds as purported collateral. (Am. Compl. ¶¶ 66, 71). JPMorgan did not demand and retain this collateral to cover clearance obligations. It did so to cover an anticipated and improper windfall under derivatives contracts, to pay JPMorgan customer claims, and to have an "extra cushion" available for any other potential claims. (Am. Compl. ¶¶ 51, 62, 69).

To the extent JPMorgan's demands for and retention of this $8.6 billion is governed by the 2000 Clearance Agreement or the August Security Agreement, JPMorgan would thus be in breach of those agreements. As demonstrated above, those agreements only permitted JPMorgan to request or retain LBHI collateral to secure clearance-related obligations, and JPMorgan had no right to be over-collateralized. JPMorgan therefore breached those agreements by demanding and retaining the $8.6 billion of LBHI collateral for other, non-clearance purposes. See In re Liquidation of N.Y. Sur. Co., 180 Misc. 2d 406, 407-9, 728 N.Y.S.2d 915, 916-17 (Sup. Ct. Nassau County 2001) (where plaintiffs posted cash collateral to support a surety bond, the defendant surety company's use of the collateral to discharge a separate uncollateralized obligation constituted a breach of contract), appeal denied, 96 N.Y.2d 719; see also Hertzoff v. Diaz, 533 F. Supp. 2d 470, 471-72 (S.D.N.Y. 2008) (where plaintiff transferred funds to defendant to pay down a specific loan, defendant's use of those funds for another

purpose stated a breach of contract claim); <u>Rajbhandari v. Shah</u>, No. 02 Civ. 8778, 2006 U.S. Dist. LEXIS 894, at *13-14 (S.D.N.Y. Jan. 12, 2006) (defendant's use of money for purpose other than the contractually-agreed upon purpose stated a breach of contract claim).

In its Moving Brief, the only other defense JPMorgan offers to its breach of the August Security Agreement is a throw-away assertion that JPMorgan did not actually sign that agreement, and therefore it "did not undertake any obligations" under that agreement. (Mov. Brief at 93). JPMorgan cites no authority for this proposition – and for good reason. It is well-established that an agreement is formed based on the intent of the parties; the fact that a party did not sign an agreement does not mean that the party is not bound by the terms of the agreement. See <u>God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs., LLP</u>, 6 N.Y.3d 371, 373, 812 N.Y.S.2d 435, 436 (2006) (agreement enforceable, even if not signed, because it was evident that the parties intended to be bound by the contract); <u>Flores v. Lower East Side Serv. Ctr.</u>, 4 N.Y.3d 363, 368, 795 N.Y.S.2d 491, 494 (2005) ("We have long held that a contract may be valid even if it is not signed by the party to be charged . . ."); <u>Municipal Consultants & Publishers, Inc. v. Ramapo</u>, 47 N.Y.2d 144, 149, 417 N.Y.S.2d 218, 220 (1979); <u>Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.</u>, 41 N.Y.2d 397, 401, 393 N.Y.S.2d 350, 352-53 (1977).

In any event, a non-signatory will be bound by the terms and limitations of an agreement where that party is an intended beneficiary of the contract and has accepted those benefits. See <u>Rector v. Calamus Group, Inc.</u>, 17 A.D.3d 960, 962, 794 N.Y.S.2d 470 (3d Dep't 2005) (finding third-party beneficiary bound by terms of inspection agreement); <u>Schietinger v. Tauscher Cronacher Prof'l Eng'rs, P.C.</u>, 40 A.D.3d 954, 956, 838 N.Y.S.2d 95, 96 (2d Dep't 2007) (holding party for whose benefit contract was made was bound by its terms). Having

demanded and accepted delivery of LBHI's collateral, JPMorgan cannot now claim that its rights to LBHI's assets were unconstrained by the bargain simply because it did not sign the August Security Agreement.

JPMorgan's motion to dismiss LBHI's alternative Counts XLI and XLIII, for breach of the 2000 Clearance Agreement and the August Security Agreement, should therefore be denied.

## 2. To the Extent Any LBHI Collateral Is Governed by the 2000 Clearance Agreement or August Security Agreement, JPMorgan's Refusal to Allow LBHI to Access That Collateral Constitutes an Additional Breach

In addition to the above, to the extent any of the LBHI collateral is governed by the 2000 Clearance Agreement or the August Security Agreement, JPMorgan's refusal to allow LBHI to access that collateral on Friday, September 12, 2008 and throughout the weekend constitutes a separate and independent breach of contract. This is so regardless of whether JPMorgan demanded the collateral for clearance or other obligations, and this claim therefore applies to the billions of dollars of LBHI's securities extracted by JPMorgan in the weeks leading up to LBHI's bankruptcy as well as the $8.6 billion in LBHI cash and money market funds.

### a. Both the 2000 Clearance Agreement and the August Security Agreement Required JPMorgan to Permit LBHI Access to Its Assets at the Close of Business

According to both the 2000 Clearance Agreement, as amended, and the August Security Agreement, JPMorgan was obligated to allow LBHI to access its collateral at the end of the business day, except to the extent any guaranteed clearance-related obligations of the Lehman subsidiaries remained outstanding.

When the 2000 Clearance Agreement was originally negotiated and executed, LBI was the only Lehman entity party to that agreement. (Am. Compl. ¶ 19). Section 3 of the

2000 Clearance Agreement required JPMorgan to permit LBI to transfer securities and cash

between any accounts (whether held at JPMorgan or otherwise). JPMorgan could only refuse

LBI's instructions if the resulting transfer would leave JPMorgan with inadequate collateral for

outstanding clearance-related obligations. (Ex. 1, 2000 Clearance Agreement § 3 ("We

[JPMorgan] . . . agree pursuant to your instructions ... to permit you to make transfers between

the Clearing Account(s), Custody Account(s) and the Segregated Account(s) or other

accounts, . . . to the extent that after such transfer we remain fully collateralized."); see also Am.

Compl. ¶¶ 22-25).

Pursuant to the August Amendment, LBHI became a party to the 2000 Clearance

Agreement. (Id. ¶ 28; see generally, Ex. 3, August Amendment). Accordingly, Section 3

obligated JPMorgan to follow LBHI's instructions regarding the movement of any LBHI assets

subject to the 2000 Clearance Agreement. In the absence of outstanding clearance-related

obligations at the close of the business day, JPMorgan had no right under the 2000 Clearance

Agreement to refuse LBHI's instructions that it be given access to its own cash or securities.

Similarly, the August Security Agreement created an intra-day lien only over

certain defined LBHI accounts and specifically granted LBHI the right to transfer assets held in

those accounts into a lien-free "Overnight Account" at the end of the business day. (Ex. 5,

August Security Agreement at 3 ("at the end of a business day, if [LBHI] has determined that no

Obligations (as defined in the Clearance Agreement) remain outstanding, [LBHI] may transfer to

an account (the 'Overnight Account') any and all Security held in or credited to or otherwise

carried in the Accounts.")).

In its Moving Brief, JPMorgan argues that the lien-free account was just "a

different account at JPMorgan" and that the above provision does "not provide LBHI with any

right to withdraw the collateral from the Bank, nor does it obligate JPMorgan to return any of the collateral." (Mov. Brief at 93). But the Amended Complaint alleges facts to the contrary – that the parties intended to grant LBHI the right to transfer assets into a lien-free account. (Am. Compl. ¶¶ 31-32 ("The parties also negotiated a crucial provision that confirmed LBHI's right to access its collateral at the end of each trading day.")). Indeed, the essential feature of a lien-free account is the owner's right to access and use assets contained therein free of the bank's security or other interest.[37]

In any event, for purposes of this motion to dismiss, the Amended Complaint's allegation that the parties' intent was to provide LBHI with the right to access and use its assets at the end of the business day should be accepted as true. See Bison Capital Corp. v. ATP Oil & Gas Corp., 10 Civ. 0714, 2010 U.S. Dist. LEXIS 62836, at *11-14 (S.D.N.Y. June 24, 2010). Such allegation is sufficient to establish JPMorgan's contractual duty to allow that access.

**b.      JPMorgan's Breach of the 2000 Clearance Agreement and the August Security Agreement**

JPMorgan has admitted that, as of the close of settlement on September 12, 2008, it had no outstanding clearance-related obligations to the Lehman subsidiaries. (Am. Compl. ¶ 73; see also Counterclaims ¶ 22). JPMorgan was thus obligated to permit LBHI to access its collateral. Indeed, use of those billions of dollars in cash and securities would have been critical in LBHI's efforts to stave off bankruptcy that day and throughout the weekend. (Am. Compl. ¶ 74). But JPMorgan locked down that collateral and refused LBHI's repeated requests that it be given access to its own assets, causing damage to LBHI in an amount equivalent to the value of

---

[37] Even if this were not the case, JPMorgan would still be in breach of the August Security Agreement because it locked down all of LBHI's assets, and did not even allow LBHI to transfer those assets into the lien-free Overnight Account. (See Am. Compl. ¶¶ 72, 75). This act alone is sufficient to establish a breach of the August Security Agreement.

the unlawfully retained securities and cash, as well as the losses that resulted from LBHI's exigent bankruptcy filing. (Id. ¶¶ 75, 320-321, 332-333).

These allegations are more than sufficient to establish a breach of the 2000 Clearance Agreement and the August Security Agreement. JPMorgan's motion to dismiss the alternative Counts XLII and XLIV should therefore be denied.

### 3. LBHI Did Not Waive Its Claims for Breach of Contract

Relying on VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A., 594 F. Supp. 2d 334 (S.D.N.Y. 2008), JPMorgan erroneously argues that LBHI somehow waived its breach of contract claims "by posting the collateral and accepting the benefits of JPMorgan's continued extensions of credit." (Mov. Brief at 99). Yet, "[w]aiver is an intentional relinquishment of a known right and should not be lightly presumed." Gilbert Frank Corp. v. Federal Ins. Co., 70 N.Y.2d 966, 968, 525 N.Y.S.2d 793, 795 (1988) (collecting authority). Moreover, "[a] waiver, not express, found in the acts, conduct or language of a party, is rarely established as a matter of law rather than as a matter of fact." Alsens Am. Portland Cement Works v. Degnon Contracting Co., 222 N.Y. 34, 37 (1917). VCG does not justify a finding of waiver on the facts of this case, and certainly not at this pleading stage.

First, LBHI received no benefits or consideration in exchange for posting the $8.6 billion of collateral to JPMorgan during the last week of LBHI's business. At all relevant times during that week, JPMorgan, which was fully collateralized, was under a contractual duty to extend clearance-related credit to Lehman pursuant to the 2000 Clearance Agreement, regardless of whether its demands for additional collateral were met. See Point III(C)(1), supra. Moreover, the Amended Complaint is clear that these $8.6 billion of transfers were not related to clearance activity. (Am. Compl. ¶¶ 62, 69). Accordingly, LBHI's acceptance of clearance-related credit cannot waive its right to challenge JPMorgan's demands for and withholding of LBHI's $8.6

billion of collateral. See Kovian v. Fulton Cnty. Nat'l Bank & Trust Co., 857 F. Supp. 1032, 1040 (N.D.N.Y. 1994) ("If . . . the cancellation of the [debt] was a pre-existing duty of the Bank, then plaintiffs can not be said to have maintained any benefit from the release").

Second, unlike the plaintiff in VCG, LBHI protested JPMorgan's excessive collateral demands. (See Am. Compl. ¶ 66 ("Although LBHI protested these demands, it had no choice but to comply.")). Such protest is sufficient to preserve any later claim for breach of contract. See, e.g., Proteus Books Ltd. v. Cherry Lane Music Co., 873 F.2d 502, 507-510 (2d Cir. 1989).

Finally, JPMorgan's waiver argument has no bearing on Counts XLII and XLIV, premised on JPMorgan's failure to allow LBHI to access its collateral on Friday, September 12, 2008 and throughout that weekend (including both the $8.6 billion of cash and money market funds and the billions of dollars of securities). JPMorgan's breach in this regard plainly did not provide any benefits to LBHI, but instead pushed LBHI into an exigent bankruptcy. (Am. Compl. ¶ 79).

In sum, VCG does not apply here, and JPMorgan's motion to dismiss Plaintiffs' breach of contract claims on purported waiver grounds should be denied.

## E.	JPMorgan Breached the Covenant of Good Faith and Fair Dealing Under the August Agreements (Count XLV) and the September Agreements (Count XLVII)

Counts XLV and XLVII describe how, in the week immediately prior to LBHI's bankruptcy, JPMorgan would have breached the covenant of good faith and fair dealing under both the August Agreements and the September Agreements, had those agreements been valid and enforceable. As demonstrated in more detail below, JPMorgan offers no legitimate basis for dismissing Counts XLV or XLVII. Instead, JPMorgan's purported defense to these breaches

119

relies on mischaracterizations of both New York law and the agreements at issue.[38] The motion to dismiss these claims should therefore be denied.

### 1. JPMorgan's Excessive Collateral Demands Breached the Duty of Good Faith and Fair Dealing

In the last weeks of LBHI's existence, JPMorgan demanded and received billions of dollars of LBHI's cash, money market funds, and securities as purported collateral. (Am. Compl. ¶¶ 62-72). By JPMorgan's own calculations, the value of the collateral received far exceeded what was reasonably required to secure both the clearance-related obligations of LBHI under the August Agreements and also non-clearance obligations purportedly arising under the September Agreements. (Id.; see also id. ¶¶ 62, 65). JPMorgan's abuse of its discretion – by demanding unreasonable and excessive amounts of collateral – constitutes a breach of the covenant of good faith and fair dealing under those agreements.

In its Moving Brief, JPMorgan argues that its excessive collateral demands did not breach the duty of good faith and fair dealing because the Amended Complaint does not "plead that JPMorgan deprived LBHI of an express contractual right." (Mov. Brief at 84). But JPMorgan's own cases demonstrate that this is not a requirement to sustain a claim for breach of the implied covenant. As explained in State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158 (2d Cir. 2004), cited in the Moving Brief at 95: "Where the contract contemplates the exercise of discretion, [the implied covenant] includes a promise not to act

---

[38] To the extent JPMorgan argues that LBHI waived these good faith and fair dealing claims (see Mov. Brief at 99), such argument should be rejected for the same reasons set forth in Point III(D)(3) above.

arbitrarily or irrationally in exercising that discretion." 374 F.3d at 169, quoting Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 979 (1995).[39]

Thus, it is irrelevant whether or not JPMorgan's excessive collateral demands frustrated some express right of LBHI under the agreements; the breach of the implied covenant occurred when JPMorgan abused its discretionary right to request and retain collateral by demanding billions of dollars in excess of what was reasonably required to secure JPMorgan under the agreements. Applying the proper standard under New York law, Plaintiffs have adequately pleaded claims for breach of the implied covenant under both the August Agreements and the September Agreements.

Indeed, numerous New York courts have found viable claims for breach of the implied covenant based on allegations of a defendant's abuse of discretion with respect to its secured position, including by demanding excessive collateral. For example, in CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A., No. 07 Civ. 11078 (LTS) (AJP), 2009 U.S. Dist. LEXIS 59540 (S.D.N.Y. July 13, 2009), defendant Wachovia had the right under credit default swap contracts to measure its exposure to the plaintiff and demand collateral to secure that

---

[39] The remaining cases cited by JPMorgan similarly do not support JPMorgan's position. For example, while the court in Metro. Life Ins. Co. v. RJR Nabisco, Inc., 716 F. Supp. 1504, 1517 (S.D.N.Y. 1989), explained that a breach of the implied covenant may lie where one party has taken action which "effectively deprived the other of . . . express, explicitly bargained-for benefits," the court did not address the rule explained by the New York Court of Appeals in Dalton that a breach may occur where a party abuses its discretionary rights under the contract.

Fasolino Foods Co. v. Banca Nazionale Del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992), cited in the Moving Brief at 95, stands for the irrelevant proposition that the law does not create an implied covenant of good faith in the absence of an underlying contract. Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co., 97 Civ. 4914 (SS), 1997 U.S. Dist. LEXIS 17217 (S.D.N.Y. Nov. 4, 1997), cited in the Moving Brief at 95, is similarly irrelevant. There, the court held that an agreement to negotiate a future contract "in good faith" does not obligate the parties to "propose only such terms as the other party is happy with." Id. at *18-19. Warner Theatre thus has no bearing here.

exposure. Id. at *5-7. The plaintiff alleged that Wachovia abused that contractual discretion by

calculating its exposure unreasonably to justify excessive collateral demands. Id. The court

denied Wachovia's motion to dismiss, holding that these allegations stated a claim for breach of

the implied covenant. Id. at *21-22. Similarly, in Mallon Resources Corp. v. Midland Bank, 96

Civ. 7458 (RPP), 1997 U.S. Dist. LEXIS 10346 (S.D.N.Y. July 17, 1997), the court refused to

dismiss a good faith and fair dealing claim where the plaintiff alleged that, although the bank

could value "borrowing base" collateral "in its discretion," the bank breached the implied

covenant by unreasonably reducing the value assigned to that collateral and demanding

repayment of a commensurate portion of the loan. Id. at *2-4, *8.

      Other New York courts have also refused to dismiss good faith and fair dealing

claims based on allegations that a bank abused its discretion in making determinations regarding

its security. See, e.g., Canterbury Realty & Equip. Corp. v. Poughkeepsie Sav. Bank, 135

A.D.2d 102, 109, 524 N.Y.S.2d 531, 536 (3d Dep't 1988) (denying a lender bank's motion for

summary judgment because fact issue existed as to whether the bank properly exercised its

contractual discretion to accelerate the loan "if the Bank deems itself insecure"); Barclays Bank

of N.Y. v. Heady Electric Co. Inc., 174 A.D.2d 963, 571 N.Y.S.2d 650, 654 (3d Dep't 1991)

(same; based on finding "there was no reasonable basis on which [lender] could have deemed

itself insecure or concluded that defendants' financial responsibility had become impaired").

      In this case, pursuant to identical provisions in the August and September

Security Agreements, the parties agreed that JPMorgan "may from time to time request further

security or payments on account of any of the Liabilities" secured under that agreement. (Ex. 5,

August Security Agreement at 5; Ex. 8, September Security Agreement at 5). The Amended

Complaint explains how JPMorgan abused that discretion by demanding and retaining billions of

dollars of LBHI collateral in excess of what was needed to secure any legitimate obligations governed by those agreements. (Am. Compl. ¶¶ 337, 339, 353-354). Pursuant to the authority discussed above, such allegations alone are sufficient to state claims that JPMorgan breached its duty of good faith and fair dealing implied in those agreements.

But the present case is even stronger than those cited above, because JPMorgan surreptitiously made its overreaching collateral demands to circumvent derivatives contracts and to take advantage of a future LBHI bankruptcy. As explained in the Amended Complaint, Lehman entities were net in-the-money by approximately $1 billion under derivatives contracts with JPMorgan entities at the time the demands were made, meaning that JPMorgan had no right to request any collateral from any Lehman subsidiary. (Am. Compl. ¶ 63). And the derivatives contracts did not allow JPMorgan to demand collateral from LBHI directly. (Id. ¶ 64). Nonetheless, JPMorgan anticipated that LBHI's bankruptcy would provide a pretext to claim favorable settlement payments under the derivatives contracts. JPMorgan could then satisfy what would ordinarily be unsecured claims 100 cents on the dollar with unlawfully acquired collateral. (Id. ¶¶ 62, 65). Similarly, the August and September Security Agreements gave JPMorgan no right to build up a $5 billion "extra cushion" in anticipation of other claims that could arise upon an LBHI bankruptcy. (Am. Compl. ¶ 69).

Under New York law, these facts are more than sufficient to state an independent breach of the covenant of good faith and fair dealing. See Wallace v. Merrill Lynch Capital Servs. Inc., 2005 N.Y. Slip. Op. 52076U, at *2, *5-6 (Sup. Ct. N.Y. Cty. Dec. 14, 2005) (claim for breach of the implied covenant well-pleaded where Merrill Lynch leveraged plaintiff's impending bankruptcy by purchasing distressed bonds of the plaintiff, in order to take advantage

of settlement provisions under swap contracts that would be triggered by that bankruptcy), aff'd Wallace v. Merrill Lynch Capital Servs. Inc., 2006 N.Y. Op. 3807 (1st Dep't 2006).

When JPMorgan's abuse of its discretion to request collateral is considered together with its improper purpose for doing so, it is clear that its misconduct is sufficient to support a claim for breach of the implied covenant of good faith and fair dealing. JPMorgan's motion to dismiss Counts XLV and XLVII should therefore be denied.

### 2. JPMorgan's Use of Improper Threats to Force LBHI to Post Collateral Constitutes an Additional Breach of the Implied Covenant

Counts XLV and XLVII further allege that JPMorgan used improper threats to force LBHI to post $8.6 billion in cash and money market funds as collateral in the week prior to LBHI's bankruptcy. Such misconduct constitutes an additional breach of JPMorgan's duty of good faith and fair dealing under either the August or September Security Agreements.

Pursuant to the August Security Agreement, JPMorgan had a right to "request" (not "demand") collateral from LBHI to support the obligations under that agreement. (Ex. 5, August Security Agreement at 5). This provision was carefully negotiated to ensure LBHI would have the right to refuse excessive or unreasonable collateral requests without triggering a "Default" under the August Security Agreement. This provision carried through to the September Security Agreement. (Ex. 8, September Security Agreement at 5). The Amended Complaint describes how JPMorgan used the improper threat to cease clearing for Lehman – which would have forced the collapse of Lehman's business – to deprive LBHI of this protection under the Security Agreements and force LBHI to comply with JPMorgan's excessive collateral demands. (Am. Compl. ¶¶ 337, 353 ("This improper conduct of JPMorgan deprived LBHI of any right under the August Agreements to refuse unreasonable and excessive collateral demands

by JPMorgan."). This allegation states a claim for breach of JPMorgan's duty of good faith and fair dealing.

Courts have found that the use of improper threats to force a counterparty to comply with requests it otherwise has a contractual right to refuse constitutes a breach of the implied covenant. See, e.g., Linzer Prods. Corp. v. Sekar, 499 F. Supp. 2d 540, 548 (S.D.N.Y. 2007) (implied covenant claim well pleaded where the defendant "allegedly threatened termination [of licensing agreement] in the absence of a material breach, and did so with the intent to force [licensee] to agree to higher royalty rates"); Bear, Stearns Funding, Inc. v. Interface Group – Nev., Inc., 361 F. Supp. 2d 283, 299-300 (S.D.N.Y. 2005) (implied covenant counterclaim survived summary judgment based on plaintiff's "employing threats and harassment to force [defendant] to purchase terrorism insurance not required under the Loan Agreement").

Accordingly, the Amended Complaint's allegation that JPMorgan used improper and unlawful threats to deprive LBHI of the right to refuse JPMorgan's overreaching collateral demands states an additional claim that JPMorgan breached its duty of good faith. JPMorgan's motion to dismiss Counts XLV and XLVII should therefore be denied.

### 3. JPMorgan Breached the Implied Covenant by Refusing to Return LBHI's Collateral

JPMorgan's final argument, that Counts XLV and XLVII should be dismissed as duplicative of Plaintiffs' breach of contract claims, is both inaccurate and flatly inconsistent with its position in the Moving Brief. (Mov. Brief at 98). It is inaccurate because significant aspects of Plaintiffs' good faith and fair dealing claims – discussed above – are based on facts and conduct different from those underlying Plaintiffs' breach of contract claims based on JPMorgan's failure to allow LBHI to access its assets on Friday, September 12, 2008. As a

result, they are clearly not duplicative. See Fantozzi v. Axsys Tech. Inc., 07 Civ. 2667 (LMM), 2007 U.S. Dist. LEXIS 61448, at *7 (S.D.N.Y. Aug. 20, 2007) ("[P]laintiff's claim of a breach of the covenant of good faith and fair dealing depends on facts in addition to those that might support a breach of contract claim, and their claim is not duplicative of the breach of contract claim.")

Plaintiffs also allege that JPMorgan further breached the implied covenant by refusing to allow LBHI the right to access any of its collateral on Friday, September 12, 2008, and throughout the following weekend. This conduct would plainly constitute a breach of both the 2000 Clearance Agreement and the August Security Agreement, to the extent either of those agreements governs the collateral at issue. See Point III(D)(2). Nonetheless, in its Moving Brief, JPMorgan takes the position that it "did not breach the express terms of any agreement by requesting and holding collateral." (Mov. Brief at 88, 93). While Plaintiffs disagree, it is nonetheless appropriate to allege in the alternative that JPMorgan's withholding of LBHI's collateral constituted a breach of the implied covenant.

New York courts routinely allow alternative, but arguably duplicative, good faith and fair dealing claims to proceed where, as here, the defendant takes the position that its conduct was not prohibited by any express provision of the contract. See, e.g., Fantozzi v. Axsys Tech., Inc., 07 Civ. 02667, 2008 U.S. Dist. LEXIS 94040, at *21 (S.D.N.Y. Nov. 6, 2008) ("The law in New York is that a party may assert causes of action in both breach of contract and quasi-contract where there is a bona fide dispute concerning existence of a contract or whether the contract covers the dispute in issue.") (collecting authority); Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc., 341 F. Supp. 2d 258, 272 (S.D.N.Y. 2004) ("Xpedior does not contest that its good faith claims are indistinguishable from its contract claims . . . [i]t does not

follow, however, that this claim must be dismissed."); <u>Sims v. First Consumer Nat'l Bank</u>, 303 A.D.2d 288, 758 N.Y.S.2d 284, 290 (1st Dep't 2003) ("While contract and implied duty claims may be redundant there are cases in which both are viable . . . [s]ince the issues in the instant case are still undeveloped in this pre-answer stage, both claims at this stage should stand.") (internal citations omitted).

Thus, unless and until this Court makes a determination that JPMorgan was required to allow LBHI to access its collateral under the express provisions of the 2000 Clearance Agreement and/or the August Security Agreement, that aspect of Plaintiffs' breach of the covenant of good faith and fair dealing claim is appropriately pleaded.

## F.     The Amended Complaint States a Claim for Fraud (Count XLIX)

The Amended Complaint describes how, in order to induce LBHI to transfer what was essentially its last $5 billion in cash to JPMorgan, JPMorgan's CEO Jamie Dimon personally assured LBHI's CEO Richard Fuld that the $5 billion would be returned to LBHI at the end of the trading day on Friday, September 12, 2008. (Am. Compl. ¶ 70). Contrary to this representation and the false implication that JPMorgan was requesting the $5 billion to support intra-day clearance-related credit, JPMorgan had already decided to lock down the $5 billion immediately upon receipt and withhold those funds to pay itself on any and all claims arising from an LBHI bankruptcy. (Am. Compl. ¶¶ 62, 69-70, 73-75). Count XLIX seeks damages for this fraud committed by JPMorgan upon LBHI. (Am. Compl. ¶¶ 364-369).

JPMorgan moves to dismiss Count XLIX on three purported grounds, none of which has merit. First, JPMorgan argues that Plaintiffs' fraud claim does not meet the pleading requirements of Federal Rule of Civil Procedure 9(b) because the Amended Complaint does not "so much as paraphrase the actual words that Mr. Dimon allegedly spoke," or provide facts "such as when it was said, whether it was on the phone or in person, who was involved in the

conversation . . . or whether it came with any conditions or qualifications." (Mov. Brief at 117). In making this argument, JPMorgan studiously ignores the Amended Complaint's description of the content of the misrepresentation, the allegations that the conversation took place in or around September 11-12, 2008, and that, quite obviously, Jamie Dimon and Richard Fuld were involved in the conversation. (Am. Compl. ¶¶ 67, 70). The remaining details that JPMorgan complains are absent are not required to plead a fraud claim.

"The primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based." Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000) (citation omitted). "Thus, so long as the allegations are sufficiently particularized to put the defendant on notice as to what the plaintiff charges its fraudulent conduct consisted of, the date, time and place need not be pled with absolute precision." In re Bayer Corp. Combination Aspirin Prod. Mktg. & Sales Practices Litig., 701 F. Supp. 2d 356, 366 (E.D.N.Y. 2010) (collecting authority); Int'l Motor Sports Group, Inc. v. Gordon, 98 Civ. 5611 (MBM), 1999 U.S. Dist. LEXIS 12610, at *9 (S.D.N.Y. Aug. 16, 1999) ("Rule 9(b) does not require that a complaint plead fraud with the detail of a desk calendar or a street map.") (collecting authority). JPMorgan cannot credibly argue that its defense would be impeded without knowing, for example, the exact words spoken by Mr. Dimon, whether the conversation took place on the phone, or whether other witnesses were present.[40]

---

[40] Even if notice of these facts were required – and they are not – JPMorgan need look no further than the Report of Anton R. Valukas, Examiner, dated March 11, 2010 (the "Examiner's Report"), which explains in detail the allegation that Mr. Dimon made this misrepresentation to Mr. Fuld while on a telephone call on September 11, 2008, with both Barry Zubrow of JPMorgan and Ian Lowitt of LBHI participating. (Examiner's Report at 1161-62). In the event this Court determines that such additional detail is required to conform with Rule 9(b), Plaintiffs respectfully request leave to amend their pleadings and thereby cure such deficiency. See Wight v. BankAmerica Corp., 219 F.3d 79, 91 (2d Cir. 2000) ("Complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend.").

Second, while recognizing that New York law allows fraud claims based on broken promises, JPMorgan again ignores the facts contained in the Amended Complaint to argue that the allegation of Mr. Dimon's intent to not honor his promise is "completely conclusory." (Mov. Brief at 118). To satisfy Rule 9(b), a complaint must plead sufficient facts to give rise to a "strong inference of fraud" on the part of the defendant. Acito v. IMCERA Group, 47 F.3d 47, 52 (2d Cir. 1995). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Id. The Amended Complaint does both.

The Amended Complaint describes how JPMorgan's last-minute demand for $5 billion culminated a campaign, initiated at least as of September 4, 2008, to coerce from LBHI a guaranty and collateral for all claims JPMorgan anticipated would arise upon an LBHI bankruptcy filing. (Am. Compl. ¶¶ 1-6, 44-46, 62, 69-70). Thus, during LBHI's last week, JPMorgan obtained billions of dollars in collateral from LBHI and swept those funds into JPMorgan's own general ledger account to ensure that LBHI would be unable to access its funds. (Am. Compl. ¶ 72). The Amended Complaint further pleads that it was JPMorgan's undisclosed intent to request and withhold the final $5 billion as an "extra cushion" (Am. Compl. ¶ 69) and that, as with the prior collateral postings made that week, JPMorgan immediately transferred the $5 billion to its own general ledger account immediately upon receipt. (Am. Compl. ¶ 72). JPMorgan then issued firm-wide instructions not to release any LBHI cash or securities from JPMorgan for any reason. (Am. Compl. ¶ 75). These facts are more than sufficient for the Court to infer that, at the time Mr. Dimon induced Mr. Fuld to authorize the posting of the $5 billion,

JPMorgan planned to lock down that collateral and had no intention of returning the funds, as Mr. Dimon promised.

Finally, JPMorgan argues that Mr. Fuld's reliance on Mr. Dimon's misrepresentation was not "reasonable as a matter of law" because the September Security Agreement provided that LBHI could "upon three days written notice to the Bank transfer any Security" and that the agreement contained a "no oral modifications" clause. (Mov. Brief at 119-120). This argument is similarly without merit. "Whether or not reliance on alleged misrepresentations is reasonable in the context of a particular case is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss." Stamelman v. Fleishman-Hillard, Inc., 02 Civ. 8318 (SAS), 2003 U.S. Dist. LEXIS 13328, at *21-22 (S.D.N.Y. July 31, 2003); see also Ogunsanya v. Langmuir, No. 08-CV-940 (JG), 2008 U.S. Dist. LEXIS 74376, at *14 (E.D.N.Y. Sept. 26, 2008) ("Questions of the reasonableness of reliance raise issues of fact that must be resolved at trial."); Country World, Inc. v. Imperial Frozen Foods Co., 186 A.D.2d 781, 589 N.Y.S.2d 81, 82 (2d Dep't 1992) ("In a fraud action, whether a party could have ascertained the facts with reasonable diligence so as to negate justifiable reliance is a factual question.") (citations omitted); Swersky v. Dreyer & Traub, 219 A.D.2d 321, 327, 643 N.Y.S.2d 33, 37 (1st Dep't 1996) (reversing lower court's grant of motion to dismiss and stating the question of reasonable reliance "should not have been resolved as a matter of law").

This is not one of those rare cases where dismissal of a fraud claim on reliance grounds is appropriate at the pleading stage. It is plainly a question of fact whether Mr. Fuld's reliance on Mr. Dimon's misrepresentation was reasonable under the extraordinary circumstances of this case – particularly given the rushed nature of the transfer and that LBHI's top management was not even aware of the terms of the September Security Agreement at the

time the transfer was made. (Am. Compl. ¶¶ 57, 61, 67-71). Indeed, Mr. Fuld's reliance on Mr. Dimon's false promise was perfectly consistent with Lehman's right to obtain overnight access to clearance-related collateral that had been in place for eight years under the 2000 Clearance Agreement and which had been recently reaffirmed under the August Agreements. (Am. Compl. ¶¶ 21-23, 31-32). Even JPMorgan argues that the $5 billion is subject to a lien under the August Security Agreement, which gave LBHI the right to access its collateral at the end of the trading day. (Mov. Brief at 82-83; see also Point III(A), supra). The Court should therefore not dismiss Plaintiffs' fraud claim without any factual inquiry.[41]

In sum, the Amended Complaint meets the requirements for pleading a fraud claim pursuant to Rule 9(b), and JPMorgan's motion to dismiss Count XLIX should be denied.

## G. The Amended Complaint Alleges Facts That Justify Imposition of a Constructive Trust (Count XXXII)

Count XXXII and paragraphs 67-71 of the Amended Complaint describe how, late in the evening of September 11, 2008, JPMorgan demanded that LBHI provide $5 billion of additional cash collateral the next morning; how JPMorgan's CEO Jamie Dimon falsely promised LBHI's CEO Richard Fuld that JPMorgan would return the $5 billion at the close-of-settlement the next evening; how LBHI relied on that misstatement to deliver to JPMorgan what was essentially its last available cash; and how the already-overcollateralized JPMorgan breached Dimon's promise and unjustly enriched itself by keeping the $5 billion as an "extra cushion." (Am. Compl. ¶¶ 67-71). As demonstrated below, these allegations are more than sufficient to justify imposition of a constructive trust with respect to the $5 billion wrongfully withheld by JPMorgan.

---

[41] In addition, to the extent the September Agreements are found to be invalid and unenforceable for any of the numerous reasons set forth in the Amended Complaint, those agreements cannot serve as a basis for defeating Plaintiffs' fraud claim.

A constructive trust is an equitable remedy that may be "imposed in favor of one entitled to property that is wrongfully withheld or where to allow the present holder to retain the property would result in unjust enrichment." Reale v. Reale, 485 F. Supp. 2d 247, 251 (W.D.N.Y. 2007). Under New York law, the following factors are relevant for determining when a constructive trust is warranted: "(1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment." Ades & Berg Group Investors v. Breeden (In re Ades & Berg Group Investors), 550 F.3d 240, 245 (2d Cir. 2008). The Court should not apply these factors rigidly. Instead, "equity and good conscience are the fundamental requirement[s] for imposition of a constructive trust." Id.

JPMorgan does not contest that the Amended Complaint alleges the last three factors. Instead, it offers a series of arguments that ignore the specific factual allegations of the Amended Complaint and distort the relevant legal principles governing constructive trusts.

**1.    The Invalid September Security Agreement Does Not Bar the Imposition of a Constructive Trust**

Relying on Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.), 377 F.3d 209 (2d Cir. 2004), JPMorgan contends that this Court cannot impose the equitable remedy of constructive trust because the "issue" is purportedly "governed by a *written* agreement: the September Security Agreement." (Mov. Brief at 122 (emphasis in original)). But as the First Central decision makes clear, this principle is only applicable if there is a "valid and enforceable agreement." First Central, 377 F.3d at 213-14; see also Bazzano v. L'Oreal, No. 93 Civ. 7121 (SHS), 1996 U.S. Dist. LEXIS 6529, at *9 (S.D.N.Y. May 14, 1996) (holding that recovery pursuant to quasi-contractual remedy is appropriate if parties fail to establish "fully enforceable contracts"); Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1272 (S.D.N.Y.

1991) (same). The Amended Complaint is clear that the September Security Agreement is invalid and unenforceable on a number of grounds, and it therefore cannot act as a bar to Plaintiffs' constructive trust claim.

## 2. Plaintiffs' Other Claims Regarding the $5 Billion, Which Seek Damages, Do Not Warrant Dismissal of the Constructive Trust Claim

JPMorgan's argument that Plaintiffs' constructive trust claim should be dismissed because the $5 billion of LBHI's cash is the subject of other causes of action, for which Plaintiffs seek legal remedies, is similarly meritless. (See Mov. Brief at 123). Plaintiffs are entitled to request the imposition of a constructive trust over these funds as an alternative to the remedies sought through Plaintiffs' other causes of action. Fed. R. Civ. P. 8(d)(2)-(3); see also U.S. Gypsum, 352 U.S. at 467. Thus, while Plaintiffs believe they are entitled to legal damages as a result of JPMorgan's misconduct regarding the $5 billion, Plaintiffs may seek the alternative equitable remedy of a constructive trust over those funds in the event the Court disagrees.

## 3. The Amended Complaint Alleges Fraud and Other Misconduct Sufficient to Justify a Constructive Trust

JPMorgan next argues that a constructive trust is not warranted in this case by attempting to downplay the fraud it perpetrated on LBHI as a simple breach of "an oral agreement" to return LBHI's $5 billion. (Mov. Brief at 121-22). As an initial matter, the Amended Complaint's allegations of JPMorgan's fraud, standing alone, are sufficient to justify the imposition of a constructive trust over these funds. (See Point III(F), supra).

But even if this were not the case, the detailed allegations of JPMorgan's misconduct surrounding the transfer of LBHI's last $5 billion are more than sufficient to support a constructive trust. As the Moving Brief concedes, "a constructive trust claim is intended to prevent one who failed to meet an obligation or committed fraud or other misconduct from becoming unjustly enriched." (Mov. Brief at 121-22, quoting First Central, 377 F.3d at 216).

"The doctrine's applicability is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them." Koreag, Controle et Revision S.A. v. Refco F/x Assoc., Inc. (In re Koreag, Controle et Revision S.A.), 961 F.2d 341, 353 (2d Cir. 1992) (internal quotations omitted). Thus, what is required to prove unjust enrichment is that "a party hold property under such circumstances that in equity and good conscience he ought not to retain it." Id. at 354.

### 4.    LBHI and JPMorgan Shared a "Confidential Relationship"

Finally, JPMorgan erroneously argues that the constructive trust claim should be dismissed because the Amended Complaint purportedly does not allege a "fiduciary or confidential relationship" between LBHI and JPMorgan. Such a relationship is not a prerequisite for a constructive trust claim. As the Second Circuit instructed in Koreag, "[a]lthough a fiduciary relationship is one of the factors cited by New York courts, the absence of any one factor will not itself defeat the imposition of a constructive trust when otherwise required by equity." Id. at 353. Given the impact of the misconduct at issue here on LBHI and its estate, the absence of a fiduciary or confidential relationship would not warrant dismissal of Plaintiffs' constructive trust claim.

But the Court need not reach this issue, because the Amended Complaint pleads the existence of a confidential relationship. Courts will allow a constructive trust where the defendant was in a dominant position over the claimant, such as where there is a disparity in the relative leverage of the parties, or the defendant has "superior access to confidential information" or a "preferential position" over the claimant. See, e.g., Calvin Klein Trademark Trust v. Wachner, 123 F. Supp. 2d 731, 734 (S.D.N.Y. 2000) (superior bargaining power or "superior access to confidential information"). The Amended Complaint is replete with allegations regarding JPMorgan's dominant position vis-à-vis LBHI, JPMorgan's insider access to LBHI's

confidential information, and LBHI's dependence on JPMorgan for the survival of its business. (See, e.g., Am. Compl. ¶¶ 35-44, 68, 71). Pursuant to the above authority, these allegations establish a "confidential relationship" for purposes of Plaintiffs' constructive trust claim.

For all the reasons set forth above, JPMorgan's motion to dismiss Count XXXII, for constructive trust, should be denied.

## H. Plaintiffs' Claims for Unjust Enrichment, Conversion and Constructive Trust Are Not Preempted by the Bankruptcy Code (Counts XXXII, XXXVI-XXXVII, XXXIX-XL)

JPMorgan next argues that Plaintiffs' unjust enrichment, conversion and constructive trust claims (Counts XXXII, XXXVI-XXXVII, XXXIX-XL) are preempted by the safe harbor provisions of section 546 of the Bankruptcy Code. (Mov. Brief at 77). As explained in Point I above, the purpose of the section 546 safe harbor is to promote the stability of financial markets by ensuring that legitimate transfers made pursuant to securities contracts, repurchase agreements or swap agreements are not subject to avoidance merely by virtue of a counterparty's bankruptcy. The safe harbors do not wipe out a company's right to seek relief for pre-existing state law violations committed in the name of such agreements simply because the victim-company subsequently files for bankruptcy. The contrary rule urged by JPMorgan would allow securities market participants to pillage struggling financial firms, knowing that the safe harbors would immunize their wrongful behavior when their victim goes bankrupt. Section 546 does no such thing.

A presumption against federal preemption of state law exists, particularly in areas that have "been traditionally occupied by the States." English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990); see also Lohr v. Medtronic Inc., 518 U.S. 470, 491 (1996). While there is nothing in the text of section 546 that explicitly preempts LBHI's state law claims for unjust enrichment, conversion or constructive trust (which JPMorgan concedes), JPMorgan apparently argues that

these claims are nonetheless precluded under either the "field preemption" or the "conflict preemption" doctrine. (Mov. Brief at 77). Neither argument has merit.

## 1. There Is No Basis for Field Preemption

JPMorgan's Moving Brief mentions field preemption but fails to argue for its application. (Mov. Brief at 77). In any event, there is no credible argument that the Bankruptcy Code "occupies the field" with respect to pre-petition transfers of a bankrupt company's property made in violation of state law. See Koffman v. Osteoimplant Tech. Inc., 182 B.R. 115, 124 (D. Md. 1995) ("because the common law of the various states provides much of the legal framework for the operation of the bankruptcy system, it cannot be said that Congress has completely preempted all state regulation which may affect the actions of parties in bankruptcy court").

Indeed, such an argument would directly conflict with decades of practice in the bankruptcy courts, which routinely order the return of property to bankrupt estates based on the successful prosecution of pre-existing state law claims. See, e.g., Geltzer v. Artists Mktg. Corp. (In re Cassandra Group), 338 B.R. 583, 599 (Bankr. S.D.N.Y. 2006) (allowing Trustee to recover value of transfer made within one year of petition date pursuant to a common law unjust enrichment claim); Kittay v. Flutie N.Y. Corp. (In re Flutie N.Y. Corp.), 310 B.R. 31, 58-59 (Bankr. S.D.N.Y. 2004) ("the Trustee is entitled to recover the sum of $1,688,898 from Michael Flutie on the claim of unjust enrichment"); Arnold v. Baisch (In re Great Lakes Boat Repair), No. 03-23051, 2006 Bankr. LEXIS 2537, at *17-18 (Bankr. W.D.N.Y. 2006) ("I find that the Trustee has met his burden to prove his Unjust Enrichment Cause of Action against Baisch. Baisch has benefitted from the acquisition of the Debtor's assets and the operations of its business, and he has failed to pay anything for that benefit.").

Field preemption of state law causes of action would further conflict with section 541 of the Bankruptcy Code, which expressly preserves all such pre-existing state law claims as property of the estate. 11 U.S.C. § 541(a)(1) (property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case"); see also Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.), 522 F.3d 575, 584 (5th Cir. 2008) (for purposes of section 541, "[t]he phrase 'all legal or equitable interests of the debtor in property' has been construed broadly, and includes 'rights of action' such as claims based on state or federal law"). Field preemption is therefore clearly inapplicable.

### 2. The Section 546 Safe Harbor Provisions Do Not Conflict With Plaintiffs' State Law Claims

Conflict preemption does not apply here either, because there is no conflict between section 546 of the Bankruptcy Code and Plaintiffs' conversion, unjust enrichment or constructive trust claims. As an initial matter, there is no conflict because none of the transfers caused by JPMorgan's misconduct would be subject to section 546's safe harbor protections (see Point I(C), supra). But even if this were not the case, the purpose of the safe harbors (i.e., to preclude the recovery of certain defined contract-related transfers based on a party's bankruptcy) does not conflict with Plaintiffs' claims seeking relief for JPMorgan's wrongdoing that are independent of, and wholly unrelated to, conduct regulated by the Bankruptcy Code. None of the cases cited by JPMorgan are to the contrary.

JPMorgan relies on two cases that found conflict preemption applied to unjust enrichment claims brought on behalf of a bankrupt estate. (Mov. Brief at 78-80, citing Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del. Inc. v. Fleet Retail Fin. Group, 274 B.R. 71 (D. Del. 2002) and Contemporary Indus. Corp. v. Frost (In re Contemporary Indus. Corp.), 546 F.3d 981, 988 (8th Cir. 2009)). However, those unjust enrichment claims were based

on identical facts and legal elements as avoidance claims arising under the Bankruptcy Code that were precluded pursuant to section 546. That is not the case here, and JPMorgan's attempt to expand these narrow holdings to cover Plaintiffs' claims should fail.

In Hechinger, supra, the court held that the plaintiff committee could not seek the return of payments made to the defendants through a leveraged buy-out of the debtor company pursuant to a fraudulent conveyance theory, because those payments were safe harbored "settlement payments" under section 546(e). 274 B.R. at 74, 86-89. The plaintiff also sought to recover those payments through a common law unjust enrichment claim which tracked the elements of the precluded fraudulent conveyance claim exactly: i.e., that the defendants did not provide value or consideration to the bankrupt company, but instead "substantially burdened [the company] with secured debt and greatly reduced its assets," and that the transaction was "unjust" because the company was insolvent at the time.[42] Id. at 94; see also id. at 75 (explaining the plaintiff's theory of the case and fraudulent conveyance claim). In other words, as the Hechinger court explicitly recognized, the plaintiff's unjust enrichment claim was simply a relabeled version of the precluded fraudulent conveyance claim. Id. at 96. On this basis, the Hechinger court found that the plaintiff's unjust enrichment claim was preempted by section 546(e), reasoning that "[c]laims that Congress deemed unavoidable under sections 544(b) and 546(e) of the Bankruptcy Code cannot be avoided by simply relabeling avoidance claims as unjust enrichment claims . . ." Id.

---

[42] Generally, a constructive fraudulent conveyance claim under the Bankruptcy Code requires proof of the following elements: (i) the debtor did not receive reasonably equivalent value for the transfer; and (ii) the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer. See 11 U.S.C. § 548(a)(1).

The district court in <u>In re Contemporary Indus. Corp.</u>, No. BK98-80382, 2007 Bankr. LEXIS 4609 (D. Neb. June 29, 2007), subsequently relied on <u>Hechinger</u> to find preemption on similar facts. There, the district court ruled that the plaintiff's state law claims seeking recovery of settlement payments made in connection with a leveraged buy-out were preempted because the "state law claims for unjust enrichment and illegal/excessive distribution are substantially identical to the avoidance claims barred by 11 U.S.C. § 546(e)." 2007 Bankr. LEXIS 4609 at *15-16, <u>citing Hechinger</u>, 274 B.R. at 95-98. On appeal, the Eighth Circuit affirmed. <u>In re Contemporary Indus. Corp.</u>, 546 F.3d 981 (8th Cir. 2009).[43]

The preemption principles relied upon in <u>Hechinger</u> and <u>Contemporary Industries</u> have no application to the state law claims in this case. Plaintiffs' unjust enrichment and conversion claims are based on JPMorgan's unlawful receipt and withholding of LBHI's assets under cover of invalid and unenforceable agreements. Plaintiffs' constructive trust claim is based on the fraud and other misconduct committed by JPMorgan in procuring $5 billion in cash from LBHI. The factual and legal bases for these claims stand wholly apart from the elements of an avoidance claim under the Bankruptcy Code. Because they are not merely "relabeled" avoidance claims, they are not preempted.[44]

---

[43] It is also far from settled whether <u>Hechinger</u> or <u>Contemporary Industries</u> would be considered good law in this district. Those decisions do not control here, and courts in other districts have refused to adopt them. <u>See, e.g.</u>, <u>In re Loranger Mfg. Corp.</u>, 324 B.R. 575 (W.D. Pa. 2005) (rejecting defendant's argument that <u>Hechinger</u> required dismissal of plaintiff's unjust enrichment claim, even though it effectively acted as a section 544(b) fraudulent transfer claim); <u>Liquidating Trust of U.S. Wireless Corp., Inc. v. Bhatnagar (In re U.S. Wireless Corp.)</u>, 333 B.R. 688, 692-93 (Bankr. D. Del. 2005) (rejecting defense that unjust enrichment claim was preempted by section 546(e)).

[44] The remaining cases cited by JPMorgan similarly do not support preemption. Each of those cases stand for the uncontroversial and irrelevant proposition that the Bankruptcy Code preempts state law claims that seek avoidance of transactions based on violations of the Bankruptcy Code, or that otherwise seek redress for the same wrongs and the same conduct already regulated by the

Not only is the conduct at issue in Plaintiffs' common law claims independent of the Bankruptcy Code, but the state law remedies to which Plaintiffs are entitled go beyond those afforded by the Code's avoidance provisions. Constructive trust, for example, is not a remedy available to Plaintiffs under the Bankruptcy Code. And the primary purpose of both the unjust enrichment and conversion claims is to hold JPMorgan responsible for the consequences of its wrongful behavior, not to rescind or avoid the transfers themselves. As a result, a remedy of both compensatory and consequential damages is available for both causes of action. Hartman v. Harris, No. 90 Civ. 6203 (RLC), 1990 U.S. Dist. LEXIS 17078, at *7 (S.D.N.Y. Dec. 18, 1990) (an award of money damages is a remedy for unjust enrichment); PDL Vitari Corp. v. Olympus Indus. Inc., 718 F. Supp. 197, 205 (S.D.N.Y. 1989) ("if no contract is ultimately found to exist, plaintiff can recover money damages on an unjust enrichment or reliance theory"); AEP Energy Servs. Gas Holding Co. v. Bank of Am., 05 Civ. 4248 (TPG), 2007 U.S. Dist. LEXIS 93022, at *6 (S.D.N.Y. Dec. 18, 2007) (a plaintiff may elect to receive money damages on a conversion claim); Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co., 04 Civ. 10014 (PKL), 2006 U.S. Dist. LEXIS 34709, at *47 (S.D.N.Y. May 31, 2006) (a money damages remedy may be awarded on a conversion claim).

Unlike JPMorgan's preemption cases, Plaintiffs' unjust enrichment, conversion and constructive trust claims do not seek relief for violations of the Bankruptcy Code or request

---

Bankruptcy Code. See E. Equip. & Servs. Corp. v. Factory Point Nat'l Bank, Bennington, 236 F.3d 117, 120-21 (2d Cir. 2001) (state law claims seeking damages for violation of the automatic stay preempted); DiPierro v. Taddeo (In re Taddeo), 685 F.2d 24, 28-29 (2d Cir. 1982) (provision of chapter 13 permitting debtors to cure defaults preempted state law causes of actions seeking to cure chapter 13 defaults); Besette v. Avco Fin. Servs. Inc., 230 F.3d 439, 447-48 (1st Cir. 2000) (unjust enrichment claim based on violation of section 524 of the Bankruptcy Code preempted); Pertuso v. Ford Motor Credit Co., 233 F.3d 417, 425-26 (6th Cir. 2000) (same). These cases therefore do not apply to Plaintiffs' common law claims, none of which seek remedies for violations of the Bankruptcy Code.

only remedies that would be available under the Code. There is therefore no basis to find that the safe harbors wipe out such claims or that the claims are otherwise preempted under the Bankruptcy Code. JPMorgan's motion to dismiss Counts XXXII, XXXVI-XXXVII and XXXIX-XL on preemption grounds should therefore be denied.

## POINT IV

### THE AMENDED COMPLAINT STATES A CLAIM FOR EQUITABLE SUBORDINATION (COUNT XXX)

Finally, the court should use its equitable power to subordinate JPMorgan's claims to those of other creditors. In determining whether equitable subordination is warranted in a particular case, courts focus on whether: (i) the claimant engaged in some type of inequitable conduct; (ii) the misconduct caused injury to the creditors or conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim is consistent with bankruptcy law. Tese-Milner v. TPAC, LLC (In re Ticketplanet.com), 313 B.R. 46, 65 (Bankr. S.D.N.Y. 2004), citing Benjamin v. Diamond (In re Mobile Steel Co.), 563 F.2d 692, 700 (5th Cir.1977).[45] The facts alleged in the Amended Complaint more than satisfy these requirements.

### A. JPMorgan Was an Insider For Purposes of Plaintiffs' Equitable Subordination Claim

Where the defendant is an "insider" with respect to the debtor, the defendant is held to a higher standard of conduct, and its claims will be equitably subordinated if it "breached a fiduciary duty or engaged in conduct that is somehow unfair." N.J. Steel Corp. v. The Bank of N.Y., No. 95 CIV 3071 (KMW), 1997 U.S. Dist. LEXIS 18137, at *17 (S.D.N.Y. 1997). To determine whether a party is an insider, courts consider various factors, including whether the creditor: (i) received information from the debtor that was not available to other creditors,

---

[45] Courts have held that when the first two prongs are satisfied, the third prong is of little significance since the Bankruptcy Code expressly authorizes equitable subordination. Ticketplanet.com, 313 B.R. at 66 fn. 12.

shareholders and the general public; (ii) attempted to influence decisions made by the debtor; (iii) had special access to the debtor's premises and personnel; and (iv) was the debtor's primary source of financial support. Pan Am Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 500 (S.D.N.Y. 1994) (citations omitted).

Each of these criteria is satisfied with respect to JPMorgan. As explained in the Amended Complaint and supra, JPMorgan had "unparalleled access" to information about LBHI's financial status and future prospects, including a preview of what LBHI would announce to the markets on its earnings call scheduled for September 10, 2008. (Am. Compl. ¶¶ 35-43). This was a result of JPMorgan's direct and close ties to senior LBHI executives, which arose out of JPMorgan's position as LBHI's primary bank and LBHI's dependence on JPMorgan to clear for LBI. (Id. ¶¶ 35, 38). Armed with this inside information, JPMorgan unlawfully forced LBHI to execute the overreaching September Agreements prior to the earning's call and transfer billions of dollars in collateral, all to ensure that JPMorgan would be able to pay itself 100% for previously unsecured claims at the expense of other creditors. (Id. ¶ 4).

Contrary to what it would have this Court believe, JPMorgan's access to LBHI was far more than that of a typical lender monitoring its credit risk. (Mov. Brief at 130-31). For example, in the critical weeks before LBHI's bankruptcy, JPMorgan was given an opportunity to review and comment on LBHI's proposed presentations to the ratings agencies, it was invited to a diligence session that it used to probe into Lehman's confidential records and plans, and it had access to the key government financial policy officials and their plans for Lehman, as well as insider access to Lehman's potential suitors. (See, e.g., Am. Compl. ¶¶ 37-43). More importantly, JPMorgan unlawfully coerced LBHI into the execution of the September Agreements and transfer of billions of dollars to JPMorgan by threatening to cut off clearance-

related credit. (Am. Compl. ¶¶ 46, 62-71). JPMorgan clearly "crossed the line" beyond the standard lender-borrower framework.

Under these circumstances, the Amended Complaint pleads more than sufficient facts for the Court to conclude that JPMorgan was an "insider" for purposes of its equitable subordination analysis and that JPMorgan's misconduct was "somehow unfair." That is all that is required to deny JPMorgan's motion to dismiss Count XXX.

**B.      Even If Not an Insider, JPMorgan's Misconduct Supports Equitable Subordination**

Even if JPMorgan were not an insider, the misconduct pleaded in the Amended Complaint nonetheless justifies equitably subordinating JPMorgan's claims to those of other LBHI creditors. As the Moving Brief concedes, equitable subordination is appropriate where the defendant's conduct is "egregious and severely unfair to other creditors" – conduct that has been described by the courts as "substantial misconduct tantamount to fraud, misrepresentation, overreaching or spoliation." (Mov. Brief at 132 (collecting authority)).

In its Moving Brief, JPMorgan studiously ignores the numerous instances of inequitable conduct and overreach described throughout the Amended Complaint and pretends that the allegations of misconduct contained in Count XXX are somehow unsupported. (Mov. Brief at 133). But the Amended Complaint is full of examples of how JPMorgan abused its position as Lehman's clearing bank to impose on LBHI the massively overreaching September Agreements and siphon billions of dollars of LBHI cash to catapult itself ahead of LBHI's other creditors and ensure that it would be in the best position to capitalize on an LBHI bankruptcy. (See, e.g., Am. Compl. ¶¶ 5-7, 44-59, 62-74). To achieve this purpose, JPMorgan employed unlawfully coercive tactics and fraud, and breached several of its contractual obligations to LBHI. Id.

Any one of these facts alone would be sufficient to justify equitably subordinating JPMorgan's claims to those of other LBHI creditors, or of equitably disallowing JPMorgan's claims. See, e.g., Nisselson v. Ford Motor Co. (In re Monahan Ford Corp.), 340 B.R. 1, 45 (Bankr. E.D.N.Y. 2006) ("since the claim of fraud against [defendant] was adequately pled, the first element of equitable subordination is also adequately pled"); Aluminum Mills Corp. v. Citicorp North Am., Inc. (In re Aluminum Mills Corp.), 132 B.R. 869, 896 (Bankr. N.D. Ill. 1991) (holding that equitable subordination claim is adequately pleaded where plaintiff has alleged lender was a party to a fraudulent act that injured other creditors); 604 Columbus Ave. Realty Trust v. Capitol Bank and Trust Co. (In re 604 Columbus Ave. Realty Trust), 119 B.R. 350, 377 (Bankr. D. Mass. 1990), aff'd in part and rev'd in part, 968 F.2d 1332 (1st Cir. 1992) ("fraud and illegality constitute grounds for equitable subordination even where the creditor is not a fiduciary or insider or does not somehow control the debtor"); see also Rosener v. Majestic Mgmt. (In re OODC, LLC), 321 B.R. 128, 146 (Bankr. D. Del. 2005) (denying motion to dismiss equitable subordination claim because the trustee had alleged sufficient facts to support claims for actual and constructive fraud and aiding and abetting breach of fiduciary duty).[46]

JPMorgan should not be allowed to enjoy the benefits of its misconduct while other creditors wait in line for payment. Because JPMorgan's actions constitute inequitable conduct under any definition, its motion to dismiss Count XXX should be denied.

---

[46] JPMorgan argues that equitable subordination cannot be used to disallow claims. (Mov. Brief at 134 fn. 35). However, the United States District Court for the Southern District of New York has stated that equitable disallowance, as distinguished from equitable subordination, of claims is permissible under certain circumstances. Adelphia Recovery Trust v. Bank of Am., N.A., 390 B.R. 64, 73-76 (S.D.N.Y. 2008), citing Pepper v. Litton, 308 U.S. 295 (1939).

## CONCLUSION

For all of the reasons set forth above, JPMorgan's motion to dismiss the Amended

Complaint should be denied in its entirety.

Dated: December 15, 2010
      New York, New York

                          **CURTIS, MALLET-PREVOST,**
                          **COLT & MOSLE LLP**

                          By: /s/   Joseph D. Pizzurro

                          Joseph D. Pizzurro
                          L. P. Harrison 3rd
                          Michael J. Moscato
                          Nancy E. Delaney
                          Peter J. Behmke
                          Cindi M. Eilbott
                          101 Park Avenue
                          New York, New York 10178-0061
                          (212) 696-6000
                          *Counsel for Plaintiff, Debtor Lehman*
                          *Brothers Holdings Inc.*

                          **QUINN EMANUEL**
                          **URQUHART & SULLIVAN, LLP**

                          By:  /s/   John B. Quinn

                          John B. Quinn
                          Erica Taggart
                          Tyler Whitmer
                          865 South Figueroa Street, 10th Floor
                          Los Angeles, California 90017

                          Susheel Kirpalani
                          Andrew J. Rossman
                          James C. Tecce
                          51 Madison Avenue, 22nd Floor
                          New York, New York 10010-1601
                          (212) 849-7000
                          *Counsel for Plaintiff/Intervenor, the Official*
                          *Committee of Unsecured Creditors of*
                          *Lehman Brothers Holdings Inc.*