UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: LEHMAN BROTHERS HOLDINGS INC., *et al.*, <br> Debtors. | Chapter 11 <br><br> **Case No. 08-13555 (JMP)** <br><br> (Jointly Administered) |
| LEHMAN BROTHERS HOLDINGS INC. and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., *et al.*, <br> Plaintiffs, <br> v. <br> JPMORGAN CHASE BANK, N.A., <br> Defendant. | **Adversary Proceeding No. 10-ap-03266 (JMP)** |

## MEMORANDUM OF LAW OF AMICI CURIAE
### THE INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, INC. AND
### THE SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION
### IN SUPPORT OF MOTION TO DISMISS
### BY JPMORGAN CHASE BANK, N.A.

MAYER BROWN LLP
Joshua Cohn
Christopher J. Houpt
Ames C. Grawert
1675 Broadway
New York, New York 10019
(212) 506-2500

*Attorneys for Amici Curiae*
*The International Swaps and*
*Derivatives Association, Inc. and*
*The Securities Industry and*
*Financial Markets Association*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................. 1

INTERESTS OF AMICI.................................................................................................... 3

ARGUMENT ................................................................................................................ 5

I.   Sections 546 and 548(d)(2) Do Not Permit Debtors to Avoid Safe-Harbored
     Transfers by Challenging the Underlying Obligation.........................................5

     A.  The Guaranties Are Protected Transfers Within the Meaning of Sections 546
         and 548(d)(2). ..............................................................................................6

         1.  The Guaranties fit within the definition of "transfer."..............................6

         2.  *Barnhill* and its progeny are inapposite. ..............................................8

     B.  Lehman's Alternative Reading of Section 546 is at Odds with Precedent and
         Congressional Purpose and Would Produce an Absurd Result. ..................11

         1.  Lehman's approach is inconsistent with Congress's intent and renders the
             safe harbors illogically incomplete. ...................................................12

         2.  Lehman's approach threatens the derivatives and securities markets. ..................14

II.  Sections 546(e), (f), and (g) and 548(d)(2) Are Not Limited to Transfers Required
     by the Original Documents or to Contracts That Relate Exclusively to Protected
     Transactions. ................................................................................................17

     A.  The Safe Harbors Apply to Transfers in Connection With New or Amended
         Contracts. ...................................................................................................18

     B.  A Security Agreement or Guarantee Need Not Relate Solely to Protected
         Financial Contracts to Be Protected Itself. ...............................................20

III. The Limited Inquiry Mandated by the Safe Harbors Should Be Protected to the
     Fullest Extent Possible on a Motion to Dismiss. ............................................21

     A.  Prompt Disposition of Safe Harbor Cases Is Essential to the Effectiveness of
         the Statutes.................................................................................................22

     B.  The Court Should Enforce the Pleading Requirements of Rule 9(b)..........................26

         1.  Lehman does not adequately allege that it had actual intent to defraud
             creditors......................................................................................27

**TABLE OF CONTENTS**

**(continued)**

2. Lehman does not allege a valid basis for imputing JPMorgan's intent to itself ........................................................................................................................ 30

3. "Market meltdown" and "haste" by the creditor should not be recognized as badges of fraud. .................................................................................................. 33

4. The policies underlying the pleading specificity requirement apply with special force here. ....................................................................................................... 34

CONCLUSION ..................................................................................................................... 35

Page

<u>C</u>ASES

*Abady v. Interco Inc.*,
   76 A.D.2d 466 (1st Dep't 1980) ...................................................................................20

*Advanced Cardio. Sys., Inc. v. Scimed Life Sys., Inc.*,
   988 F.2d 1157 (9th Cir. 1993) ....................................................................................23

*Anand v. Nat'l Republic Bank*,
   239 B.R. 511 (N.D. Ill. 1999) ....................................................................................19

*Arnold Chase Family, LLC v. UBS AB*,
   No. 3:08cv00581, 2008 WL 3089484 (D. Conn. Aug. 4, 2008) .............................5

*Ashcroft v. Iqbal*,
   574 F.3d 820 (2d Cir. 2009).............................................................................. 24-25

*Atl. Cleaners & Dyers, Inc. v. United States*,
   286 U.S. 427 (1932).....................................................................................................10

*Bailey v. United States*,
   516 U.S. 137 (1995).....................................................................................................12

*Barnhill v. Johnson*,
   503 U.S. 393 (1993)..................................................................................8, 9, 10, 17, 34

*Bell Atlantic v. Twombly*,
   550 U.S. 544 (2007).....................................................................................................24

*Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass'n*,
   878 F.2d 742 (3d Cir. 1989).........................................................................................5

*Brandt v. Sprint Corp.*,
   238 B.R. 409 (Bankr. N.D. Ill. 1999) ...................................................................9, 34

*Brookfield Asset Mgmt. v. AIG Fin. Prods. Corp.*,
   2010 WL 3910590 (S.D.N.Y. Sept., 29, 2010).........................................................5

*Concrete Pipe & Prods v. Constr. Laborers Pension Trust*,
   508 U.S. 602 (1993).....................................................................................................12

*Covey v. Commercial Nat'l Bank*,
   960 F.2d 657 (7th Cir. 1992) ....................................................................................8, 9

*Cowart v. Nicklos Drilling Co.*,
   505 U.S. 469 (1992).....................................................................................................10

CASES (CONT'D)

*Dean v. Davis,*
242 U.S. 438 (1917)........................................................................................28

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.,*
375 F.3d 168 (2d Cir. 2004)..............................................................................5

*Fin. One Pub. Co. v. LBSF,*
215 F. Supp. 2d 395 (S.D.N.Y. 2002).................................................................5

*Griffin v. Oceanic Contractors, Inc.,*
458 US 564 (1982)..........................................................................................13

*HBE Leasing Corp. v. Frank,*
48 F.3d 623 (2d Cir. 1995)..............................................................................29

*Holy Trinity Church v. United States,*
143 U.S. 457 (1892)........................................................................................13

*In re Asia Global Crossing,*
333 B.R. 199 (S.D.N.Y. 2005)........................................................................8, 9

*In re Adler, Coleman Clearing Corp.,*
263 B.R. 406 (S.D.N.Y. 2001)................................................................. *passim*

*In re Casa de Cambio Majapara S.A. de C.V.,*
390 B.R. 595 (Bankr. N.D. Ill. 2008) .....................................................18–19, 20

*In re Cushman Bakery,*
526 F.2d 23 (1st Cir. 1975)..............................................................................32

*In re Davis,*
161 B.R. 285 (Bankr. N.D. Fla. 1993) ..............................................................32

*In re Enron Corp.,*
300 B.R. 201 (Bankr. S.D.N.Y. 2003) .................................................................7

*In re Enron Corp.,*
341 B.R. 451 (Bankr. S.D.N.Y. 2006) ...............................................................30

*In re Fabrikant & Sons, Inc.,*
394 B.R. 721 (Bankr. S.D.N.Y. 2008) ...............................................................10

# TABLE OF AUTHORITIES
## (continued)

Page

CASES (CONT'D)

*In re GTI Capital Holdings, LLC*,
374 B.R. 671 (Bankr. D. Ariz. 2007)......................................................................19

*In re Imperial Credit Indus., Inc.*,
527 F.3d 959 (9th Cir. 2008) ................................................................................10

*In re Interbulk, Ltd.*,
240 B.R. 195 (Bankr. S.D.N.Y. 1999)..............................................................18, 20

*In re Kaiser*,
722 F.2d 1574 (2d Cir. 1983)................................................................................29

*In re Kaplan Breslaw Ash, LLC*,
264 B.R. 309 (Bankr. S.D.N.Y. 2001)....................................................................19

*In re Natural Gas Distribs., LLC*
556 F.3d 247 (4th Cir. 2009) ..................................................................................2

*In re Nemeroff*,
74 B.R. 30 (E.D. La. 1987) ...................................................................................29

*In re Rhone-Poulenc Rorer Inc.*,
51 F.3d 1293 (7th Cir. 1995) ................................................................................24

*In re Sharp Int'l Corp.*,
403 F.3d 43 (2d Cir. 2005)....................................................................................26

*Jackson v. Mishkin*,
263 B.R. 406 (S.D.N.Y. 2001)..........................................................................31–32

*Johnson v. United States*,
529 U.S. 694 (2000)..............................................................................................12

*Kaiser Steel Corp. v. Charles Schwab & Co.*,
913 F.2d 846 (10th Cir. 1990) ..............................................................................13

*Matter of FBN Food Servs., Inc.*,
82 F.3d 1387 (7th Cir. 1996) ................................................................................30

*Matter of Munford, Inc.*,
98 F.3d 604 (11th Cir. 1996) ..................................................................................2

*Merrill Lynch Int'l v. XL Cap. Assur. Inc.*,
564 F. Supp. 2d 298 (S.D.N.Y. 2008).....................................................................5

# TABLE OF AUTHORITIES
## (continued)

Page

CASES (CONT'D)

*Neitzke v. Williams*,
490 U.S. 319 (1989)............................................................................................23

*New York Dist. Council of Carpenters Pension Fund v. KW Const., Inc.*,
No. 07 Civ. 8008 (RJS), 2008 WL 2115225 (S.D.N.Y. May 16, 2008)................29

*RTC v. Harris Trust & Sav. Bank*,
No. 90 C 7330, 1992 WL 223807 (N.D. Ill. Sept. 2, 1992)......................................5

*Seligson v. New York Produce Exchange*,
394 F. Supp. 125 (S.D.N.Y. 1975) ...............................................................13–14

*Smith v. Duffey*,
576 F.3d 336 (7th Cir. 2009) .........................................................................24–25

*S&W Exporters v. Faberge, Inc.*,
16 B.R. 941 (Bankr. S.D.N.Y. 1982).................................................................32

*Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Assoc.*,
322 F.3d 1039 (9th Cir. 2003) ...........................................................................1

*Troll Co. v. Uneeda Doll Co.*,
483 F.3d 150 (2d Cir. 2007).................................................................................13

*United States v. Kozeny*,
541 F.3d 166 (2d Cir. 2008).................................................................................12

STATUTES & RULES

11 U.S.C. § 101(47)(A)(v) ..........................................................................19, 20, 21, 25

11 U.S.C. § 101(53B) .................................................................................................25

11 U.S.C. § 101(53B)(A)(v) ......................................................................................21

11 U.S.C. § 101(53B)(A)(vi) ..........................................................................19, 20, 25

11 U.S.C. § 101(54)(D)..............................................................................................6

11 U.S.C. § 362(a)(3).................................................................................................7

11 U.S.C. § 362(b) ....................................................................................................28

**Page**

<u>S</u>TATUTES & <u>R</u>ULES (CONT'D)

11 U.S.C. § 502(d) ..................................................................................................9

11 U.S.C. § 522(g)(1)(A) .......................................................................................32

11 U.S.C. § 544 .....................................................................................................12

11 U.S.C. § 546 ............................................................................................ *passim*

11 U.S.C. § 546(e) .........................................................9, 11, 17, 18, 19, 35

11 U.S.C. § 546(f) .........................................................9, 11, 12, 18, 19, 35

11 U.S.C. § 546(g) ............................................................1, 2, 12, 14, 18

11 U.S.C. § 547 .....................................................................................................10

11 U.S.C. § 547(b) .............................................................................................8, 9

11 U.S.C. § 547(c) .............................................................................................9, 34

11 U.S.C. § 548 .............................................................................................13, 34

11 U.S.C. § 548(a)(1)(A) ...............................................11, 13, 25, 26, 30

11 U.S.C. § 548(a)(1)(B) ...............................................................11, 29, 30

11 U.S.C. § 548(b) ...............................................................................................29

11 U.S.C. § 548(d)(2) .......................................................................5, 6, 17, 22

11 U.S.C. § 548(d)(2)(A) ...................................................................................19

11 U.S.C. § 548(d)(2)(D) ......................................................................1, 2, 22

11 U.S.C. § 550 .......................................................................................................9

11 U.S.C. § 561(b)(1) ..........................................................................................21

11 U.S.C. § 741(7) ................................................................................................25

11 U.S.C. § 741(7)(A)(xi) ...........................................................................19, 20

11 U.S.C. § 741(7)(A)(x) ....................................................................................21

FED. R. CIV. PRO. 9(b) ........................................................................................34

**Page**

**STATUTES & RULES (CONT'D)**

FED. R. BANKR. PRO. 2004 ..............................................................................34

FED. R. BANKR. PRO. 7009(b) ........................................................................26

FEDERAL RULE OF BANKRUPTCY PROCEDURE 7009(b) ..................................26

**OTHER AUTHORITIES**

136 CONG. REC. 2881–06 (1990) ...............................................................16–17

H.R. REP. 109–648 .........................................................................................28

H.R. REP. 97–420 (1982) ........................................................................2, 12, 15

H.R. REP. NO. 101–484 (1990) .........................................................................4

RESTATEMENT (SECOND) OF TORTS § 8A (1965) ...........................................28

S. REP. 95-989 (1978) .....................................................................................13

4 COLLIER'S ON BANKRUPTCY ¶ 548.09[3] ....................................................12

5 COLLIER'S ON BANKRUPTCY ¶ 548.04[2][b] ..........................................28, 34

*Interest Swap: Hearing on S. 396 Before the Subcomm. on Courts and Admin. Practice of
the S. Comm. on the Judiciary*, 101st Cong. 27 (1989) .....................................2, 22

ISDA & the Public Securities Ass'n, *Financial Transactions in Insolvency:  Reducing
Legal Risk Through Legislative Reform* (Apr. 2, 1996)....................................4, 15

David G. Carlson, *The Logical Structure of Fraudulent Transfers and Equitable
Subordination*, 45 WM. & MARY L. REV. 157, 184 (2003) .......................................8

Eleanor H. Gilbane, *Testing the Bankruptcy Code Safe Harbors in the Current Financial
Crisis*, 18 AM. BANKR. L. INST. L. REV. 241 (2010) ............................................18

Edward R. Morrison & Joerg Riegel, *Financial Contracts and the New Bankruptcy Code*,
13 AM. BANKR. INST. L. REV. 641, 642 (2005).......................................................33

# PRELIMINARY STATEMENT

This case presents another challenge by Lehman Brothers Holdings Inc. and its affiliates ("Lehman") to the safe harbors that Congress established, and repeatedly expanded, to encourage market participants, like the defendant in this case, to continue to make key financial markets available to a weakening party, secure in the knowledge that their rights under protected agreements will be respected should the weak party fail. The truly gargantuan liability that Lehman posits well illustrates the systemic risks posed by the unchecked application of avoidance claims. Lehman is well aware of the relevant statutory protections and has awkwardly attempted to disguise its claims as falling outside of the financial-agreement safe harbors. Amici curiae The International Swaps and Derivatives Association, Inc. ("ISDA") and The Securities Industry and Financial Markets Association ("SIFMA") urge the Court to enforce the plain text of the statute in light of Congress's clearly expressed intent and to refrain from further constricting the safe harbors.

Other courts have recognized the broad legislative intent behind the financial-contract safe harbors. The Ninth Circuit, for example, wrote that "[t]he legislative history of the Swap Amendments plainly reveals that Congress recognized the growing importance of interest rate swaps and sought to *immunize the swap market* from the legal risks of bankruptcy." *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Assoc.*, 322 F.3d 1039, 1050 (9th Cir. 2003) (emphasis added). The Fourth Circuit, specifically addressing Sections 546(g) and 548(d)(2)(D), emphasized that those safe harbors supersede other bankruptcy policies:

> Even though an overarching policy of the Bankruptcy Code is to provide equal distribution among creditors, in enacting 11 U.S.C. §§ 546(g) and 548(d)(2)(D), Congress intended to serve a countervailing policy of protecting financial markets and therefore favoring an entire class of instruments and participants.

*In re Natural Gas Distribs., LLC*, 556 F.3d 247, 259 (4th Cir. 2009) (citation omitted); *see also Interest Swap: Hearing on S. 396 Before the Subcomm. on Courts and Admin. Practice of the S. Comm. on the Judiciary*, 101st Cong. 27, at 62 (1989) (statement of bankruptcy attorney and U.S. Trustee Frank G. Sinatra) ("Thus, despite the significant diversion from basic tenets of the code that S. 396 [which added Sections 546(g) and 548(d)(2)(D)] takes, I believe there are substantial public policy goals to be achieved in its passage") [hereinafter "Swap Hearing"].

Congress determined that these protections were necessary to prevent "the insolvency of one commodity or security firm from spreading to other firms" and "threaten[ing] the collapse of the affected industry." H.R. REP. 97–420, at 2 (1982). The Eleventh Circuit recognized the potential for even narrowly-tailored avoidance powers to create wider uncertainty, writing (with respect to a different type of financial transaction) that "even granting trustees avoidance powers under limited circumstances in the LBO context has the potential to lessen confidence in the commodity market as a whole." *Matter of Munford, Inc.*, 98 F.3d 604, 610 n.4 (11th Cir. 1996); *see In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 477 (S.D.N.Y. 2001) ("These interests demand stability and certainty in settled transactions . . . . The statute [Section 546(e)] recognizes that if the pre-bankruptcy transactions of a securities broker-debtor could be readily reversed, confidence in the chain of guarantees upon which the functioning of the system depends would be undermined and the entire market could be threatened by serial bankruptcies."). Lehman's attempts to slip massive avoidance claims through its new, self-invented loopholes in the safe harbors risks exactly that result, even if it characterizes the present circumstances as extraordinary.

Lehman's backup arguments, which would condition the safe harbors on disposing of factual questions about party intent and open-ended policy inquiries, are no less unsettling. They would

make early resolution of safe-harbor cases virtually impossible and condemn market participants to the prospect of long, expensive, and uncertain litigation merely for exercising statutorily protected rights. The statutory standard depends only on simple, objective criteria that are apparent in this case from the pleadings and the kinds of agreements at issue. These criteria should be applied on a motion to dismiss.

This case, like others in this bankruptcy proceeding, highlights a tension between some general goals of the bankruptcy process and Congress's explicit determination to insulate certain financial contracts from that process. Amici are increasingly concerned that the vastness and initial drama of the Lehman insolvency generally might weigh inappropriately in the estate's favor upon the balance of policies that Congress has directed the Court to effect. Amici understand the principle of equal protection of creditors. But they also understand, as no doubt does the Court, that Congress has legislated to, as the Fourth Circuit said, "serve a countervailing policy of protecting financial markets." ISDA and SIFMA urge the Court to recognize the importance of serving that policy in this case.

## INTERESTS OF AMICI[1]

ISDA is the global trade association representing leading participants in the derivatives industry. Since its inception, ISDA has pioneered efforts to identify and reduce the sources of risk in the derivatives and risk management business. ISDA was chartered in 1985 and is comprised of more than 800 member institutions from 54 countries on six continents. These members include most of the world's major institutions dealing in privately negotiated derivatives, as well as many of the businesses, governmental entities, and other end users that

---

[1] ISDA and SIFMA state that no party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and that no person other than ISDA, SIFMA, their members, and their counsel contributed money that was intended to fund preparing or submitting this brief.

rely on over-the-counter derivatives to manage the market risks inherent in their core economic activities. ISDA publishes the ISDA Master Agreement, which serves as the contractual foundation for more than 90% of derivatives transactions globally (including the transactions at issue in this dispute), and distributes market-specific definitional booklets that supplement the Master Agreement.

SIFMA brings together the shared interests of hundreds of securities firms, banks, and asset managers. SIFMA's mission is to support a strong financial industry, investor opportunity, capital formation, job creation, and economic growth, while building trust and confidence in the financial markets. SIFMA, with offices in New York and Washington, D.C., is the U.S. regional member of the Global Financial Markets Association (GFMA). More information is available at www.sifma.org.

Because of their roles in the development of derivatives and securities markets, both amici are uniquely well-positioned to evaluate and comment on the interpretation of the safe harbor provisions in Section 546 of the Bankruptcy Code. Indeed, both organizations, or their predecessors, participated actively in the debates over the various amendments to the Bankruptcy Code that added and expanded the safe harbors, which were intended "to ensure that the swap and forward contract financial markets are not destabilized by uncertainties regarding the treatment of their financial instruments under the Bankruptcy Code." H.R. REP. NO. 101-484, at 1 (1990), reprinted in 1990 U.S.C.C.A.N. 223; *see also* ISDA & The Public Securities Association,[2] *Financial Transactions Insolvency: Reducing Risk through Legislative Reform*, 13–14 (1996).

---

[2]    PSA was a predecessor to The Bond Market Association, which in turn was a predecessor to SIFMA.

Both ISDA and SIFMA often appear as amici curiae in cases raising issues of importance to the derivatives and securities markets and the commercial banking industry, and courts frequently have relied on their views. *See, e.g.*, *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 173–74 (2d Cir. 2004); *Merrill Lynch Int'l v. XL Cap. Assur. Inc.*, 564 F. Supp. 2d 298, 300 (S.D.N.Y. 2008) (both citing ISDA amicus briefs); *Brookfield Asset Mgmt. v. AIG Fin. Prods. Corp.*, 2010 WL 3910590, at *6 n.3 (S.D.N.Y. Sept. 29, 2010); *Eternity Global*, 375 F.3d at 181–82 & n.24; *Fin. One Pub. Co. v. LBSF*, 215 F. Supp. 2d 395, 400 (S.D.N.Y. 2002) (both citing ISDA *User's Guides*); *Arnold Chase Family, LLC v. UBS AG*, No. 3:08cv00581, 2008 WL 3089484, at *1 (D. Conn. Aug. 4, 2008); *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass'n*, 878 F.2d 742, 745 (3d Cir. 1989); *RTC v. Harris Trust & Sav. Bank*, No. 90 C 7330, 1992 WL 223807, at *6 & n.13 (N.D. Ill. Sept. 2, 1992) (all citing SIFMA or PSA amicus briefs). The memberships of ISDA and SIFMA have decided to bring the two organizations together in a joint amicus presentation (despite members having an entire spectrum of individual positions in relation to the Lehman estate) out of a deep concern that the issues in this case threaten fundamental market protections.

## ARGUMENT

**I. Sections 546 and 548(d)(2) Do Not Permit Debtors to Avoid Safe-Harbored Transfers by Challenging the Underlying Obligation.**

Lehman seeks to evade the clear statutory prohibition on challenging individual "transfers" by asserting that it can avoid all transfers by avoiding the entire underlying "obligation," and that it can do so without regard to the safe harbor. That interpretation is wrong on the face of the statute and would open a gaping hole in the treatment of safe harbored agreements in bankruptcy, with sweeping consequences beyond this case. Success by Lehman could open to challenge as a fraudulent conveyance, not only the guarantees at issue here, but also any swap, repo, or

securities "obligation" incurred within the two years preceding bankruptcy, on the ground that its pricing was off-market and that the counterparty therefore did not provide "reasonably equivalent value." Such a result would essentially repeal the Section 546 safe harbors, and it would invite litigation that would make the current Lehman claims resolution process look effortless by comparison.

## A. The Guaranties Are Protected Transfers Within the Meaning of Sections 546 and 548(d)(2).

Lehman contends that while Section 546 protects transfers from direct attack, it leaves debtors free to avoid transfers indirectly by challenging an entire underlying agreement as a non-safe harbored "obligation." That interpretation depends on Lehman's mistaken choice of authorities addressing the meaning of the word "transfer." Lehman argues that the absence of the word "obligation" in certain subsections of Section 546 reflects a deliberate decision by Congress to leave open avoidance attacks on entire agreements, even though Congress protected transfers related to those same agreements in no uncertain terms. That is a slender reed on which to rest a multi-billion-dollar claim, and it is inconsistent with the Code's broad definition of "transfer," which precedent shows can and should be understood to encompass the incurrence of obligations in this case.

### 1. The Guaranties fit within the definition of "transfer."

The Code defines "transfer" to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing or parting with—(i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D). The safe harbors in Section 546, which apply to "transfers," therefore plainly protect "each mode" of "parting with" Lehman's property or interests in property, including modes that are merely "conditional." It is hard to see what this

language would cover if not LBHI's promises to transfer property upon the bankruptcy or default of its subsidiaries.

Moreover, it is well established in bankruptcy law that contractual rights are themselves "property of the estate." *See, e.g.*, *In re Enron Corp.*, 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003) ("Courts have consistently held that contracts rights are property of the estate, and that therefore those rights are protected by the automatic stay."). The contracts described in Lehman's Amended Complaint document an exchange of such rights, and therefore constitute transfers of property interests. Elsewhere, Lehman repeatedly has urged that contractual rights are "property" subject to the protections of the automatic stay, which addresses "act[s] to obtain possession of property of the estate" or "to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). To take just one example, in a Motion to Compel AIG to perform on certain derivatives contracts, Lehman argued that "AIG's failure to make the [contractually promised] payments owed to LBSF is an impermissible 'exercise of control over property of the estate.'" Docket No. 4728, filed August 7, 2009, at ¶ 43 (citing *Enron*, 300 B.R. at 212). Likewise, Lehman's entire Section 541 argument in *LBSF v. BNY Corporate Trust Services* rested on the notion that its contractual expectation of payment was "property of the estate." *See, e.g.*, LBSF Complaint in 09-ap-1242, filed May 20, 2009, at ¶ 34. If Lehman's contractual rights are "property" interests protected by the Code, then its counterparties' contractual rights also must be "property," the transfer of which is protected by the safe harbors.

Finally, for the reasons explained in Part I.B. below, there is no discernable reason why Congress would have intended the safe harbors to protect only actual money transfers but would have left agreements to make such transfers—and thereby the money transfers themselves, indirectly—open to retroactive attack. As Lehman acknowledges, "[a]nnullment [of a debtor's

obligation] becomes analytically necessary . . . [only] when the fraudulent obligation yields a payment or [an]other transfer secures it." Lehman Opposition ("Opp.") 33 (quoting David G. Carlson, *The Logical Structure of Fraudulent Transfers and Equitable Subordination*, 45 WM. & MARY L. REV. 157, 184 (2003)) (first and third alterations added); *see also* Carlson, 45 WM. & MARY L. REV. at 183 ("annulment of *D*'s obligation serves no purpose, unless it is also accompanied by property transfers from *D* to *X*"). Congress's expressed concern with ripple effects and systemic risks applies with at least as much force to nullifying entire financial agreements as it does to avoiding individual transfers and is ill served by a misplaced distinction between a "transfer" and an "obligation."

> 2. *Barnhill* and its progeny are inapposite.

Lehman applies faulty precedent in arguing that the Section 546 safe harbors do not protect incurrence of "obligations," as opposed to "transfers." Lehman principally relies on *In re Asia Global Crossing* (333 B.R. 199 (S.D.N.Y. 2005)) and *Covey v. Commercial National Bank of Peoria* (960 F.2d 657 (7th Cir. 1992)) to support a distinction between "obligations" and "transfers." *Asia Global Crossing* relies on *Covey*, and both cases rely on *Barnhill v. Johnson* (503 U.S. 393 (1993)). Both *Asia Global Crossing* and *Covey*, however, carry *Barnhill*'s holding past its expressly stated limitation. Lehman would perpetuate this misuse of *Barnhill* and also have this Court ignore the inapposite aspects of each of *Barnhill*, *Covey*, and *Asia Global Crossing*.

In *Barnhill*, the Supreme Court was asked to construe the transfer timing provisions relating to Section 547(b), the preference avoidance provision. To determine whether the transfer was within the avoidance period, the Court had to establish whether a "transfer" occurred on the date on which a check was *delivered* or the date on which it was *honored* by the drawee bank. In choosing the date-of-honor rule for Section 547(b) purposes, the Court distinguished the date-of-

delivery rule that applies to the exception-to-preference provision, Section 547(c). In so doing, the Supreme Court stated that the relevant portions of 547(c) are:

> designed to encourage creditors to continue to deal with troubled debtors . . . by obviating any worry that a subsequent bankruptcy filing might require the creditor to disgorge. But given this specialized purpose, we see no basis . . . to adopt a "date of delivery" rule for purposes of § 547(b).

503 U.S. at 402.

The date-of-delivery rule is still applicable to Section 547(c). *See, e.g., Brandt v. Sprint Corp.*, 238 B.R. 409, 415 (Bankr. N.D. Ill. 1999). Therefore, a check given on Monday is an "obligation" alone on Monday for purposes of Section 547(b), but it is a "transfer" on Monday for purposes of Section 547(c), the preference exception provision. Of course, Sections 546(e), (f) and (g) are both preference and fraudulent conveyance exception provisions, and should share with Section 547(c) the same rule governing when a protected "transfer" (as opposed to a vulnerable "obligation") makes its appearance. Applying the date-of-delivery rule, the Lehman guarantee is in fact a safe-harbored transfer.

*Covey* is an implied fraudulent conveyance case. It is a guarantee case, but not a safe harbor or exception case. *Asia Global Crossing* relies on *Covey*, and *Barnhill*, but without considering the *Barnhill* distinction between an avoidance provision and an exception from avoidance. The *Asia Global Crossing* court answered the question of whether Sections 502(d) and 550 together barred the claim of a beneficiary of an avoided guarantee who returned nothing to the estate in respect of the avoidance. The *Asia Global Crossing* court pragmatically observed that in the case of an avoided undischarged guarantee, there was in fact nothing for the creditor to return. Although the court relied on *Barnhill* and *Covey* in finding that an "obligation" is not subject to Section 502(d), the court actually need not have done so to reach its result. *Asia Global*

*Crossing* did not involve exception-to-avoidance provisions, and the *Asia Global Crossing* court did not focus on the exception-to-avoidance discussion in *Barnhill*.

The same distinction forbids Lehman's reliance on a host of fraudulent conveyance authority to distinguish "transactions" from "obligations." Opp. at 25-26 (citing *In re Fabrikant & Sons, Inc.*, 394 B.R. 721 (Bankr. S.D.N.Y. 2008) (construing New York State insolvency law) and *In re Imperial Credit Indus., Inc.*, 527 F.3d 959 (9th Cir. 2008) (construing a specialized provision of the Federal Deposit Insurance Act)). As Lehman candidly acknowledges, neither case arose under either Section 547, the subject of *Barnhill*, or the safe harbor provisions (Opp. at 25), and neither implicates the policies protected by the safe harbor provisions.

As the *Barnhill* Court recognized by giving "transfer" two different meanings within Section 547, it is not unknown for the same word to mean different things, even within the same statute, where such an interpretation favors congressional aims. *See Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 501 (1992) (Blackmun, J., dissenting) ("This Court, however, has not inflexibly required the same term to be interpreted in the same way for all purposes.") (noting *Barnhill* as an example) (citing *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932) ("Most words have different shades of meaning and consequently may be variously construed, not only when they occur in different statutes, but when used more than once in the same statute or even in the same section. . . . It is not unusual for the same word to be used with different meanings in the same act, and there is no rule of statutory construction which precludes the courts from giving to the word the meaning which the legislature intended it should have in each instance.")).

A careful reading of precedent brings us to the conclusion that the new incurrence of an obligation, be it a swap, for example, or a guarantee of a swap, is a "transfer" for purposes of

sections 546(e), (f) and (g). Lehman has selected the wrong meaning of "transfer" and invoked precedent inapposite to this case.

### B. Lehman's Alternative Reading of Section 546 is at Odds with Precedent and Congressional Purpose and Would Produce an Absurd Result.

Lehman's reading of the statutory text not only is incorrect, but it also could have profoundly adverse practical consequences. Although this case arises out of a series of security agreements and guarantees, if Lehman's basic premise were correct, then the underlying repurchase, swap, and securities transactions themselves would be subject to avoidance not only as actual-intent fraudulent transfers under Section 548(a)(1)(A), but also under Section 548(a)(1)(B) as constructive fraudulent transfers, whenever the debtor believes that it received less than "reasonably equivalent value." That radical result is at odds with the actual legislative intent behind the safe harbors as well as with any rational imputed legislative intent and threatens to reintroduce all of the harms that the safe harbors were designed to alleviate.

Lehman suggests that its position somehow can be limited to guarantees (Opp. 34), a point that it never explains. Lehman further protests that it is not arguing that "any plaintiff could attack a transfer falling within the safe harbors simply by attacking the underlying obligation that gave rise to those payments." *Id.* Its attempt to dispute that "gross overstatement" makes clear, though, that it would do exactly that: Lehman argues that the avoidance principle on which it relies "would have no effect on transfers, including margin and settlement payments, based on pre-existing, *valid* contracts, such as clearance or swap agreements." *Id.* ("the transfers described in section 546 would still be safe harbored, *assuming* they were made pursuant to *valid, legitimate* contractual obligations") (emphases added). In other words, transfers would remain protected from fraudulent-transfer attack, *assuming* that the contracts are not invalid, avoidable fraudulent transfers. That literally would render the safe harbors a nullity.

1. Lehman's approach is inconsistent with Congress's intent and renders the safe harbors illogically incomplete.

"If the text of the statute itself is not clear, . . . a court applying the statute may consult the legislative history to discern 'the legislative purpose as revealed by the history of the statute.'" *United States v. Kozeny*, 541 F.3d 166, 171 (2d Cir. 2008); *see also Bailey v. United States*, 516 U.S. 137, 145 (1995) ("We consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme."). The court's "obligation is to give effect to congressional purpose so long as the congressional language does not itself bar that result." *Johnson v. United States*, 529 U.S. 694, 710 n. 10 (2000); *see also Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 627 (1993) ("in the usual case of textual ambiguity," the court turns "to the legislative purpose as revealed by the history of the statute").

Here, the history and commentary on Sections 546(e), (f), and (g) make clear that Congress was concerned with the effect of avoiding actual payments and did not intend to leave open a loophole for debtors to avoid payments by avoiding entire contracts. The House Report on the 1982 amendments, which added the safe harbors for repurchase agreements ("repos") and securities contracts, explained that "the amendments will ensure that the avoiding powers of a trustee are not construed to permit margin or settlement payments to be set aside except in cases of fraud." H.R. REP. 97–420, at *2 (1982); *see also* 4 COLLIER'S ¶ 548.09[3], at 548-98 ("Pursuant to section 546(g), section 548(a)(1)(A), governing transfers made with fraudulent intent, is the *only basis available to the trustee to avoid a transfer* under a swap agreement that is made by or to a swap participant. The constructive fraud provisions of section 548(a)(1)(B) may not be used to avoid swap transfers, nor may the trustee resort to state fraudulent transfer laws under section 544.") (emphasis added).

Congress understood the safe harbors as ensuring that the only way that margin or settlement payments—and, after later amendments, transfers in connection with a securities contract, or a swap or repo agreement—could be set aside would be under Section 548(a)(1)(A). Construing the debtor's avoiding powers, as Lehman does, to permit avoidance of an entire protected contract would undo that defense. And there is no rational explanation for that result. If direct avoidance of individual transfers poses systemic risks, then indirect avoidance of entire series of transfers by challenging protected financial agreements or transactions poses at least the same risk. *Cf. Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846, 849 (10th Cir. 1990) (addressing settlement-payment safe harbor; "The danger of a 'ripple effect,' on the entire market is at least as inherent in the avoidance of an LBO as it is in the avoidance of a routine stock sale.") (citation omitted). Even if Lehman's "plain language" argument were correct (and it is not (*see* Section I.A. above)), Lehman's reading of the interplay between Code sections 546 and 548 would achieve an absurd result—a result the Court cannot accept. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *Holy Trinity Church v. United States*, 143 U.S. 457, 460 (1892) ("If a literal construction of the words of a statute be absurd, the act must be so construed as to avoid the absurdity."); *Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 160 (2d Cir. 2007) ("it is an elemental principle of statutory construction that an ambiguous statute must be construed to avoid absurd results").

As explained in JPMorgan's brief, the avoidance safe harbor originally was enacted to overrule *Seligson v. New York Produce Exchange*. *See* S. REP. 95-989, at 106 (1978). In *Seligson*, the trustee defeated a summary judgment motion against its challenge to a margin

payment transfer. 394 F. Supp. 125 (S.D.N.Y. 1975). Under Lehman's approach to the avoidance statute, however, the *Seligson* holding would still be valid, because the court there concluded that the whole agreement lacked consideration. The transferee argued that it had provided fair consideration for the transfers by clearing and guaranteeing the debtor's contracts, refraining from liquidating the debtor's account, and promising to pay margin to the debtor in the event that the transferee came into a net credit position. *Id.* at 132–33. In rejecting each of those proffered grounds, the court effectively found not only that the margin transfer was a fraudulent conveyance, but that the underlying obligation was unenforceable for lack of consideration. *Id.* at 133. If Lehman is right about the "loophole" in Section 546(g), then *Seligson* would have to be decided in the same manner today, under current law. Lehman does not shy from this result: the continuation of clearing services and financial-contract trading is precisely the consideration in this case, and Lehman argues that that was insufficient, rendering the "obligation" invalid. Similarly, promises to make net payments to the debtor when markets turn in its favor—also found inadequate in *Seligson*—are the only consideration behind virtually all swap agreements. To "overrule" *Seligson*, as the legislative history indicates that the safe harbors were intended to, Section 546 must foreclose challenges to obligations as well as individual transfers thereunder.

2. Lehman's approach threatens the derivatives and securities markets.

Adopting Lehman's interpretation also would cause serious harm to the derivatives and securities markets, for several reasons. First, Lehman's approach would subject market participants to extended litigation concerning the propriety of their initial pricing of transactions. Such litigation inevitably would be fact-intensive and require complex expert analysis of stale pricing data. The *Lehman* case itself illustrates how unworkable that result would be in the case of a dealer bankruptcy, or even the bankruptcy of a significant derivatives end user. Over two years after the Lehman petitions, the process of litigating disputed *close-out* valuations has

barely begun. Adding to the mix fraudulent transfer attacks against the *initial* pricing of each contract would present an even greater burden that would follow from a decision for Lehman in this case.

Second, the possibility of avoiding derivatives "obligations" would destroy their utility as a hedging mechanism. If entire transactions could be avoided (with or without related payments clawed-back by the estate), market participants could have little confidence in the measurement of their net, hedged exposure. As ISDA explained in a white paper published together with SIFMA's predecessor, the Public Securities Association:

> The determination of credit exposures is critical to implementing prudent risk management procedures. *Any* legal uncertainty which affects the ability to make such calculations, or *ex post* legal determinations which undermine previously calculated credit exposures, will undermine the effectiveness of such procedures and could have far-reaching effects on other institutions and markets.

ISDA & the Public Securities Ass'n, *Financial Transactions in Insolvency: Reducing Legal Risk Through Legislative Reform*, at 2 (Apr. 2, 1996) (emphasis added).

Debtors would conduct such an exercise, moreover, with the benefit of up to *two years* of hindsight. As a result, derivatives users and dealers would know that if they ended up in-the-money, their bankrupt counterparties could avoid the transaction, and those in-the-money parties would be shorn of their claims; if the counterparty ended up in-the-money, however, the estate would keep its profits. Such an asymmetric result is directly counter to Congress's intent that, upon bankruptcy, parties would *close out* their open swaps. *See* H.R. REP. 97–420, at *2 ("The prompt closing out or liquidation of such open accounts freezes the status quo and minimizes the potentially massive losses and chain reactions that could occur if the market were to move sharply in the wrong direction."). There is no question that Section 560 allows counterparties to avoid debtor cherry-picking of derivatives transactions post-petition by protecting the right to

terminate and net; it is hard to imagine why Congress would have meant to allow debtors to selectively avoid *pre*-petition initiation of those transactions.

Lehman's insistence that allowing it to selectively reopen its derivatives and securities obligations years later "does not threaten a domino effect in the markets" (Opp. 33) is truly perplexing. Derivatives and securities dealers often attempt to maintain a flat book consisting of enormous numbers of largely offsetting transactions. (Other market participants will also carefully calibrate their "positions," adjusting with trades and offsets.) Under Lehman's reading of the Code, however, parties that, for example, believed themselves to be fully-hedged, whether by hedging risk on a portfolio basis or by entering into identical back-to-back trades, could be required to disgorge payments received from the debtor, after having already paid out losses on their hedges. Any parties, dealers or otherwise, that were bankrupted as a result could then repeat the process with their own losing trades. That the resulting "ripple effect" would be delayed by months or years does not render its prospect any more appealing. Further, the prospect of such a result, even if not realized, could magnify perceived credit exposures and raise capital requirements.

Such wide-ranging avoidance powers would amplify counterparty risk—not only would market participants run the risk of losing future payments and close-out amounts from a bankrupt counterparty, they could also lose out on all prior receipts. At best, that would lead parties to refuse to trade with any counterparty that had even a hint of financial instability. That could lead parties to adopt even more draconian collateral requirements, which Lehman alleges were a substantial cause of its own bankruptcy (AC ¶ 7), and downgrade Events of Default. That result conflicts with the legislative intent that the safe harbors would enable markets to continue trading with weakening counterparties and help to avoid runs. *See also* 136 CONG. REC. 2881–06 (1990)

16

(Statement of Rep. Brooks) ("the definition of 'swap participant' was modified to remove an ambiguity that might have led courts to disregard all swap agreements entered into on the day of, but prior to, a bankruptcy petition being filed."); *Barnhill*, 503 U.S. at 402 (noting that Section 547(c) is "designed to encourage creditors to continue to deal with troubled debtors").

## II. Sections 546(e), (f), and (g) and 548(d)(2) Are Not Limited to Transfers Required by the Original Documents or to Contracts That Relate Exclusively to Protected Transactions.

Lehman further argues that the agreements here do not fall within the definition of "repurchase agreement," "swap agreement," or "securities contract" because they are blanket guarantees that cover both protected and non-protected obligations, because they left JPMorgan over-secured, and because they were entered into after the original agreements. Opp. 48–49, 53. As explained below, none of these distinctions is supported in the text of the Code or has any other merit.

Lehman also seems to imply that the September Agreements are not protected agreements because, in the case of swaps, for example, they "do not meet any recognized definition of 'swap agreements,'" because they are not on the "standard form ISDA Master Agreements." Opp. 55. That inference is bizarre. The only relevant definition is that in the Code, which says in no uncertain terms that security agreements and guarantees are both "swap agreements" to the extent that they secure swap transactions. While it is true that ISDA publishes a form Credit Support Annex, nothing in the Code suggests that that is the only security agreement that can qualify as a swap agreement. ISDA does not publish a form of guarantee. Lehman no doubt would say this failure to publish must be overcome before the guarantee language in each of the relevant safe harbored agreement definitions can be of any effect. ISDA is proud of the frequent use of its form documents, but is also aware that parties often use other available forms or their own forms. Loss of safe harbor protection for those non-ISDA documents would be an absurd

outcome of Lehman's argument. The same principle applies to each of the protected agreements at issue.

## A. The Safe Harbors Apply to Transfers in Connection With New or Amended Contracts.

Though Lehman asserts that the Agreements here cannot be protected because they were "entered into immediately prior to bankruptcy" and not at the time of the underlying swaps, repos, and securities contracts (Opp. 49), in fact, Congress amended Section 546(g) to avoid exactly the result that Lehman seeks, making clear that the safe harbors protect security agreements whether or not they are part of the original swap, securities, or repo agreement. Unlike Sections 546(e) and (f), before the 2005 amendments, Section 546(g) protected only those transfers that were "*under and* in connection with" a swap agreement. "The section now has a broader application because it only requires that the transfer be 'under *or* in connection with any swap agreement' rather than under a swap agreement *and* in connection with a swap agreement." *In re Casa de Cambio Majapara S.A. de C.V.*, 390 B.R. 595, 598 (Bankr. N.D. Ill. 2008) (rejecting "the idea that attachments could only be 'in connection with' one subject") (emphasis in original). Specifically, "'[u]nder' meant 'according to the method [specifically] prescribed' in the swap. If a transfer was not 'under,' or specifically prescribed in the swap, it was not protected by section 546(g)." Eleanor H. Gilbane, *Testing the Bankruptcy Code Safe Harbors in the Current Financial Crisis*, 18 AM. BANKR. L. INST. L. REV. 241, 270 (2010) (quoting *In re Interbulk, Ltd.*, 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999)) (alteration in original and footnote omitted). Relying on that distinction, the court in *Casa de Cambio* held that a judicial attachment based on a breach of a swap agreement was a protected "transfer . . . in connection with" those agreements because they "stem[med] from the failure of those transactions." *Casa de Cambio*, 390 B.R. at 599. The court did not disagree with the holding in

*Interbulk* that an attachment was not "under" a swap agreement, but concluded the safe harbor was no longer limited in that manner. *Id.* at 598. The definitions confirm this broad intent. "Swap agreement" includes "any security agreement or arrangement related to any" protected agreement (11 U.S.C. § 101(53B)(vi)), as do "securities contract" (11 U.S.C. § 741(7)(A)(xi)) and "repurchase agreement" (11 U.S.C. § 101(47)(A)(v)).

The "in connection with" language now present in each of Section 546(e),(f) and (g) is consistent with the general language in Section 548(d)(2)(A), which protects new collateralization against attack as a fraudulent transfer by providing that a counterparty provides "value" to the debtor by "securing . . . an antecedent debt." *See also Anand v. Nat'l Republic Bank*, 239 B.R. 511, 517 (N.D. Ill. 1999) ("There is no dispute that collateralization of an antecedent debt confers value on the debtor."). Moreover, "the Court need not, and does not, make a quantitative comparison of the amount of the antecedent debt and the value of the collateral (or the gross amount of the mortgage) at the time of the transfer." *In re Kaplan Breslaw Ash*, *LLC*, 264 B.R. 309, 329 n.69 (Bankr. S.D.N.Y. 2001); *see also In re GTI Capital Holdings*, *LLC*, 373 B.R. 671, 678 (Bankr. D. Ariz. 2007) ("A debtor can receive reasonably equivalent value for the securing of an antecedent debt without receiving any 'new value.'"). Here again, the Code, even without the safe harbors, encourages trading with weakening market participants by leaving open the possibility of counterparties enhancing their collateral positions as necessary. If such efforts were subject to routine avoidance attack amounting to no more than second-guessing the value of the transaction to the debtor, those parties either would require more onerous collateralization from the outset, would refuse to continue trading with weakening counterparties (perhaps by including strict downgrade Events of Default), or would include in the original agreement automatic collateral triggers that could rob the parties of flexibility later on

and could drain assets from the weakening party even more quickly. None of those would be positive developments.

### B. A Security Agreement or Guarantee Need Not Relate Solely to Protected Financial Contracts to Be Protected Itself.

Lehman further argues that the contracts at issue here are not protected because they guaranteed all liabilities of the Lehman Brothers group and were not limited to JPMorgan's exposure under specific protected contracts. Opp. 57. There is not a speck of support in the text of the Code for this proposition. Sections 101(53B)(vi), 101(47)(v), and 741(7)(A)(xi) all require only that, to qualify for the safe harbor, a security arrangement be "related to" or "in connection with" a protected swap, securities, or repurchase agreement. *Casa de Cambio*, cited above, agrees that both "related to" and "in connection with" carry "a broader meaning" than the old language, "under." 390 B.R. at 598 (citing *Interbulk*, 240 B.R. at 202). The definitions, moreover, are not limited to particular kinds of security arrangements, such as netting agreements; they expressly include "any guarantee or reimbursement obligation." Here, there can be no question that the contracts were "related to" other protected transactions, because the parties expressly stated that supporting and securing those transactions—"clearing advances, clearing loans," and "derivative transactions"—was the very purpose of the September Guaranty and the September Security Agreement. Lehman argues only that this language is "non-operative" and therefore meaningless (Opp. 48), but here those recitals merely confirm the "operative" language of the contracts, which secures Lehman's derivatives and clearing obligations, among others. *See also Abady v. Interco Inc.*, 76 A.D.2d 466, 491–92 (1st Dep't 1980) ("The recitals in a contract indicate the background and purpose of the parties" and should be harmonized, if possible, with operative provisions).

Further language in the same sections removes any doubt that Congress envisioned protecting security arrangements that secured other obligations—each provision states that a security arrangement is *not* a protected contract to the extent that it "exceed[s] the damages in connection with any such agreement or transaction [described above], measured in accordance with section 562." That limitation would be unnecessary under Lehman's reading, because the agreement would not be protected at all if, *ab initio*, it secured anything other than "the damages in connection with [the protected] agreement or transaction." Similarly, Section 101(53B)(A)(v) states that a master agreement is considered to be a swap agreement "without regard to whether the master agreement contains an agreement or transaction that is not a swap agreement." Sections 101(47)(A)(iv) and 741(7)(A)(x) contain the same language with respect to repurchase agreements and securities contracts. Section 561(b)(1) then provides that the protected rights under a master netting agreement are only those that would be protected as to the individual underlying contracts. Again, these statutes expressly recognize that a protected agreement may include elements that are not protected.

Nor can it possibly be relevant that JPMorgan allegedly was over-collateralized on its protected agreements at the time of the guarantee. Opp. 58. Parties should not be expected to wait until they are under-collateralized before obtaining credit support—prudent management of counterparty risk counsels the opposite. That Lehman-proposed rule, too, has no basis in the statutory text and would create needless uncertainty regarding the enforceability of security arrangements.

### III. The Limited Inquiry Mandated by the Safe Harbors Should Be Protected to the Fullest Extent Possible on a Motion to Dismiss.

Lehman argues throughout its opposition that the applicability of the safe harbors depends on disputed facts concerning the amendments to JPMorgan's contracts and the transfers themselves.

Though the Debtors strive to cast JPMorgan's actions in an unattractive light, the allegations that they make are all irrelevant to the core question of the applicability of the safe harbors. Specifically, they contend that it is somehow necessary to investigate under Sections 546 and 548(d)(2) whether obligations under protected financial contracts were "extracted through the use of misrepresentations and omissions." Opp. 3. As to the Guarantees, they argue that the applicability of the safe harbors depends on questions of unwritten party intent that may not be knowable from the contracts themselves and therefore must await discovery. *Id.* at 4. These efforts are misguided on their face, as they assert facts, or the need for facts, that are irrelevant under the statute. Moreover, as noted below, courts have recognized that the mere pendency of massive claims such as these can lead to inappropriate coerced settlements. The Court should promptly dismiss Lehman's scattershot claims as a matter of law, rather than leaving them to the delay and costs of discovery and trial. Continued litigation of this case would be, in itself, a substantive victory for the Debtors.[3]

### A. Prompt Disposition of Safe Harbor Cases Is Essential to the Effectiveness of the Statutes.

If one thing is clear from the legislative history, it is that Congress intended the safe harbors to provide certainty. *See, e.g.*, Swap Hearing at 62 (statement of Frank G. Sinatra) ("The volatile nature of the financial markets and the need for certainty and speed in quantifying exposure of its participants provide further public policy goals" supporting the safe harbors.). All of the policies behind those statutes counsel against subjecting parties that rely on them to trials, with their attendant costs and uncertainties, whenever possible. Congress's concern with "ripple effects" is not well served by leaving surviving dealers at risk of crippling liability (described in this case as

---

[3]     We recognize that some need for ancillary fact-finding might survive an appropriately ordered dismissal. Fact finding with respect to discrete questions such as, for example, how much collateral was set-off against swap sales, might remain.

being in the "tens of billions") for extended periods.  Nor would the unpredictability engendered by interpreting those statutes so as to require a fact-intensive inquiry encourage counterparties to continue trading with financially weakening counterparties.  Yet that is the inevitable result of Lehman's attempts to replace the bright-line tests established by the statutes with hazy notions of wrongdoing.

To effect Congress's purpose, the protected agreement safe harbors should (and do) establish clear and objective standards that market participants can rely on in making decisions in tumultuous markets:  as long as an agreement is one of several kinds of agreements as defined in the Code, any transfer related to it in any way is protected, unless the debtor has actually intended to defraud other creditors thereby.  That is the type of principle that is properly susceptible to application on a motion to dismiss.  *See Advanced Cardio. Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1160 (9th Cir. 1993) ("The purpose of [Rule 12(b)(6)] is to allow the court to eliminate actions that are fatally flawed in their legal premises and destined to fail, and thus to spare litigants the burdens of unnecessary pretrial and trial activity."); *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Nothing in Rule 12(b)(6) confines its sweep to claims of law which are obviously insupportable. . . .  [A] claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one.") (citation and internal quotation marks omitted).  Accordingly, when a complaint asserts a cause of action that is barred by a safe harbor, the court should, if possible, enforce those provisions on a motion to dismiss, rather than waiting for a later stage of the litigation.  This case, in which a defective amended complaint has followed a withdrawal of the original defective complaint, should be promptly dismissed.

The mere specter of huge claims, such as those here, is widely recognized to present significant financial and reputational cost and to threaten coerced settlements. Hence, the safe harbors would have little meaning if counterparties could resolve such claims only after discovery and trial. In the context of class actions, which also can produce coerced settlements by threatening massive, single-shot liability, Judge Posner has urged that courts check abuse through rigorous enforcement of class certification standards early in the case:

> [C]ertification of a class action, even one lacking merit, forces defendants to stake their companies on the outcome of a single jury trial, or be forced by fear of the risk of bankruptcy to settle even if they have no legal liability . . . . [Defendants] may not wish to roll these dice. That is putting it mildly. They will be under intense pressure to settle.

*In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1299 (7th Cir. 1995). The same concerns apply to this case and potentially to others implicating large securities and derivatives transactions.

The acute burden of litigation itself also underlies the Supreme Court's recent decisions in *Bell Atlantic v. Twombly* (550 U.S. 544 (2007)) and *Ashcroft v. Iqbal* (574 F.3d 820 (2d Cir. 2009)). The Seventh Circuit has explained those holdings in a way that highlights their individual relevance here:

> The [*Twombly*] Court held that in complex litigation (the case itself was an antitrust suit) the defendant is not to be put to the cost of pretrial discovery—a cost that in complex litigation can be so steep as to coerce a settlement on terms favorable to the plaintiff even when his claim is very weak—unless the complaint says enough about the case to permit an inference that it may well have real merit.

*Smith v. Duffey*, 576 F.3d 336, 340 (7th Cir. 2009). While those considerations may be less acute in cases that would be less costly to try, the Seventh Circuit went on to observe, *Iqbal* rested on another reason for prompt resolution, an immunity defense:

> *Iqbal* is special in its own way, because the defendants had pleaded a defense of official immunity and the Court said that the promise of [even] minimally intrusive discovery "provides especially cold comfort in this pleading context, where we are impelled to give real content to the concept of qualified immunity for high-level

> officials who must be neither deterred nor detracted from the vigorous performance
> of their duties."

*Id.* (quoting *Iqbal*, 129 S. Ct. 1937, 1954 (2009)). The instant case, of course, presents both factors—it would require immense pre-trial discovery and a lengthy trial to reconstruct the dealings between these two major institutions over a period of months, *and* JPMorgan asserts a statutory defense that, as its opening brief noted (at 28), has often been described as conveying "immunity." This Court should not permit Lehman's defective claims to survive any longer than necessary, and it should set a precedent for prompt application of the safe harbors.

In its Opposition, Lehman posits a range of confused factual questions, seemingly designed to draw out pre-trial proceedings as long as possible. These allegations are simply invitations to a fishing expedition in discovery. Section 101(53B) does not contemplate an inquiry into the "substantive characteristics" of the contracts (Opp. 44), whatever that might mean, and in any event *there is no dispute* here that the relevant contracts were security agreements and guarantees and that there were a variety of safe-harbored agreements underlying them, all of which are expressly covered in Sections 101(47A)(v) and (53B)(A)(vi) and Section 741(7). Lehman's assertion that "there is no contract language that explicitly and unambiguously defines the September Guaranty and September Security Agreement as the types of agreements referenced in section 546's safe harbor provisions" (Opp. 47) is belied by their own repeated reference to those agreements as "guarantees" and "security agreements" and their recognition that these guarantees and security agreements supported swaps, repos, and securities contracts, precisely the terms that appear in the statutory definitions. Lehman's assertions regarding JPMorgan's intent and practices are irrelevant to Section 548(a)(1)(A) and similar assertions have been repeatedly rejected. Lehman's last fact issue—"whether these transactions implicate the public

policy concerns underlying the safe harbors"—seems to envision a limitless judicial inquiry into legislative intent, unbounded by the statutory text.

Lehman's effort is to create questions where there are none, none at least founded in the conceded facts and the laws applicable to this case. Thus, generally applicable procedural rules make this case and others like it ideal candidates for early dismissal.

## B. The Court Should Enforce the Pleading Requirements of Rule 9(b).

Lehman attempts to sidestep the safe harbor by alleging an "actual intent" fraudulent transfer under Section 548(a)(1)(A). While it is true that the safe harbor does not apply to such transfers, actual intent claims are subject to additional safeguards, which Lehman's complaint ignores and its Opposition seeks to undermine. Amici are concerned that the uncontrolled expansion of actual-intent claims would undermine the safe harbors by allowing debtors to proceed, as Lehman does here, on the basis of flimsy and illogical allegations.

Actual-intent fraudulent transfer claims are subject to the pleading specificity requirements of Bankruptcy Rule 7009(b). *See In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005). That ensures that financial market participants will not even be subjected to discovery and litigation unless the plaintiff can allege, at the outset, specific facts showing the debtor's actual intent to defraud. Where the plaintiff can allege no more than a lack of reasonable value in exchange, the suit cannot proceed if it relates to a transfer in connection with a protected agreement. As explained above, litigation is itself a significant threat, even if the defendant expects ultimately to win on the merits. By limiting market participants' liability to claims subject to Rule 7009(b), the safe harbors sharply reduce the risk that an estate will use avoidance litigation to pressure a settlement. Throwaway allegations that someone—Lehman's complaint does not even identify who—acted with fraudulent intent are not particular enough to meet that standard.

Lehman attempts to bolster its fraud claim with allegations that have nothing to do with its own fraudulent intent and that would apply to virtually every derivatives-related transfer during September of 2008.  Lehman asserts four purported "traditional badges of fraud":

- "the global markets were experiencing a meltdown";

- "LBHI and many of its subsidiaries were insolvent";

- "LBHI received no consideration"; and

- the agreements "were executed on a hasty, rushed basis."

AC ¶¶ 90, 96, 106.  Several of these badges are entirely novel, and Lehman's notion that a transfer *to a creditor* can qualify as an intent-to-defraud fraudulent conveyance—that is, a conveyance designed to defraud other creditors—is unprecedented as well (despite Lehman's miscast citations to the contrary).

The caselaw is clear in actual-intent fraudulent conveyance cases that fraudulent intent must be possessed by the debtor, not the transferee.  Lehman would virtually eliminate that requirement with an expansive theory of "imputed intent," by which any transfer tied to an ill-defined "economic coercion" by a creditor would be treated as if the *debtor* intended it to defraud creditors.  That approach finds no support in the case law and makes little sense.

        1.   Lehman does not adequately allege that it had actual intent to defraud creditors.

The reference to "actual intent" in Section 548(a)(1) refers to the intent of the debtor-transferor, here Lehman.  *See, e.g.*, *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 444 (S.D.N.Y. 2001) ("There is no reference at all in the text to any requirement implicating the debtor's transferee. The only inquiry concerning actual intent that matters is that of the debtor: whether the debtor causing the transfer or incurring the obligation intended to hinder, delay or defraud its creditor.").  Lehman does not allege that it acted with fraudulent intent.  Further, the

clear import of the complaint is that it was *JPMorgan* that "required" the transfers (AC ¶ 46) and "maneuver[ed] to gain a preferred position over LBHI's other creditors" (AC ¶ 44; *see also* AC ¶ 61), using precisely the self-help measures that the Code protects when they are "in connection with" protected agreements. *See* H.R. REP. 109–648, 2006 WL 6165926, at *7 (noting that Section 362(b) "protect[s], free from the automatic stay, . . . self-help foreclosure-on-collateral rights, setoff rights and netting rights").

As to Lehman, the complaint affirmatively alleges that it "was in no position to insist on its contract rights" and that its motive in agreeing to the transfers was not to defraud its creditors but to avoid the "immediate[] collapse" of "Lehman's entire business," an aspiration that Lehman's creditors likely shared. *E.g.*, AC ¶ 49 ("Under these circumstances, LBHI had no alternative but to accede to JPMorgan's demand to enter into the September Agreements."); AC ¶¶ 57-58, 66. These allegations confirm that Lehman did not "know[]" that bankruptcy "would result," or was "certain, or substantially certain, to result," from the challenged contracts (Opp. 65, 67 (quoting *Dean v. Davis*, 242 U.S. 438, 444 (1917) and RESTATEMENT (SECOND) OF TORTS § 8A cmt. b (1965))—instead, according to the complaint, Lehman's entry into those contracts was designed to avoid exactly that result. When "the debtor's motivation is to protect credit standing, to continue in business, and to rehabilitate financially, the transfer or obligation has often been held not to be fraudulent in fact despite the insolvency at the time of the transaction." 5 COLLIER'S ¶ 548.04[2][b], at 548–48. In context, far from suggesting that JPMorgan benefited from fraud by Lehman, the complaint itself is rife with explanations for the transfer that are inconsistent with actual fraudulent intent by LBHI.

The Code recognizes the critical distinction between hard bargaining by a creditor and a transferee's collusion in the efforts by the debtor to secrete assets from creditors. The *only*

transfers that are *not* safe-harbored are those with actual intent to defraud creditors. Such transfers are typified by a debtor's attempts to retain the benefit of assets while nominally removing them from the estate. Thus, for example, "[t]he transfer of property by the debtor to his spouse while insolvent, while retaining the use and enjoyment of the property, is a classic badge of fraud. The shifting of assets by the debtor to a corporation wholly controlled by him is another badge of fraud." *In re Kaiser*, 722 F.2d 1574, 1583 (2d Cir. 1983) (citation omitted); *see also HBE Leasing Corp. v. Frank*, 48 F.3d 623, 640 (2d Cir. 1995) (finding possibility of fraud where "this arrangement effectively transferred substantial assets from the corporation to" corporate insiders); *In re Nemeroff*, 74 B.R. 30, 31 (E.D. La. 1987) ("The Bankruptcy Judge was justified in finding that the trusts were a sham since the debtors appointed themselves as trustees and retained possession and enjoyment of the property."). The allegations here look nothing like that paradigm case.

By contrast, allegations that the debtor "hastily" or without consideration transferred assets to a *creditor* must be addressed under the rubric of preferences (from which swap, repo, and security agreements, again, are protected). *Compare New York Dist. Council of Carpenters Pension Fund v. KW Const., Inc.*, 2008 WL 2115225, at *5 (S.D.N.Y. May 16, 2008) (finding fraudulent intent where debtor "has repeatedly transferred his personal assets as well as the assets of KW Construction *to family members or close business associates* for little to no consideration"). As noted above, Lehman states that it agreed to the transfers so that it could stay in business. A creditor's mere success in obtaining property at less than fair value is remediable only under Section 548(a)(1)(B) or (b), and those are precisely the sections that Congress chose to render inapplicable to financial contracts. Hence, the *Enron* court found the securities settlement payment safe harbor applicable where "Enron apparently [went] into the

market place and over pa[id] for the product it purchased to, among other things, protect its credit rating." *In re Enron Corp.*, 341 B.R. 451, 459 (Bankr. S.D.N.Y. 2006). *Cf. Matter of FBN Food Servs., Inc.*, 82 F.3d 1387, 1394 (7th Cir. 1996) (reversing finding of actual-intent transfer where lower courts "equated financial pressure [by a creditor] with 'fraud'"). Thus, even if Lehman were correct that JPMorgan's demands lacked a contractual basis and that its collateral demands were not exempt for the independent reason that they secured antecedent debts, the resulting deficiencies in the transfers would not imply that Lehman actually intended to defraud its creditors, and would not implicate Section 548(a)(1)(A).

In essence, Lehman's novel badges of fraud would expand Section 548(a)(1)(A) to cover any transfer by an insolvent debtor that lacks adequate consideration: Lehman either would render the debtor's actual intent irrelevant to an actual-intent transfer claim, or would hold that such intent can be inferred from insolvency and lack of consideration. Insolvency and "less than a reasonably equivalent value," however, are exactly the requirements of Section 548(a)(1)(B)(ii)(I), the part of the statute that *is* foreclosed by the safe harbors. The actual-intent claim in subsection (a)(1)(A) must require something more, or else subsection (B)(ii)(I) would be superfluous, and the safe harbors likewise would be superfluous as they do not circumscribe subsection (a)(1)(A).

2.   Lehman does not allege a valid basis for imputing JPMorgan's intent to itself.

Lehman attempts to avoid pleading its own fraudulent intent by alleging that JPMorgan's intent can be imputed to it. The near-boundless imputation standard that Lehman urges, however, would render the safe harbors a nullity by expanding actual-intent transfers far beyond any previously recognized limits (and destroying the distinction between actual intent and implied fraudulent conveyance theories in the process). Lehman's imputation-of-intent theory

would allow the debtor to allege an actual-intent transfer in virtually any case in which a transferee managed to bargain for a conveyance at less than reasonable value.

*Jackson v. Mishkin*, which, strangely, Lehman itself cites (at 68), is perhaps the most relevant case. 263 B.R. 406 (S.D.N.Y. 2001). *Jackson* lists four "principles that justify the imputation of the transferee's fraudulent intent to the debtor." *Id.* at 447. "[I]n the typical case the person or entity exercising control over the disposition of the debtor's property stands in a position to do so by reason of a relationship of ownership, executive office or other ***insider role***." *Id.* (emphasis added). "A second theory, not explicitly articulated in the cases, may be grounded on application of ***agency principles***" and applies to transferees who "act with actual or apparent authority to effect the disposition of the relevant property from the debtor." *Id.* at 448 (emphasis added). "Third, in some cases the controlling person is considered to stand in a ***fiduciary capacity*** or hold a position of trust in the transferor entity. Fourth, the rule imputes the fraudulent intent in order to recognize and discourage the misuse of the corporate form and insider status as instruments to commit fraud by means of transferring property between ***affiliated entities***." *Id.* (citation omitted) (emphasis added).

None of those principles applies here, for the same reasons explained in *Jackson* itself:

> Adler [the debtor] and Hanover [the transferee] were independent, unaffiliated companies. Their open legal relationship set forth in the Clearing Agreement was arms-length, and their interests potentially hostile. The parties shared no continuous institutional channel through which the transference of fraudulent intent simultaneous with a disposition of property could be effected. Nor could Hanover have been regarded as Adler's authorized agent in effectuating the property transfers at issue. In fact, as is central to the Trustee's theory, Hanover served as Appellants' agent in booking the Challenged Traders and deceiving Adler, and could not simultaneously have acted as Adler's principal directing Adler knowingly to defraud itself.

263 B.R. at 448–49. The *Jackson* court also noted that actual mechanical control by Hanover over the debtor's account did not constitute the kind of control on which imputation might rest. *Id.* at 449.

Lehman skips past the constraint of the *Jackson* case by advancing a wholly novel theory that "economic coercion or duress" is sufficient to require imputation. Opp. 69. That notion finds no support in the case law. In fact, *Jackson* itself expressly rejected a standard by which "every common thief could be deemed to be in a position to control the disposition of the victim's property." 263 B.R. at 449; *contra* Opp. 70 (arguing that "unlawful threats" warrant imputation). In so holding, the *Jackson* court relied in part on a First Circuit case refusing to extend imputation theory "to the creditor's exertion of a narrow financial relationship between otherwise independent parties based on a property interest secured by mortgages." 263 B.R. at 450 (citing *In re Cushman Bakery*, 526 F.2d 23 (1st Cir. 1975)).[4]

Nor is Lehman's proposed approach a wise policy choice, as it would nearly erase the distinction between intentional and constructive fraudulent transfers. After all, a debtor that does *not* actually intend to defraud creditors generally will not permit transfers of property at less than reasonable value, *unless* it is subject to some sort of coercion or duress. If that coercion alone could create an actual-intent transfer, that would disrupt the careful legislative scheme, which distinguishes between transfers that are fraudulent because the *debtor* intended to defraud creditors and those that are fraudulent because they lacked reasonable value in exchange.

---

[4] Lehman's other cited cases are no more relevant. *In re Davis* (cited at Opp. 68 n.23) was a constructive fraudulent transfer case, not one involving actual intent, and it found that transfers under fraud or coercion were "involuntary" within the meaning of Section 522(g)(1)(A), not intentional. 169 B.R. 285, 291, 295–96. The only case that actually supports Lehman's position is *S&W Exporters*, which was decided under the Bankruptcy Act; while it says that force and duress may "amount[] to an intent to defraud," it does not analyze or explain why that intent would be imputed to the *debtor*. 16 B.R. 941, 946–47 (Bankr. S.D.N.Y. 1982). To the extent that *S&W* could be stretched to support imputation, it cannot be good law after *Jackson*.

Congress's decision to safe harbor the latter would be meaningless, because the debtor could almost always bootstrap a constructive transfer into an imputed fraudulent one.

> 3. "Market meltdown" and "haste" by the creditor should not be recognized as badges of fraud.

ISDA and SIFMA are especially concerned by Lehman's first two purported badges of fraud, which suggest that a transfer may be inferred to have been made with actual intent to defraud creditors merely because it was effected during a financial crisis or by a market participant that is retrospectively found to have been insolvent. Such a result would fly in the face of the legislative history and the evident purpose of Section 546, which is to *facilitate* both trading and the transfer of security during periods of market disruption. As two commentators explain:

> Without these safe harbors, markets might suffer serious shocks—perhaps even a systemic liquidity crisis, causing markets to collapse—when debtors enter bankruptcy. Counterparties to financial contracts would find themselves subject to the automatic stay for extended periods. They would be unable to liquidate volatile contracts and thereby limit their exposure to market movements. . . . Losses from indefinite exposure to market movements and from cherrypicking could produce financial distress in the counterparty itself, forcing it to default on its own contracts with other parties. As one distressed party infects another, a domino effect could ensue, undermining the entire financial market.

Edward R. Morrison & Joerg Riegel, *Financial Contracts and the New Bankruptcy Code*, 13 AM. BANKR. INST. L. REV. 641, 642 (2005) (footnotes omitted). As that article notes, that is the premise that "was cited repeatedly" by Congress when it expanded the safe harbors in 2005. *Id.* Taking away those systemic protections when markets are "experiencing a meltdown" would have the perverse effect of intensifying financial crises. That legislative intent is consistent with the broader bankruptcy policy "to encourage creditors to deal with troubled businesses on regular business terms, 'by obviating any worry that a subsequent bankruptcy filing might require the creditor to disgorge as a preference an earlier received payment.'" *Brandt*, 238 B.R. at 415 (citing *Barnhill*, 503 U.S. at 402 and discussing Section 547(c)).

Not only would imputing fraudulent intent to debtors making transfers during market turmoil have adverse consequences, it does not even make factual sense.  As shown above, Section 548 is intended to remedy debtors' efforts to shield assets from their creditors; there is no reason to believe that such efforts are more likely in periods of market distress.  In other words, a period of financial distress may produce more debtors, but it does not change debtors' motives.  (Lehman's proposed "insolvency" badge is deficient for the same reason:  while a solvent debtor might have little need to fraudulently shield assets from creditors, one cannot conclude that every transfer by an insolvent debtor is motivated by fraud.)

> 4. The policies underlying the pleading specificity requirement apply with special force here.

Rule 9(b) applies to all fraud claims. A typical fraud claim, of course, requires the plaintiff to plead the fraudulent intent of the defendant.  Here, Lehman need only plead its own fraudulent intent.  The debtor has available to it not only its own records, but the broad pre-complaint discovery afforded by Rule 2004 and, in this case, the immense Examiner's Report.  Yet even though Lehman therefore should have access to all facts necessary to satisfy Rule 9(b), it not only fails to plead fraud with specificity, it does not plead its own fraudulent intent at all. *Collier*, among others, recognizes that "[w]hen a debtor in possession as opposed to a trustee brings the action, the courts will generally assume that the debtor in possession has actual first hand knowledge of the facts involved, and will likely be more strict in enforcing the requirements of Civil Procedure Rule 9(b) than in those cases commenced by a trustee."  5 COLLIER ON BANKRUPTCY ¶ 548.04[2][c] (16th ed. 2009).

The pleading deficiencies here are especially disturbing because Lehman's claim is such a blatant effort to evade the safe harbor and attack transactions that Congress specifically protected in numerous sections of the Bankruptcy Code.  There is apparently no prospect of Lehman

proving its fraudulent intent at trial, because even in opposing JPMorgan's Motion, it still cannot bring itself to allege that it intended to take money away from its estate for the sole benefit of JPMorgan. It thus appears that the sole function that Lehman's claim serves is to skirt Section 546(e), (f), and (g) and allow Lehman to continue to threaten JPMorgan with massive liability on an otherwise barred avoidance claim.

## <u>CONCLUSION</u>

For all of the foregoing reasons, this Court should hold that the Agreements and Guaranties are subject to the avoidance safe harbors to the extent that they secure and guarantee swaps, repurchase agreements, or securities contracts.

Dated:    New York, New York
          February 2, 2011

s/Joshua Cohn
MAYER BROWN LLP
Joshua Cohn
Christopher J. Houpt
Ames C. Grawert
1675 Broadway
New York, New York  10019
(212) 506-2500

*Attorneys for Amici Curiae
The International Swaps and
Derivatives Association, Inc. and
The Securities Industry and
Financial Markets Association*
