**QUINN EMANUEL**
**URQUHART & SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543

51 Madison Avenue, 22nd Floor
New York, New York 10010-1603
*Counsel for the Official Committee of Unsecured*
*Creditors of Lehman Brothers Holdings Inc.*

**CURTIS, MALLET-PREVOST,**
**COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
*Counsel for Debtor Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>        Debtors. | Chapter 11<br><br>Case No. 08-13555 (JMP)<br><br>(Jointly Administered) |
| LEHMAN BROTHERS HOLDINGS INC. and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., *et al.*<br><br>        Plaintiff and Plaintiff Intervenor<br><br>        v.<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>        Defendant | Adversary Proceeding<br><br>Case No. 10-03266 (JMP) |

## NOTICE OF MOTION TO DISMISS

PLEASE TAKE NOTICE THAT, upon the accompanying Memorandum of Law, the Declaration of Tyler G. Whitmer and the exhibits thereto, and all pleadings and proceedings heretofore had before this Court, Plaintiffs Lehman Brothers Holdings Inc. and the Official Committee of Unsecured Creditors, by their undersigned counsel, hereby move before the Honorable James M. Peck of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, for an order dismissing the Counterclaims of JPMorgan Chase Bank, N.A. in the above-captioned adversary proceeding in its entirety for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), as incorporated in Bankruptcy Rule 7012, and, where applicable, Federal Rule of Civil Procedure 9(b), as incorporated in Bankruptcy Rule 7009.

Dated: New York, New York
January 31, 2011

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

By: /s/ John B. Quinn

John B. Quinn
Erica Taggart
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
(213) 443-3000

Susheel Kirpalani
Andrew J. Rossman
James Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000
*Counsel for Plaintiff Intervenor, the Official
Committee of Unsecured Creditors of
Lehman Brothers Holdings Inc.*

8960978

**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**

By: /s/ Joseph D. Pizzurro

Joseph D. Pizzurro
L.P. Harrison 3rd
Michael J. Moscato
Nancy E. Delaney
Peter J. Behmke
Cindi M. Eilbott
101 Park Avenue
New York, New York 10178-0061
(212) 696-6000
*Counsel for Plaintiff, Debtor Lehman Brothers Holdings Inc.*

**QUINN EMANUEL**
**URQUHART & SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543

51 Madison Avenue, 22nd Floor
New York, New York 10010-1603
*Counsel for the Official Committee of Unsecured*
*Creditors of Lehman Brothers Holdings Inc.*

**CURTIS, MALLET-PREVOST,**
**COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
*Counsel for Debtor Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>        Debtors. | Chapter 11<br><br>Case No. 08-13555 (JMP)<br><br>(Jointly Administered) |
| LEHMAN BROTHERS HOLDINGS INC. and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>        Plaintiff and Plaintiff Intervenor<br><br>    v.<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>        Defendant | Adversary Proceeding<br><br>Case No. 10-03266 (JMP) |

**PLAINTIFFS LEHMAN BROTHERS HOLDINGS INC. AND OFFICIAL**
**COMMITTEE OF UNSECURED CREDITORS' MEMORANDUM OF**
**LAW IN SUPPORT OF MOTION TO DISMISS COUNTERCLAIMS OF**
**DEFENDANT JPMORGAN CHASE BANK, N.A.**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................... 1

STATEMENT OF FACTS ......................................................................... 6

    I.      JPMorgan Agrees to Be Repo Agent for LBI Pursuant to Individual Custody Agreements ................................................. 6

    II.     JPMorgan Demands That LBHI Guarantee All Subsidiaries' Liabilities of Any Kind ................................................................ 8

    III.    JPMorgan Serves as LBI's Tri-Party Repo Agent in the Week After LBHI's Bankruptcy ............................................................. 9

    IV.    Negotiation of the Barclays Asset Purchase Agreement ........................... 11

    V.     JPMorgan Unwinds All Repos on Tuesday, Wednesday, and Thursday, And Advances the Repurchase Price to All Sellers, Including Barclays ................................................................. 11

    VI.    JPMorgan Releases Claims Against Barclays Regarding the Barclays Repo ..................................................................... 12

    VII.   JPMorgan Remains Silent Throughout the Barclays Trial ......................... 14

STANDARD OF REVIEW ...................................................................... 14

ARGUMENT ..................................................................................... 15

    POINT I    JPMORGAN'S CAUSE OF ACTION FOR FRAUDULENT MISREPRESENTATION AGAINST LBHI FAILS TO STATE A CLAIM ....................................................................... 15

        A.    Legal Standards for Fraudulent Misrepresentation ...................... 15

        B.    Aside From the Filing of the APA Itself, JPMorgan Has Failed to Allege That Anyone at LBHI, Acting on Behalf of LBHI, Made Any Misrepresentation It Knew at the Time Was False ........................... 16

            1.    The Alleged Statements of Tonucci and Lowitt Cannot Be Attributed to LBHI Because, Even According to JPMorgan's Allegations, Tonucci and Lowitt Were Acting Adversely to LBHI's Interests ....................................... 17

2.     The Counterclaims Fail to Allege That Any Statements of
Tonucci or Lowitt Were Knowingly False When Made .............. 19

3.     Allegations Against "Lehman" Generally Fail to State a
Claim Against LBHI .................................................................21

4.     Any Material Representations Were All Allegedly Made by
Barclays, Not LBHI .................................................................22

C.     JPMorgan Fails to Plead Any Misrepresentation Because LBHI's
Predictions of Barclays' Future Conduct Are Not Actionable ..................24

D.     JPMorgan's Alleged Reliance on Any LBHI Statements
Extraneous to the Repurchase Agreements Was Not Reasonable ..........28

1.     Legal Standards for Reasonable Reliance Element of a
Fraudulent Misrepresentation Claim .............................................28

2.     Reliance on LBHI Statements Outside the Repo Contracts
Was Unreasonable ..................................................................29

3.     Any Reliance on LBHI for Predictions of Barclays' Future
Conduct Is Unreasonable in Light of Barclays' Direct
Representations About Its Own Intentions ....................................33

E.     JPMorgan Has Failed to Plead That LBHI Acted with Scienter
Because It Has Not, and Cannot, Plead a Motive for LBHI to Give
Barclays the Best Securities and Leave LBI with the Worst .....................34

1.     Legal Standards for Pleading the Element of Scienter .................35

2.     JPMorgan's Allegations That LBHI Wanted to Complete
the Sale Are Too General to Plead LBHI's Scienter, and
Any Personal Motives of Individual Executives Adverse to
Their Employer Cannot Be Imputed to LBHI ..............................36

3.     Counterclaims Do Not Allege Conscious or Reckless
Conduct by LBHI .....................................................................38

POINT II     JPMORGAN'S FRAUDULENT CONCEALMENT
COUNTERCLAIM FAILS TO STATE A CLAIM ..................................40

A.     Legal Standards for Fraudulent Concealment ............................................40

B.     JPMorgan's Fraudulent Concealment Claim Fails for Many of the
Same Reasons as Its Fraudulent Misrepresentation Claim ........................41

1.  JPMorgan Fails to Allege Fraudulent Concealment Against LBHI Specifically ........................................................................41

2.  Failure to Disclose What LBHI Thought Barclays Would Do Does Not State a Fraudulent Concealment Claim ..................42

3.  JPMorgan Fails to Plead That Reliance on the Concealment Was Reasonable Because the Repurchase Agreements Contained All Material Representations........................................42

4.  JPMorgan Fails to Plead that LBHI Acted with Scienter Because It Has Not, and Cannot, Plead a Motive for LBHI to Conceal the Details of the Barclays Sale Transaction..............43

C.  JPMorgan Has Failed to Allege Facts Establishing That LBHI Had a Duty to Disclose....................................................................43

1.  Legal Standards for Establishing a Duty to Disclose ....................44

2.  JPMorgan Has Not Alleged a Partial or Incomplete Statement That Requires Clarification...........................................45

3.  JPMorgan Does Not Allege a Confidential or Fiduciary Relationship Giving Rise to a Duty to Disclose ............................46

4.  JPMorgan's Allegations Fail to Plead That LBHI Owed JPMorgan a Duty to Disclose Facts About the APA Under the Special Facts Doctrine .............................................................46

5.  JPMorgan Has Not Alleged That LBHI Possessed Superior Knowledge and Knew JPMorgan Was Relying on Mistaken Knowledge ...................................................................................48

6.  Allegations Regarding the Allocation of Shells Also Fail Because Such Conduct Was Permitted by Contract, and JPMorgan Cannot Plausibly Allege That LBHI Had Superior Knowledge Regarding the Allocations ...........................50

POINT III  JPMORGAN'S AIDING AND ABETTING FRAUD COUNTERCLAIM FAILS TO STATE A CLAIM...................51

A.  Legal Standards for Aiding and Abetting Fraud........................52

B.  JPMorgan Fails to Plead Reasonable Reliance on Barclays' Alleged Underlying Fraud ........................................................52

C.     JPMorgan Fails to Plead That LBHI Substantially Assisted Barclays' Fraud Because It Does Not Show Affirmative Assistance by LBHI That Proximately Caused the Alleged Injury ............................ 53

      1.     Allegations Regarding Reallocation of the Tri-Party Repo Shells Do Not State a Claim Against LBHI .................... 53

      2.     Filing the Request for a Sale Hearing to Approve the APA Does Not Plead That LBHI Substantially Assisted in Barclays' Fraud ............................................................. 54

D.     JPMorgan Fails to Plead Actual Knowledge ............................ 56

POINT IV     JPMORGAN'S INDEMNIFICATION COUNTERCLAIMS SHOULD BE DISMISSED ......................................................... 57

A.     JPMorgan Fails to State a Claim for Indemnification Under the 2000 Clearance Agreement (Fourth Counterclaim) .................... 58

      1.     The Indemnity Clause of the Barclays Custodial Undertaking Provides the Exclusive Basis for Any Purported Indemnification Rights of JPMorgan ............................ 58

      2.     The Clearance Agreement Prohibits Indemnification for Any JPMorgan Losses Related to Plaintiffs' State Law Claims or Those Bankruptcy Code Claims Premised on JPMorgan's Misconduct .............................................. 61

      3.     JPMorgan's Losses Related to Plaintiffs' Claims Arising Under the Avoidance Provisions of the Bankruptcy Code Are Not Subject to Indemnification ................................ 64

B.     JPMorgan Fails to State a Claim for Indemnification Under the Barclays Custodial Undertaking (Fifth Counterclaim) ............................ 67

      1.     Because LBHI Is Not a Party to the Barclays Custodial Undertaking, It Cannot Form a Basis for Indemnification If Plaintiffs Establish the Invalidity of the September Guaranty and Related Agreements ................................ 67

      2.     The Barclays Custodial Undertaking Also Will Not Indemnify JPMorgan's Losses Due to the Exception for Negligence or Willful Misconduct ................................ 67

      3.     JPMorgan Cannot Invoke the Purported "Absolute[]" Indemnity Provision of the Barclays Custodial Undertaking ........ 69

CONCLUSION ............................................................................................... 71

# TABLE OF AUTHORITIES

Page(s)

## Cases

900 Unlimited, Inc. v. MCI Telecomms. Corp.,
    215 A.D.2d 227, 626 N.Y.S.2d 188 (1st Dep't 1995).........................................................44, 47

320 Realty Mgmt. Co. v. 320 West 76 Corp.,
    221 A.D.2d 174, 633 N.Y.S.2d 295 (1st Dep't 1995)........................................................27, 28

484 Assocs., L.P. v. Moy,
    No. 06 Civ. 2290(PAC), 2007 WL 683999 (S.D.N.Y. Mar. 5, 2007)....................................52

Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, Nat'l Assoc.,
    731 F.2d 112 (2d Cir. 1984) ...................................................................................................50

Acito v. IMCERA Group, Inc.,
    47 F.3d 47 (2d Cir. 1995) ........................................................................................................36

Aetna Casualty & Surety Co. v. Aniero Concrete Co., Inc.,
    404 F.3d 566 (2d Cir. 2005) ...............................................................................................40, 41

All Am. Adjusters, Inc. v. Acceleration Nat'l Ins. Co.,
    No. 96 CIV. 9344(MBM), 1997 WL 732445 (S.D.N.Y. Nov. 25, 1997) ...............................44

Allison v. Round Table Inv. Mgmt. Co., LP,
    No. 10 CV 01144(GBD), 2010 WL 4456648 (S.D.N.Y. Oct. 22, 2010) ................................35

Anderson v. Local Union No. 3,
    582 F. Supp. 627 (S.D.N.Y. 1984) ...........................................................................63, 68, 70

Ashcroft v. Iqbal,
    129 S. Ct. 1937 (2009)..............................................................................................................14

Asher v. Film Ventures Int'l, Inc. (In re Film Ventures Int'l, Inc.),
    89 B.R. 80 (9th Cir. B.A.P. 1988) ...........................................................................................66

Atlantic Gypsum Co. v. Lloyds Int'l Corp.,
    753 F. Supp. 505 (S.D.N.Y. 1990) ....................................................................................19, 37

Austro v. Niagara Mohawk Power Corp.,
    487 N.E.2d 267, 496 N.Y.S.2d 410 (1985) .............................................................................68

Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortgage Inv. Corp.),
    256 B.R. 664 (Bankr. S.D.N.Y. 2000).....................................................................................15

Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.,
    No. 03 Civ. 1537(MBM), 2003 WL 23018888 (S.D.N.Y. Dec. 22, 2003) ............................21

Bank of China, N.Y. Branch v. NBM LLC,
    359 F.3d 171 (2d Cir. 2004) ....................................................................................................18

Banque Arabe et Internationale D'Invesstisetment v. Md. Nat'l Bank,
    57 F.3d 146 (2d Cir. 1995) ....................................................................46, 48, 49

Baraliu v. Vinya Cap., L.P.,
    No. 07 Civ. 4626(MHD), 2009 WL 959578 (S.D.N.Y. Mar. 31, 2009) ...........61, 69

Bell Atlantic Corp. v. Twombly,
    550 U.S. 544 (2007)....................................................................................14

Bloor v. Carro, Spanbock, Londin, Rodman & Fass,
    754 F.2d 57 (2d Cir. 1985) ..........................................................................55

Brass v. Am. Film Techs., Inc.,
    987 F.2d 142 (2d Cir. 1993) ........................................................................45

Century Pacific, Inc. v. Hilton Hotels Corp.,
    354 Fed. Appx. 496 (2d Cir. 2009)........................................................32, 33, 43

Chase Invs., Ltd. v. Kent,
    256 A.D.2d 298, 681 N.Y.S.2d 319 (2d Dep't 1998) .................................25

Chill v. General Elec. Co.,
    101 F.3d 263 (2d Cir. 1996) ..................................................................35, 38

Cong. Fin. Corp. v. John Morrell & Co.,
    790 F. Supp. 459 (S.D.N.Y. 1992) ...............................................................16

Corporate Jet Aviation, Inc. v. Vantress (In re Corporate Jet Aviation, Inc.),
    45 B.R. 629 (Bankr. N.D. Ga. 1985) ..................................................64, 66, 68, 70

Cortec Indus., Inc. v. Sum Holding, LP,
    949 F.2d 42 (2d Cir. 1991) ...........................................................................6

Cucchiaro v. Cucchiaro,
    627 N.Y.S.2d 224 (N.Y. Sup. Ct. 1995)........................................................42

DeBeers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.,
    440 F. Supp. 2d 249 (S.D.N.Y. 2006) ..........................................................45

Deerfield Comm. Corp. v. Chesebrough-Ponds,
    68 N.Y.2d 954 (1986)..................................................................................25

Defer LP v. Raymond James Financial, Inc.,
    654 F. Supp. 2d 204 (S.D.N.Y. 2009) ....................................................22, 54

Emergent Capital Inv. Mgmt., LLC v. Stonepath Group,
    343 F.3d 189 (2d Cir. 2003) .......................................................28, 29, 32, 33, 43

Fab Industries v. BNY Financial,
    252 A.D.2d 367, 675 N.Y.S.2d 77 (1st Dep't 1998)....................................32, 33

Fallick v. Kehr (In re Fallick),
    369 F.2d 899 (2d Cir. 1966) ........................................................................65

Federated Retail Holding, Inc. v. Sanidown, Inc.,
  No. 06 Civ. 6119(LTS)(THK), 2010 WL 5298113 (S.D.N.Y. Dec. 23, 2010) .......................21

Fezzani v. Bear, Stearns & Co., Inc.,
  592 F. Supp. 2d 410 (S.D.N.Y. 2008) ........................................................................55, 56

Filler v. Hanvit Bank,
  No. 01 Civ. 9510(MGC), 02 Civ. 8251(MGC),
  2003 WL 22110773 (S.D.N.Y. Sept. 12, 2003) ...............................................................55

Footbridge, Ltd. v. Countrywide Home Loans, Inc.,
  No. 9 Civ. 4050(PKC), 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) .............................21

Friedl v. City of New York,
  210 F.3d 79 (2d Cir. 2000) ............................................................................................15

George Cohen Agency, Inc. v. Donald S. Perlman Agency, Inc.,
  114 A.D.2d 930, 495 N.Y.S.2d 408 (2d Dep't 1985) .................................................47, 48

Gladstone Bus. Loan, LLC v. Randa Corp.,
  No. 09 Civ. 4225(LMM), 2009 WL 2524608 (S.D.N.Y. Aug. 17, 2009) ..........................28

Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V. v. AT&T Commc'ns, Inc.,
  No. 92 CIV. 7862 (KMW), 1996 WL 312535
  (S.D.N.Y. June 10, 1996) ........................................................16, 26, 27, 34, 42

In re Gulf Beach Dev. Corp.,
  48 B.R. 40 (Bankr. M.D. Fla. 1984) ................................................................................65

Hayhoe v. Cole (In re Cole),
  226 B.R. 647 (9th Cir. B.A.P. 1998) ...............................................................................65

Holmes v. Lorch,
  329 F. Supp. 2d 516 (S.D.N.Y. 2004) ...........................................................17, 18, 19, 37

IMG Fragrance Brands, LLC v. Houbigant, Inc.,
  679 F. Supp. 2d 395 (S.D.N.Y. 2009) .............................................................................54

Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC,
  No. 01 Civ. 6600(RLC), 2005 WL 3370542 (S.D.N.Y. Dec. 12, 2005) ...........................32

JP Morgan Chase Bank v. Orleans,
  No. 650006/ 2007 WL 6882391 (N.Y. Sup. Ct. Jan. 25, 2007) ........................................25

Junk v. Aon Corp.,
  No. 07 Civ. 4640(LMM)(GWG), 2007 WL 4292034 (S.D.N.Y. Dec. 3, 2007) .................33

Kalnit v. Eichler,
  264 F.3d 131 (2d Cir. 2001) ..........................................................................................38

King v. George Schonberg & Co.,
  233 A.D.2d 242, 650 N.Y.S.2d 107 (1st Dep't 1996) .......................................................52

Kirschner v. KPMG LLP,
  15 N.Y.3d 446 (2010) ................................................................. 19

Kirschner v. KPMG LLP,
  590 F.3d 186 (2d Cir. 2009) ...................................................... 19

Kolbeck v. LIT Am., Inc.,
  939 F. Supp. 240 (S.D.N.Y. 1996) ......................................... 53, 56

Lama Holding Co. v. Smith Barney, Inc.,
  88 N.Y.2d 413 (1996) ......................................................... 15, 16, 20

Lane v. McCallion,
  166 A.D.2d 688, 561 N.Y.S.2d 273 (2d Dep't 1990) ............... 26, 28

Lazard Freres and Co. v. Protective Life Ins.Co.,
  108 F.3d 1531 (2d Cir. 1997) ............................................. 31, 33, 43

Lerner v. Fleet Bank, N.A.,
  459 F.3d 273 (2d Cir. 2006) .............................................. 16, 35, 52

Manley v. AmBase Corp.,
  126 F. Supp. 2d 743 (S.D.N.Y. 2001) ........................................ 45

Maxwell Commc'n Corp. PLC v. Societe Generale (In re Maxwell Commc'n Corp. PLC),
  93 F.3d 1036 (2d Cir. 1996) ...................................................... 65

In re McClelland,
  418 B.R. 61 (Bankr. S.D.N.Y. 2009) ......................................... 18

In re Mediators, Inc.,
  405 F.3d 822 (2d Cir. 1997) ...................................................... 17

Medinol Ltd. v. Boston Scientific Corp.,
  346 F. Supp. 2d 575 (S.D.N.Y. 2004) ........................................ 63

Murray v. Xerox Corp.,
  811 F.2d 118 (2d Cir. 1987) ...................................................... 25

Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank, N.A.,
  261 F.R.D. 13 (S.D.N.Y. 2009) .......................................35, 38, 39, 51

O'Brien v. Nat'l Prop. Analysts Partners,
  719 F. Supp. 222 (S.D.N.Y. 1989) ............................................ 52

O'Connor v. Readers Digest Ass'n, Inc.,
  No. 92 Civ. 7414 (CLB), 1993 WL 291372
  (S.D.N.Y. March 10, 1993) .................................................... 24, 25

PPI Enterprises (U.S.), Inc. v. Del Monte Foods Co.,
  Nos. 05-6885-cv (L), 05-7040-cv (CON),
  2006 WL 3370698 (2d Cir. Nov. 20, 2006) ................................ 63

Papasan v. Allain,
   478 U.S. 265 (1986)..............................................................................................15

Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC,
   446 F. Supp. 2d 163 (S.D.N.Y. 2006) ...........................................................54, 55, 56

Perniciaro v. Natale (In re Natale),
   136 B.R. 344 (Bankr. E.D.N.Y.1992) .........................................................................15

Pfizer, Inc. v. Stryker Corp.,
   348 F. Supp. 2d 131 (S.D.N.Y. 2004) ........................................................................36

Premier-N.Y., Inc. v. Travelers Property Cas. Corp.,
   No. 603043/03, 2008 WL 2676800 (N.Y. Sup. Ct. July 8, 2008) .............................41

Productores Asociados De Caf Rio Claro, C.A. v. Barnett,
   No. 98 CIV. 499 DAB, 1999 WL 287389 (S.D.N.Y. May 7, 1999) ....................35, 39

QSI Holdings, Inc. v. Alford,
   382 B.R. 731 (W.D. Mich. 2007) ........................................................................64, 65

Rapoport v. Asia Electronics Holding Co., Inc.,
   88 F. Supp. 2d 179 (S.D.N.Y. 2000) .........................................................................59

Ray Larsen Assocs., Inc. v. Nikko Am., Inc.,
   No. 89 Civ. 2809 (BSJ), 1996 WL 442799 (S.D.N.Y. Aug. 6, 1996) .......................46

Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.,
   68 F.3d 1478 (2d Cir. 1995) .....................................................................................45

Renner v. Chase Manhattan Bank,
   No. 98 CIV. 926(CSH), 2000 WL 781081 (S.D.N.Y. June 16, 2000) ................38, 39

Rey-Willis v. Citibank, N.A.,
   No. 03 Civ. 2006(SAS), 2003 WL 21714947 (S.D.N.Y. July 23, 2003) ...................41

Richards v. AXA Equitable Life Ins. Co.,
   No. 06 Civ. 3744(PAC), 2007 WL 3084968 (S.D.N.Y Oct. 22, 2007)......................51

Rupp v. Holling (In re Holling),
   Bankruptcy No. 05-38322, 2007 WL 2964505 (Bankr. D. Utah Feb. 8, 2007) ........65

Saltz v. First Frontier, LP,
   No. 10 Civ. 964(LBS), 2010 WL 5298225 (S.D.N.Y. Dec. 23, 1010) .....................43

Schlaifer Nance & Co. v. Estate of Warhol,
   119 F.3d 91 (2d Cir. 1997) ..................................................................................15, 35

Scott-Macon Sec., Inc. v. Zoltek Cos., Inc.,
   No. 06-2711-cv, 2007 WL 2914873 (2d Cir. Oct. 4, 2007) .....................................64

In re Shady Grove Tech Ctr. Assocs. Ltd. Partnership,
   216 B.R. 386 (Bankr. D. Md. 1998) ..........................................................................65

In re Sharp Int'l Corp.,
  403 F.3d 43 (2d Cir. 2005) ..................................................................55

Shields v. Citytrust Bancorp, Inc.,
  25 F.3d 1124 (2d Cir. 1994) ...........................................................19, 37

In re Southeast Fin. Assocs., Inc.,
  212 B.R. 1003 (Bankr. M.D. Fla. 1997) .............................................65

St. Paul Fire and Marine Ins. Co. v. Universal Builders Supply,
  409 F.3d 73 (2d Cir. 2005) ..................................................................68

State v. Peerless Ins. Co.,
  67 N.Y.2d 845 (1986) ..........................................................................42

Stengal v. Chen,
  74 A.D.3d 1050, 903 N.Y.S.2d 110 (2d Dep't 2010) ..........................27

Stewart v. Jackson & Nash,
  976 F.2d 86 (2d Cir. 1992) ..................................................................25

Stuart Lipsky, P.C. v. Price,
  215 A.D.2d 102, 625 N.Y.S.2d 563 (1st Dep't 1995)..........................28

Tomoka Re Holdings, Inc. v. Loughlin,
  No. 03 Civ. 4904(NRB), 2004 WL 1118178 (S.D.N.Y. May 19, 2004).................45

Trabucco v. Intesa Sanpaolo, S.P.A.,
  695 F. Supp. 2d 98 (S.D.N.Y. 2010) ...................................................25

Triple Z Postal Services, Inc. v. United Parcel Serv., Inc.,
  No. 118057/05, 2006 WL 3393259 (N.Y. Sup. Ct. Nov. 24, 2006)...............44, 45, 46, 47, 48

In re Tru Block Concrete Prods., Inc.,
  27 B.R. 486 (Bankr. S.D. Cal. 1983) ...................................................65

United States v. Bestfoods,
  524 U.S. 51 (1998)..........................................................................22, 54

Union Bank v. Wolas,
  502 U.S. 151, 112 S. Ct. 527 (1991)....................................................65

In re Weitzen,
  3 F. Supp. 698 (S.D.N.Y. 1933) ..........................................................65

Wells Fargo Home Mortgage Inc. v. Hiddekel Church of God, Inc.,
  781 N.Y.S.2d 628, Index No. 11911/02, 2004 WL 258144 (N.Y. Sup. Feb. 10, 2004) .........17

Wight v. BankAmerica Corp.,
  219 F.3d 79 (2d Cir. 2000) ..................................................................17

Williams v. Bank Leumi Trust Co.,
  No. 96 CIV. 6695(LMM), 1997 WL 289865 (S.D.N.Y. May 30, 1997) ..........................56, 57

Wolf v. Weinstein,
    372 U.S. 633 (1963)......................................................................18

In re Worldcom,
    382 F. Supp. 2d 549 (S.D.N.Y. 2005) .....................................................56

Wurtsbaugh v. Banc of Am. Sec. LLC,
    No. 05 CIV. 6220(DLC), 2006 WL 1683416 (S.D.N.Y. June 20, 2006).........................29, 33

## **Statutes**

11 U.S.C. § 547................................................................................66

Fed. R. Bankr. P. 7009........................................................................16

Fed. R. Bankr. P. 7012........................................................................14

Fed. R. Civ. P. 9(b) ...............................................................16, 22, 36, 41, 52

Fed. R. Civ. P. 9(c) ...........................................................................69

Fed. R. Civ. P. 12(b)..........................................................................14

# PRELIMINARY STATEMENT

Faced with numerous claims for fraudulent transfer, fraud, coercion, and various other bases to invalidate and avoid JPMorgan Chase Bank, N.A.'s ("JPMorgan") pre-bankruptcy grab for billions of dollars in securities and cash from Lehman Brothers Holdings Inc. ("LBHI"), JPMorgan has filed what can only be styled as "contingent" counterclaims (the "Counterclaims"). JPMorgan asserts that, to the extent Plaintiffs establish JPMorgan's wrongdoing and the Court orders JPMorgan to pay damages or return LBHI's collateral to the estate, JPMorgan will have suffered a "loss" because that unlawfully-acquired collateral would then be unavailable to make up the alleged deficiency in the value of securities that were the subject of a September 17, 2008 tri-party repurchase transaction ("repo") among JPMorgan, Lehman Brothers Inc. ("LBI"), and Barclays Capital Inc. ("Barclays"). JPMorgan retained such excess LBHI collateral following LBHI's bankruptcy even though, as JPMorgan admits in its Counterclaims, JPMorgan had no clearance exposure whatsoever to LBI or any other LBHI subsidiary when LBHI filed for bankruptcy. JPMorgan is thus cynically seeking to immunize itself from the consequences of its own misconduct by arguing that the LBHI estate is somehow required to reimburse JPMorgan in the event Plaintiffs are successful on their claims.

JPMorgan's Counterclaims fail as a matter of law. First of all, to the extent JPMorgan has a legitimate dispute with anyone, it is with Barclays. JPMorgan's counterclaims allege that Barclays did not intend to comply with the Asset Purchase Agreement ("APA") or representations made to this Court, that Barclays did not intend to continue to fund the $15.8 billion tri-party repo with LBI (the "Barclays Repo") on the day it assumed the $45 billion repo with LBI from the Federal Reserve Bank of New York (the "Fed," and the transaction, the "Fed Repo"), that Barclays specifically told JPMorgan to release all the margin associated with the Fed Repo, and that Barclays directly represented to JPMorgan that it would eventually acquire

the assets of Lehman's North American broker-dealer business held at JPMorgan (the "Barclays Sale"). JPMorgan has already entered into not just one, but two separate settlement agreements with Barclays for claims related to the Barclays Repo, in which JPMorgan expressly released Barclays from the conduct at issue in its Counterclaims. JPMorgan now turns to LBHI as the defendant of last resort to assert its released claims. Yet, until the recent filing of its Counterclaims, JPMorgan has never breathed a word about LBHI having anything to do with its dispute with Barclays, despite multiple opportunities to do so, especially in connection with Court-approved settlements and the protracted litigation concerning the Barclays Sale.

Critically, the Counterclaims fail to allege facts to support the conclusion that LBHI or any of its employees knowingly made a false representation to JPMorgan. Despite dozens of pages describing what "Lehman" and various "Lehman" employees said or did, JPMorgan only actually pleads that two LBHI employees made any alleged false misrepresentations: Ian Lowitt and Paolo Tonucci. But the counterclaims themselves establish why Lowitt and Tonucci's alleged statements cannot be imputed to LBHI – because they were acting for the benefit of their soon to be employer, Barclays, and against the interests of LBHI. Moreover, JPMorgan never alleges that they knew at the time that the statements were false. Aside from those two, whenever JPMorgan points to any actions or statements by "Lehman," it does not appear to be referring to LBHI. LBI was the entity that used JPMorgan's clearing services in the week after LBHI filed for bankruptcy. LBHI is not even a party to the contracts governing the tri-party repos at issue in the Counterclaims, which are among Barclays, JPMorgan, and LBI. LBI was the one authorized under the repo contract to alter the allocation of securities between repo shells. Thus, JPMorgan's generic allegations against "Lehman" fail to state a claim against LBHI.

LBHI also cannot be liable for the alleged representations because they all concern what Barclays intended or did not intend to do in the future. JPMorgan is thus attempting to hold LBHI liable for allegedly representing that Barclays would later purchase all of the assets of Lehman's North American broker-dealer business, or alternatively for concealing that Barclays would not in fact purchase all of these assets. But fraud must be based on a misrepresentation or concealment of fact. Broken promises may sound in contract law, but not fraud. Although there is a narrow exception when a defendant itself makes a promise fully knowing that it will not perform that promise, that exception does not extend to predictions one party makes about another party's future conduct. JPMorgan cannot state a fraudulent misrepresentation claim based on the facts pled here, where LBHI is alleged, at most, to have made a representation about what Barclays would do in the future.

Even if LBHI's statements about what assets Barclays planned to purchase in the APA could form the basis of a fraudulent misrepresentation claim, JPMorgan's alleged reliance on those representations was not reasonable as a matter of law. The Barclays Repo was governed by specific and detailed contractual documents, which provided all of the relevant terms and representations for those repos, such as the types of acceptable securities, the haircuts that should be applied to ensure there was adequate margin with respect to the securities, the method of determining the value of the underlying collateral, the right to reallocate securities, and the term of the repurchase transaction. The tri-party repurchase agreement among JPMorgan, Barclays, and LBI (the "Barclays Custodial Undertaking") even states that the representations contained in that Agreement are the exclusive evidence of the terms of the deal. In light of these contractual representations, it was not reasonable for JPMorgan to rely on inferences, or even direct statements, from the APA or any other source outside those contracts

3

in deciding how to conduct the repurchase transaction. Instead, JPMorgan was obligated to base its actions on the specific representations, rights and obligations set forth in the contracts governing that transaction.

JPMorgan has also not satisfied the element of scienter as to LBHI because it has failed to plead that LBHI, which was in bankruptcy and a fiduciary of its creditors at the time, acted with a motive to defraud JPMorgan in order to give Barclays more valuable securities at the expense of LBI and itself. After all, LBHI was facing the prospect of guaranteeing any clearing deficiency by LBI, and had every incentive to limit that deficiency. In light of the fact that LBHI's clear interests run counter to any such fraud, JPMorgan cannot plead that LBHI acted with scienter to defraud JPMorgan.

JPMorgan's related causes of action for fraudulent concealment and aiding and abetting fraud fail for the same reasons as the underlying fraud claims. In addition, the fraudulent concealment claim fails because LBHI did not owe any duty to JPMorgan to disclose information about Barclays to JPMorgan. And the aiding and abetting claim fails for the additional reasons that JPMorgan's allegations do not support the conclusion that LBHI substantially assisted in any fraud, or that LBHI had "actual knowledge" of the alleged underlying fraud.

JPMorgan's fourth and fifth counterclaims, asserting indemnification claims against LBHI, should also be dismissed. The fourth counterclaim is based on an indemnity clause in the 2000 Clearance Agreement, which has no application to the events at issue in JPMorgan's Counterclaims. Instead, the repos with Barclays during the week of September 15 were governed exclusively by the Barclays Custodial Undertaking.

Although the fifth counterclaim is at least based on the right contract, i.e., the Barclays Custodial Undertaking, it fails to state any claim for the contingent relief that JPMorgan seeks in its Counterclaims. LBHI is not a party to that contract, which has its own indemnity clause that obliges only Barclays and LBI to indemnify JPMorgan under certain circumstances. Thus, it does not provide any basis for LBHI to be liable for indemnification in the event Plaintiffs' challenges to LBHI's pre-bankruptcy guaranties are successful.

Furthermore, the indemnity clauses in the inapplicable 2000 Clearance Agreement and the Barclays Custodial Undertaking both prohibit indemnification where JPMorgan has acted negligently, engaged in willful misconduct, or breached a contract. This contractual exception comports with public policy, which prohibits a creditor from contracting around its own misconduct or the avoidance provisions of the Bankruptcy Code. Because the "loss" claimed by JPMorgan could only arise upon a judicial finding of JPMorgan's misconduct or an order to return fraudulently or preferentially transferred assets, JPMorgan will never be entitled to indemnification, and these Counterclaims should be dismissed.

Finally, it is worth noting that it has been two and a half years since the events described in JPMorgan's Counterclaims transpired. In that time, JPMorgan has executed two settlements (with releases) with Barclays relating to these transactions and also witnessed a months-long trial examining Barclays' conduct with regard to the Barclays Sale. At all times, JPMorgan remained silent – never accusing LBHI of wrongdoing or informing the Court of Barclays' alleged fraud despite that sale being the centerpiece of the 60(b) litigation. To come forward now with a story that LBHI conspired with Barclays to engineer Barclays' repayment while leaving JPMorgan with illiquid repo securities is untimely and only serves as an end-run around the releases JPMorgan already extended to Barclays for this conduct.

## STATEMENT OF FACTS

### I.    JPMorgan Agrees to Be Repo Agent for LBI Pursuant to Individual Custody Agreements

JPMorgan served as LBI's primary securities clearing bank in the eight years leading up to 2008. (Counterclaims ¶ 19). Prior to LBHI's bankruptcy filing, the main terms and framework of that relationship were set out in a Clearance Agreement entered into on June 15, 2000 (the "2000 Clearance Agreement") between LBI and The Chase Manhattan Bank, JPMorgan's predecessor-in-interest.[1] (Id. ¶ 21; Ex. A, 2000 Clearance Agreement).[2] Pursuant to the 2000 Clearance Agreement, JPMorgan agreed to serve as LBI's non-exclusive clearance agent for securities transactions and undertook obligations including maintaining a clearance account, receiving and transferring securities, and making payments and collections of money. (Ex. A, 2000 Clearance Agreement).

Additionally, JPMorgan agreed to act as LBI's non-exclusive custodian for tri-party repurchase transactions. (Counterclaims ¶¶ 20-21; Ex. A, 2000 Clearance Agreement § 9). A repurchase transaction is a common financing arrangement whereby one party (the "seller") sells securities to a "buyer," who in turn extends the "purchase price" to the seller. The parties also agree that the seller will repurchase the securities for the "repurchase price" (i.e. the purchase price plus the applicable margin) on or before a date certain (but in no event more than one year later). (Counterclaims ¶ 20; Ex. A., 2000 Clearance Agreement § 9, ex. A § 4(a)). LBI often engaged in repurchase transactions with a duration of a single business night, although

---

[1]    On a motion to dismiss, the Court may review and consider unambiguous provisions of contracts that are attached to, cited in, or integral to a complaint or counterclaims. Cortec Indus., Inc. v. Sum Holding, LP, 949 F.2d 42, 47 (2d Cir. 1991).

[2]    Unless otherwise specified, all citations to exhibits are to the Declaration of Tyler G. Whitmer in Support of Plaintiffs' Motion to Dismiss Counterclaims of Defendant JPMorgan Chase Bank, N.A., filed concurrently herewith.

LBI's counterparties frequently agreed to extend or "roll" repurchase transactions on a night-to-night basis on the same or similar terms. (See Counterclaims ¶ 20).

In its role as tri-party repurchase custodian, JPMorgan served as the intermediary between LBI, as seller, and the counterparty, as buyer, by processing the purchases and sales of securities under each repurchase transaction, and ensuring that the terms of the governing documents of each such transaction were satisfied – including applying the applicable margins established by the purchaser for eligible securities and determining the market value for the securities involved in the repurchase transactions. (Ex. A, 2000 Clearance Agreement § 9, ex. A. §§ 3, 4(a)). Although the 2000 Clearance Agreement contained brief summary provisions relating to the general nature of JPMorgan's role as custodian for repurchase agreements, it expressly provided that LBI and each repo counterparty would set out the specific terms and conditions of individual repos in two other contractual documents: (1) a repurchase agreement between LBI and the counterparty setting forth their obligations to each other (a "Repurchase Agreement"); and (2) a tri-party custody agreement among LBI, the counterparty, and JPMorgan as custodian for the applicable repurchase transactions (a "Tri-Party Custody Agreement"). (See id. § 9). The Tri-Party Custody Agreement in particular was expected to include detailed operating provisions such as those relating to securities eligible for purchase by the counterparty, allocation of LBI securities to a particular repurchase transaction, substitution of securities, pricing of the securities to be purchased and application of purchaser-mandated haircuts, methodology to use if either the cash for purchase or the securities to be sold did not comport

with the anticipated transaction, and authorizations for funds transfers. (See e.g., id. at ex. A §
4).[3]

The 2000 Clearance Agreement also specifically provided that, in the event of a
conflict between the 2000 Clearance Agreement and any Tri-Party Custody Agreement, the Tri-
Party Custody Agreement would govern. (Id. § 9). The 2000 Clearance Agreement itself did not
address material terms of the repo transactions. For example, the 2000 Clearance Agreement
contained no provisions relating to extensions of credit in tri-party repos. (See Counterclaims ¶
21). Rather, the 2000 Clearance Agreement only contained a general paragraph relating to Loans
and Advances, which focused on when LBI could use funds credited to its accounts prior to final
payment and when LBI would repay any loans resulting from the failure of such final payment.
(Ex. A, 2000 Clearance Agreement § 5). Any other extensions of credit were provided for only
upon receipt by JPMorgan of instructions from LBI. (Ex. A, 2000 Clearance Agreement § 5).

LBHI was not an original party to the 2000 Clearance Agreement and never used
JPMorgan's tri-party repo services to sell securities.

## II.    JPMorgan Demands That LBHI Guarantee All Subsidiaries' Liabilities of Any Kind

After performing clearance and tri-party repo services for LBI for eight years, in
August 2008, JPMorgan insisted that LBHI execute a new set of agreements. The new
agreements made LBHI a party to the 2000 Clearance Agreement and also a guarantor of any
liabilities of LBI arising from that agreement. (Counterclaims ¶¶ 118-19; Ex. B, Amendment to
the 2000 Clearance Agreement, August 26, 2008; Ex. C, Guaranty, August 26, 2008 (the
"August Guaranty"; Ex. D, Security Agreement, August 26, 2008).

---

[3] An example form of Tri-Party Custody Agreement was attached as Exhibit A to the
2000 Clearance Agreement, although alternate forms of Tri-Party Custody Agreement were
contemplated. (Ex. A, 2000 Clearance Agreement § 9).

Then, on September 9, 2008, JPMorgan insisted that LBHI enter into a new guaranty (the "September Guaranty" and, together with the August Guaranty, the "Guaranties") covering all obligations of its subsidiaries and affiliates of any kind and a security agreement securing LBHI's obligations under the September Guaranty. (Counterclaims ¶¶ 118-19; Ex. E, September Guaranty § 1; Ex. F, Security Agreement, September 9, 2008).

### III. JPMorgan Serves as LBI's Tri-Party Repo Agent in the Week After LBHI's Bankruptcy

LBHI commenced its chapter 11 proceeding early in the morning on September 15, 2008. (Counterclaims ¶ 23). At that time, despite the fact that JPMorgan was refusing to release billions of dollars in LBHI's collateral needed to stave off LBHI's bankruptcy, JPMorgan had no clearance or repo exposure to LBI. (Id. ¶ 22). As JPMorgan admits in its Counterclaims, "At the end of the day on Friday, September 12, overnight repo investors advanced sufficient funds to LBI to take out JPMorgan's intraday loans. Therefore, during the weekend of September 13-14, JPMorgan had little or no clearance-related exposure to LBI." (Id.).

However, LBI continued to operate during the following week. (Id. ¶ 24). JPMorgan agreed to serve as the clearing bank for LBI that week, performing securities clearing services as well as tri-party repo services. (Id. ¶ 25). In this role, JPMorgan acted as custodian bank for a series of overnight tri-party repurchase agreements, including those involving LBI and Barclays. (Id. ¶ 26). To define the terms of those agreements, JPMorgan, LBI, and Barclays executed the Barclays Custodial Undertaking. (Ex. G, Barclays Custodial Undertaking). LBHI was not a party or signatory to this agreement. (See Counterclaims ¶ 26).

The Barclays Custodial Undertaking set out the specific terms and conditions that would govern the tri-party repo transactions among Barclays, LBI, and JPMorgan. (See, e.g., Ex. G, Barclays Custodial Undertaking § 3). For example, it specifically allowed LBI to alter the

allocation of securities within the tri-party repo shells, as long as the valuation of the collateral in the shells remained the same. (Id. § 3(f) ("Seller may substitute other Securities for any Purchased Securities without notice to Buyer provided that the Purchased Securities in Buyer's Account after the substitution have a Margin Value equal to or greater than the Purchase Price.")).

Moreover, the Barclays Custodial Undertaking stated that it, along with certain related credit and funds transfer agreements, was the "entire agreement of the parties with respect to its subject matter." (Id. § 13). It also incorporated a Master Repurchase Agreement between LBI and Barclays dated December 19, 1996. (Id. at 1). LBHI was not a party to this agreement either, which stated that the terms of each repo, including the purchase and repurchase dates, could only be provided through written confirmation. (Ex. H, Master Repurchase Agreement § 3(b) ("Upon agreeing to enter a transaction hereunder, Buyer or Seller (or both), as shall be agreed, shall promptly deliver to the other party a written confirmation of each Transaction ('Confirmation'). The Confirmation shall . . . set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date . . . . The Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between Buyer and Seller . . . .")).

Unlike the 2000 Clearance Agreement, the Barclays Custodial Undertaking had a specific provision relating to extensions of credit by JPMorgan to LBI for tri-party repurchase transactions. (Ex. G, Barclays Custodial Undertaking § 3(d)). It provided that, if LBI did not have sufficient funds in its account to advance the repurchase price to the buyer, or the value of the securities did not equal or exceed the repurchase price, then JPMorgan had the right, "without notice to [LBI]," to advance the repurchase price to Barclays, thereby extending credit to LBI. (Id. ("However, in the event that the Margin Value of the Purchased Securities in Seller's

Account does not equal or exceed the Purchase Price . . . Bank may, at Bank's option and without notice to Seller, advance the amount of such deficiency on Seller's behalf and Seller shall be obligated to repay such amount on demand to Bank . . . .")). The Barclays Custodial Undertaking also made it very clear that JPMorgan had no obligation to extend such credit. (Id.).

## IV.     Negotiation of the Barclays Asset Purchase Agreement

During this same week, representatives from LBI, LBHI, and Barclays were negotiating the Barclays Sale, to be reflected in the APA. (Counterclaims ¶ 26). On September 17, LBHI and LBI filed a motion to schedule a sale hearing to consider approval of the Barclays Sale. (Counterclaims ¶ 33; Ex. I, Debtors' Motion to (A) Schedule A Sale Hearing; (B) Establish Sales Procedures; (C) Approve A Break-Up Fee; And (D) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets).

A hearing was held on September 17, attended by representatives of JPMorgan, at which the Court announced that a determination regarding the APA and the Barclays Sale would be made on September 19. (Counterclaims ¶ 31; Ex. J, Hearing Tr. Sept. 17, 2008 at 72:7-10).

## V.     JPMorgan Unwinds All Repos on Tuesday, Wednesday, and Thursday, and Advances the Repurchase Price to All Sellers, Including Barclays

During that week of September 15-19, JPMorgan acted as custodian for tri-party repurchase agreements involving LBI and Barclays, pursuant to the Barclays Custodial Undertaking, as well as for a number of other counterparties, including the Fed. (Counterclaims ¶ 27). In particular, JPMorgan served as the agent for tri-party repurchase agreements with Barclays for $2 billion on the night of September 15, $10.5 billion on the night of September 16, and $15.8 billion on the night of September 17. (Id. ¶ 26). On each morning after each of these repos was executed, JPMorgan "unwound" the agreements, advanced the repurchase price to Barclays and returned the securities to LBI. (Id. ¶¶ 28, 32, 59).

On the night of September 18, Barclays replaced the Fed as buyer in the $45 billion Fed Repo. (Id. ¶¶ 49, 61-70). JPMorgan served as the custodial agent of the Fed Repo, and the securities that were the subject of the repo were in accounts at JPMorgan. (Id. ¶¶ 61, 67). That night, JPMorgan transferred many but not all of the securities in the Fed Repo to Barclays' tri-party custodial bank under the Fed Repo, The Bank of New York. (Id. ¶ 70).

That same night, Barclays declined to "roll" (or re-execute) the Barclays Repo it had entered into with LBI the night before, or to otherwise enter into any separate repo with LBI beyond the Fed Repo. (Id. ¶ 71).

## VI.     JPMorgan Releases Claims Against Barclays Regarding the Barclays Repo

On September 19, the Court held the sale hearing and approved the Barclays Sale pursuant to an order signed in the early morning hours of September 20 (the "Sale Order"). (Id. ¶¶ 76, 78).

On the following Monday, September 22, when the Barclays Sale closed, JPMorgan and Barclays executed an agreement that, among other things, released all claims between them relating to the Barclays Repo. (Ex. K, Services and Settlement Agreement). Specifically, the Services and Settlement Agreement ("SSA") among Barclays, LBI, SIPC, LBHI, and JPMorgan included the following mutual release between JPMorgan and Barclays:

> JPMorgan and BarCap shall be deemed to forever release . . . all claims . . . that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the date hereof in any way relating to the clearing, settlement and other processing services provided by JPMorgan to LBI, any transactions relating to the Accounts or any cash, securities or property in the Accounts, including without limitation any disputes relating to a repurchase agreement allegedly agreed to on or about September 18, 2008 in respect of approximately $15.8 billion face amount of securities . . . .

(Id. § 4(a)).

The dispute did not end there, however, and another settlement agreement (the "December Settlement Agreement") was required. This second settlement also addressed disputes surrounding the failure to transfer certain securities from the Fed to Barclays, or to pay the $7 billion JPMorgan had promised to Barclays to plug the resulting hole. (Ex. L, December Settlement Agreement § D). But JPMorgan did not leave the $7 billion in Barclays' account; it transferred the cash out of Barclays' account and used it as leverage during the parties' negotiation of the December Settlement Agreement, which was executed on December 5, 2008. (Id.). The December Settlement Agreement, among JPMorgan, Barclays, and the LBI Trustee, contains two relevant releases by JPMorgan. (Id. §§ 4(c), 4(e)). In the first, JPMorgan releases Barclays, LBI and the affiliates of each from all claims relating to the Fed Repo:

> JPMorgan and BarCap (in each case, on its own behalf and on behalf of each of its affiliates) hereby does and shall be deemed forever to release, waive and discharge each other, the Trustee, LBI and the LBI estate, their respective property and their respective current and former officers, directors, employees, subsidiaries, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, agents, affiliates and representatives (collectively, "Representatives") from and in respect of all claims, causes of action and any other debts, obligations, rights, suits, damages, actions, interests, remedies and liabilities (other than the right to enforce the obligations of the Parties set for forth in this Agreement) (collectively, "Claims"), whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, contingent or fixed, currently existing or hereinafter arising in law, equity or otherwise, relating to the Subject Funds, the Replacement Transaction or the Delivered Securities.

(Id. § 4(c)). The December Settlement Agreement also contains a mutual release between JPMorgan and Barclays of all claims "relating to any alleged agreement by BarCap to enter into one or more triparty or other repurchase transactions involving LBI." (Id. § 4(e)).

13

## VII. JPMorgan Remains Silent Throughout the Barclays Trial

On September 15, 2009, LBHI, LBI and the Official Committee of Unsecured Creditors of Lehman Brothers Holdings, Inc. (the "Committee") filed motions pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, made applicable by Rule 9024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking to modify the Sale Order to the extent it purported to make material modifications to the Barclays Sale that were not disclosed to the Court and to enforce the Order consistently with the transaction that was disclosed to the Court. (See Counterclaims ¶¶ 79-80). Trial on the Rule 60(b) motions, and certain related claims set out in an adversary complaint against Barclays, commenced on April 26, 2010 and concluded on October 21, 2010.

Despite knowing of the trial, JPMorgan never claimed during any of the proceedings that LBHI had committed fraud or was in any way at fault regarding the Barclays Repo, the Fed Repo, or any other transaction consummated in the week after LBHI's bankruptcy.

## STANDARD OF REVIEW

To survive a motion to dismiss, the counterclaimant must allege facts that, if "accepted as true[] 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009), (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Fed. R. Civ. P. 12(b), as incorporated in Bankruptcy Rule 7012. A claim is facially plausible only if the alleged facts "allow[] the court to draw the reasonable inference" that the alleged misconduct did in fact occur. Iqbal, 129 S. Ct. at 1949 (emphasis added). Conclusory allegations and legal conclusions are not presumed to be true. Id. Nor are "formulaic" or "threadbare" recitations of the elements of a claim. Twombly, 550 U.S. at 555.

Although the Court must accept all well-pleaded factual allegations as true, not every statement in a counterclaim will meet this standard. Rather, allegations "must be 'well

pleaded' and thus the court need not accept 'sweeping and unwarranted averments of fact.'"

Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortgage Inv. Corp.), 256 B.R. 664, 675

(Bankr. S.D.N.Y. 2000), (quoting Perniciaro v. Natale (In re Natale), 136 B.R. 344, 348 (Bankr.

E.D.N.Y. 1992)).  Moreover, the Court is "not bound to accept as true a legal conclusion

couched as a factual allegation."  Papasan v. Allain, 478 U.S. 265, 286 (1986).  Rather, to

withstand a motion to dismiss, there must be specific and detailed factual allegations to support

the claim.  Friedl v. City of New York, 210 F.3d 79, 85-86 (2d Cir. 2000).

## ARGUMENT

### POINT I

### JPMORGAN'S CAUSE OF ACTION FOR FRAUDULENT MISREPRESENTATION AGAINST LBHI FAILS TO STATE A CLAIM

JPMorgan's first cause of action is for fraudulent misrepresentation against LBHI.

(Counterclaims ¶¶ 88-95).  It alleges that LBHI misrepresented through the APA and certain oral

statements purportedly made by Ian Lowitt and Paolo Tonucci that Barclays would eventually

purchase in the Barclays Sale all of the assets used by Lehman's North American broker-dealer

business.

**A.      Legal Standards for Fraudulent Misrepresentation**

The elements of fraudulent misrepresentation under New York law are:  (1) a

material misrepresentation of fact, (2) knowledge of its falsity, (3) an intent to defraud, (4)

reasonable reliance, and (5) injury.  Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98

(2d Cir. 1997); see also Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413, 421 (1996)

("In an action to recover damages for fraud, the plaintiff must prove a misrepresentation or a

material omission of fact which was false and known to be false by defendant, made for the

purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the

15

misrepresentation or material omission, and injury."). "The failure of any single element [of fraudulent misrepresentation] will void the claim." <u>Cong. Fin. Corp. v. John Morrell & Co.</u>, 790 F. Supp. 459, 469 (S.D.N.Y. 1992).

Allegations of fraud must be pled with particularity, pursuant to Federal Rule of Civil Procedure 9(b), made applicable through Bankruptcy Rule 7009. Fed. R. Bankr. P. 7009 (incorporating Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.")). To comply with the strict pleading standard of Rule 9(b), "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." <u>Lerner v. Fleet Bank, N.A.</u>, 459 F.3d 273, 290 (2d Cir. 2006) (internal quotation omitted).

Representations of what another party intends to do in the future are generally not actionable as fraud under New York law. <u>Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V. v. AT&T Commc'ns, Inc.</u>, No. 92 CIV. 7862 (KMW), 1996 WL 312535, at *15 (S.D.N.Y. June 10, 1996) ("A speaker's representations about another party's future intentions or plans are generally construed as opinion, not fact, and hence cannot give rise to a claim of fraud . . . .").

**B.      Aside From the Filing of the APA Itself, JPMorgan Has Failed to Allege That Anyone at LBHI, Acting on Behalf of LBHI, Made Any Misrepresentation It Knew at the Time Was False**

The first step in evaluating a fraudulent misrepresentation claim is to understand the purported misrepresentation. Here, although JPMorgan peppers its Counterclaims with alleged statements by numerous people involved in the APA and the Barclays Repo, the only misrepresentations JPMorgan alleges against LBHI are as follows:

(a) that the APA constituted an agreement between LBHI and
Barclays accurately describing the sale transaction that would take
place upon Court approval; (b) that the securities defined in the
APA as "Purchased Assets" were the securities that Barclays was
obligated to purchase, and would purchase in connection with the
sale transaction; and (c) that the only LBI securities that Barclays
would not purchase were those defined in the APA as "Excluded
Assets." In addition, on September 16, 2008, Tonucci and Lowitt
of LBHI made materially false and misleading representations to
Buyers-Russo that persuaded Buyers-Russo that JPMorgan's loans
to LBI would be repaid each night, either by Barclays or the Fed,
until the sale transaction closed, at which point JPMorgan would
be taken out in full.

(Counterclaims ¶ 89). Thus, JPMorgan's claim concerns only the submission of the APA for the
Court's approval and the purported statements by Paolo Tonucci and Ian Lowitt.

1.  **The Alleged Statements of Tonucci and Lowitt Cannot Be Attributed to
    LBHI Because, Even According to JPMorgan's Allegations, Tonucci and
    Lowitt Were Acting Adversely to LBHI's Interest**

To begin with, the specific allegations about Lowitt and Tonucci do not state a
claim against LBHI because, if true, they establish that Lowitt and Tonucci were acting
adversely to LBHI's interest, so that their conduct cannot be imputed to LBHI.

"Under New York law, the adverse interest exception rebuts the usual
presumption that the acts and knowledge of an agent acting within the scope of employment are
imputed to the principal." Wight v. BankAmerica Corp., 219 F.3d 79, 87 (2d Cir. 2000),
(quoting In re Mediators, Inc., 405 F.3d 822, 825-26 (2d Cir. 1997)); Wells Fargo Home
Mortgage Inc. v. Hiddekel Church of God, Inc., 781 N.Y.S.2d 628, Index No. 11911/02, 2004
WL 258144, at *6 (N.Y. Sup. Feb. 10, 2004) ("[P]ursuant to the 'adverse agent' rule, a principal
is relieved of liability for an agent's acts when the agent 'totally abandons the principal's interests
and acts entirely for his or another's purposes.'"). The adverse interest exception has been
applied to dismiss causes of action against an employer based on the acts of an employee.
Holmes v. Lorch, 329 F.Supp. 2d 516, 531-32 (S.D.N.Y. 2004) (granting motion for summary

judgment by employer-defendant of claims based on employee conduct adverse to employer's interest), (citing Bank of China, N.Y. Branch v. NBM LLC, 359 F.3d 171, 179 (2d Cir. 2004)).

Based on JPMorgan's own allegations, the adverse interest exception applies to the actions of Tonucci and Lowitt. JPMorgan alleges that, "on September 18, the same day that LBI securities were transferred to Barclays, Lowitt signed a multi-million-dollar employment contract with Barclays, which was contingent on the Barclays deal closing." (Counterclaim ¶ 86). Moreover, the counterclaims state that "prior to closing, Barclays offered Tonucci a lucrative contract, which Tonucci accepted." (Id.). JPMorgan also alleges that "Ian Lowitt, Paolo Tonucci . . . among other executives, were motivated to advance the interests of Barclays over the legitimate interests of JPMorgan during the week of September 15." (Id. ¶ 85).

These allegations, if true, would establish that Lowitt and Tonucci were acting for their own benefit and that of Barclays – and adverse to the interests of LBHI. Indeed, it was directly against LBHI's economic interest for Barclays to take the highest quality assets from the broker-dealer business and leave the worst behind. As a chapter 11 debtor-in-possession, LBHI incurred the duty to "preserve property of the estate for purposes of maximizing a distribution to creditors, and owe[d] a fiduciary duty to the creditors of the estate." In re McClelland, 418 B.R. 61, 67 (Bankr. S.D.N.Y. 2009) (describing the requirements of a chapter 11 trustee); see also Wolf v. Weinstein, 372 U.S. 633, 649 (1963) (holding that a corporate debtor-in-possession's fiduciary obligation is identical to that of a trustee). Thus, LBHI's economic interest at the time was to secure the most value for its own creditors, rather than to provide a windfall to a third party like Barclays.

This is especially true where LBHI was a purported guarantor of the obligations of LBI under the Guaranties that JPMorgan demanded on the eve of LBHI's bankruptcy, and

under cover of which JPMorgan was then holding billions of dollars of LBHI collateral.

Although those Guaranties are subject to challenge, the possibility that LBHI would have to pay

for any deficiency arising from insufficient collateral in an LBI repo belies any rational motive

for LBHI to defraud JPMorgan in aid of Barclays. See Shields v. Citytrust Bancorp, Inc., 25

F.3d 1124, 1130 (2d Cir. 1994) ("In looking for a sufficient allegation of motive, we assume that

the defendant is acting in his or her informed economic self-interest."); Atlantic Gypsum Co. v.

Lloyds Int'l Corp., 753 F. Supp. 505, 514 (S.D.N.Y. 1990) (granting motion to dismiss, stating

"Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable

inference of fraudulent intent").

Pursuant to the authority cited above, the alleged misrepresentations by Lowitt

and Tonucci thus cannot be imputed to LBHI because, as alleged by JPMorgan, these soon-to-be

Barclays employees were acting adversely to LBHI's interests to benefit themselves and their

new employer. See Holmes v. Lorch, 329 F. Supp. 2d at 531-32.[4]

### 2. The Counterclaims Fail to Allege That Any Statements of Tonucci or Lowitt Were Knowingly False When Made

Even if the conduct of Tonucci and Lowitt could be imputed to LBHI, JPMorgan

fails to allege an actionable fraudulent misrepresentation by Tonucci or Lowitt because the

---

[4] The New York Court of Appeals recently confirmed the existence of the adverse interest exception in the context of clarifying how it applies when the alleged misconduct has harmed the employees' own corporation. Kirschner v. KPMG LLP, 590 F.3d 186, 194-95 (2d Cir. 2009) (certifying to the New York Court of Appeals the question of whether the adverse interest exception "is available only where the insiders' misconduct has harmed the corporation"); Kirschner v. KPMG LLP, 15 N.Y.3d 446 (2010) (answering question in the affirmative). In this case, the harm to LBHI is apparent from the pleadings. JPMorgan's theory is that Barclays took the best securities while leaving the riskiest securities behind. (Counterclaims ¶ 52). JPMorgan alleges this fraudulent scheme involving rogue employees led to LBI owing JPMorgan $25 billion collateralized with the riskier assets. (Id. ¶ 81). Not only was this a detriment to LBHI's subsidiary but, according to the allegations in the Counterclaims, LBHI was a guarantor of LBI's obligations under the Clearance Agreement, and the scheme only served to increase the potential liability under LBHI's purported Guaranties. (Id. ¶ 118).

Counterclaims do not plead that they knew any alleged misrepresentation was false when made. Lama Holding Co., 88 N.Y.2d at 421 ("In an action to recover damages for fraud, the plaintiff must prove a misrepresentation . . . which was false and known to be false by defendant . . . .").

JPMorgan alleges that "on September 16, 2008, Tonucci and Lowitt of LBHI made materially false and misleading representations to Buyers-Russo." (Counterclaims ¶ 89). Specifically, the Counterclaims allege the following: "Lowitt and Tonucci represented [to Buyers-Russo] that Barclays would fully support LBI until the deal closed, including by providing overnight financing of LBI securities that would reduce or eliminate LBI's dependence on the Fed." (Id. ¶ 29). However, the Counterclaims do not allege any facts showing that either Tonucci or Lowitt knew on or before September 16 that this alleged representation was false when made. Indeed there is no allegation at all that Lowitt or Tonucci knew on September 16, or any time before the APA was executed, that Barclays would fail to roll any specific repo in the future.[5]

Instead, the allegations about what Lowitt and Tonucci knew all post-date this allegation and the execution of the APA itself. In the factual background of its Counterclaims, JPMorgan alleges that "Ian Lowitt has admitted that, as of September 17, it had not been determined 'how we are going to identify the series of assets that are part of the transaction.'" (Id. ¶ 37) (emphasis added). In addition, the counterclaims allege that "on September 18, Daniel Flores of Lehman again acknowledged, after conversations with Ian Lowitt and Paolo Tonucci,

---

[5]     Although JPMorgan does not reference any additional statements of Lowitt and Tonucci in the cause of action for fraudulent misrepresentation, the Counterclaims earlier allege that Tonucci represented to Buyers-Russo during the weekend of September 13 and 14 that "a sale of the securities that were pledged to JPMorgan on an intraday basis" would take place. (Counterclaims ¶ 25). These alleged statements, made even earlier than the statements named in the claim, similarly could not support a fraudulent misrepresentation claim because JPMorgan likewise fails to allege that Tonucci had knowledge that this statement was false at the time it was made.

that the schedule of assets to be purchased by Barclays was 'still a work in progress.'" (Id.) (emphasis added). But allegations of what Tonucci and Lowitt knew in the days after making the alleged misrepresentation fall short of pleading knowledge at the time it was made.

Thus, JPMorgan has failed to plead facts establishing that Tonucci and Lowitt made a knowingly false representation to JPMorgan. For this reason alone, such statements cannot support a fraud claim against LBHI. See Federated Retail Holding, Inc. v. Sanidown, Inc., No. 06 Civ. 6119(LTS)(THK), 2010 WL 5298113, at *6 (S.D.N.Y. Dec. 23, 2010) (dismissing fraud claim under New York law in part for lack of any allegation that "Defendant knew any such representation to be false"); Footbridge, Ltd. v. Countrywide Home Loans, Inc., No. 9 Civ. 4050(PKC), 2010 WL 3790810, at *19, *25 (S.D.N.Y. Sept. 28, 2010) (same); Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A., No. 03 Civ. 1537(MBM), 2003 WL 23018888, at *13 (S.D.N.Y. Dec. 22, 2003) (same).

### 3. Allegations Against "Lehman" Generally Fail to State a Claim Against LBHI

Although JPMorgan's actual counterclaim is limited to the APA and the few statements allegedly made by Lowitt and Tonucci, it is worth noting that none of the general allegations against "Lehman" or various "Lehman" personnel throughout the rest of the Counterclaims state a claim against LBHI. For example, the Counterclaims allege that "Lehman and Barclays personnel worked hand in hand to figure out which securities Barclays should take and which it should leave behind," (Counterclaims ¶ 38), and "Lehman altered the allocation of securities into overnight shells," (Id. ¶ 52). Notably, JPMorgan defines the term "Lehman" to include LBHI and all of its subsidiaries. (Id. ¶ 1). Furthermore, with the exception of Paolo Tonucci and Ian Lowitt, JPMorgan never alleges specifically how any of the conduct purportedly perpetrated by "Lehman" was, in fact, perpetrated by LBHI.

In fact, some of the conduct JPMorgan attributes to "Lehman" cannot possibly refer to LBHI. For example, JPMorgan claims that "Lehman altered the allocation of securities into overnight shells." (Id. ¶ 52). However, the Barclays Custodial Undertaking specifically authorized LBI to reallocate the securities in the overnight shells. (Ex. G, Barclays Custodial Undertaking § 3(f) ("Seller may substitute other Securities for any Purchased Securities . . . .")). LBHI was not a party to this contract and did not have access or authorization to reallocate the shells. Therefore, allegations that "Lehman" reallocated the collateral in the overnight shells in particular cannot be used to state a claim against LBHI.

Such ambiguous pleading against the entire Lehman enterprise is not sufficiently specific to state a claim against LBHI under Rule 9(b). See Defer LP v. Raymond James Financial, Inc., 654 F. Supp. 2d 204, 213 (S.D.N.Y. 2009) (dismissing fraud claims because an allegation that a speaker of fraudulent statements was a "financial advisor located in Raymond James' Chicago office" did not sufficiently allege which entity employed the speaker); see also United States v. Bestfoods, 524 U.S. 51, 61 (1998) (fraudulent misrepresentations by a subsidiary are not actionable against the parent corporation).

### 4. Any Material Representations Were All Allegedly Made by Barclays, Not LBHI

JPMorgan's difficulty in pointing to specific representations by LBHI itself is not just a technical pleading matter. It is a symptom of the foundational defect that JPMorgan's claims lie against Barclays, the entity it has already released from liability.

In comparison to the vague allegations against Lehman employees, JPMorgan pleads very specific allegations against Barclays. For example, JPMorgan pleads that:

- "LaRocca [of Barclays] told Miller [of JPMorgan] that, as part of an asset sale negotiated between Barclays and Lehman, Barclays would take out LBI's entire triparty book, after which JPMorgan would no longer have to

provide LBI with intraday loans to finance that book." (Counterclaims ¶ 28).

- "Rodefeld [of Barclays] or Petrie [of Barclays] also stated, without contradiction from Aranow or others at Lehman, that on Thursday, Barclays would finance LBI's remaining securities on an ongoing basis, leaving JPMorgan with no outstanding exposure to LBI once the sale closed." (Id. ¶ 46).

- "LaRocca [of Barclays] told Buyers-Russo that, under the deal with Barclays, JPMorgan would have no clearing exposure to LBI by the end of Thursday, September 18.  LaRocca explicitly represented that all of JPMorgan's triparty exposure to LBI would be eliminated on Thursday, September 18." (Id. ¶ 47).

Nevertheless, just days after the repurchase transactions described in the Counterclaims took place, JPMorgan released Barclays from liability for "any disputes relating to a repurchase agreement allegedly agreed to on or about September 18, 2008 in respect of approximately $15.8 billion face amount of securities." (Ex. K, SSA § 4(a)).  Then, in the December Settlement Agreement, JPMorgan released both Barclays and LBI, along with the affiliates of each, from all claims relating to the Fed Repo.  (Ex. L, December Settlement Agreement § 4(c)).  Moreover, the December Settlement Agreement also contained a provision in which JPMorgan and Barclays mutually released each other from all claims "relating to any alleged agreement of BarCap to enter into one or more triparty or other repurchase transactions involving LBI." (Id. § 4(e)).

This contrast between what is pled against Barclays and what is pled against LBHI is most stark when it comes to JPMorgan's claim that it released $5 billion of margin associated with the Fed Repo based on misrepresentations.  Notably, JPMorgan fails to plead a single representation by anyone at LBHI, or even "Lehman" generally, related to this margin release.  On the contrary, according to the Counterclaims, JPMorgan was allegedly induced to release the margin based on representations made during a September 18 phone call between

JPMorgan executives and Barclays' CEO, Bob Diamond. (Counterclaims ¶¶ 64-66). JPMorgan claims that "Diamond, through his affirmative statements and failure to reveal Barclays' true intentions, persuaded JPMorgan that, by the end of Thursday, JPMorgan's tri-party exposure to LBI would be extinguished and, at the conclusion of the transaction, JPMorgan would not have further exposure to LBI." (Id. ¶ 65). Nowhere does JPMorgan allege that LBHI took any action or made any statement that induced JPMorgan to release the margin to Barclays. Indeed, the only mention of LBHI in this part of JPMorgan's pleading is the unsubstantiated statement that JPMorgan released the margin "[b]ased on Diamond's representations, which were entirely consistent with the false representations that LBHI and Barclays had made to JPMorgan on prior occasions." (Id. ¶ 66). JPMorgan does not identify or describe these alleged prior false representations of LBHI, nor does it allege that it relied on them in any manner in deciding to release the margin. Thus, JPMorgan fails to plead with specificity that LBHI made any fraudulent misrepresentations in connection with JPMorgan's decision to release the Fed Repo margin to Barclays.

## C.    JPMorgan Fails To Plead Any Misrepresentation Because LBHI's Predictions of Barclays' Future Conduct Are Not Actionable

JPMorgan's fraudulent misrepresentation claim also fails because all of the purported misrepresentations were statements concerning what Barclays would do upon consummation of the Barclays Sale transaction. These are not actionable because one cannot be liable under New York law for misrepresenting what a third party will do in the future.

An action for fraudulent misrepresentation must arise out of a statement of fact – not a prediction of future performance. O'Connor v. Readers Digest Ass'n, Inc., No. 92 Civ. 7414 (CLB), 1993 WL 291372, at *3 (S.D.N.Y. March 10, 1993) ("[A] fraud claim cannot be based upon a statement of future intention, promises or expectations which were speculative, or a

mere expression of opinion or hope at the time when made. Thus, plaintiff's fraud claim should be dismissed.") (internal citation omitted); Chase Invs., Ltd. v. Kent, 256 A.D.2d 298, 298, 681 N.Y.S.2d 319, 319 (2d Dep't 1998) ("In order to state a cause of action for fraud, a plaintiff must allege, *inter alia*, a misrepresentation of fact, and a representation of opinion or a prediction of something which is hoped or expected to occur in the future will not sustain an action for fraud.") (internal quotations omitted); JP Morgan Chase Bank v. Orleans, No. 650006/2004, 2007 WL 6882391 (N.Y. Sup. Ct. Jan. 25, 2007) ("With respect to the element of a misrepresentation of a material fact, the plaintiff must base the claim upon a false representation of a presently existing fact, not a prediction of future conduct or a mere expression of opinion.").

Although failure to comply with a promise may state a claim for breach of contract, it does not generally state a claim for fraud. Stewart v. Jackson & Nash, 976 F.2d 86, 89 (2d Cir. 1992) (finding a difference between "'promissory statement[s] as to what will be done in the future,' which give rise only to a breach of contract claim, and . . . false 'representation[s] of present fact,' which give rise to a separable claim of fraudulent inducement") (quoting Deerfield Comm. Corp. v. Chesebrough-Ponds, 68 N.Y.2d 954, 956 (1986)).

The rule contains a narrow exception for speakers who have no intention to carry out a promise at the time they make it. Murray v. Xerox Corp., 811 F.2d 118, 121 (2d Cir. 1987) ("Under New York law, a failure to perform promises of future acts is not fraud unless there exists an intent not to comply with the promise at the time it is made."); Trabucco v. Intesa Sanpaolo, S.P.A., 695 F. Supp. 2d 98, 108 (S.D.N.Y. 2010) (granting motion to dismiss because "[w]hen a fraud claim is based on a future promise, the plaintiff must additionally show that the defendants had no intention of carrying out the promise at the time the promise was made").

However, this narrow exception does not apply to predictions about someone else's future performance. Under New York law, representations about the future conduct of third parties are opinions, not statements of fact, and therefore cannot form the basis of a fraudulent misrepresentation claim. Grupo Sistemas, 1996 WL 312535 at *15 ("A speaker's representations about another party's future intentions or plans are generally construed as opinion, not fact, and hence cannot give rise to a claim of fraud . . . ."); see also Lane v. McCallion, 166 A.D.2d 688, 690, 561 N.Y.S.2d 273, 275 (2d Dep't 1990) (holding that assurances by a seller of land that a future zoning application would be approved did not constitute a misrepresentation because it was "a prediction or an expression of expectation as to future events" rather than a statement of fact).

Here, JPMorgan's fraudulent misrepresentation claim against LBHI amounts to the allegation that LBHI represented through the APA and related statements that Barclays would purchase all of the assets used by Lehman's broker-dealer business, instead of a subset of those assets. (Counterclaims ¶ 89). Indeed, all of the alleged misrepresentations at issue concern Barclays' future conduct, as follows:

> (a) that the APA was false when filed and subject to change in the most material ways, including with respect to the securities that would be purchased; (b) that Barclays had already decided not to purchase certain securities in the triparty repo portfolio, including RACERS and other illiquid securities, even though they fell within the definition of 'Purchased Assets'; (c) that Barclays had an option to refuse to purchase significant portions of the $70 billion in securities defined as 'Purchased Assets'; and (d) accordingly, that JPMorgan would not necessarily be repaid in full on its outstanding loans to LBI.

(Id. ¶ 90) (emphasis added). However, nowhere does JPMorgan allege a misstatement by LBHI concerning a present fact. And nowhere does JPMorgan allege that LBHI made a false promise about what LBHI itself intended to do in the future. Under New York law, all of the statements

that were allegedly made constitute opinions, which are insufficient to state a fraudulent misrepresentation claim.

For example, in Grupo Sistemas, the court dismissed fraudulent misrepresentation claims brought by a party to a purchase contract for satellite communications equipment against its counterparty, who had assigned its contractual obligations to AT&T. 1996 WL 312535 at *1, *15. The claims alleged that the defendant misrepresented that AT&T would "continue its commitment to," and "would not replace," the type of satellite equipment covered in the purchase contract. Id. at *14. The court dismissed the claims, holding, "representations about another party's future intentions or plans are generally construed as opinion, not fact, and hence cannot give rise to a claim of fraud." Id. at *15.

Similarly, in Stengal v. Chen, the plaintiff brought a fraud claim against the purchasers of plaintiff's former home who allegedly intended to demolish it despite agreeing to a "no demolition" clause in the sale contract. 74 A.D.3d 1050, 1050, 903 N.Y.S.2d 110, 111 (2d Dep't 2010). The plaintiff additionally brought suit against the purchasers' attorney and real estate agent on the same allegations. Id. at 112. The Second Department affirmed dismissal of the suit, holding that the purchasers' "alleged intention to violate this provision of the contract of sale is a matter completely beyond the control of [the real estate agent and attorney]." Id. at 113.

Barclays' intent to comply with the APA at the time it was signed was similarly a matter beyond LBHI's control. Thus, any speculation by LBHI as to Barclays' intent is not a statement of fact but rather an expectation of future third-party conduct, which is not actionable as fraud under New York law. See 320 Realty Mgmt. Co. v. 320 West 76 Corp., 221 A.D.2d 174, 174, 633 N.Y.S.2d 295, 295 (1st Dep't 1995) (affirming dismissal of a claim alleging "that defendants misrepresented that a tenant intended to purchase her apartment"; such allegations did

"not suffice to state a claim of fraudulent misrepresentation" in part because "[k]nowledge of their actual intent was not exclusively within defendants' control"); Stuart Lipsky, P.C. v. Price, 215 A.D.2d 102, 103, 625 N.Y.S.2d 563, 564 (1st Dep't 1995) (dismissing a fraud claim because the alleged representation that defendant was "certain not all of his entertainment law clients would remain with him after he relocated his practice" was "a mere expression of opinion which is not actionable" as fraud); Lane, 166 A.D.2d at 690, 561 N.Y.S.2d at 275 (granting motion to dismiss where alleged misrepresentations were "an expression of expectation as to future events").

**D.     JPMorgan's Alleged Reliance on Any LBHI Statements Extraneous to the Repurchase Agreements Was Not Reasonable**

JPMorgan's fraudulent misrepresentation counterclaim also fails for the wholly independent reason that the facts alleged demonstrate that JPMorgan's purported reliance on the APA and related statements was unreasonable as a matter of law.

**1.     Legal Standards for Reasonable Reliance Element of a Fraudulent Misrepresentation Claim**

In order to establish a claim for fraudulent misrepresentation, the plaintiff must show it was reasonable to rely on the supposed misrepresentation. Gladstone Bus. Loan, LLC v. Randa Corp., No. 09 Civ. 4225(LMM), 2009 WL 2524608, at *4 (S.D.N.Y. Aug. 17, 2009) (granting motion to dismiss and stating "[u]nder New York Law, a required element of fraud is that a party must show that it relied on a misrepresentation and that the reliance is reasonable").

In order to determine whether reasonable reliance is pled sufficiently to survive a motion to dismiss, the court may consider the complexity and magnitude of the transaction, the sophistication of the parties, and any contractual agreements that have been incorporated in or relied on by the pleadings. Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, 343 F.3d 189, 195 (2d Cir. 2003) (dismissing common law fraud claim because any reliance by plaintiff

on defendant's oral statement was unreasonable as a matter of law "[g]iven [defendant's] extensive contractual representations about other matters, appellant's sophistication, and the size of the transaction"). "When plaintiffs are sophisticated parties and the statement or omission relates to a business transaction that has been formalized in a contract, New York courts are generally reluctant to find reliance on oral communications to be reasonable." Wurtsbaugh v. Banc of Am. Sec. LLC, No. 05 CIV. 6220 (DLC), 2006 WL 1683416, at *6 (S.D.N.Y. June 20, 2006) (dismissing a fraud claim because plaintiff's alleged reliance on defendant's oral representation that plaintiff's employment "would not be at jeopardy" was unreasonable as a matter of law in light of his written at-will employment agreement).

## 2. Reliance on LBHI Statements Outside the Repo Contracts Was Unreasonable

Here, JPMorgan's alleged reliance on the APA and related statements by Tonucci and Lowitt was unreasonable because the alleged misrepresentations were extraneous to the contracts that governed the Barclays Repo.

Specifically, tri-party repos among LBI, Barclays, and JPMorgan as custodian were governed by a Master Repurchase Agreement, a Custodial Undertaking, and transaction-specific confirmations. (Ex. H, Master Repurchase Agreement § 1 ("Each such [repurchase] transaction shall . . . be governed by this Agreement . . . ."), § 3(b) ("The Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between Buyer and Seller with respect to the Transaction to which the Confirmation relates . . . ."); Ex. G, Barclays Custodial Undertaking, at 1 ("WHEREAS Buyer and Seller have requested that Bank undertake certain agency and custodial functions in connection with the Repurchase Agreement pursuant to the terms hereof."); see also Counterclaims ¶ 125 ("On September 15, 2008, JPMorgan (as 'Bank'), LBI (as 'Seller'), and Barclays (as 'Buyer') entered into a Custodial Undertaking in

Connection with Master Repurchase Agreement (the 'Custodial Undertaking')," which specified "certain agency and custodial functions" that JPMorgan agreed to undertake "in connection with the [Master] Repurchase Agreement.").

Those contracts and related confirming documents contained all terms and representations material to the tri-party repos involving Barclays, LBI and JPMorgan the week of September 15 – such as provisions for determining the market value of the collateral, the margin to be applied, the term of the repo, and the procedures for terminating the agreement and consummating the repurchase transaction. In particular, the Barclays Custodial Undertaking includes three pages of representations and warranties. (Ex. G, Barclays Custodial Undertaking § 12). Furthermore, both the Master Repurchase Agreement and Barclays Custodial Undertaking contain integration clauses stating that all of the promises between the parties are contained in the documents. (Ex. H, Master Repurchase Agreement § 14 ("This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions."); Ex. G, Barclays Custodial Undertaking § 13 ("This Agreement constitutes the entire agreement of the parties with respect to its subject matter and supersedes all prior oral or written agreements in regard thereto. No modification or amendment of this Agreement shall be binding unless in writing and executed by each of the parties.")).

Notably, LBHI is not a party to any of these contracts or confirming documents. In any event, JPMorgan does not allege any breach of any term in these contracts. It does not allege, for example, that Barclays breached a contractual promise when it failed to enter into a tri-party repo the evening of September 18. Nor could it, given that Barclays had not undertaken any contractual promise, in any contract or confirmation, that it would enter a repo that night. JPMorgan also does not allege that LBI breached a contract by reallocating securities between

the Barclays and Fed repos. Nor could it, given that the contract explicitly allows for such reallocation so long as the value of the collateral in each repo shell, as determined by JPMorgan, remained equal to or greater than the purchase price. (Ex. G, Barclays Custodial Undertaking § 3(f)).

Instead, what JPMorgan alleges is that it relied on representations outside the contractual documents, concerning the likelihood that Barclays would initiate an overnight repo on the morning of September 18, when JPMorgan exercised its discretion to advance the repurchase price to Barclays on September 18. (Counterclaims ¶ 93). But reliance on such extra-contractual statements, in light of the binding contractual representations in the underlying agreements, was not reasonable as a matter of law.

Several cases illustrate the point that any purported reliance by JPMorgan on such extra-contractual statements was unreasonable. For example, in Lazard Freres and Co. v. Protective Life Ins.Co., the Second Circuit, applying New York law, addressed a fraud defense that claimed the defendant had relied on the plaintiff's oral representation regarding the contents of a "Scheme Report." 108 F.3d 1531, 1534 (2d Cir. 1997). The Second Circuit upheld the district court's summary judgment against the fraud defense because, "[a]s a substantial and sophisticated player in the bank debt market, [defendant] was under a further duty to protect itself from misrepresentation. It could easily have done so by insisting on an examination of the Scheme Report" and its failure to do so rendered "reliance on the misrepresentation unreasonable as a matter of law." Id. at 1543. JPMorgan likewise could have easily protected itself by obtaining a written confirmation, as required by the Barclays Custodial Undertaking, verifying that Barclays would roll the Barclays Repo on September 18. Failure to do so rendered its alleged reliance unreasonable as a matter of law.

Similarly, in <u>Emergent Capital</u>, the Second Circuit dismissed a claim that alleged the defendant fraudulently misrepresented the size of its largest asset to the plaintiff investor. 343 F.3d at 191. The court reasoned, "Plaintiff's failure to insist that these representations be reflected in the written stock purchase agreement leads us to conclude that a sophisticated investor like [Plaintiff] could not have reasonably relied on them." <u>Id.</u> at 192. Additionally, the court pointed to the fact that the alleged misrepresentation was made both orally *and* in a non-binding writing as further evidence that it was unreasonable for the plaintiff to rely on the statement without including it in the parties' binding contract. <u>Id.</u> at 196 ("[T]he written reference to [the alleged misrepresentation] in [defendant's] brochure should have served as additional notice to appellant that this allegedly significant representation should be reflected in the contract."). Here, JPMorgan's failure to protect itself and confirm in writing that Barclays would roll the Barclays Repo renders any reliance on extra-contractual statements to that effect unreasonable as a matter of law.

The Second Circuit addressed this issue further in <u>Century Pacific, Inc. v. Hilton Hotels Corp.</u>, 354 Fed. Appx. 496, 497 (2d Cir. 2009). There, the plaintiff claimed it relied on "defendants' alleged oral representation that they had no present intention to sell the Red Lion brand" of hotels. <u>Id.</u> at 498. The court affirmed summary judgment for the defendant and held the plaintiff's reliance was unreasonable because the plaintiff "was a sophisticated party" who "was aware that the agreement at issue granted defendants the right to sell the Red Lion brand." <u>Id.</u>; <u>see also</u> <u>Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC</u>, No. 01 Civ. 6600(RLC), 2005 WL 3370542, at *5 (S.D.N.Y. Dec. 12, 2005) (finding reliance unreasonable where the representations are "so important" that "no reasonable businessperson would have relied on them without putting them in writing"); <u>Fab Industries v. BNY Financial</u>, 252 A.D.2d

367, 367, 675 N.Y.S.2d 77, 78 (1st Dep't 1998) (granting summary judgment for the defendant because plaintiff could not reasonably rely "on defendant's alleged oral representations as a substitute for the prescribed written approval").

As in Lazard, Emergent Capital, and Century Pacific, this Court should dismiss JPMorgan's claim of fraudulent misrepresentation based on alleged extra-contractual representations because it was unreasonable for JPMorgan to alter its performance of services as tri-party repo custodian in reliance on purported information outside the contracts and related written confirmations, which exclusively governed the terms of the repurchase agreements and its rights as custodian. See Junk v. Aon Corp., No. 07 Civ. 4640(LMM)(GWG), 2007 WL 4292034, at *7 (S.D.N.Y. Dec. 3, 2007) (dismissing a fraud claim for lack of reasonable reliance where plaintiff alleged he relied upon oral representations from his employer guaranteeing his position, but plaintiff did not insist on adding these alleged representations to his written at-will employment contract); Wurtsbaugh, 2006 WL 1683416, at *6 (dismissing fraud claim where plaintiffs contended they sold their business to defendants in reliance on oral representations that business would remain linked to defendant's clearing operation; such reliance was unreasonable as a matter of law since the parties' contract gave the defendant the right to divest the business from its clearing operation).

### 3. Any Reliance on LBHI for Predictions of Barclays' Future Conduct Is Unreasonable in Light of Barclays' Direct Representations About Its Own Intentions

Finally, JPMorgan could not have reasonably relied on LBHI's predictions of Barclays' future conduct as a matter of law because Barclays made statements about its own intentions directly to JPMorgan. Where someone receives information that a party intends to take a future action both directly from that party and also from a third party, it is only reasonable

33

to rely on the party who directly communicated its own intent to take the action. Grupo Sistemas, 1996 WL 312535 at *14.

In Grupo Sistemas, the plaintiff, Grupo, brought fraud claims against two defendants, Harris and AT&T, regarding alleged misrepresentations by both parties concerning AT&T's intent to continue using a type of satellite communications technology. Id. The court dismissed the claim against Harris, holding that, not only were Harris's representations about AT&T's future intentions opinion and not fact, but "[r]eliance on such representations is generally unreasonable," in part because "[t]o verify AT&T's intentions, Grupo went directly to AT&T itself . . . . Grupo should then have relied primarily on AT&T's representations about its own intentions, not on Harris's representations speculating as to what AT&T's intentions might be. Put another way, AT&T's representations should properly have superseded Harris's in the minds of Grupo's representatives." Id. at 15.

Likewise, as stated in the Counterclaims, JPMorgan spoke directly with Barclays numerous times during the week of the Barclays Repo and received very specific representations from Barclays about its intentions regarding the APA, the Barclays Sale, and margin on the securities being transferred. (See, e.g., Counterclaims ¶¶ 28, 45-47, 63-66). In light of this direct communication with Barclays, which should properly have superseded any representations by LBHI, any continued reliance on LBHI's opinions of Barclays' future intent was unreasonable.

**E.     JPMorgan Has Failed to Plead that LBHI Acted with Scienter Because It Has Not, and Cannot, Plead a Motive for LBHI to Give Barclays the Best Securities and Leave the Worst Behind**

JPMorgan's claim for fraudulent misrepresentation also should be dismissed because JPMorgan has failed to allege scienter on behalf of LBHI. On the contrary, LBHI's interests at this time were to maximize the value of the estate for its creditors—not to allow

Barclays to take the best assets used by Lehman's North American broker-dealer business and leave the worst behind as JPMorgan alleges.

### 1. Legal Standards for Pleading the Element of Scienter

To state a claim for fraudulent misrepresentation, the claimant must plead scienter, which is the intent to commit a fraud. Schlaifer Nance & Co., 119 F.3d at 98 (listing "an intent to defraud" among the elements of fraud under New York law). To do so, the plaintiff must specifically show an intent to defraud, not merely an intent to accomplish the end result of the fraud. Allison v. Round Table Inv. Mgmt. Co., LP, No. 10 CV 01144(GBD), 2010 WL 4456648, at *3 (S.D.N.Y. Oct. 22, 2010) (granting motion to dismiss and stating "[t]o adequately plead scienter, Plaintiff must show that Defendants intentionally misrepresented the [facts at issue] in order to commit a fraud"). Scienter may be pled "'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank, N.A., 261 F.R.D. 13, 19 (S.D.N.Y. 2009) (granting motion to dismiss for failure to adequately plead scienter), (quoting Lerner, 459 F.3d at 290-91).

If scienter is pled via motive and opportunity, the alleged motive must be concrete and specific. Productores Asociados De Café Rio Claro, C.A. v. Barnett, No. 98 CIV. 499 DAB, 1999 WL 287389, at *3 (S.D.N.Y. May 7, 1999) ("Motive requires a showing of concrete benefits that could be realized by one or more of the false statements alleged . . . ."). By contrast, a "generalized motive," which could be attributed to any business, "is not sufficiently concrete for purposes of inferring scienter." Chill v. General Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996) (affirming motion to dismiss for failure to plead scienter).

Under either method, pursuant to Rule 9(b), "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." <u>Acito v. IMCERA Group, Inc.</u>, 47 F.3d 47, 52 (2d Cir. 1995).

### 2. JPMorgan's Allegations That LBHI Wanted to Complete the Sale Are Too General to Plead LBHI's Scienter, and Any Personal Motives of Individual Executives Adverse to Their Employer Cannot Be Imputed to LBHI

JPMorgan attempts to allege a motive in its first counterclaim through the following allegation:

> LBHI and its representatives were highly motivated to deceive JPMorgan. JPMorgan's extensions of credit to LBI were critical to any sale of LBI. In addition, senior Lehman executives depended on the closing of the sale to Barclays to benefit from lucrative employment contracts with Barclays.

(Counterclaims ¶ 92). None of these alleged motives is sufficient to plead scienter.

First, LBHI's alleged motive to complete the sale of assets used in the broker-dealer business is a general motive that could be attributed to any business engaged in a similar transaction. For example, in <u>Pfizer, Inc. v. Stryker Corp.</u>, the defendant, Stryker, brought a counterclaim for common law fraudulent misrepresentation against the plaintiff, Pfizer, and attempted to allege scienter through allegations that "Pfizer had an intent to defraud based on its financial interest in selling its prosthetics business, which Stryker asserts was declining, for a high price." 348 F. Supp. 2d 131, 155 (S.D.N.Y. 2004). Stryker claimed that "Pfizer's interest in selling the business as quickly as possible . . . gave Pfizer a reason to conceal any negative information." <u>Id.</u> The court dismissed the counterclaim for failure to plead scienter because the allegations of motive were "typical of general profit motivations of business persons. Such general allegations do not give rise to a strong inference of fraud." <u>Id.</u> As in <u>Pfizer</u>, the fact that LBHI had an interest in seeing the Barclays Sale consummated quickly does not create a strong inference that LBHI intended to defraud JPMorgan.

Second, the alleged personal motive of "senior Lehman executives" to profit individually through employment at Barclays after the sale likewise fails to raise a strong inference of scienter. By definition, those personal motives are attributable only to the executives themselves, not to LBHI (which obviously would not profit from the executives' future employment at Barclays). See supra Point I.B.1. Moreover, their alleged motives are antithetical to LBHI's interests because, as JPMorgan itself alleges, these executives were acting to benefit LBHI's counterparty to the transaction, Barclays, rather than LBHI. (Counterclaims ¶ 87 ("these executives, therefore, had a motive to facilitate a Barclays purchase and curry favor with Barclays.")). Although JPMorgan alleges without support that Lowitt and Tonucci were nonetheless "advancing the interests of LBHI," such a conclusory allegation does not change the fact that this alleged motive is premised on these executives acting to further their own personal interests and the interests of their future employer Barclays, and against LBHI's interest, during the Barclays Sale transaction.

As discussed above, there was no plausible economic reason for LBHI to aid Barclays in acquiring the highest quality assets, or to otherwise participate in an alleged scheme to leave JPMorgan with a shortfall for which JPMorgan would claim LBHI collateral in JPMorgan's possession. Shields, 25 F.3d at 1130; Atlantic Gypsum, 753 F. Supp. at 514 ("Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent"). To the extent that any of the LBHI employees are alleged to have participated in such a scheme, the only plausible conclusion is that they were acting for themselves and adversely to the interests of LBHI, and their actions therefore cannot be imputed to LBHI. (See supra Point I.B.1., (citing Holmes, 329 F. Supp. 2d at 531-32)).

### 3. Counterclaims Do Not Allege Conscious or Reckless Conduct by LBHI

Nor does JPMorgan plead facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." Musalli, 261 F.R.D. at 19. A claimant faces a significant burden in pleading scienter based on evidence of conscious or reckless behavior. Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (granting motion to dismiss for failure to plead scienter and stating "[w]here motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater"); see also Renner v. Chase Manhattan Bank, No. 98 CIV. 926(CSH), 2000 WL 781081, at *10 (S.D.N.Y. June 16, 2000) ("The Second Circuit has held that a plaintiff faces a 'significant burden . . . in stating a fraud claim based on recklessness.'") (quoting Chill, 101 F.3d at 270). In order to state a claim for scienter based on reckless conduct, JPMorgan must plead facts that show, at a minimum, "highly unreasonable" conduct constituting "an extreme departure from the standards of ordinary care." Chill, 101 F.3d at 270.

JPMorgan fails to plead facts that would meet this standard with respect to LBHI. Instead, JPMorgan's allegations about Lowitt and Tonucci (the only two identified LBHI employees in the Counterclaims) state only that they did not know, after signing the APA, what assets Barclays would ultimately acquire. (Counterclaims ¶ 37) ("Ian Lowitt has admitted that, as of September 17, it had not been determined 'how we are going to identify the series of assets that are part of the transaction and at what price those are going to be marked at and that Barclays is going to purchase them at.' . . . Daniel Flores of Lehman again acknowledged, after conversations with Ian Lowitt and Paolo Tonucci, that the schedule of assets to be purchased by Barclays was 'still a work in progress.'"). But far from illustrating conscious or "highly unreasonable" recklessness in failing to disclose to JPMorgan additional facts about the assets

that Barclays planned to acquire, the Counterclaims allege nothing more than that LBHI and its representatives were not certain about what assets would go into the APA when signed. There is no allegation, for example, that JPMorgan told Lowitt or Tonucci that it required additional information. Nor does JPMorgan allege any facts showing that JPMorgan expected LBHI in particular to apprise it of additional facts. Read as a whole, the allegations hardly constitute conscious and reckless behavior in concealing material information from JPMorgan. Moreover, in light of the fact that LBHI was not a party to the repo contracts at issue, JPMorgan has not pled that LBHI's failure to inform JPMorgan of additional facts about the proposed transaction amounted to an extreme departure from the standards of ordinary care.

Because JPMorgan has failed to plead scienter by circumstantial evidence of conscious misconduct or recklessness, or by motive and opportunity, the cause of action for fraudulent misrepresentation must be dismissed. See Musalli, 261 F.R.D. at 19 (dismissing fraud claim where complaint did not adequately allege a motive or plead facts constituting strong circumstantial evidence of conscious misbehavior or recklessness); Renner, 2000 WL 781081 at *10-11 (same); Barnett, 1999 WL 287389 at *4 (dismissing a fraud claim where plaintiffs "fail[ed] to plead facts that 'give rise to a strong inference' of fraud, either by pleading motive and opportunity to commit fraud, or by pleading circumstances that constitute strong circumstantial evidence of conscious behavior and recklessness").

For each of the independent reasons mentioned above, JPMorgan's counterclaim for fraudulent misrepresentation against LBHI should be dismissed for failing to state a claim.

## POINT II

## JPMORGAN'S FRAUDULENT CONCEALMENT COUNTERCLAIM FAILS TO STATE A CLAIM

JPMorgan's second counterclaim is for fraudulent concealment by LBHI. In particular, it alleges that LBHI failed to disclose the following:

> (a) that the APA, even upon signature, was inaccurate and subject to change in material ways, including with respect to the securities that would be purchased by Barclays; (b) that notwithstanding the terms of the APA, Barclays had the option, which it later exercised, to refuse to purchase significant portions of the $70 billion in securities included in the APA's definition of "Purchased Assets"; (c) that Barclays had entered into the Takeout Agreement with the Fed; (d) that Lehman and Barclays had actively manipulated LBI's triparty repo shells on September 17, 2008 to divert unwanted securities from the Fed's overnight shell to Barclays' shell; (e) that Barclays had reserved to itself the right to decide, and in fact had decided prior to entry into the APA, not to purchase certain securities, including RACERS and other illiquid securities, that fell within the definition of "Purchased Assets"; and (f) that Barclays had reserved to itself the right to decide, and in fact had decided prior to the time that JPMorgan extended intraday financing to LBI on Thursday, September 18, 2008, and prior to the time that JPMorgan agreed to release margin valued at $5 billion, not to purchase certain securities, including RACERS and other illiquid securities, that fell within the definition of "Purchased Assets."

(Counterclaims ¶ 98). For the reasons described below, this counterclaim, too, should be dismissed for failing to plead a valid cause of action against LBHI.

## A. Legal Standards for Fraudulent Concealment

"The elements of fraudulent concealment under New York law are: a relationship between the contracting parties that creates a duty to disclose, knowledge of the material facts by the party bound to disclose, scienter, reliance, and damage." Aetna Casualty & Surety Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 582 (2d Cir. 2005).

As with a fraudulent misrepresentation claim, claims for fraudulent concealment must be pled with particularity. Id. ("This claim [for fraudulent concealment], however, like that for fraudulent inducement, must pass muster under Rule 9(b)."). Reliance on the omission must also be reasonable. Premier-N.Y., Inc. v. Travelers Property Cas. Corp., No. 603043/03, 2008 WL 2676800, at *7 (N.Y. Sup. Ct. July 8, 2008) ("In order to recover for fraud or fraudulent concealment, the reliance must be 'reasonable' or 'justifiable.'").

## B. JPMorgan's Fraudulent Concealment Claim Fails for Many of the Same Reasons as Its Fraudulent Misrepresentation Claim

As an initial matter, JPMorgan's fraudulent concealment claim fails for many of the same reasons as its fraudulent misrepresentation claim.

### 1. JPMorgan Fails to Allege Fraudulent Concealment Against LBHI Specifically

First, as with any fraud claim, claims for fraudulent concealment must be pled with particularity, and the complaint must "specifically identify, by name or otherwise, the identity of the persons who engaged in fraudulent activity." Rey-Willis v. Citibank, N.A., No. 03 Civ.2006(SAS), 2003 WL 21714947, at *8 (S.D.N.Y. July 23, 2003).

Notwithstanding this requirement, JPMorgan's cause of action for fraudulent concealment fails to mention a single LBHI individual. Instead, it generally alleges that "LBHI had a duty to disclose the concealed, undisclosed and omitted facts because LBHI made false and misleading statements and representations directly to JPMorgan." (Counterclaims ¶ 100). Because all of the conduct at issue in this counterclaim is attributed to LBHI generally, rather than any specific LBHI employee, Rule 9(b) requires dismissal of this claim.

Moreover, the only two LBHI employees named anywhere in JPMorgan's actual causes of action are Lowitt and Tonucci. Even if their actions could be imputed to LBHI, the

Counterclaims fail to make any allegations whatsoever that Lowitt or Tonucci in particular had a duty to disclose information to JPMorgan or acted with any intent to defraud JPMorgan.

Because JPMorgan has failed to allege with specificity the elements of the fraudulent concealment claim as to LBHI employees, the claim should be dismissed.

### 2. Failure to Disclose What LBHI Thought Barclays Would Do Does Not State a Fraudulent Concealment Claim

Second, just as an opinion or prediction of the future conduct of a third party cannot form the basis of a fraudulent misrepresentation claim, neither can the failure to provide an opinion or prediction about what a third party might do form the basis of a fraudulent concealment claim. Cf. Cucchiaro v. Cucchiaro, 627 N.Y.S.2d 224, 229 (N.Y. Sup. Ct. 1995) (rejecting a fraudulent concealment claim, reasoning that "if liability cannot be founded upon an erroneous opinion of the status of the law, this Court cannot conclude that it may be found where, as here, a lay person did not provide any opinion"). With the exception of JPMorgan's allegation regarding the reallocation of securities within tri-party repo shells, see infra Point II.C.6, all of the alleged omissions at issue involve actions that Barclays was expected to take in the future. (Counterclaims ¶ 98).

LBHI's alleged failure to disclose its expectations regarding Barclays' future actions thus cannot form the basis of a fraudulent concealment claim. Grupo Sistemas, 1996 WL 312535 at *15.

### 3. JPMorgan Fails to Plead That Reliance on the Concealment Was Reasonable Because the Repurchase Agreements Contained All Material Representations

Third, JPMorgan has failed to plead that its reliance on the alleged omissions was reasonable. See State v. Peerless Ins. Co., 67 N.Y.2d 845, 848 (1986) (describing reliance as "an essential ingredient" in a fraudulent concealment claim). The Master Repurchase Agreement,

Barclays Custodial Undertaking, and related written confirmations were, by their own terms, the exclusive evidence of the terms of the repos between LBI and Barclays. See supra Point I.D.2. LBHI did not have any contractual duty to JPMorgan to make any disclosures (nor was LBHI a party to any of these agreements and confirmations), and it would not have been reasonable as a matter of law for JPMorgan to rely on the absence of such disclosures from LBHI in performing its duties under its agreements with LBI and Barclays. Id.; Century Pacific. 354 Fed. Appx. at 498; Emergent Capital, 343 F.3d at 191; Lazard, 108 F.3d at 1534.

4. **JPMorgan Fails to Plead that LBHI Acted with Scienter Because It Has Not, and Cannot, Plead a Motive for LBHI to Conceal the Details of the Barclays Sale Transaction**

Finally, this claim fails because JPMorgan has not sufficiently alleged that LBHI acted with the requisite scienter. See Saltz v. First Frontier, LP, No. 10 Civ. 964(LBS), 2010 WL 5298225, at *8 (S.D.N.Y. Dec. 23, 1010) ("Both common law fraud and fraudulent concealment require the Plaintiff to plead scienter."). As discussed above, JPMorgan's allegations that LBHI was generally motivated by a desire to consummate a deal with Barclays are insufficient to establish scienter as a matter of law. Nor can LBHI's scienter otherwise be established given that the goal of the alleged scheme was to provide a windfall for Barclays at the expense of the LBHI estate. See supra Point I.E.2.

Any one of the above reasons provides a sufficient and independent basis to dismiss JPMorgan's fraudulent concealment counterclaim.

**C. JPMorgan Has Failed to Allege Facts Establishing That LBHI Had a Duty to Disclose**

In addition to the flaws that this counterclaim shares with the fraudulent misrepresentation counterclaim, JPMorgan also fails to plead the additional element required for a fraudulent concealment claim: that LBHI or any of its employees had a duty to disclose the

allegedly omitted information to JPMorgan. JPMorgan pleads the following to attempt to

establish such a duty to disclose:

> LBHI had a duty to disclose the concealed, undisclosed and
> omitted facts because LBHI made false and misleading statements
> and representations directly to JPMorgan; LBHI possessed
> superior knowledge and information about the material facts that
> would have revealed that the statements and representations made
> to JPMorgan were materially false and misleading; and LBHI was
> on notice, and knew, that JPMorgan was justifiably relying upon
> the false and misleading statements made by LBHI and that
> JPMorgan was acting under a mistaken belief that those statements
> and representations were true and complete.

(Counterclaims ¶ 100). These allegations fail to state the existence of a duty to disclose.

## 1.     Legal Standards for Establishing a Duty to Disclose

"A duty to disclose generally arises in one of three ways: (1) when one party

makes a partial or incomplete statement that requires clarification; (2) when the parties are in a

fiduciary or confidential relationship; or (3) where one party possesses superior knowledge, not

readily available to the other, and knows that the other is acting on the basis of mistaken

knowledge." All Am. Adjusters, Inc. v. Acceleration Nat'l Ins. Co., No. 96 CIV. 9344(MBM),

1997 WL 732445, at *7 (S.D.N.Y. Nov. 25, 1997) (internal quotation omitted).

In order to plead a duty via the third method, termed the "special facts doctrine,"

there must be a contractual relationship between the parties. 900 Unlimited, Inc. v. MCI

Telecomms Corp., 215 A.D.2d 227, 227, 626 N.Y.S.2d 188, 188 (1st Dep't 1995) ("In the

absence of a contractual relationship or a confidential or fiduciary relationship, a party may not

recover for fraudulent concealment of fact, since absent such a relationship there is no duty to

disclose."); Triple Z Postal Services, Inc. v. United Parcel Serv., Inc., No. 118057/05, 2006 WL

3393259, at *14 (N.Y. Sup. Ct. Nov. 24, 2006) ("Although a duty to disclose has sometimes

been found to arise where one party has superior knowledge, the context has invariably involved direct negotiations between the parties to a business transactions [sic].").

### 2. JPMorgan Has Not Alleged a Partial or Incomplete Statement That Requires Clarification

As an initial matter, JPMorgan does not allege that LBHI made a partial or incomplete statement that could trigger a duty to disclose. Although JPMorgan alleges that "LBHI made false and misleading statements and representations to JPMorgan," (Counterclaims ¶ 100), an allegation of a misrepresentation, even if actually false, does not give rise to a duty to disclose due to a partial or incomplete statement. Rather, a partial statement creates a duty to disclose when the statement is true, but is partial or ambiguous such that it "requires additional disclosure to avoid misleading the other party." Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V., 68 F.3d 1478, 1484 (2d Cir. 1995); see also Manley v. AmBase Corp., 126 F. Supp. 2d 743, 756 (S.D.N.Y. 2001) ("Regarding the making of a partial or ambiguous statement, the Second Circuit has stated that 'once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth.'"), (quoting Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)); compare Tomoka Re Holdings, Inc. v. Loughlin, No. 03 Civ. 4904(NRB), 2004 WL 1118178, at *3 (S.D.N.Y. May 19, 2004) (finding a duty to disclose when defendant included a provision in a stock purchase agreement listing "the following contracts and other agreements to which the Company is a party," but the list omitted an additional contract under which defendant was potentially liable), with DeBeers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc., 440 F. Supp. 2d 249, 268 (S.D.N.Y. 2006) (finding no duty to disclose because "the omission of this material did not make any of the plaintiff's other statements ambiguous or misleading").

Here, JPMorgan does not allege that LBHI made any true statements that were rendered misleading due to the omission of relevant facts. Therefore, JPMorgan has not alleged that LBHI had a duty to disclose as a result of partial or ambiguous statements.

### 3. JPMorgan Does Not Allege a Confidential or Fiduciary Relationship Giving Rise to a Duty to Disclose

Nor does JPMorgan allege that LBHI had a confidential or fiduciary relationship with JPMorgan that could give rise to a duty to disclose facts about the APA. Nor can it. LBHI was not a party to the tri-party repo contracts among JPMorgan, LBI and Barclays. Nothing in JPMorgan's Counterclaims could give rise to a duty through such a relationship.

### 4. JPMorgan's Allegations Fail to Plead That LBHI Owed JPMorgan a Duty to Disclose Facts About the APA Under the Special Facts Doctrine

JPMorgan attempts to plead a duty to disclose via the special facts doctrine, which requires that: "(1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge." Banque Arabe et Internationale D'Invesstisetment v. Md. Nat'l Bank, 57 F.3d 146, 155 (2d Cir. 1995).

The special facts doctrine relied upon by JPMorgan only applies where there was a contractual relationship between the parties, or the parties were negotiating to enter a contractual relationship. Ray Larsen Assocs., Inc. v. Nikko Am., Inc., No. 89 Civ. 2809 (BSJ), 1996 WL 442799, at *5 (S.D.N.Y. Aug. 6, 1996) (granting motion to dismiss and stating "[a] review of the cases which recognize a duty to disclose due to one party's superior knowledge reveals that the duty ordinarily arises only in the context of business negotiations where parties are entering a contract"); Triple Z, 2006 WL 3393259 at *14 (granting motion to dismiss and stating "[a]lthough a duty to disclose has sometimes been found to arise where one party has superior knowledge, the context has invariably involved direct negotiations between the parties

to a business transactions [sic]").  In the absence of such a relationship, a party has no duty to

disclose any information.  900 Unlimited, Inc., 215 A.D.2d at 227, 626 N.Y.S.2d at 188 ("In the

absence of a contractual relationship or a confidential or fiduciary relationship, a party may not

recover for fraudulent concealment of fact, since absent such a relationship there is no duty to

disclose.").

      As described above, JPMorgan fails to allege any contractual relationship or

business negotiations between LBHI and JPMorgan, as is required for the special facts doctrine

to apply.  According to the Counterclaims, the repo at issue was governed by the Barclays

Custodial Undertaking, among JPMorgan, LBI, and Barclays.  (Counterclaims ¶ 125).  LBHI

was not a party to this agreement.  JPMorgan has not alleged any facts showing that it had the

type of relationship with LBHI that would require LBHI to inform JPMorgan of facts that could

conceivably affect JPMorgan's performance under contracts among JPMorgan, LBI and Barclays.

      Several New York cases confirm the absence of a duty in similar situations.  In

George Cohen Agency, Inc. v. Donald S. Perlman Agency, Inc., an insurance agency, Perlman,

purchased an insurance portfolio from another agency.  114 A.D.2d 930, 930, 495 N.Y.S.2d 408,

408 (2d Dep't 1985).  Included in this portfolio were policies issued by Continental.  Id.  Prior to

closing the sale, Perlman met with Continental to discuss obtaining a general agency contract.

Id.  After the sale closed, Continental withdrew Perlman's permission to write several of the

policies that Perlman had purchased because the policies failed to conform with certain

regulations.  Id.  Perlman then brought a claim for fraudulent concealment against Continental,

alleging that Continental knew the policies were deficient when the parties met prior to the sale

closing, and knew that Perlman purchased the portfolio believing the policies to be valid, but had

failed to disclose this material information.  Id.  The Second Department affirmed dismissal of

the claim, holding that "Continental was not even a party to the portfolio purchase agreements, and was thus under no duty to disclose any material facts concerning those agreements to Perlman." Id.

Similarly, in Triple Z, a Mailboxes Etc. franchisee brought suit against the franchisor and its parent corporation, as well as the franchisor's representative, Atlantic Mailboxes, Inc. and the president of Atlantic Mailboxes, Inc. (together, the "Atlantic Defendants"), alleging that the defendants engaged in a plan to destroy the franchise system. 2006 WL 3393259 at *1. The court dismissed a cause of action for fraudulent concealment against the Atlantic Defendants on the ground that "Plaintiff has no agreement with the Atlantic Defendants, who are not parties to the Franchise Agreement, and has not alleged facts demonstrating a basis for imposing a duty to disclose on the part of the Atlantic Defendants." Id. at *14.

As in these two cases, JPMorgan has brought a fraudulent concealment claim against LBHI alleging that LBHI failed to disclose information that was material to JPMorgan's performance under a contract. Like the defendants in Cohen and Triple Z, LBHI was not a party to the contract at issue, and thus had no duty to disclose information related to JPMorgan's decision to unwind the Barclays Repo under the Barclays Custodial Undertaking. Because LBHI had no duty to disclose, the special facts doctrine does not apply, and JPMorgan cannot state a claim for fraudulent concealment.

### 5. JPMorgan Has Not Alleged That LBHI Possessed Superior Knowledge and Knew JPMorgan Was Relying on Mistaken Knowledge

Even if JPMorgan could plead that the requisite contractual relationship existed with LBHI to invoke the special facts doctrine, the Counterclaims still fail to plead the existence of a duty to disclose. A duty to disclose exists under the special facts doctrine only if: "(1) one

party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge." Banque Arabe, 57 F.3d at 155.

JPMorgan fails to plead that LBHI knew JPMorgan was "acting on the basis of mistaken knowledge" with respect to any alleged omissions, as required to state a duty to disclose based on the special facts doctrine. Its only allegation regarding LBHI's supposed knowledge that JPMorgan was relying on the omission of information about the APA is the conclusory statement that "LBHI was on notice, and knew, that JPMorgan was justifiably relying upon the false and misleading statements made by LBHI and that JPMorgan was acting under a mistaken belief that those statements and representations were true and complete." (Counterclaims ¶ 100). But this statement is not supported by any factual allegation about LBHI. Instead, the only allegations in the Counterclaims that any party knew or anticipated that JPMorgan might rely on the APA or oral statements are taken from internal Barclays communications. In particular, the Counterclaims allege that on September 18 Gerard LaRocca of Barclays wrote emails to Richard Ricci and Bob Diamond of Barclays stating "JPM will BE ANNOYED with several billion of collateral tonight that we will not finance" and "JPM IS GOING TO BE MORE ANNOYED WITH WHAT I HAVE PLANNED." (Id. ¶ 62). JPMorgan does not allege that LBHI wrote, or even saw, these emails. Nor does it allege that LBHI made any similar statements. Thus, nothing in the Counterclaims establish that anyone at LBHI contemplated, let alone knew, that JPMorgan might base any decisions as repo custodian on alleged omissions concerning the APA.

This failure to allege knowledge of the supposed omissions is especially glaring with regard to JPMorgan's claim that LBHI fraudulently concealed "that Barclays had entered

into the Takeout Agreement with the Fed." (Id. ¶ 98). As with the APA, the Counterclaims fail

to plead any reasonable reliance on the alleged concealment of the Takeout Agreement, or that

LBHI knew that this agreement between the Fed and Barclays was material to JPMorgan's

performance under its tri-party repo agreement with Barclays and LBI.

### 6. Allegations Regarding the Allocation of Shells Also Fail Because Such Conduct Was Permitted by Contract, and JPMorgan Cannot Plausibly Allege That LBHI Had Superior Knowledge Regarding the Allocations

Finally, JPMorgan alleges that LBHI failed to disclose that "Lehman and Barclays

had actively manipulated LBI's triparty repo shells on September 17, 2008 to divert unwanted

securities from the Fed's overnight shell to Barclays' shell." (Counterclaims ¶ 98). In addition to

the fact that LBI – and not LBHI – was the only Lehman entity with the ability to allocate

securities in the tri-party repo shells, see supra Point I.B.3, the Counterclaims fail to allege that

LBHI possessed "superior knowledge" of the alleged reallocation of LBI's tri-party repo shells,

as required to create a duty to disclose under the special facts doctrine.

Under New York law, an allegation of superior knowledge fails if the party

making the claim had access to the information but did not take active steps to discover it.

Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A., 731 F.2d 112, 123 (2d Cir. 1984)

("[P]laintiffs failed to establish that [Defendant's] knowledge was 'superior,' because all of the

information that plaintiffs now claim was concealed from them was either a matter of public

record, was not pursued by plaintiffs, or was disclosed, at least in part, by [Defendant].").

JPMorgan claims that the "change in the composition of LBI's triparty shells was

dramatic." (Counterclaims ¶ 53). However, the Counterclaims also state that the tri-party shells

were accounts held at JPMorgan. (Id. ¶ 50). The pleadings cannot state a plausible claim that

JPMorgan lacked knowledge about "dramatic" changes in the contents of shells when the

pleadings admit that JPMorgan controlled those shells itself.

Moreover, paragraph 3(f) of the Barclays Custodial Undertaking expressly allowed LBI to change the composition of the collateral in the repo shells, stating "Seller may substitute other Securities for any Purchased Securities without notice to Buyer provided that the Purchased Securities in Buyer's Account after the substitution have a Margin Value equal to or greater than the Purchase Price." (Ex. G, Barclays Custodial Undertaking § 3(f)). Notably, JPMorgan does not plead that the reallocation violated any provision of the contract. Thus, not only should JPMorgan have known of the allegedly "dramatic" changes in the repo shells it held and managed, but such conduct was permitted by contract.

As a result, JPMorgan has not shown that LBHI had a duty to disclose the allegedly concealed information, and thus fails to state a claim for fraudulent concealment. See Richards v. AXA Equitable Life Ins. Co., No. 06 Civ. 3744(PAC), 2007 WL 3084968, at *5 (S.D.N.Y Oct. 22, 2007) (dismissing a claim for fraudulent concealment for failure to allege a duty to disclose because "the facts pled in the Complaint do not support a claim that Defendant knew Plaintiff was acting on the basis of mistaken knowledge"); Musalli, 261 F.R.D. at 23 (dismissing fraudulent concealment claim for failing to properly allege a duty to disclose, since complaint gave "no indication that [defendants] knew [plaintiff] was acting on the basis of inaccurate information").

## POINT III

### JPMORGAN'S AIDING AND ABETTING FRAUD COUNTERCLAIM FAILS TO STATE A CLAIM

JPMorgan's third cause of action is for aiding and abetting fraud. In it, JPMorgan alleges that "Barclays affirmatively misrepresented, and failed to disclose, material facts to JPMorgan concerning its purchase of assets from Lehman," that LBHI knew of Barclays fraud,

and that LBHI provided substantial assistance to JPMorgan to perpetrate that fraud. (Counterclaims ¶¶ 105-14). This claim should be dismissed as well.

## A.     Legal Standards for Aiding and Abetting Fraud

"To establish liability for aiding and abetting fraud, the plaintiffs must show (1) the existence of a fraud; (2) the defendants knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." Lerner, 459 F.3d at 292 (internal quotation omitted).

Allegations of aiding and abetting fraud must be pled with particularity pursuant to Rule 9(b). O'Brien v. Nat'l Prop. Analysts Partners, 719 F. Supp. 222, 229 n.10 (S.D.N.Y. 1989) (granting motion to dismiss and stating "[t]he particularity requirements of Rule 9(b) apply to allegations of aiding and abetting fraud").

## B.     JPMorgan Fails to Plead Reasonable Reliance on Barclays' Alleged Underlying Fraud

As an initial matter, in order to make out a claim for aiding and abetting fraud, JPMorgan must first properly plead an underlying fraud. To the extent JPMorgan alleges that Barclays' underlying fraud is based on statements outside the Barclays Custodial Undertaking and related contracts, any reliance on the underlying fraud was not reasonable and it thus fails to state a claim for the reasons discussed above. See supra Point I.D.2; 484 Assocs., L.P. v. Moy, No. 06 Civ. 2290(PAC), 2007 WL 683999, at *4 (S.D.N.Y. Mar. 5, 2007) ("Plaintiff cannot show reasonable reliance as to the underlying fraud alleged, and his aiding and abetting fraud claim must be dismissed."); King v. George Schonberg & Co., 233 A.D.2d 242, 242-43, 650 N.Y.S.2d 107, 108 (1st Dep't 1996) (holding that the failure to adequately allege reasonable reliance on the underlying fraud rendered the complaint insufficient to support a claim for aiding and abetting fraud).

**C.     JPMorgan Fails to Plead That LBHI Substantially Assisted Barclays' Fraud
Because It Does Not Show Affirmative Assistance by LBHI That Proximately
Caused the Alleged Injury**

In order to state a claim for aiding and abetting liability, JPMorgan must properly

plead that LBHI substantially assisted Barclays by affirmatively contributing to the alleged fraud

or helping Barclays to conceal it.  Kolbeck v. LIT Am., Inc., 939 F. Supp. 240, 247 (S.D.N.Y.

1996) (granting motion to dismiss and stating "[o]ne provides substantial assistance if he

affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables it

to proceed.  However, inaction constitutes substantial assistance only when an independent duty

to act was a duty owed to the defrauded [party].") (internal quotations omitted).

JPMorgan claims that LBHI provided the following allegedly substantial

assistance to Barclays:

> LBHI filed the Sale Motion and the APA, which misrepresented
> the agreement between LBHI and Barclays.  LBHI representatives
> helped Barclays identify undesirable securities in LBI's tri-party
> repo book; Lehman manipulated the repo shells on Wednesday,
> September 17 to ensure that Barclays could cherry pick LBI's best
> securities; and Lehman personnel took numerous steps to ensure
> that only the securities Barclays wanted were actually transferred
> to Barclays on September 18.

(Counterclaims ¶ 113).  None of this alleged conduct meets the requisite pleading standard for

aiding and abetting liability.

**1.     Allegations Regarding Reallocation of the Tri-Party Repo Shells Do Not
State a Claim Against LBHI**

First of all, to the extent that JPMorgan's allegations are based on the alleged

reallocation of the tri-party repo shells, they fail to state any claim against LBHI.  JPMorgan

does not explain with specificity what role LBHI played in the allocation of collateral for the tri-

party repos involving Barclays, JPMorgan, and LBI.  Instead, JPMorgan alleges generally that

"*Lehman* manipulated the shells" and "*Lehman* personnel took numerous steps." (Counterclaims

¶ 113).  But this vague attribution to all Lehman entities fails to state a claim with sufficient

particularity against LBHI.  See Defer, 654 F. Supp. 2d at 213 (dismissing fraud claims where

general allegation did not specify which Raymond James entity was involved).

Nor could JPMorgan allege that LBHI, rather than LBI, changed the composition

of the tri-party repo shells.  The contract governing these tri-party repos authorized LBI to shift

collateral between tri-party shells (so long as the Margin Value, as determined by JPMorgan,

remained equal or greater to the purchase price).  (Ex. G, Barclays Custodial Undertaking § 3(f)).

LBHI was not a party to the contract and did not have the authority to change the allocation of

securities within the shells.  These allegations of actions that could only have been taken by LBI

do not allege that LBHI gave substantial assistance to Barclays.  See Bestfoods, 524 U.S. at 61;

IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F. Supp. 2d 395, 403 (S.D.N.Y. 2009)

("Under New York law, a corporate parent is not automatically liable for the acts of its wholly

owned subsidiary, even where the parent and subsidiary corporations have interlocking

directorates.").

### 2.     Filing the Request for a Sale Hearing to Approve the APA Does Not Plead That LBHI Substantially Assisted in Barclays' Fraud

Thus, the only allegation of aiding and abetting fraud that has been pled against

LBHI in particular is that LBHI filed the Sale Motion asking for approval of the APA.  This

alone is insufficient to satisfy the element of providing substantial assistance to fraud.

Under New York law, "with respect to an aiding and abetting fraud claim, the

'substantial assistance' and 'causation' elements are interrelated - whether the assistance is

substantial or not is measured by whether the action of the aider and abettor proximately caused

the harm on which the primary liability is predicated."  Pension Comm. of Univ. of Montreal

Pension Plan v. Banc of Am. Sec. LLC, 446 F. Supp. 2d 163, 202 (S.D.N.Y. 2006) (internal

quotation omitted); see also Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 62-63 (2d Cir. 1985) (granting motion to dismiss and explaining "[i]n alleging the requisite substantial assistance by the aider and abettor, the complaint must allege that the acts of the aider and abettor proximately caused the harm to the [plaintiff] on which the primary liability is predicated" and "[a]llegations of a but for causal relationship are insufficient"); Filler v. Hanvit Bank, No. 01 Civ. 9510(MGC), 02 Civ. 8251(MGC), 2003 WL 22110773, at *2 (S.D.N.Y. Sept. 12, 2003) (quoting Bloor in a New York common law fraud context and granting motion to dismiss).

Here, the filing of a motion to schedule a sale hearing for approval of the APA can hardly be said to have proximately caused JPMorgan's injury. For all the reasons described above, JPMorgan could not have reasonably relied on this agreement in making its decisions as tri-party custodian.

Nor did the filing of the APA render substantial assistance to Barclays in making numerous allegedly false representations directly to JPMorgan. Filing the APA did not contribute to Barclays' statements, did not deliver those statements to JPMorgan, did not cause Barclays to decline to extend the Barclays Repo, and did not otherwise directly assist Barclays in making allegedly fraudulent misrepresentations to JPMorgan.

Therefore, JPMorgan has not pled sufficient facts to show that LBHI provided substantial assistance to Barclays, and the third cause of action for aiding and abetting fraud should be dismissed. See In re Sharp Int'l Corp., 403 F.3d 43, 51-53 (2d Cir. 2005) (affirming dismissal of aiding and abetting claim where complaint did not show plaintiff affirmatively assisted the fraud, helped conceal the fraud, or had a duty to act); Fezzani v. Bear, Stearns & Co., Inc., 592 F. Supp. 2d 410, 432 (S.D.N.Y. 2008) (dismissing aiding and abetting claim because

the "allegations do not sufficiently allege that the [defendants'] participation in the fraud was a proximate cause of the Plaintiffs' harm"); Pension Comm., 446 F. Supp. 2d at 202 (dismissing claim for aiding and abetting fraud because plaintiff did not allege the defendant took affirmative actions that substantially assisted the commission of the fraud).

## D.    JPMorgan Fails To Plead Actual Knowledge

Not only do the Counterclaims fail to properly plead that LBHI rendered the substantial assistance required to support an aiding and abetting claim, JPMorgan has also failed to properly allege that LBHI had "actual knowledge" of the alleged underlying fraud committed by Barclays. In order to state a claim for aiding and abetting fraud, JPMorgan has to plead with particularity facts sufficient to create a strong inference that LBHI possessed actual knowledge that Barclays was engaged in fraudulent activity. Kolbeck, 939 F. Supp. at 246 (granting motion to dismiss and stating "New York common law, which controls the analysis here, has not adopted a constructive knowledge standard for imposing aiding and abetting liability" and that "New York courts and federal courts in this district have required actual knowledge").

The Counterclaims fail to meet this standard. Instead, JPMorgan alleges that "LBHI actually knew, or consciously avoided knowing, that Barclays was perpetrating a fraud upon JPMorgan." (Counterclaims ¶ 112). The alternative allegation that LBHI's participation in the alleged fraud was "reckless" is repeated throughout the Counterclaims. (See, e.g., id. ¶¶ 89, ("LBHI made intentionally, or at least recklessly, false and misleading representations"), 97 ("LBHI intentionally, or at least recklessly, failed to disclose and omitted material facts")).

It is well-established in this district that "[p]leading knowledge in the alternative with an allegation of reckless disregard is insufficient to allege a claim" of aiding and abetting fraud. In re Worldcom, 382 F. Supp. 2d 549, 560 (S.D.N.Y. 2005). For example, in Williams v. Bank Leumi Trust Co., the court ruled on a complaint in which the "plaintiff allege[d] that

[defendant] 'knew, or recklessly disregarded,' or 'knew or should have known' of the primary wrongdoing." No. 96 CIV. 6695(LMM), 1997 WL 289865, at *5 (S.D.N.Y. May 30, 1997). The court held that "[t]hese disjunctive phrases are insufficient under the actual knowledge standard," and dismissed the claim of aiding and abetting fraud. Id. The result here should be the same. The Counterclaims' disjunctive allegation of actual knowledge and conscious disregard fails to meet the actual knowledge requirement for pleading an aiding and abetting claim, and this third counterclaim should therefore be dismissed.

**POINT IV**

**JPMORGAN'S INDEMNIFICATION COUNTERCLAIMS SHOULD BE DISMISSED**

JPMorgan's fourth and fifth counterclaims, for purported indemnification under the 2000 Clearance Agreement and the Barclays Custodial Undertaking, respectively, should similarly be dismissed for failure to state a claim upon which relief may be granted. Notably, JPMorgan does not claim that it has actually suffered any loss subject to indemnification. (Counterclaims ¶ 11). Instead, JPMorgan asserts that it will suffer a loss in the event it is found liable in connection with Plaintiffs' First Amended Complaint and is ordered to pay damages or return LBHI's collateral for the benefit of LBHI's creditors. (Id. ¶ 12). JPMorgan's claims for indemnity are fatally flawed for a number of reasons.

First of all, the fourth counterclaim, which seeks indemnification under the 2000 Clearance Agreement, should be dismissed because the Barclays Custodial Undertaking – and not the 2000 Clearance Agreement – governs the transaction of which JPMorgan complains. Thus, the only indemnification provision that could have any application to the events at issue in JPMorgan's Counterclaims is contained in the Barclays Custodial Undertaking, a contract to which LBHI is not a party. As acknowledged in the Counterclaims, LBHI could only be liable for indemnification under the Barclays Custodial Undertaking by virtue of the September

Guaranty. If the September Guaranty is invalidated, for any of the reasons raised in Plaintiffs' First Amended Complaint, there will be no basis to seek payment through that indemnification provision.

Moreover, the indemnification provision in the Barclays Custodial Undertaking (and even the inoperative provision in the 2000 Clearance Agreement) does not apply where losses are due to JPMorgan's negligence or willful misconduct. To the extent JPMorgan incurs its claimed loss because this Court finds in favor of Plaintiffs on their state law and certain bankruptcy claims against JPMorgan, such an award would necessarily be premised on a judicial finding that JPMorgan engaged in the misconduct alleged in the First Amended Complaint. Thus, the very findings that would lead JPMorgan to seek indemnification would also preclude indemnification under the applicable provision.

Nor can the indemnification clauses immunize JPMorgan from the consequences of being ordered to return fraudulently conveyed or preferentially transferred LBHI assets to the estate. As discussed below, a party may not contract around the avoidance provisions of the Bankruptcy Code in this manner, or otherwise shield preferential or fraudulent transactions by agreeing to such an indemnity clause.

In sum, because none of the causes of action set forth in the First Amended Complaint give rise to an indemnifiable loss, JPMorgan's fourth and fifth counterclaims should be dismissed.

A.      **JPMorgan Fails to State a Claim for Indemnification Under the 2000 Clearance Agreement (Fourth Counterclaim)**

1.      **The Indemnity Clause of the Barclays Custodial Undertaking Provides the Exclusive Basis for Any Purported Indemnification Rights of JPMorgan**

JPMorgan's fourth counterclaim should be dismissed because the indemnity clause contained in the 2000 Clearance Agreement, upon which this counterclaim is based, has

no application in this case. Instead, the Barclays Custodial Undertaking governs any

indemnification rights JPMorgan may have with respect to the events at issue in JPMorgan's

Counterclaims.

As alleged in the Counterclaims, on September 15, 2008, JPMorgan, LBI and

Barclays executed the Barclays Custodial Undertaking to facilitate and govern the repurchase

transactions that would occur between LBI and Barclays during the following week.

(Counterclaims ¶¶ 125, 127 ("During the week of September 15, 2008, the repo transactions

between Barclays and LBI were effectuated under the Repurchase Agreement. Moreover, each

repo transaction required the agency and custodial services of JPMorgan pursuant to the

Custodial Undertaking.")); (Ex. G, Barclays Custodial Undertaking, at 1 ("WHEREAS, Buyer

and Seller have requested that Bank undertake certain agency and custodial functions in

connection with the Repurchase Agreement pursuant to the terms hereof . . . .")).

The Barclays Custodial Undertaking contained a new clause specifically

governing extensions of credit arising in connection with the Repurchase Agreement with

Barclays, including the extensions of credit JPMorgan would make to LBI that week. This

clause significantly departed from the pre-existing provisions governing the extensions of credit

contained in the 2000 Clearance Agreement, including (for example) by eliminating the

requirement that such extensions of credit be made at LBI's instructions, and authorizing

JPMorgan to extend credit without even giving notice to LBI. (Ex. G, Barclays Custodial

Undertaking § 3(d); Ex. A, 2000 Clearance Agreement § 5).[6]

---

[6] In several places in the Counterclaims, JPMorgan makes the conclusory allegation that the September 18, 2008 extensions of credit were made "under the Clearance Agreement." (See, e.g., Counterclaims ¶ 81). However, the Court is not required to accept this conclusion, given that it is directly contradicted by JPMorgan's own factual allegations (see, e.g, id. ¶¶ 125, 127) and the relevant contracts themselves. See Rapoport v. Asia Electronics Holding Co., Inc., 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) ("If these documents contradict the allegations of the amended complaint, the documents control and this Court need not accept as true the allegations in the amended complaint.") (citation omitted).

The Barclays Custodial Undertaking also contained its own indemnity clause. (Ex. G, Barclays Custodial Undertaking § 9 ("Seller and Buyer hereby agree, jointly and severally, to indemnify Bank for, and hold it harmless against any loss, liability or expense in connection with, arising out of or in any way related to this Agreement or the Repurchase Agreement . . . .")).

Section 9 of the 2000 Clearance Agreement expressly provided that, in the event of a conflict between any provision of the 2000 Clearance Agreement and a tri-party custodial agreement (such as the Barclays Custodial Undertaking), the latter would control. (Ex. A, 2000 Clearance Agreement § 9 ("Notwithstanding anything herein to the contrary, to the extent of any conflict between this [Clearance] Agreement and any tri-party custody agreement, whether now or hereafter existing, the terms of the tri-party custody agreement will govern.")). Moreover, the Barclays Custodial Undertaking states that it is the entire agreement and supersedes all prior written agreements on the same subject matter. (Ex. G, Barclays Custodial Undertaking § 13 ("This Agreement constitutes the entire agreement of the parties with respect to its subject matter and supersedes all prior oral or written agreements in regard thereto.")).

Thus, the indemnity clause contained in the Barclays Custodial Undertaking – and not the pre-existing indemnity clause of the 2000 Clearance Agreement – governs the transactions about which JPMorgan complains, including its claim for indemnification. JPMorgan expressly recognizes this fact in its Counterclaims. (See Counterclaims ¶ 128 ("If JPMorgan is unable to recover the full amount of any of its loans to LBI, or otherwise is required to pay damages to the Lehman estates, JPMorgan will have suffered a 'loss . . . in connection with, arising out of or in any way related to th[e] [Barclays Custodial Undertaking] or the Repurchase Agreement.") (modifications in original)). Because the indemnity clause of the 2000

Clearance Agreement does not apply, the fourth counterclaim should be dismissed. See Baraliu v. Vinya Cap., L.P., No. 07 Civ. 4626(MHD), 2009 WL 959578, at *4-5 (S.D.N.Y. Mar. 31, 2009) (dismissing claim based on purported breach of provision in a contract that was superseded by a later agreement).

### 2. The Clearance Agreement Prohibits Indemnification for Any JPMorgan Losses Related to Plaintiffs' State Law Claims or Those Bankruptcy Code Claims Premised on JPMorgan's Misconduct

Even if the indemnity clause of the 2000 Clearance Agreement were to apply to the events at issue in JPMorgan's Counterclaims, the fourth counterclaim should still be dismissed. That indemnification clause contains an exception for situations where JPMorgan is negligent, engages in willful misconduct, or breaches the Clearance Agreement. All of Plaintiffs' state law causes of action asserted in the First Amended Complaint, and numerous claims arising under the Bankruptcy Code, are based on JPMorgan's willful misconduct or breach of contract. To the extent Plaintiffs prevail under any of these claims and JPMorgan suffers its asserted "loss," JPMorgan will not be entitled to indemnification.

Section 16 of the 2000 Clearance Agreement bars indemnification for losses where JPMorgan has acted negligently, engaged in willful misconduct, or has breached the contract, as follows:

> Except where we [JPMorgan] are negligent or have engaged in willful misconduct, or have breached this Agreement for reasons other than those listed in Section 12 hereof, you [Lehman] will indemnify us and hold us harmless against any and all losses, claims, damages, liabilities or actions to which we may become subject, and reimburse us for any expenses (including reasonable attorneys' fees and expenses) incurred by us in connection therewith, insofar as such losses, claims, damages, liabilities or actions arise out of or are based upon or are in any way related to this Agreement.

(Ex. A, 2000 Clearance Agreement § 16 (emphasis added)). For the avoidance of doubt, the

2000 Clearance Agreement further provided: "We [JPMorgan] shall be liable to you [Lehman]

for direct damages sustained by you to the extent such damages result from our negligence or

malfeasance or our breach of any representations, warranties or agreements contained in this

Agreement . . . ." (Id.; see also id. § 13).

      Each of the state law claims asserted in the First Amended Complaint is based on

JPMorgan's misconduct. Specifically:

- Counts XXXV and XLVI seek a declaration that the September Guaranty and related agreements are invalid and unenforceable, as well as damages, based on JPMorgan's use of unlawful coercion in acquiring them, and/or JPMorgan's failure to provide new consideration and its acceptance of those agreements from a signatory that JPMorgan knew lacked any authority to bind LBHI;

- Count XXXVIII seeks a declaration that JPMorgan has no lien or other security interest with respect to the $8.6 billion of LBHI collateral as a result of JPMorgan's unauthorized transfer of LBHI's funds on deposit to JPMorgan's own general ledger account, for the purpose of preventing LBHI from accessing its funds in violation of the relevant security agreements;

- Counts XXXVI-XXXVII and XXXIX-XL seek the return of LBHI property and damages resulting from JPMorgan's unlawful conversion of that property and its unjust enrichment thereby;

- Counts XLII-XLV and XLVII seek damages for JPMorgan's intentional breaches of its various contracts (or implied covenants of good faith) with LBHI;

- Count XLVIII seeks damages and/or the rescission of the transfers of $8.6 billion of LBHI collateral acquired by JPMorgan through the use of unlawful threats and economic coercion; and

- Count XLIX seeks damages for the fraud perpetrated by JPMorgan to induce LBHI to deliver what was essentially its last $5 billion to JPMorgan on LBHI's last day of business.

      The very provision of the 2000 Clearance Agreement on which JPMorgan relies

thus excludes from indemnification any and all losses JPMorgan may suffer if it is found liable

under Plaintiffs' state law claims. Indeed, any reading to the contrary – i.e., that the parties intended for JPMorgan to be fully indemnified by LBHI for the harm caused to LBHI by JPMorgan's misconduct – would both defy common sense and violate public policy. See PPI Enterprises (U.S.), Inc. v. Del Monte Foods Co., Nos. 05-6885-cv (L), 05-7040-cv (CON), 2006 WL 3370698, at *2-3 (2d Cir. Nov. 20, 2006) (refusing to read broadly worded indemnification clause as providing indemnity for disputes between the parties; "the test is whether the intent to indemnify is unmistakably clear from the language of the promise, not whether the agreement could be read to provide for indemnification") (citation and quotation omitted); Medinol Ltd. v. Boston Scientific Corp., 346 F. Supp. 2d 575, 604-05 (S.D.N.Y. 2004) (same); see also Anderson v. Local Union No. 3, 582 F. Supp. 627, 633 (S.D.N.Y. 1984) ("Indemnity, like contribution, cannot be allowed in favor of an intentional tortfeasor. Indeed, the rationale for this rule is even stronger in the case of indemnity, because an intentional tortfeasor receiving indemnification would escape liability for his own deliberate wrongdoing.").

For these same reasons, losses related to JPMorgan's willful violations of the Bankruptcy Code or other bankruptcy claims premised on JPMorgan's misconduct are not subject to indemnification under the 2000 Clearance Agreement. Thus, Counts XXVI-XXVII (seeking avoidance and return of transfers made for impermissible purpose of building up a purported right of setoff), XXX (equitable subordination based on JPMorgan's misconduct), XXXI (disallowance of claims based on JPMorgan's misconduct), XXXII (constructive trust based on JPMorgan's misconduct and fraud), and XXXIII-XXXIV (seeking return of funds seized through JPMorgan's intentional violation of the automatic stay), set forth claims for which JPMorgan is not entitled to indemnification.

Accordingly, to the extent the fourth counterclaim seeks indemnity for losses related to either the state law claims or the above-listed Bankruptcy Code claims asserted in the First Amended Complaint, that counterclaim should be dismissed.

### 3. JPMorgan's Losses Related to Plaintiffs' Claims Arising Under the Avoidance Provisions of the Bankruptcy Code Are Not Subject to Indemnification

JPMorgan is similarly not entitled to indemnification from the estate for the lost value of property it may be required to return pursuant to the remainder of Plaintiffs' claims, all of which arise out of the avoidance provisions of the Bankruptcy Code (Counts I-XII, XV-XXIV, and XXVIII-XXIX). As an initial matter, there is nothing in the text of the indemnification clause that indicates the parties intended that clause to cover such losses. For this reason alone, the clause should be read as excluding this category of loss. See Corporate Jet Aviation, Inc. v. Vantress (In re Corporate Jet Aviation, Inc.), 45 B.R. 629, 639 (Bankr. N.D. Ga. 1985) (dismissing indemnification counterclaim because, inter alia, "the literal terms of the indemnity agreement do not purport to require indemnification arising from an action under the avoidance powers of the Bankruptcy Code"); cf. Scott-Macon Sec., Inc. v. Zoltek Cos., Inc., No. 06-2711-cv, 2007 WL 2914873, at *16-18 (2d Cir. Oct. 4, 2007) ("It is not 'unmistakably clear' from the language of the Agreement that the parties intended that Zoltek indemnify Scott-Macon for disputes between the parties themselves. Therefore, the district court's award of attorneys' fees was error and is reversed.") (collecting authority).

Even if this were not the case, the indemnity clause cannot be read as creating an obligation on behalf of the LBHI estate, and thus LBHI's creditors, to reimburse or indemnify JPMorgan for losses it incurs in returning fraudulently or preferentially acquired property to the estate. The Bankruptcy Code's avoidance provisions are "intended to prevent a debtor from diminishing funds that are generally available for distribution to creditors." QSI Holdings, Inc. v.

Alford, 382 B.R. 731, 737 (W.D. Mich. 2007); see also Maxwell Commc'n Corp. PLC v. Societe Generale (In re Maxwell Commc'n Corp. PLC), 93 F.3d 1036, 1052 (2d Cir. 1996) ("The principal policies underlying the Code's avoidance provisions are equal distribution to creditors and preserving the value of the estate through the discouragement of aggressive pre-petition tactics causing dismemberment of the debtor."), (citing Union Bank v. Wolas, 502 U.S. 151, 161, 112 S.Ct. 527, 533 (1991)). These avoidance provisions would be rendered meaningless if creditors could contract around them by being indemnified by the estate in the event their fraudulent or preferential transactions are later avoided in bankruptcy. If public policy allowed for this outcome, any party doing business with a troubled company could give itself a preferential position over all other creditors simply by insisting that its transactions be covered by such an indemnity clause – an absurd result.

It is thus well-settled that prepetition agreements to forego bankruptcy or its benefits are unenforceable. See, e.g., Hayhoe v. Cole (In re Cole), 226 B.R. 647, 652 n.7 (9th Cir. B.A.P. 1998) (collecting authority), citing, inter alia, Fallick v. Kehr (In re Fallick), 369 F.2d 899, 904 (2d Cir. 1966) (stating in dictum that advance agreements to waive the benefits of bankruptcy are void), In re Weitzen, 3 F. Supp. 698, 698 (S.D.N.Y. 1933) ("The agreement to waive the benefit of bankruptcy is unenforceable. To sustain a contractual obligation of this character would frustrate the object of the Bankruptcy Act . . . .").[7] Federal courts have even

---

[7] See also In re Shady Grove Tech Ctr. Assocs. Ltd. Partnership, 216 B.R. 386, 390 (Bankr. D. Md. 1998) ("Prohibitions against the filing of a bankruptcy case are unenforceable"); In re Southeast Fin. Assocs., Inc., 212 B.R. 1003, 1005 (Bankr. M.D. Fla. 1997) (recognizing that a prepetition waiver of bankruptcy benefits is not self-executing or binding on third parties); In re Gulf Beach Dev. Corp., 48 B.R. 40, 43 (Bankr. M.D. Fla. 1984) (stating in dictum that "the Debtor cannot be precluded from exercising its right to file Bankruptcy and any contractual provision to the contrary is unenforceable as a matter of law"); In re Tru Block Concrete Prods., Inc., 27 B.R. 486, 492 (Bankr. S.D. Cal. 1983) ("It is a well settled principle that an advance agreement to waive the benefits conferred by the bankruptcy laws is wholly void as against public policy."); Rupp v. Holling (In re Holling), Bankruptcy No. 05-38322, 2007 WL 2964505, at *15 (Bankr. D. Utah Feb. 8, 2007) ("It is inappropriate and against public policy to allow the Debtor and LCI to contract away the essential provisions of the Code.").

sanctioned parties for attempting to enforce purported contractual prohibitions against a debtor's right to invoke the preference provisions of the Bankruptcy Code.  See, e.g., Asher v. Film Ventures Int'l, Inc. (In re Film Ventures Int'l, Inc.), 89 B.R. 80, 83-84 (9th Cir. B.A.P. 1988) ("If the agreements did contain such a prohibition it would be ineffective; otherwise, creditors could, by contract, insulate themselves from liability for preferential transfers under the Bankruptcy Code.  Such result would clearly be at odds with the equality of distribution principles underlying 11 U.S.C. § 547.").

In the only case of which Plaintiffs are aware that has directly addressed the issue, the bankruptcy court refused to read an indemnity clause as providing protection against the trustee's power to recover fraudulently transferred assets.  In Corporate Jet Aviation, Inc. v. Vantress, the trustee sought to avoid a constructively fraudulent payment made by the debtor to the defendant as part of a stock redemption.  45 B.R. at 630.  The defendant counterclaimed and argued that an indemnification clause contained in the stock redemption agreement required the debtor to reimburse the defendant in the event the trustee was successful on its claims.  Id. at 639.  The bankruptcy court rejected this argument and dismissed the defendant's counterclaim, stating there was "no authority for the proposition that a party can contractually insulate a transaction from the power of the trustee in bankruptcy to recover fraudulently transferred assets for equitable distribution to unsecured creditors."  Id. at 639.

The result in this adversary proceeding should be no different.  JPMorgan should not be allowed to invoke a contractual indemnity clause for the purpose of nullifying the trustee's avoidance powers at the expense of the LBHI estate's creditors.  Accordingly, to the extent JPMorgan's fourth counterclaim seeks indemnity from the estate for losses JPMorgan may incur

in returning to the estate fraudulently or preferentially conveyed LBHI property, that counterclaim should be dismissed.

**B.      JPMorgan Fails to State a Claim for Indemnification Under the Barclays Custodial Undertaking (Fifth Counterclaim)**

JPMorgan's fifth counterclaim, seeking indemnification pursuant to the Barclays Custodial Undertaking, should also be dismissed.  Because LBHI is not a party to that agreement, it will not provide any basis to recover losses in the event that the guaranties at issue in the First Amended Complaint are found to be invalid or unenforceable.  Moreover, JPMorgan has failed to plead underlying facts that would state a claim under the indemnification provision cited in the Counterclaims.

**1.      Because LBHI Is Not a Party to the Barclays Custodial Undertaking, It Cannot Form a Basis for Indemnification If Plaintiffs Establish the Invalidity of the September Guaranty and Related Agreements**

LBHI is not a party to the Barclays Custodial Undertaking.  Instead, the fifth counterclaim is based solely on the premise that LBHI is found to be a guarantor of LBI's obligations by virtue of the September Guaranty and related agreements.  (Counterclaims ¶ 131). This counterclaim should therefore be dismissed to the extent it seeks indemnification for losses that JPMorgan will incur in connection with the successful prosecution of Plaintiffs' claims that are premised on the invalidity of the September Guaranty and related agreements.

**2.      The Barclays Custodial Undertaking Also Will Not Indemnify JPMorgan's Losses Due to the Exception for Negligence or Willful Misconduct**

In any event, none of the losses that JPMorgan will incur in connection with the First Amended Complaint are subject to indemnification under the Barclays Custodial Undertaking for the same reasons they are not indemnifiable under the 2000 Clearance Agreement.  As in the 2000 Clearance Agreement, section nine of the Barclays Custodial Undertaking prohibits indemnification for losses resulting from JPMorgan's own negligence or

willful misconduct. (Ex. G, Barclays Custodial Undertaking § 9 ("Seller and Buyer shall not be liable for any loss, liability or expense to the extent that it is determined to be the direct result of acts or omissions on the part of [JPMorgan] constituting negligence or willful misconduct.")). With respect to the losses JPMorgan may incur in connection with Plaintiffs' prosecution of their state law and certain bankruptcy claims discussed above – i.e., the payment of damages or return of LBHI's property – such losses would only arise upon a judicial finding that JPMorgan acted willfully. Indemnification for those losses is therefore barred by the Barclays Custodial Undertaking.

The same result stems from New York law, which prohibits indemnification of intentional misconduct. Here, all of JPMorgan's misconduct at issue in the First Amended Complaint was intentional and engaged in for the purpose of unlawfully accumulating and withholding LBHI collateral to the detriment of LBHI and its creditors. New York law prohibits indemnification for the losses that JPMorgan will incur if this Court finds that JPMorgan engaged in this alleged misconduct, and thereby orders JPMorgan to pay damages or return LBHI's property. See Anderson, 582 F. Supp. at 633; see also St. Paul Fire and Marine Ins. Co. v. Universal Builders Supply, 409 F.3d 73, 86 (2d Cir. 2005), (citing Austro v. Niagara Mohawk Power Corp., 487 N.E.2d 267, 267, 496 N.Y.S.2d 410, 410 (1985) (stating that indemnity contracts are not contrary to public policy unless they "purport to indemnify a party for damages flowing from an injury that was intentional") (emphasis added)).

Moreover, as discussed above, to the extent JPMorgan is harmed by virtue of having to return fraudulent or preferential transfers pursuant to the avoidance provisions of the Bankruptcy Code, such losses are not subject to indemnification or reimbursement. See Corporate Jet Aviation, 45 B.R. 629.

### 3. JPMorgan Cannot Invoke the Purported "Absolute[]" Indemnity Provision of the Barclays Custodial Undertaking

The fifth counterclaim also cites to the part of the indemnification provision which purports to provide an "absolute[]" indemnity for losses "incurred as a result of complying with the instructions of Buyer or Seller." (See Counterclaims ¶ 129). But that clause has no application in this case, as the Counterclaims do not allege that JPMorgan was acting on the instructions of Barclays or LBI when it unwound the Barclays Repo on September 18, 2008. See Baraliu, No. 07 Civ. 4626(MHD), 2009 WL 959578 at *5-6 ("Under the Federal Rules, a plaintiff is required to 'allege generally that all conditions precedent have occurred or been performed.' Plaintiff fails to do so . . . and hence this claim must be dismissed."), (quoting Fed. R. Civ. P. 9(c)).

JPMorgan's decision not to include such an allegation in an otherwise detailed play-by-play account of the loans made to LBI during its last week is no oversight. The Barclays Custodial Undertaking expressly authorized JPMorgan to act without instruction from (or even notice to) LBI. Specifically, pursuant to section 3(d), the parties expressly agreed that JPMorgan was "not undertaking to make credit available" in the event LBI had insufficient funds to facilitate the morning unwind of its repurchase transactions, but that instead JPMorgan "may, at [JPMorgan's] option and without notice to [LBI], advance the amount of such deficiency on [LBI]'s behalf." (Ex. G, Barclays Custodial Undertaking § 3(d)). Because neither the factual allegations of the Counterclaims nor the operative agreement itself provide any basis to conclude that JPMorgan's loans to LBI were made pursuant to LBI's instructions, the Counterclaims do not state a claim under that broader indemnity provision. See Baraliu, No. 07 Civ. 4626(MHD), 2009 WL 959578 at *5-6.

Even if JPMorgan alleged the necessary factual predicate to invoke this clause, it would still not provide the indemnity claimed by JPMorgan. As discussed above, JPMorgan's claimed losses could only arise upon a judicial finding that JPMorgan engaged in the misconduct alleged in the First Amended Complaint, or that the LBHI estate is entitled to the return of its assets pursuant to the avoidance provisions of the Bankruptcy Code. Public policy prohibits contractual indemnification for such losses. See, e.g., Anderson, 582 F. Supp. at 633; Corporate Jet Aviation, 45 B.R. at 629.

In sum, JPMorgan has failed to identify any loss that would be subject to indemnification under the Barclays Custodial Undertaking. The fifth counterclaim should therefore be dismissed.

*[Remainder of page intentionally left blank.]*

## CONCLUSION

For the forgoing reasons, Plaintiffs LBHI and the Committee respectfully request that the Counterclaims be dismissed in their entirety.

Dated:      New York, New York
January 31, 2011

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: /s/ John B. Quinn

John B. Quinn
Erica Taggart
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
(213) 443-3000

Susheel Kirpalani
Andrew J. Rossman
James Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000
*Counsel for Plaintiff Intervenor, the Official
Committee of Unsecured Creditors of
Lehman Brothers Holdings Inc.*

**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**

By: /s/ Joseph D. Pizzurro

Joseph D. Pizzurro
L.P. Harrison 3rd
Michael J. Moscato
Nancy E. Delaney
Peter J. Behmke
Cindi M. Eilbott
101 Park Avenue
New York, New York 10178-0061
(212) 696-6000
*Counsel for Plaintiff, Debtor Lehman
Brothers Holdings Inc.*