**CURTIS, MALLET-PREVOST,**
**COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
*Counsel for Debtor Lehman Brothers Holdings Inc.*

**QUINN EMANUEL**
**URQUHART & SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543

51 Madison Avenue, 22nd Floor
New York, New York 10010-1603
*Counsel for the Official Committee of Unsecured*
*Creditors of Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>       Debtors. | Chapter 11<br><br>Case No. 08-13555 (JMP)<br><br>(Jointly Administered) |
| LEHMAN BROTHERS HOLDINGS INC. and<br>OFFICIAL COMMITTEE OF UNSECURED<br>CREDITORS OF LEHMAN BROTHERS HOLDINGS<br>INC., *et al.*<br><br>       Plaintiff and Plaintiff Intervenor,<br><br>  v.<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>       Defendant. | Adversary Proceeding<br><br>Case No. 10-03266 (JMP) |

**PLAINTIFFS' RESPONSE TO MEMORANDUM OF LAW OF THE**
**INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, INC. AND THE**
**SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION IN**
**SUPPORT OF MOTION TO DISMISS BY JPMORGAN CHASE BANK, N.A.**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ............................................................................................................................. 3

POINT I    AMICI PROVIDE NO BASIS TO CONCLUDE THAT GUARANTIES ARE
WITHIN THE SCOPE OF SECTION 546'S SAFE HARBOR ................................. 3

    A. The Guaranties Are Not "Transfers" as Defined in the Code; They Are Obligations ........ 3

        1. Amici's Argument Finds No Support in the Statutory Text or Applicable
Case Law ........................................................................................................................ 4

        2. The Guaranties Did Not Transfer Anything; They Created Obligations Owing
From LBHI to JPMorgan ................................................................................................ 6

        3. Cases Regarding When a Transfer by Check Occurs Do Not Support Amici's
Argument That a Guaranty Is a Transfer ...................................................................... 8

    B. Application of the Plain Text of the Statutes Will Not Render All Swap Agreements
Avoidable ............................................................................................................................ 10

POINT II   THE AMICI BRIEF INCORRECTLY ARGUES THAT A RULING ON THE
SAFE HARBOR ISSUES OF THIS CASE WOULD THREATEN
FUNDAMENTAL MARKET PROTECTIONS ...................................................... 14

    A. A Factual Inquiry Is Appropriate to Determine Whether the September Agreements
and Collateral Transfers Meet Any Definition of Safe Harbored Transactions ............... 16

    B. This Court's Ruling Regarding These Safe Harbor Issues Would Not "Threaten
Fundamental Market Protections" ....................................................................................... 19

        1. This Court's Ruling Would Have No Impact on Market Participants' Ability
to Use Non-ISDA Form Collateral Agreements, or to Enter New Collateral
Arrangements for Pre-Existing Debts ........................................................................... 19

        2. This Court's Ruling Would Have No Impact on Parties' Ability to Trade
With Weakened Counterparties ..................................................................................... 21

    C. JPMorgan's Post-Petition Claims Do Not Retroactively Convert the September
Agreements and Asset Transfers to Transactions Made "In Connection With"
Clearance or Derivatives Agreements ................................................................................. 24

CONCLUSION ......................................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

3V Capital Master Fund Ltd. v. Official Comm. of Unsecured Creditors
  (In re TOUSA, Inc.),
  No. 10-60017-Civ/Gold, 2011 WL 522008 (S.D. Fla. Feb. 11, 2011) ....................................13

Alfa, S.A.B. de C.V. v. Enron Creditors Recovery Corp.
  (In re Enron Creditors Recovery Corp.),
  422 B.R. 423 (S.D.N.Y. 2009) .................................................................................17, 18

Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.,
  351 F. Supp. 2d 79 (S.D.N.Y. 2004) ........................................................................17, 18

Anand v. Nat'l Republic Bank of Chicago,
  239 B.R 511 (Bankr. N.D. Ill. 1999) ................................................................................20

Bank of Am., N.A. v. Lehman Bros. Holdings Inc.
  (In re Lehman Bros. Holdings Inc.),
  439 B.R. 811(Bankr. S.D.N.Y. 2010) ...............................................................................17

Barnhill v. Johnson,
  503 U.S. 393 (1993) ..............................................................................................9, 10

BFP v. Resolution Trust Corp.,
  511 U.S. 531 (1994) ..................................................................................................11

Chomakos v. Allard,
  69 F.3d 769 (6th Cir. 1995) ..........................................................................................13

Covey v. Commercial Nat'l Bank of Peoria,
  960 F.2d 657 (7th Cir. 1992) .......................................................................................5, 9

Fidelity Bond & Mortg. Co. v. Brand,
  371 B.R. 708 (E.D. Pa. 2007) .........................................................................................8

Garcia v. Shanahan,
  615 F. Supp. 2d 175 (S.D.N.Y. 2009) ................................................................................6

Hutson v. E.I du Pont de Nemours & Co.
  (In re Nat'l Gas Distribs. LLC),
  556 F.3d 247 (4th Cir. 2009) .........................................................................................18

In re Asia Global Crossing, Ltd.,
    333 B.R. 199 (Bankr. S.D.N.Y. 2005) .................................................................5, 9

In re Canyon Sys. Corp.,
    343 B.R. 615 (Bankr. S.D. Ohio 2006) ..................................................................8

In re Enron Corp.,
    300 B.R. 201 (Bankr. S.D.N.Y. 2003).................................................................6, 7

In re Kaplan Breslaw Ash, LLC,
    264 B.R. 309 (Bankr. S.D.N.Y. 2001).................................................................20

In re Lehman Bros. Holdings, Inc.,
    433 B.R. 101 (Bankr. S.D.N.Y. 2010).................................................................12

In re Morris Commc'ns NC, Inc.,
    914 F.2d 458 (4th Cir. 1990) ...............................................................................13

Iselin v. United States,
    270 U.S. 245 (1926)............................................................................................12

Jackson v. Mishkin
    (In re Adler, Coleman Clearing Corp.),
    263 B.R. 406 (S.D.N.Y. 2001) ...........................................................................17

Lamie v. U.S. Trustee,
    540 U.S. 526 (2004)............................................................................................11

Maron v. Silver,
    58 A.D.3d 102, 871 N.Y.S.2d 404 (3d Dep't 2008) .............................................6

Monroe County Public School Districts v. Zyra,
    51 A.D.3d 125, 853 N.Y.S.2d 821 (4th Dep't 2008).............................................6

Official Comm. of Unsecured Creditors v. J.P. Morgan Chase Bank, N.A.
    (In re M. Fabrikant & Sons, Inc.),
    394 B.R. 721 (Bankr. S.D.N.Y. 2008)..................................................................5

Reaves v. Comerica Bank-California
    (In re GTI Capital Holdings, LLC),
    373 B.R. 671 (Bankr. D. Ariz. 2007)..................................................................20

Rubin v. Mfrs. Hanover Trust Co.,
    661 F.2d 979 (2d Cir. 1981) .............................................................................5, 9

Sand Filtration Corp. of Am. v. Cowardin,
   213 U.S. 360 (1909) .................................................................................18

Seligson v. N.Y. Produce Exch.,
   394 F. Supp. 125 (S.D.N.Y. 1975) .......................................................13

Silverman v. Paul's Landmark Inc.
   (In re Nirvana Rest. Inc.),
   337 B.R. 495 (Bankr. S.D.N.Y. 2006) ...................................................5

Stender v. Lucky Stores, Inc.,
   780 F.Supp. 1302 (N.D. Cal. 1992) ......................................................14

TRW v. Andrews,
   534 U.S. 19 (2001) .................................................................................6

W. Va. Univ. Hosp., Inc. v. Casey,
   499 U.S. 83 (1991) ....................................................................11, 12, 14

## Statutes

11 U.S.C. § 101 ..............................................................................passim

11 U.S.C. § 546 ..............................................................................passim

11 U.S.C. § 548 ..............................................................................passim

11 U.S.C. § 555 ....................................................................................12

11 U.S.C. § 556 ....................................................................................12

11 U.S.C. § 741....................................................................................24, 25

N.Y.U.C.C. § 3-104 ..............................................................................10

## Other Authorities

H.R. Rep. 97-420 (1982) ........................................................................12

S. Rep. 95-989 (1978) ............................................................................13

BLACK'S LAW DICTIONARY (9th ed. 2009)..............................................4, 5

John-Peter Castagnino, DERIVATIVES: THE KEY PRINCIPLES,
   1-2 (3d ed. 2009)..................................................................................12

Phillip I. Blumberg, Intragroup (Upstream, Cross-Stream,
    and Downstream) Guaranties Under the Uniform
    Fraudulent Transfer Act, 9 CARDOZO L. REV. 685 (1987) .......................................................8

Weintraub & Resnick, BANKRUPTCY LAW MANUAL ..................................................................20

Plaintiffs Lehman Brothers Holdings Inc. ("LBHI"; with its subsidiaries, "Lehman") and the Official Committee of Unsecured Creditors (the "Committee"; together with LBHI, "Plaintiffs") hereby respectfully submit this response to the memorandum of law submitted by the International Swaps and Derivatives Association, Inc. ("ISDA") and the Securities Industry and Financial Markets Association ("SIFMA"; together with ISDA, "Amici") in support of the motion to dismiss of defendant JPMorgan Chase Bank, N.A. ("JPMorgan").

## PRELIMINARY STATEMENT

Amici are industry organizations that represent the interests of numerous financial institutions, including JPMorgan, that have been named as defendants in adversary proceedings currently before the Court as part of the Lehman chapter 11 cases or that were counterparties to Lehman entities in the days leading up to the bankruptcy and, as such, face potential avoidance or related actions. On February 2, 2011, concurrently with JPMorgan's filing of its reply in further support of its motion to dismiss Plaintiffs' First Amended Complaint (the "Amended Complaint" or "Am. Compl."), Amici filed a memorandum of law (the "Amici Brief or "Amici Br.") that further pleads JPMorgan's case from the claimed perspective of disinterested industry representatives.

The Amici Brief hardly presents a disinterested view of the Bankruptcy Code safe harbor issues in this case. Instead, it explicitly advocates for dismissal of Plaintiffs' claims and an expanded reading of the safe harbor provisions that would sanction JPMorgan's egregious conduct, with no attendant benefit to market participants that play by the rules and rely on the safe harbor protections to facilitate actual trading activity. In so doing, Amici ignore not only governing authority, but also the unique facts of this case that distinguish the safe harbor issues presented here from those facing ordinary market participants that do not engage in the misconduct alleged in the Amended Complaint.

For example, while implicitly conceding that the section 546 safe harbor provisions shield transfers and not the incurrence of obligations, Amici argue that guaranties such as those at issue here should be deemed "transfers" for purposes of section 546.  Amici's argument wholly ignores the numerous cases within this district and elsewhere that have uniformly held that the creation of a guaranty is considered the incurrence of an obligation, as opposed to a transfer, for purposes of the Bankruptcy Code.  The illogical argument offered by Amici to the contrary -- i.e., that the guaranties should be considered transfers of contract rights, even though they do not purport to transfer or assign any contractual rights belonging to LBHI -- provides no basis to disregard this applicable authority.

Amici also warn that, if this Court refuses to dismiss Plaintiffs' claims on safe harbor grounds at the pleading stage, such a ruling would somehow "threaten fundamental market protections."  But Amici again ignore the numerous cases in this district that instruct courts, when faced with novel agreements and transfers, to undertake the fact-finding necessary to determine if they actually qualify for safe harbor protection.  That inquiry is particularly appropriate in this case, where the Amended Complaint pleads that the September Agreements[1] and multi-billion dollar asset transfers to JPMorgan were not made in connection with any actual clearance, repurchase or swap transaction.  Instead, they were procured through unlawful economic coercion and misrepresentations for the purpose of creating an "extra cushion" for any and all claims against Lehman.  None of these essential pleaded facts are even addressed by Amici, nor do they explain how the Court's ruling with respect to these particular agreements and transfers could impede legitimate market activity or frustrate participants' ability to enter credit enhancements for the purpose of facilitating actual clearance, repurchase or swap transactions.

---

[1] Capitalized terms used herein shall have the same meanings as those in the Amended Complaint, unless otherwise defined.

The Amici Brief thus fails to offer any justification for granting JPMorgan's motion to dismiss the Amended Complaint.[2] For the reasons set forth herein and in Plaintiffs' Opposition to JPMorgan's motion to dismiss (the "Opposition Brief" or "Opp. Brief"), the motion should be denied.

## ARGUMENT

### POINT I

### AMICI PROVIDE NO BASIS TO CONCLUDE THAT GUARANTIES ARE WITHIN THE SCOPE OF SECTION 546'S SAFE HARBOR

**A.     The Guaranties Are Not "Transfers" as Defined in the Code; They Are Obligations**

Amici's first argument is that the August Guaranty and the September Guaranty (the "Guaranties") are "transfers" as that term is defined in section 101(54) of the Bankruptcy Code and used in section 546(e) of the Code. (Amici Br. at 6 ("the Guaranties are protected transfers within the meaning of sections 546 and 548(d)(2).")).[3] Specifically, Amici argue that "[t]he contracts described in Lehman's Amended Complaint document an exchange of such rights, and therefore

---

[2] To the extent Amici repeat arguments previously offered by JPMorgan or on which they have no industry-specific expertise, such as their arguments regarding Plaintiffs' actual fraudulent conveyance claims arising under 11 U.S.C. § 548(a), Plaintiffs will not repeat their response to such arguments here, but instead respectfully refer the Court to Plaintiffs' Opposition Brief.

[3] It is worth noting that JPMorgan's motion to dismiss never contended that the Guaranties were themselves transfers. Instead, JPMorgan's motion relied on alternative arguments that accepted -- and assumed -- the Guaranties were obligations. (See, e.g., JPMorgan's Memorandum of Law in Support of Motion to Dismiss at 50 ("Although avoidance of LBHI's obligations under the Guaranties in this case could have no bearing on the challenged transfers for the reasons set forth above, LBHI's guaranty obligations are, in any event, not themselves avoidable. As explained below, section 546's safe harbor provisions protect LBHI's guaranty obligations just as they protect the challenged transfers.")). The closest JPMorgan comes to making the argument presented by Amici is a single paragraph in its reply brief, echoing Amici's argument. (JPMorgan's Reply Brief in Further Support of Motion to Dismiss at 29). But JPMorgan answers its own argument when it concludes the paragraph by stating that "LBHI agreed to part with property, by satisfying a debt to JPMorgan, if one of its subsidiaries defaulted on that debt," which describes an obligation, rather than a transfer.

constitute transfers of property interests." (Amici Br. at 7). As demonstrated below, Amici's

argument is contrary to settled case law and otherwise without merit.

1. **Amici's Argument Finds No Support in the Statutory Text or Applicable Case Law**

The Bankruptcy Code defines a transfer as "each mode, direct or indirect, absolute or

conditional, voluntary or involuntary, of disposing or parting with—(i) property; or (ii) an interest

in property." 11 U.S.C. § 101(54)(D). Under that definition, the Guaranties here are not "transfers"

because they do not transfer property or any interest in property, but rather purport to create a

contractual obligation owing from LBHI to JPMorgan. Specifically, they guarantee "the punctual

payment of all obligations and liabilities" subject to the Guaranties. (Ex. 7, September Guaranty

§ 1; Ex. 4, August Guaranty § 1).[4] Similarly, the Guaranties set forth the circumstances when "the

Liabilities may be declared to be due and payable" in the future. (Id.; see also Guaranties § 2 ("The

Guarantor guarantees that the Liabilities shall be paid strictly in accordance with the terms of the

Facilities . . . .")).

While the Guaranties are not transfers, they are clearly obligations. The Bankruptcy

Code does not define the term "obligations." However, Black's Law Dictionary defines

"obligation" as:

> 1. A legal or moral duty to do or not do something. The word has
> many wide and varied meanings. It may refer to anything that a
> person is bound to do or forbear from doing, whether the duty is
> imposed by law, contract, promise, social relations, courtesy,
> kindness, or morality. 2. A formal, binding agreement or
> acknowledgment of a liability to pay a certain amount or to do a
> certain thing for a particular person or set of persons; esp., a duty
> arising by contract.

---

[4] All exhibit citations refer to the Declaration of Amy R. Wolf in Support of Defendant's Motion to Dismiss and the exhibits thereto.

BLACK'S LAW DICTIONARY (9th ed. 2009). The Guaranties in this case fit within this definition because they purport to create a contingent duty arising by contract to pay a certain amount in the future.

This conclusion was reached by the United States District Court for the Southern District of New York in In re Asia Global Crossing Ltd., which ruled that a guaranty was an obligation, rather than a transfer. 333 B.R. 199, 203 (Bankr. S.D.N.Y. 2005) (holding that a guaranty was not a transfer for purposes of section 502(d) and 548 based on the definition of "obligations" in Black's Law Dictionary as "[a] formal binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing for a particular person or set of persons; esp., a duty arising by contract").

Amici do not cite to any statute or case holding that guaranties or other obligations are covered by the safe harbor. That is because every court ruling on the issue has found that a guaranty is an obligation – not a transfer. See, e.g., Rubin v. Mfrs. Hanover Trust Co., 661 F.2d 979, 990 (2d Cir. 1981) ("[Debtors], as secondary guarantors, became contingently liable if both the principal debtors and the principal guarantors defaulted. Undoubtedly, therefore, [Debtors] 'incurred' an 'obligation' of repayment [under Bankruptcy Act section 67(d), the precursor to § 548]."); Silverman v. Paul's Landmark Inc. (In re Nirvana Rest. Inc.), 337 B.R. 495, 508 (Bankr. S.D.N.Y. 2006) ("The Guaranty was an 'obligation' rather than a 'conveyance.'"); Covey v. Commercial Nat'l Bank of Peoria, 960 F.2d 657, 661 (7th Cir. 1992) ("a note or guarantee is not a 'transfer' for purposes of 11 U.S.C. § 101(54) . . . [but] both note and guarantee are obligations"); Official Comm. of Unsecured Creditors v. J.P. Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.), 394 B.R. 721, 734 n.13 (Bankr. S.D.N.Y. 2008) (New York fraudulent conveyance statute applies "[b]y its terms . . . to conveyances but not obligations, and cannot be relied on to invalidate the debtors' loan debt or guaranties.").

5

Moreover, acceptance of Amici's argument that guaranties constitute transfers would eliminate the distinction between transfers and obligations—a distinction Congress recognizes specifically in section 548(a)(1) of the Bankruptcy Code. See 11 U.S.C. § 548(a)(1) (authorizing avoidance of "any transfer . . . of an interest of the debtor in property, or any obligation"). Amici's expanded definition of "transfer" would render meaningless and superfluous the phrase "or any obligation," a reading prohibited by settled rules of statutory construction. See, e.g., Garcia v. Shanahan, 615 F. Supp. 2d 175, 183 (S.D.N.Y. 2009), quoting TRW v. Andrews, 534 U.S. 19, 31 (2001) ("[A] cardinal principle of statutory construction [is] that a statute should, upon the whole, be construed so that, if possible, no clause, sentence or word is rendered superfluous, void or insignificant."); Maron v. Silver, 58 A.D.3d 102, 125, 871 N.Y.S.2d 404, 421 (3d Dep't 2008) (noting proposed construction renders phrase "superfluous in violation of the principle of statutory construction that courts must give effect to every word of a statute") (citations omitted); Monroe County Public School Districts v. Zyra, 51 A.D.3d 125, 131, 853 N.Y.S.2d 821, 826 (4th Dep't 2008) (noting "rules of statutory construction require that we avoid rendering statutory language superfluous").

2.    **The Guaranties Did Not Transfer Anything; They Created Obligations Owing From LBHI to JPMorgan**

Rather than examining whether the Guaranties themselves transfer property, Amici point to various decisions and motions that recognize that contract rights are considered transferrable property once created by contract. (Amici Br. at 7, quoting In re Enron Corp., 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003) for the proposition that "contract rights are property of the estate"). Thus, Amici erroneously argue that because a transfer of property rights created by contract can be a transfer, "the Code's broad definition of 'transfer,' . . . can and should be understood to encompass the incurrence of obligations in this case." (Amici Br. at 6).

Indeed, the cases and motions Amici cite for their argument that the Guaranties transferred rights stand only for the unremarkable proposition that contract rights can become property of the estate *once created by contract*. (See Amici Br. at 7, <u>citing</u> <u>In re Enron Corp.</u>, 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003) ("Courts have consistently held that contract rights are property of the estate, and that therefore those rights are protected by the automatic stay."); Complaint, <u>Lehman Bros. Special Financing Inc. v. BNY Corporate Trustee Services Ltd. (In re Lehman Bros. Holdings Inc.)</u>, No. 09-ap-1242 (Bankr. S.D.N.Y. May 20, 2009), ECF No. 1 (arguing that LBSF's right to receive a certain priority of payment under a series of swaps was a pre-existing contractual right that was therefore "property of the estate"); Motion of Debtor and Debtor in Possession Pursuant to Sections 105(a), 362 and 365 of the Bankruptcy Code, to Compel Performance by AIG CDS, Inc. of its Obligations Under an Executory Contract and to Enforce the Automatic Stay, <u>In re Lehman Bros. Holdings Inc.</u>, No. 08-13555 (Bankr. S.D.N.Y. Aug. 7, 2009), ECF No. 4728 (contractual right to payment under swap agreement was property of the estate of LBSF, and AIG's refusal to pay violated automatic stay)). But the status of contract rights after they are created is irrelevant to the question before the Court, which does not involve contract rights as property of the estate or the transfer of pre-existing contract rights.

LBHI did not *transfer* contractual rights when it executed the Guaranties because no such rights existed to be transferred when the Guaranties were executed. And even upon execution, the Guaranties created rights for JPMorgan only, and concurrent obligations of LBHI to satisfy subsidiary indebtedness. Such obligations cannot constitute "property" of LBHI, and the Guaranties did not otherwise purport to transfer or assign to JPMorgan contractual rights that belonged to LBHI.

7

The fact that a guaranty creates rights and obligations, rather than transfers rights, was explained clearly in an article examining the avoidability of guaranties between members of a corporate group under the Uniform Fraudulent Transfer Act:

> UFTA section 5(b) refers only to a "transfer." This section contrasts vividly with its companion sections relating to fraudulent transactions . . . which more broadly refer to "[a] transfer made or obligation incurred." With the issuance of a guaranty, the guarantor incurs an obligation, but no transfer takes place.

Phillip I. Blumberg, Intragroup (Upstream, Cross-Stream, and Downstream) Guaranties Under the Uniform Fraudulent Transfer Act, 9 CARDOZO L. REV. 685, 703 (1987). Although the article concerned the Uniform Fraudulent Transfer Act, that Act is modeled on section 548 of the Bankruptcy Code, and its explanation for why guaranties are obligations rather than transfers applies equally here. Cf. Fidelity Bond & Mortg. Co. v. Brand, 371 B.R. 708, 719 (E.D. Pa. 2007) ("When drafting the model Uniform Fraudulent Transfer Act, the authors looked to the federal Bankruptcy Code for guidance . . . . Indeed, many provisions in the Uniform Fraudulent Transfer Act were modeled on the Bankruptcy Code . . . ."); In re Canyon Sys. Corp., 343 B.R. 615, 634 n.15 (Bankr. S.D. Ohio 2006) (noting "[t]he fraudulent transfer provisions of the Code and the UFTA are substantially similar").

### 3. Cases Regarding When a Transfer by Check Occurs Do Not Support Amici's Argument That a Guaranty Is a Transfer

Next, Amici claim that "Lehman applies faulty precedent in arguing that the Section 546 safe harbors do not protect incurrence of 'obligations,' as opposed to 'transfers.'" (Amici Br. at 8). As an initial matter, it is worth emphasizing that section 546 applies to transfers rather than obligations based on the plain language of Congress' statute—not due to common law interpretation by courts. Compare 11 U.S.C. § 548 (entitled "Fraudulent transfers and obligations" and providing "[t]he trustee may avoid any transfer . . . or any obligation . . . incurred by the debtor, that was made

8

or incurred on or within 2 years . . . ."); with 11 U.S.C. § 546(e) ("the trustee may not avoid a transfer that is a margin payment . . . .").

With respect to common law precedent, Amici argue the Supreme Court's decision in Barnhill v. Johnson, 503 U.S. 393 (1993), which was cited in Asia Global and Covey,[5] does not support Plaintiffs' position that the Guaranties at issue here do not constitute transfers under section 546. In Barnhill, the Supreme Court held that payment by check is deemed a "transfer" for purposes of section 547(b) at the time the check is honored. Id. at 400 ("For the purposes of payment by ordinary check, therefore, a 'transfer' as defined by § 101(54) occurs on the date of honor, and not before."). In doing so, the Court held that delivery of a check alone did not constitute a transfer, or even a "conditional transfer," because the debtor "retains full control over disposition of the account" until the check is honored. Id. at 400-01 (refuting argument that transfer occurred on date check was delivered because "the fairer description is that petitioner had received no interest in debtor's property, not that his interest was conditional").

Amici's argument is based on the fact that Barnhill left unchanged prior rulings by appellate courts holding that a check is considered a transfer upon delivery in the context of Bankruptcy Code section 547(c). Id. at 402 n.9 ("Those Courts of Appeals to have considered the issue are unanimous in concluding that a 'date of delivery' rule should apply to check payments for purposes of § 547(c)."). Based on purported similarities between section 547(c) and section 546, Amici argue that the "date of delivery" rule should apply to section 546 as well, and "[a]pplying the date-of-delivery rule, the Lehman guarantee is in fact a safe-harbored transfer." (Amici Br. at 9).

---

[5] Amici ignore the other Second Circuit case cited by plaintiffs also holding that a guaranty is an obligation, rather than a transfer. Rubin v. Mfrs. Hanover Trust Co., 661 F.2d 979, 990 (2d Cir. 1981) (holding that guarantor "'incurred' an 'obligation'" for purposes of section 67(d), the predecessor to section 548(a)).

If this were a case involving a delivered but unhonored check, Amici might have a valid point. But this case involves guaranties -- not checks.[6] And Barnhill makes very clear that underlying contracts promising payment in the future, like these Guaranties, are obligations -- not transfers. On this more relevant question of when an underlying contract constitutes an obligation, the following discussion in Barnhill is especially on point:

> That is not to say, however, that the recipient of a check is without any rights. Receipt of a check *for an underlying obligation* suspends *the obligation* pro tanto until the instrument's presentment; discharge of the underlying obligor on the instrument also discharges him on the obligation. But should the drawee bank refuse to honor a check, a cause of action against the drawer of the check accrues to the recipient of a check upon demand following dishonor of the instrument. And the recipient of a dishonored check, *received in payment on an underlying obligation*, may maintain an action on either the check or the obligation.

Id. at 1389-90 (internal citations and quotations omitted, emphasis added). In other words, the Supreme Court was clear in Barnhill that a contract promising to make a payment that results in the issuance of a check is an obligation -- not a transfer -- regardless of when the check rendering payment of that obligation is deemed a transfer.

**B.    Application of the Plain Text of the Statutes Will Not Render All Swap Agreements Avoidable**

Amici's argument that a parade of horribles, described as "adverse practical consequences," will befall the derivatives industry if this Court allows Plaintiffs' avoidance claims to proceed past the pleadings overstates the relief Plaintiffs are seeking. Specifically, Amici argue that if these Guaranties are not included in section 546's safe harbor as a matter of law, then derivatives contracts like ISDA master agreements and related confirmations could be subject to

---

[6] See N.Y.U.C.C. § 3-104 (defining a negotiable instrument as one that must "(a) be signed by the maker or drawer; and (b) contain an unconditional promise or order to pay a sum certain in money . . . (c) be payable on demand or at a definite time; and (d) be payable to order or to bearer. (2) A writing which complies with the requirements of this section is . . . (b) a 'check' if it is a draft drawn on a bank and payable on demand").

avoidance claims (if executed by an insolvent entity within two years of its bankruptcy for less than reasonably equivalent value). As Amici put it: "Although this case arises out of a series of security agreements and guarantees, if Lehman's basic premise were correct, then the underlying repurchase, swap, and securities transactions themselves would be subject to avoidance . . . as constructive fraudulent transfers, whenever the debtor believes it received less than 'reasonably equivalent value.'" (Amici Br. at 11).

Amici's argument seems to be that Congress erred in writing section 546 because, if implemented according to its plain terms, the safe harbor would not fully accomplish the goals that Congress intended. But that argument ignores settled maxims of statutory interpretation that require this Court to give meaning to Congress' omission of the word "obligation" from section 546, especially when that word appears in a related statute. (See Opp. Brief at 22-26, citing, e.g., BFP v. Resolution Trust Corp., 511 U.S. 531, 537 (1994) ("[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another."); Lamie v. U.S. Trustee, 540 U.S. 526, 538 (2004) (declining to read an absent word into 11 U.S.C. § 330(a)(1) because the statute has "a plain, nonabsurd meaning," and stating "[t]here is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted") (internal quotations omitted)).

Unable to identify either plain statutory language or legislative history supporting their position, Amici have no choice but to manufacture justification by describing their argument as "rational imputed legislative intent." (Amici Br. at 11). This Court must apply the statute as written, however, rather than speculate as to Congress' motives in choosing the language it did. See W. Va. Univ. Hosp., Inc. v. Casey, 499 U.S. 83, 101 (1991) ("What the Government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the

11

judicial function."), quoting Iselin v. United States, 270 U.S. 245, 250-51 (1926); see also In re

Lehman Bros. Holdings, Inc., 433 B.R. 101, 110 (Bankr. S.D.N.Y. 2010) ("[T]he Court must honor

the plain language of the safe harbor provisions . . . .").[7]

Amici inaccurately posit that all transactions under ISDA master agreements would

be vulnerable to avoidance if section 546's safe harbor were limited to transfers. Not so. "A

derivative is a contract which gives rise to rights and obligations in respect of an underlying asset or

other factor . . . . A derivative is designed primarily to be used as a risk-management tool." John-

Peter Castagnino, DERIVATIVES: THE KEY PRINCIPLES 1-2 (3d ed. 2009). Thus, at the time a

transaction such as an interest rate swap is entered into under an ISDA master agreement, each side

of the trade is vested with a contingent right to payment and a contingent obligation to pay,[8] and no

payment is made up front. Interest rate swap transactions and other types of derivatives are thus

never unilateral transfers of money from debtor to counterparty. Rather, they involve the allocation

of risk, and the chance that either party may be required to make transfers in the future.

---

[7] Amici argue that "Congress determined that these protections were necessary to prevent 'the insolvency of one commodity or security firm from spreading to other firms' and 'threatening the collapse of the affected industry.'" (Amici Br. at 2 (citing H.R. Rep. 97-420, at 2 (1982))). The protections to which Amici are referring, however, relate to the ability to terminate, liquidate and accelerate positions without first seeking relief from the automatic stay irrespective of any *ipso facto* implications—not the ability to coerce guaranties for less than reasonably equivalent value that render the debtor insolvent or are incurred at a time when the debtor is insolvent. See, e.g., 11 U.S.C. § 555 ("Contractual right to liquidate, terminate, or accelerate a securities contract") and 556 ("Contractual right to liquidate, terminate, or accelerate a commodities contract or forward contract").

[8] More properly described as a contingent right to receive payment if interest rates move in its favor, and a contingent liability to make payments if interest rates move against it, respectively.

Judged at the time of the execution of an interest rate swap, as they must be under settled law, such transactions, especially between arm's-length counterparties, would by their nature always be for reasonably equivalent value. 3V Capital Master Fund Ltd. v. Official Comm. of Unsecured Creditors (In re TOUSA Inc.), No. 10-60017-Civ/Gold, 2011 WL 522008, at *40 (S.D. Fla. Feb. 11, 2011) ("[W]hether a debtor received reasonable equivalent value must be evaluated as of the date of the transaction."); Chomakos v. Allard, 69 F.3d 769, 771-72 (6th Cir. 1995) (chance of winning conferred reasonably equivalent value for money spent betting at casino, even where odds favored casino and bettor ended up net loser); cf. In re Morris Comm'ns NC, Inc., 914 F.2d 458, 475 (4th Cir. 1990) ($5,000 payment reasonably equivalent value for stock that ended up being worth $286,000 because "when the defendant purchased the debtor's stock, there was no market for such stock, representing as it did mainly a lottery chance" to obtain a license related to cellular communications).[9]

---

[9] Amici also argue that, if the plain language of section 546 were applied to the facts in that case, the decision in Seligson v. N.Y. Produce Exch., 394 F. Supp. 125 (S.D.N.Y. 1975), would still be valid because the Seligson "court effectively found not only that the margin transfer was a fraudulent conveyance, but that the underlying obligation was unenforceable for lack of consideration." (Amici Br. at 13-14). This is a misstatement of the Seligson holding. In fact, the holding of the Seligson case concerned margin transfers, which are clearly within the safe harbor under any interpretation of section 546. Id. at 127 ("In the third count of the complaint, the plaintiff trustee . . . seeks to set aside Haupt's payments of over $12 million in variation margin . . . ."). When Congress acted to overturn Seligson, it confined its statute to margin transfers and made no mention of obligations. See S. Rep. 95-989, at 106 (1978) ("Subsection (c) overrules [Seligson], and provides as a matter of law that margin payments made by or to a clearing organization are not voidable.") (emphasis added).

Moreover, at least one United States Court of Appeals has recently noted that futures contracts by definition typically would be supported by reasonably equivalent value, suggesting that Amici's contentions regarding reasonably equivalent value would not prove accurate today, regardless of how Plaintiffs' theory fares. See Chomakos, 69 F.3d at 771 ("The investor in futures may win big, or his position may be wiped out, but the contractual right to a payoff if the market happens to move the right way at the right time constitutes a value reasonably equivalent to the money at risk.").

In the end, this Court need not reach the question of whether underlying swap agreements would constitute "obligations" or "transfers," or would ever be subject to avoidance under section 548(a)(1)(B). That question is simply not at issue in JPMorgan's motion to dismiss Plaintiffs' Amended Complaint; Amici's raising that question grossly overstates Plaintiffs' position in an attempt to paint Plaintiffs as seeking extraordinary relief and thereby obtain a decision in JPMorgan's favor. The only issue before the Court is whether the Amended Complaint states viable causes of action for avoidance of the Guaranties extracted from LBHI days before its bankruptcy. The statute should be applied, as written, to the facts at issue. See Casey, 499 U.S. at 84.[10]

## POINT II

### THE AMICI BRIEF INCORRECTLY ARGUES THAT A RULING ON THE SAFE HARBOR ISSUES OF THIS CASE WOULD THREATEN FUNDAMENTAL MARKET PROTECTIONS

Amici are similarly wrong in their argument that fundamental market protections could be threatened if this Court were to deny JPMorgan's motion to dismiss in order to conduct a factual inquiry regarding whether the September Agreements and $8.6 billion of related asset transfers are entitled to safe harbor protection. The Amended Complaint describes the

---

[10] In Casey -- a particularly noteworthy case, given Amici's argument -- the Supreme Court analyzed the language of 42 U.S.C. § 1988, which permitted the award of "a reasonable attorney's fee," to determine whether expert fees were recoverable as part of the "attorney's fee." Casey, 499 U.S. at 84. The Court noted that many statutes included plain language providing for the recovery of both attorney's fees and also, explicitly, expert witness fees. Id. at 88-92. The Court explained that "[i]f, as [petitioner] argues, the one includes the other, dozens of statutes referring to the two separately become an inexplicable exercise in redundancy." Id. at 92. After the Court adhered to the plain language and held that expert fees were not included in § 1988, Congress amended the statute to provide expressly for the recovery of expert fees. See Stender v. Lucky Stores, Inc., 780 F. Supp. 1302, 1306 n.13 (N.D. Cal. 1992) ("Section 113 [of the 1991 Civil Rights Act] legislatively reverses West Virginia University Hospital, Inc. v. Casey by permitting recovery of expert fees as part of the attorney's fee award."). If Amici are right that Congress' desired policy is best implemented by including "obligations" within the section 546 safe harbors, then Congress can change the statutory language just as it did after Casey.

extraordinary circumstances surrounding JPMorgan's last-minute extraction of a purportedly limitless guaranty and billions of dollars of assets from LBHI, for the purpose of building up a collateral pool that it could tap for any and all claims that could arise between any JPMorgan entity against any Lehman entity, across the entire range of business between the firms, in the event of an LBHI bankruptcy. (Am. Compl. ¶¶ 51, 62, 69). JPMorgan did so by using its immense leverage as Lehman's clearing bank and the unlawful threat to breach its contractual obligations as clearing agent, and by further representing that the September Agreements and billions of dollars of collateral were required to facilitate JPMorgan's clearance function, even though JPMorgan had already concluded that this was not true. (Id. ¶¶ 48-49, 62-66, 69).

Amici argue, incorrectly, that such behavior is absolutely shielded by the safe harbor provisions of the Bankruptcy Code, and warn that if this Court were to deny JPMorgan's motion on the pleadings and undertake a factual inquiry into the September Agreements and transfer of a multi-billion dollar "extra cushion," that ruling would discourage market participants from engaging in derivatives or trading activity with weakened counterparties. (See, e.g., Amici Br. at 22-23). In pleading JPMorgan's case, Amici misread the safe harbor provisions, disregard the applicable authority of this district, and completely ignore the allegations of JPMorgan's misconduct surrounding these extraordinary transactions.

More fundamentally, however, Amici's policy argument is based on the false premise that JPMorgan provided support or other benefits to a struggling LBHI as a result of the September Agreements and collateral transfers, when the pleaded facts are that JPMorgan did nothing of the kind. JPMorgan did not alter or expand any of its pre-existing obligations to LBHI, and did not agree to enter into any new derivatives trades or other transactions in connection with its demands. (Am. Compl. ¶¶ 56, 63-64). Instead, JPMorgan used the September Agreements as a vehicle to obtain an unprecedented guaranty and to strip billions of dollars in cash and cash

15

equivalents from LBHI, while JPMorgan provided no new consideration in exchange. (Id.). The issues presented by this case would therefore have no impact on market participants that legitimately seek to enhance their collateral position with respect to pre-existing obligations, or as a condition to enter new trading with or provide other support to weakened counterparties, and Amici's hypothesis to the contrary is simply without merit.

## A.    A Factual Inquiry Is Appropriate to Determine Whether the September Agreements and Collateral Transfers Meet Any Definition of Safe Harbored Transactions

Pursuant to sections 546(e), (f), and (g) of the Bankruptcy Code, respectively, a "trustee may not avoid a transfer made . . . in connection with a securities contract," "in connection with a repurchase agreement," or "under or in connection with a swap agreement." 11 U.S.C. § 546(e)-(g). Critical to the question of whether these safe harbor provisions apply to any security agreement or transfer thereunder, then, is whether the security agreement or transfer was made "in connection with" the enumerated types of protected agreements. The facts pleaded in the Amended Complaint raise serious questions as to whether this standard is met with respect to the September Agreements or the transfers of billions of dollars in LBHI assets. Among other things, the Amended Complaint pleads that: (i) there was no mutual understanding and intent of the parties regarding the nature and purpose of these agreements and transfers at the time made; (ii) the agreements and transfers were not actually or objectively made to facilitate derivatives or clearance transactions; (iii) no consideration was given by JPMorgan; and (iv) all of the agreements and transfers were procured through JPMorgan's misrepresentations and unlawful economic coercion. (See, e.g., Am. Compl. ¶¶ 44-70).

The Amici Brief asks the Court to deem these pleaded facts "irrelevant" to the issue of whether these agreements and transfers qualify as protected transfers made "in connection" with securities, repurchase or swap agreements, and argue that Plaintiffs' claims should be dismissed without any further inquiry into the nature of these agreements and transfers or the facts and

16

circumstances surrounding them. (Amici Br. at 22). Amici do not cite any authority for this proposition, and for good reason: the summary approach advocated by Amici is directly contrary to the case law in this district that instructs courts to perform a factual inquiry to determine whether novel transactions such as those at issue actually qualify for safe harbor status. See, e.g., Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.), 263 B.R. 406, 439 (S.D.N.Y. 2001); see also Alfa, S.A.B. de C.V. v. Enron Creditors Recovery Corp. (In re Enron Creditors Recovery Corp.), 422 B.R. 423, 439 (S.D.N.Y. 2009); Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp., 351 F. Supp. 2d 79, 107-08 (S.D.N.Y. 2004); cf. Bank of Am., N.A. v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.), 439 B.R. 811, 835 (Bankr. S.D.N.Y. 2010) (whether the safe harbor "exception will apply to a particular security agreement calls for a review of the facts and circumstances of each transaction or series of transactions").

This fact-based approach was taken by the United States District Court for the Southern District of New York in Jackson v. Mishkin in determining whether certain transactions qualified as "settlement payments" or "margin payments" entitled to protection under section 546. There, the court looked past any superficial resemblance to settlement or margin payments, and performed a factual analysis to determine whether the transactions actually exhibited the substantive characteristics of such payments, based on factors such as whether "consideration was paid out" for the transfers, or whether "the transfer of cash or securities effected contemplated consummation of a securities transaction." Jackson, 263 B.R. at 479-80, 483-84. Based on this analysis, the court ruled that the transfers were not actually settlement payments or margin payments, and therefore they were not entitled to safe harbor protection. Id. at 481-84.

The Jackson court's approach of performing a factual inquiry to determine whether non-routine transactions qualify for safe harbor status has been subsequently cited with approval and followed in this district. See, e.g., Enron, 422 B.R. at 439; Am. Tissue, 351 F. Supp. 2d at 107-

17

08; accord Hutson v. E.I. du Pont de Nemours & Co. (In re Nat'l Gas Distribs. LLC), 556 F.3d 247,

259-61 (4th Cir. 2009). For example, in Enron, supra, the district court affirmed that such an

inquiry is appropriate "in determining the applicability of the safe harbor to any particular set of

novel facts." 422 B.R. at 439. Although the Enron court determined that the payments at issue in

that case met the definition of protected settlement payments, that conclusion was only reached after

a factual analysis that considered whether the payments were: (i) actually made to consummate

securities transactions; (ii) perceived as settlement payments by the parties to the original

transaction; (iii) consummated using the standard clearing mechanism for commercial paper

transactions; and (iv) not otherwise "phony or sham." Id. at 439-40, 442.[11]

      The above cases thus confirm that, far from being "irrelevant" to the question of safe

harbor status, the facts and circumstances of the agreements and transfers are critical. Each of the

factors cited by the Enron court (or their analog in the context of transfers made "in connection

with" swap or clearance contracts) is called into question by the Amended Complaint: i.e., the

mutual understanding and intent of the parties regarding the nature and purpose of the September

Agreements and transfers at the time made,[12] whether they were actually and objectively made to

---

[11] The bankruptcy court in Enron determined at summary judgment that the payments at issue did not constitute protected "settlement payments" because they did not involve the purchase and sale of securities, and because they were not the type of settlement payments "commonly used" in the securities trade. Enron, 422 B.R. at 430, 435. On appeal, the district court overruled this aspect of the bankruptcy court's decision. Id. Critically, however, the district court affirmed the principle that a fact-based analysis is required to determine whether a novel transaction meets one of the Bankruptcy Code's definitions of a protected transaction in the first instance, based on the factors discussed above. Id. at 439-40, 442.

[12] This approach is also consistent with contract law generally, which at a minimum requires the Court to make determinations regarding the parties' mutual intent with respect to any given transaction, based on the circumstances at the time, in order to determine the nature and purpose of that transaction. See, e.g., Sand Filtration Corp. of Am. v. Cowardin, 213 U.S. 360, 364 (1909) ("The object of construction is to effectuate the intention of the parties in making a given contract. When the contract is in writing the language used should be interpreted in the light of the circumstances surrounding the parties at the time the contract is made.").

facilitate a derivatives or clearance transaction, whether consideration was given by JPMorgan, and whether the agreements and transfers were procured through unlawful misconduct.

Amici do not address any of the above authority. Instead, they advocate for an absolutist interpretation of the safe harbor provisions that would immunize any agreement or transfer undertaken by its members from the scrutiny of the Court, regardless of the nature or the circumstances surrounding it. As demonstrated above, this is not the law, and it is not the approach taken in this district when confronted with novel agreements and transfers such as the extraordinary September Agreements and multi-billion dollar asset transfers to JPMorgan.

**B.    This Court's Ruling Regarding These Safe Harbor Issues Would Not "Threaten Fundamental Market Protections"**

Not only are Amici incorrect on the law, but their policy-based argument that this Court's refusal to dismiss Plaintiffs' claims at the pleading stage on safe harbor grounds would "threaten fundamental market protections" is entirely off the mark.

**1.    This Court's Ruling Would Have No Impact on Market Participants' Ability to Use Non-ISDA Form Collateral Agreements, or to Enter New Collateral Arrangements for Pre-Existing Debts**

Amici argue, based on a misunderstanding of Plaintiffs' position in this case, that a guaranty or credit enhancement entered in connection with a derivatives contract should be safe harbored regardless of whether it is printed on a form ISDA agreement. (Amici Br. at 17-18). While a ruling on that issue could have broad market impact, for example, by potentially limiting the ability of market participants to innovate or customize their credit enhancements to meet the needs of their particular transactions, that question is not presented here. The question is whether the September Agreements and collateral transfers were made "in connection with" the parties' pre-existing derivatives contracts in the first instance. Thus, while the form and text of the agreements are relevant to this inquiry (and comparison to ISDA forms and other agreements used by market participants to actually facilitate derivatives transactions is useful), Plaintiffs do not contend that

*only* ISDA form credit enhancements are subject to safe harbor protection, and it is not necessary for the Court to rule on this issue in the context of this case.

Amici similarly argue that a new guaranty or credit enhancement entered in connection with a pre-existing derivatives contract should be safe harbored regardless of whether it is contained in the original transaction documentation, and that such a rule is necessary to "encourage[] trading with weakened market participants by leaving open the possibility of counterparties enhancing their collateral positions as necessary." (Amici Br. at 18-19). But this argument is also besides the point, as illustrated by the cases relied upon by Amici in which this principle was actually implicated. In each of those cases, the debtor entered into new security arrangements in order to secure outstanding, unpaid obligations to the creditor, and the court determined that the security arrangements were made for reasonably equivalent value and not subject to attack as fraudulent conveyances. See Anand v. Nat'l Republic Bank of Chicago, 239 B.R 511, 519 (Bankr. N.D. Ill. 1999) ("[t]he bankruptcy court's factual findings that, as well as the value of the proceeds of the loan, the Bank gave forbearance, a revised maturity date, and a waiver of the principal payment, must all be counted as value received by Anand"); In re Kaplan Breslaw Ash, LLC, 264 B.R. 309, 329 (Bankr. S.D.N.Y. 2001) (quoting Weintraub & Resnick, BANKRUPTCY LAW MANUAL ¶ 7.06[8]) ("Thus an insolvent debtor receives value by paying an old obligation."); Reaves v. Comerica Bank-California (In re GTI Capital Holdings, LLC), 373 B.R. 671, 673-75 (Bankr. D. Ariz. 2007) (security interest at issue was transferred on July 17, 2002 to secure unpaid loan that was disbursed on September 10, 2001).

Unlike the debtors in those cases, LBHI had no outstanding, unpaid obligation to JPMorgan with respect to either its clearance, repurchase or swap agreements when it entered the September Agreements and transferred billions of dollars to JPMorgan. Instead, JPMorgan was already fully collateralized with respect to clearance and repurchase activity, and it was JPMorgan

20

that had the obligation to post approximately $1 billion to Lehman as collateral under their derivatives contracts. (Am. Compl. ¶¶ 45, 63). Nor did JPMorgan refrain from exercising default or termination rights with respect to the parties' clearance or derivatives contracts in exchange for the September Agreements and asset transfers, because it had no such rights when its demands were made. (Id. ¶¶ 27, 49, 63-64). These facts are central to Plaintiffs' case and distinguish these transactions from those at issue in all of the cases cited by Amici. Any ruling by this Court that the September Agreements and asset transfers are not protected by the safe harbors would therefore have no precedential effect with respect to new collateralization arrangements entered to secure actual pre-existing debts, and Amici's hypothesis to the contrary is without merit.

### 2. This Court's Ruling Would Have No Impact on Parties' Ability to Trade With Weakened Counterparties

Similarly lacking merit is Amici's warning that a ruling on the safe harbor issues presented here would cause market participants to refuse to trade with weakening counterparties, or to insist on protections that could "drain assets from the weakening party even more quickly." (Amici Br. at 19-20). In effect, Amici argue JPMorgan's unjustified drain of LBHI's assets should be protected to ensure that the assets of future debtors do not suffer the same fate. At base, however, Amici again ignore the unique circumstances of the agreements and transfers at issue and the fact that a ruling in this case will have no impact on the protections afforded to new collateralization agreements reached between market participants that are actually connected to, and entered to facilitate, their trades.

Central to this case are the facts that JPMorgan used its immense leverage as Lehman's clearing bank and the unlawful threat to breach its contractual obligations as clearing agent to extract a purportedly limitless guaranty and a multi-billion dollar "cushion" for any and all claims that might arise from a Lehman bankruptcy (to which it contributed in no small part). (Am. Compl. ¶¶ 48, 66-68, 79). JPMorgan's demands for that limitless guaranty and cushion were not

part of any protected transaction -- they were not intended by JPMorgan to facilitate clearance activity (for which JPMorgan had, only weeks before, obtained a guaranty and the security it desired),[13] and they were not part of or connected to any derivatives transaction between the parties. (Id. ¶¶ 45, 62-65).

For example, with respect to JPMorgan's after-the-fact claim that the September Agreements and asset transfers were entered "in connection with" or were "related to" the parties' derivatives contracts, such claim is directly refuted by the pleaded facts. Both JPMorgan and Lehman had in place a substantial infrastructure to facilitate collateral postings for their enormous portfolio of derivatives transactions, including calculating the market movements of the tens of thousands of underlying positions and dealing with the extensive daily communications between the parties to reconcile those valuations. This process was governed in regimented detail by the parties' derivatives contracts and related credit support annexes, and had been in place for years. Even though the new agreements and billions of dollars of collateral postings would have completely upended this regime if they applied to the parties' derivatives transactions, modifications to the existing system were never even discussed between the parties in connection with JPMorgan's demands. (Am. Compl. ¶ 62).

To the contrary, JPMorgan carefully avoided any mention of derivatives contracts when demanding the September Agreements and billions of dollars of cash collateral from LBHI. (Id.). JPMorgan had no right to terminate the existing derivatives contracts, to demand new collateral, or to otherwise withhold performance under those derivative contracts if its demands were not met. (Id. ¶¶ 63-64). In fact, at the same time it was making its demands JPMorgan had agreed pursuant to the existing derivatives regime that it was out-of-the-money by approximately $1

---

[13] That JPMorgan did not require or intend the September Agreements and multi-billion asset transfers to facilitate its role as clearance agent is pleaded in the Amended Complaint (see Am. Compl. ¶¶ 45, 62, 69) and further demonstrated in Plaintiffs' Opposition Brief at pages 50-53.

billion on its derivatives contracts, and posted collateral to Lehman in that amount. (Id. ¶¶ 62-63). JPMorgan thus circumvented the entire derivatives regime by misrepresenting the purpose of the agreements and collateral as being necessary to facilitate its clearance function, and by unlawfully threatening to cease clearing for Lehman unless its demands were satisfied. (Id. ¶¶ 62, 66-69).

Even the September Agreements themselves have no substantive connection or reference to the parties' derivatives contracts. The only purported link to "derivatives activity" is found in the non-operative preliminary statements of the September Guaranty and September Security Agreement, inserted by JPMorgan without negotiation and now relied upon by Amici. (Am. Compl. ¶ 58; Amici Br. at 20). For example, the preliminary statement to the September Guaranty states that the Lehman "Borrowers" (a term that has no meaning in the context of derivatives trades) "desire[] to . . . enter into derivatives transactions . . . and to continue such . . . derivatives activity." (Ex. 7, September Guaranty). But the pleaded facts are clear that JPMorgan gave no consideration for its demands, such as by actually entering new derivatives transactions with Lehman or foregoing rights under their existing derivatives contracts. (Am. Compl. ¶¶ 56, 63-63). This empty phrase regarding undefined "derivatives transactions" inserted by JPMorgan into the non-operative preliminary statements therefore cannot provide the necessary connection between the September Agreements and actual derivatives agreements.

Under these circumstances, there is a clear factual issue as to whether the September Agreements and asset transfers were actually made "in connection with" swap agreements, as required for safe harbor protection under section 546(g). If, as Plaintiffs contend, the facts demonstrate these agreements and transfers did not have the requisite connection to the parties' swap agreements, then the Court's ruling on these safe harbor issues would have no precedential effect on collateral agreements entered by market participants to actually facilitate or support their swap trades. Amici have thus provided no basis to conclude that actual trading activity would be

23

impeded, or that market participants that do not engage in the misconduct at issue would be otherwise affected, if this Court were to rule that the September Agreements and asset transfers are subject to further scrutiny and denies JPMorgan's motion to dismiss on that basis.

**C.    JPMorgan's Post-Petition Claims Do Not Retroactively Convert the September Agreements and Asset Transfers to Transactions Made "In Connection With" Clearance or Derivatives Agreements**

Finally, Amici argue that the September Agreements and asset transfers should be deemed subject to the safe harbor protections to the extent JPMorgan has asserted post-petition clearance and derivatives claims against the LBHI estate. (Amici Br. at 20-21). But Amici again miss the point: if the September Agreements and collateral transfers were not made "in connection with" the underlying clearance and derivatives contracts in the first instance, they do not meet the definition of any safe harbored transfer. JPMorgan's assertion of post-petition clearance and derivatives claims, which themselves are disputed by the relevant Lehman subsidiaries, can neither retroactively bless JPMorgan's misconduct nor convert non-safe harbored agreements and transfers into safe harbored transfers.[14]

The provisions of the Bankruptcy Code relied upon by Amici for the proposition that an agreement may be partially protected when covering both safe harbored and non-safe harbored elements do not alter this conclusion. (Amici Brief at 21). For example, section 741(7)(A)(xi) confirms that, in order to meet the definition of a "securities contract," the security agreement or arrangement or other credit enhancement must still be "related to" and made "in connection with" a clearance agreement (or other agreements specified in subsection 741(7)(A)). 11 U.S.C.

_____

[14] As explained in Plaintiffs' Opposition, a contrary rule would give creditors sanction to "to rush to dismember a financially unstable debtor" by extracting concessions and assets, even if not required to facilitate clearance, repurchase or swap transactions. Rather than stabilizing a troubled market and protecting counterparties, such a rule would encourage creditors to strip assets from a struggling company without present justification, knowing they will have an opportunity to retroactively justify those transfers after the damage has been done and the debtor has been pushed into bankruptcy. This would serve neither the goals of the safe harbor provisions nor the Bankruptcy Code generally. (See Plaintiffs' Opposition Brief at 59-60).

§ 741(7)(A)(xi).  In the absence of that connection, no agreement can meet the definition of "securities contract" for purposes of the safe harbor provisions, and partial protection is not an issue.

Amici's reliance on sections 101(53B)(A)(v), 101(47)(A)(iv) and 741(7)(A)(x) is similarly misplaced.[15]  If the September Agreements and related collateral transfers by LBHI to JPMorgan were not made in connection with a repurchase agreement, swap agreement or derivatives contract, then these safe harbor provisions never come into play.

*[Remainder of page intentionally left blank.]*

---

[15] Section 101(53B)(A)(v) provides that master agreements governing swap transactions are themselves considered "swap agreements" for purposes of the safe harbors.  11 U.S.C. § 101(53B)(A)(v).  Section 101(47)(A)(iv) similarly provides that a "master agreement" that governs the repurchase of securities is a "repurchase agreement," and section 741(7)(A)(x) relates only to such master agreements.  11 U.S.C. §§ 101(47)(A)(iv), 741(7)(A)(x).  No party is claiming that the September Agreements qualify as any of the aforementioned "master agreements," and the sections cited by Amici therefore have no application here.

## CONCLUSION

For all of the reasons set forth above and in Plaintiffs' Opposition Brief, JPMorgan's motion to dismiss the Amended Complaint should be denied in its entirety.

Dated:  March 4, 2011
      New York, New York

**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**

By: /s/ Joseph D. Pizzurro

Joseph D. Pizzurro
L. P. Harrison 3rd
Michael J. Moscato
Nancy E. Delaney
Peter J. Behmke
Cindi M. Eilbott
101 Park Avenue
New York, New York 10178-0061
(212) 696-6000
*Counsel for Plaintiff, Debtor Lehman
Brothers Holdings Inc.*

**QUINN EMANUEL
URQUHART & SULLIVAN, LLP**

By: /s/ John B. Quinn

John B. Quinn
Erica Taggart
Tyler Whitmer
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543

Susheel Kirpalani
Andrew J. Rossman
James C. Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010-1603
(212) 849-7000
*Counsel for Plaintiff Intervenor, the Official
Committee of Unsecured Creditors of
Lehman Brothers Holdings Inc.*