**QUINN EMANUEL**
**URQUHART & SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543

51 Madison Avenue, 22nd Floor
New York, New York 10010-1603
*Counsel for the Official Committee of Unsecured*
*Creditors of Lehman Brothers Holdings Inc.*

**CURTIS, MALLET-PREVOST,**
**COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone:  (212) 696-6000
*Counsel for Debtor Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>       Debtors. | Chapter 11<br><br>Case No. 08-13555 (JMP)<br><br>(Jointly Administered) |
| LEHMAN BROTHERS HOLDINGS INC. and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., *et al.*<br><br>       Plaintiff and Plaintiff Intervenor<br><br>       v.<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>       Defendant | Adversary Proceeding<br><br>Case No. 10-03266 (JMP) |

**PLAINTIFFS LEHMAN BROTHERS HOLDINGS INC. AND OFFICIAL**
**COMMITTEE OF UNSECURED CREDITORS' MEMORANDUM OF LAW IN**
**SUPPORT OF MOTION TO DISMISS AMENDED COUNTERCLAIMS OF**
<u>**DEFENDANT JPMORGAN CHASE BANK, N.A.**</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ...................................................................................................6

I.     JPMorgan Agrees to be Repo Agent for LBI Pursuant to Individual Custody
Agreements ...........................................................................................................6

II.    JPMorgan Demands that LBHI Guarantee LBI's Clearance Liabilities, and Then
All Subsidiaries' Liabilities of Any Kind ...........................................................8

III.   JPMorgan Serves as LBI's Tri-Party Repo Agent in the Week After LBHI's
Bankruptcy...........................................................................................................9

IV.   JPMorgan Unwinds All Repos on Tuesday, Wednesday, and Thursday, And
Advances the Repurchase Price to All Sellers, Including Barclays .................11

V.    JPMorgan Participates in the Hearings Related to the Barclays Sale .............11

VI.   JPMorgan Releases Claims Against Barclays Regarding the Barclays Repo .................13

VII.  JPMorgan Remains Silent Throughout the Barclays Trial ...............................14

VIII. JPMorgan Amends its Counterclaims Following Plaintiffs' First Motion to
Dismiss................................................................................................................15

STANDARD OF REVIEW...................................................................................................16

ARGUMENT......................................................................................................................16

        POINT I JPMORGAN'S FIRST COUNTERCLAIM FOR
        FRAUDULENT MISREPRESENTATION FAILS TO STATE A
        CLAIM ...........................................................................................................16

        A.     Legal Standards for Fraudulent Misrepresentation ...................17

        B.     JPMorgan Has Failed to Allege Facts Constituting Reasonable
               Reliance On Any Alleged Misrepresentations By LBHI .........18

               1.     Legal Standards for Reasonable Reliance Element of a
                    Fraudulent Misrepresentation Claim.............................................18

               2.     According to JPMorgan's Own Factual Allegations,
                    JPMorgan Did Not In Fact Rely on LBHI's Representations........19

3.      Any Reliance on Statements Outside the Repo Contracts
        Was Unreasonable .................................................................22

4.      Any Reliance on LBHI For Predictions of Barclays' Future
        Conduct is Unreasonable In Light of Barclays' Direct
        Representations About its Own Intentions ...................................27

C.  JPMorgan Has Failed to Allege an Actionable Misrepresentation of
    Fact ..............................................................................................28

    1.      LBHI's Predictions of Barclays' Future Conduct Are Not
            Actionable as Fraudulent Misrepresentations ..............................29

    2.      JPMorgan Has Failed to Allege That Anyone at LBHI
            Made Any Oral Misrepresentation With Knowledge That it
            Was False ..................................................................................34

            a.      The Amended Counterclaims Fail to Allege That
                    Tonucci or Lowitt Knew the Alleged Statements
                    Were False When Made..................................................36

            b.      Lowitt and Tonucci's Alleged Statement is Too
                    Vague to Constitute a Fraudulent Misrepresentation
                    of Fact ..........................................................................37

    3.      JPMorgan's Claim That the APA Contained Fraudulent
            Misrepresentations is Counter to the Court's 60(b) Decision........38

D.  JPMorgan Has Failed to Plead that LBHI Acted with Scienter ...............41

    1.      Legal Standards for Pleading the Element of Scienter .................41

    2.      JPMorgan's Allegations That LBHI Wanted to Complete
            the Barclays Sale Are Too General to Plead LBHI's Intent
            to Commit Fraud .......................................................................42

    3.      The Amended Counterclaims Do Not Allege Conscious or
            Reckless Conduct by LBHI .........................................................44

POINT II JPMORGAN'S COUNTERCLAIM FOR FRAUDULENT
        CONCEALMENT FAILS TO STATE A CLAIM ..................................46

A.  Legal Standards for Fraudulent Concealment..........................................47

B.  JPMorgan's Fraudulent Concealment Claim Fails for Many of the
    Same Reasons as Its Fraudulent Misrepresentation Claim.......................47

1.    JPMorgan Fails to Plead That Reliance On The
Concealment Was Reasonable.....................................................47

2.    Failure to Disclose What LBHI Thought Barclays Would
Do In the Future Does Not State a Fraudulent Concealment
Claim.........................................................................................48

3.    JPMorgan Fails to Plead that LBHI Acted with Scienter
Because It Has Not, And Cannot, Plead a Motive for LBHI
to Conceal the Details of the Barclays Sale Transaction ..............49

C.    JPMorgan Has Failed to Allege Facts Establishing that LBHI Had
a Duty to Disclose ..................................................................................49

1.    JPMorgan Has Not Alleged a Partial or Incomplete
Statement that Requires Clarification ..........................................50

2.    JPMorgan Fails to Plead that LBHI Owed JPMorgan A
Duty to Disclose Facts About the APA Under the Special
Facts Doctrine ..........................................................................52

a.    LBHI Had No Contractual Duty to Disclose
Information Related to the Tri-Party Repos ....................53

b.    JPMorgan Has Not Alleged That LBHI Knew
JPMorgan Was Relying On Mistaken Knowledge ...........54

D.    JPMorgan Does Not State a Claim for Fraudulent Concealment of
the Takeout Agreement or the Allocation of Shells ................................56

1.    JPMorgan Does Not Allege That LBHI Knew About the
Takeout Agreement or the Allocation of Shells ..........................56

2.    JPMorgan Does Not Allege That LBHI Had Superior
Knowledge of the Takeout Agreement and Repo Shell
Allocation .................................................................................57

POINT III JPMORGAN'S FRAUDULENT INDUCEMENT TO LEND
COUNTERCLAIM FAILS TO STATE A CLAIM................................59

A.    Legal Standards for Fraudulent Inducement ............................................60

B.    JPMorgan's Fraudulent Inducement Counterclaim Fails for the
Same Reasons As Its Fraudulent Misrepresentation and Fraudulent
Concealment Counterclaims ..................................................................60

POINT IV JPMORGAN'S COUNTERCLAIM FOR AIDING AND
        ABETTING LBI'S ALLEGED FRAUD FAILS TO STATE A
        CLAIM ...................................................................................62

A.      Legal Standards for Aiding and Abetting Fraud .....................................63

B.      JPMorgan Fails to Allege an Underlying Fraud by LBI ..........................63

C.      JPMorgan Fails to Allege LBHI Knew of LBI's Alleged
        Misrepresentations...................................................................................65

POINT V JPMORGAN'S COUNTERCLAIM FOR AIDING AND
        ABETTING BARCLAYS' ALLEGED FRAUD FAILS TO
        STATE A CLAIM ...................................................................................66

A.      JPMorgan Fails To Plead That LBHI Substantially Assisted
        Barclays' Alleged Fraud...........................................................................66

        1.      JPMorgan Does Not Plead the Alleged Assistance With
                Specificity...................................................................................67

        2.      LBHI's Alleged Conduct Did Not Substantially Assist
                Barclays Because It Did Not Proximately Cause the
                Alleged Injury ............................................................................68

B.      JPMorgan Fails to Plead Reasonable Reliance on Barclays'
        Alleged Misstatements or Omissions .......................................................70

POINT VI JPMORGAN'S COUNTERCLAIM FOR UNJUST
        ENRICHMENT FAILS TO STATE A CLAIM ....................................71

POINT VII JPMORGAN'S INDEMNIFICATION COUNTERCLAIMS
        SHOULD BE DISMISSED ...................................................................72

A.      JPMorgan Fails to State a Claim for Indemnification Under the
        2000 Clearance Agreement (Seventh Counterclaim)...............................73

        1.      The Indemnity Clause of the Barclays Custodial
                Undertaking Provides the Exclusive Basis for Any
                Purported Indemnification Rights of JPMorgan..........................73

        2.      The 2000 Clearance Agreement Prohibits Indemnification
                for Any JPMorgan Losses Related to Plaintiffs' State Law
                Claims or Those Bankruptcy Code Claims Premised on
                JPMorgan's Misconduct ..............................................................76

3.       JPMorgan's Losses Related to Plaintiffs' Claims Arising
Under the Avoidance Provisions of the Bankruptcy Code
Are Not Subject to Indemnification .............................................. 79

4.       JPMorgan's New Conclusory Allegation Regarding Its
Purported Lack of "Fault" Does Not Rehabilitate Its Failed
Indemnity Claim ........................................................................ 82

B.     JPMorgan Fails to State a Claim for Indemnification Under the
Barclays Custodial Undertaking (Eighth Counterclaim) ......................... 83

1.       Because LBHI Is Not a Party to the Barclays Custodial
Undertaking, It Cannot Form a Basis for Indemnification If
Plaintiffs Establish the Invalidity of the September
Guaranty and Related Agreements ............................................... 83

2.       The Barclays Custodial Undertaking Bars Indemnification
for the Claimed Losses ............................................................... 84

3.       JPMorgan Cannot Invoke the Purported "Absolute[]"
Indemnity Provision of the Barclays Custodial Undertaking ........ 85

CONCLUSION ...................................................................................................... 87

# TABLE OF AUTHORITIES

**Page**

## Cases

320 Realty Mgmt. Co. v. 320 West 76 Corp.,
221 A.D.2d 174, 633 N.Y.S.2d 295 (1st Dep't 1995) ............................................34

484 Assocs., L.P. v. Moy,
No. 06 Civ. 2290(PAC), 2007 WL 683999 (S.D.N.Y. Mar. 5, 2007) ............................ 64, 70

900 Unlimited, Inc. v. MCI Telecomm'ns Corp.,
215 A.D.2d 227, 626 N.Y.S.2d 188 (1st Dep't 1995) ............................................52

Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.,
731 F.2d 112 (2d Cir. 1984) ................................................................ 57, 59

Abbatiello v. Monsanto Co.,
522 F. Supp. 2d 524 (S.D.N.Y. 2007) ..................................................................63

Acito v. IMCERA Group, Inc.,
47 F.3d 47 (2d Cir. 1995) ..................................................................42

Aetna Casualty & Surety Co. v. Aniero Concrete Co., Inc.,
404 F.3d 566 (2d Cir. 2005) ..................................................................47

AHT Corp. v. BioShield Techs., Inc. (In re AHT Corp.),
292 B.R. 734 (S.D.N.Y. 2003) ................................................................ 64, 65, 71

All Am. Adjusters, Inc. v. Acceleration Nat'l Ins. Co.,
No. 96 CIV. 9344 (MBM), 1997 WL 732445 (S.D.N.Y. Nov. 25, 1997) ............................50

Allison v. Round Table Inv. Mgmt. Co., LP,
No. 10 CV 01144(GBD), 2010 WL 4456648 (S.D.N.Y. Oct. 22, 2010) ............................41

Anderson v. Local Union No. 3,
582 F. Supp. 627 (S.D.N.Y. 1984) ................................................................ 78, 84, 87

Apex Oil Co. v. Belcher Co. of N.Y., Inc.,
855 F.2d 997 (2d Cir. 1988) ..................................................................22

Ashcroft v. Iqbal,
129 S. Ct. 1937 (2009) ................................................................ 16, 86

Asher v. Film Ventures Int'l, Inc. (In re Film Ventures Int'l, Inc.),
89 B.R. 80 (9th Cir. B.A.P. 1988) ..................................................................81

Atlantic Gypsum Co. v. Lloyds Int'l Corp.,
753 F. Supp. 505 (S.D.N.Y. 1990) ..................................................................44

Austro v. Niagara Mohawk Power Corp.,
487 N.E.2d 267, 496 N.Y.S.2d 410 (1985) ..................................................................84

Babiker v. Ross Univ. School of Medicine,
    No. 98 Civ. 1429 SHS THK, 1999 WL 33290 (S.D.N.Y. Jan. 22, 1999) .............................. 22

Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortgage Inv. Corp.),
    256 B.R. 664 (Bankr. S.D.N.Y. 2000) ................................................................................ 16

Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.,
    No. 03 Civ. 1537(MBM), 2003 WL 23018888 (S.D.N.Y. Dec. 22, 2003) ........................... 37

Banque Arabe et Internationale D'Invesstisetment v. Md. Nat'l Bank,
    57 F.3d 146 (2d Cir. 1995) ......................................................................................... 52, 54

Baraliu v. Vinya Cap., L.P.,
    No. 07 Civ. 4626(MHD), 2009 WL 959578 (S.D.N.Y. Mar. 31, 2009) ......................... 76, 85

Bell Atlantic Corp. v. Twombly,
    550 U.S. 544 (2007) ........................................................................................................ 16

Bloor v. Carro, Spanbock, Londin, Rodman & Fass,
    754 F.2d 57 (2d Cir. 1985) ......................................................................................... 67, 68

Brass v. Am. Film Techs., Inc.,
    987 F.2d 142 (2d Cir. 1993) ............................................................................................. 51

Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.,
    373 F.3d 296 (2d Cir. 2004) ............................................................................................. 71

C.E.K., Inc. v. CHC Indus., Inc. (In re CHC Indus., Inc.),
    389 B.R. 767 (Bankr. M.D. Fla. 2007) .............................................................................. 40

Century Pacific, Inc. v. Hilton Hotels Corp.,
    354 Fed. Appx. 496 (2d Cir. 2009) ........................................................................ 25, 26, 48

Certain Underwriters at Lloyd's v. Milberg LLP,
    No. 08 Civ. 7522(LAP), 2009 WL 3241489 (S.D.N.Y. Sept. 30, 2009) .............................. 71

Chase Invs., Ltd. v. Kent,
    256 A.D.2d 298, 681 N.Y.S.2d 319 (2d Dep't 1998) ......................................................... 29

Chill v. General Elec. Co.,
    101 F.3d 263 (2d Cir. 1996) ....................................................................................... 42, 45

Cohain v. Klimley,
    Nos. 08 Civ. 5047(PGG), 09 Civ. 4527(PGG), 09 Civ. 10584(PGG), 2010 WL 3701362
    (S.D.N.Y. Sept. 20, 2010) ................................................................................................ 35

Cong. Fin. Corp. v. John Morrell & Co.,
    790 F. Supp. 459 (S.D.N.Y. 1992) .................................................................................... 17

Corporate Jet Aviation, Inc. v. Vantress (In re Corporate Jet Aviation, Inc.),
    45 B.R. 629 (Bankr. N.D. Ga. 1985) ................................................................. 79, 81, 85, 87

Cortec Indus., Inc. v. Sum Holding, LP,
    949 F.2d 42 (2d Cir. 1991) ................................................................................................ 6

Cucchiaro v. Cucchiaro,
    627 N.Y.S.2d 224 (N.Y. Sup. Ct. 1995) ................................................................48

DeBeers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.,
    440 F. Supp. 2d 249 (S.D.N.Y. 2006) ..................................................................51

Defer LP v. Raymond James Financial, Inc.,
    654 F. Supp. 2d 204 (S.D.N.Y. 2009) ............................................................35, 68

Druyan v. Jagger,
    508 F. Supp. 2d 228 (S.D.N.Y. 2007) ..................................................................48

Emergent Capital Inv. Mgmt., LLC v. Stonepath Group,
    343 F.3d 189 (2d Cir. 2003) .......................................................... 18, 25, 26, 48

Fab Industries v. BNY Financial,
    252 A.D.2d 367, 675 N.Y.S.2d 77 (1st Dep't 1998) ...........................................26

Fallick v. Kehr (In re Fallick),
    369 F.2d 899 (2d Cir. 1966) ................................................................................80

Federated Retail Holding, Inc. v. Sanidown, Inc.,
    No. 06 Civ. 6119(LTS)(THK), 2010 WL 5298113 (S.D.N.Y. Dec. 23, 2010) ......37

Fezzani v. Bear, Stearns & Co., Inc.,
    592 F. Supp. 2d 410 (S.D.N.Y. 2008) ..................................................................70

Filler v. Hanvit Bank,
    No. 01 Civ. 9510(MGC), 02 Civ. 8251( 2003 WL 22110773 (S.D.N.Y. Sept. 12, 2003) ......67

Flickinger v. Harold C. Brown & Co., Inc.,
    947 F.2d 595 (2d Cir. 1991) ................................................................................41

FMC Corp. v. Fleet Bank
    226 A.D.2d 225 641 N.Y.S.2d 25 (1st Dept' 1996) .............................................37

Footbridge, Ltd. v. Countrywide Home Loans, Inc.,
    No. 9 Civ. 4050(PKC), 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) .................37

Friedl v. City of New York,
    210 F.3d 79 (2d Cir. 2000) ..................................................................................16

GAF Holdings, LLC v. Rinaldi (In re Farmland Indus., Inc.),
    376 B.R. 718 (Bankr. W.D. Mo. 2007) ...........................................................39, 40

GAF Holdings, LLC v. Rinaldi (In re Farmland Indus., Inc.),
    408 B.R. 497 (8th Cir. BAP 2009) .................................................................39, 40

Gekas v. Pipin (In the Matter of Met-L-Wood Corp.),
    861 F.2d 1012 (7th Cir. 1988) .............................................................................40

George Cohen Agency, Inc. v. Donald S. Perlman Agency, Inc
    114 A.D.2d 930,  495 N.Y.S.2d 408 (2d Dep't 1985) ..........................................53

Gladstone Bus. Loan, LLC v. Randa Corp.,
   No. 09 Civ. 4225(LMM), 2009 WL 2524608 (S.D.N.Y. Aug. 17, 2009)........................ 18, 22

Grupo Sistemas Integrales de Telecomunicacion S.A.de C.V. v. AT&T Commc'ns, Inc.,
   No. 92 Civ. 7862 (KMW), 1996 WL 312535 (S.D.N.Y. Jun. 10, 1996) ........27, 28, 30, 31, 49

In re Gulf Beach Dev. Corp.,
   48 B.R. 40 (Bankr. M.D. Fla. 1984)....................................................................................80

Hayhoe v. Cole (In re Cole),
   226 B.R. 647 (9th Cir. B.A.P. 1998) ..................................................................................80

IMG Fragrance Brands, LLC v. Houbigant, Inc.,
   679 F. Supp. 2d 395 (S.D.N.Y. 2009) ................................................................................68

Int'l Oil Field Supply Servs. Corp. v. Fadeyi,
   35 A.D.3d 372, 825 N.Y.S.2d 730 (2d Dep't 2006)............................................................37

Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC,
   No. 01 Civ. 6600(RLC), 2005 WL 3370542 (S.D.N.Y. Dec. 12, 2005)...............................26

JP Morgan Chase Bank v. Orleans,
   No. 650006/2004, 2007 WL 6882391 (N.Y. Sup. Ct. Jan. 25, 2007)...................................29

Junk v. Aon Corp.,
   No. 07 Civ. 4640(LMM)(GWG), 2007 WL 4292034 (S.D.N.Y. Dec. 3, 2007)  ..................26

Kalnit v. Eichler,
   264 F.3d 131 (2d Cir. 2001) ..............................................................................................44

Key Items, Inc. v. Ultima Diamonds, Inc.,
   No. 09 Civ. 3729(HBP), 2010 WL 3291582 (S.D.N.Y. Aug. 17, 2010) .................. 21, 35, 36

King v. George Schonberg & Co.,
   233 A.D.2d 242, 650 N.Y.S.2d 107 (1st Dep't 1996) ................................................... 64, 71

Kirschner v. Bennett,
   648 F. Supp. 2d 525 (S.D.N.Y. 2009) ................................................................................66

Kolbeck v. LIT Am., Inc.,
   939 F. Supp. 240 (S.D.N.Y. 1996).............................................................................. 65, 66

Labajo v. Best Buy Stores, L.P.,
   478 F. Supp. 2d 523 (S.D.N.Y. 2007) ................................................................................83

Lama Holding Co. v. Smith Barney, Inc.,
   88 N.Y.2d 413 (1996)................................................................................................. 17, 36

Lane v. McCallion,
   166 A.D.2d 688, 561 N.Y.S.2d 273 (2d Dep't 1990) ................................................... 30, 34

Lazard Freres and Co. v. Protective Life Ins.Co.
   108 F.3d at 1534 (2d Cir. 1007)............................................................................. 25, 26, 48

Lerner v. Fleet Bank, N.A.,
    459 F.3d 273 (2d Cir. 2006) ................................................................. 17, 42, 63

Malmsteen v. Berdon, LLP,
    477 F. Supp. 2d 655 (S.D.N.Y. 2007) ................................................................. 63

Manley v. AmBase Corp.,
    126 F. Supp. 2d 743 (S.D.N.Y. 2001) ................................................................. 51

Maxwell Commc'n Corp. PLC v. Societe Generale (In re Maxwell Commc'n Corp. PLC),
    93 F.3d 1036 (2d Cir. 1996) ................................................................. 80

Mazzaro de Abreu v. Bank of Am. Corp.,
    525 F. Supp. 2d 381 (S.D.N.Y. 2007) ................................................................. 71

Medinol Ltd. v. Boston Scientific Corp.,
    346 F. Supp. 2d 575 (S.D.N.Y. 2004) ................................................................. 78

Michele Pommier Models, Inc. v. Men Women N.Y. Model Mgmt. Inc.,
    14 F. Supp. 2d 331 (S.D.N.Y. 1998) ................................................................. 71

Miller v. Meinhard-Commercial Corp.,
    462 F.2d 358 (5th  Cir. 1972) ................................................................. 40

Murray v. Xerox Corp.,
    811 F.2d 118 (2d Cir. 1987) ................................................................. 33

Musalli Factor for Gold & Jewellry v. JPMorgan Chase Bank, N.A.,
    261 F.R.D. 13 (S.D.N.Y. 2009) ................................................................. 1, 42, 44, 45, 55

O'Brien v. Nat'l Prop. Analysts Partners,
    719 F. Supp. 222 (S.D.N.Y. 1989) ................................................................. 63

O'Connor v. Readers Digest Ass'n, Inc.,
    No. 92 Civ. 7414 (CLB), 1993 WL 291372 (S.D.N.Y. March 10, 1993) ................................................................. 29

OSRecovery, Inc. v. One Groupe International, Inc.,
    354 F. Supp. 2d 357 (S.D.N.Y. 2005) ................................................................. 54

In re Oyster Bay Cove, Ltd.,
    161 B.R. 338 (Bankr. E.D.N.Y. 1993) ................................................................. 39

PPI Enterprises (U.S.), Inc. v. Del Monte Foods Co.,
    Nos. 05-6885-cv (L), 05-7040-cv (CON), 2006 WL 3370698 (2d Cir. Nov. 20, 2006) ................................................................. 78

Pallonetti v. Liberty Mut.,
    No. 10 Civ. 4487, 2011 WL 519407 (S.D.N.Y. Feb. 11, 2011) ................................................................. 60

Papasan v. Allain,
    478 U.S. 265 (1986) ................................................................. 16

Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC,
    446 F. Supp. 2d 163 (S.D.N.Y. 2006) ................................................................. 67

Perniciaro v. Natale (In re Natale),
   136 B.R. 344 (Bankr. E.D.N.Y. 1992) ................................................................16

Pfizer, Inc. v. Stryker Corp
   348 F. Supp. 2d 131 (S.D.N.Y. 2004) .............................................................43

Premier-N.Y., Inc. v. Travelers Property Cas. Corp.,
   No. 603043/03, 2008 WL 2676800 (N.Y. Sup. Ct. July 8, 2008) ........................47

Premium Mortgage Corp. v. Equifax, Inc.,
   583 F.3d 103 (2d Cir. 2009) .......................................................... 29, 38, 39

Productores Asociados De Caf Rio Claro, C.A. v. Barnett,
   No. 98 CIV. 499 DAB, 1999 WL 287389 (S.D.N.Y. May 7, 1999) ...............42, 46

QSI Holdings, Inc. v. Alford,
   382 B.R. 731 (W.D. Mich. 2007) .....................................................................80

Rapoport v. Asia Electronics Holding Co., Inc.,
   88 F. Supp. 2d 179 (S.D.N.Y. 2000) ...............................................................74

Ray Larsen Assocs., Inc. v. Nikko Am., Inc.,
   No. 89 Civ. 2809 (BSJ), 1996 WL 442799 (S.D.N.Y. Aug. 6, 1996) ..................52

Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.,
   68 F.3d 1478 (2d Cir. 1995) ..........................................................................51

Renner v. Chase Manhattan Bank,
   No. 98 CIV. 926(CSH), 2000 WL 781081 (S.D.N.Y. June 16, 2000) .............44, 46

Richards v. AXA Equitable Life Ins. Co.,
   No. 06 Civ. 3744(PAC), 2007 WL 3084968 (S.D.N.Y Oct. 22, 2007) ................55

Rosner v. Bank of China,
   349 Fed. Appx. 637 (2d Cir. 2009) .................................................................66

Rupp v. Holling (In re Holling),
   Bankruptcy No. 05-38322, 2007 WL 2964505 (Bankr. D. Utah Feb. 8, 2007) ....80

Sado v. Ellis,
   882 F. Supp. 1401 (S.D.N.Y. 1995) ................................................................60

Saltz v. First Frontier, LP,
   No. 10 Civ. 964(LBS), 2010 WL 5298225 (S.D.N.Y. Dec. 23, 1010) ................49

Schlaifer Nance & Co. v. Estate of Warhol,
   119 F.3d 91 (2d Cir. 1997) ......................................................................17, 41

Scott-Macon Sec., Inc. v. Zoltek Cos., Inc.,
   No. 06-2711-cv, 2007 WL 2914873 (2d Cir. Oct. 4, 2007) ...............................79

In re Shady Grove Tech Ctr. Assocs. Ltd. Partnership,
   216 B.R. 386 (Bankr. D. Md. 1998) ................................................................80

In re Sharp Int'l Corp.,
    403 F.3d 43 (2d Cir. 2005) ...........................................................................70

Shields v. Citytrust Bancorp, Inc.,
    25 F.3d 1124 (2d Cir. 1994) .........................................................................44

In re Southeast Fin. Assocs., Inc.,
    212 B.R. 1003 (Bankr. M.D. Fla. 1997) ......................................................80

St. Paul Fire and Marine Ins. Co. v. Universal Builders Supply,
    409 F.3d 73 (2d Cir. 2005) ...........................................................................84

State v. Peerless Ins. Co.,
    67 N.Y.2d 845 (1986)....................................................................................47

Stengal v. Chen
    74 A.D.3d 1050, 903 N.Y.S.2d 110, 111 (2d Dep't 2010) ...........................31

Sternberg v. Citicorp Credit Servs., Inc.,
    69 A.D.2d 352, 419 N.Y.S.2d 142 (2d. Dep't 1979)....................................22

Stolow v. Greg Manning Auctions Inc.,
    258 F. Supp. 2d 236 (S.D.N.Y. 2003) ..........................................................59

Stuart Lipsky, P.C. v. Price,
    215 A.D.2d 102, 625 N.Y.S.2d 563 (1st Dep't 1995) ..................................34

Tomoka Re Holdings, Inc. v. Loughlin,
    No. 03Civ. 49049NRB), 2004 WL 1118178 (S.D.N.Y. May 19, 2004)........51

Transit Mgmt. LLC v. Watson Indus., Inc.,
    23 A.D.3d 1152, 803 N.Y.S.2d 860 (4th Dep't 2005)..................................34

Triple Z Postal Services, Inc. v. United Parcel Serv., Inc.,
    No. 118057/05, 2006 WL 3393259 (N.Y. Sup. Ct. Nov. 24, 2006) ..........52, 54

In re Tru Block Concrete Prods., Inc.,
    27 B.R. 486 (Bankr. S.D. Cal. 1983)............................................................80

U.S. v. Bestfoods,
    524 U.S. 51 (1998) ...................................................................................35, 68

Van Kleeck v. Hammond
    25 A.D.3d 941, 811 N.Y.S.2d 452 (3rd Dep't 2006)....................................37

Vaughn v. Consumer Home Mortgage, Inc.,
    No. 01-CV-7937(ILG), 2003 WL 21241669 (E.D.N.Y. March 23, 2003) ............62

In re Weitzen,
    3 F. Supp. 698 (S.D.N.Y. 1933)....................................................................80

Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A.,
    247 F. Supp. 2d 352 (S.D.N.Y. 2002) ..........................................................60

Williams v. Bank Leumi Trust Co. of,
    N.Y., No. 96 Civ. 6695(LMM), 1998 WL 397887 (S.D.N.Y. June 15, 1998)......................59

Wurtsbaugh v. Banc of Am. Sec. LLC,
    No. 05 CIV. 6220 (DLC), 2006 WL 1683416 (S.D.N.Y. June 20, 2006)................. 18, 22, 26

## **Statutes**

11 U.S.C. § 547...........................................................................................................................81

Fed. R. Civ. P. 9(b) ..................................................................................... 17, 35, 42, 57, 63, 64

Fed. R. Civ. P. 9(c)....................................................................................................................85

Fed. R. Civ. P. 12(b) .................................................................................................................16

## PRELIMINARY STATEMENT

Faced with numerous valid and well-pled claims for fraudulent transfer, fraud, coercion, and various other bases to invalidate and avoid JPMorgan Chase Bank, N.A.'s ("JPMorgan") pre-bankruptcy grab of billions of dollars in securities and cash from Lehman Brothers Holdings Inc. ("LBHI"), JPMorgan has filed what can only be styled as "contingent" counterclaims (the "Amended Counterclaims").  JPMorgan asserts that, to the extent Plaintiffs establish JPMorgan's wrongdoing and the Court orders JPMorgan to pay damages or return LBHI's collateral to the estate, JPMorgan will have suffered a "loss" because that unlawfully acquired collateral would then be unavailable to satisfy JPMorgan's alleged deficiency after liquidating the securities that were the subject of a September 17, 2008 tri-party repurchase transaction ("repo") among JPMorgan, Lehman Brothers Inc. ("LBI"), and Barclays Capital Inc. ("Barclays").  Notably, JPMorgan refused to return billions of dollars of excess LBHI collateral that it obtained prepetition even though, as JPMorgan admits in its Amended Counterclaims, JPMorgan had little clearance exposure to LBI or any other LBHI subsidiary when LBHI filed for bankruptcy.  JPMorgan is thus cynically seeking to immunize itself from the consequences of its own misconduct by arguing that the LBHI estate is somehow required to reimburse JPMorgan in the event Plaintiffs are successful on their claims.

JPMorgan's Amended Counterclaims fail as a matter of law.  First of all, to the extent JPMorgan has a legitimate dispute with anyone, it is with Barclays.  JPMorgan's Amended Counterclaims allege that Barclays did not intend to comply with the Asset Purchase Agreement ("APA") or representations made to this Court, that Barclays fraudulently induced JPMorgan to believe it would fund the $15.8 billion tri-party repo with LBI (the "Barclays Repo") on the day it assumed the $45 billion repo with LBI from the Federal Reserve Bank of New York (the "Fed," and the transaction, the "Fed Repo"), that Barclays explicitly told JPMorgan to release all

1

the margin associated with the Fed Repo on false pretenses, and that Barclays directly represented to JPMorgan that it would eventually acquire the assets of Lehman's North American broker-dealer business held at JPMorgan in connection with the broker-dealer sale transaction (the "Barclays Sale").  Indeed, JPMorgan has already entered into not just one, but two separate settlement agreements with Barclays for claims related to the Barclays Repo.  JPMorgan now turns to LBHI as the defendant of last resort to assert its released claims.  Yet, until the recent filing of its original Counterclaims, JPMorgan never even suggested that LBHI had anything to do with JPMorgan's dispute with Barclays, despite multiple opportunities to do so in connection with Court-approved settlements and the protracted litigation concerning the Barclays Sale.

JPMorgan's attempt to deflect blame to LBHI fails for a number of reasons.  First, JPMorgan fails to plead the element of reasonable reliance.  As an initial matter, JPMorgan concedes in the Amended Counterclaims that it did not actually rely on LBHI's statements by admitting that it held onto the margin through Thursday, September 18 to protect itself if the Barclays Sale did not go through as described in the APA.  Given that LBHI's alleged misrepresentations supposedly took place before then, this concession shows that JPMorgan did not actually rely on them and did not alter its actions as tri-party agent in response to those alleged misrepresentations.

Furthermore, any reliance on LBHI's alleged misrepresentations was not reasonable as a matter of law.  The Barclays Repo was governed by specific and detailed contractual documents, which provided all of the relevant terms and representations for those repos.  The tri-party repurchase agreement among JPMorgan, Barclays, and LBI (the "Barclays Custodial Undertaking") even states that the representations contained in that Agreement are the exclusive evidence of the terms of the deal.  In light of these contractual representations, it was

2

not reasonable for JPMorgan to rely on statements from the APA or any other source outside those contracts in deciding how to conduct the repurchase transaction. Moreover, it was especially unreasonable for JPMorgan to rely on alleged statements from LBHI, given the far more direct and explicit statements from Barclays about what Barclays itself would do.

Second, what LBHI is alleged to have said does not support a claim for fraudulent misrepresentation under New York law. First of all, the alleged representations all concern what Barclays intended or did not intend to do in the future. JPMorgan is attempting to hold LBHI liable for allegedly representing that Barclays would later purchase all of the assets of Lehman's North American broker-dealer business, or alternatively for concealing that Barclays would not in fact purchase all of these assets. But one cannot be liable for misrepresenting what someone else intends to do in the future.

Moreover, the Amended Counterclaims also fail to allege that LBHI knowingly made a false representation to JPMorgan. Despite multiple references to what unnamed "senior LBHI executives," "LBI and/or LBHI employees," or simply "Lehman" said or did, JPMorgan only actually pleads that two LBHI employees made any alleged false misrepresentations: Ian Lowitt and Paolo Tonucci. And the most JPMorgan can allege is that they represented Barclays had committed to support LBI fully until the deal closed, including overnight financing that would reduce or eliminate LBI's dependence on the Fed. Notably, despite all the inflammatory descriptions of certain securities, there are no allegations that LBHI is in any way liable for misrepresentations related to the quality of any securities. Even as to the one vague prediction noted above, and notwithstanding the benefits of months-long discovery and a second chance to plead this claim, JPMorgan is still unable to allege a single fact showing that Lowitt or Tonucci knew at the time that their alleged statements were false.

JPMorgan's allegations that the APA itself was a fraudulent misrepresentation are also denied by the Court's recent decision in the 60(b) case, which found that no one at LBHI made any intentional misrepresentations in the APA.

Third, JPMorgan has not satisfied the element of scienter because it has failed to plead that LBHI, which was in bankruptcy and a fiduciary of its creditors at the time, acted with a motive to defraud JPMorgan in order to give Barclays more valuable securities at the expense of LBI.  After all, LBHI was facing the prospect of guaranteeing any clearing deficiency by LBI – giving LBHI every incentive to limit that deficiency.  JPMorgan attempts to satisfy this element by pointing to LBHI's desire for the Barclays Sale to go through, but this general motive is insufficient to establish an intent to use fraud to achieve that goal – especially in a method that would expose LBHI's creditors to billions of dollars of potential liability.

JPMorgan's related causes of action for fraudulent concealment, fraudulent inducement, and aiding and abetting fraud fail for the same reasons as the underlying fraud claims.  In addition, the fraudulent concealment claim fails because LBHI did not owe any duty to JPMorgan to disclose information about Barclays to JPMorgan.  And the aiding and abetting claims fail for the additional reasons that JPMorgan's allegations do not support the conclusion that LBHI substantially assisted in any fraud, or that LBHI had "actual knowledge" of the alleged underlying fraud.

JPMorgan's seventh and eighth counterclaims, asserting indemnification claims against LBHI, should also be dismissed.  The seventh counterclaim is based on an indemnity clause in the 2000 Clearance Agreement, which has no application to the events at issue in JPMorgan's Amended Counterclaims.  Instead, the repos with Barclays during the week of September 15 were governed exclusively by the Barclays Custodial Undertaking.  JPMorgan's

4

attempt to fit its claim under the Clearance Agreement is unavailing because the loan it made in

unwinding the Barclays Repo is clearly governed by the specific contracts with Barclays

governing that repo.

Although the eighth counterclaim is at least based on the right contract, *i.e.*, the

Barclays Custodial Undertaking, it fails to state any claim for the contingent relief that JPMorgan

seeks in its Amended Counterclaims.  LBHI is not a party to that agreement, so cannot be

directly liable under it.  Furthermore, the indemnity clause in the Barclays Custodial Undertaking

(like the indemnity clause in the inapplicable 2000 Clearance Agreement) prohibits

indemnification where JPMorgan has acted negligently, engaged in willful misconduct, or

breached a contract.  This contractual exception comports with public policy, which prohibits a

creditor from contracting around its own negligence or the provisions of the Bankruptcy Code.

Because the "loss" claimed by JPMorgan could only arise upon a judicial finding of JPMorgan's

misconduct or an order to return fraudulently or preferentially transferred assets, JPMorgan will

never be entitled to indemnification, and these counterclaims should be dismissed.

Finally, it is worth noting that it has been two and a half years since the events

described in JPMorgan's Amended Counterclaims transpired.  In that time, JPMorgan supported

the Barclays Sale, executed two settlements (with releases) with Barclays relating to these

transactions, and also witnessed a months-long trial examining Barclays' conduct with regard to

the Barclays Sale.  Yet JPMorgan remained silent throughout that time – never voicing its

accusations of LBHI's wrongdoing or informing the Court of Barclays' alleged fraud.  To come

forward now with a story that LBHI conspired with Barclays to engineer Barclays' repayment

while leaving JPMorgan with illiquid repo securities is untimely and only serves as a desperate

attempt to deflect attention from JPMorgan's own misconduct.

## STATEMENT OF FACTS

I.    **JPMorgan Agrees to be Repo Agent for LBI Pursuant to Individual Custody Agreements**

JPMorgan served as LBI's primary securities clearing bank in the eight years leading up to 2008.  (Am. Counterclaims ¶ 19).  Prior to LBHI's bankruptcy filing, the main terms and framework of that relationship were set out in a Clearance Agreement entered into on June 15, 2000 (the "2000 Clearance Agreement") between LBI and The Chase Manhattan Bank, JPMorgan's predecessor-in-interest.[1]  (Id. ¶ 21; Ex. A, 2000 Clearance Agreement).[2]  Pursuant to that Agreement, JPMorgan agreed to serve as LBI's non-exclusive clearance agent for securities transactions and undertook obligations including maintaining a clearance account, receiving and transferring securities, and making payments and collections of money.  (Ex. A, 2000 Clearance Agreement).

Additionally, JPMorgan agreed to act as LBI's non-exclusive custodian for tri-party repurchase transactions.  (Am. Counterclaims ¶ 20-22; Ex. A, 2000 Clearance Agreement § 9).  A repurchase transaction is a common financing arrangement whereby one party (the "seller") sells securities to a "buyer," who in turn extends the "purchase price" to the seller.  The parties also agree that the seller will repurchase the securities for the "repurchase price" (i.e. the purchase price plus the applicable interest) on or before a date certain (but in no event more than one year later).  (Am. Counterclaims ¶ 20; Ex. A., 2000 Clearance Agreement § 9, ex. A § 4(a)).  LBI often engaged in repurchase transactions in which LBI's counterparties agreed to extend or

---

[1]    On a motion to dismiss, the Court may review and consider unambiguous provisions of contracts that are attached to, cited in, or integral to a complaint or counterclaims.  Cortec Indus., Inc. v. Sum Holding, LP,  949 F.2d 42, 47 (2d Cir. 1991).

[2]    Unless otherwise specified, all citations to exhibits are to the Declaration of Tyler G. Whitmer in Support of Motion to Dismiss, filed concurrently herewith.

"roll" the transactions on a night-to-night basis on the same or similar terms.  (See Am.

Counterclaims ¶ 20).

    In its role as tri-party repurchase custodian, JPMorgan served as the intermediary

between LBI, as seller, and the counterparty, as buyer, by processing the purchases and sales of

securities under each repurchase transaction, and ensuring that the terms of the governing

documents of each such transaction were satisfied – including applying the applicable margins

established by the purchaser for eligible securities and determining the market value for the

securities involved in the repurchase transactions.  (Ex. A, 2000 Clearance Agreement § 9, ex. A.

§§ 3, 4(a)).  Although the 2000 Clearance Agreement contained brief provisions relating to the

general nature of JPMorgan's role as custodian for repurchase agreements, it expressly provided

that LBI and each repo counterparty would set out the specific terms and conditions of individual

repos in two other contractual documents:  (1) a repurchase agreement between LBI and the

counterparty setting forth their obligations to each other (a "Repurchase Agreement"); and (2) a

tri-party custody agreement among LBI, the counterparty, and JPMorgan as custodian for the

applicable repurchase transactions (a "Tri-Party Custody Agreement").  (See id. § 9).  The Tri-

Party Custody Agreement in particular was expected to include detailed operating provisions

such as those relating to securities eligible for purchase by the counterparty, allocation of LBI

securities to a particular repurchase transaction, substitution of securities, pricing of the securities

to be purchased and application of purchaser-mandated margin, methodology to use if either the

cash for purchase or the securities to be sold did not comport with the anticipated transaction,

and authorizations for funds transfers.  (See e.g., id. at ex. A § 4).[3]

---

   [3] An example form of Tri-Party Custody Agreement was attached as Exhibit A to the
2000 Clearance Agreement, although alternate forms of Tri-Party Custody Agreement were
contemplated.  (Ex. A, 2000 Clearance Agreement § 9).

The 2000 Clearance Agreement itself did not address material terms of the repo transactions. For example, the 2000 Clearance Agreement contained no provisions relating to extensions of credit in tri-party repos. (See Am. Counterclaims ¶ 21). Rather, the 2000 Clearance Agreement only contained a general paragraph relating to Loans and Advances, which focused on when LBI could use funds credited to its accounts prior to final payment and when LBI would repay any loans resulting from the failure of such final payment. (Ex. A, 2000 Clearance Agreement § 5). Any other extensions of credit were provided for only upon receipt by JPMorgan of instructions from LBI. (Id.). Significantly, the 2000 Clearance Agreement also specifically provided that, in the event of a conflict between the Clearance Agreement and any Tri-Party Custody Agreement, the Tri-Party Custody Agreement would govern. (Id. § 9).

## II.    JPMorgan Demands that LBHI Guarantee LBI's Clearance Liabilities, and Then All Subsidiaries' Liabilities of Any Kind

After performing clearance and tri-party repo services for LBI for eight years, in August 2008, JPMorgan insisted that LBHI execute a new set of agreements. The new agreements made LBHI a party to the 2000 Clearance Agreement and also a guarantor of any liabilities of LBI arising from that agreement. (Am. Counterclaims ¶¶ 159-60; Ex. B, Amendment to Clearance Agreement, August 26, 2008; Ex. C, Guaranty, August 26, 2008 (the "August Guaranty"; Ex. D, Security Agreement, August 26, 2008).

Then, on September 9, 2008, JPMorgan insisted that LBHI enter into a new guaranty (the "September Guaranty" and, together with the August Guaranty, the "Guaranties") covering all obligations of its subsidiaries and affiliates of any kind and a security agreement securing LBHI's obligations under the September Guaranty. (Am. Counterclaims ¶¶ 159-60; Ex. E, September Guaranty § 1; Ex. F, Security Agreement, September 9, 2008).

### III.   JPMorgan Serves as LBI's Tri-Party Repo Agent in the Week After LBHI's Bankruptcy

LBHI commenced its chapter 11 proceeding early in the morning on September 15, 2008.  (Am. Counterclaims ¶ 27).  At that time, despite the fact that JPMorgan was refusing to release billions of dollars in LBHI's collateral needed to stave off LBHI's bankruptcy, JPMorgan had little clearance or repo exposure to LBI.  (Id. ¶ 26, ("[D]uring the weekend of September 13-14, JPMorgan had relatively little clearance-related exposure to LBI.")).[4]

However, LBI continued to operate during the following week.  (Id. ¶ 28).  JPMorgan agreed to serve as the clearing bank for LBI that week, performing securities clearing services as well as tri-party repo services.  (Id. ¶ 29).  In this role, JPMorgan acted as custodian bank for a series of overnight tri-party repurchase agreements, including those involving LBI and Barclays.  (Id. ¶ 30).  To define the terms of those agreements, JPMorgan, LBI, and Barclays executed the Barclays Custodial Undertaking.  (Ex. G, Barclays Custodial Undertaking).   LBHI was never a party or signatory to that agreement.  (See Am. Counterclaims ¶ 30).

The Barclays Custodial Undertaking set out the specific terms and conditions that would govern the tri-party repo transactions among Barclays, LBI, and JPMorgan.  (See, e.g., Ex. G, Barclays Custodial Undertaking § 3).  For example, it specifically allowed LBI to alter the allocation of securities within the tri-party repo shells, as long as the valuation of the collateral in the shells remained the same.  (Id. § 3(f) ("Seller may substitute other Securities for any Purchased Securities without notice to Buyer provided that the Purchased Securities in Buyer's

---

[4]   In JPMorgan's original counterclaims, it pleaded that "overnight repo investors advanced sufficient funds to LBI to take out JPMorgan's intraday loans.  Therefore, during the weekend of September 13-14, JPMorgan had little or no clearance-related exposure to LBI." (Original Counterclaims ¶ 22).

Account after the substitution have a Margin Value equal to or greater than the Purchase

Price.")).

        Moreover, the Barclays Custodial Undertaking stated that it, along with certain

related credit and funds transfer agreements, was the "entire agreement of the parties with respect

to its subject matter."  (Id. § 13.)   It also incorporated a Master Repurchase Agreement between

LBI and Barclays dated December 19, 1996.  (Id. at 1).  LBHI was not a party to this agreement

either, which stated that the terms of each repo, including the purchase and repurchase dates,

could only be provided through written confirmation.  (Ex. H, Master Repurchase Agreement §

3(b) ("Upon agreeing to enter a transaction hereunder, Buyer or Seller (or both), as shall be

agreed, shall promptly deliver to the other party a written confirmation of each Transaction

('Confirmation').  The Confirmation shall . . . set forth (i) the Purchase Date, (ii) the Purchase

Price, (iii) the Repurchase Date . . . .  The Confirmation, together with this Agreement, shall

constitute conclusive evidence of the terms agreed between Buyer and Seller . . . .")).

        Unlike the 2000 Clearance Agreement, the Barclays Custodial Undertaking had a

specific provision relating to extensions of credit by JPMorgan to LBI for tri-party repurchase

transactions.  (Ex. G, Barclays Custodial Undertaking § 3(d)).  It provided that, if LBI did not

have sufficient funds in its account to advance the repurchase price to the buyer, or the value of

the securities did not equal or exceed the repurchase price, then JPMorgan had the right, "without

notice to [LBI]," to advance the repurchase price to Barclays, thereby extending credit to LBI.

(Id. ("However, in the event that the Margin Value of the Purchased Securities in Seller's

Account does not equal or exceed the Purchase Price . . . Bank may, at Bank's option and without

notice to Seller, advance the amount of such deficiency on Seller's behalf and Seller shall be

obligated to repay such amount on demand to Bank . . . .")).  The Barclays Custodial

Undertaking also made it very clear that JPMorgan had no obligation to extend such credit.  (Id.).

## IV.    JPMorgan Unwinds All Repos on Tuesday, Wednesday, and Thursday, And Advances the Repurchase Price to All Sellers, Including Barclays

During the week of September 15-19, JPMorgan acted as custodian for tri-party

repurchase agreements involving LBI and Barclays, pursuant to the Barclays Custodial

Undertaking, as well as for a number of other counterparties, including the Fed.  (Am.

Counterclaims ¶ 31).  In particular, JPMorgan served as the agent for tri-party repurchase

agreements with Barclays for $2 billion on the night of September 15, $10.5 billion on the night

of September 16, and $15.8 billion on the night of September 17.  (Id. ¶ 30).  On each morning

after each of these repos was executed, JPMorgan "unwound" the agreements, advanced the

repurchase price to the buyers, including Barclays, and returned the securities to LBI.  (Id. ¶¶ 32,

36, 69).

On the night of September 18, Barclays replaced the Fed as "Purchaser" under the

$45 billion Fed Repo among LBI, the Fed, and JPMorgan.  (Id. ¶¶ 58, 72-84).  That night, as

custodial agent for LBI, JPMorgan transferred many but not all of the securities in the Fed Repo

to Barclays' tri-party custodial bank, The Bank of New York.  (Id. ¶ 84).

That same night, Barclays declined to "roll" (or re-execute) the Barclays Repo it

had entered into with LBI the night before, or to otherwise enter into any separate repo with LBI

beyond the Fed Repo.  (Id. ¶ 85).

## V.    JPMorgan Participates in the Hearings Related to the Barclays Sale

During this same week, representatives from LBI, LBHI, and Barclays were

negotiating the Barclays Sale.  (Am. Counterclaims ¶ 30).  On September 17, LBHI and LBI

filed a motion to schedule a sale hearing to consider approval of the Barclays Sale as reflected in

the APA.  (Id. ¶ 37; Ex. I, Debtors' Motion to (A) Schedule A Sale Hearing; (B) Establish Sales

Procedures; (C) Approve A Break-Up Fee; And (D) Approve the Sale of the Purchased Assets

and the Assumption and Assignment of Contracts Relating to the Purchased Assets).

        That same day, the Court held a hearing to consider the bid procedures relating to

the Barclays Sale (the "Bid Procedures Hearing").  During that hearing, counsel for LBHI

explained Barclays' planned role in financing LBI that week as follows:  "And then, your Honor,

in the interim, LBI has entered into an agreement with the prospective purchaser where there's a

repo agreement in which they are backing up and allowing these repos to be settled and to be

financed.  In addition, if this goes forward, there will be a support agreement for this interim

period of two or three days where Barclays Capital will be on premises, will be offering

oversight and in its sole discretion, may be willing to advance some monies in the interim

period."  (Ex. J, Bid Procedures Hearing Tr. at 24:9-17).  JPMorgan appeared at the Bid

Procedures Hearing, noted on the record that JPMorgan has "a lien on assets of the broker-

dealer," and expressed concern that the APA did not address assignment of financial contracts

and repos after those assets were sold to Barclays, noting that JPMorgan was "going to be

concerned about what's being assumed and what's being left behind."  (Id. at 57:3-15).

        On September 19, the Court held the sale hearing (the "Sale Hearing") and

approved the Barclays Sale pursuant to an order signed in the early morning hours of September

20 (the "Sale Order").  (Am. Counterclaims ¶¶ 92, 94).  JPMorgan appeared at the Sale Hearing

and urged the Court to approve the transaction.  (Ex. K, Sale Hearing Tr. at 175:10-15 ("We

think Your Honor should act tonight.")).  At that hearing, JPMorgan made no mention of any of

the facts it alleges substantiate the Amended Counterclaims.  Instead, JPMorgan described how

"there's simply a lack of clarity as to whether any of those securities [being acquired by

Barclays] are the securities that are held by JPMorgan as collateral [for JPMorgan's clearing]."

(Id. at 176:14-19).  JPMorgan did not request a clarification that Barclays would purchase all of

the collateral securing JPMorgan's "fail financing" for LBI or otherwise reimburse JPMorgan for

any clearing shortfalls.

**VI.    JPMorgan Releases Claims Against Barclays Regarding the Barclays Repo**

On the Monday following the Sale Hearing, September 22, when the Barclays

Sale closed, JPMorgan and Barclays executed an agreement that, among other things, released all

claims between them relating to the Barclays Repo.  (Ex. L, Services and Settlement

Agreement).  Specifically, the Services and Settlement Agreement ("SSA") among Barclays,

LBI, SIPC, LBHI, and JPMorgan included the following mutual release between JPMorgan and

Barclays:

> JPMorgan and BarCap shall be deemed to forever release . . . all
> claims . . . that are based in whole or in part on any act, omission,
> transaction or other occurrence taking place on or prior to the date
> hereof in any way relating to the clearing, settlement and other
> processing services provided by JPMorgan to LBI, any
> transactions relating to the Accounts or any cash, securities or
> property in the Accounts, including without limitation any disputes
> relating to a repurchase agreement allegedly agreed to on or about
> September 18, 2008 in respect of approximately $15.8 billion face
> amount of securities . . . .

(Id. § 4(a)).

This was not the only settlement agreement that JPMorgan and Barclays entered

into regarding the $15.8 billion repo.  They also executed a second settlement agreement in

December of that year (the "December Settlement Agreement"), which also addressed disputes

surrounding the failure to transfer certain securities from the Fed to Barclays, or to pay the $7

billion JPMorgan had promised to Barclays to satisfy the resulting shortfall.  (Ex. M, December

Settlement Agreement § D).  In the December Settlement Agreement, which was among

JPMorgan, Barclays, and the LBI Trustee, JPMorgan agreed to two separate releases related to

these events.  (Id. §§ 4(c), 4(e)).  In the first, JPMorgan releases Barclays, LBI and the affiliates

of each from all claims relating to the Fed Repo:

> JPMorgan and BarCap (in each case, on its own behalf and on
> behalf of each of its affiliates) hereby does and shall be deemed
> forever to release, waive and discharge each other, the Trustee,
> LBI and the LBI estate, their respective property and their
> respective current and former officers, directors, employees,
> subsidiaries, attorneys, financial advisors, accountants, investment
> bankers, investment advisors, actuaries, professionals, agents,
> affiliates and representatives (collectively, "Representatives") from
> and in respect of all claims, causes of action and any other debts,
> obligations, rights, suits, damages, actions, interests, remedies and
> liabilities (other than the right to enforce the obligations of the
> Parties set for forth in this Agreement) (collectively, "Claims"),
> whether known or unknown, foreseen or unforeseen, suspected or
> unsuspected, liquidated or unliquidated, contingent or fixed,
> currently existing or hereinafter arising in law, equity or otherwise,
> relating to the Subject Funds, the Replacement Transaction or the
> Delivered Securities.

(Id. § 4(c)).  The December Settlement Agreement also contains a mutual release between

JPMorgan and Barclays of all claims "relating to any alleged agreement by BarCap to enter into

one or more triparty or other repurchase transactions involving LBI."  (Id. § 4(e)).

## VII.   JPMorgan Remains Silent Throughout the Barclays Trial

On September 15, 2009, LBHI, LBI and the Official Committee of Unsecured

Creditors of LBHI ("the Committee") filed motions pursuant to Rule 60(b) of the Federal Rules

of Civil Procedure, made applicable by Rule 9024 of the Rules of Bankruptcy Procedure, seeking

to modify the Sale Order to the extent it purported to make material modifications to the

Barclays Sale that were not disclosed to the Court and to enforce the Order consistently with the

transaction that was disclosed to the Court.  (See Am. Counterclaims ¶¶ 95-96).  Shortly

thereafter, on October 27, 2009, Barclays served JPMorgan with a document subpoena related to

the 60(b) litigation, seeking all documents concerning LBHI or LBI securities used or available

for use to obtain financing and all documents concerning the Sale Transaction.  (Ex. N, Barclays'
Subpoena to JPMorgan).  The LBI Trustee served a subpoena on JPMorgan on November 3,
2009, seeking additional documents.  (Ex. O, Trustee's Subpoena to JPMorgan).

Trial commenced on the Rule 60(b) motions and certain related claims set out in
an adversary complaint against Barclays on April 26, 2010 and concluded on October 21, 2010.
Despite knowing of the trial, JPMorgan never claimed during any of the proceedings that LBHI
had made fraudulent misrepresentations in connection with the sale transaction or was in any
way at fault regarding the Barclays Repo, the Fed Repo, or any other transaction consummated
in the week after LBHI's bankruptcy.

On February 22, 2011, the Court issued an order denying the Rule 60(b) motions.
(Docket No. 14612).

## VIII.   JPMorgan Amends its Counterclaims Following Plaintiffs' First Motion to Dismiss

JPMorgan filed its original Counterclaims on December 1, 2010.  (Docket No.
33).  Plaintiffs moved to dismiss the Counterclaims on January 31, 2011.  (Docket No. 48).
Plaintiffs' motion challenged the causes of action alleged by JPMorgan on many grounds,
including:  (a) the original Counterclaims failed to specify how LBHI, as opposed to "Lehman"
more generally, made false representations to JPMorgan or participated in fraud by Barclays; and
(b) JPMorgan failed to allege any motive for LBHI, acting on behalf of its creditors, to
participate in fraud by Barclays that would leave it more exposed on its purported guaranty of
LBI than it would be in the absence of the alleged fraud.  (Id.).  JPMorgan filed its Amended
Counterclaims on February 17, 2011, including additional factual allegations and three new
counterclaims.  (Docket No. 63).

## STANDARD OF REVIEW

To survive a motion to dismiss, the counterclaimant must allege facts that, if "accepted as true[] 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009), (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Fed. R. Civ. P. 12(b), as incorporated in Bankruptcy Rule 7012. A claim is facially plausible only if the alleged facts "allow[] the court to draw the reasonable inference" that the alleged misconduct did in fact occur. Iqbal, 129 S. Ct. at 1949 (emphasis added). Conclusory allegations and legal conclusions are not presumed to be true. Id. Nor are "formulaic" or "threadbare" recitations of the elements of a claim. Twombly, 550 U.S. at 555.

Although the Court must accept all well-pleaded factual allegations as true, not every statement in a counterclaim will meet this standard. Rather, allegations "must be 'well pleaded' and thus the court need not accept 'sweeping and unwarranted averments of fact.'" Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortgage Inv. Corp.), 256 B.R. 664, 675 (Bankr. S.D.N.Y. 2000), (quoting Perniciaro v. Natale (In re Natale), 136 B.R. 344, 348 (Bankr. E.D.N.Y. 1992)). Moreover, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). Rather, to withstand a motion to dismiss, there must be specific and detailed factual allegations to support the claim. Friedl v. City of New York, 210 F.3d 79, 85-86 (2d Cir. 2000).

## ARGUMENT

### POINT I

### JPMORGAN'S FIRST COUNTERCLAIM FOR FRAUDULENT MISREPRESENTATION FAILS TO STATE A CLAIM

JPMorgan's first cause of action is for fraudulent misrepresentation against LBHI. (Am. Counterclaims ¶¶ 110-17). It alleges that LBHI misrepresented through the APA and

16

certain oral statements allegedly made by Ian Lowitt and Paolo Tonucci that Barclays would

eventually purchase in the Barclays Sale all of the assets used by Lehman's North American

broker-dealer business. The claim should be dismissed for failing to plead facts satisfying the

elements of reasonable reliance, an actionable false statement, and scienter.

## A.    Legal Standards for Fraudulent Misrepresentation

The elements of fraudulent misrepresentation under New York law are: (1) a

material misrepresentation of fact, (2) knowledge of its falsity, (3) an intent to defraud, (4)

reasonable reliance, and (5) injury. Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98

(2d Cir. 1997); see also Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413, 421 (1996)

("In an action to recover damages for fraud, the plaintiff must prove a misrepresentation or a

material omission of fact which was false and known to be false by defendant, made for the

purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the

misrepresentation or material omission, and injury."). "The failure of any single element [of

fraudulent misrepresentation] will void the claim." Cong. Fin. Corp. v. John Morrell & Co., 790

F. Supp. 459, 469 (S.D.N.Y. 1992).

Allegations of fraud must be pled with particularity, pursuant to Federal Rule of

Civil Procedure 9(b). Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake."). To comply with the strict

pleading standard of Rule 9(b), "the complaint must: (1) specify the statements that the plaintiff

contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were

made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459

F.3d 273, 290 (2d Cir. 2006) (internal quotation omitted).

17

**B.    JPMorgan Has Failed to Allege Facts Constituting Reasonable Reliance On Any Alleged Misrepresentations By LBHI**

> **1.    Legal Standards for Reasonable Reliance Element of a Fraudulent Misrepresentation Claim**

In order to establish a claim for fraudulent misrepresentation, the plaintiff must show it was reasonable to rely on the supposed misrepresentation. <u>Gladstone Bus. Loan, LLC v. Randa Corp.</u>, No. 09 Civ. 4225(LMM), 2009 WL 2524608, at *4 (S.D.N.Y. Aug. 17, 2009) (granting motion to dismiss and stating "[u]nder New York Law, a required element of fraud is that a party must show that it relied on a misrepresentation and that the reliance is reasonable").

To determine whether reasonable reliance is pled sufficiently to survive a motion to dismiss, the court may consider the complexity and magnitude of the transaction, the sophistication of the parties, and any contractual agreements that have been incorporated in or relied on by the pleadings. <u>Emergent Capital Inv. Mgmt., LLC v. Stonepath Group</u>, 343 F.3d 189, 195 (2d Cir. 2003) (dismissing common law fraud claim because any reliance by plaintiff on defendant's oral statement was unreasonable as a matter of law "[g]iven [defendant's] extensive contractual representations about other matters, appellant's sophistication, and the size of the transaction"). "When plaintiffs are sophisticated parties and the statement or omission relates to a business transaction that has been formalized in a contract, New York courts are generally reluctant to find reliance on oral communications to be reasonable." <u>Wurtsbaugh v. Banc of Am. Sec. LLC</u>, No. 05 CIV. 6220 (DLC), 2006 WL 1683416, at *6 (S.D.N.Y. June 20, 2006) (dismissing a fraud claim because plaintiff's alleged reliance on defendant's oral representation that plaintiff's employment "would not be at jeopardy" was unreasonable as a matter of law in light of his written at-will employment agreement).

2.    **According to JPMorgan's Own Factual Allegations, JPMorgan Did Not In Fact Rely on LBHI's Representations**

JPMorgan claims that it relied on representations in the APA and on alleged oral statements by Tonucci and Lowitt when it unwound LBI's overnight financings on September 18, 2008.  (Am. Counterclaims ¶¶ 111, 115).  However, JPMorgan cannot satisfy the element of reasonable reliance because JPMorgan itself admits that it did not actually rely on the APA.  In addition, the facts alleged in the Amended Counterclaims show JPMorgan could not have actually relied on the alleged statements by Lowitt and Tonucci.

First, according to the Amended Counterclaims, even after LBHI allegedly misrepresented the planned sale to Barclays through the APA and related statements, JPMorgan prepared for the possibility that the Barclays Sale would not be consummated as described in the APA.  Specifically, JPMorgan alleges in its Amended Counterclaims:

> [T]he transfer of securities to Barclays was also held up on September 18 because Barclays did not want JPMorgan to hold the margin on the securities that LBI was transferring. . . . *One of JPMorgan's objectives in keeping the margin was to protect against potential liabilities arising out of its continued clearing advances, including any shortfall that might result if the sale to Barclays fell through and JP Morgan had to liquidate the securities on its own.*  Thus, when JPMorgan made loans to LBI during the morning of Thursday, September 18, JPMorgan believed that it would end the day on Thursday not only without exposure to LBI, but also with securities valued at more than $4.6 billion, i.e., the estimated amount of the margin that it was keeping.  Once the APA was consummated and JPMorgan's exposure to LBI was eliminated and the other securities transferred, JPMorgan would then release the margin.

(Am. Counterclaims ¶ 74 (emphasis added)).  In other words, despite any representations in the APA or otherwise from LBHI, as of Thursday, September 18, JPMorgan was still planning for the possibility that the Barclays Sale would fall through, and JPMorgan would have to liquidate securities on its own.

This factual allegation disproves JPMorgan's conclusory allegation about its own reliance, which states that, "[b]ased on JPMorgan's reasonable understanding and expectation

that Barclays had agreed to buy, and would buy, the securities that JPMorgan was financing,

JPMorgan unwound LBI's overnight financing on the morning of September 18, 2008, including

by advancing $15.8 billion at LBI's and Barclays' direction for Barclays' benefit . . . ."  (Id. ¶

115).  Rather, according to JPMorgan's own factual allegations, JPMorgan was preparing for the

possibility that the sale would fall through when it unwound the Barclays Repo.  That admission

thus precludes JPMorgan's claim of reasonable reliance on the APA or any other statements

made before it released the $5 billion margin.

        Nor could JPMorgan's subsequent decision to relinquish the margin to Barclays

have been made in reliance on any alleged misrepresentations by LBHI.  All of LBHI's supposed

misrepresentations are alleged to have been made before September 18, and none of them

concerned the release of the margin.  On the contrary, according to the Amended Counterclaims,

JPMorgan was allegedly induced to release the margin based on representations made during a

September 18 phone call between JPMorgan executives and Barclays' CEO, Bob Diamond.

(Am. Counterclaims ¶¶ 75-77 ("Diamond, through his affirmative statements and failure to

reveal Barclays' true agreements and intentions, persuaded JPMorgan that, by the end of

Thursday, JPMorgan's triparty exposure to LBI would be extinguished and, at the conclusion of

the transaction, JPMorgan would not have further exposure to LBI.")).  In contrast, the only

conduct attributed to LBHI after this time is that Lowitt sent an email to Tonucci on September

18 stating, "Asked Gerald [LaRocca] to escalate with [JPMorgan] [C]hase.  Think he is calling

Heidi Miller.  May need to get Bob Diamond to call Jamie [Dimon, the CEO of JPMorgan].

They are [f***ing] this up."  (Id. ¶ 78).  But neither this internal email nor Lowitt's alleged

statement to LaRocca constitute misrepresentations to JPMorgan.  Furthermore, there is no

indication that Lowitt was in any way referring specifically to the release of the $5 billion margin.

Second,  separate from JPMorgan's admission that it was preparing for the APA not to be implemented as written, JPMorgan elsewhere alleges that it was aware of facts contradicting the alleged misrepresentations before it supposedly relied on them.  JPMorgan admits in the Amended Counterclaims that its loans to LBI were not fully repaid by Barclays or the Fed on the nights between the alleged representation and the time JPMorgan supposedly relied on it.  Specifically, JPMorgan alleges that on the night of September 16, JPMorgan had to loan LBI $1.9 billion "in order to enable LBI to satisfy intraday loans from JPMorgan to LBI." (Am. Counterclaims ¶ 36).  Likewise, on the night of September 17, LBI's securities were financed in part "by a $4.4 billion fail financing loan from JPMorgan." (Id. ¶ 68).  Thus, when JPMorgan unwound the Barclays Repo on September 18, JPMorgan knew that Barclays had not "support[ed] LBI fully" and that its loans had not in fact been repaid by Barclays or the Fed each night.

This admission that Barclays did not repay JPMorgan's loans each night shows that reliance on LBHI's supposed representations could not have been reasonable.  JPMorgan claims that "Lowitt and Tonucci represented that Barclays had committed to support LBI fully until the deal closed, including by providing overnight financing that would reduce or eliminate LBI's dependence on the Fed."  (Am. Counterclaims ¶ 33).  JPMorgan alleges that these statements "persuaded Buyers-Russo that JPMorgan's loans to LBI would be repaid each night, either by Barclays or the Fed, until the transaction closed, at which point JPMorgan would be taken out in full" (id. ¶ 111), and that it relied on this understanding when it unwound LBI's overnight financings on September 18 (id. ¶ 115).  In light of these contradictory intervening

events, when Barclays did not repay JPMorgan's loans each night, it would not have been

reasonable to rely on Lowitt and Tonucci's statements, nor on Buyers-Russo's understanding of

those statements to mean that "JPMorgan's loans to LBI would be repaid each night . . . until the

transaction closed at which point JPMorgan would be taken out in full" on September 18.

       Thus, because JPMorgan's own factual allegations prove that JPMorgan did not

actually rely on the alleged representations, and knew facts contradicting its interpretation of

them, JPMorgan has failed to plead reliance on LBHI's alleged misrepresentations.  See Apex

Oil Co. v. Belcher Co. of N.Y., Inc., 855 F.2d 997, 1009 (2d Cir. 1988) (holding a fraud claim

failed as a matter of law for lack of reliance when the plaintiff admitted it did not believe the

alleged misrepresentation); Gladstone Bus. Loan, LLC, 2009 WL 2524608 at *4 (same); Babiker

v. Ross Univ. School of Medicine, No. 98 Civ. 1429 SHS THK, 1999 WL 33290, at *3

(S.D.N.Y. Jan. 22, 1999) (stating plaintiff could not claim reliance on representation when "he

did not believe it to be true"); Sternberg v. Citicorp Credit Servs., Inc., 69 A.D.2d 352, 360 n.4,

419 N.Y.S.2d 142 (2d. Dep't 1979) (affirming dismissal of a common law fraud claim where

plaintiff admitted he did not believe the alleged misrepresentation).

    **3.**    **Any Reliance on Statements Outside the Repo Contracts Was Unreasonable**

       The next reason JPMorgan's fraudulent misrepresentation counterclaim should be

dismissed is because, even if JPMorgan had relied on the alleged misrepresentations, any

reliance would not have been reasonable as none of the alleged misrepresentations were

contained in the contractual documents (each of which contained "merger" clauses) that

governed JPMorgan's actions as tri-party repurchase agent.  See Wurtsbaugh, 2006 WL 1683416,

at *7 ("[T]he Merger Clause reflects the parties' intention to make the Agreement

comprehensive, and further undermines as a matter of law the reasonableness of plaintiffs'

asserted reliance on oral representations.").

According to the Amended Counterclaims, JPMorgan's rights and responsibilities in acting as LBI's tri-party agent are governed by written contracts that state that they, along with transaction-specific confirmations, contain all terms and conditions of JPMorgan's actions as LBI's tri-party repurchase agent.  (Ex. H, Master Repurchase Agreement § 1 ("Each such [repurchase] transaction shall . . . be governed by this Agreement . . . ."), § 3(b) ("The Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between Buyer and Seller with respect to the Transaction to which the Confirmation relates . . . ."); see also Ex. A, 2000 Clearance Agreement § 9 ("We agree to perform services as set forth in the form of tri-party custody agreement attached hereto as Exhibit A (or other forms of tri-party Custody Agreement which may be agreed upon from time to time) . . . ."); Ex. G, Barclays Custodial Undertaking § 1 ("WHEREAS Buyer and Seller have requested that Bank undertake certain agency and custodial functions in connection with the Repurchase Agreement pursuant to the terms thereof.")).

In particular, both the Master Repurchase Agreement and Barclays Custodial Undertaking contain integration clauses stating that all of the promises between the parties are contained in the documents.  (Ex. H, Master Repurchase Agreement § 14 ("This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions."); Ex. G, Barclays Custodial Undertaking § 13 ("This Agreement constitutes the entire agreement of the parties with respect to its subject matter and supersedes all prior oral or written agreements in regard thereto.")).  Furthermore, the Barclays Custodial Undertaking includes three pages of representations and warranties.  (Ex. G, Barclays Custodial Undertaking § 12).

JPMorgan does not allege that any representation in any of these contracts or confirmations was false. In fact, the only writing JPMorgan alleges was a misrepresentation was the APA. But JPMorgan itself alleges that the APA was completely separate from the contract that governed the tri-party repurchase agreements among Barclays, LBI and JPMorgan. (Am. Counterclaims ¶ 23 ("The Custodial Undertaking, a standard-form agreement JPMorgan employed in triparty-repo transactions, said nothing about, and did not concern, the sale transaction among LBHI, LBI and Barclays.")). The APA thus does not contain terms and conditions that could have been reasonably relied upon in performing JPMorgan's functions as a tri-party repurchase agent.

JPMorgan's reliance on any alleged statements would have been especially unreasonable given that each of the contracts relevant to JPMorgan's duties as tri-party repo custodian requires that modifications be in writing or that oral instructions be reduced to writing. (Ex. A, 2000 Clearance Agreement § 7 ("In addition, you will confirm any oral instructions to us in writing with two authorized signers or electronically by the close of business on the day on which they are given."); Ex. G, Barclays Custodial Undertaking § 13 ("No modification or amendment of this Agreement shall be binding unless in writing and executed by each of the parties."); Ex. H, Master Repurchase Agreement § 17 ("No modification or waiver of any provision of this Agreement and no consent by any party to a departure herefrom shall be effective unless and until such shall be in writing and duly executed by both of the parties hereto.")). Not only were the alleged misrepresentations (apart from the APA) oral, but JPMorgan never even requested that they be put in writing or incorporated into the tri-party repo contractual documents.

Several cases illustrate the unreasonableness of any purported reliance by JPMorgan on such extra-contractual statements. For example, in <u>Lazard Freres and Co. v. Protective Life Ins.Co.</u>, the Second Circuit, applying New York law, addressed a fraud defense that claimed the defendant had relied on the plaintiff's oral representation regarding the contents of a "Scheme Report." 108 F.3d 1531, 1534 (2d Cir. 1997). The district court had granted summary judgment against the fraud defense. The Second Circuit upheld this ruling because, "[a]s a substantial and sophisticated player in the bank debt market, [defendant] was under a further duty to protect itself from misrepresentation. It could easily have done so by insisting on an examination of the Scheme Report" and its failure to do so rendered "reliance on the misrepresentation unreasonable as a matter of law." <u>Id.</u> at 1543. JPMorgan likewise could have easily protected itself by obtaining a written confirmation, as required by the Barclays Custodial Undertaking, verifying that Barclays would roll the Barclays Repo on September 18. Failure to do so rendered its alleged reliance unreasonable as a matter of law.

Similarly, in <u>Emergent Capital</u>, the Second Circuit affirmed dismissal of a claim that alleged the defendant fraudulently misrepresented the size of its largest asset to the plaintiff investor. 343 F.3d at 191. The court reasoned, "Plaintiff's failure to insist that these representations be reflected in the written stock purchase agreement leads us to conclude that a sophisticated investor like [Plaintiff] could not have reasonably relied on them." <u>Id.</u> at 192. Here, JPMorgan's failure to protect itself by obtaining a binding written confirmation that Barclays would roll the Barclays Repo renders any reliance on extra-contractual statements to that effect unreasonable as a matter of law.

The Second Circuit addressed this issue further in <u>Century Pacific, Inc. v. Hilton Hotels Corp.</u>, 354 Fed. Appx. 496, 497 (2d Cir. 2009). There, the plaintiff claimed it relied on

25

"defendants' alleged oral representation that they had no present intention to sell the Red Lion

brand" of hotels.  Id. at 498.  The court affirmed summary judgment for the defendant and held

that plaintiff's reliance was unreasonable because the plaintiff "was a sophisticated party" who

"was aware that the agreement at issue granted defendants the right to sell the Red Lion brand."

Id.; see also Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC, No. 01 Civ.

6600(RLC), 2005 WL 3370542, at *5 (S.D.N.Y. Dec. 12, 2005) (finding reliance unreasonable

where the representations are "so important" that "no reasonable businessperson would have

relied on them without putting them in writing"); Fab Industries v. BNY Financial, 252 A.D.2d

367, 367, 675 N.Y.S.2d 77, 78 (1st Dep't 1998) (granting summary judgment for the defendant

because plaintiff could not reasonably rely "on defendant's alleged oral representations as a

substitute for the prescribed written approval").

        As in Lazard, Emergent Capital, and Century Pacific, JPMorgan's claim of

fraudulent misrepresentation based on alleged extra-contractual representations fails because it

was unreasonable for JPMorgan to alter its performance of services as tri-party repo custodian in

reliance on information outside the contracts and related written confirmations exclusively

governing JPMorgan's rights and responsibilities as custodian.  See also Junk v. Aon Corp.,

No. 07 Civ. 4640(LMM)(GWG), 2007 WL 4292034, at *7 (S.D.N.Y. Dec. 3, 2007) (dismissing

a fraud claim for lack of reasonable reliance where plaintiff alleged he relied upon oral

representations from his employer guaranteeing his position, but plaintiff did not insist on adding

these alleged representations to his written at-will employment contract); Wurtsbaugh, 2006 WL

1683416, at *6 (dismissing fraud claim where plaintiffs contended they sold their business to

defendants in reliance on oral representations that business would remain linked to defendant's

clearing operation; such reliance was unreasonable as a matter of law since the parties' contract

gave the defendant the right to divest the business from its clearing operation).

> **4.    Any Reliance on LBHI For Predictions of Barclays' Future Conduct is
> Unreasonable In Light of Barclays' Direct Representations About its Own
> Intentions**

Finally, reliance on LBHI's predictions of Barclays' future conduct was not

reasonable because Barclays made statements about its own intentions directly to JPMorgan.

When a complainant receives information that a party intends to take a future

action both directly from that party and from a third party, it is not reasonable as a matter of law

for the complainant to rely on the information from the third party.  Instead, it only can

reasonably rely on statements made by the party who planned to take the action.  Grupo Sistemas

Integrales de Telecomunicacion S.A.de C.V. v. AT&T Commc'ns, Inc., No. 92 Civ. 7862

(KMW), 1996 WL 312535, at *14 (S.D.N.Y. Jun. 10, 1996).  For example, in Grupo Sistemas,

the plaintiff, Grupo, brought fraud claims against two defendants, Harris and AT&T, regarding

alleged misrepresentations by both parties concerning AT&T's intent to continue using a type of

satellite communications technology.  Id.  The Southern District of New York dismissed the

claim against Harris, holding that, not only were Harris's representations about AT&T's future

intentions opinion and not fact, but "[r]eliance on such representations is generally

unreasonable," in part because "[t]o verify AT&T's intentions, Grupo went directly to AT&T

itself . . . .  Grupo should then have relied primarily on AT&T's representations about its own

intentions, not on Harris's representations speculating as to what AT&T's intentions might be.

Put another way, AT&T's representations should properly have superseded Harris's in the minds

of Grupo's representatives."  Id. at 15.

Here too, JPMorgan alleges that it spoke directly with Barclays numerous times

during the week of the Barclays Repo (September 15-19) and received very specific

representations from Barclays about its intentions regarding the APA, the Barclays Sale, and

margin on the securities being transferred.  (See, e.g., Am. Counterclaims ¶¶ 32, 54-56, 74-77).

For example, JPMorgan alleges that Barclays itself made the following specific representations

directly to JPMorgan:

> • "LaRocca [of Barclays] told Miller [of JPMorgan] that, as part of an asset
>   sale negotiated between Barclays and Lehman, Barclays would take out
>   LBI's entire triparty book, after which JPMorgan would no longer have to
>   provide LBI with intraday loans to finance that book." (Id. ¶ 32).
>
> • "Barclays also represented explicitly that JPMorgan's exposure to LBI
>   would be fully extinguished as part of the sale. . . . Rodefeld [of Barclays]
>   or Petrie [of Barclays] also stated, without contradiction from Aranow or
>   others at Lehman, that on Thursday, Barclays would purchase LBI's
>   remaining securities on an ongoing basis, leaving JPMorgan with no
>   outstanding exposure to LBI once the sale closed."  (Id. ¶ 55).
>
> • "LaRocca [of Barclays] told Buyers-Russo that, under the deal with
>   Barclays, JPMorgan would have no clearing exposure to LBI by the end of
>   Thursday, September 18.  LaRocca explicitly represented that all of
>   JPMorgan's triparty exposure to LBI would be eliminated on Thursday,
>   September 18."  (Id. ¶ 56).

These direct, specific representations contrast sharply with JPMorgan's allegations

against LBHI, which concern second-hand predictions of Barclay's future conduct and required

interpretation by JPMorgan.  (See, e.g., Id. ¶ 33 (alleging that Lowitt and Tonucci told JPMorgan

that "Barclays had committed to support LBI fully until the deal closed, including by providing

overnight financing that would reduce or eliminate LBI's dependence on the Fed.")).  Because

JPMorgan's direct communication with Barclays should properly have superseded any

representations by LBHI, any continued reliance on LBHI's opinions of Barclays' future intent

was unreasonable.  See Grupo Sistemas, 1996 WL 312535 at *15 (dismissing fraud claim).

## C.     JPMorgan Has Failed to Allege an Actionable Misrepresentation of Fact

Separate and apart from the element of reasonable reliance, JPMorgan's first

counterclaim should be dismissed for failing to allege an actionable misstatement of fact.  See

Premium Mortgage Corp. v. Equifax, Inc., 583 F.3d 103, 108 (2d Cir. 2009) (identifying "a

misrepresentation . . . of fact which was false and known to be false by defendant" as an element of

fraud under New York law) (quoting Lama Holding Co., 88 N.Y.2d at 421).

> **1.    LBHI's Predictions of Barclays' Future Conduct Are Not Actionable as Fraudulent Misrepresentations**

   JPMorgan's first counterclaim fails to allege an actionable misstatement of fact

because all of the purported misrepresentations concern what *Barclays* would do upon

consummation of the Barclays Sale transaction.  These are not actionable because one cannot be

liable under New York law for misrepresenting what someone else will do in the future.

   An action for fraudulent misrepresentation must arise out of a statement of fact—

not a prediction of future performance.  O'Connor v. Readers Digest Ass'n, Inc., No. 92 Civ.

7414 (CLB), 1993 WL 291372, at *3 (S.D.N.Y. March 10, 1993) (dismissing fraud claim

because "a fraud claim cannot be based upon a statement of future intention, promises or

expectations which were speculative, or a mere expression of opinion or hope at the time when

made") (internal citation omitted); Chase Invs., Ltd. v. Kent, 256 A.D.2d 298, 298, 681 N.Y.S.2d

319, 319 (2d Dep't 1998) ("In order to state a cause of action for fraud, a plaintiff must allege,

*inter alia*, a misrepresentation of fact, and a representation of opinion or a prediction of

something which is hoped or expected to occur in the future will not sustain an action for

fraud.") (internal quotations omitted); JP Morgan Chase Bank v. Orleans, No. 650006/2004,

2007 WL 6882391 (N.Y. Sup. Ct. Jan. 25, 2007) ("With respect to the element of a

misrepresentation of a material fact, the plaintiff must base the claim upon a false representation

of a presently existing fact, not a prediction of future conduct or a mere expression of opinion.").

   Moreover, under New York law, representations about the future conduct of third

parties are unactionable predictions or opinions, not statements of fact, and therefore cannot form

the basis of a fraudulent misrepresentation claim.  <u>Grupo Sistemas</u>, No. 92 CIV. 7862 (KMW),

1996 WL 312535 at *15 ("A speaker's representations about another party's future intentions or

plans are generally construed as opinion, not fact, and hence cannot give rise to a claim of

fraud . . . ."); <u>see</u> <u>also</u> <u>Lane v. McCallion</u>, 166 A.D.2d 688, 690, 561 N.Y.S.2d 273, 275 (2d Dep't

1990) (holding that assurances by a seller of land that a future zoning application would be

approved did not constitute a misrepresentation because it was "a prediction or an expression of

expectation as to future events" rather than a statement of fact).

   Here, JPMorgan's fraudulent misrepresentation claim against LBHI amounts to

the allegation that LBHI misrepresented that Barclays would purchase all of the assets used by

Lehman's broker-dealer business, instead of a subset of those assets.  (Am. Counterclaims ¶ 111).

Specifically, JPMorgan pleads that LBHI made the following alleged misrepresentations:

> (a) that the APA constituted an agreement between LBHI and
> Barclays accurately describing the sale transaction that the parties
> had agreed *would take place* upon Court approval; (b) that the
> securities defined in the APA as 'Purchased Assets' were securities
> that *Barclays had agreed to purchase* and LBHI had agreed to sell
> and *would require Barclays to purchase*; and (c) that the only LBI
> securities that *Barclays had not agreed to purchase*, and that LBHI
> would permit Barclays not to purchase, were those defined in the
> APA as 'Excluded assets.'  In addition, on September 16, 2008,
> Tonucci and Lowitt of LBHI made materially false and misleading
> representations to Buyers-Russo that persuaded Buyers-Russo that
> JPMorgan's loans to LBI *would be repaid each night, either by
> Barclays* or the Fed, until the sale transaction closed, at which
> point JPMorgan *would be taken out in full*.

(<u>Id.</u>) (emphasis added).  These alleged statements – both those in the APA and made orally by

Tonucci and Lowitt – about what assets Barclays would purchase in the contemplated Barclays

Sale transaction are thus not actionable as fraudulent misrepresentations made by LBHI under

New York law.

Under New York law, such allegations constitute opinions, which are insufficient to state a fraudulent misrepresentation claim. For example, in <u>Grupo Sistemas</u>, the Southern District of New York dismissed fraudulent misrepresentation claims brought by a party to a purchase contract for satellite communications equipment against its counterparty, who had assigned its contractual obligations to AT&T. 1996 WL 312535 at *1, *15. The claims alleged that the defendant misrepresented that AT&T would "continue its commitment to," and "would not replace," the type of satellite equipment covered in the purchase contract. <u>Id.</u> at *14. The court dismissed the claims, holding, "representations about another party's future intentions or plans are generally construed as opinion, not fact, and hence cannot give rise to a claim of fraud." <u>Id.</u> at *15.

Similarly, in <u>Stengal v. Chen</u>, the plaintiff brought a fraud claim against the purchasers of plaintiff's former home who allegedly intended to demolish it despite agreeing to a "no demolition" clause in the sale contract. 74 A.D.3d 1050, 1050, 903 N.Y.S.2d 110, 111 (2d Dep't 2010). The plaintiff additionally brought suit against the purchasers' attorney and real estate agent on the same allegations. <u>Id.</u> at 112. The Second Department affirmed dismissal of the suit against the attorney and real estate agent, holding that the purchasers' "alleged intention to violate this provision of the contract of sale is a matter completely beyond the control of [the real estate agent and attorney]." <u>Id.</u> at 113. Barclays' intent to comply with the APA at the time it was signed was similarly a matter beyond LBHI's control.

In a failed attempt to respond to the legal challenge Plaintiffs submitted in support of their original Motion to Dismiss, JPMorgan's Amended Counterclaims changed the description of the alleged misrepresentations in minor ways to make them seem more like

actionable misrepresentations of present fact.[5]  But JPMorgan's altered phrasing does nothing to

change the substantive flaw in the claim.  For example, JPMorgan's Amended Counterclaims

now describe the alleged misrepresentation as concerning the fact that an agreement existed,

rather than a prediction of Barclays' performance under the agreement.  (See, e.g., id. ¶ 111

("[T]he securities defined in the APA as 'Purchased Assets' were securities that Barclays *had*

*agreed* to purchase and LBHI *had agreed* to sell and would require Barclays to purchase.")

(emphasis added)).  But the question of whether there was an agreement at the time is only

relevant to the extent it indicated what Barclays would do in the future.  Indeed, JPMorgan

allegedly relied on the statement only to determine what Barclays would do in the future.  (See

id. ¶ 115 ("Based on JPMorgan's reasonable understanding and expectation that Barclays had

agreed to buy, and would buy, the securities that JPMorgan was financing, JPMorgan unwound

LBI's overnight financings on the morning of September 18, 2008, including by advancing $15.8

billion at LBI's and Barclays' direction for Barclays' benefit, and agreed to release margin valued

at $5 billion later that day, also at Barclays' request.")).

      Nor can JPMorgan render the alleged representations actionable by characterizing

them as predictions about what LBHI itself intended to sell in the future.  (See, e.g., id. ¶ 111

("[T]he securities defined in the APA as 'Purchased Assets' were securities that Barclays had

agreed to purchase and *LBHI had agreed to sell and would require Barclays to purchase*.")

(emphasis added)).  After all, according to the Amended Counterclaims, Barclays – not LBHI –

determined which securities Barclays would purchase.  (See id. ¶ 44 ("LBHI and Barclays had

---

[5]   (Cf. Counterclaims ¶ 38 ("Barclays would not necessarily purchase the securities
defined as 'Purchased Assets' . . . ."); id. ¶ 40 ("Barclays was not intending to purchase all of
LBI's commercial paper, as stated in the APA."); id. ¶ 89 ("[T]he securities defined in the APA
as 'Purchased Assets' were the securities that Barclays was obligated to purchase, and would
purchase, in connection with the sale transaction . . . .")).

agreed to let *Barclays* determine which securities it would purchase. . . . [T]he Barclays folks

determined which assets they were willing to purchase and which assets they didn't want to

purchase. . . . Barclays still had 'the final decision on what assets are bought.'") (emphasis in

original)); <u>id.</u> ¶ 45 ("*If Barclays chose not to take the security* [Pine], Paolo Tonucci recognized

that LBHI and LBI would then have to figure out 'how and where' Pine 'c[ould] be financed.'")

(emphasis added)).  In contrast, JPMorgan never alleges that LBHI declined to sell certain assets,

or otherwise did anything other than what LBHI committed to do in the APA.

Similarly, JPMorgan allegedly relied on oral statements by Tonucci and Lowitt

that JPMorgan "would be taken out in full."  (Am. Counterclaims ¶ 111).  But those alleged

statements clearly referred to Barclays taking JPMorgan out in full, not LBHI.

Moreover, even if JPMorgan were to allege that LBHI made predictions as to its

own future conduct, such statements would not be actionable as misrepresentations absent an

allegation that LBHI did not intend to comply with them at the time they were made.  <u>See</u>

<u>Murray v. Xerox Corp.</u>, 811 F.2d 118, 121 (2d Cir. 1987) ("Under New York law, a failure to

perform promises of future acts is not fraud unless there exists an intent not to comply with the

promise at the time it is made.").  But JPMorgan does not plead that LBHI possessed a present

intent at the time the APA was filed not to sell all of the "Purchased Assets" to Barclays.  Instead,

JPMorgan alleges that "LBHI had given Barclays the option to refuse to purchase significant

portions of the $70 billion in securities defined as 'Purchased Assets.'"  (Am. Counterclaims ¶

112).  Not only does this allegation fail to state that LBHI intended not to sell Barclays all assets

covered by the APA, but it underscores that the party whose future conduct was really at issue

was *Barclays*, not LBHI.

Therefore, because JPMorgan claims the alleged misrepresentations were false due to Barclays' intention not to follow through with its promises, they are not actionable against LBHI.  See Transit Mgmt. LLC v. Watson Indus., Inc., 23 A.D.3d 1152, 1155, 803 N.Y.S.2d 860 (4th Dep't 2005) (holding that an informal agreement that two parties would engage in a future transaction was insufficient to support a counterclaim for fraud because it "relates solely to future expectations"); 320 Realty Mgmt. Co. v. 320 West 76 Corp., 221 A.D.2d 174, 174, 633 N.Y.S.2d 295, 295 (1st Dep't 1995) (affirming dismissal of a claim alleging "that defendants misrepresented that a tenant intended to purchase her apartment"; such allegations did "not suffice to state a claim of fraudulent misrepresentation" in part because "[k]nowledge of their actual intent was not exclusively within defendants' control"); Stuart Lipsky, P.C. v. Price, 215 A.D.2d 102, 103, 625 N.Y.S.2d 563, 564 (1st Dep't 1995) (dismissing a fraud claim because a representation that defendant was "certain not all of his entertainment law clients would remain with him after he relocated his practice" was "a mere expression of opinion which is not actionable" as fraud); Lane, 166 A.D.2d at 690, 561 N.Y.S.2d at 275 (granting motion to dismiss where alleged misrepresentations were "an expression of expectation as to future events").

**2.      JPMorgan Has Failed to Allege That Anyone at LBHI Made Any Oral Misrepresentation With Knowledge That it Was False**

Additionally, to the extent JPMorgan alleges an oral misrepresentation by LBHI, outside of the APA, JPMorgan fails to plead that the speaker (LBHI) knew at the time that the representation was false.

Although JPMorgan peppers its Amended Counterclaims with alleged statements by numerous people involved in the APA and the Barclays Repo, the only misrepresentations outside the APA that JPMorgan alleges against LBHI are as follows:

In addition, on September 16, 2008, Tonucci and Lowitt of LBHI
made materially false and misleading representations to Buyers-

34

Russo that persuaded Buyers-Russo that JPMorgan's loans to LBI
would be repaid each night, either by Barclays or the Fed, until the
sale transaction closed, at which point JPMorgan would be taken
out in full.

(Am. Counterclaims ¶ 111).[6]  The Amended Counterclaims only contain one statement possibly

fitting this description: "Lowitt and Tonucci represented [to Buyers-Russo] that Barclays had

committed to support LBI fully until the deal closed, including by providing overnight financing

that would reduce or eliminate LBI's dependence on the Fed."  (Id. ¶ 33).

The rest of the statements alleged in the Amended Counterclaims, *i.e.* that one or two securities

were as valuable as "goat poo," may be colorful, but they are not alleged to be fraudulent

misrepresentations.  As described below, these few statements attributed to Lowitt and Tonucci

do not a state a fraudulent misrepresentation claim either.

---

[6]   JPMorgan makes other allegations concerning the APA and the Barclays Repo that are
not pled against LBHI specifically.  For example, any alleged statements by "senior LBHI
executives" (see Am. Counterclaims ¶¶ 42, 71, 149) do not satisfy Rule 9(b) because they do not
"identify the speaker."  See Cohain v. Klimley, Nos. 08 Civ. 5047(PGG), 09 Civ. 4527(PGG), 09
Civ. 10584(PGG), 2010 WL 3701362, at *20 (S.D.N.Y. Sept. 20, 2010) (dismissing a fraudulent
misrepresentation claim when misrepresentations were not attributed to specific individuals).  In
addition, allegations against "LBI and/or LBHI employees" (Am. Counterclaims ¶ 62) or
"Lehman" (id. ¶ 49), defined as "LBHI, together with its subsidiaries" (id. ¶ intro.), are not
sufficiently specific to state a claim against LBHI under Rule 9(b).  See Defer LP v. Raymond
James Financial, Inc., 654 F. Supp. 2d 204, 213 (S.D.N.Y. 2009) (dismissing fraud claims
because an allegation against a "financial advisor located in Raymond James' Chicago office" did
not sufficiently allege which entity employed the speaker); see also U.S. v. Bestfoods, 524 U.S.
51, 61 (1998) (holding fraudulent misrepresentations by a subsidiary are not actionable against
the parent corporation).

Nor can JPMorgan cure this defect with a conclusory allegation that LBI personnel were
"acting under the control and supervision of LBHI."  (Am. Counterclaims ¶ 59).  Allegations
based on control of a corporate entity only make the alleged controlling party liable if the
corporate veil is pierced, which requires a showing of "complete domination," such as the
absence of corporate formalities, inadequate capitalization, or an overlap in ownership, offices,
directors, and personnel.  Key Items, Inc. v. Ultima Diamonds, Inc., No. 09 Civ. 3729(HBP),
2010 WL 3291582, at *8 (S.D.N.Y. Aug. 17, 2010).

### a. The Amended Counterclaims Fail to Allege That Tonucci or Lowitt Knew the Alleged Statements Were False When Made

First of all, the Amended Counterclaims do not plead any facts that would show Tonucci or Lowitt knew the alleged representation was false when made on September 16, 2008. See Lama Holding Co., 88 N.Y.2d at 421 ("In an action to recover damages for fraud, the plaintiff must prove a misrepresentation . . . which was false and known to be false by defendant . . . .").

On the point of knowledge, JPMorgan only makes the conclusory allegation that "[a]t the time Lowitt and Tonucci made these statements, they knew that LBHI and LBI had not in fact reached an agreement with Barclays to sell to Barclays all the assets subject to LBI's triparty repo and other overnight financing arrangements." (Am. Counterclaims ¶ 33). But, as in the Original Counterclaims, JPMorgan again fails to allege any facts to support this conclusion. The Amended Counterclaims do not, for example, allege that Barclays advised Tonucci or Lowitt that Barclays did not "intend to fully support LBI until the deal closed" or that it did not intend to provide overnight financing to "reduce or eliminate LBI's dependence on the Fed" as of September 16, 2008, when the alleged statements were made.

Indeed, the only factual allegation regarding Tonucci or Lowitt that relates to events prior to September 16, 2008, is JPMorgan's claim that Tonucci represented to Buyers-Russo during the weekend of September 13 and 14 that "a sale of the securities that were pledged to JPMorgan on an intraday basis" would take place. (Am. Counterclaims ¶ 29). This alleged statement neither demonstrates (or relates to) the supposed falsity of the September 16, 2008 statements, nor does it independently support a fraudulent misrepresentation claim because JPMorgan likewise fails to allege that Tonucci had knowledge that this statement was false at the time it was made.

Thus, JPMorgan has failed to plead facts establishing that Tonucci and Lowitt made a knowingly false representation to JPMorgan.  See Federated Retail Holding, Inc. v. Sanidown, Inc., No. 06 Civ. 6119(LTS)(THK), 2010 WL 5298113, at *6 (S.D.N.Y. Dec. 23, 2010) (dismissing fraud claim under New York law in part for lack of any allegation that "Defendant knew any such representation to be false"); Footbridge, Ltd. v. Countrywide Home Loans, Inc., No. 9 Civ. 4050(PKC), 2010 WL 3790810, at *19, *25 (S.D.N.Y. Sept. 28, 2010) (same); Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A., No. 03 Civ. 1537(MBM), 2003 WL 23018888, at *13 (S.D.N.Y. Dec. 22, 2003) (same).

### b.    Lowitt and Tonucci's Alleged Statement is Too Vague to Constitute a Fraudulent Misrepresentation of Fact

Moreover, Lowitt and Tonucci's alleged statement about Barclays supporting LBI to reduce or eliminate dependence on the Fed is so vague that it does not constitute an actionable statement of fact that could be reasonably relied upon.  Under New York law, "[v]ague expressions of . . . future expectation provide an insufficient basis upon which to predicate a claim of fraud."  Int'l Oil Field Supply Servs. Corp. v. Fadeyi, 35 A.D.3d 372, 375, 825 N.Y.S.2d 730 (2d Dep't 2006) (affirming dismissal of fraudulent misrepresentation claim).  For example, in FMC Corp. v. Fleet Bank, the Second Department affirmed dismissal of a fraudulent misrepresentation claim premised on defendant's statements that a third-party's "account was 'satisfactory,' that defendant was 'comfortable' with it, and that defendant bank 'regarded its credit relationship with [the third-party] as long term.'"  226 A.D.2d 225, 225, 641 N.Y.S.2d 25 (1st Dept' 1996).  The court stated that these "vague expressions" constituted "nonactionable opinion" and could not be reasonably relied upon.  Id.

Similarly, in Van Kleeck v. Hammond, the Third Department rejected a claim that members of a town board fraudulently misrepresented to the police chief that there would be "no

problem" giving him a part-time position if he retired.  25 A.D.3d 941, 943, 811 N.Y.S.2d 452

(3rd Dep't 2006).  The court explained that this statement was merely a "vague assurance which

was a promise regarding future acts," and that such "indefinite statements" could not be relied

upon.  Id.

 The Amended Counterclaims allege only one statement against Lowitt and

Tonucci: that Barclays would "support LBI fully until the deal closed."  (Id. ¶¶ 33, 111).   But

JPMorgan does not allege that Lowitt or Tonucci explained or quantified what was meant by the

phrase "support . . . fully."  Indeed, it is not clear that this vague alleged misrepresentation was

even untrue, given that Barclays did in fact participate in tri-party repos with LBI each night of

that week.  (Id. ¶¶ 36, 68, 79).  For this reason as well, JPMorgan has failed to plead that Tonucci

and Lowitt made any actionable misrepresentation.

### 3. JPMorgan's Claim That the APA Contained Fraudulent Misrepresentations is Counter to the Court's 60(b) Decision

 Furthermore, JPMorgan's claim that the APA itself was a fraudulent

misrepresentation should be dismissed because it runs counter to the Court's recent ruling in the

60(b) litigation.  In particular, JPMorgan alleges that the APA contained the following three

misrepresentations:

> (a) that the APA constituted an agreement between LBHI and
> Barclays accurately describing the sale transaction that the parties
> had agreed would take place upon Court approval; (b) that the
> securities defined in the APA as 'Purchased Assets' were securities
> that Barclays had agreed to purchase and LBHI had agreed to sell
> and would require Barclays to purchase; and (c) that the only LBI
> securities that Barclays had not agreed to purchase, and that LBHI
> would permit Barclays not to purchase, were those defined in the
> APA as 'Excluded assets.'

(Am. Counterclaims ¶ 111).  Again, in order to prove its claim, JPMorgan must be able to prove that

LBHI intentionally and knowingly misrepresented these purported facts.  See Premium Mortgage

Corp., 583 F.3d at 108 (dismissing fraud claim for failing to identify an actionable misrepresentation

of fact).  However, the Court recently found, in overruling Movant's 60(b) motions, that the APA

did not contain fraudulent misrepresentations.  Specifically, the Court held:

> The APA and the Clarification Letter, the two most centrally
> important documents in this litigation, were generated during this
> highly-pressurized atmosphere described as organized chaos by
> Harvey Miller, a description validated by the testimony of other
> witnesses.  Given the chaotic circumstances, some
> misunderstandings, mistakes and disagreements relating to the
> transaction in general and these two documents in particular were
> foreseeable, but the court finds no support for the proposition that
> the resulting disclosure problems and disputes were caused by
> willful misconduct, deliberate misrepresentations or the intentional
> withholding or concealment of relevant information during the
> Sale Hearing.

(Docket No. 14612 at 18; see also id. at 52 ("[T]he Court concludes that the parties negotiated in

good faith and at arm's length, and that there was no effort to conceal relevant facts.")).[7]

These factual findings underlying the Court's affirmation of the sale order are

binding on JPMorgan, and cannot be collaterally attacked.  See In re Oyster Bay Cove, Ltd., 161

B.R. 338, 342 (Bankr. E.D.N.Y. 1993) ("It is well settled that an Order of Sale by the

Bankruptcy Court cannot be collaterally attacked.") (collecting authority).  "Even though an

action has an independent purpose and contemplates some other relief, it is a collateral attack if it

must in some fashion overrule a previous judgment."  GAF Holdings, LLC v. Rinaldi (In re

Farmland Indus., Inc.), 376 B.R. 718 (Bankr. W.D. Mo. 2007) (internal citation omitted), aff'd

408 B.R. 497 (8th Cir. BAP 2009).

For example, in Farmland, the losing bidder in a bankruptcy sale brought state

law causes of action for tortious interference against the successful bidder and various third

---

[7]   As the Court is aware, Plaintiffs challenged these underlying factual findings at trial.
The Court has since denied Plaintiffs' Rule 60(b) motions, however, and that decision is
currently binding on all parties, as explained in this section.

parties alleging that the defendants conspired to prevent it from participating in the auction of the

debtor's assets.  376 B.R. at 721.  Because plaintiff's success on its state law claim would require

the bankruptcy court to overrule its previous findings that, <u>inter alia</u>, the deal was "negotiated

and undertaken at arm's length, without collusion, and in good faith," the bankruptcy court

dismissed the claim as an improper collateral attack on the sale order and related orders.  <u>Id.</u> at

727.  On appeal, the Bankruptcy Appellate Panel for the Eighth Circuit affirmed the dismissal.

408 B.R. at 506-07  ("[I]n order for the bankruptcy court to enter a judgment for [plaintiff] on its

claims, the bankruptcy court would have to review issues it already decided and overrule

findings of its earlier orders."); <u>see also</u> <u>C.E.K., Inc. v. CHC Indus., Inc. (In re CHC Indus., Inc.)</u>,

389 B.R. 767, 775 (Bankr. M.D. Fla. 2007) (dismissing state law fraud and negligent

misrepresentation claims because "a party may not challenge a Sale Order . . . based on

allegations that clearly conflict with the Court's prior findings regarding the transaction").

        The same result is required here with respect to JPMorgan's fraud claim, to the

extent the claim requires a finding that the APA contained knowing misrepresentations when it

was submitted to the Court.  Indeed, dismissal of the claim is particularly appropriate where, as

here, the party asserting the claim that depends upon findings contrary to the sale order was

involved in the bankruptcy proceedings, had notice and an opportunity to object to the sale order,

and stood silent for months while these issues were litigated in the Rule 60(b) proceedings.  <u>See</u>,

<u>e.g.</u>, <u>Farmland</u>, 376 B.R. at 727 ("To the extent GAS was a party to the sale proceedings, and

there is precedent for finding that it was, the Sale Orders are binding on GAF under the doctrine

of collateral estoppel.") (<u>citing</u> <u>Gekas v. Pipin (In the Matter of Met-L-Wood Corp.)</u>, 861 F.2d

1012, 1017 (7th Cir. 1988), and <u>Miller v. Meinhard-Commercial Corp.</u>, 462 F.2d 358, 360 (5th

Cir. 1972), for the proposition that "creditors participating in proceeding held to be parties for purposes of res judicata").

Therefore, these findings apply in this adversary proceeding and JPMorgan is precluded from reopening the issue. As a result, the Amended Counterclaims cannot state a claim for fraudulent misrepresentation based on statements contained in the APA.

## D.      JPMorgan Has Failed to Plead that LBHI Acted with Scienter

JPMorgan's claim for fraudulent misrepresentation also should be dismissed for the independent reason that JPMorgan has failed to allege scienter on behalf of LBHI. Although JPMorgan's Amended Counterclaims allege a reason why LBHI wanted the Barclays Sale to go through, JPMorgan does not allege any motive for LBHI to accomplish that goal through an allegedly fraudulent scheme to leave LBI with securities of an insufficient value to cover its obligations to JPMorgan.

### 1.      Legal Standards for Pleading the Element of Scienter

To state a claim for fraudulent misrepresentation, the claimant must plead scienter, which is the intent to commit a fraud. Schlaifer Nance & Co., 119 F.3d at 98 (listing "an intent to defraud" among the elements of fraud under New York law). To do so, the plaintiff must specifically show an intent to defraud, not merely an intent to accomplish the end result of the fraud. Allison v. Round Table Inv. Mgmt. Co., LP, No. 10 CV 01144(GBD), 2010 WL 4456648, at *3 (S.D.N.Y. Oct. 22, 2010) (granting motion to dismiss and stating "[t]o adequately plead scienter, Plaintiff must show that Defendants intentionally misrepresented the [facts at issue] in order to commit a fraud"); see also Flickinger v. Harold C. Brown & Co., Inc., 947 F.2d 595, 599 (2d Cir. 1991) (holding that fraud under New York law requires "a showing that the defendant sought to deceive the plaintiff and knowingly lied to him in order to deprive the plaintiff of some benefit") (internal quotation omitted).

Scienter may be pled "'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" Musalli Factor for Gold & Jewellry v. JPMorgan Chase Bank, N.A., 261 F.R.D. 13, 19 (S.D.N.Y. 2009) (granting motion to dismiss for failure to adequately plead scienter) (quoting Lerner, 459 F.3d at 290-91). If scienter is pled via motive and opportunity, the alleged motive must be concrete and specific. Productores Asociados De Café Rio Claro, C.A. v. Barnett, No. 98 CIV. 499 DAB, 1999 WL 287389, at *3 (S.D.N.Y. May 7, 1999) ("Motive requires a showing of concrete benefits that could be realized by one or more of the false statements alleged . . . ."). By contrast, a "generalized motive," which could be attributed to any business, "is not sufficiently concrete for purposes of inferring scienter." Chill v. General Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996) (affirming motion to dismiss for failure to plead scienter).

Under either method, pursuant to Rule 9(b), "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995).

## 2. JPMorgan's Allegations That LBHI Wanted to Complete the Barclays Sale Are Too General to Plead LBHI's Intent to Commit Fraud

JPMorgan attempts to allege a motive by pleading that LBHI "knew that, without a transaction with Barclays, LBI would have been obliged to unwind its business and liquidate, at great potential cost to LBHI, which had guaranteed certain of LBI's debts" and that "only Barclays could and would purchase LBI's business." (Am. Counterclaims ¶ 103; see also id. ¶ 114 ("JPMorgan's extensions of credit to LBI were critical to any sale of LBI, without which LBHI would suffer 'devastating' damage. In addition, senior Lehman executives depended on the closing of the sale to Barclays to benefit from lucrative employment contracts with

42

Barclays.")).  Thus, JPMorgan's allegations of scienter all concern LBHI's motive to complete the Barclays Sale – not to defraud JPMorgan.

This general motive to complete the sale is insufficient to plead motive to commit the alleged fraud under New York law.  For example, in <u>Pfizer, Inc. v. Stryker Corp.</u>, the defendant, Stryker, brought a counterclaim for common law fraudulent misrepresentation against the plaintiff, Pfizer, and attempted to allege scienter through allegations that "Pfizer had an intent to defraud based on its financial interest in selling its prosthetics business, which Stryker asserts was declining, for a high price."  348 F. Supp. 2d 131, 155 (S.D.N.Y. 2004).  Stryker claimed that "Pfizer's interest in selling the business as quickly as possible . . . gave Pfizer a reason to conceal any negative information."  <u>Id.</u>  The Southern District of New York dismissed the counterclaim for failure to plead scienter because the allegations of motive were "typical of general profit motivations of business persons.  Such general allegations do not give rise to a strong inference of fraud."  <u>Id</u>.

Here too, allegations about LBHI's desire to consummate the Barclays Sale transaction do not plead a sufficient motive to defraud JPMorgan.  JPMorgan must plead more than a desire for a legitimate end result – it must plead a motive to accomplish that result through fraudulent means.  JPMorgan does not allege any facts showing that Barclays would have refused to consummate the sale if the securities subject to the Barclays Repo were treated other than as alleged, or if the $5 billion of margin was not released to Barclays.  Because JPMorgan has not pleaded that an alleged fraud on JPMorgan was a necessary precondition to the sale, its pleadings regarding LBHI's general motive to complete the sale cannot establish a motive on LBHI's part to commit fraud.

The fact remains that there was simply no plausible economic reason for LBHI to aid Barclays and leave JPMorgan with insufficient LBI collateral, when JPMorgan would surely attempt to offset any shortfall using LBHI's collateral. This would be tantamount to LBHI defrauding itself, because as a purported guarantor of LBI's obligations under the Guaranties that JPMorgan demanded on the eve of LBHI's bankruptcy, and under cover of which JPMorgan was then holding billions of dollars of LBHI collateral, LBHI would be exposed to increased potential liability by engaging in the alleged fraud. Although those Guaranties are subject to challenge, the possibility that LBHI would have to pay for any deficiency arising from insufficient collateral in an LBI repo belies any rational motive for LBHI to defraud JPMorgan in aid of Barclays. See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994) ("In looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic self-interest."); Atlantic Gypsum Co. v. Lloyds Int'l Corp., 753 F. Supp. 505, 514 (S.D.N.Y. 1990) (granting motion to dismiss, stating "Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent").

3.   **The Amended Counterclaims Do Not Allege Conscious or Reckless Conduct by LBHI**

Nor does JPMorgan plead facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." Musalli, 261 F.R.D. at 19. A claimant faces a significant burden in pleading scienter based on conscious or reckless behavior. Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (granting motion to dismiss for failure to plead scienter and stating "[w]here motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater"); see also Renner v. Chase Manhattan Bank, No. 98 CIV. 926(CSH), 2000 WL 781081, at *10 (S.D.N.Y. June 16, 2000)

("The Second Circuit has held that a plaintiff faces a 'significant burden . . . in stating a fraud

claim based on recklessness.'") (quoting <u>Chill</u>, 101 F.3d at 270).  In order to state a claim for

scienter based on reckless conduct, JPMorgan must plead facts that show, at a minimum, "highly

unreasonable" conduct constituting "an extreme departure from the standards of ordinary care."

<u>Chill</u>, 101 F.3d at 270.

JPMorgan fails to plead facts that would meet this standard with respect to LBHI.

Instead, JPMorgan's allegations about Lowitt and Tonucci state only they did not know, after

signing the APA, what assets Barclays would ultimately acquire.  (Am. Counterclaims ¶¶ 42-43

("Ian Lowitt has admitted that, despite the filing of the Sale Motion and the APA, it had not been

determined 'how we are going to identify the series of assets that are part of the transaction and at

what price those are going to be marked at and that Barclays is going to purchase them at.' . . .

Daniel Flores of LBI again acknowledged, after conversations with Ian Lowitt and Paolo

Tonucci, that the schedule of assets to be sold to Barclays was 'still a work in progress.'")).

A lack of certainty about the assets falls far short of demonstrating conscious or

"highly unreasonable" recklessness.  There is no allegation, for example, that JPMorgan told

Lowitt or Tonucci that it required additional information.  Nor does JPMorgan allege any facts

showing that JPMorgan expected LBHI to apprise it of additional facts.  Moreover, in light of the

fact that LBHI was not a party to the repo contracts at issue, JPMorgan has not pled that LBHI's

failure to inform JPMorgan of additional facts about the proposed transaction amounted to an

extreme departure from the standards of ordinary care.

Because JPMorgan has failed to plead scienter by circumstantial evidence of

conscious misconduct or recklessness, or by motive and opportunity, the cause of action for

fraudulent misrepresentation must be dismissed for that reason as well.  <u>See</u> <u>Musalli</u>, 261 F.R.D.

at 19 (dismissing fraud claim where complaint did not adequately allege a motive or plead facts

constituting strong circumstantial evidence of conscious misbehavior or recklessness); Renner,

2000 WL 781081 at *10-11 (same); Barnett, 1999 WL 287389 at *4 (dismissing a fraud claim

where plaintiffs "fail[ed] to plead facts that 'give rise to a strong inference' of fraud, either by

pleading motive and opportunity to commit fraud, or by pleading circumstances that constitute

strong circumstantial evidence of conscious behavior and recklessness").

        For each of the independent reasons mentioned above, JPMorgan's counterclaim

for fraudulent misrepresentation against LBHI should be dismissed for failing to state a claim.

## POINT II

## JPMORGAN'S COUNTERCLAIM FOR FRAUDULENT CONCEALMENT FAILS TO STATE A CLAIM

        JPMorgan's second counterclaim is for fraudulent concealment by LBHI.  In

particular, it alleges that LBHI failed to disclose the following:

> (a) that the APA, even upon signature, was inaccurate and subject
> to change in material ways, including with respect to the securities
> that Barclays had agreed to purchase and LBHI would require
> Barclays to purchase; (b) that notwithstanding the terms of the
> APA, LBHI had given Barclays the option, which it later
> exercised, to refuse to purchase significant portions of the $70
> billion in securities included in the APA's definition of "Purchased
> Assets"; (c) that Barclays' overnight extensions of credit to LBI
> were entirely discretionary; (d) that Barclays had entered into the
> Takeout Agreement with the Fed; (e) that Lehman and Barclays
> had actively manipulated LBI's triparty repo shells on September
> 17, 2008 to divert unwanted securities from the Fed's overnight
> shell to Barclays' shell; (f) that Barclays had reserved to itself the
> right to decide, and in fact had decided prior to signing the APA,
> not to purchase certain securities, including RACERS and other
> illiquid securities, that fell within the definition of "Purchased
> Assets"; and (g) that Barclays had reserved to itself the right to
> decide, and in fact had decided prior to the time that JPMorgan
> extended intraday financing to LBI on Thursday, September 18,
> 2008, and prior to the time that JPMorgan agreed to release margin
> valued at $5 billion, not to purchase certain securities, including

RACERS and other illiquid securities, that fell within the
definition of "Purchased Assets."

(Am. Counterclaims ¶ 120).  For the reasons described below, this counterclaim, too, should be

dismissed for failing to plead a valid cause of action against LBHI.

## A.    Legal Standards for Fraudulent Concealment

"The elements of fraudulent concealment under New York law are: a relationship

between the contracting parties that creates a duty to disclose, knowledge of the material facts by

the party bound to disclose, scienter, reliance, and damage."  Aetna Casualty & Surety Co. v.

Aniero Concrete Co., Inc., 404 F.3d 566, 582 (2d Cir. 2005).

As with a fraudulent misrepresentation claim, claims for fraudulent concealment

must be pled with particularity.  Id.  ("This claim [for fraudulent concealment], however, like

that for fraudulent inducement, must pass muster under Rule 9(b).").  Also similarly, reliance on

the omission must be reasonable.  Premier-N.Y., Inc. v. Travelers Property Cas. Corp., No.

603043/03, 2008 WL 2676800, at *7 (N.Y. Sup. Ct. July 8, 2008) ("In order to recover for fraud

or fraudulent concealment, the reliance must be 'reasonable' or 'justifiable.'").

## B.    JPMorgan's Fraudulent Concealment Claim Fails for Many of the Same Reasons as Its Fraudulent Misrepresentation Claim

As an initial matter, JPMorgan's fraudulent concealment claim fails for many of

the same reasons as its fraudulent misrepresentation claim.

### 1.    JPMorgan Fails to Plead That Reliance On The Concealment Was Reasonable

First, JPMorgan has failed to plead that its reliance on the alleged omissions was

reasonable.  See State v. Peerless Ins. Co., 67 N.Y.2d 845, 848 (1986) (describing reliance as "an

essential ingredient" in a fraudulent concealment claim).  As explained above, JPMorgan admits

it did not actually rely on any representations or admissions about the APA because, as of

September 18, it was still preparing to liquidate securities.  (See supra Point I.B.2; Am.

Counterclaims ¶ 74).  The Master Repurchase Agreement, Barclays Custodial Undertaking, and

related written confirmations were, by their own terms, the exclusive evidence of the terms of the

repos between LBI and Barclays.  See supra Point I.B.3.  They specifically provided the relevant

representations upon which the parties to the contract, including JPMorgan, could rely.  (Ex. G,

Barclays Custodial Undertaking § 12; Ex. H, Master Repurchase Agreement § 10).  To the extent

the underlying Clearance Agreement between JPMorgan and LBI would be relevant, it too

contained a recital of material representations.  (Ex. A, 2000 Clearance Agreement § 10).  In

light of these contractual recitations of material terms and disclaimers of other representations, it

was not reasonable for JPMorgan to rely on the absence of other purported representations

outside the contracts.  See Druyan v. Jagger, 508 F. Supp. 2d 228, 240-41 (S.D.N.Y. 2007)

(dismissing fraudulent concealment claim and holding where contract provided that concert

could be cancelled at any time, alleged reliance on defendants' failure to timely announce a

cancellation could never be reasonable); see also supra Point I.B.3; Century Pacific., 354 Fed.

Appx. at 498; Emergent Capital, 343 F.3d at 191; Lazard, 108 F.3d at 1534.

> ### 2.    Failure to Disclose What LBHI Thought Barclays Would Do In the Future Does Not State a Fraudulent Concealment Claim

Second, just as an opinion or prediction of the future conduct of a third party

cannot form the basis of a fraudulent misrepresentation claim, neither can the failure to provide

an opinion or prediction about what a third party might do form the basis of a fraudulent

concealment claim.  Cf. Cucchiaro v. Cucchiaro, 627 N.Y.S.2d 224, 229 (N.Y. Sup. Ct. 1995)

(rejecting a fraudulent concealment claim, reasoning that "if liability cannot be founded upon an

erroneous opinion . . . this Court cannot conclude that it may be found where, as here, a [] person

did not provide any opinion").  With the exception of JPMorgan's allegation regarding the

reallocation of securities within triparty repo shells, see infra Point II.D, all of the alleged

omissions at issue involve actions that Barclays was expected to take in the future.  (Am.

Counterclaims ¶ 120).  LBHI's alleged failure to disclose its expectations regarding Barclays'

future actions thus cannot form the basis of a fraudulent concealment claim.  Grupo Sistemas,

1996 WL 312535 at *15.

> ### 3.   JPMorgan Fails to Plead that LBHI Acted with Scienter Because It Has Not, And Cannot, Plead a Motive for LBHI to Conceal the Details of the Barclays Sale Transaction

Furthermore, this claim fails because JPMorgan has not sufficiently alleged that

LBHI acted with the requisite scienter.  See Saltz v. First Frontier, LP, No. 10 Civ. 964(LBS),

2010 WL 5298225, at *8 (S.D.N.Y. Dec. 23, 1010) ("Both common law fraud and fraudulent

concealment require the Plaintiff to plead scienter.").  As discussed above, JPMorgan's

allegations that LBHI was generally motivated by a desire to consummate the sale transaction

with Barclays are insufficient to establish scienter because they do not show any motive to

accomplish that goal through fraud, especially using a scheme that would leave LBHI and its

creditors potentially exposed to a deficiency claim by JPMorgan.  See supra Point I.D.2.

## C.   JPMorgan Has Failed to Allege Facts Establishing that LBHI Had a Duty to Disclose

In addition to the flaws that this counterclaim shares with the fraudulent

misrepresentation counterclaim, JPMorgan fails to plead the additional element required for a

fraudulent concealment claim:  that LBHI or any of its employees had a duty to disclose the

allegedly omitted information to JPMorgan.  JPMorgan pleads the following in an attempt to

establish such a duty to disclose:

> LBHI had a duty to disclose the concealed, undisclosed and
> omitted facts because LBHI executives and employees, including
> Lowitt and Tonucci, made statements and representations – in
> court filings and directly to JPMorgan – that were false and

misleading, and omitted material facts necessary to make the
statements made, in light of the circumstances under which they
were made, not misleading; LBHI possessed superior knowledge
and information about the material facts that would have revealed
that the statements and representations made to JPMorgan were
materially false and misleading; the material facts were not readily
available to JPMorgan, but instead were peculiarly within the
knowledge of Barclays and LBI; and LBHI was on notice, and
knew, that JPMorgan was justifiably relying upon the incomplete,
false and misleading statements made by LBHI and that JPMorgan
was acting under a mistaken belief that those statements and
representations were true and complete.

(Am. Counterclaims ¶ 122).

"A duty to disclose generally arises in one of three ways: (1) when one party

makes a partial or incomplete statement that requires clarification; (2) when the parties are in a

fiduciary or confidential relationship; or (3) where one party possesses superior knowledge, not

readily available to the other, and knows that the other is acting on the basis of mistaken

knowledge."  All Am. Adjusters, Inc. v. Acceleration Nat'l Ins. Co., No. 96 CIV. 9344 (MBM),

1997 WL 732445, at *7 (S.D.N.Y. Nov. 25, 1997) (internal quotation omitted).  JPMorgan thus

attempts to satisfy this element by alluding to partial statements and superior knowledge, but

fails to establish a duty under either doctrine.[8]

1.    **JPMorgan Has Not Alleged a Partial or Incomplete Statement that Requires
       Clarification**

As an initial matter, although JPMorgan alludes to a duty to disclose triggered by

partial or incomplete statements, it does not identify any such statements, and thus cannot plead a

duty in this manner.  The most JPMorgan alleges is that "LBHI executives and employees,

---

[8]    JPMorgan does not even attempt to allege that LBHI had a confidential or fiduciary
relationship with JPMorgan that could give rise to a duty to disclose facts about the APA.  Nor
can it.  LBHI was not a party to the tri-party repo contracts among JPMorgan, LBI, and Barclays.
Nothing in JPMorgan's Amended Counterclaims could give rise to a duty through such a
relationship.

including Lowitt and Tonucci, made statements and representations – in court filings and directly to JPMorgan – that were false and misleading, and omitted material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading." (Am. Counterclaims ¶ 122; <u>see</u> <u>also</u> <u>Id.</u> ¶ 69 (alleging representations in the Sale Motion and APA "were false and misleading – and omitted material facts necessary to make the statements, in the circumstances under which they were made, not misleading")). But this allegation does not to point to any specific partial or incomplete statement.

   To the extent it is referring to the same allegedly "false and misleading" statements already at issue in JPMorgan's first counterclaim for fraudulent misrepresentation, it does not establish any duty to disclose due to a partial or incomplete statement. Rather, a partial statement creates a duty to disclose when the statement is true but partial or ambiguous such that it "requires additional disclosure to avoid misleading the other party." <u>Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.</u>, 68 F.3d 1478, 1484 (2d Cir. 1995); <u>see</u> <u>also</u> <u>Manley v. AmBase Corp.</u>, 126 F. Supp. 2d 743, 756 (S.D.N.Y. 2001) ("Regarding the making of a partial or ambiguous statement, the Second Circuit has stated that 'once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth.'") (quoting <u>Brass v. Am. Film Techs., Inc.</u>, 987 F.2d 142, 150 (2d Cir. 1993)); <u>compare</u> <u>Tomoka Re Holdings, Inc. v. Loughlin</u>, No. 03 Civ. 4904(NRB), 2004 WL 1118178, at *3 (S.D.N.Y. May 19, 2004) (finding a duty to disclose when defendant included a provision in a stock purchase agreement listing "the following contracts and other agreements to which the Company is a party," but the list omitted an additional contract under which defendant was potentially liable), <u>with</u> <u>DeBeers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.</u>, 440 F. Supp. 2d 249, 268 (S.D.N.Y. 2006)

(finding no duty to disclose because "the omission of this material did not make any of the plaintiff's other statements ambiguous or misleading").

Here, JPMorgan has alleged that the underlying alleged representations were false – rather than true but incomplete. Therefore, JPMorgan has not alleged that LBHI had a duty to disclose as a result of partial or ambiguous statements.

### 2.     JPMorgan Fails to Plead that LBHI Owed JPMorgan A Duty to Disclose Facts About the APA Under the Special Facts Doctrine

JPMorgan also attempts to plead a duty to disclose via the special facts doctrine, which requires that: "(1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge." Banque Arabe et Internationale D'Invesstisetment v. Md. Nat'l Bank, 57 F.3d 146, 155 (2d Cir. 1995). Notably, the special facts doctrine relied upon by JPMorgan only applies where the alleged omission is within the scope of a contractual relationship between the parties or negotiations to enter a contractual relationship. Ray Larsen Assocs., Inc. v. Nikko Am., Inc., No. 89 Civ. 2809 (BSJ), 1996 WL 442799, at *5 (S.D.N.Y. Aug. 6, 1996) (granting motion to dismiss and stating "[a] review of the cases which recognize a duty to disclose due to one party's superior knowledge reveals that the duty ordinarily arises only in the context of business negotiations where parties are entering a contract"); Triple Z Postal Services, Inc. v. United Parcel Serv., Inc., No. 118057/05, 2006 WL 3393259, at *14 (N.Y. Sup. Ct. Nov. 24, 2006) (granting motion to dismiss and stating "[a]lthough a duty to disclose has sometimes been found to arise where one party has superior knowledge, the context has invariably involved direct negotiations between the parties to a business transactions [sic]"). In the absence of such a relationship, a party has no duty to disclose any information. 900 Unlimited, Inc. v. MCI Telecomm'ns Corp., 215 A.D.2d 227, 227,

626 N.Y.S.2d 188 (1st Dep't 1995) ("In the absence of a contractual relationship or a confidential or fiduciary relationship, a party may not recover for fraudulent concealment of fact, since absent such a relationship there is no duty to disclose.").

### a.   LBHI Had No Contractual Duty to Disclose Information Related to the Tri-Party Repos

Here, JPMorgan's actions related to the Barclays and Fed Repos were governed by specific contracts, especially the Barclays Custodial Undertaking, to which LBHI was not a party.  (Am. Counterclaims ¶ 165).   As LBHI did not have a contractual relationship with JPMorgan concerning the Barclays and Fed Repos, LBHI had no duty to disclose information to JPMorgan related to those transactions.

Several New York cases confirm the absence of a duty in similar situations.  In George Cohen Agency, Inc. v. Donald S. Perlman Agency, Inc., an insurance agency, Perlman, purchased an insurance portfolio from another agency.  114 A.D.2d 930, 930, 495 N.Y.S.2d 408 (2d Dep't 1985).  Included in this portfolio were policies issued by Continental.  Id.  Prior to closing the sale, Perlman met with Continental to discuss obtaining a general agency contract. Id.  After the sale closed, Continental withdrew Perlman's permission to write several of the policies that Perlman had purchased because the policies failed to conform with certain regulations.  Id.  Perlman then brought a claim for fraudulent concealment against Continental, alleging that Continental knew the policies were deficient when the parties met prior to the sale closing, and knew that Perlman purchased the portfolio believing the policies to be valid, but had failed to disclose this material information.  Id.  The Second Department affirmed dismissal of the claim and held, "Continental was not even a party to the portfolio purchase agreements, and was thus under no duty to disclose any material facts concerning those agreements to Perlman." Id.

53

Similarly, in <u>Triple Z</u>, a Mailboxes Etc. franchisee brought suit against the franchisor and its parent corporation, as well as the franchisor's representative, Atlantic Mailboxes, Inc. and the president of Atlantic Mailboxes, Inc. (together, the "Atlantic Defendants"), alleging that the defendants engaged in a plan to destroy the franchise system. 2006 WL 3393259 at *1.  The court dismissed a cause of action for fraudulent concealment against the Atlantic Defendants on the ground that "Plaintiff has no agreement with the Atlantic Defendants, who are not parties to the Franchise Agreement, and has not alleged facts demonstrating a basis for imposing a duty to disclose on the part of the Atlantic Defendants." <u>Id.</u> at *14.

Nor does the fact that LBHI became a party to the Clearance Agreement with JPMorgan create a duty to disclose information concerning the Barclays and Fed Repos, which were governed by different contracts.  A duty to disclose must arise from a contractual relationship on the subject matter of the allegedly concealed information – not just any contract. <u>OSRecovery, Inc. v. One Groupe International, Inc.</u>, 354 F. Supp. 2d 357, 377 (S.D.N.Y. 2005) (dismissing a fraudulent concealment claim and finding no duty to disclose where, although plaintiffs had engaged in business transactions with the defendant, these transactions were "not the ones plaintiffs allege were rendered unfair by a failure to disclose").

### b.  JPMorgan Has Not Alleged That LBHI Knew JPMorgan Was Relying On Mistaken Knowledge

Even if JPMorgan could plead that the requisite contractual relationship existed with LBHI to invoke the special facts doctrine, JPMorgan fails to plead that LBHI knew JPMorgan was "acting on the basis of mistaken knowledge" with respect to any alleged omissions, as required to state a duty to disclose based on the special facts doctrine.  <u>Banque Arabe</u>, 57 F.3d at 155.

JPMorgan states that "LBHI was on notice, and knew, that JPMorgan was justifiably relying upon the incomplete, false, and misleading statements made by LBHI and that JPMorgan was acting under a mistaken belief that those statements and representations were true and complete." (Am. Counterclaims ¶ 122). But this statement is not supported by any factual allegation about LBHI. Instead, the only allegations in the Amended Counterclaims that any party knew or anticipated that JPMorgan might rely on the APA or oral statements are taken from internal Barclays communications. (See, e.g., id. ¶ 73 (alleging that on September 18 Gerard LaRocca of Barclays wrote emails to Richard Ricci and Bob Diamond, also of Barclays, stating "JPM will BE ANNOYED with several billion of collateral tonight that we will not finance" and "JPM IS GOING TO BE MORE ANNOYED WITH WHAT I HAVE PLANNED")). Thus, nothing in the Amended Counterclaims satisfies the element that anyone at LBHI knew that JPMorgan might base any decisions as LBI's repo custodian on alleged omissions.

As a result, JPMorgan has not shown that LBHI had a duty to disclose the allegedly concealed information, and thus fails to state a claim for fraudulent concealment. See Richards v. AXA Equitable Life Ins. Co., No. 06 Civ. 3744(PAC), 2007 WL 3084968, at *5 (S.D.N.Y Oct. 22, 2007) (dismissing a claim for fraudulent concealment for failure to allege a duty to disclose because "the facts pled in the Complaint do not support a claim that Defendant knew Plaintiff was acting on the basis of mistaken knowledge"); Musalli, 261 F.R.D. at 23 (dismissing fraudulent concealment claim for failing to properly allege a duty to disclose, since complaint gave "no indication that [defendants] knew [plaintiff] was acting on the basis of inaccurate information").

**D.      JPMorgan Does Not State a Claim for Fraudulent Concealment of the Takeout
         Agreement or the Allocation of Shells**

            In addition to omissions relating to the APA, JPMorgan also alleges in this

counterclaim that LBHI failed to disclose "that Barclays had entered into the Takeout Agreement

with the Fed" and "that Lehman and Barclays had actively manipulated LBI's triparty repo shells

on September 17, 2008 to divert unwanted securities from the Fed's overnight shell to Barclays'

shell."  (Am. Counterclaims ¶ 120).  On top of the deficiencies afflicting all the fraudulent

concealment allegations as described above, both of these allegations also fail to state a claim

because JPMorgan does not plead any factual allegations that LBHI knew about these actions, let

alone that LBHI had superior knowledge of them compared to JPMorgan.

**1.       JPMorgan Does Not Allege That LBHI Knew About the Takeout Agreement
          or the Allocation of Shells**

            To begin with, JPMorgan has not alleged that LBHI knew of the Takeout

Agreement between Barclays and the Fed, which required Barclays to "purchase 'the entirety of

the Fed's position.'"  (Am. Counterclaims ¶ 58).  Instead, JPMorgan merely alleges that "Ian

Lowitt met with representatives of Barclays, Bank of New York, and the Fed on Wednesday,

September 17, to discuss how the Takeout Agreement would be implemented."  (Id.).  But

alleging that Lowitt was present at a discussion about how Barclays would take over the Fed's

position falls short of pleading that Lowitt knew about the Takeout Agreement or its terms.  This

is especially true since the Takeout Agreement was solely between Barclays and the Fed, and did

not including LBHI or any Lehman entity.  (Id.).

            As for the allocation of securities within the tri-party repo shells, JPMorgan only

alleges "LBI operations personnel" reallocated the securities "under the control and supervision

of LBHI," and that "LBI and/or LBHI employees . . . altered the allocation of securities into the

overnight shells."  (Id. ¶¶ 59, 62).  These allegations are likewise insufficient to plead LBHI's

knowledge under Rule 9(b).  They do not state that any specific person at LBHI knew of the

allocation, nor do they allege any facts to support the conclusory allegation that LBHI was

exercising "control supervision" over this activity.[9]  Once again, the actual contract relevant to

this issue did not even involve LBHI.  Only LBI had the power to allocate securities within the

shells pursuant to the Barclays Custodial Undertaking among JPMorgan, Barclays, and LBI.

(Ex. G, Barclays Custodial Undertaking § 3(f)).

**2.  JPMorgan Does Not Allege That LBHI Had Superior Knowledge of the Takeout Agreement and Repo Shell Allocation**

Not only is JPMorgan required to plead that LBHI had actual knowledge of the

Takeout Agreement and the allocation of securities within the repo shells, but JPMorgan also

must show that LBHI's knowledge of these facts was superior to JPMorgan's.  Under New York

law, an allegation of superior knowledge fails if the party making the claim had access to the

same information but did not take active steps to discover it.  Aaron Ferer & Sons, Ltd. v. Chase

Manhattan Bank, N.A., 731 F.2d 112, 123 (2d Cir. 1984) ("[P]laintiffs failed to establish that

[Defendant's] knowledge was 'superior,' because all of the information that plaintiffs now claim

was concealed from them was either a matter of public record, was not pursued by plaintiffs, or

was disclosed, at least in part, by [Defendant].").  The facts pled in the Amended Counterclaims

and the underlying contracts relied on by the Amended Counterclaims, however, establish that

JPMorgan had equal or greater access to information regarding the Takeout Agreement and the

allocation of securities in the tri-party repo shells than did LBHI.

JPMorgan does not allege that LBHI had superior access to information about the

Takeout Agreement.  The Counterclaims include one allegation that "Ian Lowitt met with

---

[9]    As explained above, this allegation of control falls far short of what is required to pierce the corporate veil and impose liability on the parent company for the actions of a subsidiary.  See supra Point I.C.2.

representatives of Barclays, Bank of New York, and the Fed on Wednesday, September 17, to discuss how the Takeout Agreement would be implemented." (Am. Counterclaims ¶ 58). As discussed above, knowledge of the Fed Repo is not the same as knowledge of the Takeout Agreement, and there are no specific allegations about anyone at LBHI knowing about that agreement. Nevertheless, to the extent JPMorgan is suggesting that knowledge of the Fed Repo indicates knowledge of the Takeout Agreement, the Amended Counterclaims allege that JPMorgan participated in discussions on that topic as well as LBHI. (Id. ¶ 55 (alleging that in "a conference call on Wednesday evening [September 17] among Ray Stancil, Jon Ciciola and Ed Corral of JPMorgan, David Petrie and John Rodenfeld from Barclays, and LBHI's David Aranow and others from Lehman," the parties discussed how "Barclays would enter into a repurchase agreement with LBI under which it would transfer approximately $45 billion in cash to JPMorgan to purchase the securities being financing by the Fed"); id. ¶ 58). JPMorgan even participated in talks with Barclays and Bank of New York on the topic in which LBHI was not involved at all. (Id. ¶ 56). Thus, according to JPMorgan's allegations, it had access to the same or more information as LBHI about Barclays' plans to take over the Fed Repo.

Similarly, JPMorgan fails to plead that LBHI had superior knowledge of the allocation of securities within the tri-party repo shells on September 17. JPMorgan does not plead that anyone at LBHI actually knew about the allocation, but merely alleges that "LBI operations personnel, acting under the control and supervision of LBHI, had access to the computer system at JPMorgan through which securities were allocated into the overnight shells." (Id. ¶ 59). The Amended Counterclaims describe how the allocation of securities was done using JPMorgan's own computer system and that, unlike LBHI, JPMorgan was actually a party to the contract that permitted LBI to reallocate securities within the shells. (Id. ¶¶ 59, 165; Ex. G,

Barclays Custodial Undertaking § 3(f)).  In fact, under the Custodial Undertaking, JPMorgan was obligated to send Barclays and LBI a statement describing which securities were in Barclays' shell at the end of each business day.  (Ex. G, Barclays Custodial Undertaking § 6 ("Bank shall send to Seller and Buyer a statement describing the Purchased Securities held in Buyer's Account as of the close of each Business Day.")).  Thus, regardless of when JPMorgan claims it "learned of" the "significance" of the reallocation (Am. Complaint ¶ 63), it cannot claim that LBHI's knowledge of the shells was superior to its own.  See Aaron Ferer & Sons, 731 F.2d at 123.

As a result, JPMorgan fails to plead a duty to disclose and its fraudulent concealment counterclaim should be dismissed.  See Stolow v. Greg Manning Auctions Inc., 258 F. Supp. 2d 236, 248 (S.D.N.Y. 2003) (dismissing fraudulent concealment claim where plaintiff "does not allege facts supporting a claim that defendants possessed superior knowledge not readily known to others"); Williams v. Bank Leumi Trust Co. of N.Y., No. 96 Civ. 6695(LMM), 1998 WL 397887, at *6-7 (S.D.N.Y. June 15, 1998) (dismissing fraudulent concealment claim for failure to plead facts supporting inference that defendant had superior knowledge of the underlying fraud).

## POINT III

## JPMORGAN'S FRAUDULENT INDUCEMENT TO LEND COUNTERCLAIM FAILS TO STATE A CLAIM

JPMorgan's third cause of action is for fraudulent inducement to lend.  In it, JPMorgan alleges, "On the morning of September 18, 2008, LBHI, through fraudulent schemes, artifices and devices, obtained from JPMorgan more than $70 billion in intraday loans for the benefit of LBI."  (Am. Counterclaims ¶ 127).  This counterclaim is duplicative of the fraudulent misrepresentation and fraudulent concealment counterclaims, and should be dismissed for all of the same reasons.

A.    **Legal Standards for Fraudulent Inducement**

Fraudulent inducement consists of the same elements as fraudulent misrepresentation or fraudulent concealment, depending on whether the inducement is premised upon a misrepresentation or an omission.  See Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A., 247 F. Supp. 2d 352, 364 (S.D.N.Y. 2002) ("New York law requires the same elements for fraudulent misrepresentation and fraudulent inducement.") (citing Fax Telecommunicaciones Inc. v. AT&T, 138 F.3d 479, 490 (2d Cir. 1998)).  To state a claim of fraudulent inducement by misrepresentation, a party must demonstrate that: "(1) the defendant made a material misrepresentation, (2) that it knew to be false, (3) such misrepresentations [sic] was made for the purpose of inducing the claimant to rely; (4) her reliance was justifiable, and (5) her reliance resulted in damages."  Pallonetti v. Liberty Mut., No. 10 Civ. 4487, 2011 WL 519407, at *8 (S.D.N.Y. Feb. 11, 2011) (dismissing fraudulent inducement claim).  A claim of fraudulent inducement by omission additionally requires a showing that the defendant had a duty to disclose the allegedly omitted information.  Sado v. Ellis, 882 F.Supp. 1401, 1405 (S.D.N.Y. 1995) ("Where concealment, as opposed to an affirmative misrepresentation, forms the basis of a fraudulent inducement claim, the inquiry turns on whether there was a duty to disclose.").

B.    **JPMorgan's Fraudulent Inducement Counterclaim Fails for the Same Reasons As Its Fraudulent Misrepresentation and Fraudulent Concealment Counterclaims**

JPMorgan's cause of action for fraudulent inducement to lend is duplicative of its causes of action for fraudulent misrepresentation and fraudulent concealment.  The facts alleged are the same as those underlying the fraudulent misrepresentation and concealment counterclaims.  Namely, in all three counterclaims, JPMorgan alleges it unwound LBI's overnight repos on the morning of September 18 in reliance on the same allegedly fraudulent misrepresentations and/or omissions by LBHI.

Specifically, in its inducement counterclaim, JPMorgan alleges that "LBHI had previously led JPMorgan to believe, through materially false misrepresentations and fraudulent omissions, that Barclays had agreed to purchase, and would buy, the less desirable securities collateralizing the remainder of the loan." (Am. Counterclaims ¶ 127). These alleged misrepresentations and omissions by LBHI are exactly the same as those alleged in the first two counterclaims. (See id. ¶¶ 111, 120). Similarly, JPMorgan claims in its inducement counterclaim that, as a result of these alleged misrepresentations and omissions, LBHI, on September 18, "obtained from JPMorgan more than $70 billion in intraday loans for the benefit of LBI," to unwind LBI's overnight repos. (Id. ¶ 127). These same loans form the basis of JPMorgan's first two counterclaims. (See id. ¶ 115 ("Based on JPMorgan's reasonable understanding and expectation that Barclays had agreed to buy, and would buy, the securities that JPMorgan was financing, JPMorgan unwound LBI's overnight financings on the morning of September 18, 2008."); id. ¶ 121 ("Had JPMorgan known that Barclays . . . could cherry pick the securities it would purchase and seek to stick JPMorgan with LBI's least desirable securities, JPMorgan would not have extended credit to LBI to repay its overnight financings on the morning of September 18."))

Indeed, the only difference with the third counterclaim for fraudulent inducement is the allegation that JPMorgan unwound *all* of "LBI's overnight financings on the morning of September 18" in reliance on LBHI's alleged statements and omissions, rather than just the $15.8 billion Barclays Repo. (Id. ¶ 130). But there are no additional facts to support this added allegation. Nowhere does JPMorgan allege it relied on representations about what Barclays would acquire through the APA in unwinding repos with parties other than Barclays.

Thus, JPMorgan's allegations of fraudulent inducement simply restate the allegations pled in the first two counterclaims.  As with the first two counterclaims, JPMorgan has not adequately alleged the following required elements:  that JPMorgan actually and justifiably relied on any alleged misrepresentation or omission, see supra Point I.B; that LBHI made a material misrepresentation or omission of fact, known to be false at the time it was made see supra Point I.C;  that any alleged misrepresentation or omission by LBHI was made for the purpose of inducing JPMorgan's reliance, see supra Point I.D; or that LBHI had a duty to disclose the allegedly omitted information to JPMorgan, see supra Point II.C.  As a result, JPMorgan's counterclaim for fraudulent inducement to lend should be dismissed.  See Vaughn v. Consumer Home Mortgage, Inc., No. 01-CV-7937(ILG), 2003 WL 21241669, at *7 (E.D.N.Y. March 23, 2003) (dismissing fraudulent inducement claim when based on the same alleged acts and omissions as a fraud claim, because the inducement claim did "not provide an independent basis for relief").

## POINT IV

### JPMORGAN'S COUNTERCLAIM FOR AIDING AND ABETTING LBI'S ALLEGED FRAUD FAILS TO STATE A CLAIM

JPMorgan's fourth cause of action is for aiding and abetting an alleged fraud by LBI.  In it, JPMorgan alleges that "LBI, through fraudulent schemes, artifices and devices, obtained from JPMorgan more than $70 billion in intraday loans for its benefit," that "LBHI actually knew that LBI was perpetrating a fraud upon JPMorgan," and that "LBHI provided LBI with substantial assistance in perpetrating a fraud upon JPMorgan."  (Am. Counterclaims ¶¶ 134-39).  Despite these allegations, JPMorgan fails to plead an alleged fraud by LBI with any specificity.  As a result, this counterclaim should be dismissed.

## A.    Legal Standards for Aiding and Abetting Fraud

"To establish liability for aiding and abetting fraud, the plaintiffs must show (1) the existence of a fraud; (2) the defendants knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." Lerner, 459 F.3d at 292 (internal quotation omitted).

Allegations of aiding and abetting fraud must be pled with particularity pursuant to Rule 9(b). O'Brien v. Nat'l Prop. Analysts Partners, 719 F. Supp. 222, 229 n.10 (S.D.N.Y. 1989) (granting motion to dismiss and stating "[t]he particularity requirements of Rule 9(b) apply to allegations of aiding and abetting fraud").

## B.    JPMorgan Fails to Allege an Underlying Fraud by LBI

The first element of a claim for aiding and abetting fraud is the existence of an underlying fraud. See Lerner, 459 F.3d at 292. To satisfy Rule 9(b), allegations of an underlying fraudulent misrepresentation must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Id. at 290. Similarly, allegations of an underlying fraudulent omission "must specify: '(1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff, and (4) what defendant obtained through the fraud.'" Abbatiello v. Monsanto Co., 522 F. Supp. 2d 524, 533 (S.D.N.Y. 2007) (quoting Malmsteen v. Berdon, LLP, 477 F. Supp. 2d 655, 665 (S.D.N.Y. 2007)). JPMorgan's pleading of LBI's underlying fraud does not remotely satisfy these requirements.

In its counterclaim for aiding and abetting LBI, JPMorgan makes a bare allegation that LBI's alleged fraud "was effectuated through, among other things, representations by LBI employees or representatives, or failure to disclose facts known that were unknown (and not

reasonably knowable) to JPMorgan."  (Am. Counterclaims ¶ 137).  However, JPMorgan does not

identify a single allegedly fraudulent statement that any LBI representative made to JPMorgan.

JPMorgan also fails to identify any speaker, the location of any alleged statement, or the timing

of any alleged statement.  Indeed, the entire cause of action for aiding and abetting LBI's fraud

does not even mention a single LBI individual.

Even in the facts section of its Amended Counterclaims, JPMorgan does not

allege that an LBI individual made any representation at all to JPMorgan until September 19, by

which point JPMorgan had already unwound the Barclays Repo and advanced the $5 billion

margin.

This cause of action is similarly deficient in alleging a fraudulent omission against

LBI.  JPMorgan never specifies what LBI's alleged omissions were.  Nor does it identify any

LBI individual responsible for the failure to disclose.[10]

As a result, JPMorgan's counterclaim for aiding and abetting LBI's fraud does not

allege an underlying fraud by LBI with anything close to the specificity required by Rule 9(b),

and this counterclaim should be dismissed.  See 484 Assocs., L.P. v. Moy, No. 06 Civ.

2290(PAC), 2007 WL 683999, at *4 (S.D.N.Y. Mar. 5, 2007) (dismissing aiding and abetting

---

[10]   To the extent JPMorgan relies on the same sort of representations outside the repo
contracts, such as those in the APA itself, it also cannot show its reliance was reasonable for the
reasons discussed above. See supra Point I.B.3; see also 484 Assocs., 2007 WL 683999 at *4
("Plaintiff cannot show reasonable reliance as to the underlying fraud alleged, and his aiding and
abetting fraud claim must be dismissed."); In re AHT Corp., 292 B.R. at 745-46 ("[Plaintiff]
cannot prevail as a matter of law on its aiding and abetting claim because it cannot get over the
first hurdle. Since reliance on [the alleged underlying fraud] was unreasonable as a matter of law,
there was no fraud."); King v. George Schonberg & Co., 233 A.D.2d 242, 242-43, 650 N.Y.S.2d
107, 108 (1st Dep't 1996) (holding that the failure to adequately allege reasonable reliance on the
underlying fraud rendered the complaint insufficient to support a claim for aiding and abetting
fraud).

fraud claim for failure to properly plead an underlying fraud); <u>AHT Corp. v. BioShield Techs., Inc. (In re AHT Corp.)</u>, 292 B.R. 734, 745-46 (S.D.N.Y. 2003) (same).

## C.    JPMorgan Fails to Allege LBHI Knew of LBI's Alleged Misrepresentations

In order to state a claim for aiding and abetting fraud, JPMorgan must plead with particularity facts sufficient to create a strong inference that LBHI possessed actual knowledge that LBI was engaged in fraudulent activity.  <u>Kolbeck v. LIT Am., Inc.</u>, 939 F. Supp. 240, 246 (S.D.N.Y. 1996) (granting motion to dismiss and stating "New York common law, which controls the analysis here, has not adopted a constructive knowledge standard for imposing aiding and abetting liability" and that "New York courts and federal courts in this district have required actual knowledge").

JPMorgan cannot show that LBHI had actual knowledge of LBI's allegedly fraudulent misrepresentations or omissions because, as discussed above, JPMorgan never identifies any misrepresentations or omissions by LBI.  <u>See</u> <u>supra</u> Point IV.B.  Moreover, JPMorgan pleads no facts to support the conclusory allegation that "LBHI knew that JPMorgan was extending credit to LBI on the mistaken belief – perpetuated by LBI's and LBHI's fraudulent schemes, artifices, and devices – that the Barclays transaction would extinguish JPMorgan's exposure to LBI."  (Am. Counterclaims ¶ 138).  The best JPMorgan can do is plead that "Tonucci instructed Lehman employees at 7:07 a.m. on September 18 to ensure that 'RACERs . . . not be funded by Barclays' that evening."  (<u>Id.</u>).  But this statement does not indicate any awareness of the use of fraudulent means by LBI or of JPMorgan's allegedly "mistaken belief" that Barclays would finance RACERS, and thus falls far short of pleading actual knowledge of a fraud.[11]  As a result, the aiding and abetting counterclaim should be

---

[11]    On the contrary, many factual allegations and provisions of the contracts suggest that LBI was acting independently of LBHI, who was then in bankruptcy, with regards to the specific

dismissed.  See Rosner v. Bank of China, 349 Fed. Appx. 637, 638-40 (2d Cir. 2009) (dismissing

aiding and abetting fraud claim for failure to allege sufficient facts to support an inference of

defendant's actual knowledge of the underlying fraud); Kirschner v. Bennett, 648 F. Supp. 2d

525, 544-46 (S.D.N.Y. 2009) (same).

**POINT V**

**JPMORGAN'S COUNTERCLAIM FOR AIDING AND ABETTING BARCLAYS'
ALLEGED FRAUD FAILS TO STATE A CLAIM**

JPMorgan's fifth cause of action is for aiding and abetting an alleged fraud by

Barclays.  In it, JPMorgan alleges that "Barclays affirmatively misrepresented, and failed to

disclose, material facts to JPMorgan concerning its purchase of assets from LBHI and LBI," that

LBHI knew of Barclays' fraud, and that LBHI provided substantial assistance to Barclays to

perpetrate that fraud.  (Am. Counterclaims ¶¶ 141-50).  This counterclaim should be dismissed as

well.

**A.**    **JPMorgan Fails To Plead That LBHI Substantially Assisted Barclays' Alleged
Fraud**

In order to state a claim for aiding and abetting liability, JPMorgan must properly

plead that LBHI substantially assisted Barclays by affirmatively contributing to the alleged fraud

or helping Barclays to conceal it.  Kolbeck, 939 F. Supp. at 247 (granting motion to dismiss and

stating "[o]ne provides substantial assistance if he affirmatively assists, helps conceal, or by

virtue of failing to act when required to do so enables it to proceed.") (internal quotations

omitted).  Assistance is considered substantial only when it proximately caused the claimant's

---

allegations that JPMorgan details.  For example, only LBI was a party to the contracts governing
the tri-party repurchase agreement.  (Id. ¶ 165).  Only LBI had permission under those contracts
to alter the allocation of securities within the repo shells.  (Ex. G, Barclays Custodial
Undertaking § 3(f)).  Only LBI received confirmations describing the terms of the repo
transactions.  (Ex. H, Master Repurchase Agreement § 3(b)).  Only LBI received notice when
required under the repo contracts.  (Ex. G, Barclays Custodial Undertaking § 22).

injury.  Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC, 446 F.

Supp. 2d 163, 202 (S.D.N.Y. 2006) ("[W]ith respect to an aiding and abetting fraud claim, the

'substantial assistance' and 'causation' elements are interrelated - whether the assistance is

substantial or not is measured by whether the action of the aider and abettor proximately caused

the harm on which the primary liability is predicated.") (internal quotation omitted); see also

Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 62-63 (2d Cir. 1985) (granting

motion to dismiss and explaining "[i]n alleging the requisite substantial assistance by the aider

and abettor, the complaint must allege that the acts of the aider and abettor proximately caused

the harm to the [plaintiff] on which the primary liability is predicated" and "[a]llegations of a but

for causal relationship are insufficient"); Filler v. Hanvit Bank, No. 01 Civ. 9510(MGC), 02 Civ.

8251(MGC), 2003 WL 22110773, at *2 (S.D.N.Y. Sept. 12, 2003) (quoting Bloor in a New York

common law fraud context and granting motion to dismiss).

JPMorgan claims that LBHI provided the following allegedly substantial

assistance to Barclays:

> LBHI filed the Sale Motion and the APA, which misrepresented the agreement
> between LBHI and Barclays and induced JPMorgan to extend credit to LBI on
> September 17 and 18.  LBHI representatives helped Barclays identify undesirable
> securities in LBI's tri-party repo book; Lehman manipulated the repo shells on
> Wednesday, September 17 to ensure that Barclays could cherry pick LBI's best
> securities; and Lehman personnel, including senior LBHI executives, took
> numerous steps to ensure that only the securities Barclays wanted were actually
> transferred to Barclays on September 18.

(Am. Counterclaims ¶ 149).  None of this alleged conduct meets the requisite pleading standard

for aiding and abetting liability.

### 1.    JPMorgan Does Not Plead the Alleged Assistance With Specificity

First of all, JPMorgan's allegations regarding the allocation of the repo shells and

selection of securities are not alleged against LBHI specifically.  Instead, JPMorgan alleges

generally that "*Lehman* manipulated the repo shells," and "*Lehman* personnel, including senior

LBHI executives, took numerous steps to ensure that only the securities Barclays wanted were

actually transferred."  (Am. Counterclaims ¶ 149) (emphasis added).  But this vague attribution

to all Lehman entities, and a general reference to unidentified LBHI individuals, fails to state a

claim with sufficient particularity against LBHI.  See supra Point I.C.2; Defer, 654 F. Supp. 2d at

213 (dismissing fraud claims where general allegation did not specify which Raymond James

entity was involved).

Nor could JPMorgan allege that LBHI, rather than LBI, changed the composition

of the tri-party repo shells.  The contract governing these tri-party repos authorized LBI to shift

collateral between tri-party shells (so long as the Margin Value, as determined by JPMorgan,

remained equal or greater to the purchase price).  (Ex. G, Barclays Custodial Undertaking § 3(f)).

LBHI was not a party to the contract and did not have the authority to change the allocation of

securities within the shells.  These allegations, of actions that could only have been taken by

LBI, do not allege that LBHI gave substantial assistance to Barclays.  See Bestfoods, 524 U.S. at

61; IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F. Supp. 2d 395, 403 (S.D.N.Y. 2009)

("Under New York law, a corporate parent is not automatically liable for the acts of its wholly

owned subsidiary, even where the parent and subsidiary corporations have interlocking

directorates.").

### 2. LBHI's Alleged Conduct Did Not Substantially Assist Barclays Because It Did Not Proximately Cause the Alleged Injury

JPMorgan's pleading is also deficient in alleging that the supposed assistance

caused JPMorgan's injury.  To plead substantial assistance, a complainant must allege "that the

acts of the aider and abettor *proximately* caused the harm."  Bloor, 754 F.2d at 62-63 (emphasis

added).  By contrast, "[a]llegations of a but for causal relationship are insufficient."  Id.  The

Amended Counterclaims, however, contain no allegation that LBHI's alleged substantial

assistance proximately caused JPMorgan's purported injury.  Instead, JPMorgan merely pleads

but-for causation.  (Am. Counterclaims ¶ 149 ("Without LBHI's substantial assistance, Barclays

would not have been able to accomplish its fraud on JPMorgan.")).  As a result, JPMorgan fails

to allege substantial assistance and does not state a claim for aiding and abetting fraud.

      Moreover, even if it had been pled correctly, the conduct attributed to LBHI could

not have proximately caused harm to JPMorgan for a number of reasons.  First, as described

above, Barclays made far more direct statements to JPMorgan than did LBHI.  These

representations would have superseded any reliance on any representations by LBHI about the

same topic.  Second, aside from these statements, JPMorgan does not allege that LBHI actually

assisted Barclays in conducting its alleged fraud.  The closest JPMorgan comes is its allegation

that LBHI representatives "helped Barclays identify undesirable securities in LBI's tri-party repo

book."  (Id.).  But JPMorgan alleges only one specific instance where an LBHI representative

helped Barclays identify which securities it should not purchase.  According to the Amended

Counterclaims, "late on Thursday, September 18, LBHI's James Seery (Global Head of Fixed

Income) stated in at least one phone call with John Mahon of Barclays that Barclays should

avoid purchasing RACERS."  (Am. Counterclaims ¶ 82).  JPMorgan also alleges, however, that

Barclays had decided not to purchase RACERS long before Seery's alleged phone call.  (Id. ¶ 46

(stating that Barclays decided on September 15 that it would not purchase RACERS)).  Thus,

Seery's alleged assistance could not possibly have proximately caused JPMorgan's alleged injury.

      In fact, JPMorgan actually pleads elsewhere in the Amended Counterclaims that

LBHI individuals attempted to convince Barclays that it *should* acquire purportedly undesirable

securities included in the APA, even when Barclays allegedly represented it did not want to.

(Am. Counterclaims ¶ 45 (stating despite the fact that "Barclays 'did not want' to acquire Pine,"

"Kelly suggested that Tonucci or Robert Azerad . . . call James Walker of Barclays to try to

convince him to take Pine")).  This allegation further contradicts JPMorgan's assertion that LBHI

assisted Barclays in its alleged fraud.

Therefore, JPMorgan has not pled sufficient facts to show that LBHI provided

substantial assistance to Barclays, and the fifth cause of action for aiding and abetting Barclays'

alleged fraud should be dismissed.  See In re Sharp Int'l Corp., 403 F.3d 43, 51-53 (2d Cir. 2005)

(affirming dismissal of aiding and abetting claim where complaint did not show plaintiff

substantially assisted the fraud); Fezzani v. Bear, Stearns & Co., Inc., 592 F. Supp. 2d 410, 432

(S.D.N.Y. 2008) (dismissing aiding and abetting claim because the "allegations do not

sufficiently allege that the [defendants'] participation in the fraud was a proximate cause of the

Plaintiffs' harm").

**B.    JPMorgan Fails to Plead Reasonable Reliance on Barclays' Alleged Misstatements
or Omissions**

Finally, JPMorgan does not plead an underlying fraud by Barclays, because it has

failed to allege facts establishing its reliance on statements outside the contracts, in light of the

representations and integration clauses in those documents.  See supra Point I.B.3; (see also Ex.

A, 2000 Clearance Agreement § 9; Ex. G, Barclays Custodial Undertaking § 1; Ex. H, Master

Repurchase Agreement § 3(b)).  While JPMorgan actually identifies allegedly fraudulent

statements made by Barclays (id. ¶ 142), Barclays' alleged fraud is nevertheless based on

statements outside the Barclays Custodial Undertaking and related contracts, such that any

reliance on them was not reasonable.  For this reason as well, the counterclaim for aiding and

abetting Barclays' alleged fraud should be dismissed.  See 484 Assocs., 2007 WL 683999 at *4

("Plaintiff cannot show reasonable reliance as to the underlying fraud alleged, and his aiding and

abetting fraud claim must be dismissed."); In re AHT Corp., 292 B.R. at 745-46 ("[Plaintiff]

cannot prevail as a matter of law on its aiding and abetting claim because it cannot get over the

first hurdle. Since reliance on [the alleged underlying fraud] was unreasonable as a matter of law,

there was no fraud."); King v. George Schonberg & Co., 233 A.D.2d 242, 242-43, 650 N.Y.S.2d

107, 108 (1st Dep't 1996) (holding that the failure to adequately allege reasonable reliance on the

underlying fraud rendered the complaint insufficient to support a claim for aiding and abetting

fraud).

## POINT VI

## JPMORGAN'S COUNTERCLAIM FOR UNJUST ENRICHMENT FAILS TO STATE A CLAIM

JPMorgan also brings a counterclaim for unjust enrichment.  Specifically,

JPMorgan alleges that "LBHI would be unjustly enriched if it were allowed to keep any portion

of the approximately $5 billion in margin that JPMorgan released to Barclays on September 18."

(Am. Counterclaims ¶ 152).

This counterclaim is contingent, and would only apply "if LBHI is able to recover

from Barclays in the Rule 60(b) proceeding."  (Id.).  However, LBHI did not recover from

Barclays in the Rule 60(b) proceeding.  (See Docket No. 14612).  Therefore, to the extent the

ruling in the 60(b) proceeding stands, JPMorgan's counterclaim for unjust enrichment would be

moot and should be dismissed.  See Certain Underwriters at Lloyd's v. Milberg LLP, No. 08 Civ.

7522(LAP), 2009 WL 3241489, at *11 (S.D.N.Y. Sept. 30, 2009) (dismissing contingent claim

as moot when the contingency did not occur).[12]

---

[12]   Moreover, even if the counterclaim was not rendered moot by this Court's decision in
the 60(b) proceeding, JPMorgan has failed to state a claim for unjust enrichment.  "The basic
elements of an unjust enrichment claim in New York require proof that (1) defendant was
enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against
permitting defendant to retain what plaintiff is seeking to recover."  Briarpatch Ltd., L.P v.

## POINT VII

## JPMORGAN'S INDEMNIFICATION COUNTERCLAIMS SHOULD BE DISMISSED

JPMorgan's seventh and eighth counterclaims, for purported indemnification under the 2000 Clearance Agreement and the Barclays Custodial Undertaking, respectively, should similarly be dismissed for failure to state a claim upon which relief may be granted. Notably, JPMorgan does not claim that it has actually suffered any loss subject to indemnification. (Am. Counterclaims ¶ 12). Instead, JPMorgan asserts that it will suffer a loss in the event it is found liable in connection with Plaintiffs' First Amended Complaint and is ordered to pay damages or return LBHI's collateral for the benefit of LBHI's creditors. (Id. ¶ 13). JPMorgan's claims for indemnity are fatally flawed for a number of reasons.

First, the seventh counterclaim, which seeks indemnification under the 2000 Clearance Agreement, should be dismissed because the Barclays Custodial Undertaking – and not the 2000 Clearance Agreement – governs the transaction of which JPMorgan complains. Thus, the only indemnification provision that could have any application to the events at issue in JPMorgan's Amended Counterclaims is contained in the Barclays Custodial Undertaking.

---

Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004). To plead the second element of unjust enrichment – that the enrichment was "at plaintiff's expense" – JPMorgan must allege that it conveyed the benefit "at the behest" of LBHI. See Michele Pommier Models, Inc. v. Men Women N.Y. Model Mgmt. Inc., 14 F. Supp. 2d 331, 338 (S.D.N.Y. 1998) ("It is not enough that the defendant received a benefit from the activities of the plaintiff; if the services were performed at the behest of someone other than the defendant, the plaintiff must look to that person for recovery.") (quoting Kagan v. K-Tel Entertainment, Inc., 172 A.D.2d 375, 376, 568 N.Y.S.2d 756 (1st Dep't 1991)).

Here, the Amended Counterclaims allege that Barclays, not LBHI, instructed JPMorgan to transfer the $5 billion margin to Barclays on September 18. (Am. Counterclaims ¶¶ 76-77). Therefore an unjust enrichment claim seeking return of this benefit could only sound against Barclays, not LBHI, and the counterclaim for unjust enrichment should be dismissed. See Mazzaro de Abreu v. Bank of Am. Corp., 525 F. Supp. 2d 381, 397 (S.D.N.Y. 2007) (dismissing unjust enrichment claim that sought recovery of funds advanced by plaintiff to defendant, because the loan had not been made at the behest of defendant).

Moreover, the indemnification provision in the Barclays Custodial Undertaking (and even the inapplicable provision in the 2000 Clearance Agreement) does not apply where losses are due to JPMorgan's negligence or willful misconduct. To the extent JPMorgan suffers any loss because this Court finds in favor of Plaintiffs on their state law and certain bankruptcy claims against JPMorgan, such an award would necessarily be premised on a judicial finding that JPMorgan engaged in the misconduct alleged in the First Amended Complaint. Thus, the very findings that would lead JPMorgan to seek indemnification would also preclude indemnification under the applicable provision of the Barclays Custodial Agreement (or the inapplicable clause in the 2000 Clearance Agreement).

Nor can the indemnification clauses immunize JPMorgan from the consequences of being ordered to return fraudulently conveyed or preferentially transferred LBHI assets to the estate. As discussed below, a party may not contract around the avoidance provisions of the Bankruptcy Code in this manner, or otherwise shield preferential or fraudulent transactions by agreeing to such an indemnity clause.

In sum, because none of the causes of action set forth in the First Amended Complaint give rise to an indemnifiable loss, JPMorgan's seventh and eighth counterclaims should be dismissed.

**A.    JPMorgan Fails to State a Claim for Indemnification Under the 2000 Clearance Agreement (Seventh Counterclaim)**

 **1.    The Indemnity Clause of the Barclays Custodial Undertaking Provides the Exclusive Basis for Any Purported Indemnification Rights of JPMorgan**

JPMorgan's seventh counterclaim should be dismissed because the indemnity clause contained in the 2000 Clearance Agreement, upon which this counterclaim is based, has no application in this case. Instead, the Barclays Custodial Undertaking governs any

73

indemnification rights JPMorgan may have with respect to the events at issue in JPMorgan's Amended Counterclaims.

        As alleged in the Amended Counterclaims, on September 15, 2008, JPMorgan, LBI and Barclays executed the Barclays Custodial Undertaking to facilitate and govern the repurchase transactions that would occur between LBI and Barclays during the following week. (Am. Counterclaims ¶¶ 166, 168 ("During the week of September 15, 2008, the repo transactions between Barclays and LBI were effectuated under the Repurchase Agreement at the instructions of LBI and Barclays.  Moreover, each repo transaction required the agency and custodial services of JPMorgan pursuant to the Custodial Undertaking.")); (Ex. G, Barclays Custodial Undertaking, at 1 ("WHEREAS, Buyer and Seller have requested that Bank undertake certain agency and custodial functions in connection with the Repurchase Agreement pursuant to the terms hereof . . . .")).

        The Barclays Custodial Undertaking contained a clause specifically governing extensions of credit that would be made that week in connection with the Repurchase Agreement with Barclays, including the loans made to LBI on September 18, 2008 that JPMorgan complains were secured by deficient collateral, and which purported deficiency JPMorgan allegedly satisfied by applying "most of the approximately $8.6 billion" of LBHI's cash collateral.  (Am. Counterclaims ¶¶ 12, 85, 101).  This credit clause in the Barclays Custodial Undertaking significantly differed from the provisions governing extensions of credit contained in the 2000 Clearance Agreement, including (for example) by authorizing JPMorgan to extend credit without receiving instructions from – or even giving notice to – LBI.  (Ex. G, Barclays Custodial Undertaking § 3(d); Ex. A, 2000 Clearance Agreement § 5).[13]

---

[13] In several places in the Amended Counterclaims, JPMorgan makes the conclusory allegation that the September 18, 2008 extensions of credit were made "under the Clearance

The Barclays Custodial Undertaking also contained its own indemnity clause. (Ex. G, Barclays Custodial Undertaking § 9 ("Seller and Buyer hereby agree, jointly and severally, to indemnify Bank for, and hold it harmless against any loss, liability or expense in connection with, arising out of or in any way related to this Agreement or the Repurchase Agreement . . . .")).

Section 9 of the 2000 Clearance Agreement expressly provided that, in the event of a conflict between any provision of the 2000 Clearance Agreement and a tri-party custodial agreement (such as the Barclays Custodial Undertaking), the latter would control.  (Ex. A, 2000 Clearance Agreement § 9 ("Notwithstanding anything herein to the contrary, to the extent of any conflict between this [Clearance] Agreement and any tri-party custody agreement, whether now or hereafter existing, the terms of the tri-party custody agreement will govern.")).  Moreover, the Barclays Custodial Undertaking stated that it was the entire agreement and superseded all prior written agreements on the same subject matter.  (Ex. G, Barclays Custodial Undertaking § 13 ("This Agreement constitutes the entire agreement of the parties with respect to its subject matter and supersedes all prior oral or written agreements in regard thereto.")).

Thus, the indemnity clause contained in the Barclays Custodial Undertaking – and not the pre-existing indemnity clause of the 2000 Clearance Agreement – governs the transactions at issue, including JPMorgan's claim for indemnification.  In fact, JPMorgan expressly recognizes the applicability of the Barclays Custodial Undertaking in its Amended Counterclaims.  (See Am. Counterclaims ¶ 169 ("If JPMorgan is unable to recover the full

---

Agreement."  (See, e.g., Counterclaims ¶ 100).  However, the Court is not required to accept this conclusion, given that it is directly contradicted by JPMorgan's own factual allegations (see, e.g., id. ¶¶ 166, 168) and the relevant contracts themselves.  See Rapoport v. Asia Electronics Holding Co., Inc., 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) ("If these documents contradict the allegations of the amended complaint, the documents control and this Court need not accept as true the allegations in the amended complaint.") (citation omitted).

amount of any of its loans to LBI, or otherwise is required to pay damages to the LBHI and/or

LBI estates, JPMorgan will have suffered losses . . . 'in connection with, arising out of or in any

way related to th[e] [Custodial Undertaking] or the Repurchase Agreement.") (modifications in

original)).  Because the indemnity clause of the 2000 Clearance Agreement does not apply, the

seventh counterclaim should be dismissed.  See Baraliu v. Vinya Cap., L.P., No. 07 Civ.

4626(MHD), 2009 WL 959578, at *4-5 (S.D.N.Y. Mar. 31, 2009) (dismissing claim based on

purported breach of provision in a contract that was superseded by a later agreement).

> **2.     The 2000 Clearance Agreement Prohibits Indemnification for Any
> JPMorgan Losses Related to Plaintiffs' State Law Claims or Those
> Bankruptcy Code Claims Premised on JPMorgan's Misconduct**

Even if the indemnity clause of the 2000 Clearance Agreement were to apply to

the events at issue in JPMorgan's Amended Counterclaims, the seventh counterclaim should still

be dismissed.  That clause prohibits indemnification where JPMorgan is negligent or engages in

willful misconduct (including breaches of contract).  All of Plaintiffs' state law causes of action

asserted in the First Amended Complaint, and numerous claims arising under the Bankruptcy

Code, are based on JPMorgan's willful misconduct or breach of contract.  To the extent Plaintiffs

prevail under any of these claims and JPMorgan suffers its asserted "loss," JPMorgan will not be

entitled to indemnification.

Section 16 of the 2000 Clearance Agreement bars indemnification for losses

where JPMorgan has acted negligently, engaged in willful misconduct, or has breached the

contract, as follows:

> Except where we [JPMorgan] are negligent or have engaged in
> willful misconduct, or have breached this Agreement for reasons
> other than those listed in Section 12 hereof, you [Lehman] will
> indemnify us and hold us harmless against any and all losses,
> claims, damages, liabilities or actions to which we may become
> subject, and reimburse us for any expenses (including reasonable
> attorneys' fees and expenses) incurred by us in connection

therewith, insofar as such losses, claims, damages, liabilities or actions arise out of or are based upon or are in any way related to this Agreement.

(Ex. A, 2000 Clearance Agreement § 16 (emphasis added)).  For the avoidance of doubt, the 2000 Clearance Agreement further provided:  "We [JPMorgan] shall be liable to you [Lehman] for direct damages sustained by you to the extent such damages result from our negligence or malfeasance or our breach of any representations, warranties or agreements contained in this Agreement . . . ."  (Id.; see also id. § 13).

Each of the state law claims asserted in the First Amended Complaint is based on JPMorgan's misconduct.  Specifically:

- Counts XXXV and XLVI seek a declaration that the September Guaranty and related agreements are invalid and unenforceable, as well as damages, based on JPMorgan's use of unlawful coercion in acquiring them, and/or JPMorgan's failure to provide new consideration and its acceptance of those agreements from a signatory that JPMorgan knew lacked any authority to bind LBHI;

- Count XXXVIII seeks a declaration that JPMorgan has no lien or other security interest with respect to the $8.6 billion of LBHI collateral as a result of JPMorgan's unauthorized transfer of LBHI's funds on deposit to JPMorgan's own general ledger account, for the purpose of preventing LBHI from accessing its funds in violation of the relevant security agreements;

- Counts XXXVI-XXXVII and XXXIX-XL seek the return of LBHI property and damages resulting from JPMorgan's unlawful conversion of that property and its unjust enrichment thereby;

- Counts XLII-XLV and XLVII seek damages for JPMorgan's intentional breaches of its various contracts (or implied covenants of good faith) with LBHI;

- Count XLVIII seeks damages and/or the rescission of the transfers of $8.6 billion of LBHI collateral acquired by JPMorgan through the use of unlawful threats and economic coercion; and

- Count XLIX seeks damages for the fraud perpetrated by JPMorgan to induce LBHI to deliver what was essentially its last $5 billion to JPMorgan on LBHI's last day of business.

The very provision of the 2000 Clearance Agreement on which JPMorgan relies thus excludes from indemnification any and all losses JPMorgan may suffer if it is found liable under Plaintiffs' state law claims.  Indeed, any reading to the contrary – i.e., that the parties intended for JPMorgan to be fully indemnified by LBHI for the harm caused to LBHI by JPMorgan's misconduct – would both defy common sense and violate public policy.  See PPI Enterprises (U.S.), Inc. v. Del Monte Foods Co., Nos. 05-6885-cv (L), 05-7040-cv (CON), 2006 WL 3370698, at *2-3 (2d Cir. Nov. 20, 2006) (refusing to read broadly worded indemnification clause as providing indemnity for disputes between the parties; "the test is whether the intent to indemnify is unmistakably clear from the language of the promise, not whether the agreement could be read to provide for indemnification") (citation and quotation omitted); Medinol Ltd. v. Boston Scientific Corp., 346 F. Supp. 2d 575, 604-05 (S.D.N.Y. 2004) (same); see also Anderson v. Local Union No. 3, 582 F. Supp. 627, 633 (S.D.N.Y. 1984) ("Indemnity, like contribution, cannot be allowed in favor of an intentional tortfeasor.  Indeed, the rationale for this rule is even stronger in the case of indemnity, because an intentional tortfeasor receiving indemnification would escape liability for his own deliberate wrongdoing.").

For these same reasons, losses related to JPMorgan's willful violations of the Bankruptcy Code or other bankruptcy claims premised on JPMorgan's misconduct are not subject to indemnification under the 2000 Clearance Agreement.  Thus, Counts XXVI-XXVII (seeking avoidance and return of transfers made for impermissible purpose of building up a purported right of setoff), XXX (equitable subordination based on JPMorgan's misconduct), XXXI (disallowance of claims based on JPMorgan's misconduct), XXXII (constructive trust based on JPMorgan's misconduct and fraud), and XXXIII-XXXIV (seeking return of funds

seized through JPMorgan's intentional violation of the automatic stay), set forth claims for which

JPMorgan is not entitled to indemnification.

Accordingly, to the extent the seventh counterclaim seeks indemnity for losses

related to either the state law claims or the above-listed Bankruptcy Code claims asserted in the

First Amended Complaint, that counterclaim should be dismissed.

### 3. JPMorgan's Losses Related to Plaintiffs' Claims Arising Under the Avoidance Provisions of the Bankruptcy Code Are Not Subject to Indemnification

JPMorgan is similarly not entitled to indemnification from the estate for the lost

value of property it may be required to return pursuant to the remainder of Plaintiffs' claims, all

of which arise out of the avoidance provisions of the Bankruptcy Code (Counts I-XII, XV-XXIV,

and XXVIII-XXIX). As an initial matter, there is nothing in the text of the indemnification

clause that indicates the parties intended that clause to cover such losses. For this reason alone,

the clause should be read as excluding this category of loss. See Corporate Jet Aviation, Inc. v.

Vantress (In re Corporate Jet Aviation, Inc.), 45 B.R. 629, 639 (Bankr. N.D. Ga. 1985)

(dismissing indemnification counterclaim because, inter alia, "the literal terms of the indemnity

agreement do not purport to require indemnification arising from an action under the avoidance

powers of the Bankruptcy Code"); cf. Scott-Macon Sec., Inc. v. Zoltek Cos., Inc., No. 06-2711-

cv, 2007 WL 2914873, at *16-18 (2d Cir. Oct. 4, 2007) ("It is not 'unmistakably clear' from the

language of the Agreement that the parties intended that Zoltek indemnify Scott-Macon for

disputes between the parties themselves. Therefore, the district court's award of attorneys' fees

was error and is reversed.") (collecting authority).

Even if this were not the case, the indemnity clause cannot be read as creating an

obligation on behalf of the LBHI estate, and thus LBHI's creditors, to reimburse or indemnify

JPMorgan for losses it incurs in returning fraudulently or preferentially acquired property to the

estate.  The Bankruptcy Code's avoidance provisions are "intended to prevent a debtor from

diminishing funds that are generally available for distribution to creditors."  QSI Holdings, Inc. v.

Alford, 382 B.R. 731, 737 (W.D. Mich. 2007); see also Maxwell Commc'n Corp. PLC v. Societe

Generale (In re Maxwell Commc'n Corp. PLC), 93 F.3d 1036, 1052 (2d Cir. 1996) ("The

principal policies underlying the Code's avoidance provisions are equal distribution to creditors

and preserving the value of the estate through the discouragement of aggressive pre-petition

tactics causing dismemberment of the debtor."), (citing Union Bank v. Wolas, 502 U.S. 151, 161,

112 S.Ct. 527, 533 (1991)).  These avoidance provisions would be rendered meaningless if

creditors could contract around them by being indemnified by the estate in the event their

fraudulent or preferential transactions are later avoided in bankruptcy.  If public policy allowed

for this outcome, any party doing business with a troubled company could give itself a

preferential position over all other creditors simply by insisting that its transactions be covered

by such an indemnity clause – an absurd result.

        It is thus well-settled that prepetition agreements to forego bankruptcy or its

benefits are unenforceable.  See, e.g., Hayhoe v. Cole (In re Cole), 226 B.R. 647, 652 n.7 (9th

Cir. B.A.P. 1998) (collecting authority) (citing, inter alia, Fallick v. Kehr (In re Fallick), 369

F.2d 899, 904 (2d Cir. 1966) (stating in dictum that advance agreements to waive the benefits of

bankruptcy are void), In re Weitzen, 3 F. Supp. 698, 698 (S.D.N.Y. 1933) ("The agreement to

waive the benefit of bankruptcy is unenforceable.  To sustain a contractual obligation of this

character would frustrate the object of the Bankruptcy Act . . . .")).[14]  Federal courts have even

---

[14]  See also In re Shady Grove Tech. Ctr. Assocs. Ltd. Partnership, 216 B.R. 386, 390
(Bankr. D. Md. 1998) ("[P]rohibitions against the filing of a bankruptcy case are
unenforceable . . . ."); In re Southeast Fin. Assocs., Inc., 212 B.R. 1003, 1005 (Bankr. M.D. Fla.
1997) (recognizing that a prepetition waiver of bankruptcy benefits is not self-executing or
binding on third parties); In re Gulf Beach Dev. Corp., 48 B.R. 40, 43 (Bankr. M.D. Fla. 1984)
(stating in dictum that "the Debtor cannot be precluded from exercising its right to file

sanctioned parties for attempting to enforce purported contractual prohibitions against a debtor's

right to invoke the preference provisions of the Bankruptcy Code.  See, e.g., Asher v. Film

Ventures Int'l, Inc. (In re Film Ventures Int'l, Inc.), 89 B.R. 80, 83-84 (9th Cir. B.A.P. 1988) ("If

the agreements did contain such a prohibition it would be ineffective; otherwise, creditors could,

by contract, insulate themselves from liability for preferential transfers under the Bankruptcy

Code.  Such result would clearly be at odds with the equality of distribution principles

underlying 11 U.S.C. § 547.").

          In the only case of which Plaintiffs are aware that has directly addressed the issue,

the bankruptcy court refused to read an indemnity clause as providing protection against the

trustee's power to recover fraudulently transferred assets.  In Corporate Jet Aviation, Inc. v.

Vantress, the trustee sought to avoid a constructively fraudulent payment made by the debtor to

the defendant as part of a stock redemption.  45 B.R. at 630.  The defendant counterclaimed and

argued that an indemnification clause contained in the stock redemption agreement required the

debtor to reimburse the defendant in the event the trustee was successful on its claims.  Id. at 639.

The bankruptcy court rejected this argument and dismissed the defendant's counterclaim,

explaining there was "no authority for the proposition that a party can contractually insulate a

transaction from the power of the trustee in bankruptcy to recover fraudulently transferred assets

for equitable distribution to unsecured creditors."  Id. at 639.

          The result in this adversary proceeding should be no different.  JPMorgan should

not be allowed to invoke a contractual indemnity clause for the purpose of nullifying the trustee's

---

Bankruptcy and any contractual provision to the contrary is unenforceable as a matter of law");
In re Tru Block Concrete Prods., Inc., 27 B.R. 486, 492 (Bankr. S.D. Cal. 1983) ("It is a well
settled principle that an advance agreement to waive the benefits conferred by the bankruptcy
laws is wholly void as against public policy."); Rupp v. Holling (In re Holling), Bankruptcy No.
05-38322, 2007 WL 2964505, at *15 (Bankr. D. Utah Feb. 8, 2007) ("It is inappropriate and
against public policy to allow the Debtor and LCI to contract away the essential provisions of the
Code.").

avoidance powers at the expense of the LBHI estate's creditors.  Accordingly, to the extent

JPMorgan's seventh counterclaim seeks indemnity from the estate for losses JPMorgan may

incur in returning to the estate fraudulently or preferentially conveyed LBHI property, that

counterclaim should be dismissed.

>    **4.    JPMorgan's New Conclusory Allegation Regarding Its Purported Lack of "Fault" Does Not Rehabilitate Its Failed Indemnity Claim**

In an apparent attempt to avoid the provisions of the 2000 Clearance Agreement

and applicable law that prohibit JPMorgan from being indemnified for losses caused by its own

wrongful conduct, JPMorgan has amended its indemnity counterclaim to now include the

conclusory allegation that, "[i]f JPMorgan is unable to recover the full amount of any of its loans

to LBI, or otherwise is required to pay damages to the Lehman estates, JPMorgan will have

suffered losses – caused by LBHI's misconduct relating to the sale transaction with Barclays, and

through no fault of JPMorgan . . ."  (Am. Counterclaims ¶ 162 (emphasis supplied)).  The

inclusion of the new highlighted phrase does nothing to alter the fact that JPMorgan's indemnity

claim fails as a matter of law.

In the first instance, the new language of the amended seventh counterclaim is

contradicted by other allegations contained in the same pleadings.  Those allegations make clear

that JPMorgan has not yet suffered any damage, whether or not LBHI is found to have

committed fraud or the other alleged misconduct, because JPMorgan has sufficient collateral to

secure it for any loss sustained as a result of the extensions of credit it made to LBI.  (Am.

Counterclaims ¶ 12 ("those loans have now been fully paid")).  JPMorgan alleges that it will only

suffer a "loss" if it is found liable on Plaintiffs' claims and is forced to disgorge the collateral that

it wrongfully took from LBHI before the bankruptcy filing.  (Id. ¶ 13).  JPMorgan thus cannot

allege that its claimed loss is due to "LBHI's misconduct . . . and through no fault of JPMorgan."

See Labajo v. Best Buy Stores, L.P., 478 F. Supp. 2d 523, 528 (S.D.N.Y. 2007) ("Where a plaintiff's conclusory allegations are clearly contradicted . . . the court is not required to accept them.").  More fundamentally, it is irrelevant whether JPMorgan's loss was caused by alleged LBHI "misconduct."  The indemnity clause does not grant any greater or lesser indemnification rights to JPMorgan based on LBHI's behavior.  The clause only addresses the conduct of the purported indemnitee, JPMorgan, and plainly provides that JPMorgan's own misconduct precludes its claim for indemnification.

**B.      JPMorgan Fails to State a Claim for Indemnification Under the Barclays Custodial Undertaking (Eighth Counterclaim)**

JPMorgan's eighth counterclaim, seeking indemnification pursuant to the Barclays Custodial Undertaking, should also be dismissed.  Because LBHI is not a party to that agreement, it will not provide any basis to recover losses in the event that the guaranties at issue in the First Amended Complaint are found to be invalid or unenforceable.  Moreover, JPMorgan has failed to plead underlying facts that would state a claim under the indemnification provision cited in the Amended Counterclaims.

**1.      Because LBHI Is Not a Party to the Barclays Custodial Undertaking, It Cannot Form a Basis for Indemnification If Plaintiffs Establish the Invalidity of the September Guaranty and Related Agreements**

LBHI is not a party to the Barclays Custodial Undertaking.  Instead, the eighth counterclaim is based solely on the premise that LBHI is found to be a guarantor of LBI's obligations by virtue of the September Guaranty and related agreements.  (Counterclaims ¶ 172). This counterclaim should therefore be dismissed to the extent it seeks indemnification for losses that JPMorgan will incur in connection with the successful prosecution of Plaintiffs' claims that are premised on the invalidity of the September Guaranty and related agreements.

2.      **The Barclays Custodial Undertaking Bars Indemnification for the Claimed Losses**

In any event, none of the losses that JPMorgan will incur in connection with the First Amended Complaint are subject to indemnification under the Barclays Custodial Undertaking for the same reasons they are not indemnifiable under the 2000 Clearance Agreement. As in the 2000 Clearance Agreement, section 9 of the Barclays Custodial Undertaking prohibits indemnification for losses resulting from JPMorgan's own negligence or willful misconduct. (Ex. G, Barclays Custodial Undertaking § 9 ("Seller and Buyer shall not be liable for any loss, liability or expense to the extent that it is determined to be the direct result of acts or omissions on the part of [JPMorgan] constituting negligence or willful misconduct.")). With respect to the losses JPMorgan may incur in connection with Plaintiffs' prosecution of their state law and certain bankruptcy claims discussed above – i.e., the payment of damages or return of LBHI's property – such losses would only arise upon a judicial finding that JPMorgan acted willfully. Indemnification for those losses is therefore barred by the Barclays Custodial Undertaking.

The same result is required by New York law, which prohibits indemnification of intentional misconduct. Here, all of JPMorgan's misconduct at issue in the First Amended Complaint was intentional and engaged in for the purpose of unlawfully accumulating and withholding LBHI collateral to the detriment of LBHI and its creditors. New York law prohibits indemnification for the losses that JPMorgan will incur if this Court finds that JPMorgan engaged in this alleged misconduct, and thereby orders JPMorgan to pay damages or return LBHI's property. See Anderson, 582 F. Supp. at 633; see also St. Paul Fire and Marine Ins. Co. v. Universal Builders Supply, 409 F.3d 73, 86 (2d Cir. 2005), (citing Austro v. Niagara Mohawk Power Corp., 487 N.E.2d 267, 267, 496 N.Y.S.2d 410, 410 (1985)).

Moreover, as discussed above, to the extent JPMorgan is harmed by virtue of having to return fraudulent or preferential transfers pursuant to the avoidance provisions of the Bankruptcy Code, such losses are not subject to indemnification or reimbursement.  See Corporate Jet Aviation, 45 B.R. 629.  Nor, as discussed above, does the indemnification clause provide an independent basis for recovery of losses purportedly caused by any of the LBHI misconduct alleged in the Amended Counterclaims.

### 3. JPMorgan Cannot Invoke the Purported "Absolute[]" Indemnity Provision of the Barclays Custodial Undertaking

The eighth counterclaim also cites to the clause of the indemnification section that purports to provide an "absolute[]" indemnity for losses "incurred as a result of complying with the instructions of Buyer or Seller."  (See Am. Counterclaims ¶ 167).  Plaintiffs' original memorandum of law demonstrated that this clause had no application here because the original Counterclaims only contained a conclusory allegation, unsupported by facts, that JPMorgan was acting on the instructions of Barclays or LBI when it unwound the Barclays Repo on September 18, 2008.  See Baraliu, No. 07 Civ. 4626(MHD), 2009 WL 959578 at *5-6 ("Under the Federal Rules, a plaintiff is required to 'allege generally that all conditions precedent have occurred or been performed.'  Plaintiff fails to do so . . . and hence this claim must be dismissed.") (quoting Fed. R. Civ. P. 9(c)).

As explained in the original memorandum of law, JPMorgan's decision not to include such an allegation in an otherwise detailed play-by-play account of the loans made to LBI during its last week was no oversight.  The Barclays Custodial Undertaking expressly authorized JPMorgan to act without instruction from (or even notice to) LBI.  Specifically, pursuant to section 3(d), the parties expressly agreed that JPMorgan was "not undertaking to make credit available" in the event LBI had insufficient funds to facilitate the morning unwind of

its repurchase transactions, but that instead JPMorgan "may, at [JPMorgan's] option and without notice to [LBI], advance the amount of such deficiency on [LBI]'s behalf." (Ex. G, Barclays Custodial Undertaking § 3(d)). Because neither the factual allegations of the original Counterclaims nor the operative agreement itself provided any basis to conclude that JPMorgan's loans to LBI were made pursuant to LBI's instructions, the Counterclaims did not state a claim under the broader indemnity provision. See Baraliu, 2009 WL 959578 at *5-6.

JPMorgan's response to this argument was to amend its Counterclaims to repeat the same unsupported allegation that it was acting "at the instructions of LBI and Barclays" in various places when describing its cause of action. (See, e.g., Am. Counterclaims ¶¶ 168-70). Critically, the Amended Counterclaims still do not provide any factual basis to support this conclusion, such as an allegation that identifies who gave the instruction or when, or a description of what was said or written. Mere repetition of the conclusion, without actual facts, cannot remedy the deficiency of the original Counterclaims. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do . . . Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement.") (internal citation and quotation marks omitted). Indeed, that JPMorgan was unable to cite a single concrete fact to support this conclusion even after being given a second chance to do so (and with the benefit of months of document discovery) further demonstrates that the allegation is meritless and provides no basis for ruling on this motion.

Even if JPMorgan alleged the necessary factual predicate to invoke the broader indemnity clause, it would still not provide the indemnity claimed by JPMorgan. As discussed above, JPMorgan's claimed losses could only arise upon a judicial finding that JPMorgan

86

engaged in the misconduct alleged in the First Amended Complaint, or that the LBHI estate is entitled to the return of its assets pursuant to the avoidance provisions of the Bankruptcy Code. Public policy prohibits contractual indemnification for such losses. See, e.g., Anderson, 582 F. Supp. at 633; Corporate Jet Aviation, 45 B.R. at 629.

In sum, JPMorgan has failed to identify any loss that would be subject to indemnification under the Barclays Custodial Undertaking. The eighth counterclaim should therefore be dismissed.

## CONCLUSION

For the forgoing reasons, Plaintiffs Lehman Brothers Holdings, Inc. and the Official Committee of Unsecured Creditors of Lehman Brothers Holdings, Inc. respectfully request that the Amended Counterclaims be dismissed in their entirety.

Dated:    April 4, 2011
          New York, New York

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By:  /s/ John B. Quinn

John B. Quinn
Erica Taggart
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
(213) 443-3000

Susheel Kirpalani
Andrew J. Rossman
James Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000
*Counsel for Plaintiff/Intervenor, the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc.*

**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**

By: /s/ Joseph D. Pizzurro

Joseph D. Pizzurro
L.P. Harrison 3rd
Michael J. Moscato
Nancy E. Delaney
Peter J. Behmke
Cindi M. Eilbott
101 Park Avenue
New York, New York 10178-0061
(212) 696-6000
*Counsel for Plaintiff, Debtor Lehman Brothers Holdings Inc.*