**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| | ) Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | ) |
| | ) |
| Debtors. | ) |
| | ) |
| | ) |
| LEHMAN BROTHERS HOLDINGS INC. and | ) Adversary Proceeding |
| OFFICIAL COMMITTEE OF UNSECURED | ) No. 10-03266 (JMP) |
| CREDITORS OF LEHMAN BROTHERS | ) |
| HOLDINGS INC., *et al.*, | ) |
| | ) |
| Plaintiff/Counterclaim-Defendant | ) |
| and Plaintiff Intervenor, | ) |
| | ) |
| -against- | ) |
| | ) |
| JPMORGAN CHASE BANK, N.A., | ) |
| | ) |
| Defendant/Counterclaimant. | ) |
| | ) |

**JPMORGAN'S MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION TO DISMISS THE AMENDED COUNTERCLAIMS**

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
(212) 403-1000

*Attorneys for Defendant/Counterclaimant*
*JPMorgan Chase Bank, N.A.*

Dated: June 3, 2011

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS ..................................................................................7

    A.    JPMorgan's role as LBI's clearing bank...........................................8

    B.    LBHI and LBI go into meltdown......................................................9

    C.    LBHI orally misrepresents its agreement with Barclays. ...................11

    D.    LBHI misrepresents its agreement with Barclays in court filings. ........12

    E.    Barclays misrepresents its agreement with LBHI and LBI. .................15

    F.    LBHI and LBI ensure that Barclays can leave behind LBI's worst
        securities. ..........................................................................16

    G.    LBHI, LBI and Barclays implement their transaction before the Court
        approves it............................................................................18

    H.    JPMorgan advances more than $70 billion to LBI and releases $5 billion
        in margin. ...........................................................................20

    I.    JPMorgan transfers securities valued at $42.7 billion to Barclays and then
        advances $7 billion to LBI.......................................................23

    J.    JPMorgan is stuck with more than $25 billion in exposure secured by
        "toxic" collateral. .................................................................25

    K.    LBHI misstates the facts again at the sale hearing. ...........................26

ARGUMENT....................................................................................................28

POINT I    JPMORGAN HAS STATED A CLAIM FOR FRAUDULENT
        MISREPRESENTATION.......................................................28

    A.    JPMorgan has alleged facts showing that it actually and justifiably relied
        on LBHI's misrepresentations. ..................................................28

        1.    JPMorgan has alleged facts showing that it actually relied on
            LBHI's misrepresentations. ..............................................28

        2.    JPMorgan has alleged facts showing that its reliance on LBHI's
            misrepresentations was justifiable. .......................................33

    B.    JPMorgan has alleged facts showing that LBHI made misrepresentations
        of present fact........................................................................38

        1.    JPMorgan has alleged that LBHI misrepresented present facts................39

- i -

2.    LBHI's oral misrepresentations are also actionable. ................................42

3.    The Rule 60(b) decision is irrelevant to this motion................................46

C.    JPMorgan has alleged facts showing that LBHI acted with scienter....................50

1.    JPMorgan has alleged facts that constitute strong evidence of conscious misbehavior. ............................................................................50

2.    JPMorgan has alleged that LBHI had the motive and opportunity to commit fraud. .........................................................................................51

POINT II    JPMORGAN HAS STATED A CLAIM  FOR FRAUDULENT CONCEALMENT. ........................................................................................55

A.    JPMorgan has pleaded the elements of a fraudulent concealment claim..............56

B.    JPMorgan has alleged facts establishing LBHI's duty to disclose. ......................57

POINT III    JPMORGAN HAS STATED A CLAIM FOR FRAUDULENT INDUCEMENT TO LEND. .....................................................................................61

POINT IV    JPMORGAN HAS STATED A CLAIM FOR AIDING AND ABETTING FRAUD BY LBI. .............................................................................................63

POINT V    JPMORGAN HAS STATED A CLAIM FOR AIDING AND ABETTING FRAUD BY BARCLAYS. ....................................................................................64

A.    JPMorgan has alleged facts showing that LBHI substantially assisted Barclays' fraud.......................................................................................................64

1.    JPMorgan's allegations of substantial assistance are sufficiently specific. ..........................................................................................................64

2.    The Amended Counterclaims allege that LBHI's assistance to Barclays proximately caused the harm on which Barclay's primary liability is predicated.................................................................................66

B.    JPMorgan has alleged facts showing that it reasonably relied on Barclays' misrepresentations and omissions........................................................................68

POINT VI    JPMORGAN HAS STATED CLAIMS  FOR INDEMNIFICATION.................68

A.    JPMorgan has stated a claim for indemnification under the Clearance Agreement.............................................................................................................69

1.    Plaintiffs have not established that the Custodial Undertaking provides the exclusive basis for indemnification......................................69

2.    Plaintiffs have not established that JPMorgan was negligent or engaged in willful misconduct........................................................................72

3.      JPMorgan's claim for indemnification is not barred by the
        Bankruptcy Code. ...................................................................................73

B.      JPMorgan has stated a claim for indemnification under the Custodial
        Undertaking................................................................................................75

CONCLUSION...................................................................................................................76

# TABLE OF AUTHORITIES

**Page**

### Cases

*380544 Canada, Inc.* v. *Aspen Tech., Inc.*,
    633 F. Supp. 2d 15 (S.D.N.Y. 2009) ................................................................. 43

*Alevy* v. *Uminer*,
    49 A.D.3d 301 (1st Dep't 2008) .......................................................... 36

*Apex Oil Co.* v. *Belcher Co. of N.Y.*,
    855 F.2d 997 (2d Cir. 1988) ............................................................. 33 n.6

*Arista Records, LLC* v. *Doe 3*,
    604 F.3d 110 (2d Cir. 2010) ................................................................ 75

*AT&T Universal Card Servs.* v. *Mercer (In re Mercer)*,
    246 F.3d 391 (5th Cir. 2001) ....................................................... 62 n.22

*Atl. Gypsum Co., Inc.* v. *Lloyds Int'l Corp.*,
    753 F. Supp. 505 (S.D.N.Y. 1990) ...................................................... 54 n.16

*Babiker* v. *Ross Univ. Sch. of Med.*,
    1999 WL 33290 (S.D.N.Y. Jan. 22, 1999) ....................................... 33 n.6

*Bank Julius Baer & Co.* v. *Waxfield Ltd.*,
    424 F.3d 278 (2d Cir. 2005) ................................................ 36 n.8, 71 n.27, 72

*Bank of N.Y.* v. *First Millennium, Inc.*,
    607 F.3d 905 (2d Cir. 2010) ........................................................... 47, 49

*Banks* v. *Siegel*,
    181 F.2d 309 (4th Cir. 1950) ............................................................... 30

*Baraliu* v. *Vinya Capital, L.P.*,
    2009 WL 959578 (S.D.N.Y. Mar. 31, 2009) ................................... 70 n.26

*Bernstein* v. *Assocs. Discount Corp. (In re Bernstein)*,
    197 F.2d 378 (7th Cir. 1952) ............................................................... 30

*Bronson* v. *CHC Indus., Inc. (In re CHC Indus., Inc.)*,
    389 B.R. 767 (Bankr. M.D. Fla. 2007) ........................................ 46 n.13

*Century Pac., Inc.* v. *Hilton Hotels Corp.*,
    354 F. App'x 496 (2d Cir. 2009) ..................................................... 34 n.7

*Chase Invs., Ltd.* v. *Kent*,
    256 A.D.2d 298 (2d Dep't 1998) ..................................................... 41 n.11

*Clark* v. *Nevis Capital Mgmt., LLC*,
     2005 WL 488641 (S.D.N.Y. Mar. 2, 2005) ......................................................... 50

*Cofacredit, S.A.* v. *Windsor Plumbing Supply Co.*,
     187 F.3d 229 (2d Cir. 1999) ............................................................................. 40

*Cohen* v. *Koenig*,
     25 F.3d 1168 (2d Cir. 1994) ............................................................................. 53

*Corporate Jet Aviation, Inc.* v. *Vantress (In re Corporate Jet Aviation, Inc.)*,
     45 B.R. 629 (Bankr. N.D. Ga. 1985) ............................................................. 73, 74

*Cortese Bros., Inc.* v. *Christofaro (In re Christofaro)*,
     360 B.R. 411 (Bankr. W.D.N.Y. 2007) ............................................................. 62 n.22

*Deerfield Commc'ns Corp.* v. *Chesebrough-Ponds, Inc.*,
     68 N.Y.2d 954 (1986) ................................................................. 61 & n.21, 63

*Diduck* v. *Kaszycki & Sons Contractors, Inc.*,
     974 F.2d 270 (2d Cir. 1992) ............................................................................. 30

*DirecTV Latin Am., LLC* v. *Park 610, LLC*,
     691 F. Supp. 2d 405 (S.D.N.Y. 2010) ................................................................. 56

*Emergent Capital Inv. Mgmt., LLC* v. *Stonepath Grp., Inc.*,
     343 F.3d 189 (2d Cir. 2003) ............................................................................. 34 n.7

*Fallick* v. *Kehr*,
     369 F.2d 899 (2d Cir. 1966) ............................................................................. 74 n.29

*Fischer* v. *Kletz*,
     266 F. Supp. 180 (S.D.N.Y. 1967) ..................................................................... 57

*FMC Corp.* v. *Fleet Bank*,
     226 A.D.2d 225 (1st Dep't 1996) .............................................................. 41 n.11, 45

*Food Holdings Ltd.* v. *Bank of Am. Corp. (In re Parmalat Sec. Litig.)*,
     477 F. Supp. 2d 602 (S.D.N.Y. 2007) ................................................ 30, 32 n.5, 37, 67

*GAF Holdings, LLC* v. *Rinaldi (In re Farmland Indus., Inc.)*,
     376 B.R. 718 (Bankr. W.D. Mo. 2007) ............................................... 46 n.13, 49, 50

*GAF Holdings, LLC* v. *Rinaldi (In re Farmland Indus., Inc.)*
     408 B.R. 497 (8th Cir. BAP 2009) ..................................................................... 50

*Gerosa* v. *Savasta & Co.*, 329 F.3d 317 (2d Cir. 2003) .......................................... 30

*Gladstone Bus. Loan, LLC* v. *Randa Corp.*,
     2009 WL 2524608 (S.D.N.Y. Aug. 17, 2009) ...................................................... 33 n.6

*Glidepath Holding B.V.* v. *Spherion Corp.*,
     590 F. Supp. 2d 435 (S.D.N.Y. 2007) .................................................. 50, 51, 52-53, 54

*Greenwich Life Settlements, Inc.* v. *ViaSource Funding Grp., LLC*,
    742 F. Supp. 2d 446 (S.D.N.Y. 2010)................................................................ 47 n.14

*Grupo Sistemas Integrales de Telecomunicacion S.A.* v. *AT&T Commc'ns, Inc.*,
    1996 WL 312535 (S.D.N.Y. June 10, 1996) .................................................. 37, 38

*Gulf Coast Dev. Grp., LLC* v. *Lebror*,
    2003 WL 22871914 (S.D.N.Y. Dec. 4, 2003) ...................................................... 35

*Hall* v. *Naylor*,
    18 N.Y. 588 (1859) ............................................................................................. 62

*Hayhoe* v. *Cole (In re Cole)*,
    226 B.R. 647 (9th Cir. BAP 1998).............................................................. 74 n.29

*Hughes* v. *BCI Int'l Holdings, Inc.*,
    452 F. Supp. 2d 290 (S.D.N.Y. 2006).................................................................. 43

*Idrees* v. *Am. Univ. of the Caribbean*,
    546 F. Supp. 1342 (S.D.N.Y. 1982)..................................................................... 57

*Ill. State Bd. of Inv.* v. *Authentidate Holding Corp.*,
    369 F. App'x 260 (2d Cir. 2010) ..................................................... 40 n.9, 57 n.18

*In re Gulf Beach Dev. Corp.*,
    48 B.R. 40 (Bankr. M.D. Fla. 1985) .......................................................... 75 n.29

*In re Lehman Bros. Holdings Inc.*,
    445 B.R. 143 (Bankr. S.D.N.Y.  2011)............................................................. 4, 47

*In re Oyster Bay Cove, Ltd.*,
    161 B.R. 338 (Bankr. E.D.N.Y. 1993)........................................................ 46 n.13

*In re Shady Grove Tech Ctr. Assocs. Ltd. P'ship*,
    216 B.R. 386 (Bankr. D. Md. 1998) .......................................................... 74 n.29

*In re S.E. Fin. Assocs., Inc.*
    212 B.R. 1003 (Bankr. M.D. Fla. 1997) .................................................... 74 n.29

*In re Tru Block Concrete Prods., Inc.*,
    27 B.R. 486 (Bankr. S.D. Cal. 1983) ......................................................... 75 n.29

*In re Weitzen*,
    3 F. Supp. 698 (S.D.N.Y. 1933)................................................................. 74 n.29

*Int'l Oil Field Supply Servs. Corp.* v. *Fadeyi*,
    35 A.D.3d 372 (2d Dep't 2006) ................................................................. 41 n.10

*JP Morgan Chase Bank* v. *Winnick*,
    350 F. Supp. 2d 393 (S.D.N.Y. 2004)............................................................ 33, 35

*JPMorgan Chase Bank* v. *Orleans*,
  2007 WL 6882391 (N.Y. Sup. Ct. Jan. 25, 2007)......................................................... 41 n.11

*Junius Constr. Co.* v. *Cohen*,
  257 N.Y. 393 (1931) ...................................................................................................... 58 n.19

*Lane* v. *McCallion*,
  166 A.D.2d 688 (2d Dep't 1990) .................................................................................. 41 n.10

*Ladd* v. *Ries (In re Ladd)*,
  450 F.3d 751 (8th Cir. 2006) .......................................................................................... 49

*Lazard Freres & Co.* v. *Protective Life Ins. Co.*,
  108 F.3d 1531 (2d Cir. 1997)........................................................................................ 34 n.7

*Loewer* v. *Harris*,
  57 F. 368 (2d Cir. 1893)................................................................................................57 n.18

*Lovell* v. *Mixon*,
  719 F.2d 1373 (8th Cir. 1983) ........................................................................................ 49

*Matthius* v. *Platinum Estates, Inc.*,
  74 A.D.3d 908 (2d Dep't  2010) .................................................................................... 71 n.27

*McMahan & Co.* v. *Wherehouse Entm't, Inc.*,
  900 F.2d 576 (2d Cir. 1990)..........................................................................................43-44

*Merrill Lynch & Co.* v. *Allegheny Energy, Inc.*,
  500 F.3d 171 (2d Cir. 2007)............................................................................................ 28

*Mitchell* v. *Home*,
  377 F. Supp. 2d 361 (S.D.N.Y. 2005)............................................................................ 9 n.3

*Mounce* v. *Wells Fargo Home Mortg., Inc. (In re Mounce)*,
  390 B.R. 233 (Bankr. W.D. Tex. 2008)......................................................................... 60

*Murray* v. *Xerox Corp.*,
  811 F.2d 118 (2d Cir. 1987)...........................................................................................61

*N.Y. Univ.* v. *Cont'l Ins. Co.*,
  87 N.Y.2d 308 (1995) .................................................................................................... 62 n.21

*Novak* v. *Kasaks*,
  216 F.3d 300 (2d Cir. 2000)........................................................................................... 50, 52

*O'Connor* v. *Reader's Digest Ass'n, Inc.*,
  1993 WL 291372 (S.D.N.Y. Mar. 10, 1993) ................................................................ 41 n.10

*Ogle* v. *Fid. & Deposit Co. of Md.*,
  586 F.3d 143 (2d Cir. 2009)........................................................................................... 73

*Oster* v. *Kirschner*,
    77 A.D.3d 51 (1st Dep't 2010) ........................................................................ 63

*Patane* v. *Clark*,
    508 F.3d 106 (2d Cir. 2007)............................................................................. 7

*Pension Comm. of Univ. of Montreal Pension Plan* v. *Banc of Am. Sec. LLC*,
    446 F. Supp. 2d 163 (S.D.N.Y. 2006)............................................................. 67

*Pfizer, Inc.* v. *Stryker Corp.*,
    348 F. Supp. 2d 131 (S.D.N.Y. 2004)............................................................. 54

*Primex Int'l Corp.* v. *Wal-Mart Stores, Inc.*,
    89 N.Y.2d 594 (1997) ...................................................... 36 n.8, 71 n.27

*Raymond L. Asher, P.C.* v. *Film Ventures Int'l, Inc. (In re Film Ventures Int'l, Inc.)*,
    89 B.R. 80 (9th Cir. BAP 1988)................................................................ 74 n.29

*Richards* v. *Jefferson Cnty., Ala.*,
    517 U.S. 793 (1996)................................................................................. 47, 49

*Rupp* v. *Holling (In re Holling)*,
    2007 WL 2964505 (Bankr. D. Utah Feb. 8, 2007) ....................................... 74 n.29

*Sabo* v. *Delman*,
    3 N.Y.2d 155 (1957) ........................................................................... 61 & n.21

*SEC* v. *Save The World Air Inc.*,
    2005 WL 3077514 (S.D.N.Y. Nov. 15, 2005)................................................ 40 n.9

*Sec. Trust Co. of Rochester* v. *Voxakis*,
    67 Misc. 2d 143 (N.Y. Sup. Ct. 1971) ............................................................ 62

*Sheridan Drive-In, Inc.* v. *State*,
    16 A.D. 2d 400 (4th Dep't 1962)................................................................ 58 n.19

*Shields* v. *Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994)....................................................................... 55 n.16

*Slavenburg Corp.* v. *Baby Doll Infants Wear Co., Inc.*,
    181 A.D.2d 555 (1st Dep't 1992) ..................................................................... 62

*Stangel* v. *Chen*,
    74 A.D.3d 1050 (2d Dep't 2010) ...................................................................... 41

*Sternberg* v. *Citicorp Credit Servs.*,
    69 A.D.2d 352 (2d Dep't 1979)................................................................... 33 n.6

*Stewart* v. *Jackson & Nash*,
    976 F.2d 86 (2d Cir. 1992)........................................................................ 39, 40

*Stuart Lipsky, P.C.* v. *Price,*
   215 A.D.2d 102 (1st Dep't 1995) .................................................................... 41 n.10

*Thomas H. Lee Equity Fund V, L.P.* v. *Grant Thornton LLP,*
   586 F. Supp. 2d 119 (S.D.N.Y. 2008) ............................................................. 33

*Transit Mgmt., LLC* v. *Watson Indus., Inc.,*
   23 A.D.3d 1152 (4th Dep't 2005) .................................................................. 41 n.11

*Travelers Cas. & Surety Co. of Am.* v. *Pac. Gas & Elec. Co.,*
   549 U.S. 443 (2007) ........................................................................................ 73

*Turkish* v. *Kasenetz,*
   27 F.3d 23 (2d Cir. 1994) ............................................................................... 53 n.15

*Van Kleeck* v. *Hammond,*
   25 A.D.3d 941 (3d Dep't 2006) ............................................................... 41 n.10, 45

*Yulaeva* v. *Greenpoint Mortg. Funding, Inc.,*
   2010 WL 5394859 (E.D. Cal. Dec. 21, 2010) ................................................ 75

## Statutes and Rules

11 U.S.C. § 523(a) .................................................................................................. 62 n.22

Fed. R. Civ. P. 8(a) ................................................................................................ 75

Fed. R. Civ. P. 9(b) ................................................................................................ passim

Fed. R. Bankr. P. 9011(b) ...................................................................................... 37, 60

## Other Authorities

60A N.Y. Jur. 2d Fraud & Deceit § 25 (2011) ..................................................... 62, 63

Restatement (Second) of Torts § 546 ..................................................................... 30

Restatement (Second) of Torts § 551 ..................................................................... 57

JPMorgan Chase Bank, N.A. ("JPMorgan") respectfully submits this memorandum of law in opposition to plaintiffs' motion to dismiss the Amended Counterclaims. Accompanying this memorandum is the transmittal declaration of Alexander B. Lees to which the Court is respectfully referred.[1]

## PRELIMINARY STATEMENT

JPMorgan's Amended Counterclaims tell the true story of how LBHI defrauded JPMorgan into making a $70 billion advance to LBI. They allege that LBHI, both in filings with this Court and in direct communications with JPMorgan, represented to JPMorgan that LBHI had entered into an agreement with Barclays to sell *all* of the securities that served as collateral for JPMorgan's intraday advances to LBI, the proceeds of which would be used to repay JPMorgan's advances in full. Unbeknownst to JPMorgan, however, these representations were false. And LBHI's senior executives knew it.

Those executives — including LBHI's CFO, Ian Lowitt, and LBHI's Global Treasurer, Paolo Tonucci — knew that LBHI had in fact granted Barclays an option to cherry-pick the securities that Barclays wanted. Indeed, on Monday, September 15, 2008, the day before LBHI represented to JPMorgan that Barclays had contractually committed to take JPMorgan out of its LBI exposure in full, LBHI knew that Barclays had already exercised its option to leave behind $5 billion of "RACERS," a security that LBHI executives had denigrated as "goat poo" and "'toxic' racer crap."

---

[1]    Capitalized terms have the same meanings as in JPMorgan's Amended Counterclaims. References to the "Lees Decl." are to the Declaration of Alexander B. Lees. References to "¶" are to paragraphs in the Amended Counterclaims, which are annexed as Exhibit A to the Lees Declaration.

Thereafter, as the week proceeded, LBHI knew that Barclays had further exercised its undisclosed option to leave behind other risky, illiquid securities, including a large position in a security known as "SASCO."  The result of all this was that when the dust settled, more than $25 billion of JPMorgan's $70 billion advance to LBI was left unpaid.  And the collateral for that unpaid advance included billions of dollars of illiquid securities that Barclays did not want.  If JPMorgan had been left to look to that collateral and nothing more, it would have suffered billions of dollars of losses.  That injury was avoided only because JPMorgan justifiably requested and obtained additional collateral from LBHI, the very collateral that LBHI is seeking to recover in its Amended Complaint.

In short, LBHI knowingly participated in deceiving JPMorgan — the only financial institution willing to support LBI during its hour of dire need — into making advances that LBI could not and would not repay, so that LBHI could complete its plan to sell LBI assets to Barclays.  These Amended Counterclaims are intended to prevent the possibility of LBHI benefiting from its fraud through its Amended Complaint, which, in LBHI's final act of biting the hand that had been feeding it, seeks to deprive JPMorgan of the protection it needed to keep funding LBI before and after "Lehman Weekend."

In light of the detailed allegations of the Amended Counterclaims, there can be no serious question that JPMorgan has pleaded all of the requisite elements of its claims and that it has satisfied the requirements of Rule 9(b):

**Fraudulent misrepresentation.**  In seeking dismissal of JPMorgan's claim for fraudulent misrepresentation, plaintiffs' first argument is that, in making advances to LBI, JPMorgan could not have justifiably relied on LBHI's misrepresentations that its exposure would be eliminated because its advances were fully secured by margin.  If only that were true.  The

very reason why this fraud was perpetrated was because the "goat poo" that LBI had pledged to JPMorgan was illiquid, unsuitable collateral that was not worth its carrying value.

The mere fact that JPMorgan held margin for advances it made to LBI after LBHI's bankruptcy filing — margin that it ultimately was defrauded into giving up — certainly does not warrant a ruling on the pleadings that JPMorgan did not justifiably rely on LBHI's misrepresentations. Plaintiffs' contention that a secured creditor can never be defrauded into making a loan is thus inconsistent with the law, the reality of secured lending and the facts alleged here. *See* Point I.A.1, *infra*.

Plaintiffs argue next that JPMorgan could not have justifiably relied on LBHI's representations regarding the Barclays sale because these representations were not contained in the preexisting agreements that governed LBI's overnight repo investments. But the repo agreements all predated the Barclays sale and therefore could not have said anything about that transaction. Rather, the agreements expressly vested JPMorgan with the discretion to make advances to LBI in the future based on future circumstances. The fraudulent conduct alleged here, all of which post-dated the agreements, was designed to and in fact did cause JPMorgan to exercise that discretion to make multibillion-dollar advances to LBI that JPMorgan had the right to refuse to make. The preexisting agreements, therefore, cannot insulate LBHI from liability for its subsequent fraudulent conduct. *See* Point I.A.2, *infra*.

Plaintiffs' argument that JPMorgan has not identified misstatements of fact by LBHI, as opposed to predictions of Barclays' future conduct, is equally spurious. The Amended Counterclaims allege that LBHI represented present facts to JPMorgan: that LBHI had an agreement in place to sell the "Purchased Assets" to Barclays when, in fact, at the time that this representation was made, there was no such agreement but, rather, an agreement that allowed

Barclays to choose which assets it would buy and which it would leave behind.  *See* Point I.B.1, *infra.*

Plaintiffs also argue that JPMorgan has failed adequately to plead scienter.  But the Amended Counterclaims contain abundant factual allegations that LBHI knew that its representations about the Barclays transaction were false — including by citing numerous contemporaneous communications in which LBHI personnel openly acknowledged that, contrary to LBHI's representations to JPMorgan, significant portions of LBI's triparty repo assets were not being transferred to Barclays.  The Amended Counterclaims also allege that LBHI had a strong motive to deceive JPMorgan — and, as plaintiffs do not dispute, a clear opportunity to do so — since disclosing the truth would have derailed the Barclays transaction then on the table and risked LBI's complete collapse.  Plainly, there is an ample factual basis alleged in the Amended Counterclaims for the Court to infer that LBHI acted with the requisite scienter.  *See* Point I.C, *infra.*

Finally, there is no merit to plaintiffs' argument that, in light of this Court's decision reaffirming the Barclays sale order, JPMorgan is precluded from claiming that the APA failed accurately to describe the agreed sale transaction between LBHI and Barclays.  In making this claim, LBHI points to the Court's conclusion that the disclosure problems alleged by LBHI in the Rule 60(b) proceedings — regarding whether the Court was misinformed about the existence of a $5 billion discount in the sale price — were not the result of "willful misconduct, deliberate misrepresentations or the intentional withholding or concealment of relevant information *during the Sale Hearing*."  *In re Lehman Bros. Holdings Inc.*, 445 B.R. 143, 157 (Bankr. S.D.N.Y. 2011) (emphasis added).  But the Rule 60(b) proceedings had nothing to do with

whether LBHI and Barclays misled *JPMorgan*, days before the Sale Hearing, by fraudulently misrepresenting the terms of their deal.

Thus, while the chaotic circumstances of "Lehman Week" may explain LBHI's failure to disclose certain aspects of the transaction to the Court at the Sale Hearing, they certainly do not explain LBHI's failure to inform JPMorgan that when the Barclays deal closed, JPMorgan would be left funding a multibillion-dollar portfolio containing LBI's "toxic" securities. The core issue facing LBHI and LBI in any of the transactions that LBHI pursued in the week prior to its bankruptcy filing was what would happen to the troubled assets on LBI's balance sheet. And when Barclays reentered the picture after LBHI's bankruptcy filing as the only party willing to acquire LBI, it was clear to LBHI that if Barclays was not going to buy the troubled assets in LBI's triparty repo book, the only alternative was for JPMorgan to get stuck with them instead.

Thus, LBHI and Barclays were well aware that because Barclays had a secret right to cherry-pick the triparty assets it would take, JPMorgan's and Barclays' interests were diametrically opposed. And since Barclays presented the only option to save the core of LBHI's business, LBHI's interests were aligned with Barclays' in making sure that Barclays got what it wanted so that the deal would go through. Nothing in the Court's Rule 60(b) decision remotely decided these issues. *See* Point I.B.3, *infra*.

**Fraudulent concealment.** In light of the facts alleged regarding the state of LBHI's knowledge when JPMorgan advanced approximately $70 billion to LBI on Thursday, September 18, 2008, the Amended Counterclaims state a classic claim for fraudulent concealment. On September 18, LBHI knew that its representations regarding the terms of the Barclays deal were materially inaccurate. Barclays had not agreed to acquire all of the Purchased Assets

but, rather, had an option to refuse to purchase any assets it did not want. LBHI also knew by September 18 that Barclays had in fact exercised that option and decided that it would leave billions of dollars of LBI's worst securities behind. Despite this, LBHI failed to correct its misrepresentations about the terms of the agreement with Barclays, even though it knew that JPMorgan was making intraday advances on the mistaken belief that Barclays had agreed to purchase all of the securities in LBI's triparty repo book.

Plaintiffs cynically assert that LBHI had no duty to disclose the truth to JPMorgan because "JPMorgan has alleged that the underlying representations were *false* — rather than *true but incomplete*." Pl. Br. 52 (emphasis added). In other words, plaintiffs interpret New York law to require correction of partially true statements but not patently false statements. New York law does not draw such an absurd distinction. Rather, under New York law, a party who makes a false representation to another has a duty to correct that false statement. That is especially true where, as here, the significance of the false statement increases over time. *See* Point II, *infra*.

**Fraudulent inducement to lend.** Contrary to plaintiffs' assertion, JPMorgan's claim of fraudulent inducement to lend is distinct from its claims of fraudulent misrepresentation and fraudulent concealment. The gravamen of this claim is that LBHI committed fraud by inducing JPMorgan to make over $70 billion in advances to LBI on September 18 while knowing and intending that LBI would default. Under New York law, procuring credit with a present intent to default, which is exactly what LBHI did, is fraud. *See* Point III, *infra*.

**Aiding and abetting LBI's fraud.** In seeking dismissal of the claim that LBHI aided and abetted fraud by LBI, plaintiffs assert that JPMorgan has not alleged fraud on the part of LBI or that LBHI knew of that fraud. Not so. The Amended Counterclaims allege that LBI — which was a party to the APA — independently defrauded JPMorgan by obtaining advances

- 6 -

that it never had any intention of repaying, and that LBHI actively participated in and substantially assisted LBI's fraud by making false representations about the Barclays transaction that induced JPMorgan to make those advances to LBI.  *See* Point IV, *infra*.

        **Aiding and abetting Barclays' fraud.**  In seeking dismissal of the claim that LBHI aided and abetted fraud by Barclays, plaintiffs assert that JPMorgan has not alleged that LBHI provided substantial assistance to Barclays.  But once again, plaintiffs ignore the allegations of the Amended Counterclaims, including the allegation that LBHI took numerous steps to ensure that Barclays could cherry-pick LBI's securities at JPMorgan's expense.  *See* Point V, *infra*.

        **Indemnification.**  Finally, plaintiffs offer no viable ground for dismissal of JPMorgan's indemnification claims.  Instead, plaintiffs mischaracterize the relevant agreements and make factual arguments that cannot be resolved on the pleadings.  *See* Point VI, *infra*.[2]

## STATEMENT OF FACTS

        The facts set forth below are drawn from the Amended Counterclaims (Lees Decl. Ex. A), LBHI's Amended Complaint (Lees Decl. Ex. B), and documents referred to in those pleadings.  For purposes of this motion, the Court must "accept all well-pleaded facts as true and consider those facts in the light most favorable to" JPMorgan.  *Patane* v. *Clark*, 508 F.3d 106, 111 (2d Cir. 2007) (per curiam).

---

[2]     In light of the Court's ruling on the Rule 60(b) motion, JPMorgan agrees that the unjust enrichment claim has been rendered moot "to the extent the ruling in the Rule 60(b) proceeding stands."  Pl. Br. 71.  As a result, JPMorgan respectfully requests that a decision on that claim be held in abeyance pending the outcome of any appeal from the Court's Rule 60(b) ruling.

- 7 -

A.      **JPMorgan's role as LBI's clearing bank.**

JPMorgan historically served as LBI's principal clearing bank.  ¶ 19.  In that ca-

pacity, JPMorgan facilitated triparty repo transactions involving LBI and triparty repo investors.

In the triparty repo transactions, repo investors purchased LBI's securities in the evening, subject

to LBI's agreement to repurchase those securities the next morning.  On the morning of each

trading day, JPMorgan made discretionary, intraday advances to LBI to settle LBI's obligation to

repurchase the securities that LBI had sold on an overnight basis to repo investors.  JPMorgan's

intraday advances to LBI, which typically exceeded $100 billion, were secured by the same secu-

rities that had been purchased overnight by repo investors.  ¶ 20.

JPMorgan cleared and settled these transactions under a Clearance Agreement

dated as of June 15, 2000 (the "Clearance Agreement").  Lees Decl. Ex. C.  Pursuant to the

Clearance Agreement, LBI entered into "Custodial Undertaking" agreements with each of LBI's

overnight triparty repo investors.  ¶ 22.  The Custodial Undertaking among LBI, JPMorgan and

Barclays, dated September 15, 2008, was one such agreement.  ¶ 23; Lees Decl. Ex. D.

To secure JPMorgan's advances to LBI, section 11 of the Clearance Agreement

granted JPMorgan a lien on all of LBI's accounts at JPMorgan and all the property and balances

in those accounts, other than segregated customer accounts.  Both the Clearance Agreement and

the Custodial Undertaking also contain broad indemnification clauses in favor of JPMorgan,

which are discussed in Point VI below.  ¶¶ 24, 167.  LBHI guarantied LBI's obligations to

JPMorgan under Guaranties executed in favor of JPMorgan dated August 26 and September 9,

2008, and secured LBI's obligations under Security Agreements entered into on the same dates.

¶ 25.

**B.     LBHI and LBI go into meltdown.**

By Friday, September 12, 2008, it had become apparent that Lehman's financial condition was quite grave; customers, counterparties and investors were fleeing in droves. A precipitating cause was S&P's announcement on September 9 that it was poised to downgrade LBHI's credit ratings, as well as the announcement that day that the Korea Development Bank was not going to make an investment in the firm. In a failed attempt to calm market fears, on September 10, LBHI pre-announced its earnings. Lees Decl. Exs. B (LBHI Amended Complaint ¶ 41), E (earnings release).[3]

The release disclosed a $3.9 billion loss for the quarter ending August 31, driven by a $7.8 billion gross mark-to-market writedown attributable largely to LBHI's residential mortgage and commercial real estate positions. Lees Decl. Ex. E at 1. In that same release, LBHI highlighted its efforts to reduce its exposure to residential mortgages, commercial real estate "and Other Less Liquid Assets" — assets with a carrying value of $64.5 billion — and disclosed that it was going to spin off its troubled commercial real estate assets into an independent, publicly-traded entity. *Id.* at 2-4.

In the face of this bad news, on the morning of Friday, September 12, JPMorgan nonetheless extended more than $120 billion of credit to LBI to unwind triparty repos and other overnight financings. At the end of the day on that Friday, overnight investors provided sufficient funds to LBI to take out nearly all of JPMorgan's intraday advances; JPMorgan was left

---

[3]     The Court can take judicial notice of the contents of the earnings release. *Mitchell* v. *Home*, 377 F. Supp. 2d 361, 367 n.1 (S.D.N.Y. 2005) (court may take judicial notice of a press release on a motion to dismiss as a document referenced in the pleadings and as a matter of public record).

with a "fail financing" to LBI of approximately $1.3 billion, an enormous sum to be sure, but only a fraction of JPMorgan's intraday exposure.  ¶¶ 20, 26.

Over the weekend, representatives of both the Fed and LBHI, including LBHI's Global Treasurer, Paolo Tonucci, requested that JPMorgan continue to finance LBI's securities business, including the triparty repo book, with intraday advances.  These advances were essential to LBI's continued operation.  The Fed, Treasury and LBHI were trying to put together an LBHI rescue plan.  ¶ 27.  Integral to any such deal was to be a commitment by the major financial institutions to "formulate a plan to avoid the collapse of Lehman and the catastrophic impact such a failure would have on the global financial system."  Lees Decl. Ex. B (Amended Complaint) ¶ 76; *see also* Lees Decl. Ex. A (Amended Counterclaims) ¶ 27 (Treasury and the Fed encouraged a sale to Bank of America, Barclays or another buyer).

That weekend, Tonucci represented to Jane Buyers-Russo of JPMorgan that, in the absence of a rescue, LBI would conduct an orderly wind-down of its business, in which its employees would sell LBI's securities and maximize the values realized from those securities in order to pay off any advances from JPMorgan.  Tonucci further represented (and the Fed confirmed) that the Fed would fully finance LBI on an overnight basis during the wind-down.  ¶ 29.

The rescue efforts failed.  Barclays' principal regulator refused to give it the necessary clearance to guaranty LBHI's liabilities, a prerequisite to an acquisition of the firm, without a shareholder vote.  On Sunday night, September 14, the Fed and the SEC pressured LBHI to file for bankruptcy.  ¶ 27.  It did so in the wee hours of Monday, September 15.

Later that morning, JPMorgan extended approximately $87 billion of credit to LBI to unwind that weekend's triparty repos and extended additional credit during the day to facilitate LBI's securities trades.  ¶ 29.  JPMorgan did so based on representations that LBI would

- 10 -

commence an orderly wind-down that would allow its advances to be repaid in full; and, of

course, with the knowledge that it had obtained $8.6 billion of additional collateral to secure

those advances.  As the week progressed, JPMorgan continued to make intraday advances to LBI

with the additional assurance that the Court, at LBHI's request, had entered the Comfort Order

on Tuesday, September 16, providing that JPMorgan's ongoing advances to LBI would be cov-

ered by LBHI's guaranties and collateral pledges to JPMorgan.  The entire purpose of LBHI's

request for the Comfort Order was to induce JPMorgan to make extensions of credit that, in

LBHI's own words, were "essential" to LBI's business.  ¶¶ 34-35.

## C.    LBHI orally misrepresents its agreement with Barclays.

Unable to effect a purchase of LBHI in its entirety, Barclays began discussing a

revised transaction in which Barclays would buy LBI's assets.  As an initial step in that process,

Barclays began to participate as an overnight investor in LBI's triparty repo arrangement.  On

Monday, September 15 — before LBHI, LBI, and Barclays had agreed to any transaction —

Barclays executed the Custodial Undertaking, which allowed Barclays to enter into triparty repo

transactions with LBI and JPMorgan.  On Monday night, Barclays purchased roughly $2 billion

of LBI-owned securities on an overnight basis.  ¶ 30.

On Tuesday, September 16, LBHI and Barclays signed the APA, the contract that

provided for the acquisition of LBI's assets by Barclays.  Tonucci and Lowitt called JPMorgan's

Buyers-Russo to give her the news.  They told Buyers-Russo that Barclays had agreed in the

APA to buy all of the assets subject to LBI's overnight financing arrangements.  Tonucci and

Lowitt also stated that Barclays had committed to support LBI fully until the deal closed, includ-

ing by providing overnight financing that would reduce or eliminate LBI's dependence on the

Fed.  Based on these statements, Buyers-Russo reasonably understood that JPMorgan's intraday

- 11 -

advances would be repaid each night by Barclays, if not by the Fed, until the deal closed, at which point JPMorgan would be taken out in full.  ¶ 33.

On the morning of Tuesday, September 16, JPMorgan provided LBI with over $70 billion in intraday credit.  ¶ 32.  That night, in order to enable LBI to repay intraday advances from JPMorgan, Barclays provided $10.5 billion in cash to LBI through an overnight tri-party repo; the Fed provided an additional $26.7 billion in overnight repo financing through the PDCF, as well as additional financing through the OMO and TSLF.  The remainder of LBI's cash financing was provided through other repos and a $1.9 billion "fail financing" from JPMorgan.  The following morning, Wednesday, September 17, JPMorgan again unwound LBI's overnight financings, making intraday advances to LBI exceeding $70 billion.  ¶ 36.

**D.     LBHI misrepresents its agreement with Barclays in court filings.**

On the morning of Wednesday, September 17, LBHI filed the Sale Motion with this Court.  The Sale Motion asked the Court to approve the sale of LBI's business and the assets defined as the "Purchased Assets" to Barclays in the attached APA.  JPMorgan, as a creditor in the case, was served with a copy of the Sale Motion and accompanying APA.  ¶ 37.

Section 2.1 of the APA defined the "Purchased Assets" as "all the assets of Seller and its Subsidiaries used in connection with the Business (excluding the Excluded Assets)."  The APA defined "Business" to include the "brokerage, dealing, [and] trading" businesses.  The definition of "Purchased Assets" made explicit that Barclays had agreed to purchase *all* of LBI's "government securities, commercial paper, corporate debt, corporate equity, exchange traded derivatives and collateralized short-term agreements with a book value as of the date hereof of approximately $70 billion (collectively, 'Long Positions')."  ¶ 38.

- 12 -

The "Excluded Assets" were defined in section 2.2 to include, among other things, commercial real estate investments and 50% of LBI's positions in residential real estate mortgage securities.  But the "Excluded Assets" definition did not encompass the government securities, corporate debt and commercial paper in LBI's triparty repo book, assets that were used "in connection with" the "brokerage, dealing, [and] trading business."  Accordingly, as plaintiffs do not dispute, RACERS — commercial paper that Lehman valued at $5 billion — was included in the definition of "Purchased Assets."  ¶ 39.

The net effect of these provisions of the APA was to confirm the terms of the deal that Lowitt and Tonucci had described to Buyers-Russo the previous day, *i.e.*, that Barclays had committed to purchase all of the securities in LBI's triparty repo book that secured JPMorgan's intraday advances to LBI, and thus to provide LBI with sufficient funds to repay those advances in full.  ¶¶ 39-40.  But senior executives at LBHI knew — *at the time that LBHI filed the Sale Motion* — that Barclays had not agreed to buy all of the "Purchased Assets."  As alleged in the Amended Counterclaims, Lowitt has admitted that, despite the terms of the APA, LBHI and Barclays had not determined how they were "going to identify the series of assets that are part of the transaction."  ¶ 42.

Likewise, in an email sent on Wednesday, September 17, Jennifer Fitzgibbon of LBHI stated to other employees that "the entire balance sheet will not move."  That same day, Gerard Reilly, LBHI's Global Product Controller, wrote to his colleagues that "the asset list . . . for the transfer to BarCap" would only be finalized "[t]he day we do the trade."  And in an email sent on Thursday, September 18, Daniel Flores of LBI acknowledged, after conversations with Lowitt and Tonucci, that the schedule of assets to be sold to Barclays was "still a work in progress."  ¶ 43.

- 13 -

Not only did LBHI executives know at the time the APA was filed that Barclays and LBHI had not agreed to buy the "Purchased Assets," they also knew that LBHI had agreed to let Barclays determine which securities it would buy.  Lowitt understood that, even after the filing of the Sale Motion, "[t]he Barclays folks determined which assets they were willing to purchase and which assets they didn't want to purchase.  So in that sense, the Barclays folks picked the assets" they would acquire.  ¶ 44.  As Mike Keegan, the head of principal trading at Barclays, has testified and as the Amended Counterclaims allege, representatives of Barclays and Lehman agreed on Monday, September 15 — before the Sale Motion and the APA were filed — that Barclays would not purchase, and had no obligation to purchase, all of the securities in LBI's triparty book.  ¶ 46.

As noted, one of the securities Barclays already had decided not to buy was RACERS, an asset-backed commercial paper issue whose credit rating was dependent upon a guaranty from LBHI.  The loans backing the security consisted largely of non-rated loans.  Barclays' refusal to buy RACERS could be no surprise to LBHI and LBI.  LBHI's Lawrence Servidio and Colin Telmer had referred to RACERS and another security called Fenway (which also had been pledged to JPMorgan) as "goat poo" to be scattered in "other people's backyards."  Another Lehman employee, John Feraca, had observed that RACERS was "[v]ery toxic and concentrated collateral."  And in April 2008, when a Lehman counterparty had previously declined to accept RACERS as "acceptable collateral" for a "financing trade," Servidio told Telmer, "[a]nother one doesn't want your 'toxic' racer crap."  ¶ 47.

A schedule of assets to be purchased that Barclays, LBHI and LBI prepared on Tuesday, September 16 — which LBHI executives have described as the guiding document for the transaction — was also totally inconsistent with the APA.  The schedule, which was prepared

by Lowitt and Tonucci, as well as by Martin Kelly and Gerard Reilly of LBHI, stated that Bar-
clays had agreed to purchase only $1.1 billion of commercial paper.  The schedule thus indicated
that LBHI, LBI and Barclays had *not* agreed that Barclays was to purchase the $5 billion of
RACERS that was in LBI's triparty repo book.  Nonetheless, LBHI filed the APA the next day,
representing that Barclays had agreed to buy all of the "Purchased Assets," including all of LBI's
commercial paper.  ¶ 48.[4]

       There was one more material misrepresentation.  On Tuesday, September 16,
Lowitt and Tonucci had told JPMorgan that Barclays had agreed to support LBI fully until the
deal closed.  What LBHI did not disclose, however, was that, concurrently with the APA, LBI
and Barclays had entered into a so-called "Interim Support and Cooperation Agreement."  Under
that secret agreement, Barclays had agreed only to "provide during the Interim Period to LBI
such overnight collateralized financing and intraday financing as it deems appropriate in its sole
discretion to support the Business, subject to such limits and conditions as [Barclays] determines
appropriate."  In short, there was no commitment by Barclays to support LBI fully until the deal
closed.  ¶ 53.

### E.  Barclays misrepresents its agreement with LBHI and LBI.

       With the full knowledge of LBHI and LBI, Barclays confirmed LBHI's misrepre-
sentations that JPMorgan's clearing exposure to LBI was to be extinguished as part of the sale.
During a conference call on Wednesday evening, September 17 — which included David Petrie

---

[4]    As alleged in the Amended Counterclaims, internal Lehman emails from the evening of
Tuesday, September 16 and the morning of Wednesday, September 17 show that Lehman em-
ployees were keenly aware that the deal had been misrepresented to this Court.  ¶ 49.

and John Rodefeld from Barclays and LBHI's David Aronow — representatives of Barclays and Lehman told their JPMorgan counterparts that on the next day, Thursday, September 18, Barclays would enter into a repurchase agreement with LBI under which Barclays would transfer approximately $45 billion in cash to JPMorgan to purchase the LBI securities being financed by the Fed, which were valued at almost $50 billion. Consistent with the APA, Petrie or Rodefeld also stated, without contradiction from anyone at LBHI, that Barclays would purchase LBI's remaining securities on Thursday. ¶¶ 55, 70.

At approximately 9:00 p.m. that Wednesday night, Gerard LaRocca of Barclays and Arthur Certosimo of Bank of New York, Barclays' clearing bank, called Buyers-Russo of JPMorgan. LaRocca reiterated to Buyers-Russo that all of JPMorgan's triparty exposure to LBI would be eliminated the next day. LaRocca stated further that, once the transaction was effectuated and JPMorgan was repaid, JPMorgan would hold *surplus* LBI securities of $1.5 billion. Needless to say, LaRocca did not disclose the truth: that Barclays had already decided not to purchase all of the securities in LBI's triparty repo book and planned to leave the worst securities behind. ¶ 56.

**F.    LBHI and LBI ensure that Barclays can leave behind LBI's worst securities.**

That same day, Wednesday, September 17, hours after LBHI filed the Sale Motion and APA, Barclays also entered into a written agreement with the Fed — the Takeout Agreement. This agreement too was not disclosed to the Court or JPMorgan, even though the negotiation of the Takeout Agreement had commenced at least a day earlier. The Takeout Agreement required Barclays, "[b]y not later than the opening of business on Monday, September 22, 2008," to purchase "the entirety of the [Fed']s position . . . for a payment equal to the aggregate outstanding amount then due to the [Fed]." Lowitt met with representatives of Barclays,

- 16 -

Bank of New York, and the Fed on Wednesday, September 17, to discuss how the Takeout Agreement would be implemented; the following day, in an email to Tonucci, he acknowledged that after the transfer, LBI would no longer have "ongoing access to pdcf." ¶¶ 58, 65.

At the same time as it was entering into the Takeout Agreement, Barclays was working with LBHI and LBI to ensure that Barclays would be able to cherry-pick LBI's best securities without running afoul of the Takeout Agreement. Each night, the securities that were eligible for LBI's triparty repo were allocated into overnight "shells" for different investors. The shells were used by LBI to designate the investor accounts into which securities subject to a triparty repo would be placed overnight. LBI personnel, acting under the control and supervision of LBHI, had access to the computer system at JPMorgan through which securities were allocated into the overnight shells. Using that access, LBHI and LBI had control over the configuration of the shells and the allocations of securities to particular investors. ¶ 59.

On Tuesday night, September 16, many of LBI's riskiest securities had been financed by the Fed. Those securities included RACERS, as well as SASCO, a security that, like RACERS, was backed largely by LBHI's credit and unsaleable assets, was priced on the basis of LBI's own marks and had never traded. Other illiquid securities were also financed by the Fed on Tuesday night. ¶ 60. If the same securities that the Fed had financed on Tuesday night, September 16, continued to be financed by the Fed on Wednesday night, September 17, and if the sale transaction were implemented on Thursday, September 18 — as LBHI and Barclays planned — the Takeout Agreement would have required Barclays to buy many of LBI's riskiest securities. ¶ 61.

Barclays, meanwhile, had secretly negotiated with LBHI and LBI to keep that from happening. To make sure it didn't, on Wednesday, September 17, LBI or LBHI employees

altered the allocation of securities into overnight shells, causing the lower-quality securities that

had been financed by the Fed on Tuesday night to be financed by Barclays on Wednesday night,

when Barclays provided $15.8 billion in triparty repo financing to LBI.  Since Barclays was only

obligated under the undisclosed Takeout Agreement to purchase the securities that the Fed was

financing, the reconfiguration of the shells — and the increase in Barclays' overnight investment

to $15.8 billion — put Barclays in a position to leave behind illiquid securities such as RACERS

and SASCO.  ¶ 62.

The change in LBI's triparty shells was dramatic.  On Tuesday night, September

16, the vast majority of the CMOs held by LBI — valued at some $2.2 billion — were financed

by the Fed.  That same night, commercial paper valued at approximately $5.2 billion (mostly

RACERS, valued at $5 billion) and other Lehman-priced structured products were financed by

the Fed.  In contrast, on Wednesday night, September 17, the vast majority of the CMOs and

Lehman-priced structured products were financed by Barclays.  Illiquid, Lehman-priced securi-

ties with an ascribed "market value" of more than $7 billion had made their way from the Fed's

to Barclays' overnight portfolio.  ¶ 63.

### G.    LBHI, LBI and Barclays implement their transaction before the Court approves it.

The Takeout Agreement gave Barclays until Monday, September 22 to take out

the Fed's financing position.  Likewise, the APA contemplated a closing on September 22.  To

accommodate this, the hearing date on the Sale Motion had been set for Friday, September 19.

Nonetheless, on Wednesday, September 17, LBHI and Barclays determined that the transfer of

securities to Barclays would occur the next day, September 18, *prior to* Court approval.  ¶ 66.

- 18 -

The timing of the transfer was crucial.  If the deal had closed after the close of business on Friday, September 19, JPMorgan's intraday advance would have been satisfied, and the entire triparty repo book would have been owned that weekend by LBI's triparty repo investors which, at that point, consisted largely of Barclays and the Fed.  By closing the deal on Thursday, September 18, and transferring Barclays' hand-picked securities to Bank of New York that day — before Court approval of the sale — LBHI, LBI and Barclays could complete their transaction before JPMorgan could discover the truth and protect itself from being left holding the bag.  ¶ 67.

An internal LBHI email demonstrates that LBHI was anxious about JPMorgan's ability to stop providing financing to LBI.  On Wednesday, September 17, Lowitt sent Tonucci an email captioned "Please assure me I am worrying about nothing."  Lowitt wrote:  "With all our pdcf, tslf, and omo collateral at Barclays, and no ongoing access to pdcf, how will we fund our box tomorrow?"  Lowitt's concern was that "Barclays are going to be full to the gunnels; will *chase* give us a box loan again?"  ¶ 65 (emphasis added).

Thus, Lowitt was acutely aware that Barclays was not obligated to purchase all of LBI's triparty repo securities, as Barclays was already going to be "full to the gunnels" with the securities it cherry-picked.  And he was concerned that "chase" — *i.e.*, JPMorgan — was the only source of financing for the securities that Barclays was going to leave behind, and that "chase" could and would refuse to make a "box loan" — *i.e.*, an extension of credit — against those securities.  Lowitt's concern was heightened by the fact that the Fed, which had just negotiated for a contractual commitment to have its position taken out by Barclays, would refuse to finance those same securities on an overnight basis going forward.  If JPMorgan also refused to finance these same securities, the Barclays deal would crater.  Lowitt and Tonucci therefore fo-

cused specifically on what JPMorgan would do once LBI could no longer look to the Fed for
overnight financing of the securities that LBHI knew Barclays had not committed to buy.  ¶¶ 65,
105.

**H.    JPMorgan advances more than $70 billion to LBI and
releases $5 billion in margin.**

Overnight on Wednesday, September 17, LBI securities valued at approximately
$70 billion were being financed in triparty repos.  That amount corresponded to the value placed
by the APA on the securities that Barclays had, under the terms of the APA, agreed to purchase
from LBI.  Barclays provided $15.8 billion of that triparty repo financing; the Fed provided ap-
proximately $27.5 billion of financing through the PDCF and the OMO.  The remainder of LBI's
securities was financed through other repos and by a $4.4 billion fail financing from JPMorgan.
¶ 68.

On the morning of Thursday, September 18, in reliance upon the APA and the
oral representations made by Tonucci, Lowitt, LaRocca and others, JPMorgan exercised its dis-
cretion to advance approximately $70 billion to LBI to unwind the overnight repos.  Of this
amount, $15.8 billion was used to settle LBI's repurchase from Barclays of the securities that
Barclays had financed overnight Wednesday through its triparty repo.  ¶ 69.

But at the time JPMorgan exercised its discretion to make an advance to LBI,
LBHI and LBI did not believe that LBI would repay that advance.  To the contrary, senior LBHI
executives knew that:  (1) a liquidation proceeding would be commenced against LBI by SIPC
on Friday, September 19; (2) Fed financing would not be available to LBI on Thursday night;
and (3) Barclays was not obligated to and would not buy the "toxic" securities in LBI's triparty
repo book.  Accordingly, it was clear to senior LBHI and LBI executives, but not to JPMorgan,

- 20 -

that JPMorgan would get stuck with a massive unpaid exposure secured by illiquid assets that Barclays did not want. ¶ 71.

In particular, Lehman documents confirm that it was known to LBHI and LBI, by the early morning of Thursday, September 18, that Barclays was not buying RACERS. At 7:07 a.m. on Thursday, September 18, before JPMorgan advanced funds to LBI to unwind the prior night's repos, Tonucci emailed LBHI's Aronow — copying Lehman's Dan Fleming, John Feraca, and Servidio — instructing Aronow to ensure that "RACERs . . . not be funded by Barclays" that evening. Moreover, in an email sent at 11:08 a.m. on Thursday, September 18, another Lehman employee stated that RACERS "are not moving to BONY/Barclays." ¶¶ 51, 71.

That same day, Barclays executives internally confirmed — at the highest levels — that Barclays would not purchase major pieces of LBI's triparty repo book. At 5:38 p.m. on Thursday, September 18, Gerard LaRocca of Barclays wrote an email to Richard Ricci, Barclays' Chief Operating Officer, with the following subject line: "JPM will BE ANNOYED with several billion of collateral tonight that we will not finance." At 5:48 p.m., LaRocca wrote an email to Ricci and Robert Diamond, the CEO of Barclays Capital Inc. and President of Barclays PLC, with the subject: "Urgent WE NEED TO TALK, JPM IS GOING TO BE MORE ANNOYED WITH WHAT I HAVE PLANNED THAT WILL SAVE BARCLAYS SIZE." ¶ 73 (emphasis in original). The email thus confirms that Barclays, like LBHI, was focused on the impact of the secret deal that LBHI had cut with Barclays and on what JPMorgan's reaction would be.

Against this backdrop, LBHI, LBI and Barclays implemented their transaction on September 18. Barclays wired $5 billion to JPMorgan. As a result of operational issues, however, the delivery of an additional $40 billion was delayed. ¶ 72. Operational issues aside, the

- 21 -

transfer of securities to Barclays was also held up because Barclays did not want JPMorgan to hold the margin on the securities that LBI was transferring. Before and after the unwind on Thursday morning, JPMorgan employees had informed Barclays, LBHI and LBI that on Thursday, JPMorgan would transfer LBI securities to Barclays on a "dollar-for-dollar" basis: in exchange for a $45 billion payment by Barclays, JPMorgan would release collateral valued at the same amount, withholding the $5 billion in margin — the difference between the cash received and the value attributed to the securities being delivered — pending a true up. ¶ 74.

Thus, when JPMorgan made extensions of credit to LBI on the morning of Thursday, September 18, JPMorgan believed that it would end the day not only without exposure to LBI, but also with securities valued at approximately $5 billion, *i.e.*, the estimated amount of the margin that it was keeping. ¶ 74. JPMorgan further believed that the LBI securities that were not transferred on September 18 would later be funded — and ultimately purchased — by Barclays, such that JPMorgan would end up with no exposure when LBI entered liquidation proceedings. ¶¶ 67, 74.

Had JPMorgan kept the margin on the securities being transferred that Thursday, the margin would have continued to secure JPMorgan's advances. If that happened, Barclays would have paid $45 billion in cash, received securities valued at $45 billion and been subject to the risk that JPMorgan would rightfully apply all or a portion of the remaining securities valued at $5 billion to satisfy any unpaid exposure. Barclays did not want to bear the risk that it would not receive the margined securities, however. So Barclays' Robert Diamond personally dealt with this problem. At around 6:00 p.m. on September 18 — shortly after LaRocca wrote Diamond "Urgent WE NEED TO TALK, JPM IS GOING TO BE MORE ANNOYED" (¶ 73) — Diamond insisted in a call with senior executives of JPMorgan that JPMorgan should release the

$5 billion of securities that represented the margin in the $50 billion portfolio that Barclays was buying for $45 billion.  ¶ 75.

Needless to say, Diamond at no time in that call told anyone about LaRocca's "PLAN[] THAT WILL SAVE BARCLAYS SIZE."  Quite the contrary.  Diamond instead reaffirmed the representations that LBHI and Barclays had previously made to JPMorgan, persuading JPMorgan that its triparty exposure would be extinguished.  ¶ 76.  Based on Diamond's representations, as well as the representations that LBHI and Barclays had previously made, JPMorgan's senior executives agreed to transfer securities valued at roughly $50 billion upon receipt of $45 billion in cash.  ¶¶ 77, 113.

## I.    JPMorgan transfers securities valued at $42.7 billion to Barclays and then advances $7 billion to LBI.

After JPMorgan agreed to release the $5 billion in margin, the transfer of securities to Barclays went forward.  Starting at approximately 6:30 p.m., Barclays transferred an additional $40 billion in cash to LBI's account at JPMorgan.  The transfer of securities to Barclays resumed, with LBHI and LBI personnel directing which securities were to be transferred to Barclays' account at Bank of New York.  ¶ 79.

During the securities transfer, Lehman employees relied on a list of the securities that Barclays did not want to purchase, and thus did not want to be transferred.  As alleged in the Amended Counterclaims, Nancy Denig of LBI has testified that Barclays decided to exclude from the asset transfer LBI's "more toxic securities" — "Lehman paper, real estate type of CUSIPs, certain equities, just more toxic, no value, you know, not able to determine a market value . . . ."  ¶ 80.  Meanwhile, James Hraska of LBI has testified that "one particular Cusip . . . was very specifically supposed to be excluded":  RACERS.  Thus, Alastair Blackwell of LBHI

instructed Hraska, Neal Ullman, and John Feraca of Lehman at 7:06 p.m. on Thursday, September 18: "We CANNOT PLEDGE the RACER's." Ten minutes later, Ullman wrote to Hraska, Lehman's John Palchynsky, and LBHI's Ricky Policke, "We need to be 100000000000000000000000000000000000000000000000000% sure that the RACER does not make its way to BONY/Barcap." This was all consistent with Tonucci's directive, made early that morning, that "RACERs . . . not be funded by Barclays." ¶ 80. An email sent by LBHI's Robert Azerad at 3:18 p.m. on Thursday, September 18 set forth the means through which Barclays would leave "behind" RACERS and other collateral it did not want: "a large box loan from JPM." That is, Barclays would decline to roll its triparty repo, and as a result, JPMorgan's intraday advances would go unpaid and turn into overnight extensions of credit. ¶ 82.

LBHI and Barclays were so committed to ensuring that Barclays did not take RACERS that, by 8:20 p.m. on Thursday, Lowitt himself sought confirmation from those overseeing the transfer that "no racers" had gone to Barclays. And later that night, when LBHI's Aronow expressed concern that LBHI and LBI had mistakenly transferred a particular CUSIP to Barclays (reportedly exclaiming, "[s**t] that one went out"), Hraska asked Palchynsky in an email, "[w]as that the racer?" Told by Palchynsky that some SASCO securities had inadvertently gone to Barclays, Hraska responded "Phew. Better than racer." ¶ 83.

Ultimately, when DTCC closed at around 11:00 p.m., securities valued at approximately $42.7 billion had been transferred to Barclays, out of securities valued at close to $50 billion that were supposed to be transferred in exchange for $45 billion in cash. In an effort to deal with this issue presented by the shortfall on Thursday night, LBHI and LBI decided to pledge cash to fill the hole. John Palchynsky and Dan Fleming of Lehman instructed JPMorgan to transfer $7 billion of cash from LBI's Demand Deposit Account at JPMorgan into a triparty

"cash collateral" account to secure Barclays. One problem: LBHI and LBI did not have $7 bil-
lion in cash. As a result, the Demand Deposit Account was in overdraft and LBI needed a dis-
cretionary advance from JPMorgan. In further reliance upon LBHI's and Barclays' representa-
tions regarding the sale transaction, JPMorgan advanced LBI the $7 billion. ¶ 84.

**J.      JPMorgan is stuck with more than $25 billion in
         exposure secured by "toxic" collateral.**

Aspects of the truth began to emerge in the early morning hours of Friday, Sep-
tember 19. In a call that took place at approximately 1:30 a.m., LBI's Hraska informed Ed Cor-
ral and Jon Ciciola of JPMorgan that, after receiving the $45 billion from Barclays, LBI had a
funding shortfall of approximately $23 billion. The single largest reason for the shortfall was
that Barclays had not rolled over the $15.8 billion repo transaction that it had provided the night
before; the result was that JPMorgan was left holding most of the securities that Barclays had
purchased from LBI at the end of the day on Wednesday, September 17, as part of a triparty repo
that JPMorgan had unwound. Since Barclays had not returned to purchase the securities repre-
sented by the $15.8 billion repo transaction, LBI was short $15.8 billion in cash and needed to
turn the unpaid portion of its intraday advance from JPMorgan for that amount into an overnight
extension of credit. ¶ 86.

In response, Corral insisted to Hraska that Barclays go through with another $15.8
billion purchase of the securities it had purchased in its triparty repo on Wednesday night. ¶ 86.
Soon thereafter, during another call, Hraska of LBI and Dan Fleming of LBHI represented to
Corral that they had checked with Barclays and that Barclays had confirmed that it would pro-
vide the $15.8 billion of triparty repo funding as soon as the transfer facilities opened the next
morning. ¶ 87.

- 25 -

Around 8:00 a.m. on Friday morning, September 19, during a phone call in which David Aronow of LBHI participated, Barclays' David Petrie claimed to JPMorgan's Ciciola that Petrie was "confused" and "forgot" about the $15.8 billion repo. Then, in a call at approximately 8:30 a.m. among Petrie, Fleming of LBHI, and Corral of JPMorgan, Petrie announced that Barclays did not recognize an obligation to purchase the securities that it had financed the night of Wednesday, September 17, with its $15.8 billion triparty repo. The result: JPMorgan was left with outstanding exposure to LBI that was secured by a pool of securities consisting largely of the undesirable assets that LBHI had agreed Barclays did not have to purchase. ¶ 88.

Later that day, Friday, September 19, SIPC commenced LBI's liquidation proceeding. At that time, more than $25 billion of JPMorgan's intraday advance from Thursday morning remained outstanding. Barclays, LBHI and LBI had succeeded in sticking JPMorgan with the securities that Barclays did not want and, unbeknownst to JPMorgan, did not have to buy. In addition, JPMorgan had been misled into further depleting its collateral position by releasing $5 billion in margin — margin that had been pledged by LBI, and that would have been immune from challenge by LBHI in this proceeding. ¶ 89.

**K.      LBHI misstates the facts again at the sale hearing.**

The hearing to approve the sale transaction went forward as planned on Friday, September 19. But no one from Barclays or LBHI told the Court that the securities transfer that the Court was being asked to approve had already taken place. At the hearing, counsel to LBHI — no doubt relying on what she had been told by her clients — told the Court that Barclays was buying only $47.4 billion in securities, rather than the approximately $70 billion in "Purchased Assets" under the APA. The explanation for the $23 billion difference offered by counsel was that "the markets dropped and the value of the securities dropped as well." ¶ 92.

- 26 -

That explanation was false. And the higher ups at LBHI and LBI knew it. The primary cause of the decline from $70 billion to $47.4 billion had nothing to do with the change in the market value of the securities and everything to do with the fact that Barclays had exercised its undisclosed option to pick and choose which triparty repo assets it would buy. ¶ 93. But this was only disclosed after the Court had approved the sale transaction when, on September 22, 2008, LBHI and Barclays submitted a "Clarification Letter" to the Court. ¶¶ 90-94.

The Clarification Letter disclosed that, despite the APA's unambiguous definition of "Purchased Assets" — a definition that expressly acknowledged a "book value as of the date hereof of approximately $70 billion" (¶ 38) — Barclays had purchased securities valued at approximately $50 billion for $45 billion in cash. The $25 billion difference between the $70 billion transaction described to the Court and JPMorgan and the $45 billion transaction described in the so-called Clarification Letter principally represented the outstanding intraday advance from JPMorgan and the collateral backing it. The securities that Barclays had not purchased — including RACERS, SASCO and the other illiquid, risky, "toxic" securities that Barclays did not want — had been left behind with JPMorgan. LBHI had succeeded in defrauding JPMorgan so that it could close its deal with Barclays. ¶ 94.

**ARGUMENT**

**POINT I**

**JPMORGAN HAS STATED A CLAIM FOR
FRAUDULENT MISREPRESENTATION.**

To state a claim for fraudulent misrepresentation — JPMorgan's first cause of action — a pleading must allege facts showing that "the defendant knowingly or recklessly misrepresented a material fact, intending to induce the plaintiff's reliance, and that the plaintiff relied on the misrepresentation and suffered damages as a result." *Merrill Lynch & Co.* v. *Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007). The Amended Counterclaims allege all of those things.

**A.     JPMorgan has alleged facts showing that it actually and
justifiably relied on LBHI's misrepresentations.**

Plaintiffs' lead argument for dismissal of JPMorgan's fraudulent misrepresentation claim is that the Amended Counterclaims do not allege facts showing that JPMorgan actually and justifiably relied on LBHI's representations. Pl. Br. 18-28. This argument fails.

**1.     JPMorgan has alleged facts showing that it actually
relied on LBHI's misrepresentations.**

The Amended Counterclaims allege that LBHI represented to JPMorgan, in the Sale Motion and the APA, that Barclays had agreed to purchase the securities defined as "Purchased Assets." ¶¶ 37-39. They further allege that, consistent with the APA, Lowitt and Tonucci represented to Buyers-Russo of JPMorgan on September 16 that Barclays had agreed to buy all of the assets subject to LBI's overnight financing arrangements and had committed to support LBI fully until the deal closed. ¶ 33. JPMorgan believed, based on these representations, that the terms of LBHI's agreement with Barclays required Barclays to purchase all of the securities JPMorgan was financing, and that its discretionary intraday advances therefore would be paid in

- 28 -

full. ¶ 40.  Absent that belief, JPMorgan would not have continued to make discretionary advances to LBI; nor would it have released its margin for those advances.  ¶¶ 69, 114-16.

Ignoring these factual allegations, plaintiffs contend that JPMorgan could not have relied upon LBHI's misstatements because it continued to hold securities as margin for its intraday advances to protect against the risk that the Barclays sale might not be consummated. That argument makes no sense.  If JPMorgan knew that Barclays, LBHI and LBI in fact had agreed — contrary to the terms of the APA — that Barclays could cherry-pick LBI's best assets, the assets it wanted, and leave LBI's "toxic waste" behind, JPMorgan would never have taken on exposure by unwinding LBI's triparty repo book at all.  Thus, the fact that JPMorgan continued to hold margin for its advances to protect against the possibility that the Barclays sale might fall through certainly does not mean that JPMorgan, as a matter of law, could not have relied on LBHI's misrepresentations.

When a party extends credit against collateral, it takes on the risk that the collateral in fact will be there if it ever has to be liquidated and that the amounts realized will fully satisfy the creditor's claim and compensate the creditor for the time and expense incurred in liquidating the collateral.  In other words, being fully secured at the time credit is extended still entails a risk of nonpayment, especially when the collateral consists of a pool of securities fluctuating in value and size.  That risk is magnified where, as here, the advance is in excess of $70 billion; in that circumstance, just a 1% misstep would result in a $700 million loss.  It therefore defies logic and common sense for plaintiffs to contend that a secured creditor, as a matter of law, cannot rely to its detriment on the borrower's misrepresentations in deciding to make an extension of credit.

Hence, courts have long held that when a lender alleges fraud, "'[t]he fact that a loan is secured by collateral makes no difference if the false . . . statement was a contributing factor in inducing the loan.'"  *Bernstein* v. *Assocs. Discount Corp. (In re Bernstein)*, 197 F.2d 378, 382 (7th Cir. 1952) (quoting 1 Collier on Bankruptcy (14th ed.)); *see also Banks* v. *Siegel*, 181 F.2d 309, 310 (4th Cir. 1950) ("Nor does the fact that the Loan Company required security for the loan necessarily negative the Loan Company's reliance on the false statement" inducing the loan).

Consistent with this authority, under New York law, "[t]he reliance element of fraud is essentially causation in fact.  Thus, a defendant's conduct need not have been *the* exclusive inducing cause of plaintiff's actions, but only *an* essential or inducing cause."  *Food Holdings Ltd.* v. *Bank of Am. Corp. (In re Parmalat Sec. Litig.)*, 477 F. Supp. 2d 602, 611 n.62 (S.D.N.Y. 2007) (emphasis in original; internal quotation marks omitted); *accord Diduck* v. *Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 278 (2d Cir. 1992), *abrogated on other grounds as recognized in Gerosa* v. *Savasta & Co.*, 329 F.3d 317, 322-23 (2d Cir. 2003); *see also* Restatement (Second) of Torts § 546 cmt. b.

Accordingly, as alleged in the Amended Counterclaims, when it became apparent over the weekend of September 13-14 that LBHI would file for bankruptcy protection, JPMorgan prepared to advance the funds necessary to unwind LBI's triparty positions on Monday, September 15 only because LBHI had posted additional collateral the week before, and because LBHI had represented that LBI would conduct an orderly liquidation of the *entire* triparty repo book. JPMorgan therefore had assurance that it would be repaid in full.  ¶ 29.  When Barclays came back on the scene proposing to buy LBI's business and related assets, JPMorgan was assured that Barclays had agreed to provide financing to the extent that the Fed did not, and had agreed to

purchase all of the securities in the triparty repo book, thus providing LBI with sufficient funds to repay any advances made by JPMorgan against those securities. ¶¶ 32-33.

JPMorgan held margin to protect against the possibility of the sale falling through, in which case *all* of LBI's securities — including LBI's more desirable collateral and, to the extent necessary, the margin and the additional collateral obtained from LBHI the week before — could have been liquidated in an orderly process. But JPMorgan only continued to make advances because of its reasonable belief that LBHI and Barclays had a binding sale agreement that required Barclays to buy all of the "Purchased Assets." ¶¶ 74, 77.

Thus, as alleged in the Amended Counterclaims, with the prospect of an LBHI bankruptcy now a reality and the markets in turmoil, JPMorgan was not content to provide LBI with tens of billions of dollars of financing solely on the basis of the additional collateral it had received the prior week and the margin built into the triparty repo book. JPMorgan wanted and got more assurance, first from LBHI and the Fed, and then from LBHI, LBI and Barclays. And it was the assurances from LBHI, LBI and Barclays — assurances that were knowingly false when made — that caused JPMorgan to make a $70 billion intraday advance to LBI the morning of Wednesday, September 17, and to make a new advance in a comparable amount on the morning of Thursday, September 18.

Further undermining plaintiffs' theory that the fact that JPMorgan held margin undercuts a claim of reliance is JPMorgan's allegation that it released $5 billion of margin on September 18 based on the belief that its advances would be fully repaid. ¶ 77. Plaintiffs assert that JPMorgan's release of its margin could not "have been made in reliance on any alleged misrepresentations by LBHI" because "LBHI's supposed misrepresentations are alleged to have been made before September 18." Pl. Br. 20. This argument is illogical. It is precisely *because*

LBHI's misrepresentations occurred *before* JPMorgan released the margin that JPMorgan relied

on them in doing so.  Moreover, the fact that LBHI's misrepresentations did not "concern[] the

release of the margin" (Pl. Br. 20) is irrelevant:  as a result of LBHI's misstatements, JPMorgan

believed that Barclays had agreed to buy all of the securities that JPMorgan was financing, that

JPMorgan therefore would be paid off in full on its exposure from unwinding the triparty repo

book and that JPMorgan therefore had no need to hold onto the $5 billion of margin collateral.

¶ 115.[5]

    Plaintiffs argue further that JPMorgan could not have relied on Lowitt and Tonu-

cci's misrepresentation to Buyers-Russo on September 16 that Barclays would fully support LBI

throughout that week because JPMorgan made limited overnight "fail financing" loans to LBI on

September 16 and 17.  Pl. Br. 21-22.  This argument, however, does not address the critical alle-

gation that Lowitt and Tonucci *also* represented to Buyers-Russo, during the same conversation,

that Barclays had agreed to buy all of the assets subject to LBI's overnight financing arrange-

ments.  ¶ 33.

    Moreover, the fail financing that JPMorgan provided to LBI was only a small

fraction of LBI's total financing:  compared to the more than $70 billion that JPMorgan provided

intraday to LBI, the fail financing totaled just $1.9 billion overnight on Tuesday, September 16,

and only $4.4 billion overnight on Wednesday, September 17.  In that same time period, Bar-

---

[5]    Equally unconvincing is plaintiffs' argument that JPMorgan could only have relied on
statements made by Barclays when it released the $5 billion in margin because the release of the
margin followed a phone call with Barclays personnel.  Pl. Br. 20.  As just explained, it is suffi-
cient that the misrepresentations or concealed omissions be "*an* essential or inducing cause."  *In
re Parmalat Sec. Litig.*, 477 F. Supp. 2d at 611 n.62 (emphasis in original; internal quotation
marks omitted).  Here, the Amended Counterclaims allege that *both* Barclays' *and* LBHI's mis-
representations induced JPMorgan's decision to release its margin.  ¶¶ 33, 77, 114-15.

clays' overnight financing increased from $2 billion overnight on Monday, September 15, to

$10.5 billion overnight on Tuesday, September 16, and ultimately to $15.8 billion overnight on

Wednesday, September 17.  ¶¶ 30, 36, 68.  Thus, Barclays steadily increased the amount of

overnight financing it provided to LBI throughout the week in amounts that quickly eclipsed the

level of fail financing that JPMorgan provided.  In that circumstance, JPMorgan's comparatively

small overnight extensions of credit do not mean that JPMorgan, as a matter of law, did not rely

upon LBHI's misrepresentation that Barclays had committed to "support LBI fully."[6]

### 2. JPMorgan has alleged facts showing that its reliance on LBHI's misrepresentations was justifiable.

LBHI's argument that JPMorgan's reliance was not justified as a matter of law

falls just as flat.  Under New York law, "the question of what constitutes reasonable reliance is

always nettlesome because it is so fact-intensive."  *Thomas H. Lee Equity Fund V, L.P.* v. *Grant

Thornton LLP*, 586 F. Supp. 2d 119, 135 (S.D.N.Y. 2008) (Lynch, J.) (citation and internal quo-

tation marks omitted); *accord JP Morgan Chase Bank* v. *Winnick*, 350 F. Supp. 2d 393, 407

(S.D.N.Y. 2004).

---

[6]     The four cases plaintiffs cite are therefore inapposite.  Pl. Br. 22.  Each stands for the ob-
vious but irrelevant proposition that a plaintiff who actually disbelieved the alleged misrepresen-
tation could not have relied on that misrepresentation.  *Apex Oil Co.* v. *Belcher Co. of N.Y.*, 855
F.2d 997, 1009 (2d Cir. 1988) (no reliance where plaintiff's president testified that he did not
believe defendant's statements to be true); *Gladstone Bus. Loan, LLC* v. *Randa Corp.*, 2009 WL
2524608, at *4 (S.D.N.Y. Aug. 17, 2009) (no reliance where plaintiff sent letter stating that it did
not believe defendant's statements); *Babiker* v. *Ross Univ. Sch. of Med.*, 1999 WL 33290, at *3
(S.D.N.Y. Jan. 22, 1999) (no reliance where the "thrust of [the plaintiff's] contentions is that he
did not believe" the defendant's statement "to be true"); *Sternberg* v. *Citicorp Credit Servs.*, 69
A.D.2d 352, 360 n.4 (2d Dep't 1979) (no reliance where plaintiff admitted in an affidavit that he
did not believe defendant's statement).

Here, the facts alleged in the Amended Counterclaims amply support the conclusion that JPMorgan was legally justified in relying on LBHI's misrepresentations.

###### a.  The agreements governing LBI's triparty repos do not bar JPMorgan's fraud claims.

Plaintiffs argue that JPMorgan has not alleged justifiable reliance because "none of the alleged misrepresentations were contained in the contractual documents" that governed JPMorgan's conduct as triparty repo agent.  Pl. Br. 22-24.  The argument totally misses the point: by the terms of those very same contracts, JPMorgan's intraday extensions of credit to LBI were discretionary.  The fact that there were preexisting agreements that gave JPMorgan the discretion to make intraday advances has no bearing on the question whether JPMorgan relied justifiably on LBHI's subsequent representations in making subsequent discretionary advances.

The three cases plaintiffs cite are wholly irrelevant.  They stand only for the proposition that in entering into a written agreement, a sophisticated investor cannot rely justifiably on oral representations by its counterparty regarding facts known to that counterparty at the time of the contract.[7]  The written agreements invoked by plaintiffs here all preceded JPMorgan's decision to exercise the discretion to extend LBI some $70 billion of intraday credit.

---

[7]      *See Lazard Freres & Co.* v. *Protective Life Ins. Co.*, 108 F.3d 1531, 1543 (2d Cir. 1997) (purchaser could not show justifiable reliance on an oral representation regarding the contents of a document when it failed to insert language in the sale contract permitting review of the document before closing); *Emergent Capital Inv. Mgmt., LLC* v. *Stonepath Grp., Inc.*, 343 F.3d 189, 196 (2d Cir. 2003) (stock purchaser that had secured "extensive contractual representations" could not rely on oral representations as to the value of the defendant's stake in another company); *Century Pac., Inc.* v. *Hilton Hotels Corp.*, 354 F. App'x 496 (2d Cir. 2009) (hotel franchisee that entered into an agreement to open a "Red Lion" franchise could not have justifiably relied on an oral representation that the franchisor would not sell the Red Lion brand).

When those agreements were entered into, accordingly, the facts that LBHI later misrepresented to JPMorgan were not known to anyone; they had not even occurred.

As numerous cases hold, reliance upon *post*-contractual misrepresentations in performing under a preexisting agreement is different from reliance upon misrepresentations made *prior* to entry into the agreement in the first place. *See, e.g.*, *JP Morgan Chase Bank* v. *Winnick*, 350 F. Supp. 2d 393, 396-97, 409 (S.D.N.Y. 2004) (Lynch, J.) ("[I]t cannot be argued that the Banks failed to bargain for adequate safeguards to establish . . . the basis for their reliance on the defendants' representations. Rather, this case deals with post-contract misrepresentations . . . ."); *accord Gulf Coast Dev. Grp., LLC* v. *Lebror*, 2003 WL 22871914, at *7 (S.D.N.Y. Dec. 4, 2003) (denying motion to dismiss fraud claim and emphasizing that "the pleadings regarding post-contractual misrepresentations are adequate to sustain plaintiffs' fraud claim").

Plaintiffs are also wrong in asserting, on the basis of no-oral-modification clauses, that JPMorgan cannot assert a fraud claim because the representations that it relied upon were not memorialized in a written modification to the triparty repo documentation. Pl. Br. 24. Plaintiffs point to no provision in any of the agreements that was "modified" by the APA or LBHI's oral representations about the Barclays transaction. Nor could they: LBHI's misrepresentations about the true terms of the Barclays deal did not even address, let alone alter or contradict, anything covered by those agreements. LBHI, LBI and Barclays all represented to JPMorgan that Barclays would ultimately own the assets that were subject to the triparty repo agreements. LBHI's fraud did not concern the subject matter of the Clearance Agreement and Custodial Undertaking — namely, how and on what terms JPMorgan would clear for LBI and how and on what terms JPMorgan, LBI and Barclays would accomplish short-term repo transactions. Rather, the fraud was that JPMorgan was told that when the triparty arrangements terminated,

Barclays would own LBI's assets permanently, leaving JPMorgan with no exposure.  ¶¶ 33, 40, 55, 90.

Indeed, the parties' agreements contemplated that statements could and inevitably would be made to induce JPMorgan to exercise its discretion and make financing available; as alleged in both the Amended Complaint and the Amended Counterclaims, that is how the relationship operated in practice.  ¶ 29; Lees Decl. Ex. B (Amended Complaint) ¶¶ 48, 67.  Accordingly, the no-oral-modification clauses in the repo documentation have no bearing on and cannot preclude JPMorgan's claim that LBHI misled it about the terms of its Barclays deal.  *See, e.g.*, *Alevy* v. *Uminer*, 49 A.D.3d 301, 302 (1st Dep't 2008) (where "oral agreement did not modify the written agreement but was a separate, unrelated agreement," it was "not subject to" the no-oral-modification clause).[8]

### b.    Barclays' misstatements do not preclude justifiable reliance on LBHI's misstatements.

LBHI's next argument is that "reliance on LBHI's predictions of Barclays' future conduct was not reasonable because Barclays made statements about its own intentions directly to JPMorgan."  Pl. Br. 27.  But the fact that "Barclays was doing it too" is no excuse.

As discussed above, "[t]he reliance element of fraud is essentially causation in fact.  Thus, defendant's conduct need not have been *the* exclusive inducing cause of plaintiff's

---

[8]    Likewise, the merger clauses invoked by plaintiffs only provide that the triparty repo documentation superseded any prior agreements between the parties on the same subject matter. The merger clauses have no bearing on subsequent representations or agreements having to with the Barclays transaction — subject matter that was not, and could not have been, addressed by the earlier triparty repo documentation.  Moreover, as discussed in Point VI.A.1, merger clauses have the limited purpose of prohibiting the use of parol evidence to contradict a written contract. *See Bank Julius Baer & Co.* v. *Waxfield Ltd.*, 424 F.3d 278, 283 (2d Cir. 2005) (citing *Primex Int'l Corp.* v. *Wal-Mart Stores, Inc.*, 89 N.Y.2d 594, 600 (N.Y. 1997)).

actions, but only *an* essential or inducing cause." *Food Holdings Ltd.* v. *Bank of Am. Corp. (In re Parmalat Sec. Litig.)*, 477 F. Supp. 2d 602, 611 n.62 (S.D.N.Y. 2007) (emphasis in original; internal quotation marks omitted); *see also* Restatement (Second) of Torts § 546 illustration 1 (defendant may not escape liability for its misrepresentations merely because the plaintiff relied upon others' misrepresentations in addition to those of the defendant).

The Amended Counterclaims thus adequately plead reliance on LBHI's misstatements when they allege that JPMorgan never would have extended credit to LBI had LBHI not misrepresented the terms of the Barclays deal. Indeed, the APA was the authoritative document describing the deal, and it was LBHI's duty and burden, as the chapter 11 debtor, to be truthful and complete in describing the terms of the APA. *See* Fed. R. Bankr. P. 9011(b) (in presenting a motion to the bankruptcy court, a party certifies that the motion "is not being presented for any improper purpose" and that "the allegations and other factual contentions have evidentiary support").

To support their argument that Barclays' additional misrepresentations somehow relieve LBHI of liability, plaintiffs cite one case — *Grupo Sistemas Integrales de Telecomunicacion S.A.* v. *AT&T Communications, Inc.*, 1996 WL 312535 (S.D.N.Y. June 10, 1996). *Grupo Sistemas* cannot bear the weight that plaintiffs place on it. In that case, Grupo contracted to purchase satellite communications equipment from Harris and then to distribute that equipment in Mexico. The same equipment was also used by AT&T in a joint venture with Harris, but AT&T became dissatisfied with the equipment and began to use other technology. After AT&T agreed to purchase Harris to settle a separate dispute regarding the functionality of the equipment, Harris informed Grupo that AT&T was prepared to assume Harris's contract with Grupo and that AT&T had a "long-term commitment" to the compromised technology. Based on this represen-

tation, Grupo consented to the assignment.  Eventually, AT&T abandoned the technology that

Grupo was distributing, and Grupo sued Harris for fraud.  *Id.* at *1-4.

Although unmentioned in plaintiffs' brief, the *Grupo Sistemas* court *sustained*

Grupo's claim that Harris fraudulently concealed AT&T's problems with the technology that

Grupo was distributing.  *Id.* at *11 ("Grupo might not have consented to the assignment of Har-

ris's obligations under the agreement to AT&T, had it known the information that Harris alleg-

edly fraudulently concealed.").

Moreover, the court's dismissal of Grupo's fraudulent misrepresentation claim

was based on a principle that is irrelevant to JPMorgan's Amended Counterclaims — that a

"speaker's representations about another party's *future intentions or plans* are generally con-

strued as opinion, not fact, and hence cannot give rise to a claim of fraud or fraudulent induce-

ment."  *Id*. at *15 (emphasis added).  Here, in contrast to *Grupo Sistemas*, the Amended Coun-

terclaims do not allege that LBHI opined about a third party's future intentions or plans.  Rather,

as explained further in the next section, they allege that LBHI misrepresented present facts about

the existence and terms of its own agreement with Barclays.

**B.   JPMorgan has alleged facts showing that LBHI made misrepresentations of present fact.**

Plaintiffs next seek dismissal of JPMorgan's fraudulent misrepresentation claim

on the ground that JPMorgan has failed to identify a misstatement of existing fact.  In doing so,

plaintiffs incorrectly argue that "all of the purported misrepresentations concern what *Barclays*

would do upon consummation of the Barclays Sale transaction" and, therefore, that JPMorgan is

seeking to hold LBHI liable for "misrepresenting what someone else will do in the future."  Pl.

Br. 29.

- 38 -

1.     **JPMorgan has alleged that LBHI misrepresented present facts.**

In fact, the Amended Counterclaims allege that on Wednesday, September 17, LBHI represented to the Court, JPMorgan and, for that matter, the world, that LBHI and Barclays had agreed to a deal under which Barclays was obligated to buy all securities defined as "Purchased Assets"; the only securities that Barclays was not obligated to buy were specifically defined as "Excluded Assets." ¶¶ 37-40.   In addition, on Tuesday, September 16, Tonucci and Lowitt represented to JPMorgan's Jane Buyers-Russo that LBHI and Barclays had agreed to the sale of all of the assets subject to LBI's overnight financings, and that Barclays had committed to support LBI fully until the deal closed. ¶ 33.

The Amended Counterclaims explicitly allege that, when each of these representations was made, Tonucci, Lowitt and other LBHI executives knew that Barclays in fact had *not* agreed to purchase all securities defined in the APA as "Purchased Assets."  Instead, Barclays had the discretion to decide which "Purchased Assets" to purchase, and had already decided, with LBHI's agreement, not to purchase certain securities, including RACERS. ¶¶ 42-50.   The Amended Counterclaims, accordingly, allege that LBHI executives misrepresented *present* facts to JPMorgan.

Plaintiffs also misstate the law when they assert that LBHI's misrepresentations as to "whether there was an agreement at the time" are non-actionable predictions of future conduct.  Pl. Br. 32.  Numerous cases, including cases from the Second Circuit, have held that misrepresentations about the existence and terms of an agreement are actionable in fraud.  For example, in *Stewart* v. *Jackson & Nash*, 976 F.2d 86 (2d Cir. 1992), a law firm represented to an attorney it was trying to recruit that the firm "had recently secured a large environmental law client."  The attorney, in reliance on that representation, took a position at the law firm; when the

- 39 -

major client "never materialized," she sued for fraud.  976 F.2d at 87.  The Second Circuit held

that the defendant's alleged misstatements about whether it had recently secured a major client

"were not future promises but representations of present fact."  *Id.* at 89.

Likewise, in *Cofacredit, S.A.* v. *Windsor Plumbing Supply Co.*, 187 F.3d 229 (2d

Cir. 1999), a purchaser of receivables alleged that the seller presented invoices reflecting firm

sales when in fact the goods had been supplied on consignment, which meant that the defen-

dants' right to payment was contingent on another sale.  Holding that the complaint adequately

alleged a false representation, the court reasoned that "[a]ny representation that the invoices evi-

denced firm sales," and thus the right to receive payment, was a "misrepresentation."  *Id*. at 239.[9]

These decisions confirm that misrepresentations about the existence or terms of a

contractual agreement with a third party are misrepresentations of *present* fact, not mere predic-

tions about whether the third party will perform.  Under these decisions, liability for fraud will

lie where, as here, a defendant induces the plaintiff to provide funds to a company based on false

statements about the company's agreements with third parties.

---

[9]    Similarly, in *SEC* v. *Save The World Air, Inc.*, 2005 WL 3077514 (S.D.N.Y. Nov. 15, 2005), a company that manufactured an anti-pollution device represented in press releases that it had reached a verbal licensing agreement with Pancorp, under which Pancorp would pay the company for the right to sell the device.  In a later press release, the company announced that the verbal agreement had been "signed, sealed and delivered" and that Pancorp had made a cash deposit.  *Id*. at *5.  The SEC sued the chairman and CEO of the company for securities fraud, alleging that "[a]t the time the Company announced the Pancorp deal, it had yet to be finalized."  *Id*. The district court granted summary judgment to the SEC, concluding that the defendant had misrepresented present facts.  *Id*. at *10, 16; *see also Ill. State Bd. of Inv.* v. *Authentidate Holding Corp*., 369 F. App'x 260, 263-64 (2d Cir. 2010) (upholding fraud claim based on company's representation that an amendment to a critical contract was forthcoming and its failure to correct that representation when negotiations over the amendment fell through).

Plaintiffs' reliance on *Stangel* v. *Chen*, 74 A.D.3d 1050 (2d Dep't 2010), is therefore completely misplaced.  Unlike the plaintiff in *Stangel*, JPMorgan's fraud claims are not "premised upon the general allegation[] that [Barclays] did not intend to honor the" terms of its agreement with LBHI.  *Id.* at 1052.  Rather, the Amended Counterclaims allege — with great particularity — that Barclays very much did intend to honor its existing agreement with LBHI.  The fraud was that JPMorgan was not told that the agreement that Barclays was going to honor was an agreement at odds with the agreement filed with this Court.  Plaintiffs are thus misguided in asserting that "the question of whether there was an agreement at the time is only relevant to the extent it indicated what Barclays would do in the future."  Pl. Br. 32.  The fraud alleged here is not that LBHI misrepresented the likelihood of Barclays' performing its contractual obligations, but that LBHI misrepresented what Barclays' contractual obligations actually were.

The remaining cases upon which plaintiffs rely are also inapposite.  The decisions recite the uncontroversial propositions that a fraud claim cannot be based on a mere failure to honor a promise[10] or on opinions about the intentions or abilities of others.[11]  But none of those cases involved fraud claims premised on the kind of misrepresentations alleged here — namely, misrepresentations about the existence and terms of an agreement to which the fraudster was a party and the victim was not.

---

[10]    *See O'Connor* v. *Reader's Digest Ass'n, Inc.*, 1993 WL 291372, at *3 (S.D.N.Y. Mar. 10, 1993); *Int'l Oil Field Supply Servs. Corp.* v. *Fadeyi*, 35 A.D.3d 372, 375 (2d Dep't 2006); *Van Kleeck* v. *Hammond*, 25 A.D.3d 941, 943 (3d Dep't 2006); *Stuart Lipsky, P.C.* v. *Price*, 215 A.D.2d 102, 103 (1st Dep't 1995); *Lane* v. *McCallion*, 166 A.D.2d 688, 690 (2d Dep't 1990).

[11]    *See Transit Mgmt., LLC* v. *Watson Indus., Inc.*, 23 A.D.3d 1152, 1155 (4th Dep't 2005); *Chase Invs., Ltd.* v. *Kent*, 256 A.D.2d 298, 299 (2d Dep't 1998); *FMC Corp.* v. *Fleet Bank*, 226 A.D.2d 225, 225 (1st Dep't 1996); *JPMorgan Chase Bank* v. *Orleans*, 2007 WL 6882391 (N.Y. Sup. Ct. Jan. 25, 2007).

- 41 -

**2.      LBHI's oral misrepresentations are also actionable.**

Plaintiffs argue next that the oral representations made by Lowitt and Tonucci to Buyers-Russo on September 16 are not alleged to have been made with knowledge that they were false and are too "vague" to support fraud claims.  Pl. Br. 34-38.[12]  Neither argument has merit.

**a.      The Amended Counterclaims allege that Lowitt and Tonucci knew that their oral representations were false.**

The Amended Counterclaims allege specifically that Lowitt and Tonucci knew that their statements to JPMorgan regarding the terms of the Barclays deal were false.  Specifically, they allege that:

- Lowitt and Tonucci were directly involved in the negotiations with Barclays over the terms of the sale of LBI's assets to Barclays.  ¶¶ 30, 41.

- On Tuesday, September 16, Lowitt and Tonucci, among others, were directly and personally involved in the preparation of a schedule prepared prior to the filing of the APA (but never disclosed to JPMorgan), which showed that only $1.1 billion of commercial paper would be transferred to Barclays, even though RACERS was a $5 billion commercial paper security that indisputably fit the APA's definition of "Purchased Assets."  That schedule has been described by senior LBHI executives as the guiding document for the transaction.  ¶ 48.

---

[12]      Although essentially a scienter argument, plaintiffs present this argument in the section of their brief arguing that the Amended Counterclaims do not allege actionable misrepresentations. The argument fails for all the reasons set forth above and those set forth in the scienter section below.

- Lowitt has admitted that, at the time the APA was executed, LBHI and Barclays still were figuring out how to "identify the series of assets that [were] part of the transaction and at what price those [were] going to be marketed at and that Barclays [was] going to purchase them at." ¶ 42.

- And the very same day they helped prepare the schedule of assets that Barclays was going to buy, Lowitt and Tonucci represented to Buyers-Russo that Barclays had agreed to buy all of the securities subject to LBI's overnight financings, which would necessarily include RACERS. ¶ 33.

Plainly, these allegations plead that Lowitt and Tonucci made representations to JPMorgan that they knew were false. And just as plainly, these allegations suffice to state a claim for fraud. *See, e.g.*, *380544 Canada, Inc.* v. *Aspen Techn., Inc.*, 633 F. Supp. 2d 15, 25, 34 (S.D.N.Y. 2009) (allegation that a defendant wrote emails stating that a transaction had closed in July were sufficient to plead that the defendant knowingly committed fraud when he represented that the transaction had closed in June); *Hughes* v. *BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290, 302-03, 310 (S.D.N.Y. 2006) (allegations that defendants were privy to communications regarding company's dire financial condition were sufficient to plead that the defendants misrepresented the company's prospects)

      **b.**      **Lowitt and Tonucci's oral representations were not too vague to support a fraud claim.**

Plaintiffs argue next that Lowitt and Tonucci's statement that Barclays had committed to support LBI fully prior to closing was too "vague" to support a fraud claim. Pl. Br. 38. That argument fails as well.

The "central issue" on a fraud claim is "whether defendants' representations, *taken together and in context*, would have misled a reasonable [person]." *McMahan & Co.* v.

- 43 -

*Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) (emphasis added).  Lowitt and Tonucci's representation that Barclays would fully support LBI prior to closing, therefore, has to be evaluated in light of the context in which it was made, *i.e.*, in the context in which JPMorgan was being assured that it should continue to make intraday advances to LBI because, regardless of LBI's fate, those advances would be repaid in full.

In particular, the context of Lowitt and Tonucci's statement that Barclays would fully support LBI is that over the weekend of September 13-14, JPMorgan was told by LBHI and the Fed that, in the absence of a sale, LBI would be wound down in an orderly fashion, with the Fed providing overnight financing during the wind-down sufficient to take out JPMorgan's intraday exposure.  ¶ 29.  Based on these assurances, JPMorgan exercised its discretion to provide $87 billion of intraday credit to unwind LBI's triparty repo book on Monday, September 15.  ¶ 29.  Later on Monday, September 15, after Barclays and LBHI began discussing a revised transaction, Barclays took an affirmative step toward consummating the sale by providing overnight financing to LBI.  ¶ 30.

Lowitt and Tonucci then represented to Buyers-Russo on Tuesday, September 16, that Barclays had agreed to "support LBI fully until the deal closed, including by providing overnight financing that would reduce or eliminate LBI's dependence on the Fed" and that Barclays had agreed to "buy all the assets subject to LBI's triparty repo and other overnight financing arrangements."  ¶ 33.  Furthermore, on the same day, September 16, LBHI filed, and the Court granted, the Comfort Order Motion, providing that JPMorgan's advances to LBI would be covered by LBHI's guaranties and collateral pledges to JPMorgan.  The purpose of that order was to induce JPMorgan to continue making advances of credit to LBI by giving JPMorgan an added layer of assurance that it would not suffer losses as a result.  ¶¶ 34-35.

In context, therefore, there was nothing "vague" about Lowitt and Tonucci's representations to Buyers-Russo on September 16. Beginning over the weekend of September 13-14 — and continuing throughout the week — everything JPMorgan was told carried the same message: that it would be made whole for any extensions of credit it made to LBI in connection with the intraday financing of LBI's triparty repo book. Thus, as alleged in the Amended Counterclaims, Lowitt and Tonucci's representations to Buyers-Russo on September 16 meant that Barclays had agreed to buy the securities that secured JPMorgan's intraday advances and, in the meantime, to provide LBI with overnight financing, thus providing LBI with sufficient funds to repay JPMorgan's extensions of credit entirely. And, in fact, from JPMorgan's perspective, that is what Barclays then did, providing ever increasing amounts of overnight funding to LBI, culminating in a $15.8 billion triparty repo transaction entered into the night of Wednesday, September 17. ¶ 30.

It was not until 8:30 a.m. on Friday morning, September 19 — after first professing that it was "confused" and that it "forgot" about the $15.8 billion repo it had provided Wednesday night — that Barclays announced that it did not recognize an obligation to fund LBI by rolling that repo. ¶ 88. That decision was the mechanism for LBHI, LBI and Barclays to stick JPMorgan with the assets that Barclays did not want. ¶¶ 89-90.

The cases cited by plaintiffs are therefore inapposite. Unlike *FMC Corp.* v. *Fleet Bank*, 226 A.D.2d 225, 225 (1st Dep't 1996), where the plaintiff alleged only that a bank officer made "vague expressions" of his "comfort" and "regard" for a borrower, JPMorgan has alleged here that Lowitt and Tonucci made specific representations that Barclays had committed to finance LBI and purchase all of its triparty repo securities. And unlike *Van Kleeck v. Hammond*, 25 A.D.3d 941, 943 (3d Dep't 2006), where a municipality said that it would have "no problem"

appointing the plaintiff to a part-time position, but never firmly committed to doing so, here,

Lowitt and Tonucci represented in no uncertain terms that Barclays had firmly committed to fi-

nance any securities not funded by the Fed, and ultimately to buy all of LBI's triparty repo as-

sets.

    **3.**      **The Rule 60(b) decision is irrelevant to this motion.**

        Plaintiffs go on to invoke this Court's factual findings in the Rule 60(b) decision

and contend that the Amended Counterclaims are an impermissible "collateral attack" on that

decision. Pl. Br. 41. This argument is misguided. JPMorgan does not dispute that the sale to

Barclays satisfied the requirements of section 363 or that Barclays is entitled to keep the assets it

purchased from LBI. This case, accordingly, is easily distinguished from the cases on which

plaintiffs rely, in which courts held that claims were precluded because they sought either to un-

wind a court-approved transaction or to deprive the buyer of the benefit of its bargain.[13] Grant-

ing JPMorgan relief on its claims will in no way upset the sale transaction.

        Nor do the "factual findings underlying the Court's affirmation of the sale order"

bear on this motion. Pl. Br. 39. The doctrine of collateral estoppel, or issue preclusion, applies

only when "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually

---

[13]     *See Bronson* v. *CHC Indus., Inc. (In re CHC Indus., Inc.)*, 389 B.R. 767, 775 (Bankr. M.D. Fla. 2007) (debtor's state-court action alleging that buyer fraudulently concealed the existence of a higher offer "attempt[ed] to unravel the economic effect of the sale by seeking damages that correspond[ed] to the higher offer"); *GAF Holdings, LLC* v. *Rinaldi (In re Farmland Indus., Inc.)*, 376 B.R. 718, 726 (Bankr. W.D. Mo. 2007) (complaint alleging that the buyer tortiously interfered with unsuccessful bidder's efforts to participate in auction sought "to undo the economics of the sale by seeking damages against [the buyer], placing [plaintiff] in [the buyer's] economic position as the successful buyer and reseller of the [debtor's assets]"); *In re Oyster Bay Cove, Ltd.*, 161 B.R. 338, 342 (Bankr. E.D.N.Y. 1993) (winning bidder in bankruptcy auction sought to renege its bid and avoid forfeiting its deposit by "challenging the order . . . authorizing the sale" and "collaterally attack[ing] [the order] as void *ab initio*").

litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to

litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final

judgment on the merits." *Bank of N.Y.* v. *First Millennium, Inc.*, 607 F.3d 905, 918 (2d Cir.

2010) (quotation marks omitted).[14]   The Due Process Clause of the Constitution imposes an

overlapping requirement — that the party sought to be precluded had an "opportunity to be

heard." *See, e.g.*, *Richards* v. *Jefferson Cnty., Ala.*, 517 U.S. 793, 797 n.4 (1996).

        The issues presented by this lawsuit were neither raised nor decided in the Rule

60(b) proceedings.  The adversary complaints in those proceedings raised the question whether

LBHI and the Creditors' Committee were "entitled to relief from the Sale Order because the

Court knew nothing about the existence of a multibillion-dollar discount in the value of acquired

financial assets." *In re Lehman Bros. Holdings Inc.*, 445 B.R. 143, 157 (Bankr. S.D.N.Y.  2011).

Addressing that issue, the Court found that *those* disclosure problems were not the result of de-

liberate misconduct at the Sale Hearing, but rather were the result of "chaotic circumstances"

that ensued in the wake of LBHI's bankruptcy filing. *Id.*  The claims alleged in JPMorgan's

Amended Counterclaims, which center on a different fraud perpetrated upon an altogether differ-

ent victim in the days leading up to the Sale Hearing, were not adjudicated in the Rule 60(b) pro-

ceeding.

        Moreover, while the "'fog' of Lehman," 445 B.R. at 156, may explain LBHI's

failure to make a full disclosure at the Sale Hearing about the $5 billion discount baked into the

---

[14]        Plaintiffs do not invoke the related doctrine of res judicata, or claim preclusion, which in
any event applies only when "the claims asserted in the subsequent suit were raised, or could
have been raised, in the prior proceeding." *E.g.*, *Greenwich Life Settlements, Inc.* v. *ViaSource
Funding Grp., LLC*, 742 F. Supp. 2d 446, 453 (S.D.N.Y. 2010) (citing cases).

Barclays transaction, it cannot serve as an innocent explanation for LBHI's failure to disclose the true terms of the Barclays deal to JPMorgan.  The Barclays transaction followed LBHI's extraordinary decision to pre-release its Q3 2008 earnings — a release that disclosed a $7.8 billion write-down for assets of the sort that Barclays did not want.  The deal was the culmination of a months-long effort by LBHI to come up with a way to deal with, in the words of the earnings release, Lehman's "Less Liquid Assets."  That process included merger talks with Bank of America; a good-bank/bad-bank transaction whereby Lehman's undesirable commercial real estate assets would be spun off into a separate entity; and a plan devised over the weekend of September 13-14 for other major Wall Street banks — including JPMorgan — to fund Lehman's "bad" assets in order to facilitate a sale of its "good" assets to Barclays.  Lees Decl. Exs. E (earnings release) at 1, B (Amended Complaint) ¶76, A (Amended Counterclaims) ¶ 27.

Every transaction under consideration hinged on the same issue:  What to do with Lehman's "toxic waste"?  LBHI needed to place LBI's worst securities somewhere.  As the Amended Counterclaims allege, since Barclays would not take those securities and the Fed could not take those securities, LBHI was fully aware that for the sale transaction to go through as planned, LBHI and Barclays would have to stick the triparty repo securities that Barclays did not want with JPMorgan.  ¶ 105.  There was no place else for them to go.

Hence, Ian Lowitt of LBHI and Gerard LaRocca of Barclays specifically focused on what they would and would not tell JPMorgan and, critically, what would happen if JPMorgan found out that Barclays had not committed to purchase the entirety of LBI's triparty repo book.  On the night of Wednesday, September 17, Lowitt expressed his worry to Tonucci that JPMorgan might not "give us a box loan again," since that was the only way Lehman would be able to "fund our box tomorrow."  ¶ 65.  To the same effect, LaRocca told Barclays' CEO Bob

Diamond on Thursday, September 18, that "JPM IS GOING TO BE MORE ANNOYED WITH WHAT I HAVE PLANNED THAT WILL SAVE BARCLAYS SIZE," namely, the plan to leave LBI's least desirable securities behind. ¶73. As these allegations make clear, amidst the "cha-otic circumstances" of Lehman Week, LBHI's and Barclays' executives were focused on what JPMorgan would do if it learned that it was going to be stuck with the LBI assets that Barclays did not want.

Finally, and in any event, collateral estoppel cannot apply here because JPMorgan has not "had a full and fair opportunity to litigate the issue[s]" presented by the Amended Coun-terclaims. *Bank of N.Y.*, 607 F.3d at 918; *see also Richards*, 517 U.S. at 797 n.4. JPMorgan has never had the opportunity to press its claims, which are not objections to the Sale Order, but in-stead are a timely response to plaintiffs' lawsuit against JPMorgan, a lawsuit initiated eight months after the Rule 60(b) motions were filed. It would offend basic principles of fairness and due process for a judgment obtained in litigation among joint tortfeasors to preclude the victim's later suit against them, when they plainly had no incentive to represent the victim's interests in the prior proceeding. *Cf. Ladd* v. *Ries (In re Ladd)*, 450 F.3d 751, 753 (8th Cir. 2006) ("[R]es judicata should not be applied where one or both parties have 'little motivation' or 'little incen-tive' to fully litigate an issue.") (quoting *Lovell* v. *Mixon*, 719 F.2d 1373, 1377 (8th Cir. 1983).

Plaintiffs' only authority applying the doctrine of collateral estoppel — *GAF Holdings, LLC* v. *Rinaldi (In re Farmland Industries, Inc.)*, 376 B.R. 718 (Bankr. W.D. Mo. 2007) — does not support their position. In that case, the bankruptcy court relied on collateral estoppel in dismissing a tortious interference action that an unsuccessful bidder had filed against the successful bidder in a bankruptcy sale. *Id.* at 726-27. The bankruptcy court was "hard pressed to find that the complaint ha[d] an independent purpose" other than "overrul[ing] key

findings" underlying *both* the orders approving the sale *and* the order denying the unsuccessful

bidder's Rule 60(b) motion. *Id.* at 726.

> Affirming the bankruptcy court's ruling on collateral estoppel, the bankruptcy ap-

pellate panel stressed that, "[n]ot only was [the unsuccessful bidder] active in [the debtor's]

bankruptcy case as both a creditor and a potential purchaser . . . , but [that bidder] actually did

litigate its grievances with a Rule 60(b) motion that challenged the sale order and its findings."

408 B.R. 497, 506-07 (8th Cir. BAP 2009).  Thus, the plaintiff in *Farmland*, unlike JPMorgan in

this case, sought to overrule the bankruptcy court's factual findings in a Rule 60(b) proceeding,

was "the movant" in the Rule 60(b) proceeding, and was therefore, "by definition, a party to

th[at] proceeding." *Farmland*, 376 B.R. at 727 n.16.

## C.    JPMorgan has alleged facts showing that LBHI acted with scienter.

> Under Rule 9(b), scienter may be pleaded by alleging "facts that give rise to a

'strong inference' of fraudulent intent." *Glidepath Holding B.V.* v. *Spherion Corp.*, 590 F. Supp.

2d 435, 454 (S.D.N.Y. 2007) (internal quotation marks omitted); *see also Novak* v. *Kasaks*, 216

F.3d 300, 307 (2d Cir. 2000).  The requisite "strong inference" of fraud may be established by

alleging either (a) facts that constitute strong circumstantial evidence of conscious misbehavior

or recklessness, or (b) facts showing that defendants had both motive and opportunity to commit

fraud. *Glidepath*, 590 F. Supp. 2d at 454.

### 1.    JPMorgan has alleged facts that constitute strong evidence of conscious misbehavior.

> To plead conscious misbehavior, a fraud claim has to allege that the defendants

"knew facts" suggesting that their statements were not true. *Novak*, 216 F.3d at 311; *accord*

*Clark* v. *Nevis Capital Mgmt., LLC*, 2005 WL 488641, at *17 (S.D.N.Y. Mar. 2, 2005);

*Glidepath*, 590 F. Supp. 2d at 456.  Plaintiffs argue that this standard has not been met because the Amended Counterclaims allege only that there was a "lack of certainty about the assets."  Pl. Br. 45.  That argument simply misses the point.

The Amended Counterclaims allege that, under the APA, it was completely "certain" that Barclays would purchase a defined group of assets, *i.e.*, the "Purchased Assets."  The fraud was that JPMorgan was never told that there was a "lack of certainty" about what assets Barclays had contractually committed to purchase and, indeed, that this "lack of certainty" was an element of the Barclays deal.  ¶¶ 33-44.  All of this is alleged to have been known by LBHI. *E.g.*, ¶¶ 42-51, 112.

Moreover, as discussed above, the Amended Counterclaims do not merely allege circumstantial evidence of conscious misbehavior or wrongdoing — they allege direct evidence of conscious or reckless misbehavior or wrongdoing.  Despite the representations made by LBHI to this Court about the terms of the deal between LBHI and Barclays, by Monday, September 15, LBHI had already agreed with Barclays that Barclays would not purchase RACERS.  ¶ 46.  Allegations that LBHI had direct knowledge of facts indicating that the deal as represented to JPMorgan was different from the deal actually reached with Barclays are sufficient raise a strong inference that LBHI acted with the requisite scienter.

## 2. JPMorgan has alleged that LBHI had the motive and opportunity to commit fraud.

The Amended Counterclaims also adequately allege that LBHI had a motive and opportunity to commit fraud.  For purposes of stating a fraud claim, motive "entail[s] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," while opportunity "entail[s] the means and likely prospect of achieving concrete

benefits by the means alleged." *Novak*, 216 F.3d at 307 (citation and quotation marks omitted).

Plaintiffs do not dispute JPMorgan's allegation that LBHI had the opportunity to commit fraud;

they challenge only the sufficiency of JPMorgan's allegation of motive. Specifically, they argue

that LBHI's "desire for a legitimate end result" — that is, the sale of LBI's business to Barclays

— does not support a fraud claim. Pl. Br. 43.

   Contrary to plaintiffs' assertion, however, the Amended Counterclaims allege

more than a "desire for a legitimate end result" — they allege that the only way LBHI could have

obtained its desired result was by using illegitimate means, *i.e.*, misleading JPMorgan, to achieve

an illegitimate end, *i.e.*, consummating a transaction at variance with the transaction memorial-

ized in the APA and thereby sticking JPMorgan with billions of dollars of securities that Bar-

clays did not want. Thus, as the Amended Counterclaims allege, Barclays' and JPMorgan's in-

terests were in conflict. Barclays was unwilling to purchase the LBI securities that it viewed as

"toxic." But JPMorgan was unwilling to provide the tens of billions of dollars of intraday fi-

nancing to bridge the Barclays deal unless JPMorgan's exposure to LBI would be eliminated by

the deal. ¶ 105. And for certain executives, a successful transaction was essential to obtaining

lucrative jobs at Barclays. ¶¶ 103-09.

   Accordingly, as LBHI was aware, deceiving JPMorgan into believing it would be

fully repaid was necessary for LBHI and a core group of senior LBHI executives to reap the sub-

stantial and concrete benefits of the Barclays sale. ¶¶ 3, 9, 105-06. The Amended Counter-

claims thus provide a factual basis for concluding that LBHI had a strong motive to defraud

JPMorgan in order to consummate a sale that would allow its estate and its employees to avoid

"devastating" losses, satisfying the requirements of Rule 9(b). *See Glidepath*, 590 F. Supp. 2d at

455  ("[A] business seeking to avoid a loss or induce a beneficial sale has sufficient motive to

commit fraud to raise the requisite 'strong inference' of fraud under Rule 9(b).").

    The Second Circuit's decision in *Cohen* v. *Koenig*, 25 F.3d 1168 (2d Cir. 1994),

is particularly instructive.  The defendants in that case, principals of KMS, sought to purchase

Eastern's assets on credit; the plaintiffs, the principals of Eastern, preferred cash.  In reliance on

the defendants' representations about the financial condition of KMS, the plaintiffs dropped their

demand for an all-cash transaction.  KMS later filed for bankruptcy, and when the plaintiffs were

left with unsecured claims that could not be paid in full, they sued the principals of KMS, alleg-

ing that the representations about the company's financial condition had been fraudulent.  *Id.* at

1170-72.

    In considering whether the alleged facts established scienter, the Second Circuit

held that the complaint "spelled out circumstances from which it could easily be inferred that the

[defendants] had a motive to make false representations." *Id.* at 1174.  As the Second Circuit

reasoned, "[i]t hardly requires a stretch of the imagination to infer that the would-be purchasers

in such circumstances had a motive to paint a far rosier financial picture than actually existed in

order to induce [the plaintiffs] to part with a sizeable portion of their assets in exchange for a

note." *Id.*  The same is true here.  In the words of the Second Circuit, "[i]t hardly requires a

stretch of the imagination" to conclude that LBHI and its most senior executives had a motive to

misrepresent the true status and terms of the Barclays deal in order to induce JPMorgan to pro-

vide the financing necessary to ensure that the deal closed.[15]

---

[15]    *Turkish* v. *Kasenetz*, 27 F.3d 23 (2d Cir. 1994), is to the same effect.  The plaintiffs there
alleged that the defendants, to induce a settlement of pending litigation, misrepresented that dis-

(footnote continued)

The main case upon which plaintiffs rely on the issue of motive, *Pfizer, Inc.* v. *Stryker Corp.*, 348 F. Supp. 2d 131 (S.D.N.Y. 2004), is readily distinguished.  LBHI's motive to commit fraud here went far beyond the "general profit motivations" alleged in that case.  *Id.* at 155.  LBHI's misrepresentations allowed LBHI to reap the benefits of selling LBI as a going concern when the alternative was a complete collapse of LBI's business, the liquidation of the firm, and the unemployment of thousands of workers including, most significantly, the very individuals who are alleged to have been involved in perpetrating the fraud.  *See Glidepath*, 590 F. Supp. 2d at 455 (defendants had motive to deceive where fraudulently induced sale allowed them to shed a troubled business and avoid substantial liabilities).

Finally, plaintiffs assert that the Amended Counterclaims do not adequately allege LBHI's motive to deceive because "there was simply no plausible economic reason for LBHI to aid Barclays to leave JPMorgan with insufficient LBI collateral, when JPMorgan would surely attempt to offset any shortfall using LBHI's collateral."  Pl. Br. 44.  That is, according to plaintiffs, LBHI, as the guarantor of LBI's obligations to JPMorgan, could not have been motivated to commit a fraud that would increase its exposure under the guaranty.  This assertion, however, boils down to the argument that LBHI could not have been motivated to deceive because JPMorgan might later wind up with a claim against it — an absurd proposition that has no support in the law.[16]

---

(footnote continued)

puted loans had been repaid and that their accountants had verified the repayment.  The Second Circuit held that the defendants' "desire to avoid repaying the loans and to end the earlier litigation" was a sufficient "motive for committing the alleged fraud."  *Id.* at 28.

[16]    Plaintiffs' authorities do not support their argument.  In *Atlantic Gypsum Co., Inc.* v. *Lloyds International Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990), the defendants' alleged

(footnote continued)

While LBHI may have recognized the possibility that committing fraud might later lead to a claim by JPMorgan, it simultaneously faced the near certainty that telling JPMorgan the truth would lead immediately to the breakdown of the Barclays transaction and the "devastating" collapse of LBI. In these circumstances, LBHI cannot reasonably claim that it lacked a motive to deceive JPMorgan.[17]

## POINT II

### JPMORGAN HAS STATED A CLAIM
### FOR FRAUDULENT CONCEALMENT.

As set forth above, JPMorgan has adequately alleged that LBHI is liable for its affirmative misrepresentations relating to the Barclays transaction. In addition, and in the alternative, JPMorgan has also adequately alleged, in its second cause of action, that LBHI is liable for fraudulent concealment.

---

(footnote continued)

motive was to prevent a borrower from repaying loans that the defendants themselves had made — a motive that made no economic sense. In *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994), the defendants' alleged motive in misrepresenting a company's financial health was to maintain their positions at the company, which the Second Circuit held was too generalized to raise an inference of fraudulent intent. These cases do not hold that a defendant can avoid liability in circumstances where, as here, it stood to reap immediate concrete benefits from its fraud that far outweighed any potential downside of possibly having to respond to a claim in the future.

[17]    Equally off-base is plaintiffs' contention that the Amended Counterclaims leave room for the inference that Barclays would have blithely proceeded to purchase the entirety of LBI's tri-party repo assets if JPMorgan had been told the truth about the deal and had refused to go along with a transaction at variance with the terms of the APA. The Amended Counterclaims allege repeatedly, with ample factual support, that Barclays was not willing to purchase LBI's entire triparty book and had made that clear to LBHI. *E.g.*, ¶¶ 8, 46.

A.      **JPMorgan has pleaded the elements of a fraudulent
        concealment claim.**

A pleading states a claim of fraudulent concealment by alleging:  "(1) failure to

discharge a duty to disclose; (2) an intention to defraud, or scienter; (3) reliance; and (4) dam-

ages." *E.g.*, *DirecTV Latin Am., LLC* v. *Park 610, LLC*, 691 F. Supp. 2d 405, 436 (S.D.N.Y.

2010) (internal quotation marks omitted).

The Amended Counterclaims more than adequately allege that LBHI failed to

disclose material facts to JPMorgan.  They allege that when JPMorgan made over $70 billion in

advances to LBI on Thursday morning, September 18, LBHI knew that the filed APA — as well

as LBHI's prior representations about JPMorgan being taken out in full — were misleading and

inaccurate.  Specifically, the Amended Counterclaims allege that:

- As of Thursday morning, September 18, LBHI knew that LBI and the

  Fed had entered into the Takeout Agreement, which only required Bar-

  clays to purchase *the Fed*'s financing position.  ¶¶ 58, 65.

- LBHI knew that the securities being financed by the Fed and Barclays

  had dramatically changed, such that Barclays was financing much of

  LBI's least desirable securities on an overnight basis in a $15.8 billion

  repo that Barclays could refuse to roll under the Interim Support and Co-

  operation Agreement.  ¶¶ 53, 59-64.

- LBHI knew that all possible steps were being taken to protect Barclays

  from receiving RACERS and other undesirable securities.  ¶¶ 80-83.

All of this highly material information was knowingly and intentionally concealed

from JPMorgan.

- 56 -

**B.      JPMorgan has alleged facts establishing LBHI's duty to
disclose.**

In addition to restating the arguments made in support of their motion to dismiss

JPMorgan's fraudulent misrepresentation claim, plaintiffs also argue that the Amended Counter-

claims do not allege facts showing that LBHI had a duty to disclose the truth to JPMorgan.  Pl.

Br. 49-55.  Seizing on language in the case law requiring correction of "partial or ambiguous"

statements, plaintiffs argue that New York law does not require correction of statements that are,

or become, completely false.  Pl. Br. 50-52.  Thus, according to plaintiffs, because "JPMorgan

has alleged that the underlying alleged representations were false — rather than true but incom-

plete," LBHI had no duty to disclose the truth to JPMorgan and therefore cannot be sued for

fraudulent concealment.  Pl. Br. 52.

Plaintiffs' theory is in direct conflict with New York law, which imposes a duty to

disclose where the speaker knows its counterparty is relying on a representation that:  (a) the

speaker believed to be true when made but subsequently learned to be materially false or mis-

leading when made, *Fischer* v. *Kletz*, 266 F. Supp. 180, 185-86 (S.D.N.Y. 1967); or (b) was true

when made but became materially false or misleading as a result of subsequent developments,

*Idrees* v. *Am. Univ. of the Caribbean*, 546 F. Supp. 1342, 1349 (S.D.N.Y. 1982).[18]

---

[18]      *Accord Ill. State Bd. of Inv.* v. *Authentidate Holding Corp.*, 369 F. App'x 260, 263-64 (2d
Cir. 2010) (upholding fraud claim based on company's failure to update representation about the
existence of a key contract that "had been rendered misleading by subsequent events"); *see also*
Restatement (Second) of Torts § 551(2)(c) & cmt. h ("One who, having made a representation
which when made was true or believed to be so, remains silent after he has learned that it is un-
true and that the person to whom it is made is relying upon it in a transaction with him, is mor-
ally and legally in the same position as if he knew that his statement was false when made." (cit-
ing, *e.g.*, *Loewer* v. *Harris*, 57 F. 368 (2d Cir. 1893)).

- 57 -

Thus, regardless of whether JPMorgan alleges that LBHI made partially untrue statements,[19] the Amended Counterclaims allege — as an alternative to the fraudulent misrepresentation claim — that LBHI made statements that, as the week passed, LBHI had to realize were not true when made or had become untrue by virtue of subsequent developments.  Specifically, the Amended Counterclaims allege that:

- On Wednesday, September 17, after the APA was filed, Barclays entered into the Takeout Agreement with the Fed, which LBHI knew about, and which gave Barclays the option to leave behind that portion of the LBI portfolio that the Fed was not financing.  ¶¶ 58, 65.

- On the night of September 17, Barclays, LBI and LBHI worked together to make sure that the riskiest assets in the LBI portfolio, including RACERS, SASCO, and others, were not allocated to the Fed, thus firmly implementing Barclays' exercise of its undisclosed right to leave those assets behind.  ¶¶ 59-64.

- On September 17 and 18, both Lowitt and Tonucci were personally involved in making sure that Barclays would not get stuck with the assets

---

[19]    In fact, it does.  The Amended Counterclaims allege that the Sale Motion and the APA disclosed that Barclays had agreed to purchase LBI assets, subject to specific exclusions, but failed to disclose that the lists of "Purchased" and "Excluded" assets were subject to change at Barclays' option.  This is sufficient to plead a claim of fraudulent concealment under the partial-disclosure doctrine.  *See, e.g.*, *Junius Constr. Co.* v. *Cohen*, 257 N.Y. 393 (1931) (Cardozo, J.) (claim for fraudulent concealment upheld where seller of property provided buyer with a partial and misleading description of the premises); *Sheridan Drive-In, Inc.* v. *State*, 16 A.D.2d 400, 407-08 (4th Dep't 1962) (state agency liable in fraud for portraying plans for bridge near owner's future plot as "final" without further informing plaintiff that plans designated as "final" were often subject to change).

that it did not want, including (in Lowitt's case) by writing an email

seeking confirmation that "no racers" had gone to Barclays, and (in To-

nucci's case) by directing subordinates to ensure that "RACERs . . . not

be funded by Barclays" on Thursday evening.  ¶¶ 71, 83.

Accordingly, while JPMorgan has sufficiently alleged for purposes of its fraudu-

lent misrepresentation claim that LBHI knew its statements to JPMorgan on September 16 and

17 were false when made (*see* Point I.C.1, *supra*), JPMorgan also has alleged for purposes of its

fraudulent concealment claim that even if LBHI's misstatements were innocent when made,

LBHI nonetheless breached a duty to speak once it became apparent that its prior representations

had become misleading.

Plaintiffs argue further that JPMorgan has failed to allege that LBHI had knowl-

edge of specific subsequent events that rendered its statements on September 16 and 17 materi-

ally misleading, including the Takeout Agreement and the manipulation of the LBI's triparty

repo shells.  Pl. Br. 56-59.  But the Amended Counterclaims allege that Lowitt attended a meet-

ing to discuss the implementation of the Takeout Agreement and sent an email to Tonucci the

following day recognizing that once the Takeout Agreement was implemented, LBI would no

longer receive financing from the Fed through the PDCF.  ¶¶ 58, 65.  They also allege that LBHI

personnel supervised and directly participated in LBI's reallocation of collateral in the triparty

repo shells.  ¶¶ 59, 62.[20]

---

[20]    Plaintiffs argue that because the reallocation of collateral in the triparty repo shells oc-
curred using JPMorgan's computer system and because JPMorgan was a party to the Custodial
Undertaking, JPMorgan must have known what LBHI was up to in manipulating the shells.  Pl.
Br. 58-59.  But regardless of whether JPMorgan could "see" the movement of collateral among
shells — an issue that plaintiffs raise only by reaching beyond the pleadings — it remains that as

(footnote continued)

Finally, plaintiffs are completely off-base in arguing that the Amended Counter-claims fail to establish that LBHI "knew or anticipated that JPMorgan might rely on the APA." Pl. Br. 55. Parties to a bankruptcy proceeding are presumed to rely on "representations to the court" in a public filing because Bankruptcy Rule 9011(b) requires the party making the representations to certify that its statements are accurate and are not being presented for an improper purpose. Fed. R. Bankr. P. 9011(b); *Mounce* v. *Wells Fargo Home Mortg., Inc. (In re Mounce)*, 390 B.R. 233, 254 n.27 (Bankr. W.D. Tex. 2008) (party is presumed to rely on misrepresentations to a bankruptcy court because the court itself "accepts the representations made on the records (or in the form of order itself) and relies upon the veracity of each party's contentions"). On a motion to dismiss, therefore, it is certainly reasonable for this Court to conclude that LBHI filed the APA with the knowledge and expectation that JPMorgan would rely on the statements contained in that filing.

---

(footnote continued)

a result of LBHI's concealment of material facts, JPMorgan had no way of knowing and no reason to suspect from the shell game that LBHI had agreed that Barclays could leave LBI's most illiquid assets behind. To the contrary, since JPMorgan was unaware of the Takeout Agreement or Barclays' option to leave LBI's most undesirable securities behind, the movement of the illiquid securities into Barclays' triparty repo shell (had it been seen by JPMorgan) had all the appearances of a welcome development: the movement would have signified that Barclays was, in fact, going to "support LBI fully" by financing those securities in advance of purchasing them, as LBHI had represented Barclays had agreed to do. Accordingly, even assuming for the sake of argument that JPMorgan focused on the movement of collateral among the triparty repo shells, this cannot relieve LBHI of liability.

## POINT III

## JPMORGAN HAS STATED A CLAIM FOR
## FRAUDULENT INDUCEMENT TO LEND.

Plaintiffs seek dismissal of JPMorgan's third cause of action, which alleges that LBHI fraudulently induced JPMorgan to advance LBI more than $70 billion on the morning of September 18, on the ground that it is duplicative of JPMorgan's claims for fraudulent misrepresentation and fraudulent concealment.  Pl. Br. 59-62.  To the contrary, the gravamen of the claim is that LBHI deceived JPMorgan when, on the morning of September 18, LBHI caused JPMorgan to extend $70 billion in credit to LBI for LBHI's benefit while LBHI knew and intended that LBI would not repay the advance.  ¶¶ 127-132.  That claim does not require the Court to find that LBHI's misrepresentations concerning the APA earlier that week were fraudulent; nor does it require the Court to find that LBHI failed to discharge a duty to disclose that those representations were untrue.

As plaintiffs concede, "a failure to perform promises of future acts" is actionable as a fraud if "there exists an intent not to comply with the promise at the time it is made."  Pl. Br. 33 (quoting *Murray* v. *Xerox Corp.*, 811 F.2d 118, 121 (2d Cir. 1987)).  Indeed, the New York Court of Appeals has squarely held that "a promise . . .  made with a preconceived and undisclosed intention of not performing it . . . constitutes a misrepresentation" that is actionable in fraud.  *Deerfield Commc'ns Corp.* v. *Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986) (quoting *Sabo* v. *Delman*, 3 N.Y.2d 155, 162 (1957)). [21]  A leading treatise similarly states that

---

[21]    Although the New York Court of Appeals has indicated that "[g]eneral allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support [a fraud] claim," *Deerfield* and *Sabo* remain good law and permit a fraud claim to go forward when it is supported by specific allegations that the defendant did not intend to perform when the

(footnote continued)

"[t]he rule is firmly established that it is an act of fraud to purchase or secure goods or services

with a preconceived intention not to pay for them.  It is likewise an act of fraud to procure money

as a loan through a fraudulent scheme with the preconceived intention not to repay the loan."

60A N.Y. Jur. 2d Fraud & Deceit § 25 (2011) (citing, *e.g.*, *Hall* v. *Naylor*, 18 N.Y. 588, 589

(1859); *Slavenburg Corp.* v. *Baby Doll Infants Wear Co.*, 181 A.D.2d 555 (1st Dep't 1992); *Sec.*

*Trust Co. of Rochester* v. *Voxakis*, 67 Misc. 2d 143 (N.Y. Sup. Ct. 1971)).[22]

Under this well established principle, there can be no doubt that the Amended

Counterclaims state a claim for fraudulent inducement against LBHI.

---

(footnote continued)

contract was entered into.  *New York Univ.* v. *Continental Ins. Co.*, 87 N.Y.2d 308, 318 (1995)
(citing *Sabo* with approval).  Unlike the fraud claim in the Amended Complaint (Count XLIX),
which is predicated on nothing more than the bare assertion that Jamie Dimon falsely made an
oral promise to give back collateral if requested — a promise that was inconsistent with an ex-
press contractual provision stating that collateral would be returned only on three days' notice —
the Amended Counterclaims contain far more than "[g]eneral allegations" of an intent not to per-
form.  The Amended Counterclaims allege specific facts supporting the conclusion that LBHI
never intended for JPMorgan to be repaid, including that LBHI misrepresented the terms of the
Barclays transaction while knowing that LBI would default on its advances, failed to disclose
that Barclays retained the option to leave LBI's least desirable securities behind, and manipu-
lated LBI's triparty repo shells to ensure that Barclays could exercise that option and leave
JPMorgan with insufficient and inappropriate collateral to satisfy its unpaid advances to LBI.

[22]    Courts interpreting section 523(a)(2)(A) of the Bankruptcy Code — which provides that a
debt may not be discharged in bankruptcy if it was procured by "actual fraud," 11 U.S.C. §
523(a)(2)(A) — likewise have held that the act of obtaining credit is an implied representation of
a present intent to repay that, if false when made, is grounds for finding fraud.  *See, e.g.*, *AT&T
Universal Card Servs.* v. *Mercer (In re Mercer)*, 246 F.3d 391, 405-07 (5th Cir. 2001) (en banc);
*Cortese Bros., Inc.* v. *Christofaro (In re Christofaro)*, 360 B.R. 411, 414-415 (Bankr. W.D.N.Y.
2007).

## POINT IV

## JPMORGAN HAS STATED A CLAIM FOR
## AIDING AND ABETTING FRAUD BY LBI.

Under New York law, "[a] plaintiff alleging an aiding-and-abetting fraud claim must allege the existence of the underlying fraud, actual knowledge, and substantial assistance." *Oster* v. *Kirschner*, 77 A.D.3d 51, 56 (1st Dep't 2010). According to plaintiffs, JPMorgan's claim that LBHI aided and abetted LBI's fraud — the fourth cause of action — is inadequate on the grounds that: (1) it does not state a claim that LBI committed a fraud; and (2) it does not plead LBHI's actual knowledge of LBI's fraud. Pl. Br. 62-66. Plaintiffs are wrong in both respects.

First, the Amended Counterclaims allege that LBI obtained an advance exceeding $70 billion from JPMorgan with the intent not to repay. ¶¶ 69-71, 134-38. As explained in Point III, *supra*, that conduct amounts to fraud under settled New York law. *See, e.g.*, *Deerfield Commc'ns Corp.* v. *Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986); 60A N.Y. Jur. 2d Fraud & Deceit § 25. LBI also participated fully in the fraudulent conduct that underlies JPMorgan's first two counterclaims. LBI employees, including Michael McGarvey and Paul Mitrokostas,[23] knew that the agreement LBHI was filing with the Court and providing to JPMorgan and other creditors did not accurately reflect the transaction between the parties. *E.g.*, ¶¶ 41, 43-44, 48-49, 51. Moreover, LBI employees were instrumental in manipulating the repo shells on September 17, *e.g.*, ¶¶ 59-63, thereby ensuring that the assets that Barclays did not want would

---

[23]    McGarvey was Finance Controller of LBI's Fixed Income Division. LBHI Examiner Report App. 3 at 14. Mitrokostas was the COO of LBI's Fixed Income Division.

remain behind at JPMorgan.  ¶¶ 59-63, 71, 80-81, 83.  LBHI was aware of all of this.  ¶¶ 42-51, 59-64.

Second, the Amended Counterclaims contain detailed allegations that LBHI, and Paolo Tonucci in particular, knew that LBI was borrowing from JPMorgan with the intention to default on those borrowings.  ¶ 139.  The Amended Counterclaims also allege that LBHI executives and employees actively assisted LBI personnel in determining which securities Barclays should leave behind and ensuring that those securities were in fact left behind at JPMorgan.  ¶¶ 80-83, 140.  That assistance not only satisfies the substantial assistance element of JPMorgan's claim — which plaintiffs do not dispute has been adequately pleaded — but also provides additional strong support for the inference that LBHI knew of LBI's wrongdoing.

### POINT V

### JPMORGAN HAS STATED A CLAIM FOR
### AIDING AND ABETTING FRAUD BY BARCLAYS.

In seeking dismissal of JPMorgan's fifth cause of action against LBHI — for aiding and abetting a fraud perpetrated by Barclays — plaintiffs do not challenge JPMorgan's allegations that Barclays made fraudulent misrepresentations, nor do they argue that LBHI was unaware of those misrepresentations.  Instead, they argue that JPMorgan fails to plead:  (1) that LBHI "substantially assisted" Barclays' fraud; and (2) that JPMorgan justifiably relied on Barclays' misrepresentations and omissions.  Pl. Br. 66-71.

**A.     JPMorgan has alleged facts showing that LBHI
        substantially assisted Barclays' fraud.**

**1.     JPMorgan's allegations of substantial assistance are
        sufficiently specific.**

Plaintiffs contend that JPMorgan's factual allegations are deficient in alleging "substantial assistance" because paragraph 150, which pleads "substantial assistance," contains

- 64 -

two references to "Lehman."  Pl. Br. 67-68 (referring to paragraph 149 but quoting paragraph 150).  Plaintiffs' argument lacks merit.

The Amended Counterclaims allege explicitly that LBHI rendered substantial assistance to Barclays, including by "fil[ing] the Sale Motion and the APA, which misrepresented the agreement between LBHI and Barclays and induced JPMorgan to extend credit to LBI on September 17 and 18." ¶ 150.  The Amended Counterclaims further allege that LBHI aided Barclays in "identify[ing] undesirable securities in LBI's triparty repo book," and that "Lehman personnel, including senior LBHI executives, took numerous steps to ensure that only the securities Barclays wanted were actually transferred to Barclays on September 18." ¶ 150.

These allegations, which specifically reference "senior LBHI executives," encapsulate numerous facts that are pleaded in the Amended Counterclaims, including that:

- "[A]t 7:07 a.m. on Thursday, September 18, Tonucci emailed LBHI's Aronow — copying Dan Fleming and Servidio of LBHI and LBI's John Feraca — instructing him to ensure that 'RACERs not be funded by Barclays'" that evening. ¶ 71.

- "Internal LBHI emails show that LBHI participated in Barclays' urgent efforts to complete the asset transfer on Thursday, September 18 and to obtain the release of $5 billion in margin from JPMorgan." ¶ 78.

- "Alastair Blackwell of LBHI instructed Hraska, LBHI's Neal Ullman, and LBI's John Feraca at 7:06 p.m. on Thursday, September 18:  'We CANNOT PLEDGE the RACER's.'  Ten minutes later, Ullman wrote to Hraska, Lehman's Palchynsky, and LBHI's Ricky Policke, 'We need to

- 65 -

be 100000000000000000000000000000000000000000000000000% sure

that the RACER does not make its way to BONY/Barcap.'" ¶ 80.

- "LBHI and Barclays were so committed to ensuring that Barclays did not

  take RACERS that, by 8:20 p.m., Lowitt himself sought confirmation

  from those overseeing the transfer that 'no racers' had gone to Barclays."

  ¶ 83.

These allegations, individually and in the aggregate, suffice to establish that LBHI rendered sub-

stantial assistance to Barclays.

Moreover, contrary to plaintiffs' contention, the Amended Counterclaims allege

that LBHI was involved in the manipulation of the overnight shells.  *E.g.*, ¶ 59 ("LBI operations

personnel, acting under the control and supervision of LBHI, had access to the computer system

at JPMorgan through which securities were allocated into the overnight shells.  Using that ac-

cess, LBHI and LBI had control over, and the ability to alter, the configuration of the shells so

that eligible securities would be allocated to particular investors."); *see also* ¶¶ 62-63.

And, finally, plaintiffs' contention that LBHI could not be responsible for the ma-

nipulation of the shells because it "was not a party to the" repo agreements misses the mark.  Pl.

Br. 68.  Regardless of whether LBHI had contractual authority to influence the allocation of se-

curities among LBI counterparties, the Amended Counterclaims allege that LBHI in fact did so

and that, by doing so, rendered substantial assistance to Barclays' fraud.

    2.    **The Amended Counterclaims allege that LBHI's
          assistance to Barclays proximately caused the harm on
          which Barclay's primary liability is predicated.**

Plaintiffs next offer two challenges to the sufficiency of JPMorgan's allegation

that LBHI's substantial assistance to Barclays caused JPMorgan's injury.  The first contention is

that JPMorgan's pleadings "contain no allegation that LBHI's alleged substantial assistance proximately caused JPMorgan's purported injury" and, instead, allege only that LBHI's conduct was the "but for" cause of JPMorgan's injury. Pl. Br. 68-70. This argument is simply wrong.

The Amended Counterclaims allege that LBHI actively assisted Barclays in making its own misleading statements to JPMorgan as to the terms of the APA and in effectuating the shell manipulation that enabled Barclays to leave JPMorgan with the securities that Barclays did not want — actions that directly resulted in JPMorgan getting stuck with outstanding exposure secured by LBI's least desirable securities. ¶¶ 114, 148, 150. These facts establish that "the action of the aider and abettor [*i.e.*, LBHI] proximately caused the harm on which [Barclays'] primary liability is predicated." *Pension Comm. of Univ. of Montreal Pension Plan* v. *Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 202 (S.D.N.Y. 2006) (internal quotation marks omitted).

Plaintiffs' second argument — that "Barclays made far more direct statements to JPMorgan than did LBHI" — is equally unavailing. Pl. Br. 69. The law is clear that "[a] defendant's conduct need not have been *the* exclusive inducing cause of plaintiff's actions, but only *an* essential or inducing cause." *See, e.g.*, *Food Holdings Ltd.* v. *Bank of Am. Corp. (In re Parmalat Sec. Litig.)*, 477 F. Supp. 2d 602, 611 n.62 (S.D.N.Y. 2007). Thus, the fact that both LBHI and Barclays made fraudulent representations — representations that were consistent with, indeed reinforcing of, each other — does not give either a "get out of jail free" card.

Indeed, even if LBHI had never spoken a word to JPMorgan, it would still be liable for aiding and abetting Barclays' fraud. The Amended Counterclaims identify a series of steps that LBHI took to ensure that Barclays received only the securities that it wanted, including by ensuring that RACERS remained behind at LBI. *E.g.*, ¶¶ 45, 51, 59, 62-63, 71, 78, 80-83. They further allege that LBHI personnel affirmatively helped Barclays to select and identify de-

sirable collateral to acquire and to finance — not only when LBHI's James Seery advised Bar-
clays' John Mahon not to acquire RACERS, as plaintiffs wrongly assert, Pl. Br. 69, but also be-
fore the filing of the APA, *e.g.*, ¶¶ 44, 46-48.  These allegations plainly establish a factual basis
for concluding that the losses JPMorgan suffered by making advances to LBI were caused by the
assistance that LBHI provided to Barclays.[24]

**B.    JPMorgan has alleged facts showing that it reasonably
relied on Barclays' misrepresentations and omissions.**

The only remaining basis upon which plaintiffs seek dismissal of JPMorgan's
claim for aiding and abetting Barclays' fraud is that any reliance by JPMorgan on Barclays' rep-
resentations and omissions was not reasonable "in light of the representations and integration
clauses" in the Clearance Agreement, the Custodial Undertaking, and the Master Repurchase
Agreement.  Pl. Br. 70-71.  This argument fails for all of the reasons stated in Point I.A.2, *supra*.

## POINT VI

## JPMORGAN HAS STATED CLAIMS
## FOR INDEMNIFICATION.

JPMorgan seeks indemnification under the Clearance Agreement and the Custo-
dial Undertaking for fees and expenses incurred in this lawsuit.  LBHI was a guarantor of LBI's

---

[24]    According to plaintiffs, JPMorgan's contention that LBHI assisted Barclays by helping it
identify undesirable securities is not plausible because "elsewhere in the Amended Counter-
claims" JPMorgan pleads "that LBHI individuals attempted to convince Barclays that it *should*
acquire purportedly undesirable securities included in the APA."  Pl. Br. 69-70.  There is no in-
consistency:  LBHI sought to sell certain undesirable securities to Barclays but, once Barclays
decided not to purchase them, LBHI helped Barclays to obtain only what it wanted.  *E.g.*, ¶ 45.
Nor is it possible to conclude at the pleading stage, as plaintiffs urge (Pl. Br. 69) that James
Seery's discussion with John Mahon was not a proximate cause of JPMorgan's injury because
Barclays had decided earlier not to purchase RACERS.  As pleaded in the Amended Counter-
claims, discussions between LBHI and Barclays about what specific securities Barclays should
acquire or finance were ongoing throughout the week.  *E.g.*, ¶¶ 42-43.

- 68 -

obligations under the Clearance Agreement.  ¶¶ 22, 25, 158.  LBHI additionally guarantied LBI's

obligations under the Custodial Undertaking.  ¶¶ 167, 172.[25]

**A.      JPMorgan has stated a claim for indemnification under
         the Clearance Agreement.**

         Section 16 of the Clearance Agreement contains an unambiguous and sweeping

indemnity clause.  It provides that LBI and LBHI will indemnify JPMorgan for any losses and

expenses, including attorneys' fees, that "arise out of or are based upon *or are in any way related*

*to* this Agreement."  Lees Decl. Ex. C § 16 (emphasis added).

**1.      Plaintiffs have not established that the Custodial
         Undertaking provides the exclusive basis for
         indemnification.**

         Plaintiffs contend that JPMorgan's indemnification claim under the Clearance

Agreement should be dismissed because that agreement does not "govern[] the transaction of

which JPMorgan complains."  Pl. Br. 72.  Any right to indemnification, they argue, must be

based exclusively on the Custodial Undertaking, since *that* agreement provides for JPMorgan's

extensions of credit to LBI to facilitate triparty repo transactions with Barclays.  The language of

the Clearance Agreement, however, belies this contention.

---

[25]      The contractual indemnity provisions under which JPMorgan brings its claims provide
for indemnification not only for attorneys' fees, but also for all losses suffered by JPMorgan that
are in any way connected to JPMorgan's role as LBI's clearing bank and triparty repo custodian
— including losses stemming from LBI's failure to repay advances made by JPMorgan after
LBHI's bankruptcy filing.  JPMorgan focuses here on its right to attorneys' fees because if it
succeeds in establishing that the guaranties and collateral transfers it received from LBHI before
the bankruptcy filing are valid and cannot be avoided, JPMorgan will be able to look to the LBHI
guaranties and collateral to recover from LBHI any losses stemming from LBI's unpaid ad-
vances.  JPMorgan reserves all rights to seek recovery for those losses under the indemnity pro-
visions as well.

The Clearance Agreement broadly governs the clearing relationship between JPMorgan and LBI. Section 9 of the agreement, entitled "Tri-Party Custodian Services," provides that JPMorgan will act as custodian for LBI's triparty transactions and will "perform the services as set forth in the form of tri-party custody agreement attached hereto as Exhibit A." Lees Decl. Ex. C § 9. Section 9 of the Clearance Agreement also expressly provides that JPMorgan's provision of services as triparty custodian would be "[s]ubject to the terms and conditions" of the Clearance Agreement and that "with respect to tri-party custody agreements," JPMorgan would "accept instructions from [LBI] via the means set forth in Section 7" of the Clearance Agreement. *Id.* The language of the Clearance Agreement, therefore, shows that the parties intended that document, in addition to the custodial undertaking agreements, to govern triparty repos and advances facilitating those transactions.[26]

Plaintiffs make much of the fact that under section 9 of the Clearance Agreement, if there is "any conflict between this [Clearance Agreement] and any triparty custody agreement, . . . the terms of the tri-party custody agreement will govern." Lees Decl. Ex. C § 9. But while plaintiffs point to language in the Custodial Undertaking — which does not appear in the Clearance Agreement — providing that JPMorgan was permitted to make advances without receiving instructions from LBI, they fail to explain how this difference creates any "conflict" that prevents application of both indemnity provisions. There is none.

---

[26]    This case is thus wholly unlike *Baraliu* v. *Vinya Capital, L.P.*, 2009 WL 959578 (S.D.N.Y. Mar. 31, 2009), on which plaintiffs rely. Pl. Br. 76. In that case, the court held that an employee could not bring a lawsuit to collect a bonus contemplated by his employment contract where he "expressly surrendered" the bonus in an amendment to the contract. *Id.* at *4. Here, there is no document under which JPMorgan "expressly surrendered" its right to indemnification under the Clearance Agreement.

Plaintiffs also invoke the merger clause of the Custodial Undertaking, which states that "[t]his Agreement constitutes the entire agreement of the parties with respect to its subject matter and supersedes all prior oral or written agreements in regard thereto."  Lees Decl. Ex. D § 13.  But the subject matter of the Custodial Undertaking with LBI and Barclays and the subject matter of the Clearance Agreement with LBI and LBHI are not remotely the same.  The Custodial Undertaking addresses JPMorgan's relationship with respect to one of LBI's triparty repo counterparties; the Clearance Agreement governs JPMorgan's entire relationship with LBI (and LBHI) with respect to all counterparties and all securities transactions.  The fees and expenses associated with this lawsuit — in which plaintiffs assert, among other things, that JPMorgan must return collateral it received from LBHI  to "secure *all* exposures of *all* JPMorgan entities to *all* Lehman entities" (Lees Decl. Ex. B (Amended Complaint) ¶ 51 (emphasis in original)) — do not derive solely from Barclays' $15.8 billion repo contract with LBI.  Rather, they derive from JPMorgan's broader role as LBI's clearing bank and custodian for transactions with numerous LBI counterparties.[27]

---

[27]   In any event, the purpose of merger clauses is simply to bar the use of parol evidence in interpreting a written agreement.  *Primex Int'l Corp.* v. *Wal-Mart Stores, Inc.*, 89 N.Y.2d 594, 600 (1997).  Where the parol evidence rule is not implicated, a merger clause in a later agreement does not abrogate a party's rights under an earlier contract.  *See, e.g.*, *Bank Julius Baer & Co.* v. *Waxfield Ltd.*, 424 F.3d 278, 282-83 (2d Cir. 2005) (arbitration agreement not abrogated by later agreement that did not contain an arbitration clause but did contain a merger clause).  Since giving effect to the indemnity provision of the Clearance Agreement would not in any way impact the interpretation of the Custodial Undertaking, the merger clause cannot vitiate JPMorgan's indemnity rights under the earlier contract.  *See Matthius* v. *Platinum Estates, Inc.*, 74 A.D.3d 908, 909 (2d Dep't  2010) (indemnity provision in earlier agreement "did not vary, alter, or contradict any terms in [a later] agreement and, thus, remained enforceable" regardless of merger clause).

Furthermore, JPMorgan is not seeking to use the Clearance Agreement to modify the Custodial Undertaking. It simply seeks indemnification under both indemnity provisions, which do not conflict in any way. This conclusion is confirmed by Section 16 of the Custodial Undertaking, which provides that "[t]he rights and remedies conferred upon the parties hereto shall be cumulative." Lees Decl. Ex. D § 16. The Second Circuit has held that when a contract contains a cumulative-remedies clause, "[i]t makes little sense to read [a] Merger Clause as destroying" the parties' rights under earlier agreements. *Bank Julius Baer & Co.* v. *Waxfield Ltd.*, 424 F.3d 278, 283 (2d Cir. 2005).

### 2.    Plaintiffs have not established that JPMorgan was negligent or engaged in willful misconduct.

Plaintiffs also argue that JPMorgan is not entitled to indemnification because the indemnity clause in the Clearance Agreement does not apply where JPMorgan is "negligent or ha[s] engaged in willful misconduct, or ha[s] breached this Agreement." Lees Decl. Ex. C § 16. This argument is plainly premature: Whether JPMorgan acted negligently or engaged in willful misconduct has not been decided by this Court. As plaintiffs effectively concede, many of their avoidance claims, including their preference and constructive fraud claims, do *not* depend on any negligent or willful misconduct by JPMorgan. Pl. Br. 78-79. Further, a number of plaintiffs' state-law claims — including those alleging that the September Agreements are invalid because they lacked consideration or were not signed by an appropriately authorized officer (*see* Lees Decl. Ex. B (Amended Complaint) ¶¶ 280-81) — clearly do not turn on JPMorgan's conduct.[28]

---

[28]    Plaintiffs also assert numerous claims for breach of contract. While the Clearance Agreement provides that JPMorgan is not entitled to indemnification for losses resulting from a breach of that agreement (§ 16), plaintiffs allege breaches of other agreements. *See* Lees Decl.

(footnote continued)

Accordingly, it is possible for plaintiffs to prevail on a number of their claims and yet still fail to establish that the indemnification clause is inapplicable.

### 3.    JPMorgan's claim for indemnification is not barred by the Bankruptcy Code.

Plaintiffs' only remaining argument is that indemnification is inappropriate because it would have the effect of "nullifying the trustee's avoidance powers" under the Bankruptcy Code.  Pl. Br. 79-81.  This argument mischaracterizes the relief JPMorgan seeks and should be rejected.

JPMorgan has not sought to insulate itself from avoidance liability by virtue of the indemnity provision.  Rather, JPMorgan is seeking indemnity at this time only for the fees and expenses it incurs in this lawsuit.  Under *Travelers Casualty & Surety Co. of America* v. *Pacific Gas & Electric Co.*, 549 U.S. 443 (2007), it is now settled that a creditor may assert a claim for attorneys' fees under a valid agreement, even if the fees "were incurred litigating issues of bankruptcy law."  *Id.* at 449; *accord Ogle* v. *Fid. & Deposit Co. of Md.*, 586 F.3d 143, 146 (2d Cir. 2009) (where indemnity agreement with debtor is valid under state law, creditor's claim for attorneys' fees that are incurred postpetition is allowable in bankruptcy).

The only case plaintiffs cite on the issue of indemnification in bankruptcy is *Corporate Jet Aviation, Inc.* v. *Vantress (In re Corporate Jet Aviation, Inc.)*, 45 B.R. 629, 639 (Bankr. N.D. Ga. 1985), which is inapposite.  There, the defendant received a fraudulent transfer when he redeemed his stock in the debtor, but claimed that any funds he was required to pay the

---

(footnote continued)

Ex. B (Amended Complaint) Counts XLIII-XLV, XLVII (alleging breaches of August and September Agreements).

estate on account of the fraudulent transfer had to be returned to him under an indemnity agreement.

    The bankruptcy court rejected this claim, holding that (1) "the literal terms of the indemnity agreement do not purport to require indemnification arising from an action under the avoidance powers of the Bankruptcy Code to set aside the stock redemption," and (2) "[the defendant] has cited no authority for the proposition that a party can contractually insulate a transaction from the power of the trustee in bankruptcy to recover fraudulently transferred assets." *Id.*

    Here, unlike in *Vantress*, the "literal terms" of the Clearance Agreement *do* provide for the relief sought. Lees Decl. Ex. C § 16 (JPMorgan shall be indemnified for all losses "related to" the Clearance Agreement, including attorneys' fees). Further, and more fundamentally, JPMorgan is not using the indemnity provision to offset any exposure it might have under the avoidance provisions of the Bankruptcy Code; rather, it is seeking to recover attorneys' fees and expenses it incurs in this litigation — something that simply was not at issue in *Vantress*.[29]

---

[29]    The remainder of the cases cited by plaintiffs reach the uncontroversial conclusions that a debtor cannot contractually waive its rights to file bankruptcy petitions, obtain discharges, or enjoy the protections of the automatic stay, and that creditors cannot enforce contracts requiring their claims to be paid in full or prohibiting avoidance actions — propositions that have nothing to do with a creditor's right to be indemnified by a debtor. *See Hayhoe* v. *Cole (In re Cole)*, 226 B.R. 647, 654 (9th Cir. BAP 1998) (agreement waiving right to discharge not enforceable); *Raymond L. Asher, P.C.* v. *Film Ventures Int'l, Inc. (In re Film Ventures Int'l, Inc.)*, 89 B.R. 80, 83-84 (9th Cir. BAP 1988) (agreement prohibiting avoidance actions not enforceable); *Fallick* v. *Kehr*, 369 F.2d 899, 904 (2d Cir. 1966) (debtor cannot waive right to discharge); *In re Weitzen*, 3 F. Supp. 698, 698-99 (S.D.N.Y. 1933) (agreement to arbitrate dischargeability enforceable because not a waiver of right to discharge); *Rupp* v. *Holling (In re Holling)*, 2007 WL 2964505, at *4 (Bankr. D. Utah Feb. 8, 2007) (agreement to treat lease obligations as having arisen postpetition not enforceable); *In re S.E. Fin. Assocs., Inc.*, 212 B.R. 1003, 1005 (Bankr. M.D. Fla. 1997) (debtor's breach of contract giving lender right to seek dismissal of chapter 11 case in event of breach did not warrant dismissal of bankruptcy petition on grounds of bad faith); *In re Shady Grove Tech Ctr. Assocs. Ltd. P'ship*, 216 B.R. 386, 390 (Bankr. D. Md. 1998) (agreement to

(footnote continued)

**B.      JPMorgan has stated a claim for indemnification under
the Custodial Undertaking.**

In arguing that JPMorgan is not entitled to indemnity under the Custodial Under-

taking, plaintiffs' principal contention is that the "absolute indemnity" provision in the Custodial

Undertaking — which states that JPMorgan "shall be absolutely indemnified" for any loss, in-

cluding attorneys' fees, "incurred as a result of complying with the instructions of [Barclays] or

[LBI]" (Lees Decl. Ex. D § 9) — is inapplicable because, although JPMorgan clearly alleges that

it effectuated the repo transactions between Barclays and LBI at the instructions of both those

parties, these pleadings are too "conclusory."  Pl. Br. 86.[30]

JPMorgan's factual allegation that it effectuated the repo transactions "at the in-

structions of LBI and Barclays" (¶ 168) is sufficient to satisfy Rule 8(a).  Plaintiffs' claim that

*Iqbal* and *Twombly* impose some greater requirement is unavailing.  *See Arista Records, LLC* v.

*Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010) (*Iqbal* and *Twombly* do not "impose[] a heightened

standard that requires a complaint to include specific evidence"); *Yulaeva* v. *Greenpoint Mortg.*

*Funding, Inc.*, 2010 WL 5394859, at *5 (E.D. Cal. Dec. 21, 2010) (factual allegations "fall[] out-

---

(footnote continued)

forgo protection of automatic stay not enforceable); *In re Gulf Beach Dev. Corp.*, 48 B.R. 40, 43
(Bankr. M.D. Fla. 1985) (same); *In re Tru Block Concrete Prods., Inc.*, 27 B.R. 486, 492 (Bankr.
S.D. Cal. 1983) (agreement to dismiss any bankruptcy petition not enforceable).

[30]      Plaintiffs also assert that because LBHI is not a party to the Custodial Undertaking, but
only a guarantor of LBI's obligations under that agreement, JPMorgan's claim should be dis-
missed "to the extent it seeks indemnification for losses that JPMorgan will incur in connection
with the successful prosecution of Plaintiffs' claims that are premised on the invalidity of the
September Guaranty and related agreements."  Pl. Br. 83.  This argument is, of course, prema-
ture, as the Court has not yet reached any conclusion as to the validity or invalidity "of the Sep-
tember Guaranty and related agreements."

side the scope of the [Supreme] Court's recent reiteration of the inadequacy of conclusory legal

allegations").

## CONCLUSION

Plaintiffs' motion to dismiss JPMorgan's Amended Counterclaims should be

denied.

Dated:  New York, New York
        June 3, 2011

                                        Respectfully submitted,

*Of counsel:*                           WACHTELL, LIPTON, ROSEN & KATZ

Harold S. Novikoff
Marc Wolinsky                           By:  /s/ Paul Vizcarrondo, Jr.
Amy R. Wolf                                   Paul Vizcarrondo, Jr.
Emil A. Kleinhaus
Alexander B. Lees                       51 West 52nd Street
Adam P. Schleifer                       New York, NY  10019
Vincent G. Levy                         Telephone:  (212) 403-1000
                                        Facsimile:   (212) 403-2000

                                        *Attorneys for Defendant and Counterclaimant*
                                        *JPMorgan Chase Bank, N.A.*