# WACHTELL, LIPTON, ROSEN & KATZ

| | | | | |
|---|---|---|---|---|
| MARTIN LIPTON | STEPHANIE J SELIGMAN | | RACHELLE SILVERBERG | JOHN F LYNCH |
| HERBERT M WACHTELL | JOHN F SAVARESE | | DAVID C BRYAN | WILLIAM SAVITT |
| BERNARD W NUSSBAUM | SCOTT K CHARLES | | STEVEN A COHEN | ERIC M ROSOF |
| LAWRENCE B PEDOWITZ | DAVID S NEILL | | GAVIN D SOLOTAR | MARTIN J E ARMS |
| PAUL VIZCARRONDO, JR | JODI J SCHWARTZ | | DEBORAH L PAUL | GREGORY E OSTLING |
| PETER C HEIN | ADAM O EMMERICH | | DAVID C KARP | DAVID B ANDERS |
| HAROLD S NOVIKOFF | GEORGE T CONWAY III | | RICHARD K KIM | ADAM J SHAPIRO |
| KENNETH B FORREST | RALPH M LEVENE | | JOSHUA R CAMMAKER | NELSON O FITTS |
| MEYER G KOPLOW | RICHARD G MASON | | MARK GORDON | JEREMY L GOLDSTEIN |
| THEODORE N MIRVIS | DOUGLAS K MAYER | | JOSEPH D LARSON | JOSHUA M HOLMES |
| EDWARD D HERLIHY | MICHAEL J SEGAL | | LAWRENCE S MAKOW | DAVID E SHAPIRO |
| DANIEL A NEFF | DAVID M SILK | | JEANNEMARIE O'BRIEN | DAMIAN G DIDDEN |
| ERIC M ROTH | ROBIN PANOVKA | | WAYNE M CARLIN | ANTE VUCIC |
| ANDREW R BROWNSTEIN | DAVID A KATZ | | JAMES COLE JR | IAN BOCZKO |
| MICHAEL H BYOWITZ | ILENE KNABLE GOTTS | | STEPHEN R DiPRIMA | MATTHEW M GUEST |
| PAUL K ROWE | DAVID M MURPHY | | NICHOLAS G DEMMO | DAVID E KAHAN |
| MARC WOLINSKY | JEFFREY M WINTNER | | IGOR KIRMAN | DAVID K LAM |
| DAVID GRUENSTEIN | TREVOR S NORWITZ | | JONATHAN M MOSES | BENJAMIN M ROTH |
| STEPHEN G GELLMAN | BEN M GERMANA | | T EIKO STANGE | JOSHUA A FELTMAN |
| STEVEN A ROSENBLUM | ANDREW J NUSSBAUM | | DAVID A SCHWARTZ | |

## 51 WEST 52ND STREET
## NEW YORK, N.Y. 10019-6150
## TELEPHONE: (212) 403-1000
## FACSIMILE: (212) 403-2000

GEORGE A KATZ (1965-1989)
JAMES H FOGELSON (1967-1991)

OF COUNSEL

| | | |
|---|---|---|
| WILLIAM T ALLEN | | ERIC S ROBINSON |
| PETER C CANELLOS | | PATRICIA A ROBINSON* |
| DAVID M EINHORN | | LEONARD M ROSEN |
| THEODORE GEWERTZ | | MICHAEL W SCHWARTZ |
| RICHARD D KATCHER | | ELLIOTT V STEIN |
| THEODORE A LEVINE | | WARREN R STERN |
| ROBERT B MAZUR | | PATRICIA A VLAHAKIS |
| PHILIP MINDLIN | | J BRYAN WHITWORTH |
| ROBERT M MORGENTHAU | | AMY R WOLF |

* ADMITTED IN THE DISTRICT OF COLUMBIA

COUNSEL

| | |
|---|---|
| MICHELE J ALEXANDER | PAULA N GORDON |
| LOUIS J BARASH | NANCY B GREENBAUM |
| DIANNA CHEN | MAURA R GROSSMAN |
| ANDREW J H CHEUNG | J AUSTIN LYONS |
| PAMELA EHRENKRANZ | AMANDA N PERSAUD |
| ELAINE P GOLIN | JEFFREY A WATIKER |

July 1, 2011

BY HAND

The Honorable James M. Peck
United States Bankruptcy Judge
United States Bankruptcy Court
  for the Southern District of New York
One Bowling Green
New York, NY 10004-1408

      Re:    *Lehman Bros. Holdings Inc., et al.* v. *JPMorgan Chase Bank, N.A.*
                *(In re Lehman Bros. Holdings, Inc.)*, No. 10-03266 (JMP)

Dear Judge Peck:

      I enclose a copy of the recent decision of the United States Court of Appeals for the Second Circuit in *Enron Creditors Recovery Corp.* v. *Alfa, S.A.B. de C.V., et al.*, No. 09-5122 (June 28, 2011), which affirms the decision of the District Court, 422 B.R. 423 (S.D.N.Y. 2009), that was relied upon by Defendant in its briefing and oral argument of its Motion to Dismiss the Amended Complaint in this action.

                        Respectfully submitted,

                        Harold S. Novikoff

Enclosure
cc: All Counsel of Record

```
1    09-5122-bk(L)
2    In re: Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.
3
4                 UNITED STATES COURT OF APPEALS
5                    FOR THE SECOND CIRCUIT
6
7                       August Term 2010
8        (Argued: November 3, 2010      Decided: June 28, 2011)
9            Docket No. 09-5122-bk(L) 09-5142-bk (Con)
10   -----------------------------------------------------x
11   In Re: ENRON CREDITORS RECOVERY CORP.,
12
13            Appellant,
14
15                       -- v. --
16
17   ALFA, S.A.B. DE C.V., ING VP BALANCED PORTFOLIO, INC.,
18   ING VP BOND PORTFOLIO, INC.,
19
20            Appellees.
21
22   -----------------------------------------------------x
23
24   B e f o r e :  WALKER, CABRANES, Circuit Judges, and KOELTL,
25                  District Judge.*
```

Appeal from a judgment of the United States District Court

for the Southern District of New York (Colleen McMahon, *Judge*)

reversing an order of the United States Bankruptcy Court for the

Southern District of New York (Arthur J. Gonzalez, Bankruptcy

*Judge*) and remanding with instructions to enter summary judgment

in favor of Appellees Alfa, S.A.B. de C.V., ING VP Balanced

Portfolio, Inc., and ING VP Bond Portfolio, Inc.  Appellant Enron

Creditors Recovery Corp. challenges the district court's

---

```
1    *    The Honorable John G. Koeltl, of the United States District
2    Court for the Southern District of New York, sitting by
3    designation.
```

1    conclusion that 11 U.S.C. § 546(e) protects from avoidance pre-

2    petition payments Enron Corp. made to redeem, prior to maturity,

3    commercial paper it had issued.  It argues that Enron Corp.'s

4    payments did not constitute "settlement payments" within the

5    meaning of § 546(e)'s safe harbor both because they were

6    repayments of debt and because they were not common in the

7    securities industry.  We hold that Enron Corp.'s payments were

8    "settlement payments" and thus were protected from avoidance

9    under § 546(e).  We therefore AFFIRM the judgment of the district

10    court.

11        Judge KOELTL dissents in a separate opinion.

MICHAEL SCHATZOW (Robert L.
Wilkins, Mitchell Y. Mirviss,
Colleen M. Mallon, Richard L.
Wasserman, on the brief), Venable
LLP, Baltimore, MD, for Appellant
Enron Creditors Recover Corp.

MICHAEL L. COOK (Brian C. Tong, on
the brief), Schulte Roth & Zabel
LLP, New York, NY, for Appellee
Alfa, S.A.B. de C.V.

SABIN WILLETT (Mark M. Elliott,
Eric Heining, on the brief),
Bingham McCutchen LLP, Boston, MA,
for Appellees ING VP Balanced
Portfolio, Inc., and ING VP Bond
Portfolio, Inc.

Mark D. Cahn, Deputy General
Counsel (Morgan Bradylyons,
Attorney, Jacob H. Stillman,
Solicitor, Katharine B. Gresham,
Assistant General Counsel), on the
brief, Securities and Exchange
Commission, Washington DC, for
amicus curiae Securities and
Exchange Commission.

Joshua D. Cohn (Christopher J.
Houpt), on the brief, Mayer Brown
LLP, New York, NY, for amicus
curiae Securities Industry and
Financial Markets Association.

JOHN M. WALKER, JR., Circuit Judge:

This appeal raises an issue of first impression in the
courts of appeals: whether 11 U.S.C. § 546(e), which shields
"settlement payments" from avoidance actions in bankruptcy,
extends to an issuer's payments to redeem its commercial paper

1    prior to maturity.  Enron Creditors Recovery Corp. ("Enron")[1]

2    seeks to avoid and recover payments Enron made to redeem its

3    commercial paper prior to maturity from Appellees Alfa, S.A.B. de

4    C.V. ("Alfa"), ING VP Balanced Portfolio, Inc., and ING VP Bond

5    Portfolio, Inc. (collectively, "ING"), whose notes were redeemed

6    by Enron.  Alfa and ING argue that § 546(e) protects these

7    payments from avoidance.

8        The Bankruptcy Court for the Southern District of New York

9    (Arthur J. Gonzalez, <u>Bankruptcy Judge</u>) concluded that § 546(e)'s

10   safe harbor does not protect Enron's payments from avoidance

11   because they were made to retire debt, not to purchase

12   securities, and because they were extraordinary.  The District

13   Court for the Southern District of New York (Colleen McMahon,

14   <u>Judge</u>) held that Enron's payments do fall within the safe harbor,

15   reversed the Bankruptcy Court's decision, and remanded with

16   instructions to enter summary judgment in favor of Alfa and ING.

17       On appeal, Enron challenges the district court's conclusion

18   that the safe harbor protects Enron's redemption payments whether

19   or not they were made to retire debt or were unusual.  Because we

20   agree with the district court that Enron's proposed exclusions

21   from the reach of § 546(e) have no basis in the Bankruptcy Code,

22   we AFFIRM its decision and order.

---

1    [1]     This opinion will refer to Enron Corp. and the reorganized
2    entity, Enron Creditors Recovery Corp., collectively as "Enron."

## BACKGROUND

After a series of events in the latter half of 2001, including the resignation of its CEO, Jeffery Skilling, its announcement of $600 million in third-quarter losses, the commencement of an SEC investigation into its practices, and the correction of four years' worth of financial statements, Enron, a Houston-based energy company, collapsed.  See, e.g., David S. Hilzenrath, Early Warnings of Trouble at Enron, Wash. Post, Dec. 30, 2001, at A10.

On December 2, 2001, Enron petitioned for Chapter 11 bankruptcy.  This appeal arises out of Enron's attempt to avoid and recover pre-petition payments it made to redeem, prior to maturity, commercial paper it had issued.

### I. Facts

Between October 25, 2001 and November 6, 2001, Enron drew down on its $3 billion revolving lines of credit and paid out more than $1.1 billion to retire certain of its unsecured and uncertificated commercial paper prior to the paper's maturity. Enron redeemed the commercial paper at the accrued par value, calculated as the price originally paid plus accrued interest. This price was considerably higher than the paper's market value.

The offering memoranda that accompanied the issuance of the commercial paper provided that the "Notes are not redeemable or

5

1  subject to voluntary prepayment by the Company prior to
2  maturity." This provision prohibited calls and puts: Enron could
3  not force investors to surrender the notes and the investors
4  could not require Enron to prepay them.

5      The Depository Trust Company (the "DTC"), a clearing agency,
6  maintained bookkeeping entries that tracked ownership of Enron's
7  commercial paper. This is the customary tracking method in the
8  industry. Every issuer of commercial paper has an issuing and
9  paying agent ("IPA") within the DTC to issue commercial paper and
10  to pay at maturity or at an early redemption.

11      Three broker-dealers, J.P. Morgan, Goldman, Sachs & Co., and
12  Lehman Brothers Commercial Paper, Inc., participated in Enron's
13  redemption. They received the commercial paper from the
14  individual noteholders and paid them the redemption price. The
15  mechanics of these transfers were as follows. The DTC debited
16  the redemption price from each broker-dealer's account and
17  credited it to the noteholder's DTC account. The broker-dealers
18  then transferred the notes to the DTC account of Enron's issuing
19  and paying agent, Chase IPA, and received payment from Enron
20  through the DTC. Immediately after the broker-dealer received
21  payment, the commercial paper Enron redeemed was extinguished in
22  the DTC system. Confirmations of these transactions referred to
23  them as securities trades, termed them "purchases" from the
24  holders, and referenced a "trade date" and "settlement date."

1     Prior to these transactions, ING and Alfa owned Enron

2     commercial paper in the amount, respectively, of $48,200,000 and

3     $5,667,255.  They both agreed to transfer their commercial paper

4     to broker-dealer J.P. Morgan in exchange for the redemption

5     price.

6     The parties dispute the circumstances and motives

7     surrounding Enron's redemption.  Enron argues that it made the

8     redemption payments under pressure from noteholders seeking to

9     recover on their investments amidst rumors of Enron's imminent

10    implosion.  Alfa and ING argue that Enron redeemed its commercial

11    paper to "calm the irrational markets" and leave a favorable

12    impression that would allow it to reenter the commercial paper

13    market once "bad publicity" about the company's stability "had

14    blown over."  They argue that the redemption was an economically

15    rational move that allowed Enron to refinance its existing

16    commercial paper debt with debt at a lower interest rate.

17    **II. Procedural History**

18    In November 2003, two years after Enron filed for

19    bankruptcy, the reorganized entity brought adversary proceedings

20    against approximately two hundred financial institutions,

21    including appellees Alfa and ING, seeking to avoid and recover

22    the redemption payments.  It alleged that the payments were

23    recoverable as (1) preferential transfers under 11 U.S.C. §

24    547(b), because they were made on account of an antecedent debt

7

within ninety days prior to bankruptcy, and (2) constructively
fraudulent transfers under 11 U.S.C. § 548(a)(1)(B), because the
redemption price exceeded the commercial paper's fair market
value.

In 2004, the defendants in the adversary proceedings moved
to dismiss Enron's complaint for failure to state a claim. They
argued that the redemption payments were "settlement payments"
protected from avoidance under 11 U.S.C. § 546(e)'s safe harbor.

Section 546(e) provides, in relevant part, that

> [n]otwithstanding sections . . . 547 [and] 548(a)(1)(B)
> . . . of this title, [which empower the trustee to
> avoid preferential and constructively fraudulent
> transfers,] the trustee may not avoid a transfer that
> is a . . . settlement payment, as defined in section .
> . . 741 of this title, made by or to (or for the
> benefit of) a . . . stockbroker, financial institution,
> financial participant, or securities clearing agency .
> . . that is made before the commencement of the case,
> except under section 548(a)(1)(A) of this title[, which
> empowers the trustee to avoid transfers made with
> actual intent to hinder, delay, or defraud creditors].

Section 741(8) of Title 11, in turn, defines a "settlement
payment" as "a preliminary settlement payment, a partial
settlement payment, an interim settlement payment, a settlement
payment on account, a final settlement payment, or any other
similar payment commonly used in the securities trade."

The bankruptcy court denied the motion to dismiss. It held
that the phrase "commonly used in the securities trade" in
§ 741(8) modifies all the terms in the section's definition and
thereby limits protected "settlement payments" to those that are

8

1    common in the industry.  In re Enron Corp., 325 B.R. 671, 685-86

2    & n.7 (Bankr. S.D.N.Y. 2005)("Enron I").  The bankruptcy court

3    held that evidence was necessary to determine whether the

4    redemption payments were commonly used, rather than, as Enron

5    alleged, extraordinary because they resulted from coercion by

6    holders of the commercial paper.  Id. at 686.  It also held that

7    a factual issue existed over whether Enron's redemption payments

8    were made to retire debt or to purchase the commercial paper, and

9    that this distinction could affect whether the payments

10   constituted settlement payments.  Id.  Most of the defendants

11   settled with Enron after Judge Gonzalez denied their motions to

12   dismiss.

13       Following discovery, Alfa and ING, relying on § 546(e)'s

14   safe harbor, moved for summary judgment.  The bankruptcy court

15   denied the motions.  In re Enron Creditors Recovery Corp., 407

16   B.R. 17, 45 (Bankr. S.D.N.Y. 2009)("Enron II").  Concluding that

17   "the transfer of 'ownership' of a security is an integral element

18   in the securities settlement process," it held that "settlement

19   payments" include only payments made to buy or sell securities

20   and not payments made to retire debt.  Id. 37-41.  The bankruptcy

21   court relied on our decision in SEC v. Sterling Precision Corp.,

22   393 F.2d 214 (2d Cir. 1968), in which we held that "a maker's

23   paying a note prior to maturity in accordance with its terms

24   would not be regarded as a 'purchase'" under the Investment

9

1    Company Act of 1940. _Enron II_, 407 B.R. at 38 (quoting _Sterling_

2    _Precision_, 393 F.2d at 217). The bankruptcy court concluded that

3    Alfa and ING had not demonstrated that Enron's payments were

4    settlement payments as defined in § 741(8), because they had

5    failed to establish that the payments were made to acquire title

6    to the commercial paper rather than to retire debt. _Id._ at 37-

7    41. At several points in its opinion, the bankruptcy court, to

8    buttress its denial of summary judgment, emphasized facts (most

9    of which are disputed) regarding the allegedly unusual nature of

10   Enron's redemption. These include the above-market price Enron

11   paid, the alleged insistence of the broker-dealers to act as

12   intermediaries instead of principals, and the supposed rarity of

13   commercial paper prepayments in general. _See, e.g._, _id._ at 37-

14   38.

15       Alfa and ING sought, and were granted by the district

16   court, interlocutory review of the bankruptcy court's decision

17   denying summary judgment. _See In re Enron Creditors Recovery_

18   _Corp._, No. 01-16034, 2009 WL 3349471 (S.D.N.Y. Oct. 16, 2009)

19   ("_Enron III_"). The district court limited the scope of review to

20   the question whether the § 546(e) safe harbor applies to an

21   issuer's redemption of commercial paper prior to maturity,

22   effected through the customary mechanism of transacting in

23   commercial paper through the Depository Trust Company, without

24   regard to extrinsic facts, such as the motives and circumstances

1  of the redemption.  See In re Enron Creditors Recovery Corp., 422

2  B.R. 423, 424 (S.D.N.Y. 2009) ("Enron IV").

3      The district court reversed the bankruptcy court.  It

4  concluded that § 546(e)'s safe harbor protects Enron's redemption

5  payments, and directed entry of summary judgment in favor of Alfa

6  and ING.  Id. at 442.  The district court held (1) that

7  § 741(8)'s definition of "settlement payment" is not limited to

8  payments that are "commonly used," and, therefore, that the

9  circumstances of a particular payment do not bear on whether that

10 payment fits within the definition, id. at 429-34; (2) that a

11 "settlement payment is any transfer that concludes or consummates

12 a securities transaction," id. at 436; and (3) that Enron's

13 redemption constitutes a securities transaction regardless of

14 whether Enron acquired title to the commercial paper, because the

15 redemption involved "the delivery and receipt of funds and

16 securities," id. at 435-42.

17     Enron appealed to this court.

18                        **DISCUSSION**

19     On appeal, Enron argues that the bankruptcy court's

20 decision was correct and that the district court erred by holding

21 that settlement payments under § 741(8) are not limited to those

22 that are commonly used in the securities trade and that involve

23 the transfer of title to a security.

24     "A district court's order in a bankruptcy case is subject to

                              11

plenary review, meaning that this Court undertakes an independent examination of the factual findings and legal conclusions of the bankruptcy court." In re Duplan Corp., 212 F.3d 144, 151 (2d Cir. 2000). Here, we review only the issue the district court agreed to hear on appeal:

> whether the § 546(e) 'safe harbor' . . . extends to transactions in which commercial paper is redeemed by the issuer prior to maturity, using the customary mechanism of the Depository Trust Company . . . for trading in commercial paper . . . , without regard to extrinsic facts about the nature of the [transactions], the motive behind the [transactions], or the circumstances under which the payments were made.

Enron IV, 422 B.R at 424. As several of our sister circuits have held, the meaning of "settlement payment" under § 741(8) is a matter of statutory construction and thus a question of law we review de novo. See, e.g., In re Comark, 971 F.2d 322, 324-25 (9th Cir. 1992)(citing In re Kaiser Steel Corp., 952 F.2d 1230 (10th Cir. 1991); Kaiser Steel Corp. v. Charles Schwab & Co., 913 F.2d 846 (10th Cir. 1990); Bevill, Bresler, & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass'n, 878 F.2d 742, 745 (3d Cir. 1989)).

I. **Judicial Interpretation of the Safe Harbor**

Congress enacted § 546(e)'s safe harbor in 1982 as a means of "minimiz[ing] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." Kaiser Steel Corp. v. Charles Schwab & Co., Inc., 913 F.2d 846, 849 (10th Cir. 1990) (quoting H.R. Rep. 97-

12

1   420, at 2 (1982), <u>reprinted in</u> 1982 U.S.C.C.A.N. 583, 583).  If a

2   firm is required to repay amounts received in settled securities

3   transactions, it could have insufficient capital or liquidity to

4   meet its current securities trading obligations, placing other

5   market participants and the securities markets themselves at

6   risk.

7       The safe harbor limits this risk by prohibiting the

8   avoidance of "settlement payments" made by, to, or on behalf of a

9   number of participants in the financial markets.  By restricting

10  a bankruptcy trustee's power to recover payments that are

11  otherwise avoidable under the Bankruptcy Code, the safe harbor

12  stands "at the intersection of two important national legislative

13  policies on a collision course-the policies of bankruptcy and

14  securities law."  <u>In re Resorts Int'l, Inc.</u>, 181 F.3d 505, 515

15  (3rd Cir. 1999) (internal quotation marks omitted).

16      Section 741(8), which § 546(e) incorporates, defines

17  "settlement payment" rather circularly as "a preliminary

18  settlement payment, a partial settlement payment, an interim

19  settlement payment, a settlement payment on account, a final

20  settlement payment, or any other similar payment commonly used in

21  the securities trade."  The parties, following our sister

22  circuits, agree that courts should interpret the definition, "in

23  the context of the securities industry," as "the transfer of cash

24  or securities made to complete [a] securities transaction."

13

1  <u>Contemporary Indus. Corp. v. Frost</u>, 564 F.3d 981, 985 (8th Cir.

2  2009) (quoting <u>In re Resorts Int'l, Inc.</u>, 181 F.3d at 515).

3       Although our circuit has not yet addressed the scope of

4  § 741(8)'s definition, other circuits have held it to be

5  "extremely broad." <u>In re QSI Holdings, Inc.</u>, 571 F.3d 545, 549

6  (6th Cir. 2009) (quoting <u>Contemporary Indus. Corp.</u>, 564 F.3d at

7  985). Several circuits, for example, have rejected limitations

8  on the definition that would exclude transactions in privately

9  held securities or transactions that do not involve financial

10  intermediaries that take title to the securities during the

11  course of the transaction. <u>See, e.g.</u>, <u>In re Plassein Int'l</u>

12  <u>Corp.</u>, 590 F.3d 252, 258-59 (3rd Cir. 2009); <u>In re QSI Holdings,</u>

13  <u>Inc.</u>, 571 F.3d at 549-50; <u>Contemporary Indus. Corp.</u>, 564 F.3d at

14  986. No circuit has yet addressed the safe harbor's application

15  to an issuer's early redemption of commercial paper.

16       Alfa and ING argue that Enron's redemption payments are

17  settlement payments within the meaning of § 741(8) because they

18  completed a transaction involving the exchange of money for

19  securities. The SEC and the Securities Industry and Financial

20  Markets Association, a trade group representing the interests of

21  securities firms, banks, and asset managers, have filed amicus

22  briefs in support of Alfa and ING's interpretation of the

23  statute.

24       Enron proposes three limitations on the definition of

14

settlement payment in § 741(8), each of which, it argues, would exclude the redemption payments. First, it contends that the final phrase of § 741(8)–"commonly used in the securities trade"–excludes all payments that are not common in the securities industry, including, Enron argues, Enron's redemption. Second, Enron argues that the definition includes only transactions in which title to the securities changes hands. Because, Enron argues, the redemption payments here were made to retire debt and not to acquire title to the commercial paper, they are not settlement payments within the meaning of § 741(8). Finally, Enron argues that the redemption payments are not settlement payments because they did not involve a financial intermediary that took title to the transacted securities and thus did not implicate the risks that prompted Congress to enact the safe harbor.

Because we find nothing in the Bankruptcy Code or the relevant caselaw that supports Enron's proposed limitations on the definition of settlement payment in § 741(8), we reject them. We hold that Enron's redemption payments fall within the plain language of § 741(8) and are thus protected from avoidance under § 546(e).

**II. "Commonly Used in the Securities Trade"**

Section 741(8) defines "settlement payment" as "a preliminary settlement payment, a partial settlement payment, an

15

interim settlement payment, a settlement payment on account, a
final settlement payment, or any other similar payment commonly
used in the securities trade." Enron argues that the phrase
"commonly used in the securities trade" modifies all the
preceding terms and thereby excludes from the definition all
uncommon payments. We disagree.

First, as the district court held, the grammatical structure
of the statute strongly suggests that the phrase "commonly used
in the securities trade" modifies only the term immediately
preceding it: "any other similar payment." Under the "rule of
the last antecedent, . . . a limiting clause or phrase . . .
should ordinarily be read as modifying only the noun or phrase
that it immediately follows." Barnhart v. Thomas, 540 U.S. 20,
26 (2003); see also Stepnowski v. Comm'r, 456 F.3d 320, 324 n.7
(3d Cir. 2006) ("Under the last-antecedent rule of construction,
. . . the series 'A or B with respect to C' contains two items:
(1) 'A' and (2) 'B with respect to C.'"). Enron seizes on a
corollary rule of construction under which "a modifier . . . set
off from a series of antecedents by a comma . . . should be read
to apply to each of those antecedents." Kahn Lucas Lancaster,
Inc. v. Lark Int'l Ltd., 186 F.3d 210, 215 (2d Cir. 1999),
abrogated on other grounds as recognized by Sarhank Grp. v.
Oracle Corp., 404 F.3d 657, 660 n.2 (2d Cir. 2005). For example,
in the phrase "no person shall be deprived of life, liberty, or

16

1    the pursuit of happiness, without due process of law," the phrase

2    "without due process of law" modifies all three terms.  This

3    rule, however, does not apply to the series in § 741(8) because

4    the modifier is not set off from its antecedents by a comma.

5    Because both the modifier and its immediate antecedent are set

6    off from the preceding terms in the series, the last-antecedent

7    rule applies.  The phrase "commonly used in the securities

8    industry" thus is properly read as modifying only the term "any

9    other similar payment."  The phrase is not a limitation on the

10   definition of settlement payment, but rather, as our sister

11   circuits have held, it is "a catchall phrase intended to

12   underscore the <u>breadth</u> of the § 546(e) exemption."  <u>In re QSI</u>

13   <u>Holdings, Inc.</u>, 571 F.3d at 550 (quoting <u>Contemporary Indus.</u>

14   <u>Corp.</u>, 564 F.3d at 986 (emphasis in original)).

15       Moreover, Enron's proposed reading would make application of

16   the safe harbor in every case depend on a factual determination

17   regarding the commonness of a given transaction. It is not clear

18   whether that determination would depend on the economic

19   rationality of the transaction, its frequency in the marketplace,

20   signs of an intent to favor certain creditors-as suggested by the

21   facts on which the bankruptcy court relied, such as the alleged

22   coercion by Enron's commercial paper noteholders, <u>Enron II</u>, 407

23   B.R. at 31-or some other factor.  This reading of the statute

24   would result in commercial uncertainty and unpredictability at

17

odds with the safe harbor's purpose and in an area of law where certainty and predictability are at a premium.

Accordingly, we hold that the phrase "commonly used in the securities industry" limits only the phrase immediately preceding it; it does not limit the other transactions that § 741(8) defines as settlement payments.

## III. Redemption of Debt Securities

Enron next argues that the redemption payments are not settlement payments because they involved the retirement of debt, not the acquisition of title to the commercial paper. We find no basis in the Bankruptcy Code or the relevant caselaw to interpret § 741(8) as excluding the redemption of debt securities. Because Enron's redemption payments completed a transaction in securities, we hold that they are settlement payments within the meaning of § 741(8).

The bankruptcy court agreed with Enron's position, relying in large part on our decision in SEC v. Sterling Precision Corp., 393 F.2d 214 (2d Cir. 1968). See Enron II, 407 B.R. at 37-40. In Sterling Precision Corp., we held that an issuer's redemption of bonds and preferred stock was not a "purchase" within the meaning of the Investment Company Act of 1940. 393 F.2d at 217. We based this conclusion, in part, on the fact that the issuer "did not acquire title to its Debentures or Preferred Stock; it discharged them." 393 F.2d at 216-18. Drawing on this

1    conclusion, the bankruptcy court held that Enron's redemption

2    payments do not constitute settlement payments under § 741(8)

3    because Enron did not acquire title to the commercial paper it

4    redeemed. <u>Enron II</u>, 407 B.R. at 38-40.

5        Alfa and ING argue that <u>Sterling Precision Corp.</u> is not

6    relevant to this case because it interpreted the Investment

7    Company Act, not the Bankruptcy Code. Setting aside this

8    argument, reliance on <u>Sterling Precision Corp.</u>'s interpretation

9    of the term "purchase" still makes sense only if we read a

10   purchase or sale requirement into § 741(8). For the following

11   reasons, we decline to do so.

12        Nothing in the text of § 741(8) or in any other provision of

13   the Bankruptcy Code supports a purchase or sale requirement.

14   Enron argues that a "settlement payment" must involve a

15   transaction in securities, which, in turn, must involve a

16   purchase or sale. While we, like our sister circuits, agree that

17   in the context of the securities industry a "'settlement' refers

18   to 'the completion of a securities transaction,'" <u>Contemporary</u>

19   <u>Indus. Corp.</u>, 564 F.3d at 985 (quoting <u>Kaiser Steel Corp. v.</u>

20   <u>Charles Schwab & Co.</u>, 913 F.2d 846, 849 (10th Cir. 1990)), we

21   find little support for the contention that a securities

22   transaction necessarily involves a purchase or sale. Several of

23   the industry definitions of "settlement payment" on which other

24   courts of appeals have relied define the term as an exchange of

money or securities that completes a securities transaction;
these definitions make no mention of a requirement that title to
the securities changes hands. See, e.g., Kaiser Steel Corp., 913
F.2d at 849 (citing, inter alia, D. Brownstone & I. Franck, The
VNR Investor's Dictionary 279 (1981) (defining "settlement" as
"finishing up of a transaction or group of transactions"); Group
of Thirty, Clearance and Settlement Systems in the World's
Securities Markets 86 (1989) (defining "settlement" as "[t]he
completion of a transaction, wherein securities and corresponding
funds are delivered and credited to the appropriate accounts");
A. Pessin & J. Ross, Words of Wall Street: 2000 Investment Terms
Defined 227 (1983) (defining "settlement" as "the completion of a
securities transaction")).  While, as the dissent notes, see
Dissent at 8-9, Kaiser Steel Corp. also cites industry
definitions that reference a purchase or sale of securities, 913
F. 2d at 849, the range of definitions that the decision cites
suggests that the securities industry does not universally
consider a purchase or sale of securities to be a necessary
element of a settlement payment.

Enron argues, and the dissent agrees, see Dissent at 11, 19-
20, that applying the safe harbor to Enron's commercial paper
redemption would contradict "uniform case law spanning two
decades" that allows "avoidance of debt-related payments."  The
cases on which Enron relies, however, involve non-tradeable bank

1    loans, not widely issued debt securities.  See, e.g., Union Bank

2    v. Wolas, 502 U.S. 151, 152-53 (1991); Ray v. City Bank & Trust

3    Co., 899 F.2d 1490, 1491-93 (6th Cir. 1990); Breeden v. L.I.

4    Bridge Fund, LLC, 220 B.R. 739, 740 (B.A.P. 2d Cir. 1998); CEPA

5    Consulting, Ltd. v. N.Y. Nat'l Bank, 187 B.R. 105, 106-07

6    (S.D.N.Y. 1995).  Concluding that the safe harbor protects

7    payments made to redeem tradeable debt securities does not

8    contradict caselaw permitting avoidance of payments made on

9    ordinary loans.  Interpreting the term "settlement payment" in

10   the context of the securities industry will exclude from the safe

11   harbor payments made on ordinary loans.

12       Indeed, it is not clear that a purchase or sale requirement

13   would necessarily exclude all payments made on ordinary loans.

14   For example, what if parties structured the early repayment of a

15   loan evidenced by a promissory note as a repurchase of that

16   promissory note?  The note's terms could prohibit voluntary early

17   redemption.  If the borrower were to buy back the promissory note

18   at a negotiated price, it would be difficult to characterize this

19   transaction as a redemption rather than a repurchase in order to

20   exclude it from the safe harbor.

21       The payments at issue in this case demonstrate the

22   difficulty with and the absence of a statutory foundation for a

23   purchase or sale requirement.  Assume, for example, that the

24   terms of Enron's commercial paper-like the terms of the

21

1　　hypothetical promissory note discussed above-prohibited early

2　　redemption.  Enron could reacquire the paper only by agreeing

3　　with the paper holders on a particular reacquisition price.  This

4　　transaction would appear to be a repurchase,[2] cf. Sterling

5　　Precision Corp., 393 F.2d at 217 ("[A] maker's paying a note

6　　prior to maturity in accordance with its terms would not be

7　　regarded as a 'purchase.'" (emphasis added)), and would thus

8　　trigger safe-harbor protection under the rule Enron and the

9　　dissent espouse.  It is difficult to see, however, why this

10　　transaction should warrant safe harbor protection while a

11　　transaction identical in every respect, except that the

12　　commercial paper's terms did not prohibit early redemption,

13　　should not.  Avoidance of the transactions in either scenario

14　　would present the same threat of systemic risk in the

15　　marketplace, and limiting safe-harbor protection to transactions

16　　in the first scenario would not prevent an issuer from making

17　　payments to reacquire commercial paper during the preference

18　　period.  Contrary to the dissent's contention, see Dissent at 18-

19　　19, a purchase or sale requirement would thus not prevent Enron

1　[2]　　Whether the reacquisition of commercial paper at issue in
2　this appeal is properly characterized as a redemption or a
3　repurchase remains an open issue.  See Enron II, 407 B.R. at 45.
4　Because the district court addressed on appeal only whether the
5　safe harbor protects an issuer's premature redemption of
6　commercial paper, we do not have occasion to address the
7　distinction between a premature redemption and an issuer's
8　repurchase of commercial paper.

1    from favoring commercial-paper holders over other creditors.

2         Because we find no basis in the Bankruptcy Code or the

3    caselaw for a purchase or sale requirement, and because we do not

4    think such a requirement is necessary to exclude from the safe

5    harbor repayment of ordinary loans, we decline to impose a

6    purchase or sale requirement on § 741(8).

7         **IV. Involvement of a Financial Intermediary**

8         Enron also argues that the redemption of debt does not

9    constitute a protected settlement payment because it did not

10   involve a financial intermediary that took a beneficial interest

11   in the securities during the course of the transaction.  Enron

12   argues that the redemption thus did not implicate the systemic

13   risks that motivated Congress's enactment of the safe harbor.

14   Although the role of the broker-dealers that participated in

15   Enron's redemption is a disputed issue of fact, see Enron IV, 422

16   B.R. at 426, Enron is correct that the DTC acted as a conduit and

17   recordkeeper rather than a clearing agency that takes title to

18   the securities during the course of the transaction.

19        Nevertheless, we do not think the absence of a financial

20   intermediary that takes title to the transacted securities during

21   the course of the transaction is a proper basis on which to deny

22   safe-harbor protection.  The Third, Sixth, and Eighth Circuits

23   rejected similar arguments in affirming application of the safe

24   harbor to leveraged buyouts of private companies that involved

financial intermediaries who served only as conduits.  See In re

Plassein Int'l Corp., 590 F.3d at 257-59; In re QSI Holdings,

Inc., 571 F.3d at 549-50; Contemporary Indus. Corp., 564 F.3d at

986.  In reasoning that provides an analog for us, these courts

explained that undoing long-settled leveraged buyouts would have

a substantial impact on the stability of the financial markets,

even though only private securities were involved and no

financial intermediary took a beneficial interest in the

exchanged securities during the course of the transaction.[3]  See

In re Plassein Int'l Corp., 590 F.3d at 258; In re QSI Holdings,

Inc., 571 F.3d at 550; Contemporary Indus. Corp., 564 F.3d at

987.  We see no reason to think that undoing Enron's redemption

payments, which involved over a billion dollars and approximately

two hundred noteholders, would not also have a substantial and

similarly negative effect on the financial markets.

---

[3]    The dissent characterizes these decisions as "stand[ing] for
the proposition that, if Section 546(e) applies to a particular
type of transaction–namely, purchases of equity securities–an
individual transaction does not lose safe-harbor protection
simply because it does not involve a central counterparty."
Dissent at 15.  We have difficulty understanding the import of
this characterization.  We rely on these decisions as support for
rejecting Enron's argument that a transaction must involve a
central counterparty to receive safe-harbor protection.  The
dissent argues that Congress enacted the safe harbor out of
"concern for the stability of central counterparties that
guarantee both sides of a securities transaction."  But the
dissent does not appear to dispute our, or the Third, Sixth, and
Eighth Circuits', rejection of a restriction on the safe harbor
that would limit it to transactions involving central
counterparties.

1      Moreover, § 546(e) applies to settlement payments made "by

2      or to (or for the benefit of)" a number of participants in the

3      financial markets.  It would appear inconsistent with this

4      language for courts to limit the safe harbor circuitously by

5      interpreting the definition of "settlement payment" to exclude

6      payments that do not involve a financial intermediary that takes

7      title to the securities during the course of the transaction.

8          In sum, we decline to adopt Enron's proposed exclusions from

9      the definition of settlement payment and the safe harbor.   The

10     payments at issue were made to redeem commercial paper, which the

11     Bankruptcy Code defines as a security.  11 U.S.C.

12     § 101(49)(A)(i).[4]  They thus constitute the "transfer of cash . .

13     . made to complete [a] securities transaction" and are settlement

14     payments within the meaning of § 741(8).  See Contemporary Indus.

15     Corp., 564 F.3d at 985 (quoting In re Resorts Int'l, Inc., 181

16     F.3d at 515 (3rd Cir. 1999)).  Because we reach this conclusion

17     by looking to the statute's plain language, we decline to address

18     Enron's arguments regarding legislative history, which, in any

19     event, would not lead to a different result.  See Lamie v. U.S.

_____

1      [4]     We reject, as the district court did, Enron's attempt to
2      supplant the Bankruptcy Code's definition of "security" with the
3      definition in the Securities Exchange Act of 1934, which excludes
4      short-term commercial paper.  15 U.S.C. § 78c(a)(10).  This case
5      calls on us to interpret a provision of the Bankruptcy Code.  It
6      makes little sense to look to a definition from a different
7      statutory scheme, particularly when that definition contradicts
8      the Bankruptcy Code's.

1    <u>Trustee</u>, 540 U.S. 526, 534 (2004) ("It is well established that

2    when the statute's language is plain, the sole function of the

3    courts-at least where the disposition required by the text is not

4    absurd-is to enforce it according to its terms." (internal

5    quotation marks omitted)).

6                              **CONCLUSION**

7         For the foregoing reasons, we AFFIRM the district court's

8    decision reversing the decision of the Bankruptcy Court and

9    directing entry of summary judgment in favor of Alfa and ING.

1    John G. Koeltl, District Judge, dissenting:

2        The Court today concludes that Section 546(e) of the

3    Bankruptcy Code, 11 U.S.C. § 546(e), which exempts a "settlement

4    payment" from a bankruptcy trustee's avoidance powers, extends

5    to every transaction in which commercial paper is redeemed by an

6    issuer prior to maturity using the customary mechanism of the

7    Depository Trust Company.  Op. at 26-27.

8        The issue resolved in this case has never been decided

9    previously by any court of appeals.  To capture a premature

10   commercial paper redemption within the definition of "settlement

11   payment" in the Bankruptcy Code, the Court broadly defines

12   "settlement payment" to include a payment that "complete[s] a

13   transaction in securities."  Op. at 19.  A "security" is, in

14   turn, broadly defined under the Bankruptcy Code to include

15   various types of debt such as a note, bond, or debenture.  11

16   U.S.C. § 101(49)(A).  The Court's holding is not required by the

17   opaque definition of "settlement payment" in the Bankruptcy

18   Code, and is inconsistent with the legislative history of that

19   provision.  Moreover, the breadth of the Court's definition

20   threatens routine avoidance proceedings in bankruptcy courts.

21   The Bankruptcy Court correctly concluded in this case that the

22   definition of "settlement payment" should include a requirement

23   that there be a purchase or sale of a security to trigger a

1

"settlement payment." <u>See</u> <u>In re Enron Creditors Recovery Corp.</u>, 407 B.R. 17, 38-40 (Bankr. S.D.N.Y. 2009). The redemption of commercial paper indisputably is not the purchase or sale of that commercial paper. Because I disagree with the Court's conclusion eliminating this requirement, I respectfully dissent.

I.

Section 547(b) of the Bankruptcy Code, 11 U.S.C. § 547(b), provides that the trustee of a bankruptcy estate may recover, among other things, money or property transferred by an insolvent debtor in the 90 days preceding bankruptcy, where the transfer (1) was made to or for the benefit of a creditor; (2) was made for or on account of an antecedent debt owed by the debtor; and (3) enabled the creditor to receive more than it otherwise would have under the provisions of the Bankruptcy Code. 11 U.S.C. § 547(b).

Section 546(e) of the Bankruptcy Code, 11 U.S.C. § 546(e), carves out a limited exception to the trustee's avoidance powers, including its power to avoid preferential transfers under Section 547(b). It provides, in relevant part, that:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section . . . 741 of this title, made by or

2

to (or for the benefit of) a commodity broker, forward
                    contract merchant, stockbroker, financial institution,
                    financial participant, or securities clearing agency
                    . . . .

11 U.S.C. § 546(e). Section 741 in turn defines "settlement

payment" in an ambiguous fashion as "a preliminary settlement

payment, a partial settlement payment, an interim settlement

payment, a settlement payment on account, a final settlement

payment, or any other similar payment commonly used in the

securities trade." 11 U.S.C. § 741(8).

      The question the Court confronts today is whether an issuer's

redemption of commercial paper prior to maturity is a

"settlement payment" within the meaning of Sections 546(e) and

741(8). Op. at 12.[1] It answers this question in the

affirmative, based on what it terms "the plain language of

§ 741(8)." Op. at 16; see also Op. at 26-27. The text of

Section 741(8), however, provides virtually no guidance as to

the types of transfers that might qualify as settlement

payments. The Court understates the severity of this problem by

_____

[1] As the Bankruptcy Court noted, commercial paper is a note
evidencing a debt, "with a corporation borrowing the money in
the marketplace instead of from a bank." Enron, 407 B.R. at 37,
38. Commercial paper with a maturity at the time of issuance of
nine months or less is excluded from the definition of a
"security" under the Securities Exchange Act of 1934. See 15
U.S.C. § 78c(a)(10).

3

describing the definition as "rather circular[]." Op. at 14.

It is in fact difficult to imagine a more circular, less clear

statute than one that defines "settlement payment" by exclusive

reference to a variety of types of "settlement payment," and

then concludes with a catch-all that refers back to the

undefined "settlement payment," namely "any other similar

payment commonly used in the securities trade." Thus, while it

may be true, as the Court notes, that no provision of the

Bankruptcy Code clearly indicates that the redemption of

commercial paper is beyond the scope of Section 741(8), <u>see,</u>

<u>e.g.,</u> Op. at 16, 19, neither does any provision of the

Bankruptcy Code clearly indicate that such transactions are

within its scope. In other words, the statute is ambiguous.

In light of this statutory ambiguity, other courts of

appeals have construed "settlement payment" as a "term . . . of

art in the securities trade," which "should be given its

established meaning in that industry." <u>Contemporary Indus.</u>

<u>Corp. v. Frost</u>, 564 F.3d 981, 985 (8th Cir. 2009) (citing

<u>McDermott Int'l, Inc. v. Wilander</u>, 498 U.S. 337, 342-46 (1991)).

"Specifically, 'settlement' refers to 'the completion of a

securities transaction,' and a 'settlement payment is generally

the transfer of cash or securities made to complete [the]

securities transaction.'" <u>Id.</u> (quoting <u>Kaiser Steel Corp. v.</u>

4

1  <u>Charles Schwab & Co.</u>, 913 F.2d 846, 849 (10th Cir. 1990); <u>In re</u>

2  <u>Resorts, Int'l, Inc.</u>, 181 F.3d 505, 515 (3d Cir. 1999)

3  (alteration in original)); <u>see also</u> <u>In re Comark</u>, 971 F.2d 322,

4  325 (9th Cir. 1992). The parties agree that this is the

5  approach the Court should follow in interpreting "settlement

6  payment," <u>see</u> Op. at 14, but disagree as to whether an issuer's

7  redemption of its commercial paper is a "securities

8  transaction." This question is one of first impression in the

9  courts of appeals.

10

11                              **II.**

12

13      Enron argues persuasively that a "securities transaction"

14  is a term of art in the securities industry that requires a

15  purchase or sale of securities. This industry understanding is

16  reflected in numerous business dictionaries. <u>See, e.g.</u>,

17  Barron's Financial Guides, <u>Barron's Dictionary of Finance and</u>

18  <u>Investment Terms</u> 641, 745 (7th ed. 2006) (defining "settlement"

19  as the "conclusion of a securities transaction in which a

20  broker/dealer pays for securities bought . . . or delivers

21  securities sold and receives payment from the buyer's broker");

22  Thomas P. Fitch, <u>Barron's Dictionary of Banking Terms</u> 423-24

23  (5th ed. 2006) ("[t]he delivery of securities by a selling

broker, and payment by a buying broker"); Group of Thirty,

_Global Clearing and Settlement: A Plan of Action_ 13 (2003) ("the

process by which the ownership interest in securities is

transferred from one investor to another, generally in exchange

for a corresponding transfer of funds"); New York Stock

Exchange, _Language of Investing Glossary_ 30 (1981)

("[c]onclusion of a securities transaction when a customer pays

a broker/dealer for securities purchased or delivers securities

sold and receives from the broker the proceeds of a sale"); Bank

for International Settlements, Committee on Payment and

Settlement Systems & Technical Committee of the International

Organization of Securities Commissions, _Recommendations for_

_Securities Settlement Systems_ 48 (2001) ("[t]he completion of a

transaction through final transfer of securities and funds

between the buyer and the seller").

The existence of a purchase or sale requirement also finds

support in case law.  _See, e.g., In re Bevill, Bresler &_

_Schulman Asset Mgmt. Corp._, 878 F.2d 742, 751 (3d Cir. 1989)

("[T]he transfer of record ownership of securities is an

integral element in the securities settlement process.").  Among

the definitions of "settlement payment" that the _Kaiser Steel_

Court relied on was the definition from the New York Stock

Exchange's _Language of Investing Glossary_: The "[c]onclusion of

a securities transaction when a customer pays a broker/dealer
for securities purchased or delivers securities sold and
receives from the broker the proceeds of a sale." Kaiser Steel,
913 F.2d at 849 (quoting New York Stock Exchange, Language of
Investing Glossary 30 (1981)). See also 17 C.F.R. 240.17f-
1(a)(5) ("The term securities-related transaction shall mean a
purpose [sic], sale or pledge of investment securities, or a
custodial arrangement for investment securities.").

There appears to be no dispute that an issuer's redemption
of its commercial paper does not involve the purchase or sale of
a security. Commercial paper is a note evidencing the issuer's
debt. As the Court recognizes, this Court has found that an
issuer's redemption of its bonds and preferred stock is not a
"purchase" within the meaning of the Investment Company Act of
1940. SEC v. Sterling Precision Corp., 393 F.2d 214, 217 (2d
Cir. 1968) (Friendly, J.). While the Court reached that
conclusion in the context of the Investment Company Act, the
Court's reasoning was based on, among other factors, the common
understanding of an issuer's repayment of its debt. As Judge
Friendly explained, "in common speech a maker's paying a note
prior to maturity in accordance with its terms would not be
regarded as a 'purchase.'" Id. at 217. Judge Friendly
continued: "[T]he normal discourse of lawyers sets redemptions

apart from purchases. The distinction is recognized in
corporation statutes, . . . ; by judicial decision, . . . ; and
by writers on corporation law." Id. The Court today does not
dispute this conclusion, but argues that it is irrelevant
because the Court declines to "read a purchase or sale
requirement into § 741(8)." Op. at 20.

The Court states that it finds little support for a
purchase or sale requirement and explains that cases "make no
mention of a requirement that title to the securities changes
hands." Op. at 21. The Court cites Kaiser Steel and its
citation to definitions of "settlement" that make no reference
to a change in title to securities. However, Kaiser Steel
concerned whether a leveraged buyout transaction was included in
the definition of a "settlement payment" in § 741(8). There was
no question that the transaction involved the purchase of
securities. Moreover, as the Court notes, Kaiser Steel
specifically cited other source materials that make clear that a
change of title is an integral element of the settlement of a
securities transaction. See Kaiser Steel, 613 F.2d at 849
(citing New York Stock Exchange, Language of Investing Glossary
30 (1981)(quoted above); D. Scott, Wall Street Words 320 (1988)
(defining "settlement" as the "[t]ransfer of the security (for
the seller) or cash (for the buyer) in order to complete a

security transaction")).  <u>Kaiser Steel</u> cannot stand for the
proposition that no purchase or sale is required for a
securities transaction when the transaction at issue did include
a purchase and when the Court cited to source materials that
identified a purchase as an essential element of a settlement
payment.

The Court today points to no case that holds that there is
no purchase or sale requirement for a securities transaction,
and provides no source that indicates that there is a common
industry understanding that the redemption of commercial paper
is the completion of a securities transaction.[2]

_____

[2] The Court downplays Enron's argument that applying the safe
harbor to the redemption of commercial paper would undermine
uniform case law that allows the avoidance of debt-related
payments.  Op. at 21-22.  But this is not an argument that a
purchase or sale requirement is not part of a "securities
transaction."  Rather, it is an effort to downplay the
significance of the Court's holding.  As explained in Part IV,
the Court's distinction is unpersuasive, and the decision will
in fact undo decades of well-established law.  It is sufficient
at this point to note that the Court's attempt to distinguish
prior case law is not an argument why the Court's definition of
a securities transaction is in fact correct.

1                              III.

2

3                               A.

4

5       The relevant legislative history supports the conclusion

6   that redemptions of commercial paper are not protected by

7   Section 546(e)'s safe harbor.  In 1975, Congress amended the

8   Securities Exchange Act of 1934 ("the 1934 Act" or "the Act"),

9   48 Stat. 881, codified at 15 U.S.C. § 78a et seq., to create a

10  national system for the clearance and settlement of securities

11  transactions.  Bradford Nat'l Clearing Corp. v. SEC, 590 F.2d

12  1085, 1091-92 (D.C. Cir. 1978).  The predecessor of Section

13  546(e) was first enacted in 1978, and applied only to

14  commodities markets.  See Kaiser Steel, 913 F.2d at 848-49; H.R.

15  Rep. No. 97-420, at 1-3 (1982).  This left open the possibility

16  that the avoidance provisions of Section 547(b) could be applied

17  to the settlement of securities transactions, and the failure to

18  include securities transactions in the settlement safe harbor

19  lent force to the argument that the clearing agencies were not

20  entitled to protection from preference avoidance when they

21  cleared securities transactions.  This anomaly inadvertently

22  jeopardized the national settlement system.  See Bankruptcy of

23  Commodity and Securities Brokers: Hearings Before the Subcomm.

                               10

on Monopolies and Commercial Law of the H. Comm. on the

Judiciary, 97th Cong. 238-67 (1981) (statement of Bevis

Longstreth, Comm'r, SEC). Clearing agencies were exposed to

risk because they were "the critical link between the buyer's

broker and the seller's broker"; they "simultaneously

guarantee[d]" the delivery of securities to the buyer and the

delivery of the purchase price to the seller. Id. at 245.[3] In

response to this concern, in 1982, Congress adopted

substantially the current version of Section 546(e), which more

broadly covered settlement payments. H.R. Rep. No. 97-420, at 2

(1982).[4]

---

[3] The Court's reading of the legislative purpose behind Section
546(e) at times appears substantially broader. It writes: "If
a firm is required to repay amounts received in settled
securities transactions, it could have insufficient capital or
liquidity to meet its current securities trading obligations,
placing other market participants and the securities markets
themselves at risk." Op. at 13 (emphasis added). However, this
concern could likewise be invoked for refusing to apply the
Bankruptcy Code's preference provisions in any context; there is
always a risk that the transferee of an avoided transfer will be
negatively affected and destabilized by the trustee's exercise
of its avoidance powers. The legislative history indicates that
Congress intended to eliminate only a particular subset of
claims: those that might jeopardize the stability of clearing
agencies.

[4] In 2006, Congress adopted amendments to Section 546(e) that
were "technical changes" designed to "update the language to
reflect current market and regulatory practices" and to "clarify
[] the treatment of certain financial products." H.R. Rep. 109-

1    These concerns were not implicated by the market for

2    commercial paper at the time of Section 546(e)'s enactment, and

3    cannot justify the application of the safe harbor to redemptions

4    of commercial paper today.  As an initial matter, the 1934 Act

5    did not, and does not, apply to commercial paper, which is not a

6    "security" for purposes of the Act.  See 15 U.S.C. § 78c(a)(10).[5]

7    Moreover, Congress's concern for the stability of central

8    counterparties that guarantee both sides of a securities

9    transaction would not justify sweeping redemptions of commercial

10   paper within Section 546(e)'s safe harbor, because transactions

11   in commercial paper are not cleared through such a central

12   counterparty.  As the Court notes, "the DTC acted as a conduit

13   rather than a clearing agency that takes title to the securities

14   during the course of the transaction."  Op. at 24.  Unlike the

15   National Securities Clearing Corporation ("NSCC"), which clears

16   transactions in equity and debt securities covered by the 1934

17   Act, the DTC does not act as an intermediary for trades by

---

648, at 2 (2006).  The amendments do not shed any light on
whether the premature redemption of commercial paper is covered
by the exclusion for a "settlement payment."

[5] The 1934 Act exempts from the definition of security "any note,
draft, bill of exchange, or banker's acceptance which has a
maturity at the time of issuance of not exceeding nine months,
exclusive of days of grace, or any renewal thereof the maturity
of which is likewise limited."  15 U.S.C. § 78c(a)(10).

undertaking independent obligations to deliver securities to the
buyer and payment to the seller.  See Pet Quarters, Inc. v.
Depository Trust and Clearing Corp., 559 F.3d 772, 776-77 (8th
Cir. 2009).  Rather than act as such a central counterparty, the
DTC serves as an electronic bookkeeper that processes payments;
it does not guarantee the performance (and assume the risk of
non-performance) of any other party.  See id. (explaining that
the DTC "tracks transfers of indirect security entitlement
positions among its members, eliminating the need to transfer
the physical stock certificates," while "NSCC acts as the
intermediary between buyer and seller . . . and assumes the
rights and obligations of buyers and sellers to receive, pay
for, and deliver securities").  Because the DTC does not
guarantee the obligations of its members, and does not take
title to the securities or funds it clears, it is not exposed to
any risk on account of a transaction that is challenged by a
bankruptcy trustee.

The Court acknowledges this distinction between the DTC and
the NSCC, but rejects it as immaterial on the theory that "the
absence of a financial intermediary that takes title to the
transacted securities during the course of the transaction is
[not] a proper basis on which to deny safe-harbor protection."
Op. at 24-25.  In support of this conclusion, it relies on cases

13

from other courts of appeals that have applied Section 546(e)'s
safe harbor to leveraged buyouts of companies that "involved
financial intermediaries who served only as conduits." Op. at
25 (citing In re Plassein Int'l Corp., 590 F.3d 252, 257-59 (3d
Cir. 2009); In re QSI Holdings, Inc., 571 F.3d 545, 549-50 (6th
Cir. 2009); Frost, 564 F.3d at 986). Accepting the reasoning of
the courts of appeals in those cases, however, does not militate
in favor of extending Section 546(e)'s safe harbor to
transactions in commercial paper. Those cases stand for the
proposition that, if Section 546(e) applies to a particular type
of transaction – namely, purchases of equity securities – an
individual transaction does not lose safe-harbor protection
simply because it does not involve a central counterparty, and
thus does not directly implicate the concerns that led Congress
to enact the section.[6] The leveraged buyout cases do not resolve
the question the Court must answer in the first instance:
whether a different type of transaction – a redemption of
commercial paper – is covered by Section 546(e).[7]

---

[6] As the Court points out, the issue on this appeal concerns only
an issuer's premature redemption of commercial paper. Opinion
at 23 n.2.

[7] The Court questions any reliance on the fact that Congress
enacted the safe harbor out of concern for the stability of
central counterparties when various courts of appeals have
rejected a restriction on the safe harbor in leveraged buyout

1                                    **B.**

2

3        The conclusion that redemptions of commercial paper are not

4   covered by Section 546(e) is further supported by subsequent

5   legislative history.[8]  Section 547(c)(2) of the Bankruptcy Code

6   provides that a trustee may not avoid under Section 547 a

7   transfer

8           to the extent that such transfer was in payment of a
9           debt incurred by the debtor in the ordinary course of
10          business or financial affairs of the debtor and the
11          transferee,  and  such  transfer  was  (A)  made  in  the
12          ordinary  course  of  business  or  financial  affairs  of
13          the debtor and the transferee; or (B) made according
14          to ordinary business terms.
15

---

transactions that do not involve such counterparties.  Op. at 25
n.3.  That is not a basis to ignore the legislative history,
which reveals that Congress was primarily concerned with
upsetting the securities settlement process.  That settlement
process involves the purchase and sale of securities that are
ordinarily cleared through a clearing agency.  The fact that
some transactions that do not involve a clearing agency –
leveraged buyouts – are protected by the safe harbor because
they were not carved out by Congress is not a basis for
disregarding the legislative history and its focus on
transactions involving the purchase and sale of securities.  The
Court points to nothing in the legislative history of the
ambiguous "settlement payment" provision that indicates that it
was intended to cover the redemption of commercial paper.

[8] Subsequent legislative history is not entitled to the same
weight as contemporaneous legislative history, but it may
provide "some guidance" as to the legislative intent for a prior
congressional act.  See Davis v. United Air Lines, Inc., 662
F.2d 120, 123-24 (2d Cir. 1981).

1   11 U.S.C. § 547(c)(2). As originally enacted in 1978, the

2   "ordinary course" defense was restricted to preference actions

3   involving short-term debts of a duration of 45 days or less.

4   See Fidelity Sav. & Inv. Co. v. New Hope Baptist, 880 F.2d 1172,

5   1175-76 (10th Cir. 1989). In 1984, two years after the passage

6   of Section 546(e), the "ordinary course" defense was amended to

7   eliminate this restriction. A discussion between Senators Dole

8   and DeConcini, as part of the debate surrounding passage of the

9   amendment, makes clear that Congress was primarily concerned

10  with ensuring that "ordinary course" redemptions of commercial

11  paper with longer maturities would come within Section

12  547(c)(2)'s safe harbor. Id. If, as the Court concludes,

13  Section 546(e) protects every redemption of commercial paper,

14  "without regard to . . . the motives and circumstances of the

15  redemption," Op. at 11, then this amendment was unnecessary

16  because any redemption of commercial paper – whether made in the

17  ordinary course of business or not – would be protected by the

18  "settlement payment" exclusion that Congress had adopted two

19  years before.

20
21
22

**IV.**

Enron's reading of Section 546(e) finds further support in the policies reflected in the Bankruptcy Code.  In <u>Union Bank v. Wolas</u>, 502 U.S. 151 (1991), the Supreme Court discussed the congressional priorities that motivated enactment of Section 547, and concluded that preference actions under that section are "intended to serve two basic policies":

> A preference is a transfer that enables a creditor to receive payment of a greater percentage of his claim against the debtor than he would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankruptcy estate.  The purpose of the preference section is two-fold.  First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy.  The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors.  Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor.  Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally.  The operation of the preference section to deter "the race of diligence" of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section — that of equality of distribution.

502 U.S. at 160-161 (citing H. R. Rep. No. 95-595 177-178 (1977)).

These goals – preventing a "race to the courthouse" and
ensuring equality of distribution among creditors – are severely
undermined by the interpretation of Section 546(e) adopted by
the Court.  What Enron alleges happened in this case, according
to the Court's interpretation of its papers, is instructive:
"it made the redemption payment under pressure from noteholders
seeking to recover on their investments amidst rumors of Enron's
imminent implosion."  Op. at 7.  That is, under intense pressure
from certain creditors, Enron extinguished its debt by paying to
them funds in excess of what they would have received on the
open market and, more importantly, far in excess of what they
would have received pursuant to the provisions of the Bankruptcy
Code.  See 11 U.S.C. § 547(b).  The scenario depicted by the
appellees is no less troubling.  They assert, according to the
Court, that "Enron redeemed its commercial paper to 'calm the
irrational markets' and leave a favorable impression that would
allow it to reenter the commercial paper market once 'bad
publicity' about the company's stability 'had blown over.'"  Op.
at 7.  Those voluntary debt payments are no different from other
efforts of a debtor shortly before bankruptcy to prefer some
creditors over others.  Such transfers, which result in
creditors of equal priority being treated unequally, and which
decrease the liquidity of a corporation attempting to avoid a

18

1 slide into bankruptcy, are at the very core of the trustee's

2 avoidance powers under Section 547.

3    The Court's holding that a settlement payment requires only

4 the transfer of cash to complete a securities transaction,

5 without any purchase or sale of a security, is indeed

6 extraordinarily broad.  In fact, the Court's definition of a

7 settlement payment would seem to bring virtually every

8 transaction involving a debt instrument within the safe harbor

9 of Section 546(e), thus allowing the settlement payment

10 exception to swallow up the Section 547(b) avoidance provision.

11    The Court concludes that its holding poses no threat to the

12 viability of the Bankruptcy Code's preference provisions on the

13 ground that this case involves "widely issued debt securities,"

14 and not "non-tradeable bank loans."  Op. at 22.  The Court,

15 however, offers no basis for distinguishing between the two

16 types of debts, and under 11 U.S.C. § 101(49)(A), there is none;

17 notes, bonds, and debentures are "securities" under the

18 Bankruptcy Code irrespective of whether they are widely issued

19 or tradeable.  The Court's reasoning thus applies equally to any

20 payment on account of a debt evidenced by a writing, and does

21 indeed imperil decades of cases that allow the avoidance of

22 debt-related payments.  See, e.g., Wolas, 502 U.S. at 162

23 (remanding to determine whether payments of long-term debt were

19

within the ordinary course of business exception to avoidance
under Section 547(c)(2)).

The Court does not dispute that the payment of any ordinary
loan evidenced by a note would fall within its definition of a
settlement payment, but the Court finds that "the context of the
securities industry will exclude from the safe harbor payments
made on ordinary loans." Opinion at 22. The Court cites no
authority for this proposition, and the terms of its definition
would cover such payments.

The Court's holding is wholly unnecessary. The issue
presented in this case is a narrow one – whether the premature
redemption of commercial paper by the issuer falls within the
safe harbor of a "settlement payment" under section 546(e). The
issue is an unusual one, as reflected by the fact that it has
never arisen in any prior decision of any court of appeals.
However, by eliminating the "purchase or sale" requirement that
would exclude such payments, the Court undermines the ability of
bankruptcy trustees to avoid preferential payments on account of
ordinary debts. The Court argues that including a "purchase or
sale" requirement would not "necessarily exclude all payments
made on ordinary loans." Opinion at 22. It is not clear why
this is an argument against a "purchase or sale requirement,"
which should be required by the common industry understanding

1  and legislative history of section 546(e).  The Court does not

2  dispute that recognizing such a requirement in fact excludes the

3  premature redemption of commercial paper from the scope of the

4  "settlement payment" safe harbor of section 546(e), and does so

5  without imperiling the regular avoidance powers of bankruptcy

6  trustees for ordinary loans.  The Court appears to object that

7  the "purchase or sale" requirement would not exclude various

8  ways in which an issuer might deal with its commercial paper.

9  The Court hypothesizes that companies could protect their

10  premature redemptions of commercial paper by turning them into

11  repurchases rather than redemptions, if there is a "purchase or

12  sale" requirement.  Opinion at 22-24.  But, under the Court's

13  approach, such repurchases would still be covered by the

14  "settlement payment" safe harbor, and, in addition, the Court's

15  approach imperils the ordinary repayment of loans.  The fact

16  that the "purchase or sale" requirement would not address all of

17  the ways in which a company might deal with its commercial paper

18  is not a reason to find that premature redemptions of commercial

19  paper do not fall within the "settlement payment" safe harbor.

20

21                          **CONCLUSION**

22

23       For the reasons explained above, I respectfully dissent.

21