**QUINN EMANUEL**
**URQUHART & SULLIVAN, LLP**
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543

51 Madison Avenue, 22nd Floor
New York, New York 10010-1603
*Counsel for the Official Committee of Unsecured*
*Creditors of Lehman Brothers Holdings Inc.*

**CURTIS, MALLET-PREVOST,**
**COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
*Counsel for Debtor Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.,*<br><br>        Debtors. | Chapter 11<br><br>Case No. 08-13555 (JMP)<br><br>(Jointly Administered) |
| LEHMAN BROTHERS HOLDINGS INC. and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., *et al*.<br><br>        Plaintiff and Plaintiff Intervenor<br><br>        v.<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>        Defendant | Adversary Proceeding<br><br>Case No. 10-03266 (JMP) |

**REPLY BRIEF IN FURTHER SUPPORT OF MOTION TO DISMISS AMENDED**
**COUNTERCLAIMS OF DEFENDANT JPMORGAN CHASE BANK, N.A.**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT ......................................................................................................... 4

POINT I. JPMORGAN'S COUNTERCLAIM FOR FRAUDULENT
MISREPRESENTATION FAILS TO STATE A CLAIM ...................... 4

A.    JPMorgan Fails to Plead Actual or Reasonable Reliance on Any Alleged
Misrepresentations by LBHI .............................................................. 4

    1.    JPMorgan's Allegation That It Held Margin on September 18 in
Preparation For the Sale Falling Through Demonstrates That
JPMorgan Did Not Rely on LBHI's Alleged Earlier
Representations ........................................................................... 5

    2.    JPMorgan's Allegation That LBI Needed Billions of Dollars of
Extra Financing Early in the Week Defeats JPMorgan's Claim That
It Believed Barclays Would Fully Fund LBI Each Night .......... 8

    3.    As a Matter of Law, JPMorgan Could Not Reasonably Rely on
Alleged Representations Outside the Repo Contracts and
Confirming Documents ............................................................. 10

    4.    It Was Not Reasonable to Rely on What LBHI Said Barclays
Would Do When Barclays Told JPMorgan Directly................ 11

B.    JPMorgan Has Failed to Allege an Actionable Misrepresentation of Fact .......... 13

    1.    LBHI's Statements are Predictions of Barclays' Future Conduct............. 13

    2.    The Alleged Oral Representation by Tonucci and Lowitt Was Not
Actionable ................................................................................. 16

        a.    The Amended Counterclaims Do Not Allege That Tonucci
and Lowitt Knew That the Oral Statement Was False When
Made ................................................................................ 16

        b.    The Alleged Oral Statement Was Too Vague to Be
Actionable........................................................................ 18

    3.    The Sale Order and Rule 60(b) Decision Preclude JPMorgan's
Fraud Claim Based on the APA and Related Filings ................ 20

C.    JPMorgan Has Failed to Plead LBHI Acted with Scienter ................... 23

      1.     JPMorgan Has Not Alleged Strong Evidence of Conscious Misbehavior ............................................................................... 23

      2.     JPMorgan Has Not Sufficiently Alleged That LBHI Had a Motive to Commit Fraud ..................................................................... 25

POINT II. JPMORGAN'S COUNTERCLAIM FOR FRAUDULENT CONCEALMENT FAILS TO STATE A CLAIM .............................................................. 27

    A.     The Fraudulent Concealment Counterclaim Fails For Many of the Same Reasons as the Fraudulent Misrepresentation Counterclaim ................................ 27

    B.     The Amended Counterclaims Do Not Allege That LBHI Had a Duty to Disclose the Allegedly Concealed Information to JPMorgan ............................. 28

POINT III. JPMORGAN'S COUNTERCLAIM FOR FRAUDULENT INDUCEMENT TO LEND FAILS TO STATE A CLAIM ............................................. 31

POINT IV. JPMORGAN'S COUNTERCLAIM FOR AIDING AND ABETTING LBI'S ALLEGED FRAUD FAILS TO STATE A CLAIM ............................................ 33

    A.     JPMorgan Fails to Allege Fraud by LBI with Particularity ................................. 33

    B.     JPMorgan Fails to Allege LBHI Knew of Any Alleged LBI Fraud ..................... 34

POINT V. JPMORGAN'S COUNTERCLAIM FOR AIDING AND ABETTING BARCLAYS' ALLEGED FRAUD FAILS TO STATE A CLAIM ..................... 34

    A.     JPMorgan Fails to Plead That LBHI Substantially Assisted Barclays' Alleged Fraud .................................................................................................... 34

    B.     LBHI's Conduct Did Not Proximately Cause Any Alleged Injury to JPMorgan .......................................................................................................... 36

POINT VI. JPMORGAN'S INDEMNIFICATION COUNTERCLAIMS SHOULD BE DISMISSED ........................................................................................... 37

    A.     JPMorgan Fails to State a Claim For Recovery of Attorneys' Fees Under the 2000 Clearance Agreement (Seventh Counterclaim) ...................................... 39

      1.     JPMorgan Fails to State a Claim For Attorneys' Fees Incurred in Connection with the Sale Transaction to Barclays ..................................... 39

          a.     The Indemnity Clause of the Barclays Custodial Undertaking Provides the Exclusive Basis For Any Recovery of the Claimed Losses ................................................. 39

ii

b.      The 2000 Clearance Agreement Does Not Provide
Indemnity For Attorneys' Fees Incurred in Prosecuting
Claims Against LBHI ...................................................................41

2.      JPMorgan Fails to State a Claim For Indemnity Under the 2000
Clearance Agreement For Fees Incurred in Defending Against
Plaintiffs' Amended Complaint ...............................................................43

a.      JPMorgan Cannot Recast the Seventh Counterclaim to
Include a Claim For Attorneys Fees Incurred in Defending
Against Plaintiffs' Amended Complaint .......................................43

b.      The 2000 Clearance Agreement Does Not Provide
Indemnity For Attorneys' Fees Incurred in Defending
Against Bankruptcy Avoidance Actions ......................................44

B.      JPMorgan Fails to State a Claim For Recovery of Attorneys' Fees Under
the Barclays Custodial Undertaking (Eighth Counterclaim) ...............................45

1.      The Barclays Custodial Undertaking Does Not Provide Indemnity
For Attorneys' Fees Incurred in Prosecuting Claims Against Third
Parties Like LBHI ...................................................................................45

2.      The Barclays Custodial Undertaking Does Not Provide Indemnity
For Fees and Expenses Incurred in Defending Against the First
Amended Complaint ................................................................................47

CONCLUSION ...........................................................................................................48

# TABLE OF AUTHORITIES

**Page**

## Cases

380544 Canada, Inc. v. Aspen Techn., Inc.,
  633 F. Supp. 2d 15 (S.D.N.Y. 2009) ................................................................17

Aetna Casualty & Surety Co. v. Aniero Concrete Co., Inc.,
  404 F.3d 566 (2d Cir. 2005) ...........................................................................28

Akhenaten v. Najee,
  No. 08 CV 970(RJH), 2010 WL 305309 (S.D.N.Y. Jan. 26, 2010)........................48

Apex Oil Co. v. Belcher Co. of N.Y., Inc.,
  855 F.2d 997 (2d Cir. 1988) ...........................................................................10

Ashland Inc. v. Morgan Stanley & Co., Inc.,
  700 F. Supp. 2d 453 (S.D.N.Y. 2010) ..............................................................26

BNP Paribas Mort. Corp. v. Bank of America, N.A.,
  Nos. 09 Civ. 9783 (RWS), 09 Civ. 9784  2011 WL 1210208
  (S.D.N.Y. March 23, 2011) ....................................................................41, 42, 45

Bank Julius Baer & Co. v. Waxfield Ltd.,
  424 F.3d 278 (2d Cir. 2005) ...........................................................................41

Banks v. Siegel,
  181 F.2d 309 (4th Cir. 1950) .............................................................................6

Banque Franco-Hellenique de Comm. Int'l et Maritime, S.A. v. Christophides,
  106 F.3d 22 (2d Cir. 1997) ...............................................................................7

Bernstein v. Assocs. Discount Corp. (In re Bernstein),
  197 F.2d 378 (7th Cir. 1952) .............................................................................6

Bin Saud v. Bank of New York,
  734 F. Supp. 628 (S.D.N.Y. 1990) ...................................................................38

Bloor v. Carro, Spanbock, Londin, Rodman & Fass,
  754 F.2d 57 (2d Cir. 1985) .............................................................................36

Brandon v. City of New York,
  705 F. Supp. 2d 261 (S.D.N.Y. 2010) ..............................................................37

Brecher v. Citigroup Inc.,
  No. 09 Civ. 7359(SHS), 2011 WL 2209145 (S.D.N.Y. June 7, 2011) ..................44

Bui v. Indus. Enterprises of Am., Inc.,
  594 F. Supp. 2d 364 (S.D.N.Y. 2009) ..............................................................23

Century Pacific, Inc. v. Hilton Hotels Corp.,
    354 Fed. Appx. 496 (2d Cir. 2009) ........................................................................10

C.E.K., Inc. v. CHC Indus., Inc. (In re CHC Indus., Inc.),
    389 B.R. 767 (Bankr. M.D. Fla. 2007) ....................................................................22

Cofacredit, S.A. v. Windsor Plumbing Supply Co,
    187 F.3d 229 (2d Cir. 1999) ....................................................................................14

Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc,
    68 N.Y.2d 954 (1986) ........................................................................................32, 34

Diduck v. Kaszycki & Sons Contractors, Inc.,
    974 F.2d 270 (2d Cir. 1992) ......................................................................................8

Dover Ltd. v. A.B. Watley, Inc.,
    423 F. Supp. 2d 303 (S.D.N.Y. 2006) ....................................................................24

ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,
    553 F.3d 187 (2d Cir. 2009) ....................................................................................26

Emergent Capital Inv. Mgmt., LLC v. Stonepath Group,
    343 F.3d 189 (2d Cir. 2003) ....................................................................................10

Eurycleia Partners, LP v. Seward & Kissel, LLP,
    12 N.Y.3d 553 (2009).............................................................................................16

In re Farmland Indus., Inc.,
    376 B.R. 718 (Bankr. W.D. Mo. 2007) .............................................................21, 22

Fax Telecommunicaciones Inc. v. AT&T,
    138 F.3d 479 (2d Cir. 1998) ..............................................................................31, 33

Fierro v. Gallucci,
    No. 06-CV-5189 (JFB)(WDW), 2010 WL 1223122
    (E.D.N.Y. Mar. 24, 2010)........................................................................................18

Fischer v. Kletz,
    266 F. Supp. 180 (S.D.N.Y. 1967) ..........................................................................30

Food Holdings Ltd. v. Bank of Am. Corp. (In re Parmalat Sec. Litig.)
    477 F. Supp. 2d 602 (S.D.N.Y. 2007) ...................................................................7, 36

Gekas v. Pipin (In re Met-L-Wood Corp.),
    861 F.2d 1012 (7th Cir. 1988)..................................................................................22

In re General Insecticide Co.,
    403 F.2d 629 (2d Cir. 1968) ....................................................................................21

Gladstone Bus. Loan, LLC v. Randa Corp.,
    No. 09 Civ 4225(LMM), 2009 WL 2524608 (S.D.N.Y. Aug. 17, 2009)...............8

Grupo Sistemas Integrales de Telecommunicacion S.A. de C.V. v. AT&T Commc'ns, Inc.,
    No. 92 Civ. 7862 (KMW), 1996 WL 312535 (S.D.N.Y. June 10, 1996) ........12, 13

Guarnieri v. Kewanee-Ross Corp.,
    263 F.2d 413 (2d Cir. 1959) ....................................................................................46, 48

In re HHG Corp.,
    No. 01-B-11982 (ASH), 2006 WL 1288591 (Bankr. S.D.N.Y. May 2, 2006) ......................23

HSBC Bank USA, N.A. v. Adelphia Commc'ns Corp.,
    No. 07-CV553A, 2009 WL 385474 (W.D.N.Y. Feb. 12, 2009) ...........................................22

Hall v. Naylor
    18 N.Y. 588 (1859)..............................................................................................................32

Healthcare Finance Group, Inc. v. Bank Leumi USA,
    669 F. Supp. 2d 344 (S.D.N.Y. 2009) .................................................................................24

Holmes v. Lorch,
    329 F. Supp. 2d 516 (S.D.N.Y. 2004) .................................................................................27

Hooper Assoc., Ltd. v. AGS Computers, Inc.,
    74 N.Y.2d 487, 548 N.E.2d 903 (1989) ......................................................41, 42, 45, 46, 48

Hughes v. BCI Int'l Holdings, Inc.,
    452 F. Supp. 2d 290 (S.D.N.Y. 2006) .................................................................................18

Idress v. American University of the Caribbean,
    546 F. Supp. 1342 (S.D.N.Y. 1982) ....................................................................................29

Ill. State Bd. of Inv. v. Authentidate Holding Corp.,
    369 F. Appx. 260 (2d Cir. 2010) ...................................................................................15, 30

Int'l Oil Field Supply Servs. Corp. v. Fadeyi,
    35 A.D.3d 372, 825 N.Y.S.2d 730 (2d Dep't 2006) ............................................................18

Kalnit v. Eichler,
    264 F.3d 131 (2d Cir. 2001) ................................................................................................23

Kregos v. Associated Press,
    3 F.3d 656 (2d Cir. 1993) ......................................................................................................7

Lazard Freres and Co. v. Protective Life Ins. Co.,
    108 F.3d 1531 (2d Cir. 1997) ..............................................................................................10

In re Lehman Brothers Holdings Inc.,
    445 B.R. 143 (Bankr. S.D.N.Y. 2011) .................................................................................20

Loewer v. Harris,
    57 F. 368 (2d Cir. 1893) ......................................................................................................29

Manley v. Ambase Corp.,
    121 F. Supp. 2d 758 (S.D.N.Y. 2000) .................................................................................46

McMahan & Co. v. Wherehouse Entertainment,
    900 F.2d 576 (2d Cir. 1990) ................................................................................................19

Mizuho Corp. Bank, Ltd. v. Enron Corp. (In re: Enron Corp.),
    302 B.R. 463 (Bankr. S.D.N.Y. 2003) ..................................................................... 40

Murray v. Xerox Corp,
    811 F.2d 118 (2d Cir. 1987) ........................................................................... 32, 34

Musalli Factor for Gold & Jewellry v. JPMorgan Chase Bank, N.A.,
    261 F.R.D. 13 (S.D.N.Y. 2009) ...................................................................... 24, 25

Novak v. Kosaks,
    216 F.3d 300 (2d Cir. 2000) .................................................................................. 23

Oscar Gruss & Son, Inc. v. Hollander,
    337 F.3d 186 (2d Cir. 2003) ........................................................................... 42, 45

Pallonetti v. Liberty Mut.,
    No. 10 Civ. 4487, 2011 WL 519407 (S.D.N.Y. Feb. 11, 2011) ...................... 31, 33

Renner v. Chase Manhattan Bank,
    No. 98 CIV. 926(CSH), 2000 WL 781081 (S.D.N.Y. June 16, 2000) .................... 25

Sabo v. Delman,
    3 N.Y.2d 155 (1957) .............................................................................................. 32

Sado v. Ellis,
    882 F. Supp. 1401 (S.D.N.Y. 1995) ...................................................................... 31

SEC v. Save the World Air, Inc,
    No. 01 Civ. 11586(GBD)FM, 2005 WL 3077514 (S.D.N.Y. Nov. 15, 2005) ....... 14

Schlaifer Nance & Co. v. Estate of Warhol,
    119 F.3d 91 (2d Cir. 1997) ...................................................................................... 4

South Cherry Street, LLC v. Hennessee Group LLC,
    573 F.3d 98 (2d Cir. 2009) .................................................................................... 23

Stewart v. Jackson & Nash,
    976 F.2d 86 (2d Cir. 1992) .................................................................................... 14

Vaughn v. Consumer Home Mortgage, Inc.,
    No. 01-CV-7937(ILG), 2003 WL 21241669 (E.D.N.Y. March 23, 2003) ............ 32

Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A.,
    247 F. Supp. 2d 352 (S.D.N.Y. 2002) ............................................................. 31, 33

Wells Fargo Home Mortgage Inc. v. Hiddekel Church of God, Inc.,
    No. 11911/02, 2004 WL 258144 (N.Y. Sup. Feb. 10, 2004) ................................ 27

**Statutes**

Rule 60(b) .................................................................................................. 20, 21, 22

**<u>Miscellaneous</u>**

Restatement (Second) of Torts § 548A ................................................................................8, 36

First Restatement of Torts § 551(2)........................................................................................30

## PRELIMINARY STATEMENT

Instead of replying directly to the myriad legal challenges Plaintiffs raise to the Amended Counterclaims, JPMorgan continues to rely on their meager allegations of how LBHI, the purported guarantor of LBI's clearing debt, supposedly worked to defraud JPMorgan. Yet close inspection of the Amended Counterclaims reveals that JPMorgan's allegations are contradictory and otherwise collapse on themselves.

To begin with, the allegations show JPMorgan did not rely on LBHI's alleged statements about the Barclays Sale. Those allegations state, for example, that notwithstanding LBHI's supposed misrepresentations about what Barclays would purchase in the sale, JPMorgan continued to operate under the assumption the sale would not close. JPMorgan's opposition brief ("Opposition Brief" or "Opp. Br.") responds by mischaracterizing Plaintiffs' argument as being that secured creditors cannot rely on false misrepresentations. But nothing in JPMorgan's Opposition Brief justifies how JPMorgan could have taken actions in reliance on Barclays buying all the North American broker-dealer assets in the sale, while at the same time preparing for the sale to not to go through.

Moreover, Plaintiffs pointed out that it would be unreasonable as a matter of law for a sophisticated tri-party repo custodian like JPMorgan to assume Barclays would engage in specific multi-billion dollar repurchase transactions in the absence of any written documentation, based solely on inferences from the APA, to which JPMorgan was not a party, and vague statements about how Barclays would "support LBI." In response, JPMorgan points to direct statements by Barclays that misled JPMorgan and argues that, in that context, it was reasonable for JPMorgan to rely on statements from LBHI that, although not actionable themselves, were consistent with Barclays' statements and actions. But that response only goes to show that it was really Barclays' statements that led to JPMorgan's mistaken beliefs. This is not surprising, as

1

JPMorgan settled with Barclays in exchange for dismissal of a multi-million dollar lawsuit

shortly after these events occurred, without ever pointing a finger at LBHI.

Plaintiffs' moving brief ("Moving Brief" or "Mov. Br.")[1] also demonstrated that

neither the APA nor Tonucci and Lowitt's prediction that Barclays would "fully support LBI"

could amount to fraudulent misrepresentations.  First, the APA was an actual signed contract

purporting to set proposed terms for a future sale.  The question raised by the Amended

Counterclaims is whether Barclays meant to comply with those terms in the future.  But under

New York law, a fraudulent misrepresentation cannot be based on a claim that a party failed to

accurately predict the future conduct of another.  Second, this Court has already ruled, after

extensive fact-finding, that the APA did not contain knowing misrepresentations about the terms

of the deal, including the description of assets that would and would not be sold to Barclays.

That ruling, contained in the Sale Order and affirmed in the Rule 60(b) proceedings, is binding

on JPMorgan.  Third, JPMorgan has failed to plead facts demonstrating that Lowitt and Tonucci

knew their statements about Barclays "support[ing] LBI" that week were false.  JPMorgan's

general allegations about Lowitt and Tonucci being part of negotiations fall far short of

establishing this element.

JPMorgan also cannot establish scienter for LBHI, a then-bankrupt entity

operating on behalf of its creditors, to commit a fraud that would leave LBHI exposed to a multi-

billion dollar guaranty claim purportedly secured by collateral held by JPMorgan.  All JPMorgan

can state is that LBHI wanted the Barclays Sale to go through.  But it cannot identify a rational

incentive for LBHI to want the sale to go through in the manner alleged, i.e. by committing a

---

[1]    All capitalized terms not defined in this reply brief have the same meaning as in the
Moving Brief.

fraud on a company holding billions of dollars of its collateral purporting to secure the very losses that would result from the supposed fraud.

These same issues, and others raised by Plaintiffs, infect the remaining counterclaims for fraudulent concealment, fraudulent inducement, and aiding and abetting fraud. JPMorgan also fails to plead the additional elements of those claims, especially when it comes to establishing that LBHI had a duty to disclose information to JPMorgan. After all, LBHI was not a party to any relevant contract with JPMorgan and did not itself engage in any tri-party repurchase transactions. The absence of a duty to disclose only supports the fact that these claims, to the extent they are valid, would have been against Barclays – not LBHI – if not for the releases contained in the settlements between Barclays and JPMorgan.

Finally, in response to Plaintiffs' argument that JPMorgan's indemnity claims should be dismissed because there is no scenario under which JPMorgan could be entitled to indemnification, JPMorgan has evidently withdrawn those claims. In their place, JPMorgan argues that it is entitled to indemnification for its attorneys' fees incurred in defending against Plaintiffs' Amended Complaint and in prosecuting its own counterclaims against LBHI. But the relevant agreements do not provide for such indemnification, and these modified claims should also be dismissed.

In sum, JPMorgan fails to allege sufficient facts to support claims that would require LBHI to potentially pay JPMorgan billions of dollars in damages. The requirement of particularized factual allegations is not simply a formal technical requirement – it is a settled legal principle to prevent a party like LBHI from needlessly defending an entire unsubstantiated case based solely on accusations that it caused an injury by commenting on or staying silent about transactions in which it was not directly involved. The pleading requirements for fraud

require far more than capricious speculation and conjecture, because fraud claims are not to be treated lightly.

## ARGUMENT

### POINT I.

### JPMORGAN'S COUNTERCLAIM FOR FRAUDULENT MISREPRESENTATION FAILS TO STATE A CLAIM

JPMorgan's first counterclaim for fraudulent misrepresentation fails because the Amended Counterclaims do not allege the necessary elements of actual and reasonable reliance, an actionable misrepresentation of fact known to be false when made, or scienter.  (Mov. Br. at 16-46); see also Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997) (explaining that a fraudulent misrepresentation claim consists of the following elements: (1) a material misrepresentation of fact; (2) knowledge of its falsity; (3) an intent to defraud; (4) reasonable reliance; and (5) injury).

### A.    JPMorgan Fails to Plead Actual or Reasonable Reliance on Any Alleged Misrepresentations by LBHI

JPMorgan's Amended Counterclaims include the following allegations that contradict any reliance on LBHI's alleged misrepresentations: (1) as of September 18, after LBHI's alleged misrepresentations, JPMorgan was still planning how to protect itself "if the sale to Barclays fell through and JPMorgan had to liquidate the securities on its own"; and (2) that JPMorgan knew from fail financing[2] beginning the night of September 15 that Barclays was not fully supporting LBI each night.  (Am. Counterclaims ¶¶ 36, 68, 74, 86).  These allegations preclude JPMorgan from stating that it unwound repos and released margin on September 18 because it believed and relied on LBHI's earlier misrepresentations.

---

[2]   "Fail financing" refers to JPMorgan's practice of extending overnight credit to LBI in the absence of sufficient financing from tri-party repo counterparties.

1.     **JPMorgan's Allegation That It Held Margin on September 18 in Preparation For the Sale Falling Through Demonstrates That JPMorgan Did Not Rely on LBHI's Alleged Earlier Representations**

JPMorgan pled in its Amended Counterclaims that, as of September 18, "[o]ne of JPMorgan's objectives in keeping the margin was to protect against any potential liabilities arising out of its continued clearing advances, including any shortfall that might result if the sale to Barclays fell through and JPMorgan had to liquidate the securities on its own."  (Am. Counterclaims ¶ 74).  This allegation fatally contradicts JPMorgan's allegation in its first counterclaim that it unwound LBI's overnight financings on September 18 "[b]ased on JPMorgan's reasonable understanding and expectation that Barclays had agreed to buy, and would buy, the securities that JPMorgan was financing."  (<u>See</u> Mov. Br. at 19-20).  JPMorgan's response to this argument in its Opposition Brief misses the point.  JPMorgan mischaracterizes Plaintiffs' position as being that "JPMorgan could not have justifiably relied on LBHI's misrepresentations that its exposure would be eliminated because its advances were fully secured by margin," (Opp. Br. at 2), and that "Plaintiffs . . . contend that a secured creditor, as a matter of law, cannot rely to its detriment on the borrower's misrepresentations in deciding to make an extension of credit," (<u>id.</u> at 29).

Of course, Plaintiffs contend no such thing.  Plaintiffs' actual argument is nothing more than the common sense proposition that a creditor has not alleged it actually relied on a representation that a certain event would occur, when the creditor pleads it was taking another action in anticipation of that event not occurring.  Here, JPMorgan cannot satisfy the element of actual reliance on statements indicating Barclays would purchase all of the securities used in the North American broker-dealer business, because JPMorgan itself admits that it was preparing for the deal to fall through even after LBHI purportedly made those statements.

5

JPMorgan's cited cases do not address Plaintiffs' argument.  In both <u>In re</u>
<u>Bernstein</u> and <u>Banks v. Siegel</u>, a secured loan was made in reliance on a financial statement that
was partially false.  <u>Bernstein v. Assocs. Discount Corp. (In re Bernstein)</u>, 197 F.2d 378, 382
(7th Cir. 1952); <u>Banks v. Siegel</u>, 181 F.2d 309, 310 (4th Cir. 1950).  In each case, the court held
that the fact that the loans were secured did not "necessarily negat[e]" the creditor's reliance on
the false statement.  <u>In re Bernstein</u>, 197 F.2d at 382; <u>Banks</u>, 181 F.2d at 310.  These cases are
thus only relevant to the straw-man argument JPMorgan constructs about whether secured
creditors can ever reasonably rely on fraudulent misrepresentations.  Neither case addresses a
situation like this one, where the creditor continued to operate under the assumption that the
alleged misrepresentation was incorrect after the misrepresentation was made.  By contrast, the
Amended Counterclaims admit that the reason JPMorgan retained the margin on September 18
was because JPMorgan believed the alleged prediction – that Barclays was certain to acquire all
the assets subject to LBI's overnight financing arrangements – might not come to fruition.  As a
result, JPMorgan is unable to satisfy the element of actual reliance.

Plaintiffs' Moving Brief also explained how JPMorgan's admission that, as of
September 18, it was still assuming the Barclays Sale would not close should result in dismissal
of the entire claim against LBHI.  All of LBHI's alleged misrepresentations – namely the APA
and the alleged statements by Lowitt and Tonucci that "Barclays would buy all the assets subject
to LBI's triparty repo" and "Barclays had committed to support LBI fully until the deal closed" –
are alleged to have occurred before September 18.  (Mov. Br. at 20).  The only events alleged to
have happened on or after September 18 that could have changed JPMorgan's mind about
releasing the margin were conversations with Barclays.  (Am. Counterclaims ¶¶ 76-77
("Diamond, through his affirmative statements and failure to reveal Barclays' true agreements

and intentions, persuaded JPMorgan that, by the end of Thursday, JPMorgan's triparty exposure

to LBI would be extinguished . . . .  Based on Diamond's representations . . . JPMorgan's senior

executives agreed to transfer securities valued at roughly $50 billion upon receipt of $45 billion

in cash.")).

In its Opposition Brief, JPMorgan argues that it does not matter that all of LBHI's

alleged misrepresentations occurred before JPMorgan changed its mind about releasing margin

or that LBHI said nothing whatsoever about that margin.  In support, JPMorgan quotes the

proposition that  "[t]he reliance element of fraud is essentially causation in fact.  Thus, a

defendant's conduct need not have been *the* exclusive inducing cause of plaintiff's actions, but

only *an* essential or inducing cause."  (Opp. Br. at 30 (quoting Food Holdings Ltd. v. Bank of

Am. Corp. (In re Parmalat Sec. Litig.), 477 F. Supp. 2d 602, 611 n.62 (S.D.N.Y. 2007)).[3]  But

JPMorgan's flawed timeline cannot be disregarded so lightly.

After all, the complainant must still plead that the representation at issue was an

"essential or inducing cause" of its actions.  (Id.)  Stated differently, the complainant must show

that the alleged misrepresentation was actually and reasonably relied upon, and was the

proximate cause of its injury.  See, e.g., Banque Franco-Hellenique de Comm. Int'l et Maritime,

S.A. v. Christophides, 106 F.3d 22, 27 (2d Cir. 1997) ("The recipient of misleading information

must prove that the misrepresentation proximately caused his injury."); Kregos v. Associated

Press, 3 F.3d 656, 665 (2d Cir. 1993) ("[L]osses must be the direct, immediate, and proximate

result of the misrepresentation.  The damages must also be independent of other causes.").

Indeed, the section of the Restatement (Second) of Torts that JPMorgan relies on, directly and in

---

[3]   It is worth noting that this proposition from In re Parmalat only describes actual
reliance, and does not alter the requirement under New York law that any reliance by JPMorgan
must have been reasonable, which as a matter of law it was not.  (See infra Point I.A.2.)

the two cases it cites on this point, explains that "[a] fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance."  Restatement (Second) of Torts § 548A; referenced in id. § 546 cmt. a., cited in Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 278 (2d Cir. 1992); Food Holdings Ltd., 477 F. Supp. 2d at 611 n.62.

In light of this settled legal requirement, it is not enough for JPMorgan to allege in a conclusory fashion that "both Barclays' and LBHI's misrepresentations induced JPMorgan's decision to release its margin."  (Opp. Br. at 32 n.5).  JPMorgan must plead facts that establish that LBHI's alleged misrepresentations independently were an essential and inducing cause of JPMorgan's injury.  JPMorgan's own pleadings belie any such allegation.  See Gladstone Bus. Loan, LLC v. Randa Corp., No. 09 Civ. 4225(LMM), 2009 WL 2524608, at *4 (S.D.N.Y. Aug. 17, 2009) (dismissing a fraudulent misrepresentation claim for failure to plead reliance because "[a] false statement does not create a tort for fraudulent misrepresentation if it is rejected and does not induce action").

2.     **JPMorgan's Allegation That LBI Needed Billions of Dollars of Extra Financing Early in the Week Defeats JPMorgan's Claim That It Believed Barclays Would Fully Fund LBI Each Night**

Plaintiffs' Moving Brief next demonstrated that JPMorgan did not actually or reasonably rely on LBHI's alleged oral statements about Barclays financing LBI securities and making JPMorgan "whole each night," because JPMorgan has also alleged that it extended billions of dollars of fail financing to LBI each night.  (Mov. Br. at 21-22; Am. Counterclaims ¶¶ 36, 68, 86 (stating that JPMorgan extended fail financing to LBI on September 16 and 17 in the amounts of $1.9 billion and $4.4 billion respectively, and alleging a "funding gap of well over $7 billion" on September 18, not including the Barclays Repo)).

8

In its Opposition Brief, JPMorgan first counters that its allegations concerning Lowitt and Tonucci in particular go beyond their alleged statement that "Barclays had committed to support LBI fully until the deal closed," but also that they supposedly conveyed to Jane Buyers-Russo of JPMorgan that "Lehman and Barclays had agreed . . . Barclays would buy all assets subject to LBI's tri-party repo and other overnight financing arrangements."  (Opp. Br. at 32 (citing Am. Counterclaims ¶ 33)).  But the basis of JPMorgan's reliance allegation is that "[b]ased on the statements made by Tonucci and Lowitt, Buyers-Russo reasonably understood that JPMorgan would be made whole each night by Barclays, if not by the Fed, until the deal closed, at which point JPMorgan would be taken out in full."  (Am. Counterclaims ¶ 33).  In fact, JPMorgan later argues that "Lowitt and Tonucci's representations to Buyers-Russo on September 16 meant that Barclays had agreed to buy the securities that secured JPMorgan's intraday advances and, in the meantime, to provide LBI with overnight financing, thus providing LBI with sufficient funds to repay JPMorgan's extensions of credit entirely."  (Opp. Br. at 45).  JPMorgan concedes, however, that this prediction was immediately proven false, because JPMorgan itself admits it was not in fact "made whole each night," (see Am. Counterclaims ¶¶ 33, 36, 68, 86) making any reliance on this understanding unreasonable.

JPMorgan next argues that these fail financings of between $1.9 billion and "well over $7 billion" were "comparatively small" and thus "JPMorgan's comparatively small overnight extensions of credit do not mean that JPMorgan, as a matter of law, did not rely upon LBHI's misrepresentations that Barclays had committed to 'support LBI fully.'"  (Opp. Br. at 33).  But having a representation proven false by billions of dollars surely makes any continued reliance unreasonable.  JPMorgan knew right away that it would not be "made whole each night by Barclays," because JPMorgan itself had to fill in a funding gap.  It is therefore not reasonable

9

for JPMorgan to believe Barclays would thereafter reverse course and "repay JPMorgan's extensions of credit entirely." (Id. at 45); see Apex Oil Co. v. Belcher Co. of N.Y., Inc., 855 F.2d 997, 1009 (2d Cir. 1988) (holding a fraud claim failed as a matter of law for lack of reliance when the plaintiff admitted it did not believe the alleged misrepresentation).

> **3.    As a Matter of Law, JPMorgan Could Not Reasonably Rely on Alleged Representations Outside the Repo Contracts and Confirming Documents**

JPMorgan's rights and responsibilities as LBI's tri-party agent were governed by a Custodial Undertaking, Master Repurchase Agreement and transaction-specific confirmations. (Mov. Br. at 23).  According to numerous Second Circuit cases, it is unreasonable for a party to rely on representations outside its contracts when it could easily have included those representations in the binding written documentation.  See Century Pacific, Inc. v. Hilton Hotels Corp., 354 Fed. Appx. 496, 497 (2d Cir. 2009); Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, 343 F.3d 189, 191 (2d Cir. 2003); Lazard Freres and Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1534 (2d Cir. 1997).

In its Opposition Brief, JPMorgan attempts to disregard this law by pointing out that the APA and Lowitt and Tonucci's alleged misrepresentations post-date the Master Repurchase Agreement and Barclays Custodial Undertaking, and argues that the merger clauses in those documents do not preclude reliance on other later representations.  (Opp. Br. at 35).  Moreover, JPMorgan contends that the alleged representations did not concern matters in the repo contracts, and no written confirmation of LBHI's statements was required because "LBHI's misrepresentations about the true terms of the Barclays deal did not even address, let alone alter or contradict, anything covered by those agreements."  (Id.).

But JPMorgan is ignoring the fact that the specific way it believed Barclays would end up with LBI's assets is by financing them through tri-party repos, especially by

"rolling" the $15.8 billion repo among LBI, Barclays, and JPMorgan.  (Am. Counterclaims ¶ 70

("JPMorgan reasonably understood . . . that Barclays would provide sufficient funding to LBI to

finance all the securities remaining in LBI's portfolio on the evening of September 18, including

by 'rolling' the $15.8 billion repo provided by Barclays the previous night (increased in size as

necessary to repay JPMorgan's intraday loans in full)."); see also id. ¶ 85 ("[O]n Friday,

September 19 . . . it began to emerge that, contrary to all the representations that had been made

to JPMorgan, Barclays had not agreed to, and would not, purchase or finance the securities left at

LBI, including the securities that Barclays had financed on Wednesday night with its $15.8

billion triparty repo."); id. ¶ 88 ("Petrie announced that Barclays did not recognize an obligation

on its part to finance the securities that it had financed the night of Wednesday, September 17

with its $15.8 billion triparty repo.")).

        In other words, JPMorgan's fraudulent misrepresentation claim rests on the

allegation that JPMorgan was wrongly led to believe Barclays would enter into additional

repurchase agreements the night of September 18 beyond the $45 billion Fed Repo.  But

JPMorgan could have secured those representations in writing before it made the decision to

unwind the $15.8 billion repo.  In light of all the contractual documents and its ability to secure

written confirmation of terms of specific repos, it was not reasonable for JPMorgan to rely on

predictions of what securities Barclays would finance without even asking that they be put in

writing.  Under New York law, JPMorgan's failure to do so precludes it from now asserting a

fraud claim based on those predictions.

    **4.**      **It Was Not Reasonable to Rely on What LBHI Said Barclays Would Do
When Barclays Told JPMorgan Directly**

        Next, JPMorgan concedes in its Opposition Brief that, according to the Amended

Counterclaims, Barclays told JPMorgan very directly and specifically Barclays' plans for taking

out JPMorgan's exposure.  (See, e.g., Am. Counterclaims ¶¶ 32, 55).  In contrast, JPMorgan

alleges that LBHI employees merely described the Asset Purchase Agreement and "represented

that Barclays had committed to support LBI fully until the deal closed."  (Id. ¶ 33).  But when a

complainant receives information that a party intends to take a future action both directly from

that party and indirectly from a third party, it is not reasonable as a matter of law for the

complainant to rely on the information from the third party.  Grupo Sistemas Integrales de

Telecommunicacion S.A. de C.V. v. AT&T Commc'ns, Inc., No. 92 Civ. 7862 (KMW), 1996

WL 312535, at *14 (S.D.N.Y. June 10, 1996))).

         JPMorgan attempts to rebut this argument on three grounds, none of which is

persuasive.  First, JPMorgan argues that the "the reliance element of fraud is essentially

causation in fact.  Thus, defendant's conduct need not have been *the* exclusive inducing cause of

plaintiff's actions, but only *an* essential or inducing cause."  (Opp. Br. at 36-37).  But this

statement concerns actual reliance and is irrelevant to the question of whether any reliance was

reasonable, as required under New York law.  In other words, what Barclays said directly to

JPMorgan was, or at least should have been, the only essential inducing cause of JPMorgan's

understanding about what Barclays would do.

         Next, JPMorgan attempts to distinguish the holding of Grupo Sistemas based on

the fact that the court in that case sustained a fraudulent concealment claim.  (Id. at 38).  The

court's decision with respect to fraudulent concealment, however, in no way changes the validity

of its holding dismissing a fraudulent misrepresentation claim on the exact grounds cited by

Plaintiffs.  Grupo Sistemas, 1996 WL 312535 at *14 (dismissing the fraudulent

misrepresentation claim because it was unreasonable for plaintiff to rely on representations by

defendant regarding AT&T's future conduct since any such representations should have been superseded by those coming directly from AT&T).

Finally, JPMorgan contends that, unlike in <u>Grupo Sistemas</u>, the alleged misrepresentations here do not concern Barclays' future intentions or plans. Instead, JPMorgan characterizes the alleged representations as related to "the existence and terms of [LBHI's] own agreement with Barclays." (Opp. Br. at 38). But, whether characterized as a current agreement to execute a certain deal in the future, or a prediction of future conduct, JPMorgan has alleged that Barclays told JPMorgan directly that "Barclays would take out LBI's entire triparty book" and "Barclays would purchase LBI's remaining securities on an ongoing basis." (Am. Counterclaims ¶¶ 32, 55). As a matter of law, JPMorgan could not have reasonably relied on anything said by LBHI on those topics in light of what Barclays told JPMorgan directly. This is evidenced by the fact that JPMorgan immediately looked to Barclays and not LBHI to resolve the dispute when these events took place.

**B.**    **JPMorgan Has Failed to Allege an Actionable Misrepresentation of Fact**

    **1.**    **LBHI's Statements are Predictions of Barclays' Future Conduct**

In their Moving Brief, Plaintiffs described in detail how under New York law, statements predicting the future conduct of another are not actionable as fraudulent misrepresentations. (Mov. Br. at 29-34). JPMorgan does not take issue with this settled legal principle. Indeed, it calls "uncontroversial" the proposition that "a fraud claim cannot be based on a mere failure to honor a promise or on opinions about the intentions or abilities of others." (Opp. Br. at 41). Nevertheless, JPMorgan argues that its fraudulent misrepresentation claim is not about what Barclays would purchase in the future, but is instead based on present facts about the terms of the APA. (<u>Id.</u> at 39). In support, JPMorgan points to cases that found a fraudulent misrepresentation claim based on representations that an agreement existed when it did not, or on

13

representations misstating the terms of an existing agreement.  But unlike the agreements in the

cases cited by JPMorgan, the APA was an existing, fully-executed contract, and LBHI submitted

a full and complete copy of the actual agreement to the Court.  The only issue was whether

Barclays was going to comply with it.

For example, in <u>Stewart v. Jackson & Nash</u>, a law firm represented that it "had

recently secured a large environmental law client" when it had in fact not entered into any

binding agreement securing the prospective client.  976 F.2d 86, 87 (2d Cir. 1992).  Similarly, in

<u>SEC v. Save the World Air, Inc.</u>, a company issued a press release stating that a "license, which

had been 'initiated verbally' the prior year was now 'signed, sealed and delivered.'"  No. 01 Civ.

11586(GBD)FM, 2005 WL 3077514, at *5 (S.D.N.Y. Nov. 15, 2005).  In fact, the agreement

was "not yet finalized" and, contrary to the press release, had not been put into writing or signed.

<u>Id.</u>  In contrast to both of these cases, the agreement at issue here – the APA – was an

enforceable written contract, containing mutual promises, filed with the Court.  Thus, unlike

<u>Stewart</u> and <u>Save the World Air</u>, JPMorgan is not arguing that LBHI represented an agreement

existed when it did not.  Instead, JPMorgan alleges the APA existed but Barclays did not intend

to comply with it.  (<u>See, e.g.</u>, Am. Counterclaims ¶ 112 ("Barclays had already conveyed to

LBHI that it would not purchase certain securities . . . even though they fell within the definition

of 'Purchased Assets' . . . .")).

JPMorgan also cites to a case where a fraud was sufficiently alleged when a party

misrepresented the terms of an existing agreement.  In <u>Cofacredit, S.A. v. Windsor Plumbing</u>

<u>Supply Co.</u>, a purchaser represented that invoices evidenced firm sales, when in fact by the terms

of the applicable contract, the goods were actually sold on consignment.  187 F.3d 229, 239 (2d

Cir. 1999).  By contrast, JPMorgan does not plead that LBHI represented the existence of

different terms than those actually in the APA.  Instead, it concedes LBHI correctly conveyed

what was in the contract, which (if approved by the Court) could have been enforced by any of

the contracting parties.  (Am. Counterclaims ¶ 37).[4]

To try to fit its claim into its authority, JPMorgan argues there was a different

"agreement" that supposedly superseded the APA, and the existence of which LBHI allegedly

misrepresented.  Specifically, JPMorgan argues, "The Amended Counterclaims allege that LBHI

represented present facts to JPMorgan:  that LBHI had an agreement in place to sell the

'Purchased Assets' to Barclays when, in fact, at the time that this representation was made, there

was no such agreement but, rather, an agreement that allowed Barclays to choose which assets it

would buy and which it would leave behind."  (Opp. Br. at 3-4).  But what JPMorgan describes

is not an alternative agreement, but rather an intent not to comply with the APA.  JPMorgan does

not allege that this supposed "agreement" was in writing, was executed, contained mutual

obligations, or was otherwise enforceable between the parties.  In fact, the full substance of the

purported "agreement" was that Barclays would not necessarily comply with the APA.  (Am.

Counterclaims ¶ 52 (describing "the true terms of the agreement" as "the parties had not in fact

agreed that Barclays would acquire all the securities defined as 'Purchased Assets.'")).

As explained in the Moving Brief, predictions of whether another party will

comply with a contract in the future are not actionable as fraud.  (Mov. Br. at 29-34).

JPMorgan's claim is the exact type New York finds unactionable as a fraudulent

misrepresentation cause of action.

_____

[4]   JPMorgan cites to one additional case that did not actually involve any fraudulent
misrepresentation at all, but rather an allegation of fraudulent concealment, which is addressed in
Point II.  See Ill. State Bd. of Inv. v. Authentidate Holding Corp., 369 F. Appx. 260, 263-64 (2d
Cir. 2010) (finding a complaint stated a claim that the defendant "failed to inform investors" that
previously true statements "had been rendered misleading by subsequent events.").

2.      **The Alleged Oral Representation by Tonucci and Lowitt Was Not Actionable**

a.      **The Amended Counterclaims Do Not Allege That Tonucci and Lowitt Knew That the Oral Statement Was False When Made**

JPMorgan also fails to plead any facts to support its conclusory allegation that Tonucci and Lowitt knew their alleged oral representation about Barclays committing to "support LBI fully" was false when made on September 16, 2008. (Mov. Br. at 36-37). Notably, in response, JPMorgan does not point to any factual allegation that would establish that Lowitt and Tonucci knew that alleged statement was false at the time. For example, JPMorgan does not allege that Barclays or anyone else told Lowitt and Tonucci that Barclays would provide inadequate financing, or that Barclays would not take JPMorgan's loans out in full. Instead, JPMorgan points to four allegations about Lowitt and Tonucci's involvement in the APA generally, none of which show the necessary knowledge. See Eurycleia Partners, LP v. Seward & Kissel, LLP, 12 N.Y.3d 553, 559-60 (2009) (dismissing fraud claim where allegation of knowledge was conclusory and based on "surrounding circumstances," without directly pleading facts to show knowledge).

First, JPMorgan points to the allegations in the Amended Counterclaims that Tonucci and Lowitt were "directly involved in the negotiations with Barclays over the terms of the sale." (Opp. Br. at 42). But Tonucci and Lowitt's involvement in the negotiations says nothing about the state of their knowledge on September 16 regarding whether Barclays would or would not "support LBI fully." It is not alleged, for example, that through their work on negotiations they learned that Barclays would not finance LBI securities each night, buy the assets used in the North American broker-dealer business, or any other fact that would contradict their alleged representations. Without such a direct allegation that they knew the statements were false, the claim must be dismissed.

16

Second, JPMorgan claims that on "September 16, Lowitt and Tonucci, among others, were directly and personally involved in the preparation of a schedule prepared prior to the filing of the APA."  (Id.).  But alleging access to inconclusive data is not the same as alleging direct knowledge of contradictory facts.  Nothing in that spreadsheet directly addresses Barclays' support for LBI or JPMorgan in any way – at most, it merely has a smaller allocation for commercial paper than JPMorgan would expect.  Moreover, neither in its Opposition Brief nor in the Amended Counterclaims does JPMorgan assert that Lowitt and Tonucci's alleged involvement with this schedule took place prior to the phone call with Buyers-Russo during which the alleged misrepresentations were made.

Third, JPMorgan argues, "Lowitt has admitted that, at the time the APA was executed, LBHI and Barclays were figuring out how to 'identify the series of assets that [were] part of the transaction.'"  (Id. at 43).  Again, knowledge that assets had to be identified is several steps removed from proving Lowitt and Tonucci knew Barclays had not committed to "support LBI fully" until the deal closed, including by providing overnight financing.

Finally, JPMorgan merely recounts that "Lowitt and Tonucci represented to Buyers-Russo that Barclays had agreed to buy all of the securities subject to LBI's overnight financings."  (Id.).  But this rehashing of the alleged misrepresentation fails to provide factual allegations showing they knew the representations were false when made.

The cases cited by JPMorgan in support of its argument are thus easily distinguishable.  In each case, the plaintiff clearly pled facts showing the defendant knew the statement was false before the statement was made.  See 380544 Canada, Inc. v. Aspen Techn., Inc., 633 F. Supp. 2d 15, 34 (S.D.N.Y. 2009) (holding that emails sent by defendant on June 27, 2001 and July 5, 2001 showed defendant had knowledge that a statement he made on August 7,

2001 was false); Hughes v. BCI Int'l Holdings, Inc., 452 F. Supp. 2d 290, 302 (S.D.N.Y. 2006)

("Plaintiffs contend that Cunningham knew these representations were false because, prior to his

meeting with Hughes in Colorado, he had written to Saltman and others detailing his concerns as

to the viability of the BCI venture.").  No such facts are pled by JPMorgan.

### b.     The Alleged Oral Statement Was Too Vague to Be Actionable

On the independent issue of whether Lowitt and Tonucci's statement was

sufficiently concrete to be actionable, JPMorgan does not dispute that, under New York law,

"[v]ague expressions of . . . future expectation provide an insufficient basis upon which to

predicate a claim of fraud."  Int'l Oil Field Supply Servs. Corp. v. Fadeyi, 35 A.D.3d 372, 375,

825 N.Y.S.2d 730 (2d Dep't 2006) (affirming dismissal of fraudulent misrepresentation claim).

However, JPMorgan argues that Lowitt and Tonucci's alleged representation that "Barclays had

committed to support LBI fully until the deal closed, including by providing overnight financing

that would reduce or eliminate LBI's dependence on the Fed," was sufficiently concrete when

"evaluated in light of the context in which it was made, *i.e.*, in the context in which JPMorgan

was being assured that it should continue to make intraday advances to LBI because, regardless

of LBI's fate, those advances would be repaid in full."  (Opp. Br. at 44).  JPMorgan then

identifies various attenuated events and alleged misrepresentations by others that supposedly

provided sufficient "context" to turn Lowitt and Tonucci's alleged vague statements into

sufficiently concrete factual misrepresentations.  (Id. at 44-45).

But a vague statement is not rendered sufficiently specific to constitute a

fraudulent misrepresentation because it was said at the same time others were making specific

misrepresentations.  Whether a statement is sufficiently specific and concrete, rather than a

vague expression of future conduct, is judged by the statement itself.  See Fierro v. Gallucci, No.

06-CV-5189 (JFB)(WDW), 2010 WL 1223122, at *13 (E.D.N.Y. Mar. 24, 2010) (granting

18

summary judgment for defendant on fraud claim where alleged fraudulent statement was vague, and explaining that, with respect to vagueness, "[t]he distinction depends upon how far the utterance implicitly presupposes the use of some subjective standard by the utterer") (quoting Stern v. Satra Corp., 539 F.2d 1305, 1308 (2d Cir. 1976)).

Furthermore, the only case cited on this issue by JPMorgan, McMahan & Co. v. Wherehouse Entertainment, did not address the issue of vagueness at all, but rather held that true statements can be actionable under the Federal securities laws if they have a misleading effect due to the context of other statements also made by that same party. 900 F.2d 576, 579 (2d Cir. 1990) ("Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."). McMahan & Co. does not support the proposition that a vague statement should be considered sufficiently specific if other parties were making specific misrepresentations regarding the same issue.

Indeed, JPMorgan's arguments elsewhere in its brief demonstrate exactly why the alleged misrepresentation is too vague to support a fraud claim. As explained above, during the week of September 15, LBI required an escalating amount of fail financing loans to finance securities that were not supported by Barclays, the Fed, or any other counterparty, including $1.9 billion overnight on September 16, $4.4 billion overnight on September 17, and "well over $7 billion" on the night of September 18. (Opp. Br. at 32; Am. Counterclaims ¶ 86). Yet JPMorgan claims that "JPMorgan's comparatively small overnight extensions of credit do not mean that JPMorgan, as a matter of law, did not rely on LBHI's misrepresentation that Barclays had committed to 'support LBI fully.'" (Opp. Br. at 33). Surely such a representation is too vague to

be actionable if, according to JPMorgan, it could be interpreted to either mean that Barclays

would support LBI "entirely" or that Barclays would leave "well over $7 billion" of securities

unfinanced.

### 3. The Sale Order and Rule 60(b) Decision Preclude JPMorgan's Fraud Claim Based on the APA and Related Filings

In their Moving Brief, Plaintiffs also demonstrated that JPMorgan's claim for

fraudulent misrepresentation based on statements contained in the APA should be dismissed

because this Court has already ruled that the APA did not contain fraudulent misrepresentations.

(Mov. Br. at 38-41); see In re Lehman Brothers Holdings Inc., 445 B.R. 143 (Bankr. S.D.N.Y.

2011) (the "Rule 60(b) Decision").  JPMorgan argues in its Opposition Brief that the issues

presented by the Amended Counterclaims were neither raised nor decided in connection with the

Rule 60(b) Decision.  (Opp. Br. at 47).  This is simply incorrect.

The Rule 60(b) Decision reiterated that not only did the "parties negotiate[] in

good faith and at arm's length, and that there was no effort to conceal relevant facts," but "[o]f

particular importance is the lack of any substantial evidence to support a finding that the Sale

Order was procured by fraud, misrepresentation, or wrongdoing of any kind."  (Rule 60(b)

Decision at 52).  In its Amended Counterclaims, JPMorgan asks the Court to revisit the issue of

whether the APA contained fraudulent misrepresentations regarding the assets that would be sold

to Barclays, and specifically claims that LBHI's submission of the proposed APA constituted a

fraud on the Court and creditors, including JPMorgan.  (Am. Counterclaims ¶¶ 111-13 ("By

filing its Sale Motion and failing to disclose the true status of the transactions contemplated by

the Sale Motion, LBHI misled not only the Court, but also LBI's creditors, including most

notably, JPMorgan.")).  As described above, the Court has already rejected this claim in the Sale

Order and subsequent Rule 60(b) Decision.[5]

JPMorgan's primary response is to argue that it is not seeking to unwind the sale,

and that its fraud claim based on the filing of the APA requests different relief than that sought

by LBHI and the Committee in the Rule 60(b) proceedings.  (Opp. Br. at 46-47).  But that

argument misses the point.  The critical issue in determining whether an action is an

impermissible collateral attack on a sale order is whether, in order for the action to prevail, the

factual findings underlying approval of the sale order would have to be overruled.  "Even though

an action has an independent purpose and contemplates some other relief, it is a collateral attack

if it must in some fashion overrule a previous judgment."  In re Farmland Indus., Inc., 376 B.R.

718, 726 (Bankr. W.D. Mo. 2007).

For JPMorgan to prevail on its fraud claim based on the APA and related filings,

this Court would have to find that LBHI fraudulently misrepresented to the Court and creditors

(including JPMorgan) that "the APA constituted an agreement between LBHI and Barclays

accurately describing the sale transaction," and that the APA contained fraudulent descriptions of

the assets that would (or would not) be purchased by Barclays.  (Am. Counterclaims ¶¶ 111-12).

Such a finding would directly conflict with this Court's previous rulings that the APA was

negotiated in good faith and without collusion, "that there was no effort to conceal relevant

facts," and that the Sale Order was not "procured by fraud, misrepresentation, or wrongdoing of

any kind."  (Rule 60(b) Decision at 52).  Were it otherwise, as JPMorgan claims, the Sale Order

could not stand.  See In re General Insecticide Co., 403 F.2d 629, 630-31 (2d Cir. 1968) (sale

---

[5]    As the Court is aware, Plaintiffs challenged these underlying factual findings at trial.
The Court has since denied Plaintiffs' Rule 60(b) motions, however, and that decision is
currently binding on all parties, as explained in this section.

orders should be set aside if the sale is "tinged with fraud, error or similar defects").  That is why

JPMorgan's fraud claim represents an impermissible collateral attack on the Sale Order and

should be dismissed.  See Farmland, 376 B.R. at 726-27; In re CHC Indus., Inc., 389 B.R. 767,

775 (Bankr. M.D. Fla. 2007) (dismissing claims where the relief requested by the plaintiffs could

not be granted without effectively overruling certain key findings in the sale order).[6]

        JPMorgan's only remaining argument is that it is not bound by the Sale Order

because it was not a party to the Rule 60(b) proceeding.  (Opp. Br. at 49).  But that fact is not

determinative of whether a creditor is bound by an order of the bankruptcy court.  In the context

of a bankruptcy proceeding, creditors of the debtor that receive notice of 363 sales are bound

with respect to section 363 sale orders that are entered in a bankruptcy case.  This is especially

true with respect to JPMorgan, which not only participated in the sale process but supported and

indeed advocated approval of the sale.  (See Ex. K, Sale Hearing Tr. at 175:10-182:9)[7]; see also

HSBC Bank USA, N.A. v. Adelphia Commc'ns Corp., No. 07-CV553A, 2009 WL 385474, at

*10 (W.D.N.Y. Feb. 12, 2009) (bankruptcy sale orders are final orders entitled to res judicata

effect); see Farmland, 376 B.R. at 729 (citing Gekas v. Pipin (In re Met-L-Wood Corp.), 861

F.2d 1012, 1016 (7th Cir. 1988) (bankruptcy sale orders are "good against the world, not just the

parties to a judgment or persons with notice of the proceeding")); C.E.K., Inc. v. CHC Indus.,

Inc. (In re CHC Indus., Inc.), 389 B.R. 767, 775 (Bankr. M.D. Fla. 2007) ("[A] party may not

---

    [6] JPMorgan's ruminations about the "fog" of Lehman and "merger talks" and "toxic
waste" have no bearing on Plaintiffs' argument, nor do JPMorgan's discussions regarding alleged
fraudulent oral statements made by Lehman employees.  (Opp. Br. at 47-48).  As the Moving
Brief and this Reply make clear, this argument addresses JPMorgan's fraud claim only to the
extent it is premised on allegations that the APA contained fraudulent descriptions of the assets
subject to sale, and that LBHI's submission of the APA constituted a fraud on the Court and
creditors such as JPMorgan.

    [7] Unless otherwise specified, all citations to exhibits are to the Declaration of Tyler G.
Whitmer in Support of Motion to Dismiss, filed concurrently with Plaintiffs' Moving Brief.

challenge a Sale Order . . . based on allegations that clearly conflict with the Court's prior

findings regarding the transaction."); In re HHG Corp., No. 01-B-11982 (ASH), 2006 WL

1288591, at *2 (Bankr. S.D.N.Y. May 2, 2006) (holding that non-party to sale transaction was

barred by doctrine of res judicata from challenging provisions in the sale order).

 Accordingly, to the extent the First Counterclaim is based on purported fraudulent

misrepresentations contained in the APA and related filings, it should be dismissed.

## C. JPMorgan Has Failed to Plead LBHI Acted with Scienter

 Finally, JPMorgan has failed to state a claim for fraudulent misrepresentation

because the Amended Counterclaims do not allege that LBHI acted with scienter.  (Mov. Br. at

41-46).  In its Opposition Brief, JPMorgan argues that it has pled scienter via strong evidence of

conscious misbehavior as well as motive and opportunity.  (Opp. Br. at 50-55).  JPMorgan is

wrong on both counts.

### 1. JPMorgan Has Not Alleged Strong Evidence of Conscious Misbehavior

 As to whether JPMorgan has sufficiently pled scienter through conscious

misbehavior, JPMorgan claims that it has met its burden by alleging "that the defendants 'knew

facts' suggesting that their statements were not true."  (Id. at 50).

 JPMorgan misstates the legal standard.  Knowledge of falsity is a wholly separate

element from scienter.[8]  Bui v. Indus. Enterprises of Am., Inc., 594 F. Supp. 2d  364, 371

---

[8] The case JPMorgan cites for this point is inapposite, as it concerns facts constituting
scienter with respect to public statements under Federal securities law.  See Novak v. Kosaks,
216 F.3d 300,308 (2d Cir. 2000) (surveying "the actual facts of our securities fraud cases" in
order to determine "precisely what actions and behaviors constitute recklessness sufficient for §
10(b) liability," and finding that "securities fraud claims typically have sufficed to state a claim
based on recklessness when they have specifically alleged defendants' knowledge of facts or
access to information contradicting their public statements"); see also South Cherry Street, LLC
v. Hennessy Group LLC, 573 F.3d 98 (2d Cir. 2009) (distinguishing Novak's scienter holding
because Novak involved fraud claims against company officials who issued public financial
statements); Kalnit v. Eichler, 264 F.3d 131, 143 (2d Cir. 2001) (same).

(S.D.N.Y. 2009) (listing "knowledge of its falsity" and "scienter or an intent to defraud" as separate elements of common law fraud under New York law); <u>Healthcare Finance Group, Inc. v. Bank Leumi USA</u>, 669 F. Supp. 2d 344, 348 (S.D.N.Y. 2009) (same); <u>Dover Ltd. v. A.B. Watley, Inc.</u>, 423 F. Supp. 2d 303, 327 (S.D.N.Y. 2006) (same).  Pleading scienter by conscious misbehavior requires more than mere knowledge of falsity; it requires a showing that the defendant acted with a conscious or reckless intent to defraud the plaintiff.  <u>See</u> <u>Musalli Factor for Gold & Jewellry v. JPMorgan Chase Bank, N.A.</u>, 261 F.R.D. 13, 21 (S.D.N.Y. 2009) ("Nor has [plaintiff] pleaded facts constituting strong circumstantial evidence of conscious misbehavior or recklessness by [defendant].  The Complaint's general and repeated assertions that they knew what [a third party who allegedly defrauded plaintiff] was doing are insufficient.").  Thus, setting aside for the moment whether JPMorgan has sufficiently pled that LBHI knew its statements in the APA and to Jane Buyers-Russo were false when it allegedly made those statements, <u>see</u> <u>supra</u> Point I.B.2.a, such allegations do not plead the separate element of scienter.

JPMorgan also claims that allegations that LBHI already knew Barclays would not take RACERS before it filed the APA constitute "direct evidence of conscious or reckless misbehavior or wrongdoing."  (Opp. Br. at 51 ("[B]y Monday, September 15, LBHI had already agreed with Barclays that Barclays would not purchase RACERS.")).  But such allegations only go to LBHI's knowledge, and say nothing about LBHI's supposed intent to defraud JPMorgan by filing the APA or supposedly telling JPMorgan that Barclays would finance and acquire assets used in Lehman's North American broker-dealer business.

Moreover, JPMorgan elsewhere makes the exact opposite allegation on this point, in arguing that LBHI's misrepresentations caused JPMorgan's injury.  (<u>Id.</u> at 68 n.24).  There, JPMorgan argues that discussions about whether Barclays would purchase RACERS were

ongoing throughout that week, and that Barclays did <u>not</u> decide to leave RACERS behind until

after LBHI supposedly made a representation on September 18.  (<u>Id.</u> ("Nor is it possible to

conclude at the pleading stage, as plaintiffs urge, that James Seery's discussion with John Mahon

was not a proximate cause of JPMorgan's injury because Barclays had decided earlier not to

purchase RACERS.  As pleaded in the Amended Counterclaims, discussions between LBHI and

Barclays about what specific securities Barclays should acquire or finance were ongoing

throughout the week.") (citation omitted)).  In sum, JPMorgan's internally contradictory

allegations about when Barclays decided it would not accept RACERS as collateral fall short of

constituting direct evidence of conscious misbehavior on the part of LBHI.  <u>See</u> <u>Musalli</u>, 261

F.R.D. at 19 (dismissing fraud claim where claimant did not adequately plead facts constituting

strong circumstantial evidence of conscious misbehavior or recklessness); <u>Renner v. Chase</u>

<u>Manhattan Bank</u>, No. 98 CIV. 926(CSH), 2000 WL 781081, at *10 (S.D.N.Y. June 16, 2000)

(same).

>    **2.**    **JPMorgan Has Not Sufficiently Alleged That LBHI Had a Motive to Commit Fraud**

Next, JPMorgan claims it has alleged scienter via motive and opportunity by

alleging that LBHI fully supported the Barclays Sale.

In doing so, JPMorgan's Opposition Brief largely ignores LBHI's huge financial

incentive to make sure JPMorgan was not left with a multi-billion dollar deficiency that it could

claim against LBHI as purported guarantor.  Instead, JPMorgan attempts to disregard it as

"boil[ing] down to the argument that LBHI could not have been motivated to deceive because

JPMorgan might later wind up with a claim against it."  (Opp. Br. at 54).  Yet Plaintiffs do not

argue that LBHI could have no motive because it would end up with a fraud claim asserted

against it (which is true in every fraud case).

25

Plaintiffs' argument is based on the fact that LBHI – rather than LBI or even departing LBHI employees – was in bankruptcy at this time and acting entirely to minimize creditors' claims.  And critically, JPMorgan was then holding billions of dollars of LBHI's assets as purported collateral for any shortfall that would arise if the supposed fraudulent scheme was accomplished.  LBHI's incentives were thus directly contrary to any plan that would accomplish the Barclays Sale by leaving JPMorgan with a multi-billion dollar shortfall that could be claimed against LBHI's collateral.  Indeed, courts have dismissed fraud claims based on similarly pled, economically irrational, motives.  See, e.g., ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 203 (2d Cir. 2009) (dismissing fraud claim for failure to plead a plausible motive, where plaintiff alleged defendant was motivated to "dup[e] other institutions for the purposes of gaining at the expense of those institutions" and accomplished this fraud by "lend[ing] Enron billions of dollars" despite being aware of Enron's financial problems); Ashland Inc. v. Morgan Stanley & Co., Inc., 700 F. Supp. 2d 453, 469 (S.D.N.Y. 2010) ("Even assuming that the [complaint] had alleged facts supporting this theory of the case, those allegations would be economically irrational.  For [defendant] to purchase billions of dollars in auctions of [student loan auction rate securities] in order to induce [plaintiff] into an already illiquid auction market would leave [defendant] in an illiquid position also.").

The only supposed benefits that JPMorgan argues would be realized by the scheme are those to LBI and a few LBHI employees.  (Opp. Br. at 54).  But none of those claimed benefits would have inured to LBHI or the creditors it was then acting to protect.  To the contrary, the alleged scheme, if successful, would have directly harmed LBHI and its creditors by increasing LBHI's purported liability under its guaranty of LBI's clearance obligations.  The law is settled that the motive of employees acting in their own interest and against those of their

26

company cannot be attributed to the company.  See Wells Fargo Home Mortgage Inc. v.

Hiddekel Church of God, Inc., No. 11911/02, 2004 WL 258144, at *6 (N.Y. Sup. Feb. 10, 2004)

("[A] principal is relieved of liability for an agent's acts when the agent totally abandons the

principal's interests and acts entirely for his or another's purposes." (internal quotation omitted));

see also Holmes v. Lorch, 329 F. Supp. 2d 516, 531-32 (S.D.N.Y. 2004) (granting motion for

summary judgment by employer-defendant of claims based on employee conduct adverse to

employer's interest).

JPMorgan has thus failed to allege LBHI's scienter indirectly by showing a strong

motive to accomplish the Barclays Sale through defrauding JPMorgan and exposing itself to a

multi-billion dollar claim.


### POINT II.

### JPMORGAN'S COUNTERCLAIM FOR FRAUDULENT CONCEALMENT FAILS TO STATE A CLAIM

JPMorgan's second counterclaim, for fraudulent concealment, fails for many of

the same reasons as its fraudulent misrepresentation counterclaim.  In addition, the fraudulent

concealment counterclaim fails because JPMorgan has not alleged that LBHI had a duty to

disclose the allegedly concealed information, as required under New York law.

**A.    The Fraudulent Concealment Counterclaim Fails For Many of the Same Reasons as the Fraudulent Misrepresentation Counterclaim**

To begin with, JPMorgan's counterclaim for fraudulent concealment suffers from

many of the same problems as its fraudulent misrepresentation counterclaim.  In particular,

JPMorgan fails to plead that it reasonably relied on omissions by LBHI in acting as LBI's repo

custodian.  The contractual documents governing those repos, including the written

confirmations, provided exclusive evidence of the terms of those transactions, and JPMorgan

27

failed to take the reasonable step of confirming its understanding in writing.  (Mov. Br. at 47-48).

In addition, just as predictions of another party's future conduct do not constitute actionable

misrepresentations under New York law, the failure to disclose a prediction of another party's

future conduct does not constitute an actionable omission.  (Id. at 48-49).  Finally, JPMorgan has

failed to plead scienter on the part of LBHI regarding either misrepresentations or omissions,

because it has not and cannot plead a motive for LBHI to commit fraud in order to leave

JPMorgan with insufficient securities to secure its claim against LBI.  (Id. at 49).

JPMorgan's Opposition Brief does not address these shortcomings of its

fraudulent concealment claim, presumably relying on its earlier responses to the fraudulent

misrepresentation claim.  But these defects are even more stark in the context of fraudulent

concealment, where JPMorgan is asking for billions of dollars because of what LBHI did not

say.  For example, it is even more unreasonable for JPMorgan to rely on LBHI's silence when

JPMorgan was acting as custodian for repos between Barclays and LBI, because LBHI was not

even a party to any of the repurchase agreements or otherwise engaged in those transactions.

**B.    The Amended Counterclaims Do Not Allege That LBHI Had a Duty to Disclose the Allegedly Concealed Information to JPMorgan**

In addition to the elements of fraudulent misrepresentation, a fraudulent

concealment claim must plead facts establishing the defendant had a duty to disclose the

allegedly concealed information.  See Aetna Casualty & Surety Co. v. Aniero Concrete Co., Inc.,

404 F.3d 566, 582 (2d Cir. 2005) (listing "a relationship between the contracting parties that

creates a duty to disclose" among the elements for fraudulent concealment).  In its response,

JPMorgan makes a single argument as to why LBHI purportedly had a duty to disclose:  "LBHI

made statements that, as the week passed, LBHI had to realize were not true when made or had

become untrue by virtue of subsequent developments."  (Opp. Br. at 58).  It relies for this

argument on the doctrine that "imposes a duty to disclose where the speaker knows its counterparty is relying on a representation that:  (a) the speaker believed to be true when made but subsequently learned to be materially false or misleading when made; or (b) was true when made but became materially false or misleading as a result of subsequent developments."  (Id. at 57 (citations omitted)).

Before turning to the merits of this argument, it is worth noting the arguments that JPMorgan concedes in its Opposition Brief, including that LBHI had no duty to disclose as a result of a partial or incomplete statement, (see Mov. Br. at 50-52), and that the special facts doctrine is inapplicable because LBHI did not have the requisite contractual relationship with JPMorgan.  (Id. at 52-59).

In fact, the argument JPMorgan does rely on – that LBHI had a duty to disclose to JPMorgan when it realized its prior statements either were, or had become, untrue – fails for the same reason as its abandoned argument under the special facts doctrine:  under New York law, such a duty arises only between parties to a business transaction.  Indeed, all of the cases relied on by JPMorgan illustrate this principle.  For example, in Loewer v. Harris, the court's holding was limited to the disclosure of information that was material to a pending contract between the parties:

> [W]hen one of the parties, pending negotiations for a contract, has held out to the other the existence of a certain state of facts, material to the subject of the contract, and knows that the other is acting upon the inducement of their existence, and, while they are pending, knows that a change has occurred, of which the other party is ignorant, good faith and common honesty require him to correct the misapprehension which he has created.

57 F. 368, 373 (2d Cir. 1893).  Similarly, in Idress v. American University of the Caribbean, a university was found to have a duty to correct untrue statements made to a student who had

enrolled in and paid tuition to the university in reliance on the statements.  546 F. Supp. 1342,

1349 (S.D.N.Y. 1982).  And in Illinois State Board of Investors v. Authentidate Holding Corp., a

company was found to have a duty to its own investors under federal securities law to correct

statements that were subsequently rendered misleading.  369 F. App'x 260, 263-64 (2d Cir.

2010).  In contrast to the parties in all of these cases, the purported statements by LBHI that

allegedly were untrue or became untrue due to subsequent events were not related to any

business transaction between LBHI and JPMorgan.  The repurchase transactions between LBI

and Barclays, with JPMorgan serving as triparty custodian, were governed by documents among

those three entities, to which LBHI was not a party.  Similarly, JPMorgan was not a party to the

Barclays Sale or the APA.

        JPMorgan also relies on Fischer v. Kletz, which likewise held that a duty to

disclose existed because "one party to a business transaction is under a duty to exercise

reasonable care to disclose to the other before the transaction is consummated." 266 F. Supp.

180, 185 (S.D.N.Y. 1967) (quoting First Restatement of Torts § 551(2)).  Although the court in

that case extended this doctrine to a suit by a party to a business transaction against an

"independent auditor" of that transaction, (id. at 188), LBHI had no responsibilities in the

transactions at issue in this case, as an independent auditor or otherwise.  As a result, the doctrine

relied upon by JPMorgan is inapplicable.

        Because LBHI had no duty to disclose information to JPMorgan about

transactions to which LBHI was not a party, JPMorgan's fraudulent concealment counterclaim

should be dismissed.

## POINT III.

## JPMORGAN'S COUNTERCLAIM FOR FRAUDULENT INDUCEMENT TO LEND FAILS TO STATE A CLAIM

JPMorgan's fraudulent inducement to lend counterclaim is duplicative of its fraudulent misrepresentation and fraudulent concealment counterclaims and should be dismissed for all of the same reasons.  In their Moving Brief, Plaintiffs cited numerous cases holding that "New York law requires the same elements for fraudulent misrepresentation and fraudulent inducement."  Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A., 247 F. Supp. 2d 352, 364 (S.D.N.Y. 2002); see also Fax Telecommunicaciones Inc. v. AT&T, 138 F.3d 479, 490 (2d Cir. 1998) ("In order to state a claim for fraudulent misrepresentation or fraudulent inducement, [plaintiff] must allege, inter alia, that it reasonably relied on false representations made by [defendant]."); Pallonetti v. Liberty Mut., No. 10 Civ. 4487, 2011 WL 519407, at *8 (S.D.N.Y. Feb. 11, 2011) ("To state a fraudulent inducement claim, a plaintiff must demonstrate that: (1) the defendant made a material misrepresentation . . . ."); Sado v. Ellis, 882 F. Supp. 1401, 1405 (S.D.N.Y. 1995) ("Under New York law, which is controlling on the issue of fraud, [plaintiff] must prove the following elements of fraudulent inducement: misrepresentation of a material fact, falsity, scienter, reliance and injury.").

JPMorgan fails to address any of this controlling law.  Instead, it proposes that its fraudulent inducement claim "does not require the Court to find that LBHI's misrepresentations concerning the APA earlier that week were fraudulent; nor does it require the Court to find that LBHI failed to discharge a duty to disclose that those representations were untrue."  (Opp. Br. at 61).  But JPMorgan cites no authority in support of this clearly erroneous statement.  In fact, the cases cited by JPMorgan in the very next paragraph of its Opposition Brief confirm that claims of fraudulent inducement require the same elements as fraudulent misrepresentation or

fraudulent concealment claims.  (Id.).  For example, <u>Murray v. Xerox Corp.</u>, was actually a misrepresentation case and did not address inducement at all.  811 F.2d 118, 121 (2d Cir. 1987) (affirming summary judgment for defendant on fraudulent misrepresentation claim).  In addition, the court in <u>Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.</u> affirmed the trial court's decision denying a motion to dismiss a fraudulent inducement claim precisely because the plaintiff had sufficiently alleged a misrepresentation of present fact.  68 N.Y.2d 954, 956 (1986) ("[A] promise . . . made with a preconceived and undisclosed intention of not performing it . . . constitutes a misrepresentation.") (quoting <u>Sabo v. Delman</u>, 3 N.Y.2d 155, 162 (1957)).  Similarly, in <u>Hall v. Naylor</u>, the fraudulent inducement claim was premised on a purchaser's alleged concealment of the fact that it was insolvent.  18 N.Y. 588, 589 (1859) ("It does not appear that Kerr & Co., on purchasing the goods in question, made any representations of their ability to pay for them.  If, however, they concealed the fact of their insolvency, with a design of procuring the goods and not paying for them, it was a fraud which rendered the sale void, if the plaintiff chose so to regard it.").[9]

New York law is clear that fraudulent inducement requires the same elements as fraudulent misrepresentation and fraudulent concealment.  Thus, JPMorgan's fraudulent inducement claim should be dismissed as duplicative.  <u>See</u> <u>Vaughn v. Consumer Home Mortgage, Inc.</u>, No. 01-CV-7937(ILG), 2003 WL 21241669, at *7 (E.D.N.Y. March 23, 2003)

---

[9]  In a final attempt to distinguish inducement from misrepresentation or concealment, JPMorgan cites in a footnote to cases "interpreting section 523(a)(2)(A) of the Bankruptcy Code" for the proposition that "the act of obtaining credit is an implied representation of a present intent to repay that, if false when made, is grounds for finding fraud."  (Opp. Br. at 62).  But the Amended Counterclaims do not allege that LBHI (as opposed to LBI) ever obtained credit from JPMorgan.  (See, e.g., Am. Counterclaims ¶¶ 30, 36, 69 (stating that JPMorgan extended credit to LBI)).  Nor do the Amended Counterclaims assert a claim under section 523(a)(2)(A).  As a result, these cases are inapposite.

(dismissing fraudulent inducement claim "as duplicative" when based on the same alleged acts

and omissions as a fraud claim).

## POINT IV.

## JPMORGAN'S COUNTERCLAIM FOR AIDING AND ABETTING LBI'S ALLEGED FRAUD FAILS TO STATE A CLAIM

JPMorgan's fourth counterclaim is for aiding and abetting a fraud allegedly

committed by LBI.  But the Amended Counterclaims fail to plead the existence of a fraud by LBI

with particularity or that LBHI had actual knowledge of the alleged fraud.

### A.    JPMorgan Fails to Allege Fraud by LBI with Particularity

Plaintiffs' Moving Brief discussed how the Amended Counterclaims do not allege

any representation made by an LBI individual to JPMorgan until after JPMorgan had already

unwound the Barclays Repo on the morning of September 18, which JPMorgan says caused its

injury.  (Mov. Br. at 63-64).  Likewise, JPMorgan has not pled that LBI committed a fraudulent

concealment because the Amended Counterclaims fail to specify any alleged omission by LBI or

to identify any LBI individual responsible for the failure to disclose.  (Id.).

JPMorgan does not address this argument in its Opposition Brief.  Instead, it

responds that it does not need to plead a misrepresentation or omission in order to state a claim

for fraudulent inducement under New York law.  (Opp. Br. at 63 ("First, the Amended

Counterclaims allege that LBI obtained an advance exceeding $70 billion from JPMorgan with

the intent not to repay. . . . [T]hat conduct amounts to fraud under settled New York law.")

(citations omitted)).  However, numerous New York cases hold that fraudulent inducement

requires the same elements as fraudulent misrepresentation or fraudulent concealment, including

allegations of an actionable misrepresentation or omission.  See supra Point III; see also Fax

Telecommunicaciones, 138 F.3d at 490; Pallonetti, 2011 WL 519407 at *8; Wells Fargo Bank

33

Nw., 247 F. Supp. 2d at 364; Sado, 882 F. Supp. at 1405. Furthermore, as also explained above,

even the cases cited to by JPMorgan on this point premised the alleged fraudulent inducement

claim on a misrepresentation or omission. See supra Point III; see also Murray, 811 F.2d at 121;

Deerfield Commc'ns, 68 N.Y.2d at 956; Hall, 18 N.Y. at 589. JPMorgan cites to no new cases

here in support of its mistaken contention.

**B.      JPMorgan Fails to Allege LBHI Knew of Any Alleged LBI Fraud**

           In addition to its failure to identify a misrepresentation or omission by LBI,

JPMorgan also fails to show that LBHI had knowledge of any alleged fraud by LBI. JPMorgan

claims it has pled facts showing knowledge on the part of LBHI, by citing to an allegation that

"Paolo Tonucci instructed Lehman employees at 7:07 a.m. on September 18 to ensure that

'RACERs . . . not be funded by Barclays' that evening." (Am. Counterclaims ¶ 139, cited by

Opp. Br. at 64). But JPMorgan has not claimed that merely keeping the RACERS securities out

of a Barclays repo was fraudulent. As a result, because the above instruction does not indicate

any awareness of the use of fraudulent means by LBI, it falls far short of pleading actual

knowledge of a fraud. (See Mov. Br. at 65).


## POINT V.

### JPMORGAN'S COUNTERCLAIM FOR AIDING AND ABETTING BARCLAYS' ALLEGED FRAUD FAILS TO STATE A CLAIM

           JPMorgan's counterclaim for aiding and abetting Barclays' alleged fraud likewise

falls short and should be dismissed.

**A.      JPMorgan Fails to Plead That LBHI Substantially Assisted Barclays' Alleged Fraud**

           In its Opposition, JPMorgan claims it has sufficiently pled that LBHI assisted

Barclays by "identifying undesirable securities in LBI's triparty repo book" and by manipulating

the repo shells in order to "ensure that only the securities Barclays wanted were actually

transferred to Barclays." (Opp. Br. at 65). As support, JPMorgan cites to a number of

allegations showing that LBHI personnel allegedly communicated internally that they did not

want Barclays to fund RACERS. (Id. at 65-66).

JPMorgan has not specifically alleged that LBHI assisted Barclays by identifying

RACERS, or any other securities, as ones that should be excluded from Barclays' repo collateral.

As stated in the Moving Brief, the only allegation in the Amended Counterclaims specifically

pleading that LBHI contacted Barclays and identified a security it should not purchase occurred

on September 18, when LBHI's James Seery allegedly told "John Mahon of Barclays that

Barclays should avoid purchasing RACERS." (Am. Counterclaims ¶ 82). But the Amended

Counterclaims also state that Barclays had already decided on its own three days earlier that it

would not purchase RACERS; therefore the alleged phone call from Seery did not actually assist

Barclays in making the decision. (See id. ¶ 46 (stating that Barclays decided on September 15

that it would not purchase RACERS); see also Opp. Br. at 51 ("[B]y Monday, September 15,

LBHI had already agreed with Barclays that Barclays would not purchase RACERS.")).

JPMorgan has thus pled no allegation showing that LBHI helped Barclays identify RACERS or

any other security as one that Barclays should avoid financing before Barclays allegedly decided

not to take it, not to mention that any information from LBHI was critical to Barclays' alleged

fraud.

In addition, JPMorgan has not pled that LBHI took any steps to ensure RACERS

or any other supposedly undesirable security would not be transferred to Barclays. JPMorgan

claims it has sufficiently alleged that "LBHI was involved in the manipulation of the overnight

shells" because the Amended Counterclaims state that "LBI personnel" had access to the shells

while "under the control and supervision of LBHI." (Opp. Br. at 66). But JPMorgan has pled no

35

facts to support its contention that LBHI was somehow controlling these unidentified LBI

employees, particularly since JPMorgan admits LBHI did not even have contractual authority to

influence the allocation of securities among LBI counterparties.  (Id.).  As a result, JPMorgan

fails to plead with specificity that LBHI provided substantial assistance to Barclays.

**B.    LBHI's Conduct Did Not Proximately Cause Any Alleged Injury to JPMorgan**

JPMorgan also fails to plead that any of LBHI's alleged assistance proximately

caused an injury to JPMorgan.  Just as JPMorgan's reliance was not reasonable, it was not

foreseeable that JPMorgan would be relying as tri-party custodian on representations outside the

contractual documents and written confirmations that contained the exclusive terms of the

transactions.  As a result, it was not foreseeable that any of the alleged assistance by LBHI would

have caused an injury to JPMorgan.[10]  (See Mov. Br. at 69-71); see also Bloor v. Carro,

Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 62-63 (2d Cir. 1985) (holding that in an aiding

and abetting fraud claim, the alleged substantial assistance must have proximately caused the

injury); Restatement (Second) of Torts § 548A (explaining that an action constitutes the

proximate cause "only of those pecuniary losses that are within the foreseeable risk of harm that

it creates").  For the reasons described above, it was neither reasonable nor foreseeable for

JPMorgan to alter its conduct as tri-party custodian based on statements outside the contractual

documents and written confirmations, and the conduct attributed to LBHI could not have

proximately caused an injury to JPMorgan.

---

[10]    In response to this point, JPMorgan quotes once again from In re Parmalat Securities
Litigation for the proposition that "[a] defendant's conduct need not have been the inducing cause
of plaintiff's actions, but only an essential or inducing cause."  (Opp. Br. at 67 (quoting 477 F.
Supp. 2d at 611 n.62)).  As explained above, however, this proposition only defines actual
reliance and does not alter the need for a showing of proximate cause.  See supra Point I.A.1.

## POINT VI.
## JPMORGAN'S INDEMNIFICATION COUNTERCLAIMS SHOULD BE DISMISSED

Plaintiffs demonstrated in their Moving Brief that JPMorgan's seventh and eighth counterclaims, for indemnification, should be dismissed because there is no scenario in which JPMorgan would have a right to indemnification for the primary claimed loss – i.e., the "loss" JPMorgan would suffer if it is found liable to LBHI on the claims asserted in the Amended Complaint and ordered to pay damages or return LBHI's collateral.  (Am. Counterclaims ¶¶ 13, 161-62, 168-69).  Among other reasons, both of the contracts at issue preclude indemnification where JPMorgan has acted negligently or willfully, and public policy prohibits indemnification by a debtor for losses arising out of the avoidance provisions of the Bankruptcy Code. JPMorgan's Opposition Brief offers no answer to Plaintiffs' argument.

Instead, JPMorgan attempts to side-step the issue by advising the Court that JPMorgan only "focuses here on its right to attorneys' fees."  (Opp. Br. at 69, n.25).  In doing so, however, it also improperly attempts to reserve some right to pursue its counterclaims for the above-described loss in the future.  (Id.).  JPMorgan's gambit should not be accepted by the Court.  JPMorgan's purported counterclaims regarding the above-described loss are clearly pled in the Amended Counterclaims.  (Am. Counterclaims ¶¶ 13, 162, 168-69).  If there were a plausible legal basis for allowing these counterclaims to survive, JPMorgan was required to assert such basis in opposition to Plaintiffs' motion.  See Brandon v. City of New York, 705 F. Supp. 2d 261, 268 (S.D.N.Y. 2010) (collecting authority).  It did not.  Accordingly, to the extent the seventh and eighth counterclaims seek indemnification for losses associated with being

37

ordered to pay damages or return LBHI's collateral (as described in paragraphs 162 and 168-69 of the Amended Counterclaims), those counterclaims should be dismissed with prejudice.  Id.[11]

       With respect to JPMorgan's new "focus" on the recovery of attorneys' fees only, that theory is also flawed, and the indemnification counterclaims under the 2000 Clearance Agreement (seventh counterclaim) and the Barclays Custodial Undertaking (eighth counterclaim) should nonetheless be dismissed.  As explained below:

- Fees incurred in prosecuting the Amended Counterclaims are not recoverable under the 2000 Clearance Agreement because: (i) the indemnity provision of the Barclays Custodial Undertaking exclusively applies; and (ii) even if applicable, the plain language of the 2000 Clearance Agreement does not provide indemnity for fees incurred in prosecuting claims against LBHI;

- The Amended Counterclaims do not plead a claim for indemnity under the 2000 Clearance Agreement for fees incurred in defending against Plaintiffs' Amended Complaint, and even if it were pled, that agreement does not provide indemnity for fees incurred in defending against Plaintiffs' claims that are not premised on JPMorgan's negligence or willful misconduct;

- The Barclays Custodial Undertaking only provides for the reimbursement of defense fees, and does not create an indemnity for fees incurred by JPMorgan in prosecuting its own Amended Counterclaims against LBHI;

- The Barclays Custodial Undertaking contains no obligation to indemnify JPMorgan for defending against Plaintiffs' Amended Complaint, because the pre-petition events at issue in that complaint are not related to the Barclays Custodial Undertaking or JPMorgan's performance thereunder.

       For these reasons and those set forth below, the seventh and eighth counterclaims should be dismissed.

---

[11] If footnote 25 of JPMorgan's Opposition Brief instead constitutes a full retraction of its indemnification claims regarding the loans made to LBI, JPMorgan is nonetheless prohibited from bringing such claims in the future.  The Third Scheduling Order dated March 22, 2011 prohibits JPMorgan from asserting additional counterclaims in this adversary proceeding without leave of the Court, and JPMorgan would be precluded by res judicata from instituting these indemnification claims after the conclusion of this adversary proceeding.  See Bin Saud v. Bank of New York, 734 F. Supp. 628, 632-33 (S.D.N.Y. 1990).

**A.     JPMorgan Fails to State a Claim For Recovery of Attorneys' Fees Under the 2000
Clearance Agreement (Seventh Counterclaim)**

**1.     JPMorgan Fails to State a Claim For Attorneys' Fees Incurred in Connection
with the Sale Transaction to Barclays**

In its seventh counterclaim, JPMorgan describes its purported losses as those

"caused by LBHI's misconduct relating to the sale transaction with Barclays," and it seeks

recovery under the 2000 Clearance Agreement "for all expenses, including attorneys' fees and

expenses, incurred by JPMorgan in connection therewith."  (Am. Counterclaims ¶¶ 162-63).

This counterclaim should be dismissed.

**a.     The Indemnity Clause of the Barclays Custodial Undertaking
Provides the Exclusive Basis For Any Recovery of the Claimed Losses**

The indemnity clause of the 2000 Clearance Agreement has no application to the

transactions at issue in the Amended Counterclaims or any losses associated with the sale

transaction with Barclays.  As explained in the Moving Brief, section 9 of the 2000 Clearance

Agreement provides that, in the event of a conflict between any provision of the 2000 Clearance

Agreement and a tri-party custodial agreement, the latter would control.  (Mov. Br. at 75).  LBI

and JPMorgan entered into the Barclays Custodial Undertaking – a tri-party custodial agreement

– specifically to govern the transactions that would occur that week (including the loans made by

JPMorgan to LBI).  (Id. at 74).  That agreement contained its own indemnity clause, which

differed in material respects from the indemnity provision in the 2000 Clearance Agreement.

(Id. at 75).  Pursuant to section 9 of the 2000 Clearance Agreement, the new indemnity provision

contained in the Barclays Custodial Undertaking provides the exclusive terms for

indemnification for losses associated with the loans made under that agreement.  (Id. at 75-76)

JPMorgan's primary response to this argument is to claim there is no conflict

between the credit clauses of the 2000 Clearance Agreement and the Barclays Custodial

39

Undertaking.  (Opp. Br. at 70).  While JPMorgan's description of the credit clauses is incorrect as

a factual matter,[12] it also misses the point.  The relevant conflict here is between the indemnity

provision of the 2000 Clearance Agreement and the new indemnity provision of the Barclays'

Custodial Undertaking.  The new indemnity provision changed the terms and conditions under

which JPMorgan could be entitled to indemnification.  It changed the scope of "losses" subject to

indemnification.[13]  It also modified the rights of LBI to assert defenses to JPMorgan's claims for

indemnity.  (Compare Ex. A, 2000 Clearance Agreement § 16 with Ex. G, Barclays Custodial

Undertaking § 9).  Because the indemnity provisions conflict, the provision contained in the

Barclays Custodial Undertaking controls.

Nevertheless, JPMorgan further argues that the boiler-plate "cumulative-remedies

clause" somehow preserves JPMorgan's ability to seek indemnification for the claimed losses

under the 2000 Clearance Agreement.  Yet the cumulative remedies clause only speaks to the

parties' performance under the Barclays Custodial Undertaking, and provides that a party's

exercise or waiver of a right under that agreement would not "preclude or inhibit" the exercise of

other existing rights.  (Ex. G, Barclays Custodial Undertaking § 16); see also Mizuho Corp.

Bank, Ltd. v. Enron Corp. (In re: Enron Corp.), 302 B.R. 463, 475 (Bankr. S.D.N.Y. 2003) ("A

provision declaring that rights are cumulative is intended to preserve available alternate remedies

when a party initially elects to pursue other available remedies.").  The clause has no relevance

to whether such rights exist in the first instance.  Id.  And it certainly does not purport to override

---

[12] For example, unlike the credit clause in the 2000 Clearance Agreement, the newly negotiated credit clause in the Barclays Custodial Undertaking authorized JPMorgan to extend credit without receiving instructions from – or giving notice to – LBI.  (Compare Ex. A, 2000 Clearance Agreement § 7 with Ex. G, Barclays Custodial Undertaking § 3(d)).

[13] Among other things, unlike the indemnity clause in the 2000 Clearance Agreement, the indemnity clause in the Barclays Custodial Undertaking does not contain an obligation for LBI to reimburse JPMorgan for legal fees incurred in defending against claims asserted by LBI. (Compare Ex. A, 2000 Clearance Agreement § 16 with Ex. G, Barclays Custodial Undertaking § 9).

the specifically negotiated changes to the parties' rights and obligations regarding

indemnification, or the parties' agreement in section 9 of the 2000 Clearance Agreement that

inconsistent provisions in any subsequent tri-party custodial agreement would control.[14]   That

agreement should be enforced, and the seventh counterclaim should be dismissed.

> **b.    The 2000 Clearance Agreement Does Not Provide Indemnity For Attorneys' Fees Incurred in Prosecuting Claims Against LBHI**

Even if the indemnity provision of the 2000 Clearance Agreement applied, the

seventh counterclaim should still be dismissed to the extent it seeks attorneys' fees incurred due

to the alleged "LBHI[] misconduct relating to the sale transaction with Barclays."  (Am.

Counterclaims ¶¶ 162-63).  Nothing in the 2000 Clearance Agreement provides that JPMorgan is

entitled to reimbursement of attorneys' fees incurred in the prosecution of its own claims against

LBHI.

Under New York law, "[w]hen a party is under no legal duty to indemnify, a

contract assuming that obligation must be strictly construed to avoid reading into it a duty which

the parties did not intend to be assumed."  Hooper Assoc., Ltd. v. AGS Computers, Inc., 74

---

[14] The only case cited by JPMorgan on this issue, Bank Julius Baer & Co. v. Waxfield Ltd., 424 F.3d 278 (2d Cir. 2005), is inapposite.  In that case, a party resisting arbitration argued that an earlier contract containing an arbitration clause was nullified in its entirety by a merger clause contained in a later contract. Id. at 282. Relying in part on the cumulative remedies provision in the second contract, the court rejected the proposed interpretation of the merger clause because it would have produced "absurd results" in the context of the parties' business relationship. Id. at 283.  None of those circumstances or arguments are presented here.

Moreover, because the court found it was ambiguous as to whether the parties intended the arbitration provision to survive, the court was compelled by public policy to interpret the two contracts in favor of arbitration.  Id. at 284 ("Under our cases, if there is a reading of the various agreements that permits the Arbitration Clause to remain in effect, we must choose it.").  Here, the clause at issue is one for indemnity, not arbitration, and thus the presumption is reversed. Courts applying New York law must strictly construe an indemnity clause "to avoid reading into it a duty which the parties did not intend to be assumed."  Hooper Assoc., Ltd. v. AGS Computers, Inc., 74 N.Y.2d 487, 491, 548 N.E.2d. 903, 905 (1989) (collecting authority); BNP Paribas Mort. Corp. v. Bank of America, N.A., Nos. 09 Civ. 9783 (RWS), 09 Civ. 9784 (RWS), 2011 WL 1210208, at *36 (S.D.N.Y. March 23, 2011).

N.Y.2d 487, 491, 548 N.E.2d. 903, 905 (1989) (collecting authority).  This rule of interpretation

carries even more force with respect to a purported indemnity for attorneys' fees incurred in

disputes between the parties themselves.  As explained by the New York Court of Appeals in

Hooper:

> Inasmuch as a promise by one party to a contract to indemnify the
> other for attorney's fees incurred in litigation between them is
> contrary to the well-understood rule that parties are responsible for
> their own attorney's fees, the court should not infer a party's
> intention to waive the benefit of the rule unless the intention to do
> so is unmistakably clear from the language of the promise.

Id. at 492; see also Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 199-200 (2d Cir. 2003)

(same); BNP Paribas Mort. Corp., 2011 WL 1210208 at *36 ("New York law construes

indemnity clauses not to cover claims by the indemnitee against the indemnitor unless the

coverage language . . . is exclusively or unequivocally referable to claims between the parties

themselves.") (internal quotation omitted; collecting authority).

    The 2000 Clearance Agreement provides that JPMorgan is only entitled to

attorneys' fees incurred in an action between the parties where such fees arise from JPMorgan's

"successful defense against claims by you [LBHI] that we [JPMorgan] were negligent or

engaged in willful misconduct."  (Ex. A, 2000 Clearance Agreement ¶ 16).  Nothing in the

indemnity clause provides that JPMorgan would also be entitled to its attorneys' fees for

prosecuting its own claims against LBHI.[15]  In the absence of any reference to an indemnity for

such fees, let alone "unmistakably clear" language that "exclusively or unequivocally" refers to

---

[15] Note that the only other reference to attorneys' fees in the indemnity provision cannot
be read as creating an obligation for LBHI to reimburse JPMorgan for attorneys' fees incurred in
suits between themselves.  Under New York law, even a provision that states it covers "all
losses" must be interpreted as applying only to third-party disputes unless – unlike here – an
intention to cover first-party losses is "unmistakably clear" from the text.  BNP Paribas, 2011
WL 1210208 at *38 (citing Hooper, 549 N.Y.S.2d at 367).

such an indemnity obligation, JPMorgan's seventh counterclaim seeking these fees should be

dismissed.

2.    **JPMorgan Fails to State a Claim For Indemnity Under the 2000 Clearance Agreement For Fees Incurred in Defending Against Plaintiffs' Amended Complaint**

a.    **JPMorgan Cannot Recast the Seventh Counterclaim to Include a Claim For Attorneys Fees Incurred in Defending Against Plaintiffs' Amended Complaint**

JPMorgan also attempts to recast the seventh counterclaim as including a claim

for the attorneys' fees and expenses incurred in defending against the allegations of Plaintiffs'

Amended Complaint.  (Opp. Br. at 71).  But that is not the claim actually pled.  The claim pled

seeks indemnification only for attorneys' fees incurred in connection with "LBHI's misconduct

relating to the sale transaction with Barclays."  (Am. Counterclaims ¶ 162).

In fact, JPMorgan specifically amended its Original Counterclaims to remove any

allegation that it is seeking indemnification under the 2000 Clearance Agreement for losses

incurred in defending against the Amended Complaint, including attorneys' fees.  In the Original

Counterclaims, JPMorgan alleged as follows:

> 120.    … The First Amended Complaint … seeks to hold JPMorgan liable for actions and omissions it allegedly took in its role as Lehman's clearing bank pursuant to the Clearance Agreement.

> 121.    The causes of action asserted in the First Amended Complaint seek payment of 'losses, claims, damages, liabilities or actions' that 'arise out of,' are 'based upon' and/or are 'related to' the Clearance Agreement.

> 122.    LBHI is therefore obligated to … reimburse JPMorgan for all expenses, including attorneys' fees and expenses, incurred by JPMorgan in connection therewith.

(Original Counterclaims ¶¶ 120-122).

43

When Plaintiffs pointed out in the motion to dismiss the Original Counterclaims

that JPMorgan would only realize the primary claimed loss upon a judicial finding of

JPMorgan's misconduct, which would preclude indemnification under the 2000 Clearance

Agreement, JPMorgan amended the Original Counterclaims to retract this claim.  In its place, the

Amended Counterclaims allege that the losses subject to indemnification under the 2000

Clearance Agreement are not related to the JPMorgan misconduct alleged in the Amended

Complaint, but were solely "caused by LBHI's misconduct relating to the sale transaction with

Barclays, and through no fault of JPMorgan."  (Am. Counterclaims ¶ 162).  The counterclaim

seeks the "expenses, including attorneys' fees and expenses, incurred by JPMorgan in connection

therewith," meaning the alleged "LBHI misconduct relating to the sale transaction with

Barclays."  (Id. at 163).  There is no allegation regarding attorneys' fees incurred in defending

against the Amended Complaint.[16]

JPMorgan may not use its Opposition Brief to amend its pleadings and reinsert

the claim it previously chose to retract for strategic or other reasons.  See Brecher v. Citigroup

Inc., No. 09 Civ. 7359(SHS), 2011 WL 2209145, at *17 (S.D.N.Y. June 7, 2011) (rejecting

plaintiffs' "impermissible attempt to amend the Complaint through an opposition brief").

**b.      The 2000 Clearance Agreement Does Not Provide Indemnity For
Attorneys' Fees Incurred in Defending Against Bankruptcy
Avoidance Actions**

Even if JPMorgan pled a claim under the 2000 Clearance Agreement for

attorneys' fees and expenses incurred in defending against the Amended Complaint, JPMorgan is

not entitled to indemnification associated with the defense of Plaintiffs' avoidance actions arising

---

[16] The allegations supporting the seventh counterclaim also stand in stark contrast to
those of the eighth counterclaim, which actually do seek indemnification for expenses and
attorneys fees incurred "[i]n defending against the First Amended Complaint." Id. at 170.

under the Bankruptcy Code.  As stated above, the indemnity clause of the 2000 Clearance

Agreement only allows JPMorgan to recover attorneys' fees for its successful defense against

claims that JPMorgan was "negligent or engaged in willful misconduct."  (Ex. A, 2000 Clearance

Agreement § 16).  It does not allow JPMorgan to recover its attorneys fees in defending against

any other type of action by LBHI, including Plaintiffs' claims arising under the Bankruptcy Code

that are not premised on JPMorgan's negligence or misconduct (Counts I-XII, XV-XXIV,

XXVIII-XXIX).

Because there is no language providing that LBHI would reimburse JPMorgan for

attorneys' fees incurred in defending against LBHI's bankruptcy avoidance claims (and certainly

no "unmistakably clear" or "unequivocal" language to that effect), such an obligation cannot be

read into the agreement.  Hooper, 74 N.Y.2d at 491-92; Oscar Gruss, 337 F.3d at 199-200; BNP

Paribas, 2011 WL 1210208 at *33 (collecting authority).  To the extent the seventh counterclaim

seeks such relief, it should be dismissed.

**B.      JPMorgan Fails to State a Claim For Recovery of Attorneys' Fees Under the
         Barclays Custodial Undertaking (Eighth Counterclaim)**

JPMorgan argues that its eighth counterclaim states a claim for indemnification

under the Barclays Custodial Undertaking for attorneys' fees and expenses incurred "in

defending against the First Amended Complaint and prosecuting these Counterclaims."  (Am.

Counterclaims ¶ 170).  As explained below, neither category of attorneys' fees and expenses is

subject to indemnification under that agreement.

**1.      The Barclays Custodial Undertaking Does Not Provide Indemnity For
         Attorneys' Fees Incurred in Prosecuting Claims Against Third Parties Like
         LBHI**

The eighth counterclaim should be dismissed to the extent it seeks attorneys' fees

and expenses incurred by JPMorgan in prosecuting its Amended Counterclaims against LBHI.

The Barclays Custodial Undertaking only provides for reimbursement of attorneys' fees and expenses incurred by JPMorgan in <u>defending</u> itself against claims brought by third parties that allege JPMorgan is liable for some act or omission that arises out of or is related to that agreement.  (<u>See</u> Ex. G, Barclays Custodial Undertaking § 9 (providing indemnity for "the reasonable costs, expenses and fees of attorneys chosen by Bank <u>incurred in defending any claim of such liability</u>") (emphasis added)).[17]

The Barclays' Custodial Undertaking does not provide that LBI would reimburse JPMorgan for its attorneys' fees in the event JPMorgan asserts its own claims against a third party, such as LBHI, for that third party's alleged misconduct.  Under New York law, LBI's indemnity obligation cannot be expanded beyond the plain terms of the agreement itself.  <u>See</u> <u>Hooper</u>, 74 N.Y.2d at 491-92; <u>see also</u> <u>Guarnieri v. Kewanee-Ross Corp.</u>, 263 F.2d 413, 422 (2d Cir. 1959) ("The law of New York requires that an indemnity agreement be expressed in unequivocal terms and be strictly construed."); <u>Manley v. Ambase Corp.</u>, 121 F. Supp. 2d 758, 769 (S.D.N.Y. 2000) (rejecting indemnity claim after "interpreting this unambiguous indemnity provision according to its plain meaning, and considering the strict interpretation that must be given to indemnity provisions").

The eighth counterclaim should therefore be dismissed to the extent it seeks fees and expenses incurred by JPMorgan in prosecuting its counterclaims against LBHI.

---

[17] While JPMorgan argues that the broader indemnity provision of section 9 applies to its indemnity claim (Opp. Br. at 75-76), that issue is irrelevant here because even the broader indemnity provision limits JPMorgan's recovery for attorneys' fees to those incurred in defending itself against claims of JPMorgan's own liability.  (<u>See</u> Ex. G, Barclays Custodial Undertaking § 9).

2.    **The Barclays Custodial Undertaking Does Not Provide Indemnity For Fees and Expenses Incurred in Defending Against the First Amended Complaint**

As explained above, the eighth counterclaim is the only one that seeks indemnity for JPMorgan's attorneys' fees and expenses "[i]n defending against the First Amended Complaint."  Id. at 170.  However, this counterclaim should also be dismissed because the Barclays Custodial Undertaking does not create an obligation on behalf of LBI to reimburse JPMorgan for any expenses or other losses associated with the events at issue in the Amended Complaint.

Section 9 of the Barclays Custodial Undertaking provides indemnity only for a "loss, liability or expense in connection with, arising out of or in any way related to this Agreement or the Repurchase Agreement, or any action or omission by Bank in connection with this Agreement."  (Ex. G, Barclays Custodial Undertaking § 9).  None of the JPMorgan misconduct at issue in the Amended Complaint has any relation to the Barclays Custodial Undertaking or the other transactions that occurred following LBHI's bankruptcy petition.

To the contrary, the Amended Complaint seeks damages, remedies under the Bankruptcy Code, and other relief based on JPMorgan's improper demands for additional guaranties and security from LBHI, and the misconduct employed by JPMorgan to force LBHI to meet its demands.  All of those events took place prior to LBHI's bankruptcy petition, and none of them have any relation to the post-petition Barclays Custodial Undertaking or JPMorgan's performance thereunder.  Indeed, as acknowledged in the Amended Counterclaims, none of the post-petition transactions related to the Barclays Custodial Undertaking were even contemplated as of the LBHI bankruptcy.  (Am. Counterclaims ¶¶ 2-4, 166).

In any event, LBI plainly did not agree in the Barclays Custodial Undertaking to indemnify JPMorgan for litigation expenses incurred in defending itself against the pre-petition

47

claims of LBHI (or, as JPMorgan would also have it, for the damages JPMorgan is ordered to pay LBHI). Such a reading would make little sense in the context of a tri-party custody agreement. See Hooper, 74 N.Y.2d at 491 ("The promise should not be found unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances.") (collecting authority). And the agreement certainly does not provide for such indemnity in "unequivocal terms," as required by New York law. Guarnieri, 263 F.2d at 422 (2d Cir. 1959); see also Akhenaten v. Najee, No. 08 CV 970(RJH), 2010 WL 305309, at *2 (S.D.N.Y. Jan. 26, 2010) ("An indemnity agreement cannot be held to have a retroactive effect unless by its express words or necessary implication it clearly appears to be the parties' intention to include past obligations.") (internal quotation marks omitted; collecting authority). JPMorgan's eighth counterclaim should therefore be dismissed to the extent it seeks this relief.

## CONCLUSION

For the reasons set forth in the Moving Brief and herein, Plaintiffs Lehman Brothers Holdings, Inc. and the Official Committee of Unsecured Creditors of Lehman Brothers Holdings, Inc. respectfully request that the Amended Counterclaims be dismissed in their entirety.

Dated:   July 18, 2011
New York, New York

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: /s/ John B. Quinn

John B. Quinn
Erica Taggart
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
(213) 443-3000

Susheel Kirpalani
Andrew J. Rossman
James Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000
*Counsel for Plaintiff/Intervenor, the Official
Committee of Unsecured Creditors of
Lehman Brothers Holdings Inc.*

**CURTIS, MALLET-PREVOST, COLT
& MOSLE LLP**

By:  /s/ Joseph D. Pizzurro

Joseph D. Pizzurro
L.P. Harrison 3rd
Michael J. Moscato
Nancy E. Delaney
Peter J. Behmke
Cindi M. Giglio
101 Park Avenue
New York, New York 10178-0061
(212) 696-6000
*Counsel for Plaintiff, Debtor Lehman
Brothers Holdings Inc.*