**CURTIS, MALLET-PREVOST,**
  **COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061

*Counsel to Plaintiff Lehman Brothers Holdings Inc.*

**QUINN EMANUEL URQUHART & SULLIVAN LLP**
51 Madison Avenue, 22nd Floor
New York, New York 10010

865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017

*Special Counsel to Plaintiff Intervenor,*
*the Official Committee of Unsecured Creditors of*
*Lehman Brothers Holdings Inc., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : Case No.: 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : |
| | : |
| Debtors. | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| LEHMAN BROTHERS HOLDINGS INC. and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., | : Adv. Proc. No.: 10-03266 (JMP) |
| | : |
| | : |
| | : |
| Plaintiff and | : |
| Plaintiff Intervenor, | : |
| v. | : |
| | : |
| JPMORGAN CHASE BANK, N.A., | : |
| | : |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**PLAINTIFFS' MEMORANDUM ADDRESSING THE EFFECT OF THE SUPREME COURT'S DECISION IN STERN V. MARSHALL ON THE BANKRUPTCY COURT'S ABILITY TO RENDER FINAL JUDGMENT ON THE COMMON LAW CLAIMS ASSERTED IN THIS ADVERSARY PROCEEDING**

Lehman Brothers Holdings Inc., a debtor and debtor in possession in the above-captioned chapter 11 cases ("LBHI") and the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. (the "Committee", and together with LBHI, "Plaintiffs"), submit this memorandum in accordance with the request of this Court made on the June 29, 2011 telephonic chambers conference to address the effect (if any) that the recent decision of *Stern v. Marshall*, 131 S. Ct. 2594 (2011), may have on the ability of this Court to issue a final judgment on the common law causes of action asserted in the above-captioned adversary proceeding (the "Adversary Proceeding").

## I.

## PRELIMINARY STATEMENT

While the *Stern* decision has engendered questions among courts and litigants, Plaintiffs submit that its application to the Adversary Proceeding is straightforward. This Court retains the power to enter final orders with respect to the 49 counts asserted in the First Amended Complaint (the "Amended Complaint") – including the common law counts – and the eight counts asserted in JPMorgan Chase Bank, N.A.'s ("JPMorgan") Amended Counterclaims (the "Amended Counterclaims").

Nothing in *Stern* imposes a blanket prohibition against bankruptcy courts deciding common law claims on a final basis. To the contrary, in affirming the constitutional parameters of core proceedings, the *Stern* Court left untouched the bankruptcy courts' authority to enter final judgments on common law claims and claims arising under the Bankruptcy Code if those claims stem from the bankruptcy itself or would necessarily be resolved in the claims allowance process. *Stern*, 131 S. Ct. at 2618.[1]

---

[1] We understand that the Court's concern was focused on its ability to issue a final judgment with respect to the common law claims. However, for the reasons discussed herein, LBHI submits that the distinction between bankruptcy claims and common law claims in this Adversary Proceeding is not relevant to the inquiry. All claims pleaded in the First Amended Complaint are inextricably linked to the claims resolution process and thus meet the *Stern* test.

Recent decisions reviewing *Stern* and prior Supreme Court precedent confirm this conclusion.[2] For example, Judge Morris of the Bankruptcy Court for the Southern District of New York recently explained:

> Nowhere in *Marathon, Granfinanciera,* or *Stern* does the Supreme Court rule that the bankruptcy court may not rule with respect to state law when determining a proof of claim in the bankruptcy, or when deciding a matter directly and conclusively related to the bankruptcy. As noted, *Stern* repeatedly emphasizes that it addresses only the constitutionality of the bankruptcy court making a final ruling on a state-law counterclaim that would not be finally resolved in the process of allowing or disallowing a proof of claim. The *Granfinanciera* Court interpreted previous cases as holding that the creditor's right to a jury trial turned on whether it submitted a claim against the estate. The *Marathon* plurality emphasized the difference between restructuring of debtor-creditor relations and enforcement of a purely private right. *The thread that binds these cases is the concept that when the jurisdiction of the bankruptcy court is at issue, the adjudication of a proof of claim -- a request for payment from the estate -- is of paramount concern.*

---

[2] To date, a majority of the courts that have substantively discussed the *Stern* decision have concluded that the Court's holding was narrow, and that non-Article III courts may still enter final judgments on claims integral to the claims resolution process. *See In re Salander O'Reilly Galleries,* Case No. 07-30005, 2011 WL 2837494, at *6-8 (Bankr. S.D.N.Y. Jul. 18, 2011) (finding that the *Stern* decision "does not remove from the bankruptcy court its jurisdiction over matters directly related to the estate that can be finally decided in connection with restructuring debtor and creditor relations" and that "the Bankruptcy Court is empowered to apply state law when so doing would finally resolve a claim"); *see also Schmidt v. Klein Bank (In re Schmidt),* Case No. 11-6028, 2011 WL 3300693, at *4 (B.A.P. 8th Cir. Aug. 3, 2011) (holding that if defendant bank had filed proof of claim in the debtor's bankruptcy cases based on guaranties, the resolution of those claims would be core, "inasmuch as the allowance or disallowance of claims against a debtor's bankruptcy estate is a matter that arises under the Bankruptcy Code"); *Stoebner v. PNY Techs., Inc. (In re Polaroid Corp.),* Case No. 10-4595, 2011 WL 2694316, at *2 n.4 (Bankr. D. Minn. Jul. 7, 2011) (finding that the *Stern* "opinion's bottom line, at its very conclusion [is that] . . . [t]he Bankruptcy Court [in *Stern*] . . . lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim); *Turner v. First Cmty. Credit Union (In re Turner),* Case No. 10–03300, 2011 WL 2708907, at *5 (Bankr. S.D. Tex. Jul. 11, 2011) (citing *Stern* for the proposition that "[d]isputes that are integrally bound up in the claims adjudication process–and thus involve the exercise of the Bankruptcy Court's *in rem* jurisdiction over the estate–are part of the 'public rights' exception"). *But see Samson v. Blixseth (In re Blixseth),* Case No. 09-60452-7, 2011 WL 3274042 (Bankr. D. Mont. Aug. 1, 2011) (construing *Stern* as creating a distinction between fraudulent conveyance claims on one hand, which must be adjudicated in an Article III court, and preference and equitable subordination claims on the other).

*Salander O'Reilly Galleries*, 2011 WL 2837494 at *7 (internal citations omitted) (emphasis supplied). As discussed herein, the *Stern* decision made clear that a bankruptcy court has the authority to make final judgments on claims asserted by the bankruptcy estate where those claims will necessarily be resolved in the claims reconciliation process. All counts in the Amended Complaint satisfy this test.

The proof of claim filed by JPMorgan against LBHI (the "Proof of Claim") is based on the Guaranty dated as of August 26, 2008 (the "August Guaranty"), the Security Agreement dated as of August 26, 2008 (the "August Security Agreement" and together with the August Guaranty, the "August Agreements"), the Guaranty dated as of September 9, 2008 (the "September Guaranty"), the Security Agreement dated as of September 9, 2008 (the "September Security Agreement") and the Account Control Agreement dated as of September 9, 2008 (the "Account Control Agreement" and together with the September Guaranty and the September Security Agreement, the "September Agreements"). JPMorgan has further asserted that each of its claims against LBHI is secured by LBHI collateral transferred to JPMorgan under color of those agreements.

In the Adversary Proceeding, Plaintiffs pleaded 49 counts (including 18 counts predicated on common law) seeking to invalidate the August Agreements and September Agreements, as well as JPMorgan's taking or withholding of collateral in connection with those agreements. The adjudication of the claims asserted in the Adversary Proceeding, including the common law claims, is necessary to determine whether to allow JPMorgan's claims against LBHI, firmly anchoring final adjudication of the Adversary Proceeding to the claims resolution process. Accordingly, under *Stern*, this Court can issue final orders regarding every count asserted in the Amended Complaint.

Moreover, *Stern* does not disturb the long-recognized principle that parties may consent to the bankruptcy court's issuance of a final judgment even in actions that do not meet the test articulated by *Stern*. As explained below, JPMorgan's conduct throughout this case constitutes its consent to have this Court enter a final judgment with respect to all of the claims asserted in the Amended Complaint and the Amended Counterclaims.

## II.

## THE SUPREME COURT'S DECISION IN STERN V. MARSHALL

### A.    FACTUAL BACKGROUND AND PROCEDURAL POSTURE

Vickie Lynn Marshall (known to the public as "Anna Nicole Smith") ("Vickie") married J. Howard Marshall ("J. Howard"). J. Howard did not include Vickie in his will. Shortly before J. Howard's death, Vickie brought suit against his son, E. Pierce Marshall ("Pierce"), in Texas state probate court, asserting Pierce fraudulently induced J. Howard to exclude her from a living trust notwithstanding J. Howard's purported intent to give Vickie one-half of his property. *See Stern*, 131 S. Ct. at 2601.

After J. Howard's death, Vickie filed a bankruptcy petition in the United States Bankruptcy Court for the Central District of California. In Vickie's bankruptcy case, Pierce filed both a complaint and a proof of claim contending Vickie defamed him by inducing her lawyers to tell the press he had engaged in fraud to gain control of his father's assets. Vickie responded with a counterclaim for tortious interference with the gift she expected from J. Howard, claiming, as she had in Texas state probate court, that Pierce wrongfully prevented J. Howard from taking the legal steps necessary to provide Vickie with one-half of J. Howard's property. The bankruptcy court awarded summary judgment in Vickie's favor on the defamation claim and, after a bench trial, ruled in Vickie's favor on the tortious interference claim. *See id.*

In post-trial proceedings, the United States District Court for the Central District of California reversed the bankruptcy court's decision that it had authority to enter a final judgment on the tortious interference claim. Although recognizing that Vickie's tortious interference claim falls within the literal language of the statute designating certain proceedings as "core," the district court, expressing constitutional concerns, held that a "counterclaim should not be characterized as core when it is only somewhat related to the claim against which it is asserted . . . ." *Id.* at 2601-2 (quotations omitted). The district court thus concluded that the tortious interference claim was not core and treated the bankruptcy court's judgment as "proposed" and engaged in a *de novo* review of the record. By that time, the Texas state probate court had entered a judgment in Pierce's favor. However, the district court declined to give preclusive effect to the Texas judgment, finding instead in Vickie's favor on the tortious interference claim. *Id.* at 2602.

On appeal, the United States Court of Appeals for the Ninth Circuit decided that a counterclaim can be considered a core proceeding only when it is "so closely related to [a creditor's] proof of claim that the resolution of the counterclaim is necessary to resolve the allowance or disallowance of the claim itself." *Id.* at 2603 (internal citation omitted) (alteration in original). Determining that the tortious interference claim was unrelated to the allowance or disallowance of the defamation claim, the Ninth Circuit also concluded that the Texas state probate court judgment in favor of Pierce should have been given preclusive effect because it was "the earliest final judgment entered on matters relevant to this proceeding." *Id.* at 2602-3 (citation omitted).

**B.     THE HOLDING IN STERN**

The Supreme Court framed the issues for consideration on appeal from the Ninth Circuit as: "(1) whether the Bankruptcy Court had the statutory authority under 28 U.S.C. § 157(b) to issue a final judgment on Vickie's counterclaim; and (2) if so, whether conferring that authority on the Bankruptcy Court is constitutional." *Id.* at 2600.

The Court held that, although Section 157(b)(2)(C) granted the bankruptcy court the statutory authority to enter a final judgment with respect to the tortious interference claim, the bankruptcy court, as a non-Article III court, "lacked the constitutional authority to enter a final judgment on a state law counterclaim *that is not resolved in the process of ruling on a creditor's proof of claim.*" *Id.* at 2620 (emphasis supplied).

**C.     INTERPRETATION OF THE STERN DECISION AND IMPLICATIONS FOR THE ADVERSARY PROCEEDING**

> 1.     BANKRUPTCY COURTS CAN ISSUE FINAL ORDERS ADJUDICATING STATE COMMON LAW CLAIMS THAT ARE SUFFICIENTLY RELATED TO A FILED PROOF OF CLAIM

The Court first addressed the adjudicative power of the bankruptcy courts under 28 U.S.C.§ 157(b) by determining whether Vickie's tortious interference claim was "core" as defined therein. *Id.* at 2603. The Court explained that "[t]he manner in which a bankruptcy judge may act on a referred matter depends on the type of proceeding involved. Bankruptcy judges may hear and enter final judgments in all core proceedings arising under title 11, or arising in a case under title 11. Core proceedings include, but are not limited to 16 different types of matters, including counterclaims by a debtor's estate against persons filing claims against the estate." *Id.* (internal citations omitted). 28 U.S.C. §157(b)(2)(C) includes as a core proceeding: "counterclaims by the estate against persons filing claims against the estate." 28 U.S.C. §157(b)(2)(C).

Examining the plain text of 28 U.S.C. §157(b)(2)(C), the Court observed that Vickie's claim against Pierce for tortious interference was literally a core proceeding. *Stern*, 131 S. Ct. at 2604. Once the Court reached this finding, however, it concluded that Congress' "designat[ion of] all counterclaims as 'core' proceedings raises serious constitutional concerns." *Id.* at 2605. Although 28 U.S.C. §157(b)(2)(C) permitted the bankruptcy court to enter a final judgment on Vickie's tortious interference claim, Article III of the Constitution did not. *Id.* at 2608. Thus, the *Stern* Court's mandate, in essence, was to rearticulate the constitutionally permissible boundaries of the bankruptcy court's core jurisdiction.

With that task in mind, the Court began its constitutional analysis by setting forth the "very basic principle[]" that "Article III § 1, of the Constitution commands that the judicial power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." *Id.* at 2600 (internal citations omitted). From that premise, Chief Justice Roberts concluded, "*in general*, Congress may not withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Id.* at 2609 (citing *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1855) (emphasis supplied)). That said, the Court recognized that the scope of Article III is not absolute, and that "there are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper." *Stern*, 131 S. Ct. at 2622-23 (quoting *Murray's Lessee*, 59 U.S. at 284).

Thus, the Court had to determine whether Vickie's tortious interference claim against Pierce was a matter that could be finally adjudicated in a non-Article III court. To this end, the

Court examined its precedent that, as a whole, stands for the proposition that a bankruptcy court has the constitutional authority to finally adjudicate both common law and Bankruptcy Code based claims when the resolution of those claims is central to the claims reconciliation process and the right to share recoveries from the debtor's estate. Stated differently, if the claims reconciliation process will necessarily resolve the estate's affirmative claims, then the bankruptcy court has the authority to enter a final judgment on those claims.

The line of cases the *Stern* Court relied upon in reaching its conclusion began with *Katchen v. Landy*, 382 U.S. 323 (1966). In *Katchen*, a case decided under the former Bankruptcy Act, the Court held that a bankruptcy referee had summary jurisdiction to adjudicate a voidable preference claim brought against a creditor who filed a proof of claim in the bankruptcy. *Id.* at 325.[3] As explained by the Court in *Stern*, the *Katchen* decision was based on the conclusion that "summary adjudication in bankruptcy was appropriate because it was not possible for the referee to rule on the creditor's proof of claim without first resolving the voidable preference issue." *Stern*, 131 S. Ct. at 2616.

This analysis is echoed in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), where the Court was faced with the question of whether a bankruptcy judge could "'constitutionally be vested with jurisdiction to decide [a] state-law contract claim' against an entity that was not otherwise part of the bankruptcy proceeding." *Stern*, 131 S. Ct. at 2609-10 (quoting *Northern Pipeline*, 458 U.S. at 87) (alteration in original). The *Northern Pipeline* plurality concluded that final adjudication by a tribunal other than an Article III court violated the Constitution. *Northern Pipeline*, 458 U.S. at 52. The *Northern Pipeline* Court took pains to delineate between actions related to the debtor-creditor relationship and purely private rights,

---

[3]Summary proceedings are less formal proceedings that lack the hallmarks of traditional civil litigation. *In re U.S.A. Diversified Prods., Inc.*, 193 B.R. 868, 876 (Bankr. N.D. Ind. 1995).

recognizing, like the *Katchen* Court had done before, that the bankruptcy courts have a paramount interest in adjudicating claims related to the bankruptcy estate. In doing so, the Court noted that an exception to Article III may exist in circumstances where a bankruptcy court is deciding a matter that is related to a creditor's proportionate share of a bankruptcy res. The Court specifically noted that the "restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power" had to be distinguished from a contract claim asserted against a stranger to the bankruptcy and designed to recover damages to augment the estate. *Northern Pipeline*, 458 U.S. at 71.

Subsequent decisions of the Supreme Court consistently have held that a bankruptcy court has the authority to adjudicate actions that are inextricably linked to the claims resolution process. *See Stern*, 131 S. Ct. at 2614 n.7. Further, these decisions confirm that the *Northern Pipeline* Court was not distinguishing between actions that arise under the Bankruptcy Code and those that arise under common law when such claims would be necessary to resolve the creditor's relationship with the bankruptcy res.

This concept was further developed in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989). There the issue before the Court was "whether a person who has not submitted a claim against a bankruptcy estate has a right to a jury trial when sued by the trustee in bankruptcy to recover an allegedly fraudulent monetary transfer." *Id.* at 36. Because the Court determined that a jury trial would have been available in England prior to the merger of the courts of law and equity, it was necessary for the Court to opine as to Congress' ability to assign resolution of the fraudulent conveyance claim "to a non-Article III adjudicative body." *Id.* at 42.

The Court concluded that when an entity had *not* filed a proof of claim, fraudulent conveyance suits "more nearly resemble state-law contract claims brought by a bankrupt

corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res." *Id.* at 56. Central to this conclusion was the Court's distinction between persons who had filed claims against the estate and those that had not. *See id.* at 58-59. The Court explained: "[b]ecause petitioners here . . . have not filed claims against the estate, the respondent's fraudulent conveyance action does not arise as part of the process of allowance and disallowance of claims. Nor is that action integral to the restructuring of debtor-creditor relations." *Id.* at 58. Thus, the fraudulent conveyance claim could not be finally decided by a bankruptcy court, notwithstanding the fact that the claims themselves were brought under Section 548 of the Bankruptcy Code, because no resolution of debtor-creditor relations could result. *See id.*

One year later, in *Langenkamp v. Culp*, 498 U.S. 42 (1990), the Court again addressed a litigant's right to a jury trial, this time in the context where the entity *did* file a proof of claim against the bankruptcy estate. In a *per curiam* opinion, the Court explained:

> In *Granfinanciera* we recognized that by filing a claim against a bankruptcy estate the creditor triggers the process of allowance and disallowance of claims, thereby subjecting himself to the bankruptcy court's equitable power. If the creditor is met, in turn, with a preference action from the trustee, that action becomes part of the claims allowance process which is triable only in equity. *In other words, the creditor's claim and the ensuing preference action by the trustee become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's equity jurisdiction.*

*Id.* at 44 (internal citations omitted) (emphasis supplied).

Thus, prior to *Stern* it was only in those cases where the party had not filed a proof of claim, *i.e.*, *Northern Pipeline* and *Granfinanciera*, that the Court had found a violation of Article III. However, upon closer examination, it is clear that the common thread in these case was whether adjudication of the claim asserted by the estate was integral to the claims resolution

process. This principle was crystallized in *Stern* where Pierce had filed a proof of claim, yet the

Court nonetheless found that the bankruptcy court lacked authority to issue a final judgment on

Vickie's counterclaim. The basis for the Court's ruling was that the resolution of Pierce's proof

of claim would not necessarily resolve the counterclaim. The Court explained:

> We see no reason to treat Vickie's counterclaim any differently
> than the fraudulent conveyance action in *Granfinanciera*.
> *Granfinanciera's* distinction between actions that seek to augment
> the estate and those that seek a pro rata share of the bankruptcy res
> reaffirms that Congress may not bypass Article III simply because
> a proceeding may have *some* bearing on a bankruptcy case; *the*
> *question is whether the action at issue stems from the bankruptcy*
> *itself or would necessarily be resolved in the claims allowance*
> *process.* Vickie has failed to demonstrate that her counterclaim
> falls within one of the 'limited circumstances' covered by the
> public rights exception . . . .

*Id.* at 2618 (internal citations omitted) (emphasis supplied).

The Court stated that in order for the bankruptcy court to rule on Vickie's counterclaim it

"was required to and did make several factual and legal determinations that were not 'disposed

of in passing on objections' to Pierce's proof of claim for defamation." *Id.* at 2617 (quoting

*Katchen*, 382 U.S. at 332 n.9). Specifically, the bankruptcy court "could not enter judgment for

Vickie unless the court additionally ruled on the questions whether Texas recognized tortious

interference with an expected gift as a valid cause of action, what the elements of that action

were, and whether those elements were met in this case." *Id.* Thus, "there was never any reason

to believe that the process of adjudicating Pierce's proof of claim would *necessarily resolve*

Vickie's counterclaim." *Stern*, 131 S. Ct. at 2617 (emphasis supplied)

Accordingly, Vickie's tortious interference claim was distinguishable from the trustee's

claims in *Katchen* where "it was not possible for the referee to rule on the creditor's proof of

claim without first resolving the voidable preference issue," *id.* at 2616 (citing *Katchen*, 382 U.S.

at 329-30), and *Langenkamp* where "the preference action by the trustee [was] integral to the

restructuring of the debtor-creditor relationship." *Stern*, 131 S. Ct. at 2617 (quoting *Langenkamp*, 498 U.S. at 44).

In reaching its ruling in *Stern*, the Court simply clarified its prior rulings relating to the significance of a creditor filing a proof of claim and reaffirmed that "core proceedings" include those that relate to the allowance or disallowance of claims and the restructuring of the debtor-creditor relationship. Indeed, Chief Justice Roberts, writing for the majority, concluded the opinion by summarizing:

> Article III of the Constitution provides that the judicial power of the United States may be vested only in courts whose judges enjoy the protections set forth in that Article. We conclude today that Congress, in one isolated respect, exceeded that limitation in the Bankruptcy Act of 1984. The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim *that is not resolved in the process of ruling on a creditor's proof of claim.*

*Id.* at 2620 (emphasis supplied).

This analysis also makes clear that the nature of a claim as one arising under state common law is not dispositive in determining the authority of the bankruptcy court. In *Granfinanciera*, the Court characterized fraudulent conveyance claims as "quintessentially suits at common law that more nearly resemble state-law contract claims[,]" even though such claims are codified in Section 548 of the Bankruptcy Code. *See Granfinanciera*, 492 U.S. at 56. Similarly, in *Schoenthal v. Irving Trust Co.*, the Court explained that an action to recover a preference under the Bankruptcy Act resembled certain actions under the common law. 287 U.S. 92, 94-95 (1932). Yet, in *Katchen* and *Langenkamp*, the Court did not find that a bankruptcy court's final adjudication of preference actions raised Article III concerns. In fact, the Supreme Court has expressly stated that "there is no reason inherent in separation of powers principles to

accord the state law character of a claim talismanic power in Article III inquiries." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 853 (1986).

This premise is not challenged by *Stern*. Nothing in that decision states that bankruptcy courts may not finally adjudicate state common law causes of action if those claims otherwise meet the *Stern* test. If the Court intended to create a blanket rule prohibiting a bankruptcy court from adjudicating state common law actions, it would have explicitly said so. It did not. Thus, based on the precedent discussed above, there is no reason to infer such a ruling.

2. THE ADJUDICATION OF LBHI'S CLAIMS ASSERTED IN THE ADVERSARY PROCEEDING IS INTEGRAL TO THE RESOLUTION OF JPMORGAN'S PROOF OF CLAIM

As demonstrated above, a bankruptcy court has the authority to finally adjudicate claims asserted by the estate that are necessarily resolved in the process of ruling on a creditor's proof of claim. The common law claims asserted by Plaintiffs in the Amended Complaint directly attack the validity and enforceability of the very agreements and pledges of collateral which serve as the basis for JPMorgan's Proof of Claim.[4] Thus, a straightforward application of the standard articulated by the *Stern* Court to the claims asserted in the Amended Complaint compels the conclusion that this Court can enter a final order on all counts asserted therein.

JPMorgan's claims against LBHI are predominantly predicated on LBHI's purported liability as guarantor under the August Guaranty and September Guaranty.[5] Similarly, JPMorgan

---

[4] Plaintiffs recognize that there are aspects of the Proof of Claim that go beyond what is challenged in the Adversary Proceeding. However, the *Stern* test hinges on whether the estate's claims must be fully resolved in ruling on the creditor's proof of claim, not whether ruling on the estate's claims would fully resolve the creditor's proof of claim.

[5] The Proof of Claim states: "LBHI owes to JPMCB the amount of all of the Claims owing by LBI under the Clearance Agreement referred to below, all as described in the JPMCB/LBO Proof of Claim referred to below . . . [p]ursuant to the Guaranty dated as of August 26, 2008 (the "First LBHI Guaranty")[.] Proof of Claim at p. 5. "LBHI owes each Claimant the amount of (a) all of the Claims of such Claimant against all of the Debtors and (b) all of the Non-Debtor Claims of such Claimant against all of the Other Lehman Obligors . . . [p]ursuant to the Guaranty dated as of September 9, 2008 (the "Second LBHI Guaranty")[.] Proof of Claim at p. 3.

predicates its status as a secured creditor, and its right to LBHI's collateral, on the August and September Security Agreements.[6] JPMorgan cannot recover on its Proof of Claim, premised on the September Agreements, if those agreements are found to be invalid and unenforceable, or if the agreements were found to have been breached by an adjudication of Plaintiffs' common law theories.[7] The same holds true for JPMorgan's assertion that it is entitled to status as a secured creditor by virtue of those agreements. Thus, the common law claims asserted in the Adversary Proceeding will "necessarily be resolved in the claims allowance process." *Stern*, 131 S. Ct. at 2618.[8] This case fits squarely within the Supreme Court's formulation of the core of federal bankruptcy power.

To demonstrate the inextricable link between the claims asserted in the Plaintiffs' Amended Complaint and reconciliation of JPMorgan's Proof of Claim, a hypothetical is instructive. Assume that, instead of commencing an adversary proceeding, the Plaintiffs brought a claim objection to JPMorgan's Proof of Claim, which included common law theories as a basis to dispute LBHI's purported liability alleged in the Proof of Claim under the August and September Guaranties. No one could seriously argue that this Court would lack the authority to

---

[6] **Secured Claim**. In addition to the collateral applied against Claims as described above, JPMCB currently holds (a) unliquidated securities collateral posted by LBHI under the [Guaranty dated August 26, 2008], the details of which have been provided to LBHI and the value of which is not currently determinable, plus (b) approximately $6,879,994,552 as of August 31, 2009 of unapplied cash and money market collateral (including amounts posted by LBHI under the Second LBHI Security Agreement and interest thereon, and principal and interest on securities posted by LBHI under the [August Security Agreement] . . ." Proof of Claim at p. 35.

[7] JPMorgan's Proof of Claim also contains a broad claim for indemnification. If Plaintiffs prevail on certain common law claims in the Adversary Proceeding, the claim for indemnification may be disallowed, thereby further tying the Amended Complaint to the claims resolution process.

[8] The claims in the Amended Complaint relate to JPMorgan's "hierarchically ordered claims to a pro rata share of the bankruptcy res," and thus, are within the core of federal bankruptcy power. *See id.* at 2614 (quoting *Granfinanciera*, 492 U.S. at 56).

adjudicate that claim objection simply because some of the theories disputing the Proof of Claim were based on common law.[9] That the common law claims are raised in a slightly different procedural context is irrelevant.[10] In both instances the common law claims would necessarily be resolved in the claims resolution process.[11]

That certain of the common law claims seek additional damages based upon LBHI's exigent bankruptcy does not alter the fact that the merits of those claims – including whether JPMorgan is required to return LBHI's collateral – must be decided in the claims resolution process. While JPMorgan may argue that there can be no final judgment with respect to those limited factual findings regarding the measure of additional "exigent bankruptcy" damages, this approach should be rejected. The better reading of *Stern* is that because those issues are

---

[9] *See* 11 U.S.C. § 502(b)(1) (noting that a claim objection can be premised upon the unenforceability of "any agreement or applicable law").

[10] Pursuant to Bankruptcy Rule 7001, LBHI had to institute an adversary proceeding to challenge the validity, priority or extent of JPMorgan's liens. In any event, an adversary proceeding is essentially a claim objection if the determination of the claims asserted in the adversary proceeding results in the allowance or disallowance, in whole or in part, of the proof of claim. *See McClellan v. Braverman Kaskey & Caprara, P.C. (In re McClellan)*, 332 B.R. 90, 97-98 (Bankr. S.D.N.Y. 2005) (finding counterclaims asserted by debtor are related to the claims allowance process because the counterclaims bear directly on the allowance or disallowance of the claims asserted by the creditor); *Leslie Fay Cos., Inc. v. Falbaum (In re Leslie Fay Cos.)*, No. 97 Civ. 2244, 1997 WL 555607, at *2 (S.D.N.Y. Sept. 4, 1997) (finding that debtor's adversary proceeding was essentially an objection to the allowance of the creditor's claims) (citing *Germain v. Conn. Nat'l Bank*, 988 F.2d 1323, 1330 n.9 (2d Cir. 1993)); *Frost, Inc. v. Miller, Canfield, Paddock & Stone P.C. (In re Frost, Inc.)*, 145 B.R. 878, 882 (Bankr. W.D. Mich. 1992) (finding that debtor's adversary proceeding for malpractice against creditor that filed proof of claim for attorney's fees was an inextricable part of the claims allowance process because the "factual basis for the Debtor's proceeding cannot be separated from questions concerning the validity and extent of the [creditor's] claim for attorney fees").

[11] While LBHI understands that this Court's concern was with the common law claims, LBHI notes that the 31 claims asserted under the Bankruptcy Code also attack the validity and enforceability of the August and September Agreements and JPMorgan's status as a secured creditor. Therefore, those claims will also necessarily be resolved in the claims resolution process and are within the *Stern* holding. Additionally, the Proof of Claim may be disallowed under Section 502(d) of the Bankruptcy Code until any fraudulently or preferentially transferred property is returned. *See* 11 U.S.C. § 502(d); *Stern*, 131 S. Ct. at 2616 (noting "[a] voidable preference claim asserts that a debtor made a payment to a particular creditor in anticipation of bankruptcy, to in effect increase that creditor's proportionate share of the estate. The preferred creditor's claim in bankruptcy can be disallowed as a result of the preference, and the amounts paid to that creditor can be recovered by the trustee").

inherently intertwined with the claims resolution process and affect LBHI's interest in the bankruptcy res, this Court retains the power to render a final judgment.

Thus, this Court has the authority to enter final judgments on the common law causes of action contained in the Amended Complaint. The validity of those claims will necessarily be resolved in the allowance or disallowance of JPMorgan's Proof of Claim, and the adjudication of those claims is integral to the restructuring of the debtor-creditor relationship between LBHI and JPMorgan.

3.    CONSENT PROVIDES AN ALTERNATIVE BASIS FOR A BANKRUPTCY COURT TO ENTER A FINAL JUDGMENT

It should be stated at the outset that although it is well-established that parties may not confer subject matter jurisdiction on a court through consent,[12] nothing in *Stern*, or in the concept of parties consenting to have a bankruptcy court enter final judgment, implicates subject matter jurisdiction. *See The Fairchild Liquidating Trust v. State of New York (In re The Fairchild Corp.)*, Case No. 09-10899, 2011 WL 3267764 (Bankr. D. Del. July 29, 2011) (explaining that "*Stern v. Marshall* is not a case about subject matter jurisdiction. Rather it addresses the power of the bankruptcy court to enter final orders, *assuming that subject matter jurisdiction exists*.") (emphasis in original). Subject matter jurisdiction is conferred by 28 U.S.C. § 1334. Given that grant of subject matter jurisdiction, 28 U.S.C. § 157 governs the division of labor between the bankruptcy court and the district court to finally adjudicate core and non-core proceedings. And Section 157(c)(2) permits the bankruptcy court to issue final judgment where the parties have consented.

---

[12] *Am. Fire & Cas. Co. v. Finn*, 341 U.S. 6, 17-18 (1951) ("The jurisdiction of federal courts is carefully guarded against expansion by judicial interpretation or by prior action *or consent of the parties*.") (emphasis supplied); *Schor*, 478 U.S. at 851 ("parties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III, § 2").

As noted above, nothing in the *Stern* decision challenges the notion of consent embodied in Section 157(c)(2), and that provision retains its vitality. However, the *Stern* Court did hold that Pierce had not provided the requisite consent by merely filing his proof of claim. *Id.* at 2614.[13] The Court explained that "Pierce did not truly consent to resolution of Vickie's claim in the bankruptcy court proceedings. He had nowhere else to go if he wished to recover from Vickie's estate." *Id.* (internal citations omitted). This lack of an available alternative forum for creditors is the basis for the Court's conclusion. *See id.* at 2615, n.8. However, this cannot be construed as a rejection of the idea that consent can supplant the right to have a claim resolved in an Article III court. *See Schor*, 478 U.S. at 848-49 ("as a personal right, Article III's guarantee of an impartial and independent federal adjudication is subject to waiver").

In addition to express consent, the Supreme Court has long recognized that a party's conduct may constitute implied consent to have a non-Article III adjudicative body enter a final judgment on a claim that would otherwise have been decided by the judicial branch. *Id.* at 850. As stated in *Schor*:

> Even were there no evidence of an express waiver . . . *[the customer's] election to forgo his right to proceed in state or federal court on his claim and his decision to seek relief instead in a CFTC . . . proceeding constituted an effective waiver*. . . . [The customer] had the option of having the common law counterclaim against him adjudicated in a federal Article III court, but, with full knowledge that the CFTC would exercise jurisdiction over that claim, chose to avail himself of the quicker and less expensive procedure Congress had provided him. In such circumstances, it is clear that [the customer] effectively agreed to an adjudication by the CFTC of the entire controversy by seeking relief in this alternative forum.

*Id.* 849-50 (internal citations omitted) (emphasis supplied).

---

[13] Here, JPMorgan did more than merely file a proof of claim. *See infra* p. 18, *et seq.*

The *Stern* decision did not alter the fundamental principles of express and implied consent; in fact, the *Stern* Court affirmed their continued vitality and validity. In ruling that the bankruptcy court had the ability to finally adjudicate Pierce's defamation claim based upon Pierce's conduct, the Court explained that:

> Given Pierce's course of conduct before the Bankruptcy Court, we conclude that he consented to that court's resolution of his defamation claim (and forfeited any argument to the contrary). We have recognized the value of waiver and forfeiture rules in complex cases and this case is no exception. In such cases, as here, the consequences of a litigant sandbagging the court – remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor – can be particularly severe.

*Stern*, 131 S.Ct. at 2608 (internal citations omitted).

4.  JPMORGAN HAS CONSENTED TO THE BANKRUPTCY COURT'S FINAL ADJUDICATION OF THE AMENDED COMPLAINT AND AMENDED COUNTERCLAIMS

As discussed above, the *Stern* decision affirmed the concept that a party's conduct can constitute an implied waiver of its right under Article III. JPMorgan's conduct during the pendency of the Adversary Proceeding demonstrates that it has impliedly consented to the complete adjudication by this Court of all counts contained within the Amended Complaint and the Amended Counterclaims.

Significantly, JPMorgan filed its Amended Counterclaims asserting eight state common law claims in this Court – even though it could have filed them in state court after having obtained relief from the automatic stay. By consciously (and perhaps strategically) making this choice, JPMorgan consented to this Court's issuance of a final judgment with respect to its Amended Counterclaims.[14] Much like the customer in *Schor*, by choosing the bankruptcy court

---

[14] Courts have found a defendant's filing of a counterclaim in an adversary proceeding to be a significant factor in determining whether a party has impliedly consented to a bankruptcy court's entry of a final judgment. *See Slagter v. Stonecraft LLC (In re Stonecraft LLC)*, 260 Fed. Appx. 656, 658 (5th Cir. 2007); *Pisgah Contractors, Inc. v. Rosen (In re Pisgah Contractors, Inc.)*, 215 B.R. 679, 682 (W.D.N.C. 1995).

as its desired forum to adjudicate its Amended Counterclaims, JPMorgan also consented to the

bankruptcy court's adjudication of *all claims* in the Adversary Proceeding, including the

common law causes of action brought by Plaintiffs in the Amended Complaint. Thus, consistent

with *Schor*, JPMorgan's election to forgo its right to proceed in state or federal court on its

Amended Counterclaims and its decision to seek relief instead from this Court constitutes

implied consent to final adjudication of the *entire controversy* by this Court. *See Schor*, 478 U.S.

at 850.

Furthermore, when JPMorgan filed its Amended Counterclaims, it specifically

acknowledged that the entire Adversary Proceeding was a core proceeding. In its Amended

Counterclaims, JPMorgan states that "[t]he Court has jurisdiction over these counterclaims under

28 U.S.C. § 1334(a) and 28 U.S.C. § 959(a). *This is a core proceeding* within the meaning of 28

U.S.C. § 157(b)." Amended Counterclaims, at ¶ 17 (emphasis supplied). This concession

contained in its own pleading constitutes consent to have this Court enter a final judgment,

certainly with respect to all counts asserted in its Amended Counterclaims, and arguably on all

counts asserted in the entire Adversary Proceeding. *See Valentine v. Elliott (In re Valentine)*,

357 B.R. 744, 751 (Bankr. E.D. Va. 2007) (explaining that an assertion that a claim is "core" can

be deemed implied consent to the bankruptcy court's exercise of final adjudicative authority).

# III.

## CONCLUSION

Plaintiffs respectfully submit that nothing in *Stern v. Marshall* has abrogated the

authority of this Court to enter a final judgment resolving any and all claims, including the

common law claims, asserted in the Adversary Proceeding.

Dated:   August 5, 2011
         New York, New York

**CURTIS MALLET-PREVOST
COLT & MOSLE LLP**

/s/ Joseph D. Pizzurro
Joseph D. Pizzurro
L. P. Harrison 3rd
Michael J. Moscato
Nancy E. Delaney
Peter J. Behmke
Cindi Eilbott Giglio
101 Park Avenue
New York, New York  10178

*Counsel to Plaintiff Lehman Brothers
Holdings Inc.*

**QUINN EMANUEL URQUHART &
SULLIVAN LLP**

/s/ John B. Quinn
John B. Quinn
Erica Taggart
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017

Susheel Kirpalani
Andrew J. Rossman
James C. Tecce
51 Madison Avenue, 22nd Floor
New York, New York  10010

*Special Counsel to Plaintiff Intervenor, the
Official Committee of Unsecured Creditors
of Lehman Brothers Holdings Inc., et al.*