**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | ) |
| | ) |
| Debtors. | ) |
| | ) |
| | ) |
| LEHMAN BROTHERS HOLDINGS INC. and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., *et al.*, | ) |
| | ) |
| Plaintiff/Counterclaim-Defendant and Plaintiff Intervenor, | ) |
| | ) |
| -against- | ) |
| | ) |
| JPMORGAN CHASE BANK, N.A., | ) |
| | ) |
| Defendant/Counterclaimant. | ) |

Chapter 11
Case No. 08-13555 (JMP)

Adversary Proceeding
No. 10-03266 (JMP)


**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS OF JPMORGAN CHASE BANK, N.A.**



WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
(212) 403-1000

*Attorneys for Defendant/Counterclaimant*
*JPMorgan Chase Bank, N.A.*

Dated: August 5, 2011

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................1

ARGUMENT ...........................................................................................................3

POINT I    *STERN* IMPOSES SIGNIFICANT NEW LIMITS ON THE
           ADJUDICATORY AUTHORITY OF BANKRUPTCY COURTS .......................3

           A.    The Supreme Court's pre-*Stern* decisions ...................................3

                 1.    *Katchen* ..................................................................3

                 2.    *Northern Pipeline* .........................................................4

                 3.    *Granfinanciera* ............................................................5

                 4.    *Langenkamp* ...............................................................6

           B.    The Supreme Court's Article III ruling in *Stern* ...........................6

                 1.    Lack of bankruptcy court authority to determine claims
                       seeking to augment the estate ...........................................7

                 2.    Limited effect of a creditor's proof of claim ...................8

           C.    The claims in the Amended Complaint ....................................11

POINT II   THE COMMON-LAW DAMAGES CLAIMS MUST BE DETERMINED
           BY AN ARTICLE III COURT.............................................................13

POINT III  THE CLAIMS SEEKING TO RECOVER TRANSFERS UNDER THE
           BANKRUPTCY CODE MUST BE DETERMINED BY AN ARTICLE
           III COURT ....................................................................................16

POINT IV   THE REMAINDER OF PLAINTIFFS' CLAIMS MUST ALSO BE
           DETERMINED BY AN ARTICLE III COURT..................................18

           A.    The claims seeking declarations and avoidance of
                 obligations must be determined by an Article III court ..............18

B.      The claim seeking equitable subordination must be determined
         by an Article III court ...................................................................................20

C.      Even if certain limited claims could constitutionally be
         determined by this Court, all of plaintiffs' claims must still be
         determined by the District Court..................................................................21

POINT V      THIS ACTION CANNOT PROCEED IN THIS COURT ...................................24

CONCLUSION....................................................................................................................27

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bankr. Servs., Inc.* v. *Ernst & Young (In re CBI Holding Co., Inc.)*,
529 F.3d 432 (2d Cir. 2008) ............................................................................ 22, 23

*Crowell* v. *Benson*,
285 U.S. 22 (1932) ..................................................................................... 10 n.3

*Granfinanciera, S.A.* v. *Nordberg*,
492 U.S. 33 (1989) ........................................................................................ passim

*Halper* v. *Halper*,
164 F.3d 830 (3d Cir. 1999) .......................................................................... 22 n.5

*In re BearingPoint, Inc.*,
2011 WL 2709295 (Bankr. S.D.N.Y. July 11, 2011) ....................................... 24 n.6

*In re Exide Techs.*,
544 F.3d 196 (3d Cir. 2008) .......................................................................... 22 n.5

*Katchen* v. *Landy*,
382 U.S. 323 (1966) ........................................................................................ passim

*Langenkamp* v. *Culp*,
498 U.S. 42 (1990) ................................................................................ 6, 8, 9, 11

*Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*,
458 U.S. 50 (1982) ........................................................................................ passim

*Official Comm. of Unsecured Creditors of FMI Forwarding Co.* v. *Union Transp. Corp.*
*(In re FMI Forwarding Co.)*,
2004 WL 1348956 (S.D.N.Y. June 16, 2004) .................................................. 22 n.5

*Stern* v. *Marshall*,
131 S. Ct. 2594 (2011) .................................................................................. passim

*Willy* v. *Coastal Corp.*,
503 U.S. 131 (1992) ........................................................................................ 26

## CONSTITUTION, STATUTES, AND RULES

11 U.S.C. § 502(d) ........................................................................................ passim

11 U.S.C. § 548(a)(2) ...................................................................................... 6

28 U.S.C. § 157(b) ...................................................................................................... 7, 22, 25

28 U.S.C. § 157(c)(1) ...................................................................................................... 25

28 U.S.C. § 157(d) ...................................................................................................... 26

Fed. R. Bankr. P. 9033(a) ...................................................................................................... 25

U.S. Const. art. III, § 1 ...................................................................................................... 4

JPMorgan Chase Bank, N.A. ("JPMorgan") submits this Supplemental Memorandum of Law at the request of the Court to address the effect on this adversary proceeding of *Stern* v. *Marshall*, 131 S. Ct. 2594 (2011) ("*Stern*").[1]

## PRELIMINARY STATEMENT

Plaintiffs' forty-nine count Amended Complaint seeks to augment LBHI's bankruptcy estate through the recovery of "tens of billions of dollars" in damages from JPMorgan for supposedly "accelerating" LBHI's bankruptcy filing. In the wake of *Stern*, an Article III court must determine the entirety of this lawsuit.

First and foremost, an Article III court must determine plaintiffs' damages claims brought under New York law. Those claims, through which plaintiffs seek to augment the estate by recovering damages for JPMorgan's alleged misconduct in precipitating LBHI's bankruptcy filing, are legally indistinguishable from the state-law tortious-interference counterclaim in *Stern*. Like the counterclaim in *Stern*, granting relief on the damages claims in the Amended Complaint would "involve[] the most prototypical exercise of judicial power: the entry of a final, binding judgment by a court with broad substantive jurisdiction, on a common law cause of action." 131 S. Ct. at 2615 (emphasis omitted). Accordingly, *Stern* dictates that an Article III tribunal must determine all of plaintiffs' damages claims, even if there is some factual overlap between those claims and any objection that may be filed to JPMorgan's proof of claim.

An Article III court must also determine plaintiffs' claims under the Bankruptcy Code to avoid or recover pre-petition transfers and alleged setoffs. Plaintiffs may argue that,

---

[1] Capitalized terms not defined herein have the same meanings as given in JPMorgan's briefs in support of its Motion to Dismiss the Amended Complaint. References to the "Wolf Decl." are to the declaration that accompanied that motion.

under section 502(d) of the Bankruptcy Code, these avoidance claims should be resolved in the context of an objection to JPMorgan's proof of claim. At least in the unique circumstances of this case, however, section 502(d) is not applicable. In the court-approved post-petition Collateral Disposition Agreement (the "CDA") between JPMorgan and LBHI, JPMorgan transferred to LBHI numerous securities that it held as collateral, JPMorgan's claims were provisionally allowed, and JPMorgan was provisionally authorized to apply to its claims the cash collateral that it held. As part of that post-petition contract, the Debtors, supported by the Creditors' Committee, agreed that section 502(d) will have no force or effect until after this adversary proceeding and all other disputes between the parties have been fully and finally resolved. Section 502(d), therefore, does not apply in this adversary proceeding, and plaintiffs' avoidance claims are no different from their other claims to augment the estate that fall outside the claims-allowance process and must be determined by an Article III court.

Similarly, an Article III court must determine plaintiffs' remaining claims, including those seeking declaratory relief, avoidance of obligations, and equitable subordination. Plaintiffs' claims for declaratory relief, as well as their claims to avoid LBHI's obligations, function as predicates to plaintiffs' affirmative claims seeking to augment the estate. And the claim for equitable subordination is simply a repackaged version of plaintiffs' common-law damages claims, and thus requires the same exercise of Article III judicial power.

Consequently, the only mechanism for determination of the claims in the Amended Complaint that is consistent with Article III of the Constitution, as well as the Judicial Code, the Bankruptcy Rules, and the agreement of the parties, is their resolution by the District Court.

## ARGUMENT

## POINT I

## *STERN* IMPOSES SIGNIFICANT NEW LIMITS ON THE ADJUDICATORY AUTHORITY OF BANKRUPTCY COURTS.

As explained below, the Supreme Court's decision in *Stern*, along with the precedents that *Stern* itself discusses, compels the conclusion that Article III of the Constitution does not permit a bankruptcy court to determine a cause of action that seeks to augment the estate and that will not necessarily be decided as part of the claims-allowance process.

### A.    The Supreme Court's pre-*Stern* decisions

The Supreme Court in *Stern* did not write on a blank slate, and a review of the Court's prior jurisprudence in this area is necessary to understand and apply *Stern*.  In four previous cases, the Court confronted important constitutional questions about a bankruptcy court's authority to resolve claims brought by a representative of the estate against another party.

### 1.    *Katchen*

The first such decision was *Katchen* v. *Landy*, 382 U.S. 323 (1966), where the Supreme Court held that a bankruptcy court had summary jurisdiction under the former Bankruptcy Act to order a creditor that had filed a proof of claim to return a voidable preference to the estate, even though that creditor would thereby forfeit its Seventh Amendment right to a jury trial in a plenary suit by the estate.

The Court reasoned that bankruptcy courts had power over the equitable process of allowing and disallowing claims, and that since section 57(g) of the former Bankruptcy Act — analogous to section 502(d) of the Bankruptcy Code — required the bankruptcy court to disallow any claim by a creditor that had received a voidable preference until the preference had been

returned, resolution of a preference claim against a creditor was "part and parcel of the allowance process." *Id.* at 330.

Thus, the Court concluded, "once a bankruptcy court ha[d] dealt with the preference issue" as mandated by section 57(g), "nothing remain[ed] for adjudication in a plenary suit," and any proceeding at law before a jury would be a "meaningless gesture." *Id.* at 334.

### 2. *Northern Pipeline*

Next, in *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U.S. 50 (1982), the Court considered the effect upon the then-existing bankruptcy court system of Article III of the Constitution, which vests "the judicial Power of the United States" only in federal judges possessing life tenure and salary protection. U.S. Const. art. III, § 1.

The Supreme Court had previously recognized that "the judicial Power of the United States" is not exercised when a non-Article III tribunal adjudicates matters involving "public rights." *See* 458 U.S. at 67. But in *Northern Pipeline*, the Court held that a state-law damages action for breach of contract, misrepresentation, and coercion and duress against a non-creditor could not be decided by a bankruptcy court, because the right of a debtor to recover "damages to augment its estate is one of private right, that is, of the liability of one individual to another under the law as defined." *Id.* at 71-72 (plurality opinion) (citation and quotation marks omitted); *see also id.* at 90-91 (Rehnquist, J., concurring) (no "public rights" exception applies to claims that seek "damages for breach of contract, misrepresentation, and other counts which are the stuff of the traditional actions at common law tried by the courts at Westminster in 1789").

### 3. *Granfinanciera*

In *Granfinanciera, S.A.* v. *Nordberg*, 492 U.S. 33 (1989), the Court held that a party that had not filed a proof of claim was entitled to a jury trial on claims asserted by the estate to recover a fraudulent transfer under section 548 of the Bankruptcy Code. The Court began by observing that "the question whether the Seventh Amendment permits Congress to assign its adjudication to a tribunal that does not employ juries as factfinders requires *the same answer* as the question whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal." *Id.* at 53 (emphasis added).

While expressly declining to decide whether "the restructuring of debtor-creditor relations" is in fact a public right, *id.* at 56 n.11, the Court concluded that the Seventh Amendment entitled the defendant to a jury trial because fraudulent-conveyance actions "are quintessentially suits at common law that more nearly resemble state-law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res. They therefore appear matters of private rather than public right." *Id.* at 56 (citation omitted); *see also id.* at 60 (by enacting 1984 legislation that classified fraudulent-conveyance actions as "core" proceedings, Congress did not "creat[e] a new cause of action, and remedies therefor, unknown to the common law," but rather "simply reclassified a pre-existing common-law cause of action that was not integrally related to the reformation of debtor-creditor relations" (footnote and internal quote marks omitted)).

The *Granfinanciera* Court was in no way deterred from its conclusion by the fact that the fraudulent-transfer claims were brought under section 548 of the Bankruptcy Code, rather than under state-law avoidance statutes. To the contrary, the majority enunciated its basic ruling as follows: "Although the issue admits of some debate, a bankruptcy trustee's right to

recover a fraudulent conveyance *under 11 U.S.C. § 548(a)(2)* seems to us more accurately characterized as a private rather than a public right *as we have used those terms in our Article III decisions*." 492 U.S. at 55 (citing *Northern Pipeline*, 458 U.S. at 71; emphasis added). Indeed, that the fraudulent transfer claim at issue arose under the Bankruptcy Code was a principal point of the dissent by Justice Blackmun. *Id.* at 94.

### 4. *Langenkamp*

The Supreme Court's latest pre-*Stern* decision to deal with bankruptcy courts' decision-making authority was *Langenkamp* v. *Culp*, 498 U.S. 42 (1990) (*per curiam*). That case, like *Katchen* before it, involved an action by a bankruptcy trustee to recover a preferential transfer to a creditor that had filed a proof of claim. Reiterating its holding in *Katchen*, the *Langenkamp* Court explained "that by filing a claim against a bankruptcy estate the creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power." *Id.* at 44 (quoting *Granfinanciera*, 492 U.S. at 58-59). "If the creditor is met, in turn, with a preference action from the trustee," the Court continued, "that action becomes part of the claims-allowance process which is triable only in equity. In other words, the creditor's claim and the ensuing preference action by the trustee become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's *equity jurisdiction*. As such, there is no Seventh Amendment right to a jury trial." *Id.* at 44-45 (emphasis in original; citations omitted).

## B. The Supreme Court's Article III ruling in *Stern*

It was against this backdrop that the Supreme Court decided *Stern*. In *Stern*, Pierce Marshall filed a proof of claim and complaint in Vickie Marshall's bankruptcy case alleging that Vickie had defamed him by inducing her lawyers to make false statements to the

press that Pierce had defrauded J. Howard Marshall (Pierce's father and Vickie's husband) into signing a living trust that excluded Vickie. In response, Vickie's estate filed a counterclaim alleging that Pierce had tortiously interfered with an *inter vivos* gift from J. Howard to Vickie. 131 S. Ct. at 2601. The bankruptcy court granted summary judgment dismissing Pierce's defamation claim. Almost a year later, after a bench trial, the bankruptcy court issued a judgment in Vickie's favor on her tortious-interference counterclaim, awarding Vickie over $425 million in compensatory and punitive damages. *Id.*

1. **Lack of bankruptcy court authority to determine claims seeking to augment the estate**

The Supreme Court first held that Vickie's tortious-interference claim constituted a counterclaim by her estate against a person filing a claim against the estate, and hence fell within the statutory definition of a "core" proceeding that the bankruptcy court was permitted to "hear and determine" under 28 U.S.C. § 157(b)(2)(C). 131 S. Ct. at 2604. But the Supreme Court went on to hold that this statutory grant of bankruptcy-court power to "determine" that core proceeding by entry of a final judgment was unconstitutional as applied to the counterclaim, based on Article III of the Constitution. *Id.* at 2608.

As in *Granfinanciera*, the Court in *Stern* assumed without deciding that the process of allowing and disallowing claims is a "public right" that does not require Article III adjudication. *See* 131 S. Ct. at 2614 n.7. After then reviewing its precedents addressing the scope of the "public rights" exception to Article III's strictures, the Court concluded that the exception could not serve as a basis for the adjudicatory power of the bankruptcy court over the counterclaim, as the "public rights" exception is limited "to cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert

government agency is deemed essential to a limited regulatory objective within the agency's authority." 131 S. Ct. at 2613.[2]

The *Stern* Court reiterated that, under its earlier cases, a bankruptcy court lacks constitutional power to determine an estate's claims at least as against persons not filing proofs of claim, including both damages claims arising under the common law and fraudulent-transfer claims arising under the Bankruptcy Code. 131 S. Ct. at 2611 (describing both *Northern Pipeline* and *Granfinanciera* as determining that the bankruptcy court lacked Article III adjudicatory authority over the subject claims); *see Northern Pipeline*, 458 U.S. at 71-72 (common-law contract, misrepresentation, and coercion claims); *Granfinanciera,* 492 U.S. at 55-56 (fraudulent-transfer claims under section 548 of the Bankruptcy Code).

Based on these precedents, the Supreme Court concluded in *Stern* that the bankruptcy court unconstitutionally "exercised the judicial power of the United States by entering final judgment on a common law tort claim" brought by Vickie, a chapter 11 debtor in possession, against Pierce, her creditor. 131 S. Ct. at 2601.

## 2. Limited effect of a creditor's proof of claim

In light of the contrast between *Northern Pipeline* and *Granfinanciera* on the one hand, and *Katchen* and *Langenkamp* on the other, it has been routine for bankruptcy practitioners and commentators to consider a creditor's filing of a proof of claim to be a dispositive event establishing the adjudicatory authority of a bankruptcy court over any claims brought by the

---

[2] The Supreme Court in *Stern* found it unnecessary to determine whether the bankruptcy claims-allowance process actually fits within the narrow "public rights" exception. JPMorgan does not here predict how that open question may ultimately be determined, including whether section 502(d) itself is unconstitutional as presently written and construed by the courts.

estate against the creditor, or at the very least any such claims that are factually intertwined with the subject of the creditor's proof of claim. *Stern* decisively exploded that premise, rejecting the contention that Pierce's filing of a proof of claim in Vickie's bankruptcy case rendered constitutional the bankruptcy court's determination of Vickie's common-law tort counterclaim.

The Court reasoned that Vickie's counterclaim was distinguishable from the preference claims in *Katchen* and *Langenkamp*, and akin to the claims in *Northern Pipeline* and *Granfinanciera*, because it not only "attempt[ed] to augment the bankruptcy estate," but also was "not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy." 131 S. Ct. at 2611, 2616. The Court explained that, in contrast to *Katchen* and *Langenkamp*, "Pierce's claim for defamation in no way affect[ed] the nature of Vickie's counterclaim for tortious interference as one at common law that simply attempts to augment the bankruptcy estate — the very type of claim that we held in *Northern Pipeline* and *Granfinanciera* must be decided by an Article III court." *Id.* at 2616.

The Court recognized that Vickie's tortious-interference counterclaim bore a sufficient legal and factual connection to Pierce's defamation claim that it might amount to a compulsory counterclaim. *Id*. at 2617. Specifically, the overlap "was the question whether Pierce had in fact tortiously taken control of his father's estate in the manner alleged by Vickie in her counterclaim and described in the allegedly defamatory statements." *Id.* Nonetheless, the Court found that the precise degree of connection did not matter, because "there was never any reason to believe that the process of adjudicating Pierce's proof of claim would *necessarily* resolve Vickie's counterclaim." *Id.* (emphasis added). And that was true even though Vickie's counterclaim and Pierce's claim both raised the question of Pierce's alleged tortious control of his father's estate. *Id*.

The Court so concluded because a decision in Vickie's favor on her counterclaim necessitated rulings on legal and factual issues "above and beyond" the question of tortious control posed in common by both Vickie's counterclaim and Pierce's proof of claim. *Id.* Specifically, in order to decide Vickie's counterclaim, the presiding court would need to determine "whether Texas recognized tortious interference with an expected gift as a valid cause of action, what the elements of that action were, and whether those elements were met." *Id.* The court would further need to determine whether Vickie had established (1) the existence of an expectancy of a gift; (2) a reasonable certainty that the expectancy would have been realized but for the interference; (3) an entitlement to compensatory damages; and (4) an entitlement to punitive damages. *Id.* Moreover, the Court held, Vickie's counterclaim sought "to augment the bankruptcy estate," and thus could not be resolved by a bankruptcy court, even if the claim had "*some* bearing on a bankruptcy case." *Id.* at 2618 (quoting *Granfinanciera*, 492 U.S. at 56; emphasis in original).[3]

The baseline lesson from *Stern*, then, is its holding that a bankruptcy court is *not* constitutionally permitted to determine claims by a bankruptcy estate against a creditor that are "not necessarily resolvable" in the context of ruling on the creditor's proof of claim (in contrast

---

[3] The final step in the Court's analysis was to reject the argument that Article III permitted bankruptcy-court adjudication of Vickie's counterclaim because bankruptcy courts are "adjuncts" of the district courts. Distinguishing *Crowell* v. *Benson* — where the Court upheld the power of an administrative agency to find facts in a specialized area, but not to resolve questions of law or issue enforceable orders, *see* 285 U.S. 22, 53-54 (1932) — the Court in *Stern* held that bankruptcy courts cannot be deemed mere "adjuncts" of Article III courts where they are empowered to enter final orders and "resolve '[a]ll matters of fact and law in whatever domains of the law to which' a counterclaim might lead." 131 S. Ct. at 2618-19 (quoting *Northern Pipeline*, 458 U.S. at 91 (Rehnquist, J., concurring in judgment)).

to the preference claims in *Katchen* and *Langenkamp*), and that seek to augment the bankruptcy estate (like the claims in *Northern Pipeline* and *Granfinanciera*).

## C.     The claims in the Amended Complaint

Plaintiffs' forty-nine causes of action in the Amended Complaint seek to obtain from JPMorgan, to augment LBHI's estate, "tens of billions of dollars" in damages allegedly caused by JPMorgan's requesting and retaining the collateral that secures its claims, as well as the recovery and return of that collateral. Plaintiffs also seek the avoidance or invalidation of obligations and liens under the August and September Agreements which, as discussed in Point III below, are predicates to their claims seeking damages and other affirmative relief.

Many of plaintiffs' claims invoke New York law to seek damages or recoveries from JPMorgan for alleged pre-petition torts and breaches of contract. Those claims seek:

- Damages for breach of contract (Counts XLI through XLIV);

- Damages for breach of the implied covenant of good faith and fair dealing (Counts XLV and XLVII);

- Damages for fraud (Count XLIX);

- Damages for unjust enrichment (Counts XXXVI and XXXIX);

- Damages for conversion (Counts XXXVII and XL);

- Damages for coercion and duress (Counts XLVI and XLVIII); and

- Imposition of constructive trust (Count XXXII).

A second category of plaintiffs' claims invokes New York law to seek declaratory judgments invalidating transfers, liens, and agreements. Specifically, those claims seek:

- Declaratory judgment invalidating transfers and liens based on the voidability of guaranties (Counts XIII and XIV);

- Declaratory judgment invalidating agreements and liens based on coercion and duress, lack of consideration, and lack of authority (Count XXXV); and

- Declaratory judgment invalidating liens under the Uniform Commercial Code (Count XXXVIII).

Other causes of action in the Amended Complaint assert claims under the Bankruptcy Code to avoid and recover transfers or setoffs, as well as claims to avoid LBHI's obligations to JPMorgan. Those claims seek:

- Avoidance and recovery of the September Security Agreement, the Account Control Agreement, and the September Transfers as preferences under section 547 of the Bankruptcy Code (Counts XXI through XXIV);

- Avoidance and recovery of collateral transfers as improper setoffs and improvements of position under sections 550 and 553 of the Bankruptcy Code (Counts XXVI and XXVIII through XXIX);

- Turnover of property under section 542 of the Bankruptcy Code on the grounds that the September and August Agreements are avoidable and that JPMorgan violated the automatic stay (Counts XXV, XXVII, XXXIII and XXXIV); and

- Avoidance of obligations under the August and September Agreements and of related collateral transfers and movements as fraudulent conveyances under sections 548 and 544 of the Bankruptcy Code (Counts I through XII and XV through XX).

Finally, the Amended Complaint seeks equitable subordination of JPMorgan's claims based on the same allegations that underlie the common-law claims (Count XXX).

JPMorgan's amended proof of claim against LBHI, meanwhile, primarily asserts secured claims against LBHI under the August and September Agreements for more than $25.5 billion owed by LBI to JPMorgan for extensions of credit under the Clearance Agreement, and reflects the application of more than $1.9 billion of cash collateral posted under the September Security Agreement to the more than $3 billion of swap agreement liabilities of various LBHI subsidiaries to JPMorgan. *See* Wolf Decl. Ex. 14, Amended and Restated Annex to the

JPMorgan Proof of Claim against LBHI, 3-39.  To date, there has been no objection filed to JPMorgan's amended proof of claim.

*                 *                 *

In light of the foregoing, as explained in Point II below, this Court now clearly lacks the constitutional authority to determine plaintiffs' common-law damages claims.  As explained in Point III, under *Stern* and the unique circumstances presented by this adversary proceeding, an Article III court must also decide plaintiffs' claims to augment the estate by avoiding or recovering transfers under the Bankruptcy Code.  In addition, as explained in Point IV, the other claims that plaintiffs have brought, which do not explicitly seek to augment LBHI's estate, are the legal predicates to the predominant claims that do seek to augment the estate, and thus also require determination by an Article III court.  Finally, as explained in Point V, as a result of the lack of adjudicatory authority in this Court, all of plaintiffs' claims must be heard and determined by the District Court, or this adversary proceeding should be dismissed.

**POINT II**

**THE COMMON-LAW DAMAGES CLAIMS MUST BE
DETERMINED BY AN ARTICLE III COURT.**

*Stern* draws a bright line as to the common-law claims:  A state-law claim by a debtor's estate seeking damages from a creditor is *per se* beyond the bankruptcy court's authority to determine, regardless of the creditor's filing of a proof of claim.  The *Stern* Court specifically held that, despite legal and factual overlap between Pierce's proof of claim and Vickie's counterclaim, the counterclaim could not be decided by the bankruptcy court because the counterclaim sought to augment Vickie's bankruptcy estate and required Vickie "to prove, above and beyond Pierce's tortious interference," that Pierce was liable for compensatory and punitive

damages.  131 S. Ct. at 2617.  Quite simply, a debtor's entitlement to damages from a creditor that would augment the estate need not be determined in adjudicating the creditor's proof of claim.

Through their common-law claims, plaintiffs have prayed for damages in an amount that they have yet to quantify, except to allege that JPMorgan has caused "tens of billions of dollars" in damage (*e.g.*, Am. Compl. ¶ 79), the precise amount of which is to be "determined at trial." *Id.* at p.73.  The claims seeking damages include claims for breach of contract, fraud, and duress, which are precisely the types of claims that were held to require Article III adjudication in *Northern Pipeline*.  *See* 458 U.S. at 56.  They also include claims for conversion, unjust enrichment, and constructive trust, which are no different from Vickie's tortious-interference claim against Pierce under the constitutional analysis in *Stern*.  In sum, as in *Stern*, plaintiffs' common-law claims "simply attempt[] to augment the bankruptcy estate" and thus are "the very type of claim that [the Supreme Court] held in *Northern Pipeline* and *Granfinanciera* must be decided by an Article III court."  131 S. Ct. at 2616.

Moreover, plaintiffs' claims for damages are replete with legal and factual issues "above and beyond" the question of JPMorgan's rights to a "pro rata share of the bankruptcy res."  131 S. Ct. at 2617-18.  In order to prove causation and damages, plaintiffs will need to demonstrate that JPMorgan's requesting and holding onto collateral actually "contributed to the exigency of LBHI's bankruptcy filing" and prevented "a more orderly wind-down" through which value could have been preserved. Am. Compl. ¶ 79.  In addition, plaintiffs will need to prove the amount of any damages suffered and show that the governing contracts do not preclude the award of such damages.  None of these matters is necessary to the resolution of JPMorgan's proof of claim. *See* 131 S. Ct. at 2617.

Even apart from damages, the common-law claims raise numerous additional issues having nothing to do with JPMorgan's right to recover from the estate. For example, the claims for breach of contract (Counts XLI through XLIV) will require plaintiffs to show, among other things, that the express terms of the Clearance Agreement and the August Agreements prohibited JPMorgan from making its September 9 and September 11 requests for collateral, that those agreements required JPMorgan to give LBHI access to the collateral at the end of the trading day on September 12, 2008, and that LBHI did not waive or ratify any purported breach of the agreements. *See* Mov. Br. Point IV.C.

Similarly, the claims for breach of the implied covenant of good faith and fair dealing (Counts XLV and XLVII) will require plaintiffs to demonstrate, among other things, that a right to "refuse unreasonable and excessive collateral demands" (Am. Compl. ¶ 337) was implied in the August and September Agreements, that JPMorgan's requests for collateral violated this implied "right," and that LBHI did not waive or ratify any purported violation of this implied covenant. *See* Mov. Br. Point IV.C.

And plaintiffs' claim for fraud will require plaintiffs to prove that an individual at JPMorgan falsely represented to LBHI that the collateral requested on September 11, 2008 would be returned the next day, that this statement was made with the intent to deceive, and that LBHI actually and reasonably relied on this promise, notwithstanding that the alleged oral statement was inconsistent with LBHI's written agreements with JPMorgan. *See id.* Point IV.E.

These allegations, and the numerous others made in the multi-count Amended Complaint, are not necessary to the resolution of JPMorgan's proof of claim. Accordingly, as the Supreme Court held in *Stern*, there is no "reason to believe that the process of adjudicating [JPMorgan's] proof of claim would necessarily resolve" plaintiffs' claims for damages. 131 S.

Ct. at 2617. Those claims are thus constitutionally required to be determined by an Article III court.

**POINT III**

**THE CLAIMS SEEKING TO RECOVER TRANSFERS**
**UNDER THE BANKRUPTCY CODE MUST BE**
**DETERMINED BY AN ARTICLE III COURT.**

The Amended Complaint seeks to avoid and recover alleged pre-petition transfers under sections 544, 547, 548, and 550 of the Bankruptcy Code, and also seeks turnover of property and avoidance of allegedly improper setoffs under sections 542 and 553 of the Code. Like plaintiffs' common-law damages claims, these claims must be determined by an Article III court.

Assuming *arguendo* that the process of allowing and disallowing claims against the estate is a "public right" that may constitutionally be adjudicated by bankruptcy courts, and even if claims to avoid and recover pre-petition transfers would otherwise be completely resolved in the process of ruling on objections to a proof of claim by operation of section 502(d) of the Bankruptcy Code, such claims here must still be adjudicated by an Article III court. That is because, in this case, section 502(d) does not confer on this Court the authority to determine the avoidance and turnover claims in the Amended Complaint even in the context of ruling on any claim objection.

By entering into the CDA, which was approved (with the support of the Creditors' Committee) by final order of this Court on March 24, 2010, LBHI immediately obtained securities that had been pledged to JPMorgan as collateral and, in exchange, agreed to a provisional allowance of JPMorgan's claims and the application of cash collateral to those claims. *See* Wolf Decl. Ex. 28, ¶ 6. Under the terms of the CDA, if any of JPMorgan's claims

- 16 -

against LBHI are ultimately disallowed or found to be unsecured — including as a result of plaintiffs' successful prosecution of avoidance claims — the CDA's "true-up" provisions require JPMorgan to repay on a net basis any payments from LBHI or its property that are deemed to have been on account of such disallowed or unsecured claims.  *See id.*  To preserve JPMorgan's right to repay the estate on a net basis, however, JPMorgan is expressly *not* required to make any payment until *all* matters necessary to determine the amount of the net payment to be paid (or received) by JPMorgan have been finally determined — including all claims disputes, avoidance claims, and other challenges asserted by or against *all* JPMorgan entities with claims against LBHI and *all* of its subsidiaries guaranteed by LBHI.  Critically, the true-up procedure in the CDA is the exclusive means by which JPMorgan's return of payments, if ever required, is to be accomplished.

To implement the deferral of any repayments required by the true-up provisions, the CDA provides that "§§ 502(d), 541 and 542 . . . *shall not apply*" — and thus JPMorgan's failure to repay any avoidable transfer shall *not* be a basis for disallowing its claims — until *after* the issuance of a final, non-appealable order or entry into a settlement agreement that resolves *all* litigation between JPMorgan and its affiliates, on the one hand, and the Debtors and their affiliates on the other, regarding JPMorgan's claims or its right to collateral to secure those claims.  *Id.* ¶ 6(b) (emphasis added); *accord* Debtors' Motion to Approve the CDA [D.I. 7269] at 15 (explaining this provision); *see also* Mov. Br. 74 n.19; Reply Br. 45 n.19.  In other words, section 502(d) has *no* application to JPMorgan's claims in this bankruptcy case until five days after *all* pending and potential litigation between all JPMorgan claimants, on the one hand, and LBHI and all of its Debtor and non-Debtor subsidiaries, on the other hand — including this adversary proceeding — have been fully and finally resolved.

Based on the agreement of the parties embodied in the CDA, as approved by this Court's order thereon, section 502(d) does not apply to this adversary proceeding. The claims in the Amended Complaint that seek to avoid transfers and procure turnover of property to the estate thus cannot be "part and parcel" of the claims-allowance process by virtue of section 502(d). *Compare Katchen*, 382 U.S. at 330. Those claims, accordingly, are legally indistinguishable from the section 548 claim in *Granfinanciera* that the Supreme Court concluded had to be decided by an Article III tribunal. *See* 492 U.S. at 53-56. Under *Stern* and *Granfinanciera*, therefore, these avoidance and turnover claims cannot be decided by this Court.

## POINT IV

### THE REMAINDER OF PLAINTIFFS' CLAIMS MUST ALSO BE DETERMINED BY AN ARTICLE III COURT.

Aside from seeking to augment the estate through common-law damages claims and claims to avoid and recover pre-petition transfers and setoffs, plaintiffs have brought claims seeking various declarations, avoidance of contractual obligations, and equitable subordination. Those claims, too, which are firmly embedded in plaintiffs' claims seeking augmentation of the estate, must be determined by an Article III court.

**A.**   **The claims seeking declarations and avoidance of obligations must be determined by an Article III court.**

Plaintiffs seek to invalidate agreements on state-law grounds of coercion, lack of consideration, and lack of authority (Count XXXV), or to invalidate agreements and liens on theories requiring the interpretation of the parties' rights under the New York Uniform Commercial Code and other New York law (Counts XIII, XIV, and XXXVIII). Similarly, among plaintiffs' avoidance claims under sections 548 and 544(b) of the Bankruptcy Code are causes of action to avoid LBHI's obligations under the August and September Guaranties

(Counts I, II, V, VI, VII, X, XI, and XII).  Although plaintiffs may argue that these causes of action implicate the claims-allowance process, plaintiffs did not bring these causes of action as part of a claim objection (and in fact, to date, no objection to JPMorgan's claims has been filed).

Rather, like all of the claims in this adversary proceeding, plaintiffs' claims to invalidate agreements and avoid obligations were brought as part of and in aid of a broad damages "action that exists without regard to any bankruptcy proceeding," 131 S. Ct. at 2618, and with far more audacious goals than a claim objection.  Indeed, plaintiffs themselves have insisted to the Court that their adversary proceeding to recover damages and transfers from JPMorgan is distinct from any claim objection to be filed in the future.  *See* Pl. Br. 15 n.3 (emphasizing that "[d]isputes regarding the merits of JPMorgan's proofs of claims will be addressed pursuant to Rule 3007 of the Federal Rules of Bankruptcy Procedure," for which "there is no time deadline" (citation and quotation marks omitted)).

In this adversary proceeding, plaintiffs seek to recover "tens of billions of dollars" in damages (*e.g.*, Am. Compl. ¶ 79), as well as billions of dollars in transfers, on the theory that JPMorgan allegedly acted unlawfully and failed to provide the debtor with value when it requested and received collateral from LBHI.  In aid of these theories for affirmative recovery, plaintiffs seek to establish, through declaratory relief and avoidance of obligations, that JPMorgan requested and received collateral under "invalid" agreements.  *E.g.*, Am. Compl. ¶ 274.  Plaintiffs' causes of action to invalidate agreements between LBHI and JPMorgan, and to avoid obligations under those agreements, thus are predicates to and are subsumed by the damages and avoidance claims that require the exercise of judicial power under Article III.  As such, they must be determined by the Article III court that will decide the ultimate overarching

question whether plaintiffs are entitled to a recovery from JPMorgan that augments the bankruptcy estate.

**B.      The claim seeking equitable subordination must be determined by an Article III court.**

Plaintiffs' claim for equitable subordination is also beyond the constitutional authority of this Court.  That claim alleges without elaboration that "JPMorgan engaged in and benefited from inequitable conduct that resulted in injury to LBHI's creditors and conferred an unfair advantage to JPMorgan."  Am. Compl. ¶ 253.  Plaintiffs' opposition brief to JPMorgan's motion to dismiss confirms that the "inequitable conduct" underlying this claim encompasses all of the conduct alleged in support of plaintiffs' damages claims — including allegations that "JPMorgan employed unlawfully coercive tactics and fraud, and breached several of its contractual obligations to LBHI."  Pl. Br. 143; *see also* Am. Compl. ¶ 252 (incorporating all previous allegations by reference into claim for equitable subordination).

Plaintiffs may argue that the claim for equitable subordination can be determined by this Court because it is brought under the Bankruptcy Code and relates to the hierarchical ordering of creditors' claims to the bankruptcy *res*.[4]  But this catch-all cause of action incorporating all of plaintiffs' state-law allegations cannot serve as a mechanism to sweep plaintiffs' common-law claims into this Court's purview.  *See Granfinanciera*, 492 U.S. at 61 (Congress cannot eliminate party's Article III right "merely by relabeling the cause of action to

---

[4] Indeed, it is not clear what plaintiffs are attempting to achieve with the claim for equitable subordination.  As described above, the true-up provisions of the CDA are LBHI's sole means of obtaining repayment from JPMorgan of LBHI's cash applied to JPMorgan's claims.  The true-up provisions may require JPMorgan to repay LBHI if, for example, JPMorgan's claims against LBHI are reduced or are determined to be unsecured, but the true-up provisions do *not* require any repayments or other adjustments for equitable subordination.

which it attaches and placing exclusive jurisdiction in an administrative agency or a specialized court of equity"); *see also id.* at 56 (actions to recover fraudulent conveyances "are quintessentially suits at common law" to "augment the bankruptcy estate" that cannot be determined by a non-Article III court, despite codification in section 548).

As the Supreme Court held in *Stern*, allowing a non-Article III court to determine a traditional state-law claim "simply by deeming it part of some amorphous 'public right'" — or, for that matter, part of some equally amorphous notion of the "restructuring of debtor-creditor relations" — would transform Article III "into mere wishful thinking." 131 S. Ct. at 2615. If the law were otherwise, section 510(c) of the Bankruptcy Code could effectively swallow the Supreme Court's Article III ruling in *Stern*.

Here, plaintiffs' all-encompassing claim for equitable subordination is dependent upon (and indeed, indistinguishable from) the common-law claims on which it is predicated, including claims of coercion, fraud, and breach of contract — paradigmatic examples of claims that require adjudication by an Article III court. *See Northern Pipeline*, 458 U.S. at 56. In these circumstances, plaintiffs' claim for equitable subordination cannot be determined by this Court.

**C.    Even if certain limited claims could constitutionally be
          determined by this Court, all of plaintiffs' claims must still be
          determined by the District Court.**

JPMorgan expects plaintiffs to take the position that if this Court is empowered to determine any of the claims in the Amended Complaint, then it is empowered to determine *all* of them, arguing that the claims are factually intertwined. After *Stern*, however, this position is constitutionally untenable. Indeed, *Stern* compels the contrary conclusion: all of plaintiffs' claims must be determined by the *District Court*.

Before *Stern*, courts sometimes concluded that the presence of interrelated core and non-core claims in a single proceeding rendered the entire proceeding core for purposes of 28 U.S.C. § 157(b). *See, e.g.*, *Bankr. Servs., Inc.* v. *Ernst & Young (In re CBI Holding Co., Inc.)*, 529 F.3d 432, 461-62 (2d Cir. 2008) (counterclaims for professional malpractice, fraudulent inducement, breach of contract and fiduciary duty, and fraud were "core" under section 157(b)(2)(C) based on overlap of facts with defenses to auditor's proof of claim).[5]

But however broadly any court may have previously interpreted section 157(b) of the Judicial Code, *Stern* now makes clear that Article III of the Constitution does not permit a bankruptcy court to determine an estate's affirmative state-law claim simply because it arises out of the same operative facts as a proof of claim or a proceeding that does not require the exercise of Article III judicial power. To reiterate, the *Stern* Court expressly acknowledged, but did not find determinative, that "[t]here was some overlap between Vickie's counterclaim and Pierce's defamation claim that led the courts below to conclude that the counterclaim was compulsory, or at least in an 'attenuated' sense related to Pierce's claim." 131 S. Ct. at 2617 (citation omitted). According to the Court, this overlap did not confer upon the bankruptcy court the authority to determine Vickie's counterclaim. *Id.*

---

[5] *But see*, *e.g.*, *In re Exide Techs.*, 544 F.3d 196, 206 (3d Cir. 2008) (independent analysis required of each claim within an adversary proceeding for statutory "core" status); *Halper* v. *Halper*, 164 F.3d 830, 836, 839 (3d Cir. 1999) ("[T]he claim-by-claim approach [is] the only one consistent with the teachings of [*Northern Pipeline*]."); *Official Comm. of Unsecured Creditors of FMI Forwarding Co.* v. *Union Transp. Corp. (In re FMI Forwarding Co.)*, 2004 WL 1348956, at *5 (S.D.N.Y. June 16, 2004) (rejecting contention "that because core claims predominate in the present adversary proceeding, the Court has the authority to treat the entire proceeding as core").

After *Stern*, the critical question in deciding whether a bankruptcy court may determine a debtor's affirmative claim against its creditor is not whether the claim arises from the "same transaction" as a proof of claim or other core proceeding, and Article III power is no longer simply a by-product of the statutory question of "core" status. As the Supreme Court held in *Stern*, "Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case," *id.* at 2618 (emphasis in original) — nor even because the proceeding is so interrelated as to render the debtor's counterclaim a compulsory one. *Id.* at 2617. Indeed, the dissenters in *Stern* specifically singled out the Second Circuit's decision in *CBI* (cited above) as an example of a case in which, as a constitutional matter, "under the majority's holding, *the federal district judge, not the bankruptcy judge, would have to hear and resolve the counterclaim*." 131 S. Ct. at 2630 (Breyer, J., dissenting) (emphasis added).

Under *Stern*, moreover, where a complaint presents overlapping issues of fact or law both in claims that constitutionally must be determined by an Article III court and in claims that the bankruptcy court is permitted to decide, *all* claims must be determined by the *Article III tribunal*. Otherwise, the bankruptcy court's determination of such a common issue of fact or law in a litigation pending before it could have an unconstitutionally preclusive effect on the district court's required determination of the overlapping issue — a constitutional problem with particularly stark consequences where the district court reaches a result that is inconsistent with the bankruptcy court's. There can be no doubt after *Stern* that application of preclusion doctrines such as collateral estoppel or *res judicata* to deprive a district court of its ability to determine traditional common-law claims (as well as claims for declaratory judgment and equitable subordination that are subsumed by them) would constitute an "unwarranted encroachment[]

upon the judicial power of the United States, which our Constitution reserves for Art. III courts."
*Northern Pipeline*, 458 U.S. at 84.

As demonstrated above, plaintiffs' damages claims arise under traditional state-law precepts, would not necessarily be completely resolved in the claims-allowance process, and seek to augment the estate. Likewise, plaintiffs' claims to avoid or recover transfers or setoffs are not subject to section 502(d) by virtue of the CDA, and thus must also be determined by an Article III court. *Stern* teaches that, even assuming this Court might otherwise have had constitutional authority to determine some limited subset of claims in the Amended Complaint (which JPMorgan disputes), the presence of factual and legal overlap among plaintiffs' claims requires that the entire lawsuit be determined by an Article III court.[6]

## POINT V

### THIS ACTION CANNOT PROCEED IN THIS COURT.

The impact of *Stern* extends beyond its constitutional limitations on the adjudicative authority of the bankruptcy courts. The combined effect of the statutory and

---

[6] Nor can notions of consent solve what is a structural constitutional problem. While *Northern Pipeline* may have left open the possibility that a party could consent to non-Article III determination of an estate's common-law claims, the Supreme Court held in *Stern* specifically that consent is not effectuated by filing a proof of claim. *See* 131 S. Ct. at 2614 ("Pierce did not truly consent to resolution of Vickie's claim in the bankruptcy court proceedings. He had nowhere else to go if he wished to recover from Vickie's estate."). Especially in light of its doubtful efficacy, JPMorgan respectfully withholds its consent to this Court's adjudication of any claims in the Amended Complaint that this Court otherwise lacks constitutional power to determine. *See In re BearingPoint, Inc.*, 2011 WL 2709295, at *7 (Bankr. S.D.N.Y. July 11, 2011) ("[I]t may now be, and it's fair to assume that it will now be argued, that consent, no matter how uncoerced and unequivocal, will never again be sufficient [after *Stern*] for bankruptcy judges ever to issue final judgments on non-core matters.").

constitutional rulings in *Stern* require that the District Court's reference of this adversary proceeding to this Court be withdrawn, or that the adversary proceeding be dismissed.

The Judicial Code in 28 U.S.C. § 157(c)(1) establishes a procedure by which a bankruptcy court may "submit proposed findings of fact and conclusions of law to the district court," subject to *de novo* review, in a proceeding "that is *not* a core proceeding," as defined by the statute. 28 U.S.C. § 157(c)(1) (emphasis added); *accord* Fed. R. Bankr. P. 9033(a). Pierce Marshall had sought before the Supreme Court to invoke this process, arguing that while Vickie's tortious-interference counterclaim was a statutory "core" matter, the bankruptcy court could not "hear and determine" it under section 157(b) of the statute, but instead was able only to make a report and recommendation on the counterclaim under section 157(c)(1). 131 S. Ct. at 2604-05. The Supreme Court squarely rejected this statutory argument and ruled that because Vickie's tortious-interference claim was a statutorily core "counterclaim[] by the estate against persons filing claims against the estate" under section 157(b)(2)(C), the bankruptcy court could not issue proposed findings and conclusions. 131 S. Ct. at 2604.

Likewise here, all of the claims in the Amended Complaint are statutorily "core" in that they are "counterclaims by the estate against persons filing claims against the estate" under section 157(b)(2)(C); the avoidance claims are also statutorily "core" as "proceedings to determine, avoid, or recover" preferences and fraudulent conveyances under section 157(b)(2)(F) and (H), and as "determinations of the validity, extent, or priority of liens" under section 157(b)(2)(K). *See also* Am. Compl. ¶ 12 (pleading all counts in the Amended Complaint as statutorily "core"). As a result, the claims in the Amended Complaint are not statutorily eligible for the section 157(c) report-and-recommendation process, and are also constitutionally incapable of being "determined" by a bankruptcy court.

Thus, there is now no constitutional power for a bankruptcy court to "determine," nor any applicable statutory mechanism for it to render "proposed findings of fact and conclusions of law" on, matters that are *statutorily* core and yet *constitutionally* beyond the power of a bankruptcy court to determine — such as Vickie's counterclaim in *Stern*, and the claims in the Amended Complaint in this case. Nor does federal law permit any solution to this quandary by creation of an *ad hoc* process not embodied in the Judicial Code or in disregard of the Constitution. *See generally, e.g.*, *Willy* v. *Coastal Corp.*, 503 U.S. 131, 135 (1992) ("[F]ederal courts, in adopting rules, [are] not free to extend or restrict the jurisdiction conferred by a statute. Such a caveat applies *a fortiori* to any effort to extend by rule the judicial power of the United States described in Article III of the Constitution." (citation omitted)).

In light of these circumstances, the only proper procedural route with respect to the claims in the Amended Complaint is adjudication by the District Court in the first instance. These circumstances were not present in *Stern* as a result of that case's unique posture, by which the case was resolved on appeal *de novo* in the Ninth Circuit through adoption of an existing Texas state court judgment. *See* 131 S. Ct. 2602-03, 2620 (state-court ruling in Pierce's favor on tortious-interference claim was entitled to preclusive effect in Vickie's bankruptcy proceedings because no constitutionally valid final judgment by a federal court preceded it).

Here, with the Supreme Court's ruling in *Stern* now extant, unless plaintiffs promptly move under 28 U.S.C. § 157(d) to withdraw the reference, the Amended Complaint should be dismissed in its entirety.

## CONCLUSION

JPMorgan respectfully submits that the holding and reasoning of *Stern* v.

*Marshall*, 131 S. Ct. 2594 (2011), dictate that this Court lacks authority to determine any of the

claims in the Amended Complaint.

Dated:  August 5, 2011
       New York, New York

Respectfully submitted,

*Of counsel:*

WACHTELL, LIPTON, ROSEN & KATZ

Harold S. Novikoff
Amy R. Wolf
Douglas K. Mayer
David C. Bryan
Emil A. Kleinhaus
Alexander B. Lees

By:  /s/ Paul Vizcarrondo, Jr.
     Paul Vizcarrondo, Jr.

51 West 52nd Street
New York, NY  10019
Telephone:  (212) 403-1000
Facsimile:   (212) 403-2000

*Attorneys for Defendant and Counterclaimant*
*JPMorgan Chase Bank, N.A.*