**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | |
| Debtors. | |

| | |
|---|---|
| LEHMAN BROTHERS HOLDINGS INC. and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., | Adversary Proceeding No. 10-03266 (JMP) |
| Plaintiff/Counterclaim-Defendant and Plaintiff Intervenor, | |
| -against- | |
| JPMORGAN CHASE BANK, N.A., | |
| Defendant/Counterclaimant. | |


**MEMORANDUM OF LAW IN SUPPORT OF JPMORGAN'S**
**MOTION TO WITHDRAW THE REFERENCE**


WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000


Dated:  September 26, 2011

*Attorneys for Defendant/Counterclaimant*
*JPMorgan Chase Bank, N.A.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ......................................................................................................................3

    A.   JPMorgan's relationship with Lehman Brothers ........................................................3

          1.    The Clearance Agreement ..........................................................................3

          2.    The August and September Agreements ......................................................5

    B.   Lehman Brothers' bankruptcy filing .........................................................................6

    C.   This adversary proceeding ......................................................................................10

          1.    The complaint .........................................................................................10

          2.    JPMorgan's counterclaims ......................................................................12

          3.    JPMorgan's motion to dismiss and briefing on *Stern* v. *Marshall* ..............................................................................................13

ARGUMENT .........................................................................................................................14

POINT I    WITHDRAWAL OF THE REFERENCE IS WARRANTED WHERE THE BANKRUPTCY COURT LACKS AUTHORITY TO ACT ....................................14

POINT II   *STERN* IMPOSES SIGNIFICANT LIMITS ON THE ADJUDICATORY AUTHORITY OF BANKRUPTCY COURTS ........................................................16

    A.   Article III and the limited scope of the "public rights" exception ............................17

    B.   Limited effect of a creditor's proof of claim ...........................................................19

POINT III  THE BANKRUPTCY COURT LACKS AUTHORITY TO ADJUDICATE THE CLAIMS IN THE AMENDED COMPLAINT ................................................23

    A.   The common-law claims must be adjudicated by an Article III court. ....................23

    B.   The claims seeking to recover transfers to JPMorgan also must be adjudicated by an Article III court. ........................................................................26

    C.   The remainder of the claims in the Amended Complaint must be adjudicated by an Article III court. ...........................................................................................29

D.     Even if some claims could be adjudicated by the bankruptcy court, all claims should still be adjudicated by this Court. .................................................................33

POINT IV    THE BANKRUPTCY COURT LACKS AUTHORITY TO PROPOSE FINDINGS AND CONCLUSIONS .........................................................................34

POINT V    THE WITHDRAWAL OF THE REFERENCE SHOULD INCLUDE JPMORGAN'S COUNTERCLAIMS .......................................................................38

CONCLUSION ....................................................................................................................40

# TABLE OF AUTHORITIES

__Cases__                                                                                                          __Page__

*1800Postcards, Inc.* v. *Morel*,
    153 F. Supp. 2d 359 (S.D.N.Y. 2001) ................................................................................... 34

*Bankr. Servs., Inc.* v. *Ernst & Young (In re CBI Holding Co.)*,
    529 F.3d 432 (2d Cir. 2008) ................................................................................ 33 & n.10

*Cullen* v. *United States*,
    194 F.3d 401 (2d Cir. 1999) ............................................................................................ 3, 37

*Granfinanciera, S.A.* v. *Nordberg*, 492 U.S. 33 (1989) ....................................................... passim

*Grassia* v. *Scully*,
    892 F.2d 16 (2d Cir. 1989) ................................................................................................... 37

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
    2006 WL 337667 (S.D.N.Y. Feb. 10, 2006) ............................................................ 34, 39 n.11

*In re Lehman Bros. Sec. & ERISA Litig.*,
    __ F. Supp. 2d __, 2011 WL 3211364 (S.D.N.Y. July 27, 2011) ...................................... 7 n.2

*Katchen* v. *Landy*,
    382 U.S. 323 (1966) ............................................................................................ 19, 20, 27

*Langenkamp* v. *Culp*,
    498 U.S. 42 (1990) .................................................................................................... 19, 20

*Mirant Corp.* v. *Southern Co.*,
    337 B.R. 107 (N.D. Tex. 2006) ...................................................................................... 39 n.11

*Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*,
    458 U.S. 50 (1982) ............................................................................................ 17, 18, 23, 25

*Orion Pictures Corp.* v. *Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
    4 F.3d 1095 (2d Cir. 1993) ............................................................................................ 15, 34, 38

*Palmdale Hills Prop., LLC* v. *Lehman Commercial Paper, Inc.
(In re Palmdale Hills Prop., LLC)*,
    __ F.3d __, 2011 WL 3320429 (9th Cir. Aug. 3, 2011) ...................................................... 32 n.9

*Pressroom Unions-Printers League Income Sec. Fund* v. *Cont'l Assurance Co.*,
    700 F.2d 889 (2d Cir. 1983) ................................................................................................. 35

*Samson* v. *Blixseth (In re Blixseth)*,
    2011 WL 3274042 (Bankr. D. Mont. Aug. 1, 2011) ............................................................ 35

*Solutia Inc.* v. *FMC Corp.*,
2004 WL 1661115 (S.D.N.Y. July 27, 2004) ...................................................................... 15

*Stern* v. *Marshall*,
131 S. Ct. 2594 (2011) ............................................................................................... passim

*United Orient Bank* v. *Green (In re Green)*,
200 B.R. 296 (S.D.N.Y. 1996) ..................................................................................... 39 n.11

*Willy* v. *Coastal Corp.*,
503 U.S. 131 (1992) ........................................................................................................ 35

## Statutes and Rules

11 U.S.C. § 502(d) ..................................................................... 19, 26, 27 & n.5, 28

11 U.S.C. § 546(e) ........................................................................................................ 29

11 U.S.C. § 547 ...................................................................................................... 29 n.7

11 U.S.C. § 548 ...................................................................................................... 28, 29

28 U.S.C. § 157(a) ......................................................................................................... 14

28 U.S.C. § 157(b) .................................................................................................. passim

28 U.S.C. § 157(c) ................................................................................... 2, 14, 34, 35, 36

28 U.S.C. § 157(d) .................................................................................... 1, 3, 14, 15

28 U.S.C. § 636(c) ......................................................................................................... 37

28 U.S.C. § 1334(b) ...................................................................................................... 14

Fed. R. Bankr. P. 9033(d) ........................................................................................ 2, 36

## Other Authorities

*In re Lehman Brothers Holdings Inc.*, 08-13555 (JPM) (S.D.N.Y. Bankr. Mar. 11, 2010)
Report of Anton R. Valukas, Examiner .............................................................. 7 n.2

*Palmdale Hills Property, LLC v. Lehman Commercial Paper, Inc.*
*(In re Palmdale Hills Prop., LLC)*, No. 10-60004 (9th Cir.),
Brief of Appellee Lehman Commercial Paper Inc., 2011 WL 2933181 ........................... 32 n.9

JPMorgan Chase Bank, N.A. ("JPMorgan") respectfully submits this memorandum of law in support of its motion under 28 U.S.C. § 157(d) for withdrawal of the reference of this adversary proceeding from the bankruptcy court.

## PRELIMINARY STATEMENT

This is a massive damages action seeking to blame JPMorgan for Lehman Brothers' precipitous bankruptcy filing in September 2008.  Based on common-law theories such as fraud, coercion, and breach of contract, Lehman Brothers seeks to recover "*tens of billions of dollars*" in damages, asserting that JPMorgan damaged Lehman Brothers and its creditors when it requested and retained collateral from Lehman Brothers before the bankruptcy.  Lehman Brothers also seeks the return of the collateral transferred to JPMorgan, asserting that it is subject to recovery both under bankruptcy law and under common-law theories such as conversion and unjust enrichment.

Under the Supreme Court's recent decision in *Stern* v. *Marshall*, 131 S. Ct. 2594 (2011), only this Court has the authority to adjudicate Lehman Brothers' claims.  In *Stern*, the Supreme Court held that Article III of the Constitution prevents a bankruptcy court from adjudicating affirmative claims brought by a bankrupt debtor against a creditor if those claims do not assert rights to relief under federal bankruptcy law that will be completely resolved in the process of allowing or disallowing the creditor's proof of claim against the estate.  Based on that test, the Supreme Court in *Stern* further held that common-law claims brought by a bankrupt debtor against its creditor could *not* be adjudicated by the bankruptcy court, even if the common-law claims raise issues that overlap with what must be resolved in ruling on the creditor's proof of claim.

The Supreme Court's decision in *Stern* prevents the bankruptcy court from adjudicating any of the causes of action asserted against JPMorgan in this lawsuit. The Amended Complaint is a 49-count barrage of claims seeking billions of dollars of damages from JPMorgan in an effort to augment the Lehman Brothers estate, and raises numerous significant issues that are not raised by JPMorgan's proof of claim. The resolution of this action will require "the most prototypical exercise of [Article III] judicial power: the entry of a final, binding judgment by a court with broad substantive jurisdiction, on a common law cause of action." *Stern*, 131 S. Ct. at 2615 (emphasis omitted).

This constitutional problem, moreover, cannot be solved by permitting the bankruptcy court to rule on dispositive motions and, if necessary, try this case, and then issue a report and recommendation to this Court for *de novo* review. Each of the claims in the Amended Complaint is a counterclaim by the estate against a creditor that filed a proof of claim, and therefore is designated by the Judicial Code as a "core" proceeding. While 28 U.S.C. § 157(c)(1) and Bankruptcy Rule 9033 permit a bankruptcy court to make proposed findings and conclusions on claims that are *not* designated by the Judicial Code as "core," those provisions are inapplicable by their terms to proceedings that are "core," such as this case.

Even if it were possible for a court to improvise a fix that would allow the bankruptcy court to issue a report and recommendation on those aspects of the Amended Complaint that are "core" matters, that solution would do little, if anything, to advance the progress of this case. Any trial in this case will take weeks, if not months, and will raise significant issues regarding the credibility of witnesses offering competing accounts of events that occurred years ago. As courts have recognized, meaningful *de novo* review by this Court would simply be impossible based on a cold record of a lengthy and vigorously contested trial.

*See, e.g.*, *Cullen* v. *United States*, 194 F.3d 401, 407 (2d Cir. 1999) (court conducting *de novo* review of report and recommendation cannot reject or modify magistrate's credibility determinations without hearing live testimony); *infra* Point IV.

In short, this adversary proceeding cannot proceed in the bankruptcy court. The only solution, therefore, is for this Court to withdraw the reference of the case under 28 U.S.C. § 157(d) and preside over it in the first instance.

## BACKGROUND

This action arises out of the historic collapse and bankruptcy filing of Lehman Brothers Holdings Inc. ("Lehman Brothers"), the publicly traded parent company of Lehman Brothers Inc. ("LBI") and numerous other entities conducting business under the "Lehman Brothers" name. The plaintiffs are the bankrupt Lehman Brothers and its Official Committee of Unsecured Creditors. The defendant is JPMorgan Chase Bank, N.A., which was one of the largest suppliers of credit and trading counterparties for Lehman Brothers and its subsidiary operating companies.[1]

### A.    JPMorgan's relationship with Lehman Brothers

#### 1.    The Clearance Agreement

Lehman Brothers' U.S. broker-dealer subsidiary was LBI. In accordance with a Clearance Agreement dated June 15, 2000 (as amended, the "Clearance Agreement"), JPMorgan served as LBI's clearing bank, and facilitated the clearance and settlement of securities trades by LBI. *See generally* Clearance Agreement (Decl. Ex. C).

---

[1]    The following facts are drawn from the Amended Complaint (Decl. Ex. A), JPMorgan's Amended Counterclaims (Decl. Ex. B), and documents referenced in those pleadings. References to the "Decl." are to the accompanying Declaration of Alexander B. Lees.

LBI financed its operations in large part through triparty repurchase agreements, or "triparty repos." Under those arrangements, LBI would sell much of its securities inventory at the end of each trading day to investors, with an agreement to repurchase those securities in the future, typically on the morning of the following trading day. The repurchase price would be slightly higher than the sale price, the difference effectively being "interest" on the funds provided by the investors via the purchase of the securities.

Pursuant to the Clearance Agreement, JPMorgan served as custodian of the securities and as agent for both sides of such transactions (hence the "triparty" name). Every morning, the triparty repos would be "unwound," *i.e.*, LBI would buy back from the repo investors the securities LBI had sold them the day before. LBI did not have the tens of billions of dollars in cash necessary to do so, however. So instead, JPMorgan would extend huge amounts of discretionary intraday credit to LBI — typically exceeding $100 billion per day — by paying the cash repurchase price to the investors on behalf of LBI and moving LBI's securities back into LBI's clearance accounts. To secure those advances, JPMorgan held a security interest in the securities and other assets in LBI's accounts. Am. Compl. ¶¶ 3, 18-22 (Decl. Ex. A).

In extending that intraday credit, JPMorgan incurred enormous exposure to LBI, and took on the risks that LBI's triparty repo investors and other financing sources would not re-invest in the evening to provide LBI with the funds to repay JPMorgan, that LBI would default, and ultimately that the securities JPMorgan held as collateral could not be sold for enough money to repay the tens or hundreds of billions of dollars owed to JPMorgan.

>    **2.**    **The August and September Agreements**

To help mitigate these massive risks, in the summer of 2008, Lehman Brothers

provided JPMorgan with securities to serve as additional collateral.  Am. Compl. ¶ 30 (Decl. Ex.

A).  Lehman Brothers also executed a set of agreements (the "August Agreements"), most

significantly a guaranty and a security agreement, under which it guarantied payment of all of

LBI's liabilities to JPMorgan under the Clearance Agreement and granted JPMorgan a lien on

the accounts in which Lehman Brothers had posted securities as collateral.  *Id.* ¶ 28; August

Guaranty § 1 (Decl. Ex. D); August Security Agreement at 2 (Decl. Ex. E).

By late August and early September 2008, Lehman Brothers' and LBI's

deteriorating financial condition was becoming increasingly apparent.  And JPMorgan's

exposure was growing, in both triparty-repo clearing and other areas such as securities clearing

in London and derivatives transactions, as it continued to support Lehman Brothers and its

subsidiaries.  The parties well understood that Lehman Brothers' credibility in the markets could

collapse instantly if JPMorgan did not continue to take on this additional exposure.  But

JPMorgan also was determined to remain supportive of Lehman Brothers, and so continued to

unwind LBI's triparty repos, enter into derivatives transactions, and otherwise deal with Lehman

Brothers on a "business as usual" basis.

In response to JPMorgan's concerns about its growing exposure, on September 9,

2008, Lehman Brothers agreed to post additional collateral in cash or cash equivalents to secure

all of JPMorgan's exposure arising from its dealings with Lehman Brothers and its subsidiaries.

Am. Compl. ¶¶ 62, 66, 71 (Decl. Ex. A).  The parties entered into another set of agreements (the

"September Agreements"), including a new guaranty and security agreement, under which

Lehman Brothers guarantied and pledged assets to secure all obligations of any of its subsidiaries

to JPMorgan and its subsidiaries and affiliates — whether arising from clearance, trading, derivatives transactions, or any other source — and granted a lien on Lehman Brothers' accounts at JPMorgan. *Id.* ¶¶ 51, 59; September Guaranty § 1 (Decl. Ex. F); September Security Agreement at 1-2 (Decl. Ex. G).

Between September 9 and September 11, 2008, Lehman Brothers delivered to JPMorgan about $3.6 billion in cash and money-market funds as collateral under the September Agreements. Am. Compl. ¶ 66 (Decl. Ex. A). Meanwhile, it came to light that some of the securities that Lehman Brothers and LBI had pledged to JPMorgan under the August Agreements and Clearance Agreement were illiquid instruments, structured by Lehman Brothers itself, that were given investment-grade ratings on the basis of Lehman Brothers' commitment to stand behind the securities — in other words, to secure LBI's exposure, Lehman Brothers had pledged securities whose value depended upon Lehman Brothers' own credit. As a consequence, it was apparent that the collateral was not suitable to secure JPMorgan's advances and that its value was overstated. Because of this and other reasons, JPMorgan requested an additional $5 billion in cash collateral on September 11, 2008, which Lehman Brothers provided the following day. *Id.* ¶¶ 67, 71.

## B.    Lehman Brothers' bankruptcy filing

During the week leading up to Friday, September 12, 2008, Lehman Brothers' financial condition grew increasingly grave: customers, counterparties, and investors were fleeing in droves, ceasing to trade with Lehman Brothers and its subsidiaries, and withdrawing their assets from LBI accounts. This run on the bank was the culmination of an aggressive growth strategy that Lehman Brothers had embarked upon in 2006 and 2007. As part of that strategy, the firm deliberately and substantially increased its investments in real-estate,

- 6 -

leveraged-loan, and similar transactions — often disregarding its own internal policies and controls for managing risk.  When those investments soured and Lehman Brothers was unable to unload them without incurring significant losses, it resorted to deceptive accounting tactics to disguise the firm's true leverage and financial condition, including the now widely-reported device known as "Repo 105."

Ultimately, the burden on Lehman Brothers' balance sheet of vast quantities of risky and illiquid investments proved too much.  S&P announced on September 9 that it was poised to downgrade Lehman Brothers' credit ratings.  And in a failed attempt to quell market fears, Lehman Brothers made an extraordinary decision to pre-announce its third-quarter earnings on September 10, disclosing multibillion-dollar losses attributable largely to the firm's investments in residential mortgages and commercial real estate.  The loss of confidence accelerated, and a classic bank run ensued.[2]

Over the weekend of September 13 and 14, 2008, the Federal Reserve Bank of New York, the U.S. Treasury Department, and Lehman Brothers tried to put together a rescue plan.  Am. Counterclaims ¶ 27 (Decl. Ex. B).  Their efforts failed when a potential life-saving acquisition of Lehman Brothers by Barclays Capital, Inc. ("Barclays") fell through at the

---

[2]     A detailed account of the causes of Lehman Brothers' demise and the firm's use of Repo 105 transactions to cover up its true leverage can be found in the Report of Anton R. Valukas, the examiner appointed by the bankruptcy court in Lehman Brothers' chapter 11 proceedings.  *In re Lehman Brothers Holdings Inc.*, 08-13555 (JPM) (S.D.N.Y. Bankr. Mar. 11, 2010) [D.I. 7531].  These topics are also at issue and discussed at length in *In re Lehman Bros. Sec. & ERISA Litig.*, __ F. Supp. 2d __, 2011 WL 3211364 (S.D.N.Y. July 27, 2011), where investors have alleged that Lehman Brothers' failure, and the attendant loss of shareholder value, resulted from Lehman Brothers' "understat[ing] its net leverage, conceal[ing] the negative balance sheet impact of its inventory of 'sticky' and illiquid assets, misstat[ing] its practices with respect to risk management, understat[ing] the extent of its exposures on Alt-A and commercial real estate holdings and, more broadly, portray[ing] Lehman as financially stronger than it was."  *Id.* at *30.

eleventh hour because of UK regulatory issues.  On Sunday night, September 14, the Fed and the

Securities and Exchange Commission pressed Lehman Brothers to file for bankruptcy, which it

did early on Monday, September 15, 2008.  *Id.*

At the open of business on September 15, just a few hours after the filing of the

largest bankruptcy in history, and in the midst of the worst financial crisis since the Great

Depression, JPMorgan could have avoided the vast bulk of its exposure to Lehman Brothers by

declining to extend credit to LBI, which continued to operate.  But JPMorgan did not cut and

run.  Instead, balancing the interests of Lehman Brothers, Lehman Brothers' customers and

overnight investors, and the financial markets generally, JPMorgan extended approximately

$87 billion of credit to LBI to unwind the previous Friday's triparty repos and other financings.

*Id.* ¶ 29.  JPMorgan also extended billions of dollars of additional credit during the day to

facilitate the clearance and settlement of LBI's securities transactions.  JPMorgan took on this

enormous risk at the request of Lehman Brothers and the Fed, on the understanding that LBI

would commence an orderly wind-down or sale process that would allow LBI to repay

JPMorgan's advances in full — and in reliance on the $8.6 billion in collateral that Lehman

Brothers had pledged the week before.  *Id.*

The following day, Tuesday, September 16, Lehman Brothers filed a motion in

the bankruptcy court, supported by the Fed, to induce JPMorgan to continue making intraday

clearance advances to LBI (the "Comfort Order Motion").  Lehman Brothers recognized in that

motion that JPMorgan, in its sole discretion, was advancing LBI tens of billions of dollars a day

"necessary to clear, and facilitate the settlement of, securities transactions," and asked the

bankruptcy court to enter an order clarifying (and thus giving JPMorgan "comfort") that Lehman

Brothers was authorized during the bankruptcy proceedings to continue incurring debt to

JPMorgan under the August and September Agreements.  Lehman Brothers represented further that "[i]t is essential to Lehman's customers that [JPMorgan] continue to clear securities transactions for the Lehman Clearance Parties in accordance with its prepetition practices," and that the relief requested was needed to "facilitate a smooth and orderly transition of Lehman's operations into chapter 11, and minimize not only the disruption of Lehman's business affairs, but also the disruption of the financial markets as a whole."  The bankruptcy court granted Lehman Brothers' motion that day.  *Id.* ¶¶ 34-35.

On the morning of Wednesday, September 17, after JPMorgan had twice more provided tens of billions of dollars in crucial funding to unwind LBI's overnight financings and facilitate LBI's securities trades, Lehman Brothers filed another motion in the bankruptcy court, this time asking the court to approve the sale of LBI's business and assets to Barclays.  *Id.* ¶¶ 36-37.  Through the statements made in this motion and through additional representations, Lehman Brothers conveyed to JPMorgan that Barclays had agreed to purchase all of the LBI-owned securities that JPMorgan was financing intraday, which would leave LBI with sufficient cash to repay JPMorgan's clearance advances in full.  *Id.* ¶¶ 37-40, 53; *see also id.* ¶ 33.  In reliance on Lehman Brothers' representations, on the morning of Thursday, September 18, JPMorgan again advanced about $70 billion to LBI to unwind triparty repos and other financings.  *Id.* ¶ 69.

As it turned out, however, contrary to what Lehman Brothers had represented, Lehman Brothers and Barclays had not agreed that Barclays was to purchase all of the securities that JPMorgan was financing.  Instead, with the agreement and active participation of Lehman Brothers, Barclays left behind large amounts of securities that senior Lehman Brothers executives described internally as "toxic waste" and "goat poo."  As a result, after the Securities

Investor Protection Corporation initiated liquidation proceedings against LBI on Friday, September 19, JPMorgan still had more than $25 billion of outstanding loans to LBI secured by a collateral pool containing many of LBI's worst securities.  *Id*. ¶¶ 6, 9, 67, 89-90.

To satisfy its enormous exposure, JPMorgan sold as much as it could of the LBI securities inventory it held as collateral.  But because it was unable to sell many of the illiquid and difficult-to-value securities posted by LBI that Barclays had left behind, and was unable to sell any of the securities posted as collateral by Lehman Brothers, JPMorgan ultimately had to use most of the $8.6 billion in cash collateral that it received from Lehman Brothers in September 2008 to pay its triparty and clearance-related extensions of credit.  *Id*. ¶ 12, 101.  JPMorgan also filed a proof of claim against Lehman Brothers' estate for the amounts owed to it under the August and September Agreements — most of which represented LBI's unpaid clearance-related advances, which Lehman Brothers had guaranteed and pledged collateral to secure.

## C.    This adversary proceeding

### 1.    The complaint

Two years later, Lehman Brothers and its Creditors' Committee commenced this adversary proceeding.  The essence of their complaint is that JPMorgan, which provided credit of unmatched magnitude to LBI during Lehman Brothers' most dire hours, in fact is *to blame* for Lehman Brothers' precipitous bankruptcy filing, and should be forced not only to return the $8.6 billion in collateral that it received from Lehman Brothers — and in fact needed to cover its enormous exposures — but also to pay "tens of billions of dollars" more in damages.  Am. Compl. ¶¶ 1-2 (Decl. Ex. A).

The Amended Complaint alleges, for example, that JPMorgan unlawfully used its right to decide whether to make discretionary advances to LBI in an effort to coerce Lehman Brothers into signing the August and September Agreements and delivering the $8.6 billion in collateral. *Id.* ¶¶ 1, 359-360. Plaintiffs allege also that JPMorgan "acted with the benefit of unparalleled inside knowledge" about Lehman Brothers' financial condition, which it supposedly gained when its "management was invited into the United States government's inner circle" to discuss Lehman Brothers' distress. *Id.* ¶¶ 1, 35. The speculative premise of plaintiffs' damages theory is that, if only Lehman Brothers had had access to the $8.6 billion in collateral that it delivered to JPMorgan, it could have avoided bankruptcy for some undefined period of time, engaged in a sale or an "orderly" liquidation, and recouped untold billions of dollars in additional value. *Id.* ¶¶ 79-80.

The 49-count Amended Complaint lays the groundwork for plaintiffs' damages theory by bringing claims to invalidate the August and September Agreements — the contracts under which Lehman Brothers guarantied LBI's liabilities and granted JPMorgan liens as security. It asserts claims to avoid the agreements and related transfers of collateral as fraudulent transfers and preferences under the Bankruptcy Code (*e.g.*, Counts I through XII, and XV through XXIV); it also seeks declaratory judgments under various state-law theories that the agreements and JPMorgan's liens are unenforceable (*e.g.*, Counts XIII and XIV, XXXV, XXXVIII).

Plaintiffs then reach the punch line of the Amended Complaint: Based on earlier claims that Lehman Brothers' agreements with and transfers to JPMorgan were invalid, plaintiffs bring a litany of common-law claims alleging that JPMorgan's conduct in requesting and holding onto collateral was unlawful, such that JPMorgan can be held liable for "tens of billions of

dollars" in damages. *Id.* ¶¶ 1, 79. These common-law damages claims allege, for instance, that because JPMorgan had no valid contractual or other right to the collateral that Lehman Brothers pledged, it was "unjustly enriched" by the collateral transfers (Counts XXXVI and XXXIX), and was guilty of "conversion" when it refused to return the collateral (Counts XXXVII and XL). In addition, plaintiffs bring a host of breach-of-contract claims alleging, among other things, that because the *September* Agreements are invalid based on plaintiffs' previous claims, JPMorgan was prohibited from requesting and holding onto collateral to secure obligations unrelated to clearance advances, and therefore is liable for violating the *August* Agreements, as well as the Clearance Agreement (*e.g.*, Counts XLI through XLV).

Plaintiffs also seek damages based on allegations that JPMorgan "coerced" Lehman Brothers into signing the September Agreements and delivering collateral by "improperly" threatening to stop clearing for and extending credit to LBI (Counts XLVI and XLVIII), and that JPMorgan fraudulently induced Lehman Brothers to deliver collateral when Jamie Dimon, JPMorgan's CEO, allegedly represented to Dick Fuld, Lehman Brothers' CEO, that JPMorgan would return $5 billion in cash collateral, delivered on the morning of September 12, 2008, at the end of the same trading day (Count XLIX).

### 2.    JPMorgan's counterclaims

JPMorgan filed counterclaims against Lehman Brothers, the crux of which is that, if JPMorgan suffers any loss by reason of being required to return the collateral that it needed to satisfy its claims, Lehman Brothers is responsible for those losses because it fraudulently induced JPMorgan's continuing extensions of credit to LBI after Lehman Brothers' bankruptcy filing. The basis for JPMorgan's claims is that Lehman Brothers misrepresented to JPMorgan that it had agreed on a transaction with Barclays that would fully extinguish LBI's clearance-

related debts to JPMorgan, when in truth, there was no such agreement.  In fact, Lehman

Brothers and Barclays had agreed that Barclays could cherry-pick the assets it would take, and

leave behind other lower-quality assets financed by JPMorgan.  The result of this was that, when

the dust settled following the September 19, 2008 commencement of LBI's liquidation

proceeding, JPMorgan was left with over $25 billion in claims against LBI secured by LBI's

least desirable collateral.  *See, e.g.*, Am. Counterclaims ¶¶ 1-13, 100-02 (Decl. Ex. B).

> **3.      JPMorgan's motion to dismiss and
> briefing on *Stern* v. *Marshall***

JPMorgan moved to dismiss all of the claims in the Amended Complaint on

October 19, 2010.  *See* JPMorgan's Mem. in Support of Mot. to Dismiss (Decl. Ex. H); Pl. Mem.

in Opp. to Mot. to Dismiss (Decl. Ex. I); JPMorgan's Reply in Support of Mot. to Dismiss (Decl.

Ex. J).[3]  On June 23, 2011, after JPMorgan's motion had been briefed and argued in the

bankruptcy court, but before the bankruptcy court issued any ruling, the Supreme Court issued its

decision in *Stern* v. *Marshall*.  The bankruptcy court directed the parties to file briefs addressing

the effect of *Stern* on the Amended Complaint, and JPMorgan filed a brief demonstrating that,

under *Stern*, none of the claims in the Amended Complaint can be constitutionally adjudicated

by the bankruptcy court.

The bankruptcy court then issued a Case Management Order on August 15, 2011,

which stated, among other things, that "[a]ny motion for withdrawal of the reference shall be

filed by no later than [September 26, 2011]" and that "[a]ny failure to file such a motion for

withdrawal of the reference by [September 26, 2011] shall constitute a waiver of the right to file

---

[3]      Plaintiffs moved to dismiss JPMorgan's Amended Counterclaims.  That fully briefed
motion has not yet been argued before the bankruptcy court.

such a motion on the basis of *Stern*." Case Management Order at 4-5 (Decl. Ex. K); Order

Amending Case Management Order (Decl. Ex. L).

## ARGUMENT

Section 157(d) of the Judicial Code provides that "[t]he district court may

withdraw, in whole or in part, any case or proceeding referred under this section, on its own

motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d). As set forth

below, there is ample cause to withdraw the reference of this proceeding based on the bankruptcy

court's lack of authority to adjudicate plaintiffs' claims.

## POINT I

### WITHDRAWAL OF THE REFERENCE IS
### WARRANTED WHERE THE BANKRUPTCY
### COURT LACKS AUTHORITY TO ACT.

Congress has granted original jurisdiction to the district courts, rather than the

bankruptcy courts, over "all civil proceedings arising under title 11, or arising in or related to

cases under title 11." 28 U.S.C. § 1334(b). At the same time, Congress has authorized the

district courts to "refer" proceedings covered by section 1334(b) to the bankruptcy courts, s*ee*

28 U.S.C. § 157(a), which has been done in this District.

The Judicial Code distinguishes between "core" bankruptcy proceedings and

"non-core" proceedings: Under the statute, "[b]ankruptcy judges may hear and determine"

proceedings referred to them that are identified by the statute as "core," subject to the ordinary

standards of appellate review. 28 U.S.C. § 157(b)(1). When "a proceeding is not a core

proceeding," however, the Judicial Code mandates that only a district judge may enter a final

judgment. 28 U.S.C. § 157(c)(1).

Under the longstanding law of the Second Circuit, as established by the *Orion* decision, the key question for this Court in determining whether to withdraw "for cause" the bankruptcy court reference of a particular proceeding is whether a bankruptcy court has the power to adjudicate the claims in that proceeding.  *Orion Pictures Corp.* v. *Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1101 (2d Cir. 1993) (district court "should first evaluate whether the claim is core or non-core, since it is upon this issue that questions of efficiency and uniformity will turn"); *see also, e.g.*, *Solutia Inc.* v. *FMC Corp.*, 2004 WL 1661115, at *3 (S.D.N.Y. July 27, 2004) ("By litigating this non-core matter in the district court, judicial resources will be conserved instead of having two courts administer two rounds of briefing and argument on the same issues.").

Before the Supreme Court's decision in *Stern*, the answer to the threshold inquiry mandated by the Second Circuit in *Orion* could be found in the statutory distinction between "core" and "non-core" proceedings, as 28 U.S.C. § 157(b) permits the bankruptcy courts to enter final orders in statutorily "core" matters, but not in other proceedings.  After *Stern*, however, the power of a bankruptcy court to enter a final judgment is determined by constitutional considerations, as discussed below, in addition to the statutory definition of "core" proceedings. But the fundamental principle established by *Orion* remains intact:  if a bankruptcy court lacks authority (whether statutory or constitutional) to resolve the claims presented to it, there is presumptively "cause" to withdraw the reference under 28 U.S.C. § 157(d).

**POINT II**

**_STERN_ IMPOSES SIGNIFICANT LIMITS
ON THE ADJUDICATORY AUTHORITY
OF BANKRUPTCY COURTS.**

The Supreme Court's _Stern_ decision stemmed from the bankruptcy petition filed

by the late Vickie Lynn Marshall (also known as Anna Nicole Smith).  Pierce Marshall, Vickie's

stepson, filed a proof of claim and complaint in Vickie's bankruptcy case alleging that Vickie

had defamed him by inducing her lawyers to state falsely to the press that Pierce had defrauded

J. Howard Marshall — Pierce's father and Vickie's deceased husband — into signing a living

trust that excluded Vickie.  In response, Vickie's estate filed a counterclaim alleging that Pierce

had tortiously interfered with an _inter vivos_ gift from J. Howard to Vickie.  131 S. Ct. at 2601.

The bankruptcy court granted summary judgment dismissing Pierce's defamation

claim.  Almost a year later, after a bench trial, the bankruptcy court entered a judgment in

Vickie's favor on her tortious-interference counterclaim against Pierce, awarding Vickie over

$425 million in compensatory and punitive damages.  _Id._  Subsequently, however, a state court

ruled in Pierce's favor on Vickie's tortious-interference claim, raising the question whether the

earlier judgment by the bankruptcy court was valid.  _Id_. at 2602-03.

The Supreme Court first held that Vickie's tortious-interference claim constituted

a counterclaim by her bankruptcy estate against a person filing a claim against the estate, and

hence fell within the statutory definition of a "core" proceeding that the bankruptcy court was

permitted to "hear and determine" under 28 U.S.C. § 157(b)(2)(C).  131 S. Ct. at 2604.  But the

Supreme Court went on to hold that this statutory grant of power to the bankruptcy court to

"determine" that proceeding was unconstitutional.  _Id._ at 2608.

- 16 -

A.      **Article III and the limited scope of the
        "public rights" exception**

Article III of the Constitution vests "the judicial Power of the United States" only

in federal judges possessing life tenure and salary protection — characteristics that bankruptcy

judges lack.  *Stern*, 131 S. Ct. at 2600-01 (quoting U.S. Const. art. III).  The constitutional

question in *Stern* thus turned on whether the bankruptcy court's entry of judgment on Vickie's

counterclaim against Pierce constituted the exercise of Article III "judicial power."   In

concluding that the bankruptcy court's entry of judgment was indeed an unconstitutional exercise

of "judicial power," the Court first analyzed its precedents addressing the scope of the so-called

"public rights" that may not require exercise of the "judicial Power of the United States."

In *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U.S. 50

(1982), the Court held that a state-law damages action by a bankruptcy estate for breach of

contract, misrepresentation, coercion, and duress against a party that had not filed a proof of

claim could not be decided by a bankruptcy court because the right of a debtor in bankruptcy to

recover "damages to augment its estate is one of *private right*, that is, of the liability of one

individual to another under the law as defined," and not one of public right.  *Id.* at 57, 71-72

(plurality opinion) (emphasis added; citation and quotation marks omitted); *id.* at 91 (Rehnquist,

J., concurring).

Likewise, in *Granfinanciera, S.A.* v. *Nordberg*, 492 U.S. 33 (1989), the Court

held that a party that had not filed a proof of claim was entitled to a jury trial on claims asserted

by the bankruptcy estate to recover a fraudulent transfer under section 548 of the Bankruptcy

Code.  Declaring at the outset that the jury-trial question before it "requires *the same answer* as

the question whether Article III allows Congress to assign adjudication of that cause of action to

a non-Article III tribunal," *id.* at 53 (emphasis added), the Court held that the Seventh

- 17 -

Amendment entitled the defendant to a jury trial because fraudulent-conveyance actions, even when brought under the Bankruptcy Code, "are quintessentially suits at common law that more nearly resemble state-law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res." *Id.* at 56 (citation omitted); *see id*. at 55-56 ("A bankruptcy trustee's right to recover a fraudulent conveyance under 11 U.S.C. § 548(a)(2) seems to us more accurately characterized as a private rather than a public right as we have used those terms in our Article III decisions." (citing *Northern Pipeline*, 458 U.S. at 71)).

In reviewing *Northern Pipeline* and *Granfinanciera*, as well as other precedents outside the bankruptcy context addressing the authority of non-Article III tribunals, the Supreme Court in *Stern* concluded that "[w]hen a suit is made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789, and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts. The Constitution assigns that job — resolution of the mundane as well as the glamorous, matters of common law and statute as well as constitutional law, issues of fact as well as issues of law — to the Judiciary." 131 S. Ct. at 2609 (citation and quotation marks omitted). Moreover, the Court held, any "public right" exception to the foregoing is limited "to cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert government agency is deemed essential to a limited regulatory objective within the agency's authority." *Id.* at 2613.

The Court concluded that Vickie's state-law counterclaim for tortious interference against Pierce did not constitute a "public right." Instead, the Court held, "this case involves the most prototypical exercise of judicial power:  the entry of a final, binding judgment *by a court*

- 18 -

with broad substantive jurisdiction, on a common law cause of action, when the action neither

derives from nor depends upon any agency regulatory regime." *Id.* at 2615 (emphasis in

original).

**B.    Limited effect of a creditor's proof of claim**

The Court next addressed Vickie's argument that, regardless of whether her

counterclaim involved a matter of public or private right, it nevertheless could be adjudicated by

a bankruptcy court because Pierce had filed a proof of claim against Vickie's bankruptcy estate.

For this argument, Vickie relied on two Supreme Court precedents: *Katchen* v. *Landy*, 382 U.S.

323 (1966), and *Langenkamp* v. *Culp*, 498 U.S. 42 (1990) (*per curiam*).  But the *Stern* Court

found those cases to be distinguishable.

In *Katchen*, the Supreme Court held that a bankruptcy court had summary

jurisdiction under the former Bankruptcy Act to order a creditor that had filed a proof of claim to

return a voidable preference under federal bankruptcy law, even though that creditor would

thereby forfeit its Seventh Amendment right to a jury trial in a plenary suit by the estate.  The

Court reasoned that because section 57g of the former Bankruptcy Act (substantively the same as

section 502(d) of the current Bankruptcy Code) required the bankruptcy court to disallow any

claim by a creditor that had received a voidable preference until the preference had been

returned, resolution of a preference claim against a creditor was "part and parcel of the [claims]

allowance process," over which the bankruptcy court had equitable power.  382 U.S. at 330.

Thus, the Court concluded, "once a bankruptcy court ha[d] dealt with the preference issue" as

mandated by section 57g — including whether a preferential transaction had occurred and how

much needed to be returned to the estate — "nothing remain[ed] for adjudication in a plenary

suit," and any proceeding before a jury would be a "meaningless gesture." *Id.* at 334-35.

- 19 -

Similarly, *Langenkamp* involved an action by a bankruptcy trustee under the Bankruptcy Code seeking recovery of a preferential transfer to a creditor that had filed a proof of claim.  Reiterating its holding in *Katchen*, the *Langenkamp* Court explained that "by filing a claim against a bankruptcy estate, the creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power." 498 U.S. at 44 (quoting *Granfinanciera*, 492 U.S. at 58-59 & n.14).  "If the creditor is met, in turn, with a preference action from the trustee," the Court continued, "that action becomes part of the claims-allowance process which is triable only in equity.  In other words, the creditor's claim and the ensuing preference action by the trustee become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's *equity jurisdiction*.  As such, there is no Seventh Amendment right to a jury trial." *Id.* at 44-45 (emphasis in original; citations omitted).

In light of the contrast between, on the one hand, lawsuits by estate representatives against non-creditors (*Northern Pipeline* and *Granfinanciera*) and, on the other hand, lawsuits against creditors that filed proofs of claim (*Katchen* and *Langenkamp*), it was assumed before *Stern* that the filing of a proof of claim is a dispositive event establishing the adjudicatory authority of a bankruptcy court over any and all claims brought by the estate against the creditor.   That assumption was codified in section 157(b)(2)(C) of the Judicial Code, which gave bankruptcy courts the statutory authority to determine all counterclaims asserted against creditors that have filed proofs of claim.  28 U.S.C. § 157(b)(2)(C).

In *Stern*, however, the Supreme Court decisively upset this received wisdom, rejecting Vickie's contention that Pierce's filing of a proof of claim in Vickie's bankruptcy case authorized the bankruptcy court to determine Vickie's counterclaim.  The Court reasoned that

- 20 -

Vickie's counterclaim was akin to the claims in *Northern Pipeline* and *Granfinanciera* because it attempted "to augment the bankruptcy estate," rather than seek "a pro rata share of the bankruptcy res." 131 S. Ct. at 2618 (quoting *Granfinanciera*, 492 U.S. at 56). In addition, the Court held, Vickie's counterclaim was distinguishable from the preference claims in *Katchen* and *Langenkamp*, not only because it did not assert "a right of recovery created by federal bankruptcy law," 131 S. Ct. at 2618, but also because it was "not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy," *id.* at 2611, 2616.

As in *Granfinanciera*, the Court in *Stern* assumed without deciding that the process of allowing and disallowing creditors' claims against the estate is a "public right" that does not require Article III adjudication. *Id.* at 2614 n.7. But it explained that "Pierce's claim for defamation [against Vickie's estate] in no way affect[ed] the nature of Vickie's counterclaim for tortious interference as one at common law that simply attempts to augment the bankruptcy estate — the very type of claim that we held in *Northern Pipeline* and *Granfinanciera* must be decided by an Article III court." *Id.* at 2616.

The Court further recognized that Vickie's tortious-interference counterclaim bore a sufficient legal and factual connection to Pierce's defamation claim that it might amount to a compulsory counterclaim. *Id*. at 2617. The overlap "was the question whether Pierce had in fact tortiously taken control of his father's estate in the manner alleged by Vickie in her counterclaim and described in the allegedly defamatory statements." *Id.* Nonetheless, the Court found that the degree of connection did not matter, because "there was never any reason to believe that the process of adjudicating Pierce's proof of claim would *necessarily* resolve Vickie's counterclaim." *Id.* (emphasis added).

The Court so concluded because a decision in Vickie's favor on her counterclaim required rulings on legal and factual issues "above and beyond" the matters presented by Pierce's proof of claim. *Id.* Specifically, to resolve the counterclaim in Vickie's favor, the presiding court would need to determine "whether Texas recognized tortious interference with an expected gift as a valid cause of action, what the elements of that action were, and whether those elements were met." *Id.* The court would further need to determine whether Vickie had established the existence of an expectancy of a gift that was reasonably certain to be realized but for Pierce's wrongful interference, and whether Vickie was entitled to compensatory and punitive damages. *Id.*

Vickie's counterclaim was thus distinct from the preference claims in *Katchen* and *Langenkamp*, which asserted claims under federal bankruptcy law that, because of section 502(d) of the Bankruptcy Code (and its predecessor), necessarily had to be completely resolved in the course of ruling on the creditors' proof of claim. *Id.* at 2616-17. Since Vickie's state-law counterclaim sought "to augment the bankruptcy estate" and would not be completely resolved in the course of ruling on Pierce's proof of claim, the counterclaim could not be resolved by a bankruptcy court, even though it had "*some* bearing on a bankruptcy case." *Id.* at 2618 (citation and quotation marks omitted; emphasis in original).

The baseline lesson from *Stern*, then, is that even assuming that a creditor's proof of claim against a bankruptcy estate raises a matter of "public right" that can be adjudicated by a bankruptcy court, an estate's counterclaim against the creditor cannot itself be determined by a bankruptcy court if it does not assert a right to recovery under federal bankruptcy law that will necessarily be completely resolved in the process of allowing or disallowing the creditor's proof of claim.

## POINT III

## THE BANKRUPTCY COURT LACKS
## AUTHORITY TO ADJUDICATE THE CLAIMS
## IN THE AMENDED COMPLAINT.

**A.     The common-law claims must be
        adjudicated by an Article III court.**

Application of *Stern*'s teaching to the allegations of the Amended Complaint

establishes that plaintiffs' claims cannot be adjudicated in a bankruptcy court.  The Amended

Complaint alleges a series of claims under New York common law seeking billions of dollars in

damages from JPMorgan for wrongfully requesting collateral from Lehman Brothers and

refusing to return it.  Many of these claims are premised on the notion, which plaintiffs attempt

to establish through their other causes of action, that JPMorgan lacked valid contractual or other

rights to the collateral it obtained.

Plaintiffs' common-law causes of action include traditional damages claims under

New York law for breach of contract, fraud, and duress (Counts XLI through XLIX) and are

precisely the types of common-law claims to augment the estate that were clearly held to require

Article III adjudication in *Northern Pipeline*.  *See* 458 U.S. at 56.  They also include claims for

conversion, unjust enrichment, and constructive trust (Counts XXXII, XXXVI-XXXVII, and

XXXIX-XL), which are no different from Vickie's tortious-interference claim in *Stern*.  That is,

they "attempt[] to augment the bankruptcy estate" by invoking state-law private rights of action,

and thus are "the very type of claim that [the Supreme Court] held in *Northern Pipeline* and

*Granfinanciera* must be decided by an Article III court."  *Stern*, 131 S. Ct. at 2616.

Moreover, plaintiffs' claims for damages are replete with issues that are "above

and beyond" the question of JPMorgan's rights to a "pro rata share of the bankruptcy res."  *Id.* at

2617-18 (quoting *Granfinanciera*, 492 U.S. at 56).  Assuming that any trial on the common-law

claims is necessary, plaintiffs will have to prove causation and damages, and thus show that

JPMorgan's requesting and holding onto collateral received from Lehman Brothers actually

"contributed to the exigency of [Lehman Brothers'] bankruptcy filing" and prevented "a more

orderly wind-down" through which Lehman Brothers could have preserved value for creditors.

Am. Compl. ¶ 79 (Decl. Ex. A).  Plaintiffs also will need to prove the amount of any damages

suffered, that those damages were foreseeable, and that JPMorgan did not in fact *forestall*

Lehman Brothers' collapse by continuing to provide crucial financing at a time when all other

Lehman Brothers counterparties and sources of credit were fleeing.  And plaintiffs will have to

establish that the relief they seek is not precluded by a provision in the Clearance Agreement

waiving claims for consequential damages.  *See* Clearance Agreement § 13 (Decl. Ex. C ); *see*

*also* JPMorgan Mem. in Support of Mot. to Dismiss, Point IV.C (Decl. Ex. H).  None of these

issues needs to be decided in the context of the claims-allowance process.[4]

       Beyond damages and causation issues, the common-law claims in the Amended

Complaint raise numerous additional questions having nothing to do with JPMorgan's right to

recover from the estate in accordance with its proof of claim.  For example, plaintiffs allege that

JPMorgan violated the Clearance Agreement and the August Agreements by requesting and

holding onto collateral that was not necessary to secure its clearance-related exposure.  Plaintiffs

allege as well that JPMorgan "leveraged its life and death power" over Lehman Brothers when it

requested that collateral, thus violating Lehman Brothers' "implied" right under both the August

---

[4]    Furthermore, JPMorgan has argued in its motion to dismiss that some of the common-law claims in the Amended Complaint, to the extent they seek to claw back transfers of collateral, are preempted by section 546(e) of the Bankruptcy Code, which expressly protects such transfers — a legal question that is irrelevant to JPMorgan's proof of claim.  *See* JPMorgan's Mem. in Support of Mot. to Dismiss, Point IV.A (Decl. Ex. H).

- 24 -

and the September Agreements to "refuse unreasonable and excessive collateral demands."  Am.

Compl. ¶¶ 1, 337, 353 (Decl. Ex. A).

Whether the parties' agreements (expressly or impliedly) contain the prohibitions

that plaintiffs say were violated, and whether JPMorgan in fact violated them, will not have to be

resolved in the course of ruling on JPMorgan's proof of claim.  Nor will the claims-allowance

process resolve the critical issue of whether Lehman Brothers waived its right to relief or ratified

any purported breach of the agreements by continuing to accept the benefits of JPMorgan's

discretionary extensions of credit to LBI both before and after Lehman Brothers' bankruptcy

filing.  *See* JPMorgan Mem. in Support of Mot. to Dismiss, Point IV.C (Decl. Ex. H).

Finally, in a particularly clear example of how plaintiffs' adversary proceeding

goes far beyond the issues raised by JPMorgan's proof of claim, plaintiffs have brought a fraud

claim alleging that on September 11, 2008, JPMorgan's CEO fraudulently represented to

Lehman Brothers' CEO that if Lehman Brothers delivered $5 billion in collateral, JPMorgan

would return it the next day.  To succeed on this claim, plaintiffs will have to prove, among other

things, that the alleged statement in fact was made, that JPMorgan's CEO had the intent to

deceive, and that Lehman Brothers reasonably relied on this oral promise — again, issues that

have nothing to do with JPMorgan's right to a *pro rata* share of the Lehman Brothers estate.  *See*

JPMorgan Mem. in Support of Mot. to Dismiss, Point IV.E (Decl. Ex. H).

In short, plaintiffs' common-law claims seek to augment the estate through the

recovery of money damages and are "made of 'the stuff of the traditional actions at common law

tried by the courts at Westminster in 1789.'"  *Stern*, 131 S. Ct. at 2609 (quoting *Northern*

*Pipeline*, 458 U.S. at 90 (Rehnquist, J., concurring)).  And there is no "reason to believe that the

process of adjudicating [JPMorgan's] proof of claim would necessarily resolve" plaintiffs'

claims.  *Id.* at 2617.  As in *Stern*, therefore, the Constitution assigns the job of resolving those claims to Article III courts.

**B.      The claims seeking to recover transfers to
          JPMorgan also must be adjudicated by an
          Article III court.**

          In addition to asserting common-law claims, the Amended Complaint also brings claims under the Bankruptcy Code to avoid as fraudulent conveyances and preferences the August and September Agreements and the September 9 and 11 collateral pledges made by Lehman Brothers to JPMorgan (Counts I-XII, XV-XXIV).  Plaintiffs also bring claims under the Bankruptcy Code for the turnover of property allegedly belonging to the estate, and for the avoidance of allegedly improper setoffs effectuated by JPMorgan (Counts XXV-XIX).

          While these claims arise under the Bankruptcy Code, they nevertheless seek to augment the Lehman Brothers estate through the recovery of property and transfers, and they assert what are essentially common-law, private rights of action.  *See Stern*, 131 S. Ct. at 2614 (fraudulent conveyance actions are "quintessentially suits at common law that more nearly resemble state law contract claims brought by a bankrupt corporation to augment the bankruptcy estate"); *Granfinanciera*, 492 U.S. at 43 ("There is no dispute that actions to recover preferential or fraudulent transfers were often brought at law in late 18th-century England.").  Under *Stern* and *Granfinanciera*, therefore, these claims are no different from plaintiffs' other common-law claims, and they must be determined by an Article III Court unless they will be completely resolved in the course of ruling on JPMorgan's proof of claim.

          In determining the validity of a creditor's claim against the estate, it is not logically necessary for the bankruptcy court to determine the separate issue of whether the creditor received an avoidable transfer from the debtor.  Under section 502(d) of the Bankruptcy

- 26 -

Code, however, a creditor's claim, even if founded upon a valid right to recovery, cannot be allowed until the bankruptcy court has determined that the creditor has returned all avoidable transfers to the estate.[5]  Accordingly, because of section 502(d), in a case where a creditor has filed a proof of claim, the estate's avoidance action is typically resolved by the bankruptcy court as a prerequisite to allowing the creditor's claim.  *See Katchen*, 382 U.S. at 333-34 (in determining whether creditor has returned preferential transfer, as required by predecessor to section 502(d), bankruptcy court must decide whether creditor received preferential transfer in the first place).  But this is not the typical case.

Here, the parties have expressly agreed in a binding, post-bankruptcy, court-approved agreement that section 502(d) of the Bankruptcy Code does not apply to actions seeking to recover avoidable transfers from JPMorgan.  Instead of deferring payment of JPMorgan's claims until after determination and payment of any avoidance claims against JPMorgan — as generally required by section 502(d) — the parties agreed to do the opposite.  Under a Collateral Disposition Agreement ("CDA") entered into during the course of Lehman Brothers' chapter 11 proceeding with the approval of the bankruptcy court, the parties agreed that JPMorgan would receive full payment of its non-contingent claims against the estate on the effective date of the CDA and that JPMorgan's payment of any avoidance claims to Lehman Brothers would be deferred until all issues between the parties are resolved.  In order to effectuate this, the parties agreed that section 502(d) of the Bankruptcy Code "shall not apply"

---

[5]    *See* 11 U.S.C. § 502(d) ("Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.").

until all disputes between the parties, including this adversary proceeding, have been fully and finally resolved.  CDA ¶ 6(b) (Decl. Ex. M).[6]

   With section 502(d) inoperative, it is evident that plaintiffs' claims to avoid transfers will not be completely subsumed by the process of allowing or disallowing JPMorgan's proof of claim.  For JPMorgan's claims to be allowed here, a court must determine that JPMorgan has a right to payment from Lehman Brothers in the amount stated in its filed proof of claim.  By contrast, resolution of plaintiffs' avoidance claims against JPMorgan will require consideration of a host of additional issues that are unrelated to the fact or amount of Lehman Brothers' liability to JPMorgan.

   For example, to succeed on their fraudulent-transfer claims, plaintiffs will have to show that Lehman Brothers transferred its property with the actual intent to hinder, delay, or defraud its creditors, or that Lehman Brothers made the transfer for less than reasonably equivalent value when it was insolvent, undercapitalized, or unable to pay its debts.  *See*

---

[6]   The parties entered into the CDA because JPMorgan was holding unsold securities collateral that Lehman Brothers wanted, and JPMorgan was willing to give Lehman Brothers the securities in exchange for an agreed-upon amount of cash necessary to complete payment of JPMorgan's claims.  Accordingly, under the CDA:  (1) JPMorgan transferred to Lehman Brothers all of the unsold securities collateral posted by Lehman Brothers and LBI; (2) Lehman Brothers agreed that JPMorgan's claims against the estate would be provisionally allowed and that JPMorgan could apply all of the $8.6 billion of cash and money-market funds posted by Lehman Brothers as collateral, plus approximately $500 million of additional cash paid by Lehman Brothers, to satisfy those claims; and (3) the parties preserved various other claims and defenses against each other, including avoidance actions by Lehman Brothers against JPMorgan under the Bankruptcy Code.  The CDA goes on to provide that when all such preserved claims are resolved, JPMorgan and Lehman Brothers will engage in a "true-up" of the amounts that each owes to the other on a net basis.  *See* CDA ¶ 6(b) (Decl. Ex. M) (emphasis added).  Without eliminating the application of section 502(d) — which prohibits debtors and creditors subject to avoidance liability from netting out their claims against one another — the true-up mechanism in the CDA would not have worked.

11 U.S.C. § 548(a)(1).  They also will have to counter evidence that JPMorgan acted in good faith and provided value in exchange for any challenged transfer, including by extending billions of dollars of discretionary credit to keep LBI and Lehman Brothers afloat while they formulated rescue plans and the eventual sale of LBI's business to Barclays.  *See id.* § 548(c).[7]  And to succeed on avoidance claims other than those alleging transfers made with actual fraudulent intent, plaintiffs will have to establish that the challenged transfers are not protected by section 546(e) and other "safe-harbor" provisions of the Bankruptcy Code, which restrict an estate's ability to avoid most transfers that have any relation to financial contracts such as repurchase agreements, securities contracts, and swap agreements.  *See* 11 U.S.C. § 546(e); JPMorgan's Mem. in Support of Mot. to Dismiss, Point II (Decl. Ex. H).

Here, therefore, as in *Granfinanciera*, Lehman Brothers' claims to avoid and recover transfers fall outside the claims-allowance process and must be adjudicated in an Article III forum.

**C.      The remainder of the claims in
        the Amended Complaint must be
        adjudicated by an Article III court.**

As demonstrated above, the primary purpose of the Amended Complaint is to recover billions of dollars in damages on the theory that JPMorgan "wrongfully" requested and

---

[7]      Similarly, the preference claims in the Amended Complaint will require plaintiffs to show, among other things, that Lehman Brothers was insolvent, that it transferred its property to satisfy a preexisting debt to JPMorgan, and that the transfer allowed JPMorgan to receive more on account of that debt than it otherwise would have received in a liquidation of Lehman Brothers.  *See* 11 U.S.C. § 547.  The same claims will also require consideration of JPMorgan's affirmative defenses to preference liability, such as that the challenged transfers were in exchange for value contemporaneously or subsequently given to Lehman Brothers — including the value of JPMorgan's ongoing extensions of discretionary credit to LBI.  *Id.* § 547(c).

held onto $8.6 billion in collateral from Lehman Brothers.  In pursuing those claims, plaintiffs

face an obvious obstacle:  namely, that Lehman Brothers *agreed* to pledge that collateral when it

executed the August and September Agreements and delivered the disputed collateral to

JPMorgan.  To overcome this fundamental problem, plaintiffs have brought a variety of

additional claims seeking to invalidate the August and September Agreements and JPMorgan's

rights to collateral thereunder.  But these are common-law claims or their equivalent that,

according to *Stern*, are within the exclusive province of Article III courts.  *See* 131 S. Ct. at 2609

("traditional actions at common law" must be adjudicated in Article III courts (citation and

quotation marks omitted)); *see also Granfinanciera*, 492 U.S. at 43 ("There is no dispute that

actions to recover preferential or fraudulent transfers were often brought at law in late

18th-century England.").

       For example, plaintiffs seek the avoidance of Lehman Brothers' obligations to

guaranty its subsidiaries' debts to JPMorgan, alleging that the guaranties were fraudulent

conveyances under the Bankruptcy Code (*e.g.*, Counts I, II, V, VI, VII, X, XI, and XII).  They

also seek declarations invalidating JPMorgan's contracts and liens under New York law, alleging

that the September Agreements were the product of coercion and duress, that they lacked

consideration, and that they were not signed by a person at Lehman Brothers with authority (*e.g.*,

Count XXXV).

       Regardless of whether these claims, standing by themselves, seek to augment

Lehman Brothers' bankruptcy estate, it is clear that they are the necessary predicates to, and are

thus entirely subsumed by, other claims that would do just that — claims that, for example, seek

damages for JPMorgan's alleged unjust enrichment, conversion, and breach of contract.[8]  The

avoidance and declaratory-judgment claims therefore require the same exercise of Article III

judicial power as the damages claims in which they are embedded, and so are constitutionally

incapable of being resolved by the bankruptcy court.

Furthermore, while plaintiffs' claims for declaratory judgment and the avoidance

of obligations may strike at the validity of some of the agreements on which the debts due under

JPMorgan's proof of claim were incurred, this does not mean that those claims necessarily will

be resolved in the process of allowing or disallowing the proof of claim.  Indeed, on August 31,

2011 — well after the Supreme Court handed down its decision in *Stern* — plaintiffs filed an

objection to JPMorgan's proof of claim for the first time that makes allegations that are starkly

different from those in the Amended Complaint, and seeks entirely different relief.  Instead of

challenging the *validity* of JPMorgan's claims against the Lehman Brothers estate, plaintiffs

assert only that the *amount* of JPMorgan's claim should be reduced.  *See* Claim Obj. at 2 (Decl.

Ex. N); *see also id.* at 4-5.  As a result, based on plaintiffs' own objection, plaintiffs' claims to

*invalidate* the agreements and liens on which JPMorgan's proof of claim is based will be

considered only in this lawsuit, *not* in the context of plaintiffs' claim objection.

Finally, in addition to alleging legal bases for invalidating JPMorgan's rights, the

Amended Complaint asserts that JPMorgan's claims should be equitably subordinated to those of

---

[8]      *See, e.g.*, Counts XXXVI and XXXIX (alleging unjust enrichment on the basis that,
"[f]or the reasons set forth above," the August and September Agreements "are invalid and
unenforceable"), Counts XXXVII and XL (same for conversion), Counts XLI through XLV
(alleging that, "[f]or the reasons set forth above, the September Agreements are invalid and
unenforceable," and that JPMorgan is thus liable for violating the August Agreements and the
Clearance Agreement by requesting and holding $8.6 billion of collateral that allegedly was
unnecessary to secure its clearance exposure).

other creditors under section 510(c) of the Bankruptcy Code (Count XXX).  This cause of action

alleges, without elaboration, that "JPMorgan engaged in and benefited from inequitable conduct

that resulted in injury to [Lehman Brothers'] creditors and conferred an unfair advantage to

JPMorgan."  Am. Compl. ¶ 253 (Decl. Ex. A).

            As plaintiffs have since conceded, the "inequitable conduct" underlying this claim

is the same conduct alleged in support of plaintiffs' common-law claims — namely, that

"JPMorgan employed unlawfully coercive tactics and fraud, and breached several of its

contractual obligations to [Lehman Brothers]."  Pl. Mem. in Opp. to Mot. to Dismiss at 143

(Decl. Ex. I); see also Am. Compl. ¶ 252 (incorporating all previous allegations by reference into

claim for equitable subordination) (Decl. Ex. A).  Plaintiffs' claim for equitable subordination

therefore requires determination of precisely the same issues that are presented by plaintiffs'

common-law claims, and so is beyond the bankruptcy court's authority.  See Granfinanciera,

492 U.S. at 61 (Congress cannot eliminate party's Article III right "merely by relabeling the

cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency

or a specialized court of equity").[9]

---

[9]        Moreover, as a Lehman Brothers entity successfully argued to the Ninth Circuit in a
recent case, a claim for equitable subordination "seeks affirmative control over property of [the
creditor] by proposing to alter the priority of [the creditor's] claims and the transfer of [the
creditor's] lien rights to Debtors' estates."  Palmdale Hills Prop., LLC v. Lehman Commercial
Paper, Inc. (In re Palmdale Hills Prop., LLC), No. 10-60004 (9th Cir.), Br. of Appellee Lehman
Commercial Paper Inc. at 18 [D.I. 12], 2010 WL 2933181; see Palmdale Hills Prop., LLC v.
Lehman Commercial Paper, Inc. (In re Palmdale Hills Prop., LLC), __ F.3d __, 2011 WL
3320429, at *5, 6 (9th Cir. Aug. 3, 2011) (adopting Lehman Brothers' position that claim for
equitable subordination against a bankruptcy estate is subject to the automatic stay because it
seeks to "change[] the character and value" of liens and to "exercise control over property"
(internal quotation marks omitted)).  In other words, an estate's claim for equitable subordination
against a secured creditor seeks to augment the estate, just like plaintiffs' other claims in the
Amended Complaint, and the debtors' claims in Stern and Granfinanciera.

**D.    Even if some claims could be adjudicated
by the bankruptcy court, all claims
should still be adjudicated by this Court.**

Before *Stern*, courts sometimes concluded that the presence in a single proceeding

of "core" claims (which statutorily could be adjudicated by a bankruptcy court) and interrelated

"non-core" claims (which, without the parties' express consent, could not) rendered the entire

proceeding "core" for purposes of 28 U.S.C. § 157(b), and thus one that the bankruptcy court

could adjudicate.  *See, e.g.*, *Bankr. Servs., Inc.* v. *Ernst & Young (In re CBI Holding Co.)*, 529

F.3d 432, 461-62 (2d Cir. 2008) (counterclaims for professional malpractice, breach of contract,

and fraud were "core" under 28 U.S.C. § 157(b)(2)(C) based on overlap of facts with defenses to

auditor's proof of claim).

The Supreme Court's decision in *Stern*, however, has since made clear that

Article III of the Constitution does not permit a bankruptcy court to decide an estate's

affirmative state-law claims simply because they arise out of the same operative facts as a

creditor's proof of claim.  In *Stern*, "[t]here was some overlap between Vickie's counterclaim

and Pierce's defamation claim that led the courts below to conclude that the counterclaim was

compulsory."  131 S. Ct. at 2617 (citation omitted).  This overlap, however, did not confer upon

the bankruptcy court the authority to rule on Vickie's counterclaim.[10]  *Id.*

Here, therefore, even if the bankruptcy court has constitutional authority to

determine some subset of the claims in the Amended Complaint (which JPMorgan disputes), the

---

[10]    The dissenters in *Stern* singled out the Second Circuit's decision in *CBI* (cited above) as
an example of a case in which, "under the majority's holding, *the federal district judge, not the
bankruptcy judge, would have to hear and resolve the counterclaim*."  131 S. Ct. at 2630
(Breyer, J., dissenting) (emphasis added).

- 33 -

presence of such overlap strongly supports withdrawal of the reference as to *all* claims in the

Amended Complaint, including those arguably falling within the bankruptcy court's purview. It

would plainly be inefficient to have two different courts considering interrelated parts of this

lawsuit when this Court (and only this Court) has the power to decide the whole case. *See Orion*,

4 F.3d at 1101 (in deciding whether to withdraw the reference, courts are directed to consider,

after deciding whether a proceeding is core or non-core, factors including "efficient use of

judicial resources" and "delay and costs to the parties"); *see also, e.g.*, *In re Adelphia Commc'ns

Corp. Sec. & Derivative Litig.*, 2006 WL 337667, at *4-5 (S.D.N.Y. Feb. 10, 2006) (withdrawing

core bankruptcy claims along with related non-core claims); *1800Postcards, Inc.* v. *Morel*, 153

F. Supp. 2d 359, 367 (S.D.N.Y. 2001) (withdrawing case, including core and non-core claims).

## POINT IV

### THE BANKRUPTCY COURT LACKS AUTHORITY
### TO PROPOSE FINDINGS AND CONCLUSIONS.

The bankruptcy court is prohibited not only from entering final judgment on any

of the claims in the Amended Complaint, but also from issuing a report and recommendation on

those claims. Section 157(c)(1) of the Judicial Code provides that "[a] bankruptcy judge may

hear a proceeding that is *not a core proceeding* but that is otherwise *related to* a case under title

11," and that "[i]n *such proceeding*, the bankruptcy judge shall submit proposed findings of fact

and conclusions of law to the district court" to be reviewed *de novo*. 28 U.S.C. § 157(c)(1)

(emphasis added). But Congress has provided no similar authority to bankruptcy courts in

statutorily "core" proceedings that, under *Stern*, may not be determined by a bankruptcy court as

a constitutional matter.

It is undisputed here that all of the claims in the Amended Complaint fall within

the Judicial Code's definition of "core" proceedings, in that they are "counterclaims by the estate

against persons filing claims against the estate." 28 U.S.C. § 157(b)(2)(C); *see also* Am. Compl.

¶ 12 (pleading all counts in the Amended Complaint as statutorily "core"). As a result, the

claims in the Amended Complaint not only are constitutionally incapable of being "determined"

by a bankruptcy court, but also are statutorily ineligible for the report-and-recommendation

procedure of section 157(c)(1). *See Samson* v. *Blixseth (In re Blixseth)*, 2011 WL 3274042, at

*12 (Bankr. D. Mont. Aug. 1, 2011) ("Since this Court may not constitutionally hear the

fraudulent conveyance claim as a core proceeding [under *Stern*], and this Court does not have

statutory authority to hear it as a non-core proceeding, it may in no case hear the claim.").

        Moreover, federal law does not permit a solution to this quandary through a court-

created *ad hoc* process that has no foundation in the Judicial Code. However expedient it may

seem to refer a "core" proceeding to a bankruptcy judge and then to treat the bankruptcy judge's

determination as "proposed findings and conclusions," that procedure is simply not contemplated

by the scheme that Congress has set up. It would therefore take an act of Congress to grant

bankruptcy courts the authority to issue reports and recommendations on matters such as the

Amended Complaint and the Amended Counterclaims. *See Willy* v. *Coastal Corp.*, 503 U.S.

131, 135 (1992) ("[F]ederal courts, in adopting rules, [are] not free to extend or restrict the

jurisdiction conferred by a statute. Such a caveat applies *a fortiori* to any effort to extend by rule

the judicial power of the United States described in Article III of the Constitution." (citation

omitted)); *Pressroom Unions-Printers League Income Sec. Fund* v. *Cont'l Assurance Co.*, 700

F.2d 889, 892 (2d Cir. 1983) ("It is beyond dispute that only Congress is empowered to grant and

extend the subject matter jurisdiction of the federal judiciary, and that courts are not to infer a

grant of jurisdiction absent a *clear* legislative mandate." (emphasis added)); *see also Stern*, 131

S. Ct. at 2604-05 (Court "would have to rewrite the statute, not interpret it," to conclude that a

"core" proceeding under "the plain text of § 157(b)(2)(C)" is merely "related to" a title 11 case (internal quotation marks omitted)).

In any event, even if a court could extend the report-and-recommendation procedure of section 157(c)(1) to proceedings not covered by the statute, doing so would be of minimal benefit here. Proposed rulings from the bankruptcy court must be reviewed *de novo* by this Court. 28 U.S.C. § 157(c)(1). And to assist in such review, the Court is entitled to receive "additional evidence." Fed. R. Bankr. P. 9033(d). But in a case such as this one, the "additional evidence" that would be required to enable effective *de novo* review likely would amount to an entirely new trial, rendering any trial before the bankruptcy court a tremendous waste of time and resources.

While the claims in the Amended Complaint are legally and factually deficient, should any of them nevertheless survive JPMorgan's motion to dismiss or any future dispositive motion, vast portions of this lawsuit will hinge on witness' recollections of events that occurred three years ago — including conversations that were not contemporaneously documented and that occurred during a period of high stress as the financial markets somersaulted. This case will thus unavoidably require assessment of witness credibility by the trier of fact. To list just a few obvious examples of issues that will turn on the recollections and credibility of witnesses, the Amended Complaint alleges that:

- Jamie Dimon, JPMorgan's CEO, during a September 11, 2008 telephone call, made a false oral promise with the intent to deceive Dick Fuld, Lehman Brothers' CEO, that JPMorgan would return $5 billion in cash collateral the following day. Am. Compl. ¶¶ 70, 366.

- JPMorgan improperly took advantage of confidential information supposedly obtained when its management team met in person with the Chairman of the Federal Reserve System and the U.S. Secretary of the Treasury on September 9, 2008 and "discussed the financial state and

future prospects of Lehman, as well as the United States government's intent not to rescue Lehman should it be forced to file for bankruptcy." *Id.* ¶¶ 39-40.

- JPMorgan executives led Lehman Brothers personnel to believe on September 9, 2008, that if Lehman Brothers did not execute the September Agreements before Lehman Brothers' earnings call the next morning, "JPMorgan would immediately stop extending intra-day credit to, and clearing trades for, Lehman." *Id.* ¶ 48.

- Lehman Brothers' September 9, 2008 guaranty of its subsidiaries' obligations to JPMorgan was not duly authorized because no Lehman Brothers employee "received approval" from Lehman Brothers' Chief Financial Officer "or any other senior [Lehman Brothers] executive with the authority to bind [Lehman Brothers]." *Id.* ¶ 61.

- JPMorgan was motivated to request $8.6 billion in collateral from Lehman Brothers by its "aware[ness] that the failure of one of its key competitors would redound to JPMorgan's benefit." *Id.* ¶ 77.

A cold record would plainly be inadequate for this Court to conduct true *de novo* review, as mandated by Article III, of issues so dependent on live testimony. Indeed, as the Second Circuit has held in the context of magistrate judges' reports and recommendations, a district court conducting *de novo* review is not permitted to reject or modify proposed credibility findings unless it hears live testimony. *Cullen* v. *United States*, 194 F.3d 401, 407 (2d Cir. 1999); *see also Grassia* v. *Scully*, 892 F.2d 16, 19 (2d Cir. 1989) ("Had the district court rejected the magistrate's conclusions regarding the credibility of the central witnesses without hearing live testimony from those witnesses, troubling questions of constitutional due process would have been raised.").

And unlike a proceeding under the Magistrate Act, where the magistrate judge may conduct a civil trial *solely* with the consent of all parties, 28 U.S.C. § 636(c)(1), a bankruptcy-court trial here would be one to which JPMorgan has not consented. To avoid "troubling questions of constitutional due process" in this case, therefore, the Court essentially

would have to order a "do over" of any trial held before the bankruptcy court — an enormous and completely unnecessary imposition and waste of judicial resources.

Since it is neither permissible nor sensible to treat this plainly "core" case as one that is eligible for a report and recommendation, withdrawal of the reference is the *only* way to advance this litigation. And that provides additional "cause" to withdraw the reference under section 157(d).

## POINT V

### THE WITHDRAWAL OF THE REFERENCE
### SHOULD INCLUDE JPMORGAN'S COUNTERCLAIMS.

Here, where the claims in the Amended Complaint must be adjudicated by an Article III court, the interests of efficiency and uniformity weigh strongly in favor of having JPMorgan's Amended Counterclaims adjudicated in the same forum. *See Orion*, 4 F.3d at 1101 (on a motion to withdraw the reference, in addition to considering the bankruptcy court's power to act, a district court should also consider the "efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors").

The Amended Complaint and the Amended Counterclaims indisputably arise out of a common set of facts, including JPMorgan's role as clearing bank for LBI, its extensions of credit to LBI in September 2008, and Lehman Brothers' pledge of inappropriate collateral to secure JPMorgan's exposure. Indeed, the losses that the Amended Counterclaims seek to remedy are contingent upon plaintiffs' succeeding on their claims in the Amended Complaint.

As a result, withdrawal of the reference with respect to all claims and counterclaims in this

proceeding would avoid the threat of waste, delay, and inconsistent outcomes.[11]

---

[11]   *See United Orient Bank* v. *Green (In re Green)*, 200 B.R. 296, 299 (S.D.N.Y. 1996)
(where defendant's complaint against a third party depended upon plaintiffs' success on a
complaint as to which the reference would be withdrawn, cause existed to withdraw the
reference as to the entire proceeding); *see also Mirant Corp.* v. *Southern Co.*, 337 B.R. 107, 119
(N.D. Tex. 2006) (withdrawing the reference of entire proceeding where "non-core claims" were
"at least as significant as the core claims"); *Adelphia Commc'ns Corp.*, 2006 WL 337667, at *4-
5 (withdrawing core bankruptcy claims along with related non-core claims).

## CONCLUSION

For all of the reasons set forth above, plaintiffs' lawsuit seeking billions of dollars in damages from JPMorgan under New York law cannot be constitutionally determined by the bankruptcy court after *Stern* v. *Marshall*. This Court, accordingly, should withdraw the reference under 28 U.S.C. § 157(d).

Dated:  September 26, 2011
         New York, New York

                                              Respectfully submitted,

*Of counsel:*                                 WACHTELL, LIPTON, ROSEN & KATZ

Harold S. Novikoff
Marc Wolinsky                                 By:  /s/ Paul Vizcarrondo, Jr.
Amy R. Wolf                                          Paul Vizcarrondo, Jr.
Douglas K. Mayer
Emil A. Kleinhaus                             51 West 52nd Street
Alexander B. Lees                             New York, NY  10019
                                              Telephone:  (212) 403-1000
                                              Facsimile:  (212) 403-2000

                                              *Attorneys for Defendant/Counterclaimant*
                                              *JPMorgan Chase Bank, N.A.*