**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**FOR PUBLICATION**

------------------------------------------------------------:

In re:

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

          Debtors.

------------------------------------------------------------:

Chapter 11

Case No. 08-13555 (JMP)

(Jointly Administered)

------------------------------------------------------------:

LEHMAN BROTHERS HOLDINGS INC. and
OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS
HOLDINGS INC., *et al.*,

          Plaintiff and
          Plaintiff Intervenor,

-against-

JPMORGAN CHASE BANK, N.A.,

          Defendant.

------------------------------------------------------------:

Adversary Proceeding

No. 10-03266 (JMP)

**MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART
MOTION TO DISMISS BY DEFENDANT JPMORGAN CHASE BANK, N.A.**

CURTIS, MALLET-PROVOST, COLT & MOSLE, LLP
*Attorneys for Plaintiff Lehman Brothers Holdings Inc.*
101 Park Avenue
New York, New York 10178

    Joseph D. Pizzurro, Esq.
    Lynn P. Harrison, III, Esq.
    Cindi M. Giglio, Esq.
    Nancy E. Delaney, Esq.
    Peter J. Behmke, Esq.
    Michael Moscato, Esq.

WACHTELL, LIPTON, ROSEN & KATZ
*Attorneys for Defendant JPMorgan Chase Bank, N.A.*
51 West 52nd Street
New York, New York 10019

    Harold S. Novikoff, Esq.
    Paul Vizcarrondo, Jr., Esq.
    Amy R. Wolf, Esq.
    Marc Wolinsky, Esq.
    Douglas K. Mayer, Esq.

QUINN EMANUEL URQUHART & SULLIVAN, LLP
*Attorneys for the Official Committee of Unsecured Creditors*
865 S. Figueroa Street
10th Floor
Los Angeles, California 90017

    John B. Quinn, Esq.
    Erica P. Taggart, Esq.

51 Madison Avenue
22nd Floor
New York, New York 10010

    James C. Tecce, Esq.
    Daniel P. Cunningham, Esq.
    Andrew J. Rossman, Esq.

**JAMES M. PECK**
**UNITED STATES BANKRUPTCY JUDGE**

### *Introduction*

The captioned adversary proceeding brought jointly by Lehman Brothers Holdings Inc.

("LBHI," and, together with its affiliated debtor entities, "Lehman") and its Official Committee

of Unsecured Creditors (the "Committee," and, together with LBHI, the "Plaintiffs") seeks to

recover $8.6 billion from JPMorgan Chase, N.A. ("JPMC") for the benefit of Lehman's

creditors.  The litigation relates to transactions that occurred shortly before LBHI's bankruptcy

filing and highlights various defensive actions taken by JPMC as part of the bank's efforts to

limit the impact on JPMC of a default by Lehman.  The litigation touches on and illuminates the

safe harbor provisions of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the

"Bankruptcy Code").

The allegations and defenses present important questions as to what a lender can do in

managing its exposure to potential losses and protect its interests at a time of intensifying

concerns about systemic risk.  Plaintiffs complain that JPMC abused the power of its position to

improperly extract billions in incremental collateral and other concessions from Lehman before

the LBHI bankruptcy, while JPMC contends that the litigation is baseless, that its credit and

clearance services benefited Lehman and its customers and that, as a matter of law, its

institutional conduct should be fully insulated from all *ex post* exposure.

This decision resolves a broad-based motion to dismiss (the "Motion") brought by JPMC

at the outset of the litigation.  The Motion is quite ambitious in its scope and endeavors to

preemptively dispose of all counts in Plaintiffs' First Amended Complaint (the "Amended

Complaint").[1]  In terms of the trajectory of the litigation itself, while the Motion has been

---

[1] First Am. Compl., ECF No. 19.

pending, the parties have largely discounted the prospects of a complete win by JPMC at the pleading stage and have moved forward diligently under a series of pretrial orders that outline a protocol of extensive and mostly cooperative pretrial discovery. This discovery has been pursued actively while the Motion has been pending and is scheduled to be concluded within the next few months.[2]

As a result of these discovery efforts, the Court assumes that the parties have developed an intimate understanding of the facts. These facts are not presently available to the Court in its consideration of the Motion, but this accumulated information will serve as evidence to be offered at trial or in connection with any future dispositive motions that may be filed. And so the contours of the surrounding litigation have expanded while proceedings with respect to the Motion have remained constant with the exception of some supplemental briefing.

The ongoing discovery has resulted in a mismatch between the bare-bones motion practice on which this decision is based and the nuanced substance of the case that has been fleshed out through discovery. A prolonged procedural detour concerning the very authority of the bankruptcy court to decide the Motion has added more asymmetry to the mismatch between what is now being decided and the case as it has been experienced by the litigators. More time has elapsed between argument and this decision than is either typical or desirable.

Having considered the arguments of the parties, the Court grants the Motion to the extent that it relates to those counts that seek relief that is unavailable under terms of the applicable

---

[2] Pursuant to the Seventh Amended Scheduling Order and Discovery Plan, so ordered on March 23, 2012, all fact discovery, including depositions, will be completed on or before April 27, 2012. *See* Seventh Am. Scheduling Order and Disc. Plan, ECF No. 129. The Parties reached agreement on the terms of a Proposed Eighth Amended Scheduling Order and Discovery Plan, which is noticed for presentment to this Court on April 20, 2012. *See* Notice of Presentation of [Proposed] Eighth Am. Scheduling Order and Disc. Plan, ECF No. 132. Pursuant to the Proposed Eighth Amended Scheduling Order and Discovery Plan, all fact discovery, including depositions, shall be completed on or before June 14, 2012.

"safe harbor" sections of the Bankruptcy Code. [3]  No relief may be granted with respect to these counts, and they are dismissed.  The remaining counts of the Amended Complaint that are outside the scope of these immunities, described in section II, *infra*, and Exhibit A to this decision, shall survive the Motion for the reasons discussed in this decision and summarized in the exhibit.

In short, as a result of a count-by-count analysis, the Court has concluded that the safe harbors are applicable to all claims based on preference liability or constructively fraudulent transfers but that Plaintiffs are entitled to proceed with the remaining complex and fact-driven causes of action in the Amended Complaint.  The safe harbors have trimmed the claims in the Amended Complaint but have not eliminated all of them.  That seems appropriate: a regime that compels dismissal of certain claims based on express statutory exemptions should be receptive to allowing all non-exempt claims to proceed so that they may be judged on their merits.  Claims subject to the safe harbors are being dismissed because strict application of the law requires it; claims not subject to the safe harbors are proceeding because informed discretion permits it.

Content and context have played an important part in this decision.  This is a case that examines the conduct of a giant lender at a time when the financial markets were in turmoil. JPMC grabbed assets for itself at a critical time in its banking relationship with Lehman.  The timing alone – weeks before bankruptcy – is reason enough to question the circumstances of what occurred.  The issues presented are especially difficult ones that one day may help to define what constitutes acceptable conduct by major financial institutions during times of crisis.  The case obviously also involves quite a lot of money.  And with so much at stake, both in terms of issues and dollars, making a decision on the merits should occur after careful consideration of a

---

[3] Such counts include Counts V through XXIV.

full evidentiary record, and that will happen in time with respect to those counts that are not being dismissed.

The sections that follow this introduction provide a detailed discussion of the procedural background of the adversary proceeding, an analysis of the safe harbors as justification for dismissal of counts in the Amended Complaint for recovery of preferences and constructively fraudulent transfers, and a discussion of those counts that are surviving the Motion for adjudication at a later time. Before reaching those substantive sections, the Court will provide an overview of the litigation and offer some initial thoughts on the issues presented by the Amended Complaint and the Motion.

The multiple causes of action in the Amended Complaint are based on allegations that JPMC took unfair advantage of Lehman at a time when Lehman depended on JPMC as its main source of prepetition credit to sustain critical trading operations for customers. The claims all arise out of a series of actions taken by JPMC to mitigate the risks associated with advancing substantial liquidity each day to Lehman – measured in the tens of billions – during the months leading up to the bankruptcy of LBHI.

These actions included "take it or leave it" demands to a submissive Lehman that additional entities within the Lehman enterprise agree to be liable to JPMC and that Lehman turn over multiple billions of dollars in incremental cash, liens and additional collateral as conditions to preserving JPMC's essential lending relationship. In combination, Lehman accepted changes imposed on it by JPMC that are claimed to have vastly improved JPMC's position relative to other creditors. This all happened urgently at a time of growing concerns and heightened anxiety as to Lehman's deteriorating financial condition and viability as an enterprise. Events proved that these concerns were justified.

The actions of JPMC during the months leading up to LBHI's bankruptcy filing, according to the Amended Complaint, were wrongful, constituted a deliberate abuse by JPMC of its position as a trusted commercial lender to Lehman and contributed to the severe liquidity constraints that ultimately doomed Lehman to fail in so spectacular a fashion. The Amended Complaint rests on a multitude of legal theories, but, when boiled down to its essence, states, under one theory or another, that JPMC should be found legally responsible for having engaged in a form of actionable economic coercion that compelled Lehman to yield to its unreasonable demands, thereby further weakening an already vulnerable Lehman and precipitating LBHI's eventual bankruptcy and the disastrous consequences that followed.

JPMC has moved to dismiss all counts of the Amended Complaint, arguing that it acted reasonably and was justified in requiring a pledge of more assets from Lehman as a condition to providing ongoing clearance services and credit at a time of obviously greater financial risk and that its rights as a secured creditor must be fully protected under the documents executed by Lehman and the applicable language of the safe harbor provisions of the Bankruptcy Code that apply to all of the transactions described in the Amended Complaint.

JPMC submits that the safe harbors were enacted to provide needed incentives to lenders to extend credit without having to even consider the risk that a bankruptcy court might later review and order a "claw back" of assets that were transferred under any of these protected transactions. Because market participants rely upon the safe harbors, and this reliance promotes essential liquidity and market stability, JPMC also argues that covered transactions should be immunized from further scrutiny under any legal theory, including several theories of recovery arising under state law, because to allow the safe harbors to be circumvented by such indirect means would frustrate the central purpose of these protections.

Stated differently, JPMC submits that the safe harbors reflect a preemptive federal policy to protect the markets and eliminate the risk of *ex post* second-guessing and interference by the bankruptcy court in financial transactions that have been completed.  Consistent with that policy, JPMC urges that the transactions in question should be exempt from challenges and not be subjected to collateral attacks of any kind.

The Court agrees with JPMC that the safe harbors apply here, and it is appropriate for these provisions to be enforced as written and applied literally in the interest of market stability.  The transactions in question are precisely the sort of contractual arrangements that should be exempt from being upset by a bankruptcy court under the more lenient standards of constructive fraudulent transfer or preference liability: these are systemically significant transactions between sophisticated financial players at a time of financial distress in the markets – in other words, the precise setting for which the safe harbors were intended.

It is for that very reason that the Motion is being granted as to those counts seeking avoidance of the transfers made to JPMC as preferences or constructively fraudulent transfers during the months of August and September 2008.  The safe harbors apply to these transactions and were designed to protect transfers from avoidance, but dismissal also is appropriate as to those counts seeking to avoid "obligations" even though that term does not appear in section 546(e) of the Bankruptcy Code.

Plaintiffs are correct that "obligations" are not specifically mentioned within the language of this safe harbor and that the term "obligations" has a different meaning from the word "transfers."  As such, the incurrence of obligations is neither exempt nor protected from challenge under section 546(e).  What might seem to be grounds for a victory for Plaintiffs fails upon further examination.  The obligations remain shielded from avoidance because they are

connected by the same transaction to transfers that are protected by the safe harbor language of section 546(e).

To say that obligations incurred may be avoided but the related transfers made in connection with such obligations are shielded from challenge creates a conundrum for the Plaintiffs. The theoretical ability to possibly exclude obligations incurred by Lehman from safe harbor protection does not support a claim upon which relief may be granted because any successful avoidance of the obligations would not impair the protected validity of the related transfers made in connection with these obligations. It amounts to legal checkmate.

Although "obligations" may escape safe harbor protection and may be exposed hypothetically to claims for potential avoidance, that does not matter because the liens and other transfers made in connection with these obligations remain exempt from such claims. Thus, Plaintiffs' success in separating the term "obligations" from section 546(e) leads to a dead end for purposes of obtaining a recovery.

Claims based on obligations, at least in this case, do not yield a potential remedy because the obligations are tied to and support transfers that are connected to securities contracts and thereby exempt from further challenges. Allowing Plaintiffs to proceed with these claims would be a vain and wasteful exercise that also would inject needless uncertainty into a realm where predictability should reign.

Granting the Motion as to all counts based on constructively fraudulent transfers and preferential transfers is supported by the broad language of the Bankruptcy Code and helps to preserve market expectations, but denying the Motion as to all counts of the Amended Complaint that are not being dismissed (the "Remaining Counts") also is consistent with these exemptions

and does nothing to impair the effectiveness or purpose of these provisions of the Bankruptcy Code.

JPMC is a systemically-important financial institution that routinely does business with other such institutions, but that status does not shield JPMC from potential liability for any wrongful acts that may be proven under the Remaining Counts.  The safe harbors provide incentives and protections to market participants, but they are not a license for major institutions to act in a commercially unreasonable manner.

If JPMC crossed the line of permissible conduct and did anything wrongful that damaged Lehman, Plaintiffs have recourse by means of those counts that involve intentional misconduct or that are based on other claims that are not expressly subject to the protections of the safe harbors.  The safe harbors specifically address certain stated bankruptcy-related risks and remedies but do not offer protection against exposure that exists under these alternative theories of recovery.  Plaintiffs are entitled to pursue the Remaining Counts based on these theories and will have their chance to prove them.

While the Motion has been pending, the parties have engaged in robust pretrial discovery[4] and also have briefed and argued questions concerning the authority of the bankruptcy court to render decisions in this litigation and perform its judicial functions in light of the holding of the United States Supreme Court in *Stern v. Marshall*, 131 S. Ct. 2594 (2011) ("*Stern*").  These questions and related procedural steps taken to address them have contributed to the delay in deciding the Motion and, as explained in more detail in the next section of this decision, prompted the filing of a motion by JPMC to withdraw the reference that currently is pending in the United States District Court for the Southern District of New York (the "District

---

[4] Discovery has been taken both domestically and in multiple foreign jurisdictions; it also has involved questions directed to present and former officials of the Department of the Treasury with personal knowledge of the events of the financial crisis.

Court").  JPMC confirmed at a pretrial conference in January that it does not object to having this Court issue this decision on the Motion.

That certainly is some progress, but regardless of this concession, the Court always has had the authority to decide the Motion.[5]  Due to its procedural character and the fact that the Court in deciding any motion to dismiss functions as a non-final gatekeeper in assessing the legal sufficiency of allegations in a complaint, any judicial determination of such a motion at the trial court level involves no factual findings and always is subject to a *de novo* standard of appellate review.  As such, the Supreme Court's analysis in *Stern* is inapposite to this decision.

### Factual Background and Procedural History

JPMC served as the principal clearing bank for Lehman Brothers Inc. ("LBI") as well as the agent for LBI's tri-party repurchase agreements.  *See* First Am. Compl. ¶¶ 3, 18, 19.  It is one of only two banks in the United States to provide tri-party repo agency services.  *See* Wolf Decl.[6] Ex. 10 (Task Force on Tri-Party Repo Infrastructure, Report of Payments Risk Committee, dated May 17, 2010) at 3.  In its capacity as LBI's clearing bank, JPMC facilitated the clearance and settlement of securities trades by LBI.  *See* First Am. Compl. ¶¶ 3, 18.  JPMC acted as agent and intermediary for LBI and its tri-party repo investors who purchased LBI's securities in the evening subject to LBI's agreement to repurchase those securities the next morning.  *Id.* at ¶ 3.

---

[5] *See O'Toole v. McTaggart (In re Trinsum Group, Inc.),* No. 08-12547 (MG), Adv. Proc. No. 11-01284 (MG), 2012 Bankr. LEXIS 1573, at *10 (Bankr. S.D.N.Y. Apr. 9, 2012) (noting that "both before and after *Stern v. Marshall,* it is clear that the bankruptcy court may handle all pretrial proceedings, including the entry of an interlocutory order dismissing fewer than all of the claims in an adversary complaint"); *Kirschner v. Agoglia (In re Refco Inc.),* 461 B.R. 181, 185 (Bankr. S.D.N.Y. 2011) (citing *Retired Partners of Coudert Bros. Trust v. Baker & McKenzie LLP (In re Coudert Bros. LLP),* 2011 U.S. Dist. LEXIS 110425, at *36-37 (S.D.N.Y. 2011)) (explaining that "the denial of [defendant's] motion to dismiss in whole or in part, would be only an interlocutory order, and thus could not in any event be subject to Stern's prohibition of this Court's entry of final judgments" [because] "an order and judgment granting [defendant's] motion to dismiss, like an order granting summary judgment, would contain no factual findings and would be subject to the same de novo standard of review on appeal as proposed conclusions of law and a recommendation to the district court").

[6] Citations to "Wolf Decl." are to that certain Declaration of Amy R. Wolf in Support of Defendants' Motion to Dismiss, dated October 19, 2010, ECF No. 30.

In addition to providing clearing services, JPMC also had other significant business relationships with Lehman in the period before it filed for bankruptcy. It was the lead arranger and administrative agent for LBHI's $2 billion unsecured revolving credit facility, was one of Lehman's main depository banks for deposit accounts, and was one of Lehman's largest global counterparties for derivatives activity. *See* First Am. Compl. ¶ 16.

### The Clearance Agreement

JPMC performed its clearing activities for LBI pursuant to a Clearance Agreement dated as of June 15, 2000. *See* Wolf Decl. Ex. 1 (Clearance Agreement between LBI and Chase Manhattan Bank, as predecessor-in-interest to JPMC) (the "Clearance Agreement"); First Am. Compl. ¶¶ 19, 20. The Clearance Agreement did not create any express obligation for JPMC to extend credit to LBI. Instead, section 5 provided that "[JPMC] may, solely at [its] discretion, permit [LBI] to use funds credited to the Account prior to final payment" and that "[a]ll loans, whether of money or securities, shall be payable on demand … ." Wolf Decl. Ex. 1 (Clearance Agreement) § 5. Section 5 further expressly preserves JPMC's right to decline a request by LBI for an extension of credit upon providing notice: "we may at any time decline to extend such credit at our discretion, with notice … ." *Id.*

To secure any advances of credit, the Clearance Agreement granted JPMC a lien on the assets held in LBI's accounts at JPMC, other than segregated customer accounts. Wolf Decl. Ex. 1 (Clearance Agreement) § 11(a) ("In consideration of any advances or loans we may extend to [LBI] pursuant to this Agreement …, you hereby: (a) Grant to us a continuing security interest in, lien upon and right of set-off as to (i) the balance of every existing or future deposit, and account which you … maintain with [JPMC] (except for any Segregated Account containing customer securities or funds) … ."). Because JPMC was the primary clearing bank for LBI, virtually all of LBI's securities and cash used in its trading activities were on deposit with JPMC

or in JPMC accounts at depositories.  *See* First Am. Compl. ¶ 22.  JPMC's security rights to

LBI's collateral were limited, however, to the assets in those accounts subject to JPMC's lien

and did not extend to the accounts of other Lehman entities.  *Id.* at ¶ 23.

The Clearance Agreement could not be terminated without proper notice.  Section 17

provided that either party could terminate the agreement by written notice if, *inter alia*, (i) the

other party filed for bankruptcy; (ii) the other party failed to comply with any material provision

of the agreement, which failure was not cured within 30 days after notice of such failure; or (iii)

any representation or warranty made in the agreement by the other party shall have proven to

have been, at the time made, false or misleading in any material respect.  *See* Wolf Decl. Ex. 1

(Clearance Agreement) § 17.  LBI also agreed to limit JPMC's liability by waiving any claim for

consequential damages under the Clearance Agreement:  "In no event shall [JPMC] be liable for

special, indirect, punitive or consequential damages, whether or not [JPMC has] been advised as

to the possibility thereof and regardless of the form of action."  *Id*. at § 13.

The initial term of the Clearance Agreement commenced on June 15, 2000 and ended on

October 7, 2002.  The parties continued to engage in transactions under terms of the Clearance

Agreement from 2000 on, and did not amend it until 2008, as discussed in greater detail below.

*See* First Am. Compl. ¶ 27.

### The August Agreements

On or about August 18, 2008, JPMC presented LBHI with a set of documents that, once

effective, materially changed the clearance relationship between the parties.  *See* First Am.

Compl. ¶ 28.  The new documents were executed on or about August 26, 2008.  They included

an amendment to the Clearance Agreement (the "August Amendment"), a guaranty agreement

(the "August Guaranty"), and a security agreement in favor of JPMC (the "August Security

Agreement") (collectively, the "August Agreements").  *Id.*  The August Security Agreement and

the August Amendment were signed by Paolo Tonucci (LBHI's treasurer), and the August

Guaranty was signed by Ian Lowitt (LBHI's chief financial officer). *See id.* at ¶ 34; Wolf Decl.

Ex. 3 (August Amendment); Wolf Decl. Ex. 4 (August Guaranty); Wolf Decl. Ex. 5 (August

Security Agreement). In accordance with the August Agreements, LBHI posted collateral with

JPMC to secure JPMC's clearance exposure to LBI and other LBHI subsidiaries. *See* First Am.

Compl. ¶ 30.

The August Amendment added LBHI and several LBHI subsidiaries as additional

customers under the Clearance Agreement, which originally was between only JPMC and LBI.

Wolf Decl. Ex. 3 (August Amendment) § 1 ("The Agreement is hereby amended by adding

Lehman Brothers Holdings Inc., Lehman Brothers International (Europe), Lehman Brothers

OTC Derivatives Inc., Lehman Brothers Commercial Bank and Lehman Brothers Japan Inc. as

additional customers."). The August Amendment further provided that the obligations of these

affiliated entities to JPMC would be "several and not joint." *See* Wolf Decl. Ex. 3 (August

Amendment) § 2 ("Notwithstanding anything provided for herein to the contrary, except for the

obligations of Lehman Brothers Holdings Inc. under the [August Guaranty and August Security

Agreement], the obligations and liabilities of each of the Lehman entities which are a party to

this Agreement under this Agreement shall be several and not joint and any security interest,

lien, right of set-off or other collateral accommodation provided by any Lehman entity pursuant

to this Agreement shall not be available to support the obligations and liabilities of any other

Lehman entity pursuant to this Agreement.").

The August Security Agreement granted JPMC a lien on certain LBHI accounts at JPMC

in which LBHI had posted collateral "as security for the payment of all the Liabilities," as

defined in the August Guaranty. Wolf Decl. Ex. 5 (August Security Agreement) at 2 ("As

security for the payment of all the Liabilities, the undersigned hereby grant(s) to the Bank a security interest in, and a general lien upon and/or right of set-off of, the Security.").

To the extent that its collateral was no longer required to secure outstanding clearance obligations owed to JPMC, LBHI could transfer the collateral pledged under the August Security Agreement to a lien-free account at JPMC. *See* Wolf Decl. Ex. 5 (August Security Agreement) at 3 ("… at the end of a business day, if [LBHI] has determined that no Obligations (as defined in the Clearance Agreement) remain outstanding, [LBHI] may transfer to an account (the 'Overnight Account') any and all Security held in or credited to or otherwise carried in the Accounts."); First Am. Compl. ¶ 31. Plaintiffs allege that because the intra-day clearance exposures between JPMC and the Lehman subsidiaries typically were reduced to zero at the close of business of each trading day, the "overnight account" provision of the August Security Agreement entitled LBHI to have access to substantially all of its collateral overnight. *See* First Am. Compl. ¶ 32.

Under the August Guaranty, LBHI guaranteed payment of all obligations and liabilities owed to JPMC under the Clearance Agreement of all of LBHI's subsidiaries that were parties to the Clearance Agreement, including LBI. *See* Wolf Decl. Ex. 4 (August Guaranty) § 1 ("The Guarantor unconditionally and irrevocably guarantees to the Bank the punctual payment of all obligations and liabilities (including without limitation the 'Obligations' as defined in the Clearance Agreement) of the Borrowers to the Bank of whatever nature … (all of the foregoing sums being the 'Liabilities'), pursuant to the Clearance Agreement, dated as of June 15, 2000 … .").

The liability of LBHI under the August Guaranty was limited to the value, adjusted on a daily basis, of the collateral held or requested to secure the August Guaranty. *Id*. ("The

Guarantor's maximum liability under this Guaranty shall adjust each day and for each such day shall be equal to the dollar amount of cash and securities … (i) held on such day in the accounts of the Guarantor subject to the Clearance Agreement and the Security Agreement and (ii) that the Bank has notified the Guarantor to be delivered to the Bank on such day in support of this Guaranty."); *See also* First Am. Compl. ¶ 30.

The preliminary statement to the August Guaranty stated that LBHI as guarantor expected to derive significant financial benefit from the continued extension of clearance services provided by JPMC to LBHI affiliates in reliance on that agreement.  *See* Wolf Decl. Ex. 4 (August Guaranty) at 1 ("The Guarantor derives, and expects to continue to derive, substantial direct and indirect benefits from the business of the Borrowers and the credit, clearing advances, clearing loans and other financial accommodations provided by the Bank to the Borrowers.").

Plaintiffs allege that the August Agreements provided LBHI with neither actual nor reasonably equivalent value in exchange for granting JPMC significant legal rights.  *See* First Am. Compl. ¶ 33 ("While the August Agreements purported to grant JPMorgan significant new rights against LBHI, they gave LBHI nothing of value in exchange … [f]urther, LBHI did not even receive reasonably equivalent value … .").

### *JPMC's access to confidential Lehman information in September 2008*

In the days before LBHI's collapse, JPMC was able to gain knowledge of Lehman's financial conditions and prospects.  *See* First Am. Compl. ¶ 35.  As Lehman's most significant relationship bank, JPMC officers attended meetings with high-level Lehman personnel in connection with its financial distress.  *Id.*  For example, on September 4, 2008, senior management of LBHI met with senior officers of JPMC, including its senior risk officer, Barry Zubrow, to discuss Lehman's upcoming third quarter results, including the expected significant asset write-downs from Lehman's commercial and residential real estate assets, and Lehman's

16

plans going forward.  *See id.* at ¶ 36.  Similarly, JPMC offered to assist Lehman by providing

feedback on its draft presentations to the rating agencies.  For example, on September 4, 2008,

LBHI treasurer Paolo Tonucci solicited comments from JPMC officials to a draft presentation

scheduled to be made to one of the ratings agencies.  *See id.* at ¶ 37.

   As a result of these and other meetings and correspondence, Plaintiffs allege that JPMC

obtained access to confidential information, results, plans, and outlook.  *Id.* at ¶¶ 35, 37.

Tonucci himself warned JPMC that the draft presentation to the ratings agency contained "a lot

of confidential info."  *Id.* at ¶ 37.  Moreover, Plaintiffs allege that officials at JPMC knew by the

morning of September 5, 2008 that the proposed transaction between Lehman and Korean

Development Bank was unlikely to be completed.  *Id.* at ¶ 38.

   In addition, during this same time period, senior executives of JPMC attended meetings

with officials in Washington D.C. in connection with Lehman's increasingly dire financial

situation.  For example, on September 9, 2008, Jamie Dimon, JPMC's chief executive, attended

meetings with Chairman of the Federal Reserve Ben Bernanke and Secretary of the United States

Treasury Henry Paulson in connection with the unfolding financial turmoil.  *Id.* at ¶ 39.

   According to Plaintiffs, JPMC abused its access to and knowledge of Lehman's internal

struggles as well as the government's plans to address the growing crisis.  After gaining this

information, Plaintiffs allege that JPMC embarked on an effort to "capitalize on" an LBHI

bankruptcy.  *See id.* at ¶ 40.  On September 9, 2008, a team of senior risk managers from JPMC

arrived at Lehman's offices under the pretense of conducting due diligence on a potential

acquisition, but Plaintiffs claim that in reality they were there to probe Lehman's confidential

records and plans.  *See id.* at ¶ 43.

***The September Agreements***

According to the Plaintiffs, JPMC exploited its access to nonpublic information about

Lehman's financial condition to "maneuver to gain a preferred position over LBHI's other

creditors."  First Am. Compl. ¶ 44.  According to JPMC's own calculations, as late as September

4, 2008, JPMC believed it was more than fully collateralized for intra-day clearing risk.  *Id.* at ¶

45.  Nonetheless, on the night of September 9, 2008, on the eve of the public release by Lehman

of its earnings, JPMC requested that LBHI sign a new set of agreements.  *Id.* at ¶ 46.

Specifically, that night, JPMC executives pressed Lehman to enter into a guaranty (the

"September Guaranty"), a security agreement (the "September Security Agreement"), a further

amendment to the Clearance Agreement (the "September Amendment"), and an account control

agreement (the "Account Control Agreement") (together, the "September Agreements").  *See id*.

at ¶ 46.

JPMC executives contacted their counterparts at LBHI and caused them to believe that if

LBHI did not execute the proposed September Agreements immediately, JPMC would then

immediately stop extending intra-day credit to and clearing trades for Lehman.  *Id.* at ¶¶ 47, 48.

During the course of the evening, JPMC's in-house counsel represented to Andrew Yeung of

LBHI that Lehman's CEO Richard Fuld previously had agreed to the terms of the September

Agreements.  Yeung did not realize that this statement was untrue, and he was unable to verify

its veracity at that time.  *Id.* at ¶ 50.  Yeung e-mailed Paolo Tonucci to advise him of the terms of

the September Agreements, but ultimately was unable to reach him.  *Id.* at ¶ 57.  As a result, that

night, neither Tonucci, Ian Lowitt, nor any other LBHI executive with the authority to bind

LBHI to the September Guaranty reviewed or approved the September Guaranty or the other

September Agreements.  *Id.*

The next day, on September 10, 2008, LBHI agreed to the September Agreements. *Id.* at ¶ 59. Although Tonucci executed the September Agreements, Plaintiffs allege that he was not authorized to sign the September Guaranty. *See id.* at ¶¶ 59, 61. Plaintiffs further allege that JPMC was aware both that Tonucci lacked the authority to sign the agreements and that Lowitt, whose authorization was necessary, was unavailable. *See id.* at ¶ 61.

These agreements secured not only the exposure of JPMC in relation to clearing securities trades, but also essentially all exposure arising from other dealings of JPMC with LBHI's subsidiaries – principally derivatives transactions. *Id.* at ¶ 51. According to Plaintiffs, LBHI received "nothing in exchange" for the legal rights granted to JPMC under the September Agreements. *See id.* at ¶ 56. Nonetheless, LBHI acceded to JPMC's demands and entered into the September Agreements to ensure that JPMC did not discontinue availability to credit and clearing services and to avoid disruptions that would devastate Lehman's business operations. *See id.* at ¶¶ 49, 58, 68.

The September Amendment (together with the August Amendment, the "Amendments") amended the Clearance Agreement by expanding the term "Obligations" to include all obligations, of whatever nature, of all Lehman entities to all JPMC entities, including clearance obligations, trading obligations, and derivatives obligations. *See* Wolf Decl. Ex. 6 (September Amendment) at 1; First Am. Compl. ¶ 51. The Account Control Agreement perfected JPMC's security interest in shares and related accounts of certain JPMC money market funds posted as collateral by LBHI. *See* Wolf Decl. Ex. 9 (Account Control Agreement) at 1; First Am. Compl. ¶ 54.

The September Guaranty (together with the August Guaranty, the "Guarantees") expanded LBHI's liabilities (the "Obligations") by defining the guaranteed "Liabilities" as all

obligations of LBHI and any of its subsidiaries to JPMC and any of its affiliates or subsidiaries. *See* Wolf Decl. Ex. 7 (September Guaranty) § 1 ("The Guarantor unconditionally and irrevocably guarantees to the Bank the punctual payment of all obligations and liabilities of the Borrowers to the Bank of whatever nature … (all of the foregoing sums being the 'Liabilities') … ."). The September Guaranty also expressly contemplated obligations arising from clearance, trading, and derivatives transactions. *See* Wolf Decl. Ex. 7 (September Guaranty) at 1 ("The Guarantor and each of the direct or indirect subsidiaries of the Guarantor … desires to … enter into derivative transactions with … the Bank … .").

The September Guaranty also specified that it was "absolute and unconditional irrespective of … any lack of validity or enforceability of … [the September Agreements,]" and that LBHI "irrevocably waived the right to assert … defenses, setoffs, or counterclaims in any litigation or other proceeding related to … [the September Agreements]." Wolf Decl. Ex. 7 (September Guaranty) § 2. Similar to the August Guaranty, LBHI's maximum liability under the September Guaranty was capped at the value of the collateral pledged as security under that agreement. *See id.* at § 1 ("The Guarantor's maximum liability under this Guaranty shall be THREE BILLION DOLLARS ($3,000,000,000) or such greater amount that the Bank has requested from time to time as further security in support of this Guaranty."); *see also* First Am. Compl. ¶ 52.

The September Security Agreement (together with the August Security Agreement, the "Security Agreements") granted a lien on all of LBHI's accounts at JPMC or its affiliates and the assets contained therein (except for the Overnight Account created under the August Security Agreement), as security for payment of the "Liabilities." *See* Wolf Decl. Ex. 8 (September Security Agreement) at 1-2 ("As security for the payment of all the Liabilities, the undersigned

hereby grants to the Bank a security interest in, and a general lien upon … the Security."); First Am. Compl. ¶ 53.

Importantly, the September Security Agreement deleted the provision from the August Security Agreement that had given LBHI the right to transfer its collateral from the pledged accounts to the lien-free overnight account. *See* First Am. Compl. ¶ 55. Instead, the September Security Agreement provided simply that LBHI could access its collateral "upon three days written notice to the Bank." *See* Wolf Decl. Ex. 8 (September Security Agreement) at 3 ("Notwithstanding anything provided for herein, the undersigned may upon three days written notice to the Bank transfer any Security … ."); *see also* First Am. Compl. ¶ 55.

### *JPMC demands collateral pursuant to the September Agreements*

JPMC promptly requested that LBHI deliver additional collateral under the September Agreements. *See* First Am. Compl. ¶¶ 62, 66. Plaintiffs allege that JPMC knew when making these requests that it already held sufficient collateral to secure its intra-day clearance risk, and used these agreements "as a pretext to improperly extract" additional collateral from LBHI. *Id.* at ¶¶ 62, 69. JPMC's demands were backed by the threat that if LBHI failed to comply, JPMC immediately would cease providing intra-day clearing services. *Id.* at ¶ 66. JPMC's collateral demands "contributed significantly" to LBHI's inability to meet the liquidity needs of its business. *Id.*

In response to these demands, on September 9, 2008 LBHI posted with JPMC $1 billion in cash and $1.67 billion in money market funds. *Id.* The next day, on September 10, 2008, LBHI turned over another approximately $300 million in cash. *Id.* Similarly, on September 11, 2008, LBHI posted additional cash collateral with JPMC in the amount of $600 million. *Id.*

That same day, on September 11, 2008, JPMC made demand for $5 billion more cash collateral and threatened that, if LBHI did not post that collateral by the opening of business the

following day, "we intend to exercise our right to decline to extend credit to you under the

[Clearance] Agreement." *Id.* at ¶ 67.  To further induce LBHI to accept this demand, Plaintiffs

allege that Jamie Dimon of JPMC promised Richard Fuld that JPMC would return the $5 billion

at the close-of-settlement on September 12, 2008.  *Id.* at ¶ 70.  LBHI had no choice but to post $5

billion in cash collateral the following day (together with the prior collateral transfers over the

prior two-day period, the "Disputed Collateral Transfers").  *Id.* at ¶¶ 68, 71.  Thereafter, JPMC

transferred the cash component of the collateral (approximately $6.9 billion of the $8.6 billion in

total collateral) out of the demand deposit account to which it had been delivered into a JPMC

general ledger account (the "Funds Sweep").  *Id.* at ¶ 72.

JPMC retained the posted collateral after the close-of-trading on Friday, September 12,

2008, despite not having had any outstanding clearance exposure to Lehman.  *Id.* at ¶ 73.

Throughout that weekend, LBHI repeatedly requested that JPMC permit it access to its collateral

to help it to stave off bankruptcy.  *Id.* at ¶ 74.  JPMC refused to grant LBHI access to its

collateral, despite having concluded that it was overcollateralized with respect to clearance

exposure by over $6 billion.  *Id.* at ¶ 75.  JPMC knew that Lehman was in danger of failing

absent access to additional liquidity or collateral, and knew that any such failure would benefit

JPMC's market share in trading and investment banking.  *Id.* at ¶¶ 76, 77.

***Lehman's chapter 11 cases***

During the weekend of September 13-14, 2008, JPMC executives participated in

meetings at the Federal Reserve Bank of New York (the "Federal Reserve") with government

officials and representatives of major financial institutions regarding a potential sale and/or

rescue of Lehman.  *See* First Am. Compl. ¶ 76.  LBHI filed a petition for relief under chapter 11

of the Bankruptcy Code in the early morning hours of September 15, 2008.  *Id.* at ¶ 78.

*JPMC's post-petition advances and LBHI's comfort order motion*

Notwithstanding LBHI's bankruptcy, JPMC continued to provide massive amounts of credit to LBI even after LBHI had filed its chapter 11 petition.  Indeed, beginning on September 15, 2008, just a few hours after the filing by LBHI  of the largest bankruptcy in history, JPMC made clearing advances to unwind LBI's outstanding tri-party repurchase agreements in the total amount of $87 billion.  *See* Wolf Decl. Ex. 11 (Motion of Lehman Brothers Holdings Inc. for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Clearing Advances, Case No. 08-13555, ECF No. 29, (Bankr. S.D.N.Y. Sept. 16, 2008)) (the "Comfort Order Motion") ¶ 9.  These advances were made at the urging of the Federal Reserve to avoid a disruption of the financial markets.  *Id.*  The following day, JPMC advanced a "comparable amount" to unwind LBI's tri-party repurchase agreements.  *Id.*

On September 16, 2008, the day after its bankruptcy filing, LBHI filed the Comfort Order Motion for the purpose of inducing JPMC to continue to extend credit to settle and clear securities transactions for LBI.  *See* Wolf Decl. Ex. 11 (Comfort Order Motion) ¶ 19.  In that motion, LBHI explained to the Court that "[JPMC] may, in its sole discretion, make advances to or for the benefit of the respective Lehman Clearance Parties [under the Clearance Agreement,] which are payable … upon demand by [JPMC]."  *Id.* at ¶ 6.  LBHI emphasized that "[a]ny cloud on the guarantees vis-à-vis the Holding Company Collateral will inhibit [JPMC] from clearing advances to or for the benefit of the Lehman Clearance Parties to the detriment of public investors."  *Id.* at ¶ 19.  The Comfort Order Motion was intended to assure JPMC that it could continue to make clearing advances knowing that such advances "will be allowed as claims under the Guarantee Agreements secured by the Holding Company Collateral."  *Id.* at ¶ 12.  LBHI also acknowledged that the Amendments, the Guarantees, and the Security Agreements

"are 'securities contracts' within the meaning of section 741(7) of the Bankruptcy Code."  *Id.* at ¶ 17.

At the hearing on the Comfort Order Motion, counsel for LBHI stated that it was "completely understandable" that JPMC needed assurances before continuing to perform the "critical function" of performing its clearance services.  *See* Wolf Decl. Ex. 12 (Comfort Order Motion Hr'g Tr., Sept. 16, 2008) at 27:9-12, 27:25-28:1.  Thus, LBHI told the Court that "we believe that the guaranty and the collateral covers [sic] not only those transactions which have already occurred but as well the future transactions."  *Id.* at 28:6-8.  The Federal Reserve supported the Comfort Order Motion, informing the Court that "the services that [JPMC] has been providing are critical to the smooth functioning of financial markets."  *Id.* at 34:12-15.  The Court granted the Comfort Order Motion, finding it "entirely appropriate and consistent with the need to provide market liquidity for this debtor and its affiliates … ."  *Id.* at 35:1-2; Wolf Decl. Ex. 13 (Order Pursuant to Section 105 of the Bankruptcy Code Confirming Status of Clearing Advances, Case No. 08-13555, ECF No. 47 (Bankr. SDNY Sept. 16, 2008)) (the "Comfort Order").

As described in proofs of claim filed with this Court, JPMC asserts claims against the LBHI estate in the total amount of approximately $30 billion.  *See* Wolf Decl. Ex. 14 (Proofs of claim filed by JPMC) (the "JPMC Proofs of Claim").  The JPMC Proofs of Claim include secured claims under the Guarantees for approximately $25 billion in connection with extensions of credit under the Clearance Agreement.  Wolf Decl. Ex. 14 Ex. B (LBI Claims Annex) at 2.

***Adversary Proceeding and the Motion to Dismiss***

On May 26, 2010, LBHI commenced this adversary proceeding (the "Adversary Proceeding") by filing the Complaint.  *See* Compl., ECF No. 1.  That same day, LBHI and the Committee filed a joint motion to authorize the Committee's intervention in the litigation.  The

Court entered an order granting the intervention on June 24, 2010. *See* Order Authorizing

Committee's Intervention, ECF No. 7. After an initial motion to dismiss filed by JPMC, the

Plaintiffs filed the Amended Complaint on September 15, 2010. *See* First Am. Compl., ECF No.

19.

JPMC filed the Motion on October 19, 2010. *See* Mem. Supp. Mot. Dismiss, ECF No.

29. Extensive briefing ensued. *See* Pls.' Opp'n, ECF No. 41; Reply Br. Supp. Mot. Dismiss,

ECF No. 53 ("Reply"); and Mem. Amici Curiae Supp. Mot. Dismiss, ECF No. 52 ("Amici

Brief").[7]

The Court heard oral argument on the Motion on May 10, 2011 (the "Hearing"). *See*

*generally*, Hr'g Tr., May 10, 2011, ECF No. 77.

### The Stern v. Marshall Detour

During the month following the Hearing, the United States Supreme Court decided *Stern*.

In *Stern* the Supreme Court ruled that a bankruptcy court, as a non-Article III court, "lacked the

constitutional authority to enter a final judgment on a state law counterclaim that [was] not

resolved in the process of ruling on a creditor's proof of claim." *Stern*, 131 S. Ct. at 2620. *Stern*

has led to a proliferation of litigation and procedural maneuvering nationwide as parties,

especially defendants in adversary proceedings, have considered the impact of the decision on

the authority of the bankruptcy courts to render final judgments. Many parties in pending

adversary proceedings have taken steps to exploit some of the unsettled issues raised by *Stern* for

procedural advantage.

---

[7] On December 15, 2010 JPMC filed counterclaims against LBHI; JPMC amended these counterclaims on February 17, 2011. *See* Countercls. of JPMorgan Chase Bank, N.A., ECF No. 39; Am. Countercls. of JPMorgan Chase Bank, N.A., ECF No. 63. The amended counterclaims are the subject of a separate motion to dismiss filed by the Plaintiffs and are not the subject of this memorandum decision.

A number of recent cases have clarified that the balance in workload between the

bankruptcy court and district court due to the narrow ruling in *Stern* actually has not changed

very much and that the bankruptcy system is continuing to function without as many disruptions

as had been feared by some observers.[8]  The standard order of reference in this district has been

amended to resolve procedural issues in relation to the holding in *Stern*.[9]

The recent developments that have helped stabilize the bankruptcy system and make it

more predictable in the aftermath of *Stern* were not clearly foreseeable or understood in June of

last year.  In recognition that the holding in *Stern* might be applicable to the litigation, the Court

asked counsel for Plaintiffs and for JPMC to submit papers addressing the effect of the decision

on the claims asserted in the Adversary Proceeding.  On August 5, 2011, the parties filed their

---

[8] *See Adelphia Recovery Trust v. FLP Group, Inc.*, 11 Civ. 6847 (PAC), 2012 U.S. Dist. LEXIS 10804, at *22
(S.D.N.Y.  Jan. 30, 2012) (stating that "maintaining the reference to [the] Bankruptcy Court is in line with the
Supreme Court's intent [set forth in *Stern*] to not 'meaningfully change[ ] the division of labor in the current
statute'"); *Walker, Truesdell, Roth & Assocs. v. Blackstone Group, L.P. (In re Extended Stay, Inc.)*, Chapter 11 Case
No. 09-13764 (JMP), Nos. 11 Civ. 5394 (SAS), 11 Civ. 5395 (SAS), 11 Civ. 5396 (SAS), 11 Civ. 5397 (SAS), 11
Civ. 5864 (SAS), 2011 U.S. Dist. LEXIS 131349, at *27-28 (S.D.N.Y. Nov. 10, 2011) ("Requiring withdrawal of
such actions would be contrary to the language of *Stern*, which categorizes itself as a 'narrow' decision that does not
'meaningfully change[ ] the division of labor' between bankruptcy courts and district courts."); *see also Weisfelner
v. Blavatnik (In re Lyondell Chem. Co.*), 11 Civ. 8251 (DLC), 11 Civ. 8445 (DLC), 2012 U.S. Dist. LEXIS 44329,
at *35 (S.D.N.Y. Mar. 29, 2012) (noting that, despite the fact that defendants were correct that the bankruptcy court
could not enter final judgment on most of the fraudulent conveyance claims at issue, "withdrawal at this stage
[where the bankruptcy court had done significant work preparing the matters for trial and the district court wished to
benefit from its expertise via a non-final determination of the merits] would result in significant inefficiencies and is
inappropriate").

[9] On January 31, 2012, the District Court issued its Amended Standing Order of Reference Re: Title 11, stating that,

> If a bankruptcy judge or district judge determines that entry of a final order or judgment by a
> bankruptcy judge would not be consistent with Article III of the United States Constitution in a
> particular proceeding referred under this order and determined to be a core matter, the bankruptcy
> judge shall, unless otherwise ordered by the district court, hear the proceeding and submit
> proposed findings of fact and conclusions of law to the district court.  The district court may treat
> any order of the bankruptcy court as proposed findings of fact and conclusions of law in the event
> the district court concludes that the bankruptcy judge could not have entered a final order or
> judgment consistent with Article II of the United States Constitution.

Amended Standing Order of Reference Re: Title 11, dated January 31, 2012 (Preska, C.J.).

position papers. *See* Pls.' Mem. Addressing Effect of *Stern v. Marshall* on Bankruptcy Court's

Ability to Render Final J., ECF No. 89; Supplemental Mem. Supp. Mot. Dismiss, ECF No. 90.

The submissions of the parties reached totally different conclusions regarding the impact

of *Stern* on the Adversary Proceeding and were not particularly helpful (one said the Court had

the authority to do everything, while the other said that the Court could do nothing other than to

dismiss the Amended Complaint). As a means to encourage further consideration of the issues,

on August 15, 2011, the Court entered a case management order with respect to the unresolved

questions raised by the parties' submissions (as subsequently amended on September 21, 2011,

the "Case Management Order"). *See* Case Management Order in Relation to the Impact of *Stern*

*v. Marshall*, ECF No. 93; Order Amending and Modifying the Case Management Order in

Relation to the Impact of *Stern v. Marshall*, ECF No. 97.

Thereafter, in accordance with paragraph 4 of the Case Management Order, the parties

filed additional briefs regarding the impact of *Stern* on each count of the Amended Complaint.[10]

*See* Pls.' Statement in Accordance with Case Management Order in Relation to the Impact of

Stern v. Marshall, ECF No. 98; JPMorgan's Submission in Resp. to Case Management Order,

ECF No. 99. JPMC also filed a motion with the District Court for an order withdrawing the

reference of the Adversary Proceeding to the United States Bankruptcy Court for the Southern

District of New York (the "Withdrawal Motion").[11] *See* JPMorgan's Motion to Withdraw the

---

[10] Paragraph 4 of the Case Management Order directed the parties to provide a more detailed statement in writing regarding why each count of the Amended Complaint either was or was not susceptible to (i) a ruling by the bankruptcy court with respect to the pending motion to dismiss, (ii) final adjudication by the bankruptcy court and (iii) the issuing of a report and recommendation to the district court regarding each such count.

[11] The Case Management Order provided that to avoid any lingering overhang of uncertainty as to the Court's authority to enter final judgments in the Adversary Proceeding, if JPMC chose to move for withdrawal of the reference, it should do so promptly. *See* Order Amending and Modifying the Case Management Order in Relation to the Impact of Stern v. Marshall, ECF No. 97.

Reference to the Bankruptcy Court of the Above-Captioned Adversary Proceeding, ECF No. 100.

The Withdrawal Motion was assigned to the Honorable District Court Judge Richard J. Sullivan.  After full briefing by the parties, a hearing on the Withdrawal Motion was held before Judge Sullivan on December 30, 2011.  At the hearing, Judge Sullivan determined, and the parties agreed, that in order to avoid further delays in deciding the Motion, he would reserve decision on the Withdrawal Motion until after a ruling by the bankruptcy court on the Motion. *See* Withdrawal Motion Hr'g Tr. 76-77, Dec. 30, 2011, No. 11 CV 6760, ECF No. 34; Order of Judge Richard J. Sullivan, December 30, 2011, No. 11 CV 6760, ECF No. 33.

In January, a chambers conference was convened in the bankruptcy court to discuss further proceedings.  During that conference, lead trial counsel for JPMC indicated that he had no objection to having this Court decide the Motion.  In addition, due to the passage of time, the Court set a supplemental briefing schedule to allow the parties to address any legal developments since the close of briefing that were relevant to the Motion.  Supplemental briefs were submitted on February 17, 2012.  *See* Pls.' Br. of Supplemental Authorities in Further Opp'n to JPMorgan Chase Bank N.A.'s Mot. Dismiss, ECF No. 125; Supplemental Br. Addressing Recent Decisions Relating to JPMorgan's Mot. Dismiss, ECF No. 126.

### *Rule 12(b)(6) Standard*

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). Federal Rule of Bankruptcy Procedure 7012(b), which incorporates Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), permits a bankruptcy court to dismiss an adversary proceeding if a plaintiff's complaint fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  In reviewing a motion to dismiss under Rule 12(b)(6), the Court accepts the

factual allegations of the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *E.E.O.C. v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000). To survive a challenge to the adequacy of a complaint under Rule 12(b)(6), the factual allegations in a complaint need to be supported by more than mere conclusory statements. *Twombly*, 550 U.S. at 555. The allegations must be sufficient "to raise a right to relief above the speculative level," and provide more than a "formulaic recitation of the elements of a cause of action." *Id.* In other words, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679.

Where a complaint alleges fraud, the pleading requirements imposed by Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"), as incorporated in Federal Rule of Bankruptcy Procedure 7009, are even more demanding. The plaintiff "must state with particularity the circumstances constituting fraud or mistake," including, at a minimum, "facts that give rise to a strong inference of fraudulent intent." Fed. R. Civ. P. 9(b); *Pereira v. Grecolas Ltd. (In re Saba Enters.)*, 421 B.R. 626, 642 (Bankr. S.D.N.Y. 2009) (citations omitted).

In ruling on a motion to dismiss, the Court may consider documents omitted from the plaintiff's complaint but attached by a defendant to its motion to dismiss. *See, e.g., Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d. Cir. 1991) (district court may consider exhibits omitted from plaintiff's complaint but attached as exhibits to defendant's motion papers because "there was undisputed notice to plaintiffs of their content and they were integral to plaintiffs' claim").

It is important for the Court to rule on those counts of the Amended Complaint that implicate the safe harbor provisions of the Bankruptcy Code. *See* Amici Brief at 22 ("Prompt

Disposition of Safe Harbor Cases is Essential to the Effectiveness of [Safe Harbor] Statutes"). Bankruptcy courts will enforce the safe harbor provisions of the Bankruptcy Code in appropriate cases by dismissing avoidance actions on the pleadings.  *See, e.g., Brandt v. B.A. Capital Co. L.P. (In re Plassein Int'l Corp)*, 366 B.R. 318, 322-26 (Bankr. D. Del. 2007) (granting a motion to dismiss claims seeking to avoid transfers protected under safe harbor section 546(e)).

### Discussion

The Amended Complaint sets forth forty-nine separate counts seeking relief on multiple theories.  *See* First Am. Compl. ¶¶ 87-369.  These counts allege distinct causes of action that fit into a number of separate categories characterized by the underlying legal premises on which the claims are based – *i.e.*, claims seeking (i) to avoid and recover actual fraudulent transfers under section 548 of the Bankruptcy Code; (ii) to avoid and recover constructively fraudulent and preferential transfers under sections 544, 547 and 548 of the Bankruptcy Code and applicable state law; (iii) relief under various common law legal doctrines; and (iv) relief under various other sections of the Bankruptcy Code, *i.e.*, turnover of estate property under section 542, setoff under section 553, equitable subordination under section 510(c), and the disallowance of claims under section 502(d).  For the reasons set forth below, the Court concludes that the claims for recovery of constructively fraudulent transfers and preferences under sections 544, 547 and 548 of the Bankruptcy Code should be dismissed.

**I.**      ***The counts seeking to avoid and recover transfers made under the August and September Agreements as constructively fraudulent or preferential transfers are dismissed.***

The bulk of the Amended Complaint alleges that the liens granted under the Security Agreements, the Obligations incurred under the Guarantees, and the Disputed Collateral Transfers made under the September Agreements constitute constructively fraudulent transfers and preferential transfers.  Specifically:

- Counts V, X, XXI, and XXII seek to avoid liens granted under the September Agreements as constructively fraudulent transfers and preferences;

- Counts VIII, IX, XV, XVI, XVII, XVIII, XIX, XX, XXIII, and XXIV seek to avoid and recover the Disputed Collateral Transfers, including the Funds Sweep, as constructively fraudulent transfers and preferences; and

- Counts V, VI, VII, X, XI, XII, XIII, and XIV seek to avoid LBHI's Obligations arising under the Guarantees as constructively fraudulent transfers and preferences, and, by extension, indirectly avoid the transfers made under the August Security Agreement and the September Agreements.

These counts are premised on the estate's avoidance powers under sections 547 and 548(a)(1)(B) of the Bankruptcy Code. Section 547(b) provides that the trustee of a bankruptcy estate may avoid as a preferential transfer any transfer made by an insolvent debtor in the ninety days preceding bankruptcy, where the transfer (i) was made to or for the benefit of a creditor; (ii) was made for or on account of an antecedent debt owed by the debtor; and (iii) enabled the creditor to receive more than it otherwise would have under the provisions of the Bankruptcy Code. *See* 11 U.S.C. § 547(b). Section 548(a)(1)(B) provides that a trustee of a bankruptcy estate may avoid as a constructively fraudulent transfer any transfer or obligation incurred by a debtor within the two years before the date of the filing of the petition when made in exchange for "less than reasonably equivalent value" and that left the debtor insolvent. *See* 11 U.S.C. § 548(a)(1)(B).

JPMC seeks dismissal of these counts, arguing that they fail as a matter of law because the transfers are fully protected from avoidance under section 546(e) of the Bankruptcy Code. *See* Mem. Supp. Mot. Dismiss at 22 ("The safe harbors of section 546 mandate dismissal of [P]laintiffs' claims to avoid transfers to [JPMC] based on theories of constructive fraudulent transfer or preference."). The plausibility of the counts alleged in the Amended Complaint

31

hinges on whether claims for avoidance are permitted given the language of section 546(e) that appears to effectively shield the agreements, transfers, and obligations from avoidance.[12]

This Court most recently addressed section 546(e) in *Official Comm. of Unsecured Creditors of Quebecor World (USA) Inc. v. American United Life Insurance Co. (In re Quebecor World (USA) Inc.)*, 453 B.R. 201 (Bankr. S.D.N.Y. 2011).  In *Quebecor*, the creditors' committee sought to avoid payments received by institutional noteholders in connection with the debtors' repurchase and subsequent cancellation of privately-placed notes.  Relying on the Second Circuit decision in *In re Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329 (2d Cir. 2011), the court granted summary judgment for the defendants, holding that the transfers of cash to complete a securities transaction were "settlement payments" that fall under the safe harbors.  *Quebecor*, 453 B.R. at 206.  While the definition of settlement payments – at issue in both *Enron* and *Quebecor* – has no direct bearing on this adversary proceeding, these decisions nonetheless are relevant precedents for the proposition that the language of the safe harbors is to be strictly interpreted even when the outcome may be prejudicial to the interests of the estate and its creditors.

In *Enron*, the Second Circuit "decline[d] to address Enron's arguments regarding legislative history" because it was able to reach a conclusion based on the plain language of the statute.  *Enron*, 651 F.3d at 339 (citing *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("It is well established that when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms.")

---

[12] As with section 546(e), sections 546(f) and (g) similarly protect from avoidance transfers made "in connection with" certain classes of financial contracts – *i.e.*, safe-harbored "repurchase agreements" and "swap agreements," respectively.  *See* 11 U.S.C. §§ 546(f), (g).  In light of the Court's determination that the challenged transfers are protected from avoidance by section 546(e), it is unnecessary for the Court to consider the question of the applicability of these other safe harbors.

(internal quotation marks omitted)).   In *Quebecor*, the Court noted the influence of *Enron* on its

deliberations, applied the language of section 546(e) to the payments at issue, and found that

they were, indeed, "settlement payments."   *See Quebecor*, 453 B.R. at 215.   Consistent with its

approach in *Quebecor*, the Court will strictly construe the plain meaning of section 546(e) in

judging whether the claims set forth in the Amended Complaint are subject to the safe harbors of

that section of the Bankruptcy Code.

> Section 546(e) carves out an express exception to section 547(b) and 548(a)(1)(B):

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this
> title, the trustee may not avoid a transfer … that is a transfer made by or to
> (or for the benefit of) a commodity broker, forward contract merchant,
> stockbroker, financial institution, financial participant, or securities
> clearing agency, in connection with a securities contract, as defined in
> section 741(7)… that is made before the commencement of the case,
> except under section 548(a)(1)(A)[13] of this Title."

11 U.S.C. § 546(e).   Thus, section 546(e) exempts from avoidance "transfers" by or to "financial

institutions" that are made "in connection with" a class of defined "securities contracts."   Once

parsed, the language is clear, and, as further explained in the following paragraphs, prevents

Plaintiffs from avoiding the August and September Agreements, the Disputed Collateral

Transfers, and the Obligations on theories of constructively fraudulent transfer or preference.

### A.        *JPMC qualifies for protection under section 546(e).*

The Court first must consider whether JPMC is eligible for protection under section

546(e).   That subsection, like the safe harbors generally, applies only to certain types of

qualifying entities.   Specifically, section 546(e) covers pre-petition transfers made by or to a

"financial institution" or "financial participant" in connection with a "securities contract."   11

U.S.C. § 546(e).

---

[13] Notably, section 546(e) expressly excludes from its protection any actual fraudulent transfers.  The counts in the
Amended Complaint seeking to avoid the Disputed Collateral Transfers as actual fraudulent transfers are discussed
in Section II of this decision, *infra*.

JPMC, as one of the leading financial institutions in the world, quite obviously is a member of the protected class and qualifies as both a "financial institution" and a "financial participant."  JPMC unquestionably fits the Bankruptcy Code's definition of "financial institution."  *See* 11 U.S.C. § 101(22) (defining "financial institution" to include a "commercial bank").  JPMC also is a "financial participant" because it is a party to outstanding safe harbor contracts totaling at least $1 billion in gross notional or principal dollar amount.  *See* 11 U.S.C. § 101(22A) (defining "financial participant").  That JPMC fits the applicable definitions for safe harbor protection is not in dispute, and the Amended Complaint concedes this point.  *See* First Am. Compl. ¶10 (identifying JPMC as a "financial institution"); ¶ 76 (identifying JPMC as a "national banking association chartered under the laws of the United States"); ¶¶ 66-67 (recognizing the extent of JPMC's derivatives obligations to LBHI and its subsidiaries).

### B.    *The Clearance Agreement, the August Agreements, and several of the September Agreements constitute "securities contracts" for purposes of section 546(e).*

Section 546(e) of the Bankruptcy Code protects from avoidance any transfer to a financial institution made in connection with a "securities contract."  11 U.S.C. § 546(e).  "Securities contracts," in turn, are defined by section 741(7) of the Bankruptcy Code:

> 'securities contract' – (A) means –
>
> (i) a contract for the purchase, sale, or loan of a security… including any repurchase or reverse repurchase transaction on any such security … (whether or not such repurchase or reverse repurchase transaction is a 'repurchase agreement' as defined in section 101);
>
> …
>
> (v) any extension of credit for the clearance or settlement of securities transactions;
>
> …

> (x) a master agreement that provides for an agreement or transaction referred to in clause (i) [or] … (v) … together with all supplements to any such master agreement, without regard to whether the master agreement provides for an agreement or transaction that is not a securities contract under this subparagraph, except that such master agreement shall be considered to be a securities contract under this subparagraph only with respect to each agreement or transaction under such master agreement that is referred to in clause (i) [or] … (v); … or
>
> (xi) any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in this subparagraph, including any guarantee … by or to a… financial institution, or financial participant in connection with any agreement or transaction referred to in this subparagraph … .

11 U.S.C. § 741(7).  The plain language of section 741(7) is very broad in its application and encompasses virtually any contract for the purchase or sale of securities, any extension of credit for the clearance or settlement of securities transactions, and a wide array of related contracts, including security agreements and guarantee agreements.

The Clearance Agreement (including the Amendments) constitutes a "securities contract" by virtue of being an "extension of credit for the clearance or settlement of securities transactions" under subsection (v) of section 741(7).  *See* Wolf Decl. Ex. 1 (Clearance Agreement) at 1 (identifying JPMC as LBI's "non-exclusive clearance agent for securities transactions"); § 5 ("We may, solely at our discretion … advance funds to you prior to final payment.").  As an agreement to extend credit to settle securities transactions, the Clearance Agreement constitutes a safe-harbored "securities contract."

Notably, the definition in subsection (v) of "securities contract" is transaction-based, not agreement-based.  Accordingly, in addition to the Clearance Agreement itself, subsection (v) includes within the definition of "securities contract" each individual extension of credit made to LBI under that agreement.  Each such extension of credit under the Clearance Agreement is an independent "securities contract" under subsection (v).  For this reason, the Clearance

Agreement governs other securities contracts and functions as a "master agreement" for purposes

of subsection (x) of section 741(7)(A).  Indeed, the definition is replete with so many "belts" and

"suspenders" that there can be no doubt as to the conclusion here: the relevant documents in

reference to the transfers made from Lehman to JPMC in August and September all fit the

definition of securities contracts.

The August Agreements and several of the September Agreements qualify as "securities

contracts" under subsection (xi) of section 741(7)(A) because of their role as credit

enhancements "related to" and "in connection with" other "securities contracts."  Subsection (xi)

specifies that a security agreement is a "securities contract" to the extent that it secures debts

"related to" another "securities contract."  Similarly, that subsection states that a guaranty is a

"security contract" to the extent that it guarantees debts incurred "in connection with" another

"securities contract."  *See* 11 U.S.C. § 741(7)(A)(xi) (identifying as a "securities contract" any

"security agreement or arrangement or other credit enhancement *related to* any [protected]

agreement or transaction … including any guarantee or reimbursement obligation ... *in

connection with* any agreement or transaction referred to in this subparagraph … .") (emphasis

added).  Thus, under subsection (xi) of section 741(7)(A), the Security Agreements and the

Guarantees are "securities contracts" to the extent that they secure debts related to (or guarantee

debts incurred in connection with) safe-harbored contracts.

Close inspection of the plain text of each agreement reveals this to be the case.  The

August Guaranty and the August Security Agreement, for example, expressly contemplated

obligations owing from LBI to JPMC under the Clearance Agreement (itself, a "securities

contract").  *See* Wolf Decl. Ex. 4 (August Guaranty) at 1 ("[certain Lehman entities] desire to

transact business with and/or to obtain credit, clearing advances… from [JPMC] … under or in

connection with the Clearance Agreement … ."); Wolf Decl. Ex. 5 (August Security Agreement) at 1 (recognizing that the lien granted is "[i]n consideration of one or more loans, letters of credit or other financial accommodation made … by [JPMC]" pursuant to the Clearance Agreement).

The September Security Agreement and the September Guaranty also constitute credit enhancements in furtherance of "securities contracts" for purposes of subsection (xi) because they expressly contemplate "derivative transactions" and "clearing advances" between JPMC and LBHI subsidiaries. *See* Wolf Decl. Ex. 7 (September Guaranty) at 1 (granting guaranty "in order to induce the Bank from time to time … to continue to extend credit, clearing advances, clearing loans, or other financial accommodations to the Borrowers … ."); Wolf Decl. Ex. 8 (September Security Agreement) at 1 ("In consideration of [JPMC] … extending credit to and/or transacting business, trading, or engaging in derivative transactions with the undersigned and/or its subsidiaries, the undersigned hereby agrees … .").

The fact that the references to safe-harbored transactions within the September Guaranty and September Security Agreement do not appear in substantively operative clauses does not matter for purposes of the definition set forth in subsection (xi) of section 741(7)(A) because all that is required is that agreements be related to one another. *See* Pls.' Opp'n at 45 (arguing that the September Agreements were not "securities contracts" under section 741(7) because "the operative language of the September Guaranty and September Security Agreement did not connect to any safe-harbored transactions …"). There is no required language to connect agreements so that they will be deemed related, and the fact that these agreements recognize the otherwise safe-harbored derivatives transactions is sufficient for purposes of identifying a "securities contract" under subsection (xi) of section 741(7)(A).

The September Guaranty in particular expressly guarantees all obligations of LBI to JPMC *"of whatever nature"* – an open-ended phrase that further confirms its status as a credit enhancement "related to" other "securities contracts" for purposes of subsection (xi). *See* Wolf Decl. Ex. 7 (September Guaranty) §1 (guaranteeing to JPMC the "punctual payment of all obligations and liabilities of the Borrowers to the Bank of whatever nature … ."). The term "all" self-evidently encompasses safe-harbored derivative obligations to JPMC. This is especially pertinent given that most of JPMC's exposure to Lehman related to clearing advances and derivatives transactions. *See* 5/10/11 Hr'g Tr. 43:12-17 (JPMC counsel noting that "more than ninety percent of the collateral was used to pay what are obviously safe harbor claims … .").[14]

**C.    The grant and perfection of liens under these "securities contracts" constitute "transfers" for purposes of section 546(e).**

**(Counts V, X, XXI, and XXII of the Amended Complaint)**

Section 546(e) bars the avoidance of "transfers" made by or to eligible financial institutions in connection with a "securities contract." The term "transfer" includes the grant of a lien for purposes of section 546(e). *See* 11 U.S.C. § 101(54) (definition of "transfer" expressly includes "the creation of a lien"). Moreover, courts uniformly have treated a pledge or the attachment and perfection of a security interest as a "transfer" of an interest in property. *See Permanent Mission of India to the United Nations v. City of N.Y.*, 551 U.S. 193, 198 (2007) (liens are "interests in property").

---

[14] LBHI itself publicly recognized at the outset of these cases that the "Clearance Agreements, Guarantee Agreements, and Security Agreements are 'securities contracts' within the meaning of section 741(7) of the Bankruptcy Code." Wolf Decl. Ex. 11 (Comfort Order Motion) ¶ 17. During oral argument on the Comfort Order Motion, the parties publicly assured the Court that they were not seeking a substantive legal determination with respect to whether these agreements constituted "securities contracts." *See* 5/10/11 Hr'g Tr. 19:11-20:16. At the Hearing, counsel for JPMC admitted that the Comfort Order Motion was undertaken at JPMC's request and clarified that JPMC is not arguing "in any way that that order precludes this action … ." *Id.* at 20:17-21; 21:13-20. Thus, while public statements made in connection with the Comfort Order Motion demonstrate that LBHI has changed its position with respect to whether these contracts are legally-protected "securities contracts," this inconsistency is of no consequence for the purpose of this decision.

The liens granted under the September Agreements, therefore, are "transfers" pursuant to safe-harbored "security contracts."  For example, the September Security Agreement granted liens to secure all "Liabilities" (as defined in the September Guaranty) in consideration of, *inter alia*, JPMC's "trading or engaging in derivative transactions."  Wolf Decl. Ex. 8 (September Security Agreement) at 1.  Similarly, the September Amendment to the Clearance Agreement expanded the scope of the lien granted by section 11 of the Clearance Agreement to secure all of the "existing or future indebtedness, obligations and liabilities of any kind," including "arising in connection with trades, derivative transactions, settlement of securities [under the Clearance Agreement] or any other business … ."  *See* Wolf Decl. Ex. 6 (September Amendment to Clearance Agreement) § 1.

The Amended Complaint includes counts to avoid these liens that are barred under section 546(e) of the Bankruptcy Code.  These counts are Count V ("Avoidance of September Agreements as Constructively Fraudulent Under Section 548 of the Bankruptcy Code"), Count X ("Avoidance of September Agreements as Constructively Fraudulent under Section 544 and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law"), and Count XXI ("Avoidance of Preferential Transfer of September Security Agreement Under Section 547 of the Bankruptcy Code").  They request relief to avoid the grant of liens under the September Security Agreement and the September Amendment, but such relief may not be granted as a matter of law because the challenged "transfers" are exempt from avoidance under section 546(e) of the Bankruptcy Code.

Similarly, the perfection under the Account Control Agreement of liens granted by certain other September Agreements constitutes a safe-harbored "transfer in connection with a securities contract."  The Account Control Agreement confirms the perfection of the liens

granted to JPMC under the other September Agreements.  *See* Wolf Decl. Ex. 9 (Account Control Agreement) at 1 (Preamble ¶¶ 2, 3) (acknowledging that LBHI "has granted" JPMC a security interest under a separate agreement and stating that the parties are entering into the Account Control Agreement in part to perfect that security interest).

Such "perfection" of a lien constitutes a "transfer" for purposes of the Bankruptcy Code. *See In re Badger Lines, Inc.*, 202 F.3d 945, 946 (7th Cir. 2000) (describing the perfection of a lien as a "transfer").  In fact, the Amended Complaint recognizes that perfecting a lien is a transfer.  *See* First Am. Compl. ¶ 210 (pleading that the Account Control Agreement "was a transfer made by LBHI to or for the benefit of JPMorgan").  Although the Account Control Agreement itself is not a "securities contract" for purposes of section 741(7) of the Bankruptcy Code, the perfection under that agreement of liens granted by other "securities contracts" is a transfer "in connection with" protected securities contracts.

In seeking to avoid the perfection of liens under the Account Control Agreement, Count XXII of the Amended Complaint seeks to avoid a safe-harbored "transfer in connection with a securities contract."  *See* First Am. Compl. Count XXII ("Avoidance of Preferential Transfer of Account Control Agreement under Section 547 of the Bankruptcy Code").  As a result, Count XXII of the Amended Complaint seeks relief that may not be granted as a matter of law.

**D.** *The Disputed Collateral Transfers, including the Funds Sweep, were made "in connection with" safe-harbored "securities contracts."*

   *(Counts VIII, IX, XV, XVI, XVII, XVIII, XIX, XX, XXIII, and XXIV of the Amended Complaint)*

Several counts in the Amended Complaint seek to avoid the Disputed Collateral Transfers made by LBHI to JPMC in September 2008 as preferential and constructively fraudulent transfers.  *See* First Am. Compl. Count VIII ("Avoidance of Collateral Transfers as Constructively Fraudulent under Section 548 of the Bankruptcy Code"); Count XV ("Avoidance

of Collateral Transfers as Constructively Fraudulent Under Section 544 and Applicable State

Fraudulent Conveyance or Fraudulent Transfer Law"); Count XVII ("Avoidance of Funds

Sweep as Constructively Fraudulent Under Section 548 of the Bankruptcy Code"); Count XIX

("Avoidance of Funds Sweep as Constructively Fraudulent Under Section 544 and Applicable

State Fraudulent Conveyance or Fraudulent Transfer Law"); and Count XXIII ("Avoidance of

Preferential Transfer of September Transfers Under Section 547 of the Bankruptcy Code").  On

this basis, Plaintiffs seek to recover the value of certain of the Disputed Collateral Transfers

under section 550 of the Bankruptcy Code.  *See* First Am. Compl. Counts IX, XVI, XVIII, XX,

and XXIV.

 Plaintiffs argue that the Disputed Collateral Transfers are not protected from avoidance

by section 546(e) because they "had nothing to do with" any JPMC "exposure" under the

Clearance Agreement or its various derivatives transactions and were not made "in connection

with" a safe-harbored securities contract.  *See* First Am. Compl. ¶ 62 (transfers "were not made

in connection with exposure under the 2000 Clearance Agreement"); Pls.' Opp'n at 51

("[N]either the September Agreements nor the $8.6 billion of collateral transfers acted as credit

support for clearance and trading activity under the 2000 Clearance Agreement" because

"JPMorgan had already determined that it had sufficient credit support in place … .").

 Plaintiffs dispute the significance of the fact that much of the collateral posted with

JPMC in September 2008 ultimately was applied by JPMC to cover exposure arising from safe-

harbored transactions.  *See* 5/10/11 Hr'g Tr. 100:18-24 (counsel for Committee) ("…it's not the

law that you can look back retrospectively and sanitize fraudulent transfer after the fact.

Whether it's a fraudulent transfer and whether the safe harbor applies … should be decided at the

time the transfer takes place … .").

Plaintiffs question the legitimacy of these JPMC claims and contest the calculation of these amounts purportedly owing. *See* Pls.' Opp'n 59; *but see* 5/10/11 Hr'g Tr. 42:10-13 (counsel for JPMC) (confirming that "an overwhelming amount of JPMorgan's exposures and ultimate claims …were the clearance advances and derivatives claims"), 43:13-17 ("more than ninety percent of the collateral was used to pay what are obviously safe harbor claims … [and, therefore, it is] glaringly obvious that the September Agreements related to JPMorgan's safe harbor claims"). Plaintiffs submit that JPMC should not be able to exploit the recognition of this subsequent liability to "retroactively cloak" the collateral demands under the shelter of section 546(e). *See* Pls.' Opp'n at 59.

Plaintiffs have focused on whether the transfer of collateral related to exposure under a safe-harbored contract that existed *at the time of the collateral demand*. *See* 5/10/11 Hr'g Tr. 106:9-11 ("It's not entered into in connection with a protected contract because they had zero exposure at that time under the safe harbor contracts."); First Am. Compl. ¶ 62 (alleging that JPMC had enough collateral at that time to cover its intra-day clearing risk); *id.* at ¶ 69 (JPMC demanded the collateral not to cover then-existing exposure but rather to serve as an "extra cushion"); *id.* at ¶ 268 ("[The Disputed Collateral Transfer] was posted by LBHI *at a time when JPMorgan did not have the contractual right to demand collateral under the derivatives or other contracts*.") (emphasis added).

The "in connection with" requirement of section 546(e) does not contain any temporal or existential requirement that a transfer must be "in connection with" then-outstanding legal exposure. Indeed, section 546(e) does not include any language that refers either to exposure or timing. The formulation is quite simple: a transfer is safe-harbored if it is "in connection with" a securities contract. And the words "in connection with" are to be interpreted liberally.

It is proper to construe the phrase "in connection with" broadly to mean "related to."  *See Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.)*, 240 BR 195, 202 (Bankr. S.D.N.Y. 1999) (interpreting the plain language of section 546(g), an analogue to section 546(e), and concluding that "a natural reading of 'in connection with' suggests a broader meaning similar to 'related to'"); *In re Keller Fin. Servs. of Fl.*, 248 B.R. 859, 879 (Bankr. M.D. Fl. 2000) (citation omitted) (interpreting section 329 of the Bankruptcy Code and noting that "the scope of the phrase 'in connection with' is broad"); *In re Powell*, 314 B.R. 567, 571 (Bankr. N.D. Tex. 2004) (interpreting section 330(a) of the Bankruptcy Code and liberally construing the phrase "in connection with").

Given this liberal interpretation of "in connection with," the Disputed Collateral Transfers necessarily "relate to" safe-harbored securities contracts.  For example, the Amended Complaint itself points out that JPMC demanded the Disputed Collateral Transfers under the September Agreements.  *See* First Am. Compl. ¶ 62 (noting that the September collateral requests were "made pursuant to [the September Agreements]" but arguing that such a purported connection to clearance activity was a pretext and sham); *id.* at ¶ 82 (alleging that JPMC "demanded and received" $8.6 billion in collateral "pursuant to the September Agreements"). Furthermore, the agreements themselves expressly reference safe-harbored "derivative transactions" and safe-harbored "clearing advances."  *See* Wolf Decl. Ex. 7 (September Guaranty) at 1; Ex. 8 (September Security Agreement) at 1.  Without doubt, the disputed transfer of collateral "related to" the safe-harbored Clearance Agreement, the September Security Agreement, and the September Guaranty.

Additionally, the suggestion that there should be demonstrable exposure as a condition to satisfying the "in connection with" language of section 546(e) advocated by Plaintiffs would

make it difficult to assure safe harbor protections without making an impractical and burdensome inquiry as to the status of countless derivatives positions at arbitrary points in time in the multiple dealings between counterparties.  Such a focus is not well-suited to analyzing liabilities under complex financial relationships with exposures that change materially and rapidly with movements of the markets.  Therefore, the Court concludes that the Disputed Collateral Transfers are within the scope of section 546(e) and that Counts VIII, XV, and XXIII should be dismissed.

Counts XVII and XIX adopt the same approach and seek to avoid the Funds Sweep from the LBHI deposit account to JPMC's separate general ledger account in the week prior to LBHI's bankruptcy.  *See* Pls.' Opp'n at 60 (arguing that Counts XVII and XIX state plausible claims for relief because "JPMC's subsequent unauthorized transfers [of the Funds Sweep] would not qualify for safe harbor status because they were not made as part of, or to facilitate, any securities contract … .").

These counts fail as well because the transfer of funds at issue constitutes a transfer "in connection with" a securities contract and is fully protected from avoidance by the language of section 546(e).  The Funds Sweep involved the internal movement of funds deposited as collateral pursuant to JPMC's requests in September 2008 – transfers that fit within the scope of section 546(e).  Because the original deposits were made "in connection with" safe-harbored securities contracts, the subsequent transfers within JPMC of those funds likewise are safe-harbored under section 546(e).

E.      *Section 546(e) also shields LBHI's Obligations from avoidance even though the word "obligations" does not appear in the text of section 546(e).*

*(Counts V, VI, VII, X, XI, XII, XIII, and XIV of the Amended Complaint)*

In addition to claims to avoid the liens granted and the Disputed Collateral Transfers made under the August and September Agreements, the Amended Complaint seeks to avoid LBHI's Obligations under the Guarantees as constructively fraudulent transfers and preferences. *See* First Am. Compl. Counts VI, VII, XI, XII; Pls.' Opp'n at 19 ("The Guarantees themselves are not transfers covered by the safe harbors – they are incurrences of obligations.").

Plaintiffs endeavor to distinguish the incurrence of obligations under the Guarantees from the transfers themselves and thereby to transform a claim that otherwise would be exempt into one that escapes the preclusive impact of section 546(e).  Plaintiffs contend that avoiding LBHI's Obligations would effectively nullify the August and September Agreements by rendering them "meaningless."  *See* First Am. Compl. Counts XIII and XIV; Pls.' Opp'n at 19 ("Without those guarantees, JPMorgan has no valid lien on the LBHI deposits at JPMorgan … .").   These counts of the Amended Complaint are creative efforts to craft theories of recovery that are outside the ambit of the safe harbors and are subject to more lenient standards of proof.

Because the language of section 546(e) as written includes no express references to the incurrence of obligations, Plaintiffs are correct that the incurrence of obligations is not exempt from avoidance, and the following paragraphs in this section confirm that analysis.  Plaintiffs are not correct that this notional ability to assert that an obligation is not exempt from avoidance is an acceptable means to whittle away at or undermine the effectiveness of the safe harbors.  Despite the linguistic exercise, the safe harbors still protect the transactions between Lehman and JPMC.

The exclusion of "obligations" from the statutory exemption, thus, becomes something of a Pyrrhic victory for Plaintiffs. The Guarantees are not transfers themselves, yet they are resistant to successful challenge because they connect so directly to transfers that are exempt and beyond reach. A transfer made in connection with a securities contract remains unavoidable regardless of whether the Guarantees could potentially be avoided.

In the Amended Complaint, Plaintiffs assert that section 546(e) cannot protect LBHI's Obligations from avoidance because that section does not refer to "obligations." *See* First Am. Compl. ¶¶ 116, 123, 130, 147, 155, 163. Their argument is textual: because the word "obligation" is missing from section 546(e), "obligations" such as LBHI's Obligations under the Guarantees are not protected. *See* Pls.' Opp'n at 20 ("[O]ne need look no further than the plain and unambiguous text of [section 546(e)] to determine that the section 546 safe harbors only shield from avoidance certain transfers and not the incurrence of obligations.").

This choice of language in the statute may reflect an intentional decision by Congress to differentiate between transfers and obligations. *See* 5/10/11 Hearing Tr. 86:2-19 (counsel for Committee) ("The Code treats transfers and obligations differently … . Congress has separately and specifically included the words 'incurrence of obligation' in some statutes and not in others."). It is difficult to know what Congress actually meant with any confidence, although given the purposes of section 546(e) to immunize the markets from certain bankruptcy risks and the seemingly boundless definition of the term "transfer," this may be an example of a word that is supposed to transcend its ordinary meaning to include the incurrence of obligations.

Although the Bankruptcy Code does not define the term "obligation," it does define "transfer" to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, *of disposing or parting with* – (i) property or (ii) an interest in property." 11 U.S.C.

§ 101(54)(D) (emphasis added).  It follows, then, that section 546(e), in providing exemptions

for "transfers," plainly protects "each mode" of "disposing or parting with" Lehman's property

or interests in property, including modes that are merely "conditional."

Looking at this definition, the incurrence of an obligation by itself does not constitute a

mode of "disposing or parting with" property.  Instead, it is a preliminary aspect of a

transactional process that must occur prior to or as a condition of transferring property or an

interest in property.  No doubt these two concepts – transfer and obligation – are very closely

related, but they are not identical.

The parsing of English can be difficult, but even when the word "transfer" is given a

most expansive meaning that encompasses every conceivable means of disposing or parting with

property or an interest in property, it still fails to capture the meaning of the undefined term

"incurrence of an obligation."  Becoming obligated to a counterparty is not the same as parting

with property.

This conclusion is supported by several cases that have distinguished between "transfers"

and "obligations" in other contexts not involving section 546(e), including sections 547 and 548.

*See* Pls.' Opp'n at 19-35, citing, *inter alia, In re Asia Global Crossing, Ltd.*, 333 B.R. 199, 203-

204 (Bankr. S.D.N.Y. 2005) (holding that a guaranty was not a transfer in the context of section

502(d)); *Covey v. Comm. Nat'l Bank of Peoria*, 960 F.2d 657, 661 (7th Cir. 1992) (noting that a

guaranty was an obligation and not a transfer in the implied fraudulent transfer context).

These authorities confirm that the words "transfers" and "obligations" have different

meanings and may be distinguished in construing other sections of the Bankruptcy Code.  The

word "transfer" also happens to be one of those chameleon-like terms that may be interpreted

differently depending on context.  Courts interpreting section 547 have recognized that "what

constitutes a 'transfer' under one subsection of § 547 does not necessarily constitute a transfer under a different subsection." *Hall-Mark Elecs. Corp. v. Sims (In re Lee)*, 108 F.3d 239, 240 (9th Cir. 1997).

Regardless of these nuanced interpretations, the language used in section 546(e) uses the word "transfer" but omits any reference to the incurrence of obligations. The missing words may not be supplied by any reasonable construction. One possibility would be to blur the distinctions between "transfer" and "obligation" and find that the words are so closely tied together that they effectively merge into a single concept that fits into the open-ended definition of transfer in section 101(54)(D).

That does not work and would lead to the absurd articulation that to the incurrence of a contingent guaranty obligation is equivalent to a conditional mode of disposing of property or an interest in property – a kind of inchoate transfer from the moment that an obligation is incurred. The words themselves are distinct, however, and cannot be so easily merged. Just because an obligation has been incurred does not mean that any property or interest in property will ever be transferred. It simply means that the legal prerequisite for a possible future transfer has occurred.

This interpretation of the term "transfer" in section 546(e) is consistent with a decision issued last year by my colleague, United States Bankruptcy Judge Robert Drain. *See Geltzer v. Mooney (In re MacMenamin's Grill Ltd.)*, 450 B.R. 414 (Bankr. S.D.N.Y. 2011) ("*MacMenamin's Grill*"). In *MacMenamin's Grill*, a trustee sought to avoid three payments made to individual owners of a bar and grill, the restaurant's incurrence of a loan obligation, and the grant of a security interest in favor of a bank, in connection with a private leveraged buyout. Both the bank and the shareholder defendants moved for summary judgment, conceding that the

challenged payments, incurrence of obligation, and grant of security interest satisfied the

requirements for a constructively fraudulent transfer but were nonetheless shielded from

avoidance by section 546(e) as protected "settlement payments." *See* 11 U.S.C. § 546(e).

In denying the motions for summary judgment, Judge Drain also addressed the argument

that section 546(e) applied to protect the loan obligation from avoidance.  The court noted that

within the Bankruptcy Code as a whole "[t]here clearly is a difference between making a transfer

and incurring an obligation … ."  *MacMenamin's Grill*, 450 B.R. at 429.  *MacMenamin's Grill,*

therefore, supports the interpretation of the term "transfer" urged by Plaintiffs:  "[i]t is clearly

proper … to presume that section 546(e) does not implicitly adopt a definition of 'transfer' that

somehow includes the 'incurrence of an obligation'."  *MacMenamin's Grill*, 450 B.R. at 430.

 Despite the fact that the term "transfer" as used in section 546(e) does not explicitly

encompass obligations such as those incurred by LBHI under the Guarantees, certain

observations in *MacMenamin's Grill* confirm the logic of extending safe harbor protection for

transactions that involve transfers that are connected to obligations.  As Judge Drain noted "…

any payments and any lien that the [bank] received in connection with the securities contract

would not be avoidable, because they were transfers."  *MacMenamin's Grill*, 450B.R. at 430.[15]

Similarly, the transfers in question here are not avoidable because they were additional steps that

took place in connection with the incurrence of obligations.

---

[15] The Second Circuit's decision in *Roswell Capital Partners LLC v. Beshara*, 436 Fed. Appx. 34 (2d Cir. 2011) has
no bearing on this conclusion.  In *Roswell*, the Court noted that "[i]t is black letter law that extinguishing a debt
obligation terminates any accompanying security interest because '[a] security interest cannot exist independent of
the obligation it secures'."  *Roswell*, 436 Fed. Appx. at 35 (citations omitted).  However, *Roswell* was decided in a
completely different context from the circumstances presented here.  The Second Circuit confirmed a district court
holding that a defendant that sought to reinstate its senior security interest by unwinding a debt-to-equity conversion
had lost its security interest by extinguishing the debt obligation (via the debt-to-equity conversion, which in turn,
resulted in full payment on the promissory note) to which the security interest attached.  The obligation at issue in
*Roswell* was not tied to an otherwise safe-harbored transfer or lien.  Accordingly, its holding has no bearing on the
interpretation of section 564(e).

Although the Plaintiffs are correct that the obligations themselves are not shielded by section 546(e), they still are unable to prevail on these counts of the Amended Complaint and have failed to state claims upon which relief may be granted.  The reason for this is that the liens and related collateral transfers remain independently immune from avoidance regardless of whether Plaintiffs can succeed in avoiding the Guarantees.  Dismissal is appropriate because pursuit of these counts ultimately leads to safe-harbored transfers that may not be avoided.

## II. *The counts in the Amended Complaint seeking to avoid and recover actual fraudulent transfers survive the Motion.*

### *(Counts I, II, III, and IV of the Amended Complaint)*

Plaintiffs allege in Counts I, II, and III of the Amended Complaint that the September Agreements, the August Guaranty, the August Security Agreement, and Disputed Collateral Transfers constitute avoidable fraudulent transfers under section 548(a)(1)(A) of the Bankruptcy Code because they were made with the "actual intent to hinder, delay or defraud."  On this basis, Count IV asserts that the estate may recover the value of the Disputed Collateral Transfers under section 550 of the Bankruptcy Code.  These counts state plausible claims for relief that survive the Motion.

Section 548(a)(1)(A) provides that:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily – (A) made such transfer or incurred such obligation with actual intent to hinder, delay or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted …

11 U.S.C. § 548(a)(1)(A).  When alleging such an actual fraudulent transfer, a plaintiff must

"state with particularity the circumstances constituting fraud."  *See* Fed. R. Civ. P. 9(b).  To

plead fraud with the required degree of particularity, a "party asserting an intentional fraudulent

transfer claim under either the Bankruptcy Code [and/or New York state fraudulent conveyance

law] must normally allege (1) the property subject to the transfer, (2) the timing and, if

applicable, frequency of the transfer and (3) the consideration paid with respect thereto."  *See In

re Saba Enters., Inc.*, 421 B.R. at 640 (citations omitted).

"In contrast to the particularity requirement for pleading fraud under Rule 9(b), the intent

element of an intentional fraudulent conveyance claim may be alleged generally so long as the

plaintiff alleges 'facts that give rise to a strong inference of fraudulent intent'."  *In re Saba

Enters., Inc.*, 421 B.R. at 642 (citation omitted); *see also Sharp Int'l Corp. v. State St. Bank &

Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (citation omitted) (noting that,

[d]ue to the difficulty of proving intent … [a plaintiff] may rely on 'badges of fraud' to support

his case").  This strong inference of fraudulent intent, in turn, may be established either "(1) by

alleging facts demonstrating that the Defendants had both the motive and the opportunity to

commit fraud or (2) by alleging facts that constitute strong circumstantial evidence of conscious

misbehavior or recklessness."  *See In re Saba Enters., Inc.*, 421 B.R. at 642 (internal quotation

marks and citations omitted).

The following badges of fraud, when present in a complaint, may create a strong

inference of fraudulent intent:  (i) a close relationship among the parties to the transaction; (ii) a

questionable or hasty transfer not in the ordinary course of business; (iii) the existence of an

unconscionable discrepancy between the value of the property transferred and the consideration

received therefor; (iv) the chronology of the events and transactions under inquiry; (v) the

existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurrence of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (vi) whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.  *See, e.g., In re Kaiser*, 722 F.2d 1574, 1582-83 (2d Cir. 1983) (upholding an intentional fraudulent transfer claim based on the presence of multiple badges of fraud); *In re Enron Corp.*, 328 B.R. 58, 73-75 (Bankr. S.D.N.Y. 2005) (denying motion to dismiss where plaintiff alleged sufficient badges of fraud so as to satisfy pleading standard).

The Amended Complaint pleads sufficient "badges of fraud" to satisfy Rule 9(b) and create a "strong inference of fraudulent intent."[16]  Specifically, the Amended Complaint alleges the existence of the following factors:  (i) LBHI was wholly dependent on JPMC for the conduct of its business, and JPMC was an insider with unparalleled access to information regarding LBHI's state of affairs and future plans (¶¶ 2, 4, 35); (ii) each transaction occurred on a rushed basis prior to LBHI's bankruptcy, with little or no negotiation, and was unprecedented in the prior course of business between the parties, and the industry generally (¶¶ 46-48, 58, 66-67); (iii) LBHI received no consideration in exchange for incurring billions of dollars in potential obligations pursuant to the agreements, or for transferring billions of dollars in LBHI assets to JPMC (¶¶ 5, 33, 56); (iv) these transactions resulted in a massive drain of LBHI liquidity and an unjustified transfer of property to JPMC prior to LBHI's bankruptcy petition (¶ 74); and (v) each

---

[16] Plaintiffs argue that two other independent bases exist for the Court to infer fraudulent intent:  (i) that the Amended Complaint sufficiently alleged that JPMC "supplanted" its will for that of LBHI and that its intent to hinder, delay or defraud LBHI's creditors should be "imputed" to LBHI for purposes of  the actual fraud claims; and (ii) that the Amended Complaint sufficiently demonstrated that "the certain and foreseeable consequences of the conveyances was to hinder, delay, or defraud creditors of LBHI."  *See* Pls.' Opp'n at 61, 65-70.  Because the alleged badges of fraud are sufficient to create a "strong inference of fraudulent intent," it is unnecessary to address the Plaintiffs' alternative legal arguments for the survival of these counts of the Amended Complaint.

transaction occurred at a time when LBHI was insolvent and/or undercapitalized (¶¶ 5, 30, 60, 66).  *See* First Am. Compl.

JPMC argues that the Court may not apply the so-called "relaxed" pleading standards that would permit a complaint seeking to avoid an actual fraudulent transfer to survive a motion to dismiss based solely on allegations of circumstantial badges of fraud.  *See* 5/10/11 Hr'g Tr. 55:13-56:13.  JPMC argues that:  (i) this approach ceases to be valid in light of the recent Supreme Court decisions of *Twombly* and *Iqbal*, and (ii) such an approach is not available to a debtor-in-possession.  *See* Reply 34-5.

While *Twombly* and *Iqbal* together have toughened the pleading standards for purposes of judging the adequacy of a complaint under Rule 12(b)(6), those cases do not speak directly to questions as to the sufficiency of a complaint that alleges badges of fraud as a means to infer fraudulent intent for purposes of Rule 9(b).  To support its position, JPMC relies on a single recent decision issued by a bankruptcy court in Texas.  *See* Reply 34 (citing *Airport Blvd. Apartments, Ltd. v. NE 40 Partners, Ltd. P'ship (In re NE 40 Partners, Ltd. P'ship)*, 440 B.R. 124, 127-8 (Bankr. S.D. Tex. 2010) (declining to adopt a "more flexible approach" to Rule 9(b) when analyzing actual fraud claims asserted by third-party bankruptcy trustees in light of *Twombly* and *Iqbal*)); 5/10/11 Hr'g Tr. 55:13-21.

This isolated case is insufficient to cause the Court to break from other persuasive authority confirming that the Rule 9(b) standard may be relaxed in appropriate circumstances. *See, e.g., Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am. Inc.)*, 405 B.R. 527, 544-45 (Bankr. D. Del. 2009) (citation omitted) (post-*Twombly* and *Iqbal*,[17] recognizing that courts continue to relax pleading

---

[17] *Iqbal* was decided on May 18, 2009; *In re Fedders N. Am. Inc.* was decided on May 21, 2009.  Given the close proximity in timing, the court in *Fedders* appears not to have considered *Iqbal* in its decision.

standards and allow plaintiff trustees to allege "badges of fraud" because "actual fraud is rarely

proven by direct-evidence, as individuals are rarely willing to admit such an intent"); *Chase*

*Bank, U.S., N.A. v. Vanarthos (In re Vanarthos)*, 445 B.R. 257, 263 (Bankr. S.D.N.Y. 2011)

(Glenn, J.) (post-*Twombly* and *Iqbal*, concluding that a complaint alleging fraud and seeking

non-dischargeability of debt under section 523(a)(2)(A) satisfied the "particularity" requirement

of Rule 9(b) by alleging a number of "circumstantial factors" ).

Pleading the badges of fraud has been found to satisfy the intent requirement of section

548(a)(1)(A).  *See, e.g., Enron*, 328 B.R. at 73, 74 (denying motion to dismiss claims brought by

a debtor-in-possession to avoid an actual fraudulent transfer, and concluding that those claims

satisfied the "relaxed" pleading requirements of Rule 9(b), when the complaint alleged badges of

fraud).  Applying such a relaxed standard for Lehman also is appropriate in view of the

enormous disruption caused by the bankruptcy filing and the immediate loss of so many senior

level employees with institutional memory.  *See id.*  (finding that the debtor-in-possession was

operating under "the same disadvantage" usually faced by a trustee with second-hand knowledge

of the relevant facts because personnel and senior management with first-hand knowledge of the

relevant facts departed the company early in the company's bankruptcy).  Moreover, the

transactions at issue are so extraordinarily complicated and intertwined that describing them with

any further detail would pose a special challenge.

In this respect, the Lehman cases are exceptional and distinguishable from other cases

that have declined to permit a relaxed pleading standard under Rule 9(b) because of the ability to

take an examination pursuant to Federal Rule of Bankruptcy Procedure 2004 ("Rule 2004") prior

to the filing of a complaint.  *See Liquidation Trust v. Daimler AG (In re Old CarCo LLC)*, 435

B.R. 169, 191-92 (Bankr. S.D.N.Y. 2010) (in *dicta*, noting that under the "circumstances of this

case," relaxed pleading standards under Rule 9(b) were inappropriate because, *inter alia*, the

trust plaintiff had prior access to Rule 2004 discovery).

Under the circumstances presented here, it is sufficient for purposes of Rule 9(b) for the

Plaintiffs to have alleged the badges of fraud in the Amended Complaint, and the Motion is

denied with respect to those counts that seek to avoid and recover actual fraudulent transfers.

### III.   *The twenty-five other counts survive the Motion.*

In addition to the claims under Bankruptcy Code sections 544, 547, 548 and 550

discussed in this decision, Plaintiffs have pleaded twenty-five other counts under both the

common law and the Bankruptcy Code (the "Other Remaining Counts"),[18] which, like Plaintiffs'

claims related to section 548(a)(1)(A) of the Bankruptcy Code, are not protected by the safe

harbors of the Bankruptcy Code and thus survive the Motion.[19]  JPMC posits various theories

pursuant to which the Other Remaining Counts should be dismissed including, among other

arguments, that certain of Plaintiffs' common law claims are preempted by federal bankruptcy

law, Plaintiffs fail to allege fraud with particularity, Plaintiffs have failed to plead sufficient facts

---

[18] These counts are included in the earlier-defined Remaining Counts.

[19] Such Other Remaining Counts include the following claims under the common law: (i) a common law fraud claim
(Count XLIX), (ii) claims for the imposition of a constructive trust and turnover, unjust enrichment, and conversion
(Counts XXXII, XXXVI, XXXVII, XXXIX, and XL), (iii) a claim seeking a declaratory judgment that JPMC has
no lien over a certain $6.9 billion in funds pursuant to either the August or the September Agreements (Count
XXXVIII), (iv) a claim seeking a declaratory judgment invalidating the September Agreements based on theories of
coercion and/or duress, lack of authority or apparent authority, and lack of consideration, as well as other claims for
coercion and/or duress (Counts XXXV, XLVI, and XLVIII), and (v) various claims in the alternative for breaches of
the Clearance Agreement and the August Agreements and breaches of the implied covenant of good faith and fair
dealing with respect to the August Agreements and the September Agreements (Counts XLI, XLII, XLIII, XLIV,
XLV, and XLVII).  Such Other Remaining Counts also include the following claims under the Bankruptcy Code: (i)
a claim for turnover of excess collateral under Bankruptcy Code section 542 (Count XXV); (ii) setoff claims,
including the avoidance of the September Transfers (as defined in Exhibit A to this decision) as transfers made for
the purposes of obtaining a right of setoff under Bankruptcy Code section 553(a) (Count XXVI), the avoidance of
the September Transfers (as defined in Exhibit A to this decision) as an improvement in position under Bankruptcy
Code section 553(b) (Count XXVIII), and related claims for turnover (Count XXVII) and recovery of avoided
transfers (Count XXIX); (iii) a claim for equitable subordination under Bankruptcy Code sections 510(c) and 105(a)
(Count XXX); (iv) claims alleging a violation of the automatic stay (Counts XXXIII and XXXIV); and (v)
disallowance of claims under Bankruptcy Code section 502(d) and avoidance of liens securing such claims under
Bankruptcy Code section 506(c) (Count XXXI).

to support their claims, and generally, that many of Plaintiffs' claims fail to state a claim upon which relief can be granted. None of these arguments, however, is sufficient to prevent Plaintiffs from pursuing the Other Remaining Counts.

For the purposes of the Motion, the allegations of the Amended Complaint must be accepted as true. It alleges that JPMC, using its "unique position as primary clearing bank to Lehman's broker-dealer business," put a "financial gun to LBHI's head" by threatening to stop crucial clearing services to LBHI's subsidiaries, including LBI, and further used such threats to "extract extraordinarily one-sided agreements from LBHI literally overnight" and to "siphon billions of dollars in critically needed assets" in order to "leapfrog JPMorgan over other creditors … ." *See* First Am. Compl. ¶¶ 1-8.

While the safe harbors of section 546(e) exist to protect the capital markets and should be strictly construed as written to carry out their salutary objectives, they are not so exalted as to trump and preemptively block every other legal theory that a creative adversary might choose to employ when seeking relief from conduct of a market participant that is outside the norms of ordinary market behavior and that is claimed to be egregious. Plaintiffs have made such claims here.

The Amended Complaint represents something of a laundry list approach to litigation. It identifies a wide-ranging variety of causes of action with the goal of obtaining redress for the harms allegedly suffered due to the actions of JPMC. This multi-pronged approach is what lawyers tend to do in complex disputes like this: they look for theories that may gain traction, but at the start of a case it is tough to predict which of the various theoretical constructs that may apply will prove in practice to be the most suitable means to remedy the alleged wrongdoing.

This expansive approach to identifying other workable theories of recovery is not impacted by the safe harbors. The safe harbors are not all encompassing and do not offer "fail safe" protection against every cognizable claim made in relation to transactions that may fit within the statutory framework. The safe harbors necessarily do not extend to the open waters of litigation and are not an impenetrable barrier to other claims against a market participant that has behaved in a manner that may expose the actor to potential liability. In sum, these important protections do not grant complete immunity from every conceivable claim made by Plaintiffs. Indeed, how could they?

The plain language of section 546(e), read literally, provides limited immunity but does not bar Plaintiffs from maintaining all common law claims, intentional fraud claims and any other claims not expressly embraced by section 546(e). As to these causes of action that are outside the scope of the safe harbors, Plaintiffs, for present pleading purposes, have adequately set forth claims that survive the Motion and that should proceed to a determination on the merits based on facts to be presented in any dispositive motions or at trial.

This is true not only as a general proposition but also based on a count-by-count assessment of the arguments made by the parties, as reflected in Exhibit A. This summary evaluates the Motion in reference to the Other Remaining Counts and shows that these claims survive because, in each instance, the Plaintiffs have given more persuasive arguments concerning the plausibility and viability of their legal theories, at least for purposes of moving ahead with their case against JPMC.

Without limiting the points made in Exhibit A, the Court is satisfied that the Amended Complaint pleads sufficient "badges of fraud" and complies with the requirements of Rule 9(b) for purposes of pleading fraudulent intent with particularity. Also, consistent with earlier

comments in this section regarding the safe harbors, JPMC's argument that federal bankruptcy law preempts certain of the Plaintiffs' unjust enrichment and conversion claims falls short.[20]

JPMC cites two cases in support of its argument, *Contemporary Indus. Corp. v. Frost (In re Contemporary Indus. Corp.)*, 564 F.3d 981 (8th Cir. 2009) and *Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del., Inc.)*, 274 B.R. 71 (D. Del. 2002). In both of these cases, however, the unjust enrichment claims were identical to the plaintiffs' constructively fraudulent transfer claims under the Bankruptcy Code and also were based upon the same facts as these constructive fraud claims. *See Contemporary Indus.*, 564 F.3d at 984, 988; *Hechinger*, 274 B.R. at 96.

This litigation is different. The claims that JPMC argues should be preempted by federal bankruptcy law are unlike classic avoidance claims for constructively fraudulent transfers. Instead, these claims have more in common with claims grounded in actual fraudulent intent. *See* 5/10/11 Hr'g Tr. 147:18-20, 148:4-10. These claims are not to be treated as replicas of claims to recover constructively fraudulent transfers, and, along with the rest of the Other Remaining Counts, they survive the Motion for further adjudication.[21]

### Conclusion

This decision enforces a blanket exemption taken directly from the language of section 546(e): notwithstanding the right that otherwise exists to avoid transfers under the Bankruptcy Code, no transfer may be avoided that is made by or to a financial institution in connection with a securities contract. That declarative statement is an overriding principle that mandates

---

[20] The claims affected by JPMC's federal preemption argument include Counts XXXII, XXXVI, XXXVII, XXXIX, and XL.

[21] *See* Exhibit A to this decision for a specific claim-by-claim analysis that states the reasons for denial of the Motion applicable to the Other Remaining Counts.

dismissal of those counts in the Amended Complaint that seek avoidance of such transfers made to JPMC.

The Remaining Counts survive the Motion to be resolved at a later stage of this adversary proceeding.  The parties are directed to submit an agreed form of order that dismisses Counts V through XXIV and that denies the Motion as to the Remaining Counts.


Dated: New York, New York
       April 19, 2012

                                    _____*s/ James M. Peck*_____
                                    Honorable James M. Peck
                                    United States Bankruptcy Judge

**Exhibit A**
**Analysis of the Other Remaining Counts**

Turnover of Excess Collateral

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| Count XXV – Turnover of Property Held by JPMC Under Section 542 of the Bankruptcy Code (Turnover of Excess Collateral)[1] | ● The claim for turnover is based on the theory that the September Agreements are "void and invalid," which they are not. (Mem. Supp. Mot. Dismiss Point III.C.3; Reply Point II.C).<br>● Plaintiffs do not allege facts showing that the Excess Collateral is property of the estate. Property that has been fraudulently or preferentially transferred does not become property of the estate until it has been recovered. (Mem. Supp. Mot. Dismiss Point III.C.3; Reply Point II.C).<br>● Any claim for turnover under Bankruptcy Code section 542 is barred by the Collateral Disposition Agreement,[2] which provides that Bankruptcy Code sections 502(d), 541, and 542 shall not apply until a final non-appealable order or settlement agreement resolves all claims of JPMC and its affiliates against the Debtors (as defined in the Collateral Disposition Agreement) and | ● The September Agreements are invalid and unenforceable. (Pls.' Opp'n Point II.B.1).<br>● The Amended Complaint demonstrates that LBHI owned the Excess Collateral and transferred it to JPMC. (Pls.' Opp'n Point II.B.1).<br>● There has been no determination in the case yet as to whether the property was fraudulently or preferentially transferred. Plaintiffs should not be denied the alternative basis for relief that because the September Agreements are void and invalid. Plaintiffs are entitled to the return of the Excess Collateral pursuant to Bankruptcy Code section 542. (Pls.' Opp'n Point II.B.1).<br>● The Collateral Disposition Agreement simply governs the timing of certain payments that may result from any claim for relief; it does not govern the timing of | ● Plaintiffs state a claim for turnover of the Excess Collateral. They have adequately alleged that the September Agreements are void and invalid and that therefore JPMC had no right to hold the Excess Collateral.<br>● The Court agrees with Plaintiffs that the Collateral Disposition Agreement does not bar this claim. |

---

[1] Excess Collateral is defined in the Amended Complaint as collateral that, on the evening of September 12, 2008 was held by JPMC and posted by LBHI that did not secure any obligations of LBHI to JPMC.

[2] The Collateral Disposition Agreement refers to the agreement approved by this Court's Order Pursuant to Sections 363 of the Bankruptcy Code and Bankruptcy Rule 6004 Approving Collateral Disposition Agreement Among the Debtors and JPMorgan Chase Bank, N.A., et al., dated March 24, 2010, Case No. 08-13555, ECF No. 7785.

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | all potential actions, proceedings, and challenges with respect to such claims, the collateral posted by Lehman to JPMC in respect of such claims, and payment on the claims. (Mem. Supp. Mot. Dismiss Point III.C.4; Reply Point II.C). | any such claims. (Pls.' Opp'n Point II.D). | |

Setoff Related Claims

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| Count XXVI – Avoidance of September Transfers[3] as Transfers Made for the Purposes of Obtaining a Right to Setoff under Section 553(a)(3) of the Bankruptcy Code | ● Plaintiffs do not allege facts showing that a setoff occurred. (Mem. Supp. Mot. Dismiss Point III.B.1; Reply Point II.B.1).<br>● Bankruptcy Code section 553(a)(3) does not give the debtor a right to "avoid" pre-petition setoffs, it simply describes exceptions to the rule that the Bankruptcy Code does not effect a party's right to set off claims. (Mem. Supp. Mot. Dismiss Point III.B.2; Reply Point II.B.1).<br>● If a setoff did in fact occur, it was authorized and protected by the Bankruptcy Code's safe harbors. (Mem. Supp. Mot. Dismiss Point III.B.3; Reply Point II.B.1). | ● Bankruptcy Code section 542(b) provides that property of the estate must be turned over except to the extent that such debt may be offset under Bankruptcy Code section 553. (Pls.' Opp'n Point II.B.2).<br>● The purpose of sections 553(a) and (b) is to prevent a creditor from intentionally accumulating the debtor's property on the eve of bankruptcy. The Amended Complaint describes how JPMC's purpose in making its collateral demands in the week before LBHI's bankruptcy was to put itself ahead of other creditors and to use such collateral to satisfy its claims in an LBHI bankruptcy. The fact that JPMC did not exercise a prepetition setoff has no bearing on whether JPMC built up an LBHI asset pool for the improper goal of | ● Plaintiffs state a claim for the avoidance of the September Transfers as transfers made for the purposes of obtaining a right of setoff under Bankruptcy Code section 553(a)(3). They have adequately alleged that JPMC's purpose in making the collateral demands that led to the September Transfers the week before LBHI's bankruptcy was to put itself ahead of other creditors and to use such collateral to satisfy |

---

[3] The Amended Complaint defines the September Transfers as the $8.6 billion in transfers from LBHI to JPMC in September 2008.

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | | improving its position over LBHI's other creditors. (Pls.' Opp'n Point II.B.2). ● The safe harbors do not apply to the transactions at issue. (Pls.'s Br. Point II.B.2). ● In response to JPMC's argument that 553(a)(3) does not give an avoidance power, Plaintiffs argue that Counts XXVI and XXVIII function as an independent challenge to any assertion by JPMC that it is entitled to withhold LBHI's property in order to set off against its claims against the bankruptcy estate. (Pls.' Opp'n Point II.B.2). | JPMC's bankruptcy-related claims. ● *See* Count XXXIII regarding safe harbor arguments. |
| Count XXVII – Turnover of September Transfers under Section 542 of the Bankruptcy Code | ● The claim for turnover is based on the theory that the September Agreements are "void and invalid," which they are not. (Mem. Supp. Mot. Dismiss Point III.C.3; Reply Point II.C). ● Plaintiffs do not allege facts showing that the property sought is property of the estate. Property that has been fraudulently or preferentially transferred does not become property of the estate until it has been recovered. (Mem. Supp. Mot. Dismiss Point III.C.3; Reply Point II.C). ● Any claim for turnover under Bankruptcy Code section 542 is barred by the Collateral Disposition Agreement, which provides that Bankruptcy Code sections 502(d), 541, and 542 shall not apply until a final non- | ● The September Agreements are invalid and unenforceable (Pls.' Opp'n Point II.B.1) ● The Amended Complaint demonstrates that LBHI owned the property and transferred it to JPMC (Pls.' Opp'n Point II.B.1). ● There has been no determination in the case yet as to whether the property was fraudulently or preferentially transferred. Plaintiffs should not be denied the alternative basis for relief that because the September Agreements are void and invalid Plaintiffs are entitled to the return of the September Transfers pursuant to Bankruptcy Code section 542. (Pls.' Opp'n Point II.B.1). | ● If Plaintiffs are successful on their claim that the September Transfers were made for the improper purpose of obtaining a right to set off, they are entitled to a turnover of the September Transfers. ● Plaintiffs state a claim for turnover of the September Transfers. They have adequately alleged that the September Agreements are void and invalid and that therefore JPMC had |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|-------|-----------------|----------------------|------------------------------------------|
| | appealable order or settlement agreement resolves all claims of JPMC and its affiliates against the Debtors (as defined in the Collateral Disposition Agreement) and all potential actions, proceedings, and challenges with respect to such claims, the collateral posted by Lehman to JPMC in respect of such claims, and payment on the claims. (Mem. Supp. Mot. Dismiss Point III.C.4; Reply Point II.C). | ● The Collateral Disposition Agreement simply governs the timing of certain payments that may result from any claim for relief; it does not govern the timing of any such claims. (Pls.' Opp'n Point II.D). | no right to hold the September Transfers.<br>● The Court agrees with Plaintiffs that the Collateral Disposition Agreement does not bar this claim. |
| Count XXVIII – Avoidance of September Transfers as Improvement in Position under Section 553(b) of the Bankruptcy Code | ● Plaintiffs do not allege facts showing that a setoff occurred. (Mem. Supp. Mot. Dismiss Point III.B.1; Reply Point II.B.1).<br>● Plaintiffs have abandoned "avoidance" of the September Transfers under section 553(b). (Reply Point II.B.1).<br>● If a setoff did in fact occur, it was authorized and protected by the Bankruptcy Code's safe harbors. (Mem. Supp. Mot. Dismiss Point III.B.3; Reply Point II.B.1). | ● Bankruptcy Code section 542(b) provides that property of the estate must be turned over except to the extent that such debt may be offset under Bankruptcy Code section 553. (Pls.' Opp'n Point II.B.2).<br>● The purpose of sections 553(a) and (b) is to prevent a creditor from intentionally accumulating the debtor's property on the eve of bankruptcy, the Amended Complaint describes how JPMC's purpose in making its collateral demands in the week before LBHI's bankruptcy was to put itself ahead of other creditors and to use such collateral to satisfy its claims in an LBHI bankruptcy. The fact that JPMC did not exercise a pre-petition setoff has no bearing on whether JPMC built up an LBHI asset pool for the improper goal of improving its position over LBHI's other creditors (Pls.' Opp'n Point II.B.2).<br>● The safe harbors do not apply to the | ● Plaintiffs state a claim for the avoidance of the September Transfers as transfers made for the purposes of obtaining an improvement of position under Bankruptcy Code section 553(b). They have adequately alleged that JPMC's purpose in making the collateral demands that led to the September Transfers the week before LBHI's bankruptcy was to put itself ahead of other creditors and to use such collateral to satisfy JPMC's bankruptcy-related claims.<br>● *See* Count XXXIII |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | | transactions at issue. (Pls.'s Br. Point II.B.2, citing Pls.' Opp'n Points I and II.C.1). | regarding safe harbor arguments. |
| Count XXIX – Recovery of Avoided Transfers as Impermissible Improvement in Position under Section 550 of the Bankruptcy Code | ● The failure of Plaintiffs' claim alleging improper setoff precludes any recovery pursuant to Bankruptcy Code section 550 based on those claims. (Mem. Supp. Mot. Dismiss Point III.C.1; Reply Point II.D). | ● Plaintiffs' claim for the avoidance of the September Transfers as an improvement of position under Bankruptcy Code section 553(b) is well-plead and not subject to dismissal, therefore Plaintiffs' claim for recovery of the September Transfers under Bankruptcy Code section 550 is not subject to dismissal. (Pls.' Opp'n Point II.D). | ● Plaintiffs' claim pursuant to Bankruptcy Code section 553(b) is not subject to dismissal, therefore Plaintiffs' related claim pursuant to Bankruptcy Code section 550 is not subject to dismissal. |

Violation of Automatic Stay

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| Count XXXIII – Violation of the Automatic Stay | ● Plaintiffs do not adequately allege that JPMC effected a setoff. Plaintiffs claim that JPMC liquidated collateral in which it had a security interest to pay obligations. Where a creditor has a security interest use of its collateral to satisfy a debt it is not a setoff, at most it is a transfer subject to avoidance. (Mem. Supp. Mot. Dismiss Point III.B.4; Reply Point II.B.2).<br>● The Amended Complaint alleges that it was JPMC's setoffs that violated the automatic stay and Bankruptcy Code | ● Whether Bankruptcy Code section 362(b)(17) applies to safe harbor a transfer is a highly fact-specific inquiry regarding the agreement, why the transfer was made, the terms of the agreement and whether or not the action taken by the financial institution after the automatic stay is in effect, relate back to that contract. (5/10/11 Hr'g Tr. 129:25-130:1-6).<br>● The Amended Complaint adequately alleges an unauthorized post-petition setoff of $1.9 billion of claims under swap | ● The Court agrees with Plaintiffs that whether the safe harbors apply to protect a particular setoff is a highly fact-specific inquiry.<br>● Furthermore, regardless of whether the safe harbors might apply to protect a setoff of the $1.9 billion in derivatives obligations |

| | | |
|---|---|---|
| | section 362(a)(7). Bankruptcy Code section 362(a)(7), however, only applies to setoffs, therefore Plaintiffs' argument that the foreclosure of a security interest violates the stay fails. (Mem. Supp. Mot. Dismiss Point II.B.2).<br>● In any event, whether JPMC set off funds or foreclosed a security interest, the Amended Complaint fails to plead a plausible basis as to how such action was not protected by the Bankruptcy Code's safe harbors. (Mem. Supp. Mot. Dismiss Point III.B.4; Reply Point II.B.2). | agreements against funds transferred in connection with the September Agreements. (Pls.' Opp'n Point II.C).<br>● None of these agreements qualify as a protected contract for the purposes of the safe harbors. (Pls.' Opp'n Point II.C.1).<br>● Whether the $1.9 billion was the foreclosure of a security interest or a setoff is irrelevant because either action is a violation of the automatic stay. (Pls.' Opp'n Point II.C.II). | against the collateral posted under the September Agreements if the September Agreements are valid, should the Court determine that the September Agreements are invalid, than a setoff against collateral posted in connection with such invalid agreements would not be a valid setoff. |
| Count XXXIV – Turnover of Funds Seized in Violation of the Automatic Stay | ● Plaintiffs' claim for turnover is based on the theory that JPMC violated the automatic stay, which is not adequately alleged. (Mem. Supp. Mot. Dismiss Point III.C.3; Reply Point II.C).<br>● Plaintiffs do not allege facts showing that the property sought is property of the estate. Property that has been fraudulently or preferentially transferred does not become property of the estate until it has been recovered. (Mem. Supp. Mot. Dismiss Point III.C.3; Reply Point II.C).<br>● Any claim for turnover under Bankruptcy Code section 542 is barred by the Collateral Disposition Agreement, which provides that Bankruptcy Code sections 502(d), 541, and 542 shall not apply until a final non-appealable order or settlement agreement resolves all claims of JPMC and its | ● JPMC improperly set off the $1.9 billion of funds, and consequently, Plaintiffs are entitled to the turnover of such funds. (Pls.' Opp'n Point II.C).<br>● The Amended Complaint demonstrates that LBHI owned the property and transferred it to JPMC (Pls.' Opp'n Point II.B.1).<br>● There has been no determination in the case yet as to whether the property was fraudulently or preferentially transferred. Plaintiffs should not be denied the alternative basis for relief that because JPMC improperly set off the $1.9 billion in funds, Plaintiffs are entitled to the return of such funds pursuant to Bankruptcy Code section 542. (Pls.' Opp'n Point II.B.1).<br>● The Collateral Disposition Agreement simply governs the timing of certain | ● If Plaintiffs are successful on their claim for violation of the automatic stay, they are entitled to a turnover of the related funds.<br>● The Court agrees with Plaintiffs that the Collateral Disposition Agreement does not bar this claim. |

| | | | |
|---|---|---|---|
| | affiliates against the Debtors (as defined in the Collateral Disposition Agreement) and all potential actions, proceedings, and challenges with respect to such claims, the collateral posted by Lehman to JPMC in respect of such claims, and payment on the claims.  (Mem. Supp. Mot. Dismiss Point III.C.4; Reply Point II.C). | payments that may result from any claim for relief; it does not govern the timing of any such claims.  (Pls.' Opp'n Point II.D). | |

Equitable Subordination Claim

| **Claim** | **JPMC's Argument** | **Plaintiffs' Argument** | **Reason Claim Survives Motion to Dismiss** |
|---|---|---|---|
| Count XXX – Equitable Subordination Under Sections 510(c) and 105(a) of the Bankruptcy Code | ● JPMC is not an insider of LBHI; therefore Plaintiffs must allege a heightened degree of inequitable conduct to state a claim for equitable subordination.  Plaintiffs have not adequately alleged that JPMC engaged in inequitable conduct, let alone the egregious inequitable conduct sufficient to support a claim for equitable subordination against a non-insider. (Mem. Supp. Mot. Dismiss Point V; Reply Point IV). | ● The Amended Complaint alleges that JPMC was an insider because it had "unparalleled access" to information about LBHI's financial status and future prospects, including a preview of what LBHI would announce to the markets on its earnings call scheduled for September 10, 2008, an opportunity to review and comment on proposed presentations to rating agencies, was invited to diligence sessions that JPMC in turn used to probe into LBHI's confidential records and plans, and had access to key government financial policy officials and their plans for Lehman as well as insider access to potential suitors for the purchase of Lehman.  (Pls.' Opp'n Point IV.A). <br>● Even if JPMC was not an insider, the Amended Complaint pleads conduct sufficient to justify equitable subordination | ● The Court agrees with Plaintiffs; the Amended Complaint alleges inequitable conduct sufficient to support a claim for equitable subordination. |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | | as the Amended Complaint details numerous examples of how JPMC abused its position as Lehman's clearing bank to impose the massively overreaching September Agreements and siphon billions of dollars of LBHI cash to get ahead of other creditors and capitalize on LBHI's bankruptcy. (Pls.' Opp'n Point IV.B). | |

Disallowance of Claims Under Bankruptcy Code Section 502(d) and Avoidance of Liens Under Section 506(d)

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| Count XXXI – Disallowance of Claims Under Section 502(d) of the Bankruptcy Code and Avoidance of Liens Securing Such Claims Under Section 506(d) | ● Plaintiffs' avoidance claims fail, therefore their claims based on sections 502(d) and 506(d) of the Bankruptcy Code also fail. (Mem. Supp. Mot. Dismiss Point III.C.4; Reply Point II.D). <br> ● Any claim for disallowance under section 502(d) is barred by the Collateral Disposition Agreement, which provides that Bankruptcy Code sections 502(d), 541, and 542 shall not apply until a final non-appealable order or settlement agreement resolves all claims of JPMC and its affiliates against the Debtors (as defined in the Collateral Disposition Agreement) and all potential actions, proceedings, and challenges with respect to such claims, the collateral posted by Lehman to JPMC in respect of such claims, and payment on the | ● Plaintiffs' avoidance claims are not subject to dismissal, therefore Plaintiffs claim for disallowance of claims under Bankruptcy Code section 502(d) and avoidance of the liens securing such claims under Bankruptcy Code section 506(d) similarly survive the Motion. (Pls.' Opp'n Point II.D). <br> ● The Collateral Disposition Agreement simply governs the timing of certain payments that may result from any claim for relief; it does not govern the timing of any such claims. (Pls.' Opp'n Point II.D). | ● As discussed in Section II of this decision, *supra*, certain of Plaintiffs' avoidance claims are surviving the Motion. As such, Plaintiffs' claim under Bankruptcy Code section 502(d) similarly survives the Motion. <br> ● The Court agrees with Plaintiffs that the Collateral Disposition Agreement does not bar this claim. |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | claims. (Mem. Supp. Mot. Dismiss Point III.C.4; Reply Point II.C). | | |

Common Law Fraud Claim

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| Count XLIX – Fraud With Respect to the September 12, 2008 Demand for $5 Billion Cash | ● Plaintiffs fail to allege fraud with particularity under Rule 9(b). (Mem. Supp. Mot. Dismiss Point IV.E; Reply Point III.E).<br>● Plaintiffs fail to plead facts giving rise to a strong inference of fraudulent intent. Instead Plaintiffs simply make a conclusory assertion that at the time Jamie Dimon promised that JPMC would return the $5 billion in collateral at the end of the trading day on September 12, 2008 JPMC had no intention of returning the collateral to LBHI. (Mem. Supp. Mot. Dismiss Point IV.E; Reply Point III.E).<br>● Plaintiffs cannot allege reasonable reliance on the alleged fraudulent promise by Jamie Dimon that JPMC would return the $5 billion in collateral at the end of the trading day on September 12, 2008 because it was inconsistent with the express terms of the September Security Agreement. (Mem. Supp. Mot. Dismiss Point IV.E; Reply Point III.E). | ● Plaintiffs have adequately pleaded fraud with particularity. The Amended Complaint alleges that on or about September 11-12[th] Jamie Dimon personally assured Richard Fuld that the $5 billion in collateral would be returned to LBHI at the end of the trading day on Friday, September 12, 2008. (Pls.' Opp'n Point III.F)<br>● Plaintiffs have pleaded facts giving rise to strong inference of fraudulent intent by describing how (i) contrary to JPMC's representation that it was requesting the $5 billion in collateral to support intra-day clearance-related credit, it already had decided to prevent LBHI from accessing the $5 billion and to withhold the funds to pay itself on any and all claims arising from an LBHI bankruptcy, (ii) JPMC's last-minute demand for $5 billion was the culmination of a campaign to coerce a guaranty and collateral from LBHI for all claims JPMC anticipated would arise upon an LBHI bankruptcy filing, (iii) after | ● For the reasons discussed in Section II of this decision, *supra*, the Court finds that Plaintiffs have adequately pleaded fraud for the purposes of Rule 9(b). The Court agrees that the Amended Complaint pleads facts sufficient to give rise to a strong inference of fraudulent intent. Furthermore, whether LBHI's reliance on any such fraudulent promise by JPMC was reasonable under the circumstances is a question of fact that is not appropriately decided in the context of a motion to dismiss. |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | | obtaining the $5 billion in funds, JPMC swept such funds into its own general ledger account to make sure that LBHI would not have access to the funds and (iv) JPMC then issued firm-wide instructions not to release any LBHI cash or securities for any reason.  (Pls.' Opp'n Point III.F).<br>● It is inappropriate for the Court to determine in a motion to dismiss whether LBHI's reliance on Jamie Dimon's alleged fraudulent promise was reasonable.  In any event, such reliance was reasonable given the rushed circumstances of the case, the fact that Lehman senior management was not aware of the terms of the September Agreements, and given that such reliance was consistent with Lehman's right to obtain overnight access to clearance-related collateral for eight years under the Clearance Agreement.  (Pls.' Opp'n Point III.F). | |

Common Law Claims Allegedly Preempted by Federal Bankruptcy Law

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| Count XXXII – Imposition of Constructive Trust and | *Federal Preemption Argument*<br>● Plaintiffs' state-law claims seeking recovery of collateral transfers are preempted by federal bankruptcy law. Courts have held that claims that seek to | *Federal Preemption Argument*<br>● The cases cited by JPMC, *Contemporary Indus. Corp. v. Frost (In re Contemporary Indus. Corp.)*, 564 F.3d 981 (8th Cir. 2009) (*"Contemporary Industries"*) and *Official* | *Federal Preemption Argument*<br>● The Court is not persuaded by JPMC's argument that certain of |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| Turnover of $5 Billion of Cash | recover the same payments and the same remedy as those that are protected by Bankruptcy Code section 546(e), such as Counts XXXII, XXXVI, XXXVII, XXXIX, and XL of the Amended Complaint are preempted by section 546(e) and should be dismissed. (Mem. Supp. Mot. Dismiss Point IV.A; Reply Point III.A). _Constructive Trust Argument_ ● Plaintiffs' constructive trust claim is effectively based on the same allegations as their fraud claim, and, as with their common law fraud claim, Plaintiffs have failed to plead fraud with particularity. (Mem. Supp. Mot. Dismiss Point IV.F.1; Reply Point III.F). ● Plaintiffs' attempts to plead a constructive fraud claim based on an alleged breach of an oral agreement to return the collateral fail because a written agreement, the September Security Agreement, governs the alleged conduct, and because Plaintiffs have an adequate remedy at law. (Mem. Supp. Mot. Dismiss Point IV.F.1; Reply Point III.F). ● The parties were sophisticated parties engaged in an arms' length lending and financial transactions; as such, Plaintiffs' allegation of a "confidential relationship" between JPMC and LBHI is insufficient as a matter of law. (Mem. Supp. Mot. Dismiss | _Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del., Inc.)_, 274 B.R. 71 (D. Del. 2002), are distinguishable from the case at bar because unlike the claims in those cases, the claims here that JPMC argues are preempted by federal bankruptcy law are not merely "relabeled" avoidance claims. (Pls.' Opp'n Point III.H.2). ● In fact, the claims that JPMC argues are preempted by federal bankruptcy law have nothing to do with the classic avoidance claims. The claims do not hinge on whether LBHI was insolvent at the time of the transfers, whether the transfers were made within the preference period or whether LBHI received adequate consideration. Instead, the claims focus on the conduct of JPMC, whether JPMC acted wrongfully, whether there was lack of authority to enter into the transactions and JPMC knew it, whether there was collusion and whether the agreements were exercised under duress. (5/10/11 Hr'g Tr. 147:21-149:13). ● If the claims at issue have something in common with any of the Plaintiffs' claims under the Bankruptcy Code it is the actual fraudulent conveyance claims. (5/10/11 Hr'g Tr. 148:4-10). | Plaintiffs' claims are preempted by federal bankruptcy law. ● JPMC relies upon the holdings in _Contemporary Industries_ and _Hechinger_ for its argument that certain of Plaintiffs' claims are preempted by federal bankruptcy law. In each of these cases the plaintiffs sought the avoidance of transfers related to certain leveraged buyouts under Bankruptcy Code section 544, and additionally made state law claims for unjust enrichment, and in _Contemporary Industries_, a claim for excessive/illegal distributions. In _Contemporary Industries_, the Eighth Circuit Court of Appeals and the District Court for the District of |

- 11 -

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | Point IV.F.2; Reply Point III.F). | ● The safe harbors do not immunize all transfers under security contracts from attack, rather they provide that particular avoidance remedies cannot be used. If Congress wanted to immunize all transfers under securities contracts it would have said so and it has not. (5/10/11 Hr'g Tr. 148: 16-21).<br><br>_Constructive Trust Argument_<br>● The Amended Complaint clearly alleges that the September Security Agreement is invalid and unenforceable, and therefore it cannot serve as a bar to Plaintiffs' constructive trust claim. (Pls.' Opp'n Point III.G.1).<br>● Plaintiffs' constructive trust claim should not be dismissed because the $5 billion in cash is the subject of other claims pursuant to which Plaintiffs seek a legal remedy. Plaintiffs are permitted to seek an alternative equitable remedy. (Pls.' Opp'n Point III.G.2) .<br>● The Amended Complaint pleads fraud with particularity and specifically alleges that late in the evening of September 11, 2008, JPMC demanded that LBHI provide $5 billion in additional cash collateral the next morning, JPMC's CEO Jamie Dimon falsely promised LBHI's CEO Richard Fuld that JPMC would return the $5 billion at the close-of-settlement the next evening, | Nebraska both affirmed the finding of the bankruptcy court that plaintiff's claims for unjust enrichment and illegal/excessive distributions were preempted by federal bankruptcy law "inasmuch as those claims sought essentially the same relief as the avoidance claims barred by § 546(e)." _Contemporary Indus._, 564 F.3d at 984, 988. In _Hechinger_ the court found that the purpose of Bankruptcy Code section 546(e) would be frustrated if plaintiff was allowed to "circumvent section 546(e) by asserting a state law claim for unjust enrichment based on the same facts and seeking essentially the same relief" in connection with a transaction the court |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|-------|-----------------|----------------------|------------------------------------------|
|  |  | notwithstanding that JPMC had no intention of returning any of LBHI's collateral.  (Pls.' Opp'n Point III.G.3).<br>● A confidential or fiduciary relationship is not a prerequisite for a constructive trust claim.  Moreover, the Amended Complaint pleads sufficient facts to show a confidential relationship between JPMC and LBHI, specifically with respect to JPMC's dominant position, LBHI's dependence on JPMC for the survival of its business, and JPMC's insider access to LBHI's confidential information.  (Pls.' Opp'n Point III.G.4). | already has found to be an unavoidable settlement payment.  *Hechinger*, 274 B.R. at 96.   These cases are distinguishable from the case at bar because it appears that the plaintiffs in both cases were solely seeking to recover alleged constructively fraudulent transfers under the Bankruptcy Code and that the unjust enrichment and excessive/illegal distribution claims sought the same relief based on the same facts as the constructive fraud claims under Bankruptcy Code section 544.  *See Contemporary Indus.*, 564 F.3d at 983, 988; *see also Hechinger*, 274 B.R. at 82, 98.  Here, however, as Plaintiffs have pointed out, if the state law claims in |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|-------|-----------------|----------------------|------------------------------------------|
|       |                 |                      | question have something in common with any of Plaintiffs' Bankruptcy Code-related fraudulent transfer claims, it is with the claims under Bankruptcy Code section 548(a)(1)(A), claims for the recovery of intentionally fraudulent transfers, that the Court holds survive the Motion, and not the claims for alleged constructively fraudulent transfers under Bankruptcy Code section 548(a)(1)(B) that the Court holds are protected by the safe harbors.<br>● This distinction is observed by the court in *Hechinger*. While plaintiff's claims under the Bankruptcy Code were to recover allegedly constructively fraudulent transfers, in its unjust enrichment claim plaintiff alleged |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | | | that defendants consummated the leveraged buyout with knowledge that company was insolvent in order to loot the company for their own gain before its financial failure. *Hechinger*, 274 B.R. at 94.  Plaintiff argued that Congress expressly exempted section 548(a)(1) claims for intentionally fraudulent transfers and, as such, intended to permit claims under the facts alleged in the unjust enrichment claim. *Id.* at 98.  The court noted that it could not agree that the exemption demonstrates Congress's intent to allow unjust enrichment claims that effectively act as section 544 claims and not as section 548(a)(1) claims. *Id.*  Here, however, the state law claims that JPMC argues should be |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | | | preempted are not based on the same facts or seeking the same relief as the claims that are protected by Bankruptcy Code section 546(e). State law claims based on facts that are entirely distinct from those necessary to state a claim for the kinds of constructively fraudulent transfer under Bankruptcy Code sections 544 or 548 that are protected by the safe harbor of section 546(e) should not be wiped out by the safe harbors.[4] _Constructive Trust Argument_ ● Plaintiffs state a claim for constructive trust. All of JPMC's |

---

[4] The court in _Hechinger_ finds in the alternative that the unjust enrichment claim is preempted "because the Bankruptcy Code, particularly _sections 544 and 546(e)_, provide an exclusive framework for addressing claims that seek to avoid transfers made more than one year before bankruptcy. Thus the Code preempts the field and precludes supplemental state remedies because the Code alone comprehensively addresses such claims." _Hechinger_, 274 B.R. at 97 (emphasis in original). However, in the Reply, JPMC notes that "JPMorgan does not ask the Court to hold that the safe harbors 'wipe out a company's right to seek relief for preexisting state law violations' or that they occupy the 'field' and displace all state-law remedies." Reply at 47. Instead, JPMC argues that these particular claims should be preempted because, like the claims in _Contemporary Industries_ and _Hechinger_, they seek the turnover or return of the collateral transferred to JPMC, and accordingly, the same payments that are unavoidable under Bankruptcy Code section 546(e). This argument fails because, as discussed, the claims JPMC argues are preempted are based on separate and distinct facts from those protected by section 546(e).

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | | | arguments to the contrary fail. Plaintiffs have adequately pleaded fraud, have adequately pleaded that the September Security Agreement, the written agreement JPMC alleges governs the conduct in question, is void and invalid, Plaintiffs are entitled to plead in the alternative, and whether there is a confidential or fiduciary relationship between LBHI and JPMC involves issues of fact that are inappropriate to determine on a motion to dismiss. |
| Count XXXVI – Unjust Enrichment: All Collateral | ● *See* Count XXXII: Federal Preemption Argument. | ● *See* Count XXXII: Federal Preemption Argument. | *See* Count XXXII: Federal Preemption Argument. |
| Count XXXVII – Conversion: All Collateral | ● *See* Count XXXII: Federal Preemption Argument. | ● *See* Count XXXII: Federal Preemption Argument. | *See* Count XXXII: Federal Preemption Argument. |
| Count XXXIX – Unjust | ● *See* Count XXXII: Federal Preemption Argument. | ● *See* Count XXXII: Federal Preemption Argument. | ● *See* Count XXXII: Federal Preemption |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| Enrichment: $8.6 Billion in Cash and Money Market Funds | ● *See* Count XXXVIII.<br>● Plaintiffs' claim to invalidate JPMC's lien on $1.7 billion in money market funds is redundant of Counts XXXV through XXXVII and should be dismissed as duplicative. (Mem. Supp. Mot. Dismiss Point IV.B; Reply Point III.B.4). | ● *See* Count XXXVIII.<br>● JPMC lost its security interest in the $6.9 billion in funds (*See* Count XXVIII) and its security interest in the remaining $1.7 billion is based exclusively on the invalid September Agreements.  (Pls.' Opp'n Point III.A.5). | Argument.<br>● *See* Count XXXVIII. |
| Count XL – Conversion: $8.6 Billion in Cash and Money Market Funds | ● *See* Count XXXII: Federal Preemption Argument.<br>● *See* Count XXXVIII.<br>● Plaintiffs' claim to invalidate JPMC's lien on $1.7 billion in money market funds is redundant of Counts XXXV through XXXVII and should be dismissed as duplicative. (Mem. Supp. Mot. Dismiss Point IV.B; Reply Point III.B.4). | ● *See* Count XXXII: Federal Preemption Argument.<br>● *See* Count XXXVIII.<br>● JPMC lost its security interest in the $6.9 billion in funds (*See* Count XXVIII) and its security interest in the remaining $1.7 billion is based exclusively on the invalid September Agreements.  (Pls.' Opp'n Point III.A.5). | ● *See* Count XXXII: Federal Preemption Argument.<br>● *See* Count XXXVIII. |

Declaratory Judgment – No Lien Over $6.9 Billion Transferred to JPMC General Ledger Account

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| Count XXXVIII – Declaratory Judgment that JPMorgan Has No Lien Over LBHI's $6.9 Billion Pursuant to Either the | ● The Security Agreements authorized JPMC to transfer into JPMC's own general ledger account the $6.9 billion in funds LBHI posted as collateral in order to preserve such collateral, and the Uniform Commercial Code (the "U.C.C.") confirms that JPMC's lien continued as a lien on proceeds of the LBHI account from which the collateral was transferred. (Mem. Supp. Mot. Dismiss Point IV.B; Reply Point | ● A security interest is enforceable only if the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party.  Since LBHI had no interest in the JPMC general ledger account, LBHI could not grant a security interest in the general ledger account. (Pls.' Opp'n Point III.A.I, citing U.C.C. § 9-203).<br>● Pursuant to the terms of the Security | JPMC's arguments regarding the dismissal of Counts XXXVIII, XXXIX and XL are unpersuasive. Plaintiffs state a claim for a declaratory judgment that JPMC lost its lien on the $6.9 billion in collateral posted by |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| August Agreements or the September Agreements | III.B). <br>● The Security Agreements provided that JPMC had the right, without LBHI's consent to issue instructions and direct disposition of any and all funds in the LBHI deposit accounts. Therefore JPMC's sweep of the $6.9 billion into its general ledger account was simply an exercise of its rights under the agreements. (Mem. Supp. Mot. Dismiss Point IV.B). <br>● The cash sweep was appropriate since the Security Agreements also provide that JPMC can "use or operate any of the Security for the purpose of preserving the Security or its value in the manner and to the extent [JPMC] deems appropriate." (Mem. Supp. Mot. Dismiss Point IV.B). <br>● Under U.C.C. section 9-312(b)(1) a secured party may perfect a security interest in a deposit account only by obtaining "control" of that account. One way a secured creditor can obtain such control is by obtaining from the debtor the right to "direct disposition of the funds in the deposit account without further consent by the debtor." (Mem. Supp. Mot. Dismiss Point IV.B. quoting U.C.C. §§ 9-312(b)(1), 9-104(a)(2)). <br>● If JPMC's purpose in sweeping the cash into its general ledger account was to prevent LBHI from gaining access to the | Agreements, the lien LBHI granted to JPMC was a floating lien in certain LBHI accounts, not in the funds or securities generally. Therefore, when funds are transferred out of the account, the lien no longer attaches to those funds. This is confirmed by U.C.C. section 9-332, which provides that when funds are transferred out of a deposit account they are transferred free of any lien on the account. (Pls.' Opp'n Point III.A.I). <br>● The Security Agreements did not provide JPMC with an unencumbered right to unilaterally transfer LBHI's property. The prefatory clause cited by JPMC provided that it could only issue instructions "as the secured party hereunder," and therefore only had a right to unilaterally transfer funds as set forth in the specific provisions of the Security Agreements that immediately followed and only in the event of a default under the Security Agreements or to preserve the security or its value. (Pls.' Opp'n Point III.A.2). <br>● It is undisputed that LBHI was not in default when JPMC transferred the $6.9 billion to its own general ledger account. Moreover, JPMC cannot rely on the provisions of the Security Agreements that authorize JPMC to take action "to preserve the Security or its value" as the | LBHI when JPMC unilaterally transferred such funds into JPMC's own general ledger account. Moreover, there are factual issues with respect to this claim regarding the proper reading of the Security Agreements and whether the collateral transferred to JPMC's general ledger account constitutes proceeds of the LBHI deposit account under the U.C.C. that are inappropriate to determine in the context of a motion to dismiss. |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | funds, that purpose is proper under the U.C.C.  The official comments to U.C.C. section 9-104 actually provide that "the arrangements giving rise to control may themselves prevent, or may enable the secured party at its discretion to prevent the debtor from reaching funds on deposit … ." (Mem. Supp. Mot. Dismiss Point IV.B. quoting U.C.C. § 9-104(a)(2), Official cmt. 3).<br>● Under the U.C.C., when a secured party transfers funds from a deposit account in which it has a security interest into another account, the second account constitutes proceeds of the first account and the secured creditor's security interest attaches to the second account.  Consequently, the transfer of the funds into JMPC's general ledger account resulted in proceeds on which JPMC retained a continuing and perfected lien.  (Mem. Supp. Mot. Dismiss Point IV.B citing U.C.C. §9-332, Official cmt. 2, Example 2; U.C.C. §9-315(a)).<br>● Plaintiffs' theory ignores the automatic grant of a lien on cash "proceeds" under U.C.C. section 9-315 which provides that "[A] security interest attaches to any identifiable proceeds of collateral." (Reply Point III.B). | preservation of collateral or its value is a duty placed on a secured party, not the right of a secured party against a debtor.  Therefore JPMC was not authorized to transfer the $6.9 billion under the Security Agreements.  (Pls.' Opp'n Point III.A.2).<br>● Pursuant to U.C.C. section 9-601, the grant of security interest and of "control" over collateral is intended to give the secured party the right to direct the disposition of collateral in agreed-upon circumstances, generally upon default.  U.C.C. section 9-104 does not supersede the Security Agreements or create an independent right to dispose of collateral, and in fact contemplates that a party's right to dispose of collateral typically would not be absolute and that the secured party's "control" of the funds can co-exist with the debtor's access to the collateral.   (Pls.' Opp'n Point III.A.3).<br>● JPMC's reliance on Comment 2, Example 2 to U.C.C. section 9-332 for the proposition that the transfer of the cash into its general ledger account resulted in proceeds on which JPMC's lien continued is misplaced.  Because JPMC gave LBHI no rights in the general ledger account, funds transferred into that account do not constitute proceeds of the collateral to which JPMC's security interest can attach. | |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
|  |  | (Pls.' Opp'n Point III.A.4). |  |

Breach of Contract Claims

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| Count XLI – In the Alternative, Breach of the 2000 Clearance Agreement: Improper Collateral Demands | ● Plaintiffs do not allege that the Clearance Agreement governed the $8.6 billion in cash and money market fund collateral.  As such, these claims are hypothetical claims.  Furthermore, Plaintiffs allege elsewhere in the Amended Complaint that the September Agreements governed the $8.6 billion in collateral.  (Mem. Supp. Mot. Dismiss Point IV.C.1.a; Reply Point III.C.1).<br>  ● Plaintiffs do not identify any provision of the Clearance Agreement that governed JPMC's requests for collateral and it is clear from the Amended Complaint that the $8.6 billion in collateral was not posted pursuant the Clearance Agreement.  (Mem. Supp. Mot. Dismiss Point IV.C.1.a; Reply Point III.C.2).<br>  ● The only provision of the Clearance Agreement Plaintiffs appear to rely on in support of their breach of contract claims is Section 3, which has nothing to do with requests for collateral, but rather deals with the transfer of funds between accounts in the course of clearing.  (Mem. Supp. Mot. Dismiss Point IV.C.1.a; Reply Point | ● Plaintiffs should be permitted to plead in the alternative that should the Clearance Agreement or August Security Agreement control, JPMC breached those agreements.  (Pls.' Opp'n Point III.D).<br>● The Clearance Agreement and the August Security Agreement both expressly provided that JPMC could only request collateral in order to secure clearance-related obligations arising under the Clearance Agreement and neither gave JPMC the right to be overcollateralized for clearance-related credit extensions.  (Pls.' Opp'n Point III.D.1).<br>● LBHI guaranteed the obligations of Lehman subsidiaries arising under the Clearance Agreement in the August Guaranty.  In the August Security Agreement LBHI pledged specific LHBI accounts as security for LBHI's obligations under the August Guaranty.  The August Security Agreement provided that JPMC "may from time to time request further security or payments on account of any of the Liabilities."  "Liabilities" are defined in | ● If all of the allegations in the Amended Complaint are accepted as true, Plaintiffs' breach of contract claims with respect to the Clearance Agreement and the August Security Agreement each state a claim upon which relief may be granted.  Issues of fact regarding the proper reading and interpretation of the agreements are not properly resolved in the context of a motion to dismiss. |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | III.C.2).<br>● Section 2.5 of the Clearance Agreement, relied upon by Plaintiffs, does not address requests for collateral by JPMC, but rather limits cross-collateralization, providing that any "collateral accommodation provided by any Lehman entity pursuant to [the Clearance] Agreement shall not be available to support the obligations and liabilities of any other Lehman entity pursuant to [the Clearance Agreement]." (Reply Point III.C.1).<br>● The Clearance Agreement contains a waiver of consequential damages. Section 13 provides, "In no event shall we [JPMC] be liable for special, indirect, punitive or consequential damages, whether or not we have been advised as to the possibility thereof and regardless of the form of action." Any claim for additional damages beyond return of collateral is therefore barred. (Mem. Supp. Mot. Dismiss Point IV.C.1.b; Reply Point III.C.4).<br>● LBHI waived any claim for breach of contract by accepting JPMC's extensions of tens of billions of dollars of credit. (Mem. Supp. Mot. Dismiss Point IV.C.3; Reply Point III.C.6). | the August Security Agreement as liabilities under the August Guaranty, which, in turn, defined liabilities as clearance-related obligations. Therefore JMPC had the right to request and retain collateral, but only for the purpose of securing clearance-related obligations. (Pls.' Opp'n Point III.D.1).<br>● LBHI also entered into the August Amendment to the Clearance Agreement, which added LBHI as a party to the Clearance Agreement and added new section 2.5 to ensure that any rights of JPMC to LBHI collateral arising under the Clearance Agreement would be limited to those set forth in the August Guaranty and the August Security Agreement (i.e., clearance-related obligations).   In addition, Section 3 of the Clearance Agreement confirmed that JPMC had no right to demand collateral beyond what it needed to "fully collaterize[ ]" clearance-related obligations under the agreement.  (Pls.' Opp'n Point III.D.1).<br>● Nothing in either the August Security Agreement or the Clearance Agreement authorized JPMC to request or retain collateral to cover anything other than clearance-related obligations, and, therefore, JPMC's demand and retention of the $8.6 billion in collateral to cover an | |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | | anticipated and improper windfall under derivatives contracts, to pay JPMC customer claims, and to have an "extra cushion" available for any other potential claims was a breach of those agreements. (Pls.' Opp'n Point III.D.1). ● LBHI did not waive its claims for breach of contract.  It received no benefits or consideration for posting the additional $8.6 billion in collateral since JPMC was fully collateralized and under a contractual duty to extend clearance-related credit to Lehman pursuant to Clearance Agreement. Moreover, the $8.6 billion in collateral transferred was not related to clearance activity.  (Pls.' Opp'n Point III.D.3). ● LBHI protested JPMC's excessive collateral demands, preserving any later claim for breach of contract.  (Pls.' Opp'n Point III.D.3). | |
| Count XLII – In the Alternative, Breach of the 2000 Clearance Agreement: Improper Withholding of Collateral | ● *See* Count XLI. ● Plaintiffs do not identify any provision of the Clearance Agreement that required JPMC to return the collateral to LBHI after the close of trading on September 12, 2008. (Mem. Supp. Mot. Dismiss Point IV.C.1.a; Reply Point III.C.3). | ● JPMC was obligated under both the Clearance Agreement and the August Security Agreement to allow LBHI to access its collateral at the end of the business day if there were no outstanding clearance-related obligations.  (Pls.' Opp'n Point III.D.2.a). ● When LBHI became a party to the Clearance Agreement pursuant to the August Amendment, Section 3 of the Clearance Agreement obligated JPMC to | ● *See* Count XLI |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | | follow LBHI's instructions regarding the movement of any of LBHI's assets subject to the Clearance Agreement.  In the absence of any outstanding clearance-related obligations at the close of the business day, JPMC had no right under the Clearance Agreement to refuse LBHI's instructions that it be given access to its own cash or securities.  (Pls.' Opp'n Point III.D.2.a). <br> ● The August Security Agreement created an intra-day lien only over certain defined LBHI accounts and specifically granted LBHI the right to transfer assets held in those accounts into a lien-free overnight account at the end of the business day. (Pls.' Opp'n Point III.D.2.a). <br> ● JPMC has admitted that, as of the close of settlement on September 12, 2008, it had no clearance-related obligations to the Lehman subsidiaries.  As such, JPMC was obligated to permit LBHI to access its collateral and its refusal to do so was a breach of the Clearance Agreement and the August Security Agreement. (Pls.' Opp'n Point III.D.2.b). <br> ● LBHI did not waive its claims for breach of contract.  It received no benefits or consideration for posting the additional $8.6 billion in collateral since JPMC was fully collateralized and under a contractual | |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | | duty to extend clearance-related credit to Lehman pursuant to Clearance Agreement. Moreover, the $8.6 billion in collateral transferred was not related to clearance activity.  (Pls.' Opp'n Point III.D.3). <br> ● LBHI protested JPMC's excessive collateral demands, preserving any later claim for breach of contract.  (Pls.' Opp'n Point III.D.3). <br> ● JPMC's failure to allow LBHI access to its collateral on Sept. 12, 2008 plainly did not provide any benefits to LBHI as they served to push LBHI into bankruptcy. (Pls.' Opp'n Point III.D.3). | |
| Count XLIII – In the Alternative, Breach of the August Agreements: Improper Collateral Demands | ● Plaintiffs do not allege that the August Agreements governed the $8.6 billion in cash and money market fund collateral.  As such, these claims are hypothetical claims. Furthermore, Plaintiffs allege elsewhere in the Amended Complaint that the September Agreements governed the $8.6 billion in collateral.  (Mem. Supp. Mot. Dismiss Point IV.C.1.c; Reply Point III.C.1). <br> ● JPMC had no obligations under the August Security Agreement, and, therefore, it could not have breached it. (Mem. Supp. Mot. Dismiss Point IV.C.1.c; Reply Point III.C.1). <br> ● Plaintiffs do not identify any provision of the August Agreements that governed | ● *See* Count XLI. | ● *See* Count XLI |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | JPMC's requests for collateral.  The only provision that addresses requests for collateral merely states that "the Bank may from time to time request further security or payments on account of any Liabilities." (Mem. Supp. Mot. Dismiss Point IV.C.1.c; Reply Point III.C.2).<br>● LBHI waived any claim for breach of contract by accepting JPMC's extensions of tens of billions of dollars of credit.  (Mem. Supp. Mot. Dismiss Point IV.C.3; Reply Point III.C.6). | | |
| Count XLIV – In the Alternative, Breach of the August Agreements: Improper Withholding of Collateral | ● *See* Count XLIII.<br>● Plaintiffs do not identify any provision of the August Agreements that required JPMC to return the collateral to LBHI after the close of trading on September 12, 2008. The only contract language cited in the Amended Complaint simply provides that LBHI may transfer the collateral overnight to a different account at JPMC, it does not provide LBHI with any right to withdraw the collateral from JPMC, or obligate JPMC to return any of the collateral. (Mem. Supp. Mot. Dismiss Point IV.C.1.c; Reply Point III.C.3). | ● *See* Count XLII. | ● *See* Count XLI |

Claims for Breach of Implied Covenant of Good Faith and Fair Dealing

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| Count XLV – In the Alternative, Breach of the Implied Covenant of Good Faith and Fair Dealing: August Agreements | ● The implied covenant claim is duplicative of Plaintiffs' claims for breach of the express terms of the August Agreements. (Mem. Supp. Mot. Dismiss Point IV.C.2; Reply Point III.C.5.a).<br>● To state a claim for breach of the implied covenant of good faith and fair dealing Plaintiffs must allege an express contractual right that was breached. Plaintiffs fail to identify any contractual rights that JPMC prevented LBHI from realizing. (Mem. Supp. Mot. Dismiss Point IV.C.2; Reply Point III.C.5.b).<br>● The August Security Agreement did not provide LBHI with any right to access the collateral overnight; it only allowed LBHI to transfer the collateral to a different account and even that right was subject to JPMC's right to issue instructions to direct disposition of the funds without the consent of LBHI. Plaintiffs' breach of the implied covenant of good faith and fair dealing claim cannot be based on conduct expressly allowed by the August Security Agreement. (Mem. Supp. Mot. Dismiss Point IV.C.2; Reply Point III.C.5.a).<br>● No provision in the August or September Agreements governed how much collateral JPMC could request or whether LBHI | ● JPMC's abuse of discretion in demanding and receiving billions of dollars in collateral that far exceeded what was reasonably required to secure both the clearance-related obligations under the August Agreements and the non-clearance obligations arising under the September Agreements constitutes a breach of the covenant of good faith and fair dealing. (Pls.' Opp'n Point III.E.1).<br>● It is irrelevant whether JPMC's excessive collateral demands frustrated some express right under the agreements, it is enough under New York law to state a claim for the breach of the implied covenant of good faith and fair dealing that JPMC abused its discretionary right to request and retain collateral. (Pls.' Opp'n Point III.E.1).<br>● JPMC additionally breached the implied covenant by threatening to stop clearing if additional collateral was not provided, which deprived LBHI of its right to refuse unreasonable or excessive collateral demands. (Lehman Br. Point III.E.2).<br>● Plaintiffs' claim related to JPMC's breach of the implied covenant of good faith and fair dealing in connection with the August Agreements is not duplicative | ● Plaintiffs have alleged that JPMC breached the implied covenant of good faith and fair dealing by interfering with and frustrating LBHI's express rights under the August and September Agreements. Accepting all of the allegations in the complaint as true, Plaintiffs have plead adequate facts to state a claim upon which relief can be granted with respect to these claims. |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | could, or could not refuse any such requests. (Mem. Supp. Mot. Dismiss Point IV.C.2; Reply Point III.C.5.a).<br>● LBHI waived any claim for breach of the implied covenant of good faith and fair dealing by accepting JPMC's extensions of tens of billions of dollars of credit. (Mem. Supp. Mot. Dismiss Point IV.C.3; Reply Point III.C.6). | of their breach of contract claims with respect to such agreements. The breach of the implied covenant claim is based on facts and conduct different from those underlying the breach of contract claims and it is appropriate to plead these claims in the alternative under New York law where, as here, a defendant takes the position that its conduct was not prohibited by an express provision of the contract. (Lehman Br. Point III.E.2).<br>● *See* Counts XLI and XLII regarding waiver argument. | |
| Count XLVII – In the Alternative, Breach of the Implied Covenant of Good Faith and Fair Dealing: September Agreements | ● To state a claim for breach of the implied covenant of good faith and fair dealing Plaintiffs must allege an express contractual right that was breached. Plaintiffs fail to identify any contractual rights that JPMC prevented LBHI from realizing. (Mem. Supp. Mot. Dismiss Point IV.C.2; Reply Point III.C.5.b).<br>● The September Agreements did not give LBHI any right to access its collateral at the end of the trading day. JPMC's retention of the collateral was expressly permitted by the three-day notice provision in the September Security Agreement. (Mem. Supp. Mot. Dismiss Point IV.C.2).<br>● No provision in the August or September Agreements governed how much collateral | ● *See* Count XLV. | ● *See* Count XLV. |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | JPMC could request or whether LBHI could, or could not refuse any such requests. (Mem. Supp. Mot. Dismiss Point IV.C.2; Reply Point III.C.5.a). ● LBHI waived any claim for breach of the implied covenant of good faith and fair dealing by accepting JPMC's extensions of tens of billions of dollars of credit. (Mem. Supp. Mot. Dismiss Point IV.C.3; Reply Point III.C.6). | | |

Claims that September Agreements are Invalid for Coercion or Duress, Lack of Authority, or Lack of Consideration

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| Count XXXV – Declaratory Judgment Invalidating the September Agreements Based on theories of: 1) Coercion and/or Duress, 2) Lack of Authority or Apparent Authority, and 3) Lack of Consideration | Waiver Argument ● The waiver-of-defenses clause in the September Guaranty precludes Plaintiffs from challenging the validity of the September Agreements. (Mem. Supp. Mot. Dismiss Point IV.D.1; Reply Point III.D.1). ● New York courts (or courts applying New York law) widely give effect to "hell or high water" clauses and have found waiver-of-defense clauses to bar assertions that a guaranty lacked consideration, that a guaranty was the product of coercion or duress, and that the party executing a guaranty lacked authority. (Mem. Supp. Mot. Dismiss Point IV.D.1; Reply Point III.D.1). | Waiver Argument ● JPMC's argument that LBHI is precluded from challenging the validity of the September Agreements relies on boilerplate provision in the September Guaranty, which was unsupported by consideration. (Pls.' Opp'n Point III.C.2.a). ● To be enforceable a waiver must be "knowing and voluntarily entered into" and not be the "product of fraud, duress, or undue influence." (Pls.' Opp'n Point III.C.2.a). ● A waiver is unenforceable when entered into by an agent without authority to do so on behalf of the principal. (Pls.' Opp'n | ● Waiver Argument: The Court agrees with the arguments advanced by the Plaintiffs. Based upon the facts alleged in the Amended Complaint, including that the September Agreements were the product of coercion and/or duress and were entered into without authority and after minimal negotiation, JPMC's argument that the waiver-of-defenses |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | Ratification Argument<br>● LBHI ratified the September Agreements by its representations to the Court in connection with the Comfort Order Motion and by inducing JPMC to extend tens of billions of dollars of credit. (Mem. Supp. Mot. Dismiss Point IV.D.2; Reply Point III.D.2).<br>● Under New York law, a contract executed under duress or by a party who lacked authority is voidable, not void *ab initio*. A party seeking to avoid a contract for duress must have acted promptly to repudiate the contract. (Mem. Supp. Mot. Dismiss Point IV.D.2; Reply Point III.D.2).<br>● LBHI was not under continuing duress. After filing for bankruptcy and when it was under the protection of this Court and free to invoke its assistance to extricate itself from the contracts in question, LBHI instead moved for an order to ensure that JPMC would extend credit under the September Agreement. (Mem. Supp. Mot. Dismiss Point IV.D.2; Reply Point III.D.2).<br>● Plaintiffs misread Bankruptcy Code section 558, which does not prevent a debtor from ratifying agreements post-petition. (Reply Point III.D.2).<br>Lack of Consideration Argument<br>● JPMC provided both present and past consideration for the September | Point III.C.2.a).<br>● The cases cited by JPMC do not address the situation where the party who waived defenses was itself under duress. Nor do they address the situation where an unauthorized agent executes the waiver without the principal's knowledge or consent. Furthermore, in half of the cases cited by JPMC, the court actually declined to enforce the waiver clause and allowed the issue to proceed to trial. (Pls.' Opp'n Point III.C.2.a).<br>● JPMC fails to cite to any controlling authority where a court ruled that a waiver provision contained in a contract while signed under duress and without authority waived a meritorious duress or lack of authority defense. (Pls.' Opp'n Point III.C.2.a).<br>● The September Guaranty does not waive the defenses of lack of authority, duress or lack of consideration because it does not specifically address them and a relaxed specificity standard does not apply where there was no negotiation of the September Guaranty whatsoever. (Pls.' Opp'n Point III.C.2.b).<br>Ratification Argument<br>● JPMC was under a pre-existing contractual duty to provide clearing services and related extensions of credit. | clause bars Plaintiffs claim to invalidate the September Agreements fails at this stage in the proceedings.<br>● Ratification Argument: The Court agrees that whether a party has ratified an agreement is a question of fact and whether the allegedly ratifying conduct is sufficient to imply such intent to ratify, whether a party acted promptly to repudiate and whether a party is under continuing duress should not be determined on a motion to dismiss.<br>● Lack of Consideration Argument: The Amended Complaint adequately states a claim for a declaratory judgment invalidating the September Agreements for lack of consideration. |

- 30 -

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | Agreements. (Mem. Supp. Mot. Dismiss Point IV.D.3; Reply Point III.D.3). <br> ● Where a third party such as LBHI seeks to guarantee obligations of a principal obligor consideration need only pass to the principal obligor. Further, under the U.C.C. a party granting a security interest to secure the debts of another need not receive consideration to support the security agreement. (Mem. Supp. Mot. Dismiss Point IV.D.3; Reply Point III.D.3). <br> ● JPMC was not obligated to extend credit to LBI, but could do so solely at its discretion. JPMC did extend credit to LBI, performing an act it was under no obligation to perform and surrendering a privilege which it had the legal right to assert (declining to extend credit) and thereby providing consideration. (Mem. Supp. Mot. Dismiss Point IV.D.3; Reply Point III.D.3). <br> ● There is indisputable evidence of past consideration, which is sufficient consideration under N.Y. General Obligation Law § 5-1105. (Mem. Supp. Mot. Dismiss Point IV.D.3; Reply Point III.D.3). | The continuation of the parties' benefits and obligations under the Clearance Agreement is not ratification of the September Agreements. (Pls.' Opp'n Point III.C.3). <br> ● Whether a party has ratified an agreement is a question of fact. A party's intent and whether the allegedly ratifying conduct is sufficient to imply such intent should not be decided on a motion to dismiss. (Pls.' Opp'n Point III.C.3). <br> ● The transfer of $8.6 billion of collateral while under duress is not ratification and where a party is under continuing duress there is no duty to repudiate. (Pls.' Opp'n Point III.C.3.a). <br> ● A bankruptcy filing is sufficient repudiation to preserve an estate's right to rescind a disputed agreement. LBHI filed for bankruptcy only three days after executing the agreements, and LBI only accepted JPMC's clearing services and related credit for five days following LBHI's bankruptcy filing. (Pls.' Opp'n Point III.C.3.a). <br> ● In connection with the Comfort Order, LBHI expressly reserved its rights to challenge the September Agreements and the transfer of $8.6 billion in collateral and counsel made clear at the time that no one was seeking a validation of the agreements | |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|-------|-----------------|----------------------|------------------------------------------|
|       |                 | or the guaranty. (Pls.' Opp'n Point III.C.3.b). <br> ● LBHI cannot waive defenses to the September Agreements or the Disputed Collateral Transfers by virtue of any postpetition conduct pursuant to Bankruptcy Code section 558. (Pls.' Opp'n Point III.C.3.d). <br> <u>Lack of Consideration Argument</u> <br> ● Under New York's pre-existing duty rule, where a party is under an existing duty to perform a certain service or act, promising to perform that same service or act cannot be consideration for a new agreement. (Lehman Br. Point III.C.1). <br> ● Pursuant to the Clearance Agreement, JPMC agreed to provide clearing services to LBI and was required to give notice before refusing to extend credit, which means commercially reasonable notice under New York law, arguably enough notice for LBI to seek alternative financing. JPMC gave no notice before refusing to extend credit and demanded that the September Agreements be ratified late in the evening on September 9, 2008 before the earnings call scheduled for 7:30 a.m. the next day. (Lehman Br. Point III.C.1). <br> ● JPMC's argument regarding the New York General Obligations Law fails |  |

| Claim | JPMC's Argument | Plaintiffs' Argument | Reason Claim Survives Motion to Dismiss |
|---|---|---|---|
| | | because the Clearance Agreement required JPMC to provide clearance services and related credit and, therefore, JPMC doing so prior to the September Agreements cannot constitute consideration. Furthermore, daily extensions of credit ended at the close of each trading day. Accordingly, there was no outstanding loan to act as the past consideration for the September Agreements.  (Lehman Br. Point III.C.1). | |
| Count XLVI – Coercion and/or Duress With Respect to the September Agreements | ● *See* Count XXXV: Waiver Argument. ● *See* Count XXXV: Ratification Argument. | ● *See* Count XXXV: Waiver Argument. ● *See* Count XXXV: Ratification Argument. | ● *See* Count XXXV: Waiver Argument. ● *See* Count XXXV: Ratification Argument. |
| Count XLVIII – Coercion and/or Duress With Respect to Demands for $8.6 Billion in Cash and Cash Equivalents | ● *See* Count XXXV: Ratification Argument. | ● *See* Count XXXV: Ratification Argument. | ● *See* Count XXXV: Ratification Argument. |