UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────────

Chapter 11 Case No. 08-13555(JMP)
Adversary Proceeding No. 10-3266 (JMP)
No. 11 Civ. 6760 (RJS)

───────────────────

IN RE LEHMAN BROTHERS HOLDINGS INC., *ET AL.*,

Debtors.

───────────────────

LEHMAN BROTHERS HOLDINGS INC. AND OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC.,

Plaintiff and Plaintiff Intervenor,

VERSUS

JPMORGAN CHASE BANK, N.A.,

Defendant.

───────────────────

MEMORANDUM AND ORDER
September 28, 2012

───────────────────

RICHARD J. SULLIVAN, District Judge:

Plaintiff Lehman Brothers Holding Inc. ("LBHI"; collectively with all of LBHI's subsidiaries, "Lehman") and Plaintiff Intervenor Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. (the "Committee"; collectively with LBHI, "Plaintiffs") bring this adversary proceeding, pursuant to and under Rule 7001 of the Federal Rules of Bankruptcy Procedure, seeking, *inter alia*, damages and the recovery of $8.6 billion from Defendant JPMorgan Chase Bank, N.A. ("JPMC") for the benefit of Lehman's creditors. Central to this litigation are JPMC's actions, in the lead-up to and in the wake of Lehman's bankruptcy, to protect itself from Lehman's default. Although this action has been automatically referred to the Honorable James M. Peck of the United States Bankruptcy Court for this district, now before the Court is JPMC's motion to withdraw the reference. For the reasons that follow, the Court denies JPMC's motion without prejudice to renewal.

I.  BACKGROUND

A.  Facts[1]

1.  The Clearance Agreement

Prior to its bankruptcy, "Lehman was the fourth largest investment bank in the United States" (FAC ¶ 15), and at all times relevant to this action, JPMC served as Lehman's primary bank, the principal clearing bank for Lehman Brothers Inc. ("LBI"), and the agent for LBI's triparty repurchase agreements that LBI used to obtain short-term financing. (*Id.* ¶¶ 3, 16, 18). As the agent for those agreements, JPMC would "act[] as custodian over the securities and cash subject to [triparty repurchases] until the counterparties had each delivered their matching part of the [repurchases]." (*Id.* ¶ 3.) On June 15, 2000, LBI and JPMC's predecessor-in-interest, the Chase Manhattan Bank ("Chase"), entered into a clearance agreement (the "Clearance Agreement"), which had both a "lending provision" and "lien provisions." (*Id.* ¶¶ 19–20; *see* Decl. of Alexander B. Lees, dated Sept. 26, 2011, Doc. No. 3 ("Lees Decl."), Ex. C.) The lending provision, *inter alia*, preserved JPMC's right, via Chase, to decline a request by LBI for an extension of credit and provided that "[a]ll loans, whether of money or securities, shall be payable on demand." (Lees Decl. Ex. C § 5.) The provision also provided that Chase, and thereby JPMC, "may, solely at [its] discretion, permit [LBI] to use funds credited to the Account prior to final payment." (*Id.*)

The lien provisions granted JPMC, via Chase, a lien over certain assets held in LBI's accounts at JPMC as security for its exposure on advances made by JPMC to LBI. (FAC ¶¶ 20, 22; *see* Lees Decl. Ex. C § 11(a).) "Because [JPMC] was the primary clearing bank for LBI" during the relevant period, "virtually all [of] LBI's securities and cash used in its trading activities were on deposit with [JPMC] or in [JPMC] accounts at depositories." (FAC ¶ 22.) However, JPMC's security rights to LBI's collateral were limited "to the assets in LBI's accounts subject to [JPMC's] lien and did not extend to the accounts of any other Lehman entity." (*Id.* ¶ 23.)

While JPMC had wide discretion under the Clearance Agreement as to whether to advance funds or extend credit, the agreement required JPMC to give notice before refusing to extend credit. (*Id.* ¶ 24; *see* Lees Decl. Ex. C § 5.) The Clearance Agreement also required notice prior to termination of the agreement itself. Section 17 of the agreement provided that:

> either party could terminate the agreement by written notice if[, *inter alia*,]: (i) the other party entered into a proceeding for bankruptcy; (ii) the other party failed to comply with any material provision of the agreement, which failure was not cured within 30 days after notice of such failure; or (iii) any representation or warrant made in the agreement by the other party shall have proven to have been, at the time made, false or misleading in any material respect.

(FAC ¶ 26; *see* Lees Decl. Ex. C § 17.) Although the "initial term" of the Clearance Agreement commenced on June 15, 2000

---

[1] The following facts are taken from the First Amended Complaint ("FAC"), JPMC's Amended Counterclaims ("Am. Countercls."), and declarations submitted in connection with the instant motion and the exhibits attached thereto. In consideration of that motion, the Court also considers JPMC's opening brief ("Mem."), Plaintiffs' opposition brief ("Opp'n"), and JPMC's reply brief ("Reply").

2

and ended on October 7, 2002, the parties continued to engage in transactions under the terms of the agreement from 2000 until they amended it in 2008. (FAC ¶ 27.)

### 2. The August Agreements

"After operating under the original . . . Clearance Agreement for eight years," on or about August 18, 2008, JPMC and LBHI conferred regarding a series of new agreements (collectively, the "August Agreements") that, once effective, would "alter[] the terms of the clearance relationship between the parties." (*Id.* ¶ 28.) The August Agreements, executed on or about August 29, 2008, included an amendment to the Clearance Agreement, a guaranty agreement (the "August Guaranty"), and a security agreement in favor of JPMC (the "August Security Agreement"). (*Id.*)

Pursuant to the August Agreements, LBHI agreed to post collateral to guarantee the intra-day trading obligations of LBI and other Lehman subsidiaries as defined in the amended Clearance Agreement. (*Id.* ¶ 30.) The parties also agreed that "LBHI's maximum liability under the August Guaranty would be limited to the value of LBHI collateral held by [JPMC] in two specified accounts subject to [JPMC's] lien." (*Id.*) Moreover, pursuant to the August Security Agreement, LBHI could transfer the collateral pledged under the agreement – provided that LBHI first determined that it had no outstanding clearance obligations to JPMC – to a lien-free account at JPMC, known as an "Overnight Account." (Lees Decl. Ex. E at 3.) Plaintiffs allege that, because the intra-day clearance exposures between JPMC and Lehman subsidiaries typically were reduced to zero at the close of business of each trading day, this Overnight Account provision essentially entitled LBHI "to have access to all – or at least a substantial majority – of its collateral overnight." (FAC ¶¶ 31–32.) Nonetheless, according to Plaintiffs, the August Agreements gave Plaintiffs neither actual nor reasonably equivalent value in exchange for giving JMPC "significant new rights against LBHI." (*Id.* ¶ 33.)

### 3. JPMC's Access to Lehman-Specific Information in September 2008

Plaintiffs allege that in the immediate lead-up to LBHI's collapse, JPMC gained "unparalleled access to and knowledge of Lehman's financial condition and prospects." (*Id.* ¶ 35.) For example, on September 4, 2008, senior management of LBHI met with senior officers of JPMC to discuss Lehman's upcoming third-quarter results, Lehman's expected significant asset write-downs, and Lehman's plans going forward. (*Id.* ¶ 36.) Moreover, according to Plaintiffs, JPMC had "first-hand knowledge" of Lehman's intentions regarding its potential acquisition by Korea Development Bank, Lehman's primary bidder, and had "advance opportunity to review and comment on Lehman's presentation to the rating agencies." (*Id.* ¶ 4.)

Also in September 2008, JPMC's senior executives attended Lehman's strategic planning meetings as well as meetings with the "United States government's inner circle as it planned its efforts to address the issues relating to Lehman's financial distress." (*Id.* ¶ 35) According to Plaintiffs, as a result of these meetings and other correspondence with Lehman, JPMC obtained confidential information regarding both Lehman's results and plans and, in particular, the government's plans to address the growing financial crisis and not rescue Lehman. (*Id.* ¶¶ 35, 37, 40, 43.)

3

4. The September Agreements

According to Plaintiffs, in September 2008, JPMC exploited its access to this nonpublic information about Lehman's dire financial condition by "maneuvering to gain a preferred position over LBHI's other creditors." (*Id.* ¶ 44.) Although JPMC allegedly believed it was over-collateralized for intra-day clearing risk as of September 4, 2008, on the night of September 9, 2008, JPMC "required LBHI to enter into a new series of agreements," which included a guaranty (the "September Guaranty"), a security agreement (the "September Security Agreement"), an amendment to the Clearance Agreement (the "September Amendment"), and an account control agreement (the "Account Control Agreement"; collectively, the "September Agreements"). (*Id.* ¶¶ 45–46.) To pressure JPMC into signing the agreements, JPMC allegedly told LBHI executives that, if they did not execute the proposed agreements before LBHI's earnings call the next day, it would "immediately stop extending intra-day credit to, and clearing trades for, Lehman." (*Id.* ¶ 48.)

Executed on September 10, 2008, the September Agreements "altered the relationship between [JPMC] and LBHI" by, *inter alia*, (1) requiring LBHI to "guarantee and secure *all* exposures of *all* [JPMC] entities to *all* Lehman entities," (2) changing the cap on LBHI's liability set forth in the August Guaranty, and (3) changing the provision in the August Security Agreement "that expressly gave LBHI the right to transfer its collateral from the pledged accounts to the lien-free overnight account."[2] (*Id.* ¶¶ 51–52, 55, 59.) The September Guaranty in particular also stated that LBHI "irrevocably waive[d] the right to assert . . . defenses, setoffs, or counterclaims in any litigation or other proceeding related to . . . [the September Agreements]." (Lees Decl. Ex. D § 2.) According to Plaintiffs, although the "September Agreements purported to give [JPMC] significant new rights vis-à-vis LBHI, [JPMC] gave LBHI nothing in exchange." (FAC ¶ 56.)

5. JPMC's Demands for Collateral Under the September Agreements

According to Plaintiffs, during the week leading up to LBHI's September 15, 2008 bankruptcy petition, JPMC made demands for additional collateral despite knowing that it had "sufficient collateral to cover its intra-day clearing risk." (*Id.* ¶ 62). Such demands allegedly "contributed significantly to LBHI's inability to meet the liquidity needs of its business" and were backed by a threat that if LBHI failed to comply, JPMC would immediately cease providing intra-day clearing services. (*Id.* ¶ 66.) According to Plaintiffs, LBHI had little choice but to post the collateral because if JPMC followed up on its threat, LBHI would immediately "fail." (*Id.* ¶ 68 (internal quotation marks omitted).)

Accordingly, on September 9, 2008, LBHI posted collateral to JPMC in the amount of $1 billion in cash and $1.67 billion in money market funds. (*Id.* ¶ 66.) On September 10, 2008, LBHI posted an additional $300 million in cash collateral, and on September 11, 2008, LBHI posted an additional $600 million in cash collateral.

---

[2] Plaintiffs allege that as of the night of September 9, 2008, neither LBHI Chief Financial Officer Ian Lowitt, nor Treasurer Paolo Tonucci, nor any other LBHI executive with authority to bind LBHI to the September Guaranty "reviewed or approved" the September Guaranty or the other September Agreements. (FAC ¶ 57.) Moreover, although Tonucci executed the September Agreements on September 10, 2008, Plaintiffs allege that he was not authorized to sign the September Guaranty. (*Id.* ¶¶ 59, 61.)

4

(*Id.*) In response to JPMC's further demands, LBHI posted $5 billion more in cash collateral on September 12, 2008. (*Id.* ¶¶ 67–68, 70–71.) The First Amended Complaint alleges that JPMC nevertheless refused to grant LBHI access to its collateral despite repeated requests and JPMC's alleged overcollateralization. (*Id.* ¶¶ 69, 73–75.)

6. JPMC's Post-Petition Advances and LBHI's Comfort Order Motion

Following LBHI's bankruptcy petition on Monday, September 15, 2008, JPMC continued to provide large amounts of credit to LBI. On September 15, JPMC provided approximately $87 billion of credit to LBI to unwind the previous Friday's triparty repurchase agreements and other financings. (Am. Countercls. ¶ 29.)

On September 16, 2008, Lehman filed a motion in bankruptcy court to induce JPMC to continue making intra-day clearance advances to LBI (the "Comfort Order Motion"). (*Id.* ¶ 34.) The motion asked the bankruptcy court to clarify in the order that Lehman was authorized during bankruptcy proceedings to continue incurring debt to JPMC under the August and September Agreements. (*Id.*) The bankruptcy court granted the Comfort Order Motion the same day. (*Id.* ¶ 35.)

On September 17, 2008, Lehman moved the bankruptcy court to approve the sale of LBI's business and assets to Barclays. (*Id.* ¶¶ 36–37.) According to the Amended Counterclaims of JPMC ("Amended Counterclaims"), JPMC relied on Lehman's representations that Barclays had agreed to purchase all of the LBI-owned securities that JPMC was financing intra-day; thereafter, JPMC advanced approximately $70 billion to LBI to unwind triparty repurchase agreements and other financings. (*Id.* ¶¶ 37–40, 69.) JPMC subsequently learned that Barclays had not agreed to purchase all of the securities that JPMC was financing. (*Id.* ¶¶ 62–65.) Accordingly, when the Securities Investor Protection Corporation initiated liquidation proceedings against LBI on September 19, 2008, JPMC still had more than $25 billion of unpaid loans to LBI. (*Id.* ¶¶ 6, 12, 89–90.) To satisfy the loans, JPMC sold $8.6 billion in cash collateral that it had previously received from Lehman. (*Id.* ¶¶ 12, 101.) Ultimately, JPMC filed proofs of claim against the LBHI estate in the amount of approximately $30 billion, including secured claims under the August and September Guarantees for approximately $25 billion in connection with extensions of credit under the Clearance Agreement. (*See* Decl. of Cindi M. Giglio, dated Oct. 26, 2011, Doc. No. 28 ("Giglio Decl."), Ex. I.)

B. Procedural History

The Lehman bankruptcy is the largest and, arguably, the most complex in United States history. Since LBHI filed its petition for bankruptcy in September 2008, Judge Peck has overseen the claims administration process for tens of thousands of claims against the LBHI estate and presided over a number of adversary proceedings stemming from the bankruptcy.

LBHI initiated this particular adversary proceeding on May 26, 2010 by filing the Complaint in the bankruptcy court. That same day, Plaintiffs filed a joint motion to authorize the Committee to intervene in this litigation. By Order dated June 24, 2010, the bankruptcy court granted Plaintiffs' motion.

On September 15, 2010, Plaintiffs filed their First Amended Complaint, which sets forth forty-nine counts and seeks, *inter alia*, damages, in addition to the return of $8.6

5

billion in collateral that JPMC received from Lehman. On October 19, 2010, JPMC filed their motion to dismiss the First Amended Complaint in the bankruptcy court.[3] After receiving briefing on the motion, the bankruptcy court heard oral argument on May 10, 2011. However, shortly thereafter, the Supreme Court held in *Stern v. Marshall* that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that [was] not resolved in the process of ruling on a creditor's proof of claim." 131 S. Ct. 2594, 2620 (2011). Because of *Stern*'s potential impact on these proceedings, the bankruptcy court instructed the parties to submit supplemental briefing addressing the effect of *Stern* on the claims asserted in the adversary proceeding. On September 26, 2011, the parties submitted their supplemental briefs. One day later, JPMC filed the instant motion to withdraw the bankruptcy reference. The motion was fully submitted as of November 16, 2011.

The Court heard oral argument on JPMC's motion on December 30, 2011. At the argument, the Court indicated that it would – with the parties' consent – reserve decision on JPMC's motion until after the bankruptcy court had ruled on the pending motion to dismiss then before it. (Doc. No. 36 ("Tr.") at 76–77.) On February 17, 2012, the bankruptcy court received supplemental briefing on the motion to dismiss.

On April 19, 2012, the bankruptcy court granted JPMC's motion to dismiss to the extent that the motion related to all claims based on preference liability or constructively fraudulent transfers – under §§ 544, 547, and 548 of the Bankruptcy Code – but denied the motion to the extent that it related to claims to which the relevant safe harbor provisions of the Bankruptcy Code do not apply. *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*, 469 B.R. 415, 420 (Bankr. S.D.N.Y. 2012); *cf. O'Toole v. McTaggart (In re Trinsum Grp., Inc.)*, 467 B.R. 734, 738 (Bankr. S.D.N.Y. 2012) (noting that "both before and after *Stern v. Marshall*, it is clear that the bankruptcy court may handle all pretrial proceedings, including the entry of an interlocutory order dismissing fewer than all of the claims in an adversary complaint"). Following the bankruptcy court's ruling on the motion to dismiss, the following categories of clams remain in the First Amended Complaint: (1) claims seeking relief under various common law legal doctrines;[4] (2) claims

---

[3] On December 1, 2010, JPMC filed Counterclaims, alleging that, if it is required to return the collateral it received from Lehman, LBHI is responsible for any loss that JPMC would suffer because LBHI fraudulently induced JPMC's continuing extensions of credit to LBI after LBHI's bankruptcy filing. JPMC subsequently filed Amended Counterclaims on February 17, 2011, which include claims for (1) fraudulent misrepresentation (Count I); (2) fraudulent concealment (Count II); (3) fraudulent inducement to lend (Count III); (4) aiding and abetting LBI's fraud (Count IV); (5) aiding and abetting Barclays's fraud (Count V); (6) unjust enrichment (Count VI); (7) indemnification under the Clearance Agreement (Count VII); and (8) indemnification under the custodial undertaking (Count VIII).

[4] Claims in this first category include: (1) a fraud claim (Count XLIX); (2) claims for imposition of a constructive trust and turnover, unjust enrichment, and conversion (Counts XXXII, XXXVI, XXXVII, XXXIX, and XL); (3) a claim seeking a declaratory judgment that JPMC has no lien over a certain $6.9 billion in funds pursuant to either the August or the September Agreements (Count XXXVIII); (4) a claim seeking a declaratory judgment invalidating the September Agreements based on theories of coercion and/or duress, lack of authority or apparent authority, and lack of consideration (Counts XXXV, XLVI, and XLVIII); and (5) claims in the alternative for breaches of the Clearance Agreement and the August Agreements and breaches of the implied covenant of good faith and fair dealing with respect to both the August Agreements and the September Agreements (Counts XLI, XLII, XLIII, XLIV, XLV, and XLVII).

6

seeking to avoid and recover actual fraudulent transfers under § 548(a)(1)(A) of the Bankruptcy Code;[5] and (3) claims seeking relief under various other sections of the Bankruptcy Code.[6] However, the bankruptcy court did not rule on Plaintiffs' motion to dismiss JPMC's Amended Counterclaims, which remains pending in the bankruptcy court. *Lehman Bros. Holdings Inc.*, 469 B.R. at 431 n.7.

## II. DISCUSSION

### A. Authority of the Bankruptcy Court to Enter Final Judgment

This Court, rather than the bankruptcy court, has original jurisdiction over "all civil proceedings arising under [T]itle 11, or arising in or related to cases under [T]itle 11," 28 U.S.C. § 1334(b); however, under 28 U.S.C. § 157, "the § 1334(b) jurisdiction is exercised by both the [d]istrict [c]ourt and the [b]ankruptcy [c]ourt," depending on the nature of the proceedings, *Dev. Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*, 462 B.R. 457, 463 (S.D.N.Y. 2011).

---

[5] Claims in this second category include claims seeking: (1) avoidance of the September Agreements as actually fraudulent under § 548 of the Bankruptcy Code (Count I); (2) avoidance of the August Guaranty and the August Security Agreement as actually fraudulent under § 548 of the Bankruptcy Code (Count II); (3) avoidance of collateral transfers as actually fraudulent under § 548 of the Bankruptcy Code (count III); and (4) recovery of avoided fraudulent transfers under § 550 of the Bankruptcy Code (Count IV).

[6] Claims in this third category include: (1) a claim for turnover of excess collateral under § 542 of the Bankruptcy Code (Count XXV); (2) setoff claims under § 553(a) of the Bankruptcy Code (Count XXVI); (3) claims alleging violation of an automatic stay (Counts XXXIII and XXXIV); and (4) claims for disallowance under § 502(d) of the Bankruptcy Code and avoidance of liens securing such claims under § 506(c) (Count XXXI).

Pursuant to the Bankruptcy Amendments and Federal Judgeship Act of 1984 (the "1984 Act"), Congress divided bankruptcy-related matters into "core" and "non-core" proceedings. 28 U.S.C. § 157(b)(1), (c)(1). As to "core" matters, bankruptcy courts "may enter appropriate orders and judgments," subject only to deferential review, *see id.* §§ 157(b)(1), 158, while as to non-core matters, the bankruptcy court "can only make recommended findings of fact and conclusions of law, subject to *de novo* review in [d]istrict [c]ourt, which then exercises final adjudicative power," *Dev. Specialists*, 462 B.R. at 463 (citing 28 U.S.C. § 157(c)(1), (2)); *accord Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 467 B.R. 712, 718 (S.D.N.Y. 2012). Although the 1984 Act does not define "core" proceedings, "it offers a non-exhaustive list of examples," *Weisfelner*, 467 B.R. at 718, including, *inter alia*, "allowance or disallowance of claims against the estate," "proceedings to determine, avoid, or recover fraudulent conveyances," and "determinations of the validity, extent, or priority of liens," 28 U.S.C. § 157(b)(2)(B), (H), (K).

Pursuant to a recently-amended standing order in this district, all cases arising under or related to a case under Title 11 are automatically referred to the bankruptcy court. *In re Standing Order of Reference Re: Title* 11, 12 Misc. 32 (S.D.N.Y. Feb 1, 2012) (Preska, C.J.) (the "Standing Order") (replacing "Standing Order of Referral of Cases to Bankruptcy Judges" (S.D.N.Y. July 10, 1984) (Ward, Acting C.J.)); *see* 28 U.S.C. § 157(a) ("Each district court may provide that any or all cases under [T]itle 11 and any or all proceedings arising under [T]itle 11 or arising in or related to a case under [T]itle 11 shall be referred to the bankruptcy judges for the district."). The question presented by the instant motion, therefore, is whether each of Plaintiff's

7

10-03266-scc    Doc 158    Filed 10/19/12    Entered 10/19/12 11:24:37    Main Document
Pg 8 of 18

claims should *remain* in the bankruptcy court or proceed in this Court instead.

### 1. The *Orion* Factors and the Impact of *Stern*

The parties do not contend that this case presents a matter of mandatory withdrawal under 28 U.S.C. § 157(d). (*See* Mem. at 14; Opp'n at 2.) Rather, it presents a matter of permissive withdrawal under the same provision, which provides that a "district court may withdraw, in whole or in part, any case or proceeding referred [to the bankruptcy court] on its own motion or on a timely motion of any party, for cause shown." 28 U.S.C. § 157(d). "To determine whether a party has shown 'cause' for permissive withdrawal . . . , the Second Circuit, prior to *Stern*, directed that the district court weigh several factors [(the "*Orion* factors")], including:

> (1) whether the claim [or proceeding] is core or non-core, (2) what is the most efficient use of judicial resources, (3) what is the delay and what are the costs to the parties, (4) what will promote uniformity of bankruptcy administration, (5) what will prevent forum shopping, and (6) other related factors.

*Kirschner v. Agoglia*, 476 B.R. 75, 83 (S.D.N.Y. 2012) (quoting *In re Burger Boys, Inc.*, 94 F.3d 755, 762 (2d Cir. 1996) (paraphrasing *In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2d Cir. 1993))).

Chief among these factors pre-*Stern* was the first factor – whether the claim or proceeding is core or non-core. *See Orion*, 4 F.3d at 1101 ("A district court considering whether to withdraw the reference should first evaluate whether the claim is core or non-core, since it is upon this issue that questions of efficiency and uniformity will turn."). However, post-*Stern*, this factor no longer occupies the same position of prominence among the *Orion* factors. *See Weisfelner*, 467 B.R. at 719 (collecting cases and explaining that "[a]fter *Stern*, the core/non-core distinction may or may not remain relevant to a district court's withdrawal of the reference 'for cause'"); *Adelphia Recovery Trust v. FLP Grp., Inc.*, No. 11 Civ. 6847 (PAC), 2012 WL 264180, at *3 (S.D.N.Y. Jan. 30, 2012) (holding that after *Stern*, "a court's consideration of a motion to withdraw the reference to bankruptcy court should – in addition to the *Orion* factors – include consideration of" the bankruptcy court's final adjudicative authority); *Dev. Specialists*, 462 B.R. at 467 ("[A]fter *Stern*, one can still apply the *Orion* [factors,] . . . not looking at whether the matter can be reclassified as 'core' under 28 U.S.C. § 157, but rather at whether, under *Stern*, the Bankruptcy Court has the final power to adjudicate it."); *Walker, Truesdall, Roth & Assocs. v. Blackstone Grp., L.P. (In re Extended Stay, Inc.)*, 466 B.R. 188, 204 (S.D.N.Y. 2011) ("[T]he core/non-core distinction is still a relevant consideration in permissive withdrawal analysis, except to the extent *Stern* holds that Congress's classification of a claim as 'core' exceeds to the boundaries of Article III.").

Thus, in evaluating a motion to withdraw post-*Stern*, the principal question is no longer whether the claim in question is "core" or "non-core" pursuant to the Bankruptcy Code but whether the bankruptcy court has *constitutional authority* to enter final judgment on the claims at issue. *See In re Arbco Capital Mgmt., LLP*, --- B.R. ----, No. 11 Civ. 6586 (JPO), 2012 WL 2852619, at *5 (S.D.N.Y. July 12, 2012); *Weisfelner*, 467 B.R. at 719; *Dev. Specialists*, 462 B.R. at 463–64.

8

2. Understanding *Stern* – The Public Rights Exception

To understand *Stern* and the question of whether the bankruptcy court has the constitutional authority to enter final judgment on the claims in this action, it is first necessary to explore a pair of older cases upon which the Supreme Court relied in *Stern*. In the first of these cases – *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.* – the Supreme Court held that the Bankruptcy Act of 1978 unconstitutionally vested final adjudicative authority on the bankruptcy courts, thereby violating Article III of the Constitution. 458 U.S. 50, 52, 87 (1982) (plurality opinion); *id.* at 91, 102 (Rehnquist, J., concurring in judgment). The plurality in that case recognized that "there was a category of cases involving 'public rights' that Congress could constitutionally assign to 'legislative' courts for resolution." *Stern*, 131 S. Ct. at 2610 (discussing *Northern Pipeline*). "Speaking loosely, public rights are: (1) rights created by federal law, to which the political branches are free to attach conditions; (2) claims tied up inextricably with such rights; or (3) 'matters that historically could have been determined exclusively by the Executive and Legislative Branches.'" *Dev. Specialists*, 462 B.R. at 464 (quoting *Stern*, 131 S. Ct. at 2611–13). Although the plurality and the concurrence in *Northern Pipeline* disagreed as to the scope of the "public rights" exception, a majority of the Supreme Court concluded that the exception did not encompass the particular state law claims at issue. *See* 458 U.S. at 69–72 (plurality opinion); *id.* at 90–91 (Rehnquist, J., concurring in judgment); *accord Stern* 131 S. Ct. at 2610.

As explained in *Stern*, following *Northern Pipeline*, the Supreme Court:

> has continued . . . to limit the [public rights] exception to cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert government agency is deemed essential to a limited regulatory objective within the agency's authority. In other words, it is still the case that what makes a right 'public' rather than private is that the right is integrally related to particular federal government action.

*Stern*, 131 S. Ct. at 2613; *see also Dev. Specialists*, 462 B.R. at 469 (explaining that claims that do "not depend on any federal statute or scheme" are not "public rights" claims). For instance, in *Granfinanciera, S.A. v. Nordberg* – a second case upon which the *Stern* Court heavily relied – the Supreme Court rejected the argument that fraudulent conveyance actions were actions involving public rights. 492 U.S. 33, 55–56 (1989); *see Stern*, 131 S. Ct. at 2614. According to the Court in *Stern*, in holding that fraudulent conveyance actions were more properly characterized as a "private" rather than "public" right, *Granfinancieria* "reasoned that fraudulent conveyance suits were 'quintessentially suits at common law that more nearly resemble state law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res.'" *Id.* (quoting *Granfinanciera*, 492 U.S. at 56). "Indeed, the Court in *Stern* analogized the state law tortuous interference counterclaim before it to the fraudulent conveyance claim before the Court in *Granfinanciera* to hold that the counterclaim was a 'private rights' claim that had to be adjudicated by an Article III Court." *Kirschner*, 476 B.R. at

9

80 (citing *Stern*, 131 S. Ct. at 2614). With this background in mind, the Court proceeds to analyze the claims at issue in this action.

3. Application to the Claims at Issue

a. Common Law Claims

As noted above, Plaintiffs bring a myriad of different common law causes of action. Among these are traditional damages claims under New York law for breach of contract, fraud, and duress (Counts XLI through XLIX). Plaintiffs also bring common law damages causes of action for for conversion, unjust enrichment, and constructive trust (Counts XXXII, XXXVI-XXXVII, and XXXIX-XL). The Court proceeds to determine whether these are "the types of common-law claims to augment the estate that were clearly held to require Article III adjudication in *Northern Pipeline*." (Mem. at 23 (citing *N. Pipeline*, 458 U.S. at 56).)

Following *Stern*, a key question for the Court to consider is "whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern*, 131 S. Ct. at 2618. In their opposition brief, Plaintiffs argue that the issue of damages would inherently be resolved in the claims allowance process because an award of damages in Plaintiffs' favor will give Plaintiffs a right of setoff against JPMC's recovery from the Lehman estate. (*See* Opp'n at 22–23.) However, the *Stern* Court specifically rejected such reasoning, finding that a defendant's status as a creditor – who had filed a proof of claim against the estate that was potentially subject to a common law counterclaim setoff – did not make the debtor's otherwise private rights counterclaim a public rights counterclaim. *See Stern*, 131 S. Ct. at 2616 ("[I]t is hard to see why [a] decision to file a [proof of] claim should make any difference with respect to the characterization of [a] counterclaim [as a private rights counterclaim]."). Such reasoning applies with equal force to the characterization of a debtor's common law *claim*. *See, e.g.*, *Fort v. SunTrust Bank (In re Int'l Payment Grp., Inc.)*, Bankruptcy No. 08-03453-HB, Adversary Proceeding No. 10-80049-HB, 2011 WL 5330783, at *2–3 (Bankr. D.S.C. Nov. 3, 2011) (collecting cases).

Furthermore, Plaintiffs argue that the "potential to recover . . . damages [on state law causes of action] does not preclude the [b]ankruptcy [c]ourt from entering a final order resolving those counts" because, *inter alia*, the underlying liability elements of their damages claims "must be resolved in order to rule" on JPMC's proof of claim. (Opp'n at 22–23.) However, to trigger the "public rights" exception, partial overlap of the action is insufficient; rather a plaintiff must demonstrate that each factual and legal element of its claim will be decided in the claims allowance process such that after the process, "nothing remains for adjudication in a plenary suit." *Stern*, 131 at 2616 (quoting *Katchen v. Landy*, 382 U.S. 323, 334 (1966)).

Here, the Court is unconvinced that "each factual and legal element" of Plaintiffs' various claims will be so resolved. For example, Plaintiffs have brought a fraud claim (Count XLIX), alleging that on September 11, 2008, JPMC's CEO fraudulently represented to Lehman's CEO that if Lehman delivered $5 billion in collateral, JPMC would return it the next day. (FAC ¶¶ 364–69.) However, as JPMC rightly argues, "[t]o succeed on this claim, [P]laintiffs will have to prove, among other things, that the alleged statement in fact was made, that [JPMC's] CEO had the intent to deceive, and that Lehman . . . reasonably relied on this oral

10

promise." (Mem. at 25); *see also Crigger v. Fahnestock & Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006) ("Under New York law, the five elements of a fraud claim must be shown by clear and convincing evidence: (1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff."). Such determinations require far more than merely passing on JPMC's right to a *pro rata* share of the Lehman estate; rather, the claim appears to be a clear "attempt[] to augment the bankruptcy estate." *See Stern*, 131 S. Ct. at 2614.

Likewise, Plaintiffs' claims for (1) breaches of the Clearance Agreement and the August Agreements (Counts XLI, XLII, XLIII, XLIV) and (2) breaches of the implied covenant of good faith and fair dealing with respect to those agreements (Counts XLV, and XLVII) will necessarily involve questions of whether the agreements indeed contained the alleged obligations that were violated and whether JMPC actually violated them. (*See* Mem. at 24–25.) Once again, these common law damages claims are unlikely to be resolved in the process of ruling on JPMC's proof of claim, and rather, are merely claims "made of 'the stuff of the traditional actions at common law.'" *See Stern*, 131 S. Ct. at 2609 (quoting *N. Pipeline*, 458 U.S. at 90 (Rehnquist, J., concurring in judgment)); *id.* at 2617.

Thus, as JPMC rightly notes, "[e]ven assuming that there is some overlap between plaintiffs' liability theories and [JPMC's] right to recover from the estate, [P]laintiffs' damages claims will not 'be *completely* resolved in the bankruptcy process of allowing or disallowing [JPMC's] claims.'" (Reply at 7–8 (quoting *Stern*, 131 S. Ct. at 2611 (emphasis added)); *see also In re Arbco Capital Mgmt.*, 2012 WL 2852619, at

*7 ("'Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process.'" (quoting *Stern*, 131 S. Ct. at 2618)). Accordingly, because Plaintiff's remaining common law claims in the First Amended Complaint are based upon "private" rather than "public" rights and are "the very type of claim that [the Supreme Court] held in *Northern Pipeline* and *Granfinanciera* must be decided by an Article III court," the bankruptcy court lacks constitutional authority to finally adjudicate them. *See Stern*, 131 S. Ct. at 2616.

b. Claims Seeking to Avoid and Recover Transfers under the Bankruptcy Code

Similarly, the Court finds that the bankruptcy court lacks authority to constitutionally adjudicate Plaintiffs' claims seeking to avoid and recover transfers to JPMC.

As noted above, the Supreme Court in *Stern*:

> analogized the state law tortious interference counterclaim before it to the fraudulent conveyance claim before the Court in *Granfinanciera* to hold that the counterclaim was a "private rights" claim that had to be adjudicated by an Article III Court. To now conclude that what is essentially the very claim presented in *Granfinanciera* – a fraudulent conveyance claim – is a "public rights" claim would be totally at odds with the [*Stern*] Court's analogy to *Granfinanciera*.

*Kirschner*, 476 B.R. at 80 (citation omitted); *see also In re Arbco Capital Mgmt.*, 2012

11

WL 2852619, at *7 (noting that "fraudulent conveyance claims do not fall within the public rights exception"). Such claims are not part of the bankruptcy *res* but "are simply intended to increase payouts to creditors under the confirmed [bankruptcy reorganization] plan." *Kirschner*, 476 B.R. at 81; *see also Weisfelner*, 467 B.R. at 720 ("Under both *Stern* and *Granfinanciera*, . . . it is axiomatic that a fraudulent conveyance claim against a person who has not submitted a claim against a bankruptcy estate, brought solely to augment the bankruptcy estate, is a matter of private right."). Indeed, Plaintiffs' claims to avoid and recover transfers raise factual and legal issues that would not necessarily be resolved in the course of deciding JPMC's proof of claim, such as whether Lehman made the challenged transfers with "actual intent to hinder, delay, or defraud [its creditors]" and whether Lehman received "reasonably equivalent value in exchange" for such transfers. *See* 11 U.S.C. § 548(a)(1).

Plaintiffs nonetheless argue in opposition that such claims *are* part of the bankruptcy *res* because "all of the securities and $8.6 billion of cash and money market funds at issue . . . is property of the [Lehman] estate." (Opp'n at 22.) However, it is well settled that property transferred by the debtor is not "property of the estate" until the debtor succeeds in compelling the property's return. *FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 131 (2d Cir. 1992); *accord Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 192 B.R. 73, 77 (S.D.N.Y. 1996) (explaining that assets transferred to and allegedly converted by defendant before the bankruptcy were "not to be considered property of the estate"). Because JPMC has already disposed of most of the collateral in question to satisfy its outstanding claims (*see* Am. Countercls. ¶¶ 12, 101; Mem. at 10), the collateral cannot be considered "property of the estate."

Plaintiffs' claims also will not be necessarily resolved in the process of deciding JPMC's proof of claim because, contrary to Plaintiffs' argument, 11 U.S.C. § 502(d) is not applicable to this particular adversary proceeding. That section provides that a creditor's claim should be disallowed until it turns over any fraudulently or preferentially transferred property. 11 U.S.C. § 502(d). Accordingly, if § 502(d) *were* applicable to this action, the bankruptcy court would necessarily need to resolve Plaintiffs' avoidance action prior to ruling on JPMC's proof of claim.

However, § 502(d) is *not* applicable because the parties executed a Collateral Disposition Agreement ("CDA") so providing. Pursuant to the CDA, which the bankruptcy court approved, the parties agreed that resolution of JPMC's payment of any avoidance claims to Lehman would be deferred until all claims in the First Amended Complaint are resolved. (Lees Decl. Ex. M at ¶ 6(b).) Although Plaintiffs are correct that the CDA affected the "*timing* by which [§] 502(d) may be invoked" (Opp'n at 26 (emphasis in original)), such timing is crucial to the question of whether that section can save Plaintiffs' avoidance claims from a problem under *Stern*. Indeed, because § 502(d) would not provide a possible basis to disallow JPMC's claims until *after* the claims in the First Amended Complaint are fully resolved, "by definition[, P]laintiffs' avoidance claims will not be resolved within the process of allowing or disallowing [JPMC's] proof of claim." (Reply at 11.) Thus, because Plaintiffs' claims to avoid and recover transfers are intended to "augment the estate" rather than to obtain a *pro rata* share of the bankruptcy *res*, *see Stern*, 131

12

S. Ct. at 2614, the bankruptcy court cannot finally adjudicate them.

c. Claims Seeking Relief Under Other Sections of the Bankruptcy Code

Because the Court concludes that the bankruptcy court lacks constitutional authority to finally adjudicate at least the majority of Plaintiffs' claims, the Court need not presently decide whether the bankruptcy court would have constitutional authority to finally determine the remaining claims or counterclaims. Given the factual interconnectedness of Plaintiffs' claims and JPMC's counterclaims, it would be a waste of judicial resources to split the case between two different forums – whether now or at a later stage in the litigation. *Cf. Dev. Specialists*, 462 B.R. at 472 ("To the extent that . . . [this] case raises issues identical to those that would be raised in the other cases, it would be a waste of judicial resources to allow the actions to proceed sperately."); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529 (LMM), 2006 WL 337667, at *4–5 (S.D.N.Y. 2006) (withdrawing core bankruptcy claims along with related non-core claims).

B. Authority of the Bankruptcy Court to Issue a Report and Recommendation

Having concluded that the bankruptcy court lacks *constitutional* authority to finally decide the majority of Plaintiffs' claims, the Court must next determine whether the bankruptcy court has the *statutory* authority to issue proposed findings of fact and conclusions of law in this matter. The Court has little trouble concluding, contrary to JPMC's argument, that the bankruptcy court has the authority to issue a report and recommendation in those core proceedings despite lacking constitutional authority to issue final judgment.

Under the Bankruptcy Code, the bankruptcy court "shall submit proposed findings of fact and conclusions of law to the district court" for non-core claims "related to" a bankruptcy proceeding. 28 U.S.C. § 157(c)(1). Notably, there is "no *express* authority [in the Code] that authorizes a bankruptcy court to issue reports and recommendations in those core proceedings where the bankruptcy court lacks constitutional authority to issue final judgment." *Kirschner*, 476 B.R. at 82 (emphasis added); *see also* 28 U.S.C. § 157(b)(1) (providing only that bankruptcy courts "may enter appropriate orders and judgments" for those core claims). Nonetheless, most other courts to address the issue have held that a bankruptcy court *does* have the authority to issue such a report and recommendation. *Kirschner*, 476 B.R. at 82 (collecting cases; explaining that "Congress, in enacting § 157 clearly wanted Bankruptcy Judges to finally adjudicate bankruptcy-related matters whenever Article III permitted them to do so, and to issue recommended findings subject to de novo review in the [d]istrict [c]ourt whenever it did not"); *see, e.g.*, *Walker, Truesdall, Roth & Assocs.*, 466 B.R. at 204–05 ("[A] bankruptcy court may still propose findings of fact and conclusions of law to the district court where it lacks authority to enter a final judgment."); *Dev. Specialists*, 462 B.R. at 467 n.3 ("This Court recently found that reviewing *de novo* determinations of the [b]ankruptcy [c]ourt in 'core' matters that nevertheless involve private rights best effectuates the Congressional intent behind the 1984 Act, as well as the Supreme Court's admonition in *Stern* that the division of labor between the [d]istrict court and the [b]ankruptcy [c]ourt should be disturbed as little as possible." (citing *Retired Partners of Coudert Bros. Trust v. Baker & McKenzie LLP (In re Coudert Bros. LLP)*, App. Case No. 11-2785 (CM), Adversary Proceeding

13

No. 08-1472, 2011 WL 5593147, at *12–15 (S.D.N.Y. Sept. 23, 2011))).

Such a conclusion is consistent with this District's Standing Order, which, as amended, provides:

> If a bankruptcy judge or district judge determines that entry of a final order or judgment by a bankruptcy judge would not be consistent with Article III of the United States Constitution in a particular proceeding referred under this order and determined to be a core matter, the bankruptcy judge shall, unless otherwise ordered by the district court, hear the proceeding and submit proposed findings of fact and conclusions of law to the district court. The district court may treat any order of the bankruptcy court as proposed findings of fact and conclusions of law in the event the district court concludes that the bankruptcy judge could not have entered a final order or judgment consistent with Article III of the United States Constitution.

*In re Standing Order*, 12 Misc. 32. Accordingly, this Court, in line with most other district and bankruptcy courts, determines that the bankruptcy court here has the authority – "statutory and otherwise" – to issue a report and recommendation as to those claims for which it otherwise lacks the constitutional authority to enter final judgment. *See, e.g.*, *Kirschner*, 476 B.R. at 82 (collecting cases).

C. Whether to Withdraw the Reference at this Stage

Given that the bankruptcy court has the authority to issue proposed findings of fact and conclusions of law, the Court next considers the remaining *Orion* factors to determine whether they weigh in favor of withdrawing the reference at the present time.

1. The Right to a Jury Trial

As an initial matter, JPMC argues that the Court should withdraw the reference of the entire lawsuit because, *inter alia*, JPMC requested a jury trial and at least some of the claims at issue in the litigation are encompassed by the Seventh Amendment jury-trial right. (JPMC's July 16, 2012 Ltr. at 2–4.) However, although a party's right to a jury, when coupled with "the court's finding that the claim is not subject to final adjudication in [b]ankruptcy [c]ourt," might provide "*sufficient* cause to withdraw the reference," *Dev. Specialists*, 462 B.R. at 472 (alterations omitted; emphasis added; internal quotation marks omitted), "such a right *does not compel* withdrawing the reference until the case is ready to proceed to trial," *In re Formica Corp.*, 305 B.R. 147, 150 (S.D.N.Y. 2004) (emphasis added); *see also McCord v. Papantoniou*, 316 B.R. 113, 125 (E.D.N.Y. 2004) ("Courts routinely deny [pretrial] motions to withdraw reference despite a litigant's refusal to consent to a jury trial in bankruptcy court because of prevailing concerns about judicial economy."); *Gioia Gucci v. Gucci*, No. 96 Civ. 8216 (JSR), 1997 WL 122838, at *1 (S.D.N.Y. May 17, 1997) (explaining that even though a case must be returned to the district court for a jury trial, "at the present infant stage of the proceedings," withdrawal is discretionary and based on factors such a judicial economy); *In re Kenai Corp.*, 136 B.R. 59, 61 (S.D.N.Y. 1992) ("A rule that would require a district court to withdraw a reference simply because a party is entitled to a jury trial, regardless of how far along toward trial a case may be, runs counter to the policy favoring judicial economy that underlies the

14

statutory scheme governing the relationship between the district courts and bankruptcy courts.").

Indeed, it is possible that Plaintiffs' claims "may be resolved before the matter is ripe for a trial before a jury." *In re Arbco Capital Mgmt.*, 2012 WL 2852619, at *10 (noting that the right to a jury trial is not dispositive because the parties "may move to withdraw the reference again should the matter progress to trial"). Therefore, the Court examines whether the other considerations identified by the Second Circuit in *Orion* warrant withdrawing the reference at this stage.

2. Core/Non-Core Claims

The Court next turns to the first *Orion* factor – whether the claims at issue are "core" or "non-core." "Although there is an intra-Circuit split as to whether the bankruptcy court must make the initial determination of whether claims are core or non-core, the majority position, supported by the language of *Orion*, supports the ability of this Court to make such a determination at this time." *Walker, Truesdall, Roth & Assocs.*, 466 B.R. at 205 n.86 (citing *In re Joseph DelGreco & Co., Inc.*, No. 10 Civ. 6422 (NRB), 2011 WL 350281, at *3 (S.D.N.Y. Jan. 26, 2011) ("[T]he weight of authority in this Circuit supports the proposition that a district court may make this determination in the first instance.")). At least some of the claims involved in this action – including those for which the bankruptcy court lacks constitutional authority to issue final judgment – are "core." For instance, Plaintiffs' claims based on alleged fraudulent conveyances are specifically defined as "core" under § 157(b)(2)(H) of the Bankruptcy Code. *See Rahl v. Bande*, 316 B.R. 127, 131 (S.D.N.Y. 2004). Moreover, the claim for disallowance of claims under § 502(d) and for avoidance of liens securing such claims under § 506(c) – Count XXXI – is also a core claim because it arises under Title 11 and is classified as a core claim by §§ 157(b)(2)(B) and 157(b)(2)(K), respectively. *See Walker, Truesdall, Roth & Assocs.*, 466 B.R. at 205.

The remaining claims may present closer questions because they are not among the claims specifically enumerated as "core" in § 157; however, the Court need not decide whether they are core because the determination of whether claims are core or non-core is not dispositive of the instant withdrawal motion. *See Walker, Truesdall, Roth & Assocs.*, 466 B.R. at 205; *see also In re Fairfield Sentry Ltd.*, No. 10 Civ. 7340 (LAP), 2010 WL 4910119, at *2 (S.D.N.Y. Nov. 22, 2010) ("The Court thus moves to the other relevant factors without reaching a conclusion on [whether the claims are core or non-core], which is not singularly dispositive.").

3. Judicial Economy/Efficiency

The Court finds that considerations of judicial economy and efficiency weigh strongly against withdrawal. The bankruptcy court has been overseeing and administering the Lehman bankruptcy proceedings since their inception three years ago and has been deeply involved in this adversary proceeding, which has been pending since May 26, 2010. As such, the bankruptcy court is already fully immersed in the issues central to this litigation, having already ruled on JPMC's motion to dismiss as well as a motion to reconsider that ruling. (*See Lehman Bros. Holdings Inc.*, 469 B.R. 415; Adversary Proceeding No. 10-3266 (JMP), Doc. No. 134.) Although it is true that the bankruptcy court acknowledged, in ruling on the motion to dismiss, that the facts thus far developed through discovery "[were] not . . . available to the [bankruptcy

15

c]ourt in its consideration of the [m]otion," the bankruptcy court has been directly involved in managing discovery for over two years, having issued "a series of pretrial orders that outline a protocol of extensive . . . pretrial discovery." *Lehman Bros. Holdings Inc.*, 469 B.R. at 420. These efforts and involvement in the "oversight of the pretrial proceeding" have likely provided the bankruptcy court with "insight into the precise nature of the claims [in this litigation] and the theories upon which they are based." *Cf. Mishkin v. Ageloff*, 220 B.R. 784, 801 n.13 (S.D.N.Y. 1998).

Particularly given the bankruptcy court's involvement thus far in the litigation, the Court finds that judicial economy weighs against withdrawing the reference at this time. *See In re Madison Bentley Assocs., LLC*, 474 B.R. 430, 440 (S.D.N.Y. 2012) (denying a motion to withdraw the reference after the completion of discovery and where a motion for summary judgment was pending because, given that the bankruptcy court was familiar with the facts of the case and had issued rulings in the case, it "is more efficient to allow the [b]ankrutpcy [c]ourt to provide recommendations on findings of facts and conclusions of law than for this [c]ourt to begin anew"); *Weisfelner*, 467 B.R. at 726 (noting that, despite the fact that defendants were correct that the bankruptcy court could not enter final judgment on most of the fraudulent conveyance claims at issue, "withdrawal at this stage [where the bankruptcy court had done significant work preparing the matters for trial and the district court wished to benefit from its expertise via a non-final determination of the merits] would result in significant inefficiencies and is inappropriate"); *Walker, Truesdell, Roth & Assocs.*, 466 B.R. at 206 ("Judicial economy would be promoted by allowing the bankruptcy court, already familiar with the extensive record in this case, to initially adjudicate [this] case[]."); *In re Wedtech Corp.*, 94 B.R. 293, 297 (S.D.N.Y. 1998) ("Disturbing the reference at this pre-trial stage would defy logic, and be a gratuitous and unnecessary waste of judicial resources. Concerns of judicial economy are particularly important in dealing with a Chapter 11 debtor-in-possession."); *cf. Adelphia Recovery Trust*, 2012 WL 264180, at *8 (stating that "maintaining the reference to [the b]ankruptcy [c]ourt is in line with the Supreme Court's intent [set forth in *Stern*] to not 'meaningfully change[] the division of labor in the current statute' . . . and Congress['s] intent that bankruptcy courts . . . have broad authority to hear 'core' matters" (internal citation omitted)). *But see Dev. Specialists*, 462 B.R. at 472 (finding that judicial economy weighed in favor of withdrawing the reference where "no discovery ha[d] taken place, and no case management plan or other course of proceeding ha[d] been agreed on").

### 4. Uniformity of Bankruptcy Administration

For largely similar reasons, the Court finds that the policy of promoting the uniformity of bankruptcy administration also weighs against withdrawal. The bankruptcy court has "a wealth of knowledge and experience with fraudulent transfer claims," *Adelphia Recovery Trust*, 2012 WL 264180, at *7, particularly those arising under the Bankruptcy Code, and the ultimate resolution of this matter will likely involve determining complex questions of bankruptcy law in addition to the questions already decided regarding the safe harbor provisions of the Bankruptcy Code, *cf. id.* (declining to withdraw reference where bankruptcy court oversaw the "Adelphia bankruptcy for ten years and this action for seven years").

16

Perhaps even more importantly, the bankruptcy court's involvement with not only this proceeding but also with the administration of the entire Lehman bankruptcy (including the related claims objections) has been – as noted above – extensive. *See Walker, Truesdall, Roth & Assocs.*, 466 B.R. at 207 ("[T]he policy promoting the uniform application of bankruptcy law also weighs against withdrawal. The bankruptcy court is thoroughly familiar with the . . . bankruptcy proceedings. . . . Allowing the bankruptcy courts to consider complex questions of bankruptcy law before they come to the district court for de novo review promotes a more uniform application of bankruptcy law."); *Fairfield Sentry Ltd.*, 2010 WL 4910119, at *3 (rejecting defendants argument that the bankruptcy court had no prior familiarity with the case and the theories upon which it was based as "miss[ing] the forest for the trees" because the bankruptcy judge had presided over other related adversary proceedings and proceedings involving the same bankruptcy); *California v. Enron Corp. (In re Enron Corp.)*, No. 05 Civ. 4079 (GDB), 2005 WL 1185804, at *3 (S.D.N.Y. May 18, 2005) ("[T]he uniform administration of the bankruptcy court proceedings weigh[s] in favor of not withdrawing the reference. The [b]ankruptcy [c]ourt has presided over the Enron bankruptcy cases for over three years. The [b]ankruptcy [c]ourt is more thoroughly familiar with the Debtors claims and issues in the instant matter and all of the other Enron-related cases. Thus, the [b]ankruptcy [c]ourt is in a better position to adjudicate them all.").

Therefore, the Court finds that having this action proceed before the bankruptcy court, at least at this time, will help promote the uniform application of the bankruptcy laws.

5. Preventing Forum Shopping and Delay

As to the Court's interests in preventing forum shopping and delay, JPMC asserted before the bankruptcy court that its only motivation for making the instant motion was its concern, following *Stern*, about "litigating the case through trial, only to discover that a constitutional or procedural defect, which the parties could not waive, renders the judgment ineffectual." (Giglio Decl. Ex. A at 5.) However, as Plaintiffs rightly note in their opposition brief, were that JPMC's sole concern, JPMC could have simply consented to the final adjudicatory authority of the bankruptcy court. (Opp'n at 32 (quoting *Stern*, 131 S. Ct. at 2607–08; *In re Olde Prairie Block Owner, LLC*, 457 B.R. 692, 700 (Bankr. N.D. Ill. 2011) ("[P]arties may consent to final adjudication by a Bankruptcy Judge of counterclaims not necessarily resolved by a ruling on a creditor's claim, even though that Judge would not otherwise have that authority.")); *see* Tr. at 17–18.) But when invited to give its express consent to the bankruptcy court's final adjudication of the adversary proceeding, JPMC declined to do so. (Giglio Decl. Ex. A at 8; Ex B. at 5.)

It is difficult to speculate as to JPMC's motives, particularly given that Judge Peck granted its motion to dismiss as to many of Plaintiffs' claims. *See Lehman Bros. Holdings Inc.*, 469 B.R. at 435. In any event, although JPMC ultimately had the right to decline such consent and proceed to trial before this Court, it seems clear that withdrawal of the reference at this stage of the adversary proceeding will only increase delay and undermine judicial economy. Accordingly, the Court finds that this factor clearly weighs against withdrawal of the reference.

17

\* \* \*

Because each of the *Orion* factors weighs against withdrawing the bankruptcy reference, the Court declines to withdraw the reference at this time. However, given the Court's conclusion that the bankruptcy court lacks constitutional authority to finally adjudicate the majority of the remaining claims in the First Amended Complaint, the Court is aware that, should this matter proceed to trial, it will likely need to withdraw the entire reference at that time.

III. CONCLUSION

For the aforementioned reasons, the Court denies JPMC's motion to withdraw the bankruptcy reference without prejudice to renewal. Should any party contemplate filing a new motion to withdraw the reference at the summary judgment stage, it shall seek leave and set forth its positions as to withdrawal and to the underlying merits of its contemplated summary judgment motion in a pre-motion letter, in accordance with Rule 2.A of my Individual Practices.

The Clerk of the Court is respectfully directed to terminate the motion located at Doc. No. 1.

SO ORDERED.

*[signature]*
RICHARD J. SULLIVAN
United States District Judge

Dated: September 28, 2012
       New York, New York

\* \* \*

Plaintiff Lehman Brothers Holdings Inc. is represented by Cindi Michael Giglio, Joseph D. Pizzurro, Michael Joseph Moscato, Nancy Eileen Delaney, Peter J. Behmke, and Lynn P. Harrison of Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, New York, 10178.

Plaintiff Intervenor Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. is represented by Erica P. Taggart of Quinn Emanuel Urquhart & Sullivan LLP, 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017; and James Charles Tecce of Quinn Emanuel Urquhart & Sullivan LLP, 51 Madison Avenue, 22nd Floor, New York, New York 10010.

Defendant is represented by Alexander Lees, Amy R. Wolf, Douglas K. Mayer, Emil A. Kleinhaus, Harold S. Novikoff, Ian Boczko, Marc Wolinsky, and Paul Vizcarrondo of Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York 10019.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/28/2012